# Active Repossession Agencies/Agents in Louisiana

Updated March 3, 2014

| AGENCY | TELEPHONE | TOLL FREE | AGENT NAME | AGENT TYPE |
|---|---|---|---|---|
| ALLSTAR RECOVERY, LLC | (601) 445-2400 | | | |
| | | | CLAYTON SHANNON GAY | QUALIFYING |
| | | | ROGER POYNER | REGULAR |
| ALLSTATE FINANCIAL ADJUSTERS, INC. | (504) 393-2300 | | | |
| | | | GARY RELLE | QUALIFYING |
| ARMS LA LLC | (225) 328-9920 | | | |
| | | | WILEY NUGENT JR | QUALIFYING |
| AUTOMOBILE RECOVERY BUREAU OF LOUISIANA INC. | (318) 222-9389 | 1-800-845-7299 | | |
| | | | DUSTIN ANDRUS | REGULAR |
| | | | WILLIAM DICKSON | REGULAR |
| | | | DUSTIN DRAY | REGULAR |
| | | | JAMES HOOD | REGULAR |
| | | | VANESSA HUDSON | QUALIFYING |
| | | | KELLY JEWELL | REGULAR |
| | | | BILLY JEWELL, JR | REGULAR |
| | | | BOBBY ROGERS | REGULAR |
| | | | KAREN ROGERS | REGULAR |
| | | | DAVID WALTERS | REGULAR |
| BAYOU RECOVERY SERVICE LLC | (225) 293-4999 | | | |
| | | | JOSHUA FENNELL | REGULAR |
| | | | SAMUEL GUIDRY | REGULAR |
| | | | DOUGLAS LOVETT | REGULAR |
| | | | RONALD RAYON | REGULAR |
| | | | CAROLYN SOMMERS | REGULAR |
| | | | JEFFERY SOMMERS | QUALIFYING |
| CENTURION AUTO RECOVERY AND COLLECTION SERVICES, LLC | (888) 368-5880 | | | |
| | | | ALLEN ARMENTOR | REGULAR |

EXHIBIT
tabbies
A

http://ofi.louisiana.gov/repolist.htm

| | |
|---|---|
| DUANE BANKSTON | REGULAR |
| JODY BLACKWELL | REGULAR |
| DEBORAH BODENHEIMER | REGULAR |
| KIRK BODENHEIMER | REGULAR |
| JEFFERY CREEL | REGULAR |
| JOHN DALME | REGULAR |
| ERIC DOUCET | REGULAR |
| JACOB DUPRE | REGULAR |
| BENJAMIN FALLON | REGULAR |
| PHILLIP GENDUSA | REGULAR |
| JOEL LEFFINGWELL | REGULAR |
| BARTON MOLAY | REGULAR |
| SHIRLEY PONTHIEUX | REGULAR |
| RICKEY RICHARD | REGULAR |
| BRYAN SMITH | REGULAR |
| LUTHER STACEY | REGULAR |
| THOMAS STRAHAN | REGULAR |
| NICHOLAS TRIST | QUALIFYING |
| JIMMY WALLEY | REGULAR |

GUARDIAN SERVICES LLC          (504) 464-5778

| | |
|---|---|
| JOSHUA ARNOLD | REGULAR |
| SAMUEL ELLIOT | REGULAR |
| ROBERT BOURNE | REGULAR |
| STEVEN CLIFTON | REGULAR |
| KAREN CURENGTON | REGULAR |
| OTTIS FORD | REGULAR |
| JULIE GRIBBEN | REGULAR |
| DAVID MATHERNE | REGULAR |
| MICHELLE MATHERNE | REGULAR |
| JERRY MCCANN | QUALIFYING |
| BRIAN NEZAT | REGULAR |
| DANNY RUSSOM | REGULAR |
| TERRANCE SANCHEZ | REGULAR |
| MERVIN SEZAR | REGULAR |
| DEWEY VARNADO | REGULAR |

JERRY CRAWFORD ADJUSTERS, INC.          (985) 893-7459          1-800-743-1716

|  |  |  | BERNARD LEE PORTER | QUALIFYING |
|---|---|---|---|---|
|  |  |  | MICHAEL PORTER | REGULAR |
| LOUISIANA RECOVERY AND COLLECTIONS AGENCY, INC. | (985) 643-9313 |  |  |  |
|  |  |  | PAUL BRADFORD | REGULAR |
|  |  |  | STIEVON COPHER JR | REGULAR |
|  |  |  | JASON CUTRIGHT | REGULAR |
|  |  |  | BRANDON DALE | QUALIFYING |
|  |  |  | TIFFANY DALE | REGULAR |
|  |  |  | PATRICIA DETERS | REGULAR |
|  |  |  | TRAMPAS DETERS | REGULAR |
|  |  |  | CARLY DUDENHEFER | REGULAR |
|  |  |  | ROY KELLETT | REGULAR |
|  |  |  | CRYSTAL KELLY | REGULAR |
|  |  |  | LUIS PADILLA | REGULAR |
|  |  |  | PAUL SMITH | REGULAR |
|  |  |  | JAMES STEPHENSON | REGULAR |
|  |  |  | HAROLD WEARY | REGULAR |
| MCX ASSOCIATES, LLC | (337) 237-1444 | 1-888-517-8914 |  |  |
|  |  |  | RICHARD BUCKLES | REGULAR |
|  |  |  | RONALD BURNETT | REGULAR |
|  |  |  | NIKOLA HORVAT | REGULAR |
|  |  |  | LAURI MURRAY | REGULAR |
|  |  |  | MATT MURRAY | QUALIFYING |
| QUICK TRACK ASSET RECOVERY LLC | (601) 597-6200 |  |  |  |
|  |  |  | REN-MICHAEL BROWN | REGULAR |
|  |  |  | BRANDON GARRITY | QUALIFYING |
| TAC R & T, LLC | (225) 778-1998 |  |  |  |
|  |  |  | MICHAEL CHEAP | QUALIFYING |

Updated March 3, 2014

Year _1992_ Stock No. _2371_ DSC     Date Sold_____ Invoice No._____

Make _FORD_ Color _White/Burg_ Sold To_____

VIN No. _2FTDF15N2NCA39960_ Address_____

Model _F150_ Body Style_____ City_____ State_____ Zip_____

Date of Purchase _2/12/13_ Mileage _89902_ Phone No. (Home)_____

Purchased From _1st Choice_     (Business)_____

Address_____ License No._____

City_____ State_____ Zip_____ Key No's. Ign_____ Trunk_____

Title No._____ Check No._____ ☐ Bill of Sale

Amount of Purchase_____ ☐ Certificate of Title

_entered_ ☐ Odometer Certificate

EXHIBIT B
tabbies

Received Title

Year 1998   Stock No. ~~2369~~ DSC   Date Sold _____   Invoice No. _____

Make Saturn   Color Gold   Sold To _____

VIN No. 1G8ZH5289WZ232501   Address _____

Model SL1   Body Style SEDAN   City _____   State ____ Zip ____

Date of Purchase 2-12-13   Mileage 122288   Phone No. (Home) _____

Purchased From 1st Choice   (Business) _____

Address _____   License No. _____

City _____   State ____ Zip ____   Key No's. Ign _____ Trunk _____

Title No. _____ Check No. _____   ☐ Bill of Sale

Amount of Purchase _____   ☐ Certificate of Title

entered   ☐ Odometer Certificate

Received Title

Year _2000_   Stock No. _2396_   _DSC_

Date Sold _____   Invoice No. _____

Make _Gmc_   Color _GRAY_

Sold To _____

VIN No. _3GKEC16T9YG208331_

Address _____

Model _YUKON_   Body Style _SUV_

City _____   State _____   Zip _____

Date of Purchase _2-24-13_   Mileage _124,956_

Phone No. (Home) _____

Purchased From _1st choice_

(Business) _____

Address _____

License No. _____

City _____   State _____   Zip _____

Key No's. Ign _____   Trunk _____

Title No. _____   Check No. _____

☐ Bill of Sale

Amount of Purchase _____

☐ Certificate of Title

☐ Odometer Certificate

Received Title

Year _2000_ Stock No. _2398_

Make _Chevrolet_ Color _Silver_

VIN No. _1GNEC13T4YJ149179_

Model _Tahoe_ Body Style _SUV_

Date of Purchase _2-26-03_ Mileage _95651_

Purchased From _1st Choice_

Address _____

City _____ State _____ Zip _____

Title No. _____ Check No. _____

Amount of Purchase _____

Date Sold _____ Invoice No. _____

Sold To _____

Address _____

City _____ State _____ Zip _____

Phone No. (Home) _____

(Business) _____

License No. _____

Key No's. Ign. _____ Trunk _____

☐ Bill of Sale

☐ Certificate of Title

☐ Odometer Certificate

Received Title

Year _2001_   Stock No. _2397_

Make _PONTIAC_   Color _RED_

VIN No. _1G2WP52K41F229981_

Model _GRAND PRIX_   Body Style _SEDAN_

Date of Purchase _2-27-13_   Mileage _70088_

Purchased From _1st choice_

Address _____

City _____ State _____ Zip _____

Title No. _____ Check No. _____

Amount of Purchase _____

Date Sold _____ Invoice No. _____

Sold To _____

Address _____

City _____ State _____ Zip _____

Phone No. (Home) _____

(Business) _____

License No. _____

Key No's. Ign _____ Trunk _____

☐ Bill of Sale

☒ Certificate of Title

☐ Odometer Certificate

Received Title

Year _2002_ Stock No. _2370_ IDSC

Make _NISSAN_ Color _GRAY_ ~~Blanco~~

VIN No. _1N4AL11D72C129864_

Model _ALTIMA_ Body Style _SEDAN_

Date of Purchase _2/12/13_ Mileage _104217_

Purchased From _1st CHOICE_

Address

City State Zip

Title No. Check No.

Amount of Purchase

_entered_

Date Sold Invoice No.

Sold To

Address

City State Zip

Phone No. (Home)

(Business)

License No.

Key No's. Ign Trunk

☐ Bill of Sale

☐ Certificate of Title

☐ Odometer Certificate

Received Title

Year _2004_ Stock No. _2233_ DSC

Date Sold _____ Invoice No. _____

Make _Dodge_ Color _Silver_

Sold To _____

VIN No. _1D4GP45R64B541022_

Address _____

Model _Caravan_ Body Style _Van_

City _____ State _____ Zip _____

Date of Purchase _12/11/12_ Mileage _86,885_

Phone No. (Home) _____

Purchased From _1st Choice Auto Auction_

(Business) _____

Address _____

License No. _____

City _____ State _____ Zip _____

Key No's. Ign. _____ Trunk _____

Title No. _____ Check No. _____

☐ Bill of Sale

Amount of Purchase _____

☐ Certificate of Title

☐ Odometer Certificate

$7595.00

_started 12/13/12_

Received Title

Year _2004_   Stock No. _2231_

Make _Ford_   Color _Gray_

VIN No. _1FTPX12554NA00514_

Model _F150_   Body Style _Truck_

Date of Purchase _12-12-12_   Mileage _158,838_

Purchased From _1st Choice_

Address _____

City _____ State _____ Zip _____

Title No. _____ Check No. _____

Amount of Purchase _____

_interest 12/14/2012_

_$8995_ = per Devo!

Date Sold _____ Invoice No. _____

Sold To _____

Address _____

City _____ State _____ Zip _____

Phone No. (Home) _____

(Business) _____

License No. _____

Key No's: Ign. _____ Trunk _____

☐ Bill of Sale

☐ Certificate of Title

☐ Odometer Certificate

**NEW VEHICLE CHECKLIST**

STOCK #
BILL OF SALE
TITLE
NADA RETAIL
LOAN VALUE
BUYERS GUIDE
CAR FAX
KEY TAG
WINDOW TAG
INVENTORIED

Received Title

Year _2005_  Stock No. _2366_  _DSC_  Date Sold _____  Invoice No. _____

Make _Ford_  Color _Gold_  Sold To _____

VIN No. _1FTPX12565NA07635_  Address _____

Model _F-150_  Body Style _Truck_  City _____  State _____  Zip _____

Date of Purchase _2-12-13_  Mileage _179092_  Phone No. (Home) _____

Purchased From _1st Choice_  (Business) _____

Address _____  License No. _____

City _____  State _____  Zip _____  Key No's. Ign _____  Trunk _____

Title No. _____  Check No. _____  ☐ Bill of Sale

Amount of Purchase _____  ☐ Certificate of Title

_entered_  ☐ Odometer Certificate

Received Title

Year _2005_   Stock No. _2361_   DSC

Make _Chevy_   Color _white_

VIN No. _1GNDS2ER5M127047_

Model _MALIBU_   Body Style _SEDAN_

Date of Purchase _2/12/13_   Mileage _96362_

Purchased From _1st Choice_

Address _____

City _____ State _____ Zip _____

Title No. _____ Check No. _____

Amount of Purchase _____

entered

Date Sold _____   Invoice No. _____

Sold To _____

Address _____

City _____ State _____ Zip _____

Phone No. (Home) _____

(Business) _____

License No. _____

Key No's. Ign. _____ Trunk _____

☐ Bill of Sale

☐ Certificate of Title

☐ Odometer Certificate

Received Title

Year 2006   Stock No. 2236

Make Honda   Color Gray

VIN No. 5FNRL38726B417437

Model Odyssey   Body Style VAN

Date of Purchase 2/11/12   Mileage 179,305

Purchased From 1st Choice Auto Auction

Address

City   State   Zip

Title No.   Check No.

Amount of Purchase

Entered 2/13/12 KL

Date Sold   Invoice No.

Sold To

Address

City   State   Zip

Phone No. (Home)

(Business)

License No.

Key No's. Ign.   Trunk

☐ Bill of Sale

☐ Certificate of Title

☐ Odometer Certificate

10998

Received Title

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF LOUISIANA

IN RE:

**CASE NO. 13-10548**

**RED BARN MOTORS, INC.**
**DEBTOR**

**CHAPTER 11**
**Dated December 10, 2013**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### DEBTOR'S AMENDED PLAN OF REORGANIZATION

### INTRODUCTION

Red Barn Motors, Inc. ("Red Barn Motors"), as debtor and debtor-in-possession ("Debtor"), proposes the following Amended Chapter 11 Plan of Reorganization ("Plan") with respect to its Chapter 11 case pursuant to Section 1121(a) of Title 11 of the United States Code (the "Bankruptcy Code").

Reference is made to the Disclosure Statement with respect to this Plan, distributed contemporaneously herewith, for a discussion of the Debtor's history, business, property, operations, risk factors, a summary and analysis of this Plan and certain related matters. Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code and Fed. R. Bankr. P. 3019, the Debtor respectfully reserves the right to alter, amend, modify, revoke or withdraw this Plan prior to consummation of this Plan.

NO SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED THEREWITH THAT ARE APPROVED BY THE BANKRUPTCY COURT, HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT FOR USE IN SOLICITING ACCEPTANCE OR REJECTION OF THIS PLAN.

