UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
(Indianapolis Division)

| | | |
|---|---|---|
| **RED BARN MOTORS, INC.,** | * | **DOCKET NO. 1:14-cv-01589-TWP-DKL** |
| **PLATINUM MOTORS, INC.,** | * | |
| **MATTINGLY AUTO SALES, INC.,** | * | **CLASS ACTION** |
| **YOUNG EXECUTIVE MANAGEMENT** | * | **Jury Trial Demanded** |
| **& CONSULTING SERVICES, INC.,** | * | |
| **Individually, and on behalf of other** | * | |
| **members of the general public** | * | |
| **similarly situated** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **COX ENTERPRISES, INC.,** | * | |
| **COX AUTOMOTIVE, INC.,** | * | |
| **NEXTGEAR CAPITAL, INC.,** | * | |
| **F/K/A DEALER SERVICES** | * | |
| **CORPORATION, successor by merger** | * | |
| **with Manheim Automotive Financial** | * | |
| **Services, Inc., and JOHN WICK** | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>VERIFIED AMENDED COMPLAINT</u>[1]

**NOW INTO COURT**, through undersigned counsel, come Plaintiffs, Red Barn Motors,

Inc. ("Red Barn"), Platinum Motors, Inc. ("Platinum Motors"), Mattingly Auto Sales, Inc.

("Mattingly Auto"), and Young Executive Management & Consulting Services, Inc. ("Executive

Auto Group") (collectively, the "Red Barn Plaintiffs"), each individually and on behalf of all other

similarly situated members of the public pursuant to Rule 23 of the Federal Rules of Civil

Procedure, who amend the original Complaint filed in this action pursuant to Rule 15 of the Federal

---

[1] Pursuant to L.R. 15-1, the substance of the entire original complaint is being reproduced herein; however, due to the nature of the claims, the new parties, and the new factual allegations being incorporated in this amended complaint, it was not possible to simply reproduce the original complaint and add new paragraphs.

Rules of Civil Procedure and the Order of the Court dated December 16, 2015 (Rec. Doc. No. 87), to aver the following in support of their Verified Amended Complaint:

## I. <u>INTRODUCTION</u>

1.      The Red Barn Plaintiffs, each individually and on behalf of all other similarly situated members of the public, allege that they have been injured by the Defendants' violations of federal and state law: to wit, the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1961, *et seq.*), breach of contract, constructive fraud, and tortious interference with business relationships.

2.      As explained and alleged in more detail below, Defendant NextGear Capital, Inc. ("NextGear"), f/k/a Dealer Services Corporation ("DSC"), successor by merger with Manheim Automotive Financial Services, Inc. ("Manheim"), devised a scheme and artifice to defraud the Red Barn Plaintiffs and others similarly situated, and to obtain money and property by means of false and fraudulent pretenses and representations by charging "interest" to the Red Barn Plaintiffs and others similarly situated, ***on money not lent from NextGear/DSC to the Red Barn Plaintiffs*** and others similarly situated.

3.      Defendant NextGear is a wholly-owned subsidiary of Defendant Cox Automotive, Inc. which claims to be "the world's leader in vehicle remarketing services and digital marketing and software solutions for automotive dealers and customers."[2]  In addition to NextGear, Cox Automotive, Inc. also owns/operates Manheim, Autotrader, Kelley Blue Book, and vAuto which "represent[s] the biggest automotive marketing and remarketing company in the world."[3]  Cox

---

[2] http://www.coxenterprises.com/about-cox/annual-review/cox-autmotive.aspx
[3] *Id.*

Automotive, Inc. claims to "partner with more than 40,000 dealers and touch over 65 percent of all car buyers in the U.S. with the most recognized brands in the industry."[4]

4.      Defendant Cox Automotive, Inc. is a wholly-owned subsidiary of Defendant Cox Enterprises, Inc. which claims "revenues of more than $17 billion and approximately 55,000 employees …"[5]  In addition to Cox Automotive, Inc., Cox Enterprises, Inc. also includes Cox Communications, Inc. and Cox Media Group, Inc.[6]

5.      In short, NextGear/DSC is an automotive financing company which provides line of credit financing to automotive sales dealers ("used car dealers") which purchase used automobiles from various auction companies throughout the United States.

6.      NextGear/DSC operates throughout the United States through approximately 183 "Account Executives" and 18 "Regional Directors.[7]  Upon information and belief, NextGear/DSC utilizes these individuals to execute and carryout the scheme and artifice to defraud its customers as alleged herein.

7.      Stuart LaBauve, NextGear/DSC's Account Executive for the region of central Louisiana, actively solicited Red Barn to utilize NextGear/DSC's line of credit.  He also hid this scheme from Red Barn, which furthered the scheme by concealing the continuous injury suffered by Red Barn.  Upon information and belief, the other Red Barn Plaintiffs were similarly solicited by NextGear/DSC's company representatives, who similarly concealed the operation of the scheme and the resultant injuries to the other Red Barn Plaintiffs and others similarly situated.

---

[4] https://www.coxautoinc.com/nextgear-capital/
[5] http://www.coxenterprises.com/about-cox.aspx
[6] *Id.*
[7] *See* http://www.nextgearcapital.com/contact-us/account-executives/

8.      NextGear/DSC utilized several auction houses in the scheme and artifice to defraud the Red Barn Plaintiffs and others similarly situated. These auction houses concealed NextGear/DSC's actions, allowing NextGear/DSC to complete the scheme to defraud.  In addition, after NextGear/DSC illegally defrauded the Red Barn Plaintiffs as detailed below, NextGear/DSC then intentionally tortiously interfered with valid business relationships held and maintained by the Red Barn Plaintiffs by "blacklisting" the Red Barn Plaintiffs with these auction houses, as a result of which these auction houses prohibited the Red Barn Plaintiffs from attending and participating in the routine sales of used cars, further economically damaging the Red Barn Plaintiffs.

9.      NextGear/DSC offers a revolving line of credit for used car dealers to purchase used cars at auction. The revolving line of credit is commonly referred to (and will hereafter be referred to) as a "Floorplan Agreement." NextGear/DSC charges fees and interest to used car dealers for the use of the line of credit to purchase automobiles at auction ***until*** such used car dealer ultimately sells to the public a particular automobile it purchased at auction or decides to pay off the line of credit itself.

10.      NextGear/DSC enters into written Floorplan Agreements with used car dealers throughout the United States, and claims to have 18,000 used car dealers engaged with it in these financing arrangements.[8]

11.      NextGear/DSC's President, Brian Geitner, claims to direct the "implementation of the organization's ***customer-centric*** business model."[9]  However, the actions described herein are

---

[8] *See* http://www.nextgearcapital.com/wp-content/.../welcomepacket.pdf.
[9] http://www.nextgearcapital.com/about/leadership/brian-geitner/ (emphasis added).

directly contradictory to such claims.  Instead, NextGear/DSC routinely defrauds its customers as alleged herein.

12.     Typically, Floorplan Agreements are used by used car dealers in conjunction with vehicle auctions in the following manner: a) a new car dealer receives a trade-in vehicle; b) the new car dealer then provides the trade-in vehicle to an auction company to present to numerous used car dealers at auction on a particular date; c) once a used car dealer's bid is accepted, the used car dealer takes possession of the vehicle; d) on the date of the auction, the used car dealer either pays the auction company directly or employs an automotive financing company (such as a NextGear/DSC) to pay the auction company on that day and provide financing by means of a Floorplan Agreement with the used car dealer for the purchase of the vehicle; e) the new car dealer delivers the title for the vehicle to the auction company; f) the auction company forwards the title to whomever paid it - either the used car dealer that paid the auction company directly, or the automotive financing company that provided financing by means of a Floorplan Agreement.  If the title is forwarded to the automotive financing company that provided financing by means of a Floorplan Agreement, the used car dealer pays the automotive financing company fees and interest on the money loaned while the used car dealer attempts to sell the vehicle to a new buyer. Once the used car dealer sells the car to a new buyer, the used car dealer pays off the automotive financing company in full.

