IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RED BARN MOTORS, INC., PLATINUM MOTORS, INC., and MATTINGLY AUTO SALES, INC., individually and on behalf of other members of the general public similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:14-cv-01589-TWP-DKL |
| COX ENTERPRISES, INC., COX AUTOMOTIVE, INC., NEXTGEAR CAPITAL, INC. F/K/A DEALER SERVICES CORPORATION, successor by merger with Manheim Automotive Financial Services, Inc., and JOHN WICK, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ............................................................................................................1

STATEMENT OF FACTS ...............................................................................................2

      A.      NextGear History and Contracts ................................................................3

      B.      How Vehicles Are Floor Planned Through NextGear ...............................5

      C.      Red Barn's History with NextGear and Unique Issues .............................6

             1.      Red Barn's Default ........................................................................7

             2.      Red Barn's Bankruptcy ..................................................................7

             3.      Red Barn's Continuing Access to Auctions...................................8

      D.      Mattingly's History with NextGear and Unique Issues.............................8

             1.      Mattingly's Fraud and Default......................................................9

             2.      Judgment Against Mattingly and Owner's Personal Bankruptcy.............10

             3.      Settlement of Claims....................................................................11

              4.      Mattingly's Continuing Access to Auctions ...............................11

      E.      Platinum's History with NextGear and Unique Issues ...........................12

             1.      Platinum's Default and the Judgment Against Platinum ...........................12

             2.      Platinum's Subsequent Business at Auctions .............................13

PROCEDURAL HISTORY.............................................................................................14

ARGUMENT AND CITATION OF AUTHORITY .......................................................14

      I.      This Case Does Not Involve Common Questions That Predominate Over Individual Questions. .............................................................................16

             A.      Plaintiffs Have Not Identified a Common Question Capable of Classwide Resolution.................................................................16

B.    Even If Plaintiffs Could Identify a Common Question Capable of
Classwide Resolution, Questions Affecting Only Individual
Putative Class Members Will Predominate. ...............................................20

II.    Plaintiffs' Unique Issues Render Them Particularly Unsuited to Represent
Others in a Class Proceeding. ...........................................................................24

A.    Plaintiffs Are Not Typical of the Class Because They Have
Suffered Different Injuries and Are Each Subject to Unique
Defenses. ....................................................................................................25

B.    Plaintiffs Will Not Adequately Represent the Proposed Class
Because Their Interests Conflict With Those of Putative Class
Members. ....................................................................................................28

III.    Plaintiffs' Class Definition Is Too Broad, and Therefore the Class Is Not
Ascertainable....................................................................................................30

IV.    A Class Action Is Not a Superior Method for Adjudicating Plaintiffs'
Claims. .............................................................................................................30

V.    There Is No Risk of Inconsistent or Varying Results in This Case. ......................33

CONCLUSION...................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ...........................................20, 30-31, 33-34

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184 (2013) ...................................20, 22

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)..................................................................................22

*Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005) .................................................................17

*CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721 (7th Cir. 2011)........... 24-25, 28

*Cima v. WellPoint Health Networks, Inc.*, 250 F.R.D. 374 (S.D. Ill. 2008) .................................16

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) .....................................................................14

*Cox v. Sherman Capital LLC*, No. 1:12-cv-01654-TWP-MJD, 2016 WL 274877 (S.D.
    Ind. Jan. 22, 2016)...........................................................................................................14, 28

*Davis v. Hutchins*, 321 F.3d 641 (7th Cir. 2003) .........................................................................15

*Deiter v. Microsoft Corp.*, 436 F.3d 461 (4th Cir. 2006)..............................................................25

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) ..................................................................15

*Gesell v. Commw. Edison Co.*, 216 F.R.D. 616 (C.D. Ill. 2003) ..................................................26

*Howard v. Ray's LLC*, No. 1:08-cv-627-RLY-MJD, 2011 WL 4625735 (S.D. Ind. Sept.
    30, 2011) .................................................................................................................................29

*Mace v. Van Ru Credit Corp.*, 109 F.3d 338 (7th Cir. 1997) .......................................................31

*Martinez v. Nash Finch Co.*, No. 11-cv-02092-MSK-KLM, 2013 WL 1313921 (D. Colo.
    Jan. 30, 2013)..........................................................................................................................17

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) .....................15, 17, 19

*Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015).................................................15, 30

*Muro v. Target Corp.*, 580 F.3d 485 (7th Cir. 2009)....................................................................25

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) .........................................................................33

*Panwar v. Access Therapies, Inc.*, No. 1:12-cv-00619-TWP-TAB, 2015 WL 329013
    (S.D. Ind. Jan. 22, 2015) ....................................................................................................26, 30

*Parko v. Shell Oil Co.*, 739 F.3d 1083 (7th Cir. 2014) ................................................................20

*Perta v. Comprehensive Accounting Corp.*, No. 84 C 5484, 1985 WL 1900 (N.D. Ill. July 3, 1985) ...........................................................................................................................22

*Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541 (7th Cir. 2016) ....................................................17

*Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584 (7th Cir. 1993) ...........................26

*Shepherd v. ASI, Ltd.*, 295 F.R.D. 289 (S.D. Ind. 2013) .............................................................25

*Spano v. Boeing Co.*, 633 F.3d 574 (7th Cir. 2011) ....................................................................16

*Susman v. Lincoln Am. Corp.*, 561 F.2d 86 (7th Cir. 1977) ..................................................14, 28

*Szabo v. Bridgeport Machs., Inc.*, 249 F3d 672 (7th Cir. 2001) ........................................15, 16, 20

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .......................................................16-17, 19

**Statutes**

U.C.C. § 9-102(48) .........................................................................................................................5

La. Stat. Ann. § 14:72.4 .................................................................................................................7

**Rules**

Fed. R. Civ. P. 23 ..........................................................................................14, 15, 16, 33, 34

Fed. R. Civ. P. 23(a) ...........................................................................................15, 16, 20, 24

Fed. R. Civ. P. 23(a)(2) .............................................................................................................16

Fed. R. Civ. P. 23(b) ..................................................................................................................15

Fed. R. Civ. P. 23(b)(1) .............................................................................................................33

Fed. R. Civ. P. 23(b)(1)(A) ...................................................................................................33, 34

Fed. R. Civ. P. 23(b)(3) ...............................................................................................16, 20, 30-31

**Other Authorities**

7AA Wright & Miller, *Federal Practice & Procedure* § 1773 (3d ed. 2005) ..............................33

## INTRODUCTION

Three small used car dealers who long ago defaulted on their contractual obligations to a lender now seek to bring racketeering, tortious interference, fraud, and contract claims against the lender and certain of its affiliates, asserting that a small amount of interest charged—dwarfed by the principal the dealers borrowed and did not pay back—was improper, and that the lender's actions—rather than their own failure to pay their creditors—caused other entities to cease doing business with them.  Plaintiffs' allegations hinge on specific misrepresentations, disparate communications with third parties, and damages evidence unique to each borrower, and Plaintiffs face individualized defenses relating to prior judgments, default, nonpayment, bankruptcies, and releases.  Yet Plaintiffs nevertheless seek to represent an entire class of borrowers who were parties to a financing agreement, in any form, with NextGear Capital, Inc. ("NextGear") or its predecessors over an eight-year period.  Plainly, a class action is not a proper vehicle for addressing Plaintiffs' claims, and even if it were, the named Plaintiffs are not appropriate representatives for the proposed class.

Plaintiffs' allegations raise overwhelmingly individual issues that must be proven on a dealer-by-dealer basis.  What representations were made to a particular dealer and by whom, whether any information was concealed from that dealer, what that dealer actually knew and when, what contractual terms applied to that dealer, whether there was in fact any gap between the time interest accrued and a transaction was funded, whether any representations were made about that dealer to third parties, and what effect any such representations had on that dealer's unique business are all issues with dramatically different answers depending on the dealer. Moreover, while Plaintiffs seek to portray this case as one involving form contracts, in fact several different contracts are at issue, and many putative members of the proposed class have since signed different contracts with NextGear by which they agreed to arbitrate any disputes

1

with NextGear on an individual basis.  Those dealers must be excluded from any proposed class.

Damages, too, will need to be determined in mini-trials.  These party-specific issues render a

class unmanageable.

