1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF INDIANA

3                 INDIANAPOLIS DIVISION

4

5   RED BARN MOTORS, INC.,      CASE NO.
    PLATINUM MOTORS, INC.,      1:14-cv-1589-TWP-
6   MATTINGLY AUTO SALES,       DKL
    INC., AND YOUNG EXECUTIVE
7   MANAGEMENT & CONSULTING
    SERVICES, INC.,
8   individually and on
    behalf of other members
9   of the general public
    similarly situated,
10
    VERSUS
11
    COX ENTERPRISES, INC.,
12  COX AUTOMOTIVE, INC.,
    NEXTGEAR CAPITAL, INC.
13  F/K/A DEALER SERVICES
    CORPORATION, successor by
14  merger with Manheim
    Automotive Financial
15  Services, Inc., and JOHN
    WICK
16

17

18          Corporate Deposition of RED BAN MOTORS,

19  INC., through its representative DEVON LONDON, 25852

20  Plantation Avenue, Denham Springs, Louisiana 70726,

21  taken in the offices of Lugenbuhl, Wheaton, Peck,

22  Rankin & Hubbard, 9311 Bluebonnet Boulevard, Suite

23  A, Baton Rouge, Louisiana on Tuesday, October 25,

24  2016, commencing at 9:07 a.m.

25



EXHIBIT L

1       Q.     Okay.   So since 2011, you've been general

2   sales manager?

3       A.     Yes.

4       Q.     Okay.   Any other positions at Red Barn?

5       A.     No.   I mean, you can say general sales

6   manager, general manager.   It's the same thing over

7   a small used car operation.

8       Q.     Okay.   Where is Red Barn?

9       A.     At 26007 LA Highway 16, Denham Springs,

10  Louisiana 70726.

11      Q.     And has that been true since you've been

12  there?

13      A.     Yes.

14      Q.     Okay.   So as general sales manager,

15  general manager, how would you describe your -- your

16  responsibilities at Red Barn?

17      A.     My responsibility was to oversee the

18  operations, oversee the employees, report back to

19  Mr. Richardson, the owner, you know, activities that

20  transpired and fulfill his desires to operate the

21  company.

22      Q.     Okay.   And so it's not just focused on

23  sales, you're basically running the business?

24      A.     Pretty much.

25      Q.     Okay.   And tell me who Mr. Richardson is?



```
 1        A.    He's my father-in-law.

 2        Q.    Okay.  It's Don Richardson, Donald?

 3        A.    Don Richardson.

 4        Q.    Is it Donald or Don?

 5        A.    Donald --

 6        Q.    Okay.

 7        A.    -- Donald B.

 8        Q.    And he's an owner of Red Barn?

 9        A.    Yes.

10        Q.    Is he the only owner?

11        A.    I believe he is an owner with his wife.

12  I may be incorrect on that.

13        Q.    And her name is?

14        A.    Barbara Richardson.

15        Q.    Are you still his son-in-law?

16        A.    Yes.

17        Q.    When did you marry into the family?

18        A.    I married into the family in 2003.

19        Q.    Okay.  That's when you were still in Las

20  Vegas?

21        A.    Yes.

22        Q.    Okay.  As general manager, do you report

23  to Mr. Richardson on a day-to-day basis or is he

24  more of an absentee owner?

25        A.    No.  I report to him, I wouldn't say
```




 1  every single day, but on a very regular basis.

 2       Q.    Okay.

 3            MR. COMAN:

 4                 And let me lodge an objection to the

 5       term "absentee owner."

 6                 Please, if you could give me a

 7       chance to think.  I'm not exactly the fastest

 8       person in the world.

 9  BY MR. McCARTER:

10       Q.    And high level, what is the business of

11  Red Barn?

12       A.    What was the question?

13       Q.    What is the business of Red Barn, how

14  does it make money?

15       A.    Basically, it purchases used cars and

16  resells those used cars for a profit.

17       Q.    Does it sell any related products like --

18  like you did at Findlay, gap insurance, warranties,

19  does it do any financing?

20       A.    We did for a short period of time, but

21  for the most part, no.

22       Q.    What period of time did you sell those

23  other products?

24       A.    That was probably sometime in the -- mid

25  2011.



DEVON LONDON                                          October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                              20

1        Q.    Okay.  At a high level, was -- was

2   Findlay Automotive in the same business of buying

3   and selling cars for profit?

4        A.    Yes.

5        Q.    Where did Findlay gets its cars generally

6   to resell?

7        A.    At automobile auctions or dealer

8   trade-ins.

9        Q.    Anywhere else you can think of, purchases

10  directly from other dealers, on-line sales, anything

11  like that?

12       A.    There would be purchases from other

13  dealers, very infrequently.  Also, very infrequently

14  -- very infrequently, a customer would come in and

15  want to just sell their car outright.

16       Q.    Okay.  And is that generally true of Red

17  Barn as well, where -- where does Red Barn get its

18  cars?

19       A.    Red Barn basically gets its cars from the

20  auto auctions, trade-ins, and occasionally from a

21  customer that would come in and want to just sell

22  the car outright.

23       Q.    What -- what auto auctions does Red Barn

24  buy and sell from now?

25       A.    As of right now, Oak View Auto Auction.



DEVON LONDON                                         October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                                21

 1      Q.      Where is that?

 2      A.      That is on Flannery Road in Baton Rouge.

 3      Q.      Okay.  Anywhere else?

 4      A.      Long Beach Auto Auction.

 5      Q.      Is that in Mississippi?

 6      A.      That's in Mississippi, Long Beach,

 7   Mississippi.

 8      Q.      Any other auction?

 9      A.      And ABC Baton Rouge.

10      Q.      Are you a buyer and seller at all of

11   those or just a buyer?

12      A.      Buyer and seller.

13      Q.      And I'm sorry to keep jumping back and

14   forth, but I keep thinking of new questions.  With

15   Findlay, where did they -- what auctions did they

16   generally go to?

17      A.      Findlay would go to -- I don't remember

18   the names of them.  There was one large Manheim

19   auction and two smaller independent auctions.

20      Q.      In Nevada?

21      A.      In Nevada.

22      Q.      All right.  So back to Red Barn, auto

23   auctions, trade-ins, and sometimes customers would

24   sell a car outright to you?

25      A.      Correct.



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                        22

1      Q.    Do you ever buy from other dealers

2   directly?

3      A.    I don't believe we have, no.

4      Q.    Okay.  Do you ever buy from other on-line

5   sources like eBay Motors or Smart Auction or

6   anything like that?

7      A.    We have bought several vehicles on eBay.

8      Q.    Okay.  Recently, in the last year or two?

9      A.    No.  That was -- that was earlier in the

10  business development.

11     Q.    Just a rough time frame?

12     A.    2011.

13     Q.    Okay.  So is Red Barn a licensed used car

14  dealer?

15     A.    Yes, with the Louisiana Used Motor

16  Vehicle Commission.

17     Q.    Are you only licensed in used cars or can

18  you sell -- buy and sell new cars, too?

19     A.    We are only licensed in used cars.  The

20  license is all inclusive of like RVs and motorcycles

21  and things like that, trailers, but we don't really

22  get into that.

23     Q.    Okay.

24     A.    We stick with used cars and trucks.

25     Q.    And you have the -- just the one lot in



1    Denham Springs?

2        A.    Yes.

3        Q.    How many cars do you have on your lot at

4    this time?

5        A.    At this time, there are approximately 37

6    --

7        Q.    Okay.

8        A.    -- 37 to 40.

9        Q.    Do you know when Red Barn first opened?

10       A.    I don't know the exact date.

11       Q.    Okay.  I think I'll have some records in

12   a minute that show 2010 was the corporate

13   organization.  Does that sound like the rough

14   starting time?

15       A.    That sounds correct.

16       Q.    In fact, let me just go ahead and show

17   you.

18             MR. McCARTER:

19                  We'll call this Exhibit #2.

20   BY MR. McCARTER:

21       Q.    And I'll represent to you this is just a

22   printout from the Louisiana Secretary of State

23   website related to Red Barn Motors, Inc.  I know you

24   may not have seen this record before, but you can

25   see in the middle that it shows a filing date of



```
 1   February 26, 2010.  Do you see that?
 2       A.    Uh-huh.
 3       Q.    Do you have any reason to think that
 4   wasn't roughly the date of organization for the
 5   company?
 6       A.    That was probably the date of
 7   organization.
 8       Q.    Okay.  And it shows -- on the second page
 9   of that exhibit, it shows Donald Richardson as
10   president and Barbara Richardson as
11   secretary-treasurer.  Is there any reason to think
12   that's not accurate?
13       A.    No.
14       Q.    Okay.  And is the company still in good
15   standing, to your knowledge?
16           MR. COMAN:
17               Objection as to vagueness.  Good
18       standing as to the Secretary of State or good
19       standing as --
20           MR. McCARTER:
21               If you don't mind, let's just do
22       basic objections like the federal rules
23       instead of directing his answers.
24           MR. COMAN:
25               Sure.
```



```
 1              MR. McCARTER:
 2                   You can object to form.
 3              MR. COMAN:
 4                   Let me make that objection to form.
 5              MR. McCARTER:
 6                   Okay.
 7    BY MR. McCARTER:
 8         Q.   So do you have any reason to think you're
 9    not still a -- an organized company that's paid its
10    dues with the Louisiana Secretary of State?
11         A.   No.
12         Q.   Thank you.  And the location has been the
13    same lot in Denham Springs the whole time?
14         A.   Correct.
15         Q.   Okay.  Do you know -- does -- does Red
16    Barn Motors, Inc., file its own tax returns, to your
17    knowledge?
18         A.   It does with the help of a firm called
19    Greg Kennedy.
20         Q.   Greg Kennedy?
21         A.   Kennedy, K-E-N-N-E-D-Y.
22         Q.   That's a CPA or something?
23         A.   CPA.
24         Q.   Okay.  Do you think that's been true
25    since 2011?
```



1    A.    Yes.

2    Q.    Are you involved in helping prepare those

3   returns?

4    A.    No, I am not.

5    Q.    Okay.  Do you know if Red Barn Motors,

6   Inc., has used any other trade names since 2010?

7    A.    Trade names, the only trade name would be

8   -- and this is, again, not -- I -- I don't -- I may

9   not understand the question, but as a buy here/pay

10  here, there is a d/b/a as Red Barn Auto Finance.

11   Q.    Okay.  And that's the only d/b/a you can

12  think of?

13   A.    Correct.

14         MR. McCARTER:

15               I'm going to show you what I'm going

16       to mark as Exhibit #3.

17  BY MR. McCARTER:

18   Q.    And I'll represent to you again these are

19  further printouts from the Louisiana Secretary of

20  State's website and it -- it does seem to show that

21  Red Barn Auto Finance is a registered trade name

22  that you mentioned.  Do you see that on the first

23  page?

24   A.    Yes.

25   Q.    Okay.  And it shows it as -- as still a



```
 1  valid trade -- registered trade name.  It shows an

 2  expiration date of -- of July 6, 2022.  Do you know

 3  -- are you still using that trade name in your

 4  operation?

 5            MR. COMAN:

 6                  Objection to form.  I think to

 7       clarify, not to step on you, but it says 2022,

 8        that is correct.  I stand corrected.

 9  BY MR. McCARTER:

10      Q.    So my -- my -- my basic question is still

11  the same.  Do you use this trade name in your

12  day-to-day operations?

13      A.    Yes.

14      Q.    Okay.  What do you use it for?

15      A.    For our buy here/pay here operation.

16      Q.    And we'll come back to that, but that --

17  that -- tell me if this is wrong, but that's

18  basically in-house financing on cars you sell?

19      A.    Correct.

20      Q.    And then if you turn the page over, it

21  shows another registered trade name of Red Barn Auto

22  Repair.  Do you see that one?

23      A.    Yes.

24      Q.    Do you use that trade name?

25      A.    No, we do not.
```



1            So since that question focused on

2       the consumer, number 7, obviously, does not.

3            MR. McCARTER:

4            Okay.  Number 7 says, "Any financing

5       arrangements Red Barn has had with any

6       financing company, auction or third party" --

7       which a consumer would be -- "since

8       December 3, 2007, including the transaction

9       history and current status of that

10      arrangement."

11           And then 22 and 23 speak to Red

12      Barn's damages to the extent trade-ins are an

13      integral part of their sales and their

14      business, then how they handle and price

15      trade-ins will affect what their damages are

16      and what they've done to mitigate those

17      damages.

18           MR. COMAN:

19           I've lodged my objection.

20           You can answer, if you know.

21           THE WITNESS:

22           Okay.  Can you repeat the question?

23           MR. McCARTER:

24           Sure.

25  BY MR. McCARTER:



1    Q.    At a high -- I just want to know, at a
2  high level, how do you handle trade-ins?  How do you
3  price them, and how do you work them into your
4  retail deals?
5    A.    At high level, there is a -- there is not
6  a high level of trade-ins.
7    Q.    Okay.
8    A.    There is a very low level of trade-ins.
9  I would say we may get one to two trade-ins a month.
10  We would value those vehicles based off of NADA,
11  Kelley Blue Book, MMR, and the condition of the
12  vehicle.
13    Q.    And then do you take that off the net
14  price of the car you're selling?  Do you buy them
15  outright, or do you handle it some other way?
16    A.    We show it as a trade credit on the
17  purchase agreement.  Which then, in turn, in the
18  state of Louisiana, they don't end up paying taxes
19  twice.
20    Q.    And then, if they have a lien
21  outstanding, you have to pay off the lienholder to
22  get the title?
23    A.    Correct.
24    Q.    Do you commonly turn around and try to
25  retail those, or do you take them to auction, or



1   both?

2        A.    Both.

3        Q.    All right.  Let's talk about auto

4   auctions.

5              You said your -- Red Barn is currently or

6   recently dealing at Oak View, ABC Baton Rouge and --

7   remind me of the third?

8        A.    Long Beach.

9        Q.    Long Beach.  Have you dealt at any other

10  auctions, that you can recall, in the last five

11  years?

12       A.    We have dealt with Manheim Lafayette and

13  Manheim New Orleans.

14       Q.    At a high level, is the process of

15  bidding on and buying cars the same across all five

16  of those auctions?

17       A.    Can you repeat the question?

18       Q.    So I'm just -- I want to talk to you

19  about the auction purchase process.

20       A.    Okay.

21       Q.    So I'm saying, is there a major

22  difference in the way that works at those five

23  auctions?

24       A.    No.

25       Q.    Okay.  And so please correct me if this



1  is wrong.  I am just trying to summarize to move

2  this more quickly.

3         But you basically identify a car that you

4  are interested in.  You bid on it along with other

5  dealers, if they are interested.  And if you have

6  the high bid, you win the car?

7         MR. COMAN:

8               Objection as to form.

9               You can answer.

10        THE WITNESS:

11              Yes.

12  BY MR. McCARTER:

13     Q.    Okay.  And say you're the winning bidder

14  on a car at these auctions.

15        Then what happens next with that car?

16  How do you take the car back to your lot?

17     A.    Basically, it depends on the auction.  At

18  ABC Baton Rouge, they have just recently allowed us

19  to write checks for the vehicle.

20     Q.    So by that you mean Red Barn's business

21  checks?

22     A.    Correct.

23     Q.    Okay.  And when did that -- when did they

24  recently begin to allow that again?

25     A.    Probably within the last six months.



1    Q.    Before that, what did they allow?

2    A.    Before that, we were cash only.

3    Q.    Cash?

4    A.    Cash, cashier's check.

5    Q.    Certified check, same thing?

6    A.    Cashier's check.

7    Q.    Okay.

8    A.    I would have to go to the bank and get a

9  cashier's check.

10    Q.    Okay.  What about Oak View?  How do you

11  acquire a car there?

12    A.    Oak View, I have to pay cash or certified

13  funds.

14    Q.    Still to this day?

15    A.    Still to this day.

16    Q.    Okay.  And what about Long Beach?

17    A.    Long Beach is cash or certified funds.

18  And they require us to put up a thousand-dollar

19  deposit.

20    Q.    That -- is that a standing deposit that

21  you've paid, and it just sits there?

22    A.    Yes.

23    Q.    Okay.

24    A.    You get it back at the end of auction if

25  there's no if bids.  But to be able to participate



```
 1    in the auction, we have to front the thousand

 2    dollars.

 3        Q.    Does it get applied to your purchases, or

 4    do you literally get a check back?

 5        A.    We take the money back.  Because we get a

 6    cashier's check for the amount of the vehicles we

 7    purchased.

 8        Q.    Okay.  And just -- so, typically, you go

 9    in with a bunch of cashier checks in hand, or do you

10    go to a bank nearby and get what you need?  Or how

11    does that work?

12        A.    I go to a bank nearby and get what we

13    need.

14        Q.    And has that changed over time?  Were you

15    previously able to write business checks at those

16    auctions?

17        A.    Yes.

18        Q.    And when did that change?

19        A.    That changed after we were listed in the

20    KO book.

21        Q.    When was that?

22        A.    Sometime around March to April of 2013.

23        Q.    And what is your understanding of what

24    the KO book is?

25        A.    My understanding is it is a list of
```



1  dealers that have had adverse relationships with

2  floorplan companies, auction houses, what have you,

3  that tracks those dealers and basically sets the

4  parameters as to how you can -- can or cannot buy

5  cars.

