Case 1:14-cv-01589-TWP-DLP  Document 160-18  Filed 10/31/16  Page 1 of 165 PageID #: 2169

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF INDIANA

3                  INDIANAPOLIS DIVISION

4

5    RED BARN MOTORS, INC., PLATINUM MOTORS INC., et

6    al.

7

8                                      PLAINTIFFS

9    V.

10                      CASE NO. 1:14-cv-01589-TWP-DKL

11

12   COX ENTERPRISES, INC., et al.

13

14                                     DEFENDANTS

15   _____

16

17          DEPOSITION FOR THE DEFENDANTS,

18          COX ENTERPRISES, INC., et al.:

19

20     The Deposition of Rule 30(b)(6) Witness, Barry

21   Wayne Mattingly, on Behalf of Mattingly Auto Sales,

22   Incorporated, taken in the above-styled matter at

23   Frost Brown Todd, LLC, 400 West Market Street, 3200

24   Mercer Tower, Louisville, Kentucky, on the 19th day of

25   October, 2016, beginning at 9:04 a.m.



EXHIBIT P

```
 1      A.   No.

 2   [WHEREUPON, phone rings.]

 3        MR. JURKIEWICZ:  Are we -- no question

 4   pending?

 5        MR. MCCARTER:  No.

 6   BY MR. MCCARTER:

 7      Q.   All right.  And do you remember the name

 8   of the officer or officers you met with?

 9      A.   Yes.

10      Q.   What was --

11      A.   Curtis Mouser.  And I don't -- don't know

12   how to spell that for you.  I'm sorry.

13      Q.   Okay.  There was the one interview,

14   and --

15      A.   Yes.

16      Q.   -- did he pull records from you?

17      A.   Yes.  Well, no.  He actually had pulled

18   them himself.

19      Q.   From where?

20      A.   The courthouse.  All property records,

21   everything, financial records from liens, that kind

22   of thing.

23      Q.   All right.  You said it was embezzling, but

24   did he give you any more sense specifically what

25   he was looking at?
```



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 3 of 165 PageID #: 2171

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              22

 1    A.   He was looking at to see what we --
 2  basically, he was looking for money possibly that
 3  we had borrowed.  That's what he was -- told us he
 4  was looking at.
 5    Q.   Okay.  But we're not talking about --
 6    A.   Liens on properties and that kind of
 7  thing.
 8    Q.   Okay.  Did he ever formally tell you he
 9  was done looking?
10    A.   Yes.  His -- I think his quote was, and he
11  looked at my lawyer as he looked at the paper and
12  said, "I can't find anything here."
13    Q.   Okay.  And that all -- that all happened in
14  May of 2012?
15    A.   Yes.
16    Q.   Okay.  How -- do you have any other
17  employees now?
18    A.   No.
19    Q.   Have you in the last ten years or so?
20    A.   No.
21    Q.   Do you have any other representatives
22  who might buy cars for you or the like?
23    A.   Yes.
24    Q.   And who are they?
25    A.   Different people.  Just to give you some



```
 1   names, Kenny Barker.
 2      Q.   Okay.
 3      A.   In the past -- in the past, a guy named
 4   Sherman Dow, Frankie Anthony.  I think -- I think
 5   Butch Fentress.
 6      Q.   Contress?
 7      A.   Fentress, F-e-n-t-r-e-s-s.
 8      Q.   Okay.  Have these folks all been reps for
 9   you in the last ten years or so?
10      A.   Yes.
11      Q.   Are any of them still reps for you?
12      A.   Yes.
13      Q.   And by "reps," I mean representatives
14   who might --
15      A.   Per -- per -- person who --
16      Q.   -- who might buy or sell cars for you?
17      A.   Yes.
18      Q.   Okay.  And they do that at auctions?
19      A.   Yes.
20      Q.   And again talking about Mr. Barker, Mr.
21   Dow, Mr. Anthony, Mr. Fentress, did they have
22   their own dealerships, or did they buy personally
23   for you?
24      A.   They bought cars for -- through me; yes.
25      Q.   Okay.  Do they do any selling for you?
```



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 5 of 165 PageID #: 2173

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                24

1    A.   Vehicles they bought were generally for
2  themselves to sell or for family members or
3  something like that to re-sell.

4    Q.   But they would still do that on your
5  account?

6    A.   Yes.

7    Q.   All right.  So what auctions are you
8  dealing at today?

9    A.   Wolfes, W-o-l-f-e-s, Wolfes Auto Auction,
10  and that's in Evansville.

11    Q.   Any others?

12    A.   That's it, pretty much it.  I do go to a
13  few, but rarely, E-town Auto Auction.

14    Q.   Say it again.

15    A.   E-town.

16    Q.   E-town?

17    A.   Elizabethtown Auto Auction.

18    Q.   And where -- is that Kentucky?

19    A.   Yeah, Kentucky.  That's actually --
20  actually outside of E-town, just call it E-town.  And
21  then also one more that I go to occasionally is
22  Clark County Auto Auction.

23    Q.   Can you think of any others you've gone
24  to since May of 2012?

25    A.   That's it.



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 6 of 165 PageID #: 2174

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            25

```
 1     Q.    Okay.  You don't have internal legal
 2   counsel; do you?
 3     A.    No.
 4     Q.    Okay.  How many cars are on your lot
 5   now?
 6     A.    One.
 7     Q.    Do you have more than one lot?
 8     A.    No.
 9     Q.    Where is your lot?
10     A.    Hardinsburg, Kentucky.
11     Q.    Can you give me the full address?
12     A.    Yeah.  It's 3826 South Highway 261, and
13   that's in Hardinsburg, H-a-r-d-i-n-s-b-u-r-g,
14   Kentucky.
15     Q.    Okay.  Since you incorporated in 2003ish,
16   have you had other lots?
17     A.    No.
18     Q.    When you're buying and wholesaling cars
19   today, do you bring those back to your lot, or do
20   they go straight to other locations?
21     A.    Usually, bring them to the lot.
22     Q.    And what's an average number of cars
23   you've had on your lot since 2012, roughly?
24     A.    Probably one to two.
25     Q.    And before 2012?
```



```
 1    A.    We had as many as 15 to 20.

 2    Q.    Is it fair to say that would matter more

 3  when you have retail buyers, the need --

 4    A.    Yes.

 5    Q.    -- to see the cars.  Now, I understand you

 6  buy and sell cars.  Is it the profit on those cars

 7  that you -- is that how you make your money?

 8    A.    Yes.

 9    Q.    Okay.  So you're trying to buy them low

10  and sell them high?

11    A.    Correct.

12    Q.    Do you do anything else to make money

13  as Mattingly Auto Sales, Inc.?

14    A.    No.

15    Q.    No financing?

16    A.    No.

17    Q.    No service?

18    A.    No.

19    Q.    No parts?

20    A.    No.

21    Q.    Okay.  Has that been true the whole time?

22    A.    The whole time.

23    Q.    Okay.  Do you specialize in a particular

24  type of car?

25    A.    No.
```



1   Q.   No.  You still buying classic cars?

2   A.   No.

3   Q.   All your cars are used, though?

4   A.   Yes.

5   Q.   But they can be any different age?

6   A.   Correct.

7   Q.   Any different value?

8   A.   M-hm.

9   Q.   You can sell a high end Porsche and -- as

10  well as a low end --

11  A.   Not where --

12  Q.   -- Sentra?

13  A.   -- I'm from.

14  Q.   Okay.  So you are specializing a little bit

15  in lower end cars?

16  A.   Yes.

17  Q.   Okay.  And what's an average price for

18  it?

19  A.   The one we have for sale today is $2200.

20  Q.   Just curious, what kind of car is it?

21  A.   It's a 2002 Mazda Millenia.

22  Q.   Has the type of car you specialize in

23  changed since 2012?

24  A.   Yes.

25  Q.   In what way?



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 9 of 165 PageID #: 2177

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              28

1    A.    Basically, lower end cars, not -- not the

2    higher dollar SUVs, trucks, sporty cars, you know.

3    From, say, a $15,000 car, now we're down to the

4    under $5,000 cars.

5    Q.    Okay.  But even before 2012, we're

6    talking mid range 15, 20,000?

7    A.    M-hm.

8    Q.    Okay.  Do you ever get cars from other

9    dealers?

10    A.    Yes.

11    Q.    Outside of an auction?

12    A.    Yes.

13    Q.    Okay.  And when and what does that look

14    like?

15    A.    Just the same.  Just if they have

16    something they want to -- they don't want to --

17    they'll take to the auction they don't want, I'll

18    shoot them a price if I -- you know, if it's worth the

19    money, I'll buy it, they'll sell it to me.

20    Q.    Okay.  Any estimate of what percentage

21    of your deals are from --

22    A.    No.  No.  Wouldn't -- wouldn't have any

23    idea.

24    Q.    Okay.  Besides auctions, other dealers,

25    any other way you get cars?



1    A.    That's about it.

2    Q.    Trade-ins?

3    A.    Yes.  If -- if there's a trade-in, yes, we

4    do that.

5    Q.    Okay.  What about online?  Do you buy

6    anything online?

7    A.    No.

8    Q.    You're aware of SmartAuction, eBay

9    Motors --

10   A.    Yes.

11   Q.    -- those kind of things?

12   A.    Yes.

13   Q.    And you don't use any of those?

14   A.    No.

15   Q.    Okay.  Is that by choice?

16   A.    Yes.  I just don't -- nothing worth putting

17   on there.

18   Q.    Okay.  I just wanted -- I asked you this

19   before, but you don't sell any add-ons or anything

20   like that, insurance products, any --

21   A.    No.  No.

22   Q.    Okay.  So if -- if you do have a retail

23   deal, what is the form of payment typically on

24   those?  Is it cash or something else?

25   A.    Cash, check, whatever; m-hm.  We don't



1    finance unless they have their own financing or

2    something.  We don't do it ourselves.

3        Q.    Have you ever done self financing?

4        A.    No, not through us.  We used to finance

5    through another dealer who had financial options.

6        Q.    Okay.

7        A.    We never had nothing ourselves.

8        Q.    So if the buyer comes in with cash, a

9    certified check, or a bank loan, you can take that?

10       A.    Right.

11       Q.    But you won't do a buy here pay here

12   deal?

13       A.    No.

14       Q.    Okay.  When -- what period of time were

15   you doing the buy here pay here deals through

16   another dealer?

17       A.    Well, it wasn't -- it was through a bank,

18   through a bank.  It was never a buy here pay here.

19   It was -- it -- we quit that in 2012, I guess.

20       Q.    Okay.  Who was that bank?

21       A.    Fort Knox Credit Union.

22       Q.    Say it again.

23       A.    Fort Knox -- Fort Knox Federal Credit

24   Union.

25       Q.    Okay.  When you were working with Fort



1   Knox, what did those contracts look like?  Was it

2   just a loan from Fort Knox to the consumer, and

3   then they would pay you directly?

4     A.   Yes.  Actually, the -- the loan, I would go

5   through another dealer.  They did all the

6   paperwork.  I would -- I -- I didn't have an account

7   with them.  I would just send the paperwork, the

8   app -- they would fill out an application, I would

9   send it to that dealer, that dealer would do all the

10  paperwork.

11          MR. JURKIEWICZ:  Matt?

12          MR. COMAN:  I'm here.

13          MR. JURKIEWICZ:  We're on the record.

14  Matt Coman is joining.

15          MR. COMAN:  I apologize for the

16  interruption.

17  BY MR. MCCARTER:

18    Q.   And so please tell me if this is wrong, but

19  so you -- you would make the deal with the

20  consumer, then you would send the paperwork to

21  another dealer, and they would send it in to Fort

22  Knox Credit Union?

23    A.   Yes.

24    Q.   And then Fort Knox would cut a check to

25  you?



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 13 of 165 PageID #: 2181

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              32

1    A.    To -- no, to Wheatley, to the -- the

2    dealer, to the dealer, and then they would pay me.

3    Q.    Okay.  And what's Wheatley's full name?

4    A.    It was Wheatley Motor Company.  They

5    have since gone out of business.

6    Q.    Do you know whether Wheatley was -- was

7    running a buy here pay here contract where they

8    would keep getting payments from the consumer,

9    or was everything paid off up front by their --

10   A.    Everything was paid by Fort Knox Credit

11   Union to them.

12   Q.    Okay.  Any other form of financing you've

13   used for your sales?

14   A.    No.  Not our sales; no.

15   Q.    Okay.  When you get a trade-in, how do

16   you deal with that?

17   A.    You just value it, and they pay the

18   difference.

19   Q.    So you write a contract for the new car,

20   you give some trade-in credit, and they pay the

21   difference?

22   A.    Correct.

23   Q.    In some of those cases, you have to pay

24   off a previous lienholder?

25   A.    Some; yes.



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 14 of 165 PageID #: 2182

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                  33

```
 1    Q.    When you were working with Wheatley and

 2  Fort Knox, if there were a trade-in, they would just

 3  finance the net?

 4    A.    No.  I would -- I would have to put that --

 5  my money into the trade.

 6    Q.    Can you explain that to me?  I'm sorry.

 7    A.    All right.  Let's say I sold a $10,000 car.

 8    Q.    M-hm.

 9    A.    They -- Fort Knox would finance the

10  $10,000 car and pay them the 10, but I would have

11  to buy -- basically, I bought the trade.  So

12  Wheatley's would never -- or Fort Knox were never

13  involved in the trade.  It was just a straight deal

14  on the -- on the car purchased.

15    And off the top of my head, I don't know that

16  that ever happened.  I can't remember an instance

17  where we got a trade that was financed through the

18  credit union.  So that might not -- that's how it

19  worked, but I'm not sure if it ever happened.  I'm

20  not -- I can't remember.

21    Q.    Okay.  If there -- if you do take a trade-in

22  and there's a lien on it and you send payment,

23  then you get title back from the lienholder?

24    A.    Yes.  Or lien statement; yes.

25    Q.    And then you have that put into your
```



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 15 of 165 PageID #: 2183

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              35

```
 1          MS. LASKY:  Don't forget to let him

 2   finish his entire question.  You're doing great, just

 3   give him a little more time.

 4   BY MR. MCCARTER:

 5      Q.   Is it fair to say those wholesale auto

 6   auctions kind of work in the same manner?

 7      A.   Yes.

 8      Q.   Okay.  Can you tell me just generally --

 9   I -- and then we'll break it down -- how it works?

10   How do you go in, get a car from an auction?

11      A.   Basically, you just go in with your card,

12   go up there, bid on it through the on kube --

13   through the lines.  Once you get your ticket, go

14   pay for it, and sign the ticket, get your gate pass,

15   and go home.

16      Q.   With the car or without the car?

17      A.   With the car.

18      Q.   Okay.  So it's a competitive environment

19   where you've got multiple dealers trying to get the

20   car?

21      A.   Yes.

22      Q.   Somehow you scout out the ones you

23   want, and then you bid on them, and if you win the

24   bid, you have to pay for the car, and then you take

25   it?
```



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 16 of 165 PageID #: 2184

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              36

1    A.    Yes.

2    Q.    Okay.  Have you ever sold at auctions?

3    A.    Yes.

4    Q.    How often?

5    A.    Well, that's the -- part of the wholesale

6    stuff.  You know, it was back before 2012

7    practically every week.

8    Q.    Okay.  So you've been both the buyer and

9    seller at auction?

10    A.    Yes.

11    Q.    On hundreds of cars?

12    A.    Yes.

13    Q.    Okay.  How -- how does it work from the

14    seller's side?  When do you get paid by the

15    auction?

16    A.    If I sell?

17    Q.    Yeah.

18    A.    If I turn in a title, when you -- when you

19    run a car -- if you sell it, I -- I would have to go up

20    front to give them the title, you know, if it's out of

21    state or Kentucky title, Kentucky being you have to

22    have the dealer signed properly.  They turn it in,

23    and they issue me a check.

24    Q.    Okay.  And that check comes from the

25    auction, not the buyer?



```
 1     A.    Auction; m-hm.
 2     Q.    And so when you're a buyer, you pay the
 3   auction, when you're a seller, you get paid by the
 4   auction?
 5     A.    Correct.
 6     Q.    Okay.  Is that part of the reason you go
 7   to auction, to sort of make sure that you get paid
 8   if you're a seller?
 9     A.    Yes.
10     Q.    And for the buyer, that's a way to be sure
11   you get a title?
12     A.    Yes.
13     Q.    And can the buyer usually take the car
14   immediately, or is there any kind of waiting
15   period?
16     A.    Usually, if it's -- as long as there's no
17   problems with the car, they have that opportunity
18   to ride and drive, to inspect the car to make sure
19   it's proper, what they advertised, and if it's given
20   a time frame, let's say an hour to check it  out --
21     Q.    Yeah.
22     A.    -- then you have to go up and pay for it,
23   and you take it the same day.
24     Q.    And is it my understanding that there's --
25   or it is my understanding that there's some
```



 1   situations where you might have longer if there

 2   was some issue with the car, if it's a --

 3       A.   Yes.

 4       Q.   -- frame damage or something?

 5       A.   Yes.

 6       Q.   Okay.  So there's -- the auction provides

 7   certain relief in cases if a car wasn't disclosed

 8   properly?

 9       A.   Yes.

10       Q.   So what are the different ways a buyer

11   can pay for the car at the auction?

12       A.   Well, you can write them a check, or if

13   you have a floor plan company you can put it on

14   the floor plan.

15       Q.   I'll come back to the floor plan in a

16   minute, but can you also pay cash?

17       A.   Yes.  Check or cash; yes.

18       Q.   Does it have to be a certified check or

19   business check or what?

20       A.   Business check.

21       Q.   Okay.  So in all cases, you have to find

22   some way to pay for the car before you take it?

23       A.   Yes.

24       Q.   All right.  So you said floor plan is one

25   way you can get the car out of the auction.



1  Explain to me what that means, and how does that

2  work?

3     A.   If I had a -- if I had an auction ticket

4  before from where I purchased the car --

5     Q.   M-hm.

6     A.   -- I would take it to the person that's

7  called a finance officer, whoever it would be that

8  does that, that's their job.  They would scan it,

9  initial it, scan it, put it in their system, stamp it,

10  initial it, something so where you can get it out of

11  the gate.  Like make like a gate pass of where you

12  can take the car out.

13     Q.   But they would have to know that you had

14  credit available from the floor planner in advance?

15     A.   Right.

16     Q.   Okay.  And tell me if this is wrong, but a

17  floor -- a high level floor planner is somebody you

18  have a line of credit with to buy cars?

19     A.   M-hm.

20     Q.   Right?

21     A.   Yes.

22     Q.   Okay.  And so somehow the floor planner

23  and the auction communicate about how much

24  credit you have as Mattingly Auto Sales, and then

25  you can just say, "Put it on my floor plan"?



```
 1      A.   Yes.
 2           MS. LASKY:  Object to the form.
 3   BY MR. MCCARTER:
 4      Q.   Have you used all those different forms of
 5   payment:  cash, check, floor plan?
 6      A.   Yes.
 7      Q.   So at a high level after you get a car at
 8   auction, then what do you do with it as far as
 9   business?
10      A.   Just --
11           MS. LASKY:  Object to the form.  You can
12   answer.
13           THE WITNESS:  Okay.
14      A.   Just take it to the lot, clean it up,
15   whatever it needs to be, put it up for sale.
16   BY MR. MCCARTER:
17      Q.   Okay.  Would you typically re-sell a car
18   at the same auction, or would you do something
19   differently?
20      A.   Typically, the way I operate I would take
21   it to another auction.
22      Q.   And so you might buy it at an auction
23   where it's less valued, and take it to an auction
24   where it's more valued?
25      A.   Yes.
```



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 21 of 165 PageID #: 2189

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                41

1    Q.    So you said when you're the seller you

2    have to provide the title to get paid; right?

3    A.    Yes.

4    Q.    And so does that sometime -- does that

5    always happen on sale day?

6    A.    I tried to, but sometimes it didn't happen,

7    you know.  They would -- I wouldn't get paid -- I

8    never got paid until I provided them a title.

9    Q.    But that sounds like some sellers can

10   provide it later; is that right?

11   A.    Oh, yeah, you -- you can turn it in later.

12   They would charge you a fee for that, but I would

13   never get paid unless I produced a title.

14   Q.    All right.  But does a buyer -- does a

15   buyer know the title is not going to be available

16   immediately?

17   A.    Some do; yes.

18   Q.    And how do they -- how do you know that?

19   A.    Well, it's -- it's always have to announce

20   it.  It's called TA.

21   Q.    Okay.

22   A.    It would be title absent.  And it kind of

23   goes up on the screen, and they know there will

24   not be a title at that time.

