UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
(Indianapolis Division)

| | | |
|---|---|---|
| **RED BARN MOTORS, INC.,** | * | **DOCKET NO. 1:14-cv-01589-TWP-DKL** |
| **PLATINUM MOTORS, INC.,** | * | |
| **MATTINGLY AUTO SALES, INC.,** | * | **CLASS ACTION** |
| **YOUNG EXECUTIVE MANAGEMENT** | * | **Jury Trial Demanded** |
| **& CONSULTING SERVICES, INC.,** | * | |
| **Individually, and on behalf of other** | * | |
| **members of the general public** | * | |
| **similarly situated,** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **COX ENTERPRISES, INC.,** | * | |
| **COX AUTOMOTIVE, INC.,** | * | |
| **NEXTGEAR CAPITAL, INC.,** | * | |
| **F/K/A DEALER SERVICES** | * | |
| **CORPORATION, successor by merger** | * | |
| **with Manheim Automotive Financial** | * | |
| **Services, Inc., and JOHN WICK.** | | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

The Named Plaintiffs, Red Barn Motors, Inc. ("Red Barn"), Platinum Motors, Inc. ("Platinum"), and Mattingly Auto Sales, Inc. ("Mattingly," with the other named plaintiffs, the "Named Plaintiffs"), individually and on behalf of those individuals and entities who are similarly situated ("putative Class Members"; with Named Plaintiffs, the "Plaintiffs") respectfully submit this Reply Memorandum in support of their motion for class certification (R. Doc. 153).

## PLAINTIFFS' BREACH OF CONTRACT CLAIM

I.    **Plaintiffs' Proposed Class Should Include Only Customer Dealers Who Had Floorplan Agreements With DSC, Not With MAFS.**

As an initial matter, many of Defendants' arguments about Plaintiffs' proposed class incorrectly assume that the proposed class would include dealers who contracted with MAFS. *See*

Defendants' Response in Opposition to Plaintiffs' Motion for Class Certification (R. Doc. 160) ("Opp."), at pp. 3-4, 19, 20-21. That was not Plaintiffs' intent in crafting the proposed class definition. Rather, Plaintiffs' proposed class would only include customer dealers who contracted with DSC, not MAFS. Indeed, Plaintiffs' opening brief discussed and attached as exhibits the substantively identical form contracts used by DSC (not MAFS) in 2005 through 2012, prior to the DSC/MAFS merger in 2013.[1] Plaintiffs propose the following, slightly revised class definition:

> All used car dealers in the United States of America that were parties to a Floorplan Agreement **with DSC, n/k/a NextGear,** effective during the time period of January 2005 through July 2013.

As a result of this clarification, Defendants' assertion that "different putative class members signed different contracts containing different terms with different predecessor companies" is inaccurate. Plaintiffs' proposed class only includes customer dealers who were parties to a Floorplan Agreement with DSC (n/k/a NextGear) during the relevant time period. Defendants assert, in Mr. Galema's declaration, that "[f]rom January 2005 through July 2013, various customers of MAFS and DSC signed materially different versions and subsets of MAFS' and/or DSC's respective agreements." Galema Decl., ¶ 9. Plaintiffs acknowledge that the MAFS contracts were different than the DSC contracts and thus have excluded MAFS customers from the proposed class (unless, of course, those plaintiffs had floorplan agreements with DSC as well).[2]

---

[1] *See* R. Docs. 154-9 through 154-16 (sample DSC contracts for 2005, 2006, 2007, 2008, 2009, 2010, 2011, and 2012). Plaintiffs also attached a sample 2013 contract produced by NextGear dated July 2013 which was the first contract produced by Defendants containing different language as to the charging of interest. *See* R. Doc. 154-17. In the declaration of Adam Galema, NextGear's Vice President of Finance, he describes that contract as "the primary NextGear form of Demand Promissory Note and Loan and Security Agreement used beginning in 2013". R. Doc. 160-2 (Galema Decl.), ¶ 12.

[2] Plaintiffs take no position as to the interpretation of the MAFS contracts and do not concede that the MAFS contracts allowed interest to be charged prior to money being lent to MAFS dealers. Plaintiffs simply note that the MAFS contracts were different from the contracts used by DSC.

However, as set forth in Plaintiffs' original memorandum, the DSC contracts produced by NextGear that were used between 2005 and the MAFS merger in 2013 were indeed form contracts identical in all pertinent respects.[3] This is consistent with the 2011 testimony of John Wick[4]:

> Q    Okay. Did any dealer ever tell you they wanted to make changes to the form before they signed it?
> A    They could have told our branch managers. We made it clear, obviously, that these are forms and happy to answer questions if they have them, but **it's not a document that we're going to negotiate.**
> Q    **So it's a – what we might call a "take-it-or-leave-it document"?**
> A    **Sure.**
> Q    Okay.
> A    **Kind of like a credit card application or a credit card agreement.**

