UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

RED BARN MOTORS, INC.,
PLATINUM MOTORS, INC.,
MATTINGLY AUTO SALES, INC.,
YOUNG EXECUTIVE MANAGEMENT &
CONSULTING SERVICES, INC.,
Individually, and on behalf
of other members of the
general public similarly
situated,
        Plaintiffs,        Docket No.
                        1:14-cv-01589-TWP-DKL
 vs.

COX ENTERPRISES, INC.,        Class Action
COX AUTOMOTIVE, INC.,
NEXTGEAR CAPITAL, INC. f/k/a
DEALER SERVICES CORPORATION,
successor by merger with
Manheim Automotive Financial
Services, Inc., and JOHN WICK,
        Defendants.

The deposition upon oral examination of

**ADAM GALEMA**, a witness produced and sworn before me,

Paula A. Morgan, Notary Public in and for the County

of Hamilton, State of Indiana, taken on the 10th day

of November, 2016, in the offices of Bose, McKinney &

Evans, 111 Monument Circle, Suite 2700, Indianapolis,

Marion County, Indiana, pursuant to the Federal Rules

of Civil Procedure.  This deposition was taken on

behalf of the Plaintiffs in the above-captioned

matter.

ASSOCIATED REPORTING, INC.
251 East Ohio Street, Suite 940
Indianapolis, Indiana 46204
(317) 631-0940
www.associated-reporting.com

**EXHIBIT "C"**

2

<u>APPEARANCES</u>

FOR THE PLAINTIFFS:

Jake Airey
Matthew M. Coman
SHER GARNER CAHILL RICHTER KLEIN & HILBERT
909 Poydras Street, Suite 2800
New Orleans, Louisiana 70112

Kerry A. Murphy (Via teleconference)
JONES SWANSON HUDDELL & GARRISON LLC
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130

FOR THE DEFENDANT
NEXTGEAR CAPITAL
F/K/A DEALER SERVICES CORPORATION:

Paul D. Vink
David J. Jurkiewicz
BOSE MCKINNEY & EVANS
111 Monument Circle, Suite 2700
Indianapolis, Indiana 46204

FOR THE DEFENDANTS:

Jason S. McCarter
SUTHERLAND ASBILL & BRENNAN LLP
999 Peachtree Street N.E., Suite 2300
Atlanta, Georgia 30309

ALSO PRESENT:

Rick Wright – in-house counsel DSC

1                        INDEX OF EXAMINATION

2                                                          Page
         EXAMINATION   (By Mr. Airey)                        4
3

4

5                          EXHIBIT INDEX

6

         No.     Description                          Page
7        1       DSC Floorplan Application              35
8                (NG004840-NG004851)

         2       DSC Floorplan Application              35
9                (NG004868-NG004883)

10       3       DSC Floorplan Application              35
11               (NG004906-NG004921)

         4       DSC Floorplan Application              35
12               (NG004943-NG004959)

13       5       DSC Floorplan Application              35
14               (NG004978-NG004995)

         6       DSC Floorplan Application              35
15               (NG005033-NG005052)

16       7       DSC Floorplan Application              35
17               (NG005060-NG005075)

         17      (Previously marked)                    56
18               Receivable Detail Report
19               (RB2178)

20

21

22

23

24

25

4

 1        A D A M   G A L E M A, the witness herein, having

 2        been first duly sworn to tell the truth, the whole

 3        truth, and nothing but the truth, was examined and

 4        testified as follows:

 5        EXAMINATION,

 6            QUESTIONS BY MR. AIREY:

 7   Q    Good morning, Mr. -- and how do you pronounce your

 8        last name?

 9   A    Galema.

10   Q    Okay.  My name is Jake Airey, and I represent the

11        plaintiffs in this case, Red Barn Motors case.  Could

12        you state your name for the record.

13   A    Adam Galema.

14   Q    And what's your address?

15   A    4913 Rustling Ridge Court.

16   Q    Have you ever given a deposition before?

17   A    No.

18   Q    Okay.  Basically, I'm going to be asking you

19        questions, and then you'll give me an answer.  If you

20        don't understand my question, please feel free to ask

21        me to rephrase it or you didn't understand it.

22   A    Okay.

23   Q    If you give me an answer, I'm going to assume that

24        you understood my question.  We have the court

25        reporter here who is taking down everything we say,

```
 1         so we can't talk over one another, and we also have
 2         to -- or you also have to give verbal responses.  Do
 3         you understand?
 4    A    Sure.
 5    Q    All right.  Have you ever testified as a witness
 6         before?
 7    A    Yes.
 8    Q    What was that case?
 9    A    It was a case several years ago involving another
10         dealer of ours.
11    Q    What was that dealer's name?
12    A    Autobahn Motors.
13    Q    Where were they located?
14    A    I can't recall.
15    Q    Do you remember where the court was?
16    A    It was here.
17    Q    What did that matter involve?
18    A    It was around just the fees and interest being
19         charged to them.
20    Q    Autobahn Motors was complaining about the fees that
21         were being charged to them?
22    A    I can't recall exactly their grounds, but that was
23         the basis of it.
24              MR. COMAN:  I'm sorry to stop.  Kerry just sent
25         me a note.  She said she can hear Jake but not Adam.
```

1           MR. VINK:  Maybe if Adam speaks up a little bit.

2           MR. COMAN:  Thank you.  I'm sorry.

3           MR. VINK:  That's fine.

4     Q   Do you remember what the outcome of the litigation

5         was?

6     A   Yes.  It was in our favor.

7     Q   Is that the only time you've testified?

8     A   Yes.

9     Q   I take it you've never testified as an expert witness

10        before?

11    A   Other than that case.

12    Q   Okay.  What's your background, as far as education?

13    A   Graduated from Anderson University in 2001 and also

14        have a master's degree from Liberty University.

15    Q   Where is Anderson University?

16    A   It's in Anderson, Indiana.

17    Q   And what was your degree in from Anderson?

18    A   Accounting.

19    Q   And is your master's in accounting as well?

20    A   Yes.

21           (Conference room telephone rings.)

22           MR. COMAN:  Can we go off the record.

23           (A discussion was held off the record.)

24    Q   Before we took that brief break you were explaining

25        you have a master's in accounting from Liberty

7

```
 1         University?
 2    A    Correct.
 3    Q    Are you a CPA?
 4    A    No.
 5    Q    Have you ever attempted to sit for the CPA exam?
 6    A    Not the CPA exam.
 7    Q    What certifications do you have?
 8    A    I have my CMA.
 9    Q    And what's that?
10    A    Certified Management Accountant.
11    Q    What's the difference between that and a CPA?
12    A    The CMA is more geared towards business finance and
13         accounting.  CPA would be geared more towards public
14         accounting.
15    Q    So, CMA, you are basically in-house, inside of a
16         business working?
17    A    Sure.
18    Q    What year did you get that?
19    A    I believe that was around 2004.
20    Q    What are the requirements for that designation?
21    A    You have to have, I believe, 150 credit hours,
22         experience in the business world as well.  There's
23         also CE requirements annually.
24    Q    What kind of CE requirements are there?
25    A    Thirty hours.  I believe, of that, two need to be in
```

8

```
 1        ethics.
 2    Q   And are those classes similar to the CPA classes, or
 3        are they just geared more toward the CMA designation?
 4    A   They can be anything.
 5    Q   Talk about your job history.  Did you work at any
 6        place while you were in college?
 7    A   Just odd jobs on campus at college.  Nothing --
 8    Q   How about when you were getting your master's degree?
 9    A   Yeah, I worked for DSC.
10    Q   And have you continuously worked for DSC since --
11        would that have been 2001?
12    A   No.
13    Q   What did you do when you worked at DSC while you were
14        getting your master's degree?
15    A   I was in the controller position at that time.
16    Q   What year was that?
17    A   That would have been two thousand -- that was 2009
18        through 2010, 2011.
19    Q   When did you get your master's in accounting?
20    A   Same.
21    Q   2009 through 2010?
22    A   Yeah.
23    Q   So after you graduated in 2001, what did you do?
24    A   I worked for Enterprise Rent-A-Car.
25    Q   What did you do there?
```

1   A   I was in the accounting department.

2   Q   What was your job title?

3   A   Staff accountant.

4   Q   How many years did you work there?

5   A   I worked there four years.

6   Q   Until roughly 2005?

7   A   Correct.

8   Q   Then where did you go?  DSC?

9   A   Yes.

10  Q   What was your first job at DSC?

11  A   Accounting manager.

12  Q   What did you do as the accounting manager?

13  A   Main functions involved AP, month-end close, you

14      know, journal entries, balance sheet reconciliations,

15      just general accounting responsibilities.

16  Q   In your capacity as account manager, did you have

17      interactions with the dealer customers?

18  A   No.

19  Q   Did you supervise anybody in that position?

20          (Conference room telephone rings.)

21          MR. AIREY:  Can we go off the record.

22          (A discussion was held off the record.)

23  Q   Did you supervise anybody as the accounting manager?

24  A   Yes.

25  Q   How many people did you supervise?

1    A    Three or four.

2    Q    And what did those people do?

3    A    They were booking journal entries, processing

4         accounts payable, more the day-to-day accounting

5         functions.

6    Q    And then the information that they would enter,

7         that's what you would use to do your month-end close?

8    A    Correct.

9    Q    Who did you report to when you were the accounting

10        manager?  Who was your boss?

11   A    The name?

12   Q    Yes.

13   A    Dave Horan.

14   Q    And what's his job title?

15   A    He was controller at that point.

16   Q    And the reports that you would give at that time,

17        what did they generally consist of?  What information

18        would be contained within the reports?

19   A    Just your basic finance reports, income statement,

20        balance sheet, cash flow.

21   Q    Would there be anything about how many dealers were

22        in default or any of that type of information?

23   A    Not at that point, no.

24   Q    When you say "at that point," you meant while you

25        were in this job position, or you meant as far as

1       those monthly reports?

2   A   As far as in that position, during that time frame.

3   Q   Okay.  So you wouldn't have had anything to do with

4       any dealer defaults or anything around that time in

5       this position?

6   A   No.

7   Q   How many years were you the account manager?

8   A   Four.

9   Q   So roughly until 2009?

10  A   Correct.

11  Q   And that's when you became the controller?

12  A   Yes, correct.

13  Q   How did that -- I'm assuming that's an upgrade or a

14      promotion.  How did your duties increase related to

15      that position?

16  A   In that position you have more oversight and

17      responsibility for the financial statements of the

18      company.  It was more involved.  Led the budgeting

19      and forecasting process.  I was heavily involved in

20      the treasury functions of the company.

21  Q   What do you mean by "treasury functions"?

22  A   Sure.  Just the -- for one, the daily movement of

23      cash and the relationships that we have with our

24      banks.

