UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

RED BARN MOTORS, INC.,            )
PLATINUM MOTORS, INC.,            )
MATTINGLY AUTO SALES, INC.,       )
YOUNG EXECUTIVE MANAGEMENT &      )
CONSULTING SERVICES, INC.,        )
Individually, and on behalf      )
of other members of the          )
general public similarly         )
situated,                        )
            Plaintiffs,           )
                                  ) Docket No.
       -v-                        ) 1:14-cv-01589-TWP-DKL
                                  )
COX ENTERPRISES, INC.,            ) Class Action
COX AUTOMOTIVE, INC.,             )
NEXTGEAR CAPITAL, INC. f/k/a      )
DEALER SERVICES CORPORATION,      )
successor by merger with         )
Manheim Automotive Financial     )
Services, Inc., and JOHN WICK,)
            Defendants.           )


     The deposition upon oral examination of **STUART
LABAUVE**, a witness produced and sworn before me, Tami
L. Scott, Notary Public in and for the County of
Marion, State of Indiana, taken on behalf of the
Plaintiffs at the offices of Bose, McKinney & Evans,
111 Monument Circle, Suite 2700, Indianapolis, Marion
County, Indiana, on November 9, 2016, at 9:00 a.m.,
pursuant to the Federal Rules of Civil Procedure.

**ASSOCIATED REPORTING, INC.**
**251 EAST OHIO STREET, SUITE 940**
**INDIANAPOLIS, INDIANA 46204**
**(317) 631-0940**
**www.associated-reporting.com**


**EXHIBIT D**

74

1   A   Realtime information.

2   Q   They focus on that, the company does?

3   A   They want the information accurate.  I mean, we do

4       have the ability to log it up afterwards, but I do

5       it when I'm there.

6   Q   Okay.  And what type of information would you put in

7       there besides the identifiers of who it is and who

8       you talked to?

9   A   Yeah.  The reason why I was there, if I accomplished

10      what I set out to accomplish, if I got any referrals

11      from the dealer, if I picked up any units to floor.

12  Q   Okay.

13  A   If I cleared an audit.

14  Q   Okay.  Were you under any type of requirement to,

15      quote, "touch" or see every existing client at least

16      once per month?

17  A   They ask us to do it within a 30- to 60-day period,

18      depending on your market.

19  Q   And would that involve both physically going out to

20      the exact dealership, as well as maybe seeing that

21      dealership at an auction?

22  A   They count it as only seeing them at the dealership.

23  Q   What if you would see somebody at an auction?

24  A   Yeah, I can have conversations with them, but I

25      don't log them up.

75

```
 1   Q    Have you ever logged a conversation that you had
 2        with a dealer at an auction?
 3   A    No.
 4   Q    Are you sure about that?
 5   A    We don't get credit for those, so I never made a
 6        habit of doing those.
 7   Q    You would input, though, that you went to a
 8        particular auction on a particular day, though;
 9        correct?
10   A    Yes, sir.
11   Q    And what type of information would you put on an
12        auction visit?
13   A    Usually just that I attended the auction that day,
14        and if there was any promo we were running, I would
15        put, you know, for the sales blitz we had or
16        whatever the circumstance might be, but normally
17        just that I attended the auction.
18   Q    You mentioned audits before.  Do you also conduct or
19        oversee site audits for customer dealers?
20   A    Yes, sir.
21   Q    You did that for DSC as well as NextGear; is that
22        correct?
23   A    Yes, sir.
24   Q    Did you document those contacts and those efforts?
25   A    Yes, sir.
```

76

1   Q   How is that recorded?  Same way?

2   A   Yeah.  Well, Salesforce, and then our collections

3       management in Discover.

4   Q   Did the computer system change from DSC to NextGear?

5   A   We still operate off of Discover, which was both.

6   Q   Okay.  So that's a no?  No change?

7   A   No, sir.

8   Q   And we've mentioned before, we've both discussed the

9       term floorplan and floorplanning.  Is that a -- are

10      those phrases commonly used in the used car

11      industry?

12  A   Yes, sir.

13  Q   And explain your understanding of the term

14      floorplanning.

15  A   It's setting up a line of credit for a dealer to buy

16      inventory.

17  Q   From whom?

18  A   It can be from auctions, from wholesalers, from

19      individuals, trade-ins.

20  Q   And in turn, who pays the auction as part of the

21      floorplanning?

