```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF INDIANA

 3                   INDIANAPOLIS DIVISION

 4

 5   RED BARN MOTORS, INC.,       CASE NO.
     PLATINUM MOTORS, INC.,       1:14-cv-1589-TWP-
 6   MATTINGLY AUTO SALES,        DKL
     INC., AND YOUNG EXECUTIVE
 7   MANAGEMENT & CONSULTING
     SERVICES, INC.,
 8   individually and on
     behalf of other members
 9   of the general public
     similarly situated,
10
     VERSUS
11
     COX ENTERPRISES, INC.,
12   COX AUTOMOTIVE, INC.,
     NEXTGEAR CAPITAL, INC.
13   F/K/A DEALER SERVICES
     CORPORATION, successor by
14   merger with Manheim
     Automotive Financial
15   Services, Inc., and JOHN
     WICK
16

17

18           Corporate Deposition of RED BAN MOTORS,

19   INC., through its representative DEVON LONDON, 25852

20   Plantation Avenue, Denham Springs, Louisiana 70726,

21   taken in the offices of Lugenbuhl, Wheaton, Peck,

22   Rankin & Hubbard, 9311 Bluebonnet Boulevard, Suite

23   A, Baton Rouge, Louisiana on Tuesday, October 25,

24   2016, commencing at 9:07 a.m.

25
```



**EXHIBIT E**

1      Q.    Okay.  So since 2011, you've been general

2    sales manager?

3      A.    Yes.

4      Q.    Okay.  Any other positions at Red Barn?

5      A.    No.  I mean, you can say general sales

6    manager, general manager.  It's the same thing over

7    a small used car operation.

8      Q.    Okay.  Where is Red Barn?

9      A.    At 26007 LA Highway 16, Denham Springs,

10   Louisiana 70726.

11     Q.    And has that been true since you've been

12   there?

13     A.    Yes.

14     Q.    Okay.  So as general sales manager,

15   general manager, how would you describe your -- your

16   responsibilities at Red Barn?

17     A.    My responsibility was to oversee the

18   operations, oversee the employees, report back to

19   Mr. Richardson, the owner, you know, activities that

20   transpired and fulfill his desires to operate the

21   company.

22     Q.    Okay.  And so it's not just focused on

23   sales, you're basically running the business?

24     A.    Pretty much.

25     Q.    Okay.  And tell me who Mr. Richardson is?



1      A.     He's my father-in-law.

2      Q.     Okay.   It's Don Richardson, Donald?

3      A.     Don Richardson.

4      Q.     Is it Donald or Don?

5      A.     Donald --

6      Q.     Okay.

7      A.     -- Donald B.

8      Q.     And he's an owner of Red Barn?

9      A.     Yes.

10     Q.     Is he the only owner?

11     A.     I believe he is an owner with his wife.

12  I may be incorrect on that.

13     Q.     And her name is?

14     A.     Barbara Richardson.

15     Q.     Are you still his son-in-law?

16     A.     Yes.

17     Q.     When did you marry into the family?

18     A.     I married into the family in 2003.

19     Q.     Okay.   That's when you were still in Las

20  Vegas?

21     A.     Yes.

22     Q.     Okay.   As general manager, do you report

23  to Mr. Richardson on a day-to-day basis or is he

24  more of an absentee owner?

25     A.     No.   I report to him, I wouldn't say



 1  every single day, but on a very regular basis.

 2      Q.    Okay.

 3          MR. COMAN:

 4              And let me lodge an objection to the

 5      term "absentee owner."

 6              Please, if you could give me a

 7      chance to think.  I'm not exactly the fastest

 8      person in the world.

 9  BY MR. McCARTER:

10      Q.    And high level, what is the business of

11  Red Barn?

12      A.    What was the question?

13      Q.    What is the business of Red Barn, how

14  does it make money?

15      A.    Basically, it purchases used cars and

16  resells those used cars for a profit.

17      Q.    Does it sell any related products like --

18  like you did at Findlay, gap insurance, warranties,

19  does it do any financing?

20      A.    We did for a short period of time, but

21  for the most part, no.

22      Q.    What period of time did you sell those

23  other products?

24      A.    That was probably sometime in the -- mid

25  2011.



1    Q.    Okay.  At a high level, was -- was

2  Findlay Automotive in the same business of buying

3  and selling cars for profit?

4    A.    Yes.

5    Q.    Where did Findlay gets its cars generally

6  to resell?

7    A.    At automobile auctions or dealer

8  trade-ins.

9    Q.    Anywhere else you can think of, purchases

10  directly from other dealers, on-line sales, anything

11  like that?

12    A.    There would be purchases from other

13  dealers, very infrequently.  Also, very infrequently

14  -- very infrequently, a customer would come in and

15  want to just sell their car outright.

16    Q.    Okay.  And is that generally true of Red

17  Barn as well, where -- where does Red Barn get its

18  cars?

19    A.    Red Barn basically gets its cars from the

20  auto auctions, trade-ins, and occasionally from a

21  customer that would come in and want to just sell

22  the car outright.

23    Q.    What -- what auto auctions does Red Barn

24  buy and sell from now?

25    A.    As of right now, Oak View Auto Auction.



1        Q.     Where is that?

2        A.     That is on Flannery Road in Baton Rouge.

3        Q.     Okay.  Anywhere else?

4        A.     Long Beach Auto Auction.

5        Q.     Is that in Mississippi?

6        A.     That's in Mississippi, Long Beach,

7    Mississippi.

8        Q.     Any other auction?

9        A.     And ABC Baton Rouge.

10       Q.     Are you a buyer and seller at all of

11   those or just a buyer?

12       A.     Buyer and seller.

13       Q.     And I'm sorry to keep jumping back and

14   forth, but I keep thinking of new questions.  With

15   Findlay, where did they -- what auctions did they

16   generally go to?

17       A.     Findlay would go to -- I don't remember

18   the names of them.  There was one large Manheim

19   auction and two smaller independent auctions.

20       Q.     In Nevada?

21       A.     In Nevada.

22       Q.     All right.  So back to Red Barn, auto

23   auctions, trade-ins, and sometimes customers would

24   sell a car outright to you?

25       A.     Correct.



1      Q.    Do you ever buy from other dealers

2    directly?

3      A.    I don't believe we have, no.

4      Q.    Okay.  Do you ever buy from other on-line

5    sources like eBay Motors or Smart Auction or

6    anything like that?

7      A.    We have bought several vehicles on eBay.

8      Q.    Okay.  Recently, in the last year or two?

9      A.    No.  That was -- that was earlier in the

10   business development.

11     Q.    Just a rough time frame?

12     A.    2011.

13     Q.    Okay.  So is Red Barn a licensed used car

14   dealer?

15     A.    Yes, with the Louisiana Used Motor

16   Vehicle Commission.

17     Q.    Are you only licensed in used cars or can

18   you sell -- buy and sell new cars, too?

19     A.    We are only licensed in used cars.  The

20   license is all inclusive of like RVs and motorcycles

21   and things like that, trailers, but we don't really

22   get into that.

23     Q.    Okay.

24     A.    We stick with used cars and trucks.

25     Q.    And you have the -- just the one lot in



1   Denham Springs?

2       A.    Yes.

3       Q.    How many cars do you have on your lot at

4   this time?

5       A.    At this time, there are approximately 37

6   --

7       Q.    Okay.

8       A.    -- 37 to 40.

9       Q.    Do you know when Red Barn first opened?

10      A.    I don't know the exact date.

11      Q.    Okay.  I think I'll have some records in

12  a minute that show 2010 was the corporate

13  organization.  Does that sound like the rough

14  starting time?

15      A.    That sounds correct.

16      Q.    In fact, let me just go ahead and show

17  you.

18            MR. McCARTER:

19                We'll call this Exhibit #2.

20  BY MR. McCARTER:

21      Q.    And I'll represent to you this is just a

22  printout from the Louisiana Secretary of State

23  website related to Red Barn Motors, Inc.  I know you

24  may not have seen this record before, but you can

25  see in the middle that it shows a filing date of



 1   February 26, 2010.  Do you see that?

 2        A.    Uh-huh.

 3        Q.    Do you have any reason to think that

 4   wasn't roughly the date of organization for the

 5   company?

