```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF INDIANA

 3                  INDIANAPOLIS DIVISION

 4

 5   RED BARN MOTORS, INC., PLATINUM MOTORS INC., et

 6   al.

 7

 8                                    PLAINTIFFS

 9   V.

10                 CASE NO. 1:14-cv-01589-TWP-DKL

11

12   COX ENTERPRISES, INC., et al.

13

14                                    DEFENDANTS

15   _____

16

17          DEPOSITION FOR THE DEFENDANTS,

18          COX ENTERPRISES, INC., et al.:

19

20     The Deposition of Rule 30(b)(6) Witness, Barry

21   Wayne Mattingly, on Behalf of Mattingly Auto Sales,

22   Incorporated, taken in the above-styled matter at

23   Frost Brown Todd, LLC, 400 West Market Street, 3200

24   Mercer Tower, Louisville, Kentucky, on the 19th day of

25   October, 2016, beginning at 9:04 a.m.
```



**EXHIBIT F**

```
 1      A.    No.
 2    [WHEREUPON, phone rings.]
 3          MR. JURKIEWICZ:  Are we -- no question
 4    pending?
 5          MR. MCCARTER:  No.
 6    BY MR. MCCARTER:
 7      Q.    All right.  And do you remember the name
 8    of the officer or officers you met with?
 9      A.    Yes.
10      Q.    What was --
11      A.    Curtis Mouser.  And I don't -- don't know
12    how to spell that for you.  I'm sorry.
13      Q.    Okay.  There was the one interview,
14    and --
15      A.    Yes.
16      Q.    -- did he pull records from you?
17      A.    Yes.  Well, no.  He actually had pulled
18    them himself.
19      Q.    From where?
20      A.    The courthouse.  All property records,
21    everything, financial records from liens, that kind
22    of thing.
23      Q.    All right.  You said it was embezzling, but
24    did he give you any more sense specifically what
25    he was looking at?
```



Case 1:14-cv-01589-TWP-DLP    Document 166-8    Filed 12/05/16    Page 3 of 72 PageID #: 2801

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          22

1    A.   He was looking at to see what we --

2  basically, he was looking for money possibly that

3  we had borrowed.  That's what he was -- told us he

4  was looking at.

5    Q.   Okay.  But we're not talking about --

6    A.   Liens on properties and that kind of

7  thing.

8    Q.   Okay.  Did he ever formally tell you he

9  was done looking?

10   A.   Yes.  His -- I think his quote was, and he

11  looked at my lawyer as he looked at the paper and

12  said, "I can't find anything here."

13   Q.   Okay.  And that all -- that all happened in

14  May of 2012?

15   A.   Yes.

16   Q.   Okay.  How -- do you have any other

17  employees now?

18   A.   No.

19   Q.   Have you in the last ten years or so?

20   A.   No.

21   Q.   Do you have any other representatives

22  who might buy cars for you or the like?

23   A.   Yes.

24   Q.   And who are they?

25   A.   Different people.  Just to give you some



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 4 of 72 PageID #: 2802

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            23

 1   names, Kenny Barker.

 2      Q.   Okay.

 3      A.   In the past -- in the past, a guy named

 4   Sherman Dow, Frankie Anthony.  I think -- I think

 5   Butch Fentress.

 6      Q.   Contress?

 7      A.   Fentress, F-e-n-t-r-e-s-s.

 8      Q.   Okay.  Have these folks all been reps for

 9   you in the last ten years or so?

10      A.   Yes.

11      Q.   Are any of them still reps for you?

12      A.   Yes.

13      Q.   And by "reps," I mean representatives

14   who might --

15      A.   Per -- per -- person who --

16      Q.   -- who might buy or sell cars for you?

17      A.   Yes.

18      Q.   Okay.  And they do that at auctions?

19      A.   Yes.

20      Q.   And again talking about Mr. Barker, Mr.

21   Dow, Mr. Anthony, Mr. Fentress, did they have

22   their own dealerships, or did they buy personally

23   for you?

24      A.   They bought cars for -- through me; yes.

25      Q.   Okay.  Do they do any selling for you?



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 5 of 72 PageID #: 2803

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              24

 1    A.    Vehicles they bought were generally for

 2   themselves to sell or for family members or

 3   something like that to re-sell.

 4    Q.    But they would still do that on your

 5   account?

 6    A.    Yes.

 7    Q.    All right.  So what auctions are you

 8   dealing at today?

 9    A.    Wolfes, W-o-l-f-e-s, Wolfes Auto Auction,

10   and that's in Evansville.

11    Q.    Any others?

12    A.    That's it, pretty much it.  I do go to a

13   few, but rarely, E-town Auto Auction.

14    Q.    Say it again.

15    A.    E-town.

16    Q.    E-town?

17    A.    Elizabethtown Auto Auction.

18    Q.    And where -- is that Kentucky?

19    A.    Yeah, Kentucky.  That's actually --

20   actually outside of E-town, just call it E-town.  And

21   then also one more that I go to occasionally is

22   Clark County Auto Auction.

23    Q.    Can you think of any others you've gone

24   to since May of 2012?

25    A.    That's it.



 1    Q.   Okay.  You don't have internal legal

 2   counsel; do you?

 3    A.   No.

 4    Q.   Okay.  How many cars are on your lot

 5   now?

 6    A.   One.

 7    Q.   Do you have more than one lot?

 8    A.   No.

 9    Q.   Where is your lot?

10    A.   Hardinsburg, Kentucky.

11    Q.   Can you give me the full address?

12    A.   Yeah.  It's 3826 South Highway 261, and

13   that's in Hardinsburg, H-a-r-d-i-n-s-b-u-r-g,

14   Kentucky.

15    Q.   Okay.  Since you incorporated in 2003ish,

16   have you had other lots?

17    A.   No.

18    Q.   When you're buying and wholesaling cars

19   today, do you bring those back to your lot, or do

20   they go straight to other locations?

21    A.   Usually, bring them to the lot.

22    Q.   And what's an average number of cars

23   you've had on your lot since 2012, roughly?

24    A.   Probably one to two.

25    Q.   And before 2012?



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 7 of 72 PageID #: 2805

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              26

1    A.    We had as many as 15 to 20.

2    Q.    Is it fair to say that would matter more

3  when you have retail buyers, the need --

4    A.    Yes.

5    Q.    -- to see the cars.  Now, I understand you

6  buy and sell cars.  Is it the profit on those cars

7  that you -- is that how you make your money?

8    A.    Yes.

9    Q.    Okay.  So you're trying to buy them low

10 and sell them high?

11   A.    Correct.

12   Q.    Do you do anything else to make money

13 as Mattingly Auto Sales, Inc.?

14   A.    No.

15   Q.    No financing?

16   A.    No.

17   Q.    No service?

18   A.    No.

19   Q.    No parts?

20   A.    No.

21   Q.    Okay.  Has that been true the whole time?

22   A.    The whole time.

23   Q.    Okay.  Do you specialize in a particular

24 type of car?

25   A.    No.



1    Q.    No.   You still buying classic cars?

2    A.    No.

3    Q.    All your cars are used, though?

4    A.    Yes.

5    Q.    But they can be any different age?

6    A.    Correct.

7    Q.    Any different value?

8    A.    M-hm.

9    Q.    You can sell a high end Porsche and -- as

10   well as a low end --

11   A.    Not where --

12   Q.    -- Sentra?

13   A.    -- I'm from.

14   Q.    Okay.   So you are specializing a little bit

15   in lower end cars?

16   A.    Yes.

17   Q.    Okay.   And what's an average price for

18   it?

19   A.    The one we have for sale today is $2200.

20   Q.    Just curious, what kind of car is it?

21   A.    It's a 2002 Mazda Millenia.

22   Q.    Has the type of car you specialize in

23   changed since 2012?

24   A.    Yes.

25   Q.    In what way?



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 9 of 72 PageID #: 2807

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           28

1    A.    Basically, lower end cars, not -- not the

2    higher dollar SUVs, trucks, sporty cars, you know.

3    From, say, a $15,000 car, now we're down to the

4    under $5,000 cars.

5    Q.    Okay.  But even before 2012, we're

6    talking mid range 15, 20,000?

7    A.    M-hm.

8    Q.    Okay.  Do you ever get cars from other

9    dealers?

10   A.    Yes.

11   Q.    Outside of an auction?

12   A.    Yes.

13   Q.    Okay.  And when and what does that look

14   like?

15   A.    Just the same.  Just if they have

16   something they want to -- they don't want to --

17   they'll take to the auction they don't want, I'll

18   shoot them a price if I -- you know, if it's worth the

19   money, I'll buy it, they'll sell it to me.

20   Q.    Okay.  Any estimate of what percentage

21   of your deals are from --

22   A.    No.  No.  Wouldn't -- wouldn't have any

23   idea.

24   Q.    Okay.  Besides auctions, other dealers,

25   any other way you get cars?



1    A.    That's about it.

2    Q.    Trade-ins?

3    A.    Yes.  If -- if there's a trade-in, yes, we

4    do that.

5    Q.    Okay.  What about online?  Do you buy

6    anything online?

