UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

RED BARN MOTORS, INC.,
PLATINUM MOTORS, INC.,
MATTINGLY AUTO SALES, INC.,
YOUNG EXECUTIVE MANAGEMENT &
CONSULTING SERVICES, INC.,
Individually, and on behalf
of other members of the
general public similarly
situated,
        Plaintiffs,         Docket No.
                                    1:14-cv-01589-TWP-DKL
 vs.

COX ENTERPRISES, INC.,        Class Action
COX AUTOMOTIVE, INC.,
NEXTGEAR CAPITAL, INC. f/k/a
DEALER SERVICES CORPORATION,
successor by merger with
Manheim Automotive Financial
Services, Inc., and JOHN WICK,
        Defendants.

The deposition upon oral examination of

**ADAM GALEMA**, a witness produced and sworn before me,

Paula A. Morgan, Notary Public in and for the County

of Hamilton, State of Indiana, taken on the 10th day

of November, 2016, in the offices of Bose, McKinney &

Evans, 111 Monument Circle, Suite 2700, Indianapolis,

Marion County, Indiana, pursuant to the Federal Rules

of Civil Procedure.  This deposition was taken on

behalf of the Plaintiffs in the above-captioned

matter.

ASSOCIATED REPORTING, INC.
251 East Ohio Street, Suite 940
Indianapolis, Indiana 46204
(317) 631-0940
www.associated-reporting.com

**EXHIBIT G**

1    guess, or publicly traded-type financial instruments?

2  A  Not publicly traded, no.

3  Q  Privately traded?

4  A  Yeah.

5  Q  Is that the same now as well, too?

6  A  Yes.

7  Q  Okay.  So various companies and individuals would be

8     able to buy a debt package?

9  A  It's a 144A transaction, so only investment companies

10    can participate.

11 Q  I'm going to turn to the affidavit that you at least

12    signed in this case.  Are you familiar with this

13    document?

14        MR. VINK:  Are you going to mark this as an

15    exhibit?

16        MR. AIREY:  I wasn't going to.

17        MR. VINK:  Okay.

18 A  Yes, I'm familiar.

19 Q  Okay.  How did this document come about?  Why were

20    you asked to draft this document?

21 A  I was asked to --

22        MR. VINK:  Before you answer that question, make

23    sure that you don't divulge anything that was

24    communicated to you by counsel related to signing

25    this declaration.  That would be protected by the

```
 1            attorney-client privilege.
 2    Q     Right.  And I should have said that before.  I don't
 3            want to know anything that they asked you.  And if
 4            that's the only reason that you have for why you did
 5            it, which wouldn't be surprising, then, you know,
 6            that will be your response.  I understand that.
 7    A     Well, are you asking why I'm here or why I signed
 8            this?
 9    Q     How about this.  Do you know why you were chosen to
10            draft this affidavit?
11    A     Yes.
12    Q     Okay.  Why is that?
13    A     Because I have knowledge of how floorplanning works
14            and how the system operates and how we calculate the
15            revenue that we generate.
16    Q     But as far as the individual dealers that are
17            mentioned in this affidavit, like Red Barn and
18            Platinum and Mattingly, did you know about those
19            prior to drafting this affidavit?
20    A     Yes, I've heard of them.
21    Q     Did you have any interaction with or any -- I guess
22            "interaction" is the best word.  Did you have any
23            interaction with their accounts for Red Barn,
24            Mattingly, or Platinum when you were in any of your
25            various positions with DSC?
```

1    A    Direct interaction, no.

2    Q    How about indirect?

3    A    Sure.

4    Q    What would that be?

5    A    It would have been part of the analysis that we do on

6         dealers who default and charge off.

7    Q    But you wouldn't have called up someone at Red Barn

8         and said, hey, what's going on here, why are you

9         defaulting, correct?

10   A    Correct.

11   Q    And same with Mattingly or Platinum?

12   A    Correct.

13   Q    So you may have interaction with their account here

14        in Indiana but not actually with any of these

15        dealers, specifically with themselves, or with those

16        dealers?

17   A    I would not communicate directly with the dealer, no.

18   Q    Now, did you actually physically write every word in

19        this affidavit?

