UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RED BARN MOTORS, INC., PLATINUM MOTORS, INC., MATTINGLY AUTO SALES, INC., and YOUNG EXECUTIVE MANAGEMENT & CONSULTING SERVICES, INC., individually and on behalf of other members of the general public similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:14-cv-01589-TWP-DKL |
| NEXTGEAR CAPITAL, INC. f/k/a DEALER SERVICES CORPORATION, COX ENTERPRISES, INC., COX AUTOMOTIVE, INC., and JOHN WICK, | ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' MOTION TO DISMISS

This matter is before the Court on a Motion to Dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) by Defendants NextGear Capital, Inc. ("NextGear"), formerly known as Dealer Services Corporation ("DSC"), Cox Enterprises, Inc., Cox Automotive, Inc., and John Wick ("Mr. Wick") (collectively, "Defendants") (Filing No. 126). In 2009 and 2011, NextGear entered into agreements with Plaintiffs Red Barn Motors, Inc. ("Red Barn"), Platinum Motors, Inc. ("Platinum Motors"), Mattingly Auto Sales, Inc. ("Mattingly Auto"), and Young Executive Management & Consulting Services, Inc. ("Executive Auto Group") (collectively, "Plaintiffs"). These agreements provided lines of credit for financing the Plaintiffs' used car dealership operations. After the Plaintiffs discovered that they had been charged fees and interest on money that had not yet actually been loaned, they initiated this litigation, asserting claims for breach of contract, constructive fraud, tortious interference with business relationships, unjust enrichment,

violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and RICO conspiracy.   The Defendants move to dismiss the Plaintiffs' Amended Complaint on various grounds but primarily on the argument that the terms of the contracts allowed the Defendants to charge fees and interest at the time that they did actually charge fees and interest. For the following reasons, the Court **grants in part and denies in part** the Motion to Dismiss.

## I.   BACKGROUND

The following facts are not necessarily objectively true, but as required when reviewing a motion to dismiss, the Court accepts as true all factual allegations in the Amended Complaint and draws all inferences in favor of the Plaintiffs.  *See Bielanski v. County of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).

Defendant NextGear has its principal place of business in Carmel, Indiana, and is a wholly-owned subsidiary of Defendant Cox Automotive.   Cox Automotive in turn is a wholly-owned subsidiary of Defendant Cox Enterprises.  Cox Automotive is a world leader in vehicle remarketing services and digital marketing and software solutions for automotive dealers and customers.   In addition to owning and operating NextGear, Cox Automotive also owns and operates Kelley Blue Book and Autotrader among other companies.   Defendant NextGear is an automotive financing company that provides line-of-credit financing to used car dealers that purchase used automobiles from auction companies throughout the United States.   NextGear also owns and operates some auction houses.   NextGear operates throughout the United States by way of almost two hundred account executives and eighteen regional directors.   Defendant Mr. Wick is general counsel and corporate secretary for NextGear.   Mr. Wick oversees all corporate, legislative, and litigation matters of NextGear.   Mr. Wick also leads NextGear's strategic and corporate development.

Plaintiffs Red Barn, Platinum Motors, Mattingly Auto, and Executive Auto Group are used car dealerships. Red Barn is a small, family-owned and operated used car dealership in Louisiana. Platinum Motors is located in Chesapeake, Virginia. Mattingly Auto is located in Hardinsburg, Kentucky, and Executive Auto Group is located in Kansas City, Missouri. Each of the Plaintiffs was solicited by NextGear to enter into a contract whereby NextGear would issue a line of credit to the Plaintiffs so that the Plaintiffs could purchase used vehicles at automobile auctions and the vehicles would initially be paid for by NextGear. The Plaintiffs would then later pay NextGear the amount NextGear paid the auction on behalf of the Plaintiffs as well as interest and other fees. Each of the Plaintiffs entered into an agreement with NextGear, specifically called a "Demand Promissory Note and Security Agreement." These agreements provided to the Plaintiffs a revolving line of credit—commonly referred to as a floorplan agreement—to purchase vehicles at auctions, which would then be resold at their used car dealerships.

The Plaintiffs describe the typical auction and financing transactions in their Amended Complaint:

> Typically, Floorplan Agreements are used by used car dealers in conjunction with vehicle auctions in the following manner: a) a new car dealer receives a trade-in vehicle; b) the new car dealer then provides the trade-in vehicle to an auction company to present to numerous used car dealers at auction on a particular date; c) once a used car dealer's bid is accepted, the used car dealer takes possession of the vehicle; d) on the date of the auction, the used car dealer either pays the auction company directly or employs an automotive financing company (such as a NextGear/DSC) to pay the auction company on that day and provide financing by means of a Floorplan Agreement with the used car dealer for the purchase of the vehicle; e) the new car dealer delivers the title for the vehicle to the auction company; f) the auction company forwards the title to whomever paid it - either the used car dealer that paid the auction company directly, or the automotive financing company that provided financing by means of a Floorplan Agreement. If the title is forwarded to the automotive financing company that provided financing by means of a Floorplan Agreement, the used car dealer pays the automotive financing company fees and interest on the money loaned while the used car dealer attempts to sell the vehicle to a new buyer. Once the used car dealer sells the car to a new buyer, the used car dealer pays off the automotive financing company in full.

([Filing No. 117 at 5](#).)   The Plaintiffs explain NextGear's deviation from this typical model; "NextGear/DSC, however, does not pay the auction houses until NextGear/DSC receives the title to the vehicles purchased, even though NextGear/DSC charges interest and curtailment fees to the Red Barn Plaintiffs under the illusion that NextGear/DSC has already paid the auction house for the vehicles." *Id.*   It can take as long as eight weeks for NextGear to receive title to a vehicle purchased at an auction, at which point it pays the auction for the vehicle; however, NextGear begins charging interest and fees at the time of the sale at the auction.

The Plaintiffs allege that the Defendants,

> devised a scheme and artifice to defraud the [] Plaintiffs and others similarly situated, and to obtain money and property by means of false and fraudulent pretenses and representations by charging "interest" to the [] Plaintiffs and others similarly situated, on money not lent from NextGear/DSC to the [] Plaintiffs.

([Filing No. 117 at 2](#)).

In the case of Red Barn, in June or July 2011 at the Oak View Auto Auction in Baton Rouge, Louisiana, Stuart LaBauve ("Mr. LaBauve"), a NextGear account executive, solicited Red Barn through Devon London ("Mr. London"), Red Barn's general manager, to enter into a floorplan agreement.   NextGear wanted to provide a revolving line of credit to Red Barn to allow it to purchase used cars at auctions that would then be placed on its sales lot for resale.   In June or July 2011, following the initial meeting between Mr. LaBauve and Mr. London, Mr. LaBauve visited Red Barn's business in Denham Springs, Louisiana, to solicit Red Barn through its owner, Donald Richardson, to enter into a floorplan agreement with NextGear.

On July 27, 2011, Red Barn and NextGear entered into a floorplan agreement, providing a line of credit up to $200,000.00 to Red Barn.   The agreement required payment of interest and other fees as well as any principal amounts paid on behalf of Red Barn.   After entering into the

agreement, Red Barn occasionally used the floorplan agreement to purchase vehicles at auction in order to sell them at the Red Barn used car lot.

In June 2012, Red Barn entered into a verbal agreement with multiple automobile auction houses that gave Red Barn up to seven days to decide whether it wanted to use its NextGear line of credit to pay for vehicles purchased at the auctions or whether it would pay for the vehicles using some other method such as cash. Even when Red Barn delayed its decision to use the line of credit provided by NextGear to purchase vehicles from these auctions, NextGear backdated the withdrawal on the line of credit to the date of the purchase at auction, and NextGear charged interest and fees from that backdated date.

Later in June 2012, Red Barn's general manager discovered transactions in which Red Barn had not used the floorplan agreement to purchase vehicles, so NextGear never actually loaned money to Red Barn for the purchase of those vehicles.  However, NextGear charged interest to Red Barn as though NextGear had actually provided the financing for the vehicles.

Around November 2, 2012, Red Barn purchased a vehicle using the NextGear floorplan agreement.  The auction house was unable to obtain title to the vehicle after 180 days, and Red Barn already had paid off its line of credit with NextGear for the purchase of the vehicle.  NextGear never paid the auction house for the vehicle, so it voluntarily reimbursed Red Barn all of the interest and fees that it had been collecting from Red Barn over the span of 180 days on the vehicle because the title was never delivered.

Between August 2011 and March 2013, Red Barn used NextGear's floorplan agreement for 524 transactions.  NextGear electronically debited approximately $80,000.00 in interest from Red Barn's bank account.  Much of the money NextGear electronically debited from Red Barn's account was based on money that was never actually loaned to Red Barn for the purchase of

vehicles, or NextGear actually loaned the money for a much shorter period of time than the period for which interest and fees were charged.

