IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RED BARN MOTORS, INC., PLATINUM MOTORS, INC., and MATTINGLY AUTO SALES, INC., individually and on behalf of other members of the general public similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:14-cv-01589-TWP-DKL |
| COX AUTOMOTIVE, INC., NEXTGEAR CAPITAL, INC. F/K/A DEALER SERVICES CORPORATION, successor by merger with Manheim Automotive Financial Services, Inc., and JOHN WICK, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**BRIEF IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE........................................................1

    A.    How and Why Vehicles Are Floor Planned Through NextGear ............................2

    B.    NextGear History and Contracts ...........................................................................4

    C.    The So-Called "KO Book" .....................................................................................7

    D.    Red Barn's Dealings with NextGear and Ultimate Default.................................7

    E.    Mattingly's Dealings with NextGear and Ultimate Default ...............................10

    F.    Platinum's Dealings with NextGear and Ultimate Default..................................13

PROCEDURAL HISTORY.................................................................................................14

ARGUMENT AND CITATION OF AUTHORITY ..................................................................15

    I.    NextGear Is Entitled to Summary Judgment on Plaintiffs' Breach of Contract Claim..........................................................................................................16

            A.    The Plaintiffs' Contracts Allow NextGear to Charge Interest as It Did.........................................................................................................16

            B.    NextGear's Reading of the Contract Is Commercially Reasonable..........19

            C.    Plaintiffs Agreed by Contract That the Amounts They Paid Were Correct...................................................................................................21

    II.    NextGear Is Entitled to Summary Judgment on Plaintiffs' Constructive Fraud Claim. .........................................................................................................22

            A.    The Constructive Fraud Claim Should Be Rejected as Duplicative of the Breach of Contract Claim. ..............................................................22

            B.    Plaintiffs Cannot Prove Each of the Elements of Constructive Fraud. ...................................................................................................23

    III.    NextGear Is Entitled to Summary Judgment on Plaintiffs' RICO Claim.............26

            A.    The Basis for Plaintiffs' RICO Claim Is Not a Racketeering Activity. .................................................................................................26

            B.    Plaintiffs Have No Evidence That Any Defendant Conducted a RICO Enterprise.......................................................................................27

            C.    Plaintiffs Cannot Prove the Required Element of Proximate Cause..........29

IV.    Defendants Are Entitled to Summary Judgment Based on Several of Their
        Affirmative Defenses. ........................................................................................30

        A.     The Claims of Plaintiffs Mattingly and Platinum Are Barred by
               *Res Judicata.* ...............................................................................30

        B.     The Claims of Plaintiffs Mattingly and Platinum Are Barred by
               Setoff..............................................................................................33

        C.     The Claims of All Three Plaintiffs Are Barred Due to Their
               Unclean Hands. ..............................................................................33

CONCLUSION...................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143 (1987) ......................................28

*Autocephalous Greek-Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc.*, 717 F. Supp. 1374 (S.D. Ind. 1989), *aff'd*, 917 F.2d 278 (7th Cir. 1990) ......................32

*Blackford v. JPMorgan Chase Bank, N.A.*, No. 1:14-cv-01717-JMS, 2015 WL 7017204 (S.D. Ind. Nov. 10, 2015) .................................................................................................28

*Bowman v. IBM Corp.*, 853 F. Supp. 2d 766 (S.D. Ind. 2012) ...................................................18

*Carman v. Tinkes*, 762 F.3d 565 (7th Cir. 2014) .......................................................................15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..........................................................................15

*Citizens Bank of Md. v. Strumpf*, 516 U.S. 16 (1995) ................................................................33

*Dow Chem. Co. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 553 N.E.2d 144 (Ind. Ct. App. 1990) ............................................................................................................... 31-32

*Eichenberger v. Eichenberger*, 743 N.E.2d 370 (Ind. Ct. App. 2001) .........................................31

*French-Tex Cleaners, Inc. v. Cafaro Co.*, 893 N.E.2d 1156 (Ind. Ct. App. 2008) ........................22

*Fritzinger v. Angie's List, Inc.*, No. 1:12-cv-01118-JMS, 2013 WL 772864 (S.D. Ind. Feb. 28, 2013) ......................................................................................................................23

*Guy v. Schuldt*, 138 N.E.2d 891 (Ind. 1956) ............................................................................32

*Haegert v. Univ. of Evansville*, 977 N.E.2d 924 (Ind. 2012) .......................................................16

*Hensley v. Jasper Police Dep't*, 163 F. Supp. 2d 1006 (S.D. Ind. 2001) ......................................30

*Hilliard v. Jacobs*, 927 N.E.2d 393 (Ind. Ct. App. 2010) ...........................................................31

*Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258 (1992) ............................................................29

*Indiana v. Pastrick*, No. 3:04 CV 506, 2008 WL 2626784 (N.D. Ind. June 26, 2008) .................27

*Jamison v. First Ga. Bank*, 387 S.E.2d 375 (Ga. App. 1989) .....................................................21

*Lake Cty. Tr. Co. v. Wine*, 704 N.E.2d 1035 (Ind. Ct. App. 1998) ..............................................34

*Lawson v. Sun Microsys., Inc.*, 791 F.3d 754 (7th Cir. 2015) ....................................................18

iii

*Leal v. Krajewski*, 803 F.2d 332 (7th Cir. 1986) ........................................................30

*Ludwig v. Ford Motor Co.*, 510 N.E.2d 691 (Ind. Ct. App. 1987) ...............................32

*McLaughlin Equip. Co. v. Servaas*, No. IP98-0127-C-T/K, 2004 WL 1629603 (S.D. Ind. Feb. 18, 2004) .....................................................................................................26, 29

*Moore v. PaineWebber, Inc.*, 189 F.3d 165 (2d Cir. 1999) ..........................................29

*Phico Ins. Co. v. Aetna Cas. & Sur. Co. of Am.*, 93 F. Supp. 2d 982 (S.D. Ind. 2000) ........... 33-34

*Pichon v. Am. Heritage Banco, Inc.*, 983 N.E.2d 589 (Ind. Ct. App. 2013)..................33

*In re Red Barn Motors, Inc.*, No. 13-10548 (Bankr. M.D. La.)................................. 9-10

*Reves v. Ernst & Young,* 507 U.S. 170 (1993).............................................................27

*Reynolds v. E. Dyer Dev. Co.*, 882 F.2d 1249 (7th Cir. 1989) ....................................27

*Rice v. Strunk*, 670 N.E.2d 1280 (Ind. 1996).............................................................23

*Rusthoven v. TCF Nat'l Bank*, No. 07-cv-3154, 2009 WL 2171105 (D. Minn. July 20, 2009) ........................................................................................................................21

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) ..................................................26

*Stefansson v. Source One Mortg.*, No. 1:02-cv-00773-LJM, 2004 WL 540921 (S.D. Ind. Jan. 29, 2004) .....................................................................................................31

*Till v. SCS Credit Corp.*, 541 U.S. 465 (2004) ...........................................................20

*Tobin v. Ruman*, 819 N.E.2d 78 (Ind. Ct. App. 2004) ................................................22

*Wedgewood Cmty. Ass'n v. Nash*, 781 N.E.2d 1172 (Ind. Ct. App. 2003)...................34

*Weinreb v. Fannie Mae*, 993 N.E.2d 223 (Ind. Ct. App. 2013)...................................31

**Statutes**

18 U.S.C. § 1961(1) ....................................................................................................26

U.C.C. § 2-328(2) .......................................................................................................19

U.C.C. § 9-102(a)(48) .................................................................................................20

Ind. Code § 24.5-3-106(1) .....................................................................................18, 19

Ind. Code § 26-1-9.1-102(48) .....................................................................................20

La. Stat. Ann. § 14:72.4 ...............................................................................................................9

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................................15

Ind. Trial Rule 13(A) ...................................................................................................................31

**Other Authorities**

Black's Law Dictionary ................................................................................................................18

Plaintiffs are three used car dealers that want the Court to award them free credit. Plaintiffs each borrowed from NextGear Capital, Inc. (formerly Dealer Services Corporation) ("DSC" or "NextGear") to obtain and sell vehicle inventory from auto auctions.  In exchange for that credit, which worked as it was supposed to and allowed Plaintiffs to obtain inventory without immediate cash payment, Plaintiffs paid NextGear certain interest and fees.  But Plaintiffs seem to think they should have been able to get vehicles and make money selling them, on NextGear's tab, for free.  Despite knowing when interest began to accrue, and despite failing to repay all the principal they borrowed from NextGear, much less all interest, Plaintiffs now claim that NextGear breached the contract and defrauded them by charging interest from the day Plaintiffs began using the credit.  Plaintiffs are also attempting to make a federal case out of that contract dispute by claiming Defendants are responsible for other third parties' alleged decisions not to do business with them.

In reality, NextGear has acted in accordance with its contracts and with industry standards, and the other two Defendants have had nothing whatsoever to do with Plaintiffs' claims.  Therefore, Plaintiffs' claims are without merit and summary judgment is appropriate.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

NextGear is an automotive financing company that offers revolving lines of credit to car dealers for the purchase of motor vehicle inventory (often referred to as "floor plans"). (Declaration of Adam Galema, dated April 26, 2017 ("4/26/2017 Galema Decl.") [Ex. 14] ¶ 8; Deposition of Stuart LaBauve [Ex. 12] ("LaBauve Dep.") 76:8-19.)  A floor plan allows used car dealers to acquire vehicles for resale at auctions and elsewhere without having to pay cash for them.  (4/26/2017 Galema Decl. [Ex. 14] ¶ 9; Deposition of Devon London as Red Barn Motors, Inc. 30(b)(6) Representative [Ex. 6] ("Red Barn Dep.") 71:11-20; Deposition of Barry Mattingly as Mattingly Auto Sales, Inc. 30(b)(6) Representative [Ex. 8] ("Mattingly Dep.") 46:17-20;

1

Deposition of Nicol Perry as Platinum Motors, Inc. 30(b)(6) Representative [Ex. 9] ("Platinum Dep.") 97:11-16.)  The dealer instead pays interest and fees in exchange for NextGear taking credit risk on its behalf while the dealer attempts to sell the inventory.  (4/26/2017 Galema Decl. [Ex. 14] ¶ 9.)  During that time, NextGear retains a security interest in all the dealer's inventory and most other personal property to secure the dealer's obligations to NextGear.  (*Id.*)  Once the dealer sells an item of inventory, it pays NextGear out of the proceeds.  (*Id.*)

Notwithstanding that the named Plaintiffs each defaulted to NextGear and failed to repay all the principal provided them, they now claim that *they* are owed money because NextGear charged them for credit from the day they began using it on each vehicle.

