UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

RED BARN MOTORS, INC.,
PLATINUM MOTORS, INC.,
MATTINGLY AUTO SALES, INC.,
YOUNG EXECUTIVE MANAGEMENT &
CONSULTING SERVICES, INC.,
Individually, and on behalf
of other members of the
general public similarly
situated,

      Plaintiffs,          Docket No.
                            1:14-cv-01589-TWP-DKL

  vs.

COX ENTERPRISES, INC.,       Class Action
COX AUTOMOTIVE, INC.,
NEXTGEAR CAPITAL, INC. f/k/a
DEALER SERVICES CORPORATION,
successor by merger with
Manheim Automotive Financial
Services, Inc., and JOHN WICK,

      Defendants.

    The deposition upon oral examination of

**ADAM GALEMA**, a witness produced and sworn before me,

Paula A. Morgan, Notary Public in and for the County

of Hamilton, State of Indiana, taken on the 10th day

of November, 2016, in the offices of Bose, McKinney &

Evans, 111 Monument Circle, Suite 2700, Indianapolis,

Marion County, Indiana, pursuant to the Federal Rules

of Civil Procedure.  This deposition was taken on

behalf of the Plaintiffs in the above-captioned

matter.

           ASSOCIATED REPORTING, INC.
      251 East Ohio Street, Suite 940
       Indianapolis, Indiana 46204
           (317) 631-0940
       www.associated-reporting.com

# EXHIBIT B

1                              <u>APPEARANCES</u>

2

        FOR THE PLAINTIFFS:
3

         Jake Airey
4        Matthew M. Coman
         SHER GARNER CAHILL RICHTER KLEIN & HILBERT
5        909 Poydras Street, Suite 2800
         New Orleans, Louisiana 70112
6
         Kerry A. Murphy (Via teleconference)
7        JONES SWANSON HUDDELL & GARRISON LLC
         601 Poydras Street, Suite 2655
8        New Orleans, Louisiana 70130

9      FOR THE DEFENDANT
       NEXTGEAR CAPITAL
10     F/K/A DEALER SERVICES CORPORATION:

11       Paul D. Vink
         David J. Jurkiewicz
12       BOSE MCKINNEY & EVANS
         111 Monument Circle, Suite 2700
13       Indianapolis, Indiana 46204

14     FOR THE DEFENDANTS:

15       Jason S. McCarter
         SUTHERLAND ASBILL & BRENNAN LLP
16       999 Peachtree Street N.E., Suite 2300
         Atlanta, Georgia 30309
17
       ALSO PRESENT:
18
         Rick Wright - in-house counsel DSC
19

20

21

22

23

24

25

3

1                        INDEX OF EXAMINATION

2                                                              Page
          EXAMINATION   (By Mr. Airey)                          4
3

4

5                          EXHIBIT INDEX

6
          No.    Description                                   Page
7         1      DSC Floorplan Application                      35
                 (NG004840-NG004851)
8
          2      DSC Floorplan Application                      35
9                (NG004868-NG004883)

10        3      DSC Floorplan Application                      35
                 (NG004906-NG004921)
11
          4      DSC Floorplan Application                      35
12               (NG004943-NG004959)

13        5      DSC Floorplan Application                      35
                 (NG004978-NG004995)
14
          6      DSC Floorplan Application                      35
15               (NG005033-NG005052)

16        7      DSC Floorplan Application                      35
                 (NG005060-NG005075)
17
          17     (Previously marked)                            56
18               Receivable Detail Report
                 (RB2178)
19

20

21

22

23

24

25

4

1        A D A M   G A L E M A, the witness herein, having

2        been first duly sworn to tell the truth, the whole

3        truth, and nothing but the truth, was examined and

4        testified as follows:

5        EXAMINATION,

6            QUESTIONS BY MR. AIREY:

7   Q    Good morning, Mr. -- and how do you pronounce your

8        last name?

9   A    Galema.

10  Q    Okay.  My name is Jake Airey, and I represent the

11       plaintiffs in this case, Red Barn Motors case.  Could

12       you state your name for the record.

