| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE SOUTHERN DISTRICT OF INDIANA |
| 3 | INDIANAPOLIS DIVISION |

RED BARN MOTORS, INC.,        CASE NO.
PLATINUM MOTORS, INC.,        1:14-cv-1589-TWP-
MATTINGLY AUTO SALES,         DKL
INC., AND YOUNG EXECUTIVE
MANAGEMENT & CONSULTING
SERVICES, INC.,
individually and on
behalf of other members
of the general public
similarly situated,

VERSUS

COX ENTERPRISES, INC.,
COX AUTOMOTIVE, INC.,
NEXTGEAR CAPITAL, INC.
F/K/A DEALER SERVICES
CORPORATION, successor by
merger with Manheim
Automotive Financial
Services, Inc., and JOHN
WICK


        Corporate Deposition of RED BAN MOTORS,

INC., through its representative DEVON LONDON, 25852

Plantation Avenue, Denham Springs, Louisiana 70726,

taken in the offices of Lugenbuhl, Wheaton, Peck,

Rankin & Hubbard, 9311 Bluebonnet Boulevard, Suite

A, Baton Rouge, Louisiana on Tuesday, October 25,

2016, commencing at 9:07 a.m.



**EXHIBIT 6**

DEVON LONDON                                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                                          17

1        Q.    Okay.  So since 2011, you've been general

2     sales manager?

3        A.    Yes.

4        Q.    Okay.  Any other positions at Red Barn?

5        A.    No.  I mean, you can say general sales

6     manager, general manager.  It's the same thing over

7     a small used car operation.

8        Q.    Okay.  Where is Red Barn?

9        A.    At 26007 LA Highway 16, Denham Springs,

10    Louisiana 70726.

11       Q.    And has that been true since you've been

12    there?

13       A.    Yes.

14       Q.    Okay.  So as general sales manager,

15    general manager, how would you describe your -- your

16    responsibilities at Red Barn?

17       A.    My responsibility was to oversee the

18    operations, oversee the employees, report back to

19    Mr. Richardson, the owner, you know, activities that

20    transpired and fulfill his desires to operate the

21    company.

22       Q.    Okay.  And so it's not just focused on

23    sales, you're basically running the business?

24       A.    Pretty much.

25       Q.    Okay.  And tell me who Mr. Richardson is?



```
 1        A.    He's my father-in-law.

 2        Q.    Okay.  It's Don Richardson, Donald?

 3        A.    Don Richardson.

 4        Q.    Is it Donald or Don?

 5        A.    Donald --

 6        Q.    Okay.

 7        A.    -- Donald B.

 8        Q.    And he's an owner of Red Barn?

 9        A.    Yes.

10        Q.    Is he the only owner?

11        A.    I believe he is an owner with his wife.

12   I may be incorrect on that.

13        Q.    And her name is?

14        A.    Barbara Richardson.

15        Q.    Are you still his son-in-law?

16        A.    Yes.

17        Q.    When did you marry into the family?

18        A.    I married into the family in 2003.

19        Q.    Okay.  That's when you were still in Las

20   Vegas?

21        A.    Yes.

22        Q.    Okay.  As general manager, do you report

23   to Mr. Richardson on a day-to-day basis or is he

24   more of an absentee owner?

25        A.    No.  I report to him, I wouldn't say
```



1   every single day, but on a very regular basis.

2       Q.    Okay.

3            MR. COMAN:

4                   And let me lodge an objection to the

5        term "absentee owner."

6                   Please, if you could give me a

7        chance to think.  I'm not exactly the fastest

8        person in the world.

9   BY MR. McCARTER:

10      Q.    And high level, what is the business of

11  Red Barn?

12      A.    What was the question?

13      Q.    What is the business of Red Barn, how

14  does it make money?

15      A.    Basically, it purchases used cars and

16  resells those used cars for a profit.

17      Q.    Does it sell any related products like --

18  like you did at Findlay, gap insurance, warranties,

19  does it do any financing?

20      A.    We did for a short period of time, but

21  for the most part, no.

22      Q.    What period of time did you sell those

23  other products?

24      A.    That was probably sometime in the -- mid

25  2011.



 1       Q.    Okay.  At a high level, was -- was

 2    Findlay Automotive in the same business of buying

 3    and selling cars for profit?

 4       A.    Yes.

 5       Q.    Where did Findlay gets its cars generally

 6    to resell?

 7       A.    At automobile auctions or dealer

 8    trade-ins.

 9       Q.    Anywhere else you can think of, purchases

10    directly from other dealers, on-line sales, anything

11    like that?

12       A.    There would be purchases from other

13    dealers, very infrequently.  Also, very infrequently

14    -- very infrequently, a customer would come in and

15    want to just sell their car outright.

16       Q.    Okay.  And is that generally true of Red

17    Barn as well, where -- where does Red Barn get its

18    cars?

19       A.    Red Barn basically gets its cars from the

20    auto auctions, trade-ins, and occasionally from a

21    customer that would come in and want to just sell

22    the car outright.

23       Q.    What -- what auto auctions does Red Barn

24    buy and sell from now?

25       A.    As of right now, Oak View Auto Auction.



1      Q.     Where is that?

2      A.     That is on Flannery Road in Baton Rouge.

3      Q.     Okay.  Anywhere else?

4      A.     Long Beach Auto Auction.

5      Q.     Is that in Mississippi?

6      A.     That's in Mississippi, Long Beach,

7   Mississippi.

8      Q.     Any other auction?

9      A.     And ABC Baton Rouge.

10     Q.     Are you a buyer and seller at all of

11  those or just a buyer?

12     A.     Buyer and seller.

13     Q.     And I'm sorry to keep jumping back and

14  forth, but I keep thinking of new questions.  With

15  Findlay, where did they -- what auctions did they

16  generally go to?

17     A.     Findlay would go to -- I don't remember

18  the names of them.  There was one large Manheim

19  auction and two smaller independent auctions.

20     Q.     In Nevada?

21     A.     In Nevada.

22     Q.     All right.  So back to Red Barn, auto

23  auctions, trade-ins, and sometimes customers would

24  sell a car outright to you?

25     A.     Correct.



 1        Q.    Do you ever buy from other dealers

 2    directly?

 3        A.    I don't believe we have, no.

 4        Q.    Okay.  Do you ever buy from other on-line

 5    sources like eBay Motors or Smart Auction or

 6    anything like that?

 7        A.    We have bought several vehicles on eBay.

 8        Q.    Okay.  Recently, in the last year or two?

 9        A.    No.  That was -- that was earlier in the

10    business development.

11        Q.    Just a rough time frame?

12        A.    2011.

13        Q.    Okay.  So is Red Barn a licensed used car

14    dealer?

15        A.    Yes, with the Louisiana Used Motor

16    Vehicle Commission.

17        Q.    Are you only licensed in used cars or can

18    you sell -- buy and sell new cars, too?

19        A.    We are only licensed in used cars.  The

20    license is all inclusive of like RVs and motorcycles

21    and things like that, trailers, but we don't really

22    get into that.

23        Q.    Okay.

24        A.    We stick with used cars and trucks.

25        Q.    And you have the -- just the one lot in



 1    Denham Springs?

 2        A.    Yes.

 3        Q.    How many cars do you have on your lot at

 4    this time?

 5        A.    At this time, there are approximately 37

 6    --

 7        Q.    Okay.

 8        A.    -- 37 to 40.

 9        Q.    Do you know when Red Barn first opened?

10        A.    I don't know the exact date.

11        Q.    Okay.  I think I'll have some records in

12    a minute that show 2010 was the corporate

13    organization.  Does that sound like the rough

14    starting time?

15        A.    That sounds correct.

16        Q.    In fact, let me just go ahead and show

17    you.

18            MR. McCARTER:

19                 We'll call this Exhibit #2.

20    BY MR. McCARTER:

21        Q.    And I'll represent to you this is just a

22    printout from the Louisiana Secretary of State

23    website related to Red Barn Motors, Inc.  I know you

24    may not have seen this record before, but you can

25    see in the middle that it shows a filing date of



1   February 26, 2010.  Do you see that?

2       A.    Uh-huh.

3       Q.    Do you have any reason to think that

4   wasn't roughly the date of organization for the

5   company?

6       A.    That was probably the date of

7   organization.

8       Q.    Okay.  And it shows -- on the second page

9   of that exhibit, it shows Donald Richardson as

10  president and Barbara Richardson as

11  secretary-treasurer.  Is there any reason to think

12  that's not accurate?

13      A.    No.

14      Q.    Okay.  And is the company still in good

15  standing, to your knowledge?

16           MR. COMAN:

17                Objection as to vagueness.  Good

18        standing as to the Secretary of State or good

19        standing as --

20           MR. McCARTER:

21                If you don't mind, let's just do

22        basic objections like the federal rules

23        instead of directing his answers.

24           MR. COMAN:

25                Sure.



```
 1              MR. McCARTER:

 2                    You can object to form.

 3              MR. COMAN:

 4                    Let me make that objection to form.

 5              MR. McCARTER:

 6                    Okay.

 7    BY MR. McCARTER:

 8         Q.    So do you have any reason to think you're

 9    not still a -- an organized company that's paid its

10    dues with the Louisiana Secretary of State?

11         A.    No.

12         Q.    Thank you.  And the location has been the

13    same lot in Denham Springs the whole time?

14         A.    Correct.

15         Q.    Okay.  Do you know -- does -- does Red

16    Barn Motors, Inc., file its own tax returns, to your

17    knowledge?

18         A.    It does with the help of a firm called

19    Greg Kennedy.

20         Q.    Greg Kennedy?

21         A.    Kennedy, K-E-N-N-E-D-Y.

22         Q.    That's a CPA or something?

23         A.    CPA.

24         Q.    Okay.  Do you think that's been true

25    since 2011?
```



DEVON LONDON                                      October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                           26

 1        A.    Yes.

 2        Q.    Are you involved in helping prepare those

 3   returns?

 4        A.    No, I am not.

 5        Q.    Okay.  Do you know if Red Barn Motors,

 6   Inc., has used any other trade names since 2010?

 7        A.    Trade names, the only trade name would be

 8   -- and this is, again, not -- I -- I don't -- I may

 9   not understand the question, but as a buy here/pay

10   here, there is a d/b/a as Red Barn Auto Finance.

11        Q.    Okay.  And that's the only d/b/a you can

12   think of?

13        A.    Correct.

14              MR. McCARTER:

15                   I'm going to show you what I'm going

16        to mark as Exhibit #3.

17   BY MR. McCARTER:

18        Q.    And I'll represent to you again these are

19   further printouts from the Louisiana Secretary of

20   State's website and it -- it does seem to show that

21   Red Barn Auto Finance is a registered trade name

22   that you mentioned.  Do you see that on the first

23   page?

24        A.    Yes.

25        Q.    Okay.  And it shows it as -- as still a



1          So since that question focused on

2     the consumer, number 7, obviously, does not.

3          MR. McCARTER:

4          Okay.  Number 7 says, "Any financing

5     arrangements Red Barn has had with any

6     financing company, auction or third party" --

7     which a consumer would be -- "since

8     December 3, 2007, including the transaction

9     history and current status of that

10    arrangement."

11         And then 22 and 23 speak to Red

12    Barn's damages to the extent trade-ins are an

13    integral part of their sales and their

14    business, then how they handle and price

15    trade-ins will affect what their damages are

16    and what they've done to mitigate those

17    damages.

18         MR. COMAN:

19         I've lodged my objection.

20         You can answer, if you know.

21         THE WITNESS:

22         Okay.  Can you repeat the question?

23         MR. McCARTER:

24         Sure.

25    BY MR. McCARTER:



1    Q.    At a high -- I just want to know, at a

2    high level, how do you handle trade-ins?  How do you

3    price them, and how do you work them into your

4    retail deals?

5    A.    At high level, there is a -- there is not

6    a high level of trade-ins.

7    Q.    Okay.

8    A.    There is a very low level of trade-ins.

9    I would say we may get one to two trade-ins a month.

10   We would value those vehicles based off of NADA,

11   Kelley Blue Book, MMR, and the condition of the

12   vehicle.

13   Q.    And then do you take that off the net

14   price of the car you're selling?  Do you buy them

15   outright, or do you handle it some other way?

16   A.    We show it as a trade credit on the

17   purchase agreement.  Which then, in turn, in the

18   state of Louisiana, they don't end up paying taxes

19   twice.

20   Q.    And then, if they have a lien

21   outstanding, you have to pay off the lienholder to

22   get the title?

23   A.    Correct.

24   Q.    Do you commonly turn around and try to

25   retail those, or do you take them to auction, or



1    both?

2        A.    Both.

3        Q.    All right.  Let's talk about auto

4    auctions.

5              You said your -- Red Barn is currently or

6    recently dealing at Oak View, ABC Baton Rouge and --

7    remind me of the third?

8        A.    Long Beach.

9        Q.    Long Beach.  Have you dealt at any other

10   auctions, that you can recall, in the last five

11   years?

12       A.    We have dealt with Manheim Lafayette and

13   Manheim New Orleans.

14       Q.    At a high level, is the process of

15   bidding on and buying cars the same across all five

16   of those auctions?

17       A.    Can you repeat the question?

18       Q.    So I'm just -- I want to talk to you

19   about the auction purchase process.

20       A.    Okay.

21       Q.    So I'm saying, is there a major

22   difference in the way that works at those five

23   auctions?

24       A.    No.

25       Q.    Okay.  And so please correct me if this



 1   is wrong.  I am just trying to summarize to move

 2   this more quickly.

 3            But you basically identify a car that you

 4   are interested in.  You bid on it along with other

 5   dealers, if they are interested.  And if you have

 6   the high bid, you win the car?

 7            MR. COMAN:

 8                 Objection as to form.

 9                 You can answer.

10            THE WITNESS:

11                 Yes.

12   BY MR. McCARTER:

13      Q.    Okay.  And say you're the winning bidder

14   on a car at these auctions.

15            Then what happens next with that car?

16   How do you take the car back to your lot?

17      A.    Basically, it depends on the auction.  At

18   ABC Baton Rouge, they have just recently allowed us

19   to write checks for the vehicle.

20      Q.    So by that you mean Red Barn's business

21   checks?

22      A.    Correct.

23      Q.    Okay.  And when did that -- when did they

24   recently begin to allow that again?