### I. DEFINED TERMS, RULES OF INTERPRETATION
### AND COMPUTATION OF TIME

**1.1. Rules of Construction.** For purposes of this Plan, unless otherwise provided herein: (a) any reference in this Plan to a contract, instrument, document, release, indenture or other agreement, whether existing or contemplated, being in a particular form or on particular terms and conditions means that such contract, instrument, document, release, indenture or other agreement shall be substantially in such form or substantially on such terms and conditions; (b) unless otherwise specified, all references in this Plan to the Introduction, Appendices, Articles, Sections, Schedules and Exhibits are references to the Introduction, Appendices, Articles, Sections, Schedules and Exhibits of or to this Plan; (c) captions and headings in this Plan are intended for convenience of reference only and are not intended to be part of or to affect interpretation of this Plan; (d) the words "herein," "hereof," "hereunder," "hereto" and other

1



words of similar import refer to this Plan in its entirety rather than to a particular portion of this Plan; (e) whenever it appears appropriate from the context, each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter; and (f) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

**1.2. Computation of Time**. Unless otherwise expressly provided, Fed. R. Bankr. P. 9006(a) shall apply in computing time prescribed or allowed by this Plan.

**1.3. Definitions**. For purposes of this Chapter 11 Plan of Reorganization and any subsequent amendments or modifications hereof, the terms set forth in the attached Uniform Glossary of Defined Terms for Plan, Disclosure Statement and Plan Documents shall have the meanings set forth therein, and any term used herein, which is defined in the Bankruptcy Code but not defined herein, shall have the meaning set forth in the Bankruptcy Code.

## II. TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS
## PRIORITY TAX CLAIMS AGAINST THE DEBTOR

**2.1. Administrative Expense Claims**. On the later of (i) the Effective Date or (ii) the date on which an Administrative Expense Claim becomes Allowed, the Reorganized Debtor shall either (a) pay to each Holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim, or (b) satisfy and discharge such Administrative Expense Claim in accordance with such other terms that the Reorganized Debtor and such Holder shall have agreed upon in writing; *provided, however,* that such agreed-upon treatment shall not be more favorable than the treatment provided in subsection (a).

**2.1.1. *Bar Date for Filing Administrative Expense Claims***. Requests for payment of Administrative Expense Claims and hearing notices related thereto shall be Filed and properly served in accordance with the local rules of the Bankruptcy Court no later than thirty (30) days after the Effective Date. Such request shall include at a minimum (a) the name of the Holder of the Administrative Expense Claim, (b) the amount of the Administrative Expense Claim, and (c) the basis for the Administrative Expense Claim. **Failure to file and serve such request and related notice(s) timely and properly shall result in the Administrative Expense Claim being forever barred and discharged.**

**2.1.2. *Professional Compensation Claims***. All professionals or other entities requesting compensation or reimbursement of expenses under Sections 327, 328, 330, 331, 333, 503(b), 506 and 1103 of the Bankruptcy Code for services rendered before the Effective Date (including any compensation requested by any professional for any other entity for making a substantial contribution in the Reorganization Case) shall File and serve on the Reorganized Debtor an application for final allowance of compensation and reimbursement of expenses no later than thirty (30) days after the Effective Date. Payment of such claims shall be from the cash of the Debtor.

**2.1.3. *Ordinary Course Liabilities***. Holders of Administrative Expense Claims based on unpaid and undisputed amounts due by the Debtor in Possession for goods and services provided to it after the Petition Date and before the Effective Date arising in the ordinary course

of the Debtor's *business* shall not be required to file any request for payment of such Claims but each shall be deemed to be an Allowed Administrative Expense Claim in the undisputed amount recognized by the Debtor in Possession. Such deemed Allowed Administrative Expense Claims shall be paid in the ordinary course of business by the Reorganized Debtor without any further action by the Holders of such Claims.

**2.2. Priority Tax Claims**. Except to the extent that the Reorganized Debtor and a Holder of an Allowed Priority Tax Claim against the Debtor agree to a different treatment, each Holder of an Allowed Priority Tax Claim against the Debtor shall receive, at the sole option of the Reorganized Debtor, (a) on the Effective Date, Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim, or (b) commencing forty-five (45) days after the occurrence of the Effective Date and continuing over a period not exceeding five (5) years from and after the Order For Relief Date, equal quarterly Cash payments in an aggregate amount equal to the unpaid portion of such Allowed Priority Tax Claim, together with interest at the applicable rate under nonbankruptcy law, subject to the sole option of the Reorganized Debtor, as applicable, to prepay the entire amount of the unpaid portion of Allowed Priority Tax Claim and in a manner not less favorable than the most favored nonpriority unsecured Claim provided for by the Plan. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due. Any Priority Tax Claim secured by a lien shall retain such lien to secure its claim until paid in full.

## III. CLASSIFICATION OF CLAIMS
## AGAINST AND INTERESTS IN DEBTOR

**3.1. Classification of Claims**. Pursuant to Section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtor. A Claim or Interest is placed in a particular Class for the purposes of voting on this Plan and of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, withdrawn or otherwise settled prior to the Effective Date. In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims of the kinds specified in Sections 507(a)(2) and 507(a)(8), respectively, of the Bankruptcy Code have not been classified and their treatment is set forth in Article II.

**3.2. Classes**. The Claims against the Debtor are classified as follows:

**3.2.1. *Class 1:*** Class 1 consists of the secured claim of Whitney Bank in the amount of approximately Twenty-Nine Thousand Dollars ($29,000.00) which is secured by the residence of the owners of Red Barn Motors in Denham Springs, Louisiana. This class is not impaired and is therefore not entitled to vote on the Plan.

**3.2.2. *Class 2:*** Class 2 consists of the secured claim of Fair Hugh in the amount of approximately Ninety-five Thousand Dollars ($95,000.00) which is secured by a lot adjoining the Red Barn Motors office. This class is not impaired and is therefore not entitled to vote on the Plan.

3

**3.2.3.** *Class 3:* Class 3 consists of the secured claim of Republic Finance in the amount of approximately $8,000.00 secured by a one acre lot in Walker, Louisiana. This claim is impaired and is entitled to vote on the Plan.

**3.2.4.** *Class 4:* Convenience Class of Unsecured Creditors

**3.2.5** *Class 5:* General Unsecured Claims. Class 5 shall consist of all Allowed General Unsecured Claims not eligible for or not electing into Class 4.

## IV. TREATMENT OF CLAIMS AND INTERESTS
## AND DESIGNATION WITH RESPECT TO IMPAIRMENT

### 4.1. Treatment of Class 1 – Whitney Bank

**4.1.1.** *Impairment and Voting.* Class 1 consists of the claim of Whitney Bank and is not impaired by this Plan. The Holder of the Class 1 Claim is not entitled to vote to accept or reject this Plan. The Class 1 Claim is secured by the residence of the owners of Red Barn Motors located at 8628 Shadow Springs Blvd., Denham Springs, Louisiana, 70726, owned by the Debtor.

**4.1.2.** *Treatment.* Prior to the Effective Date, the monthly payments owed to Whitney Bank will have been paid by an affiliate of the Debtor. The Holder of the Class 1 Claim shall retain all of its existing liens, privileges and encumbrances in the Assets of the Debtor with the same validity, priority and extent that existed on the Petition Date to secure the timely repayment of the Class 1 Claim.

Beginning on the Effective Date, the Debtor shall timely pay monthly mortgage payments, together with all taxes and insurance premiums pertaining to the collateral securing this Claim, in default of which the rights of Whitney Bank under its security documents shall obtain. Except as specifically modified hereby, all terms and conditions of the notes, guarantees and security agreements between the parties shall remain in full force and effect. All terms and conditions of the note and guarantees affecting the unsecured loan shall remain in full force and effect.

Finally, to the extent the loans in favor of Whitney Bank are cross-collateralized, Whitney Bank shall retain all of its existing liens against any and all collateral securing those loans and nothing in this Disclosure Statement or the Plan shall affect those existing liens held by Whitney Bank against such collateral.

### 4.2. Treatment of Class 2 – Fair Hugh Secured Claim.

**4.2.1.** *Impairment and Voting.* Class 2 is not impaired by this Plan. The Holder of the Class 2 Claim is not entitled to vote to accept or reject this Plan. The Class 2 Claim is secured by the Debtor's lot adjoining its business office in Denham Springs, Louisiana.

4

**4.2.2. *Treatment.*** Prior to the Effective Date, the monthly payments owed to Fair Hugh will have been paid by an affiliate of the Debtor. The Holder of the Class 2 Claim shall retain all of its existing liens, privileges and encumbrances in the Assets of the Debtor with the same validity, priority and extent that existed on the Petition Date to secure the timely repayment of the Class 2 Claim.

Beginning on the Effective Date, the Debtor shall timely pay monthly mortgage payments, together with all taxes and insurance premiums pertaining to the collateral securing this Claim, in default of which the rights of Fair Hugh under its security documents shall obtain. Except as specifically modified hereby, all terms and conditions of the notes, guarantees and security agreements between the parties shall remain in full force and effect.

The Holder of the Class 2 Claim shall retain all of its existing liens, privileges and encumbrances in the Debtor's Assets with the same validity, priority and extent that existed on the Petition Date to secure the timely repayment of the Class 2 Claim.

### 4.3. Treatment of Class 3 – Republic Finance.

**4.3.1. *Impairment and Voting.*** Class 3 is impaired by this Plan. The Holder of the Class 3 Claim is entitled to vote to accept or reject this Plan. The Class 3 Claim is secured by the Debtor's one acre lot located in Walker, Louisiana.

**4.3.2. *Treatment.*** On the Effective Date, all accrued unpaid interest calculated at the non-default contractual rate of 4.0% per annum plus any amounts Allowed by the Bankruptcy Court pursuant to 11 U.S.C. § 506(b) shall be capitalized and added to the outstanding principal balance of approximately $8,000.00 due under the Republic Finance judgment ("the New Principal Balance"). As permitted under 11 U.S.C. § 1123(a)(5)(H), the maturity of the New Principal Balance shall be extended to twenty-four (24) months from the Effective Date ("the New Maturity Date"). The Debtor shall then make an annual payment of interest only on the anniversary of the Effective Date on the New Principal Balance at the rate of 4.0% per annum from the Effective Date. The entire New Principal Balance shall be due on the second anniversary of the Effective Date or upon the sale of the collateral, whichever occurs first. The Debtor shall have the right to prepay principal on the New Principal Balance at any time and to pay the entire New Principal Balance of the Class 3 Claim in full at any time prior to the New Maturity Date without penalty. The Holder of the Class 3 Claim shall retain all of its existing liens, privileges and encumbrances in the Debtor' Assets with the same validity, priority and extent that existed on the Petition Date to secure the timely repayment of the Class 3 Claim.

### 4.4. Treatment of Class 4 – Convenience Class of Unsecured Claims.

**4.4.1. *Impairment and Voting*.** Class 4 consists of the Holders of Unsecured Claims in amounts equal to or less than Five Thousand Dollars ($5,000.00) or those Holders of Unsecured Claims in amounts in excess of Five Thousand Dollars ($5,000.00) who elect to reduce their claim to Five Thousand Dollars ($5,000.00). Class 4 Claims are impaired by this Plan. Each Holder of Class 4 Claim is entitled to vote to accept or reject this Plan.

5

**4.4.2. *Treatment*.** Each holder of a Class 4 Claim shall receive a cash payment from the Debtor on the Effective Date equal to fifty (50%) percent of its Allowed General Unsecured Claim. The remaining balance of each Allowed General Unsecured Claim shall be paid six (6) months from the Effective Date.

## 4.5. Treatment of Class 5 – General Class of Unsecured Claims.

**4.5.1. *Impairment and Voting*.** Class 5 consists of the Holders of Unsecured Claims in amounts in excess of Five Thousand Dollars ($5,000.00) which do not elect to reduce their claim to Five Thousand Dollars ($5,000.00). Class 5 Claims are impaired by this Plan. Each Holder of Class 5 Claim is entitled to vote to accept or reject this Plan.

**4.5.2. *Treatment*.** The Debtor shall pay Holders of Allowed Class 5 Claims on a Pro Rata Basis with no interest on a quarterly basis beginning on April 15, 2014 or on the Effective Date whichever is later, and on the 15th day of the following months of July, October and January the entire amount of the Creditors' Disbursement Fund as of the end of the previous quarter until such Allowed Claims are paid in full. For example, the second Plan payment shall be paid on July 15, 2014, from the Creditors' Disbursement Fund as of June 30, 2014. Based on the Debtor's projections, Allowed Class 5 Claims will be paid in full within two (2) years of the Effective Date.

## V. PROVISIONS REGARDING VOTING, EFFECT OF REJECTION BY IMPAIRED CLASSES, AND CONSEQUENCES OF NONCONFIRMABILITY

**5.1. Voting Rights**. Each Holder of an Allowed Claim or Allowed Interest as of the Voting Deadline in an impaired Class of Claims that is not deemed to have accepted this Plan shall be entitled to vote separately to accept or reject this Plan as provided in the order entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject this Plan.

**5.2. Acceptance Requirements**. An impaired Class of Claims shall have accepted this Plan if votes in favor of this Plan have been cast by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on this Plan. An impaired Class of Interests shall have accepted this Plan if votes in favor of this Plan have been cast by at least two-thirds (2/3) in amount of the Interests in such Class that have voted on this Plan.

**5.3. Cramdown**. If all applicable requirements for Confirmation of this Plan are met as set forth in Section 1129(a)(1) through (13) of the Bankruptcy Code, except Subsection (8) thereof, this Plan shall be treated as a request that the Bankruptcy Court confirm this Plan in accordance with Section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of Section 1129(a)(8), on the basis that this Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims that is impaired under, and has not accepted, this Plan.

6

**5.4. Tabulation of the Votes**.  The Debtor shall cause the tabulation of all votes on this Plan for the purpose of determining whether this Plan satisfies Sections 1129(a)(8) and/or (10) of the Bankruptcy Code.

## VI. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 6.1. Assumption of Contracts and Leases.

The Debtor is a party to any certain pre-petition executory contracts listed on Exhibit 1, attached hereto  The Debtor has designated on that Exhibit which of such executory contracts it hereby chooses to accept and assumed.  Except as otherwise provided herein or pursuant to the Confirmation Order, as of the Effective Date, if any pre-petition executory contracts between the Debtor and any Person they shall be assumed pursuant to Section 365(a) of the Bankruptcy Code except for any executory contract or unexpired lease that has been assigned or rejected or renegotiated and either assumed or rejected on renegotiated terms, pursuant to an order of the Bankruptcy Court entered prior to the Effective Date.  Entry of the Confirmation Order shall constitute approval, pursuant to Section 365(a) of the Bankruptcy Code, of the assumption of executory contracts and unexpired leases provided for on Exhibit 1, attached hereto.

## VII. MEANS OF IMPLEMENTATION OF THE PLAN

**7.1. Summary of Reorganization of the Debtor**.  On and after the Effective Date, all Assets of the Debtor and their estate shall vest in the Reorganized Debtor free and clear of all Liens, encumbrances, and claims except for the Liens securing any Priority Tax Claims and the Liens securing the Class 1, 2, and 3 Claims.  On and after the Effective Date, the Reorganized Debtor may operate their business, may use, acquire and dispose of property, may retain, compensate and pay any professionals or advisors, and compromise or settle any causes of action, claims or interests without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan and the Confirmation Order.  All payments due on or after the Effective Date shall be made from the Debtor's cash on hand and from the future revenues derived from the Reorganized Debtor's sale of used motor vehicles.