13.     NextGear/DSC, however, does not pay the auction houses until NextGear/DSC receives the title to the vehicles purchased, even though NextGear/DSC charges interest and curtailment fees to the Red Barn Plaintiffs under the illusion that NextGear/DSC has already paid the auction house for the vehicles.

14.     Upon information and belief, it often can take up to eight weeks for NextGear/DSC to receive the titles to the vehicles purchased by the Red Barn Plaintiffs at auctions.  Only at the time that NextGear/DSC receives the titles does NextGear/DSC electronically transfer funds from its account to the auction company despite charging interest and curtailment fees for this extended period of time *without ever loaning the money* to the Red Barn Plaintiffs.  NextGear/DSC calculates and charges interest on these transactions from the date the Red Barn Plaintiffs and others similarly situated purchase the vehicles from the auction rather than charging interest and curtailment fees from the time it actually loans the Red Barn Plaintiffs money for the purchase of vehicles.

15.     In other words, NextGear/DSC does not pay the auction company for the vehicle until NextGear/DSC receives title to the vehicle, although NextGear/DSC charges interest to the Red Barn Plaintiffs and others similarly situated, beginning from the date of the auction, even though NextGear/DSC has not advanced any money on behalf of the Red Barn Plaintiffs and others similarly situated or lent any money as of the date of the auction.

16.     This time span within which NextGear/DSC charges interest to the used car dealers *before* NextGear/DSC pays the auction company for the vehicle (and, hence, provides the financing to the used car dealer) varies from transaction to transaction.  In many instances, the time period spans several weeks.  During that time period, NextGear/DSC *does not pay* any money to the auction company; however, *NextGear/DSC secretly collects money* from its own unsuspecting used car dealer customers under the guise of interest and curtailment fees on financing provided for the purchase of the vehicles.

17.    NextGear/DSC executed this scheme and artifice to defraud, in part, through the use of interstate wire communications (which traveled from one state to another) by electronically debiting the fraudulent interest payments from bank accounts held by the Red Barn Plaintiffs and others similarly situated.

18.    NextGear/DSC concealed (and continues to conceal) its fraudulent actions from its used car dealer customers in order to maintain and further its scheme and artifice to defraud. Further, NextGear/DSC engaged in a pattern of racketeering activity in operating a Racketeering Enterprise as more-fully detailed below.

19.    As set forth in paragraphs 1 through 18, *supra,* throughout NextGear/DSC's relationships with the Red Barn Plaintiffs, NextGear/DSC, by and through its Account Executives, such as Stuart LaBauve, Lourdes Givens, Mark Holley, and Sean Tabb, fraudulently omitted and concealed material facts from the Red Barn Plaintiffs, including but not limited to:

a)  The actual interest rates charged to the Red Barn Plaintiffs under the Floorplan Agreements;

b)  The fact that NextGear/DSC did not pay the auction houses for the vehicles purchased by the Red Barn Plaintiffs until NextGear/DSC received the title to the vehicles purchased;

c)  The fact that NextGear/DSC began charging interest and curtailment fees to the Red Barn Plaintiffs from the date of the auction despite the fact that no money had been lent or obligated under the Floorplan Agreements; and

d)  The fact that NextGear/DSC intended to interfere with the business relationships of the Red Barn Plaintiffs if the Red Barn Plaintiffs became adverse to NextGear/DSC, by

"blacklisting" the Red Barn Plaintiffs with the auction houses at which they routinely purchased used cars as part of their business, as a result of which these auction houses prohibited the Red Barn Plaintiffs from attending and participating in the routine sales of used cars, further economically damaging the Red Barn Plaintiffs and others similarly situated.

20.     On information and belief, throughout NextGear/DSC's relationships with the others similarly situated, NextGear/DSC, by and through its Account Executives, fraudulently omitted and concealed from others similarly situated numerous material facts, including but not limited to:

a)  The actual interest rates charged to the members of the class under the Floorplan Agreements;

b)  The fact that NextGear/DSC did not pay the auction houses for the vehicles purchased by the members of the class until NextGear/DSC received the title to the vehicles purchased;

c)  The fact that NextGear/DSC began charging interest and curtailment fees to the members of the class from the date of the auction despite the fact that no money had been lent or obligated under the Floorplan Agreements; and

d)  The fact that NextGear/DSC intended to interfere with the business relationships of the members of the class if they became adverse to NextGear/DSC, by "blacklisting" them with the auction houses at which they routinely purchased used cars as part of their business, as a result of which these auction houses prohibited the Red Barn Plaintiffs

from attending and participating in the routine sales of used cars, further economically damaging the Red Barn Plaintiffs and others similarly situated.

21.    On or about February 25, 2011, John Wick[10] ("Wick"), NextGear/DSC's General Counsel and Corporate Secretary, admitted to this fraudulent activity when confronted during sworn deposition testimony unrelated to this litigation.[11] NextGear/DSC touts Wick as the overseer of "all corporate, legislative and litigation matters.[12] In addition, Wick "leads the company's strategic and corporate development."[13]

22.    The Defendants' fraudulent actions and pattern of racketeering activity inflicted injuries on the Red Barn Plaintiffs and others similarly situated, throughout the United States.

## II. JURISDICTION

23.    Pursuant to Title 28, United States Code, Section 1331 and Title 18, United States Code, Section 1964(c), subject matter jurisdiction is present in this matter as it involves a federal question.

24.    This Court has supplemental jurisdiction pursuant to Title 28, United States Code, Section 1367(a) over the state law claims asserted by the Red Barn Plaintiffs and others similarly situated, because these state law claims arise out of the same set of operative facts and are so

---

[10] NextGear lists Wick as General Counsel and Chief Strategy Officer. *See* http://www.nextgearcapital.com/about/.
[11] Question (By Attorney): Okay. And when do you start charging the dealer on an individual loan?
Answer (By Wick):        The moment that it's floorplanned.
Question (By Attorney):   Okay. And is that – can that be prior to funding of the loan?
Answer (By Wick):        Of course.
                                    ***
Question (By Attorney):   But wouldn't it be true that DSC could enjoy the float or the access to those funds until it actually funds the loan?
Answer (By Wick):        Sure.
[12] http://www.nextgearcapital.com/about/leadership/john-wick/
[13] *Id.*

related to the RICO claims that they form part of the same case or controversy.

25.     This Court has personal jurisdiction over the Defendants because the Defendants conduct substantial business in this District, and some of the actions giving rise to the Amended Complaint took place in this District and because this jurisdiction, specifically Marion and Hamilton Counties, was provided by NextGear/DSC in the Floorplan Agreements it drafted.

### III. <u>VENUE</u>

26.     Venue is proper in this judicial district pursuant to Title 28, United States Code, Section 1391(b) because NextGear Capital, Inc., as successor-in-interest to Dealer Services Corporation, is a Delaware corporation with its principal place of business located at 1320 City Center Drive, Suite 100, Carmel, Indiana 46032 (Southern District of Indiana), and a substantial portion of the events giving rise to this claim occurred in this judicial district.

27.     Venue is also proper in this judicial district pursuant to Title 18, United States Code, Section 1965(a) because the Defendants conducted their affairs in this judicial district.

### IV. <u>PARTIES</u>

28.     Plaintiff Red Barn Motors, Inc. is a Louisiana corporation with its principal place of business located at 26007 La. Hwy. 16, Denham Springs, Louisiana 70726.