Further, Plaintiffs themselves are not adequate representatives of any proposed class

because of defenses specific to each of them that do not apply to other class members.  For

example, Plaintiffs have each defaulted and owe NextGear money; NextGear has judgments

against two for the principal and interest it is owed; one filed bankruptcy; the owner of one

settled a claim in which he released NextGear; one is no longer an active corporation in good

standing; each has committed fraud and therefore has unclean hands; and some of the claims are

barred by applicable statutes of limitations.  These unique defenses will distract Plaintiffs and

their counsel from effectively representing the interests of the putative class as a whole.

Because individual issues predominate, and defenses unique to the named Plaintiffs

render them atypical and inadequate, the Court should deny Plaintiffs' motion for class

certification.

## STATEMENT OF FACTS

NextGear is an automotive financing company that offers large revolving lines of credit

to licensed car dealers for the purchase of motor vehicle inventory (often referred to as "floor

plans").  Without a financing company such as NextGear, a dealer would have to pay for

vehicles with its own funds on the date of purchase in order to obtain possession of cars for re-

sale.  But a floor plan allows dealers to acquire vehicles and offer more inventory to their

customers with a smaller amount of working capital, while they attempt to sell the inventory and

pay NextGear out of the proceeds.  The dealer pays interest and fees in exchange for NextGear

taking on the credit risk, and NextGear retains a security interest in all the dealer's inventory and

other personal property to secure the obligation.  The named Plaintiffs failed to repay NextGear

for the funding it provided, but nevertheless claim in this suit that *they* are owed money.

### A.      NextGear History and Contracts

NextGear came into existence in January 2013 as a result of the merger of two former

competitors, Dealer Services Corporation ("DSC") and Manheim Automotive Financial

Services, Inc. ("MAFS").  (Declaration of Adam Galema, attached hereto ("Galema Decl.") ¶ 3.)

Prior to early 2012, DSC was an independent automotive financing company and was not

affiliated with MAFS or with defendants Cox Enterprises, Inc. or Cox Automotive, Inc.  (Galema

Decl. ¶ 4.)  Some dealers in the proposed class did business only with DSC, some did business

only with MAFS, and some did business with both.  (Galema Decl. ¶¶ 6-8; *cf.* Deposition of

Mattingly Auto Sales, Inc. Pursuant to Rule 30(b)(6) [Ex. P] ("Mattingly Dep.") 43:7-10 (had

DSC and MAFS line); Deposition of Red Barn Motors, Inc. Pursuant to Rule 30(b)(6) [Ex. L]

("Red Barn Dep.") 92:25-93:4 (DSC only).)

DSC, MAFS, and NextGear have each used different contract documentation for their

notes, security agreements, and various related agreements, and each company's documentation

has been revised over the years.  (Galema Decl. ¶¶ 5, 9, 11.)  At least one version of DSC's

contracts provided that the company could charge interest on Liabilities incurred:

> Interest shall accrue on all Dealer Liabilities in accordance with the following: (a)
> All outstanding Liabilities under this Note shall accrue interest (based upon a 360
> day year), on a per annum basis and shall be compounded daily at the Base Rate
> plus the applicable Contract Rate, Risk Rate, or Default Rate until paid in full.

(Red Barn DSC Demand Promissory Note and Security Agreement ("Red Barn Note") [Ex. M]

§ 3(a), NG_003563; Red Barn Dep. 93:6-18, 95:5-16; Mattingly 2009 DSC Demand Promissory

Note and Security Agreement ("Mattingly 2009 Note") [Ex. R] § 3(a), MA 000024; Mattingly

Dep. 68:25-69:13.)  "Liabilities" are in turn broadly defined as

any and all Advances, debts, DSC-Financed Inventory Liabilities, financial obligations, DSC Administrative Fees, DSC Universal Fees, Interest, Floorplan Fees, NSF fees, late fees, charges, expenses, attorney fees, costs of collection, covenants, and duties owing, arising, due or payable from Dealer to DSC of any kind or nature, present o[r] future, under any instrument, guaranty, or other document whether arising under this Note or any other agreement, whether directly or indirectly (including those acquired by assignment), absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising and however acquired.

(Red Barn Note [Ex. M] § 1(y), NG_003562; Mattingly 2009 Note [Ex. R] § 1(v), MA 000023.)

At least one version of MAFS' contracts, on the other hand, expressly provided:

Interest on each Advance shall begin to accrue on the date of the Advance for such Vehicle and continue accruing on the aggregate unpaid Loan amount(s) with payments credited as specified in Section 2(h). In the event Lender pays an auction or other seller directly on Borrower's behalf, the date of Advance shall be the date of Borrower's purchase unless Lender, in its discretion, chooses a later date.

(Mattingly MAFS Loan and Security Agreement ("Mattingly MAFS Note") [Ex. S] § 3(c), MA-000264; Mattingly Dep. 76:20-78:1.)

After the merger of DSC and MAFS, NextGear revised its contract forms, and all dealers who wished to continue to do business with NextGear entered into a new form of note and security agreement, replacing and novating any prior agreements with either MAFS or DSC. (Galema Decl. ¶ 12.) That agreement form specifies that any advance "shall accrue Interest on a per annum basis from the Floorplan Date or the Receivable Origination Date, as the case may be," with the "Floorplan Date" defined as either the sale date or the date NextGear received the request for the advance. (Sample NextGear Demand Promissory Note and Loan and Security Agreement ("NextGear 2013 Note") [Ex. A] § 3(a) & App. A, NG_005148, NG_005161; Galema Decl. ¶ 12.) Dealers signing that version of the agreement also agreed that any "disputes, claims and counterclaims"—both "arising out of or relating to this Note or any other Loan Document or any aspect of Borrower's relationship with Lender, whether based in contract,

4

tort, statute, fraud, misrepresentation or any other legal theory" and which "may have arisen before this Note or any prior contract or agreement between Borrower and Lender"—would be subject to arbitration on an individual basis.  (NextGear 2013 Note [Ex. A] § 22, NG_005157 to -58.)  During the period of March 2013 through October 2013, almost all dealers who continued to obtain financing from NextGear transitioned from their prior DSC and/or MAFS agreements to the new NextGear agreement.  (Galema Decl. ¶ 13.)

      **B.**    **How Vehicles Are Floor Planned Through NextGear**

      A floor plan agreement with NextGear allows a dealer to obtain possession of a vehicle on the date of purchase while deferring payment to a later date.  For purchases at wholesale auto auctions, the dealer is able to bid on and take purchased cars from the auction simply by directing the auction to put the cost on the dealer's pre-arranged floor plan; the dealer can then offer the vehicle for sale to its own customers immediately.  (*See, e.g.*, Mattingly Dep. 38:21-40:15, 42:9-15; Red Barn Dep. 66:24-67:21, 62:17-19, 64:6-20.)  When the car is purchased at auction, it immediately becomes dealer inventory[1] and thus NextGear's collateral.  (*See* Mattingly Dep. 50:1-13; Galema Decl. ¶ 14; *see also* Red Barn Note [Ex. M] § 2, NG_003563; Mattingly 2009 Note [Ex. R] § 2, MA 000024.)  At that point, NextGear is obligated to pay the auction for the unit, but the timing and manner of funding varies based on NextGear's agreement with the particular auction.  In most cases, NextGear delivers funds to the auction the same day, upon confirmation that the auction has received the certificate of title to the vehicle from the seller, or upon NextGear's receipt of the certificate of title.  (Galema Decl. ¶¶ 15-16.)  Thus, where a dealer floor plans a vehicle through NextGear, NextGear takes on the risk that the dealer

---

[1] *See* Uniform Commercial Code § 9-102(48) ("'Inventory' means goods, other than farm products, which: . . . (B) are held by a person for sale or lease or to be furnished under a contract of service . . . .").

will not pay for the vehicle; it is financially exposed to nonpayment and loss of collateral as soon as the auction sale is complete and the car is entrusted to the dealer.

Dealers with NextGear floor plans often obtain inventory from non-auction sources as well.  For example, many dealers accept trade-ins from their customers and/or purchase cars directly from another dealer.  (*See, e.g.*, Mattingly Dep. 28:8-19 (other dealers), 29:2-4 (trade-ins); Red Barn Dep. 20:16-22 (trade-ins).)  In those cases, the dealer may elect to turn around and finance that acquisition with its NextGear line of credit, by providing the bill of sale and title to NextGear in exchange for payment.  (*See* Red Barn Dep. 69:8-70:18; Galema Decl. ¶ 17.) Interest begins to run on these transactions from the date funds are provided to the dealer. (Galema Decl. ¶ 17.)