6      Q.   Do you have a sense of who keeps that

7  list?

8      A.   I do not know.

9      Q.   And so you're -- but you're still able to

10 deal at Oak View, Long Beach and ABC.

11          So what is your sense of the change?

12     A.   Well, number one, we can't use checks.

13     Q.   Okay.

14     A.   And, number two, we have to use -- you

15 know, we have to put up a deposit to be able to

16 purchase.

17     Q.   Okay.  All right.  We'll come back to the

18 KO book.

19          And so when you were dealing at Manheim

20 Lafayette and Manheim New Orleans, how would you pay

21 for cars there?

22     A.   We would, I believe, generally floorplan

23 them off.

24     Q.   With DSC or others?

25     A.   DSC or AFC.



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                          61

1       Q.    All right.  But is it fair to say you
2    have to make some form of payment to the auction to
3    take the car out?
4       A.    That is correct.
5       Q.    And one way to do that is cash?
6       A.    Correct.
7       Q.    One way to do that is cashier's checks?
8       A.    Yes.
9       Q.    One way to do that is to designate a
10   prearranged floorplaner?
11      A.    Yes.
12      Q.    Okay.
13            MR. COMAN:
14                  And if I could -- I'm sorry to
15       interrupt.
16                  I would like to lodge an objection
17       as to form as to which auction.
18            MR. McCARTER:
19                  Okay.
20   BY MR. McCARTER:
21      Q.    And at least at some auctions, in some
22   cases, you have been able to pay with business
23   checks?
24      A.    One auction.
25      Q.    Okay.  But prior to going in the KO book,



1    you could write business checks at any of those

2    auctions?

3        A.    No.  Prior to going -- oh, yes.  Prior to

4    going into the KO book, we could write business

5    checks at any of those auctions.

6        Q.    Okay.  Did you use DSC floorplan credit

7    at all five of those auctions, or just the Manheim

8    auctions?

9        A.    At all five, I believe.

10       Q.    Okay.  All right.  So when you make some

11   form of payment at the auction, do you get some

12   paperwork?  I mean, how do you get the car out of

13   the auction?

14       A.    You get a auction slip.  You also get a

15   gate release, and that release allows you to take

16   the vehicle off the lot.

17       Q.    Once you take it off the lot, can you

18   begin selling it?

19       A.    Yes.

20       Q.    Do you always do that from your Red Barn

21   Motors lot, or do you sometimes sell from other

22   places?

23       A.    No, every -- all sales are done from Red

24   Barn Motors' lot.

25       Q.    Is the title to the vehicle always



1    available when you buy it at auction?

2         A.    No.

3         Q.    When would it not be?

4         A.    When it has not been provided to the

5    auction by the dealership that is representing it or

6    the company that is representing it.

7         Q.    And are those called TA or title absence

8    sales?

9         A.    I don't know the terminology, but.

10        Q.    That's what Mr. Mattingly, one of the

11   other plaintiffs, told me.

12        A.    Okay.

13        Q.    He suggested that they were called "title

14   absent."

15        A.    Okay.

16             MR. COMAN:

17                  I'm going to object.

18   BY MR. McCARTER:

19        Q.    I am not asking if you agree with that,

20   but have you heard the term the "title absent"

21   before?

22        A.    No.

23             MR. COMAN:

24                  I'm going to object to the form.

25                  Again, please allow me a small bit



1      of time.

2    BY MR. McCARTER:

3        Q.    But it's not uncommon for the title to

4    not be there at the time of the auction sale?

5        A.    That is correct.

6        Q.    Okay.  Have you ever sold a car at

7    auction without the title?

8        A.    Yes.

9        Q.    Okay.  And then you eventually provide it

10   later?

11       A.    Yes.

12       Q.    And when do you get paid by the auction,

13   as a seller?

14       A.    When do we get paid by the auction?

15   You're talking about cars that I sold at auction?

16       Q.    Correct.

17       A.    When we produce the title.

18       Q.    Okay.  Do you ever retail a car without

19   the title present?

20       A.    Yes.

21       Q.    In what circumstances would you do that?

22       A.    Circumstances where somebody is

23   interested in purchasing a vehicle and the title

24   isn't available.

25       Q.    Like, perhaps you are still waiting for



1    it from the auction?

2         A.    Or from the floorplan company.

3         Q.    Okay.  Do you have any floorplaner now at

4    Red Barn?

5         A.    No.

6         Q.    Okay.  Do you have any other, sort of,

7    commercial credit or financing?

8         A.    No.

9         Q.    Has that been true since the bankruptcy

10   in the 2013 time frame?

11        A.    Correct, yes.

12        Q.    Okay.  Do you keep some sort of file or

13   deal jacket on the cars you buy and sell?

14        A.    Yes.

15        Q.    I understand there may be some record in

16   your DMS software on each vehicle; is that correct?

17        A.    Correct.

18        Q.    But is there a physical file apart from

19   that?

20        A.    Yes.

21        Q.    Okay.  And what do you -- do you have a

22   name for that?  Do you call it a deal jacket or

23   something?

24        A.    Deal jacket.

25        Q.    Okay.  How far back do you keep your deal



1  jackets?

2      A.    How are you -- like, how far back do we

3  keep them from when we --

4      Q.    I mean how far back in time do you have

5  deal jackets?

6      A.    We had them until -- from the beginning

7  of time until the flood.

8      Q.    Okay.  So they've been destroyed in the

9  flood?

10      A.    Yes.

11      Q.    Every one?

12      A.    Not all of them, no.

13      Q.    Okay.  How -- is there -- are there some

14  years that were destroyed and some not, or is it

15  random?

16      A.    There are some years that were destroyed,

17  some not.  I don't know which ones.  I haven't gone

18  through and, you know, tabulated which ones were and

19  which ones weren't.

20      Q.    Okay.  And, at this point in time, are

21  you expecting to re-open after the flood damage is

22  repaired?

23      A.    Yes.

24      Q.    Okay.  All right.  So if you bought a car

25  at auction when you had a DSC floorplan, what was



1    the process at auction?   How would you pay for the

2    car with the floorplan?

3        A.    I would tell the counter clerk to

4    floorplan the vehicle on whichever floorplan I

5    chose.  You know, DSC or AFC.

6        Q.    And is it your understanding that DSC

7    stands for Dealer Services Corporation?

8        A.    Yes.

9        Q.    And is it your understanding that AFC

10   stands for Automotive Finance Corporation?

11       A.    Yes.

12       Q.    Okay.  And when you would tell the clerk

13   to put it on your floorplan, what happened next,

14   from your perspective?

15            MR. COMAN:

16                 Objection as to form.

17                 You can answer it.

18            THE WITNESS:

19                 They would give us a gate release on

20       the vehicle, and we would be able to take

21        possession of the vehicle.

22   BY MR. McCARTER:

23       Q.    And if you don't know, it's fine.

24            But do you know whether they checked your

25   credit availability in some way or would they have



1   that in hand already?

2       A.    I know occasionally they called Stuart to

3   check credit availability on a couple of occasions.

4       Q.    And who's Stuart?

5       A.    Stuart LaBauve.  He was our account

6   representative.

7       Q.    For DSC?

8       A.    For DSC.

9       Q.    But sometimes you wouldn't see that

10  happen, they would just put it on your floorplan?

11          MR. COMAN:

12               Objection as to form.

13               You can answer, if you know.

14  BY MR. McCARTER:

15      Q.    You said sometimes they called Stuart and

16  checked availability.  But that sounds like

17  sometimes they did not?

18      A.    I don't know if they did or did not in

19  those instances.

20      Q.    Okay.  Do you have any insight as to how

21  the auction knew how much credit you had available

22  on your DSC line?

23      A.    No.

24      Q.    Okay.  And if you put a car on your DSC

25  line, did you get a check for that car, or did



1    some -- did DSC settle up with the auction?

2              MR. COMAN:

3                   Objection as to form.

4                   You can answer.

5              THE WITNESS:

6                   DSC paid the auction.

7    BY MR. McCARTER:

8         Q.    Do you recall ever putting a non-auction

9    car on your DSC line?

10        A.    A non-DSC car?

11        Q.    No.   A non-auction car.

12        A.    A non-auction car?

13        Q.    Yes.

14        A.    There may have been -- there may have

15   been a handful of instances, but I don't recall.

16        Q.    Okay.  Was the process the same?  You

17   just call somebody and say, put it on the line?

18        A.    I believe, in those instances -- I think

19   Stuart would have to come and pick up the title.

20        Q.    Okay.  Do you recall whether you had to

21   provide a Bill of Sale or some proof of purchase?

22        A.    We had -- yeah.  We had to show how we --

23   how much we paid for the vehicle.

24        Q.    Do you recall whether they -- DSC --

25        A.    And the reason I'm saying I don't know is



1  because we also -- I know we did it with AFC, but

2  I'm not positive if it was done with both companies.

3       Q.    Okay.  With auction purchases, did DSC

4  always finance the auction amount?

5       A.    Yes.

6       Q.    Okay.  And with those cars that were not

7  purchased at auction, did they always finance the

8  amount you paid for it, or was there more of a

9  varying in price?

10      A.    Rephrase the question.

11      Q.    Okay.  I -- so you would -- presumably,

12  you would provide a title or a Bill of Sale.

13            Did they always finance the Bill of Sale

14  amount, or did they sometimes finance less?

15      A.    No, they always financed the Bill of Sale

16  amount.

17      Q.    Even on non-auction cars?

18      A.    Correct.

19      Q.    Okay.  And what was the benefit to Red

20  Barn of using a DSC floorplan at auction?

21            MR. COMAN:

22                 Objection to the form.

23                 If you understand the question --

24            THE WITNESS:

25                 Okay.



```
 1              MR. COMAN:
 2                   -- you can answer it.  If you don't
 3         understand the question, don't guess at it.
 4         If you would like to ask him to rephrase it,
 5         you can certainly do so.
 6              THE WITNESS:
 7                   Please rephrase it.
 8              MR. McCARTER:
 9                   Okay.
10    BY MR. McCARTER:
11         Q.    So we talked about other forms of payment
12    you can use at auction, cash, cashier's check, that
13    sort of thing.  So why would you use the DSC
14    floorplan at auction instead?
15         A.    Basically, the relationship and the
16    convenience.
17         Q.    Was it helpful not to have to come out of
18    pocket for the purchase money?
19         A.    Well, in essence, we didn't have to come
20    out of pocket for the purchase money.
21         Q.    If you used a floorplan?
22         A.    If -- if -- if you use a floorplan or if
23    you write a check.
24         Q.    Okay.  So if you write a check, you don't
25    have to have the money in the bank to cover it?
```



1      A.    No, you have the money in the bank --

2      Q.    Okay.

3      A.    -- obviously.  But they hold the title --

4  I mean they hold the check until the title comes in.

5      Q.    Okay.  And sometimes the title is there,

6  and sometimes it's not, correct?

7      A.    Correct.

8      Q.    But with the DSC floorplan, presumably

9  you get some time to pay after you put the car on

10 the floorplan?

11     A.    With the DSC floorplan, yes.

12     Q.    Okay.  Typically, how much time would you

13 get to pay if you put a car on a DSC floorplan?

14     A.    I believe there were three curtailments.

15 I think it was 120 days.

16     Q.    Okay.  If you sold a car, did you have to

17 pay sooner?

18     A.    Yes.

19     Q.    Do you remember the timing of that, if

20 you sold a car, how long that you had to pay?

21     A.    I was told 48 hours.

22     Q.    Okay.  And if you didn't sell a car

23 within 60 days, you can re-floor it and keep it

24 longer?

25     A.    Yes.



```
 1        Q.    Okay.  And then, after that, how much
 2   longer could you keep it?  And you said 120 days,
 3   but it was 60 days and then another 30 and then
 4   another 30; is that right?
 5        A.    I believe so.
 6        Q.    Okay.  And did you have an understanding
 7   that you would have to pay -- if you put a car on a
 8   DSC floorplan, then you would have to repay that
 9   principal to DSC?
10        A.    Absolutely.
11        Q.    Okay.  And did you have an understanding
12   that you would have to pay some interest and fees
13   beyond that principal?
14        A.    If it was floored, yes.
15        Q.    Okay.  Did you have an understanding that
16   DSC had a security interest or some other rights in
17   the vehicle until they were paid?
18             MR. COMAN:
19                  Objection to the extent -- let me
20        just object to form.
21                  If you understand his question --
22             THE WITNESS:
23                  I -- I don't.
24             MR. COMAN:
25                  Okay.
```



```
 1    BY MR. McCARTER:
 2         Q.    Did you -- did -- when you floored a car
 3    with DSC, did DSC have any rights to the car if they
 4    didn't get paid?
 5         A.    Yes.
 6         Q.    Okay.  And what's your understanding of
 7    what that -- their rights were?
 8         A.    Their rights were to take the vehicle,
 9    you know, and/or charge penalties and late fees.
10         Q.    Okay.  And do you have a sense of whether
11    their interest was limited to the particular
12    financed vehicle, or may -- or did it extend to
13    other property of Red Barn Motors?
14              MR. COMAN:
15                   Objection to the form to the extent
16         it calls for a legal conclusion.
17                   If you understand his question, you
18         can answer it.
19              THE WITNESS:
20                   I believe that it extended to other
21         property of Red Barn.
22    BY MR. McCARTER:
23         Q.    Like what?  And I am asking about your
24    understanding.  I am not asking you to quote the
25    legal documents.
```



```
 1              But what was your understanding of DSC's
 2    right if there was a payment default?
 3         A.    My understanding was there was a personal
 4    guaranty.  So Don Richardson would be on the hook
 5    for any payment default.  And you would have rights
 6    to the vehicles that you had floored.
 7         Q.    All right.  And so when you put a vehicle
 8    on the DSC floorplan, how did you know when payment
 9    was due on that vehicle?
10         MR. COMAN:
11              I'm going -- let me just object to
12         the form on vagueness.
13              If you understand --
14         THE WITNESS:
15              Yes, again, can you rephrase it?
16         MR. McCARTER:
17              Sure.
18    BY MR. McCARTER:
19         Q.    So we talked before that you would have
20    to pay a vehicle off within a certain amount of time
21    if you sold the vehicle, right?
22         A.    Correct.
23         Q.    Okay.  But then, if you didn't, you had
24    60 days where you could roll it over further,
25    correct?
```



1      A.      Correct.

2      Q.      Okay.   How did you keep track of when the

3  60 days ran?

4      A.      We ran a report, daily, that gave us a

5  breakdown of all the -- my office manager ran a

6  report, but --

7      Q.      And what did she run that report from?

8              MR. COMAN:

9                  I'm sorry.   Could you allow

10         Mr. London -- did you have anything further to

11         add?

12             THE WITNESS:

13                 It would just tell when, in

14         chronological order or in date order, payments

15         were due, curtailments were due, principal

16         payments were due.

17  BY MR. McCARTER:

18     Q.      Was that report specific to DSC, or was

19  it for any car you owned?   Or something else?

20     A.      No, that report was specific to DSC.

21     Q.      Okay.   And how did you create that

22  report?

23     A.      That report was created on DSC's website.

24     Q.      That's discoverdsc.com?

25     A.      Yes.



1    Q.    And you ran that daily?

2    A.    Yes.

3    Q.    And that -- besides telling you when

4    payment was due, it would also tell you how much was

5    due on each vehicle?

6    A.    Yes.

7    Q.    Were -- was Red Barn Motors ever involved

8    in collateral audits with DSC?  Does that mean

9    anything to you, that term?

10    A.    Collateral audits, they -- where somebody

11    would come out and inspect all of the vehicles and

12    make sure they're accounted for --

13    Q.    Right.

14    A.    -- is that a collateral audit?

15    Q.    That's what I had in mind.

16    A.    Yes.

17    Q.    And you were involved in those?

18    A.    I was involved.  The used car managers

19    were involved.

20    Q.    Let's step back a second.

21          Roughly what period of time were you

22    involved with DSC -- did you have a DSC floorplan?

23    A.    From 2011 to 2013.

24    Q.    Okay.  And do you have any recollection

25    of how often the collateral audits would be during



1    that period?

2         A.    Every 30 to 45 days.

3         Q.    And is your recollection that AFC would

4    do the same thing?

5         A.    Yes.

6         Q.    Did you work with any other floorplaners

7    when you were at Findlay?

8         A.    Not directly, no.

9         Q.    Okay.  All right.  Were you involved in

10   applying for Red Barn's DSC line of credit?

11        A.    Involved in applying -- Don Richardson

12   applied for the line of credit.

13        Q.    Okay.

14        A.    To the extent that I was involved, is I

15   told Don what Stuart had told me and what the

16   benefits of the line of credit would, you know, do

17   for the business.  And then Don made his decision

18   based off of that.

19        Q.    Okay.  And did DSC request certain

20   information from the dealership, and did you help

21   provide any of that?

22        A.    I know there was some information

23   requested, but I would have just turned that over to

24   the office manager and told the -- told them to

25   produce it.



1     Q.    And that was Sharon Roach, at the time?

2     A.    I believe so.

3     Q.    Let's step back to that.

4           You said, what Stuart had told you about

5     the benefits of the line.

6           Do you -- what do you recall about the

7     timing of that conversation or conversations?  Like,

8     when did you talk to Stuart in terms of getting the

9     line set up?

10    A.    It was in -- I think somewhere around May

11    to June of 2011.