25   Q.    Okay.  Did you ever buy a car TA?



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 22 of 165 PageID #: 2190

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          42

```
 1     A.    Yes.

 2     Q.    What -- what -- why would you buy a car

 3   TA if you can't immediately re-sell it?

 4     A.    Because eventually they'll -- they'll get

 5   me title.  They have a -- a time frame usually of

 6   three weeks.  If they don't provide you with a clear

 7   title, you can take the car back, and the deal is

 8   canceled.

 9     Q.    Okay.  In that mean -- in the meantime,

10   can you go ahead and get the car ready and start

11   offering it?

12     A.    Yes.

13     Q.    Did you ever re-sell a car before you got

14   the title from the auction?

15     A.    Yes.

16     Q.    How often has that happened?

17     A.    It was rare.

18     Q.    Did you ever have a situation where that

19   title never shows up and you have to unwind the

20   deal?

21     A.    It -- I have had a few, very few,

22   fortunately.

23     Q.    And I know we've -- this has been a fairly

24   general conversation, but has that been the sort of

25   process at auction the whole time from 2003
```



 1   to 2016?

 2     A.   Yes.

 3     Q.   Okay.  All right.  We -- we talked about

 4   these floor plan lines of credit.  Is that a common

 5   term in the industry, floor plan?

 6     A.   Yes.

 7     Q.   So what floor plans have -- has Mattingly

 8   Auto Sales worked with?

 9     A.   We had AFC, DSC, MAFS, M-A-F-S, which

10   you're familiar with, and, of course, now NextGear.

11     Q.   All right.  What period did you work with

12   AFC?

13     A.   They were -- they were my first.  I'm

14   going to say starting in 2003, give or take.

15     Q.   Until when?

16     A.   To two thousand probably  9.

17     Q.   And what was the size of your line during

18   that period?

19     A.   Probably 100,000.

20     Q.   And why did that get closed at some

21   point?

22     A.   I closed it.  Their fees were high.

23     Q.   All right.  And what period did you work

24   with DSC?

25     A.   I'm going to say  6 or  7 through 2012.



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 24 of 165 PageID #: 2192

BARRY WAYNE MATTINGLY  30(b)(6)                October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                         44

 1    Q.   And the size of your lines during that

 2  period?

 3    A.   It increased up to 150 is my final -- final

 4  line.

 5    Q.   From 100?

 6    A.   From 100 to 150.

 7    Q.   And high level, that means you can buy

 8  $150,000 worth of cars and put them on that line

 9  of credit?

10    A.   Yes.

11    Q.   Okay.  And what period were you with

12  MAFS?

13    A.   I'd say from 2003 or  4 to 2012.

14    Q.   Do you remember the size of that line?

15    A.   I believe it was 100, but I -- I don't

16  remember.

17    Q.   And so there's some overlap between

18  those three lines so you would -- you would have

19  multiple lines at the same time sometimes?

20    A.   Yes.

21    Q.   Okay.  And why would you have more than

22  one?

23    A.   Just more -- more credit.

24    Q.   So you can buy more cars that way?

25    A.   Yes.



1    Q.   Okay.  And you said NextGear, but is

2   that -- did you have a separate line with NextGear,

3   or was that DSC just became NextGear?

4    A.   It was when NextGear -- actually, it was

5   DSC, MAFS, and then they combined.

6    Q.   Okay.

7    A.   I never had actually a NextGear account.

8   They were owned by NextGear.

9    Q.   So your DSC and MAFS lines were closed

10  before they joined and called it NextGear?

11   A.   They actually -- right the same year.  I

12  think they joined in 2012.

13   Q.   Sure.  But you -- you never had a line

14  called a NextGear line?

15   A.   No.  No.

16   Q.   All right.  And so when you use a floor

17  plan to buy at auction, I think you just said you

18  tell the finance person to put it on your line?

19   A.   M-hm.  Correct.

20   Q.   You have to tell them which, AFC --

21   A.   Yes.

22   Q.   -- DSC?

23   A.   Yes.

24   Q.   Okay.  And do they call right then, or do

25  you see how they interact with the floor planner to



 1  know your credit?

 2    A.    No.  They actually, they -- most -- a

 3  majority of the time they just scanned it and went

 4  on.  I never -- never was close to being over, so

 5  there never was a problem.

 6    Q.    Okay.  You never got a call the next day

 7  saying you didn't have the credit?

 8    A.    Right.

 9    Q.    Okay.  And do you have any

10  understanding of sort of why these floor planners

11  would let you use their money?

12    A.    I just -- they fill out an application.

13  That's the only reason.

14    Q.    I just meant, what is -- they're just

15  getting something, interest and fees, I guess, or --

16    A.    Oh, yes.  Yes, interest and fees.

17    Q.    And so, if you put a -- if you buy a car at

18  auction, you put it on your DSC line, you don't

19  have to pay cash for it that day?

20    A.    No.

21    Q.    But presumably, you have to pay DSC

22  back for it later?

23    A.    Whenever I sell it or pay it off; yes.  And

24  they were. . .

25    Q.    All right.  So just generally under a DCS



 1   line during 2006-2012, what was your

 2   understanding of when payment would be due for

 3   the money you borrowed?

 4     A.   When I sell --

 5          MS. LASKY:  Object to the form.

 6     A.   When I sold the car.

 7   BY MR. MCCARTER:

 8     Q.   That second?  Within a day?

 9     A.   I think they had -- I think in their

10   paperwork they had a three-day period.  I'd have

11   to look back at that to see.

12     Q.   What if you never sold the car?  Is there

13   some sort of cut off?

14     A.   Yeah.  I think -- I don't want to --

15          MS. LASKY:  Object to the form.  Go

16   ahead.

17     A.   I -- I believe it was 120, 120 days with

18   DSC.  I could be wrong.

19   BY MR. MCCARTER:

20     Q.   Okay.

21     A.   But I rare -- I rarely ever -- never -- I

22   don't think it ever happened.  I either sold it or

23   took it back to the auction, whatever.

24     Q.   But there -- there would be a maturity

25   date if you didn't pay?



1    A.    Correct.

2    Q.    Okay.  And did AFC work the same way?

3    A.    Yes.

4    Q.    What -- do you remember what their

5    maturity date was?

6    A.    No, I don't.

7    Q.    What about MAFS, the same way?

8    A.    Pretty much the same.

9    Q.    So you'd have to pay a car if you sold it

10   within a short time period, and then, if you didn't

11   sell it, there would be a cut off?

12   A.    Right.

13   Q.    Okay.  Were those floor plans limited to

14   cars you bought at auction?

15   A.    No.

16   Q.    So you could take a car you bought from

17   another dealer and put it on floor plan?

18   A.    Trade; m-hm.

19   Q.    Okay.  Was that process any different?

20   How did you --

21   A.    No.

22   Q.    Well, how -- so did they pay the dealer

23   directly?

24   A.    No, they paid -- they would pay me.

25   Yeah, they paid me.



1    Q.    So it sounds a little different; right?

2    You're going to have to submit some paperwork --

3    A.    Yeah.  Yes.

4    Q.    -- and you're going to get payment?

5    A.    I would -- I would produce a title to them,

6    and they would pay me for the trade.  Put it on the

7    floor plan for that amount, I guess you'd say.

8    Q.    So how did they know the amount to

9    finance?

10   A.    Usually, my treasurer would work the

11   money, or they have a -- they have a guide they go

12   by.

13   Q.    So some way you would show them what

14   you paid for it, they would compare to it some

15   value guide, and --

16   A.    M-hm.

17   Q.    -- they would finance that amount?

18   A.    Yes.

19   Q.    Okay.  What about at auction, did they

20   ever reject your financing because you paid too

21   much for it?

22   A.    No.

23   Q.    So they would just go with the auction

24   price?

25   A.    Yes.



1    Q.   Did you have some understanding that the

2    cars you acquired were -- were collateral for the

3    loans?

4    A.   Yes.

5    Q.   Do you understand what I mean by

6    collateral?

7    A.   Yes.

8    Q.   They could pick up the cars if they didn't

9    get paid?

10   A.   Yes.

11   Q.   Okay.  And that was true of all the floor

12   planners?

13   A.   Yes.

14   Q.   Do you -- do you know what security

15   interest means?

16   A.   No.

17   Q.   Okay.  And so you would -- the -- the

18   general way it worked, would -- you would repay

19   the principal you borrowed, plus interest, plus fees

20   to the floor planner for the cars you bought?

21   A.   Yes.

22   Q.   Okay.  How would you know exactly how

23   much to pay them?  Like, how much the principal

24   was, plus the interest, plus the fees?

25   A.   Computer.  They had a website with the



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 31 of 165 PageID #: 2199

BARRY WAYNE MATTINGLY  30(b)(6)                     October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              51

1    balances.

2       Q.   DSC did?

3       A.   Yes, both.  And MAFS.

4       Q.   So each time you needed to pay off a

5    unit, you would look it up on the website and then

6    pay that amount?

7       A.   Yes.

8       Q.   Was that typically by ACH electronic

9    payment or by check?

10      A.   Yes, ACH.

11      Q.   ACH; okay.  Was that true the whole time

12   you were with DSC?

13      A.   Yes.

14      Q.    Is that true the whole time you were with

15   MAFS?

16      A.   Well, MAFS -- MAFS worked a little

17   different.  I could pay off online or at the auction,

18   because they held the titles at the auction.  So it

19   was convenient.

20      Q.   And you did both?

21      A.   Yes.

22      Q.   What about statements, did you get

23   statements from DSC?

24      A.   No.  It -- only thing we had was the

25   online.



BARRY WAYNE MATTINGLY  30(b)(6)                October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          52

1    Q.   Okay.  Did you have a secure log-in you

2    could look at any time and see what you were --

3    what you owed DSC?

4    A.   Yes.

5    Q.   Okay.  Same with MAFS?

6    A.   Yes.

7    Q.   How about AFC?

8    A.   I -- they might have.  I don't remember

9    about AFC.

10   Q.   Okay.  So other than AFC, DSC, and

11   MAFS, have you ever entered into any inventory

12   financing arrangement with anybody else?

13   A.   No.

14   Q.   Do you have any inventory financing

15   arrangement now?

16   A.   No.

17   Q.   How do you pay for cars you buy now?

18   A.   Just strictly cash.

19   Q.   And that's out of just operations of the

20   business?

21   A.   Yes.

22   Q.   Okay.  But at Wolfes, E-town, and Clark

23   County, they still take your business checks?

24   A.   Yes.

25        MS. LASKY:  Can we just take a quick --



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 33 of 165 PageID #: 2201

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              53

1          MR. MCCARTER:  Yeah.

2          MS. LASKY:  -- break?

3          MR. MCCARTER:  That's fine.

4   [WHEREUPON, a brief recess is taken.]

5   [WHEREUPON, document referred to is marked

6   Defendants' Exhibit 2 for identification.]

7   BY MR. MCCARTER:

8     Q.   Let me show you a couple of documents,

9   break up the monotony here.  I'll represent to you

10  this is just a printout from the State of Kentucky

11  website, and it shows Mattingly Auto Sales, Inc.

12  being incorporated in March of 2003; do you see

13  that?

14    A.   Yes.

15    Q.   Does that look right to you?

16    A.   Yes.

17    Q.   Okay.  And it's -- as you testified earlier,

18  it shows you and Ms. Mattingly as the officers; do

19  you see that?

20    A.   Yes.

21    Q.   Okay.  Do you see anything on this that

22  looks wrong to you?

23    A.   No, I don't.

24    Q.   Okay.  Do -- side question:  Do you --

25  does Mattingly Auto Sales do its own tax returns?



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 34 of 165 PageID #: 2202

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              54

 1    A.   Yes.

 2    Q.   You file tax returns in the name of

 3   Mattingly Auto --

 4    A.   Yes.

 5    Q.   -- Sales, Inc.?

 6    A.   Yes.

 7    Q.   And who prepares those?

 8    A.   Jackson Hewitt.

 9    Q.   Okay.  And you have those going back

10   several years?

11    A.   Yes.

12    Q.   Do you have any from pre-2012?

13    A.   Prob -- I'm sure we do, but I don't know

14   how far back we kept.

15    Q.   Okay.  And if I didn't say it, that's

16   Exhibit 2.  I'm going to show you what we're going

17   to call Defendants' Exhibit 3.

18   [WHEREUPON, document referred to is marked

19   Defendants' Exhibit 3 for identification.]

20   BY MR. MCCARTER:

21    Q.   It's two pages front -- one front, one

22   back.  And I'll represent to you this is just a

23   printout from what appears to be your website, and

24   you can see at the bottom it was printed on

25   October 12th, 2016; do you see that?



BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              55

```
 1      A.    Yes.

 2      Q.    Does this look like your website?

 3      A.    No, this is not my website or my car lot.

 4      Q.    So it's not you at all?

 5      A.    No.

 6      Q.    Okay.  You -- you see on that first page,

 7   even though it's got a Hardinsburg office --

 8      A.    M-hm.

 9      Q.    -- this is not you?

10      A.    No, that's not my office.

11      Q.    Do you know who -- who this dealer is?

12      A.    Yes.

13      Q.    Do they have any connection to you?

14      A.    No.  Other -- well, one.  Name.

15      Q.    Okay.

16      A.    Outside of that, no.

17      Q.    All right.  Do you have a website?

18      A.    No.

19      Q.    Okay.  All right.  It's not a very important

20   exhibit, but it's now marked as an exhibit.

21      All right.  I think you said your relationship

22   with DSC would have began around 2006?

23      A.    I believe so.

24      Q.    And your relationship with MAFS began

25   before that; right?
```



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          56

```
 1      A.   Yes.
 2      Q.   Okay.  I'll go ahead and show you another
 3   document we may use later.  This will be
 4   Defendants' Exhibit 4.
 5   [WHEREUPON, document referred to is marked
 6   Defendants' Exhibit 4 for identification.]
 7   BY MR. MCCARTER:
 8      Q.   And these I'll represent to you are your
 9   interrogatory responses in this case.  You --
10   take -- take as much time as you want, but I'm
11   not -- I'll call your attention to anything specific
12   we need to cover, but have you seen this document
13   before?
14      A.   Yes.
15      Q.   And do you recall participating in
16   preparing these responses?
17      A.   Yes.
18      Q.   And you reviewed and they're true, to the
19   best of your knowledge?
20      A.   Yes.
21      Q.   Okay.
22           MS. LASKY:  And I'll represent to you we
23   have a verification that I'll give to you-all
24   tomorrow.
25           MR. MCCARTER:  Okay.  Signed by Mr.
```



1  Mattingly?

2          MS. LASKY:  Correct.

3          MR. MCCARTER:  Okay.

4  BY MR. MCCARTER:

5     Q.   And so, if you -- if you flip over to

6  Number 2, it says you started with -- I think it says

7  you started with you DSC in late November

8  of 2006, late -- late October and early November

9  of 2006; is that --

10    A.   Which one --

11    Q.   -- do you see that?

12    A.   No.  Let me get to that page.

13    Q.   It's Page 4.

14    A.   Okay.

15         MS. LASKY:  It's right here.

16         THE WITNESS:  Okay.

17    A.   All right.  Now, could you repeat the

18  question?

19  BY MR. MCCARTER:

20    Q.   All right.  So this -- this language in the

21  middle of Response Number 2 says in late October,

22  early November 2006, and then that's when you

23  executed a DSC note; do you see that?

24    A.   Yes.

25    Q.   Okay.  Do you recall sort of how your



1  relationship with DSC began?  Like, how did you

2  find DSC, or how did they find you?

3     A.   They -- they had a representative at the

4  Louisville Auto Auction, Manheim Louisville, and

5  he was there, and Scott and I, we just was talking,

6  and asked if I'd be interested, and I looked -- he

7  had a brochure, and I looked it over.

8     Q.   And what was attractive about that offer?

9     A.   Just the available money.

10    Q.   Do you recall whether the fees and

11 interest were higher, lower than AFC?

12    A.   Comparable at the time.

13    Q.   And how about MAFS, how did they

14 compare to MAFS?

15    A.   Comparable.

16    Q.   Okay.  So it was primarily having more

17 credit that attracted you?

18    A.   Yes.

19    Q.   Okay.  And who was it -- do you remember

20 the name of that representative?

21    A.   Yes.  It's Mark Holley.

22    Q.   Okay.  Do you recall anything more

23 specific about what Mark Holley said to you in that

24 initial meeting?

25    A.   Nothing.  Just basically over the terms



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 39 of 165 PageID #: 2207

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              59

1    and the -- the -- how much credit available,

2    interest rate.  That was pretty much it.

3        Q.   Okay.  Was there any specific discussion

4    about how interest would be calculated?

5        A.   I think it was in the -- in the brochure or

6    maybe what I signed.  It was a percentage plus

7    prime with the prime subject to change.

8        Q.   Was there any specific discussion about

9    when interest would begin to run?

10       A.   No.

11       Q.   And so did you meet with anybody else

12   from DSC before you signed up with DSC?

13       A.   No.

14       Q.   Did you take the loan forms at that point

15   or just a brochure?

16       A.   First meeting was a brochure, and the

17   second he had the forms, and then I signed them.

18       Q.   Okay.  So you signed them physically

19   present with Mark Holley?

20       A.   Yes.

21       Q.   Okay.  So your interrogatories say you

22   worked with Mark Holley, Lourdes Givens, and two

23   other reps of NextGear at different times.

24       A.   Yes.

25       Q.   Does that sound true?



1    A.   Yes.

2    Q.   Okay.  And do -- you don't remember the

3  names of the two --

4    A.   Well, I do -- after all this, we found a

5  name -- I -- I couldn't think of his name.  One of

6  the gentleman's name for NextGear was Art -- Art

7  Felix.

8    Q.   Art Felix.

9    A.   Art Felix.

10    Q.   You don't remember the fourth person?

11    A.   No.  I think her name -- no, no.  She

12  was -- the situation was Mark Holley got sick.

13  They had a couple reps in between there, and then

14  Lourdes Givens was the -- took over.

15    Q.   Okay.  So these were -- from your

16  perspective anyway, these were NextGear -- I'm

17  sorry, DSC's reps at Manheim Louisville?

18    A.   Yes.

19    Q.   Okay.  Besides those reps at Manheim

20  Louisville, did you interact with anybody else from

21  DSC?

22    A.   No.  No.  They -- they would travel to

23  different auctions, as well.

24    Q.   Okay.  Do you recall who you interacted

25  with from MAFS?



Case 1:14-cv-01589-TWP-DLP  Document 160-18  Filed 10/31/16  Page 41 of 165 PageID #: 2209

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              61

```
 1      A.    Donna Kronauer.  Is that how -- I don't

 2   know how you pronounce that.

 3           MS. LASKY:  Kronauer.

 4      A.    Kronauer.  Sorry.

 5   BY MR. MCCARTER:

 6      Q.    Okay.

 7      A.    Excuse me.  Kronauer.  She was the rep

 8   for MAFS.

 9      Q.    Okay.  I don't think we've seen it in the

10   production, but you don't have the original

11   brochure from DSC that you looked at?

12      A.    No.

13      Q.    Okay.  And so I'm sorry if this is

14   repetitive, but you -- did you interact with DSC at

15   any other auction?

16      A.    Yes.

17      Q.    Which one?

18      A.    Both the representatives, Mark Holley,

19   Lourdes Givens, Art Felix would go to -- I would

20   see them at Louisville, Bowling Green, and

21   Evansville, which would be Wolfes.

22      Q.    Okay.  And so it sounds like they kind of

23   worked that region, that circuit?

24      A.    Yes.

25      Q.    Okay.  All right.  Number 4.
```



Case 1:14-cv-01589-TWP-DLP  Document 160-18  Filed 10/31/16  Page 42 of 165 PageID #: 2210

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              62

1    A.   4.

2    Q.   I'm going to show you what we're going to

3  call Defendants' Exhibit 4, and I'll represent for

4  the record that this is a composite exhibit.  It

5  starts with NextGear 003432, but it has various

6  other Bate's numbers included that go through

7  NextGear 003392.  They're not all sequential.

8     So again, take as much time as you want, but

9  I'll call your attention to specific questions.  I'm

10  not going to ask you to recite the whole document.

11    A.   Okay.  I'm just going to read that.

12  [examines document]

13    Q.   Okay.  So Exhibit 4, does this generally

14  look like an application from you to DSC, as well

15  as some other loan agreements you signed with

16  DSC?

17    A.   Yes.

18    Q.   Okay.  And on that first page that's

19  numbered 3432 at the bottom, NextGear 00 --

20    A.   Yes.

21    Q.   -- 3432, that is your signature?

22    A.   Yes.

23    Q.   And it's -- it's dated October of --

24  of 2006; do you see that?

25    A.   Yes.



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            63

1    Q.   Okay.  So do you think this is your first

2    application --

3    A.   I believe so.

4    Q.   -- with DSC?

5    A.   Sorry.  I believe so; yes.

6    Q.   And at the time, everything on here was

7    true, to the best of your knowledge?