February 2011 Deposition of John Wick ("Wick Depo."), excerpt attached as **Exh. A** hereto, 98:13-25 (emphasis added).[5] Defendants now assert that the agreements used by DSC were "substantially and independently revised at least twice since 2007 and have also been revised for specific customers, after negotiation with those customers, on numerous other occasions" and different customers signed "materially different" versions of the DSC contracts. Galema Decl., ¶¶ 9, 11. However, they have produced no documents supporting that assertion, and at Mr. Galema's deposition, he could not describe any differences between the different DSC contracts. *See* Nov. 10, 2016 Deposition of Adam Galema ("Galema Depo.") (transcript attached as **Exh. C** hereto),

---

[3] *See* R. Doc. 154, pp. 4-5.
[4] At the time of his deposition, Mr. Wick was the general counsel and secretary of DSC. *See* Wick Depo., 9:12-14. Today, he is NextGear's Senior Vice President of Lending and International Operations. *See* https://www.nextgearcapital.com/about/leadership/john-wick/.
[5] *See also, e.g.,* Deposition of Stuart LaBauve ("LaBauve Depo."), Red Barn's NextGear account executive, excerpt attached as **Exh. B** hereto, 103:2-104:25 (explaining that NextGear's corporate office would send the form floorplan agreements to the account executives and confirming that those contracts were "take-it-or-leave-it").

32:18-33:6. Because the 2005 through 2012 DSC contracts are substantively identical form contracts,[6] this case is particularly appropriate for class adjudication. *See Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir. 1998).[7]

## II.  Plaintiffs' Breach of Contract Claim Raises Common Issues of Fact or Law.

Plaintiffs' contract claim is fundamental to this case. It centers on the factual allegation that NextGear, as a regular practice applicable to all of its customer dealers, charged interest and fees on money not lent, that when a customer dealer made a purchase at an auction and used its NextGear floor plan to finance that purchase, NextGear would begin charging interest and fees as of the date of an auction rather than the often-later date that money was advanced on a dealer's behalf. Indeed, Mr. Galema testified that with respect to auction purchases by dealers, interest generally would be charged from the floorplan date—the date of the auction at which the dealer purchased the vehicle. *See* Galema Depo., 36:21-37:1; *see also* LaBauve Depo., 125:5-17.[8] No DSC contract from 2005 through 2012 defines the term "floor plan date" or allows interest to be charged from such a date. Rather, as set forth above, NextGear stated that it would only charge interest from the time of an advance to a third party.[9] Mr. Galema further confirmed that the date

---

[6] *See* R. Docs. 154-9 through 154-16

[7] To the extent that the Court finds there to be a factual issue as to whether the pertinent contracts are indeed substantively identical form contracts, Plaintiffs respectfully submit that the Court should accept additional evidence on that limited issue as part of its consideration of Plaintiffs' motion for class certification.

[8] Mr. Galema stated that there were times where interest was not charged until later, giving the example of where the dealer did not floorplan the vehicle right away, instead paying cash and floor planning it some time later. Galema Depo., 37:2-19. However, for the typical auction transaction, a dealer would floorplan the vehicle on the auction date and would be charged interest right away.

[9] The 2013 NextGear contract, page NG005148, section 3a, interest rates, states the interest begins to run from the floorplan date. Page two of the Demand promissory note, NG005161, states that (25) "Floorplan Date" shall mean (a) for a Universal Source Purchase, the sale date, regardless of the date the Floorplan Advance is actually requested or funded; and (b) for a Specific Source Purchase, the date the request for the Floorplan Advance is received by Lender, regardless of the

that NextGear "sent cash to the auction" could be days or weeks later than the day that the dealer bought the car from the auction. *See* Galema Depo., 38:8-24. In short, NextGear dealers were often charged interest for days or weeks before any money was loaned to them. The best way for this to be shown is through the account summaries that Defendants produced for the Named Plaintiffs. *See* NGR_000001-000035 (attached as **Exh. D** hereto).[10]

A review of one transaction on the Red Barn summary is instructive. *See* NGR-000011-33. On August 26, 2011, Red Barn purchased a 1997 Ford Explorer XLT at auction, as reflected by the entries in the "flooring date" and "unit purchase date" columns. *See* Exh. D at NGR_000014. DSC began charging interest as of that date. *See* Galema Depo., 55:8-12. Red Barn paid off DSC, with interest, on September 12, 2011, as reflected by the entry in the "completed date" column. *See* Exh. D at NGR_000014; Galema Depo., 54:20-55:7. Meanwhile, DSC ***did not pay the auction for that vehicle until October 7, 2011, almost a month later,*** as reflected by the entry in the "Total for" column. *See id.* That column reflects the date on which DSC sent cash to the auction as payment for the vehicles listed above. *Id.,* 38:8-14. This demonstrates that DSC was charging interest on money not lent, a practice that was in no way disclosed and in fact contrary to the plain language of the contracts.