25          Also, the securitization facilities that we have

```
 1        to fund the business.

 2   Q    Who are those security facilities through, or who are

 3        they with?

 4   A    At that point we had, I believe -- I believe we just

 5        had a term note.  That would have been with many

 6        investors that we don't have -- we're not privy to

 7        that information.  We traded, you know, every day.

 8        We don't know what that activity looks like.

 9   Q    And how long were you the controller?

10   A    That would have been, I guess, roughly six years.

11   Q    So just until last year?

12   A    Correct.

13   Q    What month, if you recall?

14   A    January 1 of '15.

15   Q    When you were the controller, who did you report to?

16   A    I reported to our CFO.

17   Q    And who was that?

18   A    We had two.

19   Q    Okay.

20   A    First one would be Marty McFarland, and then Dave

21        Horan again.

22   Q    And did you prepare monthly reports as well for the

23        CFO to review?

24   A    Yes.

25   Q    What were in those reports?
```

1   A   Again, just general financial statements, analysis

2       behind that, you know, variance analysis, those sorts

3       of things.

4   Q   Did you say variance analysis?

5   A   Sure.

6   Q   What is that?

7   A   When you think about actual expenses versus budget or

8       actual revenue versus budget.

9   Q   So is it safe to say this is on a more macro level

10      than on an individual dealer, how much money he's

11      being lent at a particular time?

12  A   Yeah.  I mean, we have, I mean, currently, over

13      21,000 dealers.  So it's not a dealer-by-dealer

14      financial statement.  Sure.

15  Q   Who prepares or would prepare a dealer-by-dealer

16      financial statement?

17  A   They don't exist in the sense of a -- we don't have

18      21,000 individual financial statements that roll up

19      into a consolidated one.  Maybe rephrase.

20  Q   Okay.  Maybe financial statement wasn't the best.  I

21      guess who would prepare an individual account

22      statement for a dealer if a dealer called up and

23      said, hey, I want to know what the current status of

24      my account is since I've started working with you or

25      started using you?

1      MR. VINK:  Just to be clear, what time frame are

2      we talking about?

3   Q  Let's go with now, and then we'll go back.

4   A  Okay.

5   Q  Actually, let's use this time frame since that's --

6      this would be pre-2015, when you were the controller.

7   A  Controller?

8   Q  Yes.

9   A  Okay.  I mean, the dealer could access reports

10     himself.  He could speak with his account executive.

11     He could also speak with someone in our call center.

12  Q  That's not something that your department would

13     handle, for lack of a better term?

14  A  Correct.

15  Q  So I understand from your affidavit you're now the

16     vice president of finance?

17  A  Correct.

18  Q  What do you do in that role?

19  A  It's a lot of the same responsibilities that I just

20     kind of walked through, just at a higher level.  So

21     much more -- just deeper involvement in financial

22     statement analysis, presentations, deeper

23     relationships with our banks and securitization

24     processes.  Again, the budgeting and forecasting is

25     part of my responsibility.  Again, a lot of the same

```
 1          functions, just at a higher level.

 2     Q    Who reports to you?

 3     A    I have approximately twenty direct reports.  Not all

 4          direct.  Excuse me.  Indirect as well.

 5     Q    Does the controller report to you now?

 6     A    Now we have a different structure.  We have a

 7          director of accounting and a director of FP&A, which

 8          is financial planning and analysis.

 9     Q    Who does the controller report to now?

10     A    There is no controller.

11     Q    Okay.  Is there a CFO now?

12     A    Yes.

13     Q    Who is that?

14     A    Dave Horan.

15     Q    And do you report to him?

16     A    I do.

17     Q    He's your direct report?

18     A    He is my direct supervisor, yes.

19     Q    Do you have other people that you also have to report

20          to in your position?

21     A    No.

22     Q    And now, with your position now, I would also assume

23          you don't speak with dealers?

24     A    No.

25     Q    Okay.  And is that true for your entire time at DSC,
```

1    that you don't speak with dealers?

2    A    Correct.

3    Q    How about the sales representatives?  Do you speak

4         with them?

5    A    Sure.

6    Q    What types of conversations do you have with them?

7    A    They are very few and far between.  Generally, it's a

8         question they may ask concerning the status of a

9         vehicle or why something happened the way it did in

10        the system.

11   Q    Why are they asking you that question?

12   A    Well, they're not necessarily asking me directly

13        right now, currently.  But they would ask either

14        myself or my team because we have the knowledge of

15        the business and the knowledge of the system and how

16        it works.

17   Q    So they're calling you if there's maybe a specific

18        issue with a certain vehicle?

19   A    They could.  We are not the go-to operational, you

20        know, call center.  We're the finance team.

21   Q    And that's something I was just trying to get at.  If

22        I was a salesperson and I had an issue with a dealer,

23        I wouldn't be calling you.  I would be calling

24        somebody else first, correct?

25   A    Correct.

1    Q    Who would I call, if you know?

2    A    It could vary.  I mean, they could call their

3         supervisor.  They could call in to our call center.

4         They have, you know, the operational knowledge and

5         could help them through that potential issue or

6         question they have.

7    Q    So in your positions, or at least your position now,

8         and maybe since you've been with the company, you've

9         been primarily concerned with obtaining the funding

10        or the funds that NextGear/DSC then lends out to the

11        dealers?

12   A    It's part of my job function, yeah.

13   Q    Do you do work more on the -- obtaining the funds and

14        managing the funds and the budgeting process of DSC

15        versus actually interacting with the individual

16        accounts where that money's being lent to?

17   A    That would be fair, yes.

18   Q    Okay.  Who is more over the individual accounts of

19        the dealers?  Who are making those types of

20        decisions?

21   A    What decisions?

22   Q    Well, how much money they can borrow or if there's an

23        issue with the account.

24   A    Sure.  If you're talking about how much they can

25        borrow, that's going to run through our lending

```
1          department.
2     Q    Do you supervise that?
3     A    No.
4     Q    Who does, if you know?
5     A    We have a vice president of lending.
6     Q    Who is that?
7     A    His name is Patrick Inks, I-N-K-S.
8     Q    You do monthly reports as well now too, correct?
9     A    Correct.
10    Q    And those are to the -- to Mr. Herman?
11    A    Horan?
12    Q    Horan, I'm sorry.
13    A    He's one of the recipients, sure.
14    Q    These reports wouldn't have an individual sales
15         figure from a particular dealer, correct?
16    A    No.
17    Q    It's more of a compilation of everything that's
18         happened in that month company-wide?
19    A    Correct.
20    Q    Would these figures contain an average transaction
21         amount, or is it even a higher level than that?
22    A    Sure.  No, we -- part of our analysis is to look at
23         average metrics within the portfolio.
24    Q    Would it have credit utilization rates of the dealers
25         or an average credit utilization rate?
```

1   A   We would have a consolidated utilization rate, yes.

2   Q   How about an average interest rate?

3   A   Yes.

4   Q   And an average number of days financed for vehicles?

5   A   Yes.

6   Q   And you could determine an average daily finance rate

7       throughout the portfolio as well, too, correct?

8   A   Sure, you could get there.

9   Q   And even an average amount of interest that

10      NextGear/DSC earned for that particular day?

11  A   Yeah, you could derive that from the financial

12      statements.

13  Q   Does NextGear ever get to a point where it doesn't

14      have any more funds to offer dealers?  Or is that

15      part of your job to manage, to make sure there's a

16      constant credit facility that's open.

17  A   Yeah.  I mean, there is a limit to the funding that

18      we have available to us, yes.

19  Q   Do you report to anyone at Cox Enterprises, Inc.?

20  A   Directly?  No.

21  Q   How about indirectly?

22  A   At Cox Enterprises?  No.

23  Q   How about Cox Automotive, Inc.?

24  A   Indirectly, yes.

25  Q   And how is it indirectly?

1   A   Just in the sense that we are one business unit

2       underneath the Cox Automotive umbrella, if you will.

3   Q   Do you know what the other business units are under

4       Cox?

5   A   I know a few of them.

6   Q   What would they be?

7   A   I wouldn't know all of them.  Manheim, Kelley Blue

8       Book, Autotrader, vAuto, VinSolutions.  Do you want

9       me to --

10  Q   Do you know more?

11  A   An exhaustive list of everything I know?

12  Q   This is a lot, I guess, huh?

13  A   Yeah.

14  Q   How many more are there?

15  A   I believe there are approximately 40 total companies

16      underneath Cox Automotive.

17  Q   Do you know who at Cox Automotive would be your

18      indirect report?

19  A   Sure.

20  Q   Who is that?

21  A   You know, my boss, Dave Horan, reports to the CFO of

22      Cox Automotive.

23  Q   Who is that?

24  A   Neil Johnston.

25  Q   And do you have interaction with him, with

1      Mr. Johnston?

2  A  Yeah.

3  Q  What types of interactions do you have?

4  A  Nothing frequent.  More just if, you know, we're in

5      the same place, he's visiting us or I'm visiting down

6      there.

7  Q  Where are they located?

8  A  Atlanta.

9  Q  Do you go there frequently?

10  A  Three, four times a year.

11  Q  What do you do when you go there?

12  A  Generally, it's part of an overall Cox Automotive

13      function, perhaps for the finance group.

14  Q  Do they put on training events?

15  A  No, I wouldn't call them that.

16  Q  Do you discuss budgeting issues with Cox Automotive?

17  A  I discuss NextGear budgeting issues with Cox

18      Automotive.

19  Q  And do they, ultimately, have to approve the budgets

20      for NextGear?

21  A  Yes.

22  Q  Earlier you discussed a little bit about where

23      NextGear, or I guess it was DSC at the time, got its

24      funds from that it loans out to the dealers.  And you

25      said that it was a sort of private placement, I

1      guess, or publicly traded-type financial instruments?

2   A  Not publicly traded, no.

3   Q  Privately traded?

4   A  Yeah.

5   Q  Is that the same now as well, too?

6   A  Yes.

7   Q  Okay.  So various companies and individuals would be

8      able to buy a debt package?

9   A  It's a 144A transaction, so only investment companies

10     can participate.

11  Q  I'm going to turn to the affidavit that you at least

12     signed in this case.  Are you familiar with this

13     document?

14        MR. VINK:  Are you going to mark this as an

15     exhibit?

16        MR. AIREY:  I wasn't going to.

17        MR. VINK:  Okay.

18  A  Yes, I'm familiar.

19  Q  Okay.  How did this document come about?  Why were

20     you asked to draft this document?

21  A  I was asked to --

22        MR. VINK:  Before you answer that question, make

23     sure that you don't divulge anything that was

24     communicated to you by counsel related to signing

25     this declaration.  That would be protected by the

1        attorney-client privilege.

2    Q   Right.  And I should have said that before.  I don't

3        want to know anything that they asked you.  And if

4        that's the only reason that you have for why you did

5        it, which wouldn't be surprising, then, you know,

6        that will be your response.  I understand that.

7    A   Well, are you asking why I'm here or why I signed

8        this?