22  A   NextGear does.

23  Q   What is the KO book?

24  A   Called the knockout book.

25  Q   What is it?

77

| | | |
|---|---|---|
| 1 | A | If there is a dealer that defaults either with a |
| 2 | | floorplan or writes a bad check to an auction, |
| 3 | | Auction Insurance is notified. |
| 4 | Q | What is a result for a customer dealer that is |
| 5 | | placed in the KO book? |
| 6 | A | Most floorplan companies won't give a line of |
| 7 | | credit, and it probably becomes on a cash basis at |
| 8 | | an auction. |
| 9 | Q | So it affects a customer dealer both with floorplan |
| 10 | | companies and the auctions itself; correct? |
| 11 | A | As far as I know, yes, sir. |
| 12 | Q | Have you ever caused any of your customers to be |
| 13 | | listed in the KO book? |
| 14 | A | No, sir. |
| 15 | Q | Have you ever referred to corporate any of your |
| 16 | | customer dealers for placement in the KO book? |
| 17 | A | No, sir. |
| 18 | Q | You've never had a customer dealer default? |
| 19 | A | I have. |
| 20 | Q | So what do you do? |
| 21 | A | Once I secure any inventory and get any bills of |
| 22 | | sales or disposition of all cars, our risk |
| 23 | | department takes it from there. |
| 24 | Q | As a man on the ground, though, you're a part of the |
| 25 | | collection effort; correct? |

78

```
 1   A   Yes, sir.
 2   Q   How many customers have you referred to your -- risk
 3       management, you said?
 4   A   Yes, sir.
 5   Q   -- your risk management division for placement in
 6       the KO book?
 7   A   None.
 8   Q   None.  How many of your customer dealers have been
 9       placed on the KO book?
10   A   I don't know.
11   Q   Less than five?  More than five?
12   A   I have no idea how many.  Once it goes to our risk
13       department, I don't deal with it anymore.
14   Q   Well, you see those customers --
15   A   Yes, sir.
16   Q   -- in the future; correct?
17   A   Yes, sir.
18   Q   Right?  And at some point, have any of those
19       customers said, well, geez, I'm in the KO book now,
20       Stuart?  Can you help me?
21   A   One time.
22   Q   Who said that?
23   A   A guy by the name of Beau Guidry.  I think he had
24       Affordable Auto Sales, and he was placed in the KO
25       book for a bounced check, and we allowed him to --
```

79

```
 1        he got himself out, and we allowed him to work out
 2        of the floorplan.
 3   Q    And he came to you for help?
 4   A    Yes, because he wanted to pay us off.
 5   Q    Because while he was in the KO book, how was he
 6        adversely affected?
 7   A    His floorplan with us was -- he didn't have any
 8        available credit with us anymore.
 9   Q    How many customer dealers do you believe -- I know
10        this is just a general ballpark number -- do you
11        believe that you have either signed up or
12        supervised, so to speak, since your employment in
13        2007?  More than a thousand?
14   A    No.
15   Q    More than 400?
16   A    I couldn't give you an exact figure.  I've never
17        looked at that.
18   Q    The Discover system, though, would contain that
19        information; correct?
20   A    Yes.  I could probably get it.
21   Q    So someone from corporate could certainly, and
22        correct me if I'm wrong, type in Stuart LaBauve and
23        maybe have an account history for you?
24   A    I believe so.
25   Q    Okay.  And would that show both the dealer's name,
```

80

```
 1        as well as the account number and then other
 2        activity?
 3   A    Yes, sir.
 4   Q    And that would be available for every account
 5        executive; is that correct?
 6   A    Yes, sir.
 7   Q    How soon after a default would the risk management
 8        division of NextGear or DSC take action to place
 9        someone in the KO book?
10   A    I don't know.
11   Q    Less than a week?  More than a week?
12   A    I guess it depends on the circumstances with the
13        dealer and the particular situation he's in.
14   Q    Now, once your risk management division of either
15        DSC or NextGear would place someone in the KO book,
16        at some point you had to receive notification of
17        that; correct?
18            MR. VINK:  I'm going to object to the form of
19        the question.  That mischaracterizes his testimony.
20        There's been no testimony that anybody at NextGear
21        places somebody in the KO book.  His testimony was
22        actually the opposite.
23   Q    You mentioned -- I'll rephrase.
24            You mentioned Auction Automobile, Automobile
25        Auction Insurance?
```

81

```
 1    A     Yes.

 2    Q     Who is that?

 3    A     They are a third-party company --

 4    Q     Right.

 5    A     -- that the -- they insure the dealerships at the

 6          auctions over bad checks.

 7    Q     Right.  So you have a customer, okay -- follow me

 8          here -- you have a customer; something happens, bad,

 9          right?

10    A     (Nodding head affirmatively.)

11    Q     You've got to say yes or no.

12    A     Yes.

13    Q     All right.  The risk management division of either

14          DSC/NextGear then does something; correct?

15    A     Yes.

16    Q     And then how do you know -- at some point, you must

17          find out this existing customer that you're supposed

18          to, quote, "touch" once a month is no longer in good

19          standing with the company?

20    A     (Nodding head affirmatively.)

21    Q     How do you know that?

22    A     Because when we see the signs of a dealer gone bad,

23          my regional director is involved; my risk department

24          is involved before the default ever occurs, knowing

25          what's going on; and then if there is no end in
```

82

1            sight with it, that's when they default the account.