 6        A.    That was probably the date of

 7   organization.

 8        Q.    Okay.  And it shows -- on the second page

 9   of that exhibit, it shows Donald Richardson as

10   president and Barbara Richardson as

11   secretary-treasurer.  Is there any reason to think

12   that's not accurate?

13        A.    No.

14        Q.    Okay.  And is the company still in good

15   standing, to your knowledge?

16             MR. COMAN:

17                  Objection as to vagueness.  Good

18        standing as to the Secretary of State or good

19        standing as --

20             MR. McCARTER:

21                  If you don't mind, let's just do

22        basic objections like the federal rules

23        instead of directing his answers.

24             MR. COMAN:

25                  Sure.



1          If Red Barn has acquired the vehicle with
2    credit of its own, does -- does the DMS software
3    track what interest and fees you pay on the vehicle?
4         A.    If we purchased a vehicle, it would not
5    track the interest and fees.
6         Q.    Okay.  So it just -- it just shows the
7    purchase -- or you just track the purchase price in
8    there?
9         A.    Correct.
10        Q.    And not your incremental payments?
11        A.    Correct.
12        Q.    Okay.  All right.  And a moment ago, you
13   described sort of the general responsibilities of
14   office manager.  Were those generally the same and
15   true when Ms. Roach was office manager?
16        A.    Yes.
17        Q.    Okay.  And what time frame was Ms. Roach
18   the office manager?
19        A.    From probably mid 2011 to when Jenny took
20   over.
21        Q.    Which again was roughly?
22        A.    2013.
23        Q.    Was Ms. Roach terminated or did she quit?
24        A.    She quit.
25        Q.    Besides your litigation counsel, do you



1  have regular day-to-day business counsel?

2       A.    The only counsel that we have ever used,

3  and it was just, you know, asking questions would be

4  Cassie Felder.

5       Q.    Okay.  All right.  So I -- I think we

6  discussed earlier that -- I want to walk through

7  some of the ways that Red Barn makes money and I

8  understand that one of those is to buy cars at a

9  lower price and try to sell them at a higher price?

10            MR. COMAN:

11                 Objection to form.

12  BY MR. McCARTER:

13       Q.    Is that right?

14       A.    Repeat the question.

15       Q.    Okay.  So I -- I understand one of the

16  ways Red Barn makes money is to buy and sell cars;

17  is that true?

18       A.    Correct.

19       Q.    Okay.  And you do that by buying at one

20  price and trying to sell them at a higher price?

21       A.    At a higher price.

22       Q.    Okay.  Are -- are most of your sales

23  retail or wholesale or some other?

24       A.    Most of our sales are retail.

25       Q.    But you do occasionally sell at auction?



1    A.    Yes.

2    Q.    When would you sell at auction versus

3  retail?

4    A.    If the vehicle has aged, if there's

5  something wrong with the vehicle and we don't want

6  to put that off onto a customer.

7    Q.    You put it off on another dealer.

8          The auctions we talked about earlier, Oak

9  View, Long Beach, ABC Baton Rouge, are they all

10 wholesale auctions?

11   A.    They are wholesale auctions.

12   Q.    Do you ever go to retail public auctions?

13   A.    No.

14   Q.    Do you ever host a retail public auction

15 at your lot?

16   A.    No.

17   Q.    All right.  So besides vehicle sales, I

18 understand that you do some financing -- in-house

19 financing?

20   A.    Yes --

21   Q.    Okay.

22   A.    -- very limited.

23   Q.    When would you typically do in-house

24 financing?

25   A.    We would typically do in-house financing



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                         40

 1  if the buyer shows the ability to repay the loan and

 2  we have been unable to get it approved through other

 3  sources.

 4       Q.    And have you done some of that in-house

 5  financing since Red Barn opened in 2010?

 6       A.    Yes.

 7       Q.    Do you have any estimate of how many

 8  in-house installment deals you do now per year?

 9       A.    Per year, I would say a couple a month,

10  24, 25.

11       Q.    And has that changed since 2010, that

12  number?

13       A.    That number has changed.  It's gone down

14  a little.

15       Q.    How much?

16       A.    I'm not positive.  I really -- I -- I

17  don't know the answer to that question.

18       Q.    Okay.  And at a high level, what do these

19  in-house installment deals look like, is there --

20  there's an installment contract with the retail

21  customer?

22       A.    Uh-huh.

23       Q.    Okay.  And do you -- do you agree on a

24  price for the vehicle up front?

25       A.    Yes.



1    Q.    All right.  And then they pay that price

2    over a certain number of months?

3    A.    Correct.

4    Q.    And how many months will your deals

5    typically run?

6    A.    Generally, they run between 12 and 24

7    months.

8    Q.    Do they ever go longer?

9    A.    On a rare occasion.

10   Q.    Okay.  And they're making monthly

11   payments of the purchase amount?

12   A.    They're making the monthly payments they

13   agreed to originally make when they purchased the

14   car, yes.

15   Q.    Okay.  And I assume that -- and tell me

16   if this is wrong.  I'm just trying to summarize it,

17   so we can move faster.  But I assume those monthly

18   payments have a principal and interest component?

19   A.    Correct.

20   Q.    Okay.  And what's the typical interest

21   rate you would charge on an installment contract?

22   A.    30 percent.

23   Q.    And so when you -- I'm sorry, strike

24   that.

25         If the consumer defaults on their



 1 | payments, what are -- what are -- what recourse do

 2 | you have?

 3 |      A.    The only recourse we have is to try to

 4 | get the vehicle back or to go through the legal

 5 | system and get the vehicle back.

 6 |      Q.    So you retain a security interest or some

 7 | interest in the vehicle until you're paid for it?

 8 |      A.    Correct.

 9 |      Q.    Does that mean you hang onto the title

10 | and put your lien on the title?

11 |      A.    Yes.  We are lienholder on the title.

12 |      Q.    But you do go ahead and put the title in

13 | the retail customer's name, and then you just note a

14 | lien on it?

15 |      A.    Correct.

16 |      Q.    Okay.  When does the interest start

17 | running on those deals?

18 |      A.    The interest starts running when the

19 | vehicle is purchased.

20 |      Q.    Okay.  And at that point, you're

21 | releasing the vehicle to the consumer, and then

22 | they're making monthly payments starting a month out

23 | from there?

24 |      A.    Correct, 30 to 45 days.

25 |      Q.    Other than releasing the car to the



1   consumer and putting the title in their name, are

2   you giving them anything else at the outset of that

3   arrangement?

4            MR. COMAN:

5                 Objection to form.

6            THE WITNESS:

7                 Giving them anything else?

8   BY MR. McCARTER:

9       Q.    Yes.

10      A.    What would be anything else?

11      Q.    Are you giving them anything else under

12  that contract other than the possession and use of

13  the vehicle?

14           MR. COMAN:

15                Let me just first lodge an

16       objection.  And then ask you, Mr. McCarter,

17       which deposition topic is this question

18       addressing in your Exhibit A of your 30(b)(6)?

19       If you are trying to reserve your right to

20       depose Mr. London again, for the past 50

21       minutes or so, I do not believe you have

22       touched upon any of these deposition topics

23       attached to your 30(b)(6) notice.  So if you

24       could tell me which topics that is, that would

25       be helpful for me.  If you would like, I'm



DEVON LONDON                                          October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                               44

1    ready for a break.

2         MR. McCARTER:

3              I'm going to answer your question.

4         MR. COMAN:

5              Okay.  Sure.

6         MR. McCARTER:

7              All right.  So among others, it

8    relates to Topic number 7, "Any financing

9    arrangements Red Barn has had with any

10   financing company, auction, or other third

11   party since December 3, 2007, including the

12   transaction history and current status of that

13   arrangement."

14             I also believe it relates to Topics

15   number 22 and number 23, the damages

16   originally suffered by Red Barn and it's

17   efforts to mitigate those damages.

18             To the extent these retail

19   installment contracts are part of the profit

20   of the business and the income of the business

21   and you've alleged a tortious interference

22   claim, we need to see how much that's changed

23   and what effect that may have had since 2011.