7    A.    No.

8    Q.    You're aware of SmartAuction, eBay

9    Motors --

10   A.    Yes.

11   Q.    -- those kind of things?

12   A.    Yes.

13   Q.    And you don't use any of those?

14   A.    No.

15   Q.    Okay.  Is that by choice?

16   A.    Yes.  I just don't -- nothing worth putting

17   on there.

18   Q.    Okay.  I just wanted -- I asked you this

19   before, but you don't sell any add-ons or anything

20   like that, insurance products, any --

21   A.    No.  No.

22   Q.    Okay.  So if -- if you do have a retail

23   deal, what is the form of payment typically on

24   those?  Is it cash or something else?

25   A.    Cash, check, whatever; m-hm.  We don't



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 11 of 72 PageID #: 2809

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          30

 1  finance unless they have their own financing or

 2  something.  We don't do it ourselves.

 3      Q.   Have you ever done self financing?

 4      A.   No, not through us.  We used to finance

 5  through another dealer who had financial options.

 6      Q.   Okay.

 7      A.   We never had nothing ourselves.

 8      Q.   So if the buyer comes in with cash, a

 9  certified check, or a bank loan, you can take that?

10      A.   Right.

11      Q.   But you won't do a buy here pay here

12  deal?

13      A.   No.

14      Q.   Okay.  When -- what period of time were

15  you doing the buy here pay here deals through

16  another dealer?

17      A.   Well, it wasn't -- it was through a bank,

18  through a bank.  It was never a buy here pay here.

19  It was -- it -- we quit that in 2012, I guess.

20      Q.   Okay.  Who was that bank?

21      A.   Fort Knox Credit Union.

22      Q.   Say it again.

23      A.   Fort Knox -- Fort Knox Federal Credit

24  Union.

25      Q.   Okay.  When you were working with Fort



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 12 of 72 PageID #: 2810

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              31

1  Knox, what did those contracts look like?  Was it

2  just a loan from Fort Knox to the consumer, and

3  then they would pay you directly?

4    A.   Yes.  Actually, the -- the loan, I would go

5  through another dealer.  They did all the

6  paperwork.  I would -- I -- I didn't have an account

7  with them.  I would just send the paperwork, the

8  app -- they would fill out an application, I would

9  send it to that dealer, that dealer would do all the

10 paperwork.

11        MR. JURKIEWICZ:  Matt?

12        MR. COMAN:  I'm here.

13        MR. JURKIEWICZ:  We're on the record.

14 Matt Coman is joining.

15        MR. COMAN:  I apologize for the

16 interruption.

17 BY MR. MCCARTER:

18   Q.   And so please tell me if this is wrong, but

19 so you -- you would make the deal with the

20 consumer, then you would send the paperwork to

21 another dealer, and they would send it in to Fort

22 Knox Credit Union?

23   A.   Yes.

24   Q.   And then Fort Knox would cut a check to

25 you?



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 13 of 72 PageID #: 2811

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              32

1    A.   To -- no, to Wheatley, to the -- the

2  dealer, to the dealer, and then they would pay me.

3    Q.   Okay.  And what's Wheatley's full name?

4    A.   It was Wheatley Motor Company.  They

5  have since gone out of business.

6    Q.   Do you know whether Wheatley was -- was

7  running a buy here pay here contract where they

8  would keep getting payments from the consumer,

9  or was everything paid off up front by their --

10   A.   Everything was paid by Fort Knox Credit

11 Union to them.

12   Q.   Okay.  Any other form of financing you've

13 used for your sales?

14   A.   No.  Not our sales; no.

15   Q.   Okay.  When you get a trade-in, how do

16 you deal with that?

17   A.   You just value it, and they pay the

18 difference.

19   Q.   So you write a contract for the new car,

20 you give some trade-in credit, and they pay the

21 difference?

22   A.   Correct.

23   Q.   In some of those cases, you have to pay

24 off a previous lienholder?

25   A.   Some; yes.



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 14 of 72 PageID #: 2812

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                35

1          MS. LASKY:  Don't forget to let him

2    finish his entire question.  You're doing great, just

3    give him a little more time.

4    BY MR. MCCARTER:

5      Q.   Is it fair to say those wholesale auto

6    auctions kind of work in the same manner?

7      A.   Yes.

8      Q.   Okay.  Can you tell me just generally --

9    I -- and then we'll break it down -- how it works?

10   How do you go in, get a car from an auction?

11     A.   Basically, you just go in with your card,

12   go up there, bid on it through the on kube --

13   through the lines.  Once you get your ticket, go

14   pay for it, and sign the ticket, get your gate pass,

15   and go home.

16     Q.   With the car or without the car?

17     A.   With the car.

18     Q.   Okay.  So it's a competitive environment

19   where you've got multiple dealers trying to get the

20   car?

21     A.   Yes.

22     Q.   Somehow you scout out the ones you

23   want, and then you bid on them, and if you win the

24   bid, you have to pay for the car, and then you take

25   it?



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 15 of 72 PageID #: 2813

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              36

 1    A.    Yes.

 2    Q.    Okay.  Have you ever sold at auctions?

 3    A.    Yes.

 4    Q.    How often?

 5    A.    Well, that's the -- part of the wholesale

 6  stuff.  You know, it was back before 2012

 7  practically every week.

 8    Q.    Okay.  So you've been both the buyer and

 9  seller at auction?

10    A.    Yes.

11    Q.    On hundreds of cars?

12    A.    Yes.

13    Q.    Okay.  How -- how does it work from the

14  seller's side?  When do you get paid by the

15  auction?

16    A.    If I sell?

17    Q.    Yeah.

18    A.    If I turn in a title, when you -- when you

19  run a car -- if you sell it, I -- I would have to go up

20  front to give them the title, you know, if it's out of

21  state or Kentucky title, Kentucky being you have to

22  have the dealer signed properly.  They turn it in,

23  and they issue me a check.

24    Q.    Okay.  And that check comes from the

25  auction, not the buyer?



1    A.    Auction; m-hm.

2    Q.    And so when you're a buyer, you pay the

3  auction, when you're a seller, you get paid by the

4  auction?

5    A.    Correct.

6    Q.    Okay.  Is that part of the reason you go

7  to auction, to sort of make sure that you get paid

8  if you're a seller?

9    A.    Yes.

10    Q.    And for the buyer, that's a way to be sure

11  you get a title?

12    A.    Yes.

13    Q.    And can the buyer usually take the car

14  immediately, or is there any kind of waiting

15  period?

16    A.    Usually, if it's -- as long as there's no

17  problems with the car, they have that opportunity

18  to ride and drive, to inspect the car to make sure

19  it's proper, what they advertised, and if it's given

20  a time frame, let's say an hour to check it  out --

21    Q.    Yeah.

22    A.    -- then you have to go up and pay for it,

23  and you take it the same day.

24    Q.    And is it my understanding that there's --

25  or it is my understanding that there's some



 1  situations where you might have longer if there

 2  was some issue with the car, if it's a --

 3      A.    Yes.

 4      Q.    -- frame damage or something?

 5      A.    Yes.

 6      Q.    Okay.  So there's -- the auction provides

 7  certain relief in cases if a car wasn't disclosed

 8  properly?

 9      A.    Yes.

10      Q.    So what are the different ways a buyer

11  can pay for the car at the auction?

12      A.    Well, you can write them a check, or if

13  you have a floor plan company you can put it on

14  the floor plan.

15      Q.    I'll come back to the floor plan in a

16  minute, but can you also pay cash?

17      A.    Yes.  Check or cash; yes.

18      Q.    Does it have to be a certified check or

19  business check or what?

20      A.    Business check.

21      Q.    Okay.  So in all cases, you have to find

22  some way to pay for the car before you take it?

23      A.    Yes.

24      Q.    All right.  So you said floor plan is one

25  way you can get the car out of the auction.



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 18 of 72 PageID #: 2816

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              39

 1   Explain to me what that means, and how does that
 2   work?
 3       A.    If I had a -- if I had an auction ticket
 4   before from where I purchased the car --
 5       Q.    M-hm.
 6       A.    -- I would take it to the person that's
 7   called a finance officer, whoever it would be that
 8   does that, that's their job.  They would scan it,
 9   initial it, scan it, put it in their system, stamp it,
10   initial it, something so where you can get it out of
11   the gate.  Like make like a gate pass of where you
12   can take the car out.
13       Q.    But they would have to know that you had
14   credit available from the floor planner in advance?
15       A.    Right.
16       Q.    Okay.  And tell me if this is wrong, but a
17   floor -- a high level floor planner is somebody you
18   have a line of credit with to buy cars?
19       A.    M-hm.
20       Q.    Right?
21       A.    Yes.
22       Q.    Okay.  And so somehow the floor planner
23   and the auction communicate about how much
24   credit you have as Mattingly Auto Sales, and then
25   you can just say, "Put it on my floor plan"?