20   A    No.

21   Q    Okay.  Who did?

22   A    It's my understanding our legal team.

23   Q    As far as the exhibits that are attached to this

24        affidavit, did you pick which exhibits to put on this

25        affidavit?

```
 1    A    No.
 2    Q    I'm going to hand you what was marked as Exhibit B to
 3         your affidavit.  This document has "NextGear Capital"
 4         written on the top of it.
 5    A    Correct.
 6    Q    Correct?  So it's fair to say that this would have
 7         been produced after the merger between DSC and
 8         Manheim and -- with Cox, correct?
 9    A    Correct.
10    Q    Do you know if this document was produced
11         specifically for this litigation?
12    A    Yes.
13    Q    It was specifically --
14    A    It was.
15    Q    Okay.  Did you create this Exhibit B?
16    A    I did not.
17    Q    Do you know who did?
18    A    Yes.
19    Q    Who?
20    A    Our technology team.
21    Q    Did you supervise them when they created it?
22    A    I do not have direct supervision of them.
23    Q    So you didn't ask them to create this document?
24    A    Myself directly?  No.
25    Q    Did you have any input in the information that was
```

1       put in this document?

2   A   Yes.

3   Q   Okay.  So it's fair to say that you asked them to

4       create a document with these columns on it?

5   A   I did not ask them, but I was involved in reviewing

6       and testing the accuracy.

7   Q   Other than your counsel, who else assisted you in

8       producing Exhibit B?

9   A   I can't recall exactly who was involved in the

10      development of it.  The only other person I can think

11      of is a gentleman, Lucas Hancock.

12   Q   Is he an IT person?

13   A   No.

14   Q   What does he do?

15   A   He's senior director of customer experience.

16   Q   Do you know what he does in that role?

17   A   Yeah.  He manages our call center.

18   Q   Now, prior to the Manheim and DSC merger, had you

19      ever reviewed Manheim Financial Services' promissory

20      notes?

21   A   No.

22   Q   How about any Manheim documents, like security

23      agreements, financial agreements?

24   A   No.  We are competitors.

25   Q   So it's fair to say that the first time you would

27

1   have reviewed those documents would have been in

2   drafting this affidavit?

3       MR. VINK:  Object to the form.  You can answer.

4   Q   Well, let me ask it another way.  When was the first

5       time that you reviewed any documents from Manheim

6       Financial Services, which I'll call MAFS for short.

7   A   Sure.  In this case.  I mean, we did not have any

8       involvement in MAFS documents.

9   Q   Even after the merger you didn't go and look and see

10      what they were doing versus what DSC was doing?

11  A   I did not review a particular legal document of MAFS

12      and compare it to what DSC was doing.

13  Q   Have you done that comparison for this litigation?

14  A   Have I done that?

15  Q   Correct.

16  A   I am not an attorney, so I've not reviewed and, you

17      know, compared every single -- I have not done that.

18  Q   Okay.  So you didn't go through and say what was

19      different between a MAFS document and a NextGear or

20      DSC document?

21  A   No.

22  Q   You said that right now NextGear has about 21,000

23      dealers?

24  A   Correct.

25  Q   Do you know, on a year-by-year basis, approximately

28

1     how many dealers DCS would have had -- I'm sorry, DSC

2     would have had in, let's say, 2007?

3  A  I can't recall exactly.  If I had to estimate, it

4     would be six to eight thousand.

5  Q  How about in 2005?  Would you know then?

6  A  That was the first year of DSC, so --

7  Q  Okay.  How about 2008?

8  A  Roughly the same, six to eight thousand.

9  Q  And would that be the same up until the merger?

10  A  Correct.

11  Q  Okay.  So with the merger you took on all of -- or

12     NextGear was created to take on all of MAFS customers

13     as well as DSC customers under one company?

14  A  Correct.

15  Q  And so did MAFS have more customers than DSC?

16  A  I believe they did, yes.

17  Q  You said six to eight thousand customers per year.

18     Are they the same six to eight thousand customers

19     every year?