During the course of Red Barn's nearly two-year lending relationship with NextGear, Red Barn communicated regularly with Mr. LaBauve of NextGear regarding Red Barn's floorplan agreement through in-person, telephone, and email communications. During all of these communications, NextGear concealed the fact that NextGear did not pay the auction houses for the vehicles purchased until it received the title, but it began charging interest and fees from the date of the auction, sometimes as much as eight weeks earlier, even though no money had been loaned. NextGear also concealed facts regarding the actual interest rates charged. NextGear worked with several auction houses, including some auction houses owned and operated by NextGear, to conceal these facts from Red Barn. The auction houses concealed NextGear's actions, allowing NextGear to continue its course of conduct.

NextGear intentionally interfered with the valid business relationships held by Red Barn with various auction houses when it "blacklisted[1]" Red Barn with these auction houses. As a result, auction houses prohibited Red Barn from attending and participating in the routine sales of used cars, which further damaged Red Barn financially.

In March 2013, Red Barn began experiencing financial difficulties, which resulted in an inability to make payments on its floorplan agreement with NextGear. Because of this, in April 2013, NextGear began seizing Red Barn's assets, including vehicles on the Red Barn sales lot. In April 2013, Red Barn employees delivered between eleven and fourteen vehicles to Louisiana First Choice Auto Auction ("First Choice") with the intent to sell the vehicles and use the proceeds from the sales to pay NextGear on the debt under the floorplan agreement. However, Red Barn was

---

[1] A list of people, organizations, etc., that are disapproved of or that are to be punished or avoided. www.merriam-webster.com/dictionary/blacklist.

unable to sell the vehicles because First Choice, without Red Barn's knowledge or consent, seized the vehicles and has held the vehicles since the time of seizure.  On April 25, 2013, Red Barn filed a Chapter 11 voluntary petition for bankruptcy.

In the case of Platinum Motors, in the spring of 2011 at the American Auto Auction in Chesapeake, Virginia, a NextGear account executive solicited Nicol Zenia Perry ("Ms. Perry"), Platinum Motors' owner, to execute a floorplan agreement with NextGear.  Later, Ms. Perry met with a NextGear representative at a Manheim Auto Auction in Virginia.

On May 23, 2011, Platinum Motors and NextGear entered into a floorplan agreement, providing a line of credit up to $35,000.00 to Platinum Motors.  Similar to Red Barn's agreement, Platinum Motors' agreement required payment of interest and other fees as well as any principal amounts paid on behalf of Platinum Motors.  After entering into the agreement, Platinum Motors occasionally used the floorplan agreement to purchase vehicles at auction in order to sell them at the Platinum Motors used car lot.

Similar to Red Barn's experience with NextGear, Platinum Motors was charged interest and fees based on the date of the purchase at auction even though payment was not made on Platinum Motors' behalf until NextGear received title from the auction houses—sometimes as long as eight weeks later.  Between May 2011 and June 2012, Platinum Motors used NextGear's floorplan agreement for approximately 1,000 vehicle purchases.  NextGear electronically debited interest and fees from Platinum Motors' bank account on each of these transactions.  Much of the money NextGear electronically debited was based on money that was never actually loaned, or NextGear actually loaned the money for a much shorter period of time than the period for which interest and fees were charged.

Throughout Platinum Motors' one-year lending relationship with NextGear, Platinum Motors communicated regularly with NextGear representatives, including account executive Sean Tabb, regarding Platinum Motors' floorplan agreement through in-person, telephone, and email communications.  During all of these communications, NextGear concealed the fact that NextGear did not pay the auction houses for the vehicles purchased until it received the title, but it began charging interest and fees from the date of the auction, sometimes as much as eight weeks earlier, even though no money had been loaned.  NextGear also concealed facts regarding the actual interest rates charged.

Like Red Barn, Platinum Motors was blacklisted by NextGear with various auction houses, thereby interfering with the valid business relationships held by Platinum Motors.  As a result, auction houses prohibited Platinum Motors from attending and participating in the routine sales of used cars, which further damaged Platinum Motors financially.

In the case of Mattingly Auto, sometime before February 2009, NextGear account executive Lourdes Givens solicited Barry Mattingly ("Mr. Mattingly"), Mattingly Auto's owner, to execute a floorplan agreement with NextGear.  On February 5, 2009, Mattingly Auto and NextGear entered into a floorplan agreement, providing a line of credit up to $100,000.00 to Mattingly Auto.  Similar to the other floorplan agreements in this case, Mattingly Auto's agreement required payment of interest and other fees as well as any principal amounts paid on behalf of Mattingly Auto.  After executing the agreement, Mattingly Auto used the line of credit to purchase vehicles at auction in order to sell them at its used car lot in Kentucky.

Mattingly Auto was charged interest and fees based on the date of the purchase at auction even though payment was not made on Mattingly Auto's behalf until NextGear received title from the auction houses.  Between February 2009 and May 2012, Mattingly Auto used NextGear's

floorplan agreement for approximately 320 transactions.  NextGear electronically debited interest and fees from Mattingly Auto's bank account on each of these transactions.  Much of the money NextGear electronically debited was based on money that was never actually loaned, or NextGear actually loaned the money for a much shorter period of time than the period for which interest and fees were charged.

During Mattingly Auto's more than three-year relationship with NextGear, Mattingly Auto communicated regularly with NextGear representatives, including account executives Lourdes Givens and Mark Holley, regarding Mattingly Auto's floorplan agreement through in-person, telephone, and email communications.  NextGear concealed the fact that NextGear did not pay the auction houses for the vehicles purchased until it received the title, but it began charging interest and fees from the date of the auction even though no money had yet been loaned.  NextGear also concealed facts regarding the actual interest rates charged.

Similar to the other plaintiffs, Mattingly Auto was blacklisted by NextGear with auction houses and had its business relationships interrupted, resulting in auction houses prohibiting Mattingly Auto from attending and participating in the routine sales of used cars, which further damaged Mattingly Auto financially.

In the case of Executive Auto Group, in the summer or fall of 2011, a NextGear account executive solicited Executive Auto Group through its owner, Ronald Jerome Reid ("Mr. Reid"), to execute a floorplan agreement with NextGear.  On September 14, 2011, Executive Auto Group and NextGear entered into a floorplan agreement, providing a line of credit up to $25,000.00 to Executive Auto Group.  Similar to the other floorplan agreements in this case, Executive Auto Group's agreement required payment of interest and other fees as well as any principal amounts

paid on behalf of Executive Auto Group.  Like the other plaintiffs, Executive Auto Group used the line of credit to purchase vehicles at auction in order to sell them at its used car lot in Missouri.

Like the other plaintiffs in this case, Executive Auto Group was charged interest and fees based on the date of the purchase at auction even though payment was not made on Executive Auto Group's behalf until NextGear received title from the auction houses.  Beginning in 2011, Executive Auto Group used NextGear's floorplan agreement to finance approximately seven transactions.  NextGear electronically debited interest and fees from Executive Auto Group's bank account on each of these transactions.  Much of the money NextGear electronically debited was based on money that was never actually loaned, or NextGear actually loaned the money for a much shorter period of time than the period for which interest and fees were charged.

During Executive Auto Group's lending relationship with NextGear, Mr. Reid communicated regularly with NextGear representatives regarding the floorplan agreement through in-person, telephone, and email communications.  NextGear concealed the fact that NextGear did not pay the auction houses for the vehicles purchased until it received the title, but it began charging interest and fees from the date of the auction even though no money had yet been loaned, and it concealed facts regarding the actual interest rates charged.

Executive Auto Group also was blacklisted by NextGear with auction houses and had its business relationships interrupted, resulting in auction houses prohibiting Executive Auto Group from attending and participating in the routine sales of used cars, which further damaged Executive Auto Group financially.

On December 3, 2013, Red Barn filed its Complaint against NextGear and First Choice, asserting claims for breach of contract, unjust enrichment, and conversion and illegal seizure, based on the facts noted above regarding Red Barn (Filing No. 1).  On January 8, 2016, the

Plaintiffs requested leave to file their Amended Complaint, which was granted.  The Plaintiffs' Amended Complaint, filed March 11, 2016, asserts claims for breach of contract, constructive fraud, tortious interference with business relationships, unjust enrichment, violation of RICO, and a RICO conspiracy (Filing No. 117).  The Amended Complaint did not include First Choice as a defendant but added Cox Enterprises, Cox Automotive, and Mr. Wick as defendants.  The Amended Complaint also added Platinum Motors, Mattingly Auto, and Executive Auto Group as plaintiffs and removed Donald and Barbara Richardson as plaintiffs.  The Defendants filed their Motion to Dismiss on April 15, 2016 (Filing No. 126).

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  When deciding a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff.  *Bielanski*, 550 F.3d at 633. However, courts "are not obliged to accept as true legal conclusions or unsupported conclusions of fact."  *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In *Bell Atlantic Corp. v. Twombly*, the Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level." 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id.*; *see also Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("it is not enough to give a threadbare recitation of the elements of a claim without factual support").  The allegations must "give the defendant fair notice of what the

. . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

> [T]he record under 12(b)(6) is limited to the language of the complaint and to those matters of which the court may take judicial notice. The complaint cannot be amended by the briefs filed by the plaintiff in opposition to a motion to dismiss. By the same token, the defendant cannot, in presenting its 12(b)(6) challenge, attempt to refute the complaint or to present a different set of allegations. The attack is on the sufficiency of the complaint, and the defendant cannot set or alter the terms of the dispute, but must demonstrate that the plaintiff's claim, as set forth by the complaint, is without legal consequence.