### A.    How and Why Vehicles Are Floor Planned Through NextGear

A floor plan with NextGear allows a dealer to obtain possession of a vehicle for the dealer's inventory on the date of purchase but defer payment until later.  When a dealer purchases a vehicle at a wholesale auto auction, the dealer must "find some way to pay for the car" before it leaves the auction with the vehicle.  (Mattingly Dep. 38:10-23; *see also* Red Barn Dep. 61:1-11; Mattingly Dep. 37:13-23, 81:12-25; Platinum Dep. 53:16-21, 55:19-21.)  As the corporate representative of Plaintiff Red Barn Motors, Inc. ("Red Barn") acknowledged, "you have to make some form of payment to the auction to take the car out."  (Red Barn Dep. 61:1-4.)  Dealers can make such payment by cash, by check—or by floor plan.  (*Id.* at 61:1-11; Mattingly Dep. 38:10-39:12; Platinum Dep. 52:24-53:21.)

If the dealer has a floor plan with NextGear or a similar lender, it can bid on and take purchased cars from the auction for immediate resale simply by directing the auction to put the cost on the dealer's floor plan.  Assuming the dealer has credit available, the dealer tells the auction counter clerk to floor plan the vehicle, and then it can take the vehicle from the auction without paying any cash out of its own pocket.  (Red Barn Dep. 66:24-67:21; Mattingly Dep.

46:17-20; Platinum Dep. 54:23-55:9.)  In other words, the floor plan is "like cash" (Platinum

Dep. 54:23-55:9); it means that a dealer "didn't have to come out of pocket for the purchase

money" (Red Barn Dep. 71:11-20).  A floor plan therefore benefits dealers, as it "allowed [them]

to generate more inventory" without current payment.  (*Id.* at 213:25-214:3; *see also* Platinum

Dep. 59:5-7 (floor plan "allows you to obtain inventory for resale").)  Having financed the

vehicle using a floor plan, the dealer can then offer the vehicle for sale to its own customers

immediately.  (*See, e.g.*, Mattingly Dep. 42:9-15; Red Barn Dep. 66:24-67:21, 62:17-19;

Platinum Dep. 97:11-16.)

At the moment a vehicle is purchased at auction using a floor plan, NextGear is obligated

to pay the auction for the vehicle.  (4/26/2017 Galema Decl. [Ex. 14] ¶ 10; Declaration of Jeff

Modjeski ("Modjeski Decl.") [Ex. 16] ¶ 4; Declaration of Chuck Werner ("Werner Decl.") [Ex.

18] ¶ 4.)  The exact timing of settling up with the auction varies by auction, but in many cases

NextGear's obligation is unconditional and must be met immediately, and in others the auction

must confirm possession of title or provide the title to NextGear first.  (Declaration of Adam

Galema, dated October 31, 2016 ("10/31/2016 Galema Decl.") [Ex. 13] ¶¶ 15-16; 4/26/2017

Galema Decl. [Ex. 14] ¶ 10; Modjeski Decl. [Ex. 16] ¶ 5; Werner Decl. [Ex. 18] ¶ 5.)  But, in all

cases, NextGear is obligated, cannot re-loan the same money elsewhere, and has no control over

delivery of title.  (4/26/2017 Galema Decl. [Ex. 14] ¶ 10; Deposition of Adam Galema [Ex. 10]

("Galema Dep.") 19:13-18.)

Because of that obligation, when a dealer floor plans a vehicle through NextGear,

NextGear immediately takes on the risk that the dealer will not pay for the vehicle; it is exposed

to potential nonpayment and loss of collateral as soon as the auction sale is complete and the car

is entrusted to the dealer.  (4/26/2017 Galema Decl. [Ex. 14] ¶ 11.)  The vehicle becomes dealer

3

inventory and thus NextGear's collateral immediately upon purchase.  (Red Barn Dep. 74:2-21; Mattingly Dep. 50:1-13; Platinum Dep. 62:10-19; 10/31/2016 Galema Decl. [Ex. 13] ¶ 14.)  If a dealer re-sells a floor planned unit without paying NextGear for it, NextGear still must pay the auction for the unit.  (4/26/2017 Galema Decl. [Ex. 14] ¶ 11.)

Dealers with NextGear floor plans may also obtain inventory from non-auction sources. For example, many dealers accept trade-ins from their customers and/or purchase cars directly from another dealer.  (*See, e.g.*, Mattingly Dep. 28:8-19 (other dealers), 29:2-4 (trade-ins); Red Barn Dep. 20:16-22 (trade-ins); Platinum Dep. 24:25-25:18 (trade-ins, other dealers).)  In those cases, the dealer may elect to finance the acquisition with its NextGear line of credit by providing the bill of sale and title to NextGear in exchange for payment.  (*See* Red Barn Dep. 69:8-70:18; 10/31/2016 Galema Decl. [Ex. 13] ¶ 17.)  Again, this "free[s] up [dealers'] money to do other things."  (Platinum Dep. 61:13-15.)  Interest begins to run on these transactions from the date the vehicle is floored.  (10/31/2016 Galema Decl. [Ex. 13] ¶ 17.)

## B.    NextGear History and Contracts

NextGear was originally formed in 2005 as DSC.  (4/26/2017 Galema Decl. [Ex. 14] ¶ 3.) Until 2012, it was an independent automotive financing company and was not affiliated with any auction.  (*Id.*)  DSC competed with Manheim Automotive Financial Services, Inc. ("MAFS"), the financing company affiliated with Cox Automotive, Inc. ("Cox Auto") and the Manheim auto auctions; indeed, for some time, Manheim auctions would not allow outside floor plan companies like DSC into their auctions.  (*Id.*; LaBauve Dep. 66:2-8; *see also* Galema Dep. 26:18-24; Declaration of Mike McKinney ("McKinney Decl.") [Ex. 15] ¶ 3.)

On March 1, 2012—well after each Plaintiff had begun to do business with DSC—DSC was acquired by Cox Auto.  (4/26/2017 Galema Decl. [Ex. 14] ¶ 4.)  In January 2013, MAFS was merged into DSC and the surviving company was renamed NextGear Capital, Inc.  (*Id.* ¶ 5.)

4

As discussed below, two of the Plaintiffs had defaulted to DSC and ceased borrowing from it by that time, and the third did the same within a few months.  There is no evidence that the acquisition by Cox Auto had any effect on DSC's practices with respect to charging interest on units directly floored at auction.  (*Id.* ¶ 6; McKinney Decl. [Ex. 15] ¶ 6.)  And the vast majority of Plaintiffs' direct auction purchases pre-date the Cox Auto acquisition and occurred when DSC was a competitor to Cox Auto.  (*See* Expert Report of Jay Cunningham ("Cunningham Report") [Ex. 20], at Ex. 3.)

John Wick has been with DSC since its inception, but only served as legal counsel to the company, and not a director of operations, during the entire period Plaintiffs borrowed from NextGear.  (Declaration of John Wick ("Wick Decl.") [Ex. 19] ¶ 2.)  There is no evidence he directed NextGear's operations with respect to calculating interest during that period.  (*Id.* ¶ 3.)  There is also no evidence that he or anyone else coordinated on those issues with anyone at Cox Auto prior to its acquisition of DSC in 2012.  (*Id.* ¶ 4.)

Each of the three named Plaintiffs executed contracts with DSC prior to the acquisition by Cox Auto.  (Red Barn DSC Demand Promissory Note and Security Agreement ("Red Barn Note") [Ex. 21]; Red Barn Dep. 93:6-18, 95:5-16; Mattingly 2006 DSC Demand Promissory Note and Security Agreement ("Mattingly 2006 Note") [Ex. 24]; Mattingly 2009 DSC Demand Promissory Note and Security Agreement ("Mattingly 2009 Note") [Ex. 25]; Mattingly Dep. 62:2-64:25, 68:25-69:13; Platinum DSC Demand Promissory Note and Security Agreement ("Platinum Note") [Ex. 27]; Platinum Dep. 81:17-85:3.)  Each Plaintiff's contract provides that the company could charge interest on Liabilities incurred:

> Interest shall accrue on all Dealer Liabilities in accordance with the following: (a) All outstanding Liabilities under this Note shall accrue interest (based upon a 360 day year), on a per annum basis and shall be compounded daily at the Base Rate plus the applicable Contract Rate, Risk Rate, or Default Rate until paid in full.

(Red Barn Note [Ex. 21] § 3(a), NG_003563; Mattingly 2009 Note [Ex. 25] § 3(a), MA 000024;

Platinum Note [Ex. 27] § 3(a), NG_003514.)  "Liabilities" are in turn broadly defined as

> any and all Advances, debts, DSC Financed Inventory Liabilities, financial
> obligations, DSC Administrative Fees, DSC Universal Fees, Interest, Floorplan
> Fees, NSF fees, late fees, charges, expenses, attorney fees, costs of collection,
> covenants, and duties owing, arising, due or payable from Dealer to DSC of any
> kind or nature, present o[r] future, under any instrument, guaranty, or other
> document whether arising under this Note or any other agreement, whether
> directly or indirectly (including those acquired by assignment), absolute or
> contingent, primary or secondary, due or to become due, now existing or hereafter
> arising and however acquired.

(Red Barn Note [Ex. 21] § 1(y), NG_003562; Mattingly 2009 Note [Ex. 25] § 1(v), MA 000023;

Platinum Note [Ex. 27] § 1(y), NG_003513.)  Thus, interest will accrue on all "Liabilities,"

which include—but are not limited to—"Advances."