13  A    Adam Galema.

14  Q    And what's your address?

15  A    4913 Rustling Ridge Court.

16  Q    Have you ever given a deposition before?

17  A    No.

18  Q    Okay.  Basically, I'm going to be asking you

19       questions, and then you'll give me an answer.  If you

20       don't understand my question, please feel free to ask

21       me to rephrase it or you didn't understand it.

22  A    Okay.

23  Q    If you give me an answer, I'm going to assume that

24       you understood my question.  We have the court

25       reporter here who is taking down everything we say,

22

1      guess, or publicly traded-type financial instruments?

2   A  Not publicly traded, no.

3   Q  Privately traded?

4   A  Yeah.

5   Q  Is that the same now as well, too?

6   A  Yes.

7   Q  Okay.  So various companies and individuals would be

8      able to buy a debt package?

9   A  It's a 144A transaction, so only investment companies

10     can participate.

11  Q  I'm going to turn to the affidavit that you at least

12     signed in this case.  Are you familiar with this

13     document?

14         MR. VINK:  Are you going to mark this as an

15     exhibit?

16         MR. AIREY:  I wasn't going to.

17         MR. VINK:  Okay.

18  A  Yes, I'm familiar.

19  Q  Okay.  How did this document come about?  Why were

20     you asked to draft this document?

21  A  I was asked to --

22         MR. VINK:  Before you answer that question, make

23     sure that you don't divulge anything that was

24     communicated to you by counsel related to signing

25     this declaration.  That would be protected by the

1        attorney-client privilege.

2    Q   Right.  And I should have said that before.  I don't

3        want to know anything that they asked you.  And if

4        that's the only reason that you have for why you did

5        it, which wouldn't be surprising, then, you know,

6        that will be your response.  I understand that.

7    A   Well, are you asking why I'm here or why I signed

8        this?

9    Q   How about this.  Do you know why you were chosen to

10       draft this affidavit?

11   A   Yes.

12   Q   Okay.  Why is that?

13   A   Because I have knowledge of how floorplanning works

14       and how the system operates and how we calculate the

15       revenue that we generate.

16   Q   But as far as the individual dealers that are

17       mentioned in this affidavit, like Red Barn and

18       Platinum and Mattingly, did you know about those

19       prior to drafting this affidavit?

20   A   Yes, I've heard of them.

21   Q   Did you have any interaction with or any -- I guess

22       "interaction" is the best word.  Did you have any

23       interaction with their accounts for Red Barn,

24       Mattingly, or Platinum when you were in any of your

25       various positions with DSC?

24

1   A   Direct interaction, no.

2   Q   How about indirect?

3   A   Sure.

4   Q   What would that be?

5   A   It would have been part of the analysis that we do on

6       dealers who default and charge off.

7   Q   But you wouldn't have called up someone at Red Barn

8       and said, hey, what's going on here, why are you

9       defaulting, correct?

10  A   Correct.

11  Q   And same with Mattingly or Platinum?

12  A   Correct.

13  Q   So you may have interaction with their account here

14      in Indiana but not actually with any of these

15      dealers, specifically with themselves, or with those

16      dealers?

17  A   I would not communicate directly with the dealer, no.

18  Q   Now, did you actually physically write every word in

19      this affidavit?

20  A   No.

21  Q   Okay.  Who did?

22  A   It's my understanding our legal team.

23  Q   As far as the exhibits that are attached to this

24      affidavit, did you pick which exhibits to put on this

25      affidavit?

25

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | I'm going to hand you what was marked as Exhibit B to |
| 3 | | your affidavit.  This document has "NextGear Capital" |
| 4 | | written on the top of it. |
| 5 | A | Correct. |
| 6 | Q | Correct?  So it's fair to say that this would have |
| 7 | | been produced after the merger between DSC and |
| 8 | | Manheim and -- with Cox, correct? |
| 9 | A | Correct. |
| 10 | Q | Do you know if this document was produced |
| 11 | | specifically for this litigation? |
| 12 | A | Yes. |
| 13 | Q | It was specifically -- |
| 14 | A | It was. |
| 15 | Q | Okay.  Did you create this Exhibit B? |
| 16 | A | I did not. |
| 17 | Q | Do you know who did? |
| 18 | A | Yes. |
| 19 | Q | Who? |
| 20 | A | Our technology team. |
| 21 | Q | Did you supervise them when they created it? |
| 22 | A | I do not have direct supervision of them. |
| 23 | Q | So you didn't ask them to create this document? |
| 24 | A | Myself directly?  No. |
| 25 | Q | Did you have any input in the information that was |

26

1          put in this document?