25      A.    Probably within the last six months.



1      Q.    Before that, what did they allow?

2      A.    Before that, we were cash only.

3      Q.    Cash?

4      A.    Cash, cashier's check.

5      Q.    Certified check, same thing?

6      A.    Cashier's check.

7      Q.    Okay.

8      A.    I would have to go to the bank and get a

9    cashier's check.

10     Q.    Okay.  What about Oak View?  How do you

11   acquire a car there?

12     A.    Oak View, I have to pay cash or certified

13   funds.

14     Q.    Still to this day?

15     A.    Still to this day.

16     Q.    Okay.  And what about Long Beach?

17     A.    Long Beach is cash or certified funds.

18   And they require us to put up a thousand-dollar

19   deposit.

20     Q.    That -- is that a standing deposit that

21   you've paid, and it just sits there?

22     A.    Yes.

23     Q.    Okay.

24     A.    You get it back at the end of auction if

25   there's no if bids.  But to be able to participate



1    in the auction, we have to front the thousand

2    dollars.

3         Q.    Does it get applied to your purchases, or

4    do you literally get a check back?

5         A.    We take the money back.  Because we get a

6    cashier's check for the amount of the vehicles we

7    purchased.

8         Q.    Okay.  And just -- so, typically, you go

9    in with a bunch of cashier checks in hand, or do you

10   go to a bank nearby and get what you need?  Or how

11   does that work?

12        A.    I go to a bank nearby and get what we

13   need.

14        Q.    And has that changed over time?  Were you

15   previously able to write business checks at those

16   auctions?

17        A.    Yes.

18        Q.    And when did that change?

19        A.    That changed after we were listed in the

20   KO book.

21        Q.    When was that?

22        A.    Sometime around March to April of 2013.

23        Q.    And what is your understanding of what

24   the KO book is?

25        A.    My understanding is it is a list of



DEVON LONDON                                          October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                              60

 1  dealers that have had adverse relationships with

 2  floorplan companies, auction houses, what have you,

 3  that tracks those dealers and basically sets the

 4  parameters as to how you can -- can or cannot buy

 5  cars.

 6      Q.    Do you have a sense of who keeps that

 7  list?

 8      A.    I do not know.

 9      Q.    And so you're -- but you're still able to

10  deal at Oak View, Long Beach and ABC.

11          So what is your sense of the change?

12      A.    Well, number one, we can't use checks.

13      Q.    Okay.

14      A.    And, number two, we have to use -- you

15  know, we have to put up a deposit to be able to

16  purchase.

17      Q.    Okay.  All right.  We'll come back to the

18  KO book.

19          And so when you were dealing at Manheim

20  Lafayette and Manheim New Orleans, how would you pay

21  for cars there?

22      A.    We would, I believe, generally floorplan

23  them off.

24      Q.    With DSC or others?

25      A.    DSC or AFC.



1        Q.    All right.  But is it fair to say you

2   have to make some form of payment to the auction to

3   take the car out?

4        A.    That is correct.

5        Q.    And one way to do that is cash?

6        A.    Correct.

7        Q.    One way to do that is cashier's checks?

8        A.    Yes.

9        Q.    One way to do that is to designate a

10  prearranged floorplaner?

11       A.    Yes.

12       Q.    Okay.

13             MR. COMAN:

14                  And if I could -- I'm sorry to

15        interrupt.

16                  I would like to lodge an objection

17        as to form as to which auction.

18             MR. McCARTER:

19                  Okay.

20  BY MR. McCARTER:

21       Q.    And at least at some auctions, in some

22  cases, you have been able to pay with business

23  checks?

24       A.    One auction.

25       Q.    Okay.  But prior to going in the KO book,



1  you could write business checks at any of those

2  auctions?

3      A.    No.  Prior to going -- oh, yes.  Prior to

4  going into the KO book, we could write business

5  checks at any of those auctions.

6      Q.    Okay.  Did you use DSC floorplan credit

7  at all five of those auctions, or just the Manheim

8  auctions?

9      A.    At all five, I believe.

10     Q.    Okay.  All right.  So when you make some

11 form of payment at the auction, do you get some

12 paperwork?  I mean, how do you get the car out of

13 the auction?

14     A.    You get a auction slip.  You also get a

15 gate release, and that release allows you to take

16 the vehicle off the lot.

17     Q.    Once you take it off the lot, can you

18 begin selling it?

19     A.    Yes.

20     Q.    Do you always do that from your Red Barn

21 Motors lot, or do you sometimes sell from other

22 places?

23     A.    No, every -- all sales are done from Red

24 Barn Motors' lot.

25     Q.    Is the title to the vehicle always



1   available when you buy it at auction?

2        A.    No.

3        Q.    When would it not be?

4        A.    When it has not been provided to the

5   auction by the dealership that is representing it or

6   the company that is representing it.

7        Q.    And are those called TA or title absence

8   sales?

9        A.    I don't know the terminology, but.

10       Q.    That's what Mr. Mattingly, one of the

11   other plaintiffs, told me.

12       A.    Okay.

13       Q.    He suggested that they were called "title

14   absent."

15       A.    Okay.

16             MR. COMAN:

17                   I'm going to object.

18   BY MR. McCARTER:

19       Q.    I am not asking if you agree with that,

20   but have you heard the term the "title absent"

21   before?

22       A.    No.

23             MR. COMAN:

24                   I'm going to object to the form.

25                   Again, please allow me a small bit



Case 1:14-cv-01589-TWP-DLP   Document 197-6   Filed 04/26/17   Page 22 of 121 PageID #: 3437

DEVON LONDON                                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                                            64

```
 1        of time.
 2   BY MR. McCARTER:
 3        Q.    But it's not uncommon for the title to
 4   not be there at the time of the auction sale?
 5        A.    That is correct.
 6        Q.    Okay.  Have you ever sold a car at
 7   auction without the title?
 8        A.    Yes.
 9        Q.    Okay.  And then you eventually provide it
10   later?
11        A.    Yes.
12        Q.    And when do you get paid by the auction,
13   as a seller?
14        A.    When do we get paid by the auction?
15   You're talking about cars that I sold at auction?
16        Q.    Correct.
17        A.    When we produce the title.
18        Q.    Okay.  Do you ever retail a car without
19   the title present?
20        A.    Yes.
21        Q.    In what circumstances would you do that?
22        A.    Circumstances where somebody is
23   interested in purchasing a vehicle and the title
24   isn't available.
25        Q.    Like, perhaps you are still waiting for
```


800.211.DEPO (3376)
EsquireSolutions.com

1    it from the auction?

2        A.    Or from the floorplan company.

3        Q.    Okay.  Do you have any floorplaner now at

4    Red Barn?

5        A.    No.

6        Q.    Okay.  Do you have any other, sort of,

7    commercial credit or financing?

8        A.    No.

9        Q.    Has that been true since the bankruptcy

10   in the 2013 time frame?

11       A.    Correct, yes.

12       Q.    Okay.  Do you keep some sort of file or

13   deal jacket on the cars you buy and sell?

14       A.    Yes.

15       Q.    I understand there may be some record in

16   your DMS software on each vehicle; is that correct?

17       A.    Correct.

18       Q.    But is there a physical file apart from

19   that?

20       A.    Yes.

21       Q.    Okay.  And what do you -- do you have a

22   name for that?  Do you call it a deal jacket or

23   something?

24       A.    Deal jacket.

25       Q.    Okay.  How far back do you keep your deal



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                          66

1   jackets?

2       A.   How are you -- like, how far back do we

3   keep them from when we --

4       Q.   I mean how far back in time do you have

5   deal jackets?

6       A.   We had them until -- from the beginning

7   of time until the flood.

8       Q.   Okay.  So they've been destroyed in the

9   flood?

10      A.   Yes.

11      Q.   Every one?

12      A.   Not all of them, no.

13      Q.   Okay.  How -- is there -- are there some

14  years that were destroyed and some not, or is it

15  random?

16      A.   There are some years that were destroyed,

17  some not.  I don't know which ones.  I haven't gone

18  through and, you know, tabulated which ones were and

19  which ones weren't.

20      Q.   Okay.  And, at this point in time, are

21  you expecting to re-open after the flood damage is

22  repaired?

23      A.   Yes.

24      Q.   Okay.  All right.  So if you bought a car

25  at auction when you had a DSC floorplan, what was



1   the process at auction?  How would you pay for the

2   car with the floorplan?

3       A.    I would tell the counter clerk to

4   floorplan the vehicle on whichever floorplan I

5   chose.  You know, DSC or AFC.

6       Q.    And is it your understanding that DSC

7   stands for Dealer Services Corporation?

8       A.    Yes.

9       Q.    And is it your understanding that AFC

10  stands for Automotive Finance Corporation?

11      A.    Yes.

12      Q.    Okay.  And when you would tell the clerk

13  to put it on your floorplan, what happened next,

14  from your perspective?

15          MR. COMAN:

16              Objection as to form.

17              You can answer it.

18          THE WITNESS:

19              They would give us a gate release on

20       the vehicle, and we would be able to take

21       possession of the vehicle.

22  BY MR. McCARTER:

23      Q.    And if you don't know, it's fine.

24          But do you know whether they checked your

25  credit availability in some way or would they have



DEVON LONDON                                              October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                                    68

1   that in hand already?

2       A.    I know occasionally they called Stuart to

3   check credit availability on a couple of occasions.

4       Q.    And who's Stuart?

5       A.    Stuart LaBauve.  He was our account

6   representative.

7       Q.    For DSC?

8       A.    For DSC.

9       Q.    But sometimes you wouldn't see that

10  happen, they would just put it on your floorplan?

11          MR. COMAN:

12              Objection as to form.

13              You can answer, if you know.

14  BY MR. McCARTER:

15      Q.    You said sometimes they called Stuart and

16  checked availability.  But that sounds like

17  sometimes they did not?

18      A.    I don't know if they did or did not in

19  those instances.

20      Q.    Okay.  Do you have any insight as to how

21  the auction knew how much credit you had available

22  on your DSC line?

23      A.    No.

24      Q.    Okay.  And if you put a car on your DSC

25  line, did you get a check for that car, or did



 1   some -- did DSC settle up with the auction?

 2              MR. COMAN:

 3                   Objection as to form.

 4                   You can answer.

 5              THE WITNESS:

 6                   DSC paid the auction.

 7   BY MR. McCARTER:

 8       Q.    Do you recall ever putting a non-auction

 9   car on your DSC line?

10       A.    A non-DSC car?

11       Q.    No.  A non-auction car.

12       A.    A non-auction car?

13       Q.    Yes.

14       A.    There may have been -- there may have

15   been a handful of instances, but I don't recall.

16       Q.    Okay.  Was the process the same?  You

17   just call somebody and say, put it on the line?

18       A.    I believe, in those instances -- I think

19   Stuart would have to come and pick up the title.

20       Q.    Okay.  Do you recall whether you had to

21   provide a Bill of Sale or some proof of purchase?

22       A.    We had -- yeah.  We had to show how we --

23   how much we paid for the vehicle.

24       Q.    Do you recall whether they -- DSC --

25       A.    And the reason I'm saying I don't know is



1  because we also -- I know we did it with AFC, but

2  I'm not positive if it was done with both companies.

3      Q.    Okay.  With auction purchases, did DSC

4  always finance the auction amount?

5      A.    Yes.

6      Q.    Okay.  And with those cars that were not

7  purchased at auction, did they always finance the

8  amount you paid for it, or was there more of a

9  varying in price?

10     A.    Rephrase the question.

11     Q.    Okay.  I -- so you would -- presumably,

12 you would provide a title or a Bill of Sale.

13          Did they always finance the Bill of Sale

14 amount, or did they sometimes finance less?

15     A.    No, they always financed the Bill of Sale

16 amount.

17     Q.    Even on non-auction cars?

18     A.    Correct.

19     Q.    Okay.  And what was the benefit to Red

20 Barn of using a DSC floorplan at auction?

21          MR. COMAN:

22              Objection to the form.

23              If you understand the question --

24          THE WITNESS:

25              Okay.



 1           MR. COMAN:

 2                -- you can answer it.  If you don't

 3       understand the question, don't guess at it.

 4       If you would like to ask him to rephrase it,

 5       you can certainly do so.

 6           THE WITNESS:

 7                Please rephrase it.

 8           MR. McCARTER:

 9                Okay.

10   BY MR. McCARTER:

11       Q.    So we talked about other forms of payment

12   you can use at auction, cash, cashier's check, that

13   sort of thing.  So why would you use the DSC

14   floorplan at auction instead?

15       A.    Basically, the relationship and the

16   convenience.

17       Q.    Was it helpful not to have to come out of

18   pocket for the purchase money?

19       A.    Well, in essence, we didn't have to come

20   out of pocket for the purchase money.

21       Q.    If you used a floorplan?

22       A.    If -- if -- if you use a floorplan or if

23   you write a check.

24       Q.    Okay.  So if you write a check, you don't

25   have to have the money in the bank to cover it?



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                          72

1        A.    No, you have the money in the bank --

2        Q.    Okay.

3        A.    -- obviously.  But they hold the title --

4    I mean they hold the check until the title comes in.

5        Q.    Okay.  And sometimes the title is there,

6    and sometimes it's not, correct?

7        A.    Correct.

8        Q.    But with the DSC floorplan, presumably

9    you get some time to pay after you put the car on

10   the floorplan?

11       A.    With the DSC floorplan, yes.

12       Q.    Okay.  Typically, how much time would you

13   get to pay if you put a car on a DSC floorplan?

14       A.    I believe there were three curtailments.

15   I think it was 120 days.

16       Q.    Okay.  If you sold a car, did you have to

17   pay sooner?

18       A.    Yes.

19       Q.    Do you remember the timing of that, if

20   you sold a car, how long that you had to pay?

21       A.    I was told 48 hours.

22       Q.    Okay.  And if you didn't sell a car

23   within 60 days, you can re-floor it and keep it

24   longer?