**7.2. Post-Effective Date Management of the Reorganized Debtor**.  Except as expressly provided in this Plan, the operation, management and control of the Reorganized Debtor shall remain with Don Richardson.

**7.3. Authorization to Implement this Plan**.  The entry of the Confirmation Order shall constitute authorization for the Debtor and the Reorganized Debtor to take or cause to be taken all action necessary or appropriate to implement all provisions of, and to consummate this Plan and the Plan Documents prior to, on and after the Effective Date and all such actions taken or caused to be taken for which Bankruptcy Court authorization is required shall be deemed to have

been authorized by the Bankruptcy Court without further act or action under any applicable law, order, rule or regulation, except as otherwise expressly set forth in this Plan.

**7.4. Effectuating Documents and Further Transactions.** The Debtor and the Reorganized Debtor are authorized and directed to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan Documents.

## VIII. METHOD OF DISTRIBUTIONS UNDER THE PLAN AND CLAIMS RECONCILIATION

**8.1. Method of Distributions Under the Plan.** Distributions under this Plan shall be made in accordance with the following:

**8.1.1. *Distributions for Claims Allowed as of the Effective Date.*** Other than as set forth herein, all Distributions under this Plan to be made on the Effective Date to Holders of Claims that are Allowed as of the Effective Date shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than ten (10) days after the Effective Date. In the event that, pursuant to this Plan, any Plan payment is to be paid on a date before the Effective Date, the Debtor shall place the payment in a trust account of their bankruptcy counsel for payment of the Claim on the Effective Date.

**8.1.2. *Distributions for Claims Allowed after the Effective Date.*** Following the Effective Date, the Reorganized Debtor shall make all distributions that become deliverable to Holders of Allowed Claims.

**8.1.3. *Delivery of Distributions.*** All Distributions to be made under this Plan shall be made to Holders of Allowed Claims (a) if any such Holder has filed a Proof of Claim, at the address of such Holder as set forth in the Proof of Claim, or at the addresses set forth in any written certification of address change delivered to the Disbursing Agent after the date of filing of such Proof of Claim, or (b) if any such Holder has not filed a Proof of Claim, at the last known address of such Holder as set forth in the Debtor' Schedules or Debtor' books and records.

**8.1.4. *Timing of Distributions.*** Any payment or other Distribution required to be made under this Plan on a day other than a Business Day shall be due on the next succeeding Business Day. All payments or Distributions due on the Effective Date shall be made thereon or as soon as practicable thereafter but in no event later than ten (10) calendar days after the Effective Date. Any payment of Cash made pursuant to this Plan shall be deemed made when such payment by check or wire transfer is transmitted.

**8.1.5. *Minimum Cash Distributions.*** No Cash payment less than ten dollars ($10.00) shall be made to any Holder of a Claim unless a request therefore is made in writing to the Reorganized Debtor.

8

**8.1.6.** *Unclaimed/Undeliverable Distributions*. If any Cash or other Distribution pursuant to this Plan to any Holder of an Allowed Claim is returned as undeliverable, no further Distributions to such Holder shall be made until such time as the Reorganized Debtor are notified by written certification of such Holder's then-current address, at which time Distributions to such Holder shall be made without interest.

**8.1.7.** *Failure to Claim Undeliverable Distributions*. Any Holder of an Allowed Claim that does not assert a claim pursuant to this Plan for an undeliverable Distribution within one (1) year after the Distribution was initially attempted shall have its claim for such undeliverable Distribution discharged and such Distributions shall be deemed to be unclaimed property under Section 347(b) of the Bankruptcy Code. After such date, all Cash or other Distribution shall be forfeited and transferred to or retained by the Reorganized Debtor free from any restrictions thereon, and the claim of any Holder to such Cash or other Distribution pursuant to this Plan shall be discharged and forever barred. Nothing contained in this Plan shall require the Reorganized Debtor to attempt to locate any Holder of an Allowed Claim.

**8.1.8.** *Withholding and Reporting Requirements*. In connection with this Plan, the Debtor and the Reorganized Debtor, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local, and/or foreign taxing authorities and all Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such Distribution.

**8.1.9.** *Setoff Rights*. The Reorganized Debtor may, but shall not be required to, setoff against or recoup from the Holder of any Allowed Claim on which payments or other Distributions are to be made hereunder, claims of any nature that the Debtor or the Reorganized Debtor may have against the Holder of such Allowed Claim. However, neither the failure to do so, nor the allowance of any Claim under this Plan, shall constitute a waiver or release of any such claim, right of setoff or right of recoupment against the Holder of such Allowed Claim.

## 8.2. Claims Administration Responsibility.

**8.2.1.** *Right to Object to Claims*. The Debtor and the Reorganized Debtor have the responsibility and authority for administering, disputing, objecting to, compromising and settling or otherwise resolving and finalizing Distributions (if any) with respect to all Claims. In addition, the Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtor have previously objected to such Claim.

**8.2.2.** *Claims Objection Deadline*. The Reorganized Debtor shall have until the date that is ninety (90) days after the Effective Date to bring any objections to Claims; *provided, however,* that such deadline may be extended by the Bankruptcy Court upon *ex parte* motion of the Reorganized Debtor.

**8.2.3. *Compromise and Settlements*.** From and after the Effective Date, and without any further approval by the Bankruptcy Court, the Reorganized Debtor may compromise and settle any Claims and Causes of Action against the Debtor or their Estate.

**8.3. Process for Disputing Claims.**

**8.3.1. *Disallowance of Improperly Filed Claims*.** Any Administrative Expense Claim or other Claim for which the filing of a motion for allowance is required shall be disallowed if such filing is not timely and properly made and set for hearing contemporaneously therewith, subject to the right of the Claimant to seek permission under applicable law to file a late Claim.

**8.3.2. *No Distributions Pending Allowance*.** If a Claim or any portion of a Claim is disputed, no payment or Distribution shall be made on account of the disputed portion of such Claim (or the entire Claim, if the entire Claim is disputed), unless such Disputed Claim or portion thereof becomes an Allowed Claim.

## IX. EFFECT OF CONFIRMATION OF PLAN

**9.1. Discharge.**

**9.1.1. *Discharge of Claims Against the Debtor and the Reorganized Debtor*.** Except as otherwise expressly provided in this Plan or the Confirmation Order, Confirmation of this Plan shall as of the Effective Date: (i) discharge the Debtor, the Reorganized Debtor and any of their Assets from all Claims demands, liabilities, other debts and Interests that arose on or before the Effective Date, including, without limitation, all debts of the kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (A) a Proof of Claim based on such debt is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code, (B) a Claim based on such debt is Allowed pursuant to Section 502 of the Bankruptcy Code, or (C) the Holder of a Claim based on such debt has accepted this Plan; and (ii) preclude all Persons from asserting against the Debtor, the Reorganized Debtor or any of their Assets any other or further Claims or Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, all pursuant to Sections 524 and 1141 of the Bankruptcy Code. The discharge provided in this provision shall void any judgment obtained against any of the Debtor at any time, to the extent that such judgment relates to a discharged Claim or cancelled Interest.

**9.1.2. *Injunction Related to the Discharge*.** Except as otherwise provided in this Plan or the Confirmation Order, all entities that have held, currently hold or may hold Claims or other debts or liabilities against the Debtor or an Interest or other right of an equity security Holder in the Debtor that are discharged pursuant to the terms of this Plan are permanently enjoined, on and after the Effective Date, from taking any of the following actions on account of any such Claims, debts, liabilities or Interests or rights: (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim debt, liability, Interest or right other than to enforce any right to a Distribution pursuant to this Plan; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award decree or order against

the Debtor, the Reorganized Debtor or any of their Assets on account of any such Claim debt, liability, Interest or right; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Debtor, the Reorganized Debtor or any of their Assets on account of any such Claim debt liability, Interest or right; (iv) asserting any right of setoff subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor, the Reorganized Debtor or any of their Assets on account of any such Claim debt, liability, Interest or right; and (v) commencing or continuing any action in any manner, in any place that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order. Such injunction shall extend to any successor of the Debtor, the Reorganized Debtor and any of their Assets. Any entity injured by a willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages from the willful violator.

**9.2. Retention of Causes of Action.**

**9.2.1.** *Preservation of Rights of Action by the Debtor and the Reorganized Debtor.* Except as provided in this Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with this Plan, in accordance with Section 1123(b) of the Bankruptcy Code and to the fullest extent possible under applicable law, the Reorganized Debtor shall retain and may enforce, and shall have the sole right to enforce, any claims, demands, rights and Causes of Action that the Debtor or their Estate may hold against any Entity. The Reorganized Debtor or their successor may pursue such retained claims, demands, rights or Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor, or their successor. Further, the Reorganized Debtor, as the case may be, retain their rights to file and pursue, and shall have the sole right to file and pursue any adversary proceedings against any account debtor related to debit balances or deposits owed to any Debtor. Notwithstanding the above, the Debtor does not intend to bring any Avoidance Actions after entry of the Confirmation Order.

## X. EFFECTIVENESS OF THE PLAN

**10.1. Conditions Precedent.** This Plan shall not become effective unless and until the following conditions have been satisfied:

**10.1.1.** *Conditions to Effective Date.*

(1) The Confirmation Order, in form and substance satisfactory to the Debtor shall have become a Final Order.

(2) The Debtor shall have sufficient cash on hand with which to make all payments required to be made on the Effective Date.

**10.2.** *Effect of Failure of Conditions.* In the event that the conditions specified in Article 10.1 have not been satisfied on or before thirty (30) days after the Confirmation Date, then without an order of the Bankruptcy Court: (a) this Plan shall be null and void in all

respects; (b) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtor may assume and assign or reject all executory contracts and unexpired leases shall be extended for a period of sixty (60) days after such date.

## XI. RETENTION OF JURISDICTION

**11.1. Bankruptcy Court.** Pursuant to Sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over all matters arising out of, and related to, the Reorganization Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

**11.1.1.** allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim or Priority Tax Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

**11.1.2.** hear and rule upon all Causes of Action retained by the Debtor and commenced and/or pursued by the Reorganized Debtor provided that such Causes of Action are properly before the Bankruptcy Court;

**11.1.3.** resolve any matters related to the rejection, assumption or assumption and assignment of any executory contract or unexpired lease to which any Debtor are a party or with respect to which the Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

**11.1.4.** ensure that Distributions on Allowed Claims are accomplished pursuant to the provisions of this Plan;

**11.1.5.** decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

**11.1.6.** enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents created in connection with this Plan, the Disclosure Statement or the Confirmation Order;

**11.1.7.** resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release or other agreement or document that is executed or created pursuant to this Plan, or any entity's rights arising from or obligations incurred in connection with this Plan or such documents;

**11.1.8.** approve any modification of this Plan before or after the Effective Date pursuant to Section 1127 of the Bankruptcy Code or approve any modification of the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

**11.1.9.** hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under Sections 330, 331, 363, 503(b), 1103 and 1129(a)(9) of the Bankruptcy Code, which shall be payable by the Debtor only upon allowance thereof pursuant to the order of the Bankruptcy Court;

**11.1.10.** issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation of this Plan, implementation or enforcement of this Plan or the Confirmation Order, including designating one or more Persons under Fed. R. Bankr. P. 7070 and F. R. Civ. P. 70;

**11.1.11.** hear and determine matters concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code;

**11.1.12.** enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if Distributions pursuant to this Plan are enjoined or stayed;

**11.1.13.** determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement, or document created in connection with this Plan, the Disclosure Statement or the Confirmation Order;

**11.1.14.** enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Reorganization Case; and,

**11.1.15.** hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code.

**11.2. Alternative Jurisdiction.** In the event that the Bankruptcy Court is found to lack jurisdiction to resolve any matter, then such matter may be brought before any court having jurisdiction with regard thereto; *provided, however,* that any party that has filed a Claim or votes to accept this Plan consents to the jurisdiction of the United States District Court for the Middle District of Louisiana and to venue in the Parish of East Baton Rouge, Louisiana, regardless of whether the Class of which such party is a member votes to accept this Plan.

## XII. MISCELLANEOUS PROVISIONS

**12.1. Authorization of Effectuating Documents and Further Transactions.** The Debtor's President, Don Richardson, is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures and other agreements or documents, and to take such actions as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of this Plan and the debt and equity securities issued pursuant to this Plan.

**12.2. Exemption from Transfer Taxes.** Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under this Plan, the creation of any mortgage, deed of trust, Lien, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

**12.3. Statutory Fees.** All fees payable pursuant to Section 1930 of Title 28 of the United States Code shall be paid by the Debtor on or before the Effective Date, and thereafter by the Reorganized Debtor. The Debtor shall pay all such fees on a timely basis and comply with all reporting requirements of the Office of the U.S. Trustee.

**12.4. Third Party Agreements.** The Distributions to the various Classes of Claims hereunder shall not affect the right of any Person to levy, garnish, attach, or employ any other legal process with respect to such Distributions by reason of any claimed subordination rights or otherwise. All of such rights and any agreements relating thereto shall remain in full force and effect, except as compromised and settled pursuant to this Plan. Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in this Plan.

**12.5. Severability.** In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in this Plan is invalid, void or unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any other provision of this Plan, or alter, amend, revoke, or withdraw this Plan.

**12.6. Governing Law.** Except to the extent that federal law (including, but not limited to, the Bankruptcy Code and the Bankruptcy Rules) is applicable or this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Louisiana without giving effect to its conflicts of law principles.

**12.7. Notices.** Any notice required or permitted to be provided under this Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) reputable overnight delivery service, freight prepaid. If to the Debtor or Reorganized Debtor, any such notice shall be directed to the following at the addresses set forth below:

14

Red Barn Motors, Inc.
Attn: Don Richardson
26007 LA Hwy. 16
Denham Springs, Louisiana 70726

with a copy to:

Mr. Don Richardson
8628 Shadow Springs Blvd.
Denham Springs, Louisiana 70726

and to:

Steffes, Vingiello & McKenzie, LLC
13702 Coursey Blvd., Building 3
Baton Rouge, Louisiana 70817
Attention: Arthur A. Vingiello
E-mail: *avingiello@steffeslaw.*com
Facsimile: (225) 751-1998

**12.8. Interest and Attorneys' Fees**. Interest accrued after the Petition Date shall accrue and be paid on Claims only to the extent specifically provided for in this Plan, the Confirmation Order or as otherwise required by the Bankruptcy Court or applicable law. No award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim, except as set forth in this Plan or as ordered by the Bankruptcy Court.

**12.9. Binding Effect**. This Plan shall be binding upon the Debtor, the Reorganized Debtor, the Holders of all Claims and Interests, parties in interest, Persons, Entities and Governmental Units and their respective successors and assigns. To the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of this Plan, the terms of this Plan shall be binding and conclusive.

**12.10. No Admissions**. As to contested matters, adversary proceedings and other Causes of Action or threatened Causes of Actions, nothing in this Plan, the Disclosure Statement or other Plan Documents shall constitute or be construed as an admission by any Person of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations. This Plan shall not be construed to be conclusive advice on the tax, securities, and other legal effects of this Plan as to Holders of Claims against, or Interests in, the Debtor or any of their subsidiaries and affiliates, as debtor and debtor-in-possession in this Reorganization Case.

The undersigned have executed this Amended Plan of Reorganization, as of the 10th day

of December, 2013.