29.     Plaintiff Platinum Motors, Inc. is a Virginia Corporation with its principal place of business located at 5831 Jefferson Avenue, Newport News, Virginia 23605.

30.     Plaintiff Mattingly Auto Sales, Inc. is a Kentucky Corporation with its principal place of business located at 3826 South Highway 261, Hardinsburg, Kentucky 40183.

31.     Plaintiff Young Executive Management & Consulting Services, Inc. is a Missouri Corporation with its principal place of business located at 2329 Prospect Avenue, Kansas City,

Missouri 64127.

32.     Defendant Cox Enterprises, Inc. is a Delaware corporation with it principal place of business located at 6205 Peachtree Dunwoody Road, Atlanta, Georgia 30328.

33.     Defendant Cox Automotive, Inc. is a Delaware corporation with it principal place of business located at 6205 Peachtree Dunwoody Road, Atlanta, Georgia 30328.

34.     Defendant NextGear Capital, Inc., f/k/a Dealer Services Corporation, successor by merger with Manheim Automotive Financial Services, Inc., is a Delaware corporation with its principal place of business at 1320 City Center Drive, Suite 100, Carmel, Indiana 46032.

35.     Defendant John Wick, NextGear/DSC's General Counsel and Corporate Secretary, is an adult resident of the State of Indiana with a business address of 1320 City Center Drive, Suite 100, Carmel, Indiana 46032.

## V. FACTS

### A. Scheme to Defraud Red Barn Motors, Inc.

36.     Red Barn Motors, Inc. is a small, family-owned and operated used car dealership located in Denham Springs, Louisiana.

37.     In or about June or July 2011, at the Oak View Auto Auction in Baton Rouge, Louisiana, Stuart LaBauve, NextGear/DSC's Account Executive, solicited Red Barn, through Devon London, Red Barn's General Manager, to enter into a Floorplan Agreement, which, as described hereinabove, generally provides a revolving line of credit to used car dealers that allows for the purchase of used cars at auction that will, in turn, be placed on their lots for sale. By means of a Floorplan Agreement, when used car dealers buy vehicles at auction, the automotive financing company lends the money to pay the auction house for the purchase of the vehicle, and that loan

is generally paid back to the automotive financing company after the sale of the vehicle by the used car dealer.

38.     In or about June or July 2011, following the initial meeting between Mr. LaBauve and Mr. London, Mr. LaBauve visited Red Barn's place of business in Denham Springs, Louisiana, to solicit Red Barn, through its owner, Donald Richardson, to enter into a Floorplan Agreement with NextGear/DSC.

39.     On or about July 29, 2011, Red Barn and NextGear/DSC entered into a Demand Promissory Note and Security Agreement (the "Red Barn Note") in the principal sum of $200,000.00, together with interest payable and other charges as stated in the Red Barn Note (sometimes hereafter referred to as "line of credit"). *See* Demand Promissory Note and Security Agreement attached hereto as Exhibit "A."

40.     In turn, Red Barn sometimes utilized the Floorplan Agreement to purchase vehicles at auction in order to sell them at the Red Barn Motors used car lot in Denham Springs, Louisiana.

41.     During the time in which Red Barn utilized its Floorplan Agreement with NextGear/DSC, on or about November 2, 2012, Red Barn purchased a vehicle using the NextGear/DSC Floorplan Agreement, but ultimately, the auction house was unable to obtain title to the vehicle after 180 days even though Red Barn had already paid off its line of credit with NextGear/DSC for the purchase of these vehicle.

42.     In this particular instance, ***NextGear/DSC never paid*** the auction house for these vehicles and therefore voluntarily reimbursed Red Barn all of the interest and curtailment fees (periodic principal and interest payments made by Red Barn to NextGear/DSC) that it had been collecting over a span of 180 days on that vehicle because the title was never delivered.  This

voluntary reimbursement by NextGear/DSC of the amount collected from Red Barn during these 180 days is an admission and acknowledgement by NextGear/DSC that it was never proper to collect from Red Barn in the first place.

43.     In or about June 2012, Red Barn entered into a verbal agreement with multiple automobile auction houses which allowed Red Barn up to seven days to decide whether it wanted to use its line of credit with NextGear/DSC in order to pay for the vehicles purchased at the auctions, or whether it would pay for the vehicles using some other method, such as cash.

44.     Even when Red Barn delayed its decision to use the line of credit provided by NextGear/DSC to purchase vehicles from these auctions, ***NextGear/DSC backdated the withdrawal*** on the line of credit to the date on which Red Barn purchased a vehicle, and ***charged interest and curtailment fees from that backdated date***.

45.     Worse yet, in or about June 2012, Devon London, Red Barn's General Manager, discovered transactions in which Red Barn had not actually chosen to use the Floorplan Agreement, such that NextGear/DSC had ***never actually loaned money*** to Red Barn for the purchase of vehicles but ***NextGear/DSC had, in fact, charged interest*** to Red Barn as if NextGear/DSC had actually provided the financing for the vehicle situated.

46.     In all, Red Barn used NextGear/DSC's Floorplan Agreement on 524 transactions beginning on or about August 16, 2011, and continuing to on or about March 11, 2013, by means of which NextGear/DSC electronically debited approximately $80,000.00 in interest fees from Red Barn's account. As detailed above, much of the money NextGear/DSC electronically debited from Red Barn was procured by fraudulent representations and false pretenses because NextGear/DSC never lent the principal sum to Red Barn in the first place (*i.e.* actually funded the

loan for the purchase of the vehicle), or NextGear/DSC lent the money for a much shorter period of time than they falsely led Red Barn to believe. *See* the Red Barn/NextGear/DSC transaction history attached hereto as Exhibit "B."

47.     In or about March 2013, Red Barn began experiencing financial difficulties, which caused it to be unable to make payments on its Floorplan Agreement extended by NextGear/DSC. As a result, in or about April 2013, NextGear/DSC began seizing Red Barn's assets, including vehicles on the Red Barn lot.

48.     In or about April 2013, Red Barn employees delivered between 11 and 14 vehicles to Louisiana First Choice Auto Auction, L.L.C. ("First Choice"), with the intention of selling said vehicles, and using the proceeds from the sales to pay NextGear/DSC toward the debt Red Barn owed pursuant to its Floorplan Agreement.

49.     Red Barn was unable to sell the referenced vehicles because First Choice, without Red Barn's knowledge or consent, seized the vehicles and, on information and belief, has held the vehicles since the time of seizure.

50.     On or about April 25, 2013, Red Barn filed a voluntary petition for bankruptcy pursuant to Chapter 11 of the United States Code in the United States Bankruptcy Court for the Middle District of Louisiana.

51.     During the course of Red Barn's nearly two year lending relationship with NextGear/DSC, from in or about June 2011 through in or about March 2013, Red Barn representatives, primarily Mr. London, communicated regularly with Mr. LaBauve regarding Red Barn's Floorplan Agreement through in person, telephone, and email communications.

***B. Scheme to Defraud Platinum Motors, Inc.***

52.     Platinum Motors is a used car dealership located in Chesapeake, Virginia.

53.     In or about the spring of 2011, an Account Executive with NextGear/DSC approached Platinum Motors, through its owner, Nicol Zenia Perry, at the now-defunct American Auto Auction in Chesapeake, Virginia, to solicit Platinum Motors to enter into a Floorplan Agreement with NextGear/DSC.

54.     Subsequently, on or about May 23, 2011, Ms. Perry also met with a representative of NextGear/DSC at a Manheim Auto Auction in Virginia.

55.     On or about May 23, 2011, Platinum Motors and NextGear/DSC entered into a Demand Promissory Note and Security Agreement (the "Platinum Motors Note") in the principal sum of $35,000.00, together with interest payable and other charges as stated in the Platinum Motors Note (sometimes hereafter referred to as "line of credit").  *See* Demand Promissory Note and Security Agreement attached hereto as Exhibit "C."