### C.     Red Barn's History with NextGear and Unique Issues

Plaintiff Red Barn Motors, Inc. ("Red Barn") is a licensed used car dealer in Denham Springs, Louisiana.  (Red Barn Dep. 22:13-23:2.)  Red Barn began doing business with DSC in July 2011, when it signed a floor plan application seeking a line of credit in the amount of $200,000, a demand promissory note and security agreement, and related contract documentation.  (*See generally* Red Barn Note [Ex. M].)  The contract documentation outlined the fees and interest rate applicable to the floor plan agreement.  (*Id.*; Red Barn Dep. 96:6-18.) DSC did not make any affirmative representations to Red Barn regarding the timing of when interest would begin to accrue.  (Red Barn Dep. 79:3-81:17, 182:20-183:4, 225:1-20.)  At the same time that it had a line of credit with DSC, Red Barn also had a floor plan through another unrelated financing company.  (*Id.* at 92:25-93:4.)

From July 2011 through March 2013, Red Barn used DSC/NextGear financing to acquire over 500 vehicles.  (Red Barn Transaction Report [Ex. B]; Galema Decl. ¶¶ 39-40.)  Red Barn printed and reviewed statements "daily" from DSC's online account portal showing Red Barn's

transactions with, and charges from, DSC/NextGear.  (Red Barn Dep. 76:2-77:6.)  Those

statements were binding and dispositive as to the amount owed under Section 4(k) of Red Barn's

Note.  (Red Barn Note [Ex. M] § 4(k), NG_003564.)  In addition, Red Barn knew when DSC

began to charge interest on floored auction purchases by at least June 2012, when that

information was discussed with and confirmed by DSC, and Red Barn continued to borrow

DSC's money for auction purchases for nine months thereafter.  (Red Barn Dep. 183:5-184:23;

Red Barn Transaction Report [Ex. B] (showing over 200 units floored by Red Barn with DSC, at

a principal value in excess of $850,000, after June 2012); Am. Compl. [Doc. 117] ¶¶ 45-46.)

          1.   <u>Red Barn's Default</u>

In 2013, Red Barn defaulted on its obligations to NextGear, purportedly because one of

its retail financing sources dried up.  (Red Barn Dep. 108:17-109:16.)  NextGear learned in mid-

March that the dealership had sold financed collateral vehicles out of trust—a fraud and a

crime[2]—and that the dealership had closed its doors.  NextGear was required to release the titles

held as security on a number of vehicles to retail customers without payment from them or from

Red Barn.  (Red Barn Dep. 111:4-18.)  Around the same time, several of Red Barn's payments

were returned for insufficient funds.  As a result, Red Barn's account was in default as of March

2013.  (NextGear's Response to Interrogatory 13 [Ex. K]; *see also* Red Barn Dep. 106:15-

109:16.)

          2.   <u>Red Barn's Bankruptcy</u>

While NextGear was attempting to liquidate the limited collateral it was able to recover,

and thereby mitigate Red Barn's debt, Red Barn filed for Chapter 11 bankruptcy protection on

April 25, 2013.  *In re Red Barn Motors, Inc.*, No. 13-10548 (Bankr. M.D. La.).  In its bankruptcy

---

[2] *See* La. Stat. Ann. § 14:72.4.

petition, Red Barn represented that it owed NextGear over $70,000[3] and owed various other

creditors in excess of $800,000.  (Amended Bankruptcy Petition, *In re Red Barn Motors, Inc.*

[Ex. N]; Red Barn Dep. 153:24-154:6.)  Red Barn also admitted to numerous pre-filing insider

transactions in that bankruptcy, including house and loan payments to and for its officers, their

family members, and its manager out of DSC collateral, including sale proceeds.  (Red Barn

Insider Transactions, *In re Red Barn Motors, Inc.* [Ex. O]; Red Barn Dep. 171:17-174:23.)

3. <u>Red Barn's Continuing Access to Auctions</u>

Since its default to NextGear and its bankruptcy, Red Barn has continued to buy and sell

vehicles at three wholesale auto auctions and to acquire trade-ins and vehicles from other

dealers, notwithstanding its alleged "blacklisting."  (Red Barn Dep. 20:23-21:12.)  At least one

of those auctions currently allows Red Barn to write business checks.  (*Id.* at 57:13-25.)

Although Red Barn claims some inconvenience at having to pay by cash or cashier's check at the

other two auctions, it concedes that it must have cash in the bank to cover any business checks

regardless.  (*Id.* at 60:9-16, 196:1-22.)  Red Barn has not sought access to or reinstatement at

most other auctions in the country since its default to NextGear and its bankruptcy, nor has it

sought commercial credit from any auctions or lenders since then.  (*Id.* at 86:10-87:22, 177:15-

17, 226:5-228:25, 180:16-19.)

**D.**   **Mattingly's History with NextGear and Unique Issues**

Plaintiff Mattingly Auto Sales, Inc. ("Mattingly") borrowed from DSC, MAFS, and a

third, unrelated financing company through a series of floor plan agreements.  (Mattingly Dep.

43:7-45:15.)  In October 2006 and February 2009, Mattingly signed demand promissory notes

---

[3] In comparison, NextGear's records show that the interest charges on *all* vehicles Red Barn
floor planned with DSC/NextGear totaled less than $40,000.  (Red Barn Transaction Report [Ex.
B]; Galema Decl. ¶ 40.)

and security agreements with DSC.  (Mattingly 2006 DSC Demand Promissory Note and Security Agreement [Ex. Q]; Mattingly 2009 Note [Ex. R]; Mattingly Dep. 64:1-10, 69:5-13.) Mattingly also signed at least two different security agreements with MAFS, in February 2007 and July 2010.  (*See* Mattingly MAFS Note [Ex. S]; Mattingly Dep. 77:18-78:9.)  The relevant interest rate and applicable fees were included in the related documentation signed at the time of each security agreement.  However, Mattingly's owner did not discuss with DSC when interest would begin to run on Mattingly's transactions.  (Mattingly Dep. 59:8-10, 74:25-76:18.)

From November 2006 through May 2012, Mattingly floored approximately 160 vehicles through DSC and was charged approximately $26,000 in interest.  (Mattingly Transaction Report [Ex. D]; Galema Decl. ¶¶ 43-44.)  During that time, Mattingly had continuous access to information about its DSC account, including balances and charges, through the DSC website. (Mattingly Dep. 50:22-52:6; *see also* Galema Decl. ¶¶ 18-19.)

Mattingly's professed concern with DSC's interest charges differs from Red Barn's. Mattingly specifically disagreed with the perceived charging of interest when it paid off a vehicle before DSC could obtain and deliver a title from auction as to cars it knowingly bought "title absent."  (Mattingly Dep. 75:6-76:18, 79:4-16.)  It admits to no concern with interest charged in other situations.  (*Id.* at 79:17-81:1.)  Mattingly's owner also testified that he raised the issue with DSC's account representatives, who confirmed it was "common practice," and Mattingly continued to borrow from DSC following those discussions.  (*Id.* at 75:6-76:18, 155:6-9.)

### 1.    Mattingly's Fraud and Default

Towards the end of its relationship with DSC, Mattingly committed several fraudulent acts that led to its default under its DSC floor plan agreement.  On May 8, 2012, a MAFS account representative notified DSC that MAFS was defaulting Mattingly's account and would be attempting to repossess its collateral from the dealer.  (NextGear's Response to Interrogatory

9

13 [Ex. K].)  DSC learned that Mattingly created fake "sales" to obtain financing based on an inflated purchase price.  Mattingly and/or its principal had set up a separate entity and created artificial transactions with this other entity so that it could floor or re-floor the cars at higher prices.  (*See generally* Mattingly Dep. 180:2-194:25; NextGear's Response to Interrogatory 13 [Ex. K].)  Mattingly's owner testified that he put the same car on the floor plan more than once, and on possibly ten different occasions bought a car at an auction or online from another dealer at a pre-arranged price and then put the car on the DSC floor plan.  (Mattingly Dep. 91:15-92:1 (same car more than once), 93:6-21 (pre-arranged price and then floor plan).)

As a result of Mattingly's default and fraudulent acts, NextGear declared Mattingly in default and attempted to repossess the vehicles on Mattingly's lot in May 2012.  Only five cars remained at the dealer's location, however, despite contractual obligations to keep collateral units there until sold.  (NextGear's Response to Interrogatory 13 [Ex. K]; *cf.* Mattingly 2009 Note [Ex. R] § 4(b), MA 000024; Mattingly MAFS Note [Ex. S] § 6, MA-000265.)