12    Q.    And what do you recall was said in those

13    conversations?

14    A.    I recall he -- when soliciting us, he

15    told us -- he told me that the interest -- one thing

16    that sticks out in my mind was that the interest

17    rate was 4 percent, which it turned out not to be.

18    He told us -- told me the benefits of -- you know,

19    the advantages of having a floorplan and the amounts

20    that you could apply for and, you know, basically

21    asked if I was the one that had the ability to enter

22    into the agreement.  And I told him no, and that's

23    when the appointment was set up with Don Richardson.

24    Q.    Okay.  What do you recall, if anything,

25    that he said about the benefits of having a



1   floorplan?

2        A.    I don't.

3        Q.    And you -- do you have any records at Red

4   Barn that would provide clarity on what he said?

5        A.    No.

6        Q.    Okay.  And you said the interest rate

7   turned out not to be 4 percent.

8              What's your recollection of what it

9   turned out to be?

10       A.    I could never figure that out.

11       Q.    But somehow you know it wasn't 4 percent?

12       A.    Correct.

13       Q.    You couldn't figure out, so how do you

14   know it wasn't 4 percent?

15       A.    Because in looking at the calculations

16  and the interest charged, it was much higher than a

17  4 percent figure.

18       Q.    Okay.  And did he say anything else about

19  interest?  For example, how long -- when it would

20  start accruing or anything like that?

21       A.    I don't recall.

22       Q.    Do you have any records at Red Barn

23  Motors that would improve your recollection on that

24  point?

25       A.    Just the contract.



1    Q.    So your recollection is that, at some

2  point, the deal with DSC got reduced to contract,

3  right?

4    A.    Yes.

5    Q.    Were you involved in reviewing and

6  signing those?

7    A.    I viewed it.  I did not sign it.

8    Q.    Did you review them before Mr. Richardson

9  signed and give him your input?

10   A.    Yes.

11   Q.    Okay.  And what do you recall was said

12 during that discussion?

13   A.    Just the benefit of having the

14 availability to have a credit line that would allow

15 us to, you know, increase sales volume.  And that's

16 basically the gist of it.  Just the benefits of

17 having the floorplan.

18   Q.    Okay.  So after reviewing the contracts,

19 you basically conveyed to Mr. Richardson that you

20 thought it made sense to move forward with DSC?

21   A.    Yes.

22   Q.    Do you recall whether Red Barn had those

23 contracts reviewed by counsel?

24   A.    They did not.

25   Q.    Other than yourself and Mr. Richardson,



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                          82

1    do you know if anybody else reviewed the contracts

2    pre-signing?

3         A.    No one.

4         Q.    Do you recall any discussion with

5    Mr. LaBauve or anybody else at DSC about your right

6    to consult with counsel?

7         A.    I do not recall.

8         Q.    Okay.

9         A.    I don't remember that at all.

10        Q.    Okay.  I am going to show you what we are

11   going to call Exhibit #4.  All right.

12             MR. McCARTER:

13                  And this document is NextGear004545

14        through 4549.  Or, I am sorry, NG.  Excuse me.

15        Let me restate the Bates numbers.  It's

16        NG004545 through 4550.

17   BY MR. McCARTER:

18        Q.    You can take as much time as you want

19   with it, but I'll call your attention to the

20   specific questions.

21             So, to be fair to you, this looks like a

22   NextGear internal -- or an DSC internal document

23   that you may never have seen before.

24             Have you seen this document before?

25        A.    No.

```
 1        Q.    Okay.  It suggests --
 2              MR. COMAN:
 3                   Let me just lodge an objection.
 4        Hold on, please.  Let me just lodge an
 5        objection.  As Mr. London has stated that he
 6        has never seen this, and based on your
 7        additional representation that this is an
 8        internal DSC document, any questions,
 9        therefore, following that, would lack any
10        foundation, and we would lodge an objection.
11              MR. McCARTER:
12                   Okay.  Fine.  But I'm not asking him
13        to authenticate the document.  I want to ask
14        him about specific information in the
15        document.
16   BY MR. McCARTER:
17        Q.    So it suggests, on the first page, a DSC
18   start date of July 28, 2011.
19              And do you recall whether that was the
20   DSC start date for Red Barn, or not?
21        A.    I don't know if that was the exact date.
22        Q.    Okay.  Does it seem roughly correct?
23        A.    Roughly.
24        Q.    Okay.  At the bottom, do you see there is
25   an account executive recommendation?  And
```



1  recognizing you didn't prepare this document, it

2  is -- it says, in that last sentence, "They do

3  prefer using DSC over AFC and would like to increase

4  their line with us for tax time coming up so they

5  can stock as much inventory as possible and continue

6  to grow and be profitable."

7          Do you see that language?

8      A.    Yes.

9      Q.    Do you recall having any discussions like

10  that or related to that point with Stuart or anybody

11  else at DSC?

12     A.    I don't recall that.

13     Q.    Okay.  And this document is, at least

14  dated on its face, September 26, 2012.

15          Do you recall being involved in any kind

16  of a request for a line increase or discussions of a

17  line increase with DSC around that time?

18     A.    What do you mean "a line increase"?

19     Q.    Okay.  So this is -- this looks like --

20  you know, it's roughly a year and a couple of months

21  after you started with DSC.

22     A.    Okay.

23     Q.    Do you remember asking for more credit or

24  a bigger line of credit with DSC around that time?

25     A.    DSC would -- I don't know if it was DSC



DEVON LONDON                                          October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                              85

```
 1   or AFC, but they would give an additional $100,000
 2   worth of credit at tax time or near tax time to
 3   acquire more cars.
 4       Q.    And do you -- is that something Red Barn
 5   would have been interested in around that time?
 6       A.    It is something -- we utilized it.
 7       Q.    Okay.  So did you actually get extra
 8   credit from DSC -- or an extra, you know, line of
 9   credit from DSC around tax time?
10       A.    Yes.
11       Q.    Okay.
12       A.    Again, I'm -- as long as I'm not confused
13   that it was AFC and not DSC.
14       Q.    Okay.
15       A.    Because --
16       Q.    And tax time is April 15th each year?  Is
17   that what you mean by tax time?
18       A.    No.  Tax time begins, generally, at the
19   end of February and goes through April.  You know,
20   mid April, I would say.
21       Q.    Okay.
22       A.    That's when the bulk of the early
23   filers --
24       Q.    If you'll turn to page 4548.  It's about
25   four pages back.  Do you see that?  This mentions
```



```
 1   auctions at which -- you know, the author of this is
 2   suggesting Red Barn did business.  And it says, "Oak
 3   View Louisiana, First Choice, Manheim and Total
 4   Resources, Long Beach, Mississippi Auto Auction."
 5            Do you see that?
 6       A.   Yes, I do.
 7       Q.   Do you -- would that have been accurate
 8   in 2012?
 9       A.   Yes.
10       Q.   So do you still do business at Louisiana
11   First Choice?
12       A.   No.
13       Q.   Okay.  When did you stop doing business
14   with them?
15       A.   We stopped doing business with them in
16   2013.
17       Q.   Around the time of the bankruptcy?
18       A.   Yes.
19       Q.   And what's the reason you stopped doing
20   business with them?
21       A.   For one, I was told that we were not
22   welcome at the auction.  And for two, there was a
23   situation where there were some vehicles that
24   belonged to Red Barn that were seized by First
25   Choice Auto Auction, when we delivered them to sell
```



1    them, that, effectively, was directed by DSC.

2       Q.   Okay.  So the first reason, that you were

3    not welcome, was there any more said about that?

4       A.   No.  Just that we were no longer welcome

5    to attend the auction.

6       Q.   Who told you that?

7       A.   It was the general manager.  I don't know

8    his name.  The gentleman right under John Poteet.

9       Q.   Do you remember the timing of that

10   discussion?

11       A.   The timing of that discussion was after

12   my confrontation to try to get the vehicles back.

13       Q.   Just ballpark, was that spring of 2013,

14   or some other time?

15       A.   That was, probably, April of 2013, I'm

16   guessing.

17       Q.   Okay.  And you haven't done business

18   there since?

19       A.   No.

20       Q.   Have you attempted to go back or request

21   reinstatement?

22       A.   Not since -- not since.

23       Q.   Okay.  And it also mentions Total

24   Resources.

25           Did you do business at a Total Resources



1  auction?

2       A.    That was Manheim Lafayette.

3       Q.    Okay.  At the Total Resources auction,

4  were you buying or selling salvage units or just

5  whole-car units or what?

6       A.    Just whole-car units.

7       Q.    Okay.

8       A.    I did not attend a salvage sale.

9       Q.    All right.  And then this document also,

10 in the next question, suggests that Red Barn may use

11 billboards, displays on lot, newspaper ads, auto

12 websites, eBay, Craigslist and Referral Spiffs as

13 marketing tools.

14            Do you see that language?

15      A.    Yes.

16      Q.    Do you -- is -- was that true in 2012?

17      A.    That was true in 2012.

18      Q.    Is it still true, that -- you know, just

19 prior to August of 2016?

20      A.    Billboards, no.  Displays on lots,

21 obviously the cars are displayed on the lot.

22 Newspaper ads, yes.  Auto websites -- our DMS system

23 updates to auto websites, so, yes.  eBay, we have

24 not used.  Craig's List, we have not -- we have

25 used.  And Referral Spiffs, we did not use.



DEVON LONDON                                           October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                              89

1        Q.    Which auto site -- websites does your DMS

2    system update to?

3        A.    I don't know that.

4        Q.    Okay.  It also suggests your website at

5    the time was www.redbarnmotorsla.com.

6              Do you see that language?

7        A.    Yes.

8        Q.    Was that your website at the time?

9        A.    I'm not sure.

10       Q.    Is that your website now?

11       A.    No.  It's www.redbarnmotors.net.

12       Q.    Okay.  And then this document also

13   suggests -- in the next question, it talked about

14   additional services offered to customers and income

15   streams.  And it mentions warranties, limited BHPH,

16   gap insurance, finance reserve, mechanic shop

17   retail, vehicle registration, doc fees, prep fees,

18   temp tag fees.

19             Do you see that language?

20       A.    Doc, in -- in where?  Right here?

21       Q.    Yes.

22       A.    Doc fees, prep fees, temp tag fees.

23   Uh-huh.

24       Q.    Okay.  We talked about some of this

25   earlier, but was that accurate in 2012?  Did you



DEVON LONDON
RED BARN MOTORS VS. COX ENTERPRISES

October 25, 2016
90

1  have income from each of those sources?

2      A.    I don't believe we were doing mechanic

3  shop retail.

4      Q.    Are the rest accurate, as of 2012?

5      A.    Vehicle registration, doc fees, prep

6  fees, temp tag fees.  Yes.

7      Q.    Do you have any sense of what that term

8  "finance reserve" means?

9      A.    That is a term for a referral fee that we

10  get from the lender, which is a flat fee, for

11  procuring a customer for their business.

12      Q.    Okay.  And that would be in those

13  bank-loan situations that we talked about earlier?

14      A.    Correct.

15      Q.    Okay.  Just high level, how -- what's the

16  size of that fee, and how is it priced?

17      A.    It depends on the bank itself.  We -- at

18  that time, we were doing the majority of our

19  business with Southwest Finance.  And they paid

20  3 percent of the payment financed.

21      Q.    And we talked about some of this earlier,

22  but which of these sources of income did -- does Red

23  Barn no longer have as of, you know, pre-flood this

24  year?

25      A.    Gap insurance, mechanic shop retail,



```
 1   warranties, vehicle registration.  There is a doc
 2   fee and a temp tag fee.
 3        Q.    And so you --
 4        A.    There are no prep fees.
 5        Q.    I'm sorry, what was the last part?
 6        A.    No prep fees.
 7        Q.    Okay.  So you no longer register vehicles
 8   for your consumers?
 9        A.    It's done through a Denham Springs
10   notary.
11        Q.    Do you collect their fee and pass it
12   through, or --
13        A.    Yes.
14        Q.    Okay.  No markup?
15        A.    I don't think so, no.
16        Q.    Okay.  If you go to page 4549, it's the
17   next page, it suggests some of the consumer lenders
18   associated with Red Barn may have been Southwest
19   Finance, which you mentioned; Pelican Federal Credit
20   Union, which you've mentioned.  It also mentions CPS
21   and Credit Plan of Hammond?
22        A.    Correct.
23        Q.    Do you see that language?
24        A.    Yes.
25        Q.    Were those sources of consumer lending
```



DEVON LONDON                                          October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                              92

```
 1   used at the time?
 2       A.    CPS, we used for a very short period of
 3   time.  I don't know -- I don't remember the time
 4   period, but it was very short.  Pelican, we did.
 5   Southwest Finance, Credit Plan of Hammond, that
 6   was -- those were the general ones.
 7       Q.    Do you know what CPS stands for?
 8       A.    No.
 9       Q.    And I think you said earlier you are
10   still using Pelican.  But you're not using the other
11   three?
12       A.    No, not using CPS, Southwest Finance or
13   Credit Plan of Hammond.
14       Q.    Okay.
15           MR. McCARTER:
16               Is everybody good?  You need another
17     break?
18           MR. COMAN:
19               Yes, let's take a short break.
20                 (Recess taken.)
21           MR. McCARTER:
22               We're going back on the record,
23     please.
24   BY MR. McCARTER:
25       Q.    Mr. London, my apologies if I asked this
```



```
 1   already, but just to confirm, besides AFC and DSC,

 2   Red Barn has never had a floorplan with any other

 3   company?

 4        A.    No.

 5              MR. McCARTER:

 6                   I'm going to show you a -- a

 7        document I'm going to call Exhibit #5.

 8   BY MR. McCARTER:

 9        Q.    And this one runs NG003581 through 3560

10   -- I'm sorry.  I got that -- let me back up, 3560

11   through 3581.  And I'll represent to you, Mr.

12   London, that this is a composite exhibit that's got

13   different documents in it, but they -- they

14   generally appear to be an application and a legal

15   agreement that Red Barn signed with DSC.

16        A.    Uh-huh.

17        Q.    Do you see that?

18        A.    Yes.

19        Q.    All right.  And we can look at the exact

20   dates, but it looks like they're generally signed in

21   July of 2011.  Do you see that?

22        A.    Yes.

23        Q.    Okay.  And on that first page, 3560, do

24   you recognize the signature there?

25        A.    3560?
```



DEVON LONDON                                         October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                              94

1       Q.     Yes.   Whose signature is that?

2       A.     That's Don Richardson.

3       Q.     And he was the owner and president of Red

4   Barn at the time?

5       A.     Correct.

6       Q.     On that first page, that application

7   page, take a second to look at it.  Do you see any

8   of the filled in information there that appears to

9   be wrong to you or inaccurate?

10          MR. COMAN:

11               I'll lodge an objection to the form.

12      If you can specify or if your question is to

13       the entire document, then I'd lodge the same

14       objection.

15  BY MR. McCARTER:

16      Q.     It's obviously the form, you know, to the

17  question, but the stuff that's specific to Red Barn

18  like the name of the company, they requested the

19  floorplan amount, the address.  Do you see --

20      A.     I mean, I see a mistake of ownership.

21      Q.     Where do you see that?

22      A.     It says 100 percent.

23      Q.     Okay.

24      A.     I mean, I don't know -- I don't know if

25  that is 100 percent or if it's 50/50.



1    Q.    With his wife Barbara?

2    A.    Yes.

3    Q.    Fair enough.

4    A.    I'm not positive of that.

5    Q.    Okay.  And then turning to the -- the

6  document that follows on the next page, it's called

7  Demand Promissory Note and Security Agreement.

8    A.    Uh-huh.

9    Q.    Do you see that, do you see that title?

10   A.    Yes.

11   Q.    Okay.  And then if we skip back several

12  pages to 3569 in that exhibit --

13   A.    Okay.

14   Q.    -- does that look like Mr. Richardson's

15  signature again?

16   A.    Yes.

17   Q.    Okay.  And he's signing both as

18  president, and then as a guarantor.  Do you see

19  that?

20   A.    Yes.

21   Q.    Okay.  All right.  And then we will turn

22  to 3571.  Do you see that document?

23   A.    Yes.

24   Q.    Again, that appears to be Mr.

25  Richardson's signature on the lower left-hand side.



1  Do you see that?

2       A.    Yes.

3       Q.    And his initials a couple of times in the

4  document?

5       A.    Uh-huh.

6       Q.    Do you recall seeing this term sheet when

7  it was signed with DSC?

8       A.    I don't recall seeing the term sheet when

9  it was signed, but I do recall the terms.  I mean,

10  those were the terms that were represented.

11       Q.    Okay.  And -- and we talked about this

12  earlier, right, the 60 days, and then 30 more --

13       A.    Yes.

14       Q.    -- and 30 more?

15       A.    Right.

16       Q.    Right.  And so those terms there look

17  accurate to how things worked with DSC?

18       A.    Correct.

19       Q.    Okay.  All right.  And, again, Mr.

20  Richardson's signature on the power of attorney at

21  3572?

22       A.    Yes.

23       Q.    On the individual guaranty that follows,

24  his signature for 3575, do you see that?