8    A.   Yes.

9    Q.   Okay.  And if you flip over to the second

10   page, it's labeled NextGear 003378; do you see

11   that?

12   A.   Yes.

13   Q.   It looks like some sort of follow-up

14   application or -- that's dated November 2nd, 2006;

15   do you see that?

16   A.   Yes.

17   Q.   Do you recall signing that?

18   A.   Not -- no.

19   Q.   Let me ask you:  Is that your signature?

20   A.   Yes.

21   Q.   Okay.

22   A.   Yes.

23   Q.   And again, you know, this was true, to the

24   best of your knowledge, at the time?

25   A.   Yes.



1   Q.   Okay.  And so then, if we go to the third

2   page of that exhibit that starts at 3379, do you see

3   that?

4   A.   Yes.

5   Q.   That looks like a promissory note you

6   signed with DSC on October -- in October of 2006?

7   A.   Yes.

8   Q.   And your signature -- that is your

9   signature on 3384?

10   A.   Yes.

11   Q.   Okay.  And then the next page, 3385, it's

12   a term sheet dated October 30th, 2006, again, with

13   your signature?

14   A.   Yes.

15   Q.   Okay.  And the next few pages, there's a

16   power of attorney, a -- an individual guarantee, an

17   incumbency certificate, corporate resolutions, and

18   then an understanding page.  Are all those your

19   signature on those pages?

20   A.   Yes.

21   Q.   And these documents are generally dated

22   in October and November of 2006.  So does this

23   look like generally the first batch of documents

24   you signed with DSC?

25   A.   Yes.



1    Q.   Okay.  Just calling your attention back to

2    the middle, it's labeled 3385, and it's called a

3    term sheet.

4    A.   Yes.

5    Q.   All right.  In that document, you see

6    about four lines down it says program type is

7    retail; do you see that?

8    A.   Okay.  Yes.

9    Q.   Yeah.  Does that mean anything to you?

10    A.   No.

11    Q.   Okay.  If you go on down to the middle of

12    that document, it says [reads] Period:  The initial

13    term for an Advance under this Note shall be 30

14    days and shall mature at that time.  All extensions

15    allowed for the same event shall not -- shall be not

16    more than 30 days.  Do you see that?

17    A.   Yes.

18    Q.   And then below that, it says, "Extensions:

19    The number of Extensions allowed shall be 2."

20    A.   Yes.

21    Q.   Does that refresh your memory about, you

22    know, when a car payment would be due and how

23    many times you could extend it?

24    A.   Yes.

25    Q.   Okay.  And is -- is that accurate?  You



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 46 of 165 PageID #: 2214

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              66

1    had 30 days to pay it, but you could extend it
2    twice?
3      A.   Yes.
4      Q.   Okay.  And of course, if you sold it before
5    that, you'd have to pay it off; right?
6      A.   Yes.
7      Q.   Okay.  Okay.  All right.  Show you a
8    couple more documents.  We're on Number 6, I
9    think.
10           MS. LASKY:  Number 5.
11           MR. MCCARTER:  Number 5; okay.
12           THE WITNESS:  I have two 4s.
13           MS. LASKY:  Oh.
14           MR. MCCARTER:  Uh-oh.
15           THE WITNESS:  Let me see what we've
16    got here.  This is 1.
17           MR. MCCARTER:  Let's go off the record
18    for a second.
19    [WHEREUPON, a brief recess is taken.]
20    [WHEREUPON, document referred to is marked
21    Defendants' Exhibit 5 for identification.]
22    BY MR. MCCARTER:
23      Q.   Okay.  Mr. Mattingly, did my error that
24    the exhibit we just talked about that contained the
25    application and initial batch of loan documents will



Case 1:14-cv-01589-TWP-DLP  Document 160-18  Filed 10/31/16  Page 47 of 165 PageID #: 2215

BARRY WAYNE MATTINGLY  30(b)(6)                           October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                      67

1   be labeled Exhibit Number 5; do you see that?

2       A.   Yes.

3       Q.   And you agree with that?

4       A.   Yes.

5       Q.   Okay.  And so now I'm going to show you

6   the next exhibit, which we're going to call Exhibit

7   Number 6.

8   [WHEREUPON, document referred to is marked

9   Defendants' Exhibit 6 for identification.]

10  BY MR. MCCARTER:

11      Q.   And again, this is a composite exhibit

12  with different term sheets in it, and some of them

13  were produced by you, and some of them were

14  produced by NextGear; do you see those?

15      A.   Yes.

16      Q.   And is it accurate to say that each of

17  those have your signature on them?

18      A.   Yes.

19      Q.   Okay.  And do you have any reason to

20  doubt that these are the term sheets that applied

21  to your DSC line of credit at -- at the dates

22  indicated on these term sheets?

23      A.   Yes.

24      Q.   You have a reason to doubt that?

25      A.   Oh, I'm sorry.  Yes, they are correct.



 1    Q.   Okay.

 2    A.   Sorry.

 3    Q.   Just because I asked the question

 4  backwards.   These are term sheets you signed with

 5  DSC that controlled at the time they say they

 6  controlled?

 7    A.   Yes.

 8         MS. LASKY:  Objection to the form.

 9    A.   Yeah, they look to be accurate.

10  BY MR. MCCARTER:

11    Q.   Okay.  I'm going to show you what we're

12  going to call Defendants' Exhibit 7.

13  [WHEREUPON, document referred to is marked

14  Defendants' Exhibit 7 for identification.]

15  BY MR. MCCARTER:

16    Q.   Again, this is another composite exhibit

17  that starts with NextGear 3394, but it has some

18  documents that you produced and some that we

19  produced.   It includes a power of attorney, indiv --

20  individual personal guarantee, and a few other

21  documents.

22    I just wanted you to confirm that those are

23  your signatures again.

24    A.   Yes.

25    Q.   Okay.  I'm going to show you what we're



BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              69

```
 1   going to call Exhibit 8.
 2   [WHEREUPON, document referred to is marked
 3   Defendants' Exhibit 8 for identification.]
 4   BY MR. MCCARTER:
 5     Q.   This document, it's Bate's labeled
 6   MA 000022 through MA 34.  Do you see that at the
 7   bottom?
 8     A.   Yes.
 9     Q.   Okay.  And this looks like a promissory
10   note that you signed with DSC in February, on
11   February 5th, 2009; does that look accurate to you?
12   You can look at Page 30.
13     A.   Yes.
14     Q.   Okay.  And Page 31 has a power of
15   attorney?
16     A.   Yes.
17     Q.   And Page 33 is a term sheet?
18     A.   Yes.
19     Q.   And again, those are your signatures on
20   the power of attorney and the term sheet?
21     A.   Yes.
22     Q.   All right.  And then Page 34 is a credit
23   limit amendment to demand promissory note and
24   security agreement; do you see that?
25     A.   Yes.
```



1    Q.   And that's your signature?

2    A.   Yes.

3    Q.   Okay.  I mean, this generally looks like a

4    batch of loan documents you signed in October

5    of 2011; does that look right?

6    A.   Yes.

7    Q.   Do you believe this is the last set of loan

8    documents you signed with DSC?

9    A.   Yes.

10   Q.   Okay.  And there are handwritten notes

11   on this document, and I'll represent to you that

12   this document was produced by you to us.  Do you

13   know whose handwriting that is?

14   A.   You know what, no, I don't.

15   Q.   Okay.  Is it yours?

16   A.   No.

17   Q.   Would you recognize it if it was your

18   wife's?

19   A.   Yes.

20   Q.   Is it hers?

21   A.   Oh, no.

22   Q.   Okay.

23   A.   Way not neat enough.

24   Q.   Do you recall whether the handwriting

25   was on there when you produced it to your



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 51 of 165 PageID #: 2219

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              71

1   attorney?

2       A.   No, I don't.

3       Q.   Okay.  So these loan documents we just

4   looked at, Exhibits 6, 7, 8, was it your

5   understanding they governed the legal terms of

6   your arrangement with DSC?

7       A.   Yes.

8       Q.   Okay.  Are you aware of any other legal

9   agreements that you had with DSC besides the

10   ones we've looked at?

11      A.   No.

12      Q.   And you know, we talked about this

13   generically with floor plans earlier, but was your

14   understanding that in exchange for DSC's money

15   you would have to pay that money back plus

16   interest and fees?

17      A.   Yes.

18      Q.   Okay.  And you understood they had a

19   security interest in your cars to secure payment?

20      A.   Yes.

21      Q.   Okay.  Did you always pay DSC by ACH?

22      A.   I think at first Mark Holley would come

23   down to auctions if I called him early before -- I

24   think even before they had their website, I could

25   call him and tell him that I was going to be at the



1  auction, need to pay off a particular vehicle, and I

2  would give him a check.  He worked out of

3  Lexington.

4    Q.   And he'd hand you the title?

5    A.   He'd hand me the title, and I'd hand him

6  the check.

7    Q.   Okay.  And I should have asked this

8  before, but that would generally mean that DSC

9  would hold the titles after you floored the car with

10  them until they were paid?

11   A.   Yes.

12   Q.   And is that true of other floor plans?

13   A.   Yes.

14   Q.   Okay.  And that's sort of part of their

15  security to make sure they get paid?

16   A.   Yes.

17   Q.   Do you -- do you have any knowledge of

18  while they were holding those titles whose name

19  the vehicle be titled in?

20        MS. LASKY:  Object to the --

21   A.   No.

22        MS. LASKY:  -- form.

23   A.   No.

24  BY MR. MCCARTER:

25   Q.   During that period you were with



Case 1:14-cv-01589-TWP-DLP Document 160-18 Filed 10/31/16 Page 53 of 165 PageID #: 2221

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              73

 1  DSC, 2006 to 2012, how did you keep your books

 2  internally at Mattingly, if any?

 3      A.   Well, I would -- I don't know that I

 4  understand the question.

 5      Q.   Okay.  So presumably, you keep some

 6  accounting record of some sort of what you paid

 7  for a car, how much you sell it for, that sort of

 8  thing?

 9      A.   Yes.  We'd have something from --

10  familiar -- we called it the manilla -- the binders,

11  and we have ve -- all the -- everything related to

12  that car in that particular binder.

13      Q.   Okay.  Is that --

14      A.   Auction ticket.

15      Q.   Have you heard the term deal jacket?  Is

16  it kind of the same thing?

17      A.   Yeah, jacket.  A jacket; yes.

18      Q.   Okay.

19      A.   Thank you for that term.  I knew it, but I

20  just couldn't -- it was on the tip of my tongue.

21      Q.   No problem.  But at some point when

22  you've got to file your taxes, I guess, you've got

23  to translate that to profit or loss; right?

24      A.   Correct.

25      Q.   How do you do that?



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 54 of 165 PageID #: 2222

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              74

1    A.   Well, we just -- we -- actually, my wife

2    puts them into the computer --

3    Q.   Uh-huh.

4    A.    -- and we just calculate every one of them

5    at -- at the end of the day when it was sold.  We

6    knew on that vehicle what the profit or loss was.

7    Q.   Okay.  Do you know during 2006, 2012,

8    were you using a particular software to do that?

9    A.   No, I don't -- I don't know.

10   Q.   You may have been, you just don't know?

11   A.   Yeah.  There was something, but I don't

12   know what it would be.

13   Q.   Okay.  But as -- as far as you know, you

14   didn't attempt to track how much interest and fees

15   would be due to NextGear during that period?  You

16   just looked at their online statement for that?

17   A.   Yes.  And we could do it the end of the

18   year statement, as well.  There was an end of the

19   year statement they could pull.

20   Q.   From NextGear?

21   A.   From NextGear.

22   Q.   Okay.  And when I say NextGear in those

23   last two questions, we're talking about DSC; right?

24   A.   DSC; yes.

25   Q.   Okay.  So we talked about, you know,



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           75

 1  your initial discussion with Mark Holley, and you

 2  said there was no specific discussion about the

 3  timing of interest, when it would start accruing;

 4  right?

 5      A.    Correct.

 6      Q.    Did you ever talk about that issue with

 7  anybody at DSC?

 8      A.    Possibly.  I -- I just don't remember.

 9      Q.    As we sit here today, you don't remember

10  any specific conversations with anybody at DSC

11  about when DSC would start charging interest?

12      A.    Well, occasionally, they -- if I was --

13  can -- can I give you an example?

14      Q.    Yeah.

15      A.    If I bought a car today, and let's say I

16  sold it next week, and I paid it off online, there

17  would -- and I -- and when they -- when I check,

18  there's no title available.  So they basically didn't

19  have the title yet, but yet I was still paying the

20  interest, and they didn't even have the title.

21      So I would have to wait until they got the title

22  to send to me.  Other than that, that would be

23  about the only thing.

24      Q.    But did you -- do you remember talking to

25  somebody at NextGear about that?



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 56 of 165 PageID #: 2224

BARRY WAYNE MATTINGLY 30(b)(6)                          October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                    76

 1    A.   Yes.

 2    Q.   And who was that?

 3    A.   That would be both Mark Holley, as well

 4  as -- mostly, Lourdes Givens.

 5    Q.   Okay.  And what did you say to them

 6  about it?

 7    A.   Just in a -- I said in a jokingly -- I'm sure

 8  that they told me it was common practice, but I

 9  said, "That's kind of a shame that I'm paying

10  interest on something that you-all are still holding

11  the money on that I don't even have yet."

12    Q.   M-hm.  But do you remember any specific

13  discussions with anybody at DSC about when

14  interest would start accruing on your floor plan

15  cars in the first place?

16    A.   Other than --

17         MS. LASKY:  Object to the form.

18    A.   Other than that, no.

19  BY MR. MCCARTER:

20    Q.   Okay.  All right.  I'm going to show what

21  we're going to call Defendants' Exhibit 9.

22  [WHEREUPON, document referred to is marked

23  Defendants' Exhibit 9 for identification.]

24  BY MR. MCCARTER:

25    Q.   This document is Bate's labeled MA 252



1   through 283.  Do you see that at the bottom?  You

2   see those numbers --

3      A.    Yes.

4      Q.    -- right?

5      A.    I'm sorry.

6      Q.    252 --

7      A.    Yes.  Yes.  I'm sorry.

8      Q.    No problem.  And I'll represent to you

9   that MA generally means it's a document that you

10  produced to us.  So is -- do you recognize this

11  document?

12     A.    Yes.  It looks like a sheet; yes.

13     Q.    Does it -- well, it -- it starts with

14  Manheim Automotive Financial Services, Inc.

15  Security Agreement, Inventory Financing bridge

16  Line of Credit; do you see that?

17     A.    Yes.

18     Q.    All right.  Is it fair to say this is

19  generally the loan agreements you signed with

20  MAFS in -- in July of 2010?

21     A.    Yes.  It looks like the typical -- typical

22  thing; yes.

23     Q.    Okay.  And those are your signatures

24  internally, like, for example, on 2 -- Page 272

25  and 275?



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            78

```
 1      A.   Yes.

 2      Q.   Okay.  And that's your signature on 279?

 3      A.   Yes.

 4      Q.   And 283?

 5      A.   Yes.

 6      Q.   Okay.  So, after July 2010, this would

 7   generally be the loan agreements that would

 8   govern your floor plan with MAFS?

 9      A.   Yes.

10      Q.   Okay.

11           MR. MCCARTER:  What number are we

12   on?

13           THE WITNESS:  Number 10 will be the

14   next one.

15   [WHEREUPON, document referred to is marked

16   Defendants' Exhibit 10 for identification.]

17   BY MR. MCCARTER:

18      Q.   All right.  I'm going to show you what

19   we're going to call Defendant's Exhibit 10.  This is

20   Bate's labeled MA 242 through 244.  This is called

21   "MAFS Floor Plan Guideline"; do you see that?

22      A.   Yes.

23      Q.   And is that your signature on the second

24   page?

25      A.   Yes.
```



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 59 of 165 PageID #: 2227

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              79

1    Q.   Okay.  So these are generally guidelines

2  for the MAFS line around the time you signed this?

3    A.   Yes.

4    Q.   Okay.  And at a high level do you

5  understand that part of your complaint in this case

6  relates to when interest began accruing on your

7  DSC line?

8    A.   Yeah.

9    Q.   Okay.  Can you give me your

10  understanding of what your concern is?

11    A.   I believe they were -- basically when I

12  bought a car title attached or title absent, it

13  appears that they were writing -- charging me

14  interest from Day 1, and MAFS was even charging

15  me interest, two -- two days worth of interest the

16  day I put it on the floor plan.

17    Q.   So on the DSC side, is your only concern

18  the cars that were sold title absent?

19          MS. LASKY:  Object to the form.

20    A.   Possibly.  I believe so.

21  BY MR. MCCARTER:

22    Q.   Okay.  So if the title is present on the

23  day of the auction, you believe it would be

24  appropriate for DSC to start charging interest from

25  that day?



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 60 of 165 PageID #: 2228

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              80

1    A.    Yes.

2    Q.    Okay.  And on MAFS, you believe it would

3  be appropriate for MAFS to start charging interest

4  from the day of sale if title was present?

5    A.    Yes.

6    Q.    Okay.  Do you believe your MAFS line of

7  credit and your MAFS documents are at issue in

8  this case?

9    A.    I'm sorry.  Repeat that.

10    Q.    Do you believe your MAFS line of credit

11  separate from your DSC --

12    A.    M-hm.

13    Q.    -- line of credit is at issue in this case?

14    A.    Possibly; yes.

15    Q.    So on the -- step back to the cars that

16  were sold title absent.  So if you bought a title

17  absent car and you put it on your DSC line, your

18  position is that interest would start being charged

19  from the day of sale?

20    A.    Correct.

21        MS. LASKY:  Object to the form.

22  BY MR. MCCARTER:

23    Q.    Okay.  And is it your position that you

24  think it was only appropriate to charge it once title

25  was present?



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 61 of 165 PageID #: 2229

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            81

```
 1      A.    Yes.
 2      Q.    But in that period between when you
 3   purchased it and when the title showed up, where
 4   was the car?
 5      A.    Usually at my lot unless I had it sold.
 6      Q.    And so you would be able to go ahead and
 7   take the car that day from auction, you just
 8   wouldn't have the title until later?
 9      A.    Yes.
10      Q.    Okay.  And is it -- do you have a -- strike
11   that.
12      You'd said earlier that you -- you'd always
13   have to make some part of payment or arrangement
14   for payment with the auction to take the car; right?
15      A.    Yes.
16      Q.    Do you believe the auction would have let
17   you take the car sold title absent without you
18   putting it on the DSC line?
19      A.    I could --
20            MS. LASKY:  Object to the form.
21      A.    I'm not sure if I understand the question.
22   I couldn't leave the auction until that car was
23   signed for by either paid for or by -- if it was a
24   floor plan, somebody has to initial it and scan it
25   in.
```



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 62 of 165 PageID #: 2230

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                82

1  BY MR. MCCARTER:

2    Q.   Okay.  But you were able to take the cars

3  put on the DSC line because you told the auction

4  you were putting on the DSC line?

5    A.   Yes.

6    Q.   Okay.  And that's true whether the title is

7  present or not?

8    A.   Yes.

9    Q.   Okay.  Let me show what you we're going

10  to call Exhibit 11.

11  [WHEREUPON, document referred to is marked

12  Defendants' Exhibit 11 for identification.]

13  BY MR. MCCARTER:

14    Q.   And this document is Bate's labeled

15  MA 306 through 309.  So this was produced to

16  you -- I mean, by you to us in this case.  Do you

17  recognize this document?

18    A.   Yes.  It looks like a dealer statement

19  document from DSC.

20    Q.   Okay.  And if you -- you can see it was

21  printed on -- on -- in the -- I guess, let's see, this

22  is the second page of the exhibit.  You can see a

23  printed date of Monday, January 11th, 2010 at 4:45

24  p.m.; do you see that?

25    A.   Yes.



Case 1:14-cv-01589-TWP-DLP Document 160-18 Filed 10/31/16 Page 63 of 165 PageID #: 2231

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              83

1    Q.   And then it -- it's got a start date of -- on

2    the left-hand side from January 1st, 2009 through

3    December 31st, 2009; do you see that?

4    A.   Yes.

5    Q.   Would this be that sort of year end

6    statement you were talking about?

7    A.   Yes.  Yes.  Yeah.  Correct.

8    Q.   And so is this something you could go

9    online and get from DSC and then print on your

10   end?

11   A.   Yes.

12   Q.   Okay.  It looks like there's a fax line at

13   the top of the document on each page; do you see

14   that?