Defendants' assertion that putative class members signed different contracts is contradicted by the fact that the 2005 through 2012 contracts that have been produced are substantively

---

date such Floorplan Advance is actually funded." *See* R. Doc. 154-17. Thus, while the current version of the NextGear contract may allow NextGear to charge interest from the date of the auction sale, the "advance" language NextGear used from 2005 through 2012 does not allow it to charge interest from the date of the auction, only when such funds are paid to a third party.

[10] These summaries were produced by NextGear's technology team specifically for purposes of this litigation. Galema Depo., 25:10-20. Dealers did not have access to that type of report. *Id.,* 55:13-17.

identical. Moreover, even if there were three different iterations of the DSC contract as asserted by Mr. Galema,[11] regardless of which iteration a dealer signed, NextGear consistently charged interest on auction transactions based on the floorplan date (*see* Galema Depo., 33:7-13)—a fact not disclosed in any of the contracts. The issues of whether the putative class members were, as Plaintiffs allege and as the sample DSC contracts suggest, parties to substantively identical form contracts with NextGear, and whether those contracts allowed NextGear to charge interest and fees on money not lent, are important and common issues of fact and law to be determined on a class wide basis. Either of these questions would be sufficient for a finding of commonality, as only one common question need exist to meet this prong for certification. *See, e.g., Keele*, 149 F.3d at 594; *Rosario v. Livaditis,* 963 F.2d 1013, 1017 (7th Cir. 1992); *Cunningham Charter Corp. v. Learjet, Inc.,* 258 F.R.D. 320, 328 (S.D. Ill. 2009).

### III.   The Common Questions Relative to Plaintiffs' Breach of Contract Claim Predominate Over Any Individual Issues Raised by Defendants.

Defendants' arguments regarding predominance, as they pertain to Plaintiffs' breach of contract claim, fail for several reasons. First, Defendants incorrectly presume that the proposed class would include dealers who had contracted with MAFS. Without such dealers in the proposed class, any individual issues that could be raised by the need to interpret both the DSC and the MAFS contract are moot.

Second, Defendants make much of the choice of law provision found in "the DSC agreement" (Opp. at 21)[12]—a phrase highlighting that there was in fact one form contract used by DSC during the applicable time period. However, the fact that the law applicable to two groups of

---

[11] *See* Galema Decl., ¶ 11 and Galema Depo., 32:18-33:6.
[12] Defendants also highlight the different choice of law provision found in the MAFS contract, but that point is moot in light of the clarified definition including only DSC dealers.

dealers differs—California law for California dealers and Indiana law for all other dealers—does not pose individual issues that would predominate over the common questions central to this litigation—namely, the propriety of DSC's charging of interest and fees prior to lending money to its dealers. If the Court deems the choice of law issue significant to its management of the class, the Court has the power to create subclasses, such as one subclass of California customer dealers and another of all other dealers. *See* Fed. R. Civ. P. 23(c)(5).[13]

Third, Defendants' protests regarding other individual factual issues—that the timing of NextGear's payments to auctions varied, that dealers purchased vehicles at different auctions, and that dealers purchased other vehicles from non-auction sources—are red herrings in the predominance analysis. None of these issues will impose substantial burdens on the Court. Rather, the Court will be able to use NextGear records (for example, the account summaries) to determine when each car was floor planned by a particular dealer, when NextGear began charging interest, and when NextGear made payment on the dealer's behalf for each vehicle. Mr. Galema testified that NextGear's computer system can produce that data on a per transaction and a per customer basis, and that he has reviewed such data in the past. Galema Depo., 41:6-16; 52:23-53:12.

---

[13] *See also, e.g., Thomas v. UBS AG,* 706 F.3d 846, 849 (7th Cir. 2013) ("The problem of choice of law created by a nationwide class action governed by laws of different states or other jurisdictions is usually solved by the district court's certifying a different subclass for class members in each jurisdiction whose law differs in some relevant respect from that of the other jurisdictions in which members of the class reside or the allegedly unlawful acts were committed."); *Ellsworth v. U.S. Bank, N.A.,* No. C 12-02506 LB, 2014 WL 2734953, at *22 (N.D. Cal. June 13, 2014) (where contracts at issue were "form mortgage contracts involving identical harm with relatively small damages" and Plaintiffs proposed grouping the breach of contract classes into two subclasses to address differences in state law, the Court held the claims at issue were "precisely the sort of contract claims that lend[] themselves to class treatment"); NEWBERG ON CLASS ACTIONS § 7:32 (5th ed.) (discussing cases regarding subclassing based on state law variations).

As Mr. Galema explained at his deposition, NextGear began charging interest on the floorplan date, which is reflected in the transaction summaries, and the "total for" line on the summary reports produced by NextGear reflects the date that NextGear sent cash to the auction for the transactions listed. *See* Galema Depo., 38:8-14 ("Total for" is "the total of the transactions that were funded on that particular date" … "the date that NextGear sent cash to the auction."). All of this information came from NextGear's internal records. Individual factual questions, such as the location of a particular dealer purchase or NextGear's different agreements with different auctions, are irrelevant and do not predominate over the overarching common questions identified by Plaintiffs, most importantly whether NextGear's form contract allowed it to charge interest and fees on money not lent. That question and others raised by Plaintiffs' breach of contract claim are capable of proof at trial through evidence common to the class, specifically NextGear's internal records. *See, e.g., Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 818 (7th Cir. 2012).