9    Q   How about this.  Do you know why you were chosen to

10       draft this affidavit?

11   A   Yes.

12   Q   Okay.  Why is that?

13   A   Because I have knowledge of how floorplanning works

14       and how the system operates and how we calculate the

15       revenue that we generate.

16   Q   But as far as the individual dealers that are

17       mentioned in this affidavit, like Red Barn and

18       Platinum and Mattingly, did you know about those

19       prior to drafting this affidavit?

20   A   Yes, I've heard of them.

21   Q   Did you have any interaction with or any -- I guess

22       "interaction" is the best word.  Did you have any

23       interaction with their accounts for Red Barn,

24       Mattingly, or Platinum when you were in any of your

25       various positions with DSC?

1   A   Direct interaction, no.

2   Q   How about indirect?

3   A   Sure.

4   Q   What would that be?

5   A   It would have been part of the analysis that we do on

6       dealers who default and charge off.

7   Q   But you wouldn't have called up someone at Red Barn

8       and said, hey, what's going on here, why are you

9       defaulting, correct?

10  A   Correct.

11  Q   And same with Mattingly or Platinum?

12  A   Correct.

13  Q   So you may have interaction with their account here

14      in Indiana but not actually with any of these

15      dealers, specifically with themselves, or with those

16      dealers?

17  A   I would not communicate directly with the dealer, no.

18  Q   Now, did you actually physically write every word in

19      this affidavit?

20  A   No.

21  Q   Okay.  Who did?

22  A   It's my understanding our legal team.

23  Q   As far as the exhibits that are attached to this

24      affidavit, did you pick which exhibits to put on this

25      affidavit?

1    A   No.

2    Q   I'm going to hand you what was marked as Exhibit B to

3         your affidavit.  This document has "NextGear Capital"

4         written on the top of it.

5    A   Correct.

6    Q   Correct?  So it's fair to say that this would have

7         been produced after the merger between DSC and

8         Manheim and -- with Cox, correct?

9    A   Correct.

10   Q   Do you know if this document was produced

11       specifically for this litigation?

12   A   Yes.

13   Q   It was specifically --

14   A   It was.

15   Q   Okay.  Did you create this Exhibit B?

16   A   I did not.

17   Q   Do you know who did?

18   A   Yes.

19   Q   Who?

20   A   Our technology team.

21   Q   Did you supervise them when they created it?

22   A   I do not have direct supervision of them.

23   Q   So you didn't ask them to create this document?

24   A   Myself directly?  No.

25   Q   Did you have any input in the information that was

1          put in this document?

2     A    Yes.

3     Q    Okay.  So it's fair to say that you asked them to

4          create a document with these columns on it?

5     A    I did not ask them, but I was involved in reviewing

6          and testing the accuracy.

7     Q    Other than your counsel, who else assisted you in

8          producing Exhibit B?

9     A    I can't recall exactly who was involved in the

10         development of it.  The only other person I can think

11         of is a gentleman, Lucas Hancock.

12    Q    Is he an IT person?

13    A    No.

14    Q    What does he do?

15    A    He's senior director of customer experience.

16    Q    Do you know what he does in that role?

17    A    Yeah.  He manages our call center.

18    Q    Now, prior to the Manheim and DSC merger, had you

19         ever reviewed Manheim Financial Services' promissory

20         notes?

21    A    No.

22    Q    How about any Manheim documents, like security

23         agreements, financial agreements?

24    A    No.  We are competitors.

25    Q    So it's fair to say that the first time you would

27

1          have reviewed those documents would have been in

2          drafting this affidavit?

3               MR. VINK:  Object to the form.  You can answer.

4     Q    Well, let me ask it another way.  When was the first

5          time that you reviewed any documents from Manheim

6          Financial Services, which I'll call MAFS for short.

7     A    Sure.  In this case.  I mean, we did not have any

8          involvement in MAFS documents.

9     Q    Even after the merger you didn't go and look and see

10         what they were doing versus what DSC was doing?

11    A    I did not review a particular legal document of MAFS

12         and compare it to what DSC was doing.

13    Q    Have you done that comparison for this litigation?

14    A    Have I done that?

15    Q    Correct.

16    A    I am not an attorney, so I've not reviewed and, you

17         know, compared every single -- I have not done that.

18    Q    Okay.  So you didn't go through and say what was

19         different between a MAFS document and a NextGear or

20         DSC document?

21    A    No.

22    Q    You said that right now NextGear has about 21,000

23         dealers?

24    A    Correct.

25    Q    Do you know, on a year-by-year basis, approximately

28

```
 1        how many dealers DCS would have had -- I'm sorry, DSC
 2        would have had in, let's say, 2007?
 3   A    I can't recall exactly.  If I had to estimate, it
 4        would be six to eight thousand.
 5   Q    How about in 2005?  Would you know then?
 6   A    That was the first year of DSC, so --
 7   Q    Okay.  How about 2008?
 8   A    Roughly the same, six to eight thousand.
 9   Q    And would that be the same up until the merger?
10   A    Correct.
11   Q    Okay.  So with the merger you took on all of -- or
12        NextGear was created to take on all of MAFS customers
13        as well as DSC customers under one company?
14   A    Correct.
15   Q    And so did MAFS have more customers than DSC?
16   A    I believe they did, yes.
17   Q    You said six to eight thousand customers per year.
18        Are they the same six to eight thousand customers
19        every year?
20   A    No.
21   Q    What's the turnover rate of customers that would
22        maybe use the floorplan in 2007 versus 2008?
23   A    I can't speak specifically to the turnover rate back
24        then.  As an estimate, we could potentially turn
25        over, back then, maybe a hundred accounts each month.
```

1   Q   When you say "turn over," what do you mean by that?

2   A   They could leave our relationship voluntarily.  They

3       can move to another financier, another lender.  They

4       could also default on their account and be charged

5       off.

6   Q   Do you know what the default rate would have been in

7       2007?

8   A   I don't know exactly.  You know, it's going to be

9       somewhere around 5 percent of our dealers.

10   Q   Is that per year or per month?

11   A   It's an annual list.

12   Q   Did that number stay true throughout 2008, 2009,

13       2010?

14   A   I can't speak to that.  I don't have, obviously, the

15       information in front of me.  But it would not have

16       varied significantly other than -- you know, during

17       '08, '09, with the economic downturn, we did

18       experience larger losses.

19   Q   So maybe more than 5 percent in '08, '09?

20   A   Sure.  I think you would find that everywhere.

21   Q   With the six to eight thousand customers that DSC

22       would have had, did those customers also use MAFS as

23       well?

24   A   Some of them could.

25   Q   Do you know, was it common in the industry to have

1    two different sources for floorplanning?

2  A  Sure.

3  Q  And, generally, would a dealer use one maybe as the

4    primary and another one as a secondary line?

5  A  Potentially, yes.

6  Q  Do you know how common that would be?  Is it the

7    common practice to have one as the floorplan that you

8    would use more and then another one that you would

9    maybe use less, with a lower amount?

10  A  Each dealer would be different.  They could operate

11    how they choose, obviously.  But, sure, they could

12    have one main and, you know, another secondary.

13  Q  I went over your work history, but you've never

14    worked at a used car dealer before, have you?

15  A  No, I have not.

16    MR. AIREY:  Okay if we take a short break?

17    MR. VINK:  Sure.

18    (A recess was taken.)

19  Q  We were discussing the affidavit that you've signed

20    and has been filed in this matter.  Other than your

21    attorneys, did you discuss this affidavit with anyone

22    else?

23  A  No.

24  Q  No one at NextGear?

25  A  No.

1   Q   Have you discussed the lawsuit with anyone at

2       NextGear?

3   A   No.

4           MR. VINK:  Other than counsel?

5           MR. AIREY:  Correct, other than counsel.

6   A   No.

7   Q   Now, in the affidavit, if you look at paragraph 9,

8       could you read that for me.

9   A   "From January 2005 through July 2013, various

10      customers of MAFS and DSC signed materially different

11      versions and subsets of MAFS' and/or DSC's respective

12      agreements."

13  Q   Now, I think you said earlier that -- obviously,

14      you're not an attorney, correct?

15  A   Correct.

16  Q   And you weren't working at the company until 2007?

17  A   No, that's not correct.

18  Q   I'm sorry.  You started working at the company in

19      2005, correct?

20  A   Correct.

21  Q   Okay.  Now, since you've been working at the company

22      in 2005, have you had any input in the drafting of

23      any of the contracts that the customers would sign?

24  A   No.

25  Q   Have you reviewed those contracts prior to them being

32

```
 1         used by DSC or NextGear?

 2   A     In their drafting phase?  No.

 3   Q     So you didn't have any input in what went into an

 4         individual contract?

 5   A     No.

 6   Q     Have you participated in any training sessions with

 7         the sales representatives regarding the contracts?

 8   A     No.

 9   Q     Have you designed any materials for the sales

10         representatives regarding any training that they

11         would have?

12   A     No.

13   Q     Do you know who at either NextGear or DSC was in

14         charge of training the sales representatives?

15   A     Our operations teams.

16   Q     But that wasn't within your sphere of operations?

17   A     That's correct.

18   Q     Now, have you gone through and looked at the

19         different contracts to try to figure out whether

20         there were different versions or subsets of them?

21   A     Again, I've not done a deep dive into each of the

22         documents, but I am aware that we have had multiple

23         versions of the contract.

24   Q     What is your understanding of the differences between

25         the different contracts?
```

1  A   The different contracts for DSC and NextGear?

2  Q   For -- let's say from January 2005 to January -- I

3      guess let me rephrase this.

4          How many different versions of the promissory

5      notes did NextGear or DSC -- or, I guess, DSC have?

6  A   I believe we may have had around three, as DSC.

7  Q   As far as the different versions of the contracts,

8      are you aware of when DSC starts to charge interest

9      to a dealer on a transaction?

10 A   Yes.

11 Q   Could you explain that to me?

12 A   Well, it could vary, but, generally, it happens on

13     the floorplan date.

14 Q   And is the floorplan date a defined term in all the

15     three different versions of the DSC contracts?

16 A   I'm not -- I couldn't answer that.

17 Q   When is the floorplan date?  What is your

18     understanding of when the floorplan date would be?

19 A   Again, it could vary.  But in the example of a dealer

20     buying a car at an auction, the floorplan date would

21     be that date that he bought the car.

22 Q   So interest would be charged from the date that the

23     dealer bought the car from the auction?

24 A   In that scenario, yes.

25 Q   Okay.  And that process is true regardless of what

34

1      version of the contract that DSC had, these three

2      versions that you're aware of?

3   A  It's my understanding, yes.

4   Q  Are you aware of the language in the contract that

5      would allow for the interest to be charged from the

6      floorplan date?

7          MR. VINK:  Object to the form.  Calls for a legal

8      conclusion.  But you can answer, to the extent you

9      can.