2     Q     Right.  And so then what are you told from corporate

3            at that point when the relationship ends, so to

4            speak?

5     A     If there is any inventory left on the floorplan,

6            it's to secure that, get it to an auction.  If there

7            is any sold units, get bills of sales on those

8            units.

9     Q     And when you said the dealer goes bad, the dealer

10           goes bad, at that point, or at some point, he is

11           placed -- he or she is placed in the KO book?

12    A     I don't know when that happens.

13    Q     You don't continue to do business with that person;

14           correct?

15    A     No, sir.

16    Q     You stop seeing them; correct?

17    A     Yes, sir.

18    Q     Have you seen some of those people, though, at other

19           auctions?

20    A     I still do.

21    Q     You still do.  And give us a for instance.

22    A     There is no communication between me and them.

23    Q     Okay.  How is their ability to work at an auction or

24           to attend an auction or buy from an auction affected

25           once they're in the KO book, from your

83

```
 1         understanding?
 2    A    I believe the auctions place them on a cash-only
 3         basis.
 4    Q    And how many customer dealers would you estimate
 5         that have, quote, "gone bad"?
 6    A    I don't know.
 7    Q    Would you say less than 50?  More than 50?
 8    A    I can't give you an exact number.
 9    Q    Well, certainly, this is your portfolio we're
10         discussing; correct?
11    A    Correct.
12    Q    And over time, your portfolio changes; correct?
13    A    Uh-huh.  Yes, sir.
14    Q    New additions; right?
15    A    Yes, sir.
16    Q    And customer dealers going bad; correct?
17    A    Yes, sir.
18    Q    These are people that you actually, in addition to
19         seeing them at the auction, you actually are
20         mandated to see them at least once every 60 days,
21         correct, at their dealership; correct?
22    A    Yes, sir.
23    Q    So these are people that you know in person;
24         correct?
25    A    Yes, sir.
```

84

1    Q    You know their first name, you know their last name?

2    A    Yes, sir.

3    Q    You know where they work?

4    A    Yes, sir.

5    Q    How many of those people do you stop seeing when it

6         goes bad?

7    A    Stop seeing them at their dealership?

8    Q    Correct.

9    A    Once a default happens and we're clear of any

10        inventory, I don't see them; I don't visit the

11        dealership.

12   Q    Right.  So give me a total number; of course, an

13        estimate.

14   A    Maybe 50.

15   Q    Okay.  Just in that region?

16   A    When I first started, I covered the whole state of

17        Louisiana.

18   Q    So that includes both that particular geographic

19        region, as well as what you have now; correct?

20   A    Yes, sir.

21   Q    When is the last time you had a, quote, "dealer go

22        bad" as we sit here today, September 9th, 2016?

23        September.  I'm sorry.  November.

24            MR. VINK:  Feels like September.

25   Q    A little off.

85

| | | |
|---|---|---|
| 1 | A | A dealer go bad?  I guess just two months ago, a |
| 2 | | month ago. |
| 3 | Q | Is that person or that company any longer a customer |
| 4 | | dealer for NextGear? |
| 5 | A | They are still a customer. |
| 6 | Q | Have they been placed on some type of restrictions? |
| 7 | A | They don't have available credit and they are on |
| 8 | | certified funds to pay us. |
| 9 | Q | You mentioned earlier the risk management division; |
| 10 | | is that right? |
| 11 | A | Yes, sir. |
| 12 | Q | Of NextGear or DSC.  Was it the same under both? |
| 13 | A | Risk department, yes. |
| 14 | Q | Risk department.  Okay.  And is that housed here in |
| 15 | | Carmel, Indiana? |
| 16 | A | Yes, sir. |
| 17 | Q | And is the Auto Auction Insurance Company, the |
| 18 | | third-party company that you mentioned before, is |
| 19 | | that located in Birmingham, Alabama? |
| 20 | A | I don't know where they're located. |
| 21 | Q | The KO book, what you called -- I guess it is called |
| 22 | | the knockout book, is this some super secret |
| 23 | | process, or is this pretty widely known within |
| 24 | | NextGear and DSC? |
| 25 | A | I'm sure it's widely known. |

86

1    Q    In addition to working with this third-party

2         company, the Auto Auction Insurance Company that you

3         mentioned earlier, and the KO book, does NextGear,

4         obviously, work with its sister company, Manheim

5         Auto Auctions?  Do you interface with those

6         individuals?