24        MR. COMAN:

25             For the record, I understand your



```
 1        reference is to number 22 and number 23.

 2        However, your question involves Red Barn's

 3        practices with retail customers and his

 4        finance practices as opposed to what damages

 5        he may have suffered according to the

 6        complaint.

 7             MR. McCARTER:

 8                  Are you instructing him not to

 9        answer?

10             MR. COMAN:

11                  No.

12             MR. McCARTER:

13                  Okay.  All right.  We can take a

14        break now if you want.

15                    (Recess taken.)

16             MR. McCARTER:

17                  We're back on the record.

18   BY MR. McCARTER:

19        Q.    Mr. London, right before we took a break,

20   we were talking about your in-house

21   buy-here/pay-here paper?  Do you remember that?

22        A.    Yes.

23        Q.    One more question on that.

24             Do you generally hold that paper in

25   house, or do you then try to sell it out to other
```



1          So since that question focused on

2      the consumer, number 7, obviously, does not.

3          MR. McCARTER:

4              Okay.  Number 7 says, "Any financing

5      arrangements Red Barn has had with any

6      financing company, auction or third party" --

7      which a consumer would be -- "since

8      December 3, 2007, including the transaction

9      history and current status of that

10     arrangement."

11             And then 22 and 23 speak to Red

12     Barn's damages to the extent trade-ins are an

13     integral part of their sales and their

14     business, then how they handle and price

15     trade-ins will affect what their damages are

16     and what they've done to mitigate those

17     damages.

18         MR. COMAN:

19             I've lodged my objection.

20             You can answer, if you know.

21         THE WITNESS:

22             Okay.  Can you repeat the question?

23         MR. McCARTER:

24             Sure.

25     BY MR. McCARTER:



 1      Q.    At a high -- I just want to know, at a

 2   high level, how do you handle trade-ins?  How do you

 3   price them, and how do you work them into your

 4   retail deals?

 5      A.    At high level, there is a -- there is not

 6   a high level of trade-ins.

 7      Q.    Okay.

 8      A.    There is a very low level of trade-ins.

 9   I would say we may get one to two trade-ins a month.

10   We would value those vehicles based off of NADA,

11   Kelley Blue Book, MMR, and the condition of the

12   vehicle.

13      Q.    And then do you take that off the net

14   price of the car you're selling?  Do you buy them

15   outright, or do you handle it some other way?

16      A.    We show it as a trade credit on the

17   purchase agreement.  Which then, in turn, in the

18   state of Louisiana, they don't end up paying taxes

19   twice.

20      Q.    And then, if they have a lien

21   outstanding, you have to pay off the lienholder to

22   get the title?

23      A.    Correct.

24      Q.    Do you commonly turn around and try to

25   retail those, or do you take them to auction, or



1  both?

2      A.    Both.

3      Q.    All right.  Let's talk about auto

4  auctions.

5            You said your -- Red Barn is currently or

6  recently dealing at Oak View, ABC Baton Rouge and --

7  remind me of the third?

8      A.    Long Beach.

9      Q.    Long Beach.  Have you dealt at any other

10  auctions, that you can recall, in the last five

11  years?

12      A.    We have dealt with Manheim Lafayette and

13  Manheim New Orleans.

14      Q.    At a high level, is the process of

15  bidding on and buying cars the same across all five

16  of those auctions?

17      A.    Can you repeat the question?

18      Q.    So I'm just -- I want to talk to you

19  about the auction purchase process.

20      A.    Okay.

21      Q.    So I'm saying, is there a major

22  difference in the way that works at those five

23  auctions?

24      A.    No.

25      Q.    Okay.  And so please correct me if this



1  is wrong.  I am just trying to summarize to move

2  this more quickly.

3          But you basically identify a car that you

4  are interested in.  You bid on it along with other

5  dealers, if they are interested.  And if you have

6  the high bid, you win the car?

7          MR. COMAN:

8              Objection as to form.

9              You can answer.

10          THE WITNESS:

11              Yes.

12  BY MR. McCARTER:

13    Q.    Okay.  And say you're the winning bidder

14  on a car at these auctions.

15          Then what happens next with that car?

16  How do you take the car back to your lot?

17    A.    Basically, it depends on the auction.  At

18  ABC Baton Rouge, they have just recently allowed us

19  to write checks for the vehicle.

20    Q.    So by that you mean Red Barn's business

21  checks?

22    A.    Correct.

23    Q.    Okay.  And when did that -- when did they

24  recently begin to allow that again?

25    A.    Probably within the last six months.



1        Q.    Before that, what did they allow?

2        A.    Before that, we were cash only.

3        Q.    Cash?

4        A.    Cash, cashier's check.

5        Q.    Certified check, same thing?

6        A.    Cashier's check.

7        Q.    Okay.

8        A.    I would have to go to the bank and get a

9    cashier's check.

10        Q.    Okay.  What about Oak View?  How do you

11    acquire a car there?

12        A.    Oak View, I have to pay cash or certified

13    funds.

14        Q.    Still to this day?

15        A.    Still to this day.

16        Q.    Okay.  And what about Long Beach?

17        A.    Long Beach is cash or certified funds.

18    And they require us to put up a thousand-dollar

19    deposit.

20        Q.    That -- is that a standing deposit that

21    you've paid, and it just sits there?

22        A.    Yes.

23        Q.    Okay.

24        A.    You get it back at the end of auction if

25    there's no if bids.  But to be able to participate



1  in the auction, we have to front the thousand

2  dollars.

3      Q.    Does it get applied to your purchases, or

4  do you literally get a check back?

5      A.    We take the money back.  Because we get a

6  cashier's check for the amount of the vehicles we

7  purchased.

8      Q.    Okay.  And just -- so, typically, you go

9  in with a bunch of cashier checks in hand, or do you

10 go to a bank nearby and get what you need?  Or how

11 does that work?

12     A.    I go to a bank nearby and get what we

13 need.

14     Q.    And has that changed over time?  Were you

15 previously able to write business checks at those

16 auctions?

17     A.    Yes.

18     Q.    And when did that change?

19     A.    That changed after we were listed in the

20 KO book.

21     Q.    When was that?

22     A.    Sometime around March to April of 2013.

23     Q.    And what is your understanding of what

24 the KO book is?

25     A.    My understanding is it is a list of



1   dealers that have had adverse relationships with

2   floorplan companies, auction houses, what have you,

3   that tracks those dealers and basically sets the

4   parameters as to how you can -- can or cannot buy

5   cars.

6        Q.   Do you have a sense of who keeps that

7   list?

8        A.   I do not know.

9        Q.   And so you're -- but you're still able to

10  deal at Oak View, Long Beach and ABC.

11            So what is your sense of the change?

12       A.   Well, number one, we can't use checks.

13       Q.   Okay.

14       A.   And, number two, we have to use -- you

15  know, we have to put up a deposit to be able to

16  purchase.

17       Q.   Okay.  All right.  We'll come back to the

18  KO book.

19            And so when you were dealing at Manheim

20  Lafayette and Manheim New Orleans, how would you pay

21  for cars there?

22       A.   We would, I believe, generally floorplan

23  them off.

24       Q.   With DSC or others?

25       A.   DSC or AFC.



DEVON LONDON                                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                                          73

1      Q.    Okay.  And then, after that, how much
2   longer could you keep it?  And you said 120 days,
3   but it was 60 days and then another 30 and then
4   another 30; is that right?
5      A.    I believe so.
6      Q.    Okay.  And did you have an understanding
7   that you would have to pay -- if you put a car on a
8   DSC floorplan, then you would have to repay that
9   principal to DSC?
10      A.    Absolutely.
11      Q.    Okay.  And did you have an understanding
12   that you would have to pay some interest and fees
13   beyond that principal?
14      A.    If it was floored, yes.
15      Q.    Okay.  Did you have an understanding that
16   DSC had a security interest or some other rights in
17   the vehicle until they were paid?
18           MR. COMAN:
19              Objection to the extent -- let me
20      just object to form.
21              If you understand his question --
22           THE WITNESS:
23              I -- I don't.
24           MR. COMAN:
25              Okay.



```
 1   BY MR. McCARTER:

 2       Q.    Did you -- did -- when you floored a car

 3   with DSC, did DSC have any rights to the car if they

 4   didn't get paid?

 5       A.    Yes.

 6       Q.    Okay.  And what's your understanding of

 7   what that -- their rights were?

 8       A.    Their rights were to take the vehicle,

 9   you know, and/or charge penalties and late fees.

10       Q.    Okay.  And do you have a sense of whether

11   their interest was limited to the particular

12   financed vehicle, or may -- or did it extend to

13   other property of Red Barn Motors?

14            MR. COMAN:

15                Objection to the form to the extent

16       it calls for a legal conclusion.

17                If you understand his question, you

18       can answer it.

19            THE WITNESS:

20                I believe that it extended to other

21       property of Red Barn.

22   BY MR. McCARTER:

23       Q.    Like what?  And I am asking about your

24   understanding.  I am not asking you to quote the

25   legal documents.
```



 1          But what was your understanding of DSC's

 2    right if there was a payment default?