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 19 of 72 PageID #: 2817

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            40

```
 1      A.   Yes.

 2           MS. LASKY:  Object to the form.

 3   BY MR. MCCARTER:

 4      Q.   Have you used all those different forms of

 5   payment:  cash, check, floor plan?

 6      A.   Yes.

 7      Q.   So at a high level after you get a car at

 8   auction, then what do you do with it as far as

 9   business?

10      A.   Just --

11           MS. LASKY:  Object to the form.  You can

12   answer.

13           THE WITNESS:  Okay.

14      A.   Just take it to the lot, clean it up,

15   whatever it needs to be, put it up for sale.

16   BY MR. MCCARTER:

17      Q.   Okay.  Would you typically re-sell a car

18   at the same auction, or would you do something

19   differently?

20      A.   Typically, the way I operate I would take

21   it to another auction.

22      Q.   And so you might buy it at an auction

23   where it's less valued, and take it to an auction

24   where it's more valued?

25      A.   Yes.
```



1    Q.   So you said when you're the seller you

2   have to provide the title to get paid; right?

3    A.   Yes.

4    Q.   And so does that sometime -- does that

5   always happen on sale day?

6    A.   I tried to, but sometimes it didn't happen,

7   you know.  They would -- I wouldn't get paid -- I

8   never got paid until I provided them a title.

9    Q.   But that sounds like some sellers can

10   provide it later; is that right?

11    A.   Oh, yeah, you -- you can turn it in later.

12   They would charge you a fee for that, but I would

13   never get paid unless I produced a title.

14    Q.   All right.  But does a buyer -- does a

15   buyer know the title is not going to be available

16   immediately?

17    A.   Some do; yes.

18    Q.   And how do they -- how do you know that?

19    A.   Well, it's -- it's always have to announce

20   it.  It's called TA.

21    Q.   Okay.

22    A.   It would be title absent.  And it kind of

23   goes up on the screen, and they know there will

24   not be a title at that time.

25    Q.   Okay.  Did you ever buy a car TA?



1    A.    Yes.

2    Q.    What -- what -- why would you buy a car

3    TA if you can't immediately re-sell it?

4    A.    Because eventually they'll -- they'll get

5    me title.  They have a -- a time frame usually of

6    three weeks.  If they don't provide you with a clear

7    title, you can take the car back, and the deal is

8    canceled.

9    Q.    Okay.  In that mean -- in the meantime,

10   can you go ahead and get the car ready and start

11   offering it?

12   A.    Yes.

13   Q.    Did you ever re-sell a car before you got

14   the title from the auction?

15   A.    Yes.

16   Q.    How often has that happened?

17   A.    It was rare.

18   Q.    Did you ever have a situation where that

19   title never shows up and you have to unwind the

20   deal?

21   A.    It -- I have had a few, very few,

22   fortunately.

23   Q.    And I know we've -- this has been a fairly

24   general conversation, but has that been the sort of

25   process at auction the whole time from 2003



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 22 of 72 PageID #: 2820

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              47

1    line during 2006-2012, what was your

2    understanding of when payment would be due for

3    the money you borrowed?

4      A.    When I sell --

5            MS. LASKY:  Object to the form.

6      A.    When I sold the car.

7    BY MR. MCCARTER:

8      Q.    That second?  Within a day?

9      A.    I think they had -- I think in their

10   paperwork they had a three-day period.  I'd have

11   to look back at that to see.

12     Q.    What if you never sold the car?  Is there

13   some sort of cut off?

14     A.    Yeah.  I think -- I don't want to --

15           MS. LASKY:  Object to the form.  Go

16   ahead.

17     A.    I -- I believe it was 120, 120 days with

18   DSC.  I could be wrong.

19   BY MR. MCCARTER:

20     Q.    Okay.

21     A.    But I rare -- I rarely ever -- never -- I

22   don't think it ever happened.  I either sold it or

23   took it back to the auction, whatever.

24     Q.    But there -- there would be a maturity

25   date if you didn't pay?



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 23 of 72 PageID #: 2821

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            48

 1     A.    Correct.

 2     Q.    Okay.  And did AFC work the same way?

 3     A.    Yes.

 4     Q.    What -- do you remember what their

 5  maturity date was?

 6     A.    No, I don't.

 7     Q.    What about MAFS, the same way?

 8     A.    Pretty much the same.

 9     Q.    So you'd have to pay a car if you sold it

10  within a short time period, and then, if you didn't

11  sell it, there would be a cut off?

12     A.    Right.

13     Q.    Okay.  Were those floor plans limited to

14  cars you bought at auction?

15     A.    No.

16     Q.    So you could take a car you bought from

17  another dealer and put it on floor plan?

18     A.    Trade; m-hm.

19     Q.    Okay.  Was that process any different?

20  How did you --

21     A.    No.

22     Q.    Well, how -- so did they pay the dealer

23  directly?

24     A.    No, they paid -- they would pay me.

25  Yeah, they paid me.



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 24 of 72 PageID #: 2822

BARRY WAYNE MATTINGLY  30(b)(6)                              October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                        49

1    Q.   So it sounds a little different; right?

2  You're going to have to submit some paperwork --

3    A.   Yeah.  Yes.

4    Q.   -- and you're going to get payment?

5    A.   I would -- I would produce a title to them,

6  and they would pay me for the trade.  Put it on the

7  floor plan for that amount, I guess you'd say.

8    Q.   So how did they know the amount to

9  finance?

10   A.   Usually, my treasurer would work the

11  money, or they have a -- they have a guide they go

12  by.

13   Q.   So some way you would show them what

14  you paid for it, they would compare to it some

15  value guide, and --

16   A.   M-hm.

17   Q.   -- they would finance that amount?

18   A.   Yes.

19   Q.   Okay.  What about at auction, did they

20  ever reject your financing because you paid too

21  much for it?

22   A.   No.

23   Q.   So they would just go with the auction

24  price?

25   A.   Yes.



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 25 of 72 PageID #: 2823

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              50

1    Q.   Did you have some understanding that the

2    cars you acquired were -- were collateral for the

3    loans?

4    A.   Yes.

5    Q.   Do you understand what I mean by

6    collateral?

7    A.   Yes.

8    Q.   They could pick up the cars if they didn't

9    get paid?

10   A.   Yes.

11   Q.   Okay.  And that was true of all the floor

12   planners?

13   A.   Yes.

14   Q.   Do you -- do you know what security

15   interest means?

16   A.   No.

17   Q.   Okay.  And so you would -- the -- the

18   general way it worked, would -- you would repay

19   the principal you borrowed, plus interest, plus fees

20   to the floor planner for the cars you bought?

21   A.   Yes.

22   Q.   Okay.  How would you know exactly how

23   much to pay them?  Like, how much the principal

24   was, plus the interest, plus the fees?

25   A.   Computer.  They had a website with the



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 26 of 72 PageID #: 2824

BARRY WAYNE MATTINGLY  30(b)(6)                              October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                        51

 1 | balances.
 2 |   Q.   DSC did?
 3 |   A.   Yes, both.  And MAFS.
 4 |   Q.   So each time you needed to pay off a
 5 | unit, you would look it up on the website and then
 6 | pay that amount?
 7 |   A.   Yes.
 8 |   Q.   Was that typically by ACH electronic
 9 | payment or by check?
10 |   A.   Yes, ACH.
11 |   Q.   ACH; okay.  Was that true the whole time
12 | you were with DSC?
13 |   A.   Yes.
14 |   Q.   Is that true the whole time you were with
15 | MAFS?
16 |   A.   Well, MAFS -- MAFS worked a little
17 | different.  I could pay off online or at the auction,
18 | because they held the titles at the auction.  So it
19 | was convenient.
20 |   Q.   And you did both?
21 |   A.   Yes.
22 |   Q.   What about statements, did you get
23 | statements from DSC?
24 |   A.   No.  It -- only thing we had was the
25 | online.



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 27 of 72 PageID #: 2825

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            52

1    Q.   Okay.  Did you have a secure log-in you

2    could look at any time and see what you were --

3    what you owed DSC?

4    A.   Yes.

5    Q.   Okay.  Same with MAFS?

6    A.   Yes.

7    Q.   How about AFC?

8    A.   I -- they might have.  I don't remember

9    about AFC.

10    Q.   Okay.  So other than AFC, DSC, and

11    MAFS, have you ever entered into any inventory

12    financing arrangement with anybody else?

13    A.   No.

14    Q.   Do you have any inventory financing

15    arrangement now?

16    A.   No.

17    Q.   How do you pay for cars you buy now?

18    A.   Just strictly cash.

19    Q.   And that's out of just operations of the

20    business?