20  A  No.

21  Q  What's the turnover rate of customers that would

22     maybe use the floorplan in 2007 versus 2008?

23  A  I can't speak specifically to the turnover rate back

24     then.  As an estimate, we could potentially turn

25     over, back then, maybe a hundred accounts each month.

1    Q    When you say "turn over," what do you mean by that?

2    A    They could leave our relationship voluntarily.  They

3         can move to another financier, another lender.  They

4         could also default on their account and be charged

5         off.

6    Q    Do you know what the default rate would have been in

7         2007?

8    A    I don't know exactly.  You know, it's going to be

9         somewhere around 5 percent of our dealers.

10   Q    Is that per year or per month?

11   A    It's an annual list.

12   Q    Did that number stay true throughout 2008, 2009,

13        2010?

14   A    I can't speak to that.  I don't have, obviously, the

15        information in front of me.  But it would not have

16        varied significantly other than -- you know, during

17        '08, '09, with the economic downturn, we did

18        experience larger losses.

19   Q    So maybe more than 5 percent in '08, '09?

20   A    Sure.  I think you would find that everywhere.

21   Q    With the six to eight thousand customers that DSC

22        would have had, did those customers also use MAFS as

23        well?

24   A    Some of them could.

25   Q    Do you know, was it common in the industry to have

36

1   A   Yeah, I would have no reason to believe it would not

2       be.

3   Q   Now, on -- let's see.  It's the second page of the

4       document, first page of the promissory note.  Under

5       1(a) there's a definition of "advance."  Is that the

6       definition that you were discussing earlier when you

7       talked about loans?

8   A   Correct.

9   Q   Could you read that for me?

10  A   "'Advance' shall mean all loans or payments pursuant

11      to this Note made by DSC to Dealer or on Dealer's

12      behalf to any third party."

13  Q   In your affidavit, on page 2, paragraph 15, that

14      paragraph generally states what you told me earlier,

15      that when NextGear pays an auction direct -- or,

16      sorry.

17          That the date NextGear conveys funds for a

18      vehicle varies by transaction type and source,

19      correct?  First paragraph of that statement.

20  A   Yeah, that statement is true.

21  Q   Okay.  It's also true that for the auction

22      vehicles -- for dealers that buy cars at auction,

23      NextGear charges interest to the dealer on the day

24      that the dealer purchases the car from the auction,

25      correct?

37

1    A    Generally, yes.

2    Q    You said "generally."  When would they not?

3    A    It could be, you know, if a dealer buys a car at

4         auction and then three months later floorplans it

5         with us, we're not going to backdate interest to the

6         date that it was sold or purchased.

7    Q    I'm sorry.  Could you explain that example a little

8         bit more?

9    A    Sure.  I mean, a dealer buys a car, and he could pay

10        with cash.

11   Q    Okay.

12   A    And then two, three, four months later he might

13        choose to put it on his floorplan to free up that

14        cash.

15   Q    So if a dealer buys a car at auction using the

16        NextGear or DSC floorplan, then, at that time, the

17        date that the dealer purchases that vehicle is the

18        date that interest begins to run?

19   A    Correct.

20   Q    Are you aware of anywhere in the contract where it

21        makes a distinction between vehicles that are bought

22        at an auction and vehicles that are bought at -- or

23        vehicles that are owned by the dealer?

24             MR. VINK:  Object to the form.  You can answer.

25   A    I don't know.

38

1    Q    With the -- let's see.  It's Exhibit B to your

2         affidavit that I handed you.  I think I gave it to

3         you earlier.

4    A    Yes.  Sorry.

5    Q    Okay.  In the far left column there's -- -- on the

6         first page, about halfway down, it says "Total for"?

7    A    Correct.

8    Q    Do you know what that "Total for" means?

9    A    That is the total of the transactions that were

10        funded on that particular date.

11   Q    So that's the day that NextGear funded the

12        transaction to the auction or buyer in this case?

13   A    It is the date that NextGear sent cash to the

14        auction.

15   Q    Now, the day that NextGear sends cash to the auction

16        is, in many cases, days and even weeks later than the

17        actual day that the dealer buys from the auction,

18        correct?