*Gomez v. Illinois State Bd. of Education*, 811 F.2d 1030, 1039 (7th Cir. 1987) (citation omitted). However, "[courts] consider documents attached to the complaint as part of the complaint itself. Such documents may permit the court to determine that the plaintiff is not entitled to judgment." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (citations omitted). Additionally, the court may consider documents that are referred to in the complaint and that are concededly authentic and central to the plaintiff's claim. *Santana v. Cook County Bd. of Review*, 679 F.3d 614, 619 (7th Cir. 2012). When a party attaches exhibits to its complaint and incorporates the exhibits into the pleadings, if there are contradictions between the exhibits and the complaint, the exhibits generally will control. *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).

### III.  DISCUSSION

The Defendants have requested dismissal of the Plaintiffs' Amended Complaint on numerous grounds, but their argument for dismissal is premised on their claim that the unambiguous terms of the floorplan agreements allowed the Defendants to charge fees and interest

at the time that they did actually charge fees and interest.  The Court will address each of the arguments presented by the Defendants in their Motion to Dismiss.

A.    ***Res Judicata***

The Defendants assert that the Plaintiffs' claims arising from allegations of improper interest—RICO, breach of contract, constructive fraud, and unjust enrichment—are barred by the doctrine of *res judicata* between NextGear and Platinum Motors, Mattingly Auto, and Executive Auto Group.  Citing *Hensley v. Jasper Police Dep't*, 163 F. Supp. 2d 1006, 1021 (S.D. Ind. 2001), the Defendants point out that, under Indiana law, *res judicata* applies when there has been a judgment on the merits between the same parties and their privies involving the same issue that was or could have been determined in the prior litigation.

The Defendants explain that NextGear obtained default judgments against Platinum Motors, Mattingly Auto, and Executive Auto Group for their failure to repay financing extended by NextGear pursuant to the parties' floorplan agreements.  The Defendants argue that, because these plaintiffs failed to raise the allegedly improper interest charges in the prior litigation under the same floorplan agreements at issue here, they cannot bring claims arising out of those charges now.  Default judgments were entered in favor of NextGear and against Platinum Motors, Mattingly Auto, and Executive Auto Group on February 12, 2014, June 6, 2013, April 11, 2013, and January 14, 2015 on NextGear's claims for breach of contract and breach of guaranty in the Hamilton County (Indiana) Superior Court.  The Defendants assert that *res judicata* applies here because there have been judgments on the merits between the same parties and their privies involving the same issue that was or could have been determined in the prior litigation.

Furthermore, the Defendants argue that a default judgment is a judgment on the merits for purposes of *res judicata*, citing *Eichenberger v. Eichenberger*, 743 N.E.2d 370, 374 (Ind. Ct. App.

2001), and "any matter within the issues of the [earlier] case that might have been alleged and proven will be presumed to have been proven and adjudicated." *Stefansson v. Source One Mortg.*, 2004 U.S. Dist. LEXIS 4458, at *4–5 (S.D. Ind. Jan. 29, 2004). Any affirmative defense or compulsory counterclaim that a party was required to raise in the prior action, but failed to do so, will be deemed proven and adjudicated for *res judicata* purposes. *See id.*; *Hilliard v. Jacobs*, 927 N.E.2d 393, 402 (Ind. Ct. App. 2010). The Plaintiffs' claims against NextGear arising out of allegations of wrongful interest could and should have been determined in the prior actions. Thus, the claims are barred by *res judicata*.

In response to this argument, the Plaintiffs assert that the default judgments obtained by NextGear do not constitute a judgment on the merits regarding the claims asserted in this lawsuit. They point out that for claim preclusion to apply, four requirements must be met:

> (1) the former judgment must have been rendered by a court of competent jurisdiction; (2) the former judgment must have been rendered on the merits; (3) the matter now in issue was, or could have been, determined in the prior action; and (4) the controversy adjudicated in the former action must have been between the parties to the present suit or their privies.

*Angelopoulos v. Angelopoulos*, 2 N.E.3d 688, 696 (Ind. Ct. App. 2013). The Plaintiffs assert that the second and third requirements are not met.

The Plaintiffs explain that "[w]here a default judgment is entered, only those issues presented by the complaint can be deemed concluded; the defaulting party cannot be charged with admitting matters not within the complaint by his default," quoting *Van Den Biggelaar v. Wagner*, 978 F. Supp. 848, 856–57 (N.D. Ind. 1997). The Plaintiffs argue that the default judgments were based on complaints that were "extremely limited" and did not address the issues raised in their Amended Complaint. The complaints contained few facts and only two claims: breach of contract and breach of guaranty. The Plaintiffs assert that this lawsuit goes well beyond the few facts and

basic claims of breach of contract and breach of guaranty, and thus, their claims in this litigation cannot be deemed adjudicated by the default judgments.

Additionally, the Plaintiffs argue that the claims now asserted in this case could not have been determined in the prior state court collection actions. They explain that the Defendants focus on the "same transaction or occurrence" language of the trial rule regarding compulsory counterclaims but fail to account for the important preceding language of the rule. The trial rule governing compulsory counterclaims states,

> A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject-matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

Ind. R. Trial P. 13(A) (Fed. R. Civ. Pro. 13(a) is similarly worded). Therefore, under the rule, claims that had not accrued at the time of the original lawsuit cannot be considered compulsory counterclaims. The Plaintiffs assert that their claims in this action were not compulsory counterclaims because they had not yet accrued at the time NextGear's collection suits were initiated. The Plaintiffs had not and could not have discovered their claims at the time of NextGear's collection lawsuits.

As the Plaintiffs point out, "the cause of action of a tort claim accrues and the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another." *Wehling v. Citizens Nat. Bank*, 586 N.E.2d 840, 843 (Ind. 1992). Similarly, a breach of contract claim "accrues, and the statute of limitations begins to run, when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered the breach of contract." *McFreen v. Alcatel-Lucent USA, Inc.*, 2014 U.S. Dist. LEXIS 170680, at *4 (S.D. Ind. Dec. 10, 2014).

The Plaintiffs argue that the claims they assert in this case had not yet accrued at the time of NextGear's prior state court actions, and thus, the claims could not have been brought in those cases and cannot now be barred on the basis of *res judicata*. They explain that the facts giving rise to their breach of contract, tort, and other claims were fraudulently concealed by the Defendants, thereby delaying the accrual of the claims. These facts include the actual interest rates charged to the Plaintiffs, the timing of NextGear's payments to the auction houses and when NextGear began charging interest and fees, and NextGear's interference of Plaintiffs' business relationships with auction houses. Because of the Defendants' fraudulent omission and concealment of material facts, the Plaintiffs assert that they did not know and could not have discovered with diligence their injuries at the time NextGear sued them in 2012.

The Defendants suggest that the Plaintiffs could have discovered the facts giving rise to their injuries by a diligent review of their own bank statements, which would show when interest and other charges had been automatically debited from their accounts. However, this argument overlooks the fact that the bank account statements would not have indicated the actual interest rate charged or when NextGear actually paid the auction houses. Without knowing when NextGear actually paid the auction houses, the Plaintiffs could not have been apprised of the alleged scheme to prematurely charge fees and interest on their accounts well before NextGear paid the auction houses.

*Res judicata* and statute of limitations arguments are affirmative defenses. *See* Fed. R. Civ. P. 8(c)(1). Quoting Seventh Circuit case law, another district court in this Circuit has explained the interplay between affirmative defenses and motions to dismiss:

> A statute of limitations is an affirmative defense. Fed. R. Civ. P. 8(c)(1). Dismissing a claim as untimely at the pleading state is an "unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559

> F.3d 671, 674 (7th Cir. 2009). "[A] federal complaint does not fail to state a claim simply because it omits facts that would defeat a statute of limitations defense." *Hollander v. Brown*, 457 F.3d 688, 691 n.1 (7th Cir. 2006). A claim may be dismissed as untimely, however, if "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005).

*Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 815–16 (N.D. Ill. 2013).

The Plaintiffs' Amended Complaint alleges that Platinum Motors executed the floorplan agreement with NextGear in May 2011 and used the agreement for financing through June 2012. NextGear's state court complaint was filed against Platinum Motors on June 21, 2012, and Platinum Motors never responded to that complaint (Filing No. 127-2).

The Amended Complaint alleges that Mattingly Auto executed the floorplan agreement with NextGear in February 2009 and used the agreement for financing through May 2012. NextGear's state court complaint was filed against Mattingly Auto on November 19, 2012, and Mattingly Auto never responded to that complaint (Filing No. 127-4).

Finally, the Amended Complaint alleges that Executive Auto Group executed the floorplan agreement with NextGear in September 2011 and used the agreement for financing at least throughout the rest of 2011.  NextGear's state court complaint was filed against Executive Auto Group on October 26, 2012, and Executive Auto Group never responded to that complaint (Filing No. 127-6).