Once a dealer borrows under its floor plan, DSC takes a security interest in the dealer's

inventory.  (Red Barn Note [Ex. 21] § 2(a), NG_003563; Mattingly 2009 Note [Ex. 25] § 2(a),

MA 000024; Platinum Note [Ex. 27] § 2(a), NG_003514.)  The dealer must pay back DSC the

amount borrowed, plus interest and fees owing, within the earlier of (a) two days after selling the

vehicle; (b) one day after receiving payment for the vehicle; or (c) maturity, which occurs a

contractually-agreed number of days after the vehicle was first floor planned.  (Red Barn Note

[Ex. 21] § 5(e), NG_003565; Mattingly 2009 Note [Ex. 25] § 5(e), MA 000026; Platinum Note

[Ex. 27] § 5(e), NG_003516; Red Barn Dep. 72:8-73:10; Mattingly Dep. 46:17-48:1; Platinum

Dep. 70:19-72:2.)

The contracts also provide that "any statement of Dealer's account" provided by DSC is

definitive and binding on dealers as to the amount owed unless the dealer objects within 30 days.

(Red Barn Note [Ex. 21] § 4(k), NG_003564; Mattingly 2009 Note [Ex. 25] § 4(h), MA 000025;

Platinum Note [Ex. 27] § 4(k), NG_003515.)  Each of the named Plaintiffs regularly received

statements of the amounts they owed DSC through an online portal available 24 hours a day,

through monthly or annual statements, through calls to the company, or through a combination of those sources.  (Red Barn Dep. 76:2-77:6; Mattingly Dep. 50:22-52:4, 74:13-24; Platinum Dep. 65:10-24, 67:19-70:9, 72:3-7, 90:19-22.)

**C.     The So-Called "KO Book"**

A third party not named in this litigation, Auction Insurance Agency ("AIA"), offers payment and title guaranty insurance to protect auctions against bad checks, failure to collect from buying dealers, and losses that result from the auctioning of stolen vehicles.  (Declaration of Brandon Walton ("Walton Decl.") [Ex. 17] ¶ 4; *see also* 10/31/2016 Galema Decl. [Ex. 13] ¶ 35; Mattingly Dep. 112:3-10.)  Auctions and other industry participants can report to AIA when a dealer fails to pay, defaults, or otherwise causes a loss.  (Walton Decl. [Ex. 17] ¶ 6.)  AIA maintains a list of dealers with known or alleged default issues whose transactions AIA will not generally insure, known in the industry as the "KO Book."  (*Id.* ¶ 5; 10/31/2016 Galema Decl. [Ex. 13] ¶ 36.)  AIA determines, in its sole discretion, whether a dealer will be included in the KO Book based on the reported circumstances.  (Walton Decl. [Ex. 17] ¶ 6.)

None of the Defendants in this case is affiliated with AIA or controls whether AIA includes a dealer in the KO Book.  (*Id.* ¶¶ 3, 6; McKinney Decl. [Ex. 15] ¶ 4.)  In addition, neither Cox Auto nor John Wick controls NextGear's day-to-day processes or policies with respect to reporting individual dealer defaults to AIA.  (McKinney Decl. [Ex. 15] ¶ 6; Wick Decl. [Ex. 19] ¶ 3.)

**D.     Red Barn's Dealings with NextGear and Ultimate Default**

Plaintiff Red Barn is a licensed used car dealer in Denham Springs, Louisiana.  (Red Barn Dep. 22:13-23:2.)  Red Barn began doing business with DSC in July 2011, when it signed a floor plan application seeking a line of credit in the amount of $200,000, a demand promissory note and security agreement, and related contract documentation.  (*See generally* Red Barn Note

[Ex. 21].)  The contract documentation outlined the fees and interest rate applicable to the floor

plan.  (*Id.*; Red Barn Dep. 96:6-18.)

There is no evidence that anyone at DSC made any false representations to Red Barn

regarding the timing of when interest would begin to accrue.  (Red Barn Dep. 79:3-81:17,

182:20-183:4, 225:1-20; Deposition of Donald Richardson as Red Barn 30(b)(6) Representative

[Ex. 7] ("Red Barn (Richardson) Dep.") 23:12-25, 24:20-25:14, 26:2-12, 35:3-39:3; LaBauve

Dep. 151:5-13.)  Nor is there any evidence that Red Barn asked at the time of contracting when

interest would begin to accrue.  Rather, Red Barn's understanding of the interest terms was based

on "what's in the contract."  (Red Barn Dep. 225:1-20.)

From July 2011 through March 2013, Red Barn used DSC/NextGear financing to acquire

over 500 vehicles.  (Red Barn Transaction Report [Ex. 13-B]; 10/31/2016 Galema Decl. [Ex. 13]

¶¶ 39-40.)  This financing allowed Red Barn to "generate more inventory" without having to

"come out of pocket for the purchase money."  (Red Barn Dep. 213:25-214:3, 71:11-20.)  Red

Barn printed and reviewed statements "daily" from DSC's online account portal showing Red

Barn's transactions with, and charges from, DSC/NextGear.  (Red Barn Dep. 76:2-77:6.)  Those

statements were binding and dispositive as to the amount owed under Red Barn's Note because

Red Barn did not timely object to the charges.  (Red Barn Note [Ex. 21] § 4(k), NG_003564.)

Red Barn knew or should have known the number of days of interest charged by DSC on

particular vehicles from its online statements and the maturity dates on each, and it knew by at

least June 2012 that DSC had not always settled with the selling auction on the date that interest

began to accrue.  (Red Barn Dep. 75:19-77:6, 182:20-184:23, 186:20-187:7, 217:23-220:10.)

Red Barn's corporate representative and General Manager testified that he "confronted" his DSC

representative in June 2012 to ask "why are we being charged interest when I haven't even

chosen the floorplan." (*Id.* at 183:5-184:5; Red Barn Resp. to Interrog. 6 [Ex. 2].)  According to

Red Barn, the DSC representative responded, "That was just the way that it was. . . . They

always go from the date of the sale." (Red Barn Dep. 217:23-218:20.)  Nonetheless, Red Barn

continued to borrow DSC's money for auction purchases. (Red Barn Dep. 183:5-184:23; Red

Barn Transaction Report [Ex. 13-B] (showing over 200 units floored with DSC, at a principal

value in excess of $850,000, *after* June 2012).)

In 2013, Red Barn defaulted on its obligations to NextGear, purportedly because one of

its retail financing sources dried up. (Red Barn Dep. 108:17-109:16.)  NextGear learned in mid-

March that the dealership had sold financed collateral vehicles out of trust—a fraud and a

crime[1]—and that Red Barn had closed its doors. (NextGear's Resp. to Interrog. 13 [Ex. 1].)

NextGear was required to release the titles held as security on a number of vehicles to retail

customers without payment from them or from Red Barn. (Red Barn Dep. 111:4-18.)  Around

the same time, several of Red Barn's payments were returned for insufficient funds. (NextGear's

Resp. to Interrog. 13 [Ex. 1]; *see also* Red Barn Dep. 106:19-107:11.)  As a result, Red Barn's

account was in default as of March 2013. (NextGear's Resp. to Interrog. 13 [Ex. 1]; *see also*

Red Barn Dep. 106:15-109:16.)

In response to the default, DSC attempted to recover the remaining Red Barn inventory,

which constituted collateral for its loans to Red Barn. (Red Barn Dep. 86:19-87:1, 107:13-

108:15; Red Barn Note [Ex. 21] § 2(a), NG_003563.)  While NextGear was attempting to

liquidate the limited collateral it was able to recover, and thereby mitigate Red Barn's debt, Red

Barn filed for Chapter 11 bankruptcy protection on April 25, 2013. *In re Red Barn Motors, Inc.*,

No. 13-10548 (Bankr. M.D. La.).  In its bankruptcy petition, Red Barn represented that it owed

---

[1] *See* La. Stat. Ann. § 14:72.4.

NextGear over $70,000[2] and owed various other creditors in excess of $800,000.  (Amended

Bankruptcy Petition, *In re Red Barn Motors, Inc.* [Ex. 22]; Red Barn (Richardson) Dep. 75:9-

16.)  Red Barn also admitted to numerous pre-filing insider transactions in that bankruptcy,

including house and loan payments to and for its officers, their family members, and its manager

out of DSC collateral, including sale proceeds.  (Red Barn Insider Transactions, *In re Red Barn

Motors, Inc.* [Ex. 23]; Red Barn Dep. 171:17-174:16.)

>    **E.    Mattingly's Dealings with NextGear and Ultimate Default**

Plaintiff Mattingly Auto Sales, Inc. ("Mattingly") sells used cars in Hardinsburg,

Kentucky.  (Mattingly Dep. 25:9-14.)  In October 2006 and February 2009, Mattingly signed

demand promissory notes and security agreements with DSC.  (Mattingly 2006 Note [Ex. 24];

Mattingly 2009 Note [Ex. 25].)  The interest rate and fees applicable to the DSC note were

included in the related documentation signed at the time of each security agreement.  (*See

generally* Mattingly 2006 Note [Ex. 24]; Mattingly 2009 Note [Ex. 25].)  However, Mattingly's

owner did not discuss with DSC when interest would begin to run on Mattingly's transactions

before signing the contract.  (Mattingly Dep. 59:8-10, 74:25-76:18.)

From November 2006 through May 2012, Mattingly floored approximately 160 vehicles

with DSC.  (Mattingly Transaction Report [Ex. 13-D]; 10/31/2016 Galema Decl. [Ex. 13] ¶¶ 43-

44.)  During that time, Mattingly had continuous access to information about its DSC account,

including balances and charges, through the DSC website.  (Mattingly Dep. 50:22-52:6, 74:13-

24; *see also* 10/31/2016 Galema Decl. [Ex. 13] ¶¶ 18-19.)  That information was binding and

---

[2] This representation was misleading; in fact, Red Barn owed NextGear over $130,000 in
principal, fees, interest, and other charges on vehicles purchased, as well as account-level
charges, as of July 26, 2013.  (4/26/2017 Galema Decl. [Ex. 14] ¶ 17.)  By way of comparison,
Red Barn's damages expert in this litigation has identified only $7,083.82 in allegedly wrongful
interest charged over the parties' two-year relationship.  (Cunningham Report [Ex. 20], at 10.)

dispositive as to the amount owed under the terms of Mattingly's Notes because it did not timely object to the charges.  (Mattingly 2009 Note [Ex. 25] § 4(h), MA 000025.)