2     A    Yes.

3     Q    Okay.  So it's fair to say that you asked them to

4          create a document with these columns on it?

5     A    I did not ask them, but I was involved in reviewing

6          and testing the accuracy.

7     Q    Other than your counsel, who else assisted you in

8          producing Exhibit B?

9     A    I can't recall exactly who was involved in the

10         development of it.  The only other person I can think

11         of is a gentleman, Lucas Hancock.

12    Q    Is he an IT person?

13    A    No.

14    Q    What does he do?

15    A    He's senior director of customer experience.

16    Q    Do you know what he does in that role?

17    A    Yeah.  He manages our call center.

18    Q    Now, prior to the Manheim and DSC merger, had you

19         ever reviewed Manheim Financial Services' promissory

20         notes?

21    A    No.

22    Q    How about any Manheim documents, like security

23         agreements, financial agreements?

24    A    No.  We are competitors.

25    Q    So it's fair to say that the first time you would

27

1    have reviewed those documents would have been in

2    drafting this affidavit?

3        MR. VINK:  Object to the form.  You can answer.

4    Q   Well, let me ask it another way.  When was the first

5    time that you reviewed any documents from Manheim

6    Financial Services, which I'll call MAFS for short.

7    A   Sure.  In this case.  I mean, we did not have any

8    involvement in MAFS documents.

9    Q   Even after the merger you didn't go and look and see

10   what they were doing versus what DSC was doing?

11   A   I did not review a particular legal document of MAFS

12   and compare it to what DSC was doing.

13   Q   Have you done that comparison for this litigation?

14   A   Have I done that?

15   Q   Correct.

16   A   I am not an attorney, so I've not reviewed and, you

17   know, compared every single -- I have not done that.

18   Q   Okay.  So you didn't go through and say what was

19   different between a MAFS document and a NextGear or

20   DSC document?

21   A   No.

22   Q   You said that right now NextGear has about 21,000

23   dealers?

24   A   Correct.

25   Q   Do you know, on a year-by-year basis, approximately

28

1       how many dealers DCS would have had -- I'm sorry, DSC

2       would have had in, let's say, 2007?

3   A   I can't recall exactly.  If I had to estimate, it

4       would be six to eight thousand.

5   Q   How about in 2005?  Would you know then?

6   A   That was the first year of DSC, so --

7   Q   Okay.  How about 2008?

8   A   Roughly the same, six to eight thousand.

9   Q   And would that be the same up until the merger?

10   A   Correct.

11   Q   Okay.  So with the merger you took on all of -- or

12       NextGear was created to take on all of MAFS customers

13       as well as DSC customers under one company?

14   A   Correct.

15   Q   And so did MAFS have more customers than DSC?

16   A   I believe they did, yes.

17   Q   You said six to eight thousand customers per year.

18       Are they the same six to eight thousand customers

19       every year?

20   A   No.

21   Q   What's the turnover rate of customers that would

22       maybe use the floorplan in 2007 versus 2008?

23   A   I can't speak specifically to the turnover rate back

24       then.  As an estimate, we could potentially turn

25       over, back then, maybe a hundred accounts each month.

29

```
 1    Q    When you say "turn over," what do you mean by that?

 2    A    They could leave our relationship voluntarily.  They

 3         can move to another financier, another lender.  They

 4         could also default on their account and be charged

 5         off.

 6    Q    Do you know what the default rate would have been in

 7         2007?

 8    A    I don't know exactly.  You know, it's going to be

 9         somewhere around 5 percent of our dealers.

10    Q    Is that per year or per month?

11    A    It's an annual list.

12    Q    Did that number stay true throughout 2008, 2009,

13         2010?

14    A    I can't speak to that.  I don't have, obviously, the

15         information in front of me.  But it would not have

16         varied significantly other than -- you know, during

17         '08, '09, with the economic downturn, we did

18         experience larger losses.

19    Q    So maybe more than 5 percent in '08, '09?

20    A    Sure.  I think you would find that everywhere.

21    Q    With the six to eight thousand customers that DSC

22         would have had, did those customers also use MAFS as

23         well?

24    A    Some of them could.

25    Q    Do you know, was it common in the industry to have
```

35

1    Q    And what's the date that is entered into the system?

2    A    In that scenario, for a non-auction purchase, it

3         would be the date that we receive that floorplan

4         information, bill of sale, et cetera, from the

5         dealer.