25       A.    Yes.



DEVON LONDON                                           October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                              73

```
 1        Q.    Okay.  And then, after that, how much
 2    longer could you keep it?  And you said 120 days,
 3    but it was 60 days and then another 30 and then
 4    another 30; is that right?
 5        A.    I believe so.
 6        Q.    Okay.  And did you have an understanding
 7    that you would have to pay -- if you put a car on a
 8    DSC floorplan, then you would have to repay that
 9    principal to DSC?
10        A.    Absolutely.
11        Q.    Okay.  And did you have an understanding
12    that you would have to pay some interest and fees
13    beyond that principal?
14        A.    If it was floored, yes.
15        Q.    Okay.  Did you have an understanding that
16    DSC had a security interest or some other rights in
17    the vehicle until they were paid?
18            MR. COMAN:
19                Objection to the extent -- let me
20        just object to form.
21                If you understand his question --
22            THE WITNESS:
23                I -- I don't.
24            MR. COMAN:
25                Okay.
```



1   BY MR. McCARTER:

2       Q.    Did you -- did -- when you floored a car

3   with DSC, did DSC have any rights to the car if they

4   didn't get paid?

5       A.    Yes.

6       Q.    Okay.  And what's your understanding of

7   what that -- their rights were?

8       A.    Their rights were to take the vehicle,

9   you know, and/or charge penalties and late fees.

10      Q.    Okay.  And do you have a sense of whether

11  their interest was limited to the particular

12  financed vehicle, or may -- or did it extend to

13  other property of Red Barn Motors?

14          MR. COMAN:

15              Objection to the form to the extent

16      it calls for a legal conclusion.

17              If you understand his question, you

18      can answer it.

19          THE WITNESS:

20              I believe that it extended to other

21      property of Red Barn.

22  BY MR. McCARTER:

23      Q.    Like what?  And I am asking about your

24  understanding.  I am not asking you to quote the

25  legal documents.



 1              But what was your understanding of DSC's

 2      right if there was a payment default?

 3         A.    My understanding was there was a personal

 4      guaranty.  So Don Richardson would be on the hook

 5      for any payment default.  And you would have rights

 6      to the vehicles that you had floored.

 7         Q.    All right.  And so when you put a vehicle

 8      on the DSC floorplan, how did you know when payment

 9      was due on that vehicle?

10              MR. COMAN:

11                   I'm going -- let me just object to

12           the form on vagueness.

13                   If you understand --

14              THE WITNESS:

15                   Yes, again, can you rephrase it?

16              MR. McCARTER:

17                   Sure.

18      BY MR. McCARTER:

19         Q.    So we talked before that you would have

20      to pay a vehicle off within a certain amount of time

21      if you sold the vehicle, right?

22         A.    Correct.

23         Q.    Okay.  But then, if you didn't, you had

24      60 days where you could roll it over further,

25      correct?



 1        A.    Correct.

 2        Q.    Okay.  How did you keep track of when the

 3   60 days ran?

 4        A.    We ran a report, daily, that gave us a

 5   breakdown of all the -- my office manager ran a

 6   report, but --

 7        Q.    And what did she run that report from?

 8             MR. COMAN:

 9                  I'm sorry.  Could you allow

10        Mr. London -- did you have anything further to

11        add?

12             THE WITNESS:

13                  It would just tell when, in

14        chronological order or in date order, payments

15        were due, curtailments were due, principal

16        payments were due.

17   BY MR. McCARTER:

18        Q.    Was that report specific to DSC, or was

19   it for any car you owned?  Or something else?

20        A.    No, that report was specific to DSC.

21        Q.    Okay.  And how did you create that

22   report?

23        A.    That report was created on DSC's website.

24        Q.    That's discoverdsc.com?

25        A.    Yes.



1    Q.    And you ran that daily?

2    A.    Yes.

3    Q.    And that -- besides telling you when

4  payment was due, it would also tell you how much was

5  due on each vehicle?

6    A.    Yes.

7    Q.    Were -- was Red Barn Motors ever involved

8  in collateral audits with DSC?  Does that mean

9  anything to you, that term?

10    A.    Collateral audits, they -- where somebody

11  would come out and inspect all of the vehicles and

12  make sure they're accounted for --

13    Q.    Right.

14    A.    -- is that a collateral audit?

15    Q.    That's what I had in mind.

16    A.    Yes.

17    Q.    And you were involved in those?

18    A.    I was involved.  The used car managers

19  were involved.

20    Q.    Let's step back a second.

21         Roughly what period of time were you

22  involved with DSC -- did you have a DSC floorplan?

23    A.    From 2011 to 2013.

24    Q.    Okay.  And do you have any recollection

25  of how often the collateral audits would be during





1   that period?

2        A.     Every 30 to 45 days.

3        Q.     And is your recollection that AFC would

4   do the same thing?

5        A.     Yes.

6        Q.     Did you work with any other floorplaners

7   when you were at Findlay?

8        A.     Not directly, no.

9        Q.     Okay.  All right.  Were you involved in

10  applying for Red Barn's DSC line of credit?

11       A.     Involved in applying -- Don Richardson

12  applied for the line of credit.

13       Q.     Okay.

14       A.     To the extent that I was involved, is I

15  told Don what Stuart had told me and what the

16  benefits of the line of credit would, you know, do

17  for the business.  And then Don made his decision

18  based off of that.

19       Q.     Okay.  And did DSC request certain

20  information from the dealership, and did you help

21  provide any of that?

22       A.     I know there was some information

23  requested, but I would have just turned that over to

24  the office manager and told the -- told them to

25  produce it.



1      Q.    And that was Sharon Roach, at the time?

2      A.    I believe so.

3      Q.    Let's step back to that.

4            You said, what Stuart had told you about

5      the benefits of the line.

6            Do you -- what do you recall about the

7      timing of that conversation or conversations?  Like,

8      when did you talk to Stuart in terms of getting the

9      line set up?

10     A.    It was in -- I think somewhere around May

11     to June of 2011.

12     Q.    And what do you recall was said in those

13     conversations?

14     A.    I recall he -- when soliciting us, he

15     told us -- he told me that the interest -- one thing

16     that sticks out in my mind was that the interest

17     rate was 4 percent, which it turned out not to be.

18     He told us -- told me the benefits of -- you know,

19     the advantages of having a floorplan and the amounts

20     that you could apply for and, you know, basically

21     asked if I was the one that had the ability to enter

22     into the agreement.  And I told him no, and that's

23     when the appointment was set up with Don Richardson.

24     Q.    Okay.  What do you recall, if anything,

25     that he said about the benefits of having a



 1   floorplan?

 2        A.    I don't.

 3        Q.    And you -- do you have any records at Red

 4   Barn that would provide clarity on what he said?

 5        A.    No.

 6        Q.    Okay.  And you said the interest rate

 7   turned out not to be 4 percent.

 8              What's your recollection of what it

 9   turned out to be?

10        A.    I could never figure that out.

11        Q.    But somehow you know it wasn't 4 percent?

12        A.    Correct.

13        Q.    You couldn't figure out, so how do you

14   know it wasn't 4 percent?

15        A.    Because in looking at the calculations

16   and the interest charged, it was much higher than a

17   4 percent figure.

18        Q.    Okay.  And did he say anything else about

19   interest?  For example, how long -- when it would

20   start accruing or anything like that?

21        A.    I don't recall.

22        Q.    Do you have any records at Red Barn

23   Motors that would improve your recollection on that

24   point?

25        A.    Just the contract.



1    Q.    So your recollection is that, at some

2    point, the deal with DSC got reduced to contract,

3    right?

4    A.    Yes.

5    Q.    Were you involved in reviewing and

6    signing those?

7    A.    I viewed it.  I did not sign it.

8    Q.    Did you review them before Mr. Richardson

9    signed and give him your input?

10   A.    Yes.

11   Q.    Okay.  And what do you recall was said

12   during that discussion?

13   A.    Just the benefit of having the

14   availability to have a credit line that would allow

15   us to, you know, increase sales volume.  And that's

16   basically the gist of it.  Just the benefits of

17   having the floorplan.

18   Q.    Okay.  So after reviewing the contracts,

19   you basically conveyed to Mr. Richardson that you

20   thought it made sense to move forward with DSC?

21   A.    Yes.

22   Q.    Do you recall whether Red Barn had those

23   contracts reviewed by counsel?

24   A.    They did not.

25   Q.    Other than yourself and Mr. Richardson,



```
 1    do you know if anybody else reviewed the contracts
 2    pre-signing?
 3        A.    No one.
 4        Q.    Do you recall any discussion with
 5    Mr. LaBauve or anybody else at DSC about your right
 6    to consult with counsel?
 7        A.    I do not recall.
 8        Q.    Okay.
 9        A.    I don't remember that at all.
10        Q.    Okay.  I am going to show you what we are
11    going to call Exhibit #4.  All right.
12              MR. McCARTER:
13                   And this document is NextGear004545
14        through 4549.  Or, I am sorry, NG.  Excuse me.
15        Let me restate the Bates numbers.  It's
16        NG004545 through 4550.
17    BY MR. McCARTER:
18        Q.    You can take as much time as you want
19    with it, but I'll call your attention to the
20    specific questions.
21              So, to be fair to you, this looks like a
22    NextGear internal -- or an DSC internal document
23    that you may never have seen before.
24              Have you seen this document before?
25        A.    No.
```



```
 1        Q.    Okay.  It suggests --

 2              MR. COMAN:

 3                   Let me just lodge an objection.

 4        Hold on, please.  Let me just lodge an

 5        objection.  As Mr. London has stated that he

 6        has never seen this, and based on your

 7        additional representation that this is an

 8        internal DSC document, any questions,

 9        therefore, following that, would lack any

10        foundation, and we would lodge an objection.

11              MR. McCARTER:

12                   Okay.  Fine.  But I'm not asking him

13        to authenticate the document.  I want to ask

14        him about specific information in the

15        document.

16   BY MR. McCARTER:

17        Q.    So it suggests, on the first page, a DSC

18   start date of July 28, 2011.

19              And do you recall whether that was the

20   DSC start date for Red Barn, or not?

21        A.    I don't know if that was the exact date.

22        Q.    Okay.  Does it seem roughly correct?

23        A.    Roughly.

24        Q.    Okay.  At the bottom, do you see there is

25   an account executive recommendation?  And
```



DEVON LONDON                                         October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                              84

1    recognizing you didn't prepare this document, it

2    is -- it says, in that last sentence, "They do

3    prefer using DSC over AFC and would like to increase

4    their line with us for tax time coming up so they

5    can stock as much inventory as possible and continue

6    to grow and be profitable."

7              Do you see that language?

8        A.    Yes.

9        Q.    Do you recall having any discussions like

10   that or related to that point with Stuart or anybody

11   else at DSC?

12       A.    I don't recall that.

13       Q.    Okay.  And this document is, at least

14   dated on its face, September 26, 2012.

15             Do you recall being involved in any kind

16   of a request for a line increase or discussions of a

17   line increase with DSC around that time?

18       A.    What do you mean "a line increase"?

19       Q.    Okay.  So this is -- this looks like --

20   you know, it's roughly a year and a couple of months

21   after you started with DSC.

22       A.    Okay.

23       Q.    Do you remember asking for more credit or

24   a bigger line of credit with DSC around that time?

25       A.    DSC would -- I don't know if it was DSC



1    or AFC, but they would give an additional $100,000

2    worth of credit at tax time or near tax time to

3    acquire more cars.

4        Q.    And do you -- is that something Red Barn

5    would have been interested in around that time?

6        A.    It is something -- we utilized it.

7        Q.    Okay.  So did you actually get extra

8    credit from DSC -- or an extra, you know, line of

9    credit from DSC around tax time?

10       A.    Yes.

11       Q.    Okay.

12       A.    Again, I'm -- as long as I'm not confused

13   that it was AFC and not DSC.

14       Q.    Okay.

15       A.    Because --

16       Q.    And tax time is April 15th each year?  Is

17   that what you mean by tax time?

18       A.    No.  Tax time begins, generally, at the

19   end of February and goes through April.  You know,

20   mid April, I would say.

21       Q.    Okay.

22       A.    That's when the bulk of the early

23   filers --

24       Q.    If you'll turn to page 4548.  It's about

25   four pages back.  Do you see that?  This mentions



 1   auctions at which -- you know, the author of this is

 2   suggesting Red Barn did business.  And it says, "Oak

 3   View Louisiana, First Choice, Manheim and Total

 4   Resources, Long Beach, Mississippi Auto Auction."

 5            Do you see that?

 6       A.    Yes, I do.

 7       Q.    Do you -- would that have been accurate

 8   in 2012?

 9       A.    Yes.

10       Q.    So do you still do business at Louisiana

11   First Choice?

12       A.    No.

13       Q.    Okay.  When did you stop doing business

14   with them?

15       A.    We stopped doing business with them in

16   2013.

17       Q.    Around the time of the bankruptcy?

18       A.    Yes.

19       Q.    And what's the reason you stopped doing

20   business with them?

21       A.    For one, I was told that we were not

22   welcome at the auction.  And for two, there was a

23   situation where there were some vehicles that

24   belonged to Red Barn that were seized by First

25   Choice Auto Auction, when we delivered them to sell



1  them, that, effectively, was directed by DSC.

2      Q.    Okay.  So the first reason, that you were

3  not welcome, was there any more said about that?

4      A.    No.  Just that we were no longer welcome

5  to attend the auction.

6      Q.    Who told you that?

7      A.    It was the general manager.  I don't know

8  his name.  The gentleman right under John Poteet.

9      Q.    Do you remember the timing of that

10 discussion?

11     A.    The timing of that discussion was after

12 my confrontation to try to get the vehicles back.

13     Q.    Just ballpark, was that spring of 2013,

14 or some other time?

15     A.    That was, probably, April of 2013, I'm

16 guessing.

17     Q.    Okay.  And you haven't done business

18 there since?

19     A.    No.

20     Q.    Have you attempted to go back or request

21 reinstatement?

22     A.    Not since -- not since.

23     Q.    Okay.  And it also mentions Total

24 Resources.

25          Did you do business at a Total Resources



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                          88

1  auction?

2      A.    That was Manheim Lafayette.

3      Q.    Okay.  At the Total Resources auction,

4  were you buying or selling salvage units or just

5  whole-car units or what?

6      A.    Just whole-car units.

7      Q.    Okay.

8      A.    I did not attend a salvage sale.

9      Q.    All right.  And then this document also,

10 in the next question, suggests that Red Barn may use

11 billboards, displays on lot, newspaper ads, auto

12 websites, eBay, Craigslist and Referral Spiffs as

13 marketing tools.

14          Do you see that language?

15     A.    Yes.

16     Q.    Do you -- is -- was that true in 2012?

17     A.    That was true in 2012.

18     Q.    Is it still true, that -- you know, just

19 prior to August of 2016?

20     A.    Billboards, no.  Displays on lots,

21 obviously the cars are displayed on the lot.