Respectfully submitted;

By: s/ Don Richardson, President
Red Barn Motors, Inc., Debtor

STEFFES, VINGIELLO & McKENZIE, LLC
13702 Coursey Blvd., Building 3
Baton Rouge, Louisiana 70817
Telephone: (225) 751-1751
Facsimile: (225) 751-1998
E-mail: *avingiello@steffeslaw.com*

By: s/Arthur A. Vingiello
ARTHUR A. VINGIELLO (#13098)

16

## UNIFORM GLOSSARY OF DEFINED TERMS FOR PLAN, DISCLOSURE STATEMENT, AND PLAN DOCUMENTS

*Administrative Expense* means (a) any cost or expense of administration of the Reorganization Case incurred before the Effective Date and allowable under Section 503(b) of the Bankruptcy Code and entitled to priority under Section 507(a)(2) of the Bankruptcy Code including, without limitation, (i) any actual and necessary post-petition cost or expense of preserving the Estate or operating the businesses of the Debtor, (ii) any payment required to cure a default on an Assumed Contract, (iii) any post-petition cost, indebtedness, or contractual obligation duly and validly incurred or assumed by the Debtor in the ordinary course of their business, and (iv) compensation or reimbursement of expenses of professionals to the extent allowed by the Bankruptcy Court under Sections 330(a) or 331 of the Bankruptcy Code and (b) any fee or charge assessed against the Estates under 28 U.S.C. § 1930.

*Administrative Expense Claim* means any Claim for the payment of an Administrative Expense.

*Allowed* means Bankruptcy Court approval of a Claim or Interest.

*Allowed Amount* of any Claim or Interest means the amount at which that Claim or Interest is Allowed.

*Allowed Claim; Allowed Interest* means any Claim or Interest in the Debtor or their Estate, (i) proof of which was filed on or before the Bar Date (defined below), (ii) if no such proof of Claim or Interest has been timely filed, which has been or hereafter is listed by the Debtor in their Schedules as liquidated in amount and not disputed or contingent or (iii) any Interest registered in the membership register maintained by or on behalf of the Debtor as of the Record Date, in each such case in clauses (i), (ii) and (iii) above, a Claim or Interest as to which no objection to the allowance thereof, or action to equitably subordinate or otherwise seek recovery from the Holder of the Claim or Interest, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, or as to which an objection has been interposed and such Claim has been allowed in whole or in part by a Final Order.

*Assets* means all property in which the Debtor hold a legal or equitable interest, including all property described in 11 U.S.C. § 541 and all property disclosed in such Debtor' respective Schedules and the Disclosure Statement.

*Avoidance Actions* any means all of the Debtor' and the Estate's rights and claims under Sections 541 through 553 of the Bankruptcy Code, inclusive, or under any similar or related state or federal statute or common law, whether or not an action is initiated on or before the Effective Date.

*Ballot* means each of the ballot forms for voting to accept or reject the Plan distributed to all Holders of Impaired Claims entitled to vote on the Plan.

17

***Balloting and Claims Agent*** means Steffes, Vingiello & McKenzie, LLC, 13702 Coursey Blvd., Building 3, Baton Rouge, Louisiana 70817.

***Bankruptcy Code*** means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.,* as in effect on the Petition Date, together with all amendments and modifications thereto subsequently made, to the extent applicable to the Reorganization Cases.

***Bankruptcy Court*** means the United States Bankruptcy Court for the Middle District of Louisiana, or such other court having jurisdiction over the Reorganization Case.

***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure and the local rules and general orders of the Bankruptcy Court, as in effect on the Petition Date, together with all amendments and modifications thereto subsequently made applicable to the Reorganization Cases.

***Bar Date*** means the date(s) by which any Entity asserting certain Claims against the Debtor must have filed a Proof of Claim or be forever barred from asserting such Claims against the Debtor or their Estate, as established by any order(s) of the Bankruptcy Court or the Plan.

***Business Day*** means any day other than a Saturday, Sunday, or legal holiday (as such term is defined in Bankruptcy Rule 9006(a)).

***Cash*** means cash, cash equivalents, and other readily marketable securities or instruments, including, without limitation, direct obligations of the United States and certificates of deposit issued by federally insured banks.

***Causes of Action*** means all causes of action, rights, claims, and demands against any Persons that the Debtor or their Estate own or have an interest in or can assert in any fashion, or which could be asserted by the Debtor on behalf of any Creditor or Creditor representative under the Bankruptcy Code as Debtor in Possession, including but not limited to actions under 11 U.S.C. § 510 to subordinate Claims.

***Claim*** has the meaning set forth in Section 101(5) of the Bankruptcy Code, against the Debtor or their Estate whether or not asserted.

***Claimant*** means the Holder of a Claim.

***Class*** means a category of Holders of Claims or Interests, as set forth in Articles III of the Plan pursuant to Section 1122 of the Bankruptcy Code.

***Collateral*** means any property or interest in property of an Estate that is subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

***Confirmation, Confirmation of the Plan,*** or ***Plan Confirmation*** means the approval of the Plan by the Bankruptcy Court at the Confirmation Hearing.

*Confirmation Date* means the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court.

*Confirmation Hearing* means the hearing held by the Bankruptcy Court pursuant to Section 1128 of the Bankruptcy Code to consider Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

*Confirmation Order* means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 and other applicable sections of the Bankruptcy Code.

*Convenience Class* means the Holders of Unsecured Claims in amounts equal to or less than Five Thousand Dollars ($5,000.00) or those Holders of Unsecured Claims in amounts greater than Five Thousand Dollars ($5,000.00) who elect to reduce their claim to Five Thousand Dollars ($5,000.00).

*Creditor* means any Person or Entity holding a Claim against the Debtor's Estate or pursuant to Section 102(5) of the Bankruptcy Code against property of the Debtor that arose or is deemed to have arisen on or prior to the Petition Date.

*Creditors' Disbursement Fund* means that fund of money established by the Debtor from the following sources:

a) net cash flow from sales operations which is all cash over and above Debtor's monthly operating expenses (which average $22,113.00) and the funding of the Operational Reserve (see definition) as necessary; and,

b) collections from BHPH receivables as follows: collections will be used to pay the Whitney Bank secured payment of $994.00, the Fair Hugh payment of $1,362.00, $2,000.00 per month into the Operational Reserve (see definition), and $5,000.00 per month into Red Barn Motors vehicle inventory for one (1) year or until that inventory reaches a maximum of $125,000.00 (roughly 80 vehicles). The balance of collections will be put into the Creditors' Disbursement Fund for distribution to Class 5 Claimants.

*Debtor* means Red Barn Motors, Inc.

*Debtor in Possession* means the Debtor between the Petition Date and the Effective Date when acting in the capacity of representative of their Estate in the Reorganization Case.

*Disclosure Statement* means the Disclosure Statement in Support of the Plan of Reorganization Proposed by the Debtor dated October 22, 2013, including all exhibits attached thereto or referenced therein, as submitted pursuant to Section 1125 of the Bankruptcy Code and approved by the Bankruptcy Court, as such Disclosure Statement may be further amended, supplemented, or modified from time to time.

*Disputed Claim* means a Claim that is not an Allowed Claim, including a Claim that is, in whole or in part: (a) listed on the Schedules as, or proof of which is filed as, unliquidated, disputed or contingent; (b) as to which a Proof of Claim designating such Claim as liquidated in amount and not contingent was not timely and properly filed; (c) as to which the Debtor, Reorganized Debtor, or other party in interest has filed a timely objection or request for estimation in accordance with the Bankruptcy Code and Bankruptcy Rules; or (d) is otherwise disputed by the Debtor, the Reorganized Debtor or other party in interest in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

*Distribution* means any distribution by the Debtor or the Reorganized Debtor to the Holders of Allowed Claims pursuant to the Plan.

*Effective Date* means the date specified by the Debtor in a notice filed with the Bankruptcy Court as the date on which this Plan shall take effect, and which occurs after (i) the Confirmation Order becomes a Final Order; and (ii) the condition precedent to the Effective Date provided for in Article X of the Plan has been satisfied.

*Entity* has the meaning set forth in Section 101(15) of the Bankruptcy Code.

*Equity Interests* or *Interests* means the rights of the Holders of the equity securities of the Debtor.

*Estate* means the legal entity administering the property of the Debtor, in its capacity as a Debtor in Possession, between the Petition Date and the Effective Date, created pursuant to Section 541 of the Bankruptcy Code.

*Filed* means properly and timely filed with the Bankruptcy Court in the Bankruptcy Case, as reflected on the official docket of the Court for the Bankruptcy Case and properly served, as such filing and service are required pursuant to the Bankruptcy Code, Bankruptcy Rules and/or Order of the Court.

*Final Order* means an order of a court: (a) as to which the time to appeal, petition for writ of certiorari, or otherwise seek appellate review or to move for reargument, rehearing, reconsideration or stay has expired and as to which no appeal, petition for writ of certiorari, or other appellate review, or proceedings for reargument, rehearing, reconsideration or stay shall then be pending; or (b) as to which any right to appeal, petition for certiorari, or move for reargument, rehearing or stay shall have been waived in writing by all parties with such right; or (c) in the event that an appeal, writ of certiorari, or other appellate review or reargument, rehearing, reconsideration or stay thereof has been sought, which order shall have been affirmed by the highest court to which such order was appealed or from which writ of certiorari or other appellate review or reargument, rehearing, reconsideration or stay was sought, and as to which the time to take any further appeal, to petition for writ of certiorari, to otherwise seek appellate review, and to move for reargument, rehearing, reconsideration or stay shall have expired; *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or under Section 1144 of the Bankruptcy Code, or any analogous rule

under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order.

*General Unsecured Claim* means a Claim against the Debtor that is not an Administrative Expense Claim, a Priority Tax Claim, or a Secured Claim (but shall not include Claims that are disallowed or released, whether by operation of law or pursuant to order of the Bankruptcy Court, written release or settlement, the provisions of the Plan or otherwise), which Claims are classified in Class 5 of the Plan.

*Governmental Unit* has the meaning ascribed to such term in Section 101(27) of the Bankruptcy Code.

*Holder* means any Person holding an Interest or Claim.

*Impaired* means a Claim or a Class of Claims that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

*Lien* has the meaning set forth in Section 101(37) of the Bankruptcy Code.

*Opererational Reserve* means that fund of money established by the Debtor from sales operations and collection of BHPH receivables until the fund reaches two (2) months of estimated operational expenses, i.e. $44,226.00.

*Order for Relief Date* means the Petition Date.

*Petition Date* means April 26, 2013, the date on which the Debtor's Reorganization Case was commenced with the filing of a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

*Plan* means this Amended Plan of Reorganization for the Debtor, proposed by the Debtor, dated December 10, 2013 under Chapter 11 of the United States Bankruptcy Code, including all exhibits attached hereto or referenced therein, as the same may be amended, modified, or supplemented from time to time.

*Priority Tax Claim* means a Claim of a Governmental Unit of the kind specified in Section 507(a)(8) of the Bankruptcy Code and specifically includes such claims that are secured by Liens.

*Pro Rata* means, with reference to any Distribution on account of any Allowed Claim or Allowed Interest in a Class, a Distribution equal in amount to the ratio (expressed as a percentage) that the amount of such claim bears to the aggregate amount of all Allowed Claims in the same Class.

*Proof of Claim* means any proof of claim filed with the Bankruptcy Court or the Balloting and Claims Agent with respect to the Debtor pursuant to Section 501 of the Bankruptcy Code and Bankruptcy Rules 3001 or 3002.

21

*Reorganization Case* means this Chapter 11 case.

*Reorganized Debtor* means the Debtor after the occurrence of the Effective Date.

*Schedules* means the schedules, statements, and lists filed by the Debtor with the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as may be amended or supplemented from time to time.

*Secured Claim* means any Claim that is (a) secured in whole or part, as of the Petition Date, by a Lien against property of a Debtor that is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law, or (b) subject to setoff under Section 553 of the Bankruptcy Code; *provided, however,* with respect to both (a) and (b) above, a Claim is a Secured Claim only to the extent of the value, net of any senior Lien, of the Estate's interest in the assets or property securing any such Claim or the amount subject to setoff, as the case may be.

*Tax Claim* means any Claim for any and all federal, state, county and local income, *ad valorem*, excise, stamp and other taxes of any type or nature whatsoever.

*U.S. Trustee* means the Office of the United States Trustee.

*Voting Deadline* means the deadline set by the Bankruptcy Court for submitting Ballots on the Plan.

22

# Red Barn Motors, Inc.
# Case # 13-10548
## Executory Contracts and Unexpired leases

| Name | Date | Purpose | Status |
|------|------|---------|--------|
| * Marlin Bank | Nov-12 | Copy Machines | Still Using. Trying to re-negotiate for reduced contract as all machines not now needed - |
| Cox Communications | Jul-12 | Cable | Recently discontinued service as would not restructure the lease for reduced services -=balance owing. |
| *AT&T | Oct-13 | Phone & Internet | restoring contract with termination of Cox services |
| * Carfax | May-10 | reports | Still using |
| * First Data Global Leasing | Jun-10 | Credit Card Machines | Still using. Returned some of equipment. Lease balance owing. FDGL pursuing guarantors. |
| * Equifax | Mar-11 | reports | Continuing |
| All Data | Jan-13 | diagnostic program | contract terminated. |
| Wright Express | Jul-12 | gas card | Service terminated. Balance owing |
| Fuelman | Dec-11 | gas card | Service terminated. Balance owing |
| * Arceneaux Pest Management | May-10 | pest control | Continuing |
| * Signature Alarms | Apr-10 | Security | Continuing on reduced service basis |
| * Central Dispatch | Oct-10 | Car Carrier | Continuing on pay as you go basis |
| Chase Bank | Nov-11 | Credit Card | Card use discontinued. Balance owing. |
| Pelican Pages | Aug-11 | advertising | Discontinued |
| Sunshine Media | Feb-11 | advertising | Discontinued |
| * Friday Systems | Apr-13 | Inventory software | Reinstututed contract. Currently using. |
| * Greg Kennedy, CPA | Feb-11 | payroll processing | Continuing to use. |
| * Autonique | Jan-13 | Auto reports | Continuing to use. |

Note: Parties to contracts/leases are Red Barn Motors, Inc. and vendor.