56.     In turn, Platinum Motors utilized the Floorplan Agreement to purchase vehicles at auction in order to sell them at the Platinum Motors used car lot in Chesapeake, Virginia.

57.     NextGear/DSC did not pay the auction houses ***until*** NextGear/DSC received the title to the vehicles purchased even though NextGear/DSC charged Platinum Motors interest and curtailment fees under the illusion that NextGear/DSC had already paid the auction houses for the vehicles.

58.     NextGear/DSC calculated and charged interest on these transactions from the date Platinum Motors purchased the vehicles from the auction rather than charging interest and

15

curtailment fees from the time in which it actually loaned Platinum Motors money for the purchase of vehicles.

59.     NextGear/DSC executed this scheme and artifice to defraud, in part, through the use of interstate wire communications (which traveled from one state to another) by electronically debiting the fraudulent interest payments from bank accounts held by Platinum Motors and others similarly situated.

60.     In all, Platinum Motors used NextGear/DSC's Floorplan Agreement to finance approximately 1,000 vehicles beginning on or about May 23, 2011, and continuing to on or about June 21, 2012.  In each of these transactions, NextGear/DSC electronically debited interest and curtailment fees from Platinum Motors' account. As detailed above, much of the money NextGear/DSC electronically debited from Platinum Motors was procured by fraudulent representations and false pretenses because NextGear/DSC never lent the principal sum to Platinum Motors in the first place (*i.e.* actually funded the loan for the purchase of the vehicle), or NextGear/DSC lent the money for a much shorter period of time then it falsely led Platinum Motors to believe.

61.     During the course of Platinum Motors' more than one-year lending relationship with NextGear/DSC, from in or about May 2011 through in or about June 2012, Ms. Perry of Platinum Motors communicated regularly with NextGear/DSC representatives, including but not limited to Account Executive Sean Tabb, regarding Platinum Motors' Floorplan Agreement through in person, telephone, and email communications.

**C. Scheme to Defraud Mattingly Auto Sales, Inc.**

62.     Mattingly Auto is a used car dealership located in Hardinsburg, Kentucky.

63.     In or near Hardinsburg, Kentucky at a time prior to February 2009, NextGear/DSC Account Executive Lourdes Givens approached Mattingly Auto, through its owner, Barry Mattingly, to solicit Mattingly Auto to enter into a Floorplan Agreement with NextGear/DSC.

64.     On or about February 5, 2009, Mattingly Auto and NextGear/DSC entered into a Demand Promissory Note and Security Agreement (the "Mattingly Auto Note") in the principal sum of $100,000.00, together with interest payable and other charges all as stated in the Mattingly Auto Note (sometimes hereafter referred to as "line of credit"). *See* Demand Promissory Note and Security Agreement attached hereto as Exhibit "D."

65.     In turn, Mattingly Auto utilized the Floorplan Agreement to purchase vehicles at auction in order to sell them at the Mattingly Auto used car lot in Hardinsburg, Kentucky.

66.     NextGear/DSC did not pay the auction houses ***until*** NextGear/DSC received the title to the vehicles purchased even though NextGear/DSC charged Mattingly Auto interest and curtailment fees under the illusion that NextGear/DSC had already paid the auction house for the vehicles.

67.     NextGear/DSC calculated and charged interest on these transactions from the date Mattingly Auto purchased the vehicles from the auction rather than charging interest and curtailment fees from the time in which it actually loaned Mattingly Auto money for the purchase of vehicles.

68.     NextGear/DSC executed this scheme and artifice to defraud, in part, through the use of interstate wire communications (which travelled from one state to another) by electronically debiting the fraudulent interest payments from bank accounts held by Mattingly Auto and others similarly situated.

69.     In all, Mattingly Auto used NextGear/DSC's Floorplan Agreement on approximately 320 transactions beginning in or about February 2009, and continuing to on in or about May 2012, in which NextGear/DSC electronically debited interest and curtailment fees from Mattingly Auto's account. As detailed above, much of the money NextGear/DSC electronically debited from Mattingly Auto was procured by fraudulent representations and false pretenses because NextGear/DSC never lent the principal sum to Mattingly Auto in the first place (*i.e.* actually funded the loan for the purchase of the vehicle), or NextGear/DSC lent the money for a much shorter period of time than they falsely led Mattingly Auto to believe.

70.     During the course of Mattingly Auto's more than three-year lending relationship with NextGear/DSC, from in or about February 2009 and through in or about May 2012, Barry Mattingly of Mattingly Auto communicated regularly with NextGear/DSC representatives, including Ms. Givens and another Account Executive named Mark Holley, regarding Mattingly Auto's Floorplan Agreement through in person, telephone, and email communications.

### D. Scheme to Defraud Young Executive Management & Consulting Services, Inc. ("Executive Auto Group")

71.     Executive Auto Group is a used car dealership located in Kansas City, Missouri.

72.     In or about the summer or early fall of 2011, in or near Kansas City, Missouri area, an Account Executive with NextGear/DSC approached Executive Auto Group, through its owner, Ronald Jerome Reid, to solicit Executive Auto Group to enter into a Floorplan Agreement with NextGear/DSC. On or about September 14, 2011, Executive Auto Group and NextGear/DSC entered into a Demand Promissory Note and Security Agreement (the "Executive Auto Group Note") in the principal sum of $25,000.00, together with interest payable and other charges all as

stated in the Executive Auto Group Note (sometimes hereafter referred to as "line of credit"). *See* Demand Promissory Note and Security Agreement attached hereto as Exhibit "E."

73.     In turn, Executive Auto Group utilized the Floorplan Agreement to purchase vehicles at auction in order to sell them at the Executive Auto Group used car lot in Kansas City, Missouri.

74.     NextGear/DSC did not pay the auction houses *until* NextGear/DSC received the title to the vehicles purchased even though NextGear/DSC charged Executive Auto Group interest and curtailment fees under the illusion that NextGear/DSC had already paid the auction house for the vehicles.

75.     NextGear/DSC calculated and charged interest on these transactions from the date Executive Auto Group purchased the vehicles from the auction rather than charging interest and curtailment fees from the time in which it actually loaned Executive Auto Group money for the purchase of vehicles.

76.     NextGear/DSC executed this scheme and artifice to defraud, in part, through the use of interstate wire communications (which traveled from one state to another) by electronically debiting the fraudulent interest payments from bank accounts held by Executive Auto Group and others similarly situated.

77.     In all, Executive Auto Group used NextGear/DSC's Floorplan Agreement on approximately 7 transactions beginning in 2011, by means of which NextGear/DSC electronically debited interest and curtailment fees from Executive Auto Group's account. As detailed above, much of the money NextGear/DSC electronically debited from Executive Auto Group was procured by fraudulent representations and false pretenses because NextGear/DSC never lent the

principal sum to Executive Auto Group in the first place (*i.e.* actually funded the loan for the purchase of the vehicle), or NextGear/DSC lent the money for a much shorter period of time than they falsely led Executive Auto Group to believe.

78.     During the course of Executive Auto Group's lending relationship with NextGear/DSC, Executive Auto Group owner Mr. Reid communicated regularly with a NextGear/DSC Account Executive regarding Executive Auto Group's Floorplan Agreement through in person, telephone, and email communications.

## VI. CLASS ACTION ALLEGATIONS

79.     The Red Barn Plaintiffs bring this action on behalf of themselves and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

80.     The class which the Red Barn Plaintiffs seeks to represent (the "Class") is defined as follows (the following hereinafter sometimes referred to as the "Class definition"):

> All residents, individuals, and companies in the United States of America that contracted with NextGear/DSC as a customer dealer and that were charged interest (and fees) on money not lent, at any time, continuing through the date of the final disposition of this action.