2.    Judgment Against Mattingly and Owner's Personal Bankruptcy

Unlike many of the proposed class members, Mattingly was sued by DSC in an attempt to collect Mattingly's debt—including unpaid principal, interest, and fees—and judgment was entered for NextGear against Mattingly and its owner in June 2013, in the amount of $58,000 plus post-judgment interest.  (Mattingly Dep. 123:13-127:7; Certified Judgment, *NextGear Capital, Inc. v. Mattingly Auto Sales, Inc.* ("Mattingly Judgment") [Ex. T].)  Mattingly's owner received timely service of the complaint and raised no defenses or counterclaims, such as those at issue in this case, in response.  (Mattingly Dep. 124:8-125:6.)  Despite Mattingly's awareness of the lawsuit and failure to dispute the accuracy of the debt claimed, Mattingly never paid the judgment and has no intention of paying it.  (*Id.* at 130:25-131:22.)

Mattingly's owner and guarantor, Barry Mattingly, filed personal bankruptcy thereafter, but the plaintiff Mattingly Auto Sales, Inc. has not sought bankruptcy protection.  (Mattingly Dep. 131:23-132:16.)  In Barry Mattingly's personal bankruptcy, NextGear filed a proof of claim under Mr. Mattingly's individual guaranty that Mr. Mattingly did not challenge.  (*Id.* at 132:25-136:22, 136:25-137:19; NextGear Proof of Claim, *In re Mattingly* [Ex. U].)

3.    Settlement of Claims

Barry Mattingly also filed a small claims action against NextGear/DSC in October 2013 relating to alleged property damage caused by DSC during its attempted repossession of collateral vehicles from Mattingly Auto Sales, Inc.  The parties eventually settled that dispute by written agreement, in which Mr. Mattingly, "on behalf of himself [and] his current and former . . . affiliates," released NextGear from any and all claims related to that small claims lawsuit "and the claims that were raised or could have been raised therein."  (Mattingly Dep. 138:21-144:17; Small Claims Complaint, *Mattingly v. NextGear Capital* [Ex. V]; Settlement Agreement and Release [Ex. W].)

4.    Mattingly's Continuing Access to Auctions

A third-party auction, not DSC, reported Mattingly to Auction Insurance Agency in late 2012 for failure to pay for a vehicle acquired at that auction.[4]  (*See* Galema Decl. ¶ 46; 11/16/2012 Email from Ute Brandt [Ex. E]; Mattingly Dep. 106:3-107:3.)  Mattingly testified that its listing in the KO Book did not affect its business between 2012 and 2014-2015, as Mattingly was not even aware of it until then.  (Mattingly Dep. 114:23-115:1.)  Even after

---

[4] Auction Insurance Agency is an insurance company that provides insurance for auto auctions to protect against bad checks, collection problems, and/or stolen vehicles.  (Galema Decl. ¶ 35; *see also* Mattingly Dep. 112:5-10.)  It is not affiliated with any of the defendants in this case. (Galema Decl. ¶ 35.)  Auction Insurance Agency maintains a list of dealers whose checks at auction it will not insure, sometimes known as the "KO Book."  (*Id.* ¶ 36.)  But auctions remain free to deal with those dealers at their discretion.  (*Id.*)

Mattingly learned of the listing, the only effect was that Mattingly had to wait longer for a title from one auction with which it does business.  (*Id.* at 110:10-111:1.)  Mattingly is still able to do business with at least three auctions, which are willing to accept its business checks, and can still acquire inventory through trade-ins and other dealers.  (*Id.* at 24:7-25, 52:14-24, 28:8-10, 28:24-29:4.)  Mattingly has made no effort to procure other commercial financing for auction purchases since its default to NextGear.  (*Id.* at 166:25-167:8.)

      **E.**     **Platinum's History with NextGear and Unique Issues**

      Plaintiff Platinum Motors, Inc. ("Platinum") executed a demand promissory note and security agreement with DSC, along with various other related contract documentation, in May 2011.  (Platinum DSC Demand Promissory Note and Security Agreement [Ex. F]; Galema Decl. ¶ 47.)  The contract documents outlined the fees and interest rate applicable to the floor plan agreement.  Platinum did not have a line of credit with MAFS.  (Galema Decl. ¶ 48.)  In June and July 2011, Platinum floored approximately 20 vehicles with DSC.  (Galema Decl. ¶¶ 49-50; Platinum Transaction Report [Ex. G].)  A handful of these vehicles were purchased from other dealers, rather than at auction.  (Galema Decl. ¶ 50.)

      1.     <u>Platinum's Default and the Judgment Against Platinum</u>

      Platinum defaulted on its obligations to DSC in 2011.  In August of that year, some of DSC's collateral could not be located when DSC performed an audit of the vehicles on Platinum's lot.  During that same time period, approximately ten of Platinum's payments were returned for insufficient funds.  Although DSC attempted to work with Platinum to address these issues, Platinum did not resolve them and its account was plainly in default by September 2011.  (NextGear's Response to Interrogatory 13 [Ex. K].)  Platinum paid DSC in full for only five of the vehicles it floor planned.  (*See* Galema Decl. ¶ 50; Platinum Transaction Report [Ex. G].)

DSC filed and served a collection action against Platinum and its owner-guarantor to recover Platinum's debt owed on the floor plan, which included principal, interest, and fees, and the court entered judgment in the amount of approximately $35,000 in favor of NextGear and against Platinum and its owner-guarantor on February 12, 2014.  (Complaint, *Dealer Services Corp. v. Platinum Motors, Inc.* [Ex. H]; Certified Judgment, *NextGear Capital, Inc. v. Platinum Motors, Inc.* ("Platinum Judgment") [Ex. I]; Galema Decl. ¶¶ 52-53.)  Platinum has produced the complaint, summons, and docket report from that action, thereby acknowledging its awareness of the lawsuit.[5]  (Galema Decl. ¶ 54; Platinum Document Production [Ex. J].)  Yet prior to the current litigation, neither Platinum nor its owner-guarantor ever raised any defense or counterclaim related to DSC's charges and/or alleged blacklisting.  (Galema Decl. ¶ 52.)  Thus far, NextGear has been unsuccessful in its attempts to collect the full judgment against Platinum.  (Galema Decl. ¶ 55.)

2.  Platinum's Subsequent Business at Auctions

Platinum has yet to be deposed in this action, and so the extent of its operations and auction dealings after defaulting to DSC, if any, are not yet known.  Nevertheless, Platinum was based in Chesapeake, Virginia and acquired most of its DSC-financed units at Tidewater Auto Auction and directly from other dealers.  Thus, the specifics of its post-default dealings will certainly vary from the other named Plaintiffs, which dealt and continue to deal at other auctions (as outlined above).  Likewise, the Virginia State Corporation Commission records show that Platinum's corporate existence has been terminated.  (*See* Virginia State Corporation Commission, Business Entity Details, https://sccefile.scc.virginia.gov/Business/0735699 (last

---

[5] These were the only documents Platinum produced in response to requests for production in this litigation.  (Galema Decl. ¶ 54.)

visited October 27, 2016).)  Its current status and standing to sue herein will therefore be an issue for discovery and a potential defense to its particular claims and damage assertions.

## PROCEDURAL HISTORY

Plaintiff Red Barn initially filed suit against NextGear in 2013, asserting claims for breach of contract and unjust enrichment.  [Doc. 1.]  In January 2016, Red Barn sought to amend its complaint to (a) add three additional named Plaintiffs (one of whom later withdrew from the case), (b) add three additional defendants, Cox Enterprises, Inc., Cox Automotive, Inc., and John Wick, (c) add class allegations, and (d) add causes of action for violation of RICO, RICO conspiracy, tortious interference, and constructive fraud.  [*See* Doc. 117.]  Plaintiffs' new class claims allege fraudulent actions that will require evidence of representations and misrepresentations between the specific parties, reliance by each putative class member, communications with third parties as to each putative class member, and damages to each putative class member proximately caused by defendants.  The defendants have moved to dismiss on grounds of failure to state a claim, applicable statutes of limitations, and *res judicata*, which motion remains pending.  [Docs. 126, 127.]

## ARGUMENT AND CITATION OF AUTHORITY

A class action is only appropriate where plaintiffs can show they meet the statutory requirements for class certification.  "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (citation omitted).  Therefore, a party seeking to maintain a class action has the burden to demonstrate affirmatively that it can in fact comply with the requirements of Rule 23.  *Id.*; *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 90 (7th Cir. 1977); *Cox v. Sherman Capital LLC*, No. 1:12-cv-01654-TWP-MJD, 2016 WL 274877, at *4 (S.D. Ind. Jan. 22, 2016).