25       A.    Yes.



```
 1        Q.    Some of these, at least that one, is
 2    notarized by Catherine Edwards.  Do you know who
 3    that is?
 4        A.    Yes.
 5        Q.    Who is she?
 6        A.    She is a notary in the state of Louisiana
 7    in Denham Springs.
 8        Q.    So an independent notary, not with Red
 9    Barn and not with DSC?
10        A.    Not with Red Barn and not with DSC.
11        Q.    Okay.  And then the next document is
12    called Contract Quick Facts.  Do you see 3576, 3577?
13        A.    Uh-huh.
14        Q.    Again, that 3577, that's Mr. Richardson's
15    signature?
16        A.    Yes.
17        Q.    And do you have any reason to doubt
18    that's his initials on -- on 3576 and 3577 in the
19    various blanks?
20        A.    No, no.
21        Q.    And then the next document at 3578 and 79
22    is an ACH authorization and request.  Again, it
23    appears to be signed by Mr. Richardson, correct?
24        A.    Uh-huh.
25        Q.    Is that generally how Red Barn paid DSC,
```



1    through ACH payments?

2        A.    Yes.

3        Q.    And do you recall what kind of notice or

4    confirmation or paperwork you would get when it was

5    an ACH payment to DSC?

6        A.    We would get a printout stating the

7    curtailment, you know, paid -- I mean, the

8    curtailment, the interest, the principal paid, I

9    mean, just the -- the term sheet on what we just did

10   on-line.

11       Q.    Okay.  And would you authorize each of

12   those payments or would DSC just automatically pull

13   them or both?

14       A.    Both.

15       Q.    Okay.  And when you were authorizing

16   them, did you go through the same website,

17   discoverdsc.com?

18       A.    I'm not positive.  I believe Sharon Roach

19   did.

20       Q.    Okay.  And -- and the printout you

21   mentioned would come from that same site?

22       A.    Yes.

23       Q.    Okay.  On the last page of that Exhibit

24   #3581, you see that page?

25       A.    Uh-huh.



```
 1        Q.    That -- that does not look like Mr.
 2   Richardson's signature, right?
 3        A.    No.
 4        Q.    That looks like a DSC representative?
 5        A.    Right.
 6        Q.    Do you recall whether you saw this
 7   checklist at the time or not?
 8        A.    I don't recall seeing this.
 9        Q.    Okay.  It mentions in there -- you know,
10   in this checklist, it mentions preview,
11   discoverdsc.com website and the Unplugged with the
12   dealer.  Do you see that?
13             MR. COMAN:
14                  I'm sorry.  Where --
15             MR. McCARTER:
16                  On the checklist down at the bottom,
17        it says, preview discoverdsc.com website and
18        it goes on.
19   BY MR. McCARTER:
20        Q.    Do you see that?
21        A.    Okay.
22        Q.    My question is just, do you remember Mr.
23   LaBauve or anybody else, you know, going through the
24   website with you?
25        A.    Like navigating it?
```



```
 1                      I'm going to show you a document
 2           we're going to call Exhibit #7.  And this is
 3            the only copy I have of this one.  So you guys
 4            can look off each other.
 5    BY MR. McCARTER:
 6         Q.    But I -- I will represent to you that
 7    this is Exhibit B of your amended complaint and I
 8    just -- I want to know have you seen this document
 9    before?
10         A.    Yes.
11         Q.    What is this, I mean, what -- what does
12    it show?
13         A.    This shows all of the DSC payoffs that we
14    made through our -- I believe this was the
15    transaction history of our bank account.
16         Q.    Okay.  So you think that that's a
17    printout from your bank account?
18              MR. COMAN:
19                   Actually, let me -- let me stop.  If
20         we can go off the record.
21              MR. McCARTER:
22                   Yes.
23         (Discussion held off the record.)
24              MR. McCARTER:
25                   Back on the record.
```



1    BY MR. McCARTER:

2        Q.    So, Mr. London, Exhibit #7, the second

3    page of that exhibit was a declaration by a former

4    plaintiff Young Executive in this case, and it's

5    just in there sort of by mistake, because it was in

6    my copy of the complaint.  So the first page of

7    that, and then the third page and succeeding of

8    Exhibit #7 are Exhibit B of your complaint.  And,

9    again, I think you were saying that this came from

10   your bank account?

11       A.    I believe so, yes.

12       Q.    Okay.  And do you recall what it purports

13   to show?

14       A.    It purports to show when payoffs were

15   made to DSC --

16       Q.    Okay.  And you had a way to sort --

17       A.    -- on specific vehicle.

18       Q.    Sorry for interrupting.  So you had a way

19   to sort by payee?

20       A.    No.  I believe I had a way to sort by

21   description, DSC payoff.

22       Q.    Okay.  And just to be clear, though, this

23   would just show the actual amount paid to DSC, it

24   wouldn't necessarily show --

25       A.    Actually, yes, transaction categories,



 1   DSC payoffs.  So it shows me all of the DSC payoffs.

 2       Q.    Okay.  But just to be clear, these show

 3   actual ACH transfers to DSC, it doesn't really show

 4   us what you borrowed on that unit, how much interest

 5   or fees?

 6       A.    Correct.

 7       Q.    This is just the actual money that was

 8   transferred to DSC on those dates?

 9       A.    On those dates, correct.

10       Q.    Okay.  All right.  Mr. London, did you

11   have any understanding of what Mr. LaBauve's

12   responsibility was or what his role at DSC was?

13       A.    His responsibility was to make sure --

14             MR. COMAN:

15                 I'm sorry for interrupting.  Let me

16         just lodge an objection -- to the extent that

17          you know, but let me just lodge an objection

18          to the form, but you can answer the question.

19   BY MR. McCARTER:

20       Q.    And I'm asking about your working

21   understanding, not whether it was actually right or

22   wrong.

23       A.    Okay.

24       Q.    But how did you understand his role to

25   be?



1    A.    His role was to procure new dealers, to

2  monitor and maintain those dealers, and to keep

3  track of the ongoings of those dealers, to protect

4  DSC, and to procure profit for DSC.

5    Q.    All right.  Do you have a recollection of

6  how many cars you may have financed with DSC?

7    A.    I believe it was 524.

8    Q.    And, again, that's roughly from July 2011

9  to March 2013?

10    A.    Correct.

11    Q.    Okay.  What happened to your recollection

12  in March of 2013 to bring that relationship to an

13  end?

14    A.    What happened --

15    Q.    What happened in March 2013 to bring Red

16  Barn's relationship with DSC to an end?

17    A.    We had some financial difficulties and, I

18  mean, that's pretty much it.

19    Q.    Okay.  Did Red Barn give DSC checks that

20  didn't clear?

21    A.    I don't think so.

22    Q.    You don't think there were any NSF checks

23  involved?

24        MR. COMAN:

25            Objection as to form.



```
 1            THE WITNESS:
 2                  There may have been ACHs that
 3        weren't paid, but I don't think there were any
 4         actual checks.
 5    BY MR. McCARTER:
 6        Q.    So you think there may have been payments
 7    made to DSC that didn't clear?
 8            MR. COMAN:
 9                  Objection to form.
10            THE WITNESS:
11                  I don't know.  I don't know.
12    BY MR. McCARTER:
13        Q.    That's fine.  I'll show you some records
14    in a minute.  I'm trying to get what's your
15    recollection of how did financial difficulties
16    translate into an end of the relationship with DSC?
17        A.    Well, financial difficulties translated
18    to an end with DSC, because we were working with
19    Stuart LaBauve to take care of the deficiencies.  We
20    actually came up with a plan that was going to take
21    care of those deficiencies.  Mr. Richardson
22    presented that plan to DSC and AFC, and AFC agreed
23    to it verbally.  DSC was seeming to go along with it
24    verbally.  And then the vehicles that we had stated
25    that we were going to go sell at First Choice
```



1    Louisiana Auto Auction to give to -- to give the

2    funds to DSC and AFC were seized.

3        Q.    And I think you said earlier they were

4    seized by First -- Louisiana First Choice and you

5    think on behalf of DSC?

6        A.    I would say I know on behalf of DSC.

7        Q.    You're talking about taking care of

8    deficiencies, though.  It sounds like that there may

9    have been repossessions prior to that.  Does that

10   ring a bell?

11           MR. COMAN:

12               Objection to form.

13           THE WITNESS:

14               I don't know if there were

15       repossessions prior to that.

16   BY MR. McCARTER:

17       Q.    So how -- how -- do you have any

18   recollection of how deficiencies to DSC were created

19   in the first place?

20       A.    What caused the problems -- are you

21   asking what caused the problems for us to have

22   deficiencies?

23       Q.    Sure, yes.

24       A.    Okay.  We have a ongoing relationship

25   with Southwest Finance.  Southwest Finance wanted to



1    be our primary lender.  We agreed to that and made

2    them our primary lender.  And sometime in February,

3    we were informed by Southwest Finance that they had

4    accumulated all the paper that they wanted to

5    accumulate.  They had grown the office to the amount

6    that they wanted to grow it to.  And, therefore,

7    they did not want to finance as many vehicles as we

8    were providing them.  So during tax time, this was

9    tax time, we had a whole bunch of deals that we

10   needed to get funded on that we were unable to get

11   funded on very rapidly that were sold that needed to

12   be paid off to DSC by the terms of the agreement.

13        Q.    And so you were unable to make certain

14   payments to DSC that were required under the

15   agreement?

16        A.    That is correct.

17        Q.    Do you remember how many cars you were

18   unable to pay DSC for that were due?

19        A.    I don't remember.  I just know that there

20   was an outstanding balance.

21        Q.    Okay.  Did that lead to DSC recovering

22   cars from Red Barn?

23        A.    That led to DSC taking all of our

24   inventory, yes.

25        Q.    And you -- you do or don't remember



```
 1   particular payments coming back or balancing at the
 2   time?
 3        A.    I don't remember payments balancing
 4   unless they were initiated by DSC and we were
 5   unaware of it.
 6        Q.    Okay.  Do you recall Louisiana Used Motor
 7   Vehicle Commission getting involved in -- in those
 8   deals in any way?
 9        A.    Yes.
10        Q.    And what was their involvement?
11        A.    Their involvement was to secure titles on
12   the vehicles, which had a -- that were DSC's that we
13   had not paid off.
14        Q.    And by securing titles, do you mean
15   secure titles from DSC for the retail customer?
16        A.    No.  They -- they were on the floorplan.
17        Q.    I -- I guess I'm asking why -- why did
18   the Motor Vehicle Commission want titles from DSC?
19             MR. COMAN:
20                  Objection to form.  If you know.
21             THE WITNESS:
22                  I believe I know.  Okay.  I believe
23        I know, but I'm not positive.  I believe
24        there's a law in the state of Louisiana where
25        a third party or something cannot be harmed.
```



```
 1        So the titles had to be turned over pursuant
 2        to Louisiana law to the customer.
 3    BY MR. McCARTER:
 4        Q.    Just to confirm, from your perspective,
 5    the Louisiana Used Motor Vehicle Commission was
 6    trying to get titles from DSC to get to your retail
 7    buyers?
 8            MR. COMAN:
 9                Objection to form.
10            THE WITNESS:
11                Yes.
12    BY MR. McCARTER:
13        Q.    And do you have any knowledge of whether
14    DSC turned over titles for that purpose?
15        A.    DSC did.
16        Q.    And that was prior to any payment by Red
17    Barn for those units?
18        A.    Yes.
19        Q.    Do you remember the name of the agent or
20    inspector from the Louisiana Used Motor Vehicle
21    Commission that might have been involved?
22        A.    His name was Ronnie Wisenor.
23        Q.    Is he someone that you had known or
24    worked with before this incident?
25        A.    Just on various complaints, if somebody
```



1   lodged a complaint against us.  We were regulated by

2   them.  So he was required to look into it and make

3   sure.  A lot of them were title absent complaints.

4        Q.    What do you mean by that, what's a title

5   absent complaint?

6        A.    Well, where we didn't have the title,

7   because we had paid off -- I can give you a bunch of

8   instances, where you had paid off -- we had paid off

9   the DSC and DSC did not have the title yet, but it

10  had gone past the 20 days that was allowed.

11       Q.    Who -- who -- what -- who allowed the 20

12  days, what do you mean by 20 days?

13       A.    You are required -- I -- I believe you're

14  required by Louisiana law, almost positive, 20 days

15  to get the title to the retail buyer in the event of

16  a sale.

17       Q.    Okay.

18       A.    Now, the -- the Louisiana Used Car

19  Commission has told me that they don't enforce that

20  law, because they understand the -- the problem of

21  getting titles from the auctions and floorplan

22  companies and things like that.

23       Q.    Would -- would those typically have been

24  cars that were bought at auction without a title

25  present?



1      A.     Yes.

2      Q.     Just ballpark, how often do you think you

3  heard from the Louisiana Used Motor Vehicle

4  Commission on a consumer complaint prior to March

5  2013?

6      A.     Prior to the DSC involvement and prior to

7  everything else, probably five times, four times.

8      Q.     Total?

9      A.     Yes.

10     Q.     Okay.  Did you have a particular contact

11 at Southwest Finance?

12     A.     Yes.

13     Q.     Who was that?

14     A.     Tara Brouillette.

15     Q.     Okay.  Do you have any sense of how many

16 titles DSC released to retail customers without

17 payment related to Red Barn?

18     A.     I do not know the total number.

19     Q.     Okay.  All right.  And I think you said

20 -- strike that.

21          Do you have any understanding of where

22 the cars recovered by DSC went to?

23     A.     They went to Louisiana First Choice Auto

24 Auction.

25     Q.     Okay.  And is it your understanding that



1    all of them went there?

2        A.    Yes.

3        Q.    And I understand there's some issue --

4    strike that.

5              Did all of those vehicles eventually get

6    sold by DSC through Louisiana First Choice Auto

7    Auction?

8              MR. COMAN:

9                   Objection to form.  If you know.

10             THE WITNESS:

11                  Did all of those vehicles get sold

12        -- rephrase.

13   BY MR. McCARTER:

14       Q.    Yes.  I understand you had some issue

15   with how they were held and sold, but did they

16   eventually get resold and credited to Red Barn?

17       A.    I believe there is still some that have

18   not been sold and have not been credited to Red

19   Barn.

20       Q.    What's that belief based on?

21       A.    That belief is based on a list that was

22   provided to me by, I think, Louisiana First Choice

23   Auto Auction listing 19 vehicles that were still in

24   their possession that we were supposed to sell or we

25   had finally agreed to sell after three years and all



1   hospitals and -- and things like that, overseeing

2   employees.

3      Q.    Who was he in the car business with prior

4   to Red Barn?

5      A.    I do not know that.

6      Q.    Do you remember -- do you know what his

7   role was?  Was he an owner, a manger?

8      A.    No.  He was a salesperson.

9      Q.    Okay.  Do you believe that was in

10   Louisiana?

11      A.    That I don't know.

12      Q.    Okay.  Does he have an additional

13   occupation, now, besides working with Red Barn?

14      A.    Yes, he does.

15      Q.    What's that?

16      A.    He works for his son.

17      Q.    Okay.  Doing what?

18      A.    Basically, he overseas the operations of

19   his son's insurance company.

20      Q.    Okay.  Did you know the name of that

21   insurance company?

22      A.    Pelican Advisory Group.

23      Q.    I'm going to show you a document we are

24   going to label as Exhibit #14.  Okay.  This document

25   is Bates labeled NGR000011 through -- well, this



1   only goes through 33.

2          Do you have unnumbered pages at the end

3   of yours?

4      A.    Uh-huh.

5          MR. COMAN:

6              We do.

7          MR. McCARTER:

8              Okay.  Let's separate out those

9      unnumbered pages.  If you don't mind, just rip

10     them off.

11         MR. COMAN:

12             Yeah.  Actually, we can't.

13         MR. McCARTER:

14             I see what you're saying.  All

15     right.  So go through 33.  And then there's

16     one, two, three, four unnumbered pages at the

17     end of it -- at the end of Exhibit #14.  Okay.

18  BY MR. McCARTER:

19     Q.    So, sir, looking at the document that's

20  11 -- page number 11 through 33, I will just

21  represent to you this is something that NextGear

22  created and produced to your side in this litigation

23  and is -- appears to be a summary of transactions

24  that Red Barn floored with DSC.

25          My question is, have you seen this



```
 1   document before?
 2        A.    I believe I have.
 3        Q.    Okay.  And have you had a chance to, you
 4   know, study it for accuracy or make an assessment of
 5   whether you think it accurately shows your
 6   transactions with DSC?
 7                  MR. COMAN:
 8                       Objection to form.
 9                       As best -- you know, to your
10           knowledge, obviously, you can answer the
11           question.
12                  THE WITNESS:
13                       To my knowledge --
14                  MR. COMAN:
15                       I just want to make sure you
16           remember the question.
17                  THE WITNESS:
18                       -- this --
19                  MR. COMAN:
20                       And let me stop you right there.  I
21           do want to instruct you not to answer -- not
22           his particular question, but do not touch upon
23           any communication that you had with counsel.
24                       So his question was -- and you can
25           repeat it if you want, or I can have her.  But
```



1       I just want to make sure you confine it to his

2       question and don't touch upon any

3       communication you had with me or with Cassie.

4               Understood?

5           THE WITNESS:

6               Okay.  I have not gone through it

7       thoroughly, but the one thing that jumps out

8       to me is that the floorplan date is incorrect.