15   A.   Where -- if you could point it out to me?

16   Q.   Yeah.

17        MS. LASKY:   This.

18   BY MR. MCCARTER:

19   Q.   Right there.

20   A.   Oh, okay.  Yes.  I'm sorry.

21   Q.   Do you --

22   A.   Yes.

23   Q.   -- see that?

24   A.   Yes.

25   Q.   And it -- it shows a fax date of



1   January 11th, 2010, and it's got a fax number, and

2   then it says "Dealer Services Corporation."  Do

3   you read that as a document faxed to you by DSC

4   or from you to DSC?

5   A.    From DSC to us.

6   Q.    Okay.  Yet -- I mean, I know you -- you

7   probably don't remember, but do you have any

8   reason to doubt it was faxed to you by DSC on

9   January 11th, 2010?

10  A.    No, I don't.

11  Q.    Okay.  And do you read this sort of as all

12  the cars financed during that period and the total

13  due and paid on those?

14        MS. LASKY:  Object to the form.

15  A.    It appears so, as well as where it also

16  has collateral audits, as well.

17  BY MR. MCCARTER:

18  Q.    Okay.  The top of Page 2?

19  A.    Yes, it does, and I -- apparently, I missed

20  something here.  It appears that they charged me

21  two lot audits in the same month.  I must have

22  missed that.

23  Q.    Okay.  And you didn't have two lots?

24  A.    No.  It looks like they charged me on

25  the 22nd, and another 75 on the 23rd.



1   Page 452 and 453, it's the last two pages in that

2   exhibit; do you see that?

3     A.   Yes.

4     Q.   And this document looks like it's called

5   "Receivable Detail Report"?

6     A.   Yes.

7     Q.   And it's got a date of 5/23/2012?

8     A.   Yes.

9     Q.   Do you have any sense of what this is and

10  what it shows?

11    A.   This is --

12         MS. LASKY:  Object to the form.

13    A.   This is the final -- this is the final cars

14  that we had with DSC.

15  BY MR. MCCARTER:

16    Q.   Okay.  And you -- you had possession of

17  this.  Do you recall how you got possession of it?

18    A.   I'm sure it was off the website.

19    Q.   Okay.  You know, it shows 120,311.28

20  outstanding at that point.  Do you see in the

21  middle?

22    A.   Yes.

23    Q.   Do you -- do you know whether Mattingly

24  ever paid that to DSC?

25         MS. LASKY:  Object to the form.



```
 1      A.    No.

 2   BY MR. MCCARTER:

 3      Q.    No, you didn't pay it?

 4      A.    Did not; no.

 5      Q.    Okay.  And however -- why did you not

 6   pay it?

 7      A.    Excuse me?

 8      Q.    Why did you not pay that?

 9      A.    These cars were involved in the

10   repossession.  Some of them were.  Some of them

11   were already paid off or sold.  Sorry.  Sold.

12      Q.    And so do you have some recollection

13   that some cars were resold and reduced that

14   amount?

15      A.    We had -- we had actually -- several of

16   these cars were ours that we paid off ourselves,

17   and some of them went to repossession.

18      Q.    Okay.  Do you recall whether there was a

19   deficiency on the repossessed cars?

20      A.    Yes.

21      Q.    And was that paid?

22      A.    No.

23      Q.    Okay.  All right.  At some point, I think

24   you said this already, DSC declared a default and

25   picked up cars?
```



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 67 of 165 PageID #: 2235

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                90

1    A.    Yes.

2    Q.    Okay.  And what's your recollection of --

3   of when that happened?

4    A.    May the 9th of 2012.

5    Q.    Okay.  Do you recall any discussions with

6   DSC at the time about why they did that?

7    A.    No, they did not.  No reason.

8    Q.    No reason.  Did -- did you have any

9   problems with MAFS around the same time?

10   A.    No.

11   Q.    No.  Did MAFS ever declare default?

12   A.    Yes, at the same -- they did it at the

13  same time.

14   Q.    Did they pick up cars?

15   A.    Yes.

16   Q.    Okay.

17   A.    No.  I -- no.  I only took one back to

18  them.

19   Q.    Okay.  So you voluntarily returned one to

20  MAFS after they declared a default?

21   A.    Yes, involuntarily [phonetic].  The

22  remainder of DCS, as well.

23   Q.    So DSC picked up some cars

24  involuntarily, you returned others?

25   A.    Yes.



1    Q.   Okay.  And both of those things happened

2    in May of 2012?

3    A.   Yes.

4    Q.   Okay.  Did you have any -- do you recall

5    whether the AFC line was still out -- or still

6    existing at that time?

7    A.   It was not.

8    Q.   Was not; okay.  Did you have any other

9    sources of inventory credit at the time?

10   A.   No.

11   Q.   Okay.  Had you heard anything from the

12   police, the -- the state police you talked about

13   before, before DSC declared its default?

14   A.   No.

15   Q.   Just as a general matter apart from DSC,

16   would you ever floor the same car more than once?

17        MS. LASKY:  Object to the form.

18   A.   Possibly.

19   BY MR. MCCARTER:

20   Q.   Okay.  In what circumstances would you

21   do that?

22   A.   If it was in my -- it was my name, I would

23   floor it for -- use the money.

24   Q.   You would floor it and use the money?

25   A.   Yeah.  Floor it, and -- and they would



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 69 of 165 PageID #: 2237

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            92

 1  pay -- give me -- send me a  check or whatever.

 2    Q.   So if -- was there ever a situation where

 3  you bought it at auction, put it on a floor plan, and

 4  then, at some point, you re-floored the same car

 5  with another --

 6    A.   Yes.

 7    Q.   -- company?  When would that happen?

 8    A.   If it ran over in time, and generally it was

 9  done by Donna, or Lourdes would do it for me.

10    Q.   Okay.  And how did they value the car at

11  that time?  How much -- how did they value how

12  much to finance at that time?

13    A.   I --

14        MS. LASKY:  Object to the form.

15    A.   They would -- I guess they would use a --

16  they had a chart, or they had the auction ticket

17  where I purchased it.

18  BY MR. MCCARTER:

19    Q.   Okay.  Did you ever use the original

20  auction ticket to floor it a second time?

21        MS. LASKY:  Object to the form.

22    A.   No.  No, I don't believe so.  Unless it

23  was -- unless Donna changed the -- I think one

24  instance I just saw some of the paperwork where

25  Donna changed it from MAFS to DSC.



1   BY MR. MCCARTER:

2      Q.   Did you ever sell a car at auction or

3   online, like on -- you know OVE, Online Vehicle

4   Exchange?

5      A.   M-hm.

6      Q.   Okay.  Did you ever sell a car at an

7   auction or on OVE to another dealer at a

8   pre-arranged price?

9           MS. LASKY:  Object to the form.

10     A.   No.

11  BY MR. MCCARTER:

12     Q.   Did you ever buy a car at an auction or on

13  OVE from another dealer at a pre-arranged price?

14     A.   Yes.

15     Q.   Okay.  When would that happen?

16     A.   I -- I don't recall dates.

17     Q.   And then did you ever put that car, those

18  cars on the floor plan?

19     A.   Yes.

20     Q.   With DSC?

21     A.   Yes.

22     Q.   Do you -- do you think that's proper to

23  finance a car like that with a floor plan?

24          MS. LASKY:  Object to the form.

25     A.   It would have to be, because they did it



BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                               94

```
 1    for me.
 2     BY MR. MCCARTER:
 3      Q.   Okay.  But in that situation, you're using
 4    a pre-arranged non-auction price, and you're
 5    representing to a floor planner that that's the
 6    auction price; right?
 7          MS. LASKY:  Object to the form.
 8      A.   I'm not sure of your question, but I can
 9    say that -- they would have to be a certain -- the --
10    the vehicle price would have to meet certain
11    guidelines, and that would be set by Donna, and
12    Lourdes would know that.
13    BY MR. MCCARTER:
14      Q.   Okay.  But if they're -- if they're typically
15    financing the auction price and relying on the
16    auction to set the value and you've preset that
17    value with a dealer unbeknownst to the floor
18    planner, would that be a misrepresentation to the
19    floor planner?
20          MS. LASKY:  Object to the form.
21      A.   No, because they -- they -- they wouldn't
22    allow an overpriced car on the floor plan.
23    BY MR. MCCARTER:
24      Q.   Okay.  How do you -- how do you know
25    that?  How do you know what DSC would finance?
```



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 72 of 165 PageID #: 2240

BARRY WAYNE MATTINGLY  30(b)(6)                                October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                          95

1    A.   Well, they'd have a -- they have

2  guidelines.  I -- I don't know their -- what they call

3  it.  Manheim has an MMR.  It's an average market

4  price of a vehicle.

5    Q.   Do you know for a fact that DSC used

6  that?

7    A.   No, I don't.  I'm -- I'm not sure what they

8  used.

9    Q.   Okay.  How often do you think that

10 happened where you would sell a car at an auction

11 on -- I'm sorry, buy a car at auction on an OVE at

12 a pre-arranged price?

13   A.   Oh, I --

14        MS. LASKY:  Object to the form.

15   A.   I don't have a number.  I don't have --

16 wouldn't have a number for you.

17 BY MR. MCCARTER:

18   Q.   More than ten?

19   A.   I'd say -- oh, yeah, possibly.  Ten or so.

20   Q.   Ten or so?

21   A.   M-hm.

22   Q.   Okay.  Did you ever -- while you were

23 with DSC, did you ever obtain duplicate titles?

24   A.   No.

25   Q.   Never?



1    A.   No.

2    Q.   Okay.  Do -- do you have an

3  understanding what title washing is?

4    A.   No.

5    Q.   Okay.  Did you ever apply for or obtain a

6  title that removed an owner or a lienholder from

7  the titles without having paid off that owner or

8  lienholder?

9         MS. LASKY:  Object to the form.

10   A.   No.

11  BY MR. MCCARTER:

12   Q.   Okay.  During these de -- the default time

13  frame with DSC, did you close your line with them,

14  or did they close it?

15   A.   I guess they closed it, because they cut

16  us off with them a couple of weeks after that.

17  That -- that printout you had was for our last

18  statement.

19   Q.   Okay.  Did they leave you on sale only for

20  a little bit?

21   A.   No.

22   Q.   Okay.  What about MAFS, did you close

23  that, or did MAFS close it?

24   A.   Once we defaulted, I guess we both

25  closed it.  I -- there was no arrangement.  I just



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 74 of 165 PageID #: 2242

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              97

1   was barred from the auction.

2      Q.    Okay.  You said you were barred from the

3   auction.  Which auction are you talking about?

4      A.    Manheim.

5      Q.    Okay.  And you had an understanding

6   prior to 2012 that MAFS was affiliated with

7   Manheim?

8      A.    Yes.

9      Q.    And was it your understanding that prior

10  to 2012 MAFS and DSC were not affiliated?

11     A.    Yes.

12     Q.    And so DSC was not affiliated with

13  Manheim?

14     A.    Yes, I believe so.

15     Q.    Okay.  So, prior to 2012, did you have

16  an understanding that DSC and MAFS were

17  competitors?

18     A.    Yes.

19     Q.    Okay.  Do you know whether DSC was

20  affiliated, like, connected by corporate ownership

21  with any particular auction company?

22     A.    No, I wouldn't have any idea.

23     Q.    Okay.  So around the time that DSC

24  declared its default, do you remember whether

25  they did a lot audit?



```
 1     A.   They did a lot audit; yes.  Yes.

 2     Q.   Okay.  And did they find cars not

 3  present?

 4     A.   Yes.  Well, they found all cars, but

 5  they -- some of them were at different places in

 6  town, and I took them to all those.

 7     Q.   But that -- that happened over the next

 8  few days; right?

 9     A.   It was prior, prior to the repossession.

10     Q.   Okay.  So they did a lot audit, not all

11  cars were on your lot; right?

12     A.   Basically, yes.

13     Q.   And over the next few days, you helped

14  them locate each of those cars?

15     A.   No, no.  The same day.

16     Q.   Same day; okay.  And where were the

17  other cars?

18     A.   One was in a garage, and the other one

19  was at a salesman's house.

20     Q.   What were they doing there?

21     A.   One was just in a garage because it was

22  a BMW, and the other one was --

23          THE REPORTER:  I'm sorry.  It was being

24  what?

25          THE WITNESS:  It was a BMW.
```



```
 1          THE REPORTER:  Thank you.

 2          THE WITNESS:  Sorry.

 3     A.   And the other was -- the guy was driving

 4   it.

 5   BY MR. MCCARTER:

 6     Q.   Did you have any understanding that the

 7   inventory was supposed to remain on your lot until

 8   it was sold?

 9     A.   No.

10     Q.   Were any of the cars out with retail

11   customers when MAFS was -- I'm sorry, when DSC

12   was looking for them?

13     A.   Yes, there was one.  One.

14     Q.   Had it been sold?

15     A.   It had been sold and waiting to transfer.

16     Q.   When you say waiting to transfer, does

17   that mean to provide title to the buyer?

18     A.   Yes.  To transfer it because they had

19   already paid for it, and it was. . .

20     Q.   And you didn't have the title yet because

21   you hadn't paid DSC for it?

22     A.   Right.

23     Q.   Okay.  Do you recall at all the gap in time

24   there as -- between when you sold it to the retail

25   customer versus when DSC came looking for it?
```

1    A.    No, I don't.  I don't remember the exact

2    dates and times, but I -- I know who I sold it to

3    and -- a good friend of mine.

4    Q.    Okay.  Was it beyond the -- the 24-hour

5    period you had to pay DSC?

6          MS. LASKY:  Object to the form.

7    A.    Yes, because I was holding a check for a

8    customer.

9    BY MR. MCCARTER:

10    Q.    Okay.  So at that point, you had sold a

11    car retail, and you hadn't paid DSC for it within

12    the required time frame?

13          MS. LASKY:  Object to the form

14    A.    Right.

15    BY MR. MCCARTER:

16    Q.    Okay.  Have you ever signed a title for

17    someone else that you provided to DSC for floor

18    planning?

19          MS. LASKY:  Object to the form.

20    A.    I -- I don't understand the question about

21    what you're --

22    BY MR. MCCARTER:

23    Q.    Have you ever signed anyone else's name

24    to a -- the title to a vehicle you put on the DSC

25    floor plan?

Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 78 of 165 PageID #: 2246

BARRY WAYNE MATTINGLY  30(b)(6)                          October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                  101

1    A.    Not that I recall; hm-m.

2    Q.    And have you ever duplicated a title to a

3  vehicle that you put on the DSC floor plan?

4    A.    Duplicated?  No.  I had original titles.

5    Q.    And by duplicating, we understand that

6  that means going to the state to get another title;

7  right?

8    A.    Unless it was put in Mattingly Auto Sales'

9  name, if that's what you're talking about.

10    Q.    So I just want to make sure you -- you

11  didn't -- you never got a duplicate title from the

12  state on a car that you had already put on the DSC

13  floor plan?

14        MS. LASKY:  Object to the form.

15    A.    I don't -- I don't know.

16  BY MR. MCCARTER:

17    Q.    You don't have any --

18    A.    That one I would not -- I don't know.  I

19  don't have an answer to that one.

20    Q.    Did you ever present a duplicate title to

21  DSC to floor plan a car when you had already sold

22  the car and passed on the original title to someone

23  else?

24    A.    No.

25    Q.    Okay.  Have you ever moved vehicles to



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 79 of 165 PageID #: 2247

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          102

1    avoid DSC repossessing them?

2      A.    Yes.

3      Q.    Okay.  Can you tell me about that?

4      A.    When they -- we moved our vehicles the

5    day that they came in for repossession.  We didn't

6    know what was going on, because we -- we did not

7    have any contact, we were not in contact with --

8    Lourdes would -- would not return our calls.

9      Q.    M-hm.

10     A.    To protect ourselves, we moved vehicles,

11   a few of them.

12     Q.    Where did you move them to?

13     A.    A friend of mine's property.

14     Q.    Who was that?

15     A.    Thornhill Equipment.

16           THE REPORTER:  What was it?

17           THE WITNESS:  Thornhill --

18           THE REPORTER:  Thank you.

19           THE WITNESS:  -- Equipment.

20   BY MR. MCCARTER:

21     Q.    Were all of those vehicles that you moved

22   eventually returned to DSC?

23     A.    Yes, every one of them.

24     Q.    Okay.  Have you ever moved cars to

25   prevent MAFS or AFC from repossessing?



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           103

```
 1    A.    No.
 2          MS. LASKY:  I'm sorry.  Can we take a
 3   break?
 4          MR. MCCARTER:  Absolutely.
 5          MS. LASKY:  Okay.
 6   [WHEREUPON, a brief recess is taken.]
 7   BY MR. MCCARTER:
 8    Q.    All right.  I just want to clear up a couple
 9   of things we heard earlier. You -- you mentioned
10   an Art Felix that you may have dealt with at --
11    A.    Yes.
12    Q.    -- DSC?
13    A.    Yes.
14    Q.    Do you recall that?
15    A.    Yes.
16    Q.    Is it possible Mr. Felix was with AFC?
17    A.    No, he was Dealer Services.
18    Q.    You're sure.
19    A.    Yeah.
20    Q.    Okay.
21    A.    Yes.
22    Q.    And you mentioned an auction at Bowling
23   Green.  Is that ABC Bowling Green?
24    A.    Yes.
25    Q.    Okay.
```



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 81 of 165 PageID #: 2249

BARRY WAYNE MATTINGLY  30(b)(6)                          October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                    104

 1    A.    One other thing.  Can I throw this in?

 2   This document on 307 on Exhibit Number 11 --

 3    Q.    Okay.

 4    A.    -- I mean, this was the -- this was a --

 5   let's see if this is the right one.  No, that's not.

 6   I'm sorry.  That's the wrong one [examines

 7   document].

 8     Yeah, I'm sorry.  It's 452.  That was not

 9   requested by us.  We -- we were at that time

10   locked out of the -- DSC's website.

11    Q.    Okay.

12    A.    That was requested, I guess, by that

13   Kevin Fredericks.

14    Q.    Who's --

15    A.    This is --

16    Q.    -- Kevin Fredericks?

17    A.    He's something to do with DSC.  I'm not

18   sure of his title.

19    Q.    Well how did you get it and produce to

20   us?

21    A.    To be honest with you, I don't know.

22    Q.    Okay.

23    A.    I don't recall.

24    Q.    Okay.  And how did you come to this new

25   knowledge during our break?



1    A.    My wife ref -- talked to me.

2    Q.    Okay.  That's fine.  I just want to make --

3    A.    Yeah.

4    Q.    -- sure you know --

5    A.    Yeah, right.

6    Q.    -- you're not supposed to be talking to

7   anybody else during the break.  You can talk to

8   your attorney, obviously, but you're not supposed

9   to change your testimony and talk to people about

10  how to testify during the break.  So just next time

11  let's be careful about that.

12   A.    Okay.

13   Q.    Okay.

14        MS. LASKY:  Well, I would just -- as

15  a 30(b)(6), he does have the obligation to educate

16  himself, so --

17        MR. MCCARTER:  Before the deposition,

18  yes, not during the deposition.

19        MS. LASKY:  Okay.

20        THE WITNESS:  Okay.

21        MR. MCCARTER:  Okay.

22  BY MR. MCCARTER:

23   Q.    All right.  So we were -- so you've got a

24  blacklisting allegation in this case, too.

25   A.    Yes.



1    Q.   Do you know that?

2    A.   Yes.

3    Q.   Okay.  What -- what is your understanding

4    of your concern about blacklisting?

5    A.   They -- after -- did not realize until a few

6    years later that Manheim put us on a K -- with

7    Auction Insurance, reported that we did not pay for

8    a vehicle.  And they put us in what they call a KO

9    Book, which basically means that if I write a check

10   to the auction, that they don't insure that check.

11   Q.   Who's "they"?

12   A.   Auction Insurance.

13   Q.   Okay.

14   A.   Auction Insurance will not insure the

15   check.  I found this out from Wolfe's Auto Auction.

16   Q.   Okay.  So it's your understanding that

17   Manheim put you in the --

18   A.   Yes.

19   Q.   -- this KO Book?

20   A.   Yes.

21   Q.   Okay.  And that's not DSC?

22   A.   Well, it was -- actually, at the time it was

23   NextGear.

24   Q.   Okay.

25   A.   Well no, actually, it was Manheim.  It was



1   actually Manheim, from my understanding.  Now I

2   do not know that.  That's what one of the guys at

3   the auction told me.

4       Q.    Okay.  So your knowledge is based on

5   something you heard at Wolfe's Auto Auction.

6       A.    That's when I first heard it, and I actually

7   called them.

8       Q.    Called who?

9       A.    Called Auction Insurance.  And they said

10  I was in the KO Book because I didn't -- and they

11  wouldn't give me much more details other than I

12  didn't pay for a vehicle.