Defendants' argument that "the proposed class includes thousands of putative class members who later [in 2013] signed new NextGear contracts" containing arbitration provisions and class action waivers[14] is premature and does not preclude certification. *See, e.g., Garcia v. JCPenney Corp., Inc.,* No. 12-CV-3687, 2016 WL 878203, at *7 (N.D. Ill. Mar. 8, 2016). In *Garcia*, as here, the defendant did not file a motion to compel arbitration but rather argued in opposition to class certification that all potential class members who signed documents containing arbitration provisions must assert their claims in individual arbitrations.  The court held that the arbitration agreement at issue was not grounds for denying class certification, and "the sensible course… [was] to decide whether to certify the class without considering the possibility of

---

[14] *See* Opp., p. 21 and Galema Decl., ¶¶ 12-13.

arbitration and then allow JCPenney, if it so chooses, to file its motion to compel arbitration." *Id.* (citations omitted). Plaintiffs submit that the same course of action is appropriate here.[15] In addition to being premature, Defendants' arbitration argument is unsupported by any documents showing how many putative class members purportedly signed the new contracts and how many did not, despite the fact that that information is readily available through NextGear's computer system.[16] Notably, Defendants have not challenged numerosity because there is no doubt that requirement is met here. Their assertions about certain putative class members' subsequently-signed arbitration provisions do not preclude certification.

Defendants also argue that statute of limitations issues "abound" on Plaintiffs' contract claims (Opp. at p. 23), but they provide no legal support for that assertion and their motion to dismiss did not raise the statute of limitations as a defense to Plaintiffs' contract claim. Even if Defendants had properly raised this defense, it would not preclude class certification. "[C]ourts have been nearly unanimous ... in holding that possible differences in the application of a statute of limitations to individual class members, including the named plaintiffs, does not preclude certification of a class action." *Tait v. BSH Home Appliances Corp.,* 289 F.R.D. 466, 486 (C.D. Cal. 2012) (citing *Schramm v. JPMorgan Chase Bank, N.A.,* LA CV09–09442 JAK, 2011 WL 5034663, *11–12 (C.D.Cal. Oct. 19, 2011) and 2 Newberg on Class Actions § 4:57 (5th ed.) ("Statute of limitations defenses—like damage calculations, affirmative defenses, and counterclaims—rarely defeat class certification.")).

---

[15] Of course, Plaintiffs reserve all rights to oppose any future motion to compel arbitration.

[16] At his deposition, Mr. Galema made a "pure guess" that 4,000 to 5,000 dealers were doing business with NextGear between 2005 and 2012 but not in 2013 (Galema Depo., 40:14-41:2), but that number certainly could be much higher. Mr. Galema confirmed that the exact number could be determined through NextGear's system because the company has a transaction history for every dealer. Galema Depo., 41:6-12.

Similarly, notwithstanding Defendants' argument that they have different individualized defenses, such as individual knowledge and setoff, against particular putative class members, *see* Opp. at p. 22, such defenses do not preclude class certification. *See, e.g., Holtzman v. Turza,* No. 08 C 2014, 2009 WL 3334909, at *5 (N.D. Ill. Oct. 14, 2009) ("the existence of individualized defenses does not preclude class certification") (citations omitted); *In re Checking Account Overdraft Litig.,* 307 F.R.D. 656, 679–80 (S.D. Fla. 2015) (setoff defense pertains to damages and does not defeat certification) (citations omitted*); In re Chase Bank USA, N.A. CHECK LOAN Contract Litig.,* 274 F.R.D. 286, 292, n. 11 (N.D. Cal. 2011) (same premise). Such defenses will not predominate over the issues common to the class and do not defeat class certification.

## IV.     Defendants' Typicality and Adequacy Arguments Lack Merit.

Defendants' arguments as to typicality fail with respect to the breach of contract claim. A named plaintiff's "claim is typical if it 'arises from the same event or practice or course of conduct that gives rise to the claims of other class members and ... her claims are based on the same legal theory.'" *Oshana v. Coca-Cola Co.,* 472 F.3d 506, 514 (7th Cir. 2006) (quoting *Rosario,* 963 F.2d at 1018. This requirement is "meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Id.* (internal quotations and citation omitted). Defendants do not—and indeed cannot—dispute that the Named Plaintiffs' breach of contract claim arises from the same practice and they suffered that same basic injury as every other member of the proposed Class. Quite simply, NextGear charged them interest and/or fees on money not lent. *See, e.g.,* Exh. D hereto (account summaries). As discussed below, while Defendants assert that the Named Plaintiffs differ from other putative class members in various respects, none of those purported differences affect typicality. Importantly, typicality "should be determined with reference to the company's actions, not with respect to particularized defenses it

10

might have against certain class members." *Wagner v. NutraSweet Co.,* 95 F.3d 527, 534 (7th Cir. 1996) (citing *Rosario,* 936 F.2d at 1018). Thus, what matters is that Defendants' actions were common across the class—charging interest on the floorplan date even when payment was not made to the auction until days or weeks later. The Named Plaintiffs are typical of the proposed class of dealers who were subject to the improper charges.