10  Q  And I understand you're not an attorney.  If you

11     don't feel comfortable answering it, that's fine.

12  A  Correct.  I'm not an attorney.  But general knowledge

13     of that definition, of an advance, would indicate

14     that the time the loan is made, that that's the date

15     of the advance.

16  Q  Now, in the example that you gave, you talked about

17     from an auction.  Would there be a different time

18     that interest would start to be charged to a dealer

19     if it was a non-auction vehicle?

20  A  Sure.

21  Q  Okay.  And what happens in that instance?

22  A  The flooring date, floorplan date, would be the date

23     that the floorplan is entered into our system.  And

24     we would begin charging interest on that date for a

25     unit not purchased at an auction.

1   Q   And what's the date that is entered into the system?

2   A   In that scenario, for a non-auction purchase, it

3       would be the date that we receive that floorplan

4       information, bill of sale, et cetera, from the

5       dealer.

6           (Deposition Exhibits 1 through 7 were marked for

7       identification.)

8   Q   I'll hand you a stack of documents here.  I do have

9       these marked.  I've got these kind of backwards, but

10      that's 7.  I apologize.  The staple came out.  Here's

11      6.  This is 5, 4, 3, 2, 1.

12          You're familiar with the discovery requests that

13      were asked in this case?

14  A   Generally.

15  Q   One of the requests that we asked for were examples

16      of the contracts of the various years that DSC used

17      during the -- for floorplanning.  Exhibit 1 -- let's

18      see.  If we can look back on page -- it's NG004848.

19  A   (The witness complies.)

20  Q   Right above the redaction box it appears to indicate

21      that this is a November 20, 2005, contract?

22  A   Mine says May 20.

23  Q   I'm sorry.  May 20, 2005.  As far as in 2005, to your

24      knowledge, would this be an accurate representation

25      of the contract that DSC used with its dealers?

1   A   Yeah, I would have no reason to believe it would not

2       be.

3   Q   Now, on -- let's see.  It's the second page of the

4       document, first page of the promissory note.  Under

5       1(a) there's a definition of "advance."  Is that the

6       definition that you were discussing earlier when you

7       talked about loans?

8   A   Correct.

9   Q   Could you read that for me?

10  A   "'Advance' shall mean all loans or payments pursuant

11      to this Note made by DSC to Dealer or on Dealer's

12      behalf to any third party."

13  Q   In your affidavit, on page 2, paragraph 15, that

14      paragraph generally states what you told me earlier,

15      that when NextGear pays an auction direct -- or,

16      sorry.

17          That the date NextGear conveys funds for a

18      vehicle varies by transaction type and source,

19      correct?  First paragraph of that statement.

20  A   Yeah, that statement is true.

21  Q   Okay.  It's also true that for the auction

22      vehicles -- for dealers that buy cars at auction,

23      NextGear charges interest to the dealer on the day

24      that the dealer purchases the car from the auction,

25      correct?

1    A    Generally, yes.

2    Q    You said "generally."  When would they not?

3    A    It could be, you know, if a dealer buys a car at

4          auction and then three months later floorplans it

5          with us, we're not going to backdate interest to the

6          date that it was sold or purchased.

7    Q    I'm sorry.  Could you explain that example a little

8          bit more?

9    A    Sure.  I mean, a dealer buys a car, and he could pay

10         with cash.

11   Q    Okay.

12   A    And then two, three, four months later he might

13         choose to put it on his floorplan to free up that

14         cash.

15   Q    So if a dealer buys a car at auction using the

16         NextGear or DSC floorplan, then, at that time, the

17         date that the dealer purchases that vehicle is the

18         date that interest begins to run?

19   A    Correct.

20   Q    Are you aware of anywhere in the contract where it

21         makes a distinction between vehicles that are bought

22         at an auction and vehicles that are bought at -- or

23         vehicles that are owned by the dealer?

24         MR. VINK:  Object to the form.  You can answer.

25   A    I don't know.

38

1    Q    With the -- let's see.  It's Exhibit B to your

2         affidavit that I handed you.  I think I gave it to

3         you earlier.

4    A    Yes.  Sorry.

5    Q    Okay.  In the far left column there's -- -- on the

6         first page, about halfway down, it says "Total for"?

7    A    Correct.

8    Q    Do you know what that "Total for" means?

9    A    That is the total of the transactions that were

10        funded on that particular date.

11   Q    So that's the day that NextGear funded the

12        transaction to the auction or buyer in this case?

13   A    It is the date that NextGear sent cash to the

14        auction.

15   Q    Now, the day that NextGear sends cash to the auction

16        is, in many cases, days and even weeks later than the

17        actual day that the dealer buys from the auction,

18        correct?

19   A    Sure.

20   Q    And in some instances a dealer can purchase the

21        vehicle at auction, sell that vehicle, send funds to

22        NextGear before NextGear actually pays the auction as

23        well, correct?

24   A    That is possible.

25   Q    In the affidavit you indicate that there's a dealer

1       that has a $40 million line of credit with NextGear?

2    A  Yes.

3    Q  Who is that?

4    A  We have -- I don't know who exactly has the $40

5       million line of credit.  That's just a range given.

6    Q  That's just something you looked on a computer system

7       somewhere to see what the max range was, without

8       actually knowing who it was?

9    A  Yeah.  I mean, it's all information within our

10      system.

11   Q  How many dealers have a $40 million line of credit,

12      do you know?

13   A  We only have a couple that are in that -- at that

14      level.

15   Q  Do you know what the average credit limit, credit

16      line is for a dealer?

17   A  Yeah.  The mathematical average is approximately

18      $300,000 today.

19   Q  Has that gone up or down in the years since you've

20      been working at NextGear?

21   A  It has increased.

22   Q  You don't know what the dealers' names are that have

23      a $40 million line of credit?

24         MR. VINK:  Object to form.  You can answer.

25   A  I mean, I can give you a couple of names of our

```
 1         largest accounts.
 2    Q    Yeah.
 3    A    I don't know that they're exactly $40 million.
 4    Q    Okay.
 5    A    Hertz Corporation, Wholesale, Inc.  Those would be
 6         probably two of our bigger ones.
 7    Q    Does NextGear do any business with, like, the
 8         Enterprise rental car?
 9    A    No.
10    Q    Do you know what Hertz uses its line for?
11    A    It's my understanding it's for their car sales
12         division.  It's a very short time frame that they're
13         on floorplan.
14    Q    Do you know how many dealers would have been doing
15         business with NextGear from 2005 through 2012 but
16         would not have been doing business in 2013?
17    A    I could provide a guess.  If you -- complete estimate
18         here, but dealers who may have been terminated,
19         right?  Is that what you're getting at, dealers
20         who --
21    Q    Who no longer do business with DSC, for whatever
22         reason.  I know you said there was about a 5 percent
23         turnover earlier.
24    A    Yeah.  It could be -- again, I don't have the
25         information in front of me.  But a pure guess for
```

41

1      that time frame might be, I don't know, four to five

2      thousand dealers.  Pure guess.

3  Q  That's something you could find out through the

4      system, though?

5  A  Yeah.

6  Q  And NextGear would have a record of the relationship

7      between a particular dealer and NextGear/DSC for each

8      transaction that that dealer has done with NextGear

9      or DSC?

10  A  Correct.  We have a history of all the transactional

11      volume for a particular dealer, as a dealer with DSC

12      and NextGear.

13  Q  And it would be similar to what was Exhibit B to your

14      affidavit?

15  A  Correct.  That's where -- this report was created

16      using that data.

17      MR. AIREY:  I'm sorry.  I'm trying to narrow this

18      down for you.  It's good I'm pausing.  We've gone

19      over some of this.

20      Actually, if we could take a five-minute break.

21      (A recess was taken.)

22  Q  With the affidavit that you drafted, on page 3, at

23      paragraphs 24, 25, and 26 -- well, let's go 24 and

24      25.  You say many dealers in the proposed class

25      defaulted on their obligations to NextGear, correct?

1    A    Correct.

2    Q    And you know that from a review of the records at

3         NextGear?

4    A    Correct.

5    Q    And there's also many dealers that have defaulted on

6         their obligations as well, too?

7    A    Correct.

8    Q    And you know that from looking at NextGear's records?

9    A    Correct.

10   Q    Did you do a generalized search of NextGear's records

11        to prepare this affidavit?

12   A    Personally, no.  I relied on other information

13        provided.

14   Q    Who provided that information to you?

15   A    I can't say exactly who.

16   Q    You don't remember, or is it because it was an

17        attorney that provided it to you?

18   A    Yeah, I don't know who actually pulled the

19        information.

20   Q    Did you review any documents to determine whether the

21        dealers defaulted -- many dealers defaulted?

22   A    I know it to be true because I'm heavily involved

23        with that -- with the data presented inside of our

24        system regarding that and am familiar with the

25        dealers who defaulted and, ultimately, are charged

1      off.

2    Q   On a global level, because of the reporting that you

3        do, that's how you're familiar with those?

4    A   Sure.  But I'm familiar with the -- some of the

5        dealers themselves.

6    Q   Are you familiar with all the dealers that default?

7        I mean, is that something that you look at, each

8        individual account when there's a default?

9    A   I do not review each individual account and determine

10       a default needs to occur or has occurred.  But I do

11       see a list, both a detailed list and, obviously,

12       summary information too, that details all that

13       information.

14    Q  And that's something that's reported to you in the

15       ordinary course of your job?

16    A  Correct.

17    Q  How is that reported to you?  Is that an e-mail that

18       you get or a company memo?

19    A  Today we receive an e-mail every morning that details

20       dealers who have defaulted.

21    Q  And have you always had some interaction with the

22       dealers that have defaulted, in all your previous

23       positions at NextGear?

24    A  I would say I became more involved as controller.

25    Q  When you were controller, how would you get notified

44

1    of a dealer default?

2  A  I can't recall.

3  Q  Would it be in writing, though, generally, that you

4    would have been notified, with a list of dealers?

5  A  I can't recall.

6  Q  Do you have any role in any legal process that

7    NextGear files against any dealer that has defaulted?

8  A  Potentially.  It's not a standard practice for me to

9    be involved in that.

10  Q  So other than the one case that we talked about

11    earlier, where you testified in, do you routinely

12    prepare affidavits for any defaults or legal process?

13  A  Yeah.  I'll be asked -- either myself or my team will

14    be asked for information surrounding certain

15    defaults.  Again, it's not a checkbox, you know,

16    every single default is coming through us.

17  Q  You said not every single default comes through you?

18  A  Correct.  I mean, I have no -- I cannot determine a

19    default.  And I'm also not necessarily providing

20    information, financial information, related to every

21    single default.  A lot of that resides in our system.

22  Q  Do you perform an analysis to find out why somebody's

23    defaulted on a loan?

24  A  I do not.

25  Q  Do you know who does?

1    A    Yeah.  That would be our risk department.

2    Q    Do you review that information on why someone's

3         defaulted, or is it more you just log in the

4         information once one has happened?