7    A    Yes, sir.

8    Q    And when someone is placed in the KO book, in

9         addition, are they also banned from Manheim

10        Auctions?

11   A    I don't know what their policies are.

12   Q    The customer dealers, those approximately 50,

13        ballpark, 50 customer dealers, do you still see them

14        at Manheim Auto Auctions?

15   A    I can't speak to that.  I don't know.  I haven't

16        attended Manheim in 30 days or so.

17   Q    Okay.  Well, prior to that, people that have --

18        dealers that have -- you've ended your relationship

19        with, or NextGear has, the dealers that you don't go

20        see anymore, do you see them walking around at

21        Manheim Auction?

22   A    There are dealers that I don't do business with that

23        I see walking out there.  I know they defaulted.

24        Where they stand with the KO book, I don't know.

25   Q    Manheim would be able to tell us that information;

100

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | Where did Mr. O'Dell come from? |
| 3 | A | I don't know his work history. |
| 4 | Q | Did he come from Manheim? |
| 5 | A | Which?  When? |
| 6 | Q | I don't know.  I'm asking you. |
| 7 | A | You're saying he left, so I don't know. |
| 8 | Q | Okay.  Flip to 5056 and 5057, if you could.  It's |
| 9 | | the last couple of pages, or third and fourth pages. |
| 10 | A | Yes, sir. |
| 11 | Q | Do you see this document entitled Contract Quick |
| 12 | | Facts? |
| 13 | A | Yes. |
| 14 | Q | That's 5056.  The next page, though, is upside down; |
| 15 | | is that right? |
| 16 | A | Yes, sir. |
| 17 | Q | That's 5057? |
| 18 | A | Yes, sir. |
| 19 | Q | Do you recognize the signature on 5057? |
| 20 | A | No, sir. |
| 21 | Q | You don't recognize that? |
| 22 | A | No, sir. |
| 23 | Q | It's not yours? |
| 24 | A | I don't believe so, no, sir. |
| 25 | Q | Okay.  Fair enough.  Flip back to the second page, |

101

1       and that's 5035 of this document, and at the top,

2       it's entitled Demand Promissory Note and Security

3       Agreement.  Do you see that Mr. LaBauve?

4 A    Yes.

5 Q    Again, Dealer Services Corporation?

6 A    Yes, sir.

7 Q    Carmel, Indiana?

8 A    Yes, sir.

9 Q    The definition of 1(a), the term "Advance," again,

10       could you please read that into the record?

11 A    "...shall mean any loan or payment in any amount

12       made pursuant to the note by DSC to dealer or on

13       dealer's behalf to any third party."

14 Q    Same as before in the 2007; correct?

15 A    I would have to --

16          MR. VINK:  I'll object to the form.  It's

17       actually not the same.

18 Q    Well, you go ahead and look at it, Mr. LaBauve, and

19       tell me the difference, if there is one.

20 A    The words "in any amount made" has been added.

21 Q    And before -- that's 2011; correct, Exhibit 3?

22 A    Yes, sir, 2011.

23 Q    That's the only change to that term; correct?

24 A    To that 1(a) definition, yes, sir.

25 Q    Now, when you would have a, let's say, 2007,

102

| | | |
|---|---|---|
| 1 | | contract, this standard form, you would basically |
| 2 | | have stacks of these with you, or would they be sent |
| 3 | | by corporate per individual customer applicant? |
| 4 | A | We would print them out. |
| 5 | Q | Where? |
| 6 | A | From our printer. |
| 7 | Q | Like in your office? |
| 8 | A | Yes, sir. |
| 9 | Q | And you would print out standard forms, or would it |
| 10 | | be after someone would apply? |
| 11 | A | Blank forms. |
| 12 | Q | Blank forms.  And would you carry these with you? |
| 13 | A | Well, this, we would take the application, get all |
| 14 | | the documentation, send it in.  When lending had a |
| 15 | | decision and a contract, then we would get this |
| 16 | | form. |
| 17 | Q | And you'd go ahead and print that out and go back to |
| 18 | | the dealer and get them to sign it; correct? |
| 19 | A | Yes, sir. |
| 20 | Q | And you would use whatever they sent you; correct? |
| 21 | A | Yes, sir. |
| 22 | Q | They, being corporate; correct? |
| 23 | A | Yes, sir. |
| 24 | Q | These contracts that you would present to the |
| 25 | | customer dealer after they would apply and be |

1          approved, this was not something that you would

2          negotiate with the customer; correct?

3    A    We could discuss terms.

4    Q    Right.  And the terms being, what, the 60/30/30

5          terms?