 3        A.    My understanding was there was a personal

 4    guaranty.  So Don Richardson would be on the hook

 5    for any payment default.  And you would have rights

 6    to the vehicles that you had floored.

 7        Q.    All right.  And so when you put a vehicle

 8    on the DSC floorplan, how did you know when payment

 9    was due on that vehicle?

10          MR. COMAN:

11                I'm going -- let me just object to

12       the form on vagueness.

13                If you understand --

14          THE WITNESS:

15                Yes, again, can you rephrase it?

16          MR. McCARTER:

17                Sure.

18    BY MR. McCARTER:

19        Q.    So we talked before that you would have

20    to pay a vehicle off within a certain amount of time

21    if you sold the vehicle, right?

22        A.    Correct.

23        Q.    Okay.  But then, if you didn't, you had

24    60 days where you could roll it over further,

25    correct?



 1        A.    Correct.

 2        Q.    Okay.  How did you keep track of when the

 3   60 days ran?

 4        A.    We ran a report, daily, that gave us a

 5   breakdown of all the -- my office manager ran a

 6   report, but --

 7        Q.    And what did she run that report from?

 8             MR. COMAN:

 9                  I'm sorry.  Could you allow

10        Mr. London -- did you have anything further to

11        add?

12             THE WITNESS:

13                  It would just tell when, in

14        chronological order or in date order, payments

15        were due, curtailments were due, principal

16        payments were due.

17   BY MR. McCARTER:

18        Q.    Was that report specific to DSC, or was

19   it for any car you owned?  Or something else?

20        A.    No, that report was specific to DSC.

21        Q.    Okay.  And how did you create that

22   report?

23        A.    That report was created on DSC's website.

24        Q.    That's discoverdsc.com?

25        A.    Yes.



1    Q.    And you ran that daily?

2    A.    Yes.

3    Q.    And that -- besides telling you when

4  payment was due, it would also tell you how much was

5  due on each vehicle?

6    A.    Yes.

7    Q.    Were -- was Red Barn Motors ever involved

8  in collateral audits with DSC?  Does that mean

9  anything to you, that term?

10   A.    Collateral audits, they -- where somebody

11  would come out and inspect all of the vehicles and

12  make sure they're accounted for --

13   Q.    Right.

14   A.    -- is that a collateral audit?

15   Q.    That's what I had in mind.

16   A.    Yes.

17   Q.    And you were involved in those?

18   A.    I was involved.  The used car managers

19  were involved.

20   Q.    Let's step back a second.

21         Roughly what period of time were you

22  involved with DSC -- did you have a DSC floorplan?

23   A.    From 2011 to 2013.

24   Q.    Okay.  And do you have any recollection

25  of how often the collateral audits would be during

1  that period?

2      A.    Every 30 to 45 days.

3      Q.    And is your recollection that AFC would

4  do the same thing?

5      A.    Yes.

6      Q.    Did you work with any other floorplaners

7  when you were at Findlay?

8      A.    Not directly, no.

9      Q.    Okay.  All right.  Were you involved in

10 applying for Red Barn's DSC line of credit?

11     A.    Involved in applying -- Don Richardson

12 applied for the line of credit.

13     Q.    Okay.

14     A.    To the extent that I was involved, is I

15 told Don what Stuart had told me and what the

16 benefits of the line of credit would, you know, do

17 for the business.  And then Don made his decision

18 based off of that.

19     Q.    Okay.  And did DSC request certain

20 information from the dealership, and did you help

21 provide any of that?

22     A.    I know there was some information

23 requested, but I would have just turned that over to

24 the office manager and told the -- told them to

25 produce it.



```
 1        Q.    And that was Sharon Roach, at the time?

 2        A.    I believe so.

 3        Q.    Let's step back to that.

 4              You said, what Stuart had told you about

 5   the benefits of the line.

 6              Do you -- what do you recall about the

 7   timing of that conversation or conversations?  Like,

 8   when did you talk to Stuart in terms of getting the

 9   line set up?

10        A.    It was in -- I think somewhere around May

11   to June of 2011.

12        Q.    And what do you recall was said in those

13   conversations?

14        A.    I recall he -- when soliciting us, he

15   told us -- he told me that the interest -- one thing

16   that sticks out in my mind was that the interest

17   rate was 4 percent, which it turned out not to be.

18   He told us -- told me the benefits of -- you know,

19   the advantages of having a floorplan and the amounts

20   that you could apply for and, you know, basically

21   asked if I was the one that had the ability to enter

22   into the agreement.  And I told him no, and that's

23   when the appointment was set up with Don Richardson.

24        Q.    Okay.  What do you recall, if anything,

25   that he said about the benefits of having a
```



1  floorplan?

2       A.    I don't.

3       Q.    And you -- do you have any records at Red

4  Barn that would provide clarity on what he said?

5       A.    No.

6       Q.    Okay.  And you said the interest rate

7  turned out not to be 4 percent.

8            What's your recollection of what it

9  turned out to be?

10      A.    I could never figure that out.

11      Q.    But somehow you know it wasn't 4 percent?

12      A.    Correct.

13      Q.    You couldn't figure out, so how do you

14  know it wasn't 4 percent?

15      A.    Because in looking at the calculations

16  and the interest charged, it was much higher than a

17  4 percent figure.

18      Q.    Okay.  And did he say anything else about

19  interest?  For example, how long -- when it would

20  start accruing or anything like that?

21      A.    I don't recall.

22      Q.    Do you have any records at Red Barn

23  Motors that would improve your recollection on that

24  point?

25      A.    Just the contract.



1    Q.    So your recollection is that, at some

2    point, the deal with DSC got reduced to contract,

3    right?

4    A.    Yes.

5    Q.    Were you involved in reviewing and

6    signing those?

7    A.    I viewed it.  I did not sign it.

8    Q.    Did you review them before Mr. Richardson

9    signed and give him your input?

10    A.    Yes.

11    Q.    Okay.  And what do you recall was said

12    during that discussion?

13    A.    Just the benefit of having the

14    availability to have a credit line that would allow

15    us to, you know, increase sales volume.  And that's

16    basically the gist of it.  Just the benefits of

17    having the floorplan.

18    Q.    Okay.  So after reviewing the contracts,

19    you basically conveyed to Mr. Richardson that you

20    thought it made sense to move forward with DSC?

21    A.    Yes.

22    Q.    Do you recall whether Red Barn had those

23    contracts reviewed by counsel?

24    A.    They did not.

25    Q.    Other than yourself and Mr. Richardson,



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                          82

 1 | do you know if anybody else reviewed the contracts
 2 | pre-signing?
 3 |     A.    No one.
 4 |     Q.    Do you recall any discussion with
 5 | Mr. LaBauve or anybody else at DSC about your right
 6 | to consult with counsel?
 7 |     A.    I do not recall.
 8 |     Q.    Okay.
 9 |     A.    I don't remember that at all.
10 |     Q.    Okay.  I am going to show you what we are
11 | going to call Exhibit #4.  All right.
12 |           MR. McCARTER:
13 |                 And this document is NextGear004545
14 |       through 4549.  Or, I am sorry, NG.  Excuse me.
15 |       Let me restate the Bates numbers.  It's
16 |       NG004545 through 4550.
17 | BY MR. McCARTER:
18 |     Q.    You can take as much time as you want
19 | with it, but I'll call your attention to the
20 | specific questions.
21 |           So, to be fair to you, this looks like a
22 | NextGear internal -- or an DSC internal document
23 | that you may never have seen before.
24 |           Have you seen this document before?
25 |     A.    No.