21    A.   Yes.

22    Q.   Okay.  But at Wolfes, E-town, and Clark

23    County, they still take your business checks?

24    A.   Yes.

25        MS. LASKY:  Can we just take a quick --



```
 1            MR. MCCARTER:  Yeah.
 2            MS. LASKY:  -- break?
 3            MR. MCCARTER:  That's fine.
 4   [WHEREUPON, a brief recess is taken.]
 5   [WHEREUPON, document referred to is marked
 6   Defendants' Exhibit 2 for identification.]
 7   BY MR. MCCARTER:
 8     Q.   Let me show you a couple of documents,
 9   break up the monotony here.  I'll represent to you
10   this is just a printout from the State of Kentucky
11   website, and it shows Mattingly Auto Sales, Inc.
12   being incorporated in March of 2003; do you
13   that?
14     A.   Yes.
15     Q.   Does that look right to you?
16     A.   Yes.
17     Q.   Okay.  And it's -- as you testified earlier,
18   it shows you and Ms. Mattingly as the officers; do
19   you see that?
20     A.   Yes.
21     Q.   Okay.  Do you see anything on this that
22   looks wrong to you?
23     A.   No, I don't.
24     Q.   Okay.  Do -- side question:  Do you --
25   does Mattingly Auto Sales do its own tax returns?
```



Case 1:14-cv-01589-TWP-DLP  Document 166-8  Filed 12/05/16  Page 29 of 72 PageID #: 2827

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              54

 1     A.    Yes.

 2     Q.    You file tax returns in the name of

 3   Mattingly Auto --

 4     A.    Yes.

 5     Q.    -- Sales, Inc.?

 6     A.    Yes.

 7     Q.    And who prepares those?

 8     A.    Jackson Hewitt.

 9     Q.    Okay.  And you have those going back

10   several years?

11     A.    Yes.

12     Q.    Do you have any from pre-2012?

13     A.    Prob -- I'm sure we do, but I don't know

14   how far back we kept.

15     Q.    Okay.  And if I didn't say it, that's

16   Exhibit 2.  I'm going to show you what we're going

17   to call Defendants' Exhibit 3.

18   [WHEREUPON, document referred to is marked

19   Defendants' Exhibit 3 for identification.]

20   BY MR. MCCARTER:

21     Q.    It's two pages front -- one front, one

22   back.  And I'll represent to you this is just a

23   printout from what appears to be your website, and

24   you can see at the bottom it was printed on

25   October 12th, 2016; do you see that?



```
 1      A.   Yes.

 2      Q.   Does this look like your website?

 3      A.   No, this is not my website or my car lot.

 4      Q.   So it's not you at all?

 5      A.   No.

 6      Q.   Okay.  You -- you see on that first page,

 7    even though it's got a Hardinsburg office --

 8      A.   M-hm.

 9      Q.   -- this is not you?

10      A.   No, that's not my office.

11      Q.   Do you know who -- who this dealer is?

12      A.   Yes.

13      Q.   Do they have any connection to you?

14      A.   No.  Other -- well, one.  Name.

15      Q.   Okay.

16      A.   Outside of that, no.

17      Q.   All right.  Do you have a website?

18      A.   No.

19      Q.   Okay.  All right.  It's not a very important

20    exhibit, but it's now marked as an exhibit.

21      All right.  I think you said your relationship

22    with DSC would have began around 2006?

23      A.   I believe so.

24      Q.   And your relationship with MAFS began

25    before that; right?
```



1    A.   Yes.

2    Q.   Okay.  I'll go ahead and show you another

3  document we may use later.  This will be

4  Defendants' Exhibit 4.

5  [WHEREUPON, document referred to is marked

6  Defendants' Exhibit 4 for identification.]

7  BY MR. MCCARTER:

8    Q.   And these I'll represent to you are your

9  interrogatory responses in this case.  You --

10  take -- take as much time as you want, but I'm

11  not -- I'll call your attention to anything specific

12  we need to cover, but have you seen this document

13  before?

14    A.   Yes.

15    Q.   And do you recall participating in

16  preparing these responses?

17    A.   Yes.

18    Q.   And you reviewed and they're true, to the

19  best of your knowledge?

20    A.   Yes.

21    Q.   Okay.

22       MS. LASKY:  And I'll represent to you we

23  have a verification that I'll give to you-all

24  tomorrow.

25       MR. MCCARTER:  Okay.  Signed by Mr.



1    Mattingly?

2          MS. LASKY:  Correct.

3          MR. MCCARTER:  Okay.

4    BY MR. MCCARTER:

5      Q.   And so, if you -- if you flip over to

6    Number 2, it says you started with -- I think it says

7    you started with you DSC in late November

8    of 2006, late -- late October and early November

9    of 2006; is that --

10     A.   Which one --

11     Q.   -- do you see that?

12     A.   No.  Let me get to that page.

13     Q.   It's Page 4.

14     A.   Okay.

15          MS. LASKY:  It's right here.

16          THE WITNESS:  Okay.

17     A.   All right.  Now, could you repeat the

18   question?

19   BY MR. MCCARTER:

20     Q.   All right.  So this -- this language in the

21   middle of Response Number 2 says in late October,

22   early November 2006, and then that's when you

23   executed a DSC note; do you see that?

24     A.   Yes.

25     Q.   Okay.  Do you recall sort of how your



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 33 of 72 PageID #: 2831

BARRY WAYNE MATTINGLY  30(b)(6)                October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              58

1  relationship with DSC began?  Like, how did you

2  find DSC, or how did they find you?

3    A.   They -- they had a representative at the

4  Louisville Auto Auction, Manheim Louisville, and

5  he was there, and Scott and I, we just was talking,

6  and asked if I'd be interested, and I looked -- he

7  had a brochure, and I looked it over.

8    Q.   And what was attractive about that offer?

9    A.   Just the available money.

10   Q.   Do you recall whether the fees and

11  interest were higher, lower than AFC?

12   A.   Comparable at the time.

13   Q.   And how about MAFS, how did they

14  compare to MAFS?

15   A.   Comparable.

16   Q.   Okay.  So it was primarily having more

17  credit that attracted you?

18   A.   Yes.

19   Q.   Okay.  And who was it -- do you remember

20  the name of that representative?

21   A.   Yes.  It's Mark Holley.

22   Q.   Okay.  Do you recall anything more

23  specific about what Mark Holley said to you in that

24  initial meeting?

25   A.   Nothing.  Just basically over the terms



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 34 of 72 PageID #: 2832

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           59

 1  and the -- the -- how much credit available,

 2  interest rate.  That was pretty much it.

 3      Q.   Okay.  Was there any specific discussion

 4  about how interest would be calculated?

 5      A.   I think it was in the -- in the brochure or

 6  maybe what I signed.  It was a percentage plus

 7  prime with the prime subject to change.

 8      Q.   Was there any specific discussion about

 9  when interest would begin to run?

10      A.   No.

11      Q.   And so did you meet with anybody else

12  from DSC before you signed up with DSC?

13      A.   No.

14      Q.   Did you take the loan forms at that point

15  or just a brochure?

16      A.   First meeting was a brochure, and the

17  second he had the forms, and then I signed them.

18      Q.   Okay.  So you signed them physically

19  present with Mark Holley?

20      A.   Yes.

21      Q.   Okay.  So your interrogatories say you

22  worked with Mark Holley, Lourdes Givens, and two

23  other reps of NextGear at different times.

24      A.   Yes.

25      Q.   Does that sound true?



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 35 of 72 PageID #: 2833

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              60

1    A.   Yes.

2    Q.   Okay.  And do -- you don't remember the

3  names of the two --

4    A.   Well, I do -- after all this, we found a

5  name -- I -- I couldn't think of his name.  One of

6  the gentleman's name for NextGear was Art -- Art

7  Felix.

8    Q.   Art Felix.

9    A.   Art Felix.

10    Q.   You don't remember the fourth person?

11    A.   No.  I think her name -- no, no.  She

12  was -- the situation was Mark Holley got sick.

13  They had a couple reps in between there, and then

14  Lourdes Givens was the -- took over.

15    Q.   Okay.  So these were -- from your

16  perspective anyway, these were NextGear -- I'm

17  sorry, DSC's reps at Manheim Louisville?

18    A.   Yes.

19    Q.   Okay.  Besides those reps at Manheim

20  Louisville, did you interact with anybody else from

21  DSC?

22    A.   No.  No.  They -- they would travel to

23  different auctions, as well.

24    Q.   Okay.  Do you recall who you interacted

25  with from MAFS?



Case 1:14-cv-01589-TWP-DLP  Document 166-8  Filed 12/05/16  Page 36 of 72 PageID #: 2834

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           61

 1      A.    Donna Kronauer.  Is that how -- I don't

 2   know how you pronounce that.

 3            MS. LASKY:  Kronauer.

 4      A.    Kronauer.  Sorry.

 5   BY MR. MCCARTER:

 6      Q.    Okay.

 7      A.    Excuse me.  Kronauer.  She was the rep

 8   for MAFS.

 9      Q.    Okay.  I don't think we've seen it in the

10   production, but you don't have the original

11   brochure from DSC that you looked at?

12      A.    No.

13      Q.    Okay.  And so I'm sorry if this is

14   repetitive, but you -- did you interact with DSC at

15   any other auction?

16      A.    Yes.

17      Q.    Which one?

18      A.    Both the representatives, Mark Holley,

19   Lourdes Givens, Art Felix would go to -- I would

20   see them at Louisville, Bowling Green, and

21   Evansville, which would be Wolfes.

22      Q.    Okay.  And so it sounds like they kind of

23   worked that region, that circuit?

24      A.    Yes.

25      Q.    Okay.  All right.  Number 4.



1    A.    4.

2    Q.    I'm going to show you what we're going to

3  call Defendants' Exhibit 4, and I'll represent for

4  the record that this is a composite exhibit.  It

5  starts with NextGear 003432, but it has various

6  other Bate's numbers included that go through

7  NextGear 003392.  They're not all sequential.

8    So again, take as much time as you want, but

9  I'll call your attention to specific questions.  I'm

10  not going to ask you to recite the whole document.