19   A    Sure.

20   Q    And in some instances a dealer can purchase the

21        vehicle at auction, sell that vehicle, send funds to

22        NextGear before NextGear actually pays the auction as

23        well, correct?

24   A    That is possible.

25   Q    In the affidavit you indicate that there's a dealer

1      that has a $40 million line of credit with NextGear?

2    A    Yes.

3    Q    Who is that?

4    A    We have -- I don't know who exactly has the $40

5         million line of credit.  That's just a range given.

6    Q    That's just something you looked on a computer system

7         somewhere to see what the max range was, without

8         actually knowing who it was?

9    A    Yeah.  I mean, it's all information within our

10        system.

11   Q    How many dealers have a $40 million line of credit,

12        do you know?

13   A    We only have a couple that are in that -- at that

14        level.

15   Q    Do you know what the average credit limit, credit

16        line is for a dealer?

17   A    Yeah.  The mathematical average is approximately

18        $300,000 today.

19   Q    Has that gone up or down in the years since you've

20        been working at NextGear?

21   A    It has increased.

22   Q    You don't know what the dealers' names are that have

23        a $40 million line of credit?

24        MR. VINK:  Object to form.  You can answer.

25   A    I mean, I can give you a couple of names of our

40

```
 1          largest accounts.
 2    Q     Yeah.
 3    A     I don't know that they're exactly $40 million.
 4    Q     Okay.
 5    A     Hertz Corporation, Wholesale, Inc.  Those would be
 6          probably two of our bigger ones.
 7    Q     Does NextGear do any business with, like, the
 8          Enterprise rental car?
 9    A     No.
10    Q     Do you know what Hertz uses its line for?
11    A     It's my understanding it's for their car sales
12          division.  It's a very short time frame that they're
13          on floorplan.
14    Q     Do you know how many dealers would have been doing
15          business with NextGear from 2005 through 2012 but
16          would not have been doing business in 2013?
17    A     I could provide a guess.  If you -- complete estimate
18          here, but dealers who may have been terminated,
19          right?  Is that what you're getting at, dealers
20          who --
21    Q     Who no longer do business with DSC, for whatever
22          reason.  I know you said there was about a 5 percent
23          turnover earlier.
24    A     Yeah.  It could be -- again, I don't have the
25          information in front of me.  But a pure guess for
```

41

1   that time frame might be, I don't know, four to five

2   thousand dealers.  Pure guess.

3  Q   That's something you could find out through the

4   system, though?

5  A   Yeah.

6  Q   And NextGear would have a record of the relationship

7   between a particular dealer and NextGear/DSC for each

8   transaction that that dealer has done with NextGear

9   or DSC?

10  A   Correct.  We have a history of all the transactional

11   volume for a particular dealer, as a dealer with DSC

12   and NextGear.

13  Q   And it would be similar to what was Exhibit B to your

14   affidavit?

15  A   Correct.  That's where -- this report was created

16   using that data.

17      MR. AIREY:  I'm sorry.  I'm trying to narrow this

18   down for you.  It's good I'm pausing.  We've gone

19   over some of this.

20      Actually, if we could take a five-minute break.

21      (A recess was taken.)

22  Q   With the affidavit that you drafted, on page 3, at

23   paragraphs 24, 25, and 26 -- well, let's go 24 and

24   25.  You say many dealers in the proposed class

25   defaulted on their obligations to NextGear, correct?

1    A   Correct.

2    Q   And you know that from a review of the records at

3        NextGear?

4    A   Correct.

5    Q   And there's also many dealers that have defaulted on

6        their obligations as well, too?

7    A   Correct.

8    Q   And you know that from looking at NextGear's records?

9    A   Correct.

10   Q   Did you do a generalized search of NextGear's records

11       to prepare this affidavit?

12   A   Personally, no.  I relied on other information

13       provided.

14   Q   Who provided that information to you?

15   A   I can't say exactly who.

16   Q   You don't remember, or is it because it was an

17       attorney that provided it to you?

18   A   Yeah, I don't know who actually pulled the

19       information.

20   Q   Did you review any documents to determine whether the

21       dealers defaulted -- many dealers defaulted?