On a motion to dismiss, the Court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff.  *Bielanski*, 550 F.3d at 633.  A reasonable inference from all the facts alleged in the Amended Complaint is that the Plaintiffs were not aware and could not have been aware of their injuries during their ongoing business relationship with NextGear, which relationship ended at or near the time when NextGear sued the Plaintiffs for failing to pay the debts owed under the floorplan agreements.  It is reasonably inferred from the

allegations of the Amended Complaint that the Plaintiffs could not have discovered their injuries until after their relationship with NextGear had ended.

More importantly, a complaint need not anticipate and overcome affirmative defenses, and a complaint does not fail to state a claim simply because it omits facts that would defeat a defense. *Cancer Found.*, 559 F.3d at 674; *Hollander*, 457 F.3d at 691 n.1. Because "the allegations of the [Amended] complaint itself [do not] set forth everything necessary to satisfy the affirmative defense," *see Lewis*, 411 F.3d at 842, the Court determines that at the motion to dismiss stage of this litigation, *res judicata* cannot be used to bar the Plaintiffs' claims.

**B.**    **Statutes of Limitation and Relation Back**

The Defendants also assert that the Plaintiffs' RICO claim and tortious interference claim are barred by statutes of limitation.  The Court will address each claim separately.

**1.**    **RICO Claim**

The Defendants argue that the Plaintiffs' RICO claim against the new defendants added in the Amended Complaint is untimely.  Relying on *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 156 (1987) and *Cancer Found.*, 559 F.3d at 674, the Defendants point out that RICO claims have a four-year limitations period.

> It begins to run when the plaintiffs discover, or should, if diligent, have discovered, that they had been injured by the defendants. *Limestone Dev. Corp v. Village of Lemont, Ill.*, 520 F.3d 797, 800 (7th Cir. 2008). A plaintiff does not need to know that his injury is actionable to trigger the statute of limitations--the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim. *Rotella v. Wood*, 528 U.S. 549, 555, 558, 120 S. Ct. 1075, 145 L. Ed. 2d 1047 (2000) (statute of limitations begins running even if the plaintiff is unaware of the pattern of racketeering activity).

*Cancer Found.*, 559 F.3d at 674.

Citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188, 190 (1997), the Seventh Circuit explained that "a RICO claim cannot accrue at the time of the first predicate act.  So if that act

happened to occur more than four years before the second act, the damage caused by the first act would still be recoverable in a RICO suit." *Limestone Dev. Corp.*, 520 F.3d at 802. However, "[a] plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Id.* But the Seventh Circuit further explained, "[i]f the plaintiff doesn't know or have reason to know that he has been injured, the discovery rule clicks in and allows him to delay suing." *Id.*

Based on this case law, the Defendants argue that, "[w]here, as here, the allegedly wrongful interest charges were open and obvious through Plaintiffs' bank statements and otherwise, the statute of limitations began to run once the allegedly wrongful charge was made." ([Filing No. 127 at 13.](#)) They assert that most of the bank account charges were made more than four years before the filing of the Amended Complaint and would have been known immediately at the time of the debit, and thus, the RICO claim related to charges made before January 8, 2012 (four years prior to the Amended Complaint) are time barred.

The Plaintiffs add further case law when responding in opposition to the Defendants' RICO statute of limitations argument. They point to *Barry Aviation*, which clarifies the accrual of RICO claims:

> For both RICO claims and § 1983 claims, a cause of action accrues when the plaintiff knew or should have known that it had sustained an injury. This rule is referred to as the discovery rule because the accrual date is not determined when the injury occurs but when it is discovered or should have been discovered. . . . [S]elf-concealing frauds do not extend the limitations period through equitable tolling but, instead, postpone the date of accrual by preventing the plaintiff from discovering he is a victim of a fraud.

*Barry Aviation, Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 688 (7th Cir. 2004). Furthermore, "'[t]here must, of course, be a pattern of racketeering before the plaintiff's RICO claim accrues, and this requirement might delay accrual until after the plaintiff discovers her

injury.'" *Limestone Dev. Corp. v. Vill. of Lemont*, 473 F. Supp. 2d 858, 869 (N.D. Ill. 2007) (quoting *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1465 (7th Cir. 1992)).

The Plaintiffs respond that the Defendants are simply wrong in arguing the "wrongful interest charges were open and obvious through Plaintiffs' bank statements and otherwise." (Filing No. 135 at 34.)  The interest and fees debited from the bank accounts were charged under the false pretense that NextGear had actually paid the auction houses at the time of the auction when in reality NextGear did not pay until it received title to the vehicles, sometimes as long as eight weeks later.  NextGear committed multiple and continuous wire frauds against the Plaintiffs, and the Plaintiffs had no cause to believe that they were being defrauded.  Their bank account statements would not have given them any indication that they were being fraudulently injured.  The Plaintiffs point out that, as to Red Barn, the Amended Complaint plainly alleges that there was no cause to believe it was being injured until, at the earliest, June 2012 when its manager discovered charges to its bank account for vehicles that were never financed through NextGear.  The Amended Complaint was filed in January 2016, within the four-year limitation period.  The other Plaintiffs had no reason to know or suspect that they were being injured by NextGear's concealed fraudulent activities during the course of their ongoing business relationship.  Their bank account statements would not have provided such notice.

The Plaintiffs' argument is well-taken.  As the Court discussed above, the Plaintiffs' bank account statements would not have indicated the actual interest rate charged or when NextGear actually paid the auction houses.  Without knowing when NextGear actually paid the auction houses, the Plaintiffs could not have known of the alleged scheme to prematurely charge fees and interest on their accounts well before NextGear paid the auction houses.  Thus, the Plaintiffs could not have known that they were being injured by NextGear's actions by a simple review of their

bank account statements.  According to the Amended Complaint, the earliest date that Red Barn could have known of its injury was June 2012.  As noted above, the reasonable inference regarding when the other Plaintiffs should have known of their injury came at an even later date.  Therefore, the Plaintiffs' RICO claim is not barred by the statute of limitations, and this argument cannot serve as a basis to dismiss the Plaintiffs' claim.

### 2.    Tortious Interference Claim

The Defendants explain that tortious interference claims have the same two-year limitations period as general tort claims.  *See Martin v. Richey*, 711 N.E.2d 1273, 1279 (Ind. 1999); *Graves v. Ind. Univ. Health*, 32 N.E.3d 1196, 1214 (Ind. Ct. App. 2015).  As noted above, a tort claim accrues "when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another."  *Wehling*, 586 N.E.2d at 843.

The Defendants assert that the tortious interference claim in the Amended Complaint does not arise out of the same conduct, transaction, or occurrence alleged in the original complaint. They point out that the original complaint contained no allegations of any "blacklisting" or coordination with auction houses to ban the Plaintiffs from doing business with any auctions.  As a result, the new allegations underlying the tortious interference claim do not relate back to the date the original complaint was filed.  *See* Fed. R. Civ. P. 15(c)(1).  Thus, the Defendants argue, any tortious interference claim is untimely where the alleged interference was or should have been discovered by January 8, 2014, two years before the Plaintiffs moved to amend their original complaint.

The Defendants then focus on their own relationship with the Plaintiffs, explaining that each of the Plaintiffs' relationship with NextGear ended well before January 2014, and the alleged

interference must likewise have occurred well before 2014.  They point out that Red Barn declared bankruptcy in April 2013.  Platinum Motors' relationship with NextGear ended in June 2012.  Mattingly Auto's relationship with NextGear ended in May 2012, and Executive Auto Group does not allege any interaction with NextGear after 2011.

Regarding Red Barn, the Defendants assert that, as a bankrupt entity, Red Barn could not have had valid business relationships with auction houses or other companies after April 25, 2013, which was over two years before the Amended Complaint was filed.  The other Plaintiffs should have discovered any "blacklisting" as soon as they were barred from participating in auctions.  "Since there are no allegations of interactions with NextGear or attempts to enter an auction later than June 2012, well over two years before the Amended Complaint was filed, the other Plaintiffs' claims are likewise time-barred."  (Filing No. 127 at 20.)

Responding to the Defendants' argument, the Plaintiffs assert that the end of their relationship with NextGear has no bearing on the interference by NextGear of their relationships with auction houses and the timing of that interference.  NextGear's blacklisting was not based on its own ongoing business relationship with the Plaintiffs.  The Plaintiffs explain that "[t]here are no allegations in the Amended Complaint that the end of the lending relationship between Plaintiffs and NextGear (and similarly the bankruptcy filing by Red Barn) gave rise to the tortious interference claims."  (Filing No. 135 at 21.)