Regarding interest, Mattingly's only concern was for cars it purchased from auction without a title; Mattingly's owner testified that he believed DSC should not have charged interest after Mattingly paid off a vehicle but before DSC obtained title from the auction.  (Mattingly Dep. 75:6-76:18, 79:4-16.)  Mattingly admits to no concern with interest charged in other situations.  (*Id.* at 79:17-81:1.)  However, its owner acknowledged that he could have chosen not to buy cars announced as "title absent" at auction, or chosen not to put them on his DSC floor plan.  (*Id.* at 41:14-20,158:23-159:21.)  And when it did put the "title absent" cars on its floor plan, Mattingly "had the car" and was "doing whatever [it] wanted to do with the car."  (*Id.* at 152:20-154:3.)  Mattingly's owner also testified that he raised the issue of paying interest before DSC had the title with DSC's account representatives "from day one," that those account representatives confirmed it was "common practice," and that Mattingly continued to borrow from DSC following those discussions.  (*Id.* at 75:6-76:18, 154:4-155:9.)

Towards the end of its relationship with DSC, Mattingly committed several fraudulent acts that led to its default under its DSC floor plan agreement.  Mattingly created fake "sales" to obtain financing based on an inflated purchase price, knowing that the purchase price determined the amount DSC would advance.  Mattingly and/or its principal had set up a separate entity and created artificial transactions with this other entity so that it could floor or re-floor the cars at higher prices.  (*See generally* Mattingly Dep. 180:2-194:25; Deposition of Lourdes Givens [Ex. 11] ("Givens Dep.") 168:4-170:17; NextGear's Resp. to Interrog. 13 [Ex. 1].)  Mattingly put the same car on a floor plan more than once; bought cars at auction or online from another dealer at a pre-arranged price and then put the cars on the DSC floor plan; and attempted to put a vehicle

on its floor plan after it had already sold the vehicle.  (Mattingly Dep. 91:15-92:1 (same car more than once), 93:6-21 (pre-arranged price); Givens Dep. 156:19-157:9 (floor plan after sale).)

As a result of Mattingly's default and fraudulent acts, NextGear declared Mattingly in default and attempted to repossess the vehicles on Mattingly's lot in May 2012.  Only five cars remained at the dealer's location, however, despite contractual obligations to keep all collateral units there until sold.  (NextGear's Resp. to Interrog. 13 [Ex. 1]; *cf.* Mattingly 2009 Note [Ex. 25] § 4(b), MA 000024.)  Mattingly had sold vehicles to customers without paying NextGear, in violation of its contract.  (Givens Dep. 161:22-162:8, 163:6-164:18.)

DSC sued Mattingly in an attempt to collect Mattingly's debt, and judgment was entered for NextGear against Mattingly and its owner in June 2013, in the amount of $58,000 plus post-judgment interest.[3]  (Mattingly Dep. 123:13-127:7; Certified Judgment, *NextGear Capital, Inc. v. Mattingly Auto Sales, Inc.* ("Mattingly Judgment") [Ex. 26].)  Mattingly's owner received timely service of the complaint, knew about the interest issue, and raised no defenses or counterclaims in response.  (Mattingly Dep. 124:8-125:6, 74:25-76:18.)  Despite Mattingly's awareness of the lawsuit and failure to dispute the accuracy of the debt claimed, Mattingly never paid the judgment and has no intention of paying it.  (*Id.* at 130:25-131:22.)

A third-party auction, not DSC, reported Mattingly to AIA in late 2012 for failure to pay for a vehicle acquired at that auction.  (*See* 10/31/2016 Galema Decl. [Ex. 13] ¶ 46; 11/16/2012 Email from Ute Brandt [Ex. 13-E]; Mattingly Dep. 106:3-107:3.)  Mattingly was not even aware of its listing in the KO Book until 2014-2015, and continued to do business with various auctions after 2012.  (Mattingly Dep. 114:23-115:1, 110:10-111:1, 24:7-25, 52:14-24.)

---

[3] In comparison, Plaintiffs' expert opined that Mattingly was overcharged for interest by $961.58.  (Cunningham Report [Ex. 20], at 10.)

**F.      Platinum's Dealings with NextGear and Ultimate Default**

Plaintiff Platinum Motors, Inc. ("Platinum") did business in Chesapeake, Virginia until 2014.  (Platinum Dep. 20:14-22, 35:22-24.)  In May 2011, Platinum executed a demand promissory note and security agreement with DSC, along with various other related contract documentation.  (Platinum Note [Ex. 27].)  The contract documents outlined the fees and interest rate applicable to the floor plan.  (*See generally id.*; Platinum Dep. 85:4-7.)  When Platinum signed the contract with DSC, its owner was fully aware that she would need to pay interest for the benefit of using a floor plan to obtain vehicle inventory.  (Platinum Dep. 61:13-62:4.)  Platinum's owner never asked about or raised the issue of when interest would begin to run.  (*Id.* at 81:14-16, 97:22-25.)  She does not suggest that anyone from DSC made any false representations to her; there was simply no discussion of the issue.  (*Id.* at 95:5-10, 78:23-81:16, 93:3-10, 97:17-25.)

In June and July 2011, Platinum floored approximately 20 vehicles with DSC and was allegedly overcharged $44.55 in interest.  (10/31/2016 Galema Decl. [Ex. 13] ¶¶ 49-50; Platinum Transaction Report [Ex. 13-G]; Cunningham Report [Ex. 20], at 10.)  By using a DSC floor plan at auction, Platinum was able to take a vehicle immediately "[w]ithout putting any cash out."  (Platinum Dep. 54:23-55:9, 97:11-16.)  This allowed it to put the car on its lot for sale, even if the title had not yet come in from the auction.  (*Id.* at 58:16-19.)  While it was doing business with DSC, Platinum regularly accessed information about amounts it owed DSC through its online account; it also received statements by mail or at the local office, and called DSC to find out how much it owed.  (*Id.* at 65:10-24, 67:19-70:9, 72:3-7, 90:19-22.)

Platinum ultimately defaulted on its obligations to DSC in 2011.  In August of that year, some of DSC's collateral could not be located when DSC performed an audit of the vehicles on Platinum's lot.  (NextGear's Resp. to Interrog. 13 [Ex. 1].)  Platinum had sold the cars without

paying DSC for them, in violation of its contract.  (Platinum Dep. 108:12-109:18.)  During that same time period, approximately ten of Platinum's payments were returned for insufficient funds.  (NextGear's Resp. to Interrog. 13 [Ex. 1].)  Although DSC attempted to work with Platinum to address these issues, Platinum did not resolve them, and its account was plainly in default by September 2011.  (*Id.*)  Platinum paid DSC in full for only five of the vehicles it floor planned and admits that it still owes DSC money.  (10/31/2016 Galema Decl. [Ex. 13] ¶ 50; Platinum Transaction Report [Ex. 13-G]; Platinum Dep. 131:15-17.)

DSC filed and served a collection action against Platinum and its owner-guarantor to recover Platinum's debt owed on the floor plan, and on February 12, 2014, the court entered judgment in favor of NextGear and against Platinum and its owner-guarantor for approximately $35,000.  (Complaint, *Dealer Services Corp. v. Platinum Motors, Inc.* [Ex. 13-H]; Certified Judgment, *NextGear Capital, Inc. v. Platinum Motors, Inc.* ("Platinum Judgment") [Ex. 13-I]; 10/31/2016 Galema Decl. [Ex. 13] ¶¶ 52-53.)  Platinum never raised any defense or counterclaim related to DSC's interest charges.  (10/31/2016 Galema Decl. [Ex. 13] ¶ 52.)  Thus far, NextGear has been unsuccessful in its attempts to collect its full judgment against Platinum.  (*Id.* ¶ 55.)

Platinum stopped doing business in 2014.  (Platinum Dep. 35:22-36:5.)  The Virginia State Corporation Commission's records show that Platinum's corporate existence has been terminated.  (*See* Virginia State Corporation Commission, Business Entity Details [Ex. 28]; Platinum Dep. 32:23-33:7.)

## PROCEDURAL HISTORY

Plaintiff Red Barn initially filed suit against NextGear in 2013, asserting claims for breach of contract and unjust enrichment.  [Doc. 1.]  In early 2016, Red Barn amended its complaint to (a) add three additional named Plaintiffs (one of whom later withdrew from the case), (b) add three additional defendants, Cox Enterprises, Inc., Cox Auto, and John Wick,

(c) add class allegations, and (d) add causes of action for violation of RICO, RICO conspiracy, tortious interference, and constructive fraud. [*See* Doc. 117.] The defendants moved to dismiss. The Court dismissed the claims for unjust enrichment, RICO conspiracy, and tortious interference as to all Defendants, and dismissed the claims for breach of contract and constructive fraud as to all Defendants except NextGear. [Doc. 186.]

The Court's Order on Defendants' Motion to Dismiss left no claims remaining against Cox Enterprises, Inc. and only the RICO claim pending against Cox Auto and John Wick. Defendants now move for summary judgment on all remaining claims.

## ARGUMENT AND CITATION OF AUTHORITY

Rule 56 of the Federal Rules of Civil Procedure requires entry of summary judgment if the record shows "there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Summary judgment is thus mandated "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Although the moving party "bears the initial responsibility of informing the district court of the basis for its motion," there is no requirement that it "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id*. at 323. If, after construing "the evidence in the light most favorable to the non-moving party," the court finds that "no reasonable jury could find for the other party based on the evidence in the record," then the moving party is entitled to summary judgment. *Carman v. Tinkes*, 762 F.3d 565, 566 (7th Cir. 2014).

All the facts are now before the Court as factfinder.[4]  Since a trier of fact could not reasonably find in favor of Plaintiffs on the evidence presently before the Court, summary judgment is appropriate.