6         (Deposition Exhibits 1 through 7 were marked for

7         identification.)

8    Q    I'll hand you a stack of documents here.  I do have

9         these marked.  I've got these kind of backwards, but

10       that's 7.  I apologize.  The staple came out.  Here's

11       6.  This is 5, 4, 3, 2, 1.

12       You're familiar with the discovery requests that

13       were asked in this case?

14   A    Generally.

15   Q    One of the requests that we asked for were examples

16       of the contracts of the various years that DSC used

17       during the -- for floorplanning.  Exhibit 1 -- let's

18       see.  If we can look back on page -- it's NG004848.

19   A    (The witness complies.)

20   Q    Right above the redaction box it appears to indicate

21       that this is a November 20, 2005, contract?

22   A    Mine says May 20.

23   Q    I'm sorry.  May 20, 2005.  As far as in 2005, to your

24       knowledge, would this be an accurate representation

25       of the contract that DSC used with its dealers?

36

```
 1    A    Yeah, I would have no reason to believe it would not

 2         be.

 3    Q    Now, on -- let's see.  It's the second page of the

 4         document, first page of the promissory note.  Under

 5         1(a) there's a definition of "advance."  Is that the

 6         definition that you were discussing earlier when you

 7         talked about loans?

 8    A    Correct.

 9    Q    Could you read that for me?

10    A    "'Advance' shall mean all loans or payments pursuant

11         to this Note made by DSC to Dealer or on Dealer's

12         behalf to any third party."

13    Q    In your affidavit, on page 2, paragraph 15, that

14         paragraph generally states what you told me earlier,

15         that when NextGear pays an auction direct -- or,

16         sorry.

17             That the date NextGear conveys funds for a

18         vehicle varies by transaction type and source,

19         correct?  First paragraph of that statement.

20    A    Yeah, that statement is true.

21    Q    Okay.  It's also true that for the auction

22         vehicles -- for dealers that buy cars at auction,

23         NextGear charges interest to the dealer on the day

24         that the dealer purchases the car from the auction,

25         correct?
```

37

1    A    Generally, yes.

2    Q    You said "generally."  When would they not?

3    A    It could be, you know, if a dealer buys a car at

4         auction and then three months later floorplans it

5         with us, we're not going to backdate interest to the

6         date that it was sold or purchased.

7    Q    I'm sorry.  Could you explain that example a little

8         bit more?

9    A    Sure.  I mean, a dealer buys a car, and he could pay

10        with cash.

11   Q    Okay.

12   A    And then two, three, four months later he might

13        choose to put it on his floorplan to free up that

14        cash.

15   Q    So if a dealer buys a car at auction using the

16        NextGear or DSC floorplan, then, at that time, the

17        date that the dealer purchases that vehicle is the

18        date that interest begins to run?

19   A    Correct.

20   Q    Are you aware of anywhere in the contract where it

21        makes a distinction between vehicles that are bought

22        at an auction and vehicles that are bought at -- or

23        vehicles that are owned by the dealer?

24             MR. VINK:  Object to the form.  You can answer.

25   A    I don't know.

38

1   Q   With the -- let's see.  It's Exhibit B to your

2       affidavit that I handed you.  I think I gave it to

3       you earlier.

4   A   Yes.  Sorry.

5   Q   Okay.  In the far left column there's -- -- on the

6       first page, about halfway down, it says "Total for"?

7   A   Correct.

8   Q   Do you know what that "Total for" means?

9   A   That is the total of the transactions that were

10      funded on that particular date.

11  Q   So that's the day that NextGear funded the

12      transaction to the auction or buyer in this case?