22 Newspaper ads, yes.  Auto websites -- our DMS system

23 updates to auto websites, so, yes.  eBay, we have

24 not used.  Craig's List, we have not -- we have

25 used.  And Referral Spiffs, we did not use.



1     Q.    Which auto site -- websites does your DMS

2   system update to?

3     A.    I don't know that.

4     Q.    Okay.  It also suggests your website at

5   the time was www.redbarnmotorsla.com.

6          Do you see that language?

7     A.    Yes.

8     Q.    Was that your website at the time?

9     A.    I'm not sure.

10     Q.    Is that your website now?

11     A.    No.  It's www.redbarnmotors.net.

12     Q.    Okay.  And then this document also

13   suggests -- in the next question, it talked about

14   additional services offered to customers and income

15   streams.  And it mentions warranties, limited BHPH,

16   gap insurance, finance reserve, mechanic shop

17   retail, vehicle registration, doc fees, prep fees,

18   temp tag fees.

19          Do you see that language?

20     A.    Doc, in -- in where?  Right here?

21     Q.    Yes.

22     A.    Doc fees, prep fees, temp tag fees.

23   Uh-huh.

24     Q.    Okay.  We talked about some of this

25   earlier, but was that accurate in 2012?  Did you



1  have income from each of those sources?

2       A.    I don't believe we were doing mechanic

3  shop retail.

4       Q.    Are the rest accurate, as of 2012?

5       A.    Vehicle registration, doc fees, prep

6  fees, temp tag fees.  Yes.

7       Q.    Do you have any sense of what that term

8  "finance reserve" means?

9       A.    That is a term for a referral fee that we

10  get from the lender, which is a flat fee, for

11  procuring a customer for their business.

12       Q.    Okay.  And that would be in those

13  bank-loan situations that we talked about earlier?

14       A.    Correct.

15       Q.    Okay.  Just high level, how -- what's the

16  size of that fee, and how is it priced?

17       A.    It depends on the bank itself.  We -- at

18  that time, we were doing the majority of our

19  business with Southwest Finance.  And they paid

20  3 percent of the payment financed.

21       Q.    And we talked about some of this earlier,

22  but which of these sources of income did -- does Red

23  Barn no longer have as of, you know, pre-flood this

24  year?

25       A.    Gap insurance, mechanic shop retail,



1    warranties, vehicle registration.  There is a doc

2    fee and a temp tag fee.

3        Q.    And so you --

4        A.    There are no prep fees.

5        Q.    I'm sorry, what was the last part?

6        A.    No prep fees.

7        Q.    Okay.  So you no longer register vehicles

8    for your consumers?

9        A.    It's done through a Denham Springs

10   notary.

11       Q.    Do you collect their fee and pass it

12   through, or --

13       A.    Yes.

14       Q.    Okay.  No markup?

15       A.    I don't think so, no.

16       Q.    Okay.  If you go to page 4549, it's the

17   next page, it suggests some of the consumer lenders

18   associated with Red Barn may have been Southwest

19   Finance, which you mentioned; Pelican Federal Credit

20   Union, which you've mentioned.  It also mentions CPS

21   and Credit Plan of Hammond?

22       A.    Correct.

23       Q.    Do you see that language?

24       A.    Yes.

25       Q.    Were those sources of consumer lending



1   used at the time?

2       A.    CPS, we used for a very short period of

3   time.  I don't know -- I don't remember the time

4   period, but it was very short.  Pelican, we did.

5   Southwest Finance, Credit Plan of Hammond, that

6   was -- those were the general ones.

7       Q.    Do you know what CPS stands for?

8       A.    No.

9       Q.    And I think you said earlier you are

10  still using Pelican.  But you're not using the other

11  three?

12      A.    No, not using CPS, Southwest Finance or

13  Credit Plan of Hammond.

14      Q.    Okay.

15          MR. McCARTER:

16              Is everybody good?  You need another

17      break?

18          MR. COMAN:

19              Yes, let's take a short break.

20              (Recess taken.)

21          MR. McCARTER:

22              We're going back on the record,

23      please.

24  BY MR. McCARTER:

25      Q.    Mr. London, my apologies if I asked this



```
 1   already, but just to confirm, besides AFC and DSC,

 2   Red Barn has never had a floorplan with any other

 3   company?

 4       A.    No.

 5            MR. McCARTER:

 6                 I'm going to show you a -- a

 7       document I'm going to call Exhibit #5.

 8   BY MR. McCARTER:

 9       Q.    And this one runs NG003581 through 3560

10   -- I'm sorry.  I got that -- let me back up, 3560

11   through 3581.  And I'll represent to you, Mr.

12   London, that this is a composite exhibit that's got

13   different documents in it, but they -- they

14   generally appear to be an application and a legal

15   agreement that Red Barn signed with DSC.

16       A.    Uh-huh.

17       Q.    Do you see that?

18       A.    Yes.

19       Q.    All right.  And we can look at the exact

20   dates, but it looks like they're generally signed in

21   July of 2011.  Do you see that?

22       A.    Yes.

23       Q.    Okay.  And on that first page, 3560, do

24   you recognize the signature there?

25       A.    3560?
```



DEVON LONDON                                     October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                          94

1       Q.     Yes.   Whose signature is that?

2       A.     That's Don Richardson.

3       Q.     And he was the owner and president of Red

4    Barn at the time?

5       A.     Correct.

6       Q.     On that first page, that application

7    page, take a second to look at it.  Do you see any

8    of the filled in information there that appears to

9    be wrong to you or inaccurate?

10              MR. COMAN:

11                   I'll lodge an objection to the form.

12         If you can specify or if your question is to

13          the entire document, then I'd lodge the same

14          objection.

15   BY MR. McCARTER:

16      Q.     It's obviously the form, you know, to the

17   question, but the stuff that's specific to Red Barn

18   like the name of the company, they requested the

19   floorplan amount, the address.  Do you see --

20      A.     I mean, I see a mistake of ownership.

21      Q.     Where do you see that?

22      A.     It says 100 percent.

23      Q.     Okay.

24      A.     I mean, I don't know -- I don't know if

25   that is 100 percent or if it's 50/50.



1       Q.     With his wife Barbara?

2       A.     Yes.

3       Q.     Fair enough.

4       A.     I'm not positive of that.

5       Q.     Okay.  And then turning to the -- the

6   document that follows on the next page, it's called

7   Demand Promissory Note and Security Agreement.

8       A.     Uh-huh.

9       Q.     Do you see that, do you see that title?

10      A.     Yes.

11      Q.     Okay.  And then if we skip back several

12  pages to 3569 in that exhibit --

13      A.     Okay.

14      Q.     -- does that look like Mr. Richardson's

15  signature again?

16      A.     Yes.

17      Q.     Okay.  And he's signing both as

18  president, and then as a guarantor.  Do you see

19  that?

20      A.     Yes.

21      Q.     Okay.  All right.  And then we will turn

22  to 3571.  Do you see that document?

23      A.     Yes.

24      Q.     Again, that appears to be Mr.

25  Richardson's signature on the lower left-hand side.



1   Do you see that?

2       A.    Yes.

3       Q.    And his initials a couple of times in the

4   document?

5       A.    Uh-huh.

6       Q.    Do you recall seeing this term sheet when

7   it was signed with DSC?

8       A.    I don't recall seeing the term sheet when

9   it was signed, but I do recall the terms.  I mean,

10  those were the terms that were represented.

11      Q.    Okay.  And -- and we talked about this

12  earlier, right, the 60 days, and then 30 more --

13      A.    Yes.

14      Q.    -- and 30 more?

15      A.    Right.

16      Q.    Right.  And so those terms there look

17  accurate to how things worked with DSC?

18      A.    Correct.

19      Q.    Okay.  All right.  And, again, Mr.

20  Richardson's signature on the power of attorney at

21  3572?

22      A.    Yes.

23      Q.    On the individual guaranty that follows,

24  his signature for 3575, do you see that?

25      A.    Yes.



1        Q.     Some of these, at least that one, is

2   notarized by Catherine Edwards.  Do you know who

3   that is?

4        A.     Yes.

5        Q.     Who is she?

6        A.     She is a notary in the state of Louisiana

7   in Denham Springs.

8        Q.     So an independent notary, not with Red

9   Barn and not with DSC?

10       A.     Not with Red Barn and not with DSC.

11       Q.     Okay.  And then the next document is

12  called Contract Quick Facts.  Do you see 3576, 3577?

13       A.     Uh-huh.

14       Q.     Again, that 3577, that's Mr. Richardson's

15  signature?

16       A.     Yes.

17       Q.     And do you have any reason to doubt

18  that's his initials on -- on 3576 and 3577 in the

19  various blanks?

20       A.     No, no.

21       Q.     And then the next document at 3578 and 79

22  is an ACH authorization and request.  Again, it

23  appears to be signed by Mr. Richardson, correct?

24       A.     Uh-huh.

25       Q.     Is that generally how Red Barn paid DSC,



DEVON LONDON                                      October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                          98

1   through ACH payments?

2        A.    Yes.

3        Q.    And do you recall what kind of notice or

4   confirmation or paperwork you would get when it was

5   an ACH payment to DSC?

6        A.    We would get a printout stating the

7   curtailment, you know, paid -- I mean, the

8   curtailment, the interest, the principal paid, I

9   mean, just the -- the term sheet on what we just did

10  on-line.

11       Q.    Okay.  And would you authorize each of

12  those payments or would DSC just automatically pull

13  them or both?

14       A.    Both.

15       Q.    Okay.  And when you were authorizing

16  them, did you go through the same website,

17  discoverdsc.com?

18       A.    I'm not positive.  I believe Sharon Roach

19  did.

20       Q.    Okay.  And -- and the printout you

21  mentioned would come from that same site?

22       A.    Yes.

23       Q.    Okay.  On the last page of that Exhibit

24  #3581, you see that page?

25       A.    Uh-huh.



DEVON LONDON                                           October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                              99

1          Q.    That -- that does not look like Mr.
2     Richardson's signature, right?
3          A.    No.
4          Q.    That looks like a DSC representative?
5          A.    Right.
6          Q.    Do you recall whether you saw this
7     checklist at the time or not?
8          A.    I don't recall seeing this.
9          Q.    Okay.  It mentions in there -- you know,
10    in this checklist, it mentions preview,
11    discoverdsc.com website and the Unplugged with the
12    dealer.  Do you see that?
13              MR. COMAN:
14                    I'm sorry.  Where --
15              MR. McCARTER:
16                    On the checklist down at the bottom,
17        it says, preview discoverdsc.com website and
18        it goes on.
19    BY MR. McCARTER:
20         Q.    Do you see that?
21         A.    Okay.
22         Q.    My question is just, do you remember Mr.
23    LaBauve or anybody else, you know, going through the
24    website with you?
25         A.    Like navigating it?



```
 1                    I'm going to show you a document
 2          we're going to call Exhibit #7.  And this is
 3          the only copy I have of this one.  So you guys
 4          can look off each other.
 5    BY MR. McCARTER:
 6        Q.    But I -- I will represent to you that
 7    this is Exhibit B of your amended complaint and I
 8    just -- I want to know have you seen this document
 9    before?
10        A.    Yes.
11        Q.    What is this, I mean, what -- what does
12    it show?
13        A.    This shows all of the DSC payoffs that we
14    made through our -- I believe this was the
15    transaction history of our bank account.
16        Q.    Okay.  So you think that that's a
17    printout from your bank account?
18              MR. COMAN:
19                    Actually, let me -- let me stop.  If
20          we can go off the record.
21              MR. McCARTER:
22                    Yes.
23          (Discussion held off the record.)
24              MR. McCARTER:
25                    Back on the record.
```



 1  BY MR. McCARTER:

 2       Q.    So, Mr. London, Exhibit #7, the second

 3  page of that exhibit was a declaration by a former

 4  plaintiff Young Executive in this case, and it's

 5  just in there sort of by mistake, because it was in

 6  my copy of the complaint.  So the first page of

 7  that, and then the third page and succeeding of

 8  Exhibit #7 are Exhibit B of your complaint.  And,

 9  again, I think you were saying that this came from

10  your bank account?

11       A.    I believe so, yes.

12       Q.    Okay.  And do you recall what it purports

13  to show?

14       A.    It purports to show when payoffs were

15  made to DSC --

16       Q.    Okay.  And you had a way to sort --

17       A.    -- on specific vehicle.

18       Q.    Sorry for interrupting.  So you had a way

19  to sort by payee?

20       A.    No.  I believe I had a way to sort by

21  description, DSC payoff.

22       Q.    Okay.  And just to be clear, though, this

23  would just show the actual amount paid to DSC, it

24  wouldn't necessarily show --

25       A.    Actually, yes, transaction categories,



1   DSC payoffs.  So it shows me all of the DSC payoffs.

2       Q.    Okay.  But just to be clear, these show

3   actual ACH transfers to DSC, it doesn't really show

4   us what you borrowed on that unit, how much interest

5   or fees?

6       A.    Correct.

7       Q.    This is just the actual money that was

8   transferred to DSC on those dates?

9       A.    On those dates, correct.

10      Q.    Okay.  All right.  Mr. London, did you

11  have any understanding of what Mr. LaBauve's

12  responsibility was or what his role at DSC was?

13      A.    His responsibility was to make sure --

14            MR. COMAN:

15                 I'm sorry for interrupting.  Let me

16        just lodge an objection -- to the extent that

17        you know, but let me just lodge an objection

18        to the form, but you can answer the question.

19  BY MR. McCARTER:

20      Q.    And I'm asking about your working

21  understanding, not whether it was actually right or

22  wrong.