* Assumed by Debtor pursuant to Plan of Reorganization

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF LOUISIANA

IN RE:

**CASE NO. 13-10548**

**RED BARN MOTORS, INC.**
**DEBTOR**

**CHAPTER 11**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### DISCLOSURE STATEMENT FOR AMENDED PLAN OF REORGANIZATION
### UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AS OF DECEMBER 10, 2013

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE
CHAPTER 11 PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED
UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE
BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED
FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY
COURT. THERE WILL BE A HEARING ON THIS DISCLOSURE STATEMENT TO
DETERMINE IF IT PROVIDES ADEQUATE INFORMATION. IF THE DISCLOSURE
STATEMENT IS APPROVED BY THE BANKRUPTCY COURT, THERE WILL BE A
SUBSEQUENT HEARING TO CONSIDER CONFIRMATION OF THE PLAN. ALL
CREDITORS AND EQUITY INTEREST HOLDERS WILL BE NOTIFIED OF THE
DATE OF SUCH CONFIRMATION HEARING.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED
BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE SECURITIES
AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY
OF THE STATEMENTS CONTAINED HEREIN.

i



# TABLE OF CONTENTS

EXHIBITS TO DISCLOSURE STATEMENT ........................................................................ IV

INTRODUCTION ..................................................................................................................1

I. PURPOSE AND SUMMARY OF THE PLAN .......................................................................1

II. SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND

INTERESTS UNDER THE PLAN...........................................................................................2

A. TREATMENT OF CLAIMS....................................................................................................2

III. GENERAL OVERVIEW AND BACKGROUND INFORMATION ....................................7

A. BACKGROUND AND GENERAL INFORMATION ......................................................................7

1. OVERVIEW AND BACKGROUND OF THE DEBTOR ...............................................................7

B. SIGNIFICANT POST-PETITION EVENTS.................................................................................9

1. CONTINUATION OF BUSINESS; STAY OF LITIGATION.........................................................11

2. COMPLIANCE WITH BANKRUPTCY CODE, BANKRUPTCY RULES, LOCAL COURT RULES, AND

U.S. TRUSTEE DEADLINES.................................................................................................11

IV. THE PLAN....................................................................................................................11

A. VALUATION OF THE DEBTOR'S ASSETS .............................................................................12

B. TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN ..................................................12

1. ADMINISTRATIVE CLAIMS................................................................................................12

2. PRIORITY TAX CLAIMS.....................................................................................................14

C. TREATMENT OF CLASSIFIED CLAIMS UNDER THE PLAN.......................................................14

D. MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN................................... 17

E. Objections to Claims/Administrative Claims/Interests...........................................20

F. OBJECTIONS TO CLAIMS/ADMINISTRATIVE CLAIMS/INTERESTS ............................................23

G. CLAIMS AGAINST OTHERS ..................................................................................................24

H. EXECUTION OF DOCUMENTS AND PARTNERSHIP ACTION ...................................................25

V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...............25

VI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ........................................26

VII. LIQUIDATION ANALYSIS UNDER CHAPTER 7 ........................................................27

VIII. CONFIRMATION PROCEDURE..................................................................................33

A. VOTING AND OTHER PROCEDURES .....................................................................................33

B. DISCLAIMERS AND ENDORSEMENTS ...................................................................................36

C. THE CONFIRMATION HEARING ...........................................................................................36

D. CONFIRMATION ..................................................................................................................37

E. UNFAIR DISCRIMINATION AND FAIR AND EQUITABLE TESTS ..............................................37

F. FEASIBILITY .......................................................................................................................40

G. BEST INTEREST TEST .........................................................................................................40

H. CERTAIN RISK FACTORS TO BE CONSIDERED .....................................................................41

I. CERTAIN BANKRUPTCY CONSIDERATIONS ...........................................................................41

IX. CONCLUSION AND RECOMMENDATION ..................................................................42

## EXHIBITS TO DISCLOSURE STATEMENT

EXHIBIT D-1      CHAPTER 11 AMENDED PLAN OF REORGANIZATION

EXHIBIT D-2      SUMMARY OF QUALIFICATIONS OF DON RICHARDSON, CEO

EXHIBIT D-3      SUMMARY OF QUALIFICATIONS OF DEVON LONDON, GM

EXHIBIT D-4      SEPTEMBER, 2013 FINANCIAL OPERATING STATEMENT OF THE

                 DEBTOR

EXHIBIT D-5      INCOME STATEMENT

EXHIBIT D-6      BALANCE SHEET AS OF SEPTEMBER, 2013

EXHIBIT D-7      FINANCIAL PROJECTIONS

EXHIBIT D-8      DEBTOR'S ASSETS

EXHIBIT D-9      CREDITOR LIST

EXHIBIT D-10     LIQUIDATION ANALYSIS

## INTRODUCTION

Red Barn Motors, Inc. referred to as the "Debtor", or on and after the Effective Date of the Plan, the "Reorganized Debtor", has filed its Debtor's Amended Plan of Reorganization dated December 10, 2013 (the "Plan"). The Plan is attached to this Disclosure Statement as Exhibit D-1. The Debtor submit this Disclosure Statement ("Disclosure Statement"), pursuant to Section 1125 of Title 11 of the United States Code (the "Bankruptcy Code"), to holders of Claims against the Debtor, in connection with (i) the solicitation of acceptances or rejections of the Plan (together with any modification, amendment or supplement, of the Plan), and (ii) the hearings to consider approval of the Plan to be scheduled before the United States Bankruptcy Court for the Middle District of Louisiana (the "Bankruptcy Court") on the date(s) set forth in the accompanying notice.

In the event of a conflict or difference between the definitions used, and provisions contained, in this Disclosure Statement and the Plan, the definitions and provisions contained in the Uniform Glossary of Defined Terms for Plan, Disclosure Statement and Plan Documents shall control.

## I. PURPOSE AND SUMMARY OF THE PLAN

THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY. HOLDERS OF CLAIMS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW AND ANALYZE THE PLAN IN ITS ENTIRETY.

The primary purpose of the Plan is to reorganize the debts of the Debtor and pay all Allowed Claims in full.

## II. SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

### A. TREATMENT OF CLAIMS AND INTERESTS

### CREDITOR CLASSES

- Secured Creditors:

    o Whitney Bank for its secured claim

    o Fair-Hugh for the loan on the lot adjoining the Business Office on the south side

    o Republic Finance Company which has a judgment lien on the Debtor's one acre lot in Walker, La.

- Unsecured Creditors with a Priority Claim

    o The Internal Revenue Service

    o Livingston Parish

- Unsecured Creditors

    o All trade creditors,, floor plan creditors, and other unsecured creditors some of which have residual balances after return of their collateral on their loans

### THE ESSENCE OF THE PLAN

- Red Barn operations will be covered by net cash flow from the sales operation

    o Cash collections from sales less cost of vehicles plus reconditioning = net cash flow

        ▪ Cash collections will be:

            • cash collected on retail sales

            • cash down payments on Buy Here Pay Here sales

- o Average monthly operations expenses for the months of July, August and September are $22,113.00. This includes all operational expenses including payroll, payroll taxes and commissions.

- Collections on the Red Barn Auto Finance receivables will fund:
  - o Monthly payments on secured creditor mortgages
    - ▪ Whitney secured claim
    - ▪ Adjoining lot south of Red Barn Business Office
  - o <u>Note:</u> Those mortgages are currently up to date and will be maintained so until the plan is approved. The owner of Red Barn also owns a notary business, Denham Springs Notary, LLC, which has made the intervening payments on these mortgages since the filing of the Chapter 11. After all Chapter 11 plan payments have been made, the payments made by the notary business can be reimbursed. Denham Springs Notary, LLD is owed roughly $68,000.00 by the Debtor for loans to date. No other affiliates of the Debtor are owed money by the Debtor, and no affiliates owe the Debtor any funds. No claim is being made or will be made for reimbursement to Denham Springs Notary, LLC until all plan payments have been made.
  - o The judgment lien on the one acre lot has no monthly payments. The plan is to sell the lot, pay off the lien, sales cost and commissions and put the rest of the sale proceeds aside as part of creditor payments.
  - o Pay off the Unsecured Priority claims as part of the first disbursement with the balance as part of the second disbursement to unsecured payments.

    o Pay Unsecured claims on a pro-rata basis with payments being made quarterly beginning at the end of the third full month following the approval of the plan.

        ■ Small claims ($5,000.00 or less) will be approached with a discounted full payment plan. If the creditor is willing to accept a partial payment in a lump sum instead of two payments, these payments will be made up front in the unsecured payments process.

    o In the event a creditor's claim is disputed, payments will not be made to that creditor, but the payment that would have been made will be put in escrow in the event the creditor prevails in the judicial proceeding. Once the verdict is rendered in the proceeding, if the creditor prevails, the escrowed funds will be released to the creditor in accordance with the allowed claim; if the debtor prevails, the funds in escrow will be released to other creditors on a Pro Rata basis on the next scheduled disbursement following the release of the funds.

## PUTTING NUMBERS TO THE PLAN

Operational Expenses. These expenses have averaged $22,113.00 for the months of July, August and September.

- Net Cash Flow from Sales Operations.
  - o Pays current months operational expenses. Average = $22,113.00.
  - o Excess Net Cash Flow will go into the Operational Reserve until that account is (2) two months operational expenses.
  - o Excess Net Cash Flow beyond the needs of the Operational Reserve will go into the creditor's disbursement funds pool.

- Cash collections from Red Barn Auto Finance receivables has averaged $25,000.00 over the months of July, August and September. The collections will be disbursed as follows:

    o  Payment of the Red Barn Business Office mortgage monthly payment: $994.00

    o  Payment of the Adjoining lot on the south side of the Office: $1,632.00

    o  Payment of $2,000.00 per month into the Operational Reserve until it reaches two (2) months of operational expenses or approximately $45,000.00. Thereafter, no contributions will be made into the Operational Reserve fund unless it falls under $45,000.00.

    o  Payment of $5,000.00 per month into Red Barn vehicle inventory for one (1) year or until that inventory reaches a maximum of $125,000.00 (80 vehicles). Thereafter no further inventory contributions will be made.

    o  The balance of the collections will be put into the Creditor's Disbursement Fund.

## In Summary

To summarize the above projections in bullet point form:

    o  Whitney secured payment………..……..….. $   994.00

    o  Fair Hugh payment………….…….….…….. $ 1,362.00

    o  Payment into Operational Reserve………….. $ 2,000.00

    o  Payment into the Inventory…………………. $  5,000.00

    o  Balance into Creditors Disbursement……….. $15,644.00

    o  …………………………..Total…………………$25,000.00

    o  Quarterly Creditor Distribution:…$15,644.00 x 3 =……. $46,932.00

    o  Total Creditor claims……………………………………… $352,023.00

    o  Payment at $46,932.00 per quarter = 7.5 quarters or 1 year 10 months.

Page 5 of 43

Assuming that performance collectively was 50% of projected performance, the creditors could be paid in full in 15 quarters or 3 years, 9 months.

The above plan would provide full payment of all creditor claims at current claim balance in just short of two (2) years if performed as projected or in less than four (4) years if performance was as low as 50% of projected performance (or a quarterly payment of $23,466.00). The plan is sufficiently flexible that should sales or collections vary in a month or months, it is still viable. The plan is designed to pay creditors in full in a reasonable time.

## A WORD ABOUT INVENTORY

Inventory is critical to used vehicle sales. Red Barn sales have been running about 50% of inventory the last couple of months. This results in inventory turns of six (6) per year. This ratio holds as inventory increases. If inventory was double what it is now, sales would double what they are now. As sales are managed to produce the cash flow, increased sales means increased cash flow. This translates into more net cash flow excess to pay creditors and is part of the reason for increasing inventory. The other part of the reason is the viability of the business. Sales of fifty (50) cars per month allows a small independent used car dealership to stabilize and remain profitable. Lessons learned in this struggle will contribute to much more careful management and close scrutiny of operational results and trends. It is believed that Red Barn working out of the Chapter 11 will make it a much stronger business with a strong future.

Except as to any amount described as an "Allowed Amount," the Claims and Claim amounts listed above are amounts estimated by the Debtor, as of the filing of this Disclosure Statement, and all such Claims are still being reviewed by the Debtor. Generally, a listing of Claims or any amounts with respect thereto above or elsewhere in this Disclosure Statement shall not constitute, or be deemed to constitute, allowance of such Claims and all such Claims and

amounts are subject, and will remain subject, to challenge and objection by the Debtor and the Reorganized Debtor prior to voting on the Plan and at any time thereafter as provided in the Plan. However, if any such Claim is listed or described as an "Allowed Amount" that Claim will not be contested by the Debtor as to said Allowed Amount.

## III. GENERAL OVERVIEW AND BACKGROUND INFORMATION

### A. BACKGROUND AND GENERAL INFORMATION

#### 1. OVERVIEW AND BACKGROUND OF THE DEBTOR

Red Barn Motors, Inc., ("Red Barn") began business April 2010 with six (6) vehicles in inventory. There was modest growth in 2010. In years 2011 and 2012, Red Barn experienced rapid growth. The dealership's targeted market demographic was the lower end of the used car market with many of the customers having damaged credit. Relationships created with lenders coupled with the reputation of the Red Barn going beyond the sale to make customers happy contributed to that growth.

Red Barn established relationships with two floor plan companies. The tax season was approaching and Red Barn geared up for the rush. The vehicle inventory exceeded two-hundred (200) units expecting a major sales surge during tax season. Unfortunately, tax season never happened. The last minute, December 31, 2012, changes to the tax code and the IRS mandated delays in filings pushed the tax season back. Refunds were also delayed. The tax season never happened. Red Barn had borrowed heavily against the floor plans and had staffed up preparing for a tax season which wasn't. The high cost of borrowing coupled with the increased cost of extra staff coupled with reduced sales put an unusually heavy drain on the thin cash flow.

Red Barn was heavily dependent on a single lender which financed many of the second chance borrowers for the cars that were sold. In late February, this lender, for internal reasons, stopped making second chance loans. Red Barn was advised of this retrospectively. Dozens of customers who had purchased vehicles could not be financed. This cut off a major source of cash inflow and was particularly damaging in this time of increased demands on cash flow. This was seriously exacerbated by a well recommended Finance Manager completely failing to perform. When it was discovered that he had not secured any financing for any sales, he was fired but the damage had been done.

Because of the rapid growth, Red Barn struggled with establishing infrastructure and staffing key positions with experienced people. Many of these people needed training in key elements of their responsibilities and supervisory techniques. This training was attempted but failed to properly train these key individuals resulting in breakdowns of critical work flow. Key supervisors were overwhelmed with the work and training that needed to be done. A highly recommended, experienced Business Manager critically failed to put in place an effective business office team or establish an effective accounting program. Even with the overstaffed condition, critical work output was sporadic in getting done to the detriment of the company.

Expenses during this time were extraordinary resulting from the gearing up for the tax season. This included extra staffing, extra supplies, extra inventory and other costs in leases and equipment to handle the expected rush of sales. The average monthly number of sales in 2012 was near seventy (70) per month. Early in 2013, sales approached one hundred (100) per month with the expectation of sales exceeding one-hundred fifty (150) per month during the typical tax season which lasted from mid-February through April or the first of May. The sales dropped off instead of increasing. The expenses didn't.

Compounding the above problems were the health issues of top management. The owner and general manager of Red Barn had serious cardiac health issues during early 2013. These issues impaired the ability of these individuals of effectively supervising operations aggravating an already bad situation.

The end result was a temporary closing of Red Barn in mid-March. Massive layoffs and returns of inventory to the floor plan companies left Red Barn with little inventory and lots of debt. Efforts were made to perform an out-of-court workout using the substantial receivables created by a Buy-Here-Pay-Here ("BHPH") self-financing program at Red Barn. All creditors were willing to go along with this except one of the floor plan companies. When it was clear that this creditor was not going to work with Red Barn, the Chapter 11 case was filed.

The Debtor is owned and managed by Donald Richardson. Summaries of the qualifications of Mr. Richardson and, his son-in-law, Devon London, are found on Exhibit D-2 and Exhibit D-3 respectively.