81.     The Red Barn Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveals that the Class should be expanded or otherwise modified.

82.     The Red Barn Plaintiffs reserve the right to establish sub-classes as appropriate.

83.     This action is brought and properly maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2), or (b)(3), and satisfies the requirements thereof. As used herein, the term "Class Members" shall mean and refer to the members of the Class.

84.     <u>Community of Interest</u>: As detailed above, there is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

85.     <u>Numerosity</u>: While the exact number of members of the Class is unknown to the Red Barn Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon records maintained by the Defendants. At this time, the Red Barn Plaintiffs believe that the Class includes hundreds (and possibly thousands) of similarly-situated members. Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable as set forth in Rule 23(a)(1) of the Federal Rules of Civil Procedure, and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

86.     <u>Ascertainability</u>: Names and addresses of members of the Class are available from Defendants' own records. Notice can be provided to the members of the Class through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in similar matters.

87.     <u>Typicality</u>: The Red Barn Plaintiffs' claims are typical of the claims of other members of the Class which they seek to represent under Rule 23(a)(3) of the Federal Rules of Civil Procedure because each Plaintiff and each member of the Class has been subjected to the same deceptive and improper practices and has been damaged in a similar manner.

88.     <u>Adequacy</u>: The Red Barn Plaintiffs will fairly and adequately represent and protect the interests of the Class as Required by Rule 23(a)(4) of the Federal Rules of Civil Procedure. The Red Barn Plaintiffs are adequate representatives of the Class because they have no interests

which are adverse to the interests of the other members of the Class. The Red Barn Plaintiffs are committed to the vigorous prosecution of this action and, to that end, The Red Barn Plaintiffs have retained counsel who are competent and experienced in handling complex litigation, including class action litigation, on behalf of similar plaintiffs.

89.     <u>Superiority</u>: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Rule 23(b)(3) of the Federal Rules of Civil Procedure because:

    a)  the expense and burden of individual litigation make it economically unfeasible for members of the Class to seek redress of their claims other than through the procedure of a class action;

    b)  if separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members to seek redress of their claims other than through the procedure of a class action; and

    c)  absent a class action, Defendants would likely retain the ill-gotten windfall from their fraudulent activities.

90.     Common questions of law and fact exist as to the members of the Class, as required by Rule 23(a)(2) of the Federal Rules of Civil Procedure, and predominate over any questions which affect individual members of the Class.

91.     The common questions of fact include, but are not limited to, the following:

    a)  whether Defendants charged interest to their customer used car dealers on money NextGear/DSC did not actually lend to the Plaintiffs;

    b)  whether Defendants were members of, or participants in, the conspiracy alleged herein;

c)   whether Defendants engaged in a pattern of racketeering activity as alleged herein;

d)   whether Defendants committed wire and mail fraud through their scheme and artifice to defraud the Red Barn Plaintiffs and other members of the Class;

e)   whether Defendants committed wire and mail fraud through their efforts to obtain money and property by means of false and fraudulent pretenses and representations to the Red Barn Plaintiffs and other members of the Class;

f)   whether Defendants committed wire fraud in their use of interstate wire communications in their scheme and artifice to defraud the Red Barn Plaintiffs and other members of the Class;

g)   whether Defendants committed mail fraud by using the United States Postal Service or private or commercial interstate mail carriers to execute the scheme and artifice to defraud;

h)   whether Defendants concealed their fraudulent actions from the Red Barn Plaintiffs and other members of the Class;

i)   whether the Red Barn Plaintiffs and other members of the Class sustained damages, and if so, the appropriate measure of damages; and

j)   whether the Red Barn Plaintiffs and other members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

92.    In the alternative, this action is certifiable under the provisions of Rule 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure because:

a)  the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants;

b)  the prosecution of separate actions by individual members of the Class would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other members of the Class not the parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c)  Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole, necessitating that any such relief be extended to members of the Class on a mandatory, class-wide basis.

93.     The Red Barn Plaintiffs are unaware of any difficulty which will be encountered in the management of this litigation precluding its maintenance as a class action.

## VII. <u>COUNT 1</u>
### *Substantive RICO Violation* **(18 U.S.C. § 1962(c))**

94.     The Red Barn Plaintiffs re-allege and incorporate by reference each and every allegation of the preceding paragraphs in this verified amended complaint with the same force and effect as though fully set forth herein.

### A. The "NextGear/DSC Enterprise"

95.     The Defendants are each persons within the meaning of Title 18, United States Code, Section 1961(3). At all relevant times, in violation of Title 18, United States Code, Section 1962(c), the Defendants conducted the affairs of an association-in-fact enterprise as that term is

defined in Title 18, United States Code, Section 1961(4). The affairs of this enterprise affected interstate commerce through a pattern of racketeering activity.

96.     The NextGear/DSC Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of maximizing profits by fraudulently charging and debiting money from accounts held by its customer used car dealers on money not lent by NextGear/DSC. Further, the members of the NextGear/DSC Enterprise concealed their fraudulent activity from the Red Barn Plaintiffs and other members of the Class.

97.     While the Defendants participate in and are part of the NextGear/DSC Enterprise, the Defendants also exist separately and distinctly from the enterprise.

98.     The NextGear/DSC Enterprise maintains a structure, in that the executive management of NextGear/DSC (including John Wick, as detailed above) knowingly established a uniform approach to secretly charge customers interest and curtailment fees which NextGear/DSC itself was unauthorized to obtain because NextGear/DSC had not provided any financing to the auction houses via Floorplan Agreements.  The NextGear/DSC Enterprise includes auction houses owned and operated by the Defendants as well as other auction houses associated with the Defendants where these auction houses concealed NextGear/DSC's actions allowing NextGear/DSC to conduct the pattern of racketeering activity.  The NextGear/DSC Enterprise executes and carries out individual, fraudulent transactions on a daily basis, which are solicited by lower-level employees, including Account Executives such as Stuart LaBauve and others throughout the United States. The NextGear/DSC Enterprise maintains this common and shared purpose of defrauding customers for the Enterprise's unlawful financial gain.  The NextGear/DSC Enterprise maintains the same basic structure and personnel and does not take another form from

the racketeering activity versus other activity.  In addition to the fraudulent activity detailed herein, NextGear/DSC and the NextGear/DSC Account Executives also conduct/facilitate legitimate automobile resales and related financing which further conceal their fraudulent activity as they continue to pose as legitimate industry participants.

99.     The NextGear/DSC Enterprise benefits the Defendants through the increase in revenues collected by the scheme and artifice to defraud.

**B. Predicate Acts**

100.     The Defendants' scheme and artifice to defraud the Red Barn Plaintiffs and other members of the Class, and to obtain money and property by means of false and fraudulent pretenses and representations by charging "interest" to the Plaintiffs and other members of the Class, ***on money not lent from NextGear/DSC to the Red Barn Plaintiffs and*** other members of the Class, constitutes "racketeering activity" within the meaning of Title 18, United States Code, Section 1961(1) as acts of mail and wire fraud pursuant to Title 18, United States Code, Sections 1341 and 1343.

101.     Defendants violated the wire fraud statute, Title 18, United States Code, Section 1343, when they devised a scheme and artifice to defraud the Red Barn Plaintiffs and other members of the Class, and executed and attempted to execute that scheme by using interstate wire communications.

102.     Defendants also violated the wire fraud statute, Title 18, United States Code, Section 1343, when they obtained money from the Red Barn Plaintiffs and other members of the Class, by means of false and fraudulent pretenses, representations, or promises and by using interstate wire communications.