Plaintiffs correctly state that they are only entitled to class certification if they can meet each of the following requirements:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  The proposed class must be defined clearly and based on objective criteria.  *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659-60 (7th Cir. 2015).  Plaintiffs must also show that "prosecuting separate actions by or against individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class" or that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b).

"Before deciding whether to allow a case to proceed as a class action . . . a judge should make whatever factual and legal inquiries are necessary under Rule 23."  *Szabo v. Bridgeport Machs., Inc.*, 249 F3d 672, 676 (7th Cir. 2001).  The Court must conduct "a rigorous analysis" to determine whether the prerequisites of Rule 23(a) have been satisfied.  *Davis v. Hutchins*, 321 F.3d 641, 649 (7th Cir. 2003); *see also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("actual, not presumed, conformance with Rule 23(a) remains . . . indispensable").  While consideration of class certification is not "a dress rehearsal for the trial on the merits," the Court "must receive evidence . . . and resolve the disputes before deciding whether to certify the class."  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012)

(quoting *Szabo*, 249 F.3d at 676). In doing so, the court "must take into account the substantive elements of plaintiffs' cause of action and inquire into the proof necessary for the various elements and envision the form that trial on these issues would take." *Cima v. WellPoint Health Networks, Inc.*, 250 F.R.D. 374, 377 (S.D. Ill. 2008) (citation omitted).

Plaintiffs in this case have not met their burden to demonstrate compliance with the requirements of Rule 23. Indeed, aside from conclusory declarations, their brief lacks any evidence supporting class certification. *Cf. Spano v. Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011) ("Before certifying a class, the district court must do more than review a complaint and ask whether, taking the facts as the party seeking the class presents them, the case seems suitable for class treatment."). The motion for class certification should therefore be denied.

## I.  This Case Does Not Involve Common Questions That Predominate Over Individual Questions.

Rule 23(a) requires a plaintiff to show that there are questions of law or fact common to the class, and Rule 23(b)(3) requires a plaintiff to show that those common questions predominate over individual ones. Plaintiffs have shown neither, and their case therefore cannot proceed as a class action.

### A.  Plaintiffs Have Not Identified a Common Question Capable of Classwide Resolution.

Plaintiffs have not met their burden to show that "there are questions of law or fact common to the class," as required by Rule 23(a)(2). The commonality analysis requires a plaintiff to (1) point to a common contention that each member of the class had suffered the same instance or course of wrongful conduct, and (2) show that this "common contention" is "of such a nature that it is capable of classwide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[A]ny competently crafted class complaint literally raises common questions." *Id.* at 349 (citation omitted). A common question will only support class

certification, however, if "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims *in one stroke*." *Id.* at 350 (emphasis added). In other words, proceeding as a class must allow the Court "to generate common *answers* apt to drive the resolution of the litigation." *Id.* (citation omitted).

This commonality analysis may overlap with the merits of plaintiffs' underlying claims. *Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 550 (7th Cir. 2016) (citing *Dukes*, 564 U.S. at 349-51). The commonality requirement is not merely a pleading standard; rather, the putative class "must be prepared to prove that there are *in fact* . . . common questions of law or fact." *Id.* at 550 (quoting *Dukes*, 564 U.S. at 350). Further, it is well settled that plaintiffs' "mere recitation" of the cause of action alleged cannot qualify as a common question for purposes of class certification. *See, e.g.*, *Martinez v. Nash Finch Co.*, No. 11-cv-02092-MSK-KLM, 2013 WL 1313921, at *5 (D. Colo. Jan. 30, 2013).

In this case, Plaintiffs' proposed "common questions" (Br. [Doc. 154] at 14-15, 23) cannot be resolved on a classwide basis. Many of the purportedly common questions posed in Plaintiffs' brief must be answered on a case-by-case basis and are therefore neither "capable of classwide resolution" nor of generating "common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350. Plaintiffs themselves acknowledge the rule that "[i]f, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question." *Messner*, 669 F.3d at 815 (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)). Such is the case here.

For example, whether NextGear actively solicited any particular putative class member to enter into a floor plan agreement, whether NextGear made any representation (either true or

false) to any putative class member about when interest begins to accrue, and whether NextGear charged interest and fees before it actually delivered funds to an auction on behalf of a dealer will all need to be proven as to each dealer—or even as to each transaction.  The answers can only be determined on an individual, not a classwide, basis.  Despite the allegations in the Complaint, two of the named Plaintiffs have testified that NextGear made no affirmative representations to them about the timing of interest accrual on auction transactions at the time of contracting, outside terms in their loan agreements, and that they were both well aware of the actual practices while they continued to borrow from NextGear.  (Red Barn Dep. 183:5-184:23, 219:3-6; Mattingly Dep. 59:8-10, 75:2-76:20.)  But representations to other dealers may have been different, and thousands of different dealers in the putative class may have interpreted certain contract terms differently than did the named Plaintiffs.  (*See generally* Motion to Dismiss and Reply in Support [Docs. 126-127, 136].)

Similarly, whether NextGear interfered with any dealer's business relationships or "blacklisted" a dealer—and whether such action was justified—cannot be determined on a classwide basis.  Such an inquiry is inexorably fact-specific to each dealer, requiring an investigation into whether the dealer was actually "blacklisted," how extensive and detrimental that blacklisting is to the dealer, and what, if anything, NextGear had to do with it.  Indeed, one named Plaintiff acknowledged that DSC had nothing to do with its placement in the KO Book. (Mattingly Dep. 106:5-107:5.)  All three named Plaintiffs defaulted on their obligation to repay NextGear for their auction (and other vehicle) purchases, meaning that NextGear was justified in reporting that default to parties with which it did business.  (*See* Galema Decl. ¶ 37.)  By contrast, most dealers in the proposed class never materially defaulted and are not in the KO

Book.  (Galema Decl. ¶¶ 24, 38.)  These are precisely the types of "individual question[s]" that preclude certification.  *Messner*, 669 F.3d at 815.

Other so-called common questions merely restate the causes of action or the class definition, and therefore cannot support a finding of commonality.  Merely having "suffered a violation of the same provision of law" does not create commonality.  *Dukes*, 564 U.S. at 350.  Thus, questions about whether the defendants engaged in a pattern of racketeering activity, conspiracy, mail or wire fraud, intentional interference with business relationships, or practices that unjustly enriched them simply cannot suffice to show commonality.[6]  What matters is whether all the putative class members have suffered the same injury.

In their brief, Plaintiffs contend that a common contract existed between the dealers and NextGear, the interpretation of which is particularly well-suited for class treatment.  But that is simply not accurate.  Plaintiffs omit that different putative class members signed different contracts containing different terms with different predecessor companies.  In addition to the important factual question of when payments were actually made to an auction for a particular transaction, the question of whether that timing was appropriate will depend on the interpretation of several different contract documents.  Where an interpretation of one contract will not resolve the central issue as to putative class members whose contract terms differed, Plaintiffs have not identified a common question.

---

[6] One is also left to wonder how a RICO enterprise or conspiracy could have existed at all from 2005-2012, the portion of the purported class period during which DSC was not related to the other defendants.  (*See* Galema Decl. ¶ 4.)  In any event, the existence of such a RICO enterprise or conspiracy would not be a "common question" for purposes of a class analysis.

B.    Even If Plaintiffs Could Identify a Common Question Capable of Classwide Resolution, Questions Affecting Only Individual Putative Class Members Will Predominate.

Certification of Plaintiffs' proposed class requires individualized proof of NextGear's liability to each putative class member.  As a result, any common question that could hypothetically be raised would still not meet the test for predominance.

Rule 23(b)(3) requires that the questions of law or fact common to class members predominate over any questions affecting only individual members.  The requirement of predominance is not satisfied if "individual questions . . . overwhelm questions common to the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1196 (2013).  "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (finding lack of predominance despite commonality that all class members were exposed to asbestos supplied by defendants).

"Even if Rule 23(a)'s commonality requirement may be satisfied by [a] shared experience, the predominance criterion is far more demanding." *Id.* at 623-24.  "Mere *assertion* by class counsel that common issues predominate is not enough.  That would be too facile.  Certification would be virtually automatic." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014).  Thus, if there are factual disputes as to whether a suit should be litigated as a class action, including the question of predominance, "the court must receive evidence . . . and resolve the disputes before deciding whether to certify the case." *Id.* (quoting *Szabo*, 249 F.3d at 676).