9       The floor date.

10  BY MR. McCARTER:

11      Q.    And what do you mean by that?

12      A.    When we floorplan a vehicle, especially

13  during the period from June of 2012, we had verbal

14  agreements with Louisiana First Choice Auto Auction

15  and Oak View Auto Auction -- no, not Louisiana First

16  Choice, it was Long Beach Auto Auction -- to allow

17  us to delay deciding whether or not we wanted to

18  floorplan the vehicle on the specific date.  And we

19  chose -- or whether we wanted to pay cash.  And we

20  chose to let them know at a later date.  But as all

21  of the documents show, the floorplan date is the

22  date that the vehicle was purchased and not the date

23  that it was actually floored.

24      Q.    Okay.  So would that only apply to the

25  transactions that were where Long Beach Auto Auction



```
 1   is shown as the auction?
 2        A.    It would be the Long Beach Auto Auction
 3   and the Oak View Auto Auction.
 4        Q.    So you're saying you had a similar
 5   arrangement with Oak View?
 6        A.    Correct.
 7        Q.    And, logistically, how would that work?
 8   So if you have taken a car out of Long Beach Auto
 9   Auction and you are in that initial decision period,
10   you do have the car during that period?
11        A.    We do have the car during that period.
12        Q.    Okay.  And so if you made the decision to
13   then put that car on DSC, how would you do that?
14   How would that work?
15        A.    I would make a phone call the following
16   week and just let them know whether or not I want to
17   floorplan the vehicle or pay cash for the vehicle.
18        Q.    You would call the auction and tell them
19   that?
20        A.    I would call the auction and tell them
21   that.
22        Q.    Did you have to tell DSC anything about
23   that?
24        A.    No.
25        Q.    Okay.  So if you made that decision, it's
```



DEVON LONDON                                            October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                              143

```
 1   your understanding that DSC would have been on the
 2   hook to pay the auction for that vehicle?
 3            MR. COMAN:
 4                   Object to the form.
 5                   Answer if you can.
 6            THE WITNESS:
 7                   DSC was not on the hook.  Because I
 8       had not chosen whether or not to floorplan the
 9        vehicle or to pay cash for the vehicle.
10   BY MR. McCARTER:
11       Q.    My question was about when you did choose
12   to put it on DSC.
13            You would call the auction.  You would
14   tell them that.  And it's -- at that point, it's
15   your understanding that DSC is obligated to pay the
16   auction for the vehicle?
17       A.    From that date, yes.
18       Q.    Okay.  And the same -- it was the same at
19   Long Beach and at Oak View?
20       A.    Correct.
21       Q.    Okay.  And I'm sorry if you said this.
22            But you had how long to make that
23   decision?
24       A.    Generally, it was between four to seven
25   days.
```



1    Q.    Okay.  And you didn't have to call DSC

2  and give them any warning or clear the credit with

3  DSC directly?

4    A.    No.

5    Q.    Okay.  Were -- did you ever try to sell

6  the vehicle during that period -- during that

7  seven-day period -- four to seven-day period?

8         MR. COMAN:

9             Objection to form.

10        THE WITNESS:

11             The vehicle was for sale, yes.

12  BY MR. McCARTER:

13    Q.    Okay.  And so, in some cases, it may have

14  been retailed during that period?

15    A.    Correct.

16    Q.    Do you know whether that applied to any

17  of the vehicles that got involved in the DSC default

18  situation later?  You know, we talked about a number

19  of vehicles that were sold that you -- Red Barn

20  wasn't able to pay DSC for in March of 2013 --

21    A.    Uh-huh.

22    Q.    -- do you recall that?  Do you recall

23  that?

24    A.    I do.

25    Q.    Okay.  Do you know whether any of those



1  vehicles were in this, sort of, one-week delay

2  situation you had with Oak View and Long Beach?

3       A.    That, I am unaware.  I would not have

4  known that because it was made at the time there was

5  no written agreement.

6       Q.    Okay.

7       A.    Also, from my understanding, NextGear or

8  DSC does not pay for the vehicle until the title

9  comes in.  Therefore, the interest that is shown on

10  here would be incorrect in the amount paid.

11      Q.    Do you have a way to know when the title

12  came into the auction on all these transactions?

13      A.    You would have that information.

14      Q.    Well, I don't, personally.

15            But do you have a way to do it, is my

16  question.

17      A.    Do I have a way to do it?

18      Q.    Yes.

19      A.    No.

20      Q.    Okay.  So other than those two issues we

21  just discussed, was there anything else that jumped

22  out at you as problematic with this report?

23            MR. COMAN:

24                 Objection to form.  If you know.

25            THE WITNESS:



```
 1                    It's a lengthy report, and I don't
 2         know.
 3    BY MR. McCARTER:
 4         Q.    Okay.  If you'll turn to page 33.  I
 5    think about three-quarters of the way down, the
 6    vehicle is listed there.  There is a stock number,
 7    524.
 8              Do you see that one?  It is the
 9    third-to-last transaction.
10         A.    Yes.
11         Q.    Okay.  And I will just represent to you
12    that that is the highest stock number that I found
13    on this report, and that would seem to jive with the
14    524 cars you say were floored with DSC before.
15              Do you see that?
16         A.    Uh-huh.
17         Q.    Does that still sound right to you?
18         A.    Yes.
19         Q.    Okay.
20         A.    I -- I believe the number was 524, also.
21         Q.    Okay.  And then let's turn to the last
22    four pages of that exhibit, that don't have Bates
23    numbers.  And it is called a Receivable Detail
24    Report.
25              And just so there is no confusion, my
```



1    belief is that this is a separate document from

2    everything that appeared before that in that

3    exhibit.  It's -- you know, it's just copied this

4    way, unfortunately.

5            So my question is, have you seen this

6    resale -- Receivable Detail Report before?

7        A.    If this is the report that is

8    generated -- I'm not sure.

9        Q.    Okay.  So respecting that you don't know

10   if you have seen this before, it does show a report

11   date of March 27, 2013.

12           Do you see that, right here?  I'm sorry,

13   right there.

14       A.    Okay.

15       Q.    And then, if you kind of go to the last

16   page of that report, it shows, you know, 69 units on

17   this report.  You see, it says "Unit Count" on the

18   last page of your report?

19           MR. COMAN:

20                Objection to form.

21           THE WITNESS:

22                I do see 69 units.

23   BY MR. McCARTER:

24       Q.    Okay.  Do you know, one way or the other,

25   whether this represents what Red Barn Motors owed



1    DSC on March 27, 2013?

2              MR. COMAN:

3                   Objection to form.

4              THE WITNESS:

5                   It is not to my knowledge that we

6         ever owed DSC -- what was the outstanding?

7         $262,328?  I mean, that's what was on the

8         floorplan, but that is not what was owed

9         pursuant to --

10   BY MR. McCARTER:

11       Q.    So you're saying --

12             MR. COMAN:

13                  Go ahead and let him finish, if

14        he -- if you weren't done.

15             THE WITNESS:

16                  No, I'm done.

17             MR. COMAN:

18                  Okay.

19   BY MR. McCARTER:

20       Q.    So you're saying this is what was

21   outstanding on the floorplan, but you're just saying

22   it wasn't all due yet?

23             Is that your answer?

24       A.    Yes.

25       Q.    Okay.



```
 1              Objection to form.  You want to go
 2    ahead and read it from back to front.
 3              Or is that how it goes, time-wise?
 4              No, front to back.
 5       MR. McCARTER:
 6              Yeah, it looks like they are -- the
 7    first e-mails are the earliest in time.
 8       MR. COMAN:
 9              Go ahead and read them, the back to
10    front pages, and be prepared to answer any
11    questions, if you know the answer to those
12    questions, without guessing.
13       THE WITNESS:
14              (Witness reads document.)
15              These suggest --
16       MR. COMAN:
17              Hold on.  Was there a question?
18       MR. McCARTER:
19              There was.  Before the long
20    objection, there was.
21       MR. COMAN:
22              And it was?
23       MR. McCARTER:
24              Can you read back the question?
25          (Previous question read back.)
```



1          MR. COMAN:

2               Objection to form.

3          THE WITNESS:

4               In these e-mails, we had not been

5     given legal notice as to the disposition of

6     the 14 vehicles that had been seized by

7     Louisiana First Choice Auto Auction.  And this

8     is -- this an interoffice e-mail from Linda --

9     from Amanda to Linda telling them that they

10    can't sell the vehicles -- can't sell the 14

11    vehicles, legally, until the 4/30 sale date

12    because they can't offer them for sale until

13    4/29.

14  BY MR. McCARTER:

15    Q.    Okay.

16    A.    I received this document when I went to

17  Louisiana First Choice Auto Auction and demanded our

18  vehicles back, showing proof of title.  I spoke to

19  John Poteet.  He said he was going to talk to

20  Samantha Snyder or whoever he was going to talk to.

21  He was going to help us get the vehicles back.  The

22  next day, I found out that he was not really helping

23  us.  So I showed up with 14 people and 14 titles to

24  the vehicles, because the original plan was to sell

25  the vehicles and distribute the monies to lower the



1    amount due to AFC and DSC.

2            And this is an interoffice e-mail of them

3    conspiring to hold those vehicles until they are

4    legally able to be sold.

5        Q.    Okay.

6        A.    And I got this because the office manager

7    at Louisiana First Choice Auto Auction, when I

8    pressed her for wanting the vehicles and she

9    wouldn't give them to me, I said, they're our

10   vehicles.  We have titles to these vehicles.  I have

11   titles to the vehicles.  I want possession of the

12   vehicles.  And she said that she cannot do so

13   because DSC said so.

14           I said, DSC doesn't own the vehicles.  I

15   said, Red Barn owns the vehicles.  She said, well,

16   let me show you this interoffice -- let me show you

17   the interoffice e-mail I got from Amanda Butler

18   telling me that I can't sell the vehicles, and I

19   can't give the vehicles to you.

20       Q.    Okay.  So the vehicles listed here are

21   Red Barn vehicles that were being held at Louisiana

22   First Choice Auto Auction around that time?

23       A.    Yes.

24       Q.    Okay.  And you're saying that Red Barn

25   had title to these vehicles at the time?



1    A.    Yes.

2    Q.    Okay.  So they were inventory of Red

3    Barn?

4    A.    They were inventory of Red Barn.  I'm not

5    saying the ones that they said need to run tomorrow,

6    those are -- see, these have makes and models next

7    to them, and these don't.

8    Q.    You are looking at page 1900?  You are

9    talking about --

10    A.    Correct.

11    Q.    -- the top section has make and models?

12    A.    Right.  And also these ones.  So I am

13    assuming, since I don't have the makes and models,

14    that those are -- I -- I confirmed it before, but I

15    am assuming that those are the vehicles that were

16    seized.

17    Q.    And what do you think the ones with makes

18    and models are?

19    A.    I think those are ones that were not

20    owned by Red Barn Motors, we did not hold title to.

21    Q.    So they were on floorplan with DSC or

22    somebody else, and they were holding the title?

23    A.    Correct.

24    Q.    Okay.  I will show you what we will call

25    Exhibit #16.  And this one is Bates labeled RB0001



1   through 39.

2        A.    Okay.

3        Q.    Okay.  This looks like Red Barn Motors'

4   bankruptcy petition that you produced to us in this

5   case; is that right?

6        A.    It appears to be.

7        Q.    Okay.  Will you please turn to page 6 of

8   that document, RB0006?

9        A.    Uh-huh.

10       Q.    All right.  In there is Schedule B,

11  Personal Property.  And there is a line item that

12  says "Buy here/Pay here Accounts Receivables due to

13  Red Barn Auto Finance.  See attached Exhibit M."

14            And it shows a value of $386,975.

15            Do you see that?

16       A.    Uh-huh.

17       Q.    Do you believe this was Red Barn's

18  estimate of the value of its receivables at that

19  time?

20            MR. COMAN:

21                 Objection to form.

22            THE WITNESS:

23                 If that is the amount stated, then

24       that is what the belief was.  It also states,

25       right underneath that, that there is an



1    unfunded claim against NextGear Capital Dealer

2    Services Corporation for unfair trade

3    practices.

4              Because had we not been defrauded

5    over a long period of time, since the

6    beginning of the relationship, we would not

7    have -- basically, we are a small, mom-and-pop

8    used-car dealership and resources are limited.

9    And all of the curtailment fees and interests

10   that were, what I feel, improperly procured,

11   basically limited the cash flow that Red Barn

12   Motors has to operate.

13             So if you go back to the beginning

14   of the relationship to present, to when the

15   relationship ended, and take all those fees

16   and -- and curtailment fees on money that was

17   never lent, there would be a -- a large sum of

18   money that could have been utilized by Red

19   Barn to benefit Red Barn, possibly not putting

20   us in a position that we had to file

21   bankruptcy.

22   BY MR. McCARTER:

23       Q.    Okay.  So my question was about the value

24   of the receivables.

25             Do you have any reason to think that



1    wasn't the value of the receivables at the time,

2    $386,975?

3         A.    That's Page 10 --

4         Q.    Page 6.

5         A.    I'm sure that was the value of the

6    receivables.

7         Q.    Okay.  And then that claim you just

8    mentioned, against NextGear, there is an estimated

9    value of $3,000 placed on that.

10              You see that?

11        A.    Yes.  They did not know what it was.

12   They just said "unknown amount."

13        Q.    Did you have any involvement in setting

14   that value?

15        A.    I -- no, I did not.

16        Q.    Do you know -- excepting this litigation,

17   do you know if that claim was ever pursued with

18   NextGear or otherwise?  Did you ever write a demand

19   to NextGear or did you ever file suit against

20   NextGear on that, other than this litigation?

21        A.    No.

22        Q.    Okay.  All right.  On page 7, the next

23   page, there is a -- here, where it's continuing on

24   Schedule B, it's got "DSC Vehicles," and it says,

25   "See attached, Exhibit A."  But then it says, "value



  
1    unknown."
2            Do you see that?
3       A.    Uh-huh.
4       Q.    Okay.  And then you have got 36,408 for
5    the AFC vehicles on Exhibit B.
6            Do you see that?
7       A.    Wait, what was that?
8       Q.    I am just asking about the next line.  It
9    says $36,408 for AFC vehicles?
10      A.    Okay.
11      Q.    Did you help prepare those estimates or
12   those values?
13      A.    I did not.
14      Q.    Okay.  Do you recall some reason you
15   didn't know the value of the DSC vehicles at that
16   time?
17      A.    It's because we didn't know the amount
18   that we had been defrauded by DSC, to offset the
19   amount that DSC said that we owed them.
20      Q.    Okay.  So you -- so at that -- this time,
21   on this Schedule B of personal property, you thought
22   you had -- you, the debtor, owned $36,408 of value
23   in the AFC vehicles?
24      A.    Correct.
25      Q.    Okay.  That's apart from AFC's interest?



1    DSC payoff?

2              Do you see that?

3         A.    Uh-huh.

4         Q.    Okay.  And then the first page looks

5    like, sort of, a summary of the totals on the

6    following pages; is that right?

7         A.    That looks right.

8         Q.    Okay.  And is this something that you

9    created for use in the bankruptcy, or for some other

10   purpose?

11        A.    I don't know what it was created for.

12        Q.    Okay.  But you did say, a minute ago, you

13   were involved in creating it, right?

14        A.    Yes, correct.

15        Q.    But you don't remember why?

16        A.    I don't remember why.

17        Q.    Okay.  I want to show you what we are

18   going to call Exhibit #18.  I don't -- this is Bates

19   labeled NG008087 through 88.  I don't know -- is

20   this a document that you would have ever seen

21   before?

22        A.    No.

23        Q.    Okay.  At the bottom --

24              MR. COMAN:

25                   Objection to form.



1   BY MR. McCARTER:

2       Q.    -- it says, on May 7, 2013, there is

3   apparent e-mail.  And it says, "I received a call

4   from the dealer, Don Richardson, and he would like a

5   detailed report of all activity on the account since

6   the default, and would like to know the remaining

7   balance on each unit sold at auction, as well as a

8   list of the units that have not yet sold."

9            Do you know -- do you remember whether

10  Red Barn asked for an account statement around this

11  time?

12      A.    I don't remember.  I didn't ask for an

13  account statement around that time.

14      Q.    Okay.  Do you recall getting or seeing

15  one from DSC that was used in the bankruptcy or for

16  some other purpose?

17      A.    No.

18      Q.    Okay.  I am going if show you what we're

19  going to call Exhibit #19.  For the record, this is

20  Bates labeled NG008120.  This looks like it may be

21  an April 26, 2013 letter from Red Barn's bankruptcy

22  attorney to NextGear; is that right?

23      A.    Yes.

24      Q.    All right.  And Arthur Vingiello --

25      A.    That's to Louisiana First Choice Auto



1    Auction.

2        Q.    Correct.  And so this was your bankruptcy

3    attorney at the time?

4        A.    Yes.

5        Q.    Okay.  And he's representing that Red

6    Barn is a debtor in possession and that DSC should

7    cease from selling any collateral in its possession?

8        A.    Yes.

9        Q.    Okay.  All right.  I am going to show you

10   what we're going to call Exhibit #20.  This is Bates

11   labeled NG008358 through 8359.

12       A.    Okay.

13       Q.    This looks like a series of e-mails

14   between you and personnel at NextGear Capital

15   regarding two vehicles that may have been on your

16   DSC floorplan; is that right?

17       A.    Uh-huh.

18       Q.    Okay.  Can you just describe for me what

19   appears to be happening here?