13      Q.    At Manheim.

14      A.    At Manheim.

15      Q.    Okay.

16      A.    Which was part of the bankruptcy, so it

17  was discharged.

18      Q.    Okay.  We'll come to the bankruptcy in a

19  second.

20      A.    Okay.

21      Q.    All right.  So I'll -- you can turn to it, if

22  you want, or I'll just read it to you.  These are in

23  the interrogatories, which I think --

24      A.    The fir -- the first --

25      Q.    Number 4, maybe, Exhibit Number 4.



```
 1      A.    Uh-huh.

 2      Q.    And at Response Number 15, which is on

 3   Page 12 and 13, at -- at the end of that it says,

 4   "Further responding, Mr. Mattingly was informed by

 5   Carol Gardner with Wolfe's Auto Auction that

 6   Mattingly Auto Sales was listed in the KO Book

 7   compiled and issued by Auction Insurance

 8   Agency."  Do you see that?

 9      A.    Yes.

10      Q.    And is that accurate?

11      A.    Yes.

12      Q.    Okay.  So who's Carol Gardner?

13      A.    She is -- she works for Wolfe's Auto

14   Auction.  I don't know her official titles, but she

15   works for Wolfe -- Wolfe's Auto Action.

16      Q.    Is she a manager there?

17      A.    Yes, of some capacity, but --

18      Q.    Not the --

19      A.    -- what exactly I do not know.

20      Q.    But not the --

21      A.    She's not an owner.

22      Q.    Not the general manager?

23      A.    No.

24      Q.    Okay.  And you said -- I think you said it

25   basically means Auction Insurance Agency won't
```



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 86 of 165 PageID #: 2254

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            109

```
 1   insure your checks.

 2     A.   Yes.

 3     Q.   Okay.  And -- but you'd testified earlier

 4   that you are able to write checks at Wolfe's

 5   Evansville and Clark County; right?

 6     A.   Yes.

 7     Q.   All right.  And do you know -- do you

 8   know what connection, if any, Auction Insurance

 9   Agency has to Manheim?

10     A.   I have -- no, I wouldn't have any idea.

11     Q.   Do you know if any -- what connection it

12   has to NextGear?

13     A.   No, I wouldn't have any idea.

14     Q.   Okay.  And earlier in that same

15   Interrogatory Number 15 it says, "Subject to the

16   foregoing specific and general objections,

17   Mattingly Auto Group experienced the effects of

18    blacklisting' by NextGear/DSC by its inability to

19   participate in any auctions at auction houses

20   owned by Manheim and by the refusal of other

21   auction houses to extend credit to Mattingly."

22     A.   Yes.

23     Q.   Do you see that?

24     A.   Yes.  Uh-huh.  Yes.

25     Q.   Thank you.  And that's true.  I mean,
```



```
 1  that's still your testimony.

 2     A.   Yes.

 3     Q.   Okay.  Do -- do you -- to the extent

 4  Manheim -- you believe Manheim put you in the KO

 5  Book for a non-payment to Manheim, do you have

 6  any reason to think that's not the reason you can't

 7  deal at Manheim?

 8     A.   I believe that is the reason; yes.

 9     Q.   Okay.  Okay.

10     And this -- this sounds like you can deal at

11  other auction houses; you just don't necessarily

12  get credit from them.

13     A.   Well, can I give you an example?

14     Q.   Yeah.

15     A.   If I bought a vehicle at Wolf -- Wolfe's,

16  being as they -- they just flat told me I am a good

17  customer; but I'm -- according to Auction

18  Insurance, in that situation I have to write them a

19  check that has to clear the bank before I get a

20  title.

21     So if I bought one today and the check cleared

22  three days from now, if I needed the title I have to

23  drive three hours to get it.

24     Q.   Okay.  You can still buy there.  You just

25  have to wait a little longer for the title.
```



1    A.   Correct.

2    Q.   Okay.

3    A.   And at ABC Bowling Green, I talked to the

4  general manager, Jim Dodd.  And he would -- he --

5  he said if I went in there to even pay in cash, he

6  has to get approval.  And I haven't talked to him

7  since.  I can't even go in there to pay -- pay -- buy

8  a vehicle because of Auction Insurance.

9    And ABC Bowling Green, which -- ABC Bowling

10  Green is where I go.  So I'm assuming it's all ABC

11  auctions nationwide that I cannot even buy from

12  them even if I pay in cash, $100 bills cash.

13    Q.   But I thought -- I thought you said you

14  are doing business at ABC Bowling Green.

15    A.   No, I -- I'm still go -- I still -- I don't go

16  to that one because it's -- they've changed their

17  dates.  And I never have pursued it because --

18    Q.   Okay.

19    A.   -- I don't ever go to that one.

20    Q.   All right.

21    A.   I haven't been since 2012 probably.

22    Q.   Gotcha.  So -- but it was E-town, Clark

23  County, and Wolfe where you do business now?

24    A.   Yes.

25    Q.   And so they clearly have the ability to do



1  business with you even if you're in the KO Book.

2     A.    Yes.

3     Q.    Okay.  Do you know at all what Auction

4  Insurance Agency is?

5     A.    It's an insurance agency that insures

6  checks for the var -- auc -- auctions all around.

7     Q.    Okay.  Do you know whether every

8  auction in the country uses them as an insurer?

9     A.    No, I wouldn't have any idea.  A lot -- a

10  lot of the big ones do.

11    Q.    Okay.

12    A.    I know Wolfe's does.  Now, whether

13  E-town or Clark County do, I would not have any

14  idea.

15    Q.    Okay.

16    A.    I -- even though I've been to those

17  auctions, I probably haven't purchased a vehicle

18  from them in a couple years.

19    Q.    Okay.  And so you said you called Auction

20  Insurance Agency to confirm what Wolfe's told you;

21  is that right?

22    A.    Yes.

23    Q.    And when was that conversation?

24    A.    That was probably -- I'm going say

25  thir --  14,  15 possibly.



1      Q.    2014?

2      A.    2014/'15.

3      Q.    Okay.

4      A.    Because I didn't even know it until it was

5    brought up where I bought one at Wolfe's, and they

6    said I -- I had to wait to pick up the title.  And I

7    questioned why, and they -- they referred me to

8    Carol Gardner.

9      Q.    Okay.  Oh, so you talked to Auction

10   Insurance Agency -- Agency before you talked to

11   Carol?

12     A.    No, but she was the one that informed me

13   that I -- about this KO Book store [phonetic].

14     Q.    And that would have happened shortly

15   before the conversation with Auction Insurance --

16     A.    No, I never did talk to Auction Insurance.

17   I talked to Auction Insurance after to find out what

18   was going on.  I talked -- Carol Gardner is the one

19   that told me I was in a KO Book.

20     Q.    Okay.

21     A.    And then I -- and I had heard ex -- "Well,

22   what is that?"  I don't -- you know, didn't know.

23   And then I called Auction Insurance, and that's

24   when they informed me it was Manheim; but they

25   had -- wouldn't give me a whole lot of details other



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 91 of 165 PageID #: 2259

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              114

 1  than, "You didn't pay for a vehicle."  And they

 2  never -- apparently didn't care of my side of the

 3  story.

 4    Q.    But did they mention Manheim?

 5    A.    I believe so; yes.

 6    Q.    Okay.  That conversation --

 7          THE REPORTER:  I'm sorry.  Mention

 8  what?

 9          THE WITNESS:  Manheim.

10          MR. MCCARTER:  Manheim.

11          THE WITNESS:  Manheim.

12          THE REPORTER:  Thank you.

13          MR. MCCARTER:  That's M-a-n-h-e-i-m.

14  BY MR. MCCARTER:

15    Q.    They -- but the conversation with Carol

16  and then the call to Auction Insurance Agency

17  were pretty close in time to one another?

18    A.    It -- the first call to Auction Insurance,

19  yes.

20    Q.    Okay.  And you think that's 2014/2015?

21    A.    Two -- yeah, because it was several years

22  before I even realized it.

23    Q.    Okay.  So between 2012 and two

24  thousand -- that call in 2014/2015, you didn't know

25  you were in the KO Book.



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          115

```
 1    A.   Right.  Correct.

 2    Q.   Okay.  So it -- that means it didn't seem

 3  to have any effect on your business during that

 4  period.

 5         MS. LASKY:  Object to the form.

 6    A.   Well, other than the fact that it would

 7  have -- it'd be -- it's kind of inconvenient to have

 8  to drive for three hours for a title.

 9  BY MR. MCCARTER:

10    Q.   Okay.  Do you have any records from

11  anybody that talk about the KO Book or the in --

12  uninsurable list or. . .

13    A.   I don't recall.  I don't believe so, but I

14  don't -- I don't really know.

15    Q.   Is it something you searched for to

16  produce in this case?

17    A.   I don't re -- I don't remember.  I do -- I'm

18  going to correct myself.  I believe there was a

19  letter from a lawyer that we sent from Stephen

20  Hopkins to Auction Insurance questioning that.

21    Q.   Okay.  And do you think you produced it

22  in this case, or not?

23    A.   I believe so.  I believe -- I believe it was

24  in there somewhere, but I don't. . .

25    Q.   I've got a letter from Mr. Hopkins to
```



1    Manheim asking about it.

2       A.    Okay.  It was -- I'm sorry.

3       Q.    Is that what you think --

4       A.    It was to Manheim, apparently.

5       Q.    Okay.  I'll -- I'll show you that in a bit.

6       A.    Yeah, that's -- that's the -- that's the

7    one.

8       Q.    Okay.

9       A.    Because Manheim's the one that put me

10   in, so -- so I guess he sent the letter to them.

11      Q.    And is this -- is this KO status -- KO Book

12   status, is it affection you on the sales side at all?

13      A.    No, just on the purchase side, you know.

14      Q.    Okay.  Do you -- I should have asked this

15   earlier, but do you ever work as a representative

16   for other dealerships?

17      A.    No.

18      Q.    You -- since 2006, you've never bought or

19   sold for another dealership?

20      A.    Well, I -- I -- yeah, I stand corrected.

21   I -- I probably have repped for people at auctions

22   if they're --

23      Q.    On --

24      A.    -- they had some vehicles there.

25      Q.    On sales?



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 94 of 165 PageID #: 2262

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          117

1    A.   Yes.

2    Q.   Okay.  And who -- what dealers were

3  that?

4    A.   I remember doing it for Scott Auto Sales;

5  Parker & Sons.  And then -- off the top of the

6  head, that's the ones I can remember, but that --

7  that would have been prior to 2012, not

8  since 2012.

9    Q.   So you haven't repped cars for anybody

10  since 2012 besides Mattingly?

11    A.   I don't believe so; no.

12    Q.   Okay.  Have you had anybody buy from

13  Mattingly since 2012 under a different dealership's

14  name?

15        MS. LASKY:  Object to the form.

16    A.   I -- clarify that.

17  BY MR. MCCARTER:

18    Q.   Okay.  So earlier we talked about some

19  repre -- representatives who have done some

20  purchasing for you; right?

21    A.   Right.

22    Q.   And I'm assuming they do that under the

23  name of Mattingly Auto Sales?

24    A.   Correct; yes.

25    Q.   So when they're at auction, they buy on



1    your account.

2      A.    Right.

3      Q.    Have you ever had a dealer buy on its

4    own account or another account and then convey

5    the car to you --

6      A.    Oh, since then?

7      Q.    -- outside of auction?

8      A.    No.

9      Q.    Okay.  You said "since then."  Does that

10   mean since 2012?

11     A.    Yes.

12     Q.    Did you do that before 2012?

13     A.    Rarely.  I don't recall any specific one.  I

14   don't -- I don't believe -- believe so.

15     Q.    Okay.

16     A.    I just -- I just don't recall it.

17     Q.    But, theoretically, that would be a way

18   you could get cars from an auction --

19     A.    Well --

20           MS. LASKY:  Object to the form --

21   BY MR. MCCARTER:

22     Q.    -- to go -- to have another dealer buy

23   them for you and -- and sell them for you?

24     A.    I guess I could, but I don't -- I -- I --

25   honestly, I don't recall ever having another dealer



1  Manheim.

2      Q.    So this is -- these are the cars that you

3  had bought with Manheim money that Manheim's

4  trying to repossess?

5      A.    Yes.

6      Q.    Okay.  Do you know whether these

7  particular cars were recovered?

8      A.    Yes.   The -- let's start with the '94

9  GMC --

10     Q.    Uh-huh.

11     A.    -- that would be 706.  This is the one

12  where we voluntary -- voluntarily brought back to

13  Manheim; spoke with Andrew -- blanking on his

14  last name -- and left it -- you know, sent it back to

15  Manheim Louisville.

16     Q.    Okay.

17     A.    This is the one that is in question over

18  the KO Book.  It was in the repossession, and it's

19  also in the bankruptcy.  Mysteriously with this car,

20  six days after we brought it back to them, it wound

21  up in a junkyard.

22     Q.    Okay.  And this is --

23     A.    We have no idea why.

24     Q.    -- this is the GMC --

25     A.    The  94.



1    Q.    -- that ends in 562 VIN?

2    A.    I don't see the -- yes.  Yes, I do.  Yes.

3    Q.    Okay.  But that car was not on your DSC

4    line.

5    A.    No.

6    Q.    Okay.  And then there's a -- I guess

7    there's a second car on 707?

8    A.    Yes, this one here, 707 -- yes, seven --

9    Q.    It's a Chevrolet 1500; 976 is the last of

10   the VIN?

11   A.    Yes.  Yes.  This car was -- they sent that

12   to be repossessed.  This particular truck had a

13   story behind it, as well.  It was on repo -- they

14   sent it to repossess.  This vehicle was paid off

15   when they came to get it.  I had had it on the floor

16   plan, but I had previously paid it off.

17       And a few days before the repossession, I

18   actually had called and told -- asked them to -- "I

19   was busy at work, and could you go ahead and mail

20   me the title?"  The title never -- after -- several

21   weeks after repossession, we were actually looking

22   for the title.  Could not find it.

23       Called the auction, and they had the title.

24   And I said, "Well, I'll be in Louisville that day.

25   Don't worry about mailing it.  I'll pick it up."



1    We went to pick up the vehicle -- or the title.

2  And I put -- drove over here, and they had a lien

3  on the vehicle -- on a vehicle I had paid off.  Not

4  only did they have that, but they was in Mattingly

5  Auto Sales' name, but the address was to Dixie

6  Auto Sales on Dixie Highway here in Louisville.

7    They -- Manheim, two days after the

8  repossession on a paid-off vehicle, took this

9  vehicle, retitled it, put a lien on it, and sent the

10  title to a dealer -- to -- in my name to another

11  dealer in Louisville.

12    Q.    Okay.  Did -- did you have an

13  understanding at all that -- that MAFS and DSC

14  have a blanket lien on all your inventory?

15    A.    No, just --

16    Q.    Okay.

17    A.    -- the ones that I had floored.

18    Q.    Okay.  And on the -- going back to the

19  GMC that ends in 562 --

20    A.    Uh-huh.

21    Q.    -- you said it was returned to DS -- or to

22  Manheim.  Where -- where was it when they tried

23  to pick it up?

24    A.    It was in our lot -- at our lot.

25    Q.    Okay.  And why do you have these orders



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          123

1   to repossess?  Just curious.

2   A.   The -- the-- the repossession guy, the

3   truck driver, actually let us have them, and we

4   made copies of them.

5   Q.   Okay.  All right.

6   And so at some -- after DSC recovers cars and

7   resells them, do you recall getting demand for

8   payment of the deficiency?

9   A.   I believe so; yes.

10   Q.   Okay.  And at some point that proceeded

11   to litigation?

12   A.   Yes.

13   Q.   Okay.  I'm going to show you what we're

14   going to call Exhibit 13.

15   [WHEREUPON, document referred to is marked

16   Defendants' Exhibit 13 for identification.]

17   BY MR. MCCARTER:

18   Q.   And this is Bates labeled MA 41 through

19   MA 61, and then it's -- in the middle of the exhibit

20   it starts a different set of numbers, MA 656

21   through 672.  Does this look like, you know, filings

22   and pleadings from that collection case?

23   A.   Yes.

24   Q.   Okay.  And this is something you've

25   produced to us, so when -- when did you get



```
 1   these?
 2     A.    This -- I'm -- shortly thereafter, like -- it
 3   appears, like, in November of  12 according to the
 4   stamp.  And I'm assuming that -- I'm assuming
 5   that's about the same time when I --
 6     Q.    Okay.
 7     A.    -- when we got it.
 8     Q.    So you do recall getting served with
 9   these when the case was pending?
10     A.    Yes.
11     Q.    Okay.  And it -- it's DSC versus Mattingly
12   Auto Sales and you, personally, Barry Mattingly.
13   Do you see that?
14     A.    Yes.
15     Q.    And you had some understanding that you
16   were a guarantor on the line of credit?
17     A.    Yes.
18     Q.    Okay.  Was your wife a guarantor on the
19   line of credit?
20     A.    No.
21     Q.    Okay.  And she's not named in this case?
22     A.    No.
23     Q.    Okay.  Do you -- I don't want to know
24   about discussions with your counsel, but do you
25   recall what you did with this complaint when you
```

1   got served with it?

2       A.   Oh, yeah, sure do.

3       Q.   What did you do?

4       A.   Well, my wife's laughing because it -- it

5   was a funny story, but, actually, I did nothing, and

6   my lawyer pretty much did the same.

7       Q.   Okay.

8       A.   Lawyers.

9       Q.   And then later you got this motion for

10  default that starts at 656?

11      A.   I -- [examines document].

12      Q.   If you look at 658, it shows as -- that,

13  you know, DSC representing it served it on you.

14      A.   Six -- oh, I'm sorry.  I don't have that.

15      Q.   The motion starts at 656, and the

16  certificate of service is on 658.

17      A.   Oh, okay.  Sure.  Yeah.

18      Q.   Do you recall getting that motion?

19      A.   Yes, that looks familiar.

20      Q.   Okay.  And again, you produced this to

21  us; so it's in your records somewhere; right?

22      A.   Yes.

23      Q.   Okay.

24      A.   I will give the -- can I -- I stop just to

25  give you a little bit?  The -- my -- the lawyer -- I'm



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 102 of 165 PageID #: 2270

BARRY WAYNE MATTINGLY  30(b)(6)                October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                        126

```
 1   from Kentucky, so I -- obviously, I had to have a

 2   lawyer that was licensed in Indiana.

 3     Q.   Uh-huh.

 4     A.   The lawyer I hired --

 5          MS. LASKY:  Wait.  Wait.  Just make sure

 6   you don't tell him what you discussed with that

 7   lawyer.

 8          THE WITNESS:  Okay.

 9     A.   Well, basically, he got sick, so that's kind

10   of -- so that's where we -- what happened in that

11   case.

12   BY MR. MCCARTER:

13     Q.   Okay.

14     A.   And so we had to move on.

15     Q.   So you're saying that's why he didn't

16   answer and it was a default?

17     A.   Right.

18     Q.   Okay.  And -- let's see -- if you keep

19   going back in that same exhibit at Page 665 -- it

20   starts at 665 and goes through the end of the

21   Exhibit at 672, there's an affidavit of debt.  Do you

22   see that?

23     A.   Six -- it's on 665?

24     Q.   Yes.

25     A.   Okay.  Yes.
```



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 103 of 165 PageID #: 2271

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                         127

1    Q.   And -- and I'll represent to you:  This was

2   an exhibit to that motion for default that we looked

3   at earlier.  And again, this is produced by you.  Do

4   you have any reason to believe you didn't get that

5   affidavit of debt?

6    A.   No.  That's correct.  Yeah, we re -- we

7   received this.

8    Q.   Okay.  All right.  I'm going to show what

9   we're going to call Exhibit Number --

10         MS. LASKY:  14.

11         THE REPORTER:  14.

12   BY MR. MCCARTER:

13    Q.   -- 14.

14         MR. MCCARTER:  Thank you.

15         MS. LASKY:  No problem.

16   [WHEREUPON, off-the-record remarks are

17   made.]

18   [WHEREUPON, document referred to is marked

19   Defendants' Exhibit 14 for identification.]

20   BY MR. MCCARTER:

21    Q.   So I just handed you 14 -- Exhibit 14.

22    A.   Yes.

23    Q.   And this, again, is sort of a composite

24   exhibit, but it's -- it's -- it's  documents you

25   produced to us that appear to be letters from DSC



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 104 of 165 PageID #: 2272

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          128

1    and from MAFS in that May time frame.

2       A.   Yes.

3       Q.   Do you see that?

4       A.   Yes.

5       Q.   Do you recall -- since you produced them

6    to us, do you recall receiving all these letters

7    around that time?