Defendants argue that the Named Plaintiffs' claims are not typical because they defaulted on their contractual obligations to NextGear. Yet, the Named Plaintiffs' defaults do not change the fact that they suffered the same essential injury as every member of the putative class as a result of Defendants' breach of contract—they were charged interest on money not lent by NextGear.[17] For the same reason, none of Defendants' potential individualized defenses against the Named Plaintiffs affect the typicality of their claims. First, Red Barn's preservation of its claims against NextGear in its bankruptcy proceedings does not affect the nature of its underlying claims, which are indeed typical of the class.[18] Second, Mattingly's settlement agreement with NextGear was extremely limited in scope and was reached in a small claims suit by Mattingly against NextGear relating to physical damage to Mattingly's garage.[19] That agreement has no bearing on Mattingly's

---

[17] Moreover, even if the Named Plaintiffs' contractual default status were relevant, they were far from alone in defaulting on their NextGear contracts. *See* Galema Depo., 41:22-42:7 (confirming that many dealers defaulted on their obligations to NextGear). Indeed, the Hamilton County, Indiana court records indicate that in just part of the pertinent time period (between May 2010 and the end of 2012), DSC/NextGear filed 541 collection suits against dealers and secured default judgments in nearly half of them (248 suits). *See* **Exh. E** hereto (highlighted entries representing cases in which default judgments were entered and redacted entries representing cases where DSC/NextGear was a defendant). Electronic records from prior to 2009 are not available through the Hamilton County court.
[18] Moreover, had Red Barn not preserved its claims in its bankruptcy, NextGear undoubtedly would have sought dismissal on that basis and argued that that fact made it an inadequate class representative.
[19] *See* R. Docs. 160-4 (small claims complaint) and 160-5 (settlement agreement).

claims in this suit or its ability to litigate this suit as a named plaintiff. Similarly, NextGear's allegations of fraud against Mattingly, which have never been substantiated or pursued by NextGear or any law enforcement authority, have no bearing on whether NextGear charged interest on money not lent in violation of its contract with Mattingly. Those allegations, like the so-called settlement and Red Barn's bankruptcy, are just red herring attempts to prevent class certification. Finally, Platinum's current status with the Virginia Secretary of State as terminated is irrelevant to the typicality analysis and does not prevent Platinum from suing or being sued, *see* Va. Code Ann. § 13.1-745(B)(5) ("Dissolution of the corporation does not… "[p]revent commencement of a proceeding by or against the corporation in its corporate name[.]"), nor does it affect the typicality of Platinum's claims.[20]

Defendants' arguments as to adequacy likewise fail. First, Defendants' reliance upon *Susman v. Lincoln Am. Corp.,* 561 F.2d 86 (7th Cir. 1977) for the assertion that a proposed class representative is not adequate if its interests are antagonistic to the class is misplaced. While that general premise is correct, the Named Plaintiffs' interests are not antagonistic to the class. Further, the *Susman* court's concern was with a situation not present here—where there is a "possible conflict of interest resulting from the relationship of the putative class representative and the putative class attorney[,]" as "courts fear that a class representative who is closely associated with the class attorney would allow settlement on terms less favorable to the interests of absent class members." 561 F.2d at 91.

---

[20] Further, as set forth in Nicol Zenia Perry's affidavit filed in support of class certification, Ms. Perry also owns another entity, Carkey, that financed vehicles through NextGear. *See* R. Doc. 154-3, ¶ 8.

In addition, Defendants rely upon *CE Design Ltd. v. King Architectural Metals, Inc.,* 637 F.3d 721, 728 (7th Cir. 2011) for the premise that a named plaintiff with credibility issues or individual defenses may not be an adequate class representative. In that case, however, the Court explained as follows:

> We don't want to be misunderstood, however, as extending an invitation to defendants to try to derail legitimate class actions by conjuring up trivial credibility problems or insubstantial defenses unique to the class representative. Serious challenges to typicality and adequacy must be distinguished from petty issues manufactured by defendants to distract the judge from his or her proper focus under Rule 23(a)(3) and (4) on the interests of the class, as emphasized in *Dubin v. Miller,* 132 F.R.D. 269, 272 (D.Colo.1990), where the judge, while decertifying the class, remarked that "few plaintiffs come to court with halos above their heads; fewer still escape with those halos untarnished. For an assault on the class representative's credibility to succeed, the party mounting the assault must demonstrate that there exists admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of the absent class members' claims."