5    A    That information is available to me if I would like

6         to review it.  Again, I don't need to.  I'm not the

7         one that's actually defaulting that account.

8    Q    So you wouldn't routinely look at that information?

9    A    No.

10   Q    Did you look at that information for this litigation?

11   A    Yes, I'm familiar with some of the details around it.

12   Q    The details for why dealers in the proposed class

13        would have defaulted or just these particular dealers

14        that are named?

15   A    Just the named dealers.

16   Q    Now, as far as any contracts that NextGear or DSC

17        would have had with or has with the auctions

18        themselves, do you have any role in negotiating those

19        contracts?

20   A    No, I do not.

21   Q    Do you review those contracts?

22   A    Today, sometimes I'm asked to sign them as

23        representative of NextGear.

24   Q    And that's in your job that you have now since 2015?

25   A    Correct.

1    Q    Prior to 2015 would you have reviewed those --

2    A    No.

3    Q    -- contracts?

4    A    No, I would not.

5    Q    And you also wouldn't have had any role in signing a

6         particular individual dealer up to a particular

7         contract with NextGear?

8    A    No.

9    Q    Are you familiar with the Auction Insurance Agency?

10   A    Yes.

11   Q    What's your role in dealing with Auction Insurance

12        Agency on behalf of NextGear?

13   A    I do not have a direct role.

14             MR. VINK:  I was going to say for what time

15        frame?

16   Q    How about for any time that you've worked at

17        NextGear.

18   A    For any time I've not had a direct role with them.

19   Q    So you don't report dealers to Auction Insurance

20        Agency?

21   A    I do not.

22   Q    Did you supervise the people that did?

23   A    No, I did not.

24   Q    With Auction Insurance Agency, there's several

25        paragraphs in your affidavit that you discuss that.

1          Have you become familiar with that in the course

2          of -- or with that agency or reporting process during

3          the course of this litigation?

4     A    With Auction Insurance Agency?

5     Q    Yes.

6     A    No.  I have had general knowledge of that

7          relationship for -- throughout the course of my

8          employment.

9     Q    So you have some general knowledge of what Auction

10         Insurance Agency does.  But as far as your role in

11         NextGear, you don't interact with them?

12    A    That's correct.  I'm aware of the relationship and

13         mutual benefit but not -- I do not have direct

14         involvement there.

15    Q    Do you know who does have direct involvement with

16         them?

17    A    It's my understanding the risk department does.

18    Q    Do you know a Mr. John Fuller that may have worked at

19         NextGear?

20    A    Yes.

21    Q    Do you know where he is now?

22    A    I do not.

23    Q    Do you know when he left?

24    A    He left after the acquisition.

25    Q    Close in time to the acquisition or --

1   A   Yes.

2   Q   Do you have any role in setting salaries or bonuses

3       for the sales representatives?

4   A   No, I do not.

5   Q   Who would have a role at the company doing that?

6   A   Well, their hiring manager would determine what their

7       salary is, through, you know, cooperation with our HR

8       department.

9   Q   That's outside your scope of what you do at NextGear,

10      though?

11  A   The salary piece, yeah.  I mean, incentives, bonus

12      plans do fall under my responsibilities.

13  Q   When you say it falls within your responsibilities,

14      do you have a role in setting what the salaries -- or

15      how bonuses or incentive plans for employees are --

16  A   I have a collaborative role, I guess you'd say.  I do

17      not set the bonus plan.  I am asked for input and

18      guidance as those are developed.

19  Q   What kind of input do you give?

20  A   Just related to the data that they want to measure,

21      the actual dollar amounts that are proposed for that

22      bonus plan.

23  Q   You mean on a companywide basis or for an individual?

24      Like, creating a pool of money for the sales

25      representatives, or is it on an individual basis?

1    A    Yeah.  No, just on an individual basis, like what
2         would be an appropriate amount to incentivize
3         someone.
4    Q    And you do that for all the sales representatives?
5    A    Yeah.  Every incentive plan runs through finance.
6    Q    Do you have any input in what the goals are that a
7         salesperson needs to reach in order to earn a bonus?
8    A    No, I do not.  Those are set by their -- the
9         operational folks.
10   Q    Do you have any input in the metrics that may be used
11        to determine a particular goal or particular amount
12        of money that an individual sales representative
13        would get?
14   A    Sure.  My team is responsible for calculating the
15        incentive, so we use the data that comes out of our
16        system and calculate the incentive from that.
17   Q    What data would you use?
18   A    During that time frame?  During this time frame here?
19        I can't recall exactly what would have been part of
20        the incentive plans.  You know, guessing, it probably
21        would have been something revolving around
22        activations and -- you know, dealer activations and
23        new loan count.
24   Q    And have those metrics changed over time?
25   A    Sure.

50

1    Q    What changes were made?

2    A    They change every year.  So I couldn't tell you

3         exactly each year what changes, but different metrics

4         are used each year.

5    Q    Is it generally based on the dealer activation and

6         maybe default rate as well, too?  Would those be

7         terms that were normally included?

8    A    Sure.  Potentially, yeah.  It's generally based

9         around the activity that account executive manages

10        and that their portfolio generates.

11   Q    With the merger purchase by Cox, did you have any

12        role in negotiating that merger?

13   A    No, I did not.

14   Q    Did you have any role in the integration of MAFS with

15        NextGear?

16   A    Yes.

17   Q    What did you do with that?

18   A    Just assisted with the combination of financial

19        statements, the combination of the securitization

20        facilities for both companies.  Just, you know, a

21        whole litany of those things.  Those are the main

22        overarching themes there.

23   Q    You would have been in charge of integrating any

24        salesperson training, anything like that, with --

25   A    No, I do not train the salespeople.

1    Q    How about the contracts that the salespeople would

2         have used?  Did you have any role in the integration

3         of those contracts between MAFS and DSC?

4    A    No.  That was handled through our legal team.

5    Q    Before, you stated that there was a mutual benefit

6         between the auto auction agency and NextGear.  Could

7         you explain what you mean by "mutual benefit"?

8    A    Sure.  So we provide information to them, you know,

9         such as a defaulted dealer, that they can -- you

10        know, they choose to do with it what they want.  I

11        mean, they can, you know, enter that dealer into the

12        KO book, if they choose.

13             We also receive data back from them of the

14        dealers that are listed in the KO book, and that

15        information is used to make credit decisions at

16        NextGear.

17   Q    With the reporting that you do now on a monthly

18        basis, are you receiving reports from the people that

19        you supervise and then putting them into a different

20        form to give to the persons you report to?

21   A    Which reports?

22   Q    Like a monthly report.  Would you have a profit and

23        loss statement?

24   A    Financial statements?  Those are -- financial

25        statements are generated out of our accounting

52

1     software, so there's no manipulation, if you will, of

2     those.

3  Q   I assume you're familiar with the term "float"?

4  A   Yes.

5  Q   And in this case the delay between the time that

6     NextGear or DSC would fund an auction for a car

7     versus the time that the dealer's being charged

8     interest would be the float, correct?

9  A   No, I would not call it a float.

10  Q   What would you call that?

11  A   I would call that the period between the floorplan

12     date and the date that the auction was funded.

13  Q   And during that time frame DSC or NextGear hadn't

14     actually sent any money to the auction at all,

15     correct?

16         MR. VINK:  Object to the form.  You can answer.

17  A   Can you rephrase that?

18  Q   From the time that the dealer purchased the vehicle

19     from an auction and NextGear sends the money to that

20     auction, there's a delay period in some instances,

21     correct?

22  A   In some instances, yes, there can be a delay.

23  Q   Does NextGear keep track of the time between the day

24     that a transaction is funded versus the day that it

25     was first requested?

1    A    The information resides in the system.  It is not a

2         metric or a data point that we review frequently.

3    Q    But you do review that sometimes, correct?

4    A    I've seen data around it, yeah.

5    Q    What was the purpose for that data?

6    A    Just to investigate, make sure that vehicle was still

7         a valid floorplan.

8    Q    So the system could generate that information for

9         each transaction, correct?

10   A    Yeah, those data points reside in the system for

11        every transaction.  And those are the same data

12        points shown on this report.

13   Q    Let's make it easier.  Let's walk through one of the

14        transactions here.  If we go to page NGR000012, which

15        is page 2 of Exhibit B that was attached to your

16        affidavit, if we go to the column starting underneath

17        where it says "Total for - 8/17/2011," it's stock

18        number 13.  It says "2000 Saturn S-Series SL2."  Walk

19        me through that transaction.

20   A    Sure.  I mean, based on the facts here, dealer would

21        have purchased the vehicle at Oak View Auto Auction

22        on August 5, 2011.  That auction would have

23        transmitted that flooring information to DSC at the

24        time, on the same date, August 5, 2011, and -- you

25        know, under the terms there noted to the right.  And

54

1       then that third date there is completed date,

2       August 17, 2011.

3            Based on that information there, you know, it's

4       easy to reason that we had an agreement with the

5       auction to fund that vehicle either on notice of

6       title or on possession of title.  And that's why

7       the -- sorry.  Let me get my dates right.  It's the

8       one underneath it.  So, yeah, that's why on the 18th

9       of August the funding occurred.

10  Q   When you say "the funding occurred," that's the day

11      that NextGear sent funds to Oak View Auction in this

12      case?

13  A   That's correct.

14  Q   But you're not familiar with the terms or contents of

15      the Oak View Auction agreement between NextGear

16      and -- in this case it was DSC and -- well, between

17      Oak View Auction and DSC?

18  A   I don't have that document in front of me, no.  I can

19      make a reasonable --

20  Q   If we go to NGR000014 -- it's page 4 -- toward the

21      bottom of the page it's stock number 58.  It's a 1997

22      Ford Explorer.

23  A   Yes.

24  Q   Can you walk me through that transaction as well?

25  A   Sure.  Dealer would have purchased that vehicle at

1          Oak View Auto Auction on August 26, 2011.  That

2          auction would have sent that information to DSC on

3          the same date, August 26.  And that dealer -- the

4          dealer, ultimately, paid that vehicle off, completed

5          it on September 12, 2011.  And, again, same thing.

6          They would have -- the auction received -- or we sent

7          funding to the auction on October 7, 2011.

8     Q    And that August 26 date, the flooring date, that's

9          the day that DSC would have been charging, started

10         charging, Red Barn Motors interest?

11    A    Yes, that's correct.  That's the day they started

12         utilizing their floorplan for that vehicle.

13    Q    Now, this document, which is Exhibit B that was

14         created for this litigation, is this something also

15         that a dealer would be able to create?

16    A    This exact form?  No.  This is created specifically

17         for this case.  The dealer does have access to

18         reporting that's very similar, that has all the same

19         information on it.

20    Q    It would have the "Total for" date on it?

21    A    I believe it would, yes.

22    Q    Is there any indication on here of what "Total for"

23         means?