6    A    Depends on what they were interested in would fit

7          for their business model that they told us about.

8    Q    Right.  You wouldn't -- I'm sorry -- on like

9          Exhibit 3 and Exhibit 2, they wouldn't have -- the

10         customer dealer wouldn't have the option to go, you

11         know what, I want to change this definition to

12         advance, or I want to change that definition;

13         correct?

14   A    Yes, sir.

15   Q    This was a take it or leave it; correct?

16   A    Yes, sir.

17   Q    The only options they would have would be what --

18         the Term Sheet numbers; correct?

19   A    Yes, sir.

20   Q    And what options were those, again?

21   A    We had different options of terms we could do.

22         Depends on the line of credit they were applying

23         for.

24   Q    If I was a customer dealer back in 2007, could I say

25         Stuart, 2 percent, that's what I'm willing to pay.

104

1            Did he have that option?

2     A     If his credit was strong enough and if there was --

3            on the terms, yes, we could negotiate some of that

4            stuff.

5     Q     Did you often negotiate interest rates?

6     A     We could if we needed to.

7     Q     How many times have you changed an interest rate?

8     A     I couldn't give you an exact number.

9     Q     Less than five?

10    A     It was more than that.

11    Q     Less than ten?

12    A     More than that.

13    Q     How many?

14    A     I don't know.  We've talked to the number we did

15           before.  I don't know how many, you know, sales that

16           I've done, and I don't know how many contract

17           terms -- I can't tell you all the terms because in

18           the middle of contracts, we can change terms as

19           well.

20    Q     The records would show whatever they are; correct?

21    A     Yes, sir.

22    Q     But as far as the contract itself, the customer

23           didn't have the option of altering in any fashion?

24    A     No, sir.

25    Q     Correct?

105

1    A    Correct.

2    Q    It was a take it or leave it; correct?

3    A    Yes, sir.

4    Q    Still on Exhibit 3, go ahead and flip to, if you

5         could, page number 5054.  What's the title of this

6         document?

7    A    Dealer Services Corporation ACH Authorization and

8         Request Withdrawal or Deposit.

9    Q    And does this record, this sheet of paper, does it

10        document that DSC would be and did electronically

11        withdraw money from customer dealers' checking

12        accounts?

13   A    Yes.

14   Q    And as you testified earlier, DSC has customer

15        dealers in every state of the United States;

16        correct?

17   A    I believe so, yes, sir.

18   Q    And DSC has always been headquartered in Carmel,

19        Indiana; correct?

20   A    Yes, sir.

21   Q    And that remained the same after the merger with

22        MAFS; correct?

23   A    Yes, sir.

24   Q    So these withdrawals for your contracts in the state

25        of Louisiana would come from Carmel, Indiana, and

106

```
 1        they would withdraw money from customer dealers in
 2        Louisiana, let's say; is that correct?
 3   A    They would withdraw money from any customer that
 4        owed money.
 5   Q    Wherever their banks were; correct?
 6   A    Yes.
 7   Q    And for instance, for your dealers, those banks were
 8        in the state of Louisiana; correct?
 9   A    Depends on what -- I don't know where they --
10        different dealers had different banks.  Some had
11        online banking that could be out of state.
12   Q    All of your dealers didn't have banks inside the
13        state of Indiana, though; correct?
14   A    No, sir.
15   Q    So when DSC would take money from a customer dealer,
16        it would cross state lines?
17   A    I'm sure, yes, sir.
18   Q    All right.  They don't have -- this sheet of paper
19        doesn't have numbers, but you see the bullet points,
20        so to speak?
21   A    Yes, sir.
22   Q    Look at the second bullet point.  Do you see that?
23   A    Yes, sir.
24   Q    Okay.  And this bullet point, you correct me if I'm
25        wrong, provides that DSC may initiate, and that's a
```

107

```
 1              quote, right, DSC may initiate a payment -- I'll
 2              just go ahead and read it -- "DSC may initiate a
 3              required payment from the designated account on or
 4              after the first business day following the date that
 5              such amount would come due and owing under the
 6              note."  Is that correct?
 7    A         Yes, sir.
 8    Q         So when you take this provision in this document
 9              here that says DSC is going to initiate, it may
10              initiate that withdrawal; right?
11    A         Yes, sir.
12    Q         After the payment becomes due; correct?
13    A         Yes, sir.
14    Q         Flip back and combine that with the term "Advance"
15              on page one, and that's 5035.  When you combine
16              those two statements in this contract package, DSC
17              was allowed to withdraw the money only after DSC
18              made a loan or payment either to the dealer or on
19              the dealer's behalf to a third party; correct?
20                   MR. VINK:  I'm going to object to the form of
21              the question.  Clearly calls for a legal conclusion,
22              as this is a lay witness, not a lawyer.
23    Q         From your understanding, not the legal conclusion,
24              but this is the contract you sold; correct?
25    A         Repeat it, the question, please.
```

111

1          MR. JURKIEWICZ:  Sure.

2          MR. COMAN:  Go off the record.

3          *(A recess was taken.)*

4     BY MR. COMAN:

5     Q    Going back on the record here.  Have you had a

6          chance to review Exhibit No. 3, Mr. LaBauve?