DEVON LONDON                                          October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                                83

```
 1        Q.    Okay.  It suggests --
 2              MR. COMAN:
 3                   Let me just lodge an objection.
 4        Hold on, please.  Let me just lodge an
 5        objection.  As Mr. London has stated that he
 6        has never seen this, and based on your
 7        additional representation that this is an
 8        internal DSC document, any questions,
 9        therefore, following that, would lack any
10        foundation, and we would lodge an objection.
11              MR. McCARTER:
12                   Okay.  Fine.  But I'm not asking him
13        to authenticate the document.  I want to ask
14        him about specific information in the
15        document.
16   BY MR. McCARTER:
17        Q.    So it suggests, on the first page, a DSC
18   start date of July 28, 2011.
19              And do you recall whether that was the
20   DSC start date for Red Barn, or not?
21        A.    I don't know if that was the exact date.
22        Q.    Okay.  Does it seem roughly correct?
23        A.    Roughly.
24        Q.    Okay.  At the bottom, do you see there is
25   an account executive recommendation?  And
```



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                          84

1    recognizing you didn't prepare this document, it

2    is -- it says, in that last sentence, "They do

3    prefer using DSC over AFC and would like to increase

4    their line with us for tax time coming up so they

5    can stock as much inventory as possible and continue

6    to grow and be profitable."

7              Do you see that language?

8        A.    Yes.

9        Q.    Do you recall having any discussions like

10   that or related to that point with Stuart or anybody

11   else at DSC?

12       A.    I don't recall that.

13       Q.    Okay.  And this document is, at least

14   dated on its face, September 26, 2012.

15             Do you recall being involved in any kind

16   of a request for a line increase or discussions of a

17   line increase with DSC around that time?

18       A.    What do you mean "a line increase"?

19       Q.    Okay.  So this is -- this looks like --

20   you know, it's roughly a year and a couple of months

21   after you started with DSC.

22       A.    Okay.

23       Q.    Do you remember asking for more credit or

24   a bigger line of credit with DSC around that time?

25       A.    DSC would -- I don't know if it was DSC



1  waive the $1,000 deposit that we were required to --

2  up front at each auction and he refused to do that.

3      Q.    And so that was 2013?

4      A.    That was 2000 -- that was -- that was

5  2015.

6      Q.    Have you had any conversations with Long

7  Beach Auto Auction since that conversation in 2015

8  about writing business checks?

9      A.    No.

10     Q.    What exactly did Long Beach Auto Auction

11 say to you about the KO book?

12     A.    Again, that we were in the KO book.  I

13 mean --

14     Q.    Anything more about the KO book or how it

15 works?

16     A.    No.

17     Q.    How about ABC Baton Rouge, have you had

18 any conversations with them about writing checks?

19     A.    Yes.

20     Q.    When was that?

21     A.    I don't know the exact date.

22     Q.    Was it closer to the bankruptcy in 2013

23 or more recent?

24     A.    It was more recent than that.  I don't

25 think they were established back then, but it was --

1    I don't want to guess.

2        Q.    Do you think it was this year?

3        A.    It wasn't this year.  It would have -- it

4    would have been possibly 2015.

5        Q.    Okay.  And what exactly did ABC Baton

6    Rouge say about writing checks?

7        A.    ABC Baton Rouge allowed us to write

8    checks up to a certain amount.

9        Q.    Up to how much?

10       A.    It's a $12,000 figure.

11       Q.    Is that per car or total for the day?

12       A.    No, total for the day.

13       Q.    Was there any discussion with ABC Baton

14   Rouge about the KO book, specifically?

15       A.    No.

16       Q.    I apologize if we covered this, but have

17   -- have you applied for any form of floorplan

18   financing since the bankruptcy?

19       A.    No.

20       Q.    All right.  You -- you mentioned earlier

21   that you had a concern about DSC charging interest

22   on floorplanned vehicles before DSC received the

23   title; is that correct?

24       A.    Before DSC paid for the vehicle.

25       Q.    And I think you had some understanding



 1 │ that typically happens when the title comes in to

 2 │ the auction?

 3 │      A.    Correct.

 4 │            MR. McCARTER:

 5 │                  I'm going to show you what I'm going

 6 │      to call Exhibit #23.

 7 │            MR. COMAN:

 8 │                  Thank you.

 9 │ BY MR. McCARTER:

10 │      Q.    I'll represent to you that this is Red

11 │ Barn Motors' responses to NextGear Capital's first

12 │ set of interrogatories in this case.  I believe we

13 │ just got a verification in yesterday; is that right?

14 │            MR. COMAN:

15 │                  That's correct.

16 │            MR. McCARTER:

17 │                  Okay.  So that will shorten this.

18 │ BY MR. McCARTER:

19 │      Q.    This suggests that you were involved in

20 │ responding to these interrogatories; is that

21 │ correct?

22 │      A.    Yes.

23 │      Q.    Okay.  And in a couple of different

24 │ places, it says that you, Donald Richardson, and

25 │ Sharon Roach would be the Red Barn personnel that



DEVON LONDON                                          October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                              182

1  would have interacted with DSC and have knowledge of

2  the DSC floorplan.  Does that sound right?

3       A.    It does.

4       Q.    Okay.  Is there anybody else you think of

5  at the dealership that has specific knowledge of the

6  DSC floorplan?

7       A.    No.

8       Q.    Can I turn your attention to

9  interrogatory response #6?  In the middle of the

10  Page 6, so there's an objection, and then it says,

11  "Subject to the foregoing specific and general

12  objection, Red Barns responds that during its

13  communications with NextGear and DSC to include

14  account executive Stuart LaBauve, NextGear and DSC

15  concealed from Red Barn that interest or fees would

16  be charged before money was actually lent under the

17  Floorplan Agreement."

18            Do you see that?

19       A.    Yes.

20       Q.    Okay.  So that's -- that's saying that it

21  was hidden, but was there any specific discussion of

22  that issue with Stuart at the time you first entered

23  into the agreement with DSC?

24       A.    At the time that we first entered into

25  the agreement with DSC, that was not brought up.  It



1  was assumed -- it was assumed that, you know, based

2  on the agreement and the term advance and, you know,

3  when payment is made, you know, that it would have

4  been when the money was actually lent.

5      Q.    Okay.  Going on down in that same answer,

6  Red Barn has said, "Eventually, Devon London

7  confronted Stuart LaBauve following Devon London's

8  suspicion that defendants were, in fact, charging

9  interest and fees on money not actually lent.  In

10  turn, Stuart LaBauve admitted that the defendants

11  were charging interest and fees on money not

12  actually lent."

13          Do you see that?

14      A.    Yes.

15      Q.    When did that conversation occur?

16      A.    That occurred on or about -- it was when

17  I found out that they were back dating the interest

18  charged to the date of the auction versus the date

19  that I actually floorplanned the vehicle, and I

20  confronted him and said, you know, why are we being

21  charged interest when I haven't even chosen the

22  floorplan.  And he said, I'll have to get back with

23  you.  And he got back with me and basically said,

24  that's the way that it is, you know.  They -- they

25  charge interest from the date of the sale versus the



1   date of the actual loan.

2       Q.    Okay.  What time frame -- I mean, when

3   did that actually happen?

4       A.    I believe that it was June -- June or

5   July of 2012 is when I figured that out, mid 2012.

6       Q.    And that seems to be consistent with

7   paragraph 45 of your -- of your complaint where you

8   -- you said -- and I'll just read it to you.  It

9   says, "First met in or about June of 2012.  Devon

10  London, Red Barn's general manager, discovered

11  transactions in which Red Barn had not actually

12  chosen to use the Floorplan Agreement such as

13  NextGear.  And DSC had never actually loaned money

14  to Red Barn for the purchase of vehicles.  It goes

15  on, but that -- that seems to be the time frame,

16  June of 2012?

17      A.    Yes.

18      Q.    Okay.  And we responded back to you along

19  the lines that --

20      A.    That's the way that it is.

21      Q.    Okay.  And your line stayed opened, you

22  continued to borrow from DSC until March of 2013?