11    A.    Okay.  I'm just going to read that.

12  [examines document]

13    Q.    Okay.  So Exhibit 4, does this generally

14  look like an application from you to DSC, as well

15  as some other loan agreements you signed with

16  DSC?

17    A.    Yes.

18    Q.    Okay.  And on that first page that's

19  numbered 3432 at the bottom, NextGear 00 --

20    A.    Yes.

21    Q.    -- 3432, that is your signature?

22    A.    Yes.

23    Q.    And it's -- it's dated October of --

24  of 2006; do you see that?

25    A.    Yes.



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          72

1    auction, need to pay off a particular vehicle, and I

2    would give him a check.  He worked out of

3    Lexington.

4      Q.   And he'd hand you the title?

5      A.   He'd hand me the title, and I'd hand him

6    the check.

7      Q.   Okay.  And I should have asked this

8    before, but that would generally mean that DSC

9    would hold the titles after you floored the car with

10   them until they were paid?

11     A.   Yes.

12     Q.   And is that true of other floor plans?

13     A.   Yes.

14     Q.   Okay.  And that's sort of part of their

15   security to make sure they get paid?

16     A.   Yes.

17     Q.   Do you -- do you have any knowledge of

18   while they were holding those titles whose name

19   the vehicle be titled in?

20          MS. LASKY:  Object to the --

21     A.   No.

22          MS. LASKY:  -- form.

23     A.   No.

24   BY MR. MCCARTER:

25     Q.   During that period you were with



1   DSC, 2006 to 2012, how did you keep your books

2   internally at Mattingly, if any?

3      A.   Well, I would -- I don't know that I

4   understand the question.

5      Q.   Okay.  So presumably, you keep some

6   accounting record of some sort of what you paid

7   for a car, how much you sell it for, that sort of

8   thing?

9      A.   Yes.  We'd have something from --

10  familiar -- we called it the manilla -- the binders,

11  and we have ve -- all the -- everything related to

12  that car in that particular binder.

13     Q.   Okay.  Is that --

14     A.   Auction ticket.

15     Q.   Have you heard the term deal jacket?  Is

16  it kind of the same thing?

17     A.   Yeah, jacket.  A jacket; yes.

18     Q.   Okay.

19     A.   Thank you for that term.  I knew it, but I

20  just couldn't -- it was on the tip of my tongue.

21     Q.   No problem.  But at some point when

22  you've got to file your taxes, I guess, you've got

23  to translate that to profit or loss; right?

24     A.   Correct.

25     Q.   How do you do that?



1    A.    Well, we just -- we -- actually, my wife

2    puts them into the computer --

3    Q.    Uh-huh.

4    A.    -- and we just calculate every one of them

5    at -- at the end of the day when it was sold.  We

6    knew on that vehicle what the profit or loss was.

7    Q.    Okay.  Do you know during 2006, 2012,

8    were you using a particular software to do that?

9    A.    No, I don't -- I don't know.

10   Q.    You may have been, you just don't know?

11   A.    Yeah.  There was something, but I don't

12   know what it would be.

13   Q.    Okay.  But as -- as far as you know, you

14   didn't attempt to track how much interest and fees

15   would be due to NextGear during that period?  You

16   just looked at their online statement for that?

17   A.    Yes.  And we could do it the end of the

18   year statement, as well.  There was an end of the

19   year statement they could pull.

20   Q.    From NextGear?

21   A.    From NextGear.

22   Q.    Okay.  And when I say NextGear in those

23   last two questions, we're talking about DSC; right?

24   A.    DSC; yes.

25   Q.    Okay.  So we talked about, you know,



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 41 of 72 PageID #: 2839

BARRY WAYNE MATTINGLY 30(b)(6)                          October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                  75

 1   your initial discussion with Mark Holley, and you

 2   said there was no specific discussion about the

 3   timing of interest, when it would start accruing;

 4   right?

 5     A.    Correct.

 6     Q.    Did you ever talk about that issue with

 7   anybody at DSC?

 8     A.    Possibly.  I -- I just don't remember.

 9     Q.    As we sit here today, you don't remember

10   any specific conversations with anybody at DSC

11   about when DSC would start charging interest?

12     A.    Well, occasionally, they -- if I was --

13   can -- can I give you an example?

14     Q.    Yeah.

15     A.    If I bought a car today, and let's say I

16   sold it next week, and I paid it off online, there

17   would -- and I -- and when they -- when I check,

18   there's no title available.  So they basically didn't

19   have the title yet, but yet I was still paying the

20   interest, and they didn't even have the title.

21     So I would have to wait until they got the title

22   to send to me.  Other than that, that would be

23   about the only thing.

24     Q.    But did you -- do you remember talking to

25   somebody at NextGear about that?



1    A.    Yes.

2    Q.    And who was that?

3    A.    That would be both Mark Holley, as well

4  as -- mostly, Lourdes Givens.

5    Q.    Okay.  And what did you say to them

6  about it?

7    A.    Just in a -- I said in a jokingly -- I'm sure

8  that they told me it was common practice, but I

9  said, "That's kind of a shame that I'm paying

10  interest on something that you-all are still holding

11  the money on that I don't even have yet."

12    Q.    M-hm.  But do you remember any specific

13  discussions with anybody at DSC about when

14  interest would start accruing on your floor plan

15  cars in the first place?

16    A.    Other than --

17        MS. LASKY:  Object to the form.

18    A.    Other than that, no.

19  BY MR. MCCARTER:

20    Q.    Okay.  All right.  I'm going to show what

21  we're going to call Defendants' Exhibit 9.

22  [WHEREUPON, document referred to is marked

23  Defendants' Exhibit 9 for identification.]

24  BY MR. MCCARTER:

25    Q.    This document is Bate's labeled MA 252



1   through 283.  Do you see that at the bottom?  You

2   see those numbers --

3   A.   Yes.

4   Q.   -- right?

5   A.   I'm sorry.

6   Q.   252 --

7   A.   Yes.  Yes.  I'm sorry.

8   Q.   No problem.  And I'll represent to you

9   that MA generally means it's a document that you

10  produced to us.  So is -- do you recognize this

11  document?

12  A.   Yes.  It looks like a sheet; yes.

13  Q.   Does it -- well, it -- it starts with

14  Manheim Automotive Financial Services, Inc.

15  Security Agreement, Inventory Financing bridge

16  Line of Credit; do you see that?

17  A.   Yes.

18  Q.   All right.  Is it fair to say this is

19  generally the loan agreements you signed with

20  MAFS in -- in July of 2010?

21  A.   Yes.  It looks like the typical -- typical

22  thing; yes.

23  Q.   Okay.  And those are your signatures

24  internally, like, for example, on 2 -- Page 272

25  and 275?



1    A.    Yes.

2    Q.    Okay.  And that's your signature on 279?

3    A.    Yes.

4    Q.    And 283?

5    A.    Yes.

6    Q.    Okay.  So, after July 2010, this would

7  generally be the loan agreements that would

8  govern your floor plan with MAFS?

9    A.    Yes.

10    Q.    Okay.

11          MR. MCCARTER:  What number are we

12  on?

13          THE WITNESS:  Number 10 will be the

14  next one.

15  [WHEREUPON, document referred to is marked

16  Defendants' Exhibit 10 for identification.]

17  BY MR. MCCARTER:

18    Q.    All right.  I'm going to show you what

19  we're going to call Defendant's Exhibit 10.  This is

20  Bate's labeled MA 242 through 244.  This is called

21  "MAFS Floor Plan Guideline"; do you see that?

22    A.    Yes.

23    Q.    And is that your signature on the second

24  page?

25    A.    Yes.



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 45 of 72 PageID #: 2843

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                             79

1    Q.    Okay.   So these are generally guidelines

2    for the MAFS line around the time you signed this?

3    A.    Yes.

4    Q.    Okay.   And at a high level do you

5    understand that part of your complaint in this case

6    relates to when interest began accruing on your

7    DSC line?

8    A.    Yeah.

9    Q.    Okay.   Can you give me your

10   understanding of what your concern is?

11   A.    I believe they were -- basically when I

12   bought a car title attached or title absent, it

13   appears that they were writing -- charging me

14   interest from Day 1, and MAFS was even charging

15   me interest, two -- two days worth of interest the

16   day I put it on the floor plan.

17   Q.    So on the DSC side, is your only concern

18   the cars that were sold title absent?

19        MS. LASKY:   Object to the form.

20   A.    Possibly.  I believe so.

21   BY MR. MCCARTER:

22   Q.    Okay.   So if the title is present on the

23   day of the auction, you believe it would be

24   appropriate for DSC to start charging interest from

25   that day?



1  BY MR. MCCARTER:

2    Q.   Okay.  But you were able to take the cars

3  put on the DSC line because you told the auction

4  you were putting on the DSC line?

5    A.   Yes.

6    Q.   Okay.  And that's true whether the title is

7  present or not?

8    A.   Yes.

9    Q.   Okay.  Let me show what you we're going

10  to call Exhibit 11.