22   A   I know it to be true because I'm heavily involved

23       with that -- with the data presented inside of our

24       system regarding that and am familiar with the

25       dealers who defaulted and, ultimately, are charged

43

1        off.

2    Q   On a global level, because of the reporting that you

3        do, that's how you're familiar with those?

4    A   Sure.  But I'm familiar with the -- some of the

5        dealers themselves.

6    Q   Are you familiar with all the dealers that default?

7        I mean, is that something that you look at, each

8        individual account when there's a default?

9    A   I do not review each individual account and determine

10        a default needs to occur or has occurred.  But I do

11        see a list, both a detailed list and, obviously,

12        summary information too, that details all that

13        information.

14    Q   And that's something that's reported to you in the

15        ordinary course of your job?

16    A   Correct.

17    Q   How is that reported to you?  Is that an e-mail that

18        you get or a company memo?

19    A   Today we receive an e-mail every morning that details

20        dealers who have defaulted.

21    Q   And have you always had some interaction with the

22        dealers that have defaulted, in all your previous

23        positions at NextGear?

24    A   I would say I became more involved as controller.

25    Q   When you were controller, how would you get notified

44

1       of a dealer default?

2  A  I can't recall.

3  Q  Would it be in writing, though, generally, that you

4       would have been notified, with a list of dealers?

5  A  I can't recall.

6  Q  Do you have any role in any legal process that

7       NextGear files against any dealer that has defaulted?

8  A  Potentially.  It's not a standard practice for me to

9       be involved in that.

10  Q  So other than the one case that we talked about

11       earlier, where you testified in, do you routinely

12       prepare affidavits for any defaults or legal process?

13  A  Yeah.  I'll be asked -- either myself or my team will

14       be asked for information surrounding certain

15       defaults.  Again, it's not a checkbox, you know,

16       every single default is coming through us.

17  Q  You said not every single default comes through you?

18  A  Correct.  I mean, I have no -- I cannot determine a

19       default.  And I'm also not necessarily providing

20       information, financial information, related to every

21       single default.  A lot of that resides in our system.

22  Q  Do you perform an analysis to find out why somebody's

23       defaulted on a loan?

24  A  I do not.

25  Q  Do you know who does?

45

1    A    Yeah.  That would be our risk department.

2    Q    Do you review that information on why someone's

3         defaulted, or is it more you just log in the

4         information once one has happened?

5    A    That information is available to me if I would like

6         to review it.  Again, I don't need to.  I'm not the

7         one that's actually defaulting that account.

8    Q    So you wouldn't routinely look at that information?

9    A    No.

10   Q    Did you look at that information for this litigation?

11   A    Yes, I'm familiar with some of the details around it.

12   Q    The details for why dealers in the proposed class

13        would have defaulted or just these particular dealers

14        that are named?

15   A    Just the named dealers.

16   Q    Now, as far as any contracts that NextGear or DSC

17        would have had with or has with the auctions

18        themselves, do you have any role in negotiating those

19        contracts?

20   A    No, I do not.

21   Q    Do you review those contracts?

22   A    Today, sometimes I'm asked to sign them as

23        representative of NextGear.

24   Q    And that's in your job that you have now since 2015?

25   A    Correct.

46

```
 1    Q    Prior to 2015 would you have reviewed those --

 2    A    No.

 3    Q    -- contracts?

 4    A    No, I would not.

 5    Q    And you also wouldn't have had any role in signing a

 6         particular individual dealer up to a particular

 7         contract with NextGear?

 8    A    No.

 9    Q    Are you familiar with the Auction Insurance Agency?

10    A    Yes.

11    Q    What's your role in dealing with Auction Insurance

12         Agency on behalf of NextGear?

13    A    I do not have a direct role.

14              MR. VINK:  I was going to say for what time

15         frame?

16    Q    How about for any time that you've worked at

17         NextGear.

18    A    For any time I've not had a direct role with them.

19    Q    So you don't report dealers to Auction Insurance

20         Agency?

21    A    I do not.

22    Q    Did you supervise the people that did?

23    A    No, I did not.

24    Q    With Auction Insurance Agency, there's several

25         paragraphs in your affidavit that you discuss that.
```

47

1       Have you become familiar with that in the course

2       of -- or with that agency or reporting process during

3       the course of this litigation?