The Plaintiffs then claim that there can be no dispute that the tortious interference claim in the Amended Complaint relates back to the original complaint. Quoting *Henderson v. Bolanda*, 253 F.3d 928, 931 (7th Cir. 2001), the Plaintiffs explain, "an amended complaint in which the plaintiff merely adds legal conclusions or changes the theory of recovery will relate back to the filing of the original complaint if the factual situation upon which the action depends remains the

22

same and has been brought to defendant's attention by the original pleading." The Plaintiffs argue that the conduct, transaction, or occurrence alleged in the original complaint regarding the Defendants' actions that led to Red Barn's financial distress are the same basis for the "blacklisting" tortious interference claim in the Amended Complaint. Thus, the claim should relate back to the December 3, 2013 original complaint, and the possible dates that the claims could have accrued, according to the Defendants,[2] fall within the two-year period from December 3, 2013.

The Defendants reply, and the Court agrees, that the tortious interference claim does not relate back to the filing date of the original complaint because the factual situation alleged in the original complaint is not the same as the factual situation alleged in the Amended Complaint. The original complaint alleged facts to support breach of contract, unjust enrichment, and illegal seizure claims. The allegations in the original complaint could not have brought to the Defendants' attention a potential claim for tortious interference or even a factual situation giving rise to that claim. Allegations that NextGear repossessed collateral after Red Barn defaulted on its floorplan agreement do not put NextGear, Cox Enterprises, Cox Automotive, and Mr. Wick on notice of a claim for tortious interference of a relationship between third-party auction houses and Red Barn, Platinum Motors, Mattingly Auto, or Executive Auto Group. The claim for tortious interference and the factual basis for that claim as alleged in the Amended Complaint do not relate back to the date of filing of the original complaint. Therefore, the Plaintiffs' claims must have accrued after January 8, 2014, two years before the filing of the Amended Complaint, in order to survive the Motion to Dismiss based on the statute of limitation.

All of the allegations in the Amended Complaint describe activities that occurred in 2011 and 2012, with the only outliers being Mattingly Auto's execution of the floorplan agreement in

---

[2] According to the Defendants, the claims could have accrued for Red Barn in April 2013, for Platinum Motors in June 2012, for Mattingly Auto in May 2012, and for Executive Auto Group at the end of 2011.

2009 and Red Barn's financial troubles, bankruptcy, and inability to sell cars through the First Choice auction in April 2013.  Under the factual circumstances alleged in the Amended Complaint, using reasonable diligence, the Plaintiffs could and should have discovered their injuries regarding any blacklisting and interference with their relationships with auction houses in 2012 and early 2013 when each of the Plaintiffs was prohibited from participating at routine auctions.

> The Defendants assert,
>
> [T]he alleged interference must have occurred at or near the end of each Plaintiff's lending relationship with NextGear, which was well before January 2014. It is simply not plausible under *Twombly* to argue in Opposition [sic], without actually alleging in the Amended Complaint, that NextGear would have waited until long after Plaintiffs defaulted on their payment obligations to interfere with their auction relationships.

([Filing No. 136 at 12](#)).  The Court agrees.  The latest factual allegations in the Amended Complaint concern events in April 2013.  Most of the allegations concern events in 2011 and 2012.  The Plaintiffs could and should have discovered their tortious interference injuries well before January 2014.  Having waited until January 2016 to file their Amended Complaint, the Plaintiffs' claim for tortious interference falls outside the two-year statute of limitations and is untimely.  Therefore, the Court **GRANTS** the Defendants' Motion to Dismiss the tortious interference claim.  Because it may be possible that the Plaintiffs might have a viable claim for tortious interference under some set of facts that have not been sufficiently alleged, this claim is **dismissed without prejudice**.

## C.   **Breach of Contract Claim**

The breach of contract claim in the Amended Complaint centers on the Plaintiffs' floorplan agreements with NextGear.  Those agreements allowed the Plaintiffs to purchase vehicles at auctions in order to resell those vehicles at their used car lots while NextGear financed the auction purchases.  The Plaintiffs would then pay NextGear interest, fees, and later the principal amount

loaned.  These agreements were memorialized in valid, binding written contracts ([Filing No. 117-1](#), [Filing No. 117-3](#), [Filing No. 117-4](#), [Filing No. 117-5](#)).

The Plaintiffs allege that the contracts were breached when NextGear fraudulently and prematurely charged interest and fees before NextGear actually loaned money, and in some instances, without NextGear ever loaning money on the Plaintiffs' behalf.  They allege that NextGear charged interest and fees from the date of sale at auction even though NextGear did not actually pay the auctions until it received title to the vehicles, sometimes eight weeks later.

The Defendants argue that the breach of contract claim should be dismissed because the allegations and theories of recovery in the Amended Complaint contradict the plain language of the parties' agreements.  Noting that a breach of contract claim requires the existence of a contract, the defendant's breach of the contract, and damages, the Defendants assert that the Court can review the unambiguous terms of the contracts and plainly see that there has been no breach.  The Defendants claim that the contracts plainly allowed NextGear to charge interest and fees starting on the date of the sale at auction even though NextGear did not pay the auctions until a later date.  The Defendants briefly argue that damages are not sufficiently pled because the Plaintiffs received the benefit of obtaining vehicles through financing, and "[i]n light of such benefit, they were not damaged by the minimal interest charged between the date of purchase and the date payment was actually made by NextGear to the auction."  ([Filing No. 127 at 23](#).)

Responding to the Motion to Dismiss, the Plaintiffs argue that the contractual terms do not allow the premature charges that NextGear withdrew from their bank accounts.  They further assert that the terms of the contracts are ambiguous, and therefore, it would be improper to dismiss the breach of contract claim at this stage of the litigation based on the ambiguous terms.

25

The contract terms the Defendants reply upon to argue that NextGear was plainly allowed to charge interest and fees before actually paying money on the Plaintiffs' behalf are as follows: "Interest shall accrue on all Dealer Liabilities in accordance with" certain terms. (Filing No. 117-1 at 3, § 3.)  "'Interest' shall mean the aggregate rate of interest which accrues on all Liabilities owed by Dealer to [NextGear] under or arising out of this Note by combining the Base Rate plus the applicable Contract Rate, Risk Rate or Default Rate." (Filing No. 117-1 at 2, § 1(w).)

> "Liabilities" shall mean any and all Advances, debts, DSC Financed Inventory Liabilities, financial obligations, DSC Administrative Fees, DSC Universal Fees, Interest, Floorplan Fees, NSF fees, late fees, charges, expenses, attorney fees, costs of collection, covenants, and duties owing, arising, due or payable from Dealer to [NextGear] of any kind or nature, present o[r] future, under any instrument, guaranty, or other document whether arising under this Note or any other agreement, whether directly or indirectly (including those acquired by assignment), absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising and however acquired.

(Filing No. 117-1 at 2, § 1(y).)

Based on these contract provisions, the Defendants argue that the contracts expressly contemplate that interest may accrue not only on advances actually made but also on other financial obligations to pay in the future.  Thus, when the Plaintiffs became obligated to pay for vehicles on the date of auctions and NextGear became obligated to pay the auction houses on the Plaintiffs' behalf, NextGear could start charging interest and fees on the date of the auctions even if NextGear did not actually pay the auction houses until a later date.

The Plaintiffs assert that the above quoted language from the contracts does not allow NextGear to prematurely charge interest and fees.  They further explain that the Court must view the contracts in their entirety, not in a vacuum.  The contracts provide that interest could accrue when NextGear made payments to the Plaintiffs or to a third-party on the Plaintiffs' behalf.  The Plaintiffs' point to the contractual definition of "Advance," which "mean[s] any loan or payment

in any amount made pursuant to this Note by [NextGear] to Dealer or on Dealer's behalf to any third party." (Filing No. 117-1 at 1.)  Based on all the language of the contracts, NextGear was not authorized to charge interest and fees before it actually paid the auction houses on the Plaintiffs' behalf.  If nothing else, the Plaintiffs argue, the contracts do not unambiguously allow NextGear to prematurely charge interest and fees.

Regarding the element of damages, the Plaintiffs explain that the Defendants are simply wrong that the benefit of obtaining cars through financing negates the fact that they were damaged by the improperly charged interest and fees.  They assert that characterizing the interest and fees charged as "minimal" is inaccurate where the allegations assert interest in the amount of $80,000.00 and the period of time for improperly charging interest sometimes was eight weeks.

After reviewing the language of the parties' contracts, the Court determines that dismissal of the breach of contract claim is not appropriate at this stage of the litigation.  The parties agree that they entered into contracts.  The contracts are not sufficiently clear to support the argument that NextGear was plainly allowed to charge interest and fees before actually paying the auction houses on the Plaintiffs' behalf.  Thus, there are sufficient allegations of a breach to allow the case to proceed beyond the motion to dismiss stage.  The Plaintiffs also have sufficiently pled damages resulting from the alleged breach.  Therefore, the Court **DENIES** the Defendants' Motion to Dismiss the breach of contract claim against NextGear.  To the extent the Plaintiffs bring their breach of contract claim against Cox Enterprises, Cox Automotive, and Mr. Wick, the Court **GRANTS** the Motion to Dismiss that claim because those three Defendants were not parties to the contracts.