**I.    NextGear Is Entitled to Summary Judgment on Plaintiffs' Breach of Contract Claim.**

The undisputed evidence demonstrates that, as a matter of law, NextGear did not breach the terms of the Plaintiffs' Notes.  "To prevail on a claim for breach of contract, the plaintiff must prove the existence of a contract, the defendant's breach of that contract, and damages resulting from the breach."  *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012) (affirming summary judgment on breach of contract claim).  Plaintiffs cannot show that DSC or NextGear breached any contracts with them.  Summary judgment as to Plaintiffs' breach of contract claim is therefore appropriate.

A.    The Plaintiffs' Contracts Allow NextGear to Charge Interest as It Did.

Plaintiffs' complaint about when NextGear began to charge interest is without merit.  An analysis of the contract terms demonstrates that, as a matter of law, NextGear did not breach the contract by charging Plaintiffs interest starting from the date of an auction purchase—the point at which Plaintiffs had incurred a Liability.

There can be no breach of any NextGear obligation to Plaintiffs in charging interest from the date of auction, because the contracts at issue do not preclude NextGear from doing so.  The contracts state that interest "shall accrue" on all "outstanding Liabilities" under the Note.  (*E.g.*, Red Barn Note [Ex. 21] § 3(a), NG_003563.)  Importantly, this term of the Note is phrased passively—*i.e.*, it obligates the borrower but does not purport to require anything of NextGear—

---

[4] The Court has granted Defendants' unopposed motion to strike Plaintiffs' jury demand and set the remaining claims for a bench trial in August.  [Doc. 187.]

as a minimum charge for which Plaintiffs were liable.  It does not restrict the parties from taking other actions or doing other business with one another outside the contract.

Liabilities are broadly defined to include all of the following:

any and all Advances, debts, DSC Financed Inventory Liabilities, financial obligations, . . . charges, expenses, attorney fees, costs of collection, covenants, and duties owing, arising, due or payable from Dealer to [NextGear] of any kind or nature, present o[r] future, . . . whether directly or indirectly (including those acquired by assignment), absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising and however acquired.

(*E.g.*, *id.* § 1(y), NG_003562.)

It is undisputed that Plaintiffs were obligated to pay for a vehicle purchased at auction before they could leave with the vehicle.  (Mattingly Dep. 38:10-23; *see also* Red Barn Dep. 61:1-11; Mattingly Dep. 37:13-23, 81:12-25; Platinum Dep. 53:16-21, 55:19-21.)  There is also no dispute that—by the nature of the floor plan and its funding agreements with the auctions— NextGear was obliged to pay an auction from the date of the auction.  (4/26/2017 Galema Decl. [Ex. 14] ¶ 10; Modjeski Decl. [Ex. 16] ¶ 4; Werner Decl. [Ex. 18] ¶ 4.)  Finally, it is undisputed that Plaintiffs had to repay NextGear at or before maturity for agreeing to pay money on their behalf.  (*E.g.*, Red Barn Note [Ex. 21] § 5(e), NG_003565; Red Barn Dep. 72:8-73:10; Mattingly Dep. 46:17-48:1; Platinum Dep. 70:19-72:2.)

The obligation to pay for vehicles purchased at auction was a "financial obligation," "covenant," or "duty" due or owing from Plaintiffs presently or in the future, absolute or contingent, primary or secondary, due or to become due, then existing or after arising—in short, it was a Liability as defined in the Notes.  As such, Plaintiffs promised NextGear to pay interest from the date of auction, while there was no NextGear promise to the contrary.  Since Plaintiffs willingly paid that interest until they defaulted, NextGear has not failed in any promise it made to Plaintiffs.

17

Plaintiffs rely solely on the term "Advance," one of the many types of Liabilities under the Note, but even that term expressly covers NextGear's executory commitment to fund a vehicle purchase prior to the actual transfer of funds.  The floor plan agreement defines "Advance" broadly, as a "*loan or payment* in any amount made pursuant to this Note by [NextGear] to Dealer or on Dealer's behalf to any third party."  (*E.g.*, Red Barn Note [Ex. 21] § 1(a), NG_003561 (emphasis added).)  Although "loan" is not separately defined in the floor plan agreement, its common definition includes "*the creation of debt by the lender's* payment of or *agreement to pay money* to the debtor or *to a third party for the account of the debtor*."  Ind. Code § 24-4.5-3-106(1) (emphasis added); *see also* Black's Law Dictionary.  In other words, an Advance includes not only NextGear's payment of the purchase price for a vehicle, but it also encompasses NextGear's commitment to pay the third-party auction on behalf of a dealer.  Reading "Advance" to mean only "payment," as Plaintiffs do, would improperly render the "loan or" language in the agreed definition meaningless and redundant.  *Bowman v. IBM Corp.*, 853 F. Supp. 2d 766, 770 (S.D. Ind. 2012) ("Additionally, the court should make every effort to avoid an interpretation that renders any words, phrases, or terms ineffective or meaningless."); *cf. Lawson v. Sun Microsys., Inc.*, 791 F.3d 754, 762 (7th Cir. 2015) (Indiana courts prefer interpretation that harmonizes contract provisions).

Thus, whether it is termed an "Advance" or a "Liability"—and it can be both—NextGear's commitment to fund is what triggers the accrual of interest.  That commitment occurred from the date of an auction, because that was the moment at which NextGear was obligated to pay the auction on the Plaintiff's behalf.  The contract therefore contemplates that interest on a directly-financed auction purchase will run from the date of auction.

B.     NextGear's Reading of the Contract Is Commercially Reasonable.

It is fair and commercially reasonable to interpret an "Advance" or "Liability" as taking place on the date of an auction and to charge interest from that date.  At that time, Plaintiffs have received the core benefit of their bargain: a new item of vehicle inventory on credit.

Plaintiffs became obligated to fund their vehicle purchases at auction from the moment of a sale.  *See* U.C.C. § 2-328(2) ("A sale by auction is complete when the auctioneer so announces by the fall of the hammer or in other customary manner.").  Indeed, Plaintiffs acknowledge that they would not be permitted to take a car they purchased without paying for it then, whether by cash, check, or the floor plan financing provided by NextGear.  (Red Barn Dep. 61:1-11 ("you have to make some form of payment to the auction to take the car out"); Mattingly Dep. 38:10-23 ("in all cases, you have to find some way to pay for the car before you take it"), 81:2-82:8; Platinum Dep. 53:16-21 ("you have to pay the auction on the date of the auction"); Modjeski Decl. [Ex. 16] ¶ 6; Werner Decl. [Ex. 18] ¶ 6.)

When Plaintiffs used NextGear's name and credit to cover their obligations to the auction they chose to buy from, NextGear assumed their responsibility to pay the auction, and Plaintiffs incurred a substitute obligation to repay NextGear.  From the moment the car was purchased at auction, Plaintiffs enjoyed the benefit of NextGear's credit—they had the additional item of inventory to sell for a profit and could defer paying cash for it.  (Red Barn Dep. 62:10-19, 66:24-67:21, 68:24-69:6, 71:11-20 ("we didn't have to come out of pocket for the purchase money"), 213:25-214:3; Mattingly Dep. 42:9-15, 46:17-20 ("you don't have to pay cash for it that day"), 153:25-154:3; Platinum Dep. 51:7-55:21, 58:16-19, 59:5-7, 97:11-16 ("you were able to take the car . . . [w]ithout putting any cash out of your own").)  That is the epitome of a loan on which interest typically accrues between commercial parties.  *Cf.* Ind. Code § 24-4.5-3-106(1).

19

While Plaintiffs incurred a benefit on the date of auction, NextGear incurred a risk.  As soon as the hammer fell and a Plaintiff was contractually obliged to buy a vehicle, it became inventory of that Plaintiff subject to NextGear's security interest—*i.e.*, collateral of NextGear—under the Note.  U.C.C. § 9-102(a)(48); Ind. Code § 26-1-9.1-102(48).  (*See also, e.g.*, Red Barn Note [Ex. 21] § 2(a), NG_003563.)  Thus, when a dealer floor plans a vehicle, it benefits from possession for resale from the date of the auction, while NextGear's additional unit of collateral is at risk of being sold without repayment, being damaged (accident, weather, vandalism, etc.), being seized by law enforcement or another creditor, and other depleting events outside NextGear's control.  NextGear's risk exists as of the date of auction, regardless of when money is actually transferred to the auction.  Because NextGear is on the hook from the date of the auction, it is typical (and reasonable) for it to require compensation, in the form of interest and fees, for that risk.  *Cf. Till v. SCS Credit Corp.*, 541 U.S. 465, 474, 477 (2004) (recognizing that one aim of bankruptcy court is ensuring that "debtor's interest payments will adequately compensate all such creditors for the time value of their money and the risk of default").

Any other reading of their contracts would allow Plaintiffs free use of vehicle inventory for the period prior to settlement between NextGear and the auction, while NextGear bore all the risk.  That would be commercially unreasonable.  Plaintiffs' interpretation would require buyers to leave vehicles at auction until title and all other funding logistics were resolved, creating vehicle depreciation and damage risks that benefitted no one—certainly not borrowers like Plaintiffs that want immediate access to the inventory they have bought for resale.  NextGear's reading of the provisions regarding interest is therefore the most commercially reasonable understanding of Plaintiffs' contracts.

C.     Plaintiffs Agreed by Contract That the Amounts They Paid Were Correct.

Given the need for certainty in commercial transactions, the parties agreed that any statement of account furnished by NextGear to Plaintiffs would "constitute a definitive statement of" their "Credit Line and Liabilities as of the date of the statement and shall be binding upon [Plaintiff]" if not challenged by said Plaintiff within 30 days of receipt. (*E.g.*, Red Barn Note [Ex. 21] § 4(k), NG_003564.) Plaintiffs had 24-hour access to their account statements through an online dealer portal offered by NextGear, and in many other forms. (Red Barn Dep. 76:2-77:6; Mattingly Dep. 50:22-52:6, 74:13-24; Platinum Dep. 65:10-24, 67:19-70:9, 72:3-7, 90:19-22.) There is no evidence that any of them objected to their stated interest or other Liabilities in writing under this provision until this lawsuit was filed.