13  A   It is the date that NextGear sent cash to the

14      auction.

15  Q   Now, the day that NextGear sends cash to the auction

16      is, in many cases, days and even weeks later than the

17      actual day that the dealer buys from the auction,

18      correct?

19  A   Sure.

20  Q   And in some instances a dealer can purchase the

21      vehicle at auction, sell that vehicle, send funds to

22      NextGear before NextGear actually pays the auction as

23      well, correct?

24  A   That is possible.

25  Q   In the affidavit you indicate that there's a dealer

| | | |
|---|---|---|
| 1 | | that has a $40 million line of credit with NextGear? |
| 2 | A | Yes. |
| 3 | Q | Who is that? |
| 4 | A | We have -- I don't know who exactly has the $40 |
| 5 | | million line of credit.  That's just a range given. |
| 6 | Q | That's just something you looked on a computer system |
| 7 | | somewhere to see what the max range was, without |
| 8 | | actually knowing who it was? |
| 9 | A | Yeah.  I mean, it's all information within our |
| 10 | | system. |
| 11 | Q | How many dealers have a $40 million line of credit, |
| 12 | | do you know? |
| 13 | A | We only have a couple that are in that -- at that |
| 14 | | level. |
| 15 | Q | Do you know what the average credit limit, credit |
| 16 | | line is for a dealer? |
| 17 | A | Yeah.  The mathematical average is approximately |
| 18 | | $300,000 today. |
| 19 | Q | Has that gone up or down in the years since you've |
| 20 | | been working at NextGear? |
| 21 | A | It has increased. |
| 22 | Q | You don't know what the dealers' names are that have |
| 23 | | a $40 million line of credit? |
| 24 | | MR. VINK:  Object to form.  You can answer. |
| 25 | A | I mean, I can give you a couple of names of our |

40

```
 1        largest accounts.
 2   Q    Yeah.
 3   A    I don't know that they're exactly $40 million.
 4   Q    Okay.
 5   A    Hertz Corporation, Wholesale, Inc.  Those would be
 6        probably two of our bigger ones.
 7   Q    Does NextGear do any business with, like, the
 8        Enterprise rental car?
 9   A    No.
10   Q    Do you know what Hertz uses its line for?
11   A    It's my understanding it's for their car sales
12        division.  It's a very short time frame that they're
13        on floorplan.
14   Q    Do you know how many dealers would have been doing
15        business with NextGear from 2005 through 2012 but
16        would not have been doing business in 2013?
17   A    I could provide a guess.  If you -- complete estimate
18        here, but dealers who may have been terminated,
19        right?  Is that what you're getting at, dealers
20        who --
21   Q    Who no longer do business with DSC, for whatever
22        reason.  I know you said there was about a 5 percent
23        turnover earlier.
24   A    Yeah.  It could be -- again, I don't have the
25        information in front of me.  But a pure guess for
```

41

1        that time frame might be, I don't know, four to five

2        thousand dealers.  Pure guess.

3   Q   That's something you could find out through the

4        system, though?

5   A   Yeah.

6   Q   And NextGear would have a record of the relationship

7        between a particular dealer and NextGear/DSC for each

8        transaction that that dealer has done with NextGear

9        or DSC?

10  A   Correct.  We have a history of all the transactional

11       volume for a particular dealer, as a dealer with DSC

12       and NextGear.

13  Q   And it would be similar to what was Exhibit B to your

14       affidavit?

15  A   Correct.  That's where -- this report was created

16       using that data.

17       MR. AIREY:  I'm sorry.  I'm trying to narrow this

18       down for you.  It's good I'm pausing.  We've gone

19       over some of this.

20       Actually, if we could take a five-minute break.

21       (A recess was taken.)

22  Q   With the affidavit that you drafted, on page 3, at

23       paragraphs 24, 25, and 26 -- well, let's go 24 and

24       25.  You say many dealers in the proposed class

25       defaulted on their obligations to NextGear, correct?

1    Q    How about the contracts that the salespeople would

2         have used?  Did you have any role in the integration

3         of those contracts between MAFS and DSC?