23      A.    Okay.

24      Q.    But how did you understand his role to

25  be?



```
 1        A.    His role was to procure new dealers, to

 2   monitor and maintain those dealers, and to keep

 3   track of the ongoings of those dealers, to protect

 4   DSC, and to procure profit for DSC.

 5        Q.    All right.  Do you have a recollection of

 6   how many cars you may have financed with DSC?

 7        A.    I believe it was 524.

 8        Q.    And, again, that's roughly from July 2011

 9   to March 2013?

10        A.    Correct.

11        Q.    Okay.  What happened to your recollection

12   in March of 2013 to bring that relationship to an

13   end?

14        A.    What happened --

15        Q.    What happened in March 2013 to bring Red

16   Barn's relationship with DSC to an end?

17        A.    We had some financial difficulties and, I

18   mean, that's pretty much it.

19        Q.    Okay.  Did Red Barn give DSC checks that

20   didn't clear?

21        A.    I don't think so.

22        Q.    You don't think there were any NSF checks

23   involved?

24             MR. COMAN:

25                  Objection as to form.
```



```
 1              THE WITNESS:
 2                   There may have been ACHs that
 3        weren't paid, but I don't think there were any
 4        actual checks.
 5   BY MR. McCARTER:
 6        Q.    So you think there may have been payments
 7   made to DSC that didn't clear?
 8              MR. COMAN:
 9                   Objection to form.
10              THE WITNESS:
11                   I don't know.  I don't know.
12   BY MR. McCARTER:
13        Q.    That's fine.  I'll show you some records
14   in a minute.  I'm trying to get what's your
15   recollection of how did financial difficulties
16   translate into an end of the relationship with DSC?
17        A.    Well, financial difficulties translated
18   to an end with DSC, because we were working with
19   Stuart LaBauve to take care of the deficiencies.  We
20   actually came up with a plan that was going to take
21   care of those deficiencies.  Mr. Richardson
22   presented that plan to DSC and AFC, and AFC agreed
23   to it verbally.  DSC was seeming to go along with it
24   verbally.  And then the vehicles that we had stated
25   that we were going to go sell at First Choice
```



DEVON LONDON                                          October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                          108

1    Louisiana Auto Auction to give to -- to give the

2    funds to DSC and AFC were seized.

3        Q.    And I think you said earlier they were

4    seized by First -- Louisiana First Choice and you

5    think on behalf of DSC?

6        A.    I would say I know on behalf of DSC.

7        Q.    You're talking about taking care of

8    deficiencies, though.  It sounds like that there may

9    have been repossessions prior to that.  Does that

10   ring a bell?

11           MR. COMAN:

12               Objection to form.

13           THE WITNESS:

14               I don't know if there were

15      repossessions prior to that.

16   BY MR. McCARTER:

17       Q.    So how -- how -- do you have any

18   recollection of how deficiencies to DSC were created

19   in the first place?

20       A.    What caused the problems -- are you

21   asking what caused the problems for us to have

22   deficiencies?

23       Q.    Sure, yes.

24       A.    Okay.  We have a ongoing relationship

25   with Southwest Finance.  Southwest Finance wanted to



 1    be our primary lender.  We agreed to that and made

 2    them our primary lender.  And sometime in February,

 3    we were informed by Southwest Finance that they had

 4    accumulated all the paper that they wanted to

 5    accumulate.  They had grown the office to the amount

 6    that they wanted to grow it to.  And, therefore,

 7    they did not want to finance as many vehicles as we

 8    were providing them.  So during tax time, this was

 9    tax time, we had a whole bunch of deals that we

10    needed to get funded on that we were unable to get

11    funded on very rapidly that were sold that needed to

12    be paid off to DSC by the terms of the agreement.

13         Q.    And so you were unable to make certain

14    payments to DSC that were required under the

15    agreement?

16         A.    That is correct.

17         Q.    Do you remember how many cars you were

18    unable to pay DSC for that were due?

19         A.    I don't remember.  I just know that there

20    was an outstanding balance.

21         Q.    Okay.  Did that lead to DSC recovering

22    cars from Red Barn?

23         A.    That led to DSC taking all of our

24    inventory, yes.

25         Q.    And you -- you do or don't remember



1  particular payments coming back or balancing at the

2  time?

3       A.    I don't remember payments balancing

4  unless they were initiated by DSC and we were

5  unaware of it.

6       Q.    Okay.  Do you recall Louisiana Used Motor

7  Vehicle Commission getting involved in -- in those

8  deals in any way?

9       A.    Yes.

10      Q.    And what was their involvement?

11      A.    Their involvement was to secure titles on

12  the vehicles, which had a -- that were DSC's that we

13  had not paid off.

14      Q.    And by securing titles, do you mean

15  secure titles from DSC for the retail customer?

16      A.    No.  They -- they were on the floorplan.

17      Q.    I -- I guess I'm asking why -- why did

18  the Motor Vehicle Commission want titles from DSC?

19           MR. COMAN:

20                Objection to form.  If you know.

21           THE WITNESS:

22                I believe I know.  Okay.  I believe

23       I know, but I'm not positive.  I believe

24       there's a law in the state of Louisiana where

25       a third party or something cannot be harmed.



1           So the titles had to be turned over pursuant

2       to Louisiana law to the customer.

3   BY MR. McCARTER:

4       Q.     Just to confirm, from your perspective,

5   the Louisiana Used Motor Vehicle Commission was

6   trying to get titles from DSC to get to your retail

7   buyers?

8           MR. COMAN:

9               Objection to form.

10          THE WITNESS:

11              Yes.

12  BY MR. McCARTER:

13      Q.     And do you have any knowledge of whether

14  DSC turned over titles for that purpose?

15      A.     DSC did.

16      Q.     And that was prior to any payment by Red

17  Barn for those units?

18      A.     Yes.

19      Q.     Do you remember the name of the agent or

20  inspector from the Louisiana Used Motor Vehicle

21  Commission that might have been involved?

22      A.     His name was Ronnie Wisenor.

23      Q.     Is he someone that you had known or

24  worked with before this incident?

25      A.     Just on various complaints, if somebody



 1    lodged a complaint against us.  We were regulated by

 2    them.  So he was required to look into it and make

 3    sure.  A lot of them were title absent complaints.

 4        Q.    What do you mean by that, what's a title

 5    absent complaint?

 6        A.    Well, where we didn't have the title,

 7    because we had paid off -- I can give you a bunch of

 8    instances, where you had paid off -- we had paid off

 9    the DSC and DSC did not have the title yet, but it

10    had gone past the 20 days that was allowed.

11        Q.    Who -- who -- what -- who allowed the 20

12    days, what do you mean by 20 days?

13        A.    You are required -- I -- I believe you're

14    required by Louisiana law, almost positive, 20 days

15    to get the title to the retail buyer in the event of

16    a sale.

17        Q.    Okay.

18        A.    Now, the -- the Louisiana Used Car

19    Commission has told me that they don't enforce that

20    law, because they understand the -- the problem of

21    getting titles from the auctions and floorplan

22    companies and things like that.

23        Q.    Would -- would those typically have been

24    cars that were bought at auction without a title

25    present?



 1      A.     Yes.

 2      Q.     Just ballpark, how often do you think you

 3  heard from the Louisiana Used Motor Vehicle

 4  Commission on a consumer complaint prior to March

 5  2013?

 6      A.     Prior to the DSC involvement and prior to

 7  everything else, probably five times, four times.

 8      Q.     Total?

 9      A.     Yes.

10      Q.     Okay.  Did you have a particular contact

11  at Southwest Finance?

12      A.     Yes.

13      Q.     Who was that?

14      A.     Tara Brouillette.

15      Q.     Okay.  Do you have any sense of how many

16  titles DSC released to retail customers without

17  payment related to Red Barn?

18      A.     I do not know the total number.

19      Q.     Okay.  All right.  And I think you said

20  -- strike that.

21             Do you have any understanding of where

22  the cars recovered by DSC went to?

23      A.     They went to Louisiana First Choice Auto

24  Auction.

25      Q.     Okay.  And is it your understanding that



1  all of them went there?

2        A.    Yes.

3        Q.    And I understand there's some issue --

4  strike that.

5              Did all of those vehicles eventually get

6  sold by DSC through Louisiana First Choice Auto

7  Auction?

8              MR. COMAN:

9                   Objection to form.  If you know.

10             THE WITNESS:

11                  Did all of those vehicles get sold

12        -- rephrase.

13  BY MR. McCARTER:

14       Q.    Yes.  I understand you had some issue

15  with how they were held and sold, but did they

16  eventually get resold and credited to Red Barn?

17       A.    I believe there is still some that have

18  not been sold and have not been credited to Red

19  Barn.

20       Q.    What's that belief based on?

21       A.    That belief is based on a list that was

22  provided to me by, I think, Louisiana First Choice

23  Auto Auction listing 19 vehicles that were still in

24  their possession that we were supposed to sell or we

25  had finally agreed to sell after three years and all



1    DSC payoff?

2           Do you see that?

3       A.    Uh-huh.

4       Q.    Okay.  And then the first page looks

5    like, sort of, a summary of the totals on the

6    following pages; is that right?

7       A.    That looks right.

8       Q.    Okay.  And is this something that you

9    created for use in the bankruptcy, or for some other

10   purpose?

11      A.    I don't know what it was created for.

12      Q.    Okay.  But you did say, a minute ago, you

13   were involved in creating it, right?

14      A.    Yes, correct.

15      Q.    But you don't remember why?

16      A.    I don't remember why.

17      Q.    Okay.  I want to show you what we are

18   going to call Exhibit #18.  I don't -- this is Bates

19   labeled NG008087 through 88.  I don't know -- is

20   this a document that you would have ever seen

21   before?

22      A.    No.

23      Q.    Okay.  At the bottom --

24            MR. COMAN:

25                 Objection to form.



DEVON LONDON                                          October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                            169

1    BY MR. McCARTER:

2       Q.    -- it says, on May 7, 2013, there is

3    apparent e-mail.  And it says, "I received a call

4    from the dealer, Don Richardson, and he would like a

5    detailed report of all activity on the account since

6    the default, and would like to know the remaining

7    balance on each unit sold at auction, as well as a

8    list of the units that have not yet sold."

9          Do you know -- do you remember whether

10   Red Barn asked for an account statement around this

11   time?

12      A.    I don't remember.  I didn't ask for an

13   account statement around that time.

14      Q.    Okay.  Do you recall getting or seeing

15   one from DSC that was used in the bankruptcy or for

16   some other purpose?

17      A.    No.

18      Q.    Okay.  I am going if show you what we're

19   going to call Exhibit #19.  For the record, this is

20   Bates labeled NG008120.  This looks like it may be

21   an April 26, 2013 letter from Red Barn's bankruptcy

22   attorney to NextGear; is that right?

23      A.    Yes.

24      Q.    All right.  And Arthur Vingiello --

25      A.    That's to Louisiana First Choice Auto



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                        170

1   Auction.

2       Q.    Correct.  And so this was your bankruptcy

3   attorney at the time?

4       A.    Yes.

5       Q.    Okay.  And he's representing that Red

6   Barn is a debtor in possession and that DSC should

7   cease from selling any collateral in its possession?

8       A.    Yes.

9       Q.    Okay.  All right.  I am going to show you

10  what we're going to call Exhibit #20.  This is Bates

11  labeled NG008358 through 8359.

12      A.    Okay.

13      Q.    This looks like a series of e-mails

14  between you and personnel at NextGear Capital

15  regarding two vehicles that may have been on your

16  DSC floorplan; is that right?

17      A.    Uh-huh.

18      Q.    Okay.  Can you just describe for me what

19  appears to be happening here?

20      A.    It appears to be that we have possession

21  of two vehicles that were not returned to DSC, and

22  we are trying to get those back in your possession.

23      Q.    Okay.  And the advice was to consult your

24  attorney -- or the response was to consult your

25  attorney?



```
 1        A.    I don't recall that.

 2        Q.    I mean, do you see, at the top, it says,

 3   "Devon, you will need to consult your attorney"?

 4        A.    Oh, okay.

 5        Q.    And that e-mail address for you, it looks

 6   like wwwdevo@aol.com.

 7        A.    Yes.

 8        Q.    Is that your e-mail address?

 9        A.    Yes, it is.

10        Q.    And so this was going on a couple of

11   months after that letter from your attorney, that we

12   just looked at, Exhibit #19?

13        A.    Uh-huh.

14        Q.    And so that -- the bankruptcy would have

15   been pending at that time?

16        A.    Yes.

17        Q.    Okay.  All right.  I'm going to call this

18   Exhibit #21.

19        A.    Okay.

20        Q.    This document is Bates labeled RB0075.

21   It looks like another, you know, exhibit from the

22   bankruptcy that you may have produced to us.

23              Does that look right to you?

24        A.    Yes.

25        Q.    Okay.  And it's a list of insider
```



1    transactions, the past year, for Red Barn Motors,

2    Inc.

3              Do you see that?

4        A.    Uh-huh.

5        Q.    All right.  And, among others -- like,

6    the first line item is "Devon house payment."

7        A.    Uh-huh.

8        Q.    1750.  You see that?

9        A.    Uh-huh.

10       Q.    So was Red Barn Motors paying your house

11   payment?

12       A.    No.  That house is actually owned by Don

13   and Barbara Richardson.

14       Q.    So was Red Barn Motors paying Don and

15   Barbara's house payment?

16             MR. COMAN:

17                  Objection to form.

18             THE WITNESS:

19                  Let me see.  It would appear, based

20       on this, it was.

21   BY MR. McCARTER:

22       Q.    Okay.  And there are several others,

23   below, that say "Devon house payment."  And in the

24   same case, those are all that same house owned by

25   Don and Barbara?



DEVON LONDON                                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                                        173

```
 1        A.     Uh-huh.

 2        Q.     Where is that house located?  What's the

 3   address?

 4        A.     25852 Plantation Avenue.

 5        Q.     Is that still owned by the Richardsons?

 6        A.     Yes, it is.

 7        Q.     Okay.  And then the second entry, for

 8   example, says "payment on car financing, BHPH loan."

 9             Do you know anything about what that was

10   for?

11        A.     Payment on car financing, BHPH loan.

12             I don't.

13        Q.     Okay.  You don't have any knowledge of

14   why that would be listed as an insider transaction

15   here?

16             MR. COMAN:

17                  Objection to form.

18                  Obviously, to the extent that you

19       know --

20             THE WITNESS:

21                  I don't know.

22   BY MR. McCARTER:

23        Q.     Do you recall whether you or either the

24   Richardsons had any personal car loan that was being

25   serviced by Red Barn Motors, Inc.?
```



1       A.      Neither me nor the Richardsons had a car

2  loan being serviced by Red Barn Motors.

3       Q.      Okay.

4       A.      I was provided a vehicle to drive.

5       Q.      By Red Barn Motors?

6       A.      By Red Barn Motors.  But it was an

7  inventory vehicle.

8       Q.      Okay.  Did you guys ever drive DSC

9  vehicles?

10       A.      I would occasionally drive them, to make

11  sure that there weren't any problems with them.  And

12  I would switch off on a daily basis.  But my primary

13  vehicle was not a DSC vehicle.