## B. SIGNIFICANT POST-PETITION EVENTS

On May 25, 2013 (the "Petition Date"), Debtor filed for relief under Chapter 11 of the Bankruptcy Code. The Debtor continues to operate its businesses and manage its financial affairs as a Debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Attached to this Disclosure Statement as Exhibit D-4 is the monthly financial statement of the Debtor for the month of September, 2013. This statement does not in itself demonstrate that the Debtor is generating sufficient cash flow to fund the proposed payments under the Plan. However, because this Debtor has purchased significant inventory during the pendency of the case, future cash flow will increase.

In addition to the continuation of used car sales and the collection of BHPH receivables by the Debtor, the primary events which have occurred post-petition are:

1) the sale by the Debtor of property located in Denham Springs which was not necessary to the Debtor's business operations. The sale was made pursuant to motion and order of the Bankruptcy Court and resulted in full payment to the secured creditor, First Guaranty Bank.

2) the sale of several used motor vehicles securing debt owed to Automotive Finance Corporation ("AFC") with net proceeds of $23,500.00 being paid to AFC pursuant to motion and order of the Bankruptcy Court.

3) the investigation into causes of action against NextGear Capital f/k/a DSC ("NextGear") and Louisiana First Choice Auto Auction ("First Choice"). The Debtor plans to apply to the Bankruptcy Court for authority to retain the services of Cassie Felder and Associates to represent the Debtor in litigation against NextGear and First Choice.

An income statement for the period of May 1, 2012 through April 25, 2013, is also included as Exhibit 5. The information for the income January 1, 2013 through April 25, 2013, is developed from bank records and sales records that have been re-entered into the current inventory system and are used as basis of sales for this income period. A Balance Sheet as of September 30, 2013, is included in this Disclosure Statement as Exhibit 6.

Red Barn had contracted with a company to establish a new accounting and inventory system as of January 1, 2013. The previous system and the new system were totally separate and distinct. There was no "communication" between them. This new system was just getting up and running when the business collapsed. The system was too expensive to keep, and all records were stored at the accounting vendor's location and not at Red Barn. Those records are inaccessible at this time and have been inaccessible from the collapse.

**1. CONTINUATION OF BUSINESS; STAY OF LITIGATION.**

Following the Petition Date, the Debtor has continued to operate as Debtor-in-possession with the protection of the Bankruptcy Court. The Bankruptcy Court has certain supervisory powers over the Debtor's operations during the pendency of the Chapter 11 case, including the power to approve any transactions that are outside the ordinary course of the Debtor' business. An immediate effect of the filing of a bankruptcy case is the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all litigation against the Debtor. This injunction will remain in effect until the Effective Date unless modified or lifted by order of the Bankruptcy Court.

The financial outlook for the Debtor is very bright, as the primary methods of funding the plan payments are 1) the operation of the used vehicle business and 2) the collection of Buy Here Pay Here ("BHPH") receivables. The Debtor reasonably believes cash flow will be sufficient to allow payment of all allowed claims through this Plan.

**2. COMPLIANCE WITH BANKRUPTCY CODE, BANKRUPTCY RULES, LOCAL COURT RULES, AND U.S. TRUSTEE DEADLINES.**

The Debtor timely filed its Statement of Financial Affairs, Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Lists of Equity Security Holders. Pursuant to Section 341 of the Bankruptcy Code, a meeting of creditors for the Debtor was held on May 31, 2013. The Debtor has also timely filed all monthly financial reports required by the Office of the U.S. Trustee to date.

## IV. THE PLAN

The Debtor has proposed the Plan in good faith and believes that the classification and treatment of Claims and Membership Interests provided for in the Plan are consistent with the

Page 11 of 43

requirements of the Bankruptcy Code. Under the Bankruptcy Code, holders of Allowed Claims against the Debtor that are Impaired and that receive distributions under the Plan are entitled to vote on the Plan. A copy of the Plan accompanies this Disclosure Statement as Exhibit D-1. A summary of the classification and treatment of Claims and Interests under the Plan is set forth above in this Disclosure Statement.

The interest rates for the creditors set forth in the Plan are based upon the non-default rate of the Debtor's secured loans (or judgment) from Whitney Bank, Fair Hugh and Republic Finance Company.

## A. VALUATION OF THE DEBTOR'S ASSETS

The Debtor's primary assets are listed on Exhibit D-8.

## B. TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN

The Plan provides for the payment of Claims against the Debtor, including the treatment of unclassified Claims. The principal Administrative Claims known to the Debtor are the fees and expenses of the Debtor's attorneys, Steffes, Vingiello & McKenzie, LLC. As of September 30, 2013, those fees and expenses are approximately $27,000.00. Additional fees and expenses will continue to be incurred through the closing of the case. These additional fees are estimated at roughly $18,000.

### 1. ADMINISTRATIVE CLAIMS.

A. ADMINISTRATIVE EXPENSE CLAIMS. On the later of (i) the Effective Date or (ii) the date on which an Administrative Expense Claim becomes Allowed, the Reorganized Debtor shall either (a) pay to each Holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim, or (b) satisfy and discharge such Administrative Expense Claim in accordance with such other terms that the Reorganized Debtor

and such Holder shall have agreed upon in writing; *provided, however,* that such agreed-upon treatment shall not be more favorable than the treatment provided in subsection (a).

Administrative expense claims include all fees payable to the Office of the U.S. Trustee which will be paid in accordance with 28 U.S.C. §1930(a)(6). The Debtor shall pay all such fees on a timely basis and comply with all reporting requirements of the OUST.

**B. BAR DATE FOR FILING ADMINISTRATIVE EXPENSE CLAIMS.** Requests for payment of Administrative Expense Claims and hearing notices related thereto shall be Filed and properly served in accordance with the local rules of the Bankruptcy Court no later than thirty (30) days after the Effective Date. Such requests shall include, at a minimum, (a) the name of the Holder of the Administrative Expense Claim, (b) the amount of the Administrative Expense Claim and (c) the basis for the Administrative Expense Claim. Failure to file and serve such requests and related notice(s) timely and properly shall result in the Administrative Expense Claim being forever barred and discharged.

**C. PROFESSIONAL COMPENSATION CLAIMS.** All professionals or other entities requesting compensation or reimbursement of expenses under Sections 327, 328, 330, 331, 333, 503(b), 506 and 1103 of the Bankruptcy Code for services rendered before the Effective Date (including any compensation requested by any professional for any other entity for making a substantial contribution in the Reorganization Case) shall File and serve on the Reorganized Debtor an application for final allowance of compensation and reimbursement of expenses no later than thirty (30) days after the Effective Date.

**D. ORDINARY COURSE LIABILITIES.** Holders of Administrative Expense Claims based on unpaid and undisputed amounts due by the Debtor in Possession for goods and services provided to it after the Petition Date and before the Effective Date arising in the ordinary course

of the Debtor's business shall not be required to file any request for payment of such Claims but each shall be deemed to be an Allowed Administrative Expense Claim in the undisputed amount recognized by the Debtor in Possession. Such deemed Allowed Administrative Expense Claims shall be paid in the ordinary course of business by the Reorganized Debtor without any further action by the Holders of such Claims.

### 2. PRIORITY TAX CLAIMS.

Except to the extent that the Reorganized Debtor and a Holder of an Allowed Priority Tax Claim against the Debtor agree to a different treatment, each Holder of an Allowed Priority Tax Claim against the Debtor shall receive, at the sole option of the Reorganized Debtor, (a) on the Effective Date, Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim, or (b) commencing forty-five (45) days after the occurrence of the Effective Date and continuing over a period not exceeding five (5) years from and after the Order For Relief Date, equal quarterly Cash payments in an aggregate amount equal to the unpaid portion of such Allowed Priority Tax Claim, together with interest at the applicable rate under nonbankruptcy law, subject to the sole option of the Reorganized Debtor, as applicable, to prepay the entire amount of the unpaid portion of Allowed Priority Tax Claim and in a manner not less favorable than the most favored nonpriority unsecured Claim provided for by the Plan. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due. Any Priority Tax Claim secured by a lien shall retain such lien to secure its claim until paid in full.

### C. TREATMENT OF CLASSIFIED CLAIMS UNDER THE PLAN

#### 1. Treatment of Class 1 – Whitney Bank

*Impairment and Voting.* Class 1 consists of the secured claim of Whitney Bank and is not impaired by this Plan. The Holder of the Class 1 Claim is not entitled to vote to accept or reject this Plan. The Class 1 Claim is secured by the real estate constituting the residence of the owners of Red Barn Motors located at 8628 Shadow Springs Blvd., Denham Springs, Louisiana, 70726.

*Treatment.* Prior to the Effective Date, the monthly payments owed to Whitney Bank will have been paid by an affiliate of the Debtor. The Holder of the Class 1 Claim shall retain all of its existing liens, privileges and encumbrances in the Assets of the Debtor with the same validity, priority and extent that existed on the Petition Date to secure the timely repayment of the Class 1 Claim.

Beginning on the Effective Date, the Debtor shall timely pay all monthly mortgage payments, together with all taxes and insurance premiums pertaining to the collateral securing this Claim, in default of which the rights of Whitney Bank under its security documents shall obtain. All terms and conditions of the notes, guarantees and security agreements between the parties shall remain in full force and effect.

Additionally, Whitney Bank has an unsecured loan to the Debtor which will be paid in accordance with payments to other unsecured creditors based on its allowed claim. All terms and conditions of the note and guarantees affecting the unsecured loan shall remain in full force and effect.

Finally, to the extent the loans in favor of Whitney Bank are cross-collateralized, Whitney Bank shall retain all of its existing liens against any and all collateral securing those loans and nothing in this Disclosure Statement or the Plan shall affect those existing liens held by Whitney Bank against such collateral.

### 2. Treatment of Class 2 – Fair Hugh Secured Claim.

*Impairment and Voting.* Class 2 is not impaired by this Plan. The Holder of the Class 2 Claim is not entitled to vote to accept or reject this Plan. The Class 2 Claim is secured by the Debtor's lot adjoining its business office in Denham Springs, Louisiana.

*Treatment.* Prior to the Effective Date, the monthly payments owed to Fair Hugh will have been paid by an affiliate of the Debtor. The Holder of the Class 2 Claim shall retain all of its existing liens, privileges and encumbrances in the Assets of the Debtor with the same validity, priority and extent that existed on the Petition Date to secure the timely repayment of the Class 2 Claim.

Beginning on the Effective Date, the Debtor shall timely pay monthly mortgage payments, together with all taxes and insurance premiums pertaining to the collateral securing this Claim, in default of which the rights of Fair Hugh under its security documents shall obtain. Except as specifically modified hereby, all terms and conditions of the notes, guarantees and security agreements between the parties shall remain in full force and effect.

The Holder of the Class 2 Claim shall retain all of its existing liens, privileges and encumbrances in the Debtor's Assets with the same validity, priority and extent that existed on the Petition Date to secure the timely repayment of the Class 2 Claim.

### 3. Treatment of Class 3 – Republic Finance.

*Impairment and Voting.* Class 3 is impaired by this Plan. The Holder of the Class 3 Claim is entitled to vote to accept or reject this Plan. The Class 3 Claim is secured by the Debtor's one acre lot located in Walker, Louisiana.

***Treatment.*** On the Effective Date, all accrued unpaid interest calculated at the non-default contractual rate of 4.0% per annum plus any amounts Allowed by the Bankruptcy Court pursuant to 11 U.S.C. § 506(b) shall be capitalized and added to the outstanding principal balance of approximately $8,000.00 due under the Republic Finance judgment ("the New Principal Balance"). As permitted under 11 U.S.C. § 1123(a)(5)(H), the maturity of the New Principal Balance shall be extended to twenty-four (24) months from the Effective Date ("the New Maturity Date"). The Debtor shall then make an annual payment of interest only on the anniversary of the Effective Date on the New Principal Balance at the rate of 4.0% per annum from the Effective Date. The entire New Principal Balance shall be due on the second anniversary of the Effective Date or upon the sale of the collateral, whichever is sooner The Debtor shall have the right to prepay principal on the New Principal Balance at any time and to pay the entire New Principal Balance of the Class 3 Claim in full at any time prior to the New Maturity Date without penalty. The Holder of the Class 3 Claim shall retain all of its existing liens, privileges and encumbrances in the Debtor' Assets with the same validity, priority and extent that existed on the Petition Date to secure the timely repayment of the Class 3 Claim.

### Treatment of Class 4 – Convenience Class of Unsecured Claims.

***Impairment and Voting.*** Class 4 consists of the Holders of Unsecured Claims in amounts equal to or less than Five Thousand Dollars ($5,000.00) or those Holders of Unsecured Claims in amounts in excess of Five Thousand Dollars ($5,000.00) who elect to reduce their claim to Five Thousand Dollars ($5,000.00). Class 4 Claims are impaired by this Plan. Each Holder of Class 4 Claim is entitled to vote to accept or reject this Plan.

***Treatment.*** Each holder of a Class 4 Claim shall receive a cash payment from the Debtor on the Effective Date equal to fifty (50%) percent of its Allowed General Unsecured Claim. The

remaining balance of each Allowed General Unsecured Claim shall be paid six (6) months from the Effective Date.

### 5. Treatment of Class 5 – General Class of Unsecured Claims.

*Impairment and Voting.* Class 5 consists of the Holders of Unsecured Claims in amounts in excess of Five Thousand Dollars ($5,000.00) which do not elect to reduce their claim to Five Thousand Dollars ($5,000.00). Class 5 Claims are impaired by this Plan. Each Holder of Class 5 Claim is entitled to vote to accept or reject this Plan. Class 5 Claims are estimated to total roughly $316,000.00.

*Treatment.* The Debtor shall pay Holders of Allowed Class 5 Claims on a Pro Rata Basis with no interest on a quarterly basis beginning on April 15, 2014 or on the Effective Date whichever is later, and on the 15th day of the following months of July, October and January from the Creditor's Disbursement Fund as of the end of the previous quarter until such Allowed Claims are paid in full. For example, the second Plan payment shall be paid on July 15, 2014, from the Creditor's Disbursement Fund as of June 30, 2014. Based on the Debtor's projections, Allowed Class 5 Claims will be paid in full within two (2) years of the Effective Date.

### D. MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

#### 1. EFFECTIVE DATE.

The "Effective Date" of the Plan shall be the date specified by the Debtor in a notice filed with the Bankruptcy Court as the date on which the Plan shall take effect, and which occurs after the Confirmation Order becomes a Final Order.

#### 2. EFFECTIVE DATE CONDITIONS.

The Effective Date shall occur when both:

(1)     The Confirmation Order, in form and substance satisfactory to the Debtor shall have become a Final Order, and

(2)     The Debtor shall have sufficient cash on hand with which to make all payments required to be made on the Effective Date.

*Effect of Failure of Conditions.*  In the event that the conditions specified in Article 10.1 of the Plan have not been satisfied on or before thirty (30) days after the Confirmation Date, then without an order of the Bankruptcy Court: (a) this Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtor may assume and assign or reject all executory contracts and unexpired leases shall be extended for a period of sixty (60) days after such date.

### 3. MEANS TO IMPLEMENT THE PLAN.

The Reorganized Debtor shall act as Disbursing Agent under the Plan and make all distributions required under the Plan.  The Financial Projections of the Debtor are on Exhibit 7, attached hereto.  These Projections were prepared by Don Richardson based on his experience with the Debtor's business, his knowledge of the industry, and the Debtor's financial history and all in accordance with the business plan described herein

As shown on those projections, Red Barn operations will be covered by net cash flow from the used vehicle sales operation.   Cash collections from sales less cost of vehicles plus reconditioning = net cash flow.