103.    As detailed above, from in or about May 2011 continuing through at least March 2013, the Defendants used and caused multiple interstate wire communications which traveled from one state to another in order to defraud the Red Barn Plaintiffs and other members of the Class, on multiple occasions throughout this period.

104.    NextGear/DSC charged interest and curtailment fees on purchases made by the Red Barn Plaintiffs and others members of the Class without actually loaning money against Plaintiffs' line of credit.

105.    NextGear/DSC paid the auction houses from the Red Barn Plaintiffs' lines of credit *when NextGear/*DSC *received title* to the vehicles purchased by the Red Barn Plaintiffs at auction, instead of paying for the vehicles *at the time of the auction*.

106.    NextGear/DSC back-dated payments made from the Red Barn Plaintiffs' lines of credit to the dates on which the Red Barn Plaintiffs were successful in bidding on vehicles at auction. These actions caused interstate wire communications to occur.

107.    NextGear/DSC electronically debited payment for the interest and curtailment fees it charged to the Red Barn Plaintiffs without loaning money to the Red Barn Plaintiffs through electronic banking transactions. See e.g., the statement of payments made to NextGear/DSC in Exhibit "B." These actions caused interstate wire communications to occur.

108.    The unearned payments debited by NextGear/DSC from the Red Barn Plaintiffs' accounts were accomplished through deceptive means as described herein and constitute a scheme and artifice to defraud.

109.   NextGear/DSC executed the scheme and artifice to defraud each and every time it electronically debited money from the Red Barn Plaintiffs' accounts when NextGear/DSC had not actually provided any financing to the auction house for the purchase of the vehicle.

110.   Each of these acts constituted an act of wire fraud as provided by Title 18, United States Code, Section 1343.

111.   The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of Title 18, United States Code, Section 1961(5) in which the Defendants have engaged under Title 18, United States Code, Section 1962(c).

112.   As a direct and proximate result of these violations of Title 18, United States Code, Section 1962(c), the Red Barn Plaintiffs and other members of the Class have suffered substantial damages.  Defendants are jointly and severally liable to the Red Barn Plaintiffs and other members of the Class for treble damages, together with all costs of this action, plus reasonable attorneys' fees as provided pursuant to Title 18, United States Code, Section 1964(c).

## VIII. <u>COUNT 2</u>
### *Conspiracy to Violate RICO* **(18 U.S.C. § 1962(d))**

113.   The Red Barn Plaintiffs re-allege and incorporate by reference each and every allegation of the preceding paragraphs in this verified amended complaint with the same force and effect as though fully set forth herein.

114.   The Defendants have knowingly and willfully combined, conspired, confederated and agreed together and with others to violate Title 18, United States Code, Section 1962(c) as described above; all in violation of Title 18, United States Code, Section 1962(d).

115.   Upon information and belief, the Defendants knew that they were engaged in a

conspiracy to commit the predicate acts, and they knew that the predicate acts constituted racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.  This conduct constitutes a conspiracy to violate Title 18, United States Code, Section 1962(c); all in violation of Title18, United States Code, Section 1962(d).

116.    Upon information and belief, the Defendants agreed to conduct or participate, directly and indirectly, in the conduct, management, and/or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of Title 18, United States Code, Section 1962(c).

117.    Each Defendant knew about and agreed to facilitate the Enterprise's scheme and artifice to defraud and to obtain money and property from the Red Barn Plaintiffs and other members of the Class, by means of false and fraudulent pretenses and representations.

118.    It was part of the conspiracy that the co-conspirator Defendants would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including those acts listed herein and others known and unknown.

119.    As a direct and proximate result of these violations of Title 18, United States Code, Section 1962(c), the Red Barn Plaintiffs and other members of the Class have suffered substantial damages.  Defendants are liable to the Red Barn Plaintiffs and other members of the Class for treble damages, together with all costs of this action, plus reasonable attorneys' fees as provided pursuant to Title 18, United States Code, Section 1964(c).

## IX. <u>COUNT 3</u>
### *Breach of Contract*

120.    The Red Barn Plaintiffs re-allege and incorporate by reference each and every allegation of the preceding paragraphs in this verified amended complaint with the same force and effect as though fully set forth herein.

121.    As alleged above, the Red Barn Plaintiffs and other members of the Class entered into contracts titled Demand Promissory Notes and Security Agreements ("Notes") with NextGear/DSC in various amounts as detailed above, which the Red Barn Plaintiffs and other members of the Class used to purchase vehicles to sell on their used car lots.

122.    NextGear/DSC breached these Notes by charging interest and curtailment fees on purchases made by the Red Barn Plaintiffs without actually loaning money against the Red Barn Plaintiffs' lines of credit provided for by NextGear/DSC.

123.    NextGear/DSC made distributions on the lines of credit when it received titles to the vehicles purchased by the Red Barn Plaintiffs at auction instead of paying for the vehicles at the time of auction.

124.    NextGear/DSC, however, back-dated its distributions from the Red Barn Plaintiffs' line of credit to the date the Red Barn Plaintiffs were successful in bidding on vehicles at auction, thereby charging interest and curtailment fees on money that it had not actually lent to the Red Barn Plaintiffs and other members of the Class.

125.    By failing to properly perform its obligations, and by charging interest on money that was not actually lent, NextGear/DSC breached the agreement contained in the Notes.

126.   The Red Barn Plaintiffs and other members of the Class allege that as a direct and proximate result of NextGear/DSC's fraudulent actions the Red Barn Plaintiffs and other members of the Class have sustained damages in the following non-exclusive particulars:

a)  loss of earnings (past, present, and future);

b)  business interruption;

c)  property loss (to include money);

d)  loss of customers;

e)  loss of goodwill;

f)  devaluation of their businesses;

g)  other pecuniary losses including, but not limited to, attorney fees, costs, and interest; and

h)  other consequential damages as may be ongoing, as well as any other equitable relief as this Court deems just and proper.

## X. COUNT 4
### *Constructive Fraud*

127.   The Red Barn Plaintiffs re-allege and incorporate by reference each and every allegation of the preceding paragraphs in this verified amended complaint with the same force and effect as though fully set forth herein.

128.   As more fully set forth in the Introduction and Scheme to Defraud sections above, throughout NextGear/DSC's relationships with the Red Barn Plaintiffs, NextGear/DSC, by and through its Account Executives, such as Stuart LaBauve, Lourdes Givens, Mark Holley, and Sean Tabb, omitted and concealed from the Red Barn Plaintiffs numerous material facts relating to the

31

Floorplan Agreements, including but not limited to:

 a) The actual interest rates charged to the Red Barn Plaintiffs under the Floorplan Agreements;

 b) The fact that NextGear/DSC did not pay the auction houses for the vehicles purchased by the Red Barn Plaintiffs until NextGear/DSC received the title to the vehicles purchased;

 c) The fact that NextGear/DSC began charging interest and curtailment fees to the Red Barn Plaintiffs from the date of the auction despite the fact that no money had been lent or obligated under the Floorplan Agreements; and

 d) The fact that NextGear/DSC intended to interfere with the business relationships of the Red Barn Plaintiffs if those parties became adverse to NextGear/DSC, by "blacklisting" the Red Barn Plaintiffs with the auction houses at which they routinely purchased used cars as part of their business, as a result of which these auction houses prohibited the Red Barn Plaintiffs from attending and participating in the routine sales of used cars, further economically damaging the Red Barn Plaintiffs and other members of the Class..