Here, Plaintiffs have provided no evidence that common questions affecting both the named Plaintiffs and the putative class members would predominate.  To the contrary, individual questions—and the proof required to answer them—will overwhelm questions common to the class.  First, various putative class members have signed different contract documents.  Plaintiffs

20

have attempted to limit their class to those who did business with NextGear and its predecessors

prior to 2013.  But even that proposed class includes thousands of putative class members who

later signed new NextGear contracts in which they agreed to arbitrate any past, present, or future

claims on an individual basis and agreed to other limitations of liability.  (*See* NextGear 2013

Note [Ex. A]; Galema Decl. ¶ 13.)  The proposed class also includes dealers whose contracts

contain widely varying terms relating to interest.  And the proposed class includes dealers

subject to the laws of different jurisdictions, since the DSC agreement provides that California

law applies to California dealers and Indiana law applies to all others, while the MAFS

agreement provides that Georgia law will apply.  (*Compare* Mattingly 2009 Note [Ex. R] § 21,

MA 000029, *with* Mattingly MAFS Note [Ex. S] § 23, MA-000271.)  Thus, certification will

impose on the Court the daunting task of sifting through differing contractual terms from various

contracts while applying the law from at least three different states.

Second, different auctions had different payment (and title delivery) agreements with

NextGear, and in many cases a putative class member's floor planned transaction might not have

involved an auction at all.  NextGear paid some auctions on the date a dealer purchased a vehicle

at auction, without waiting for title delivery or because title had already been delivered, but that

was not true of all.  (Galema Decl. ¶ 16.)  And where a putative class member financed a car it

already owned, the dealer was usually paid with interest commencing from the date of payment,

meaning it would have no claim for earlier-charged interest on that car.  (Galema Decl. ¶ 17.)

Many putative class members financed cars from multiple auctions, sometimes dozens of

auctions, on different arrangements with NextGear, and many financed non-auction vehicles as

well.  (*Cf.* Red Barn Transaction Report [Ex. B] (showing purchases from at least five auctions,

as well as purchases from other dealers and trade-ins); Mattingly Transaction Report [Ex. D]

(showing purchases from four auctions, as well as purchases from other dealers and trade-ins).) Thus, any proof of allegedly improper interest charges will have to be analyzed for *each car* floor planned with NextGear.

Third, several of Plaintiffs' claims will require individualized proof of concealment, misrepresentations, reliance, and knowledge.  "Courts have generally recognized that common law fraud claims are particularly unsuitable for class action treatment."  *Perta v. Comprehensive Accounting Corp.*, No. 84 C 5484, 1985 WL 1900, at *3 (N.D. Ill. July 3, 1985).  The element of reliance in a fraud claim "would ordinarily preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class." *Amgen*, 133 S. Ct. at 1193.  "Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would [prevent plaintiffs] from proceeding with a class action, since individual issues then would have overwhelmed the common ones."  *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988).  In addition, proof of the misrepresentations themselves is another obstacle to class certification in fraud cases, except where the alleged misrepresentations are identical.  Where oral misrepresentations were made to different parties at different times, "they necessarily raise issues which are not common to the class and which will require[] individual treatment."  *Perta*, 1985 WL 1900, at *3.  Plaintiffs' tort claims cannot be adjudicated on a classwide basis, as they require individualized evidence of what was said, by and to whom, when, and whether and how it was relied upon.

Fourth, NextGear has individualized defenses against particular putative class members' claims.  For example, some putative class members were undoubtedly fully aware of how interest was calculated and therefore did not rely on any representations by NextGear.  Even named Plaintiffs Red Barn and Mattingly admit they have no evidence of affirmative

misrepresentations; that their signed contracts, including their "Term Sheets," governed the appropriate charges; that they had access to account statements continuously; and that they were well aware that NextGear often settled up with the selling auctions after their purchase dates. Yet both continued to borrow from NextGear.  In addition, both Mattingly and Platinum still owe NextGear significant judgments, giving rise to set-off defenses.  (Mattingly Judgment [Ex. T]; Platinum Judgment [Ex. I].)  (Other defenses to the named Plaintiffs' claims are detailed below.) Other putative class members have had entirely different experiences with NextGear.  (*See* Galema Decl. ¶¶ 18-34.)

Fifth, statute of limitations issues abound for a class going back to 2005 with claims that were first filed in 2016.  For example, Mattingly's claims regarding interest charged prior to 2010 would be time-barred.  Statute of limitations issues would need to be considered not just on a dealer-by-dealer basis, but on a transaction-by-transaction basis.

Sixth, questions of "blacklisting" and tortious interference will require an inquiry into the facts and circumstances of a particular case.  Did a material number of auctions cease doing business with the particular plaintiff?  Was any change materially detrimental rather than simply to the form or convenience of that business?  Did the plaintiff have a legally cognizable expectancy of continued access to each of those private auctions before that?  Did NextGear cause the action by each of the relevant auctions?  Did each of those auctions have its own valid reasons for ceasing business with the particular plaintiff?  Was NextGear's involvement justified in each case, such as through appropriate and mutually-beneficial sharing of trade credit experience with others in the same industry?  Moreover, the vast majority of NextGear dealers, who remain in good standing and continue to acquire vehicles at the auctions of their choice or otherwise, will have no "blacklisting" experience or claims at all.  For the few that might have

been listed in the KO Book, the nature, history, and extent of their expectancy with third-party auctions; NextGear's involvement in the auction relationships; whether they suffered any business damages given the numerous sources of credit and used vehicle inventory in the country; the extent of those damages; and whether they adequately attempted to mitigate them will be complex and vary wildly from dealer to dealer.

Finally, the damages analysis is unique and individualized for each dealer. The calculation of damages will vary based on the auction source; how the relevant fees were assessed (flat fees, fees based on a certain threshold number of days, etc.); the dealer's awareness of any charges and review of statements; the changes in profitability of the business, if any; whether those changes were related to any alleged "blacklisting"; the dealer's access to other credit and inventory sources; the dealer's mitigation of its damages; and any number of other factors.

These examples of individual issues demonstrate that class treatment of Plaintiffs' claims is inappropriate. Because Plaintiffs simply cannot show that common issues predominate, class certification should be denied.

## II.   Plaintiffs' Unique Issues Render Them Particularly Unsuited to Represent Others in a Class Proceeding.

The three named Plaintiffs in this action have failed to show that their claims or defenses are typical of the claims or defenses of the class or that they will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). A plaintiff cannot meet this test if it is subject to unique defenses:

> The presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation. The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer.

*CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011) (citation

omitted).  Because the named Plaintiffs have unique claims and are subject to unique defenses,

they would be inadequate representatives even if a class could otherwise be certified.

     A.    <u>Plaintiffs Are Not Typical of the Class Because They Have Suffered Different</u>
<u>Injuries and Are Each Subject to Unique Defenses.</u>

To satisfy the typicality requirement, the named Plaintiffs' claims must "have the same

essential characteristics as the claim of the class at large."  *Shepherd v. ASI, Ltd.*, 295 F.R.D.

289, 297-98 (S.D. Ind. 2013) (quoting *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009)).

"In other words, the named plaintiff must be fully representative of the class, possessing the

same interest and suffering the same injury—in broad terms—as the other class members."  *Id.* at

298.  "A plaintiff's claims need not be identical to those of other class members, but a court will

deny class certification when the variation in claims between potential class members 'strikes at

the heart of the respective causes of action.'"  *Id.* (quoting *Deiter v. Microsoft Corp.*, 436 F.3d

461, 466-467 (4th Cir. 2006)).

As an initial matter, Plaintiffs' claims of injury are atypical insofar as they are based on

supposed "blacklisting" or tortious interference.  The majority of NextGear's dealers remain in

good standing with NextGear and the auctions from which they purchase vehicles, and thousands

of others in the proposed class closed their credit lines voluntarily, resolved any default issues

quickly, and/or released NextGear from all claims through subsequent settlement agreements.

(Galema Decl. ¶¶ 24-26.)  These dealers would not have suffered any "blacklisting" injury.  In

addition, unlike the named Plaintiffs, the majority of NextGear's dealers do business with

NextGear pursuant to the most recent version of NextGear's loan agreement, which contains an

arbitration clause with class and damage waivers.  (Galema Decl. ¶ 13.)  Even if they could be

proven, then, Plaintiffs' supposed injuries are not typical of the rest of the proposed class.