20       A.    It appears to be that we have possession

21   of two vehicles that were not returned to DSC, and

22   we are trying to get those back in your possession.

23       Q.    Okay.  And the advice was to consult your

24   attorney -- or the response was to consult your

25   attorney?



1    A.    I don't recall that.

2    Q.    I mean, do you see, at the top, it says,

3    "Devon, you will need to consult your attorney"?

4    A.    Oh, okay.

5    Q.    And that e-mail address for you, it looks

6    like wwwdevo@aol.com.

7    A.    Yes.

8    Q.    Is that your e-mail address?

9    A.    Yes, it is.

10   Q.    And so this was going on a couple of

11   months after that letter from your attorney, that we

12   just looked at, Exhibit #19?

13   A.    Uh-huh.

14   Q.    And so that -- the bankruptcy would have

15   been pending at that time?

16   A.    Yes.

17   Q.    Okay.  All right.  I'm going to call this

18   Exhibit #21.

19   A.    Okay.

20   Q.    This document is Bates labeled RB0075.

21   It looks like another, you know, exhibit from the

22   bankruptcy that you may have produced to us.

23         Does that look right to you?

24   A.    Yes.

25   Q.    Okay.  And it's a list of insider



1  transactions, the past year, for Red Barn Motors,

2  Inc.

3          Do you see that?

4      A.    Uh-huh.

5      Q.    All right.  And, among others -- like,

6  the first line item is "Devon house payment."

7      A.    Uh-huh.

8      Q.    1750.  You see that?

9      A.    Uh-huh.

10     Q.    So was Red Barn Motors paying your house

11 payment?

12     A.    No.  That house is actually owned by Don

13 and Barbara Richardson.

14     Q.    So was Red Barn Motors paying Don and

15 Barbara's house payment?

16         MR. COMAN:

17             Objection to form.

18         THE WITNESS:

19             Let me see.  It would appear, based

20    on this, it was.

21 BY MR. McCARTER:

22     Q.    Okay.  And there are several others,

23 below, that say "Devon house payment."  And in the

24 same case, those are all that same house owned by

25 Don and Barbara?



1      A.    Uh-huh.

2      Q.    Where is that house located?  What's the

3  address?

4      A.    25852 Plantation Avenue.

5      Q.    Is that still owned by the Richardsons?

6      A.    Yes, it is.

7      Q.    Okay.  And then the second entry, for

8  example, says "payment on car financing, BHPH loan."

9            Do you know anything about what that was

10  for?

11      A.    Payment on car financing, BHPH loan.

12            I don't.

13      Q.    Okay.  You don't have any knowledge of

14  why that would be listed as an insider transaction

15  here?

16            MR. COMAN:

17                 Objection to form.

18                 Obviously, to the extent that you

19     know --

20            THE WITNESS:

21                 I don't know.

22  BY MR. McCARTER:

23      Q.    Do you recall whether you or either the

24  Richardsons had any personal car loan that was being

25  serviced by Red Barn Motors, Inc.?



1      A.    Neither me nor the Richardsons had a car
2   loan being serviced by Red Barn Motors.
3      Q.    Okay.
4      A.    I was provided a vehicle to drive.
5      Q.    By Red Barn Motors?
6      A.    By Red Barn Motors.  But it was an
7   inventory vehicle.
8      Q.    Okay.  Did you guys ever drive DSC
9   vehicles?
10     A.    I would occasionally drive them, to make
11  sure that there weren't any problems with them.  And
12  I would switch off on a daily basis.  But my primary
13  vehicle was not a DSC vehicle.
14     Q.    Would you ever have a DSC vehicle parked
15  at your house overnight?
16     A.    That's possible.
17     Q.    The -- on down, there is a -- it mentions
18  "repay part of the Cliff Richardson loan."
19          Do you know anything about that?
20     A.    I know that Cliff had loaned some money
21  to Red Barn Motors.
22     Q.    And who is Cliff?
23     A.    Cliff is Don's son.
24     Q.    And where -- on down, where it says
25  "Pelican Advisory Group loan to RBM," that's Don's



1  son's insurance company?

2      A.    That's correct.

3      Q.    Okay.  I'm going to show you what we're

4  going to call Exhibit #22.  And I will just

5  represent to you these are just pages that we

6  printed recently from the website redbarnmotors.net.

7          Does this look like Red Barn Motors'

8  website?

9      A.    Yes, it does.

10     Q.    What's going with this pig?  Is that

11  you all's mascot?

12     A.    Yes.

13     Q.    Is it -- do you own the pig?

14     A.    No.  It's a Photoshop.

15     Q.    Gotcha.

16         MR. McCARTER:

17              All right.  Can we take a short

18      break?

19              (Recess taken.)

20         MR. McCARTER:

21              Back on the record.

22  BY MR. McCARTER:

23     Q.    So, Mr. London, one of the things we

24  talked about before was the KO book and at the time,

25  you said you don't know who maintains and organizes



DEVON LONDON                                          October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                              176

1   the KO book; is that right?

2       A.    Correct.

3       Q.    Okay.  Have you made any inquiry of

4   anyone about how to get out of the KO book?

5       A.    No.

6       Q.    Okay.  The auctions where you cannot

7   write business checks, and I'm sorry please

8   remember, were Long Beach and Baton Rouge -- ABC

9   Baton Rouge?

10      A.    Long Beach and Oak View Auto Auction.

11      Q.    Oak View Auto Auction.  Okay.  And --

12      A.    And we were barred from Manheim auctions.

13      Q.    Okay.  Have you inquired with Manheim how

14  to get reinstated with Manheim?

15      A.    We would have to payoff DSC.

16      Q.    How do you know that?

17      A.    That's what they told me.

18      Q.    Who is they?

19      A.    The manager that I spoke to on the phone.

20      Q.    Who was that, what --

21      A.    I don't know.

22      Q.    Was it a particular auction?

23      A.    It was Manheim New Orleans.

24      Q.    Was it GM or somebody else?

25      A.    Somebody else.



1    Q.    When was that conversation?

2    A.    That conversation was probably somewhere

3  around the time of us finding out we were in the KO

4  book, because I had tried to attend the auction and

5  they would not let us enter.  So then I called TRA,

6  which is Manheim Lafayette, and they said the same

7  thing.

8    Q.    And -- so you said it was around the time

9  you found out you were in the KO book, but when --

10  when was that, what year was that?

11    A.    That was right after -- I believe it was

12  2013.

13    Q.    Okay.  During the time of bankruptcy?

14    A.    Probably later on in the bankruptcy.

15    Q.    Have you made any inquiry Manheim since

16  then on how to get back in?

17    A.    No.

18    Q.    At Oak View Auto Auction, have you made

19  any inquiry about what it would take for them to

20  accept your business checks?

21    A.    I have and they refused.  I've done it on

22  multiple occasions.

23    Q.    Have you offered to provide any security

24  or collateral to them?

25    A.    I have not.



1    Q.    Okay.  Did they say anything about how

2  the KO book applies to them or whether they're bound

3  by it?

4    A.    I just know that we're in the KO book and

5  that's their policies based on --

6    Q.    Okay.  But other than telling you, you're

7  in the KO book and they can't accept your checks,

8  what -- what else did Oak View Auto Auction tell you

9  about the KO book?

10    A.    Nothing.

11    Q.    When -- when -- when did you last ask

12  them to be able to write checks?

13    A.    When did I last ask them?

14    Q.    Yes.

15    A.    Probably six months ago.

16    Q.    Okay.  Same thing with Long Beach, have

17  you had any specific discussions with them about

18  writing checks?

19    A.    I believe I have.

20    Q.    And when were those?

21    A.    The first one was when again we first

22  found out we were in the KO book and they told us

23  that we were cash only.  And the second time, I

24  spoke to the general manager.  I don't remember his

25  name.  And all I was trying to do was to have him



DEVON LONDON
RED BARN MOTORS VS. COX ENTERPRISES

October 25, 2016
179

1   waive the $1,000 deposit that we were required to --

2   up front at each auction and he refused to do that.

3       Q.    And so that was 2013?

4       A.    That was 2000 -- that was -- that was

5   2015.

6       Q.    Have you had any conversations with Long

7   Beach Auto Auction since that conversation in 2015

8   about writing business checks?

9       A.    No.

10      Q.    What exactly did Long Beach Auto Auction

11  say to you about the KO book?

12      A.    Again, that we were in the KO book.  I

13  mean --

14      Q.    Anything more about the KO book or how it

15  works?

16      A.    No.

17      Q.    How about ABC Baton Rouge, have you had

18  any conversations with them about writing checks?

19      A.    Yes.

20      Q.    When was that?

21      A.    I don't know the exact date.

22      Q.    Was it closer to the bankruptcy in 2013

23  or more recent?

24      A.    It was more recent than that.  I don't

25  think they were established back then, but it was --

DEVON LONDON                                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                                          180

1   I don't want to guess.

2        Q.    Do you think it was this year?

3        A.    It wasn't this year.  It would have -- it

4   would have been possibly 2015.

5        Q.    Okay.  And what exactly did ABC Baton

6   Rouge say about writing checks?

7        A.    ABC Baton Rouge allowed us to write

8   checks up to a certain amount.

9        Q.    Up to how much?

10       A.    It's a $12,000 figure.

11       Q.    Is that per car or total for the day?

12       A.    No, total for the day.

13       Q.    Was there any discussion with ABC Baton

14   Rouge about the KO book, specifically?

15       A.    No.

16       Q.    I apologize if we covered this, but have

17   -- have you applied for any form of floorplan

18   financing since the bankruptcy?

19       A.    No.

20       Q.    All right.  You -- you mentioned earlier

21   that you had a concern about DSC charging interest

22   on floorplanned vehicles before DSC received the

23   title; is that correct?

24       A.    Before DSC paid for the vehicle.

25       Q.    And I think you had some understanding



1  that typically happens when the title comes in to

2  the auction?

3      A.    Correct.

4           MR. McCARTER:

5                I'm going to show you what I'm going

6       to call Exhibit #23.

7           MR. COMAN:

8                Thank you.

9  BY MR. McCARTER:

10     Q.    I'll represent to you that this is Red

11 Barn Motors' responses to NextGear Capital's first

12 set of interrogatories in this case.  I believe we

13 just got a verification in yesterday; is that right?

14          MR. COMAN:

15               That's correct.

16          MR. McCARTER:

17               Okay.  So that will shorten this.

18 BY MR. McCARTER:

19     Q.    This suggests that you were involved in

20 responding to these interrogatories; is that

21 correct?

22     A.    Yes.

23     Q.    Okay.  And in a couple of different

24 places, it says that you, Donald Richardson, and

25 Sharon Roach would be the Red Barn personnel that



```
 1   would have interacted with DSC and have knowledge of
 2   the DSC floorplan.  Does that sound right?
 3        A.    It does.
 4        Q.    Okay.  Is there anybody else you think of
 5   at the dealership that has specific knowledge of the
 6   DSC floorplan?
 7        A.    No.
 8        Q.    Can I turn your attention to
 9   interrogatory response #6?  In the middle of the
10   Page 6, so there's an objection, and then it says,
11   "Subject to the foregoing specific and general
12   objection, Red Barns responds that during its
13   communications with NextGear and DSC to include
14   account executive Stuart LaBauve, NextGear and DSC
15   concealed from Red Barn that interest or fees would
16   be charged before money was actually lent under the
17   Floorplan Agreement."
18             Do you see that?
19        A.    Yes.
20        Q.    Okay.  So that's -- that's saying that it
21   was hidden, but was there any specific discussion of
22   that issue with Stuart at the time you first entered
23   into the agreement with DSC?
24        A.    At the time that we first entered into
25   the agreement with DSC, that was not brought up.  It
```



1    was assumed -- it was assumed that, you know, based

2    on the agreement and the term advance and, you know,

3    when payment is made, you know, that it would have

4    been when the money was actually lent.

5        Q.    Okay.  Going on down in that same answer,

6    Red Barn has said, "Eventually, Devon London

7    confronted Stuart LaBauve following Devon London's

8    suspicion that defendants were, in fact, charging

9    interest and fees on money not actually lent.  In

10   turn, Stuart LaBauve admitted that the defendants

11   were charging interest and fees on money not

12   actually lent."

13           Do you see that?

14       A.    Yes.

15       Q.    When did that conversation occur?

16       A.    That occurred on or about -- it was when

17   I found out that they were back dating the interest

18   charged to the date of the auction versus the date

19   that I actually floorplanned the vehicle, and I

20   confronted him and said, you know, why are we being

21   charged interest when I haven't even chosen the

22   floorplan.  And he said, I'll have to get back with

23   you.  And he got back with me and basically said,

24   that's the way that it is, you know.  They -- they

25   charge interest from the date of the sale versus the

DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                          184

```
 1    date of the actual loan.
 2        Q.    Okay.  What time frame -- I mean, when
 3    did that actually happen?
 4        A.    I believe that it was June -- June or
 5    July of 2012 is when I figured that out, mid 2012.
 6        Q.    And that seems to be consistent with
 7    paragraph 45 of your -- of your complaint where you
 8    -- you said -- and I'll just read it to you.  It
 9    says, "First met in or about June of 2012.  Devon
10    London, Red Barn's general manager, discovered
11    transactions in which Red Barn had not actually
12    chosen to use the Floorplan Agreement such as
13    NextGear.  And DSC had never actually loaned money
14    to Red Barn for the purchase of vehicles.  It goes
15    on, but that -- that seems to be the time frame,
16    June of 2012?
17        A.    Yes.
18        Q.    Okay.  And we responded back to you along
19    the lines that --
20        A.    That's the way that it is.
21        Q.    Okay.  And your line stayed opened, you
22    continued to borrow from DSC until March of 2013?
23        A.    That is correct.
24        Q.    And were -- were there any other
25    witnesses to that conversation with Mr. LaBauve?
```



DEVON LONDON                                          October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                               185

1        A.      No.

2        Q.      Okay.  Have you ever been part of a

3    discussion between DSC and any other dealer besides

4    Red Barn about the timing of DSC's interest charges?

5        A.      Have I ever been in --

6        Q.      A discussion between DSC and any other

7    dealer besides Red Barn about how DSC calculates

8    interest or when it starts to accrue?

9        A.      I have.

10       Q.      Who was that?

11       A.      Dewitt Hall.

12       Q.      You told me earlier.  Is it Hall or Hull?

13       A.      Hall, H-A-L-L.

14       Q.      Okay.  And what's -- what's his

15   dealership's name?

16       A.      I don't know.

17       Q.      And who was the DSC representative or

18   representatives?

19       A.      For him?

20       Q.      Well, you -- you said you were -- you

21   witnessed a discussion between DSC and him about

22   interest?

23       A.      Oh, no, no.  I -- I said I had a

24   conversation with him.

25       Q.      Okay.



1    A.    I didn't witness a conversation between

2  him and --

3    Q.    Okay.  So you talked -- I'm sorry.  You

4  talked about it with Dewitt, but you haven't

5  actually witnessed a conversation --

6    A.    No.

7    Q.    -- between DSC and Dewitt about interest?

8    A.    No.

9    Q.    Have you witnessed any conversation or

10  e-mails or other communication between DSC and any

11  third-party dealership besides Red Barn about

12  interest charges and how they're calculated?

13    A.    Rephrase the question.

14    Q.    Okay.  Have you witnessed personally,

15  either you were -- you were there or you heard it or

16  you saw it, communications between DSC and some

17  dealer other than Red Barn about how DSC charged and

18  calculated interest?

19    A.    No.

20    Q.    Okay.  And these conversations between

21  you and -- or this conversation that's mentioned in

22  interrogatory #6, was any of that in writing?

23    A.    No.

24    Q.    Where did the conversation take place?

25    A.    At Oak View Auto Auction.



DEVON LONDON                                                October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                                      187

 1       Q.     And you said he -- he got back with you.
 2   Did he get back with you the same day or same place?
 3       A.     No.   He got back to me the following week
 4   I questioned him about it, again.
 5       Q.     Did you escalate your concern to anybody
 6   else at DSC?
 7       A.     No.
 8       Q.     You had conversations with Dewitt Hall
 9   about this issue.   What -- when did those take
10   place?
11       A.     Those took place probably around 2014.
12       Q.     Okay.  And where did they take place?
13       A.     At Red Barn Motors.
14       Q.     All right.  And who raised the subject,
15   you or him?
16       A.     I believe -- I believe he did.
17       Q.     Okay.  And what was the substance of
18   those discussions?
19           MR. COMAN:
20                I'm going to object.  Is there a
21       particular item number in this deposition
22       topic that addresses Dewitt Hall?
23           MR. McCARTER:
24                I'm sure there is one that addresses
25       Red Barn Motors' concern with DSC's interest



```
 1          charges.  So if they made statements to any

 2          party about those, that's certainly well

 3          within the scope.

 4               MR. COMAN:

 5                    Just give me a number.

 6               MR. McCARTER:

 7                    Go to #2 just to start there.

 8               MR. COMAN:

 9                    That's fine.

10     BY MR. McCARTER:

11          Q.   So back to the question, what was the

12     substance of your discussions with Mr. Hall about

13     DSC's interest charges?

14          A.   Basically, just that they were charging

15     interest on money that was never lent.  I mean,

16     that's the gist of it.

17          Q.   Did you raise that to him or did he raise

18     it to you?

19          A.   I think it was mutual.  It was a mutual

20     discussion.

21          Q.   Okay.  And what did he say related to

22     that?

23          A.   I don't remember.

24          Q.   Okay.  And do you recall whether he

25     mentioned ever raising it to DSC or addressing it
```



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                         189

1   with DSC?