8       A.   Yes.

9       Q.   Okay.  And a few of them are dated a

10   little later.  Like if you look at Man -- MA 120, you

11   know, it says --

12      A.   Yes, I'm looking -- yes.

13      Q.   -- it says July 24, 2012.  So you would

14   have received it on or about that date?

15      A.   Yes.

16      Q.   And that one, for example, is signed by

17   Donna Kronauer -- Kro -- that's the lady you spoke

18   about before as representing MAFS?

19      A.   Yes.

20      Q.   Okay.  Okay.  All right.

21      Now, excepting the very last two pages, which

22   are MA -- MA 131 and 132, do you recall receiving

23   the rest of those letters from DSC or MAFS as

24   indicated?

25      A.   31, 32?



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 105 of 165 PageID #: 2273

BARRY WAYNE MATTINGLY  30(b)(6)                           October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              129

1    Q.    I'm sorry, except for 131 --

2    A.    Oh, I'm sorry.

3    Q.    -- and 132, did you receive the --

4    A.    Yes.

5    Q.    -- rest of them?

6    A.    Yes, yes.

7    Q.    Okay.

8    A.    I believe so; uh-huh.

9    Q.    And MA 131, 32 -- well, strike that.

10   MA 131 looks like a letter from your attorney

11   to DSC requesting information.  Do you see that?

12   A.    Yes.

13   Q.    And it's -- it's signed by Dwight Preston?

14   A.    Yes.

15   Q.    Is this the attorney you hired to deal with

16   the complaint?

17   A.    The -- the -- the original lawsuit in

18   Indiana?

19   Q.    Yeah.

20   A.    No.

21   Q.    Okay.  So you hired Mr. Preston after

22   that?

23   A.    Yes.

24   Q.    All right.  And is -- did you have a -- I

25   don't want to know the details of it, but did you



1  have a relationship with him before that?

2    A.   Yes.

3    Q.   Okay.  Is he your general attorney?

4    A.   No.

5    Q.   Okay.  And so here you're asking for a

6  detailed analysis and accounting of the DSC

7  claim?

8    A.   Yes.

9       MS. LASKY:  Object to the form.

10    A.   Yes.

11  BY MR. MCCARTER:

12    Q.   Okay.  And is this something he did send

13  on your behalf on or about October of -- 17, 2012?

14    A.   Yes.

15    Q.   Okay.  The very last page of that exhibit,

16  MA 132, is a card for a Terry Dashner at DSC.  Do

17  you see that?

18    A.   Uh-huh.  Yes.

19    Q.   How did you have that card?  What does

20  that have to do with this?

21    A.   He had something to do with DSC.  I

22  remember the name, but I don't remember what he

23  did.

24    Q.   Okay.

25    Q.   All right.  And you had an understanding



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 107 of 165 PageID #: 2275

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          131

 1   that there was a judgement entered in that case

 2   DSC filed against you?

 3      A.   Yes.

 4      Q.   Okay.  I'm going to show you what we're

 5   going to call Defendants' Exhibit 15.  Sorry.

 6   [WHEREUPON, document referred to is marked

 7   Defendants' Exhibit 15 for identification.]

 8   BY MR. MCCARTER:

 9      Q.   This document, again, is a composite, but

10   it's -- it's sort of, basically, two copies of -- of the

11   judgement.  It's 34 of 33 -- I'm sorry.  Strike that.

12      It's NG 3433 through NG 3435, and then it's

13   MA 673 through MA 674.  And it looks like it's sort

14   of NextGear's copy of a judgement against you and

15   your copy of the judgement against you.  Does that

16   look right?

17      A.   Yes.

18      Q.   Okay.  And as we sit here today, have you

19   paid this judgement?

20      A.   No.

21      Q.   Do you have any intent to pay it?

22      A.   No, it was discharged at bankruptcy.

23      Q.   Okay.  We'll come to that in a minute, but

24   who filed bankruptcy?

25      A.   Barry Mattingly.



1    Q.    And would --

2    A.    I did not -- huh?

3    Q.    Did your wife file with you?

4    A.    Yes.

5    Q.    Okay.  Did Mattingly Auto Sales pay --

6    A.    No.

7    Q.    Does Matting --

8          MS. LASKY:  Sorry.  What was your

9    question?

10   BY MR. MCCARTER:

11   Q.    Does Mattig -- did Mattingly Auto Sales,

12   Inc. file bankruptcy?

13   A.    No.

14   Q.    Okay.  Does Mattingly Auto Sales, Inc.

15   intend to pay this judgement?

16   A.    No.

17   Q.    Okay.  If Mattingly Auto Sales, Inc. were

18   to recover damages in this current case, do you

19   believe that it would be -- those will be offset by

20   the amount of that judgement?

21         MS. LASKY:  Object to the form.

22   A.    I wouldn't have any idea.

23   BY MR. MCCARTER:

24   Q.    Okay.  All right.

25   I'm going to show you what we're going to call



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 109 of 165 PageID #:
2277

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              133

1    Defendants' Exhibit 16.

2    [WHEREUPON, document referred to is marked

3    Defendants' Exhibit 16 for identification.]

4    BY MR. MCCARTER:

5       Q.   All right.  And this is Bates labeled

6    NG 8820 through 8895.  And I don't want to go

7    through these in detail.  I'll call your attention to

8    particular pages, but this would appear to be,

9    generally, the -- the bankruptcy papers that --

10   of -- of yours and your wife's bankruptcy file?

11      A.   Yes.

12      Q.   Okay.  And it looks like, from the top of

13   that, that that -- that this first document, the

14   petition, was filed in -- September 27, 2013.  Do

15   you see that?

16      A.   Yes.

17      Q.   Does that sound about right to you?

18      A.   About right.

19      Q.   Okay.  And when you signed these

20   bankruptcy papers, they were true, to the best of

21   your knowledge?

22      A.   Yes.

23      Q.   If you flip back to Page 8831 in there, in

24   Exhibit 16, do you see about halfway down there's

25   a list of a judgement in Hamilton Superior Court?



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 110 of 165 PageID #: 2278

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              134

1    Do you see that?

2      A.    Yes.

3      Q.    And that's the judgement DSC had against

4    you at the time?

5      A.    Yes.

6      Q.    And there's another judgement mentioned

7    in Breckinridge Circuit Court, Division 1, a civil

8    case right below that.  Do you see that?

9      A.    Yes.

10     Q.    Who -- who is that case?

11     A.    That was a -- like a Discover card.

12     Q.    Okay.  It's a -- a Discover card that went

13   unpaid?

14     A.    Yes, it -- it was in the bankruptcy.

15     Q.    And that was a personal Discover card?

16     A.    Yes.

17     Q.    Do you remember the amount of that

18   judgement?

19     A.    No.  It's -- it -- I'm sure it's listed here,

20   but I -- I don't remember it.

21     Q.    Okay.  And if we skip on back to

22   Page 8860 --

23     A.    Okay.

24     Q.    -- do you see that, it's called Schedule

25   F?



1    A.    [no audible response]

2    Q.    And the first two creditor names on there

3  are Manheim Louisville and then NextGear Capital,

4  Inc.  Do you see that?

5    A.    Yes.

6    Q.    And it shows business debt of Manheim

7  Louisville -- to Manheim Louisville of 9180?

8    A.    Yes.

9    Q.    And is that the -- the -- is that -- was that

10 an amount due to the auction or due to MAFS or

11 both?

12   A.    It was due to -- actually due to MAFS.

13   Q.    Okay.  But as far as you know, this was

14 an accurate statement of the amount at that time?

15   A.    Yes.

16   Q.    Okay.  And then it shows an amount due

17 to NextGear Capital of $58,432.52.  Do you see

18 that?

19   A.    Yes.

20   Q.    And that matches the judgement amount?

21   A.    I believe so.

22   Q.    Okay.  And I'll -- if you can turn back

23 to 8869?

24   A.    [complies]

25   Q.    I realize these are digital signatures, but



1  you authorized your attorney to file these with

2  your signature and your wife's signature?

3     A.   Yes.

4     Q.   Okay.  If you flip back to -- same exhibit,

5  to Number 8889 --

6     A.   Yes.

7     Q.   -- this looks like a -- a proof of claim

8  filed by DSC in your bankruptcy.  Do you see that?

9     A.   Yes.

10    Q.   And at the time they're saying the amount

11 due is 59,879 and six -- 73 cents.

12    A.   Yes.

13    Q.   Do you see that?  And then there's some

14 more detail attached to that at 8891 and following

15 that?

16    A.   Yes.

17    Q.   Okay.  Do you recall seeing that proof of

18 claim at that time in the bankruptcy?

19    A.   Yes.

20    Q.   Okay.  And did you or your attorney

21 challenge that proof of claim in the bankruptcy?

22    A.   Not that I'm aware of.

23    Q.   Okay.

24    A.   He did pretty much everything.

25    Q.   Do you recall specifically noting or



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                         137

```
 1   reserving any claims against DSC in your

 2   bankruptcy?

 3     A.   No.

 4          MS. LASKY:  Object to the form.

 5     A.   No, I don't really know what that means,

 6   but --

 7   BY MR. MCCARTER:

 8     Q.   Okay.

 9     A.   What. . .

10     Q.   Do -- do you recall telling the bankruptcy

11   court on paper or orally that, "I have a valuable

12   claim against DSC" --

13     A.   No.

14     Q.   -- "that's an asset"?

15     A.   No.

16     Q.   Okay.  Do you recall having -- saying that

17   on paper or orally about MAFS, that you had a

18   claim against MAFS?

19     A.   No.

20          MS. LASKY:  Object to the form.

21   BY MR. MCCARTER:

22     Q.   Okay.  And again, Mattingly Auto Sales,

23   Inc. did not participate in that bankruptcy.

24     A.   Correct.

25     Q.   Has Mattingly Auto Sales, Inc. filed
```



1   bankruptcy to date?

2     A.    No.

3     Q.    Okay.  All right.  All right.

4     And I'm sorry, at some point that bankruptcy

5   played out, and you were discharged in --

6     A.    Cor --

7     Q.    -- the bankruptcy?

8     A.    Yes.

9     Q.    Okay.  And by "you," I mean you

10  personally and your wife personally.

11    A.    Yes.

12    Q.    Okay.  Do you recall when -- when it was

13  done and the discharge  happened?  I can look it

14  up, but I don't -- do you recall?

15    A.    It was -- it was either the last --

16  December of  13 or January  14.

17    Q.    Okay.

18    A.    So I believe it was De -- actually

19  December of  13.

20    Q.    Okay.  All right.

21    I'm going to show what we're going to call

22  Defendants' Exhibit 17.

23  [WHEREUPON, document referred to is marked

24  Defendants' Exhibit 17 for identification.]

25  BY MR. MCCARTER:



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 115 of 165 PageID #: 2283

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              139

1    Q.    And this is labeled -- Bates labeled

2    MA 566 through 567?

3    A.    Yes.

4    Q.    Have you seen this before?

5    A.    Yes.

6    Q.    All right.  Again, this is something you

7    produced to us in the case?

8    A.    Yes.

9    Q.    And it looks like it's a small claims

10   complaint that you filed against NextGear Capital?

11   Do you see that?

12   A.    Yes.

13   Q.    And the signature's dated

14   October 24, 2013?

15   A.    I believe so; yes.

16   Q.    All right.  So based on the rough dates

17   we looked at before, this would have been while

18   your bankruptcy was pending?

19   A.    Yes, but they had to -- they delayed it

20   because of that, that they -- they wouldn't -- they

21   wanted to stop it because of bankruptcy.

22   Q.    They stopped this --

23   A.    Well -- or --

24   Q.    -- small claims case?

25   A.    Yeah.  Yeah, they stopped it or delayed



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 116 of 165 PageID #: 2284

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            140

1   it.

2     Q.   Who's "they"?

3     A.   The -- the judge.

4     Q.   So the -- the judge in this case didn't --

5   he didn't set you for hearing or -- or -- or didn't

6   accept what during that period?

7     A.   He -- because of -- due to the bankruptcy,

8   he wanted to delay the case.  And I think it was

9   actually -- and I do not remember her name.  It

10  was a lawyer also requested from DSC -- or

11  NextGear.

12    Q.   Okay.  And this is a claim for $1836 plus

13  court costs by you against NextGear?

14    A.   Yes.

15    Q.   Okay.  And do you recall whether you

16  listed this claim -- and I'm sorry.  By "you," I mean

17  you personally; right?

18    A.   Uh-huh.

19    Q.   And do you recall whether you listed this

20  claim as an asset in your bankruptcy?

21    A.   I do not recall.

22    Q.   Okay.  And this looks like -- correct me if

23  I'm wrong, I'm just trying to summarize it, but it's

24  basically you -- related to some physical property

25  damage you think was incurred when NextGear



```
 1    repossessed cars from you?

 2      A.    Yes.

 3      Q.    To the extent the cars belonged to

 4    Mattingly Auto Sales, Inc. and were repossessed

 5    from that entity, why is this filed in your name and

 6    not the entity's name?

 7      A.    Because it --

 8            MS. LASKY:  Object to the form.

 9      A.    This was on my personal property.

10    BY MR. MCCARTER:

11      Q.    Okay.  What personal property?

12      A.    My garage.

13      Q.    At your house?

14      A.    Yes.

15      Q.    Okay.  And is there anything in this case

16    about improper interest charges by NextGear or a

17    blacklisting by NextGear?

18      A.    No, this doesn't have nothing to do with

19    that.

20      Q.    Okay.

21      A.    I don't -- well, as far as I know.

22      Q.    And do you remember how this was

23    resolved?

24      A.    Yes, they basically paid the claim,

25    NextGear.
```



1    Q.   Okay.  Did -- was there ever a hearing or

2    anything on this case?

3    A.   No.  They actually spoke to a lawyer.

4    They called, and we settled it --

5    Q.   Okay.

6    A.   -- basically over the phone.

7    Q.   And I think there was a written settlement

8    agreement; right?

9    A.   Yes.

10   Q.   I'll show you that now.

11        MR. MCCARTER:  This is Exhibit 18.

12   [WHEREUPON, document referred to is marked

13   Defendants' Exhibit 18 for identification.]

14   BY MR. MCCARTER:

15   Q.   This is labeled NG 3425 through 3431,

16   and then there's a couple of extra pages on the

17   end that are MA 569, MA 581.

18   A.   Yes.

19   Q.   Have -- have you seen this first document

20   before that's called Settlement Agreement and

21   Release?

22   A.   Yes.

23   Q.   Okay.  And is this the agreement you

24   signed with NextGear to settle that small claims

25   case?



BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          143

```
 1      A.   Yes, it is.

 2      Q.   So this relates to the small claims case

 3   at Exhibit 17; right?

 4      A.   Yes.

 5      Q.   Okay.  And that is your signature on

 6   Page 3428?

 7      A.   [examines document] Yes.

 8      Q.   Okay.  And then on the -- the second to

 9   the last page, MA 569, it looks like there's a letter

10   delivering the check to you.

11      A.   Yes.

12      Q.   Okay.  And so NextGear did pay the

13   settlement amount?

14      A.   Yes.

15      Q.   And then you filed a dismissal that's

16   at 581?

17      A.   Yes.

18      Q.   Okay.  If you look at the first page of the

19   Settlement Agreement at 3425, about three

20   paragraphs down it does say the lawsuit was

21   disclosed to the trustee in the bankruptcy case.

22   Do you see that?

23      A.   Yes.

24      Q.   Do you know whether that was true?

25      A.   Yes, that sounds correct.
```



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 120 of 165 PageID #: 2288

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            144

1    Q.   Okay.  And you understood when you

2    signed this that you were releasing your claims

3    against NextGear according to Paragraph 3, the

4    release language?

5    A.   Paragraph 3?  Yes, for the garage

6    damage?  Yes.

7    Q.   Okay, but you -- you did sign this

8    Settlement Agreement as it's written here.

9    A.   I believe so; yes.

10   Q.   Okay.  And Pa -- and on 4, it says that

11   this agreement -- under Section 4, [reads] This

12   agreement represents the entirement -- agreement

13   between the parties.

14   Do you see that?

15   A.   Yes.

16   Q.   Okay.  And that was true?

17   A.   Yes.

18   Q.   All right.  I'm going to show you what I'm

19   going to call Exhibit 19.

20   A.   19.

21   [WHEREUPON, document referred to is marked

22   Defendants' Exhibit 19 for identification.]

23   [WHEREUPON, off-the-record remarks are

24   made.]

25   BY MR. MCCARTER:



1    Q.    This is la -- Bates labeled NG 7994

2  through 7998.

3    A.    Yes.

4    Q.    So what is this first page?

5          MS. LASKY:   Object to the form.

6    A.    This is where we -- Mr. Hopkins sent a

7  letter to Manheim about the KO Book, that I should

8  not be in there due to the car -- truck was

9  discharged in bankruptcy.

10  BY MR. MCCARTER:

11   Q.    Okay.  So mis -- at this point Mr. Hopkins

12  is representing you?

13   A.    On this case, yes.

14   Q.    Okay.

15   A.    This was in  15.

16   Q.    And it says he's been retained by Barry

17  W. Mattingly.  It doesn't say Mattingly Auto Sales

18  there.  Was it your understanding he was just

19  representing you personally?

20   A.    Well, both, but it -- actually, in the KO

21  Book it -- I believe, if I'm not mistaken, it's my

22  name --

23   Q.    Okay.

24   A.    -- not just -- not Mattingly Auto Sales so

25  much as it is Barry Mattingly.



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 122 of 165 PageID #: 2290

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          146

1    Q.    Okay.  So seeing the date of this letter,

2    does that refresh your memory at all about when

3    you talked to Carol at Wolfe's?

4    A.    It would have been shortly there before,

5    yes.  So it -- it would have been a few -- I'm going

6    to say a few months before that.

7    Q.    Okay.  And you talked to Auction

8    Insurance Agency by phone somewhere between

9    those two dates?

10   A.    Right.

11   Q.    Okay.  And here he's -- he's suggesting

12   that it's your understanding that he's been -- you

13   know, that you've been advised that Manheim

14   Auctions is responsible for your placement on that

15   list of bidders that you're now calling the KO Book;

16   right?

17   A.    Yes, I believe it was mi -- one of the

18   Auction Insurance reps.

19   Q.    Okay.  And here he's describing that as a

20   list of bidders who are required to verify their

21   financial ability to purchase vehicles at auction.

22   A.    Yes.

23   Q.    And so he's -- neither he nor you are

24   really saying it's impossible for you to purchase at

25   auction.  You're just saying it's more difficult?



```
 1      A.   No, it --
 2           MS. LASKY:  Objection to form.
 3      A.   I can purchase some -- I cannot purchase
 4    at any Manheim.
 5    BY MR. MCCARTER:
 6      Q.   Okay.  And he says in the middle
 7    paragraph that you believe it's in retaliation for
 8    your bankruptcy filing, and then also for the
 9    disposition of that GMC Sierra; right?
10      A.   Yes.
11      Q.   Do you know one way or the other when
12    you were put on the KO Book list?
13      A.   I wouldn't know that.  I do not know that.
14      Q.   Okay.  Did you get any response from
15    Manheim to this letter?
16      A.   No.
17      Q.   Did you send a copy of this letter to
18    DSC?
19      A.   No.
20      Q.   The documents that come after that in
21    that same exhibit --
22      A.   Uh-huh.
23      Q.   -- 7995 and the following --
24      A.   Yes.
25      Q.   -- do they relate to this letter in some
```



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 124 of 165 PageID #: 2292

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              152

 1   contacted about being involved in this case by an

 2   attorney in Louisiana about a year ago.

 3       A.   Uh-huh.

 4       Q.   Okay.  Before that, had you ever raised

 5   the issue or discussed the issue with DSC about

 6   when interest begins to accrue on floor plan cars?

 7       A.   I had --

 8            MS. LASKY:  Object to the form.

 9       A.   I had spoke with Lourdes and Donna on a

10   couple occasions about always looking to save

11   money, and I questioned particularly NextGear and

12   their charging interest two days before it

13   happened -- or two days with -- you know, we put it

14   on today; they already charged you two days.

15   BY MR. MCCARTER:

16       Q.   I think you said earlier that was MAFS;

17   right?

18       A.   MAFS.

19       Q.   Okay.

20       A.   And with Lourdes, it was always -- I was

21   always looking to cut -- you know, to save a dollar.

22   And I asked her -- because one -- an occasion, I --

23   I can't recall the exact vehicle or what happened;

24   but I got a vehicle -- like I say, I got a vehicle,

25   called -- got the -- I called to do -- pay the payoff,



1  and they still didn't have the title, but yet I was

2  charged.  I probably asked her for a deal --

3  Q.   Okay.

4  A.   -- but I don't remember.

5  Q.   And -- and that's those title-absent cars;

6  right?

7  A.   Yes.

8  Q.   Okay.

9  A.   That's when I was aware, because it --

10  it's -- DSC was different, because Manheim

11  actually had an office in their auction.