(citations omitted). Plaintiffs respectfully submit that the individual defenses presented by Defendants in opposition to class certification do not constitute "serious challenges" to the Named Plaintiffs' typicality and adequacy. While the Named Plaintiffs may face allegations that they do not "have halos over their heads," they are adequate class representatives because they suffered the same injury due to NextGear's actions as the other class members and are committed to vigorously prosecuting this action on behalf of the Class.[21]

---

[21] *See* R. Docs. 154-2, 3, and 4 (Named Plaintiffs' declarations filed in support of Plaintiffs' motion for class certification). While Defendants assert that Platinum has not participated fully in discovery to date, Platinum's deposition, at Defendants' request, is scheduled for December 6, 2016 and Platinum is working on locating additional documents for production.

## PLAINTIFFS' RICO AND TORT CLAIMS

**I.    Plaintiffs' RICO and Tort Claims Raise Common Questions That Predominate.**

Contrary to Defendants' assertions, Plaintifs' tort and RICO claims, like their contract claim, raise common issues of fact and law that are capable of class wide resolution.

With respect to the RICO and constructive fraud claims, Plaintiffs allege a common scheme to defraud, that the NextGear Enterprise (including NextGear executives as well as auction houses and lower level NextGear employees such as account executives) knowingly established a uniform approach to, *inter alia,* secretly charge customers interest and fees to which NextGear was not entitled, to conceal that activity, and to carry out individual, fraudulent transactions (the automatic debits from Plaintiffs' accounts for interest and fees). Indeed, while discovery continues, the evidence thus far has shown that the documentation provided to NextGear's dealers (the members of the putative class) did not provide information as to when NextGear actually loaned money on the dealers' behalf. The account summaries that NextGear created and produced for purposes of this litigation provide this information, but those documents were never provided to NextGear's dealers. *See* Galema Depo., 55:13-17. Even if they had been, those summaries are impossible to interpret without inside knowledge of NextGear's practices. *See* LaBauve Depo., 187:2-6 (even if a dealer had access to the account summary document, it was not clear from that document what "Total For" meant). The summaries do not include an "Advance Made" or "Payment Made" column; rather, they include the "Total For" column, which Mr. Galema testified represented the date on which cash was sent to the auctions. The dealers only had access to Receivable Detail Reports, which did not include a "Total For" line or any other information as to when NextGear advanced funds on the dealer's behalf. *See* Galema Depo., 55:17-57:13 and Exh. 17 thereto. Mr.

14

Galema testified that he did not know why that information—when money was actually loaned—would be important to the dealer:

> 8   Q   What I was asking is, does that document, anywhere in
> 9      that document, show when NextGear or DSC --
> 10  A   Sorry.
> 11  Q   -- paid the auction?
> **12  A   No, it does not.  I don't know why that would be**
> **13     important to them.**

Galema Depo., 57:8-13 (emphasis added). Quite the opposite, when NextGear actually loaned money to Plaintiffs was of the utmost importance to Plaintiffs, and the omission and concealment of that critical fact was done on a class wide basis. Likewise, Plaintiffs allege that the electronic debits of interest and fees from their accounts were made fraudulently on a class wide basis in order to pay for the interest and fees charged made before money was lent. These are a few of the common factual issues relating to Plaintiffs' RICO and constructive fraud claims that can be determined across the class.

While Plaintiffs' RICO and tort claims surely raise some individual issues, importantly, all dealers were defrauded through a common scheme and using the same types of documents, including the Receivable Detail Reports, which (like the contracts themselves) lacked information as to when NextGear advanced funds on the dealer's behalf. Due to the common scheme to defraud and the uniform documents provided to each dealer, individual issues will not predominate here. *See, e.g., Nelson v. IPALCO Enterprises, Inc.,* 2003 WL 23101792, at *5-6 (S.D. Ind. Sept. 30, 2003) (certifying a class claim of fraud where the relevant representations were distributed or made available on a class wide basis); *Rohlfing v. Manor Care, Inc.,* 172 F.R.D. 330, 338 (N.D. Ill. 1997) (in RICO class actions based on fraud, "where the fraud was perpetrated in a uniform manner against every member of the class, such as when all plaintiffs received virtually identical written

materials from the defendants, courts typically hold that individual reliance questions do not predominate.") (citations omitted).

Plaintiffs' allegations also raise a common question of whether NextGear's prevailing practices in communicating with auction and other companies comprised a tortious interference with the Plaintiffs' business relationships with the used car auctions. The evidence thus far shows NextGear's practice was to report certain dealers to Auction Insurance Agency to be added to the "KO Book" or "Knockout Book" which was then provided to all auctions.[22] While Defendants assert that NextGear "was justified in reporting [the Named Plaintiffs'] default to parties with which it did business[,]" that argument bolsters the existence of common issues as to whether NextGear routinely blacklisted dealers by reporting them to Auction Insurance Agency and whether that practice constituted tortious interference with dealers' business relationships with the auctions. Plaintiffs' RICO and tort claims raise common question capable of class wide resolution.