24    A    On this report it does not specifically say, but we

25         understand that to be the case, that it's the total

1   amount funded on that particular day.  I believe the

2   reporting available to the dealer is a little more

3   descriptive.

4 Q  Have you seen more descriptive reporting that's

5   available to the dealer than this?

6 A  To the extent that this -- this report has a lot of

7   information on it.  Again, I can't say exactly if

8   every single column on here is on the report that

9   they see, but, you know, to my -- yeah, I would say

10   that all those are -- in one form or another, all

11   that information is on the reporting, the Receivable

12   Detail Report that the dealer has access to.

13       MR. AIREY:  I don't have additional copies of

14   this.  This was an exhibit that we used yesterday,

15   Exhibit 17.

16       MR. VINK:  Okay.

17 Q  You stated that dealers can get the Receivable Detail

18   Report.  Is this one of the reports that you were

19   discussing?

20 A  This is a Receivable Detail Report, yes.

21 Q  Okay.  That's something that the dealer would have?

22 A  Yes.

23 Q  Get?  Okay.  Can you show me where the "Total for"

24   column is on that?

25 A  On this report there's not a "Total for" amount.

1   Q   Okay.  Is there a day that shows when NextGear paid

2       the auction on that report?

3   A   Yes.  There is a column labeled "Days."  That is the

4       number of days that that vehicle has been on

5       floorplan.  You can run that back to the floordate

6       and determine kind of when that floorplan started.

7       Sorry.  Did you -- restate your question.

8   Q   What I was asking is, does that document, anywhere in

9       that document, show when NextGear or DSC --

10  A   Sorry.

11  Q   -- paid the auction?

12  A   No, it does not.  I don't know why that would be

13      important to them.

14          MR. AIREY:  Can we take a little break?  We're

15      pretty much toward the end.

16          MR. VINK:  Okay.

17          (A recess was taken.)

18  Q   Earlier you mentioned Lucas Hancock, I believe?

19  A   Yes.

20  Q   And he is the director of customer experience now?

21  A   Correct.

22  Q   Okay.  Who was in that role before him?

23  A   I couldn't tell you.  It's a new role as well, within

24      the last couple of years.

25  Q   Was there somebody that did a similar role prior to

1           this role being created?

2    A      During this time frame there would not have been

3           someone in that position.

4    Q      There was still a -- was there a call center during

5           the time frame of the Red Barn transactions?

6    A      During a portion of that time frame.

7    Q      When did the call center start?

8    A      I believe it was around 2010, 2011.

9    Q      What did the dealers do prior to 2010, 2011 when they

10          wanted to contact DSC?

11   A      They contacted their account executive.

12   Q      And then he would go to a regional director?  He

13          would report to a regional director then?

14   A      Yeah, he reported to a regional director.  Whether or

15          not he went to that director with every single

16          issue --

17   Q      And then who would the regional directors report to?

18   A      During this time I believe we had maybe a couple of

19          vice presidents of operations.  I don't recall

20          exactly the org structure back then.

21   Q      Do you know the names of any of those people?

22   A      I'm trying to think.  I'm not sure who was in those

23          positions back then.

24   Q      Are those people still with the company now, just in

25          different roles?

1   A   I mean, I don't know who it would have been.  I mean,
2       we -- yeah, it's hard to say.
3   Q   So you just don't have any recollection of who those
4       people were?
5   A   No.
6   Q   So you wouldn't have had a lot of interaction with
7       them?
8   A   Well, I would have.  I just don't know, in 2009 or
9       2010, what the org structure was exactly or who was
10      in each role.
11  Q   In your current role do you participate in monthly
12      financial review meetings?
13  A   Yes.
14  Q   And who usually attends those meetings?
15  A   All of the executive team of NextGear.
16  Q   That's, like, the CEO, the CFO?
17  A   Yeah, the C-level and the vice presidents.
18  Q   Do you take minutes at those meetings?
19  A   No.
20  Q   How about notes?
21  A   No.
22  Q   Does anybody?
23  A   People may take individual notes as they see fit, but
24      there's no standard format.
25  Q   Are the financial statements circulated prior to the

60

1      meetings?

2  A   Yeah, they're circulated ahead of time.

3  Q   What's generally included in those financial review

4      meetings?  What data do you look at?

5  A   We look at, you know, financial -- you know, an

6      income statement view.  We definitely look at our

7      defaults and charge-offs.  Also, you know, do a

8      little bit of forecasting and looking ahead.

9  Q   For your position, do you have any policies,

10      procedure books that you routinely look at that may

11      have been created specifically for NextGear?

12  A   I mean, there are NextGear policies, yes.  They're

13      available to the entire company.

14  Q   Do you have any specific ones that are just for your

15      department?

16  A   Sure.

17  Q   What are those called?

18  A   Travel/entertainment expense policy.  We have payment

19      posting policies.  That's generally -- you know, a

20      couple of the main ones.  There could be others.

21  Q   Do you have policies regarding the withdrawal or

22      termination of credit from customer dealers?

23  A   We do have a policy around charge-offs and defaults,

24      so yes.

25  Q   Does your department handle when something is charged

1   off, or is that more for the risk people?

2 A It's a collaborative effort today between both

3   departments.

4 Q When you say "today," you mean since 2015, when you

5   took over, or --

6 A Yes.  And I can't speak to exactly how it operated

7   back then.  It certainly was always a risk function

8   with finance involvement.  But, you know, in the past

9   couple of years we clearly have more involvement

10   there.

11 Q Did you have any role in creating any of those

12   policies?

13 A During this time frame?  No, I did not.

14 Q Do you have a role now in creating them?

15 A It's a collaborative role, sure.  Certainly with

16   policies that affect finance, I'm involved and have

17   been involved.  I currently sit on a policy review

18   committee.

19 Q Who else sits on that committee?

20 A There are -- there's a VP of operations, VP of risk,

21   VP of legal.

22 Q Who's --

23 A Along with the audit team.

24 Q Who's the vice president of legal?

25 A Rick Wright.

1       MR. AIREY:  I think, with that, we pass the

2    witness.

3       MR. VINK:  All right.  We have nothing on

4    cross-examination.  We will take signature.  You can

5    go ahead and send that to me, and I'll deliver it to

6    the witness.

7       MR. AIREY:  I did want to attach what's RB2178.

8    It was Exhibit 17 from the prior deposition.  So if

9    you want to use that copy instead of this copy,

10   because this one's got writing on it, if that's okay

11   with you all.  But we can cross-reference it, however

12   you want to do it.

13      MR. VINK:  That's fine.

14          AND FURTHER THE DEPONENT SAITH NOT

15

16      _____

17                ADAM GALEMA

18

19

20

21

22

23

24

25

```
 1        STATE OF INDIANA    )
                              )    SS:
 2        COUNTY OF HAMILTON  )


 3


 4            I, Paula A. Morgan, Notary Public in Hamilton
          County, Indiana, do hereby certify that the deponent
 5        was, by me, sworn to tell the truth in the
          aforementioned matter;
 6            That the deposition was taken on behalf of the
          Plaintiffs at the time and place heretofore mentioned
 7        with counsel present as noted;
              That the deposition was taken down by means of
 8        Stenograph notes, reduced to typewriting under my
          direction and is a true record of the testimony given
 9        by said deponent and was thereafter presented to the
          deponent for signature.
10            I do further certify that I am a disinterested
          person in this cause of action; that I am not a
11        relative or attorney of any of the parties or
          otherwise interested in the event of this action and
12        am not in the employ of the attorneys for the
          respective parties.
13
              IN WITNESS HEREOF, I have hereunto set my hand
14        and affixed my notarial seal this _____ day of
          November, 2016.
15

16

17
                         _____
18                       Paula A. Morgan, Notary Public

19
          County of Residence:  Hamilton
20
          My Commission expires:  October 9, 2024
21

22

23

24

25
```

Jake Airey
SHER GARNER CAHILL RICHTER KLEIN & HILBERT
909 Poydras Street, Suite 2800
New Orleans, Louisiana 70112

NOTICE OF DEPOSITION FILING

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

RED BARN MOTORS, INC., et al.,

     Plaintiffs,          Docket No.
                                  1:14-cv-01589-TWP-DKL
     vs.

COX ENTERPRISES, INC., et al.,      Class Action

     Defendants.

     In compliance with the Indiana Rules of Procedure, Rules of the Industrial Board or Federal Rules of Procedure, pursuant to Indiana Supreme Court Order dated 10-1-86, you are hereby notified of the filing with Counsel for Plaintiffs of the deposition of ADAM GALEMA, taken on November 10, 2016.

                          _____
                            (Date of Filing)

cc:  Paul D. Vink

ASSOCIATED REPORTING, INC.
251 East Ohio Street, Suite 940
Indianapolis, Indiana 46204
(317) 631-0940
www.associated-reporting.com

Receivable Detail Report



EXHIBIT
17

RB 2178

# NEXTGEAR CAPITAL

## Receivable Detail Report

| Region | Not Selected | | Market | Not Selected |
|---|---|---|---|---|
| Business | Red Barn Motors, Inc. (61099) | | Report Date | FRI, 04/26/2013 03:21:06 PM |
| Exclude Default Dealers | False | | Requested By | Gary Hoke |
| Exclude Account Level Charges | False | | Include Comments | No |

### Customer Profile

| | |
|---|---|
| Name: | Red Barn Motors, Inc. |
| Dealer Id: | 61099 |
| Address Line 1: | 24007 La Hwy 16 |
| Address Line 2: | |
| City, State, ZIP: | Denham Springs, LA 70726 |
| Phone: | (225)665-7770 |
| Fax: | (225)665-7716 |

### Market Info & Account Profile

| | |
|---|---|
| Market: | Baton Rouge (180) |
| Market Phone: | (225)620-1660 |
| Dealer Status: | DL |
| Lot Audit: | Incomplete |
| Unapplied Funds: | $9.12 |
| Reserved Funds: | $.00 |

| Fee Type | Description | Amount Due | Date Incurred |
|---|---|---|---|
| NSF | | $25.00 | 03/15/2013 |
| NSF | | $25.00 | 03/15/2013 |
| Repo (Account) | LA Auto Transport Inv#4159 | $200.00 | 04/29/2013 |
| Repo (Account) | la auto transport llc #2862,4034,4035,4036,4037,4038 s#4911,4677,4777,412,449,460 | $2,760.00 | 04/05/2013 |
| NSF | | $25.00 | 03/15/2013 |
| NSF | | $25.00 | 03/15/2013 |
| NSF | | $25.00 | 03/15/2013 |
| NSF | | $25.00 | 03/15/2013 |
| Repo (Account) | La Auto Transport LLC Inv#2129,3867 | $530.00 | 04/27/2013 |
| NSF | | $25.00 | 03/14/2013 |