7     A    Yes, sir.

8     Q    And as to my question, when you look at the ACH

9          authorization on 5054 stating that DSC is allowed to

10         extract the money from a customer dealer when the

11         amount becomes due and owing under the note and you

12         combine that with the definition of the term

13         "Advance" on page 5035, that is the time period or

14         the occurrence of when DSC is allowed to pull money

15         out of a customer's account after an advance is made

16         on their behalf; correct?

17    A    Yes, sir.

18         MR. VINK:  Object to the form of the question.

19         Again, it calls for legal conclusions.  You can

20         answer to the extent you feel comfortable opining a

21         legal answer.

22    Q    What was your answer?

23    A    When a dealer wants to floor a car with us, when he

24         tells the auction, floor it with NextGear, we

25         consider it a loan.  A loan is generated that day

112

1    and an advance will be made on that loan.

2 Q  Okay.  Originally while your counsel was objecting

3    before that answer, your answer was yes, and then

4    that was your explanation; is that correct?

5 A  Okay.  Rephrase it.

6 Q  Okay.  When we look at those two pieces of paper in

7    this contract package that's presented to a customer

8    dealer back in 2011, again, when the customer takes

9    the car from the auction, tells the auctioneer, put

10    it on DSC's floorplan, leaves with the car, he or

11    she leaves with the car, okay, DSC is only allowed

12    to start taking those wires, those monies out of the

13    customer's account after the advance is made;

14    correct?

15     MR. VINK:  Objection.  Again, calls for a legal

16    conclusion, asking him to construe legal documents.

17 Q  And your answer is?

18 A  When that car is floored, we consider it a loan, and

19    an advance will be made on that loan for that

20    dealer.

21 Q  Okay.  Where is that contained in this document?

22    You've had 15 minutes to review it.  Did you see it

23    anywhere?

24     MR. VINK:  Same objection.  Again, asking a lay

25    witness for a legal opinion.

113

1   A   That's my understanding of when we're flooring cars,

2       the advance is going to be made when the customer

3       tells us he wants to floor, make a loan with

4       NextGear on that -- DSC on that unit.

5   Q   I think we're in agreement of what happens.  I'm

6       talking about this contract, though.  What you said,

7       where is what you just said in this contract

8       somewhere?

9           MR. VINK:  Same objection.  It's also been

10      asked and answered.

11  Q   Where is that in there?

12  A   That's my understanding of the contract.

13  Q   Did you find it anywhere?

14  A   Of --

15  Q   As best you could tell?

16  A   In --

17          MR. VINK:  Same objection.  Can I just have a

18      standing objection to this whole line of questions?

19          MR. COMAN:  Yes.  That's fine.

20          MR. VINK:  It's inappropriate asking him for a

21      legal conclusion.

22  A   Yeah.  When we floor the car, we consider it a loan,

23      and an advance is going to be made on it.

24  Q   Did you find what you just said in that document,

25      Exhibit No. 3, yes or no?

114

```
 1            MR. VINK:  If you feel comfortable answering
 2       the question.
 3   A   The definition of advance says a loan made, a loan
 4       or payment.
 5   Q   It says, for the record, "'Advance' shall mean any
 6       loan or payment in any amount made pursuant to this
 7       note by DSC to dealer or on dealer's behalf to any
 8       third party."  And a loan or payment is money;
 9       correct?
10   A   A loan is the car that we're being -- that is being
11       floored.
12   Q   But the money is not paid by DSC to the auction;
13       right?
14   A   I don't know when the money gets paid to the
15       auctions.
16   Q   Okay.  Sitting here now, you know when it's paid;
17       correct?
18   A   No, sir, because different auctions get paid at
19       different times, so I can't speak to any one
20       auction.
21   Q   The floorplan date is not the loan date, though;
22       correct?
23   A   The floorplan date is the sale date.
24   Q   Sale to the customer dealer; correct?
25   A   If we're talking auction, from the auction to the
```

115

1              customer.

2    Q    Right.  That's not the date of when DSC or NextGear

3         pays the auction, though; right?

4              MR. VINK:  Objection.  Asked and answered.  You

5         can --

6    A    Like I said, I don't know when loans get paid.

7    Q    Even as you sit here right now, you don't know when

8         NextGear is paying auctions?

9    A    On a --

10             MR. VINK:  Same objection.  He's answered the

11        question.  He said it varies.