23      A.    That is correct.

24      Q.    And were -- were there any other

25  witnesses to that conversation with Mr. LaBauve?



```
 1        A.    No.
 2        Q.    Okay.  Have you ever been part of a
 3   discussion between DSC and any other dealer besides
 4   Red Barn about the timing of DSC's interest charges?
 5        A.    Have I ever been in --
 6        Q.    A discussion between DSC and any other
 7   dealer besides Red Barn about how DSC calculates
 8   interest or when it starts to accrue?
 9        A.    I have.
10        Q.    Who was that?
11        A.    Dewitt Hall.
12        Q.    You told me earlier.  Is it Hall or Hull?
13        A.    Hall, H-A-L-L.
14        Q.    Okay.  And what's -- what's his
15   dealership's name?
16        A.    I don't know.
17        Q.    And who was the DSC representative or
18   representatives?
19        A.    For him?
20        Q.    Well, you -- you said you were -- you
21   witnessed a discussion between DSC and him about
22   interest?
23        A.    Oh, no, no.  I -- I said I had a
24   conversation with him.
25        Q.    Okay.
```



DEVON LONDON                                          October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                              186

1       A.    I didn't witness a conversation between
2   him and --
3       Q.    Okay.  So you talked -- I'm sorry.  You
4   talked about it with Dewitt, but you haven't
5   actually witnessed a conversation --
6       A.    No.
7       Q.    -- between DSC and Dewitt about interest?
8       A.    No.
9       Q.    Have you witnessed any conversation or
10  e-mails or other communication between DSC and any
11  third-party dealership besides Red Barn about
12  interest charges and how they're calculated?
13      A.    Rephrase the question.
14      Q.    Okay.  Have you witnessed personally,
15  either you were -- you were there or you heard it or
16  you saw it, communications between DSC and some
17  dealer other than Red Barn about how DSC charged and
18  calculated interest?
19      A.    No.
20      Q.    Okay.  And these conversations between
21  you and -- or this conversation that's mentioned in
22  interrogatory #6, was any of that in writing?
23      A.    No.
24      Q.    Where did the conversation take place?
25      A.    At Oak View Auto Auction.



1      Q.     And you said he -- he got back with you.
2   Did he get back with you the same day or same place?
3      A.     No.   He got back to me the following week
4   I questioned him about it, again.
5      Q.     Did you escalate your concern to anybody
6   else at DSC?
7      A.     No.
8      Q.     You had conversations with Dewitt Hall
9   about this issue.   What -- when did those take
10  place?
11     A.     Those took place probably around 2014.
12     Q.     Okay.   And where did they take place?
13     A.     At Red Barn Motors.
14     Q.     All right.   And who raised the subject,
15  you or him?
16     A.     I believe -- I believe he did.
17     Q.     Okay.   And what was the substance of
18  those discussions?
19            MR. COMAN:
20                  I'm going to object.   Is there a
21         particular item number in this deposition
22         topic that addresses Dewitt Hall?
23            MR. McCARTER:
24                  I'm sure there is one that addresses
25         Red Barn Motors' concern with DSC's interest



DEVON LONDON                                October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                    188

```
 1        charges.  So if they made statements to any

 2        party about those, that's certainly well

 3        within the scope.

 4             MR. COMAN:

 5                  Just give me a number.

 6             MR. McCARTER:

 7                  Go to #2 just to start there.

 8             MR. COMAN:

 9                  That's fine.

10   BY MR. McCARTER:

11        Q.    So back to the question, what was the

12   substance of your discussions with Mr. Hall about

13   DSC's interest charges?

14        A.    Basically, just that they were charging

15   interest on money that was never lent.  I mean,

16   that's the gist of it.

17        Q.    Did you raise that to him or did he raise

18   it to you?

19        A.    I think it was mutual.  It was a mutual

20   discussion.

21        Q.    Okay.  And what did he say related to

22   that?

23        A.    I don't remember.

24        Q.    Okay.  And do you recall whether he

25   mentioned ever raising it to DSC or addressing it
```



 1   with DSC?

 2        A.    I don't.

 3        Q.    You don't know one way or the other?

 4        A.    I don't know one way or the other.

 5        Q.    Okay.  Do you recall high level what Red

 6   Barn Motors' net income was prior to the time of

 7   bankruptcy in 2013?

 8        A.    I would not know that.

 9        Q.    Who would know that?

10        A.    Don Richardson and the accountant.

11        Q.    Do you know what Red Barn Motors' net

12   income is now as of 2016?

13        A.    It is substantially lower.  I, again,

14   don't have the exact figure.

15        Q.    And you don't know what it was pre-2013,

16   but you know it's lower now?

17        A.    I know it's lower now, yes.

18        Q.    And you said substantially.  How -- how

19   much lower?

20        A.    I don't want to just guess.  I just know

21   that we're selling less cars.

22        Q.    Okay.  Well, damages is certainly a topic

23   in -- in the notice.  Are you -- are you prepared at

24   all to talk about what Red Barn's damages are in

25   this case?



 1         A.     I assume I should -- I would be.

 2         Q.     Okay.  Do you have some understanding you

 3    have a claim for the harm to your business allegedly

 4    caused by DSC?

 5         A.     Yes.

 6         Q.     Okay.  How -- how would you quantify that

 7    harm?

 8         A.     How would I quantify that harm?  I would

 9    quantify that harm by the charging of interest over

10    a period of time and curtailment fees on money that

11    was never lent.  There were many cases, in fact,

12    that not only was there money never lent, but we had

13    paid off the vehicle to DSC and had to wait for the

14    title to come in.  So there was never a transaction

15    whatsoever for the money for -- for a floorplan

16    agreement and DSC was holding the money for the --

17    what they should have paid for the floorplan and the

18    amount that they collected from us including

19    interest and fees.  We -- I mean, that happened many

20    occasions.

21         Q.     Okay.

22         A.     And --

23         Q.     I'm sorry.  Go ahead.

24         A.     -- we were damaged, because it limited

25    our capital.  As I said, we're a small mom-and-pop



1  used-car dealership and when you siphon money out of

2  a corporation over a period of years, that equates

3  to a substantial sum of money that would adversely

4  affect the business and would harm -- would harm the

5  business.

6      Q.   Have you made any attempt to put a dollar

7  figure on the amount of interest that you believe

8  DSC overcharged you?

9      A.   I have no attempt -- I have no way to do

10  that --

11      Q.   Okay.

12      A.   -- because DSC is the only one that knows

13  when the title was actually received.

14      Q.   Is that something while you were with DSC

15  you ever asked DSC to let you know, the timing of

16  when it received the title and when it paid the

17  auction?

18      A.   No.  It -- it basically -- the whole

19  scheme basically evolved from Stuart and that first

20  conversation that we had.  And then there was a car

21  that was a Ford 500 that we purchased in November of

22  2012 and it was a vehicle that we ended up returning

23  to the auction, because they could never get a

24  title.  And DSC voluntarily reimbursed us for all of

25  the interest fees and curtailments and everything



1   else and there had never been any transaction

2   through the auction.  So I started thinking back to

3   all the times that we had actually paid off

4   vehicles, because we had a separate bin on the wall

5   that was a wall pocket for DSC vehicles paid off

6   that were waiting on a title.  And so I just started

7   putting together the scheme and that's how I figured

8   out that there was never -- there was never money

9   lent in the first place.  If -- if I go to a bank

10  and I get a line of credit, which this was a line of

11  credit, and I go in and take a loan against that

12  line of credit, they're going to charge me interest

13  from the day that I take the loan.  If I go into a

14  payday loan store and say, I'm going to need $500

15  next week, the payday loan store, when I come back

16  next week to loan the money, isn't going to say, you

17  owe us for the last week, because we had a

18  commitment to pay you.  The payday loan store is

19  going to charge me from the date that I actually

20  took out the loan.