11  [WHEREUPON, document referred to is marked

12  Defendants' Exhibit 11 for identification.]

13  BY MR. MCCARTER:

14    Q.   And this document is Bate's labeled

15  MA 306 through 309.  So this was produced to

16  you -- I mean, by you to us in this case.  Do you

17  recognize this document?

18    A.   Yes.  It looks like a dealer statement

19  document from DSC.

20    Q.   Okay.  And if you -- you can see it was

21  printed on -- on -- in the -- I guess, let's see, this

22  is the second page of the exhibit.  You can see a

23  printed date of Monday, January 11th, 2010 at 4:45

24  p.m.; do you see that?

25    A.   Yes.



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            83

1      Q.    And then it -- it's got a start date of -- on
2    the left-hand side from January 1st, 2009 through
3    December 31st, 2009; do you see that?
4      A.    Yes.
5      Q.    Would this be that sort of year end
6    statement you were talking about?
7      A.    Yes.  Yes.  Yeah.  Correct.
8      Q.    And so is this something you could go
9    online and get from DSC and then print on your
10   end?
11     A.    Yes.
12     Q.    Okay.  It looks like there's a fax line at
13   the top of the document on each page; do you see
14   that?
15     A.    Where -- if you could point it out to me?
16     Q.    Yeah.
17          MS. LASKY:  This.
18   BY MR. MCCARTER:
19     Q.    Right there.
20     A.    Oh, okay.  Yes.  I'm sorry.
21     Q.    Do you --
22     A.    Yes.
23     Q.    -- see that?
24     A.    Yes.
25     Q.    And it -- it shows a fax date of



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 48 of 72 PageID #: 2846

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              84

 1   January 11th, 2010, and it's got a fax number, and

 2   then it says "Dealer Services Corporation."  Do

 3   you read that as a document faxed to you by DSC

 4   or from you to DSC?

 5     A.    From DSC to us.

 6     Q.    Okay.  Yet -- I mean, I know you -- you

 7   probably don't remember, but do you have any

 8   reason to doubt it was faxed to you by DSC on

 9   January 11th, 2010?

10     A.    No, I don't.

11     Q.    Okay.  And do you read this sort of as all

12   the cars financed during that period and the total

13   due and paid on those?

14         MS. LASKY:  Object to the form.

15     A.    It appears so, as well as where it also

16   has collateral audits, as well.

17   BY MR. MCCARTER:

18     Q.    Okay.  The top of Page 2?

19     A.    Yes, it does, and I -- apparently, I missed

20   something here.  It appears that they charged me

21   two lot audits in the same month.  I must have

22   missed that.

23     Q.    Okay.  And you didn't have two lots?

24     A.    No.  It looks like they charged me on

25   the 22nd, and another 75 on the 23rd.



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 49 of 72 PageID #: 2847

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              85

1    Q.    Okay.   What is a collateral audit?

2    A.    It's -- it's where they come and check the

3    inventory of your cars to make sure that they're

4    there or where they're at and there's -- that kind

5    of thing.

6    Q.    Okay.   And that's -- that's sort of a

7    routine thing that you agreed they could do?

8    A.    Yes.

9    Q.    Okay.   And you -- you produced this to

10   us.  Do you have any recollection of where you

11   would have found this or where you would have

12   kept it?

13   A.    It would have been -- well, at the time,

14   we would have had it in our records, but it -- we

15   would have got it offline at DCS's website.

16   Q.    Okay.   Well, and we talked a minute ago

17   that maybe it was faxed to you by DSC?

18   A.    Yes.   I -- I would say the year end

19   statement was probably faxed to us.  They --

20   because we probably had to call -- they would

21   probably only do up to date what was current on --

22   online.

23   Q.    Okay.

24   A.    So we'd have to get a current, like, an up

25   to date thing for taxes.



1    Q.   Okay.  And actually, you know, I -- I

2    didn't see this a minute ago, but it -- how many

3    pages are in your document?  I'm sorry.

4    A.   I go all the way up to 4245.  I'm sorry.

5    Or 4 -- 452.  I'm sorry.  Looks like there's -- it's a

6    four-page -- four pages.

7    Q.   Okay.  And so, actually, if -- it looks like,

8    again, it's a composite exhibit.  If you -- if you go

9    back a couple of pages and there's MA 310 --

10   A.   Yeah.

11   Q.   -- and it looks like a fax cover sheet that

12   probably went with the statement that we just

13   looked at that's on 307, 308.

14   A.   M-hm.

15        MS. LASKY:  I'm sorry.  What -- is the

16   question --

17   A.   You'll have to repeat --

18        MS. LASKY:  -- whether --

19   A.   -- the question.

20   BY MR. MCCARTER:

21   Q.   Yeah.  And -- and I don't want to get

22   bogged down on this, but it looks like maybe it was

23   produced -- maybe produced out of order.  Looks

24   like 310, Page 310 might be the fax cover sheet

25   for 307 and -- through 309, because it's got the



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 51 of 72 PageID #: 2849

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          87

 1  same date, it's got the fax number.

 2    A.   Yes, that's possible.

 3    Q.   Okay.  And -- no, let me step back.  310

 4  looks like it might be a request from Ms. Mattingly

 5  to fax the interest paid in 2009; do you see that?

 6    A.   Yes.

 7    Q.   Okay.  And so maybe this statement is

 8  what was faxed back?

 9    A.   Yes.

10    Q.   Okay.  All right.  So let's move on in that

11  same exhibit to Page 361.  It's the next page after

12  the cover sheet; do you see that?

13    A.   Yes.

14    Q.   Again, this was produced by you to us.

15  Do you know what this is?

16    A.   No, I don't.

17    Q.   Does it look like -- I mean, I see AFC in

18  the upper left-hand corner; do you see that?

19    A.   Yeah.  This is something from AFC,

20  apparently.

21    Q.   Okay.

22    A.   So you produced it to us, but it may not

23  have anything to do with DSC?

24    A.   No.

25    Q.   Okay.  All right.  Now, if we go on to



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 52 of 72 PageID #: 2850

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              88

1    Page 452 and 453, it's the last two pages in that

2    exhibit; do you see that?

3       A.   Yes.

4       Q.   And this document looks like it's called

5    "Receivable Detail Report"?

6       A.   Yes.

7       Q.   And it's got a date of 5/23/2012?

8       A.   Yes.

9       Q.   Do you have any sense of what this is and

10   what it shows?

11      A.   This is --

12           MS. LASKY:  Object to the form.

13      A.   This is the final -- this is the final cars

14   that we had with DSC.

15   BY MR. MCCARTER:

16      Q.   Okay.  And you -- you had possession of

17   this.  Do you recall how you got possession of it?

18      A.   I'm sure it was off the website.

19      Q.   Okay.  You know, it shows 120,311.28

20   outstanding at that point.  Do you see in the

21   middle?

22      A.   Yes.

23      Q.   Do you -- do you know whether Mattingly

24   ever paid that to DSC?

25           MS. LASKY:  Object to the form.



BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           89

```
 1      A.    No.

 2   BY MR. MCCARTER:

 3      Q.    No, you didn't pay it?

 4      A.    Did not; no.

 5      Q.    Okay.  And however -- why did you not

 6   pay it?

 7      A.    Excuse me?

 8      Q.    Why did you not pay that?

 9      A.    These cars were involved in the

10   repossession.  Some of them were.  Some of them

11   were already paid off or sold.  Sorry.  Sold.

12      Q.    And so do you have some recollection

13   that some cars were resold and reduced that

14   amount?

15      A.    We had -- we had actually -- several of

16   these cars were ours that we paid off ourselves,

17   and some of them went to repossession.

18      Q.    Okay.  Do you recall whether there was a

19   deficiency on the repossessed cars?

20      A.    Yes.

21      Q.    And was that paid?

22      A.    No.

23      Q.    Okay.  All right.  At some point, I think

24   you said this already, DSC declared a default and

25   picked up cars?
```



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          90

1    A.    Yes.

2    Q.    Okay.  And what's your recollection of --

3  of when that happened?

4    A.    May the 9th of 2012.

5    Q.    Okay.  Do you recall any discussions with

6  DSC at the time about why they did that?

7    A.    No, they did not.  No reason.

8    Q.    No reason.  Did -- did you have any

9  problems with MAFS around the same time?

10    A.    No.

11    Q.    No.  Did MAFS ever declare default?

12    A.    Yes, at the same -- they did it at the

13  same time.

14    Q.    Did they pick up cars?

15    A.    Yes.

16    Q.    Okay.

17    A.    No.  I -- no.  I only took one back to

18  them.

19    Q.    Okay.  So you voluntarily returned one to

20  MAFS after they declared a default?

21    A.    Yes, involuntarily [phonetic].  The

22  remainder of DCS, as well.

23    Q.    So DSC picked up some cars

24  involuntarily, you returned others?

25    A.    Yes.



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 55 of 72 PageID #: 2853

BARRY WAYNE MATTINGLY  30(b)(6)                October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                        91

1    Q.   Okay.  And both of those things happened

2  in May of 2012?

3    A.   Yes.

4    Q.   Okay.  Did you have any -- do you recall

5  whether the AFC line was still out -- or still

6  existing at that time?