4   A   With Auction Insurance Agency?

5   Q   Yes.

6   A   No.  I have had general knowledge of that

7       relationship for -- throughout the course of my

8       employment.

9   Q   So you have some general knowledge of what Auction

10      Insurance Agency does.  But as far as your role in

11      NextGear, you don't interact with them?

12  A   That's correct.  I'm aware of the relationship and

13      mutual benefit but not -- I do not have direct

14      involvement there.

15  Q   Do you know who does have direct involvement with

16      them?

17  A   It's my understanding the risk department does.

18  Q   Do you know a Mr. John Fuller that may have worked at

19      NextGear?

20  A   Yes.

21  Q   Do you know where he is now?

22  A   I do not.

23  Q   Do you know when he left?

24  A   He left after the acquisition.

25  Q   Close in time to the acquisition or --

48

1   A   Yes.

2   Q   Do you have any role in setting salaries or bonuses

3       for the sales representatives?

4   A   No, I do not.

5   Q   Who would have a role at the company doing that?

6   A   Well, their hiring manager would determine what their

7       salary is, through, you know, cooperation with our HR

8       department.

9   Q   That's outside your scope of what you do at NextGear,

10      though?

11   A   The salary piece, yeah.  I mean, incentives, bonus

12      plans do fall under my responsibilities.

13   Q   When you say it falls within your responsibilities,

14      do you have a role in setting what the salaries -- or

15      how bonuses or incentive plans for employees are --

16   A   I have a collaborative role, I guess you'd say.  I do

17      not set the bonus plan.  I am asked for input and

18      guidance as those are developed.

19   Q   What kind of input do you give?

20   A   Just related to the data that they want to measure,

21      the actual dollar amounts that are proposed for that

22      bonus plan.

23   Q   You mean on a companywide basis or for an individual?

24      Like, creating a pool of money for the sales

25      representatives, or is it on an individual basis?

1    A    Yeah.  No, just on an individual basis, like what
2         would be an appropriate amount to incentivize
3         someone.
4    Q    And you do that for all the sales representatives?
5    A    Yeah.  Every incentive plan runs through finance.
6    Q    Do you have any input in what the goals are that a
7         salesperson needs to reach in order to earn a bonus?
8    A    No, I do not.  Those are set by their -- the
9         operational folks.
10   Q    Do you have any input in the metrics that may be used
11        to determine a particular goal or particular amount
12        of money that an individual sales representative
13        would get?
14   A    Sure.  My team is responsible for calculating the
15        incentive, so we use the data that comes out of our
16        system and calculate the incentive from that.
17   Q    What data would you use?
18   A    During that time frame?  During this time frame here?
19        I can't recall exactly what would have been part of
20        the incentive plans.  You know, guessing, it probably
21        would have been something revolving around
22        activations and -- you know, dealer activations and
23        new loan count.
24   Q    And have those metrics changed over time?
25   A    Sure.

50

1    Q    What changes were made?

2    A    They change every year.  So I couldn't tell you

3         exactly each year what changes, but different metrics

4         are used each year.

5    Q    Is it generally based on the dealer activation and

6         maybe default rate as well, too?  Would those be

7         terms that were normally included?

8    A    Sure.  Potentially, yeah.  It's generally based

9         around the activity that account executive manages

10        and that their portfolio generates.

11   Q    With the merger purchase by Cox, did you have any

12        role in negotiating that merger?

13   A    No, I did not.

14   Q    Did you have any role in the integration of MAFS with

15        NextGear?

16   A    Yes.

17   Q    What did you do with that?

18   A    Just assisted with the combination of financial

19        statements, the combination of the securitization

20        facilities for both companies.  Just, you know, a

21        whole litany of those things.  Those are the main

22        overarching themes there.

23   Q    You would have been in charge of integrating any

24        salesperson training, anything like that, with --

25   A    No, I do not train the salespeople.