**D.**     **Unjust Enrichment Claim**

A claim for unjust enrichment requires "(1) a benefit conferred upon another at the express or implied request of this other party; (2) allowing the other party to retain the benefit without restitution would be unjust; and (3) the plaintiff expected payment." *Woodruff v. Ind. Family & Soc. Servs. Admin.*, 964 N.E.2d 784, 791 (Ind. 2012).

The Defendants acknowledge that a party may plead claims in the alternative; however, they point out "[w]hen the rights of parties are controlled by an express contract, recovery cannot be based on a theory implied in law," *Zoeller v. E. Chicago Second Century, Inc.*, 904 N.E.2d 213, 221 (Ind. 2009) (citation omitted), and a party cannot seek equitable relief "just in case" its contract claim fails unless it alleges that there was either no valid contract on point or the contract at issue was unenforceable. *CoMentis, Inc. v. Purdue Research Found.*, 765 F. Supp. 2d 1092, 1103 (N.D. Ind. 2011). The Defendants assert that the parties agree that valid, enforceable contracts apply to the claims in this case, and there are no alternative allegations that the contracts are not enforceable or not on point. Thus, the Defendants argue, the Plaintiffs' claim for unjust enrichment cannot proceed against NextGear. Additionally, they assert that the allegations of the Amended Complaint do not support a factual basis for an unjust enrichment claim against the other three Defendants. There are no allegations of payments made to or benefits conferred upon Cox Enterprises, Cox Automotive, or Mr. Wick. Further, there are no allegations that these three Defendants requested any payment or benefits from the Plaintiffs. As a result, the unjust enrichment claim should be dismissed.

In response to the Defendants' argument, the Plaintiffs explain that the Federal Rules of Civil Procedure allow them to plead claims in the alternative. However, the Plaintiffs fail to address the case law cited by the Defendants that pleading in the alternative for unjust enrichment requires a factual basis of an unenforceable contract or that no contract was on point. The Plaintiffs

then argue that there was no contract between them and Cox Enterprises, Cox Automotive, or Mr. Wick, so an unjust enrichment claim can proceed against these Defendants in addition to the Plaintiffs' alternatively pled claim against NextGear.  They point to the following allegation from the Amended Complaint to support their claim for unjust enrichment: "By charging and collecting interest from the Red Barn Plaintiffs on money that was not lent, Cox Enterprises, Inc., Cox Automotive, Inc., and NextGear/DSC were unjustly enriched at the expense of the Red Barn Plaintiffs and other members of the Class."  (Filing No. 117 at 37 ¶ 151.)

Upon review of the entire Amended Complaint, this legal conclusion of unjust enrichment is not supported by factual allegations against Cox Enterprises, Cox Automotive, or Mr. Wick. There are no factual allegations of Cox Enterprises, Cox Automotive, or Mr. Wick receiving payment or benefits.  All the factual allegations in the Amended Complaint concerning benefits and payments relate to NextGear. There simply is not a factual basis to support an unjust enrichment claim against Cox Enterprises, Cox Automotive, or Mr. Wick.  Furthermore, there are no alternatively pled allegations in the Amended Complaint that the floorplan agreements between the Plaintiffs and NextGear were invalid, unenforceable, or not applicable to the claims at issue. As such, it appears that the unjust enrichment claim was not properly pled in the alternative but rather was pled "just in case" the breach of contract claim fails.  Therefore, the Defendants' Motion to Dismiss the unjust enrichment claim is **GRANTED**.  Similar to the tortious interference claim, because it may be possible that the Plaintiffs might have a viable claim for unjust enrichment against some of the Defendants under some set of facts that have not been sufficiently alleged, this claim is **dismissed without prejudice**.

**E.      Substantive RICO Claim**

RICO is an anti-fraud statute.  Thus, RICO claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which states, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *See Crissen v. Gupta*, 994 F. Supp. 2d 937, 945 (S.D. Ind. 2014).  However, "enterprise allegations necessary to support a RICO claim need only meet the requirements of Fed. R. Civ. P. 8(a), and not the heightened pleading requirements of Fed. R. Civ. P. 9(b)."  *Id.* at 948; *see also United Food & Commer. Worker Unions & Emplrs. Midwest Health Bens. Fund v. Walgreen Co.*, 719 F.3d 849, 853 (7th Cir. 2013).

Under the RICO statute,

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  Further, "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. § 1962(d).  To state a RICO claim under 18 U.S.C. § 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (footnote omitted).

The Plaintiffs assert claims for violation of RICO and a RICO conspiracy based on NextGear and the other Defendants devising a scheme and artifice to defraud the Plaintiffs to obtain money and property by means of false and fraudulent pretenses and representations by charging interest and fees to the Plaintiffs on money not actually paid by NextGear on behalf of the Plaintiffs.

The Defendants argue that the Amended Complaint fails to allege any conduct or participation in the conduct of an enterprise by the Defendants.  They explain that the Supreme Court has held that to be liable for "conduct[ing] or participat[ing] . . . in the conduct of [an] enterprise's affairs" under section 1962(c), a defendant "must participate in the operation or management of the enterprise itself."  *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).  Thus, it must be shown that defendants had "some part in directing [the enterprise's] affairs," although "a formal position in the enterprise" is not necessary. *Id.* at 179. "[L]iability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 646 (7th Cir. 1995) (citation omitted).

The Defendants assert that there are no allegations in the Amended Complaint that Cox Enterprises, Cox Automotive, or Mr. Wick participated in the operation or management of the alleged NextGear enterprise.  While the allegations contain a general identification of these Defendants, the factual allegations do not assert any involvement in an enterprise's operations.

The Defendants further argue that the Plaintiffs have failed to allege a RICO enterprise separate from a pattern of racketeering activity.  An "enterprise" under RICO is "an ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making." *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990).  An "association-in-fact enterprise" is a "union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  An enterprise "must be more than a group of people who get together to commit a 'pattern of racketeering activity.'" *United States v. Neapolitan*, 791 F.2d 489, 499–500 (7th Cir. 1986). "The hallmark of an enterprise is a 'structure,'" and there must be "a structure and goals separate from the predicate acts themselves."

31

*United States v. Korando*, 29 F.3d 1114, 1117 (7th Cir. 1994). "[T]here need not be much structure, but the enterprise must have some continuity and some differentiation of the roles within it." *Richmond*, 52 F.3d at 645 (citation omitted). The structure of a RICO enterprise should have at least three features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit the associates to pursue the enterprise's purpose." *Panwar v. Access Therapies, Inc.*, 975 F. Supp. 2d 948, 957 (S.D. Ind. 2013).

According to the Defendants, the Amended Complaint does not identify an enterprise with a structure and purpose separate from the alleged fraudulent scheme, and the only allegation regarding any purpose is to maximize the profits of the Defendants by fraudulently charging interest and fees on money not loaned by NextGear. Additionally, the Defendants assert, the allegations only describe NextGear's own legitimate business affairs of loaning money and collecting interest, not the conduct of a separate RICO enterprise.

Finally, the Defendants assert that the allegations are deficient because they do not allege a RICO "person" separate and distinct from a RICO "enterprise." They explain that a corporate family, or an employer and its employees, cannot be a RICO enterprise. The Defendants rely on *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) and *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226 (7th Cir. 1997) for these propositions. The Plaintiffs cannot allege management or operation of a RICO enterprise by Cox Enterprises, Cox Automotive, or Mr. Wick. Thus, the only conduct they can allege is that of NextGear itself, but NextGear alone cannot be both the RICO person and the RICO enterprise. As such, the Plaintiffs have not sufficiently alleged a RICO enterprise that is distinct from the RICO person they are suing, so the RICO claims must be dismissed.

Responding to the Defendants, the Plaintiffs point to the language of the RICO statute, which prohibits conducting or participating in a pattern of racketeering activity by any person employed by or associated with any enterprise. *See* 18 U.S.C. § 1962(c). A complaint must allege at least two predicate acts of racketeering activity, which could include wire fraud.

The Plaintiffs assert that their Amended Complaint sufficiently alleges that each Defendant participated in the affairs of the enterprise. The purpose of the enterprise was to defraud the Plaintiffs, and others, to obtain money by charging interest and fees on money not actually loaned by NextGear. The allegations explain that NextGear is a subsidiary of Cox Automotive, which owns and operates some auction houses in the automotive industry. In order to carry out the purpose of defrauding the Plaintiffs, NextGear utilized auction houses owned and operated by Cox Automotive as well as other independent auction houses. The auction houses concealed NextGear's actions of charging interest and fees from the date of the auction while not actually paying the auction houses until a later date when it received title to the vehicles.

Regarding Mr. Wick, the Plaintiffs assert that NextGear's chief strategy officer led NextGear's strategic and corporate development as well as oversaw all corporate, legislative, and litigation matters. The allegations explain that Mr. Wick knew of the practice of charging interest and fees before any money was even loaned, and as such, Mr. Wick participated in the enterprise's affairs. The core of the alleged scheme and enterprise was to conceal the practice of charging interest and fees without actually loaning money.