NextGear relied on the 30-day contractual limitations provision, as it was entitled to do, in continuing to loan to Plaintiffs after each 30-day period lapsed. NextGear would not have continued to loan to Plaintiffs for years if past transactions and obligations were not considered liquidated and resolved. (4/26/2017 Galema Decl. [Ex. 14] ¶ 14.) In the very same Notes they now sue under, Plaintiffs agreed to be bound to the amounts they were billed, and they cannot now object several years later. *See, e.g.*, *Rusthoven v. TCF Nat'l Bank*, No. 07-cv-3154 (JRT/JJK), 2009 WL 2171105, at *3 (D. Minn. July 20, 2009) (limiting claims to those occurring within 60 days of when bank transmitted account statement to customer); *Jamison v. First Ga. Bank*, 387 S.E.2d 375, 377 (Ga. App. 1989) ("[A]ppellant's failure to notify appellee within 60 days of his receipt of the November statement reflecting the discrepancy in his balance resulted in the forfeiture of appellant's right to challenge the statement.").

In short, NextGear breached no promise to Plaintiffs in charging interest from the date of auction, Plaintiffs received the benefit of their bargain at the time of the auction, charging interest from the date of auction is commercially reasonable and expected because that is when

21

NextGear began bearing the risk, and the agreed time to object to the accuracy of the charges at issue has long passed.  Because there can be no breach for doing what the contract permits, NextGear is entitled to summary judgment on Plaintiffs' breach of contract claim.

## II.    NextGear Is Entitled to Summary Judgment on Plaintiffs' Constructive Fraud Claim.

Plaintiffs have alleged that NextGear defrauded them by failing to disclose that NextGear would, in some cases, settle up with their auction vendors on floor planned units at some point in time after interest began accruing on a particular advance.  Yet none of them asked about the process before borrowing, each got the cars they bargained for immediately and without paying their own funds by using NextGear credit, and at least two of the Plaintiffs knew of the variable settlement dates and continued to borrow anyway.  Because Plaintiffs cannot prove essential elements of their constructive fraud claim, summary judgment is appropriate.

### A.    The Constructive Fraud Claim Should Be Rejected as Duplicative of the Breach of Contract Claim.

As an initial matter, if the Court finds that the interest issue raised by Plaintiffs is addressed by their contracts, summary judgment should be granted because the constructive fraud claim is "in fact, merely a repackaged version of [a] breach of contract claim." *Tobin v. Ruman*, 819 N.E.2d 78, 86 (Ind. Ct. App. 2004).  Where the source of one party's duty to the other arises from a contract, then tort law should not interfere.  *French-Tex Cleaners, Inc. v. Cafaro Co.*, 893 N.E.2d 1156, 1167 (Ind. Ct. App. 2008).  "A claimant who brings both a breach of contract and a fraud claim must prove that (1) the breaching party committed the separate and independent tort of fraud; and (2) the fraud resulted in injury distinct from that resulting from the breach."  *Tobin*, 819 N.E.2d at 86.  If the tort and injury are not distinct from the breach of contract—as in this case—the tort claim should be dismissed.

22

This Court has dismissed a plaintiff's tort claim as duplicative under very similar factual circumstances. In *Fritzinger v. Angie's List, Inc.*, the Southern District of Indiana dismissed a tort claim, finding that the plaintiff made no allegation that the tort "resulted in an injury different from the injury sustained from the alleged breach of contract." No. 1:12-cv-01118-JMS, 2013 WL 772864, at *3 (S.D. Ind. Feb. 28, 2013). In that case, the plaintiff asserted both breach of contract and deception claims based on the defendant's allegedly charging her more than an agreed-upon membership fee. This Court rejected the deception claims because the plaintiff did not allege that the defendant "committed a separate and independent tort of deception . . . , and that the deception resulted in injury distinct from that resulting from the breach." *Id.*

Plaintiffs assert that they were somehow defrauded because NextGear allegedly did not explain how interest would be calculated under their contracts. As such, the constructive fraud claim is merely a repackaged breach of contract claim and should be dismissed.

B.     Plaintiffs Cannot Prove Each of the Elements of Constructive Fraud.

Even assuming Plaintiffs could repackage their breach of contract claim as a constructive fraud claim, the undisputed evidence is that there was no actionable fraud. A claim for constructive fraud requires a plaintiff to prove five things:

> (i) a duty owing by the party to be charged to the complaining party due to their relationship; (ii) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (iii) reliance thereon by the complaining party; (iv) injury to the complaining party as a proximate result thereof; and (v) the gaining of an advantage by the party to be charged at the expense of the complaining party.

*Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996) (affirming summary judgment on constructive fraud claim). Plaintiffs' constructive fraud claim fails because they cannot prove several elements of their claim.

23

The undisputed evidence demonstrates that Plaintiffs did not rely on any statements or silence of NextGear.  None of the Plaintiffs raised the behind-the-scenes mechanics of NextGear's reimbursement of auctions as a concern before they signed their contracts or began borrowing, and both Red Barn and Mattingly admit that they learned during the course of their relationships with NextGear that in some cases they were paying interest before funding was transferred to the auctions.  (Red Barn Dep. 79:3-81:17, 225:1-20, 182:20-184:23, 186:20-187:7, 217:23-220:10; Mattingly Dep. 59:8-10, 74:25-76:18, 152:4-153:18, 153:25-155:9; Platinum Dep. 78:23-81:16, 97:17-25, 95:5-10.)  Even after that, both continued to do business with NextGear.  Red Barn complained about the interest issue in June 2012, but continued to borrow on over ***200 more vehicles*** for over eight months until it defaulted.  (Red Barn Dep. 183:5-184:23; Red Barn Transaction Report [Ex. 13-B].)  Mattingly's owner claimed to have known that he was being charged interest before NextGear received titles from the auctions, but he too continued to borrow until he defaulted.  (Mattingly Dep. 75:6-76:18, 154:4-155:9.)  Platinum, likewise, has presented no evidence that it ever relied on anything NextGear said or failed to say on the issue.  Plaintiffs cannot, as a matter of law, have relied on NextGear's supposed silence when they actually knew the facts that give rise to their constructive fraud claim.

Moreover, the undisputed evidence of the floor planning process itself demonstrates that Plaintiffs cannot prove materiality, injury, or unfair advantage.  When Plaintiffs used their floor plans, they were able to take a vehicle on the date of auction and immediately offer it for resale as additional inventory without putting any money down.  They could do this because NextGear provided the credit.  At that point, the auction looked to NextGear rather than to the Plaintiffs for payment; NextGear was obligated to provide funding and therefore bore the risk of Plaintiffs' non-payment.  So long as Plaintiffs got their cars and the auction did not look to them for further

payment, exactly when and how NextGear settled with an auction behind the scenes, by agreement with the auction, was not material to the Plaintiffs.  As a matter of law, it did not affect any party's obligations; as a matter of fact, it was so immaterial that two of the Plaintiffs continued to borrow from NextGear after they became aware of it.  For the same reason, Plaintiffs have suffered no injury where the undisputed evidence shows that they got the benefit of their bargain—a vehicle for inventory without a cash outlay.[5]  And, as a matter of law, NextGear gained no unfair advantage from the manner in which it charged interest because it was on the hook to the auction immediately, and therefore incurred risks that were paid for by interest.[6]

To allow Plaintiffs to manufacture a fraud claim out of when NextGear paid auctions would give Plaintiffs an unfair advantage at NextGear's expense—they would be able to take a vehicle from auction (thanks to NextGear's credit) and sell it, without paying anything for that benefit or compensating NextGear for incurring that risk.  Plaintiffs got what they bargained for and did not rely on anything that NextGear said or did not say.  The Court should therefore grant summary judgment on the constructive fraud claim in favor of NextGear.

---

[5] In this way, floor planning is no different than a typical credit card transaction.  A customer gets the benefit of taking the merchandise out of the store immediately based on the guaranteed payment from the credit card company to the store.  The exact date that the credit card company pays the store—based on whatever contract exists between the credit card company and the store—is immaterial to the customer.

[6] Although the Court suggested in its motion to dismiss order that NextGear may have some sort of duty to Plaintiffs, NextGear respectfully submits that the undisputed evidence indicates no such duty existed.  Because Plaintiffs never asked, because it did not affect them, and because the parties were sophisticated commercial parties in an arms-length lending relationship, NextGear could have no duty to tell Plaintiffs when it settled with third-party inventory vendors after a vehicle was floor planned.  In any event, the existence of a duty is immaterial where there is no evidence that would support the existence of any other elements of fraud, either.

### III.    NextGear Is Entitled to Summary Judgment on Plaintiffs' RICO Claim.

Even after months of discovery, during which thousands of pages of documents were exchanged and numerous were depositions taken, Plaintiffs still have no evidence to support their RICO claim.  "To establish a violation of § 1962(c), a plaintiff must prove: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *McLaughlin Equip. Co. v. Servaas*, No. IP98-0127-C-T/K, 2004 WL 1629603, at *37 (S.D. Ind. Feb. 18, 2004) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).  In discovery, Plaintiffs stated that the factual underpinning of their RICO claim was alleged blacklisting.  The asserted basis for the RICO claim does not constitute a predicate act, Plaintiffs have no evidence of any conduct of an enterprise, and Plaintiffs cannot demonstrate proximate cause.

### A.    The Basis for Plaintiffs' RICO Claim Is Not a Racketeering Activity.

Plaintiffs' RICO claim must fail for the simple reason that they have presented no evidence of a predicate act.  In their interrogatory responses, Plaintiffs asserted that the basis for their RICO claim is the Defendants' "blacklisting" of them at auctions: "The Defendants used the auctions which they own, along with their relationships with other auctions, to blacklist Plaintiffs . . . through inclusion in the K.O. book and other means, from participating in auctions where [they] had previously purchased vehicles."  (Red Barn's Supp. & Am. Resp. to Interrog. 12 [Ex. 2]; Mattingly's Supp. & Am. Resps. to Interrogs. 9-12 [Ex. 3]; *see also* Platinum's Supp. & Am. Resps. to Interrogs. 9-12 [Ex. 4].)