4    A    No.  That was handled through our legal team.

5    Q    Before, you stated that there was a mutual benefit

6         between the auto auction agency and NextGear.  Could

7         you explain what you mean by "mutual benefit"?

8    A    Sure.  So we provide information to them, you know,

9         such as a defaulted dealer, that they can -- you

10        know, they choose to do with it what they want.  I

11        mean, they can, you know, enter that dealer into the

12        KO book, if they choose.

13            We also receive data back from them of the

14        dealers that are listed in the KO book, and that

15        information is used to make credit decisions at

16        NextGear.

17   Q    With the reporting that you do now on a monthly

18        basis, are you receiving reports from the people that

19        you supervise and then putting them into a different

20        form to give to the persons you report to?

21   A    Which reports?

22   Q    Like a monthly report.  Would you have a profit and

23        loss statement?

24   A    Financial statements?  Those are -- financial

25        statements are generated out of our accounting

52

1    software, so there's no manipulation, if you will, of

2    those.

3  Q  I assume you're familiar with the term "float"?

4  A  Yes.

5  Q  And in this case the delay between the time that

6    NextGear or DSC would fund an auction for a car

7    versus the time that the dealer's being charged

8    interest would be the float, correct?

9  A  No, I would not call it a float.

10 Q  What would you call that?

11 A  I would call that the period between the floorplan

12   date and the date that the auction was funded.

13 Q  And during that time frame DSC or NextGear hadn't

14   actually sent any money to the auction at all,

15   correct?

16     MR. VINK:  Object to the form.  You can answer.

17 A  Can you rephrase that?

18 Q  From the time that the dealer purchased the vehicle

19   from an auction and NextGear sends the money to that

20   auction, there's a delay period in some instances,

21   correct?

22 A  In some instances, yes, there can be a delay.

23 Q  Does NextGear keep track of the time between the day

24   that a transaction is funded versus the day that it

25   was first requested?

53

1   A   The information resides in the system.  It is not a

2       metric or a data point that we review frequently.

3   Q   But you do review that sometimes, correct?

4   A   I've seen data around it, yeah.

5   Q   What was the purpose for that data?

6   A   Just to investigate, make sure that vehicle was still

7       a valid floorplan.

8   Q   So the system could generate that information for

9       each transaction, correct?

10  A   Yeah, those data points reside in the system for

11      every transaction.  And those are the same data

12      points shown on this report.

13  Q   Let's make it easier.  Let's walk through one of the

14      transactions here.  If we go to page NGR000012, which

15      is page 2 of Exhibit B that was attached to your

16      affidavit, if we go to the column starting underneath

17      where it says "Total for - 8/17/2011," it's stock

18      number 13.  It says "2000 Saturn S-Series SL2."  Walk

19      me through that transaction.

20  A   Sure.  I mean, based on the facts here, dealer would

21      have purchased the vehicle at Oak View Auto Auction

22      on August 5, 2011.  That auction would have

23      transmitted that flooring information to DSC at the

24      time, on the same date, August 5, 2011, and -- you

25      know, under the terms there noted to the right.  And

54

```
 1          then that third date there is completed date,

 2          August 17, 2011.

 3               Based on that information there, you know, it's

 4          easy to reason that we had an agreement with the

 5          auction to fund that vehicle either on notice of

 6          title or on possession of title.  And that's why

 7          the -- sorry.  Let me get my dates right.  It's the

 8          one underneath it.  So, yeah, that's why on the 18th

 9          of August the funding occurred.

10    Q     When you say "the funding occurred," that's the day

11          that NextGear sent funds to Oak View Auction in this

12          case?

13    A     That's correct.

14    Q     But you're not familiar with the terms or contents of

15          the Oak View Auction agreement between NextGear

16          and -- in this case it was DSC and -- well, between

17          Oak View Auction and DSC?

18    A     I don't have that document in front of me, no.  I can

19          make a reasonable --

20    Q     If we go to NGR000014 -- it's page 4 -- toward the

21          bottom of the page it's stock number 58.  It's a 1997

22          Ford Explorer.

23    A     Yes.

24    Q     Can you walk me through that transaction as well?

25    A     Sure.  Dealer would have purchased that vehicle at
```

55

1        Oak View Auto Auction on August 26, 2011.  That

2        auction would have sent that information to DSC on

3        the same date, August 26.  And that dealer -- the

4        dealer, ultimately, paid that vehicle off, completed

5        it on September 12, 2011.  And, again, same thing.