14       Q.      Would you ever have a DSC vehicle parked

15  at your house overnight?

16       A.      That's possible.

17       Q.      The -- on down, there is a -- it mentions

18  "repay part of the Cliff Richardson loan."

19              Do you know anything about that?

20       A.      I know that Cliff had loaned some money

21  to Red Barn Motors.

22       Q.      And who is Cliff?

23       A.      Cliff is Don's son.

24       Q.      And where -- on down, where it says

25  "Pelican Advisory Group loan to RBM," that's Don's



1   son's insurance company?

2       A.    That's correct.

3       Q.    Okay.  I'm going to show you what we're

4   going to call Exhibit #22.  And I will just

5   represent to you these are just pages that we

6   printed recently from the website redbarnmotors.net.

7            Does this look like Red Barn Motors'

8   website?

9       A.    Yes, it does.

10      Q.    What's going with this pig?  Is that

11  you all's mascot?

12      A.    Yes.

13      Q.    Is it -- do you own the pig?

14      A.    No.  It's a Photoshop.

15      Q.    Gotcha.

16           MR. McCARTER:

17                All right.  Can we take a short

18     break?

19                (Recess taken.)

20           MR. McCARTER:

21                Back on the record.

22  BY MR. McCARTER:

23      Q.    So, Mr. London, one of the things we

24  talked about before was the KO book and at the time,

25  you said you don't know who maintains and organizes



1    the KO book; is that right?

2        A.    Correct.

3        Q.    Okay.  Have you made any inquiry of

4    anyone about how to get out of the KO book?

5        A.    No.

6        Q.    Okay.  The auctions where you cannot

7    write business checks, and I'm sorry please

8    remember, were Long Beach and Baton Rouge -- ABC

9    Baton Rouge?

10       A.    Long Beach and Oak View Auto Auction.

11       Q.    Oak View Auto Auction.  Okay.  And --

12       A.    And we were barred from Manheim auctions.

13       Q.    Okay.  Have you inquired with Manheim how

14   to get reinstated with Manheim?

15       A.    We would have to payoff DSC.

16       Q.    How do you know that?

17       A.    That's what they told me.

18       Q.    Who is they?

19       A.    The manager that I spoke to on the phone.

20       Q.    Who was that, what --

21       A.    I don't know.

22       Q.    Was it a particular auction?

23       A.    It was Manheim New Orleans.

24       Q.    Was it GM or somebody else?

25       A.    Somebody else.



1     Q.    When was that conversation?

2     A.    That conversation was probably somewhere

3  around the time of us finding out we were in the KO

4  book, because I had tried to attend the auction and

5  they would not let us enter.  So then I called TRA,

6  which is Manheim Lafayette, and they said the same

7  thing.

8     Q.    And -- so you said it was around the time

9  you found out you were in the KO book, but when --

10  when was that, what year was that?

11     A.    That was right after -- I believe it was

12  2013.

13     Q.    Okay.  During the time of bankruptcy?

14     A.    Probably later on in the bankruptcy.

15     Q.    Have you made any inquiry Manheim since

16  then on how to get back in?

17     A.    No.

18     Q.    At Oak View Auto Auction, have you made

19  any inquiry about what it would take for them to

20  accept your business checks?

21     A.    I have and they refused.  I've done it on

22  multiple occasions.

23     Q.    Have you offered to provide any security

24  or collateral to them?

25     A.    I have not.



1  waive the $1,000 deposit that we were required to --

2  up front at each auction and he refused to do that.

3      Q.    And so that was 2013?

4      A.    That was 2000 -- that was -- that was

5  2015.

6      Q.    Have you had any conversations with Long

7  Beach Auto Auction since that conversation in 2015

8  about writing business checks?

9      A.    No.

10     Q.    What exactly did Long Beach Auto Auction

11 say to you about the KO book?

12     A.    Again, that we were in the KO book.  I

13 mean --

14     Q.    Anything more about the KO book or how it

15 works?

16     A.    No.

17     Q.    How about ABC Baton Rouge, have you had

18 any conversations with them about writing checks?

19     A.    Yes.

20     Q.    When was that?

21     A.    I don't know the exact date.

22     Q.    Was it closer to the bankruptcy in 2013

23 or more recent?

24     A.    It was more recent than that.  I don't

25 think they were established back then, but it was --



1    I don't want to guess.

2         Q.    Do you think it was this year?

3         A.    It wasn't this year.  It would have -- it

4    would have been possibly 2015.

5         Q.    Okay.  And what exactly did ABC Baton

6    Rouge say about writing checks?

7         A.    ABC Baton Rouge allowed us to write

8    checks up to a certain amount.

9         Q.    Up to how much?

10        A.    It's a $12,000 figure.

11        Q.    Is that per car or total for the day?

12        A.    No, total for the day.

13        Q.    Was there any discussion with ABC Baton

14   Rouge about the KO book, specifically?

15        A.    No.

16        Q.    I apologize if we covered this, but have

17   -- have you applied for any form of floorplan

18   financing since the bankruptcy?

19        A.    No.

20        Q.    All right.  You -- you mentioned earlier

21   that you had a concern about DSC charging interest

22   on floorplanned vehicles before DSC received the

23   title; is that correct?

24        A.    Before DSC paid for the vehicle.

25        Q.    And I think you had some understanding



1   that typically happens when the title comes in to

2   the auction?

3       A.    Correct.

4             MR. McCARTER:

5                  I'm going to show you what I'm going

6         to call Exhibit #23.

7             MR. COMAN:

8                  Thank you.

9   BY MR. McCARTER:

10      Q.    I'll represent to you that this is Red

11  Barn Motors' responses to NextGear Capital's first

12  set of interrogatories in this case.  I believe we

13  just got a verification in yesterday; is that right?

14            MR. COMAN:

15                 That's correct.

16            MR. McCARTER:

17                 Okay.  So that will shorten this.

18  BY MR. McCARTER:

19      Q.    This suggests that you were involved in

20  responding to these interrogatories; is that

21  correct?

22      A.    Yes.

23      Q.    Okay.  And in a couple of different

24  places, it says that you, Donald Richardson, and

25  Sharon Roach would be the Red Barn personnel that



1    would have interacted with DSC and have knowledge of

2    the DSC floorplan.  Does that sound right?

3         A.    It does.

4         Q.    Okay.  Is there anybody else you think of

5    at the dealership that has specific knowledge of the

6    DSC floorplan?

7         A.    No.

8         Q.    Can I turn your attention to

9    interrogatory response #6?  In the middle of the

10   Page 6, so there's an objection, and then it says,

11   "Subject to the foregoing specific and general

12   objection, Red Barns responds that during its

13   communications with NextGear and DSC to include

14   account executive Stuart LaBauve, NextGear and DSC

15   concealed from Red Barn that interest or fees would

16   be charged before money was actually lent under the

17   Floorplan Agreement."

18              Do you see that?

19        A.    Yes.

20        Q.    Okay.  So that's -- that's saying that it

21   was hidden, but was there any specific discussion of

22   that issue with Stuart at the time you first entered

23   into the agreement with DSC?

24        A.    At the time that we first entered into

25   the agreement with DSC, that was not brought up.  It



1   was assumed -- it was assumed that, you know, based

2   on the agreement and the term advance and, you know,

3   when payment is made, you know, that it would have

4   been when the money was actually lent.

5        Q.    Okay.  Going on down in that same answer,

6   Red Barn has said, "Eventually, Devon London

7   confronted Stuart LaBauve following Devon London's

8   suspicion that defendants were, in fact, charging

9   interest and fees on money not actually lent.  In

10  turn, Stuart LaBauve admitted that the defendants

11  were charging interest and fees on money not

12  actually lent."

13            Do you see that?

14       A.    Yes.

15       Q.    When did that conversation occur?

16       A.    That occurred on or about -- it was when

17  I found out that they were back dating the interest

18  charged to the date of the auction versus the date

19  that I actually floorplanned the vehicle, and I

20  confronted him and said, you know, why are we being

21  charged interest when I haven't even chosen the

22  floorplan.  And he said, I'll have to get back with

23  you.  And he got back with me and basically said,

24  that's the way that it is, you know.  They -- they

25  charge interest from the date of the sale versus the



1   date of the actual loan.

2        Q.    Okay.  What time frame -- I mean, when

3   did that actually happen?

4        A.    I believe that it was June -- June or

5   July of 2012 is when I figured that out, mid 2012.

6        Q.    And that seems to be consistent with

7   paragraph 45 of your -- of your complaint where you

8   -- you said -- and I'll just read it to you.  It

9   says, "First met in or about June of 2012.  Devon

10  London, Red Barn's general manager, discovered

11  transactions in which Red Barn had not actually

12  chosen to use the Floorplan Agreement such as

13  NextGear.  And DSC had never actually loaned money

14  to Red Barn for the purchase of vehicles.  It goes

15  on, but that -- that seems to be the time frame,

16  June of 2012?

17       A.    Yes.

18       Q.    Okay.  And we responded back to you along

19  the lines that --

20       A.    That's the way that it is.

21       Q.    Okay.  And your line stayed opened, you

22  continued to borrow from DSC until March of 2013?

23       A.    That is correct.

24       Q.    And were -- were there any other

25  witnesses to that conversation with Mr. LaBauve?



1      A.    No.

2      Q.    Okay.  Have you ever been part of a

3  discussion between DSC and any other dealer besides

4  Red Barn about the timing of DSC's interest charges?

5      A.    Have I ever been in --

6      Q.    A discussion between DSC and any other

7  dealer besides Red Barn about how DSC calculates

8  interest or when it starts to accrue?

9      A.    I have.

10     Q.    Who was that?

11     A.    Dewitt Hall.

12     Q.    You told me earlier.  Is it Hall or Hull?

13     A.    Hall, H-A-L-L.

14     Q.    Okay.  And what's -- what's his

15  dealership's name?

16     A.    I don't know.

17     Q.    And who was the DSC representative or

18  representatives?

19     A.    For him?

20     Q.    Well, you -- you said you were -- you

21  witnessed a discussion between DSC and him about

22  interest?

23     A.    Oh, no, no.  I -- I said I had a

24  conversation with him.

25     Q.    Okay.



1    A.    I didn't witness a conversation between

2  him and --

3    Q.    Okay.  So you talked -- I'm sorry.  You

4  talked about it with Dewitt, but you haven't

5  actually witnessed a conversation --

6    A.    No.

7    Q.    -- between DSC and Dewitt about interest?

8    A.    No.

9    Q.    Have you witnessed any conversation or

10  e-mails or other communication between DSC and any

11  third-party dealership besides Red Barn about

12  interest charges and how they're calculated?

13    A.    Rephrase the question.

14    Q.    Okay.  Have you witnessed personally,

15  either you were -- you were there or you heard it or

16  you saw it, communications between DSC and some

17  dealer other than Red Barn about how DSC charged and

18  calculated interest?

19    A.    No.

20    Q.    Okay.  And these conversations between

21  you and -- or this conversation that's mentioned in

22  interrogatory #6, was any of that in writing?

23    A.    No.

24    Q.    Where did the conversation take place?

25    A.    At Oak View Auto Auction.



 1      Q.     And you said he -- he got back with you.

 2   Did he get back with you the same day or same place?

 3      A.     No.   He got back to me the following week

 4   I questioned him about it, again.

 5      Q.     Did you escalate your concern to anybody

 6   else at DSC?

 7      A.     No.

 8      Q.     You had conversations with Dewitt Hall

 9   about this issue.   What -- when did those take

10   place?

11      A.     Those took place probably around 2014.

12      Q.     Okay.   And where did they take place?

13      A.     At Red Barn Motors.

14      Q.     All right.  And who raised the subject,

15   you or him?

16      A.     I believe -- I believe he did.

17      Q.     Okay.   And what was the substance of

18   those discussions?

19           MR. COMAN:

20              I'm going to object.   Is there a

21        particular item number in this deposition

22        topic that addresses Dewitt Hall?

23           MR. McCARTER:

24              I'm sure there is one that addresses

25        Red Barn Motors' concern with DSC's interest



 1         charges.  So if they made statements to any

 2         party about those, that's certainly well

 3         within the scope.

 4              MR. COMAN:

 5                   Just give me a number.

 6              MR. McCARTER:

 7                   Go to #2 just to start there.

 8              MR. COMAN:

 9                   That's fine.

10    BY MR. McCARTER:

11         Q.    So back to the question, what was the

12    substance of your discussions with Mr. Hall about

13    DSC's interest charges?

14         A.    Basically, just that they were charging

15    interest on money that was never lent.  I mean,

16    that's the gist of it.

17         Q.    Did you raise that to him or did he raise

18    it to you?

19         A.    I think it was mutual.  It was a mutual

20    discussion.

21         Q.    Okay.  And what did he say related to

22    that?

23         A.    I don't remember.

24         Q.    Okay.  And do you recall whether he

25    mentioned ever raising it to DSC or addressing it



 1   with DSC?

 2       A.    I don't.

 3       Q.    You don't know one way or the other?

 4       A.    I don't know one way or the other.

 5       Q.    Okay.  Do you recall high level what Red

 6   Barn Motors' net income was prior to the time of

 7   bankruptcy in 2013?

 8       A.    I would not know that.

 9       Q.    Who would know that?

10       A.    Don Richardson and the accountant.

11       Q.    Do you know what Red Barn Motors' net

12   income is now as of 2016?

13       A.    It is substantially lower.  I, again,

14   don't have the exact figure.

15       Q.    And you don't know what it was pre-2013,

16   but you know it's lower now?

17       A.    I know it's lower now, yes.

18       Q.    And you said substantially.  How -- how

19   much lower?

20       A.    I don't want to just guess.  I just know

21   that we're selling less cars.

22       Q.    Okay.  Well, damages is certainly a topic

23   in -- in the notice.  Are you -- are you prepared at

24   all to talk about what Red Barn's damages are in

25   this case?



 1       A.    I assume I should -- I would be.

 2       Q.    Okay.  Do you have some understanding you

 3  have a claim for the harm to your business allegedly

 4  caused by DSC?

 5       A.    Yes.

 6       Q.    Okay.  How -- how would you quantify that

 7  harm?