- Cash collections will be:
  - cash collected on retail sales
  - cash down payments on Buy Here Pay Here sales

Average monthly operations expenses for the months of July, August and
September are $22,113.00. This includes all operational expenses including
payroll, payroll taxes and commissions.

Collections on the Red Barn Auto Finance receivables will fund:

Monthly payments on secured creditor mortgages

- Red Barn Business Office
- Adjoining lot south of Red Barn Business Office

Those mortgages are currently up to date. It is expected that they will be maintained on
an up to date basis until the plan is approved. The owner of Red Barn also owns a notary
business which has made the intervening payments on these mortgages since the filing of the
Chapter 11. After the all Plan payments have been made, the payments can be reimbursed to the
notary business. No claim is being made or will be made for restitution while Red Barn is in
Chapter 11.

The judgment lien in favor of Republic Finance on the one acre lot has no monthly
payments. The plan is to sell the lot, pay off the lien, sales cost and commissions and put the
rest of the sale proceeds aside as part of creditor payments.

The Debtor will pay off the Unsecured Priority Claims as part of the first disbursement
with any remaining balance as part of the second disbursement of unsecured payments. The
Debtor will pay Allowed Unsecured Claims on a pro-rata basis with payments being made
quarterly as stated above.

The Debtor's strategy for financial success includes the following:

During the past six (6) months, Red Barn operations have accumulated negligible cash.
The Debtor has analyzed this problem to determine the reason.

Collections in May will be discounted as Red Barn personnel were focused on stabilizing the operation. This included getting the final work done on returning vehicles to floor plan companies, getting numerous pending sales sorted out, which included registrations, repossessions and title work. Office files were a shambles as a result of a major move brought on from releasing office space back to the landlord because it was no longer needed. BHPH files had to be cleaned up following two months of neglect. Persons assigned to pursue collections and were sent to jail for theft or fired for non-performance. In the end, a lot of work had to be done to get things straightened out.

During the months of June, July, August, September, 2013 and continuing into October, there were three major focuses of operations: 1) support operations and pay the bills, 2) build a vehicle inventory which would support reasonable sales and 3) build the BHPH receivables inventory back to a level to generate the needed monthly collection income.

Initially, BHPH receivables were the only source of income as Red Barn was left with a vehicle inventory of only four (4) vehicles that could be sold following the illegal seizure of eleven (11) Red Barn vehicles by NextGear Capital. This inventory could not sustain operations. All monies in excess of funds needed for operations were put into increased vehicle inventory. Each sale included a cost of sales component which provided for restoration to inventory the vehicle sold. Profits were split between restoring BHPH receivables inventory (for BHPH sales) and adding vehicles to sales inventory.

During these few months, approximately $75,000.00 of receivables inventory was charged off following repossession of vehicles. At the same time BHPH sales were restoring the receivables inventory. From a low point of $ 343,842.00 in receivables in June, the September 30, 2013, inventory was $ 385,855.00 in receivables. This inventory is now in reasonable

condition. Those people who were in arrears on payments have brought accounts up to date or have arrangements to bring up to date or have had their vehicles repossessed.

During the same months, vehicular inventory went from the low of four (4) vehicles in early May to a total of forty (40) vehicles at the end of September, 2013. The value of the inventory went from $4,500.00 to $ 68,180.00 of owned inventory at the end of September. A simple review of data on the Receivables, Inventory & Sales Data sheet provides some indication of the relationship between receivables and collections as well as the relationship between inventory and sales.

The focus of sales will now begin to shift from receivables inventory building to receivables inventory maintenance. BHPH sales will be de-emphasized. The focus for sales will be directed more to cash sales and higher down payments on the limited number of BHPH sales in order to support an increasing vehicle inventory. The most profitable time for used car sales is "tax time", when tax refunds are being received. To take maximum advantage of the opportunity of tax time, inventory needs to be increased to the maximum that resources will allow.

During early 2014, sales will be supporting operations allowing receivables collections to support creditor repayment. With inventory at about eighty (80) vehicles, the plan for repayment of creditors will begin in earnest. The projections are expected to provide funds to meet the objectives of the repayment plan on all points with a full repayment of all creditors in a relatively short period of time.

### 4. MANAGEMENT AND STAFFING.

Staffing at the downsized Red Barn will be limited. In addition to the Owner, who will be a general overseer and will work sporadically as needed and for monthly reports, there will be a General Manager/Collector/Vehicle Purchaser; a Sales Manager/Appraiser/Sales

Closer/Marketer and an Administrative Assistant/Clerical Manager/Payables and Receivables Supervisor/Girl Friday.

The above individuals are:

- Owner: Don Richardson
    - Compensation: None
    - Benefits: Cell phone. Communication with Red Barn personnel is a daily event
    - Resume attached as Exhibit D-2
- General Manager: Devon London
    - Compensation: $1,000.00 a month
    - Benefits: Health insurance (family only), cell phone and $100.00 per month gas allowance
    - Resume attached as Exhibit D-3
        - Special note: Owner's son-in-law. His wife receives weekly compensation from another business the owner has.
- Administrative Assistant: Sharon Roach
    - Compensation: $14.00 per hour
    - Benefits: Health Insurance (employee only)

## E. OBJECTIONS TO CLAIMS/ADMINISTRATIVE CLAIMS/INTERESTS

### 1. OBJECTIONS TO CLAIMS OR INTERESTS; PROSECUTION OF DISPUTED CLAIMS OR DISPUTED INTERESTS.

The Debtor and the Reorganized Debtor have the responsibility and authority for administering, disputing, objecting to, compromising and settling or otherwise resolving and finalizing Distributions (if any) with respect to all Claims.

### 2. ESTIMATION OF DISPUTED CLAIMS.

The Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtor have previously objected to such Claim.

### 3. NO DISTRIBUTION ON ACCOUNT OF DISPUTED CLAIMS.

If a Claim or any portion of a Claim is disputed, no payment or Distribution shall be made on account of the disputed portion of such Claim (or the entire Claim, if the entire Claim is disputed), unless such Disputed Claim or portion thereof becomes an Allowed Claim.

## F. CLAIMS AGAINST OTHERS

The Debtor has filed suit against Next Gear Capital and Louisiana First Choice Auction as defendants. The suit was filed in the U.S. District Court for the Middle District of Louisiana, *Red Barn Motors, Inc., et al v. NextGear Capital, Inc., et al.* There are many facts believed by the Debtor to form the basis of complaint. These include:

- Financing vehicles without a lending license in the state of Louisiana
- Charging interest on cars before funding the purchase from the auction, sometimes by as much as six (6) weeks to two (2) months
- Seizing Red Barn Motors, Inc. inventory without judicial authorization
- Collusion between Next Gear and First Choice Auction including communications across state lines to illegally seize the Red Barn Motors' vehicles
- Predatory lending practices by Next Gear

The Debtor anticipates that this litigation will be very time consuming and will take several years to complete. Consequently, the Debtor believes that all creditors will be paid in full before any proceeds are derived from the litigation. However, if such is not the case, any and all proceeds from the litigation will be deposited into the Creditor's Disbursement Fund and paid to any remaining creditors on a quarterly, Pro Rata basis. There will not be any significant out of pocket costs to the Debtor or need to provide litigation costs as the litigation dealing with Next Gear is to be handled on a contingency basis.

No other litigation is anticipated. There are no other known preference or fraudulence conveyance actions to pursue by the Debtor other that those that be included as part of the litigation against Next Gear.

### G. EXECUTION OF DOCUMENTS

The Debtor are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures and other agreements or documents, and to take such actions as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of this Plan and the debt restructuring issued pursuant to this Plan.

## V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Debtor is a party to certain pre-petition executory contracts listed on Exhibit 1 of the Plan. The Debtor has designated on that Exhibit which of such executory contracts it hereby chooses to accept and assume. Except as otherwise provided herein or pursuant to the Confirmation Order, as of the Effective Date, if any pre-petition executory contracts between the Debtor and any Person, they shall be assumed pursuant to Section 365(a) of the Bankruptcy Code except for any executory contract or unexpired lease that has been assigned or rejected or

renegotiated and either assumed or rejected on renegotiated terms, pursuant to an order of the Bankruptcy Court entered prior to the Effective Date. Entry of the Confirmation Order shall constitute approval, pursuant to Section 365(a) of the Bankruptcy Code, of the assumption of executory contracts and unexpired leases provided in the Plan.

## VI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and certain U.S. holders of Claims and Interests. The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. No assurance can be given that legislative or administrative changes or court decisions may not be forthcoming which would require significant modification of the statements expressed in this section. Certain tax aspects of the Plan are uncertain due to the lack of applicable regulations and other tax precedent. The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt.

TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND ANY INTERESTS ARE HEREBY NOTIFIED THAT (a) ANY DISCUSSION OF TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE

OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE TAX CODE, AND (b) THIS DISCUSSION WAS WRITTEN IN CONNECTION WITH THE PROMOTION OF THE PLAN.

THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, ALL HOLDERS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

The plan treatment of the Debtor's assets generates a potential tax event for the Debtor. The tax event can be a gain or loss depending on the equity owner's basis in the property and the gain or loss can either be a capital gain or ordinary income depending on the individual's treatment of the investment in the Debtor.  Because the Debtor's Plan is a full pay plan that will not discharge or reduce any of its indebtedness, it does not appear that confirmation of the Plan will result in any adverse tax consequences to the Debtor.

## VII. LIQUIDATION ANALYSIS UNDER CHAPTER 7

Under the Bankruptcy Code, in order for a plan to be confirmed, each creditor must receive or retain under the Plan a recovery that has a value at least equal to the value of the distribution that such creditor would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

Pursuant to the Debtor' liquidation analysis, the Debtor believe that recoveries under a Chapter 7 liquidation scenario would be significantly lower than that proposed by the Plan for a variety of reasons.  First, the sale of the Debtor's primary assets under a compressed timeframe

and the distressed nature of a Chapter 7 liquidation will most likely result in a lower sale price than true fair market value of the property. Second, the conversion of the case to Chapter 7 liquidation would necessitate the payment of fees to the Chapter 7 Trustee, and attorneys, accountants and other professionals retained by the Chapter 7 Trustee, for disposition of the assets. These fees directly reduce any recovery otherwise available to creditors and/or the holders of Equity Interests. Accordingly, each holder of a Claim will receive or retain under the Plan a recovery that has a value at least equal to the value of the distribution that such creditor would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The essentials of this liquidation analysis include 1) what will be liquidated and for how much and 2) Who will get paid from liquidated funds and how much. This rationale will provide a brief overview of those two essentials.

**What will be liquidated?**

The assets of Red Barn have been summarized and valued in the Section titled "Assets: Description and Estimated Value" of this Disclosure Statement and will not be repeated here.

**Who will get paid and how much?**

The payments from the funds generated by the liquidation process will follow this order:

- Secured Creditors
    - o It is assumed that Red Barn's remaining secured creditors will be paid in full since the remaining secured creditors are all over-collateralized. Excess funds from paying secured creditors in full will be included in funds available for unsecured creditors.
- Unsecured Creditors with a Priority Claim

- o In Red Barn's case, this class includes only tax creditors. It is assumed they will be paid in full.

- Unsecured Creditors

  - o In Red Barn's case, this includes trade creditors and the floor plan companies for residual balances following recovery and liquidation of their collateral.

The above creditors are identified with estimated values of their claims on the Summarized Creditor List and attachments thereto included as Exhibit 9. The claims figures shown in the Summarized Creditor List are the amounts shown in the SOFA statement filed with the US Trustee of the Middle District of Louisiana previously in these proceedings. These figures may be adjusted as proofs of claim are filed and validated.

Payments to creditors are summarized in the Liquidation Analysis document included in this Disclosure Statement. After liquidation of assets, payment of estimated administrative expenses and payment of unsecured priority claims, the projection shows approximately $82,500.00 remaining to pay creditor claims estimated to be $315,784.00. This works out to be a payment of just over $0.26 on the dollar.

The bases for values of the liquidation process are listed below:

- Business building (offices): The current value is shown as $140,000.00 which is appraised/purchase price to Red Barn in spring of 2010 ($130,000.00) plus approximately 50% of interior improvements costs (approximately $20,000.00 to $25,000.00).

  - o Liquidation value is shown as $110,000.00 which is the estimated quick sale price as given by a local realtor. This is a rounded value of a 20% reduction for a quick sale of the property. The property is in a good location but is very small, consisting of a small building which sits on only 0.14 of an acre of ground.

- Adjoining Lot. This lot is on the South side of the offices and is the total vehicle display area for the business. It is a corner lot. Current value is carried at $115,000.00 which is an approximant value of the lot as a commercial property. The Debtor paid $111,000.00 for the property. The owner gave a slight discount off an offer from a pharmacy company which wanted to buy the lot. Red Barn had done a number of favors for this individual and family members (all unrelated to Red Barn owners and managers) and returned the favor since Red Barn was renting the lot and it was essential to its success.

  o Liquidation value is estimated to be $110,000.00. This is only a slight reduction from the estimated commercial value but is felt to be reasonable because of the size (approximately 100' by 200'), location (corner lot) and announced commercial developments in the area, although not in the immediate vicinity.

- 1 Acre lot in Walker. This is a non-business related lot owned by Red Barn. It is very rural. Roads there are gravel and flood when it rains hard. It is valued at $15,000 as that was the last offer that was not accepted when the lot was listed in 2011. When the existing lien was discovered, it was removed from the market.

  o A quick sale should result in $12,000.00 as that was an offer made within the first week the lot was on the market in 2011. It was a cash offer made by a neighbor who wanted to expand his land. That offer should still be good.

- Red Barn Auto Finance. Red Barn has a license to finance vehicles internally under the name of Red Barn Auto Finance, generically called Buy Here Pay Here or BHPH. This book of loans has built up over time to the point the current value, as of September 30, 2013 was $385,856.00. This is the payoff value carried on the books and is included Exhibit 10. Statement.

- o Liquidation value. The liquidation value is listed as $115,757.00. This is 30% of the book value of the loan inventory. When the collapse was imminent, the Debtor attempted to sell the BHPH loan inventory to provide working capital and pay down the debt. The Debtor received several offers that were between 25% and 35% of the total value of the book of loans. While it may bring more to a second chance lending company, the paperwork required in BHPH loans does not always meet lender standards and this decreases the potential for a higher value for the block. It is felt that 30% is a middle of the road figure for what was offered in a quick sale situation within the last year.

- Furniture Fixtures and Equipment. The current value of these assets is estimated to be $5,466.00. All of our items were purchased as pre-owned rather than as new. Items such as desks, chairs, computers, telephones are included in this group.

  - o Liquidation value was estimated to be $5,000.00. This is a little less than a 10% reduction for quick sale.

- Antique decorations. A number of items used to decorate Red Barn were in the antique class. Most of these were purchases made at less than retail. The collection of odds and ends is valued at $382.00. The objective of the decoration process was to make the place look like an old barn with odds and ends on shelves, attached to the walls and so forth.

  - o The liquidation value is estimated to be $400.00, slightly more than our cost valuation. Since the costs generally was somewhat less than retail, it is felt we could get at least $400.00 for the items sold piecemeal in the current market in the area. The liquidation process would include listing on eBay, Craig's List and local web swap-meet sites.