 129. As set forth more fully in the Introduction section above, on information and belief, throughout NextGear/DSC's lending relationship with the other members of the Class, NextGear/DSC, through its Account Executives throughout the country, omitted and concealed from the other members of the Class numerous material facts relating to the Floorplan Agreements, including but not limited to the following

a) The actual interest rates charged to the members of the Class under the Floorplan Agreements;

b) The fact that NextGear/DSC did not pay the auction houses for the vehicles purchased by the members of the Class until NextGear/DSC received the title to the vehicles purchased;

c) The fact that NextGear/DSC began charging interest and curtailment fees to the members of the Class from the date of the auction despite the fact that no money had been lent or obligated under the Floorplan Agreements; and

d) The fact that NextGear/DSC intended to interfere with the business relationships of the members of the Class if they became adverse to NextGear/DSC, by "blacklisting" them with the auction houses at which they routinely purchased used cars as part of their business, as a result of which these auction houses prohibited the Red Barn Plaintiffs from attending and participating in the routine sales of used cars, further economically damaging the Red Barn Plaintiffs and other members of the Class.

130.   The above-referenced facts were fraudulently omitted and/or concealed by NextGear/DSC Account Executives, including but not limited to Stuart LaBauve, Lourdes Givens, Mark Holley, and Sean Tabb, at the following times:

a) As to each of the Red Barn Plaintiffs, at the initial meetings identified in the preceding sections at which the NextGear/DSC Account representatives approached and solicited the Red Barn Plaintiffs to enter into Floorplan Agreements;

b) As to each of the Red Barn Plaintiffs, throughout their lending relationship with NextGear/DSC, in the course of regular in person, telephone, and email

communications between the NextGear/DSC Account Executives and representatives of the Red Barn Plaintiffs.

c) As to each of the other members of the Class, on information and belief, at the time of solicitation by NextGear/DSC to enter into Floorplan Agreements; and

d) As to each of the other members of the Class, on information and belief, throughout the course of their lending relationship with NextGear/DSC, in the course of regular in person, telephone, and email communications between the NextGear/DSC Account Executives and representatives of the other members of the Class.

131.     NextGear/DSC owed a duty to the Red Barn Plaintiffs and the other members of the Class to speak regarding and not conceal the material facts set forth above by virtue of the relationship between the parties, including but not limited to the facts that:

a) NextGear/DSC possessed knowledge not possessed by the Red Barn Plaintiffs and other members of the Class regarding the floorplan agreements and NextGear/DSC's policies and practices; and

b) NextGear/DSC as the lender enjoyed a superior relationship over the Red Barn Plaintiffs and other members of the Class as borrowers.

132.     NextGear/DSC violated that duty by omitting and/or concealing the material facts set forth above from the Red Barn Plaintiffs.

133.     On information and belief, NextGear/DSC violated that duty by omitting and/or concealing the material facts set forth above from the other members of the Class.

134.     The Red Barn Plaintiffs relied upon the omissions of NextGear/DSC and its Account Executives.

135.     On information and belief, the other members of the Class relied upon the omissions of NextGear/DSC and its Account Executives.

136.     The Red Barn Plaintiffs suffered injury as a result of the omissions of NextGear/DSC and its Account Executives, including but not limited to paying interest and fees on money that was not actually lent by NextGear/DSC.

137.     On information and belief, the other members of the Class suffered injury as a result of the omissions of NextGear/DSC and its Account Executives, including but not limited to paying interest and fees on money that was not actually lent by NextGear/DSC.

138.     NextGear/DSC gained an advantage at the expense of the Red Barn Plaintiffs, including but not limited to by taking money from the Red Barn Plaintiffs under the false pretense of "interest and curtailment fees" on money not lent.

139.     On information and belief, NextGear/DSC gained an advantage at the expense of the other members of the Class, including but not limited to by taking money from the other members of the Class under the false pretense of "interest and curtailment fees" on money not lent.

## XI. COUNT 5
### *Tortious Interference with Business Relationships*

140.     The Red Barn Plaintiffs re-allege and incorporate by reference each and every allegation of the preceding paragraphs in this verified amended complaint with the same force and effect as though fully set forth herein.

141.     The Red Barn Plaintiffs established and maintained valid business relationships with multiple auction houses in and around their respective business operations to include, but not limited to, within the states of Louisiana, Mississippi, Virginia, Kentucky, and Missouri.

142.    The Red Barn Plaintiffs maintained these valid business relationships throughout their respective existence in the used car sales industry as a critical component to their respective business operations.

143.    The Red Barn Plaintiffs relied upon these business relationships in order to purchase used cars which the Red Barn Plaintiffs, in turn, held for sale and sold at their own used car lots.

144.    NextGear/DSC knew of these valid business relationships held and maintained by the Red Barn Plaintiffs with these multiple auction houses.

145.    After NextGear/DSC illegally defrauded the Red Barn Plaintiffs as detailed above, NextGear/DSC then intentionally interfered with these valid business relationships held and maintained by the Red Barn Plaintiffs by "blacklisting" the Red Barn Plaintiffs with these auction houses, as a result of which these auction houses prohibited the Red Barn Plaintiffs from attending and participating in the routine sales of used cars, further economically damaging the Red Barn Plaintiffs and other members of the Class.

146.    After NextGear/DSC illegally defrauded the Red Barn Plaintiffs as detailed above, NextGear/DSC actively attempted to prohibit the Red Barn Plaintiffs from participating in auctions held at these multiple auction houses in addition to prohibiting the Red Barn Plaintiffs from participating in auctions operated by Manheim auctions, a division of Defendant Cox Automotive, Inc. (NextGear's parent company).

147.    As part of their injurious activity, NextGear/DSC used the power and influence it maintains in the used car industry to include, but not limited to, its parent company, Defendant Cox Automotive, Inc. and Manheim auctions.

148.    NextGear/DSC intentionally interfered without justification with these valid business relationships held and maintained by the Red Barn Plaintiffs.

149.    NextGear/DSC's intentional interference with these valid business relationships held and maintained by the Red Barn Plaintiffs was the proximate cause of the loss or impairment of the Red Barn Plaintiffs' business relationship with multiple auction houses in and around their respective business operations to include, but not limited to, the states of Louisiana, Mississippi, Virginia, Kentucky, and Missouri.

## XII. COUNT 6
### Unjust Enrichment

150.    The Red Barn Plaintiffs re-allege and incorporate by reference each and every allegation of the preceding paragraphs in this verified amended complaint with the same force and effect as though fully set forth herein.

151.    By charging and collecting interest from the Red Barn Plaintiffs on money that was not lent, Cox Enterprises, Inc., Cox Automotive, Inc., and NextGear/DSC were unjustly enriched at the expense of the Red Barn Plaintiffs and other members of the Class.

152.    Thus, the Red Barn Plaintiffs and other members of the Class were unjustly deprived of the money and property unjustly taken from them by NextGear/DSC as detailed above.

153.    The Red Barn Plaintiffs and other members of the Class seek restitution from the Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by the Defendants from their wrongful conduct.

## XIII. DAMAGES

154.    In addition to the damages alleged above, the Red Barn Plaintiffs and other

members of the Class, allege that as a direct and proximate result of the fault of the Defendants herein, and each of them, Red Barn Plaintiffs and other members of the Class, have sustained damages in the following non-exclusive particulars:

a)  loss of earnings (past, present, and future);

b)  business interruption;

c)  property loss (to include money);

d)  loss of customers;

e)  loss of goodwill;

f)  devaluation of the business;

g)  depreciation on illegally seized vehicles;

h)  other pecuniary losses including, but not limited to, attorney fees, costs, and interest; and

i)  other consequential damages as may be ongoing, as well as any other equitable relief as this Court deems just and proper.