Further, typicality is generally absent when the claims are based on non-standardized oral communications.  *See, e.g.*, *Gesell v. Commw. Edison Co.*, 216 F.R.D. 616, 624 (C.D. Ill. 2003) (citing *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 597 (7th Cir. 1993)).  Here, Plaintiffs' contract, fraud, RICO, and tortious interference claims are premised on supposed oral representations or omissions allegedly made by account executives and other DSC personnel.  To the extent any representations about interest and fees were made at all to dealers, and assuming for the sake of argument they could override the written contracts between the parties, those oral representations were not uniform or standardized.  (Galema Decl. ¶ 20; *cf.* Mattingly Dep. 59:8-10, 75:2-76:20; Red Barn Dep. 79:3-81:17, 182:20-184:23, 225:1-20.)  As a result, these claims will depend on each putative class member's interactions with DSC throughout the course of the parties' relationship, which often spans many years, and "[a] named plaintiff who proved his own claim would not necessarily have proved anybody else's claim." *Id.* (citation omitted).  Plaintiffs' claims arising from purported misrepresentation lack typicality.

A plaintiff also cannot meet the typicality requirement where the defenses against the named plaintiff's claims are not typical of the defenses against the proposed class.  *Panwar v. Access Therapies, Inc.*, No. 1:12-cv-00619-TWP-TAB, 2015 WL 329013, at *4-5 (S.D. Ind. Jan. 22, 2015).  Here, the defendants will have several compelling defenses against the named Plaintiffs that are not typical of the defenses against the rest of the class.

For example, each of the named Plaintiffs has defaulted on its contractual obligations to NextGear and currently owes NextGear money.  (*See* NextGear's Response to Interrogatory 13 [Ex. K].)  Thus, NextGear has (and will assert) compelling defenses of anticipatory breach,

setoff, and unclean hands against the named Plaintiffs on each of their claims.[7]  One or more
named Plaintiffs fraudulently sold NextGear's collateral out of trust; one of the named Plaintiffs
fraudulently re-floored vehicles on its NextGear line of credit; and at least two of the named
Plaintiffs attempted to procure titles from NextGear through payments returned for insufficient
funds—all facts which may support an unclean hands and/or *in pari delicto* defense.
(NextGear's Response to Interrogatory 13 [Ex. K].)  NextGear also holds outstanding judgments
against two of the named Plaintiffs, Mattingly and Platinum, which suggests that *res judicata*
may also bar those Plaintiffs' claims (Mattingly Judgment [Ex. T]; Platinum Judgment [Ex. I]);
indeed, NextGear raised this defense in its pending motion to dismiss.  Further, Mattingly's
owner executed a release of NextGear on his own behalf and on behalf of his affiliates.
(Settlement Agreement and Release [Ex. W].)  Platinum's corporate existence has been
terminated, which may affect its standing to sue and the scope of the alleged damages to its
operations.  Red Barn is also atypical in that it purported to preserve its claims against NextGear
in its bankruptcy (Amended Bankruptcy Petition, *In re Red Barn Motors, Inc.* [Ex. N]; Red Barn
Dep. 153:24-154:6; Amended Plan of Reorganization at 11, Doc. 84-1, *In re Red Barn Motors,
Inc.*, No. 13-10548 (Bankr. M.D. La. Dec. 10, 2013)), whereas other putative class members who
filed bankruptcy will not have preserved their claims.

These unique defenses against the claims of the named Plaintiffs, among others, render
the named Plaintiffs atypical and preclude them from obtaining class certification.

---

[7] As noted above, Red Barn scheduled its debt to NextGear in a Chapter 11 bankruptcy, which
proceeded through a confirmed plan.  NextGear is still evaluating the status of its contractual
claim against Red Barn in light of that, but certainly Red Barn still has unclean hands.  In any
event, Red Barn is a small, closely-held entity run by and co-owned by Donald Richardson, who
is still obligated to NextGear under his individual guaranty.  (Red Barn Note [Ex. M], at
NG_003573 to -75; Red Barn Dep. 75:1-6, 96:23-25.)

     B.    <u>Plaintiffs Will Not Adequately Represent the Proposed Class Because Their Interests Conflict With Those of Putative Class Members.</u>

For many of the same reasons, Plaintiffs are also inadequate representatives of a class. The adequacy requirement calls for courts to find that the representative parties will fairly and adequately protect the interests of the class. "Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 90 (7th Cir. 1977) (citation omitted). "Whether a party would adequately protect the interests of the class is a question of fact depending on the circumstances of each case." *Id*.

A proposed class representative is not adequate if its claims conflict with, or are antagonistic to, the claims and interests of the putative class members it seeks to represent. *Cox v. Sherman Capital LLC*, No. 1:12-cv-01654-TWP-MJD, 2016 WL 274877, at *8 (S.D. Ind. Jan. 22, 2016). "A named plaintiff who has serious credibility problems or who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative." *CE Design*, 637 F.3d at 726.

> Basic consideration[s] of fairness require that a court undertake a stringent and continuing examination of the adequacy of representation by the named class representatives at all stages of the litigation where absent members will be bound by the court's judgment. Strict oversight is necessitated since due process requires that absent class members be adequately represented in order to be bound by a court's judgment.

*Susman*, 561 F.2d at 89-90 (citation omitted).

For the reasons discussed above, the named Plaintiffs' claims conflict with the interests of the class members, who are not subject to the same individual defenses of default, unclean hands, setoff, *res judicata*, and release. Each of the named Plaintiffs also defrauded NextGear, severely hampering their credibility. (*See, e.g.*, Mattingly Dep. 91:15-93:19, 100:10-14, 180:2-

194:25; NextGear's Response to Interrogatory 13 [Ex. K] (Red Barn and Platinum made payments with insufficient funds).)  Issues such as these disqualify the named Plaintiffs from representing the class.  *See Howard v. Ray's LLC*, No. 1:08-cv-627-RLY-MJD, 2011 WL 4625735, at *5 (S.D. Ind. Sept. 30, 2011) ("A class is not fairly and adequately represented if class members have claims which conflict or are antagonistic to the representatives, and a named plaintiff with credibility problems may be considered to have interests antagonistic to the class.").

In addition, a class member who is not familiar with the claims of the class or who is unwilling to participate in discovery is not an adequate representative.  Here, the corporate representatives for Red Barn and Mattingly did not even know the factual basis for the RICO and unjust enrichment claims or their alleged damages.  (*See* Mattingly Dep. 155:11-156:2, 160:2-11, 195:23-196:10; Red Barn Dep. 189:5-191:13, 195:20-25.)  Nor did they know the basis for their claims against Cox Enterprises, Cox Automotive, or John Wick.[8]  (Mattingly Dep. 156:3-157:6; *see also* Red Barn Dep. 203:8-206:11.)  Similarly, Platinum has managed to produce only three documents in response to NextGear's discovery requests and has not yet verified its interrogatory responses despite repeated requests from counsel for defendants, raising questions about its motivation to pursue this matter vigorously for the class.  (*See* Galema Decl. ¶ 54.)

In sum, the named Plaintiffs possess all or some of the following characteristics: they defaulted on their repayment obligations to NextGear, they owe judgments to NextGear, they failed to raise any claims of improper interest charges during previous proceedings brought against them, and they engaged in fraudulent activity while a borrower that contributed to the

[8] Plaintiffs Red Barn and Mattingly also testified to distinctly different concerns with NextGear's interest charges.  (*Compare* Red Barn Dep. 141:12-23, 145:7-10 (taking issue with charges prior to NextGear paying auction), *with* Mattingly Dep. 75:9-76:11, 79:17-81:1 (taking issue with "title absent" transactions only).)

declaration of default.  Without question, Plaintiffs' baggage creates credibility problems and dealer-specific issues that will conflict with their representation of a class.  Simply put, Plaintiffs are inadequate to represent and bind a class of thousands of absent dealers, many of whom are still in current and harmonious credit relationships with NextGear under different loan forms.

**III.    Plaintiffs' Class Definition Is Too Broad, and Therefore the Class Is Not Ascertainable.**

A proposed class must be defined clearly and based on objective criteria.  Classes may fail to meet this test if they are defined too vaguely, defined by subjective criteria, or defined in terms of success on the merits ("fail-safe" classes).  *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659-60 (7th Cir. 2015).  In addition, "[w]hile not all class members need to be injured in order to certify a class, the inclusion of a great number of non-injured plaintiffs renders the class too broad, and thus not ascertainable."  *Panwar*, 2015 WL 329013, at *3.