2        A.    I don't.

3        Q.    You don't know one way or the other?

4        A.    I don't know one way or the other.

5        Q.    Okay.  Do you recall high level what Red

6   Barn Motors' net income was prior to the time of

7   bankruptcy in 2013?

8        A.    I would not know that.

9        Q.    Who would know that?

10       A.    Don Richardson and the accountant.

11       Q.    Do you know what Red Barn Motors' net

12  income is now as of 2016?

13       A.    It is substantially lower.  I, again,

14  don't have the exact figure.

15       Q.    And you don't know what it was pre-2013,

16  but you know it's lower now?

17       A.    I know it's lower now, yes.

18       Q.    And you said substantially.  How -- how

19  much lower?

20       A.    I don't want to just guess.  I just know

21  that we're selling less cars.

22       Q.    Okay.  Well, damages is certainly a topic

23  in -- in the notice.  Are you -- are you prepared at

24  all to talk about what Red Barn's damages are in

25  this case?



1    A.    I assume I should -- I would be.

2    Q.    Okay.  Do you have some understanding you

3  have a claim for the harm to your business allegedly

4  caused by DSC?

5    A.    Yes.

6    Q.    Okay.  How -- how would you quantify that

7  harm?

8    A.    How would I quantify that harm?  I would

9  quantify that harm by the charging of interest over

10  a period of time and curtailment fees on money that

11  was never lent.  There were many cases, in fact,

12  that not only was there money never lent, but we had

13  paid off the vehicle to DSC and had to wait for the

14  title to come in.  So there was never a transaction

15  whatsoever for the money for -- for a floorplan

16  agreement and DSC was holding the money for the --

17  what they should have paid for the floorplan and the

18  amount that they collected from us including

19  interest and fees.  We -- I mean, that happened many

20  occasions.

21    Q.    Okay.

22    A.    And --

23    Q.    I'm sorry.  Go ahead.

24    A.    -- we were damaged, because it limited

25  our capital.  As I said, we're a small mom-and-pop



1  used-car dealership and when you siphon money out of

2  a corporation over a period of years, that equates

3  to a substantial sum of money that would adversely

4  affect the business and would harm -- would harm the

5  business.

6      Q.    Have you made any attempt to put a dollar

7  figure on the amount of interest that you believe

8  DSC overcharged you?

9      A.    I have no attempt -- I have no way to do

10  that --

11      Q.    Okay.

12      A.    -- because DSC is the only one that knows

13  when the title was actually received.

14      Q.    Is that something while you were with DSC

15  you ever asked DSC to let you know, the timing of

16  when it received the title and when it paid the

17  auction?

18      A.    No.  It -- it basically -- the whole

19  scheme basically evolved from Stuart and that first

20  conversation that we had.  And then there was a car

21  that was a Ford 500 that we purchased in November of

22  2012 and it was a vehicle that we ended up returning

23  to the auction, because they could never get a

24  title.  And DSC voluntarily reimbursed us for all of

25  the interest fees and curtailments and everything



1   else and there had never been any transaction

2   through the auction.  So I started thinking back to

3   all the times that we had actually paid off

4   vehicles, because we had a separate bin on the wall

5   that was a wall pocket for DSC vehicles paid off

6   that were waiting on a title.  And so I just started

7   putting together the scheme and that's how I figured

8   out that there was never -- there was never money

9   lent in the first place.  If -- if I go to a bank

10  and I get a line of credit, which this was a line of

11  credit, and I go in and take a loan against that

12  line of credit, they're going to charge me interest

13  from the day that I take the loan.  If I go into a

14  payday loan store and say, I'm going to need $500

15  next week, the payday loan store, when I come back

16  next week to loan the money, isn't going to say, you

17  owe us for the last week, because we had a

18  commitment to pay you.  The payday loan store is

19  going to charge me from the date that I actually

20  took out the loan.

21       Q.    Okay.  On the Ford 500, you said DSC

22  reimbursed everything you had paid on that?

23       A.    Uh-huh.

24       Q.    Okay.  And that -- that vehicle was

25  actually unwound at the auction, the auction could



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                        193

1   not provide title for that vehicle?

2       A.    That is correct.

3       Q.    Okay.  On these other vehicles you're

4   talking about, there would be situations where the

5   auction is holding together the transaction and

6   eventually provides title, just sometime later,

7   correct?

8       A.    Correct --

9       Q.    And in the meantime --

10      A.    -- after we paid off the vehicle.

11      Q.    -- and in the meantime, you have the

12  vehicle and you're able to offer it for sale?

13      A.    Correct.  But in many cases, we were

14  unable to get funded.  So our capital is tied up,

15  because we've paid DSC for the vehicle and we can't

16  get paid by the bank for the vehicle, because we

17  don't have a title to the vehicle.  And in the

18  interim, we're paying interest and fees and charges

19  for -- mailing charges and everything else when

20  there was never a transaction in the first place.

21      Q.    Okay.  And I think you said earlier that

22  some vehicles are sold at auction with title present

23  and some are sold without title present?

24      A.    That I -- I don't know.  I would assume

25  that they have titles on some of them, I mean,



1  especially the used car dealers that generally sell

2  vehicles, which we don't buy from, you know,

3  generally, because if a used car dealer is offering

4  a vehicle for sale, there's generally something

5  wrong with it, but new car dealers, I -- I don't

6  know whether they provide the titles or don't

7  provide the titles and when they do and when they

8  don't.

9       Q.    Do you know whether that -- in your

10  experience at auto auctions, whether that's

11  typically announced, whether the car is announced or

12  there's a certain color light, for example, that

13  would show whether the title is present or not?

14       A.    There was -- there was one auction I was

15  at that it was announced.  I don't remember which

16  one it was, but it was announced on specific

17  vehicles and -- but it was not the majority of the

18  auctions.

19       Q.    So you don't believe it is announced at

20  the majority of auctions, you believe it's not

21  announced at the majority of auctions?

22       A.    Yes.

23       Q.    Okay.  And if the auctions and other

24  dealers say otherwise, you would disagree with that?

25       A.    Yes.



1    Q.    Okay.  And back to the original question,

2  you have not made an attempt to quantify the actual

3  dollar figure damage caused by this -- what you

4  believe is improper timing of the interest charges

5  by DSC?

6          MR. COMAN:

7               Objection to form.

8          THE WITNESS:

9               There is no way for me to calculate

10      that, because you are the only one and the

11      auction is the only one that knows when the

12      title was received and when they actually got

13      paid for the vehicle.

14  BY MR. McCARTER:

15    Q.    Okay.  And you understand there's a

16  separate claim related to business damages caused by

17  the alleged black listing being in the KO book, you

18  understand that?

19    A.    Uh-huh.

20    Q.    Okay.  Have you made any attempt to

21  quantify the damages caused to Red Barn Motors

22  because of that?

23    A.    I personally have not.  I don't know if

24  Don has personally done that, but they are

25  substantial.



1    Q.    To the extent that you have access to Oak

2  View and Baton Rouge and Long Beach, you know,

3  whether it's cash or not, what -- what categories of

4  damages -- I mean, what do you believe your damages

5  are by not -- by being in the KO book?

6    A.    Our damages are limiting us to fewer

7  auctions.  So we don't have the available inventory

8  that other dealers have, having to pay cash for

9  every single vehicle, having to front a -- a

10  deposit, loss of customers from not being able to

11  operate in a manner that we should be able to

12  operate.

13    Q.    And what -- what is the manner you

14  believe you should be able to operate?  I mean, is

15  it just being able to write checks at auctions or is

16  it something more than that?

17    A.    No.  It's the ability to write checks at

18  auctions.

19    Q.    And when you write those checks, you do

20  have to have the money to cover those checks?

21    A.    That is correct, and we do.  We don't

22  write the check, but we have the money before we --

23    Q.    As we sit here today, you -- you can't

24  really put a specific dollar figure on the change in

25  Red Barn's net income pre-bankruptcy and



DEVON LONDON                                     October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                          197

1    post-bankruptcy?

2        A.     I could get that information for you, but

3    I don't have that information.

4        Q.     Okay.  Have there been any changes in the

5    economy or the local market since 2013 that have

6    affected your business?

7        A.     Not except the flood.

8        Q.     Okay.  Is the market for used cars in

9    Louisiana better or worse now than it was in 2013?

10       A.     It's about the same.

11       Q.     Okay.  Do you have any sense of when

12   Manheim acquired DSC?

13           MR. COMAN:

14               Objection to form.

15           THE WITNESS:

16               I believe -- I'm not positive, but I

17       believe it was just prior to our bankruptcy or

18       during that same period of time.

19   BY MR. McCARTER:

20       Q.     In 2013?

21       A.     Yes.

22       Q.     But besides Mr. Hall, have you talked to

23   any other dealer about the allegations in this

24   complaint?

25       A.     I have talked to other dealers, yes.



DEVON LONDON                                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                                          198

```
 1       Q.     Whom?

 2       A.     Jason Helmke was one of them.

 3       Q.     Do you know the dealership's name?

 4       A.     ABC Auto Sales.

 5       Q.     Is he in this area?

 6       A.     He's in Baton Rouge.

 7       Q.     Anybody else?

 8       A.     He's on Plank Road.  I mean, I have had

 9   conversations.  I don't -- I don't remember, just

10   with various dealers of, you know, the extent of

11   what's happening between DSC and the dealer.

12       Q.     Okay.  Do you remember any other names?

13       A.     I don't.

14       Q.     Okay.  When did you speak to Mr. Helmke

15   about it?

16       A.     Probably within the last six months.

17       Q.     So are you suggesting to these other

18   dealers that NextGear improperly charges interest?

19              MR. COMAN:

20                   Objection to form.

21              THE WITNESS:

22                   I am not -- I am not suggesting.

23       I'm telling them what happened to us and

24       explaining that -- I mean, I have told them

25       that there's loans that have never been made.
```



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                         199

1   BY MR. McCARTER:

2       Q.    Do these other dealers, including Mr.

3   Helmke, have NextGear loans, to your knowledge?

4       A.    I don't know.

5       Q.    Are you trying to recruit them to be

6   parties in this case?

7            MR. COMAN:

8                 Objection to form.

9            THE WITNESS:

10                Am I personally trying to recruit

11      them?

12  BY MR. McCARTER:

13      Q.    Right.

14      A.    I believe Dewitt Hall was --

15           MR. COMAN:

16                Let me stop you there.  I'm

17      instructing you not to answer any question

18      that involves any communication between a

19      counsel and you.  If you had a conversation on

20      your own with Dewitt Hall that was outside of

21      this litigation, that's fair game.

22           THE WITNESS:

23                What was the question again?

24  BY MR. McCARTER:

25      Q.    Are you trying to recruit Mr. Hall, Mr.



DEVON LONDON
RED BARN MOTORS VS. COX ENTERPRISES

October 25, 2016
200

```
1    Helmke, or any dealer to be a party in this case?
2         A.    No.
3         Q.    Have you done that?
4         A.    No.
5         Q.    Okay.  What interest do you think they
6    would have in how DSC charged you interest and why
7    are you raising that to them?
8              MR. COMAN:
9                   Objection.  If you know.
10             THE WITNESS:
11                  Because I feel it is unfair what DSC
12        and NextGear is doing and I want -- I don't
13        want them to continue the practice of
14        defrauding used car dealers.  And I believe
15        the conversation came up with Mr. Helmke,
16        because he was having a problem with DSC.
17   BY MR. McCARTER:
18        Q.    And you said that was about six months
19   ago.  So it would be NextGear at that point?
20        A.    Correct.
21        Q.    And -- and just to be clear, Red Barn
22   Motors has not signed any loan agreements or any
23   agreements with DSC since filing its bankruptcy?
24        A.    Has not signed any loan agreements?
25        Q.    Have you -- has Red Barn Motors signed
```



1  any agreement with DSC or NextGear since it filed
2  its bankruptcy in June of 2013?
3          MR. COMAN:
4              Objection to form.
5          THE WITNESS:
6              I don't think we've entered into any
7      agreements since the filing of the bankruptcy.
8  BY MR. McCARTER:
9      Q.   With DSC or NextGear?
10     A.   Correct.
11     Q.   Okay.  Do you have an understanding --
12  you've alleged a RICO conspiracy between the
13  defendants in this case?
14     A.   Yes.
15     Q.   Okay.  What's your understanding of how
16  the conspiracy worked?
17         MR. COMAN:
18             I'm going to object to form.
19         THE WITNESS:
20             I would have to refer back to
21      counsel -- my counsel, because I -- I don't
22      know all the laws of RICO.  So I would be
23      unable to properly answer that question.
24  BY MR. McCARTER:
25     Q.   And I'm not asking you about RICO or a



DEVON LONDON
RED BARN MOTORS VS. COX ENTERPRISES

October 25, 2016
202

```
1    legal opinion, but you've suggested that -- you've
2    alleged that there's some sort of conspiracy between
3    the defendant and --
4         A.    Correct.
5         Q.    So actually how do you believe that
6    conspiracy worked?
7         A.    The conspiracy worked --
8              MR. COMAN:
9                   I'm going to object to form again.
10             THE WITNESS:
11                  Basically, they all knew what they
12        were doing.  They all knew that they were
13        together not providing a service or not
14        providing financing on vehicles that they were
15        charging interest on.  They were all aware of
16        that.  They conspired together to defraud used
17        car dealers of interest and fees by charging
18        interest when money was never lent and by
19        charging curtailment fees when money was never
20        lent.
21   BY MR. McCARTER:
22        Q.    Okay.  What specifically was Cox
23   Enterprises' role in that?
24             MR. COMAN:
25                  Objection to form.
```



```
 1              THE WITNESS:
 2                   Can he repeat it?
 3              MR. COMAN:
 4                   You can ask him to.
 5              THE WITNESS:
 6                   Can you restate it, please?
 7    BY MR. McCARTER:
 8         Q.    You just described how you believe they
 9    were all part of a conspiracy, because they were all
10    aware and I'm asking you, do you have any factual
11    knowledge of Cox Enterprises' specific role in the
12    conspiracy you're alleging?
13         A.    It has been going on for a very, very
14    long time.  So I believe that they had knowledge of
15    how their business operates and how they collect
16    interest and how they charge their customers when
17    they collect fees and when they collect interest.
18         Q.    Okay.  Were you -- were you personally,
19    Red Barn Motors, a party to or a witness of any --
20    into any conversations with Cox Enterprises or
21    anybody at Cox Enterprises about these interest
22    issues?
23              MR. COMAN:
24                   Objection.  Answer if you know.
25              THE WITNESS:
```



```
 1                    I don't know, no.

 2    BY MR. McCARTER:

 3         Q.    So you were not a witness to those?

 4         A.    No.

 5         Q.    Okay.  Were you, Red Barn Motors, a

 6    witness to or a party to any conversations with Cox

 7    Automotive, Inc., about these interest issues?

 8         A.    Cox Automotive, Inc., is owned by Manheim

 9    or Manheim is owned by Cox Automotive, Inc.  And

10    NextGear is owned by Cox Automotive, Inc.  So

11    communications between those two entities would also

12    be dealing with that company.

13         Q.    Okay.  I asked you whether you were a

14    party to or a witness to any conversations with Cox

15    Automotive, Inc., itself, about these interest

16    issues you're alleging?

17         A.    No.

18         Q.    Okay.  Were you, Red Barn Motors, a party

19    to or a witness to any conversations with John Wick,

20    who's a defendant in this case, about these interest

21    issues?

22         A.    Was I party to any conversation?

23         Q.    Or a witness in conversation or

24    communication --

25         A.    No.
```



```
 1        Q.    -- with John Wick?

 2        A.    No.

 3        Q.    What benefit did you, Red Barn, confer on

 4   Cox Enterprises, specifically?

 5             MR. COMAN:

 6                  Objection to form.

 7             THE WITNESS:

 8                  Well, what do you mean by that?

 9   BY MR. McCARTER:

10        Q.    You've got an unjust enrichment claim in

11   this case.  And so I understand you are saying you

12   paid interest to NextGear Capital, Inc., that you

13   don't think it was due.  Did you pay any money to

14   Cox Enterprises, Inc., specifically?

15             MR. COMAN:

16                  Objection to form.

17             THE WITNESS:

18                  No.

19   BY MR. McCARTER:

20        Q.    Did Red Barn Motors pay any money to Cox

21   Automotive, Inc., specifically?

22             MR. COMAN:

23                  Objection to form.

24             THE WITNESS:

25                  Indirectly.
```



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                        206

1   BY MR. McCARTER:

2       Q.    What does that mean?

3       A.    If it's being paid to NextGear or DSC,

4   then it's being paid to Cox Automotive.

5       Q.    Okay.  Do you remember ever writing a

6   check or transferring an ACH directly into an

7   account with the name of Cox Automotive, Inc.?

8       A.    No.

9       Q.    Okay.  Do you recall paying John Wick

10  personally any money from Red Barn Motor's account?