12  Q.   Yeah.

13  A.   Dealer Services did not.  They just had a

14  rep, so I didn't see much of anything like that.

15  Q.   Did that happen with MAFS, too?  I mean,

16  they would start charging interest when they didn't

17  have the title present yet?

18  A.   Yes.

19  Q.   And did that happen with AFC?

20  A.   That I do not know.  I'm -- I'm sure

21  they -- I'm sure they all work alike, but --

22  Q.   Okay.

23  A.   -- I do not -- don't recall anything about

24  AFC.

25  Q.   But in each of those cases, you had the

Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 126 of 165 PageID #: 2294

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              154

 1   car, already had it.  You were doing whatever you

 2   wanted to do with the car.

 3      A.   Yes.

 4      Q.   Okay.  And do you recall when those

 5   discussions with Lourdes would have been?

 6      A.   No, no.  I -- I don't -- I don't know any

 7   dates.

 8      Q.   Okay.  Do you recall when you would have

 9   had the discussion with Donna about the two days

10   of interest?

11      A.   Yes, it would have been in her office.

12      Q.   When?

13      A.   Oh, the -- probably from day one when I

14   realized that they charged it on the compu --

15   you -- you could look at it on the computer and see

16   it.

17      Q.   Okay.  So it was transparent to you,

18   something that you were aware of.

19      A.   Yeah.  And I asked about it, and they

20   said -- their standard answer -- I mean, both of

21   them gave me the sta -- standard answer.  "Well,

22   that's the way we do it."

23      Q.   Okay.  And the same thing with the

24   title-absent, that you -- you were aware you were

25   being charged interest for that period.  You just



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 127 of 165 PageID #: 2295

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            155

```
 1    didn't like it.

 2      A.    Yeah.

 3      Q.    Okay.

 4            MS. LASKY:  Object to the form.

 5    BY MR. MCCARTER:

 6      Q.    And in each case, you continued to

 7    borrow from DSC and MAFS after those

 8    conversations?

 9      A.    Yes.

10      Q.    Okay.  All right.

11      Do -- are you aware that in this case you have

12    RICO allegations that I'll -- you know, I'm not --

13    I'm not trying to pin you to this summary, but

14    generally you're alleging a conspiracy between

15    NextGear, Cox Automotive, Cox Enterprises, John

16    Wick, and others.  Are you aware of that?

17      A.    Yes.

18      Q.    Okay.  What's your understanding of how

19    that conspiracy works?

20      A.    As -- as far as the word "RICO," I didn't

21    know nothing about it.  The only thing I've ever

22    seen is on A&E channel with mobsters.  Outside of

23    that, I know nothing about it.

24      Q.    Okay.  So -- but, factually, what is your

25    understanding of how this conspiracy works?
```



1    A.   Basically, they were charging interest on

2  titles they did not have.

3    Q.   Okay.  Are you -- are you aware of any

4  specific conversations between NextGear and Cox

5  Automotive about that?

6    A.   No, I wouldn't -- I wouldn't have any idea.

7    Q.   Are you aware of any specific

8  conversations between NextGear and Cox

9  Enterprises about that?

10    A.   No.

11    Q.   Are you aware of any specific

12  conversations between NextGear and John Wick

13  about that?

14    A.   No.

15    Q.   Are you aware of any conversations

16  among any of those parties about the issue of

17  charging interest?

18    A.   No.

19    Q.   Okay.  And by "conversations," I mean

20  emails, letters.  You haven't seen any --

21    A.   No.

22    Q.   -- of those?

23    A.   No, I would have.

24    Q.   Okay.  Do you -- do you have some --

25  you -- I think you said earlier you understood that



1   Manheim acquired DSC sometime in 2012?

2     A.   Yes.

3     Q.   Okay.  So did -- do you have any

4   knowledge about interactions between the Cox

5   entities and DSC before that?

6     A.   No, I wouldn't have any.  No.

7     Q.   Okay.  And just -- I think you said this,

8   but just to confirm:  You never dealt with -- you

9   never had a line of credit with NextGear after DSC

10  and MAFS were merged into Next -- to become

11  NextGear?

12    A.   After May of  12, no, we nev -- we didn't

13  have -- ever have no business after May of  12.

14    Q.   Okay.  Just the collection and bankruptcy

15  stuff?

16    A.   Yes.

17    Q.   Okay.  All right.

18       You've also got what's called an unjust

19  enrichment claim in this case where you're

20  suggesting that NextGear and/or the other

21  defendants received an unfair benefit from you --

22  or an unjust benefit from you.  What's your

23  understanding of that?

24    A.   Is that --

25       MS. LASKY:  Object to the form.



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 130 of 165 PageID #: 2298

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              158

```
 1    A.   I'm not really sure what -- the legal term,

 2   but it seemed like I was paying them money that

 3   they should not have had yet, you know,

 4   BY MR. MCCARTER:

 5    Q.   And are --

 6    A.   -- as far as the interest and stuff.

 7    Q.   Okay.  Is -- is that focused on the

 8   title-absent cars?

 9    A.   Well, yes, and -- and I -- I -- of course, I

10   wouldn't know if they char -- how much they

11   charged daily, or if -- even if I -- even if they did

12   have a title, I don't know the length of it because,

13   you know, I just wouldn't have -- the printout did

14   not say that.  So I wouldn't have caught it.

15    Q.   To the extent you had the cars at that

16   point and you'd been able to take that by putting it

17   on your DSC or MAFS floor plan, what did -- why

18   do you think that's unfair?

19    A.   It's just --

20         MS. LASKY:  Object to the form.

21    A.   -- costing me more money.

22   BY MR. MCCARTER:

23    Q.   Okay.  Did you -- I think you said

24   title-absent cars were disclosed on the block or

25   some --
```



BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          159

```
 1      A.   Yes.

 2      Q.   Okay.  So you could have not purchased

 3   title-absent cars if you chose to.

 4      A.   Yes.

 5      Q.   Okay.  And if you did choose to purchase

 6   a title-absent car, you could choose not to put that

 7   on your DSC line.

 8      A.   Right.

 9      Q.   Okay.  And to -- during the period when

10   you had an AFC and a MAFS line, you could have

11   chosen to put the car on your AFC line instead of

12   your MAFS line.

13      A.   Like we -- yeah, we could choose --

14   choose anybody, I guess.

15      Q.   And the same thing, when you had a

16   DSC/MAFS line, you could have chosen to put the

17   car on MAFS instead of DSC.

18      A.   Yes.

19      Q.   Or you could have chosen to pay cash for

20   them.

21      A.   Yes.

22      Q.   Okay.

23      A.   Of course, when I paid cash at the

24   auction, if I wrote the auction a check today with a

25   title-absent, they don't actually cash my check
```



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 132 of 165 PageID #: 2300

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              160

 1  until they receive the title.

 2      Q.    Okay.  What benefit do you believe you

 3  conferred on John Wick, who's a Defendant in this

 4  case?

 5      A.    I wouldn't have any idea.

 6      Q.    Okay.  What benefit do you believe you

 7  conferred on Cox Enterprises in this case?

 8      A.    The same.  I have no any.

 9      Q.    Okay.  What benefit do you believe you

10  conferred on Cox Automotive in this case?

11      A.    No idea.

12      Q.    Okay.  All right.

13      You said before, I think, two -- correct me if

14  this is wrong, but before 2012 you might

15  have 20, 25 cars in the lot, or was it 15, 20?

16      A.    Anywhere -- more like 15.

17      Q.    Okay.  And now you might have 1 or 2 on

18  the lot?

19      A.    Yes.

20      Q.    Okay.  But might you be owning other

21  cars that are at auction or somewhere else?

22      A.    I could --

23          MS. LASKY:  Object to the form.

24      A.    -- but that's -- right now that's the only

25  ones we have for sale.



BARRY WAYNE MATTINGLY  30(b)(6)                October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                         161

1   BY MR. MCCARTER:

2      Q.    Okay.  So, on average, you're owing 1

3   or 2 cars at a time now?

4      A.    Yes.

5      Q.    Okay.  And, on average, you think you

6   were owning 15 or so before --

7      A.    I'd be -- I'd have 15 and --

8      Q.    -- before 2012?

9      A.    Yes.

10     Q.    Okay.  Do you have any recollection of

11  sort of what your net income was annually from the

12  automotive business between 2006 and 2012?

13     A.    No, I don't -- I don't recall right off the

14  top of my head.

15     Q.    Can you ballpark it?

16     A.    I know -- I could give you ballpark of

17  gross sales --

18     Q.    Okay.

19     A.    -- if that would help you any.  It -- it'd

20  be -- let's say prior to  12, we -- we would do

21  anywhere from 800.  And I -- I think one time we

22  might have even hit a million.  This year our gross

23  sales would luckily to -- be 60,000.

24     Q.    Okay.  But, obviously, gross sales

25  doesn't -- hasn't --



1    A.    Turn -- turned a --

2    Q.    -- yet subtracted out of your --

3    A.    -- turned a profit.

4    Q.    -- costs; right?

5          MS. LASKY:  Wait, wait, wait.

6    BY MR. MCCARTER:

7    Q.    Gross sales hasn't yet taken out your

8    cost of doing business; right?

9    A.    Correct.

10   Q.    All right.  So do you have any

11   recollection of what your net income was any time

12   between 2006 and 2012?

13   A.    No.

14   Q.    Would that be shown on accounting

15   records or tax returns that --

16   A.    Tax; uh-huh.

17   Q.    -- that you would still have access to?

18   A.    Yes.

19   Q.    Okay.  And since 2012, do you have any

20   sense of what your net income would be from the

21   automotive business?

22   A.    Yes.

23   Q.    What is it?

24   A.    I -- I don't recall the income last year.

25   I -- I don't recall it off the top of my head.



1    Q.    Okay.

2    A.    Very little.  I mean, once you take

3  expenses as far as insurance, taxes, and that kind

4  of thing.

5    Q.    Okay.  But again, that would be shown in

6  your tax returns?

7    A.    Correct.

8    Q.    And you still have access to all of those.

9    A.    For the -- well, for -- go back a few

10  years; yes.

11    Q.    Okay.  Is there -- besides your tax

12  returns, are there any other records you can look

13  at to compare your pre-2012 income -- net income

14  to your post-2012 net income?

15    A.    I'm not sure.  I'm not -- I don't know.  I

16  don't --

17    Q.    Okay.

18    A.    -- I don't know if we saved records that

19  far back.

20    Q.    Okay.  Do you recall ever doing a net

21  income statement?

22    A.    No.

23    Q.    So if it's not in the tax returns, you'd

24  have to reconstruct it from individual purchases

25  and sales?



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 136 of 165 PageID #: 2304

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          164

1    A.    Yes, and then the computer records.

2    Q.    Okay.   Have -- have you done any

3  analysis of the amount of interest that you believe

4  NextGear overcharged you?

5    A.    No.

6    Q.    Do you have any estimate of what that

7  would be?

8    A.    No, none.

9    Q.    Okay.   If -- do you have records you

10  could look at to determine that?

11    A.    Probably not, maybe not that far back.

12    Q.    How far back --

13    A.    I --

14    Q.    -- would they go?

15    A.    Well, I -- like your income tax, we're

16  lucky we found what we did.   I wouldn't -- I

17  wouldn't think we could go back much more than

18  five years.   I wouldn't have any idea.

19    Q.    But your tax returns are not going to

20  show individual --

21    A.    Right.

22    Q.    -- floors and payoffs, are they?

23        THE WITNESS:   What?

24        MS. LASKY:   I just didn't want you to

25  answer before he finished.



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 137 of 165 PageID #: 2305

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          165

 1          THE WITNESS:  I'm sorry.  I do that a
 2    lot.
 3      A.   I do not know.  I -- I didn't -- have to --
 4    wouldn't know how far back I'd have to go.
 5    BY MR. MCCARTER:
 6      Q.   Well, I just want to be clear:  Your tax --
 7    your tax returns for the business will not show
 8    individually what you paid for a particular car and
 9    what you paid it off at; right?
10      A.   No.
11      Q.   It's going to be an aggregate of all your
12    income.
13      A.   Correct.
14      Q.   Okay.  How far back do your deal jackets
15    go?
16      A.   Oh, well, we -- I'd say we turned some in
17    that -- probably at least five years ago.  We've
18    probably got some to 2009.  I don't recall.
19      We had some tickets, but not that far back --
20    auction tickets from 2007, but we don't -- don't
21    have them -- have them all.
22      Q.   Okay.  And are all -- those all stored at
23    your business lot?
24      A.   Yes; uh-huh.
25      Q.   Okay.  How long has Jackson Hewitt been



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 138 of 165 PageID #: 2306

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           166

 1 | your tax accountant?

 2 |   A.   Well, for -- since I was out of high

 3 | school.  It -- it was Jackson -- it was Powell

 4 | Services.  It's now called Jack -- Jackson Hewitt

 5 | Powell Services, and I -- my parents had them, and

 6 | I did them even when I was in a high school job

 7 | and -- since 1980.

 8 |   Q.   And they're --

 9 |   A.   Basic --

10 |   Q.   -- since -- hang on.  Hang on a second.

11 | Since 2006, they're been preparing your individual

12 | returns and the returns for Mattingly Auto Sales,

13 | Inc.?

14 |   A.   Yes.

15 |   Q.   Okay.  And those are two separate

16 | returns.

17 |   A.   Yes.

18 |   Q.   Okay.  All right.  Have you attempted to

19 | calculate how much you've been damaged by the

20 | alleged blacklisting in the KO Book?

21 |   A.   No.

22 |   Q.   Do you have any records that would show

23 | the extent of that damage?

24 |   A.   No.

25 |   Q.   Okay.  Have you applied for floor plan



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 139 of 165 PageID #: 2307

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              167

 1   credit with anybody else since 2012?

 2      A.   No.

 3      Q.   Have you applied for any sort of business

 4   credit with anybody since 2012?

 5      A.   No.

 6      Q.   Okay.  So you haven't been rejected.  You

 7   just haven't applied.

 8      A.   Right.

 9      Q.   Okay.  What have -- you know, so

10   you're -- you're making a claim in this case for

11   damages from NextGear related to interest and

12   blacklisting.  What -- have you made any effort at

13   all to calculate those damages yourself?

14      A.   No.

15      Q.   Okay.  Have you done anything that you

16   can think of to reduce those damages or to

17   mitigate those damages?

18      A.   I don't know what you're -- how you are --

19   how to answer that one.

20      Q.   Yeah.  So I -- you're claiming some sort

21   of damage from -- from the blacklisting and

22   interest, and so what -- I'm asking you:  Have you

23   done anything to try to prevent that damage or

24   reduce that damage?

25      A.   From blacklisting?



1    Q.   Yeah.

2    A.   A -- not -- not that I recall.  I mean, I

3  don't know what you're looking for in that answer.

4    Q.   Okay.  How about the interest issue?

5  Have you done anything --  demand payment of

6  interest back from NextGear?

7    A.   No.

8    Q.   Okay.

9    A.   I mean --

10    Q.   Have you -- well, strike that.

11  Okay.  Do you have an understanding that you

12  and the other Plaintiffs are seeking to represent a

13  class of Plaintiffs in this case?

14    A.   Yes.

15    Q.   What is your understanding of -- of that

16  class?

17    A.   The only thing --

18         MS. LASKY:  Object to the form.

19    A.   I don't know much about that stuff.  It --

20  legal stuff.  The only thing I know, it's just a --

21  "class action" means -- I -- I assume it to be a

22  group of people --

23  BY MR. MCCARTER:

24    Q.   Okay.

25    A.   -- a group of entities or whatever.



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 141 of 165 PageID #: 2309

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              169

```
 1      Q.    Do you have some understanding it's

 2   other NextGear borrowers?

 3      A.    Yes.

 4      Q.    Okay.  Do you have any idea of how far

 5   back or anything like that?

 6      A.    No; huh-uh.

 7      Q.    Okay.  Have you spoken to any other

 8   dealers about this case?

 9      A.    No.

10      Q.    Besides your attorney and your wife, have

11   you spoken to anybody else about this case?

12      A.    No.

13      Q.    Do you -- have you made any kind of

14   study of what the other NextGear dealers look like

15   or what their business looks like?

16      A.    No.

17            MS. LASKY:   Object to the form.

18   BY MR. MCCARTER:

19      Q.    Okay.

20      A.    No.

21      Q.    Do you have some understanding that

22   other NextGear borrowers may be bigger than you?

23            MS. LASKY:   Object to the form.

24      A.    That's possible; yes.

25   BY MR. MCCARTER:
```



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 142 of 165 PageID #: 2310

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          170

 1    Q.   Do you -- have you heard of dealers

 2   having multiple lots?

 3    A.   With NextGear?

 4    Q.   Yeah.

 5    A.   No, I wouldn't know any --

 6    Q.   Okay.

 7    A.   -- anything about their personal business.

 8    Q.   Do -- do all dealers buy the same types of

 9   cars?

10    A.   No.

11    Q.   So they can be higher end?  Lower end?

12    A.   Yes.

13    Q.   Okay.  Some can deal in volume and some

14   can deal in just high-profit cars?

15    A.   Yes.

16    Q.   Okay.  Do you -- do all dealers go to

17   auctions?

18    A.   I assume --

19         MS. LASKY:  Object to the form.

20    A.   -- I -- I don't know about the other

21   people's business.  You know, I wouldn't have any

22   idea.

23   BY MR. MCCARTER:

24    Q.   Okay.  Do -- do you have some reason to

25   believe that all the other NextGear borrowers have



1    Q.    -- cars you might own --

2    A.    Yeah, other than cars.

3    Q.    -- do you own a building or --

4    A.    No.

5    Q.    -- anything like that?

6    A.    No.

7    Q.    Okay.  Do you have equipment for the

8    dealership?

9    A.    No.

10    Q.    Okay.  Is your job with Ford as an income

11    quality inspector -- incoming quality inspector, is

12    that a full-time job?

13    A.    Yes.

14    Q.    Okay.  And it has been for the whole

15    time?

16    A.    Yeah, for all -- yes --

17    Q.    Okay.

18    A.    -- 27 years.

19    Q.    Twenty-seven years?  Okay.  So when did

20    you work on the car business?  Like what time of

21    the day?

22    A.    Depending on what shift I was on,

23    weekends or during the day I would --

24    A.    Okay.

25    Q.    At the time -- at the time of the re --



```
 1   started, I'm trying to think what year.  Basically, I

 2   worked night shift up until two thousand possibly

 3   seven.  Then I went to day shift, a day-shift job.

 4      Q.   Is it fair to say your job with Ford is your

 5   main job?

 6      A.   Yes.

 7      Q.   Okay.  What -- what do you make from

 8   Ford now?

 9      A.   Last year maybe 100,000.

10      Q.   Okay.  And is that all salary, or is there a

11   bonus component.

12      A.   There are bonuses included in that.

13      Q.   Okay.  How's that changed since 2002 --

14   two -- I'm sorry, 2012?

15      A.   I -- really, the only other thing would

16   be -- is raises.

17      Q.   So roughly from what level?  I mean, I

18   don't need exact numbers, but. . .

19      A.   I'd say a 20% increase possibly.

20      Q.   Okay.

21      A.   You know, I'd -- I'd have to look back.  I

22   wouldn't have any -- you know, right off the top of

23   my head.

24      Q.   Is it steady 3 --

25      A.   Nor -- nor --
```



1    Q.    -- 3% a year --

2    A.    -- nor --

3    Q.    -- or 5% a year?

4    A.    Yeah, getting normal raises.  Yeah, I --

5    yes, that's about -- that's about right.

6    Q.    Okay.  And are the bonus -- what are the

7    bonuses based on?

8    A.    Profit sharing.

9    Q.    Okay.  And that income has not been

10   affected by the DSC situation?

11   A.    No.

12   Q.    Has it been affected for the positive?  I

13   mean, have you had more time to focus on Ford?

14   A.    Well, yes, I have the same time of -- the

15   other was part-time.

16   Q.    Okay.

17   A.    Same thing.

18   Q.    Were there -- at -- at the time of the

19   NextGear default in, you know, May of 2012, were

20   there a couple of vehicles involved that you had

21   acquired from ABC Bowling Green?  Does that ring

22   a bell?

23   A.    I'm sure I have.  I'm sure I've purchased

24   some there --

25   Q.    Okay.



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 146 of 165 PageID #: 2314

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          180

1    A.    -- floored them from there; yes.

2    Q.    Do you recall whether there were any

3   cars that you floored from ABC Bowling Green with

4   DSC that hadn't actually sold at ABC Bowling

5   Green?

6    A.    Yes.

7    Q.    Okay.  Can you tell me about those?

8    A.    Yes.  To put them on the floor plan,

9   they -- with a suggested -- started with Art Felix to

10  Lourdes to Donna Kronauer, they -- if I wanted to

11  put them on a  floor plan just to run them through

12  the auction and for -- to another dealer to the --

13  through the -- through there or to put them on --

14  we had to put them on the floor plan, more or less.