## II.    Defendants' Arguments as to Typicality and Adequacy Are Unsupported in Light of the Evidence Thus Far on Blacklisting.

Defendants argue that the Named Plaintiffs' claims of injury are atypical "as they are based on supposed 'blacklisting' or tortious interference" (Opp. at p. 25), but this argument ignores the

---

[22] *See, e.g.,* Deposition of Lourdes Givens, Mattingly's account executive, excerpt attached as **Exh. F** hereto, 149:7-13 ("Auction Insurance Agency is an insurance agency that the auctions use, and they are the ones that manage the KO book" and the KO book "[s]tands for knockout book or knockout, and it's for people that are uninsured by Auction Insurance Agency."); Galema Decl., ¶ 37 ("NextGear shares dealer information with Auction Insurance Agency in certain cases, in exchange for access to KO Book information, which NextGear uses as one factor in its own underwriting and credit-review processes…"); Galema Depo., 51:5-16 (there is a "mutual benefit" between Auction Insurance Agency and NextGear in that NextGear "provide[s] information to them, you know, such as a defaulted dealer, that they can – you know, they choose to do with it what they want. I mean, they can, you know, enter that dealer into the KO book, if they choose. We also receive data back from them of the dealers that are listed in the KO book, and that information is used to make credit decisions at NextGear.").

Named Plaintiffs' other allegations of injury, including but not limited to the improperly charged interest and fees on money not loaned. Those damages alone, which were suffered across the entire class, confirm that the Named Plaintiffs' claims are indeed typical of the proposed class.

In addition, discovery continues, including on the issue of blacklisting by Defendants. Defendants submitted the October 31, 2016 declaration of Mr. Galema, NextGear's Vice President of Finance, in opposition to class certification, which included several assertions regarding the KO Book and blacklisting. *See* Galema Decl., ¶¶ 35-38. However, at his November 10 deposition, Mr. Galema stated that he possessed little firsthand knowledge of NextGear's interactions with Auction Insurance Agency. *See* Galema Depo., 47:9-14 (he was "aware of the relationship [between NextGear and Auction Insurance Agency] and mutual benefit but… do[es] not have direct involvement there"). Rather, NextGear's risk department has direct involvement with that agency. *See id.,* 47:15-17. Mr. Galema's lack of knowledge of the KO book is demonstrated by his assertion that Manheim Louisville, not DSC, reported Mattingly to Auction Insurance Agency in late 2012 (*see* Galema Decl., ¶ 46). That statement is belied by Defendants' own documents showing that DSC did report Mattingly to the KO Book in May 2012. *See* internal notes from DSC's computer system (attached as **Exh. G** hereto, at NG_003809 (5/15/12 note from Kevin Frederick stating, "had swat meeting submitting to ko book and will file lawsuit now. no need to wait"). Particularly in light of Mr. Galema's lack of knowledge on these issues, his factual assertions with respect to the KO Book fail to establish that the Named Plaintiffs' blacklisting claims were atypical.[23]

---

[23] Further, the documents produced by Defendants relating to the submission of dealer information to the K.O. Book are heavily redacted, only showing the Named Plaintiffs' names, which makes it impossible to discern how many other dealers were blacklisted. *See, e.g.,* August 24, 2012 email from Adri Campbell to Dealer Services regarding KO Report, attached as **Exh. H** hereto ("Below are the 11 DSC dealers added to the KO report this week. There were [      ] dealers removed.") (blank space in original) (redacting all dealer names except for Mattingly). If the Court deems it

## ASCERTAINABILITY AND SUPERIORITY

Defendants' argument that Plaintiffs' class definition is too broad because "most members of the putative class have not been injured" makes an improper assumption about the merits of this case. NextGear has not disputed—and cannot dispute—that it often charged interest and fees on auction purchases before lending money to its dealers. Rather, Defendants reargue that "[w]hen NextGear actually settled up with the auctions had no effect on those dealers because they were able to take possession of the cars and offer them for sale immediately—exactly what they bargained for." Opp. at p. 30. However, Plaintiffs do not allege that under the floorplan agreements, they bargained for the use of the cars but rather for *financing* the purchase of each car under certain agreed-upon terms. And Plaintiffs did not receive that bargained-for benefit because NextGear breached the terms of the contract by charging interest and fees on money not loaned. This resulted in substantial additional interest charges which Plaintiffs never agreed to pay. NextGear's suggestion that the timing of the actual payments on Plaintiffs' behalf is inconsequential ignores the central question of this case—whether the contracts permitted NextGear to charge interest and fees before advancing any funds. That question must be resolved on the merits, and the fact that Defendants disagree with the merits of Plaintiffs' claims does not negate Plaintiffs' injuries. The proposed class meets the ascertainability requirement.