Total Account Charges for Red Barn Motors, Inc. (61099) : **$3,655.00**

| LOC Type | Approved Credit | Temp. Credit | Temp. Expiration | Total Credit | Outstanding | Credit Available | Term Plan |
|---|---|---|---|---|---|---|---|

RB 2179

RB 2 #8

| LoC Type | Approved Credit | Temp. Credit | Temp. Expiration | Total Credits | Outstanding | Credit Available | Term Plan |
|---|---|---|---|---|---|---|---|
| Retail (Buyer) | $200,000.00 | $.00 | | $200,000.00 | $109,908.15 | $.00 | DKG30/70 – R95/70/70 – RX-5 ... |
| Total Line of Credit for Red Barn Motors, Inc. (61099) | $200,000.00 | | $.00 | $200,000.00 | $109,908.15 | $.00 | CN10/20 |

**Retail (Buyer) Inventory Detail for Red Barn Motors, Inc. (61099)**

| Floor Date | Last Days Paid | VS | Vehicle Description | Car | VIN | Site # | TS | Due | Disb | Source | Original Amt. | Principal Bal. | One Day Bal. | Fee | Interest | Insurance | Term Plan | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/16/12 | 169 | 02/07/12 | SAU | 2002 Crew Suba | Red | 2004SCJ42A03250036 | 383 | ST | 03/18/13 | S | Oak View Auto Auction | $3,176.00 | $2,654.98 | $.00 | $245.00 | $52.46 | $.00 | | $120.00 | $2,852.98 |
| 11/06/12 | 168 | 02/18/13 | SAU | 2005 Ford Free | Red | 2FAD342102D249067 | 414 | ST | 04/10/13 | S | Oak View Auto Auction | $4,457.00 | $3,571.66 | $.00 | $245.00 | $94.17 | $.00 | | $195.00 | $12,473.40 |
| 11/06/12 | 168 | 02/07/12 | SAU | 2001 Mdx Acur | Wht | 3RN182B11YC615572 | 418 | TR | 03/11/13 | S | Oak View Auto Auction | | | $.00 | $70.00 | $52.48 | $.00 | | $120.00 | $2,852.02 |
| 11/16/12 | 161 | 02/14/13 | REP | 2002 Chev Mali | Red | 1G1ND52J024254304 | 424 | ST | 03/18/13 | S | Oak View Auto Auction | $5,208.00 | $4,318.45 | $.00 | $70.00 | $81.57 | $.00 | | $165.00 | $4,652.57 |
| 11/16/12 | 161 | 02/14/13 | REP | 2000 Ford Econ | Red | 1G2NJ52F02Y718235 | 426 | AU | 03/18/13 | S | Oak View Auto Auction | $4,732.00 | $3,160.00 | $.00 | $70.00 | $81.97 | $.00 | | $165.00 | $3,408.57 |
| 11/26/12 | 151 | 04/04/13 | DIS | 2001 Tend Audi | Wht | 2GBDBR1MX88388 | 439 | AU | 04/20/13 | S | Oak View Auto Auction | $1,950.00 | $1,404.00 | $.00 | $270.00 | $29.36 | $.00 | | $175.00 | $1,877.36 |
| 12/06/12 | 141 | 04/04/13 | DIS | 2003 Merc Gran | Wht | 2MEFM74W7Y702938S | 440 | AU | 04/20/13 | S | Oak View Auto Auction | $4,376.00 | $3,000.00 | $.00 | $70.00 | $18.00 | $.00 | | $50.00 | $3,142.44 |
| 12/07/12 | 140 | 03/07/13 | SAU | 2006 Dodg Dura | Bik | 1D4HD38K46F690444 | 446 | ST | 04/20/13 | S | Oak View Auto Auction | $3,275.00 | $3,000.00 | $.00 | $275.00 | $152.92 | $.00 | | $50.00 | $137.32 |
| 12/21/12 | 136 | 02/11/13 | SAU | 2002 Ford Expl | Bik | 1FA2U30E2J48291S | 448 | ST | 03/13/13 | S | Loubianie's 1st Choice | $5,820.00 | $6,408.00 | $.00 | $140.00 | $146.67 | $.00 | | $185.00 | $7,922.17 |
| | | | | | | | | | | Auto Auction | | $3,528.00 | $.00 | $140.00 | $172.50 | $.00 | | $189.64 | $3,630.15 |
| 12/21/12 | 136 | 04/04/13 | DIS | 22nd Dodg Cara | Sil | 1D4GP45R86B246212 | 449 | AU | 04/20/13 | S | Loubianie's 1st Choice | $3,500.00 | | $.00 | $140.00 | $84.56 | $.00 | | $115.00 | $369.62 |
| 12/17/12 | 138 | 04/04/13 | DIS | 2001 Neus Horn | Sil | 1N6DD26S81C267687 | 450 | AU | 04/20/13 | S | Loubianie's 1st Choice | $6,140.00 | $1.00 | $.00 | $140.00 | $96.16 | $.00 | | $275.00 | $305.10 |
| | | | | | | | | | | Auto Auction | | | $.00 | | | $.00 | | | |
| 12/11/12 | 148 | 04/04/13 | DIS | 2000 Hond Odyw | Grn | 5FNRL1872B8417037 | 452 | AU | 04/20/13 | S | Loubianie's 1st Choice | $5,640.00 | $.00 | $.00 | $100.30 | $1.21 | $.00 | | $115.00 | $205.51 |
| | | | | | | | | | | Auto Auction | | | $.00 | | | $.00 | | | |
| 12/17/12 | | | RND | 2004 Ford F150 | Grn | 1FTRX12544NA08514 | 453 | ST | 03/13/13 | S | Auto Auction | $5,240.00 | $4,716.00 | $.00 | $140.00 | $95.49 | $.00 | | $179.64 | $3,131.33 |
| 12/21/12 | 126 | 02/19/13 | SAU | 2003 Toyo Tund | Yel | 5TBJN32162S323110 | 460 | FR | 02/21/13 | S | Oak View Auto Auction | $2,550.00 | $4,235.00 | $.00 | $140.00 | $42.60 | $.00 | | $165.00 | $2,987.25 |
| 12/21/12 | 128 | 02/19/13 | SAU | 2002 Ford Wind | Tan | 2FMZA51444208837S5 | 461 | FR | 02/21/13 | S | Oak View Auto Auction | $1,150.00 | $1,035.00 | $.00 | $140.00 | $39.13 | $.00 | | $189.94 | $1,286.47 |
| 12/24/12 | 119 | 04/04/13 | DIS | 2006 Ford Musu | Sil | 1FA8P46N48DO5788 | 468 | RV | 04/20/13 | S | Oak View Auto Auction | $3,775.00 | $3,775.00 | $.00 | $140.00 | $28.57 | $.00 | | $115.00 | $189.94 |
| 12/29/12 | 119 | 05/24/13 | REP | 2003 Ford Must | Sil | 1FA8P664Z4F427881 | 470 | AU | 04/28/13 | S | Oak View Auto Auction | $4,375.00 | $.00 | $.00 | $140.00 | $41.23 | $.00 | | $115.00 | $296.23 |
| 12/29/12 | 116 | 04/04/13 | DIS | 2000 GMC Sier | Grn | 2GTEK19T13308368 | 471 | AU | 05/28/13 | S | Oak View Auto Auction | $4,075.00 | $2,887.00 | $.00 | $140.00 | $88.66 | $.00 | | $175.00 | $368.06 |
| 01/11/13 | 106 | 04/17/13 | DIS | 2004 Merc Sabl | Gry | 1MEHM40W52602873 | 472 | AU | 04/12/13 | S | Oak View Auto Auction | $2,350.00 | $1,260.00 | $.48 | $225.00 | $97.63 | $.00 | | $157.44 | $1,708.57 |
| 01/11/13 | 105 | 04/04/13 | DIS | 2004 Mitz V6 | Blu | 4A3AC84H34E037680 | 476 | AU | 04/26/13 | S | Oak View Auto Auction | $1,950.00 | $1,500.00 | $.00 | $225.50 | $59.26 | $.00 | | $147.54 | $2,281.92 |
| 01/11/13 | 106 | 04/04/13 | DIS | 2001 Chev S10 | Vils | 1G8CS14V81K162 | 476 | AU | 04/26/13 | S | Oak View Auto Auction | $2,500.00 | $1,000.00 | $.00 | $155.00 | $53.48 | $.00 | | $119.00 | $411.96 |
| 01/11/13 | 105 | 04/04/13 | DIS | 2002 Buic Cent | Boo | 2G4WS52J621121189 | 477 | AU | 04/26/13 | S | Oak View Auto Auction | $2,450.00 | $480.00 | $.00 | $225.77 | $72.77 | $.00 | | $189.00 | $1,378.47 |
| 01/24/13 | 91 | 04/30/13 | DIS | 1997 Acur Infu | Gre | 19HDB7051XC07044 | 480 | FR | 02/05/13 | S | Oak View Auto Auction | $2,850.00 | $2,560.00 | $.00 | $225.50 | $65.32 | $.00 | | $206.00 | $3,044.32 |
| 01/24/13 | 91 | 04/03/13 | Cal | 2004 Ford Flex | Cal | 2FAGZ05134G014720 | 481 | FR | 02/08/13 | S | Oak View Auto Auction | $3,275.00 | $3,275.00 | $.00 | $225.00 | $58.13 | $.00 | | $206.00 | $3,044.32 |
| 01/25/13 | 91 | 04/28/13 | Cal | 1PMDE41WT388709 | Gre | 1PMDE41WT388709 | 481 | FR | 02/08/13 | S | Oak View Auto Auction | $3,225.00 | | $.00 | $228.95 | $58.00 | $.00 | | $206.00 | $3,851.13 |
| 01/25/13 | 91 | 2001 Toyo Camr | Vils | 4T1BG22K11U452822 | | 484 | AU | 04/28/13 | S | Oak View Auto Auction | | $3,275.00 | $789.00 | $.00 | $155.00 | $53.15 | $.00 | | $133.00 | $3,118.05 |
| 01/25/13 | 91 | 2008 Chy 300 | Vils | 2C8KA49880U352890 | | 485 | FR | 02/28/13 | S | Oak View Auto Auction | $7,713.00 | $7,713.00 | $.00 | $225.00 | $186.54 | $.00 | | $216.00 | $159.22 |
| 01/25/13 | 91 | 2008 Toyb Aval | Vils | 4T1BK36B90U060224 | | 486 | AU | 04/04/13 | S | Oak View Auto Auction | $11,500.00 | $690.00 | $.00 | $225.00 | $322.01 | $.00 | | $133.00 | $6,203.56 |
| 01/25/13 | 91 | 04/04/13 | DIS | 1997 Dodg Gran | Vils | 1B4GP44R0VB427005 | 487 | AU | 04/04/13 | S | Oak View Auto Auction | $3,575.00 | $469.31 | $.00 | $165.00 | $72.77 | $.00 | | $133.00 | $5,156.06 |
| | | | | | | | | | | | | | | | | | | | $966.11 |