12             MR. COMAN:  Right.

13             MR. VINK:  It's been answered.

14   Q    Thank you.  But my question is as you sit here

15        today, not talking about the 2011 contract, but as

16        you sit here today, you're not testifying that the

17        floor date, i.e., the date of the auction, is the

18        same date that NextGear is paying the auction on

19        behalf of the dealer?

20   A    I don't know when the auctions get paid.

21   Q    You haven't inquired as to that transaction, that

22        sequence?

23   A    No, sir.  I mean, different auctions get paid at

24        different times.  I don't know when that transaction

25        happens.  I have, in a week's time, I might have 120

116

1      units that are floored, maybe 200.  I don't know

2      when they get paid.

3    Q    We will get back to that in a minute.  As far as

4      your process for signing up a customer dealer, and

5      we're looking back at both Exhibit 2 from 2007, as

6      well as Exhibit 3 from 2011, you sold those

7      contracts on a daily and weekly basis; is that

8      correct?

9    A    Yes, sir.  I did sign up new dealers.

10   Q    Okay.  That's a -- would you state that that was, or

11     estimate that that was a large part of your

12     activity?

13   A    In the beginning, yes, sir.

14   Q    Okay.  Did you have a script to follow for this

15     process?

16   A    No, sir.

17   Q    Did DSC provide you with any materials that aided

18     you or gave you some type of substance that you were

19     to pitch or relay to a potential customer dealer?

20   A    We ran through some role-play scenarios on selling.

21   Q    When you would approach a potential customer with

22     the application, what would you tell the potential

23     customer during that process?

24   A    It depends on if he was interested or not interested

25     in signing up.

117

1    Q    If he was not interested, I guess that's a short

2         conversation.

3    A    Well, I mean, we have objections we try to overcome.

4    Q    Okay.  And what would you tell -- what were some of

5         the typical objections or issues that would come up?

6    A    They use their own cash, or it was too expensive.

7    Q    And in response, what was your counter?

8    A    We would try to show them, you know, their cash

9         might be limited, so the floorplan can add

10        additional capital for them to purchase inventory.

11        And when they say it was too expensive, we would go

12        through a scenario of what an actual cost of a car

13        would be for the time frame that they have it on

14        floor when they sell -- before they sell it.

15   Q    Would that discussion involve when interest and

16        curtailment fees are applied?

17   A    Uh-huh.

18   Q    Tell us about that.

19   A    That when the car, you know, car is purchased and

20        floored, the clock starts that day on the

21        curtailment fee to the curtailment date, and

22        interest and insurance at the same time, if they

23        elected our insurance, accrued on a daily basis.

24   Q    Did you ever tell them in addition to that's the

25        date their clock starts ticking, did you tell them

118

1          that that's not necessarily the date that your clock

2          starts ticking?

3    A     Our clock, meaning?

4    Q     Paying the auction.

5    A     Like I say, it just depends on which auction they

6          bought it from and when we pay it, but no, that

7          conversation didn't come up.

8    Q     Once someone would execute or fill out an

9          application, as evidenced on the first page of both

10         Exhibits 2 and 3, what would you do with that

11         application?

12   A     Send it in to our lending department.

13   Q     And once a customer dealer was approved, what did

14         you do next?

15   A     Convey the approval to them and make sure we had all

16         relevant documents.

17   Q     As a ballpark, with the several hundred, whatever

18         number it is that you've signed up, or -- strike

19         that.

20              Of the applications that you've put in or

21         submitted on behalf of dealers, how many, what

22         percentage of those applications would you estimate

23         have been rejected by corporate?

24   A     I don't know.  I can't give you a figure on that.

25   Q     Less than 5 percent?  More than 5 percent?

119

1  A    Probably more than 5 percent.

2  Q    More than 10?

3  A    Possibly.  I mean, I don't know a figure.  I've

4       never looked at that number.

5  Q    Is it an occurrence that takes place on an often

6       basis, or is it something that's more rare?

7  A    I'm not involved in the sales as much currently, so

8       I don't keep up with it as much.

9  Q    Back then, 2011?

10 A    2011?  One a month, possibly.

11 Q    Okay.  Fair to say that it's somewhat rare, given

12      the numbers of people you were interacting with at

13      that time?

14 A    Not rare, but, you know, we would find ways to --

15      you know, maybe we will not give them -- not lend

16      them as much based on their credit, so it might

17      not -- we might have turned it down, but instead we

18      will work with them for $10,000 and let them prove

19      themselves to us.

20 Q    You would work to sign the customer up as best you

21      could; correct?