21       Q.    Okay.  On the Ford 500, you said DSC

22  reimbursed everything you had paid on that?

23       A.    Uh-huh.

24       Q.    Okay.  And that -- that vehicle was

25  actually unwound at the auction, the auction could



1  not provide title for that vehicle?

2      A.    That is correct.

3      Q.    Okay.  On these other vehicles you're

4  talking about, there would be situations where the

5  auction is holding together the transaction and

6  eventually provides title, just sometime later,

7  correct?

8      A.    Correct --

9      Q.    And in the meantime --

10     A.    -- after we paid off the vehicle.

11     Q.    -- and in the meantime, you have the

12  vehicle and you're able to offer it for sale?

13     A.    Correct.  But in many cases, we were

14  unable to get funded.  So our capital is tied up,

15  because we've paid DSC for the vehicle and we can't

16  get paid by the bank for the vehicle, because we

17  don't have a title to the vehicle.  And in the

18  interim, we're paying interest and fees and charges

19  for -- mailing charges and everything else when

20  there was never a transaction in the first place.

21     Q.    Okay.  And I think you said earlier that

22  some vehicles are sold at auction with title present

23  and some are sold without title present?

24     A.    That I -- I don't know.  I would assume

25  that they have titles on some of them, I mean,



1   especially the used car dealers that generally sell

2   vehicles, which we don't buy from, you know,

3   generally, because if a used car dealer is offering

4   a vehicle for sale, there's generally something

5   wrong with it, but new car dealers, I -- I don't

6   know whether they provide the titles or don't

7   provide the titles and when they do and when they

8   don't.

9        Q.    Do you know whether that -- in your

10  experience at auto auctions, whether that's

11  typically announced, whether the car is announced or

12  there's a certain color light, for example, that

13  would show whether the title is present or not?

14       A.    There was -- there was one auction I was

15  at that it was announced.  I don't remember which

16  one it was, but it was announced on specific

17  vehicles and -- but it was not the majority of the

18  auctions.

19       Q.    So you don't believe it is announced at

20  the majority of auctions, you believe it's not

21  announced at the majority of auctions?

22       A.    Yes.

23       Q.    Okay.  And if the auctions and other

24  dealers say otherwise, you would disagree with that?

25       A.    Yes.



1      Q.    Do you know what the nature of that claim

2   was?

3      A.    Those were loans that -- basically, what

4   they did, and the claim was -- was much smaller than

5   that.  That was an estimated amount based on what

6   the total claim could have been, but that was a

7   claim against defaults on loans, which Red Barn had

8   personally guaranteed.

9      Q.    When you say "personally guaranteed," do

10  you mean they had recourse to Red Barn if they

11  didn't collect on their retail --

12     A.    Correct.

13     Q.    Okay.  Do you know whether Mr.

14  Richardson, himself, personally guaranteed that

15  loan?

16     A.    He -- Mr. Richardson personally gave

17  permission to personally guaranty them.

18     Q.    So he gave permission for Red Barn to

19  guaranty them?

20     A.    Yes.

21     Q.    Okay.  And just generally, on Schedule --

22  let's see, Schedule D -- this starts at Page 8.

23  Then, there's a Schedule E, and then there's a

24  Schedule F, and these -- those all show different

25  types of credit if you had claims against Red Barn



```
 1   at the time of the bankruptcy.
 2            Do you see that?
 3            MR. COMAN:
 4                It's multiple pages so I object to
 5       form, but if can answer whatever question he's
 6       got.
 7            MR. McCARTER:
 8                Well, we can go through them one by
 9       one.  I'm trying to knock it out.
10   BY MR. McCARTER:
11       Q.   So between pages 8 and page 19 of Exhibit
12   #16, there's basically a list of a whole bunch of
13   creditors to Red Barn.
14            Do you see that?
15       A.   Uh-huh.
16       Q.   Okay.  Do you know one way or the other
17   whether Red Barn was current with every one of those
18   creditors except DSC at the time this bankruptcy was
19   filed?
20            MR. COMAN:
21                I'll object to the form again.
22            THE WITNESS:
23                No, we are not current with all of
24       them.
25   BY MR. McCARTER:
```



```
 1        Q.    You're weren't current with AFC either,
 2   right, at the time the bankruptcy was filed?
 3        A.    No.
 4        Q.    Okay.  Are there any other significant
 5   creditors that you can recall that you weren't
 6   current with at the time?
 7             MR. COMAN:
 8                  Objection to form.
 9             THE WITNESS:
10                  I wouldn't know off the top of my
11        head.
12   BY MR. McCARTER:
13        Q.    Okay.  But there are several on these
14   pages that you were not current with?
15        A.    Yes.
16             MR. McCARTER:
17                  All right.  Guys, I need five
18        minutes and I'll be able to rap it up.
19             MR. COMAN:
20                  Sure.
21             MR. McCARTER:
22                  Okay.  Off the record.
23                  (Recesses taken.)
24             MR. McCARTER:
25                  All right.  Ready?
```



1          MR. COMAN:

2                  Yes, sir.

3          MR. McCARTER:

4                  This won't take long.  Back on the

5      record.

6   BY MR. McCARTER:

7      Q.    Mr. London, we've talked before about

8   sort of the net income and business before

9   bankruptcy and after bankruptcy.  Do you remember

10  that?

11     A.    Uh-huh.

12     Q.    So prior to bankruptcy, how did the

13  business compare from 2010 to 2011?

14     A.    From 2010 to 2011, there was growth.

15     Q.    Okay.  And is that because you started up

16  in 2010 and you were just expanding operations?

17     A.    Pretty much.  I mean, in 2011 is when we

18  really started operating, you know, and running it

19  like a car dealership.

20     Q.    Yes.  And you got into credit

21  arrangements with both AFC and DSC in 2011?

22     A.    Was it 2011?

23     Q.    I think so.

24     A.    Yes, okay.

25     Q.    Okay.  And did that credit allow you to



1  acquire more inventory and make more profit?

2      A.    Yes.  It allowed us to generate more

3  inventory.

4      Q.    Okay.  And then from 2011 to 2012, was

5  the business still growing, shrinking, do you

6  recall?

7      A.    It was growing.

8      Q.    Okay.  And then 2012 to 2013, was it --

9  was it growing in 2013 before the NextGear default?

10     A.    It was always on an upward swing.

11     Q.    Okay.  You testified earlier, though, and

12 it's in your answer as well, but in 2013 -- I'm

13 sorry, not your answer, in your complaint, that in

14 2013, Red Barn ran into financial difficulties --

15     A.    Uh-huh.

16     Q.    -- is that right?

17     A.    Correct.

18     Q.    And you described those as being mostly

19 caused by the issue of Southwest Finance, right?

20     A.    Well, it was not largely caused by the

21 issue with Southwest Finance.  That was an issue.

22 It was largely caused by this scheme that siphoned a

23 whole bunch of money off of the business.

24     Q.    Okay.  Prior to DSC, you know, claiming

25 default and picking up its cars in March of 2013,



1   were you having any other financial difficulties,

2   were there any other creditors you were having

3   trouble paying?

4       A.    It all happened at once.  It all happened

5   at once.

6       Q.    Okay.  But at some point prior to DSC

7   picking up cars, Southwest Finance informed you that

8   they weren't going to buy as much paper as you

9   thought they were going to buy?

10      A.    That is correct.

11      Q.    Okay.  And were there any other creditors

12  that you can recall Red Barn defaulting to prior to

13  the middle of March 2013?

14      A.    No.  I believe we were current with

15  everybody.

16      Q.    Okay.

17          MR. McCARTER:

18              Okay.  No further questions, thank

19      you.

20                    EXAMINATION

21  BY MR. COMAN:

22      Q.    Mr. London, I just have a few.  At the

23  beginning of your relationship with DSC -- and I say

24  your relationship, I should rephrase.

25          Red Barn -- Red Barn's relationship with



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                          216

1  Dealer Services Corporation, did DSC, through

2  contracts or through representatives represent to

3  you that they would only charge you interest and

4  curtailment fees beginning from the date of advance?

5              MR. McCARTER:

6                   Object to form.

7  BY MR. COMAN:

8      Q.    You can answer.

9              MR. McCARTER:

10                  Object.   Asked and answered.   Go

11      ahead.