7    A.   It was not.

8    Q.   Was not; okay.  Did you have any other

9  sources of inventory credit at the time?

10   A.   No.

11   Q.   Okay.  Had you heard anything from the

12 police, the -- the state police you talked about

13 before, before DSC declared its default?

14   A.   No.

15   Q.   Just as a general matter apart from DSC,

16 would you ever floor the same car more than once?

17       MS. LASKY:  Object to the form.

18   A.   Possibly.

19 BY MR. MCCARTER:

20   Q.   Okay.  In what circumstances would you

21 do that?

22   A.   If it was in my -- it was my name, I would

23 floor it for -- use the money.

24   Q.   You would floor it and use the money?

25   A.   Yeah.  Floor it, and -- and they would



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 56 of 72 PageID #: 2854

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           92

 1  pay -- give me -- send me a  check or whatever.

 2    Q.   So if -- was there ever a situation where

 3  you bought it at auction, put it on a floor plan, and

 4  then, at some point, you re-floored the same car

 5  with another --

 6    A.   Yes.

 7    Q.   -- company?  When would that happen?

 8    A.   If it ran over in time, and generally it was

 9  done by Donna, or Lourdes would do it for me.

10    Q.   Okay.  And how did they value the car at

11  that time?  How much -- how did they value how

12  much to finance at that time?

13    A.   I --

14        MS. LASKY:  Object to the form.

15    A.   They would -- I guess they would use a --

16  they had a chart, or they had the auction ticket

17  where I purchased it.

18  BY MR. MCCARTER:

19    Q.   Okay.  Did you ever use the original

20  auction ticket to floor it a second time?

21        MS. LASKY:  Object to the form.

22    A.   No.  No, I don't believe so.  Unless it

23  was -- unless Donna changed the -- I think one

24  instance I just saw some of the paperwork where

25  Donna changed it from MAFS to DSC.



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 57 of 72 PageID #: 2855

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          93

1   BY MR. MCCARTER:

2     Q.   Did you ever sell a car at auction or

3   online, like on -- you know OVE, Online Vehicle

4   Exchange?

5     A.   M-hm.

6     Q.   Okay.  Did you ever sell a car at an

7   auction or on OVE to another dealer at a

8   pre-arranged price?

9          MS. LASKY:  Object to the form.

10    A.   No.

11  BY MR. MCCARTER:

12    Q.   Did you ever buy a car at an auction or on

13  OVE from another dealer at a pre-arranged price?

14    A.   Yes.

15    Q.   Okay.  When would that happen?

16    A.   I -- I don't recall dates.

17    Q.   And then did you ever put that car, those

18  cars on the floor plan?

19    A.   Yes.

20    Q.   With DSC?

21    A.   Yes.

22    Q.   Do you -- do you think that's proper to

23  finance a car like that with a floor plan?

24          MS. LASKY:  Object to the form.

25    A.   It would have to be, because they did it



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 58 of 72 PageID #: 2856

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              94

 1   for me.
 2    BY MR. MCCARTER:
 3     Q.   Okay.  But in that situation, you're using
 4   a pre-arranged non-auction price, and you're
 5   representing to a floor planner that that's the
 6   auction price; right?
 7          MS. LASKY:  Object to the form.
 8     A.   I'm not sure of your question, but I can
 9   say that -- they would have to be a certain -- the --
10   the vehicle price would have to meet certain
11   guidelines, and that would be set by Donna, and
12   Lourdes would know that.
13   BY MR. MCCARTER:
14     Q.   Okay.  But if they're -- if they're typically
15   financing the auction price and relying on the
16   auction to set the value and you've preset that
17   value with a dealer unbeknownst to the floor
18   planner, would that be a misrepresentation to the
19   floor planner?
20          MS. LASKY:  Object to the form.
21     A.   No, because they -- they -- they wouldn't
22   allow an overpriced car on the floor plan.
23   BY MR. MCCARTER:
24     Q.   Okay.  How do you -- how do you know
25   that?  How do you know what DSC would finance?



1   contacted about being involved in this case by an

2   attorney in Louisiana about a year ago.

3       A.   Uh-huh.

4       Q.   Okay.  Before that, had you ever raised

5   the issue or discussed the issue with DSC about

6   when interest begins to accrue on floor plan cars?

7       A.   I had --

8            MS. LASKY:  Object to the form.

9       A.   I had spoke with Lourdes and Donna on a

10  couple occasions about always looking to save

11  money, and I questioned particularly NextGear and

12  their charging interest two days before it

13  happened -- or two days with -- you know, we put it

14  on today; they already charged you two days.

15  BY MR. MCCARTER:

16      Q.   I think you said earlier that was MAFS;

17  right?

18      A.   MAFS.

19      Q.   Okay.

20      A.   And with Lourdes, it was always -- I was

21  always looking to cut -- you know, to save a dollar.

22  And I asked her -- because one -- an occasion, I --

23  I can't recall the exact vehicle or what happened;

24  but I got a vehicle -- like I say, I got a vehicle,

25  called -- got the -- I called to do -- pay the payoff,



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              153

1  and they still didn't have the title, but yet I was

2  charged.  I probably asked her for a deal --

3      Q.    Okay.

4      A.    -- but I don't remember.

5      Q.    And -- and that's those title-absent cars;

6  right?

7      A.    Yes.

8      Q.    Okay.

9      A.    That's when I was aware, because it --

10 it's -- DSC was different, because Manheim

11 actually had an office in their auction.

12     Q.    Yeah.

13     A.    Dealer Services did not.  They just had a

14 rep, so I didn't see much of anything like that.

15     Q.    Did that happen with MAFS, too?  I mean,

16 they would start charging interest when they didn't

17 have the title present yet?

18     A.    Yes.

19     Q.    And did that happen with AFC?

20     A.    That I do not know.  I'm -- I'm sure

21 they -- I'm sure they all work alike, but --

22     Q.    Okay.

23     A.    -- I do not -- don't recall anything about

24 AFC.

25     Q.    But in each of those cases, you had the



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 61 of 72 PageID #: 2859

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                        154

 1  car, already had it.  You were doing whatever you

 2  wanted to do with the car.

 3    A.   Yes.

 4    Q.   Okay.  And do you recall when those

 5  discussions with Lourdes would have been?

 6    A.   No, no.  I -- I don't -- I don't know any

 7  dates.

 8    Q.   Okay.  Do you recall when you would have

 9  had the discussion with Donna about the two days

10  of interest?

11    A.   Yes, it would have been in her office.

12    Q.   When?

13    A.   Oh, the -- probably from day one when I

14  realized that they charged it on the compu --

15  you -- you could look at it on the computer and see

16  it.

17    Q.   Okay.  So it was transparent to you,

18  something that you were aware of.

19    A.   Yeah.  And I asked about it, and they

20  said -- their standard answer -- I mean, both of

21  them gave me the sta -- standard answer.  "Well,

22  that's the way we do it."

23    Q.   Okay.  And the same thing with the

24  title-absent, that you -- you were aware you were

25  being charged interest for that period.  You just



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 62 of 72 PageID #: 2860

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           155

1   didn't like it.

2     A.    Yeah.

3     Q.    Okay.

4           MS. LASKY:   Object to the form.

5   BY MR. MCCARTER:

6     Q.    And in each case, you continued to

7   borrow from DSC and MAFS after those

8   conversations?

9     A.    Yes.

10    Q.    Okay.  All right.

11    Do -- are you aware that in this case you have

12  RICO allegations that I'll -- you know, I'm not --

13  I'm not trying to pin you to this summary, but

14  generally you're alleging a conspiracy between

15  NextGear, Cox Automotive, Cox Enterprises, John

16  Wick, and others.  Are you aware of that?

17    A.    Yes.

18    Q.    Okay.  What's your understanding of how

19  that conspiracy works?

20    A.    As -- as far as the word "RICO," I didn't

21  know nothing about it.  The only thing I've ever

22  seen is on A&E channel with mobsters.  Outside of

23  that, I know nothing about it.

24    Q.    Okay.  So -- but, factually, what is your

25  understanding of how this conspiracy works?



1    A.   Basically, they were charging interest on

2    titles they did not have.

3    Q.   Okay.  Are you -- are you aware of any

4    specific conversations between NextGear and Cox

5    Automotive about that?

6    A.   No, I wouldn't -- I wouldn't have any idea.

7    Q.   Are you aware of any specific

8    conversations between NextGear and Cox

9    Enterprises about that?

10   A.   No.

11   Q.   Are you aware of any specific

12   conversations between NextGear and John Wick

13   about that?

14   A.   No.

15   Q.   Are you aware of any conversations

16   among any of those parties about the issue of

17   charging interest?

18   A.   No.

19   Q.   Okay.  And by "conversations," I mean

20   emails, letters.  You haven't seen any --

21   A.   No.

22   Q.   -- of those?

23   A.   No, I would have.

24   Q.   Okay.  Do you -- do you have some --

25   you -- I think you said earlier you understood that



1   Manheim acquired DSC sometime in 2012?

2      A.   Yes.

3      Q.   Okay.  So did -- do you have any

4   knowledge about interactions between the Cox

5   entities and DSC before that?