Concerning their allegations of a RICO enterprise, the Plaintiffs explain that they meet the basic requirements of alleging an enterprise and structure. They point to the following allegations from their Amended Complaint:

> 96. The NextGear/DSC Enterprise is an ongoing, continuing group or unit
> of persons and entities associated together for the common purpose of maximizing

33

profits by fraudulently charging and debiting money from accounts held by its customer used car dealers on money not lent by NextGear/DSC. Further, the members of the NextGear/DSC Enterprise concealed their fraudulent activity from the Red Barn Plaintiffs and other members of the Class.

97. While the Defendants participate in and are part of the NextGear/DSC Enterprise, the Defendants also exist separately and distinctly from the enterprise.

98. The NextGear/DSC Enterprise maintains a structure, in that the executive management of NextGear/DSC (including John Wick, as detailed above) knowingly established a uniform approach to secretly charge customers interest and curtailment fees which NextGear/DSC itself was unauthorized to obtain because NextGear/DSC had not provided any financing to the auction houses via Floorplan Agreements. The NextGear/DSC Enterprise includes auction houses owned and operated by the Defendants as well as other auction houses associated with the Defendants where these auction houses concealed NextGear/DSC's actions allowing NextGear/DSC to conduct the pattern of racketeering activity. The NextGear/DSC Enterprise executes and carries out individual, fraudulent transactions on a daily basis, which are solicited by lower-level employees, including Account Executives such as Stuart LaBauve and others throughout the United States. The NextGear/DSC Enterprise maintains this common and shared purpose of defrauding customers for the Enterprise's unlawful financial gain. The NextGear/DSC Enterprise maintains the same basic structure and personnel and does not take another form from the racketeering activity versus other activity. In addition to the fraudulent activity detailed herein, NextGear/DSC and the NextGear/DSC Account Executives also conduct/facilitate legitimate automobile resales and related financing which further conceal their fraudulent activity as they continue to pose as legitimate industry participants.

(Filing No. 117 at 25–26).

The Plaintiffs assert that these allegations more than suffice to show the structure of a RICO enterprise. They establish a purpose and relationships among those associated with the enterprise. The allegations in the Amended Complaint further show longevity—a number of years, with daily transactions—sufficient to permit the associates to pursue the enterprise's purpose.

They explain that the NextGear enterprise existed, and still exists, by utilizing auction houses, companies, and lower-rung employees such as Stuart LaBauve, Lourdes Givens, Mark Holley, and Sean Tabb to execute its predicate acts of numerous wire fraud transmissions. Concerning Red Barn, the Amended Complaint alleges 524 transactions between August 2011 and

34

March 2013 where the NextGear enterprise electronically debited approximately $80,000.00 in interest and fees from Red Barn's account. The Amended Complaint alleges nearly 1,000 transactions with Platinum Motors from May 2011 through June 2012, 320 transactions with Mattingly Auto from February 2009 through May 2012, and seven transactions with Executive Auto Group beginning after the contract was executed in September 2011.

Concerning a pattern of racketeering activity that requires at least two predicate acts, the Plaintiffs point to their allegations of predicate acts of wire fraud through obtaining money by fraudulent means using interstate wire communications, charging interest and fees on money not actually loaned.

> 104. NextGear/DSC charged interest and curtailment fees on purchases made by the Red Barn Plaintiffs and others members of the Class without actually loaning money against Plaintiffs' line of credit.
>
> 105. NextGear/DSC paid the auction houses from the Red Barn Plaintiffs' lines of credit *when NextGear/*DSC *received title* to the vehicles purchased by the Red Barn Plaintiffs at auction, instead of paying for the vehicles *at the time of the auction*.
>
> 106. NextGear/DSC back-dated payments made from the Red Barn Plaintiffs' lines of credit to the dates on which the Red Barn Plaintiffs were successful in bidding on vehicles at auction. These actions caused interstate wire communications to occur.
>
> 107. NextGear/DSC electronically debited payment for the interest and curtailment fees it charged to the Red Barn Plaintiffs without loaning money to the Red Barn Plaintiffs through electronic banking transactions.
>
> 108. The unearned payments debited by NextGear/DSC from the Red Barn Plaintiffs' accounts were accomplished through deceptive means as described herein and constitute a scheme and artifice to defraud.
>
> 109. NextGear/DSC executed the scheme and artifice to defraud each and every time it electronically debited money from the Red Barn Plaintiffs' accounts when NextGear/DSC had not actually provided any financing to the auction house for the purchase of the vehicle.

(Filing No. 117 at 27–28) (emphasis in original).

The Plaintiffs argue that they have also sufficiently alleged a RICO "person" separate and distinct from the RICO "enterprise."  Contrary to the Defendants' claim, "[a] parent corporation can be a 'person' separate and distinct from its wholly-owned subsidiary, the 'enterprise.'" *Wesleyan Pension Fund Inc. v. First Albany Corp.*, 964 F. Supp. 1255, 1275–76 (S.D. Ind. 1997) (citation omitted).  A corporate owner is distinct from the corporation because the corporation is "a legally different entity with different rights and responsibilities due to its different legal status." *Cedric Kushner Promotions*, 533 U.S. at 163.  The Plaintiffs point out that the allegations of their Amended Complaint allege RICO persons not identical to the group making up the RICO enterprise as the enterprise is not composed of only wholly-owned subsidiaries but also separately owned entities and at least one individual, Mr. Wick.  The Amended Complaint identifies NextGear, Cox Automotive, auction houses owned and operated by Cox Automotive, independent auction houses, and Mr. Wick.

The Plaintiffs allege that the enterprise is more than an association that conducts the normal affairs of the Defendants.  Specifically, the alleged enterprise carries out the Defendants' scheme by committing multiple acts of wire fraud by charging interest and fees on money never loaned.  This is separate and distinct from the Defendants' regular business of providing legitimate financing for purchasing used car or selling cars at auction.

Upon close examination of the Amended Complaint viewed in its entirety, and applying the standards of Rule 12(b)(6) and Rule 9(b), the Court determines that the Plaintiffs have sufficiently alleged a claim for a RICO violation under 18 U.S.C. § 1962(c) by alleging conduct of an enterprise through a pattern of racketeering activity.  The Plaintiffs' arguments concerning the substantive RICO claim are well-taken.  Based upon the allegations noted above and pointed out in the Plaintiffs' argument, the Plaintiffs have alleged an enterprise, the Defendants'

participation in the conduct of the enterprise, and a pattern of racketeering activity through multiple predicate acts of wire fraud. The Amended Complaint alleges RICO "persons" separate from the RICO "enterprise," noting the participation of NextGear, Cox Automotive, auction houses owned and operated by Cox Automotive, independent auction houses, and Mr. Wick. There are sufficient details regarding the claimed fraudulent transactions, the timeframe of those transactions, and who was involved in the transactions to provide sufficient notice to the Defendants.

Defendant Cox Enterprises is the exception to this determination. The only allegations regarding Cox Enterprises is that it is the parent company of Cox Automotive. This fact standing alone is not enough to make Cox Enterprises a RICO defendant in this matter. Therefore, the Defendants' Motion to Dismiss the substantive RICO claim is **DENIED** as to NextGear, Cox Automotive, and Mr. Wick, but **GRANTED** as to Cox Enterprises.

**F.   RICO Conspiracy Claim**

"It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). A RICO conspiracy claim must allege: "(1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Goren v. New Vision Int'l*, 156 F.3d 721, 732 (7th Cir. 1998). "To state a conspiracy claim under RICO, Plaintiffs must plead 'facts indicating an act of agreement among the alleged conspirators *or* what roles the various defendants would play in the conspiracy.'" *Kuhn v. Asset Acceptance Capital Corp.*, 2015 U.S. Dist. LEXIS 41391, at *17 (S.D. Ind. Mar. 31, 2015) (quoting *Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 785 (7th Cir. 1999) (emphasis added)).

The Defendants assert that the Amended Complaint contains nothing more than conclusory allegations of a conspiracy.  They argue that there are no allegations of an agreement among the Defendants to participate in the affairs of the alleged enterprise, to play a role in the conspiracy, or to commit at least two predicate acts to further the enterprise.

In response to the Defendants' argument, the Plaintiffs assert that courts have recognized intra-corporate conspiracies because corporations and their subsidiaries and employees are distinct legal entities, and, thus, agents may be liable for their own conspiratorial actions, pointing to *Ashland Oil v. Arnett*, 875 F.2d 1271, 1281 (7th Cir. 1989) ("intracorporate conspiracies do threaten RICO's goals of preventing the infiltration of legitimate businesses by racketeers and separating racketeers from their profits").  The Plaintiffs also point out that a "RICO conspiracy, like all conspiracies, does not require direct evidence of agreement; an agreement can be inferred from the circumstances."  *United States v. Neapolitan*, 791 F.2d 489, 501 (7th Cir. 1986).

The Plaintiffs assert that the allegations of their Amended Complaint factually support the conspiratorial agreement among the Defendants.  The allegations show that the Defendants agreed to participate in the RICO enterprise and commit multiple predicate acts, and those involved included the corporate Defendants, Mr. Wick, Stuart LaBauve, Lourdes Givens, Mark Holley, and Sean Tabb, as well as numerous auctions houses, some of which were owned and operated by Cox Automotive.  The Plaintiffs assert that the Defendants and others conspired to blacklist the Plaintiffs from participating at auctions.