First, as this Court has already held in this case, alleged "blacklisting" from auto auctions is not a predicate act that can give rise to RICO liability.  18 U.S.C. § 1961(1); Order on Defs.' Mot. to Dismiss [Doc. 186], at 39.  Second, there is no such thing as a "blacklist."  It is not disputed that the so-called "KO Book" is maintained and controlled by a third party, AIA; that the KO Book is merely AIA's list of dealers it will not insure; that none of the Defendants has

any control over who goes on or comes off that list; and that AIA does not control whether or

how auctions deal with dealers in the KO Book.  (Walton Decl. [Ex. 17] ¶¶ 3, 5-7; 10/31/2016

Galema Decl. [Ex. 13] ¶ 36; McKinney Decl. [Ex. 15] ¶ 4.)  Third, Mattingly has admitted that it

was added to the KO Book by a non-party auction in 2012, not NextGear.  (Mattingly Dep.

106:3-107:14, 110:3-8.)  And fourth, the so-called "blacklist" did not prevent any of the

Plaintiffs from continuing to attend and purchase vehicles at auction.  (Platinum Dep. 133:1-

138:14; Mattingly Dep. 114:23-115:1, 110:10-111:1, 24:7-25, 52:14-24, 28:8-10, 28:24-29:4;

Red Barn Dep. 20:23-21:12, 57:13-25.)  Because Plaintiffs' RICO claim depends entirely on its

"blacklisting" allegation and because such a claim fails as a matter of law and fact, Defendants

are entitled to judgment as a matter of law.[7]

      B.     <u>Plaintiffs Have No Evidence That Any Defendant Conducted a RICO Enterprise.</u>

In addition to the absence of a predicate act, there is simply no evidence in the record that

any of the Defendants conducted a RICO enterprise—in fact, there is no evidence that Cox Auto

or John Wick did anything at all.  Proof of conducting an enterprise is governed by the

"operation or management test" set forth in *Reves v. Ernst & Young,* 507 U.S. 170 (1993).

*Indiana v. Pastrick*, No. 3:04 CV 506, 2008 WL 2626784, at *3 (N.D. Ind. June 26, 2008).

"This test limits liability to defendants who exercise a 'degree of direction' over the enterprise,

which the Court further described as taking '*some* part in directing the enterprise's affairs.'"  *Id.*

(quoting *Reves*, 507 U.S. at 179).

---

[7] To the extent that Plaintiffs assert their RICO claim is based on mail fraud—which should not be permitted, given the representations in their interrogatory responses—Seventh Circuit precedent holds that a mail fraud claim cannot be based on "mere failure to disclose."  *Reynolds v. E. Dyer Dev. Co.*, 882 F.2d 1249, 1252 (7th Cir. 1989).  And indeed, it is not clear how there can be any "fraud" once Plaintiffs knew and accepted how interest was being charged.

One thing is crystal clear: no enterprise could have existed at all prior to 2012. Before then, DSC had no relationship to Cox Auto or to any auction. It is true that John Wick was an employee of DSC prior to 2012, but it is black-letter law that a company and its employee cannot by themselves be an enterprise. *See, e.g.*, *Blackford v. JPMorgan Chase Bank, N.A.*, No. 1:14-cv-01717-JMS, 2015 WL 7017204, at *4-5 (S.D. Ind. Nov. 10, 2015) (acknowledging that firm and employees do not constitute enterprise separate from firm itself).[8]

There is no evidence of an enterprise after 2012, either. Plaintiffs provided no evidence during discovery of any collusion between DSC or NextGear and any auctions, whether owned by Cox Auto or not. (Mattingly Dep. 171:18-172:4; *see also* Wick Decl. [Ex. 19] ¶¶ 3, 5-6; McKinney Decl. [Ex. 15] ¶¶ 6-7; 4/26/2017 Galema Decl. [Ex. 14] ¶ 15.) To the extent that Plaintiffs attempt to rehabilitate their RICO claim based on alleged breaches of contract or constructive frauds related to interest, there is also no evidence that Cox Auto or Mr. Wick directed the manner in which DSC and later NextGear continued to charge interest. (Red Barn Dep. 201:11-205:2; Mattingly Dep. 155:24-156:23, 157:3-6; *see also* Wick Decl. [Ex. 19] ¶¶ 3-5; McKinney Decl. [Ex. 15] ¶¶ 6-7; 4/26/2017 Galema Decl. [Ex. 14] ¶ 15.) Indeed, the Court has dismissed the breach of contract and constructive fraud claims against all of the other alleged participants in the alleged enterprise—Cox Enterprises, Inc., Cox Auto, and Mr. Wick—finding that Plaintiffs failed even to allege that those parties had any contract with or duty to the Plaintiffs. [Doc. 186.]

---

[8] Thus, Platinum's RICO claim is subject to summary judgment for the simple reason that Platinum ceased to do business with DSC before DSC ever had any relationship to Cox Auto or its affiliated auctions—and thus, before any RICO enterprise could have existed. For the same reason, Platinum's RICO claim is barred by the four-year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 156 (1987). There is no evidence that Platinum suffered any blacklisting (or paid any interest charges) after January 8, 2012—four years before Plaintiffs moved to amend their Complaint.

There is simply no evidence that any Defendant played any role in conducting any sort of enterprise.  None of the Plaintiffs could identify any communications among the enterprise, let alone any role each particular Defendant may have had.  (Red Barn Dep. 201:11-205:2; Mattingly Dep. 155:24-156:23, 157:3-6, 171:18-172:4; Platinum Dep. 139:8-142:9; *see also* Second Am. Notice of 30(b)(6) Dep. to Red Barn, Topic 19, Am. Notice of 30(b)(6) Dep. to Mattingly, Topic 18, & Am. Notice of 30(b)(6) Dep. to Platinum, Topic 17 [Ex. 5].)  In fact, some of the Plaintiffs had no idea who the Defendants were or why they were involved in the suit.  (Red Barn (Richardson) Dep. 44:21-46:4; Platinum Dep. 139:8-142:9.)  Defendants are therefore entitled to summary judgment, as Plaintiffs have presented no evidence that any Defendant conducted a RICO enterprise.

       C.      <u>Plaintiffs Cannot Prove the Required Element of Proximate Cause.</u>

Plaintiffs' RICO claim must also fail due to the lack of proximate cause.  "A RICO plaintiff must prove more than mere cause-in-fact; the plaintiff must prove proximate cause." *McLaughlin Equip.*, 2004 WL 1629603, at *39 (citing *Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 268-69 (1992)).  In the context of a claim under § 1962(c), the causation element has two components: transaction causation and loss causation.

Loss causation means "that the misrepresentation must be both an actual and a proximate source of the loss that the plaintiffs suffered."  *Id.* at 40 (quoting *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 170 (2d Cir. 1999)).  To the extent Plaintiffs' claims are based on alleged "blacklisting," they cannot demonstrate loss causation because intervening decisions by AIA and auctions broke the chain of causation.  It was AIA, not Defendants, who determined that Plaintiffs were a credit risk due to previous nonpayments and who reported the same to auctions.

Transaction causation means "that the misrepresentation must have led the plaintiffs to enter into the transactions at issue." *Id.* (quoting *Moore*, 189 F.3d at 169-70).  In other words, to

the extent Plaintiffs' claim is based on wrongful interest charges, Plaintiffs must prove that they only did business with NextGear because NextGear represented that interest would not start running until the date NextGear sent funds to the auction.  There is no evidence of any relevant representation or misrepresentation here.  And even if there had been, Plaintiffs cannot argue they would have declined to contract with NextGear, because the evidence shows that they continued to do business with NextGear even after they were fully aware of how interest was being charged.

Because there is no predicate act, no enterprise, and no proximate cause, Defendants are entitled to summary judgment on Plaintiffs' RICO claim.

## IV.   Defendants Are Entitled to Summary Judgment Based on Several of Their Affirmative Defenses.

Defendants are also entitled to summary judgment because the undisputed evidence shows that Plaintiffs' claims are barred by *res judicata*, setoff, and unclean hands.

### A.   The Claims of Plaintiffs Mattingly and Platinum Are Barred by *Res Judicata*.

Two Plaintiffs' claims are barred by the doctrine of *res judicata*.  Under Indiana law, *res judicata*, or claim preclusion, applies when there has been (1) a judgment (2) on the merits (3) between the same parties and their privies involving (4) the issue which was or might have been determined in the prior litigation.  *See Hensley v. Jasper Police Dep't,* 163 F. Supp. 2d 1006, 1021 (S.D. Ind. 2001) (citing *Leal v. Krajewski*, 803 F.2d 332, 334 (7th Cir. 1986)).

Platinum and Mattingly were previously sued by NextGear after they failed to repay financing extended by NextGear, and NextGear obtained judgments against each of them. (Mattingly Judgment [Ex. 26]; Platinum Judgment [Ex. 13-I].)  Both admit that they in fact owed the money to NextGear, and Mattingly acknowledged contemporaneous knowledge of the lawsuit.  (Mattingly Dep. 124:8-10, 130:25-132:16; Platinum Dep. 131:15-17.)  Under Indiana

30

law, default judgments are "judgment[s] on the merits" for purposes of *res judicata*.
*Eichenberger v. Eichenberger*, 743 N.E.2d 370, 374 (Ind. Ct. App. 2001).  It is therefore
undisputed that the first three elements of *res judicata* are present here.

      The evidence also demonstrates that Plaintiffs' claims against NextGear arising out of
alleged wrongful interest could have been determined in the prior action.  *Weinreb v. Fannie
Mae*, 993 N.E.2d 223, 229 (Ind. Ct. App. 2013).  This fourth *res judicata* factor means that any
affirmative defense or compulsory counterclaim that a party was required to raise in the prior
action will be deemed proven and adjudicated for *res judicata* purposes.  *Stefansson v. Source
One Mortg.*, No. 1:02-cv-00773-LJM, 2004 WL 540921, at *2 (S.D. Ind. Jan. 29, 2004)
(affirmative defense); *Hilliard v. Jacobs*, 927 N.E.2d 393, 402 (Ind. Ct. App. 2010) (compulsory
counterclaims).  Indiana rules define a compulsory counterclaim as one that "arises out of the
transaction or occurrence that is the subject-matter of the opposing party's claim and does not
require for its adjudication the presence of third parties of whom the court cannot acquire
jurisdiction."  Ind. Trial Rule 13(A).