6        They would have -- the auction received -- or we sent

7        funding to the auction on October 7, 2011.

8  Q   And that August 26 date, the flooring date, that's

9        the day that DSC would have been charging, started

10       charging, Red Barn Motors interest?

11  A   Yes, that's correct.  That's the day they started

12       utilizing their floorplan for that vehicle.

13  Q   Now, this document, which is Exhibit B that was

14       created for this litigation, is this something also

15       that a dealer would be able to create?

16  A   This exact form?  No.  This is created specifically

17       for this case.  The dealer does have access to

18       reporting that's very similar, that has all the same

19       information on it.

20  Q   It would have the "Total for" date on it?

21  A   I believe it would, yes.

22  Q   Is there any indication on here of what "Total for"

23       means?

24  A   On this report it does not specifically say, but we

25       understand that to be the case, that it's the total

1        amount funded on that particular day.  I believe the

2        reporting available to the dealer is a little more

3        descriptive.

4    Q   Have you seen more descriptive reporting that's

5        available to the dealer than this?

6    A   To the extent that this -- this report has a lot of

7        information on it.  Again, I can't say exactly if

8        every single column on here is on the report that

9        they see, but, you know, to my -- yeah, I would say

10       that all those are -- in one form or another, all

11       that information is on the reporting, the Receivable

12       Detail Report that the dealer has access to.

13           MR. AIREY:  I don't have additional copies of

14       this.  This was an exhibit that we used yesterday,

15       Exhibit 17.

16           MR. VINK:  Okay.

17   Q   You stated that dealers can get the Receivable Detail

18       Report.  Is this one of the reports that you were

19       discussing?

20   A   This is a Receivable Detail Report, yes.

21   Q   Okay.  That's something that the dealer would have?

22   A   Yes.

23   Q   Get?  Okay.  Can you show me where the "Total for"

24       column is on that?

25   A   On this report there's not a "Total for" amount.

57

1    Q    Okay.  Is there a day that shows when NextGear paid

2         the auction on that report?

3    A    Yes.  There is a column labeled "Days."  That is the

4         number of days that that vehicle has been on

5         floorplan.  You can run that back to the floordate

6         and determine kind of when that floorplan started.

7         Sorry.  Did you -- restate your question.

8    Q    What I was asking is, does that document, anywhere in

9         that document, show when NextGear or DSC --

10   A    Sorry.

11   Q    -- paid the auction?

12   A    No, it does not.  I don't know why that would be

13        important to them.

14            MR. AIREY:  Can we take a little break?  We're

15        pretty much toward the end.

16            MR. VINK:  Okay.

17            (A recess was taken.)

18   Q    Earlier you mentioned Lucas Hancock, I believe?

19   A    Yes.

20   Q    And he is the director of customer experience now?

21   A    Correct.

22   Q    Okay.  Who was in that role before him?

23   A    I couldn't tell you.  It's a new role as well, within

24        the last couple of years.

25   Q    Was there somebody that did a similar role prior to

58

1        this role being created?

2  A   During this time frame there would not have been

3        someone in that position.

4  Q   There was still a -- was there a call center during

5        the time frame of the Red Barn transactions?

6  A   During a portion of that time frame.

7  Q   When did the call center start?

8  A   I believe it was around 2010, 2011.

9  Q   What did the dealers do prior to 2010, 2011 when they

10        wanted to contact DSC?

11  A   They contacted their account executive.

12  Q   And then he would go to a regional director?  He

13        would report to a regional director then?

14  A   Yeah, he reported to a regional director.  Whether or

15        not he went to that director with every single

16        issue --

17  Q   And then who would the regional directors report to?

18  A   During this time I believe we had maybe a couple of

19        vice presidents of operations.  I don't recall

20        exactly the org structure back then.

21  Q   Do you know the names of any of those people?

22  A   I'm trying to think.  I'm not sure who was in those

23        positions back then.

24  Q   Are those people still with the company now, just in

25        different roles?