 8       A.    How would I quantify that harm?  I would

 9  quantify that harm by the charging of interest over

10  a period of time and curtailment fees on money that

11  was never lent.  There were many cases, in fact,

12  that not only was there money never lent, but we had

13  paid off the vehicle to DSC and had to wait for the

14  title to come in.  So there was never a transaction

15  whatsoever for the money for -- for a floorplan

16  agreement and DSC was holding the money for the --

17  what they should have paid for the floorplan and the

18  amount that they collected from us including

19  interest and fees.  We -- I mean, that happened many

20  occasions.

21       Q.    Okay.

22       A.    And --

23       Q.    I'm sorry.  Go ahead.

24       A.    -- we were damaged, because it limited

25  our capital.  As I said, we're a small mom-and-pop



DEVON LONDON                                          October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                          198

1      Q.     Whom?

2      A.     Jason Helmke was one of them.

3      Q.     Do you know the dealership's name?

4      A.     ABC Auto Sales.

5      Q.     Is he in this area?

6      A.     He's in Baton Rouge.

7      Q.     Anybody else?

8      A.     He's on Plank Road.  I mean, I have had

9  conversations.  I don't -- I don't remember, just

10 with various dealers of, you know, the extent of

11 what's happening between DSC and the dealer.

12     Q.     Okay.  Do you remember any other names?

13     A.     I don't.

14     Q.     Okay.  When did you speak to Mr. Helmke

15 about it?

16     A.     Probably within the last six months.

17     Q.     So are you suggesting to these other

18 dealers that NextGear improperly charges interest?

19            MR. COMAN:

20                 Objection to form.

21            THE WITNESS:

22                 I am not -- I am not suggesting.

23        I'm telling them what happened to us and

24        explaining that -- I mean, I have told them

25        that there's loans that have never been made.



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                        199

```
 1   BY MR. McCARTER:
 2       Q.    Do these other dealers, including Mr.
 3   Helmke, have NextGear loans, to your knowledge?
 4       A.    I don't know.
 5       Q.    Are you trying to recruit them to be
 6   parties in this case?
 7             MR. COMAN:
 8                   Objection to form.
 9             THE WITNESS:
10                   Am I personally trying to recruit
11      them?
12   BY MR. McCARTER:
13       Q.    Right.
14       A.    I believe Dewitt Hall was --
15             MR. COMAN:
16                   Let me stop you there.  I'm
17      instructing you not to answer any question
18      that involves any communication between a
19      counsel and you.  If you had a conversation on
20      your own with Dewitt Hall that was outside of
21      this litigation, that's fair game.
22             THE WITNESS:
23                   What was the question again?
24   BY MR. McCARTER:
25       Q.    Are you trying to recruit Mr. Hall, Mr.
```



1   Helmke, or any dealer to be a party in this case?

2        A.    No.

3        Q.    Have you done that?

4        A.    No.

5        Q.    Okay.  What interest do you think they

6   would have in how DSC charged you interest and why

7   are you raising that to them?

8             MR. COMAN:

9                  Objection.  If you know.

10            THE WITNESS:

11                 Because I feel it is unfair what DSC

12        and NextGear is doing and I want -- I don't

13        want them to continue the practice of

14        defrauding used car dealers.  And I believe

15        the conversation came up with Mr. Helmke,

16        because he was having a problem with DSC.

17  BY MR. McCARTER:

18       Q.    And you said that was about six months

19  ago.  So it would be NextGear at that point?

20       A.    Correct.

21       Q.    And -- and just to be clear, Red Barn

22  Motors has not signed any loan agreements or any

23  agreements with DSC since filing its bankruptcy?

24       A.    Has not signed any loan agreements?

25       Q.    Have you -- has Red Barn Motors signed



1  any agreement with DSC or NextGear since it filed

2  its bankruptcy in June of 2013?

3           MR. COMAN:

4                Objection to form.

5           THE WITNESS:

6                I don't think we've entered into any

7      agreements since the filing of the bankruptcy.

8  BY MR. McCARTER:

9      Q.    With DSC or NextGear?

10     A.    Correct.

11     Q.    Okay.  Do you have an understanding --

12 you've alleged a RICO conspiracy between the

13 defendants in this case?

14     A.    Yes.

15     Q.    Okay.  What's your understanding of how

16 the conspiracy worked?

17          MR. COMAN:

18                I'm going to object to form.

19          THE WITNESS:

20                I would have to refer back to

21      counsel -- my counsel, because I -- I don't

22      know all the laws of RICO.  So I would be

23      unable to properly answer that question.

24 BY MR. McCARTER:

25     Q.    And I'm not asking you about RICO or a



1   legal opinion, but you've suggested that -- you've

2   alleged that there's some sort of conspiracy between

3   the defendant and --

4       A.    Correct.

5       Q.    So actually how do you believe that

6   conspiracy worked?

7       A.    The conspiracy worked --

8             MR. COMAN:

9                  I'm going to object to form again.

10            THE WITNESS:

11                 Basically, they all knew what they

12        were doing.  They all knew that they were

13        together not providing a service or not

14        providing financing on vehicles that they were

15        charging interest on.  They were all aware of

16        that.  They conspired together to defraud used

17        car dealers of interest and fees by charging

18        interest when money was never lent and by

19        charging curtailment fees when money was never

20        lent.

21  BY MR. McCARTER:

22      Q.    Okay.  What specifically was Cox

23  Enterprises' role in that?

24            MR. COMAN:

25                 Objection to form.



DEVON LONDON                                      October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                          203

```
 1              THE WITNESS:
 2                    Can he repeat it?
 3              MR. COMAN:
 4                    You can ask him to.
 5              THE WITNESS:
 6                    Can you restate it, please?
 7    BY MR. McCARTER:
 8         Q.    You just described how you believe they
 9    were all part of a conspiracy, because they were all
10    aware and I'm asking you, do you have any factual
11    knowledge of Cox Enterprises' specific role in the
12    conspiracy you're alleging?
13         A.    It has been going on for a very, very
14    long time.  So I believe that they had knowledge of
15    how their business operates and how they collect
16    interest and how they charge their customers when
17    they collect fees and when they collect interest.
18         Q.    Okay.  Were you -- were you personally,
19    Red Barn Motors, a party to or a witness of any --
20    into any conversations with Cox Enterprises or
21    anybody at Cox Enterprises about these interest
22    issues?
23              MR. COMAN:
24                    Objection.  Answer if you know.
25              THE WITNESS:
```



1          I don't know, no.

2    BY MR. McCARTER:

3          Q.    So you were not a witness to those?

4          A.    No.

5          Q.    Okay.  Were you, Red Barn Motors, a

6    witness to or a party to any conversations with Cox

7    Automotive, Inc., about these interest issues?

8          A.    Cox Automotive, Inc., is owned by Manheim

9    or Manheim is owned by Cox Automotive, Inc.  And

10   NextGear is owned by Cox Automotive, Inc.  So

11   communications between those two entities would also

12   be dealing with that company.

13         Q.    Okay.  I asked you whether you were a

14   party to or a witness to any conversations with Cox

15   Automotive, Inc., itself, about these interest

16   issues you're alleging?

17         A.    No.

18         Q.    Okay.  Were you, Red Barn Motors, a party

19   to or a witness to any conversations with John Wick,

20   who's a defendant in this case, about these interest

21   issues?

22         A.    Was I party to any conversation?

23         Q.    Or a witness in conversation or

24   communication --

25         A.    No.



1      Q.      -- with John Wick?

2      A.      No.

3      Q.      What benefit did you, Red Barn, confer on

4   Cox Enterprises, specifically?

5              MR. COMAN:

6                    Objection to form.

7              THE WITNESS:

8                    Well, what do you mean by that?

9   BY MR. McCARTER:

10     Q.      You've got an unjust enrichment claim in

11  this case.  And so I understand you are saying you

12  paid interest to NextGear Capital, Inc., that you

13  don't think it was due.  Did you pay any money to

14  Cox Enterprises, Inc., specifically?

15             MR. COMAN:

16                   Objection to form.

17             THE WITNESS:

18                   No.

19  BY MR. McCARTER:

20     Q.      Did Red Barn Motors pay any money to Cox

21  Automotive, Inc., specifically?

22             MR. COMAN:

23                   Objection to form.

24             THE WITNESS:

25                   Indirectly.



 1  BY MR. McCARTER:

 2      Q.    What does that mean?

 3      A.    If it's being paid to NextGear or DSC,

 4  then it's being paid to Cox Automotive.

 5      Q.    Okay.  Do you remember ever writing a

 6  check or transferring an ACH directly into an

 7  account with the name of Cox Automotive, Inc.?

 8      A.    No.

 9      Q.    Okay.  Do you recall paying John Wick

10  personally any money from Red Barn Motor's account?

11      A.    No.

12      Q.    Other than the involvement of the

13  Louisiana Used Motor Vehicle Commission and sorting

14  out the title issues in this case, has Red Barn ever

15  been investigated or looked into by any state

16  agency, to your knowledge?

17          MR. COMAN:

18              Objection to form.  Answer if you

19      know.

20          THE WITNESS:

21              There was a complaint filed and I --

22      I'm not sure if it was the Attorney General,

23      but they came in and investigated a complaint

24      of a woman who said that she was renting a

25      vehicle and never purchased a vehicle and was



1          asking for her money back, and we had the

2          whole transaction on video.  So they watched

3          the video and it was put to bed.

4    BY MR. McCARTER:

5          Q.    Do you recall the timing of that?

6          A.    Probably sometime in 2000 -- I don't.

7    I'm not going to guess.

8          Q.    Do you recall her name?

9          A.    I don't.

10         Q.    Any other investigations by any federal,

11   state or local agency that you can think of?

12         A.    No.

13         Q.    What did you do to prepare for the

14   deposition today?

15              MR. COMAN:

16                   I'm going to object to the extent

17        that it invades attorney-client privilege, but

18        past that --

19   BY MR. McCARTER:

20         Q.    I'm not asking you to describe any

21   discussions with your attorneys.  I'm asking you to

22   tell me what you did to prepare for the deposition

23   today and if that includes meeting with them, then

24   you need to tell me that, but don't tell me the

25   substance of it.



 1      A.     Okay.  I did meet with them.

 2      Q.     And when was this?

 3      A.     On Friday and I re-read the topics that

 4   you were going to be going over and the amended

 5   complaint.

 6      Q.     Okay.  And did you talk to anybody else

 7   besides your attorneys about those issues?

 8      A.     No.

 9      Q.     Quickly again before -- we talked about

10   some of your retail financing deals when you would

11   send, you know, papers to the bank for approval.  Do

12   you recall that?

13      A.     Uh-huh.

14      Q.     When you would do that, is there -- does

15   it -- how long does it usually take the bank to

16   approve the financing?

17      A.     Like, when we submit a loan, just fax it

18   over?

19      Q.     Yes.

20      A.     Sometimes, you can get an answer the same

21   day.

22      Q.     And when did you get funding typically

23   from the bank?

24      A.     When you -- when they received the title.

25      Q.     Which is when?  I mean, is it always at



1    Q.    Do you know what the nature of that claim

2  was?

3    A.    Those were loans that -- basically, what

4  they did, and the claim was -- was much smaller than

5  that.  That was an estimated amount based on what

6  the total claim could have been, but that was a

7  claim against defaults on loans, which Red Barn had

8  personally guaranteed.

9    Q.    When you say "personally guaranteed," do

10 you mean they had recourse to Red Barn if they

11 didn't collect on their retail --

12   A.    Correct.

13   Q.    Okay.  Do you know whether Mr.

14 Richardson, himself, personally guaranteed that

15 loan?

16   A.    He -- Mr. Richardson personally gave

17 permission to personally guaranty them.

18   Q.    So he gave permission for Red Barn to

19 guaranty them?

20   A.    Yes.

21   Q.    Okay.  And just generally, on Schedule --

22 let's see, Schedule D -- this starts at Page 8.

23 Then, there's a Schedule E, and then there's a

24 Schedule F, and these -- those all show different

25 types of credit if you had claims against Red Barn



 1   at the time of the bankruptcy.

 2            Do you see that?

 3            MR. COMAN:

 4                 It's multiple pages so I object to

 5        form, but if can answer whatever question he's

 6        got.

 7            MR. McCARTER:

 8                 Well, we can go through them one by

 9        one.  I'm trying to knock it out.

10   BY MR. McCARTER:

11        Q.    So between pages 8 and page 19 of Exhibit

12   #16, there's basically a list of a whole bunch of

13   creditors to Red Barn.

14            Do you see that?

15        A.    Uh-huh.

16        Q.    Okay.  Do you know one way or the other

17   whether Red Barn was current with every one of those

18   creditors except DSC at the time this bankruptcy was

19   filed?

20            MR. COMAN:

21                 I'll object to the form again.

22            THE WITNESS:

23                 No, we are not current with all of

24        them.

25   BY MR. McCARTER:



```
 1        Q.    You're weren't current with AFC either,
 2   right, at the time the bankruptcy was filed?
 3        A.    No.
 4        Q.    Okay.  Are there any other significant
 5   creditors that you can recall that you weren't
 6   current with at the time?
 7             MR. COMAN:
 8                  Objection to form.
 9             THE WITNESS:
10                  I wouldn't know off the top of my
11        head.
12   BY MR. McCARTER:
13        Q.    Okay.  But there are several on these
14   pages that you were not current with?
15        A.    Yes.
16             MR. McCARTER:
17                  All right.  Guys, I need five
18        minutes and I'll be able to rap it up.
19             MR. COMAN:
20                  Sure.
21             MR. McCARTER:
22                  Okay.  Off the record.
23                  (Recesses taken.)
24             MR. McCARTER:
25                  All right.  Ready?
```



DEVON LONDON                                          October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                                 213

```
 1            MR. COMAN:

 2                 Yes, sir.

 3            MR. McCARTER:

 4                 This won't take long.  Back on the

 5        record.

 6  BY MR. McCARTER:

 7       Q.    Mr. London, we've talked before about

 8  sort of the net income and business before

 9  bankruptcy and after bankruptcy.  Do you remember

10  that?

11       A.    Uh-huh.

12       Q.    So prior to bankruptcy, how did the

13  business compare from 2010 to 2011?

14       A.    From 2010 to 2011, there was growth.

15       Q.    Okay.  And is that because you started up

16  in 2010 and you were just expanding operations?

17       A.    Pretty much.  I mean, in 2011 is when we

18  really started operating, you know, and running it

19  like a car dealership.

20       Q.    Yes.  And you got into credit

21  arrangements with both AFC and DSC in 2011?

22       A.    Was it 2011?

23       Q.    I think so.

24       A.    Yes, okay.

25       Q.    Okay.  And did that credit allow you to
```



```
1   acquire more inventory and make more profit?

2        A.    Yes.  It allowed us to generate more

3   inventory.

4        Q.    Okay.  And then from 2011 to 2012, was

5   the business still growing, shrinking, do you

6   recall?

7        A.    It was growing.

8        Q.    Okay.  And then 2012 to 2013, was it --

9   was it growing in 2013 before the NextGear default?

10       A.    It was always on an upward swing.

11       Q.    Okay.  You testified earlier, though, and

12  it's in your answer as well, but in 2013 -- I'm

13  sorry, not your answer, in your complaint, that in

14  2013, Red Barn ran into financial difficulties --

15       A.    Uh-huh.

16       Q.    -- is that right?

17       A.    Correct.

18       Q.    And you described those as being mostly

19  caused by the issue of Southwest Finance, right?

20       A.    Well, it was not largely caused by the

21  issue with Southwest Finance.  That was an issue.

22  It was largely caused by this scheme that siphoned a

23  whole bunch of money off of the business.

24       Q.    Okay.  Prior to DSC, you know, claiming

25  default and picking up its cars in March of 2013,
```



1    were you having any other financial difficulties,

2    were there any other creditors you were having

3    trouble paying?