- Decorations. This includes a large number of items that are used to establish the country barn atmosphere in the building. Many of these pieces were purchased for just a few dollars. Current valuation is $1,064.00.

  o Liquidation value - $800.00. Given the number of pieces and discounts that would be sought by buyers for the "group" of an item, the value for liquidation was about 20% less than the current valuation.

- Vehicles held at First Choice Auction. There are eleven vehicles being held there by NextGear Capital with a cost value of $36,926.00.

  o Liquidation value - $0.00. Since they are not in the Debtor's possession.

- Red Barn vehicle inventory. Currently (9/30/2013) there are forty (40) vehicles in inventory with a cost value of $68,780.00.

  o Liquidation value - $54,024.00. The quick sale alternative is the auto auction. The Debtor uses Oak View (the other auctions are generally not receptive to Red Barn as the floor plan companies have black listed Red Barn at the auctions). This is a relatively small community (auto dealers) and everyone knows everyone else, at least by reputation. A sale of forty (40) vehicles at the auction would signal that Red Barn had to sell, sharks would circle and prices would go down. Its valuation is 20% less than its cost value.

A table summarizing these values, estimated liquidation costs and encumbrances, if any, is found on the Liquidation Values sheet included as Exhibit 10 in this Disclosure Statement. All Liquidation Values were provided by Don Richardson based on his experience with the Debtor's business, his knowledge of the industry, and the Debtor's financial history and all in accordance with the business plan described herein.

## VIII. CONFIRMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A. VOTING AND OTHER PROCEDURES

A Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Claims that are entitled to vote to accept or reject the Plan. Each holder of a Claim in Classes 3, 4, and 5 shall be entitled to vote to accept or reject the Plan. Pursuant to the provisions of the Bankruptcy Code, only holders of claims in classes that are impaired under the terms and provisions of a Chapter 11 plan and are to receive distributions there under are entitled to vote to accept or reject the plan. Classes of claims in which the holders of claims and interests will not receive or retain any property under a Chapter 11 plan are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan. Classes of claims in which the holders of claims are Unimpaired under a Chapter 11 plan, such as Class 1, are deemed to have accepted the plan and also are not entitled to vote to accept or reject the plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (i) Claims, as acceptance by creditors actually voting in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims; and (ii) Interests, as acceptance by interest holders in that class actually voting that hold at least two-thirds (2/3) in number of ownership shares of the common stock of a debtor.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or otherwise in accordance with the provisions of the Bankruptcy Code.

With respect to the Plan, any holder of a Claim in an Impaired Class (i) whose Claim has

Page 33 of 43

been listed by the Debtor in the Schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as disputed, contingent or unliquidated), or (ii) who filed a proof of claim on or before the applicable bar date (or, if not filed by such date, any proof of claim filed within any other applicable period of limitations or with leave of the Bankruptcy Court), which Claim has not been disallowed and is not the subject of an objection, is entitled to vote. Holders of Claims that are disputed, contingent and/or unliquidated are entitled to vote their Claims only to the extent that such Claims are Allowed for the purpose of voting pursuant to an order of the Bankruptcy Court. The Debtor may seek a determination that any Class of Claims that is entitled to vote to accept or reject the Debtor's Plan that does not vote to accept or reject the Debtor's Plan be deemed to accept the Plan, as applicable.

After carefully reviewing this Disclosure Statement, including any exhibits, each holder of an Allowed Claim or Equity Interest entitled to vote may vote whether to accept or reject the Debtor's Plan. A Ballot for voting on the Plan accompanies this Disclosure Statement. If you hold a Claim or Equity Interest in more than one Class and you are entitled to vote Claims in more than one Class, you may receive a Ballot or Ballots, which will permit you to vote in all appropriate Classes of Claims. Please vote and return your Ballot to Steffes, Vingiello & McKenzie, LLC as follows, whether by U.S. mail, or by hand delivery or courier service:

**Steffes, Vingiello & McKenzie, LLC**
**Attention: Arthur A. Vingiello**
**13702 Coursey Blvd., Building 3**
**Baton Rouge, Louisiana 70817**

ANY EXECUTED BALLOT THAT FAILS TO INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED. BALLOTS RETURNED TO STEFFES, VINGIELLO & McKENZIE, LLC BY FACSIMILE TRANSMISSION OR ANY OTHER ELECTRONIC MEANS WILL NOT BE COUNTED.

**THE VOTING DEADLINE IS 5:00 P.M., CENTRAL TIME ZONE, ON**
_____ __, 2013.

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN. ALL CREDITORS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

**Ballots must be _received_ by Steffes, Vingiello & McKenzie, LLC by the Voting Deadline.** If a Ballot is received after the Voting Deadline, it will not be counted. Complete the Ballot by providing all the information requested, and sign, date and return the Ballot by mail, overnight courier or personal delivery to Steffes, Vingiello & McKenzie, LLC at the address set forth above.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN THE TIME AND DATE SET FORTH IN THE ACCOMPANYING NOTICE. ANY OBJECTIONS TO THE CONFIRMATION OF THE PLAN MUST BE FILED IN ACCORDANCE WITH AND NO LATER THAN THE TIME AND DATE SET FORTH IN THE ACCOMPANYING NOTICE.

If you are entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please telephone the Arthur A. Vingiello at the following telephone number: **1-225-751-1751.**

## B. DISCLAIMERS AND ENDORSEMENTS

This Disclosure Statement contains information about the Debtor's Plan. Holders of Claims and Membership Interests are urged to study the text of the Plan carefully to determine the impact of the Plan on their Claims or Membership Interests and to consult with their financial, tax and legal advisors.

Nothing contained in this Disclosure Statement or the Plan will be deemed an admission or statement against interest that can be used against the Debtor in any pending or future litigation. Any reference to creditors or Claims or Membership Interests in this Disclosure Statement is not an admission with respect to the existence, ownership, validity, priority, or extent of any alleged Lien, Claim, Equity Interest or encumbrance.

Certain statements and assertions in this Disclosure Statement may be subject to dispute by parties in interest.

## C. THE CONFIRMATION HEARING

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing with respect to the Plan. The Confirmation Hearing in respect of the Plan has been scheduled for the date and time set forth in the accompanying notice before the Honorable **Douglas D. Dodd**, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Middle District of Louisiana, on _____ __, 2013. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice other than an announcement of the adjourned date made at the Confirmation Hearing or posted at the courthouse at the Confirmation Hearing or at an adjournment thereof. Any objection to confirmation (i) must be made in writing, (ii) must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or a description of the interest

in the Debtor held by the objector, and (iii) must be timely made. Any such objections must be filed with the Bankruptcy Court and served so that they are received by the Bankruptcy Court, and the following counsel, on or before the date and time set forth in the accompanying notice:

**Counsel to the Debtor:**

Steffes, Vingiello & McKenzie, LLC
Arthur A. Vingiello, #13098
13702 Coursey Blvd., Building 3
Baton Rouge, Louisiana 70817
Telephone: (225) 751-1751
Facsimile: (225) 751-1998

## D. CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if the requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that the plan is (i) accepted by all Impaired Classes of Claims or, if rejected by an Impaired Class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) feasible, and (iii) in the "best interests" of creditors that are Impaired under the Plan.

## E. UNFAIR DISCRIMINATION AND FAIR AND EQUITABLE TESTS

Under the Bankruptcy Code, a plan does not have to be accepted by every class of creditors or interest holders to be confirmed. If a class of claims or interests rejects a plan or is deemed to reject a plan, the plan proponent has the right to request confirmation of the plan pursuant to Section 1129(b) of the Bankruptcy Code the so-called "cramdown" provision of the Bankruptcy Code. Section 1129(b) permits the confirmation of a plan notwithstanding the non-acceptance of such plan by one or more impaired classes of claims and interests. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and

is "fair and equitable" with respect to each non-accepting class, and meets the other legal criteria for confirmation.

In the event that any Class of Claims or Interests fails to accept the Plan in accordance with Section 1129(a)(8) of the Bankruptcy Code, the Debtor (a) may request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code.

Accordingly, to obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Impaired, non-accepting Class.   The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable."   The Bankruptcy Code establishes "cram down" tests for Classes of Secured Claims, unsecured Claims and Interests that do not accept the plan, as follows:

### 1. Secured Creditors

Either (a) each Impaired secured creditor retains the Liens securing its Secured Claim and receives on account of its Secured Claim deferred cash payments (x) totaling at least the Allowed Amount of the Secured Claim and (y) having a present value at least equal to the value of the secured creditor's collateral, (b) each Impaired secured creditor realizes the "indubitable equivalent" of its Allowed Secured Claim, or (c) the property securing the Claim is sold free and clear of Liens with the secured creditor's Lien to attach to the proceeds of the sale and such Lien on proceeds is treated in accordance with clause (a) or (b) of this subparagraph.

### 2. Unsecured Creditors

Either (a) each Impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its Allowed Claim, or (b) the holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive any property under the plan, and

the "best interest" test is met so that each Impaired unsecured creditor recovers at least what that creditor would receive if the case was converted to a Chapter 7 case.

### 3. Holders of Interests

Either (a) each holder of Impaired Interests receives or retains under the plan property of a value equal to the greatest of the Allowed Amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (b) no holder of junior interests receives or retains any property, and the "best interest" test is met, so that each Impaired Membership Interest holder recovers at least what that Equity Interest holder would receive if the case was converted to a Chapter 7 case.

### 4. No Unfair Discrimination

In addition, the "cram down" standards of the Bankruptcy Code prohibit "unfair discrimination" with respect to the claims of any impaired, non-accepting class. While the "unfair discrimination" determination depends upon the particular facts of a case and the nature of the claims at issue, in general, courts have interpreted the standard to mean that the impaired, non-accepting class must receive treatment under a plan of reorganization which allocates value to such class in a manner that is consistent with the treatment given to other classes with claims against the debtor of equal or junior status.

All Classes of creditors will receive distributions under the Plan; thus, no Class of creditors is conclusively presumed to have rejected the Plan. The Debtor believes that the treatment of all Classes of Claims and Interests under the Plan satisfies the "no unfair discrimination" requirement for nonconsensual confirmation of the Plan under Section 1129(b) of the Bankruptcy Code. With respect to each such Impaired, non-accepting Class, there is no Class of equal priority receiving more favorable treatment under the Plan, and no Class that is

junior to such Impaired, non-accepting Class will receive or retain any property under the Plan on account of the Claims in such Class.

## F. FEASIBILITY

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless the liquidation of the debtor is provided for in the plan. It is not likely that the confirmation will be followed by liquidation or the need for further financial reorganization of the Debtor. Financial projections demonstrating the anticipated results of collection of BHPH receivables and the sales of the used motor vehicles of the Reorganized Debtor are attached as Exhibit D-7.

## G. BEST INTEREST TEST

In order to confirm a plan of reorganization, the Bankruptcy Court must determine that the plan is in the best interests of all classes of creditors impaired under that plan. The "best interest" test requires that the Bankruptcy Court find that the plan provides to each member of each impaired class of claims (unless each such member has accepted the plan) a recovery which has a value at least equal to the value of the distribution that each creditor would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code.

All Classes of creditors will receive distributions under the Plan; thus, no Class of creditors is conclusively presumed to have rejected the Plan. The Debtor request confirmation of the Plan over the rejection of any Classes. In so doing, the Debtor seek to establish that the Plan complies with the best interest of creditors test with respect to any such Class or Classes, and satisfy all other legal criteria for confirmation.

As reflected in the discussion above, and as demonstrated in the Liquidation Analysis contained in this Disclosure Statement, the Debtor believe that the Plan provides to each holder

of a Claim and Interest holder a value at least equal to the value of the distribution that each

holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

## H. CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND

CONSIDER CAREFULLY THE INFORMATION SET FORTH IN THIS DISCLOSURE

STATEMENT, THE PLAN (AND ANY DOCUMENTS DELIVERED TOGETHER

HEREWITH AND/OR INCORPORATED BY REFERENCE), BEFORE VOTING TO

ACCEPT OR REJECT THE PLAN.    THESE RISK FACTORS SHOULD NOT BE

REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION

WITH THE PLAN AND THE IMPLEMENTATION OF THE PLAN.

The major risk factor is that the Debtor will be unable to achieve the projections set forth

in the Plan and make the payments required by the Plan.  This can occur in the event of an

unforeseen downturn in the used car market in Baton Rouge causing a reduction in projected

income.

## I. CERTAIN BANKRUPTCY CONSIDERATIONS

### 1. RISK OF LIQUIDATION OF THE DEBTOR'S ESTATE

If the Plan is not confirmed and consummated, there can be no assurance that the

Debtor's Chapter 11 Case will continue as Chapter 11 reorganization case rather than be

converted to liquidation, or that any alternative plan of reorganization would be on terms as

favorable or more favorable to holders of Claims as the terms of the Plan.  If a liquidation or

different reorganization were to occur, the distributions to certain holders of Allowed Claims

may be reduced, or possibly completely eliminated.  As previously noted, the Debtor believes

that in a liquidation case under Chapter 7, only the Priority Tax Claims and the secured claims

are likely to be paid in full. In addition, certain additional Claims may arise in a Chapter 7 liquidation and from the rejection of unexpired leases and other executory contracts in connection with any cessation of the Debtor's operations. As described above, this might negatively impact the amount of distributions under the Plan, if any, to holders of Allowed Claims or Allowed Equity Interests. As a result of these circumstances, the Debtor believes that the Plan provides a significantly higher return to holders of Claims in the Debtor, as compared to liquidation.

### 2. RISK OF NON-OCCURRENCE OF THE EFFECTIVE DATE

The occurrence of the Effective Date in the Plan is conditioned upon the happening of certain events. There can be no assurance that all of these events will occur or that those that do not occur will be waived. Accordingly, even if the Plan is confirmed, there can be no assurance that the Effective Date will occur.

### 3. UNCERTAINTY REGARDING OBJECTIONS TO CLAIMS

The Plan provides that certain objections to Claims can be filed with the Bankruptcy Court after the Effective Date. A creditor may not know that its Claim will be objected to until after the Effective Date.

### 4. PERFORMANCE OF OBLIGATIONS BY THE DEBTOR UNDER THE PLAN

Although the Debtor and the Reorganized Debtor believe that it can successfully perform all of its obligations under the Plan, there can be no assurance that the Reorganized Debtor will do so. This could result in a subsequent liquidation of the Debtor.

## IX. CONCLUSION AND RECOMMENDATION

The Debtor believes that confirmation and implementation of the Plan is preferable to any alternative. In addition, any other alternative would involve significant delay, litigation,

uncertainty, substantial additional administrative costs, and may result in the Debtor's liquidation. The Debtor urges holders of Impaired Claims to vote in favor of the Plan.

Dated: December 10, 2013

Respectfully submitted by:

**STEFFES, VINGIELLO & McKENZIE, LLC**
13702 Coursey Blvd., Building 3
Baton Rouge, Louisiana 70817
Telephone: (225) 751-1751
Facsimile: (225) 751-1998
E-mail: avingiello@steffeslaw.com

By: **s/ Arthur A. Vingiello**
    **ARTHUR A. VINGIELLO (#13098)**

*Attorneys for Debtor, Red Barn Motors, Inc.*