## XIV. <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, the Red Barn Plaintiffs and other members of the Class, respectfully pray for the following relief:

a)  Certification of this action as a class action, pursuant to Fed. R. Civ. P. 23, appointment of Plaintiff Red Barn as representative of the Class, and appointment of Plaintiff's counsel as Class Counsel;

b)  Enter joint and several judgments against Defendants in favor of the Red Barn Plaintiffs and the Class;

c)  A finding that Defendants' wrongful conduct alleged herein violated the laws set forth above, and an award for all measure of damages allowable under such laws, in an amount to be determined at trial, plus costs of suit, including reasonable attorney's fees and litigation expenses;

d)  Grant the Red Barn Plaintiffs and the Class equitable relief in the nature of disgorgement and restitution to remedy Defendants' unjust enrichment;

e)  Grant the Red Barn Plaintiffs and the Class an award for damages and, where applicable, treble, multiple, punitive, and/or other damages, in such an amount to be determined at trial and as provided by applicable law;

f)  Grant the Red Barn Plaintiffs and the Class injunctive relief requiring Defendants to cease and desist from engaging in the unlawful, unfair, and fraudulent practices alleged herein;

g)  An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein;

h)  Grant the Red Barn Plaintiffs and the Class pre-judgment and post-judgment interest on all damages;

i)  Grant the Red Barn Plaintiffs and the Class costs of suit, including reasonable attorneys' fees and litigation expenses as provided by law; and

j)  Grant the Red Barn Plaintiffs and the Class all such other and further relief as necessary to correct Defendants' unlawful conduct, and as the Court deems just and proper under the circumstances.

## XV. <u>JURY DEMAND</u>

Pursuant to Federal Rules of Civil Procedure 38(b), the Red Barn Plaintiffs request a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Cassie E. Felder*
CASSIE E. FELDER (La. Bar No. 27805)
*Pro Hac Vice*
**LUGENBUHL, WHEATON, PECK,**
**RANKIN & HUBBARD**
9311 Bluebonnet Blvd., Suite A
Baton Rouge, Louisiana 70810
Telephone: (225) 291-1990
Facsimile: (504) 3109195
cfelder@lawla.com

and

*/s/ James M. Garner*
JAMES M. GARNER (La. Bar No. 19589)
*Pro Hac Vice*
RYAN D. ADAMS (La. Bar No. 27931)
*Pro Hac Vice*
MATTHEW M. COMAN
(La. Bar No. 23613)
*Pro Hac Vice*
**SHER GARNER CAHILL RICHTER**
**KLEIN & HILBERT, L.L.C.**
909 Poydras Street, Suite 2800
New Orleans, Louisiana  70112
Telephone: (504) 299-2100
Facsimile: (504) 299-2300
jgarner@shergarner.com
radams@shergarner.com
mcoman@shergarner.com

and

*/s/ Gladstone N. Jones, III*
GLADSTONE N. JONES, III
(La. Bar No. 22221)
*Pro Hac Vice*
LYNN E. SWANSON (La. Bar No. 22650)
*Pro Hac Vice*
KERRY A. MURPHY (La. Bar No. 31382)
*Pro Hac Vice*
**JONES, SWANSON, HUDDELL &
GARRISON, L.L.C**.
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 523-2500
Facsimile: (504) 523-2508
gjones@jonesswanson.com
lswanson@jonesswanson.com
kmurphy@jonesswanson.com

**COUNSEL FOR PLAINTIFFS AND
THE PROPOSED CLASS**

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 11th day of March, 2016, served a copy of the foregoing

upon all counsel of record by CM/ECF filing.


*/s/ James M. Garner* _____

## VERIFICATION

**STATE OF LOUISIANA**

**PARISH OF** _Livingston_

BEFORE ME, the undersigned Notary Public, personally came and appeared Donald B. Richardson, owner of Red Barn Motors, Inc., who, after being duly sworn, did depose and say as follows:

That in his capacity as owner of Red Barn Motors, Inc., he has read all the facts, assertions, allegations, and statements contained in attached Amended Complaint; that all the facts, assertions, allegations, and all other statements contained in the Amended Complaint are true and correct to the best of his knowledge, information, and belief; and that this Verification shall serve as due proof of any statement of claim needed or required by law.

_____
Donald B. Richardson
Owner of Red Barn Motors, Inc.

SWORN TO AND SUBSCRIBED BEFORE ME

THIS _8th_ DAY OF _January_, 2016.

_____
NOTARY PUBLIC
Print Name: _Cassie Felder_

My commission expires on: _at death_

Cassie E. Felder, Notary Public,
State of Louisiana
My Commission expires at death.
La. Bar Roll #27805

## VERIFICATION

STATE OF VIRGINIA

COUNTY OF _City of Chesapeake_

      BEFORE ME, the undersigned Notary Public, personally came and appeared Nicol Zenia

Perry, owner of Platinum Motors, Inc., who, after being duly sworn, did depose and say as

follows:

      That in her capacity as owner of Platinum Motors, Inc., she has read all the facts,

assertions, allegations, and statements contained in attached Amended Complaint; that all the

facts, assertions, allegations, and all other statements contained in the Amended Complaint are

true and correct to the best of her knowledge, information, and belief; and that this Verification

shall serve as due proof of any statement of claim needed or required by law.

                              _____

                              Nicol Zenia Perry

                              Owner of Platinum Motors, Inc.

SWORN TO AND SUBSCRIBED BEFORE ME

THIS _8th_ DAY OF _Jan_ , 2016.

                                  SHERI DENISE SPENCE BRIGGS
                                  NOTARY PUBLIC
                           COMMONWEALTH OF VIRGINIA
                  MY COMMISSION EXPIRES SEPT. 30, 2016
                            COMMISSION # 7198509

NOTARY PUBLIC

Print Name: _Sheri Denise Spence Briggs_

My commission expires on: _9|30|2016_

**VERIFICATION**

**STATE OF KENTUCKY**

**COUNTY OF** _____

BEFORE ME, the undersigned Notary Public, personally came and appeared Barry

Mattingly, owner of Mattingly Auto Sales, Inc., who, after being duly sworn, did depose and say

as follows:

That in his capacity as owner of Mattingly Auto Sales, Inc. he has read all the facts,

assertions, allegations, and statements contained in attached Amended Complaint; that all the

facts, assertions, allegations, and all other statements contained in the Amended Complaint are

true and correct to the best of his knowledge, information, and belief; and that this Verification

shall serve as due proof of any statement of claim needed or required by law.

_____
Barry Mattingly
Owner of Mattingly Auto Sales, Inc.

SWORN TO AND SUBSCRIBED BEFORE ME

THIS ___7___ DAY OF __Jan____, 2016.

_____
NOTARY PUBLIC
Print Name: Denise Mattingly

My commission expires on: 10-24-2017

## VERIFICATION

**STATE OF MISSOURI**

**COUNTY OF** _JACKSON_

BEFORE ME, the undersigned Notary Public, personally came and appeared Ronald Jerome Reid, Jr., owner of Young Executive Management & Consulting Services, Inc., who, after being duly sworn, did depose and say as follows:

That in his capacity as owner of Young Executive Management & Consulting Services, Inc. he has read all the facts, assertions, allegations, and statements contained in attached Amended Complaint; that all the facts, assertions, allegations, and all other statements contained in the Amended Complaint are true and correct to the best of his knowledge, information, and belief; and that this Verification shall serve as due proof of any statement of claim needed or required by law.

Ronald Jerome Reid, Jr.
Owner of Young Executive Management &
Consulting Services, Inc.

SWORN TO AND SUBSCRIBED BEFORE ME

THIS _8th_ DAY OF _January_, 2016.

NOTARY PUBLIC
Print Name: _Marriah Brown-Logan_

My commission expires on: _June 20, 2016_

MARRIAH BROWN-LOGAN
Notary Public - Notary Seal
State of Missouri
Commissioned for Jackson County
My Commission Expires: June 20, 2016
19357762