In this case, most members of the putative class have not been injured.  They obtained vehicles immediately while NextGear accepted credit risk on their behalf.  When NextGear actually settled up with the auctions had no effect on those dealers because they were able to take possession of the cars and offer them for sale immediately—exactly what they had bargained for.  Most dealers paid their bills on time, and therefore never had issues with being "blacklisted" or pursued for default.  Because "a great number of non-injured plaintiffs" would be included in the class proposed in this case, the putative class is not ascertainable.

**IV.    A Class Action Is Not a Superior Method for Adjudicating Plaintiffs' Claims.**

Rule 23(b)(3) requires that a class action be superior to other available methods for fairly and efficiently adjudicating the controversy.  Rule 23(b)(3) includes a "nonexhaustive list of factors pertinent to a court's 'close look' at the predominance and superiority criteria":

(A)  the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B)  the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(D)  the difficulties likely to be encountered in the management of a class action.

*Amchem*, 521 U.S. at 615-16 (citing Fed. R. Civ. P. 23(b)(3)).

"In setting out these factors, the Advisory Committee for the 1966 reform anticipated that in each case, courts would 'consider the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit.'"  *Id.* at 616 (citing Adv. Comm. Notes, 28 U.S.C. App., p. 698).  "While the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high, the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'"  *Id.* at 617.  Class actions are meant to solve "the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."  *Id.* (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)).  They do so by aggregating the small potential recoveries into a larger amount.  *Id.*

As relates to the first superiority factor, individual plaintiffs would likely have an interest in managing their own cases.  Plaintiffs assert that putative class members "were wrongfully charged interest and/or fees in the range of tens of thousands of dollars each and suffered additional harm to their business as a result of NextGear's blacklisting."  (Br. at 28-29.)  If that is true—which NextGear denies—then each individual plaintiff has the incentive and ability to bring an action on its own behalf.  *See Mace*, 109 F.3d at 344.  The merits and proof of such damages will vary dramatically, eliminating any advantages of a class trial.

31

The fourth superiority factor also indicates that a class action is inappropriate here because it will be incredibly difficult to manage.  All the varying elements of the claims and defenses need to be adjudicated in mini-trials.  For example, Plaintiffs suggest that "blacklisting" damages could be measured by comparing a putative class member's "appraised value or profitability before and after NextGear's blacklisting prevented it from participating in the auctions where it did business."  (Br. at 26.)  But analyzing the value or profitability of an entire business, which may or may not be extant and have records, at two distinct points in time, and testing the accuracy and basis of that analysis in each case, would be incredibly complex for a single plaintiff, let alone a class.  Doing so on a class basis will require individual trials with valuation experts opining about alleged decreases in entity value for each class member.  (*Cf.* Galema Decl. ¶¶ 32-34 (significant demographic variety among borrowers' businesses).)

There will also be fundamental issues of causation and mitigation of damages for each proposed class member.  As to causation, dealers were allegedly "blacklisted" following their contractual defaults to NextGear, but a contractual default generally indicates an independent inability to pay the dealer's business obligations.  It will therefore be exceedingly difficult to tease out any incremental harm caused by the alleged "blacklisting"—even assuming the putative class member can prove liability in the first place.  (*Cf.* Galema Decl. ¶¶ 24-31.)  As to mitigation, two named Plaintiffs had access to other lines of credit that overlapped with the time period when they did business with DSC, suggesting that they had other options to purchase cars if they believed they were being harmed by DSC's practices.  Those options for any given dealer will vary based on its access to other credit and other sources of inventory.  Moreover, deposition testimony indicates that some named Plaintiffs failed to mitigate their damages.  (*See, e.g.*, Mattingly Dep. 26:12-30:13 (did not offer any other automotive services; regularly bought

cheaper cars at a lesser quantity when business was down; did not offer financing to customers);
Red Barn Dep. 226:5-228:25, 180:16-19, 90:21-91:15 (few attempts to get into other auctions;
applied for no other credit since bankruptcy; shut down some of their prior money-making
services).)  Again, determining causation and damages will require a mini-trial with each
affected dealer.

Because individual plaintiffs have an incentive to bring an individual action if they
believe they have been harmed, and the individual issues in this case would require numerous
mini-trials, a class action is not a superior method of managing this action.

## V.        There Is No Risk of Inconsistent or Varying Results in This Case.

Plaintiffs' attempt to obtain certification of their proposed class under Rule 23(b)(1) fails.
Rule 23(b)(1)(A) is meant to address circumstances where "[o]ne person may have rights
against, or be under duties toward, numerous persons constituting a class, and be so positioned
that conflicting or varying adjudications in lawsuits with individual members of the class might
establish incompatible standards to govern his conduct."  Fed. R. Civ. P. 23 advisory
committee's note to 1966 amendment.  Rule 23(b)(1) class actions are sometimes referred to as
"mandatory" class actions because absent class members are not entitled to notice or the
opportunity to opt out of the class.  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 833 n.13 (1999).

A determination that there is a risk of inconsistent or varying results in individual actions
under Rule 23(b)(1)(A) "requires more than a risk that separate judgments would oblige the
opposing party to pay damages to some class members but not to others or to pay them different
amounts."  7AA Wright & Miller, *Federal Practice & Procedure* § 1773 (3d ed. 2005).  Rule
23(b)(1)(A) is properly held to apply only "in cases where the party is obliged by law to treat the
members of the class alike (a utility acting toward customers; a government imposing a tax), or

where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)." *Amchem*, 521 U.S. at 614 (citation omitted).

Here, there is no injunctive aspect to the relief sought by Plaintiffs.  Moreover, they have specifically conceded that, since at least August of 2013, the NextGear form contracts allow the interest charges at issue.  (*See* Br. at 5 & n.10, 16.)  Separate judgments against NextGear would, at most, require NextGear to pay damages to some class members but not others, or to pay them in different amounts, but it would not change any standards applicable to NextGear going forward.  The putative class therefore cannot be certified under Rule 23(b)(1)(A).

## CONCLUSION

This case is ill-suited for class treatment.  Individual issues abound, and unique defenses applicable to the named Plaintiffs should prevent them from representing a class of absent dealers, especially since most of those dealers have not actually been harmed and, in fact, continue in their amicable and voluntary business relationships with NextGear.  Because Plaintiffs have not met their burden to show that the Rule 23 requirements are met, this Court should deny the motion for class certification.

Respectfully submitted, this 31st day of October, 2016.

  *s/ Tracey K. Ledbetter*
David J. Jurkiewicz (18018-53)
Paul D. Vink (23785-32)
BOSE McKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN  46204
(317) 684-5000
(317) 684-5173 fax
djurkiewicz@boselaw.com
pvink@boselaw.com

Jason S. McCarter (*pro hac vice*)
Tracey K. Ledbetter (*pro hac vice*)
SUTHERLAND ASBILL & BRENNAN LLP

34

999 Peachtree Street, NE, Suite 2300
Atlanta, GA 30309-3996
(404) 853-8000
(404) 853-8806 fax
jason.mccarter@sutherland.com
tracey.ledbetter@sutherland.com

*Attorneys for Defendants Cox Enterprises, Inc., Cox
Automotive, Inc., NextGear Capital, Inc. f/k/a
Dealer Services Corporation, and John Wick*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing has been served upon the

following counsel of record via the Court's electronic service notification system, this 31st day

of October, 2016:

Ryan D. Adams
James M. Garner
Matthew M. Coman
SHER GARNER CAHILL RICHTER
KLEIN & HILBERT, L.L.C.
radams@shergarner.com
jgarner@shergarner.com
mcoman@shergarner.com
jairey@shergarner.com
ksimcox@shergarner.com
akeller@shergarner.com
jstockstill@shergarner.com
jchocheles@shergarner.com
priggs@shergarner.com

Gladstone N. Jones, III
Lynn E. Swanson
Kerry A. Murphy
Catherine E. Lasky
JONES, SWANSON, HUDDELL &
GARRISON, LLC
gjones@jonesswanson.com
lswanson@jonesswanson.com
greed@jonesswanson.com
cmason@jonesswanson.com
sjoshua@jonesswanson.com
kmurphy@jonesswanson.com
lreeves@jonesswanson.com
klasky@jonesswanson.com

Cassie E. Felder
LUGENBUHL, WHEATON, PECK,
RANKIN & HUBBARD
cfelder@lawla.com
kfisher@lawla.com

Kathleen A. DeLaney
DELANEY & DELANEY LLC
Kathleen@delaneylaw.net

Lisa Brener
BRENER LAW FIRM, LLC
lbrener@brenerlawfirm.com
tkeller@brenerlawfirm.com

_s/ Tracey K. Ledbetter_
Tracey K. Ledbetter