11      A.    No.

12      Q.    Other than the involvement of the

13  Louisiana Used Motor Vehicle Commission and sorting

14  out the title issues in this case, has Red Barn ever

15  been investigated or looked into by any state

16  agency, to your knowledge?

17           MR. COMAN:

18                Objection to form.  Answer if you

19      know.

20           THE WITNESS:

21                There was a complaint filed and I --

22      I'm not sure if it was the Attorney General,

23      but they came in and investigated a complaint

24      of a woman who said that she was renting a

25      vehicle and never purchased a vehicle and was



```
 1         asking for her money back, and we had the

 2         whole transaction on video.  So they watched

 3         the video and it was put to bed.

 4   BY MR. McCARTER:

 5      Q.    Do you recall the timing of that?

 6      A.    Probably sometime in 2000 -- I don't.

 7   I'm not going to guess.

 8      Q.    Do you recall her name?

 9      A.    I don't.

10      Q.    Any other investigations by any federal,

11   state or local agency that you can think of?

12      A.    No.

13      Q.    What did you do to prepare for the

14   deposition today?

15         MR. COMAN:

16              I'm going to object to the extent

17      that it invades attorney-client privilege, but

18      past that --

19   BY MR. McCARTER:

20      Q.    I'm not asking you to describe any

21   discussions with your attorneys.  I'm asking you to

22   tell me what you did to prepare for the deposition

23   today and if that includes meeting with them, then

24   you need to tell me that, but don't tell me the

25   substance of it.
```



1     A.     Okay.  I did meet with them.

2     Q.     And when was this?

3     A.     On Friday and I re-read the topics that

4  you were going to be going over and the amended

5  complaint.

6     Q.     Okay.  And did you talk to anybody else

7  besides your attorneys about those issues?

8     A.     No.

9     Q.     Quickly again before -- we talked about

10  some of your retail financing deals when you would

11  send, you know, papers to the bank for approval.  Do

12  you recall that?

13     A.     Uh-huh.

14     Q.     When you would do that, is there -- does

15  it -- how long does it usually take the bank to

16  approve the financing?

17     A.     Like, when we submit a loan, just fax it

18  over?

19     Q.     Yes.

20     A.     Sometimes, you can get an answer the same

21  day.

22     Q.     And when did you get funding typically

23  from the bank?

24     A.     When you -- when they received the title.

25     Q.     Which is when?  I mean, is it always at



1  that time or is it later when you get the title?

2       A.    It's -- it's later.  It's when we provide

3  the title to the lender.

4       Q.    Okay.  And do you know typically when

5  those banks start charging consumers interest --

6            MR. COMAN:

7                 Objection to form.

8  BY MR. McCARTER:

9       Q.    -- as of what date?

10      A.    Rephrase the question.

11      Q.    Do the banks typically charge the

12 consumer interest from the date of sale or do they

13 start running from when they get the title from you?

14           MR. COMAN:

15                Objection to the form.  You can

16     answer if you know.

17           THE WITNESS:

18                I don't know.

19 BY MR. McCARTER:

20      Q.    Okay.  If you can flip back to Exhibit

21 #16 for me.  It's the bankruptcy petition.  And I

22 turn your attention to page 18, RB 18.  See in the

23 middle of this middle of the page, there's $100,000

24 claim by Southwest Finance; do you see that?

25      A.    Uh-huh.



 1   Dealer Services Corporation, did DSC, through

 2   contracts or through representatives represent to

 3   you that they would only charge you interest and

 4   curtailment fees beginning from the date of advance?

 5             MR. McCARTER:

 6                  Object to form.

 7   BY MR. COMAN:

 8        Q.    You can answer.

 9             MR. McCARTER:

10                  Object.  Asked and answered.  Go

11        ahead.

12             THE WITNESS:

13                  Yes.

14   BY MR. COMAN:

15        Q.    Okay.  Did DSC conceal that fact from Red

16   Barn?

17        A.    Yes.

18             MR. McCARTER:

19                  Object to form.

20   BY MR. COMAN:

21        Q.    Let me rephrase it.  I'm sorry.

22             Did Red Barn conceal the fact that it

23   was, in fact -- did DSC conceal from Red Barn that

24   it was, in fact -- DSC was hiding and actually

25   charging interest and curtailment fees to you



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                         217

1   without your knowledge?

2            MR. McCARTER:

3                 Object to form.  These are all

4       leading and full of false assumptions.

5   BY MR. COMAN:

6       Q.    You can answer.

7       A.    Yes.

8       Q.    Did that damage Red Barn or did Southwest

9   damage Red Barn?

10           MR. McCARTER:

11                Object to form.

12           THE WITNESS:

13                The damage to Red Barn was caused by

14      DSC.

15  BY MR. COMAN:

16      Q.    Earlier, you testified under counsel's

17  questions regarding Stuart LaBauve and an

18  interaction you had with him, without the quote, you

19  were somewhere midstream, let's say, in the

20  relationship between Red Barn and DSC.  Do you

21  recall that testimony?

22      A.    Yes.

23      Q.    Okay.  And describe for us the

24  interaction that you had and the confrontation,

25  quote/unquote, that you had with Stuart LaBauve and



DEVON LONDON                                          October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                                218

 1   what you learned at that date?

 2           MR. McCARTER:

 3               Objection, asked and answered in

 4       detail.

 5   BY MR. COMAN:

 6       Q.    You can answer.

 7       A.    I basically learned at that date that DSC

 8   was charging interest from the date of the advance

 9   -- from the date of the -- from the date of the

10   auction versus the date that we actually

11   floorplanned the vehicle through the auction.

12       Q.    And what was your understanding at that

13   time from Stuart LaBauve as to that difference in

14   time between those two?

15           MR. McCARTER:

16               Object to form.

17           THE WITNESS:

18               That was just the way that it was.

19       He said that -- that's the way it was.  They

20       always go from the date of the sale.

21   BY MR. COMAN:

22       Q.    Okay.  And did your knowledge and

23   understanding of this process evolve from that

24   moment to the end of the relationship, let's say, in

25   March of 2013?



DEVON LONDON                                             October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                                   219

```
 1        A.    Yes, it did.

 2        Q.    Okay.  Tell us how.

 3        A.    Well, we had the conversation with Stuart

 4   and under the assumption it was three to four days

 5   or however many days it was, we chose to continue

 6   the relationship and just not cause any problems,

 7   but --

 8        Q.    Let me stop you there.

 9             MR. McCARTER:

10                  No.  Let him answer the question.

11         He's answering the question and you stopped

12         him in the middle of his answer.  Go ahead and

13         answer.

14             THE WITNESS:

15                  Okay.  Then, it really came to light

16         with the Ford 500 in 2013 where we had paid

17         off the vehicle.  We had paid all of the

18         curtailment fees.  We had paid all of the

19         interest.  We had paid everything to DSC and

20         DSC was the one that reimbursed us for the

21         money that we paid, because they had never

22         paid the auction for the car.  So if the

23         auction had never gotten paid for the car, DSC

24         utilized all of our funds for the time since

25         they were collected without ever making a loan
```



1      on the vehicle.  Then, I started thinking

2      about all of the times that we had actually

3      paid off a car before DSC had the title and

4      how many times this actually happened, and it

5      was voluminous.  It was not one time.  It

6      wasn't two times.  It was many times that we

7      paid off DSC and the title wasn't available

8      and we had to wait for the title.  And that

9      was when I realized how big the scheme was and

10      how voluminous it was.

11   BY MR. COMAN:

12      Q.    Are you done?

13      A.    Yes.

14      Q.    I didn't mean to cut you off.  Your

15   knowledge level that you just described, that was at

16   the end of the relationship; is that correct?

17      A.    Yes.

18      Q.    That grew and expanded from your original

19   conversation with Stuart LaBauve when you confronted

20   him about the differential in time; is that correct?

21           MR. McCARTER:

22               Objection to form.

23           THE WITNESS:

24               That is correct.

25   BY MR. COMAN:



1      Q.    All right.  Now, you were asked several

2  questions regarding auction houses and you mentioned

3  Manheim Auctions.  Okay.  How many of those auctions

4  have you been barred from, at least that you know of

5  specifically, Manheim auctions?

6            MR. McCARTER:

7                 Object to form.

8            THE WITNESS:

9                 I have been told by Manheim New

10      Orleans that I'm barred from all Manheim

11       auctions.

12  BY MR. COMAN:

13      Q.    Okay.  Did you also check with Manheim

14  Lafayette?

15      A.    Manheim Lafayette has barred us, yes.

16      Q.    Okay.  The non-Manheim auction houses in

17  the industry, you described at length the various,

18  and I'll call them restrictions; is that a fair

19  statement that you're operating under at this point?

20            MR. McCARTER:

21                 Object to form.

22            THE WITNESS:

23                 Repeat the question.

24  BY MR. COMAN:

25      Q.    Sure.  Look over here.  I'm sorry.  The



1  non-Manheim auctions, the deposits, whatever --
2  whatever relationship you have at this point with
3  non-Manheim auctions --
4      A.    Uh-huh.
5      Q.    -- in the business relationship, okay,
6  how is that -- is that restricting -- is that
7  adversely affecting you and your business at this
8  minute?
9          MR. McCARTER:
10              Objection to form.
11         THE WITNESS:
12              Yes, it does.
13  BY MR. COMAN:
14     Q.    How?
15     A.    It -- it limits our ability to procure
16  cars.  It limits our ability to write checks on
17  vehicles.  We have to pay for the vehicle at the
18  time that we purchase the vehicle, whether title is
19  present or not.  The auctions -- the amount of
20  auctions that we can go to limits our ability to get
21  the same inventory that other dealers have access
22  to.
23     Q.    Has that -- all those items, have those
24  adversely affected Red Barn's income?
25     A.    Yes.



```
1        Q.    Has it adversely affected Red Barn's
2    business reputation?
3              MR. McCARTER:
4                    Object to form.  Lack of foundation.
5              THE WITNESS:
6                    Yes.
7    BY MR. COMAN:
8        Q.    Has that adversely affected your goodwill
9    within the industry?
10             MR. McCARTER:
11                   Object to form.
12             THE WITNESS:
13                   Absolutely.
14   BY MR. COMAN:
15       Q.    Has it also affected the overall
16   valuation of Red Barn at this point?
17             MR. McCARTER:
18                   Object to form.
19   BY MR. COMAN:
20       Q.    You can answer.
21       A.    Absolutely.
22             MR. COMAN:
23                   Okay.  One moment, please.
24                   I don't think I have any further
25       questions at this time.
```



```
 1          MR. McCARTER:

 2              Okay.  I've got to clear up a couple

 3      things.

 4                   RE-EXAMINATION

 5  BY MR. McCARTER:

 6      Q.    So we went in detail over your

 7  conversations with Mr. LaBauve before and you said

 8  in the initial conversations with him, you said that

 9  he concealed the interest issue, but you didn't

10  recall any specifics representations about the

11  timing of interest.  Do you remember that?

12      A.    He said -- repeat.

13      Q.    Okay.  So both your complaint and your

14  testimony earlier was that Mr. LaBauve concealed the

15  timing of DSC's interest charging in initial sales

16  meeting that you had with him, but you testified he

17  didn't make any specific statements or

18  representations to you about the interest.  Do you

19  recall that?

20      A.    Yes.

21      Q.    Okay.  And so when your attorney just now

22  asked you about did he misrepresent to you in that

23  initial conversation, you're talking about the

24  concealment and not actual statements, correct?

25      A.    I don't understand your question.
```



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                      225

1    Q.    Okay.  So he didn't make any actual
2  statements to you about the timing of interest and
3  when it would start on the DSC line in your initial
4  meeting with Mr. LaBauve?
5    A.    No, but the contract stated it.
6    Q.    Okay.  So you're relying on what's in the
7  contract?
8    A.    I'm relying on what's in the contract and
9  what was represented by Stuart LaBauve, which is not
10  the truth --
11    Q.    Okay.
12    A.    -- the -- the 4 percent, the -- there
13  were -- there were numerous things that weren't
14  true.
15    Q.    Okay.  We're specifically talking about
16  the timing of when interest began to accrue on the
17  advance.  And you testified that Mr. LaBauve did not
18  make any statements to you on that issue in your
19  initial sales meeting with him.  Do you recall that?
20    A.    Yes.
21    Q.    Okay.  And there was some testimony just
22  now with your attorney where you were talking about
23  non-Manheim auctions.  We -- we covered a handful.
24  Was it three or four non-Manheim auctions that
25  you've dealt at since 2013.  Do you recall that?



```
 1   Again, they were Oak View Auto Auction, Long Beach,
 2   Mississippi, Baton Rouge ABC.  Okay.  Have you dealt
 3   at any other Manheim auctions since 2013?
 4        A.    No.
 5        Q.    Okay.  Have you tried to deal at any
 6   other Manheim auction -- non-Manheim auction since
 7   2013?
 8        A.    Yes.
 9        Q.    Which one?
10        A.    I don't know the name of it.
11        Q.    Do you know where it was?
12        A.    It was, I believe, in Lafayette.  We --
13   we signed up and we basically have not gone.
14        Q.    So you -- you can go to this -- this
15   non-Manheim auction in Lafayette, you just chose not
16   to?
17        A.    I don't -- I -- I don't remember if we
18   were approved or not approved.
19        Q.    Okay.  So as we sit here today, you don't
20   know whether you can do business at that auction?
21        A.    Correct.
22        Q.    Okay.  Have you tried to go to any other
23   non-Manheim auctions since 2013?
24        A.    No.
25        Q.    Besides ABC Baton Rouge, have you tried
```



DEVON LONDON                                      October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                        227

1   to go any other ABC auto auctions?

2       A.    No.

3       Q.    Okay.  Have you tried to pass a check at

4   any other non-ABC auction -- I mean, any other ABC

5   auction?

6       A.    Have I tried to pass a check?

7       Q.    Have you paid with a check at any other

8   ABC auction?

9             MR. COMAN:

10                  Objection to form.

11            THE WITNESS:

12                  At any another ABC auction, because

13       AB -- you're saying just ABC auctions in

14       whole?

15  BY MR. McCARTER:

16      Q.    Okay.  You -- you understand that ABC

17  auction is an auction company with multiple

18  locations, right?

19      A.    Yes.

20      Q.    Okay.  And we covered your permissions at

21  ABC Baton Rouge, right?

22      A.    Correct.

23      Q.    You said you haven't dealt at any other

24  ABC auctions since 2013?

25      A.    Correct.



 1        Q.    So can I -- can I assume you haven't
 2    tried to pay any other ABC auction a check since
 3    2013?
 4        A.    Yes.
 5        Q.    Okay.  Have you tried to pay any -- have
 6    you tried to go to any Odessa auto auctions since
 7    2013?
 8        A.    No.
 9        Q.    Have you tried to go any other
10    independent auctions besides the ones that we just
11    talked about specifically?
12        A.    No.  The reasoning is because our target
13    market, if you go outside of this market and have to
14    pay transportation fees and everything else to get
15    the vehicle here when you're dealing with a $2,000
16    car is going to, you know, make you pay more for the
17    vehicle or end up being in the vehicle more
18    generally than if you stayed within the area.
19        Q.    Okay.  So it would be less profitable for
20    you to go outside of this area of Louisiana?
21        A.    Generally, yes.
22        Q.    Okay.  And have you tried to buy on-line
23    at any wholesale vehicle source like Smart Auction,
24    Copart, anything like that?
25        A.    No.



1     Q.    Okay.  You mentioned before that the

2  goodwill of your -- of -- of Red Barn Motors has

3  suffered since 2013.  Do you recall that?

4     A.    Yes.

5     Q.    What was the value of the goodwill of Red

6  Barn Motors before it's bankruptcy in 2013?  I mean,

7  monetary value, what -- what was the monetary value

8  of it before 2013?

9           MR. COMAN:

10               Objection.

11          THE WITNESS:

12               I would have to ask Mr. Richardson.

13  BY MR. McCARTER:

14     Q.    Okay.  And what is the value of it now, I

15  mean, pre-flood and in August, the value of Red

16  Barn's goodwill?

17     A.    Again, I -- I cannot put a figure on

18  that.

19     Q.    Okay.  Do you know what the current going

20  concern value of Red Barn Motors is?

21     A.    The current going concern value?

22     Q.    Yes.  You testified to your attorney that

23  the value of Red Barn Motors is less than it was

24  prior to the issue with DSC.  So what is the value

25  of it now?



 1              MR. COMAN:

 2                   Objection to form.

 3              THE WITNESS:

 4                   We haven't had it appraised.

 5    BY MR. McCARTER:

 6        Q.    Okay.  What was the value of it before

 7    bankruptcy in 2013?

 8        A.    I would be guessing.  I don't know.

 9        Q.    You don't know.  Okay.

10        A.    Again, Don Richardson did all the

11    valuations and --

12        Q.    Okay.  And you previously testified you

13    didn't know the net income of Red Barn Motors prior

14    to bankruptcy in 2013; is that right?

15        A.    Yes.

16        Q.    And you don't know the net income of Red

17    Barn Motors as we sit here today?

18        A.    Not the exact figures, no.

19              MR. McCARTER:

20                   Okay.  No further questions.

21              MR. COMAN:

22                   We have no further questions.

23              COURT REPORTER:

24                   Do y'all need a copy?

25              MR. COMAN:



DEVON LONDON                                              October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                              231

1          Yes, ma'am.

2

3

4

5

6    (Deposition concluded at 4:02 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