15   Q.    But when you say "run them through the

16  auction," you mean they ran through, and then they

17  didn't sell --

18   A.    Right.

19   Q.    -- and so you had a no-sale ticket.

20   A.    Yeah.

21   Q.    And then those were put on a floor plan

22  with a no-sale ticket.

23    A.    Yeah, or I purchased them from the

24  dealer whose name was in.

25   Q.    But you used the no-sale ticket to put



Case 1:14-cv-01589-TWP-DLP  Document 160-18  Filed 10/31/16  Page 147 of 165 PageID #: 2315

BARRY WAYNE MATTINGLY  30(b)(6)                October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                       181

 1  them on the floor plan.

 2    A.   Well, it was a -- it was a no-sale ticket,

 3  but they would -- it would turn into a sale, I guess

 4  you would say, to put them on the floor plan.

 5    Q.   Well -- so I -- and if you don't --

 6    A.   It's --

 7    Q.   -- know the answer, that's fine, but

 8  what's the value of -- of running it through and not

 9  selling it?  I mean, how does that help --

10    A.   Well --

11    Q.   -- for --

12    A.   -- to -- to -- what -- what you're -- what

13  you're asking is -- is to put them on the floor plan,

14  Lourdes and Art Felix would have to say, "Put

15  them -- run it through the auction as -- as -- as a

16  post or trade," and I don't -- I can't remember if

17  they do trades or not, but, "Run it through the

18  auction, have a -- you know, put it on there, and

19  we could put it on the floor plan as a sale through

20  the auction."

21    And the -- you know, I -- I said, "Well, that

22  sounds like a winner to me," because it sounded

23  like a good deal.

24    Q.   Okay.  And you're say -- so you're saying

25  they're fully aware that it didn't sell at auction.



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 148 of 165 PageID #: 2316

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           182

1   That is just ran and --

2     A.   They are --

3     Q.   -- no sale.

4     A.   Yes.  Yes.

5     Q.   Okay.

6     A.   Yes.

7     Q.   And do you know anything about a Post

8   Office Box 66 that titles may have been sent to

9   related to your dealer --

10    A.   Yes, it was Breckenridge Automotive.

11    Q.   Okay.  So what is -- what is Breckenridge

12  Automotive?

13    A.   It's -- it's a business that we would put

14  titles, you know, if it just -- detail work, parts, or

15  something, me and a friend of mine we had some --

16  starting a business, but it was never an official car

17  lot.

18          THE REPORTER:  I'm sorry.  It was or

19  wasn't?

20          THE WITNESS:  It was never a -- not an

21  official car lot.

22          THE REPORTER:  Thank you.

23    A.   As opposed to an auto sales.

24  BY MR. MCCARTER:

25    Q.   So you were doing business with a friend



1    under the name of Breckenridge Automotive.

2    A.    Yes.

3    Q.    And there you did detail work?

4    A.    Detail, parts, you know, tru -- you know,

5    anything that we needed to do.  We just never did

6    use it, and then dissolved it.

7    Q.    All right.  And was it -- so when you say

8    "dissolved it," does that mean it was a legal

9    entity?  Did you --

10   A.    Yes.

11   Q.    -- incorporate it?

12   A.    Yes, it was an LLC.

13   Q.    Okay.  Who was the friend?

14   A.    It was Richard Smiley, and the entity was

15   owned by Denise, my wife.

16   Q.    Is there any reason you would have titles

17   for cars that were on your NextGear floor plan or

18   your DSC floor plan sent to that address?

19   A.    Yes.  They had to have a -- they had to

20   have a title from -- from a -- someone else other

21   than Barry Mattingly.  So with their -- they told me

22   how to do this, the reps, to put it into a dealership

23   name or some other name.  The dealer would sign

24   it to Mattingly Auto Sales, and we could put it on

25   the floor plan.



1    Q.   So you're -- you're saying that you were

2    advised to create a -- an apparent transaction

3    between Breckenridge and Mattingly Auto sales so

4    that that car could be floored with NextGear.

5    A.   Yes.

6    Q.   Okay.  And you're saying that the

7    DSC/NextGear people told you to do that?

8    A.   Well, they -- well, they said it would

9    work, and that's how I could put them on that way.

10   And that's what I did.

11   Q.   Okay.  And who specifically advised you

12   of that?

13   A.   The first person was Art Felix, and then

14   Lourdes and then Donna at MAFS.

15   Q.   Would -- but Donna wouldn't have spoken

16   for the Next -- for the DSC --

17   A.   No, no.

18   Q.   -- floor plan --

19   A.   No.

20   Q.   -- right?

21   A.   No, but she was aware of it because --

22   Q.   Okay.

23   A.   -- she'd actually done some for me,

24   so. . .

25   Q.   Would -- would DSC typically finance



1    those cars at the price that you showed on the

2    ticket between Breckenridge and you?

3        A.    Yes.

4        Q.    And that -- that was sort of an artificial

5    price that your two entities made up?

6        A.    Right, or -- it was always under their --

7    under their level, under their max-out range, I

8    guess.

9        Q.    And Breckenridge didn't have a line with

10   DSC --

11       A.    No.

12       Q.    -- right?  Okay.

13       So you're moving cars from Breckenridge's

14   name to Mattingly Automotive's name so they can

15   be put on Mattingly Automotive's floor plan?

16       A.    Correct.

17       Q.    Okay.  So how did Breckenridge acquire

18   the cars in the first place?

19       A.    Oh, that -- I mean, just regular

20   purchases.  I mean, just trades or trade-ins or

21   anything like that.

22       Q.    Were they purchased and traded -- were

23   they purchased by Breckenridge or traded to

24   Breckenridge, or had they been purchased by

25   Mattingly in the first place?



Case 1:14-cv-01589-TWP-DLP  Document 160-18  Filed 10/31/16  Page 152 of 165 PageID #: 2320

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          186

 1          MS. LASKY:  Object to the form.

 2      A.    Purchased by Mattingly.  I mean, it was

 3   our -- it was our vehicle, but they told me how to

 4   show -- I needed to have the title done to someone

 5   else's name.

 6   BY MR. MCCARTER:

 7      Q.    Okay.  So did the title show Mattingly

 8   Auto Sales assigned to Breckenridge, Breckenridge

 9   assigned back to Mattingly Auto Sales?

10      A.    No, no.  It was a new title.  It was always

11   dealer at the la -- it was -- would say Bracken --

12   so this title here was Breckenridge Automotive, or

13   whoever it may be; then I would dealer assign it to

14   Mattingly Auto Sales, and then sold -- you know,

15   put on the floor plan.

16      Q.    Okay.  So did -- did Breckenridge

17   Automotive have a dealer license?

18      A.    No.

19      Q.    Okay.  So it was dealing in cars without a

20   dealer license.

21      A.    Right.

22      Q.    Okay.

23      A.    It was like an individual, your name or

24   something like that.  It just couldn't be in my

25   personal name or Mattingly Auto Sales to -- on a



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            187

```
 1   trade.
 2       Q.    Do you have any idea how many times
 3   this happened --
 4       A.    No.
 5       Q.    -- over the years?
 6       A.    That -- no.
 7       Q.    Estimate?
 8       A.    No, I wouldn't have any idea.
 9       Q.    Okay.  Do you -- do you have a sense of
10   whether Breckenridge Automotive was supposed to
11   have a license under the law to transfer those
12   cars?
13       A.    Yes, they would not have -- it was --
14   there's no need to, because it was not a
15   dealership; don't need to have a license.
16       Q.    Okay.  All right.
17       So -- but just to be clear:  We're talking about
18   cars that belong to Mattingly Auto Sales being
19   assigned to Breckenridge and being assigned back
20   to Mattingly so they could be put on the NextGear
21   floor plan.
22       A.    Correct, but it actually wouldn't be
23   assigned -- well, as far as what you're assigning,
24   it would be tilted.  I'd have a title.
25       Q.    Okay.
```



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           188

```
 1      A.    And -- and then -- then reassigned -- or
 2   assignment to Mattingly Auto Sales.
 3      Q.    Okay.  Breckenridge got that title in its
 4   name in the first place somehow; right?
 5      A.    Right.
 6      Q.    All right.  So how did it do that?
 7      A.    Just transferred it.
 8      Q.    From Mattingly Auto Sales.
 9      A.    Or -- Mattingly Auto Sales or a trade-in
10   from John Doe or whoever.
11      Q.    Okay.  So we're talking about cars that
12   were originally purchased by Mattingly Auto Sales
13   or traded to Mattingly Auto Sales.  You assigned
14   those to Breckenridge.  Breckenridge gets a new
15   title, and assigns those back to you.
16      A.    Through the -- run through the auction.
17      Q.    So the second part -- the second
18   transaction from Breckenridge to you is run
19   through the auction?
20      A.    Or -- yeah, or -- could be, or -- I could
21   run it through the auctions or just give it to them
22   and say, "Here, Donna.  Here's the title.  Put it on
23   the floor plan."
24      Q.    Okay.  That's fine.  I -- I just want to be
25   clear that they -- these are cars started out
```



```
 1   belonging to Mattingly --

 2     A.   Yeah.  Well --

 3     Q.   -- Auto Sales; right?

 4     A.   I misspoke, I guess.  Breckenridge

 5   Automotive couldn't run it through the auction

 6   because they're not a dealer.  Your -- that's

 7   correct; yeah.

 8     Q.   They -- they could not them run through

 9   auction.

10     A.   Right.

11     Q.   Okay.  So again, Mattingly Auto Sales

12   may have acquired it at auction or by trade-in;

13   right?

14     A.   Uh-huh; correct.

15     Q.   Okay.  And then you assign them or

16   convey them to Breckenridge Automotive; right?

17     A.   Right.

18     Q.   And that wouldn't happen at auction

19   because Breckenridge couldn't go to auction.

20     A.   That's correct.

21     Q.   Okay.  And so then Breckenridge is going

22   to assign them back to you, Mattingly Auto Sales.

23   And they're getting -- they're not going to go to

24   auction because Breckenridge can't go to auction;

25   right?
```



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          190

1    A.    Correct.

2    Q.    And then Mattingly Automotive is going to

3  take that car and put it on its -- its DSC floor plan.

4    A.    Correct.

5    Q.    Okay.  Do you think that happened more

6  than five times?

7    A.    I -- I'd -- I'd have to look.  I -- I don't

8  know.  It's possible.  It's possible.  I don't know.

9    Q.    Okay.  Did you have any sense that DSC

10  might be relying on the --the price that you --

11  Breckenridge created to Mattingly as the floor plan

12  amount?

13         MS. LASKY:  Object to the form.

14    A.    You have to -- run it by me again.

15  BY MR. MCCARTER:

16    Q.    Okay.  So did -- did DSC finance those

17  cars at the price that Matt --

18    A.    We put on -- yes.

19         MS. LASKY:  Wait, wait, wait.

20  BY MR. MCCARTER:

21    Q.    -- that you put on?

22         MS. LASKY:  Let him -- let him finish.

23         THE WITNESS:  I'm sorry.  I'm sorry.

24  BY MR. MCCARTER:

25    Q.    Did DSC finance those cars at the price



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           191

```
 1   that Breckenridge and Mattingly assigned to that
 2   second transaction?
 3     A.   Yes.
 4     Q.   Okay.  Did -- were you -- as Mattingly
 5   Auto Sales or through Breckenridge, were you ever
 6   involved in creating bills of sale later on cars that
 7   had already been assigned to you?
 8     A.   To put them on MAFS and the -- yes, we'd
 9   have to have a bill of sale.
10     Q.   Okays.  So sometimes you would have
11   gotten the car title to you long before, but then
12   you would create a bill of sale to -- to put it on the
13   floor?
14     A.   Yes.  I'd have to have a -- from
15   Breckenridge, just use it as example, Breckenridge
16   to Mattingly, I'd have to have a bill of sale.  And
17   they would -- that was also a requirement from the
18   floor plan companies.
19     Q.   Okay.  So I -- I understand the floor plan
20   companies required a bill of sale, but are you --
21   are you saying the floor plan companies told you
22   to go out and create a bill of sale for a transaction
23   that occurred months before and will --
24     A.   Yes.
25     Q.   -- put it on the floor?
```



1    A.    Uh-huh.

2    Q.    Okay.  Did you -- did -- at the time, did

3  you see any problem with that, that it might be a

4  mis-representative bill of sale?

5    A.    No, because both -- like I said, both

6  representatives were aware of it, so it seemed like

7  something like, you know, they -- they didn't mind.

8    Q.    Okay.  Would -- would the -- the -- when

9  you and -- when Breckenridge assigned price on its

10  deal on Mattingly Auto Sales, was that always the

11  same price at which Mattingly had acquired it at

12  auction?

13    A.    That I wouldn't know.  I can't remember

14  all that stuff.  It's -- that's so long ago.

15    Q.    Is it possible --

16    A.    I couldn't give you numbers.

17    Q.    -- it was at a higher price?  So in other

18  words, you originally required as Mattingly at one

19  price, then you convey to Breckenridge for -- for

20  nothing, and then Breckenridge conveys it back to

21  Mattingly at a higher price?

22        MS. LASKY:  Object to the form.

23    A.    I  mean, it's possible depending on if

24  there was repairs involved.  I -- I -- I just don't

25  recall specifics.



```
 1    BY MR. MCCARTER:
 2      Q.    Okay.  So -- but in -- if that happened,
 3    you could be financing it with NextGear at a higher
 4    price than you paid at auction for it.
 5            MS. LASKY:  Object to the form.
 6      A.    I'd just have -- it's -- I guess that would
 7    make sense, but I just -- I don't recall doing it.  I
 8    mean, I just don't recall the details.
 9    BY MR. MCCARTER:
10      Q.    You don't recall either way?  You can't
11    say --
12      A.    No, I --
13      Q.    -- it happened?
14      A.    -- I don't know.  I don't know.
15            MS. LASKY:  Object to the form.
16    BY MR. MCCARTER:
17      Q.    So besides Breckenridge -- oh, strike
18    that.
19      Breckenridge Automotive, LLC, is that a
20    Kentucky LLC?
21      A.    Yes.
22      Q.    Okay.  Is it still existing?
23      A.    No.
24      Q.    When was it shut down?
25      A.    I think maybe two years ago.
```



1    Q.    Okay.  Did it file tax returns?

2    A.    Yes.

3    Q.    All right.  And did it have profit --

4    A.    No.

5    Q.    -- during -- at all?

6    A.    Huh-uh.

7    Q.    Okay.  Did it file its own returns, or did

8  it -- or was it passed through to you, and you --

9    A.    It filed its own return -- had to file --

10  LLCs in Kentucky have to file their own return.

11   Q.    Okay.  And did Jackson Hewitt do those,

12  too?

13   A.    Yes.

14   Q.    Okay.  And how -- what -- what years,

15  roughly, was Breckenridge Automotive in

16  existence?

17   A.    I'd say  10,  11,  12 -- probably about

18  four years, from, say,  12 to -- or  11 -- or   10

19  to  14 possibly.

20   Q.    2010 to 2014?

21   A.    Possibly, yes.

22   Q.    Okay.

23   A.    I'd have to -- I don't remember, to be

24  honest with you.  That's close.  Somewhere in that

25  time frame definitely.



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 161 of 165 PageID #: 2329

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           195

1    Q.   Do you recall Breckenridge Automotive

2    ever dealing at auction, Manheim or otherwise?

3    A.   No.

4    Q.   Okay.  Have you or your wife ever done

5    your own business under any other entity besides

6    Mattingly Automotives -- Automobile Bill -- excuse

7    me, Mattingly Automotive Sales, Inc. or

8    Breckenridge Automotive?

9    A.   No.

10   Q.   Okay.  All right.

11   I'm just going to read a paragraph to you from

12   your declaration in this case to support your

13   motion for class certification.  Paragraph 7 says,

14   [reads] As a result of Defendants' conduct alleged

15   in the verified amended complaint, Mattingly Auto

16   Sales has suffered monetary loss, including, but

17   not limited to, interest and fees on money not lent

18   and damage to its business relationships.

19   Do you recall signing that?

20   A.   It sounds familiar, but. . .

21   Q.   Okay.  Is that true?

22   A.   Yes.

23   Q.   All right.  So we covered damages

24   earlier, but do you -- what is your best

25   understanding of -- of the amount of your damages



Case 1:14-cv-01589-TWP-DLP   Document 160-18   Filed 10/31/16   Page 162 of 165 PageID #: 2330

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           196

1   as we sit here today?

2     A.    I wouldn't --

3           MS. LASKY:   Objection.

4     A.    I wouldn't have any idea about that.

5   BY MR. MCCARTER:

6     Q.    Okay.  What is your understanding of the

7   type of damages you have as we sit here today?

8     A.    I -- like I said, once again, I -- I just

9   wouldn't have any idea; wouldn't know how to

10  answer that one.

11    Q.    Okay.  So I -- I think you said you

12  sometimes would work on some cars you acquired

13  at auction before you sold them; is that right?

14    A.    Correct.

15    Q.    Okay.  What -- I mean, just give me some

16  examples of what that might look like.

17    A.    Cleanup, tires, maybe some paint work,

18  just various.

19    Q.    All right.  And those things cost money?

20    A.    Absolutely.

21    Q.    And do -- do you have some way to track

22  those and take them off out of your profit on the

23  unit?

24    A.    Yes.

25    Q.    Okay.  And how do you do that?



Case 1:14-cv-01589-TWP-DLP  Document 160-18  Filed 10/31/16  Page 163 of 165 PageID #: 2331

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          197

 1    A.    What -- what do you mean?

 2    Q.    How do you figure out -- how do you keep

 3  track of what you --

 4    A.    Oh.

 5    Q.    -- spend on a car --

 6    A.    We have a fi --

 7    Q.    -- that's not --

 8        MS. LASKY:   Wait.   Wait a minute.

 9  BY MR. MCCARTER:

10    Q.    Let me finish.

11    A.    I'm sorry.

12    Q.    How do you keep track of what you spend

13  on a car besides just purchase price and figure out

14  what your net profit is?

15    A.    We have a file for each individual, say,

16  like a repair shop, paint shop, different -- any time

17  a ticket's made, it goes to that -- into their folder.

18    Q.    Okay.   But you track that by car with

19  the --

20    A.    Yeah.   We --

21    Q.    -- deal jackets --

22    A.    -- also can do it by cars.

23    Q.    -- with the dealer jackets we talked about

24  before; right?

25    A.    Yes.



1    Q.   Okay.

2    A.   Yes.

3    Q.   I'm going to show you one more exhibit

4   here.  I mean, I'm not promising it's the last, but it

5   might be.

6         MS. LASKY:  20.

7         MR. MCCARTER:  Let me get my stickers.

8   Thank you.  This will be called Exhibit 20.

9   [WHEREUPON, document referred to is marked

10   Defendants' Exhibit 20 for identification.]

11   BY MR. MCCARTER:

12    Q.   And this is labeled -- Bates labeled

13   NextGear -- I'm sorry, NGR 1 through NGR 10.

14   And I'll represent to you that this is a report that

15   NextGear created in this litigation to show the

16   vehicles that you had floor planned with it.

17    I don't -- I'm just curious:  Have you seen this

18   before?

19    A.   I believe so.

20    Q.   Okay.

21    A.   I believe we have that.

22    Q.   I'm -- I'm not holding you to any specific

23   transaction, but when you reviewed it and as you

24   review it now, do you see anything that looks

25   wrong or completely out of whack on it?



```
 1      A.   No, not --
 2           MS. LASKY:  Object to the form.
 3      A.   I wouldn't really know.  It's -- no, it looks
 4   like a list of cars, you know.
 5   BY MR. MCCARTER:
 6      Q.   I'll just tell you, too, the stock numbers
 7   on here go through 165.  They start at 1, and then
 8   they go through 165 as far as dates, you know,
 9   earliest in time to latest in time.
10      Does -- does that sound about like the number
11   of cars you would have floor planned with
12   DSC, 165?
13           MS. LASKY:  Object to the form.
14      A.   I wouldn't have any idea.  I'd have to go
15   back to look.  I wouldn't know a -- wouldn't know a
16   specific number.
17   BY MR. MCCARTER:
18      Q.   Okay.  And I don't -- I'm not sure where
19   I've seen it, but I thought in either your
20   interrogatory responses or your declaration that
21   you estimated 100 or so cars with DSC.  Does that
22   sound about right?
23      A.   I believe.
24      Q.   Okay.  And so if there were 165, that
25   wouldn't be way off?
```