Further, Defendants' arguments that a class action is not a superior method of adjudication here lack merit. First, the suggestion that the amount of potential individual damages at stake are sufficiently high that each "individual plaintiff has the incentive and ability to bring an action on its own behalf" is contradicted by the fact that most of the putative class members are small

---

necessary to determine for certification purposes how many dealers were blacklisted by NextGear, it should receive evidence on that issue. *See, e.g., Messner,* 669 F.3d at 811.

businesses which rely upon credit to operate and by the large number of default judgments entered against dealers in collection suits brought by NextGear. In light of the relatively low amount of damages suffered by each dealer and Defendants' class wide breach of form contracts with its customer dealers, this case is a true example of how a class action will "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." *Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750, 759 (7th Cir. 2014) (citation omitted).

Moreover, contrary to Defendants' assertion that likely variation in damages from plaintiff to plaintiff will eliminate any advantages of a class trial, courts in this Circuit have held that variations in damages will not defeat class certification. *See, e.g., Arreola v. Godinez*, 546 F.3d 788, 800–01 (7th Cir. 2008); *Warren v. Town of Speedway,* No. 1:13-CV-1049-JMS-DKL, 2013 WL 6729655, at *5 (S.D. Ind. Dec. 19, 2013) ("The Court finds that the fact that each class member may have suffered a different amount of damages is not problematic for class certification purposes, so long as 'the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses....'") (citing *Butler v. Sears, Roebuck & Co.,* 2013 U.S.App. LEXIS 17748, *13, 2013 WL 4478200 (7th Cir. 2013) and *Arreola,* 546 F.3d at 801)); *In re Fedex Ground Package Sys., Inc.,* No. 3:05MD527RM(MDL1700), 2006 WL 3755311, at *5 (N.D. Ind. Dec. 14, 2006) ("it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate.") (citation omitted).

Further, Defendants do not dispute that determining the amount of interest and fees improperly charged to Plaintiffs would be manageable on a class wide basis. Indeed, doing so would be very straightforward—a simple calculation, for each class member, based on information

19

already compiled by Defendants for the Named Plaintiffs, of the interest and fees charged between the floorplan date and the date of the advance. As discussed, Mr. Galema confirmed that NextGear's computer system can produce this information for all of its dealers.

With respect to Plaintiffs' business damages caused by Defendants' blacklisting, any manageability challenges that might arise could be easily addressed in a number of ways. As the Court held in *Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (7th Cir. 2004):

> Often, and possibly in this case as well, there is a big difference from the standpoint of manageability between the liability and remedy phases of a class action… Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues. Those solutions include "(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class."

(citations omitted). Accordingly, notwithstanding any individual damages issues, a class action is a superior method for adjudicating Plaintiffs' claims.

## <u>CONCLUSION</u>

For the foregoing reasons, as well as those set forth in Plaintiffs' original memorandum, this case satisfies all of the criteria for certification as a class action pursuant to Rule 23 and the proposed class should be certified.

Respectfully submitted,

*/s/ Kerry A. Murphy*
Gladstone N. Jones (La. Bar #22221) (*pro hac vice*)
Lynn E. Swanson (La. Bar #22650) (*pro hac vice*)
Kerry A. Murphy (La. Bar #31382) (*pro hac vice*)
**JONES, SWANSON, HUDDELL & GARRISON, L.L.C.**
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 523-2500
Facsimile: (504) 523-2508

James M. Garner (La. Bar #19589) (*pro hac vice*)
Ryan D. Adams (La. Bar #27931) (*pro hac vice*)
Matthew M. Coman (#23613) (*pro hac vice*)
**SHER GARNER CAHILL RICHTER KLEIN & HILBERT, L.L.C.**
909 Poydras Street
Suite 2800
New Orleans, Louisiana 70112
Telphone: (504) 299-2100
Facsimile: (504) 299-2300

Cassie E. Felder (La. Bar #27805) (*pro hac vice*)
**LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD**
9311 Bluebonnet Blvd., Suite A
Baton Rouge, Louisiana 70810
Telephone: (225) 291-1990
Facsimile: (504) 3109195

and

Kathleen A. DeLaney (#18604-49)
**DeLaney & Delaney LLC**
3646 North Washington Blvd.
Indianapolis, IN 46205
Telephone: (317) 920-0400
Facsimile: (317) 0404

***Attorneys for Plaintiffs***

21

## CERTIFICATE OF SERVICE

I do hereby certify that I have, on the 15th day of November, 2016, served a copy of the foregoing Reply Memorandum In Support of Motion for Class Certification and Appointment of Class Counsel on all counsel of record via electronic service by the court's CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

David J. Jurkiewicz
Paul D. Vinkp
Stephen D. Groth
**Bose, McKinney & Evans, L.L.P.**
djurkiewicz@boselaw.com, pvink@boselaw.com, sgroth@boselaw.com

Tracey K. Ledbetter
Jason S. McCarter
**Sutherland Asbill & Brennan LLP**
Tracey.ledbetter@sutherland.com, Jason.mccarter@sutherland.com

*/s/ Kerry A. Murphy*
Kerry A. Murphy