Report Run time: FRI, 04/26/2013 03:21:08 PM

RB 2178

RB 2180

| Floor Date | Last Paid | Days | VS | DIS | Vehicle Description | CH | Clr | VIN | Sta # | TS | Due | Disb | Source | Original Amt. | Principal Bal. | One Day Bal | Fee | Interest | Insurance | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/05/13 | 04/15/13 | 51 | | | 2003 Niss Maxi | Gol | | JN1DA31D23T319876 | 490 | AU | 04/15/13 | S | Oak View Auto Auction | $4,975.00 | $526.00 | $.00 | $155.00 | $311.57 | $.00 | $750.00 | $304.57 |
| 01/02/13 | | 81 | RMD | | 2004 Ford Must | Red | | 1FAFP42X74F123105 | 492 | ST | 05/26/13 | S | Oak View Auto Auction | $3,775.00 | $3,775.00 | $.00 | $225.00 | $25.25 | $.00 | $3268.00 | $4,458.34 |
| 02/21/13 | 04/29/13 | 94 | DIS | | 1988 Chev C30 | Red | | 1GBHC33K8HV2PAT4D | 493 | AU | 04/26/13 | S | Oak View Auto Audtion | $2,450.00 | $834.00 | $.00 | $155.00 | $25.25 | $.00 | $731.00 | $31,708.23 |
| 02/07/13 | 04/15/13 | 84 | DIS | | 2008 Hyun Sona | Gre | | 5NPET46C56H016642 | 494 | AU | 04/26/13 | S | Oak View Auto Audtion | $4,775.00 | $1,080.00 | $.00 | $155.00 | $25.25 | $.00 | $733.00 | $1,392.24 |
| 02/04/13 | | 77 | RMD | | 2001 Chev 2FT C | | | 2GCEK19B651T311458 | 495 | ST | 04/26/13 | S | Oak View Auto Audtion | $3,075.00 | $3,075.00 | $.00 | $155.00 | $70.25 | $.00 | $203.00 | $4,008.00 |
| 02/04/15 | | 77 | REP | | 2002 Chev Malj | | | 1G1ND52J22MU651055 | 496 | ST | 04/18/13 | S | Oak View Auto Audtion | $3,075.00 | $3,075.00 | $.00 | $155.00 | $70.25 | $.00 | $203.00 | $14,008.00 |
| 02/30/13 | 04/04/13 | 77 | DIS | | 2000 Mazd MPV | Blu | | JM3LW28G9Y0108514 | 497 | AU | 04/24/13 | S | Oak View Auto Audtion | $2,720.00 | $2,750.00 | $.00 | $155.00 | $69.07 | $.00 | $750.00 | $53,157.07 |
| 02/06/13 | | 77 | SAU | | 1989 Dodg D100 | Blu | | 1B4HE56Z3KW990343 | 499 | AU | 04/26/13 | S | Oak View Auto Audtion | $3,375.00 | $805.00 | $.00 | $155.00 | $57.01 | $.00 | $56.00 | $915.01 |
| 02/21/13 | 04/15/13 | 77 | DIS | | 2006 Chev Malj | Whi | | 1G1NDS25F6R147047 | 501 | AU | 04/26/13 | S | Oak View Auto Audtion | $3,375.00 | $3,375.00 | $.00 | $155.00 | $71.06 | $.00 | $5223.00 | $53,544.96 |
| 02/21/13 | 04/24/13 | 73 | DIS | | 2005 Ford F150 | Gol | | 1FTPW12586SA447635 | 502 | AU | 04/24/13 | S | Eashview's 1st Choice Auto Audition | $5,045.00 | $1,675.00 | $.00 | $385.00 | $85.13 | $.00 | $563.00 | $1,762.13 |
| | | | | | | | | | | | | | Eashview's 1st Choice Auto Audition | | | | | | | | $21,629.60 |
| 02/07/13 | 04/12/13 | 73 | DIS | | 1932 FORD F150 | Whi | | 2FTGF15N3NCA34980 | 503 | AU | 04/12/13 | S | Loudabush's 1st Choice Auto Audition | $3,596.00 | $1,123.00 | $.00 | $563.00 | $55.23 | $.00 | $663.00 | $11,333.20 |
| 02/21/13 | 04/26/13 | D80 | | | 2003 Niss A45 | Gre | | 1N4AL11D72C129904 | 505 | AU | 04/24/13 | S | Loudabush's 1st Choice Auto Audition | $5,245.00 | $845.93 | $.00 | $285.00 | $378.21 | $.00 | $603.00 | $875.24 |
| 02/12/13 | | 72 | REP | | 1998 Saw S-Se | Gul | | 1G8ZH5288WZ228581 | 506 | FR | 04/18/13 | S | Loudabush's 1st Choice Auto Audition | $2,195.00 | $2,195.00 | $.00 | $155.00 | $34.00 | $.00 | $53.00 | $2,547.00 |
| 02/11/13 | 04/04/13 | 70 | DIS | | 2002 Ford Expl | Blu | | 1FMZU63E52ZB34807 | 507 | AU | 04/04/13 | S | Oak View Auto Audition | $3,675.00 | $925.00 | $.00 | $585.00 | $21.77 | $.00 | $563.00 | $324.77 |
| 02/04/13 | | 70 | HHD | | 1995 LAa Izert | | | 4N7NB40D86660282 | 508 | ST | 04/18/13 | S | Oak View Auto Audition | $6,050.00 | $6,050.00 | $.00 | $185.00 | $130.53 | $.00 | $133.00 | $7,378.33 |
| 02/15/13 | | 70 | SAU | | 2002 Chev Silv | Whi | | 1G1EC16T322214763 | 509 | FR | 04/18/13 | S | Oak View Auto Audition | $80,810.00 | $89,910.00 | $.00 | $155.00 | $197.70 | $.00 | $193.00 | $80,375.76 |
| 02/18/13 | | 70 | DIS | | 2001 Mazd MX-5 | Gre | | JM1NB353112214022 | 510 | ST | 04/18/13 | S | Oak View Auto Audition | $3,575.00 | $585.00 | $.00 | $155.00 | $158.00 | $.00 | $143.00 | $143.00 |
| 02/14/13 | 04/04/13 | 70 | DIS | | 1999 GMC C2K1 | Whi | | 1GTEC14V09Z2302537 | 911 | AU | 04/26/13 | S | Oak Tler Auto Audition | $2,920.00 | $.00 | $.00 | $155.00 | $100.81 | $.00 | $143.00 | $3,959.41 |
| 02/14/13 | | 70 | DIS | | 1990 Mazd MP4 | Red | | 1YVGE31G2N8164539 | 513 | AU | 04/26/13 | S | Oak View Auto Audition | $2,850.00 | $1,480.00 | $.00 | $0.00 | $9.41 | $.00 | $663.00 | $11.10 |
| 02/14/13 | | 70 | DIS | | 2002 Toyo 4Run | Gre | | JTDHA40G7322B194 | 514 | AU | 04/24/13 | S | Oak View Auto Audition | $5,475.00 | $490.00 | $.00 | $155.00 | $55.33 | $.00 | $193.00 | $11,450.13 |
| 02/14/13 | | 70 | DIS | | 2008 Ford Taur | | | 1FAHP25U8A220441 | 516 | AU | 04/24/13 | S | Oak View Auto Audition | $4,775.00 | $320.00 | $.00 | $385.00 | $377.20 | $.00 | $58.00 | $31,045.52 |
| 02/27/13 | | 58 | DIS | | 2001 Ford Gren | Gol | | 1BZW2P2304F22981 | 516 | AU | 04/24/13 | S | Loudabush's 1st Chrion Auto Audition | $3,703.00 | $1,030.03 | $.00 | $385.00 | $483.31 | $.00 | $169.00 | $1,234.31 |
| 02/27/13 | | 56 | DIS | | 1GMEC13TXY2149770 | | | 1GMEC13TXY2149770 | 517 | AU | 04/19/13 | S | Loudabush's 1st Choice Auto Audition | $8,445.00 | $2,859.00 | $.00 | $385.00 | $57.33 | $.00 | $588.00 | $9,259.53 |
| 02/27/13 | | 48 | DIS | | 2000 Dodg Yuke | Gre | | 30R1EC1MTFVG330331 | 518 | AU | 04/24/13 | S | Loudabush's 1st Choice Auto Audition | $4,235.00 | $553.00 | $.00 | $385.00 | $45.10 | $.00 | $362.00 | $31,125.44 |
| | | | | | | | | | | | | | Loudabush's 1st Choice Auto Audition | | | | | | | | $753.10 |
| 03/01/13 | 04/04/13 | 56 | DIS | | 2002 Jeep Liber | Blu | | 1J4GK48KX6W214545 | 519 | AU | 04/04/13 | S | Oak View Auto Audition | $3,675.00 | $109.00 | $.00 | $385.00 | $33.60 | $.00 | $562.00 | $295.60 |
| 03/31/15 | 04/08/13 | 56 | DIS | | 2002 Hond Odys | VIN | | 2HKRL18232H019217 | 520 | AU | 04/08/13 | S | Oak View Auto Audition | $3,000.00 | $220.00 | $.00 | $385.00 | $32.34 | $.00 | $588.00 | $1,415.34 |
| 03/10/13 | | 56 | DIS | | 2006 Dodg Neon | Whi | | 1B3ES56C85D211244 | 521 | AU | 04/04/13 | S | Oak View Auto Audition | $2,850.00 | $380.00 | $.00 | $365.00 | $29.97 | $.00 | $588.00 | $1,769.97 |
| 03/01/13 | 04/04/13 | 56 | DIS | | 2000 Toyo Camr | Whi | | 4T1BG22K9YU420109 | 522 | AU | 04/04/13 | S | Oak View Auto Audition | $3,950.00 | $1,125.00 | $.00 | $385.00 | $29.51 | $.00 | $583.00 | $1,333.47 |
| 03/10/13 | | 56 | DIS | | 1994 Toyo Camr | Gol | | 4T1SK13E2RU062116 | 523 | AU | 04/04/13 | S | Oak View Auto Audition | $3,275.00 | $1,205.00 | $.00 | $385.00 | $44.51 | $.00 | $588.00 | $31,022.51 |
| 03/01/13 | | 56 | DIS | | 2003 Dodg Neon | Blu | | 1B3ES56C03D163902 | 524 | AU | 04/29/13 | S | Oak View Auto Audition | $1,650.00 | $.00 | $.00 | $385.00 | $32.95 | $.00 | $88.00 | $736.96 |

**Unit Count: 60**

**Total Retail (Buyer)**    $246,520.00    $109,968.15    $.00    $7,800.31    $3,644.21    $.00    $7,800.31    $129,392.79

Report Run time: FRI, 04/26/2013 03:21:05 PM