22 A    Yes, sir.

23 Q    So how many would you estimate that, regardless

24      of -- not a temporary denial, but like that's it,

25      we're not doing business with John Doe, how often

120

```
 1        would that take place?  Rare or often?
 2   A    I would say it's -- it was -- I can't give you a
 3        number.  I mean, it wasn't rare, but it wasn't often
 4        either.  It was --
 5   Q    Once someone was approved and -- once a dealership,
 6        a customer dealer was approved and you would bring
 7        to them the contract, would you review the contract
 8        with the customer?
 9   A    Yes, sir.
10   Q    What did you tell the customer during the
11        contract-signing process?
12   A    By that time, we had gone through most scenarios of
13        how the floorplan worked as far as when you buy a
14        car, when you floor it, how the payments come due,
15        everything, so this we would read, we would go over
16        everything again and sign and go through the term
17        plans and the payments and the audits and everything
18        like that.
19   Q    Was there some pamphlet or guide on what you were
20        supposed to tell or not tell?
21   A    No.
22   Q    Was there a lawyer present?
23   A    No, sir.
24   Q    Okay.  So when your counsel was objecting to --
25        before when we were talking about this contract,
```

121

1       this is something that you sold several hundred

2       times on your own; correct?

3 A   Yes, sir.

4 Q   Okay.  No one helped you; right?

5 A   No, sir.  It was me with the customer.

6 Q   You with the customer, right.  And you would sit

7       down, and that same contract that we've looked at,

8       you would literally go through it with that

9       particular customer?

10 A   Yes, sir.

11 Q   Okay.  Did you keep notes or upload notes on

12       meetings with customers?

13 A   No, sir.

14 Q   You would certainly keep notes, though, on, hey, I

15       signed up John Doe today; correct?

16 A   Well, it depends on the time frame.  This was before

17       Salesforce and all that.

18 Q   When did Salesforce come into existence, ballpark?

19 A   Earlier this year.

20 Q   Before that, how would your supervisor or corporate,

21       the corporate office know that you had signed up

22       John Doe on a particular date?

23 A   Because we would send in the contracts for

24       activation.

25 Q   And that would exist as the evidence that, hey, I

122

| | | |
|---|---|---|
| 1 | | signed up John Doe? |
| 2 | A | Yes, sir. |
| 3 | Q | Did you maintain an electric calendar, like a |
| 4 | | digital calendar, like on Office Outlook or |
| 5 | | something like that? |
| 6 | A | No, sir. |
| 7 | Q | You had no digital calendar? |
| 8 | A | The only thing would be if there was a conference |
| 9 | | call scheduled, they would put it on my calendar, |
| 10 | | but other than that, no, sir. |
| 11 | Q | How would that show up? |
| 12 | A | They have access to our Outlook calendars. |
| 13 | Q | Okay.  So you do use Outlook? |
| 14 | A | Yes, sir. |
| 15 | Q | You used Outlook under DSC as well? |
| 16 | A | I believe so, yes, sir. |
| 17 | Q | So whatever appointments you had with customers, |
| 18 | | auction houses, whatever it would be, would be |
| 19 | | maintained on that Outlook calendar? |
| 20 | A | No, sir. |
| 21 | Q | Where would that be maintained? |
| 22 | A | If I had things to do, I still use pen and paper on |
| 23 | | to-do stuff. |
| 24 | Q | You kept like a monthly calendar? |
| 25 | A | No, sir. |

123

| | | |
|---|---|---|
| 1 | Q | Did you keep any type of calendar? |
| 2 | A | No, sir. |
| 3 | Q | How would you know who you needed to go see? |
| 4 | A | I would review what I needed to do either that |
| 5 | | evening or that morning, made my notes, and go and |
| 6 | | do what I had to do. |
| 7 | Q | We've heard mention of a queue.  Have you heard that |
| 8 | | term before? |
| 9 | A | Yes, sir. |
| 10 | Q | What does that refer to? |
| 11 | A | There is a -- I mean, they have a floorplan queue, |
| 12 | | if there is dealers to be floorplanned that we need |
| 13 | | to go and look at, or applications, if there are |
| 14 | | certain points in an application we need to go and |
| 15 | | check out and see what needs to be done on them. |
| 16 | Q | How is that shown?  Electronically? |
| 17 | A | In Discover, yes, sir. |
| 18 | Q | In Discover.  Is that something you would view on a |
| 19 | | daily basis? |
| 20 | A | Yes, sir. |
| 21 | Q | When you would meet with these potential customers |
| 22 | | in the application process, not the contract |
| 23 | | signing, but the application process, did you inform |
| 24 | | those customers that DSC was going to charge |
| 25 | | interest from the day of the auction, even if they |