12             THE WITNESS:

13                  Yes.

14  BY MR. COMAN:

15     Q.    Okay.   Did DSC conceal that fact from Red

16  Barn?

17     A.    Yes.

18             MR. McCARTER:

19                  Object to form.

20  BY MR. COMAN:

21     Q.    Let me rephrase it.   I'm sorry.

22             Did Red Barn conceal the fact that it

23  was, in fact -- did DSC conceal from Red Barn that

24  it was, in fact -- DSC was hiding and actually

25  charging interest and curtailment fees to you



1   without your knowledge?

2           MR. McCARTER:

3                 Object to form.  These are all

4       leading and full of false assumptions.

5   BY MR. COMAN:

6       Q.    You can answer.

7       A.    Yes.

8       Q.    Did that damage Red Barn or did Southwest

9   damage Red Barn?

10          MR. McCARTER:

11                Object to form.

12          THE WITNESS:

13                The damage to Red Barn was caused by

14      DSC.

15  BY MR. COMAN:

16      Q.    Earlier, you testified under counsel's

17  questions regarding Stuart LaBauve and an

18  interaction you had with him, without the quote, you

19  were somewhere midstream, let's say, in the

20  relationship between Red Barn and DSC.  Do you

21  recall that testimony?

22      A.    Yes.

23      Q.    Okay.  And describe for us the

24  interaction that you had and the confrontation,

25  quote/unquote, that you had with Stuart LaBauve and



1    non-Manheim auctions, the deposits, whatever --

2    whatever relationship you have at this point with

3    non-Manheim auctions --

4        A.    Uh-huh.

5        Q.    -- in the business relationship, okay,

6    how is that -- is that restricting -- is that

7    adversely affecting you and your business at this

8    minute?

9            MR. McCARTER:

10               Objection to form.

11           THE WITNESS:

12               Yes, it does.

13   BY MR. COMAN:

14       Q.    How?

15       A.    It -- it limits our ability to procure

16   cars.  It limits our ability to write checks on

17   vehicles.  We have to pay for the vehicle at the

18   time that we purchase the vehicle, whether title is

19   present or not.  The auctions -- the amount of

20   auctions that we can go to limits our ability to get

21   the same inventory that other dealers have access

22   to.

23       Q.    Has that -- all those items, have those

24   adversely affected Red Barn's income?

25       A.    Yes.



DEVON LONDON                                          October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                              223

1        Q.    Has it adversely affected Red Barn's

2    business reputation?

3            MR. McCARTER:

4                  Object to form.  Lack of foundation.

5            THE WITNESS:

6                  Yes.

7    BY MR. COMAN:

8        Q.    Has that adversely affected your goodwill

9    within the industry?

10           MR. McCARTER:

11                 Object to form.

12           THE WITNESS:

13                 Absolutely.

14   BY MR. COMAN:

15       Q.    Has it also affected the overall

16   valuation of Red Barn at this point?

17           MR. McCARTER:

18                 Object to form.

19   BY MR. COMAN:

20       Q.    You can answer.

21       A.    Absolutely.

22           MR. COMAN:

23                 Okay.  One moment, please.

24                 I don't think I have any further

25        questions at this time.



```
 1          MR. McCARTER:
 2              Okay.  I've got to clear up a couple
 3       things.
 4                  RE-EXAMINATION
 5    BY MR. McCARTER:
 6       Q.    So we went in detail over your
 7    conversations with Mr. LaBauve before and you said
 8    in the initial conversations with him, you said that
 9    he concealed the interest issue, but you didn't
10    recall any specifics representations about the
11    timing of interest.  Do you remember that?
12       A.    He said -- repeat.
13       Q.    Okay.  So both your complaint and your
14    testimony earlier was that Mr. LaBauve concealed the
15    timing of DSC's interest charging in initial sales
16    meeting that you had with him, but you testified he
17    didn't make any specific statements or
18    representations to you about the interest.  Do you
19    recall that?
20       A.    Yes.
21       Q.    Okay.  And so when your attorney just now
22    asked you about did he misrepresent to you in that
23    initial conversation, you're talking about the
24    concealment and not actual statements, correct?
25       A.    I don't understand your question.
```



1   Q.   Okay.  So he didn't make any actual

2   statements to you about the timing of interest and

3   when it would start on the DSC line in your initial

4   meeting with Mr. LaBauve?

5   A.   No, but the contract stated it.

6   Q.   Okay.  So you're relying on what's in the

7   contract?

8   A.   I'm relying on what's in the contract and

9   what was represented by Stuart LaBauve, which is not

10  the truth --

11  Q.   Okay.

12  A.   -- the -- the 4 percent, the -- there

13  were -- there were numerous things that weren't

14  true.

15  Q.   Okay.  We're specifically talking about

16  the timing of when interest began to accrue on the

17  advance.  And you testified that Mr. LaBauve did not

18  make any statements to you on that issue in your

19  initial sales meeting with him.  Do you recall that?

20  A.   Yes.

21  Q.   Okay.  And there was some testimony just

22  now with your attorney where you were talking about

23  non-Manheim auctions.  We -- we covered a handful.

24  Was it three or four non-Manheim auctions that

25  you've dealt at since 2013.  Do you recall that?



1   Again, they were Oak View Auto Auction, Long Beach,

2   Mississippi, Baton Rouge ABC.  Okay.  Have you dealt

3   at any other Manheim auctions since 2013?

4        A.    No.

5        Q.    Okay.  Have you tried to deal at any

6   other Manheim auction -- non-Manheim auction since

7   2013?

8        A.    Yes.

9        Q.    Which one?

10       A.    I don't know the name of it.

11       Q.    Do you know where it was?

12       A.    It was, I believe, in Lafayette.  We --

13   we signed up and we basically have not gone.

14       Q.    So you -- you can go to this -- this

15   non-Manheim auction in Lafayette, you just chose not

16   to?

17       A.    I don't -- I -- I don't remember if we

18   were approved or not approved.

19       Q.    Okay.  So as we sit here today, you don't

20   know whether you can do business at that auction?

21       A.    Correct.

22       Q.    Okay.  Have you tried to go to any other

23   non-Manheim auctions since 2013?

24       A.    No.

25       Q.    Besides ABC Baton Rouge, have you tried



1   to go any other ABC auto auctions?

2        A.     No.

3        Q.     Okay.  Have you tried to pass a check at

4   any other non-ABC auction -- I mean, any other ABC

5   auction?

6        A.     Have I tried to pass a check?

7        Q.     Have you paid with a check at any other

8   ABC auction?

9             MR. COMAN:

10                Objection to form.

11            THE WITNESS:

12                At any another ABC auction, because

13       AB -- you're saying just ABC auctions in

14       whole?

15  BY MR. McCARTER:

16       Q.     Okay.  You -- you understand that ABC

17  auction is an auction company with multiple

18  locations, right?

19       A.     Yes.

20       Q.     Okay.  And we covered your permissions at

21  ABC Baton Rouge, right?

22       A.     Correct.

23       Q.     You said you haven't dealt at any other

24  ABC auctions since 2013?

25       A.     Correct.



1      Q.    So can I -- can I assume you haven't

2    tried to pay any other ABC auction a check since

3    2013?

4      A.    Yes.

5      Q.    Okay.  Have you tried to pay any -- have

6    you tried to go to any Odessa auto auctions since

7    2013?

8      A.    No.

9      Q.    Have you tried to go any other

10   independent auctions besides the ones that we just

11   talked about specifically?

12     A.    No.  The reasoning is because our target

13   market, if you go outside of this market and have to

14   pay transportation fees and everything else to get

15   the vehicle here when you're dealing with a $2,000

16   car is going to, you know, make you pay more for the

17   vehicle or end up being in the vehicle more

18   generally than if you stayed within the area.

19     Q.    Okay.  So it would be less profitable for

20   you to go outside of this area of Louisiana?

21     A.    Generally, yes.

22     Q.    Okay.  And have you tried to buy on-line

23   at any wholesale vehicle source like Smart Auction,

24   Copart, anything like that?

25     A.    No.