6      A.   No, I wouldn't have any.  No.

7      Q.   Okay.  And just -- I think you said this,

8   but just to confirm:  You never dealt with -- you

9   never had a line of credit with NextGear after DSC

10  and MAFS were merged into Next -- to become

11  NextGear?

12     A.   After May of  12, no, we nev -- we didn't

13  have -- ever have no business after May of  12.

14     Q.   Okay.  Just the collection and bankruptcy

15  stuff?

16     A.   Yes.

17     Q.   Okay.  All right.

18     You've also got what's called an unjust

19  enrichment claim in this case where you're

20  suggesting that NextGear and/or the other

21  defendants received an unfair benefit from you --

22  or an unjust benefit from you.  What's your

23  understanding of that?

24     A.   Is that --

25          MS. LASKY:  Object to the form.



1   A.   I'm not really sure what -- the legal term,

2  but it seemed like I was paying them money that

3  they should not have had yet, you know,

4  BY MR. MCCARTER:

5   Q.   And are --

6   A.   -- as far as the interest and stuff.

7   Q.   Okay.  Is -- is that focused on the

8  title-absent cars?

9   A.   Well, yes, and -- and I -- I -- of course, I

10 wouldn't know if they char -- how much they

11 charged daily, or if -- even if I -- even if they did

12 have a title, I don't know the length of it because,

13 you know, I just wouldn't have -- the printout did

14 not say that.  So I wouldn't have caught it.

15  Q.   To the extent you had the cars at that

16 point and you'd been able to take that by putting it

17 on your DSC or MAFS floor plan, what did -- why

18 do you think that's unfair?

19  A.   It's just --

20     MS. LASKY:  Object to the form.

21  A.   -- costing me more money.

22 BY MR. MCCARTER:

23  Q.   Okay.  Did you -- I think you said

24 title-absent cars were disclosed on the block or

25 some --



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 66 of 72 PageID #: 2864

BARRY WAYNE MATTINGLY  30(b)(6)                October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           161

1 | BY MR. MCCARTER:

2 |   Q.  Okay.  So, on average, you're owing 1

3 | or 2 cars at a time now?

4 |   A.  Yes.

5 |   Q.  Okay.  And, on average, you think you

6 | were owning 15 or so before --

7 |   A.  I'd be -- I'd have 15 and --

8 |   Q.  -- before 2012?

9 |   A.  Yes.

10 |   Q.  Okay.  Do you have any recollection of

11 | sort of what your net income was annually from the

12 | automotive business between 2006 and 2012?

13 |   A.  No, I don't -- I don't recall right off the

14 | top of my head.

15 |   Q.  Can you ballpark it?

16 |   A.  I know -- I could give you ballpark of

17 | gross sales --

18 |   Q.  Okay.

19 |   A.  -- if that would help you any.  It -- it'd

20 | be -- let's say prior to  12, we -- we would do

21 | anywhere from 800.  And I -- I think one time we

22 | might have even hit a million.  This year our gross

23 | sales would luckily to -- be 60,000.

24 |   Q.  Okay.  But, obviously, gross sales

25 | doesn't -- hasn't --



BARRY WAYNE MATTINGLY  30(b)(6)                     October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          162

1    A.    Turn -- turned a --

2    Q.    -- yet subtracted out of your --

3    A.    -- turned a profit.

4    Q.    -- costs; right?

5          MS. LASKY:  Wait, wait, wait.

6    BY MR. MCCARTER:

7    Q.    Gross sales hasn't yet taken out your

8    cost of doing business; right?

9    A.    Correct.

10   Q.    All right.  So do you have any

11   recollection of what your net income was any time

12   between 2006 and 2012?

13   A.    No.

14   Q.    Would that be shown on accounting

15   records or tax returns that --

16   A.    Tax; uh-huh.

17   Q.    -- that you would still have access to?

18   A.    Yes.

19   Q.    Okay.  And since 2012, do you have any

20   sense of what your net income would be from the

21   automotive business?

22   A.    Yes.

23   Q.    What is it?

24   A.    I -- I don't recall the income last year.

25   I -- I don't recall it off the top of my head.



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 68 of 72 PageID #: 2866

BARRY WAYNE MATTINGLY  30(b)(6)                October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                        163

1    Q.    Okay.

2    A.    Very little.  I mean, once you take

3    expenses as far as insurance, taxes, and that kind

4    of thing.

5    Q.    Okay.  But again, that would be shown in

6    your tax returns?

7    A.    Correct.

8    Q.    And you still have access to all of those.

9    A.    For the -- well, for -- go back a few

10   years; yes.

11   Q.    Okay.  Is there -- besides your tax

12   returns, are there any other records you can look

13   at to compare your pre-2012 income -- net income

14   to your post-2012 net income?

15   A.    I'm not sure.  I'm not -- I don't know.  I

16   don't --

17   Q.    Okay.

18   A.    -- I don't know if we saved records that

19   far back.

20   Q.    Okay.  Do you recall ever doing a net

21   income statement?

22   A.    No.

23   Q.    So if it's not in the tax returns, you'd

24   have to reconstruct it from individual purchases

25   and sales?



Case 1:14-cv-01589-TWP-DLP  Document 166-8  Filed 12/05/16  Page 69 of 72 PageID #: 2867

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              164

1    A.    Yes, and then the computer records.

2    Q.    Okay.  Have -- have you done any

3    analysis of the amount of interest that you believe

4    NextGear overcharged you?

5    A.    No.

6    Q.    Do you have any estimate of what that

7    would be?

8    A.    No, none.

9    Q.    Okay.  If -- do you have records you

10   could look at to determine that?

11   A.    Probably not, maybe not that far back.

12   Q.    How far back --

13   A.    I --

14   Q.    -- would they go?

15   A.    Well, I -- like your income tax, we're

16   lucky we found what we did.  I wouldn't -- I

17   wouldn't think we could go back much more than

18   five years.  I wouldn't have any idea.

19   Q.    But your tax returns are not going to

20   show individual --

21   A.    Right.

22   Q.    -- floors and payoffs, are they?

23         THE WITNESS:  What?

24         MS. LASKY:  I just didn't want you to

25   answer before he finished.



1        THE WITNESS:  I'm sorry.  I do that a

2   lot.

3     A.   I do not know.  I -- I didn't -- have to --

4   wouldn't know how far back I'd have to go.

5   BY MR. MCCARTER:

6     Q.   Well, I just want to be clear:  Your tax --

7   your tax returns for the business will not show

8   individually what you paid for a particular car and

9   what you paid it off at; right?

10    A.   No.

11    Q.   It's going to be an aggregate of all your

12   income.

13    A.   Correct.

14    Q.   Okay.  How far back do your deal jackets

15   go?

16    A.   Oh, well, we -- I'd say we turned some in

17   that -- probably at least five years ago.  We've

18   probably got some to 2009.  I don't recall.

19    We had some tickets, but not that far back --

20   auction tickets from 2007, but we don't -- don't

21   have them -- have them all.

22    Q.   Okay.  And are all -- those all stored at

23   your business lot?

24    A.   Yes; uh-huh.

25    Q.   Okay.  How long has Jackson Hewitt been



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 71 of 72 PageID #: 2869

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          166

1    your tax accountant?

2       A.   Well, for -- since I was out of high

3    school.  It -- it was Jackson -- it was Powell

4    Services.  It's now called Jack -- Jackson Hewitt

5    Powell Services, and I -- my parents had them, and

6    I did them even when I was in a high school job

7    and -- since 1980.

8       Q.   And they're --

9       A.   Basic --

10      Q.   -- since -- hang on.  Hang on a second.

11   Since 2006, they're been preparing your individual

12   returns and the returns for Mattingly Auto Sales,

13   Inc.?

14      A.   Yes.

15      Q.   Okay.  And those are two separate

16   returns.

17      A.   Yes.

18      Q.   Okay.  All right.  Have you attempted to

19   calculate how much you've been damaged by the

20   alleged blacklisting in the KO Book?

21      A.   No.

22      Q.   Do you have any records that would show

23   the extent of that damage?

24      A.   No.

25      Q.   Okay.  Have you applied for floor plan



Case 1:14-cv-01589-TWP-DLP   Document 166-8   Filed 12/05/16   Page 72 of 72 PageID #: 2870

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              167

1    credit with anybody else since 2012?

2       A.    No.

3       Q.    Have you applied for any sort of business

4    credit with anybody since 2012?

5       A.    No.

6       Q.    Okay.  So you haven't been rejected.  You

7    just haven't applied.

8       A.    Right.

9       Q.    Okay.  What have -- you know, so

10   you're -- you're making a claim in this case for

11   damages from NextGear related to interest and

12   blacklisting.  What -- have you made any effort at

13   all to calculate those damages yourself?

14      A.    No.

15      Q.    Okay.  Have you done anything that you

16   can think of to reduce those damages or to

17   mitigate those damages?

18      A.    I don't know what you're -- how you are --

19   how to answer that one.

20      Q.    Yeah.  So I -- you're claiming some sort

21   of damage from -- from the blacklisting and

22   interest, and so what -- I'm asking you:  Have you

23   done anything to try to prevent that damage or

24   reduce that damage?

25      A.    From blacklisting?