After a close review of all the allegations in the Amended Complaint, the Court determines that the Plaintiffs have failed to sufficiently allege a claim for a RICO conspiracy under 18 U.S.C. § 1962(d) because the only allegations regarding an agreement among the Defendants are conclusory assertions of a conspiracy.  While the Plaintiffs may have a valid claim for a RICO

conspiracy, they have failed to allege sufficient details to support such a claim.  The Court notes

that conspiring to blacklist the Plaintiffs from participating at auctions does not support a RICO

conspiracy claim because "blacklisting" from auctions is not a predicate act for a RICO claim.

Because it may be possible that the Plaintiffs might have a viable claim for a RICO conspiracy

against some of the Defendants under some set of facts that have not been sufficiently alleged, this

claim is **dismissed without prejudice**.

## G.     <u>Constructive Fraud</u>

Finally, the Defendants assert that the Court should dismiss the Plaintiffs' constructive

fraud claim because they owe no special duty to the Plaintiffs, and the Plaintiffs could not have

reasonably relied on any actions or representations of NextGear.

> The elements of constructive fraud are: (i) a duty owing by the party to be charged
> to the complaining party due to their relationship; (ii) violation of that duty by the
> making of deceptive material misrepresentations of past or existing facts or
> remaining silent when a duty to speak exists; (iii) reliance thereon by the
> complaining party; (iv) injury to the complaining party as a proximate result
> thereof; and (v) the gaining of an advantage by the party to be charged at the
> expense of the complaining party. As such, plaintiffs' claims for . . . constructive
> fraud depend upon the existence of a duty running from defendants to plaintiffs. In
> the absence of such a duty, plaintiffs cannot recover . . . .

*Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996) (citations omitted).

The Defendants explain that a lender-borrower relationship does not impose a special duty

that could support a constructive fraud claim.  They point to *Wilson v. Lincoln Fed. Sav. Bank*, 790

N.E.2d 1042, 1047 (Ind. Ct. App. 2003), which explains, "[a]bsent special circumstances, a lender

does not owe a fiduciary duty to a borrower."  Because the only relationship between the Plaintiffs

and NextGear is one of borrower and lender, a constructive fraud claim cannot be supported.

Additionally, the Defendants assert that the Plaintiffs cannot reasonably have relied on any

action or representation by NextGear because, "[i]n enforcing this requirement, Indiana courts

reject fraud claims that could have been prevented by reading a document." *Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, 2010 WL 1258052, at *4 (S.D. Ind. Mar. 25, 2010) (citing *Weber v. Costin*, 654 N.E.2d 1130 (Ind. Ct. App. 1995)). The Defendants argue that the allegedly wrongful interest charges were open and obvious because the Plaintiffs paid by contemporaneous debits from their bank accounts, so they did not need to rely on representations by NextGear to know about any allegedly wrongful interest charges. Because the Plaintiffs could have prevented the alleged harm by reading their contracts and bank statements, they cannot show reasonable reliance on NextGear. Thus, the constructive fraud claim should be dismissed.

The Plaintiffs respond that Indiana law allows for a duty to arise "where one party may possess knowledge not possessed by the other and may thereby enjoy a position of superiority over the other." *Strong v. Jackson*, 777 N.E.2d 1141, 1147 (Ind. Ct. App. 2002). A duty may arise out of confidential relationships or where a power of attorney exists. *See id.* at 1148.

The Plaintiffs assert that their Amended Complaint alleges NextGear possessed information not known to the Plaintiffs regarding the floorplan agreements and NextGear's policies and practices. Only NextGear knew when it made payments to the auction houses, and it concealed this fact from the Plaintiffs, even though NextGear was charging interest and fees at an earlier date. At the initial meetings with the Plaintiffs and throughout the lending relationship, NextGear concealed the actual interest rates that would be charged and the fact that the charges would accrue before payments were made on behalf of the Plaintiffs. The Plaintiffs were required to execute a broad power of attorney in favor of NextGear as well as a personal guaranty. NextGear also had access to the Plaintiffs' bank accounts and debited those accounts automatically. Based on these facts, NextGear possessed superior knowledge and a superior relationship over the

Plaintiffs, giving rise to a duty to speak and not conceal the material facts set forth in the Amended Complaint.  Thus, the constructive fraud claim should survive dismissal.

Regarding the element of reasonable reliance, the Plaintiffs allege that they relied on representations by NextGear in entering into the floorplan agreements and then using those agreements to purchase numerous vehicles for their business operations.  The Plaintiffs allege they relied on NextGear's representations to consummate thousands of transactions.  They assert that they reasonably relied on NextGear to accurately debit their bank accounts based on payments on their behalf at the time of the auctions, not payments actually made weeks or months later.  The Plaintiffs argue that the Defendants' assertion that the interest charges were open and obvious based on the Plaintiffs' bank statements is unavailing because their bank account statements did not indicate the interest rates used or when NextGear actually paid the auction houses on their behalf.

The Court determines that the allegations of the Amended Complaint are sufficient to support a claim of constructive fraud.  The allegations and the attached floorplan agreements indicate that the Plaintiffs executed a very broad power of attorney in favor of NextGear that gave NextGear far reaching authority over the Plaintiffs.  The Plaintiffs also had to execute personal guarantees, and the bank accounts of the Plaintiffs were made available to NextGear.  NextGear did in fact freely access the Plaintiffs' bank accounts for numerous transactions.  Based on all these facts, the Court determines that the allegations support a special relationship giving rise to a duty to support the first element of the constructive fraud claim.  The allegations also are sufficient to support the element of reasonable reliance.  The Plaintiffs relied on NextGear when entering into the floorplan agreements and when entering into numerous transactions based on the agreements. As the Court discussed above, the Plaintiffs' bank account statements would not have provided

the Plaintiffs with knowledge regarding the premature interest charges.  Therefore, the Court **DENIES** the Defendants' Motion to Dismiss the constructive fraud claim against NextGear. However, to the extent the Plaintiffs bring their constructive fraud claim against Cox Enterprises, Cox Automotive, and Mr. Wick, the Court **GRANTS** the Motion to Dismiss that claim because the allegations do not support a special relationship and duty between those three Defendants and the Plaintiffs.

## IV.   CONCLUSION

For the reasons stated herein, Defendants' Motion to Dismiss (Filing No. 126) is **granted in part and denied in part**. The Plaintiffs' breach of contract claim and constructive fraud claim against NextGear survive the Motion to Dismiss. The substantive RICO claim against NextGear, Cox Automotive, and Mr. Wick also survives dismissal. The claims for RICO conspiracy, unjust enrichment, and tortious interference are dismissed. The Court concludes, however, that these dismissals should be with **without prejudice**. Fed. R., Civ. P. 15 directs that courts should "freely" grant leave to amend a pleading "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  If in fact, Plaintiffs' can plead sufficient facts to support their claims for RICO conspiracy, unjust enrichment, and tortious interference they are granted leave to file a Second Amended Complaint within **fourteen (14) days** of the date of this Entry.

**SO ORDERED.**

Date: 3/27/2017

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

David J. Jurkiewicz
BOSE MCKINNEY & EVANS, LLP
djurkiewicz@boselaw.com

Catherine E. Lasky
JONES SWANSON HUDDELL &
GARRISON, LLC
klasky@jonesswanson.com

Paul D. Vink
BOSE MCKINNEY & EVANS, LLP
pvink@boselaw.com

Steven D. Groth
BOSE MCKINNEY & EVANS, LLP
sgroth@boselaw.com

Joshua P. Melder
CASSIE FELDER & ASSOCIATES, LLC
joshua@felderllc.com

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Jason S. McCarter
SUTHERLAND ASBILL & BRENNAN LLP
jason.mccarter@sutherland.com

Tracey K. Ledbetter
SUTHERLAND ASBILL & BRENNAN LLP
tracey.ledbetter@sutherland.com

Cassie E. Felder
LUGENBUHL, WHEATON, PECK, RANKIN
& HUBBARD
cfelder@lawla.com

Gladstone N. Jones
JONES SWANSON HUDDELL &
GARRISON, LLC
gjones@jonesswanson.com

Kerry A. Murphy
JONES, SWANSON, HUDDELL &
GARRISON, LLC
kmurphy@jonesswanson.com

Lynn E. Swanson
JONES, SWANSON, HUDDELL&
GARRISON, LLC
lswanson@jonesswanson.com

Matthew M. Coman
SHER GARNER CAHILL RICHTER
KLEIN & HILBERT LLC
mcoman@shergarner.com

Ryan D. Adams
SHER GARNER CAHILL RICHTER
KLEIN & HILBERT LLC
radams@shergarner.com

James M. Garner
SHER GARNER CAHILL RICHTER
KLEIN & HILBERT, LLC
jgarner@shergarner.com

Jacob A. Airey
SHER GARNER CAHILL RICHTER
KLEIN & HILBERT, LLC.
jairey@shergarner.com