      Since the prior judgments against both Mattingly and Platinum were for recovery of
principal and interest based on loans to them, the defense (or counterclaim) that the money was
not owed because interest had been improperly charged, that they had been defrauded into
entering the contract with NextGear, or that NextGear somehow violated RICO should have been
raised in the prior action.  Having failed to raise those claims in that prior suit, Plaintiffs should
not be permitted to raise them here.

      Plaintiffs have attempted to avoid the *res judicata* defense by asserting fraudulent
concealment, but this argument is unavailing.  "[A] party asserting fraudulent concealment must
establish by a preponderance of the evidence, (1) the wrongdoer had a duty to disclose certain

facts to another, (2) it knowingly failed to do so, and (3) the other justifiably relied upon such non-disclosure to his detriment." *Dow Chem. Co. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 553 N.E.2d 144, 149-50 (Ind. Ct. App. 1990).

As discussed above, Mattingly was well aware while it was doing business with NextGear that NextGear charged interest even before title came in on a vehicle; its owner discussed the issue with NextGear personnel and continued to use NextGear financing. (Mattingly Dep. 74:25-76:18, 152:4-153:18, 153:25-155:9.)  In other words, the allegedly wrongful interest charges *were* ultimately disclosed, Mattingly had actual knowledge of them while doing business with NextGear, and Mattingly did not rely on any non-disclosure by NextGear.  Hence, Mattingly cannot rely on supposed fraudulent concealment to avoid the defense of *res judicata*.

A fraudulent concealment assertion is likewise unavailing as to Platinum, which failed to investigate its claims.  A plaintiff must "exercise due diligence to investigate the claim and attempt to discover the fraud" to invoke the doctrine of fraudulent concealment.  *Autocephalous Greek-Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc.*, 717 F. Supp. 1374, 1387 (S.D. Ind. 1989), *aff'd*, 917 F.2d 278 (7th Cir. 1990).  "If the fraud, although not discovered, ought to have been discovered, and could have been if reasonable diligence had been exercised by the plaintiff, the statute will run from the time discovery ought to have been made." *Guy v. Schuldt*, 138 N.E.2d 891, 896 (Ind. 1956).  In addition, the concealment must be active and intentional; mere silence on the part of NextGear or lack of knowledge on the part of Platinum will be insufficient to invoke the doctrine.  *Ludwig v. Ford Motor Co.*, 510 N.E.2d 691, 697 (Ind. Ct. App. 1987).  Here, there is no evidence that NextGear purposely kept silent regarding how interest was charged; rather, Platinum never asked.  Having failed to investigate

its claims while doing business with NextGear, or after it defaulted, Platinum cannot now claim information that it never sought was fraudulently concealed.

Because the claims in this suit should have been determined in their prior lawsuits against NextGear, Mattingly's and Platinum's claims against NextGear are barred by *res judicata*, and NextGear is entitled to summary judgment against both of them.

B.   The Claims of Plaintiffs Mattingly and Platinum Are Barred by Setoff.

Mattingly and Platinum should also be barred from recovery under the doctrine of setoff. Setoff "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A." *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995) (internal citation omitted); *see Pichon v. Am. Heritage Banco, Inc.*, 983 N.E.2d 589, 601 (Ind. Ct. App. 2013) (recognizing right to set off outstanding debt against any recovery).

In this case, it is not disputed that NextGear holds judgments in the amount of $58,433 against Mattingly and $35,775 against Platinum.  (Mattingly Judgment [Ex. 26]; Platinum Judgment [Ex. 13-I].)  The amounts of these judgments far exceed the amounts these Plaintiffs claim to be owed ($961.58 and $44.55, plus interest, respectively)—in fact, they each owe NextGear more than 10 times what they allege NextGear owes them.  (Cunningham Report [Ex. 20], at 10.)  These Plaintiffs' claims should therefore be dismissed, as they will not be entitled to recover any money against NextGear even if their claims are successful.

C.   The Claims of All Three Plaintiffs Are Barred Due to Their Unclean Hands.

The principle of unclean hands requires that "[o]ne who comes before a court in equity must do so with clean hands."  *Phico Ins. Co. v. Aetna Cas. & Sur. Co. of Am.*, 93 F. Supp. 2d 982, 994 (S.D. Ind. 2000).  "For the doctrine of unclean hands to apply, the party charged with having unclean hands must be guilty of intentional misconduct."  *Id.*  "The 'intentional

misconduct' necessary for application of the doctrine under Indiana law need not rise to conduct of a criminal nature. Rather, . . . the failure to do that which one has an affirmative duty to do satisfies the element of misconduct." *Id.*; *see Lake Cty. Tr. Co. v. Wine*, 704 N.E.2d 1035, 1042 (Ind. Ct. App. 1998) (recovery precluded under doctrine of unclean hands when parties intentionally breached terms of lease). "[T]he wrong that is ordinarily invoked to defeat a claimant by using the unclean hands doctrine must have an immediate and necessary relation to the matter before the court." *Wedgewood Cmty. Ass'n v. Nash*, 781 N.E.2d 1172, 1178 (Ind. Ct. App. 2003).

Here, each of the named Plaintiffs comes before the Court with unclean hands. All three Plaintiffs defaulted on their obligations to NextGear by committing fraud and refusing to pay what they owed, including principal amounts well above any interest allegedly mischarged. (NextGear's Resp. to Interrog. 13 [Ex. 1]; Red Barn Dep. 109:13-16; Mattingly Dep. 89:18-90:1; Platinum Dep. 109:7-18.) Their fraudulent acts included selling vehicles out of trust, false representations to NextGear, and self-dealing.

Mattingly sold NextGear's collateral out of trust and committed fraud by flooring vehicles after it sold them. In other words, Mattingly violated its contract by failing to repay NextGear for vehicles it sold within the time required. It also obtained financing from NextGear by making false representations about the status of the vehicle it was floor planning and by colluding with another dealer to obtain inflated prices for certain vehicles. (Mattingly Dep. 91:15-95:21 (two floor plans, pre-arranged price), 99:6-100:14 (selling out of trust), 182:70-192:25 (pre-arranged price), 206:21-207:15 (selling out of trust); Givens Dep. 156:19-157:9, 168:4-170:17.) And Mattingly was clear that it has no intention of repaying the debt it acknowledges it owes to NextGear. (Mattingly Dep. 132:14-16.)

Red Barn made payments to NextGear that were dishonored.  (Red Barn Dep. 106:19-107:11; NextGear's Resp. to Interrog. 13 [Ex. 1].)  Red Barn also admits to self-dealing from the NextGear collateral by, among other things, using company funds to make payments on the house where its general manager lived.  (Red Barn Dep. 172:5-173:6.)

Platinum, like Mattingly, sold cars out of trust by failing to timely pay for vehicles that it sold.  (Platinum Dep. 108:12-109:2.)  And, as with Red Barn, some of Platinum's payments were dishonored.  (NextGear's Resp. to Interrog. 13 [Ex. 1].)

Having defrauded NextGear and refused to repay amounts they promised by contract to pay, Plaintiffs cannot come before the Court to complain that a small fraction of that amount was incorrectly charged.  All of these wrongful acts by Plaintiffs that caused NextGear to incur losses should preclude Plaintiffs from recovering against Defendants in this case.

## CONCLUSION

The undisputed evidence demonstrates that Plaintiffs should not be entitled to recover as a matter of law: NextGear charged interest in accordance with its contract, Plaintiffs were never defrauded, and there is no evidence to support a RICO claim against any of the Defendants.  For all of the foregoing reasons, the Court should reject Plaintiffs' attempts to use NextGear's credit for free and should grant summary judgment in favor of Defendants Cox Automotive, Inc., NextGear Capital, Inc., and John Wick.

Respectfully submitted, this 26th day of April, 2017.

  *s/ Tracey K. Ledbetter*
David J. Jurkiewicz (18018-53)
Paul D. Vink (23785-32)
BOSE McKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN  46204
(317) 684-5000
(317) 684-5173 fax

djurkiewicz@boselaw.com
pvink@boselaw.com

Jason S. McCarter (*pro hac vice*)
Tracey K. Ledbetter (*pro hac vice*)
EVERSHEDS SUTHERLAND (US) LLP
999 Peachtree Street, NE, Suite 2300
Atlanta, GA 30309-3996
(404) 853-8000
(404) 853-8806 fax
jasonmccarter@eversheds-sutherland.com
traceyledbetter@eversheds-sutherland.com

*Attorneys for Defendants Cox Automotive, Inc.,
NextGear Capital, Inc. f/k/a Dealer Services
Corporation, and John Wick*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been served upon the following counsel of record via the Court's electronic service notification system, this 26th day of April, 2017:

Ryan D. Adams
James M. Garner
Matthew M. Coman
Jacob A. Airey
SHER GARNER CAHILL RICHTER
KLEIN & HILBERT, L.L.C.
radams@shergarner.com
jgarner@shergarner.com
mcoman@shergarner.com
jairey@shergarner.com

Catherine E. Lasky
Kerry A. Murphy
LASKY MURPHY LLC
klasky@laskymurphy.com
kmurphy@laskymurphy.com


Cassie E. Felder
LUGENBUHL, WHEATON, PECK,
RANKIN & HUBBARD
cfelder@lawla.com

Gladstone N. Jones, III
Lynn E. Swanson
JONES, SWANSON, HUDDELL &
GARRISON, LLC
gjones@jonesswanson.com
lswanson@jonesswanson.com


Kathleen A. DeLaney
DELANEY & DELANEY LLC
Kathleen@delaneylaw.net

Lisa Brener
BRENER LAW FIRM, LLC
lbrener@brenerlawfirm.com


_s/ Tracey K. Ledbetter_
Tracey K. Ledbetter