4        A.    It all happened at once.  It all happened

5    at once.

6        Q.    Okay.  But at some point prior to DSC

7    picking up cars, Southwest Finance informed you that

8    they weren't going to buy as much paper as you

9    thought they were going to buy?

10       A.    That is correct.

11       Q.    Okay.  And were there any other creditors

12   that you can recall Red Barn defaulting to prior to

13   the middle of March 2013?

14       A.    No.  I believe we were current with

15   everybody.

16       Q.    Okay.

17             MR. McCARTER:

18                   Okay.  No further questions, thank

19       you.

20                   EXAMINATION

21   BY MR. COMAN:

22       Q.    Mr. London, I just have a few.  At the

23   beginning of your relationship with DSC -- and I say

24   your relationship, I should rephrase.

25             Red Barn -- Red Barn's relationship with



1  Dealer Services Corporation, did DSC, through

2  contracts or through representatives represent to

3  you that they would only charge you interest and

4  curtailment fees beginning from the date of advance?

5          MR. McCARTER:

6                Object to form.

7  BY MR. COMAN:

8      Q.    You can answer.

9          MR. McCARTER:

10               Object.  Asked and answered.  Go

11     ahead.

12         THE WITNESS:

13               Yes.

14 BY MR. COMAN:

15     Q.    Okay.  Did DSC conceal that fact from Red

16 Barn?

17     A.    Yes.

18         MR. McCARTER:

19               Object to form.

20 BY MR. COMAN:

21     Q.    Let me rephrase it.  I'm sorry.

22         Did Red Barn conceal the fact that it

23 was, in fact -- did DSC conceal from Red Barn that

24 it was, in fact -- DSC was hiding and actually

25 charging interest and curtailment fees to you



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                        217

```
 1   without your knowledge?
 2              MR. McCARTER:
 3                   Object to form.  These are all
 4        leading and full of false assumptions.
 5   BY MR. COMAN:
 6        Q.    You can answer.
 7        A.    Yes.
 8        Q.    Did that damage Red Barn or did Southwest
 9   damage Red Barn?
10              MR. McCARTER:
11                   Object to form.
12              THE WITNESS:
13                   The damage to Red Barn was caused by
14        DSC.
15   BY MR. COMAN:
16        Q.    Earlier, you testified under counsel's
17   questions regarding Stuart LaBauve and an
18   interaction you had with him, without the quote, you
19   were somewhere midstream, let's say, in the
20   relationship between Red Barn and DSC.  Do you
21   recall that testimony?
22        A.    Yes.
23        Q.    Okay.  And describe for us the
24   interaction that you had and the confrontation,
25   quote/unquote, that you had with Stuart LaBauve and
```



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                         218

```
 1   what you learned at that date?
 2            MR. McCARTER:
 3                 Objection, asked and answered in
 4       detail.
 5   BY MR. COMAN:
 6       Q.    You can answer.
 7       A.    I basically learned at that date that DSC
 8   was charging interest from the date of the advance
 9   -- from the date of the -- from the date of the
10   auction versus the date that we actually
11   floorplanned the vehicle through the auction.
12       Q.    And what was your understanding at that
13   time from Stuart LaBauve as to that difference in
14   time between those two?
15            MR. McCARTER:
16                 Object to form.
17            THE WITNESS:
18                 That was just the way that it was.
19       He said that -- that's the way it was.  They
20       always go from the date of the sale.
21   BY MR. COMAN:
22       Q.    Okay.  And did your knowledge and
23   understanding of this process evolve from that
24   moment to the end of the relationship, let's say, in
25   March of 2013?
```



DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                         219

1       A.      Yes, it did.

2       Q.      Okay.  Tell us how.

3       A.      Well, we had the conversation with Stuart

4    and under the assumption it was three to four days

5    or however many days it was, we chose to continue

6    the relationship and just not cause any problems,

7    but --

8       Q.      Let me stop you there.

9              MR. McCARTER:

10                   No.  Let him answer the question.

11          He's answering the question and you stopped

12          him in the middle of his answer.  Go ahead and

13          answer.

14              THE WITNESS:

15                   Okay.  Then, it really came to light

16          with the Ford 500 in 2013 where we had paid

17          off the vehicle.  We had paid all of the

18          curtailment fees.  We had paid all of the

19          interest.  We had paid everything to DSC and

20          DSC was the one that reimbursed us for the

21          money that we paid, because they had never

22          paid the auction for the car.  So if the

23          auction had never gotten paid for the car, DSC

24          utilized all of our funds for the time since

25          they were collected without ever making a loan



800.211.DEPO (3376)
EsquireSolutions.com

DEVON LONDON                                    October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                         220

1          on the vehicle.  Then, I started thinking

2          about all of the times that we had actually

3          paid off a car before DSC had the title and

4          how many times this actually happened, and it

5          was voluminous.  It was not one time.  It

6          wasn't two times.  It was many times that we

7          paid off DSC and the title wasn't available

8          and we had to wait for the title.  And that

9          was when I realized how big the scheme was and

10         how voluminous it was.

11   BY MR. COMAN:

12        Q.    Are you done?

13        A.    Yes.

14        Q.    I didn't mean to cut you off.  Your

15   knowledge level that you just described, that was at

16   the end of the relationship; is that correct?

17        A.    Yes.

18        Q.    That grew and expanded from your original

19   conversation with Stuart LaBauve when you confronted

20   him about the differential in time; is that correct?

21             MR. McCARTER:

22                  Objection to form.

23             THE WITNESS:

24                  That is correct.

25   BY MR. COMAN:



1    Q.   All right.  Now, you were asked several

2    questions regarding auction houses and you mentioned

3    Manheim Auctions.  Okay.  How many of those auctions

4    have you been barred from, at least that you know of

5    specifically, Manheim auctions?

6              MR. McCARTER:

7                   Object to form.

8              THE WITNESS:

9                   I have been told by Manheim New

10        Orleans that I'm barred from all Manheim

11         auctions.

12   BY MR. COMAN:

13    Q.   Okay.  Did you also check with Manheim

14   Lafayette?

15    A.   Manheim Lafayette has barred us, yes.

16    Q.   Okay.  The non-Manheim auction houses in

17   the industry, you described at length the various,

18   and I'll call them restrictions; is that a fair

19   statement that you're operating under at this point?

20             MR. McCARTER:

21                  Object to form.

22             THE WITNESS:

23                  Repeat the question.

24   BY MR. COMAN:

25    Q.   Sure.  Look over here.  I'm sorry.  The



1    non-Manheim auctions, the deposits, whatever --

2    whatever relationship you have at this point with

3    non-Manheim auctions --

4        A.    Uh-huh.

5        Q.    -- in the business relationship, okay,

6    how is that -- is that restricting -- is that

7    adversely affecting you and your business at this

8    minute?

9            MR. McCARTER:

10                Objection to form.

11           THE WITNESS:

12                Yes, it does.

13   BY MR. COMAN:

14       Q.    How?

15       A.    It -- it limits our ability to procure

16   cars.  It limits our ability to write checks on

17   vehicles.  We have to pay for the vehicle at the

18   time that we purchase the vehicle, whether title is

19   present or not.  The auctions -- the amount of

20   auctions that we can go to limits our ability to get

21   the same inventory that other dealers have access

22   to.

23       Q.    Has that -- all those items, have those

24   adversely affected Red Barn's income?

25       A.    Yes.



DEVON LONDON                                      October 25, 2016
RED BARN MOTORS VS. COX ENTERPRISES                              223

```
 1        Q.    Has it adversely affected Red Barn's

 2   business reputation?

 3              MR. McCARTER:

 4                    Object to form.  Lack of foundation.

 5              THE WITNESS:

 6                    Yes.

 7   BY MR. COMAN:

 8        Q.    Has that adversely affected your goodwill

 9   within the industry?

10              MR. McCARTER:

11                    Object to form.

12              THE WITNESS:

13                    Absolutely.

14   BY MR. COMAN:

15        Q.    Has it also affected the overall

16   valuation of Red Barn at this point?

17              MR. McCARTER:

18                    Object to form.

19   BY MR. COMAN:

20        Q.    You can answer.

21        A.    Absolutely.

22              MR. COMAN:

23                    Okay.  One moment, please.

24                    I don't think I have any further

25      questions at this time.
```



1           MR. McCARTER:

2                 Okay.  I've got to clear up a couple

3        things.

4                       RE-EXAMINATION

5     BY MR. McCARTER:

6        Q.    So we went in detail over your

7     conversations with Mr. LaBauve before and you said

8     in the initial conversations with him, you said that

9     he concealed the interest issue, but you didn't

10    recall any specifics representations about the

11    timing of interest.  Do you remember that?

12       A.    He said -- repeat.

13       Q.    Okay.  So both your complaint and your

14    testimony earlier was that Mr. LaBauve concealed the

15    timing of DSC's interest charging in initial sales

16    meeting that you had with him, but you testified he

17    didn't make any specific statements or

18    representations to you about the interest.  Do you

19    recall that?

20       A.    Yes.

21       Q.    Okay.  And so when your attorney just now

22    asked you about did he misrepresent to you in that

23    initial conversation, you're talking about the

24    concealment and not actual statements, correct?

25       A.    I don't understand your question.



1    Q.    Okay.  So he didn't make any actual

2  statements to you about the timing of interest and

3  when it would start on the DSC line in your initial

4  meeting with Mr. LaBauve?

5    A.    No, but the contract stated it.

6    Q.    Okay.  So you're relying on what's in the

7  contract?

8    A.    I'm relying on what's in the contract and

9  what was represented by Stuart LaBauve, which is not

10  the truth --

11    Q.    Okay.

12    A.    -- the -- the 4 percent, the -- there

13  were -- there were numerous things that weren't

14  true.

15    Q.    Okay.  We're specifically talking about

16  the timing of when interest began to accrue on the

17  advance.  And you testified that Mr. LaBauve did not

18  make any statements to you on that issue in your

19  initial sales meeting with him.  Do you recall that?

20    A.    Yes.

21    Q.    Okay.  And there was some testimony just

22  now with your attorney where you were talking about

23  non-Manheim auctions.  We -- we covered a handful.

24  Was it three or four non-Manheim auctions that

25  you've dealt at since 2013.  Do you recall that?



 1   Again, they were Oak View Auto Auction, Long Beach,

 2   Mississippi, Baton Rouge ABC.  Okay.  Have you dealt

 3   at any other Manheim auctions since 2013?

 4        A.    No.

 5        Q.    Okay.  Have you tried to deal at any

 6   other Manheim auction -- non-Manheim auction since

 7   2013?

 8        A.    Yes.

 9        Q.    Which one?

10        A.    I don't know the name of it.

11        Q.    Do you know where it was?

12        A.    It was, I believe, in Lafayette.  We --

13   we signed up and we basically have not gone.

14        Q.    So you -- you can go to this -- this

15   non-Manheim auction in Lafayette, you just chose not

16   to?

17        A.    I don't -- I -- I don't remember if we

18   were approved or not approved.

19        Q.    Okay.  So as we sit here today, you don't

20   know whether you can do business at that auction?

21        A.    Correct.

22        Q.    Okay.  Have you tried to go to any other

23   non-Manheim auctions since 2013?

24        A.    No.

25        Q.    Besides ABC Baton Rouge, have you tried



1   to go any other ABC auto auctions?

2        A.    No.

3        Q.    Okay.  Have you tried to pass a check at

4   any other non-ABC auction -- I mean, any other ABC

5   auction?

6        A.    Have I tried to pass a check?

7        Q.    Have you paid with a check at any other

8   ABC auction?

9             MR. COMAN:

10                 Objection to form.

11             THE WITNESS:

12                 At any another ABC auction, because

13        AB -- you're saying just ABC auctions in

14        whole?

15   BY MR. McCARTER:

16        Q.    Okay.  You -- you understand that ABC

17   auction is an auction company with multiple

18   locations, right?

19        A.    Yes.

20        Q.    Okay.  And we covered your permissions at

21   ABC Baton Rouge, right?

22        A.    Correct.

23        Q.    You said you haven't dealt at any other

24   ABC auctions since 2013?

25        A.    Correct.



 1      Q.    So can I -- can I assume you haven't

 2   tried to pay any other ABC auction a check since

 3   2013?

 4      A.    Yes.

 5      Q.    Okay.  Have you tried to pay any -- have

 6   you tried to go to any Odessa auto auctions since

 7   2013?

 8      A.    No.

 9      Q.    Have you tried to go any other

10   independent auctions besides the ones that we just

11   talked about specifically?

12      A.    No.  The reasoning is because our target

13   market, if you go outside of this market and have to

14   pay transportation fees and everything else to get

15   the vehicle here when you're dealing with a $2,000

16   car is going to, you know, make you pay more for the

17   vehicle or end up being in the vehicle more

18   generally than if you stayed within the area.

19      Q.    Okay.  So it would be less profitable for

20   you to go outside of this area of Louisiana?

21      A.    Generally, yes.

22      Q.    Okay.  And have you tried to buy on-line

23   at any wholesale vehicle source like Smart Auction,

24   Copart, anything like that?

25      A.    No.

