1

```
1        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF INDIANA
2              INDIANAPOLIS DIVISION

3

  RED BARN MOTORS, INC., PLATINUM
4 MOTORS, INC., MATTINGLY AUTO
  SALES, INC., AND YOUNG EXECUTIVE
5 MANAGEMENT & CONSULTING
  SERVICES, INC., INDIVIDUALLY
6 AND ON BEHALF OF OTHER MEMBERS
  OF THE GENERAL PUBLIC SIMILARLY
7 SITUATED

8      PLAINTIFFS,
                              CASE NO.
9 VERSUS
                        1:14-CV-01589-TWP-DKL
10 COX ENTERPRISES, INC., COX
   AUTOMOTIVE, INC., NEXTGEAR
11 CAPITAL, INC. F/K/A DEALER
   SERVICES CORPORATION, SUCCESSOR
12 BY MERGER WITH MANHEIM AUTOMOTIVE
   FINANCIAL SERVICES, INC., AND
13 JOHN WICK

14     DEFENDANTS.

15

  * * * * * * * * * * * * * * * * * * * * * *
16     TRANSCRIPT OF THE 30(b)(6) DEPOSITION OF:
              RED BARN MOTORS, INC.,
17 TAKEN ON BEHALF OF THE DEFENDANTS THROUGH THE
   TESTIMONY OF DONALD RICHARDSON, IN HIS INDIVIDUAL
18 AND CORPORATE CAPACITY, REPORTED IN THE ABOVE
   ENTITLED AND NUMBERED CAUSE BY BRITTANY E. VIDRINE,
19 CERTIFIED COURT REPORTER FOR THE STATE OF
   LOUISIANA.
20 * * * * * * * * * * * * * * * * * * * * * *

21       REPORTED AT THE OFFICES OF:
         LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD
22       9311 BLUEBONNET BOULEVARD, SUITE A
         BATON ROUGE, LA  70810
23
     COMMENCING AT 10:40 A.M. ON DECEMBER 15TH, 2016.
24

25
```

**EXHIBIT 7**

20

```
 1  specifically say it in the question.
 2      A.   Okay.
 3           MR. AIREY:  And are you doing this
 4           as an individual capacity on this?  I
 5           think all of them Devon answered, so...
 6           MS. LEDBETTER:  Yeah.  I guess
 7           that -- to the extent it's not responsive
 8           to the topics.
 9  BY MS. LEDBETTER:
10      Q.   So you said Devon is or was the GM of Red
11  Barn, right?
12      A.   Yes.
13      Q.   How often did you interact with him as
14  GM?
15      A.   At a minimum, weekly.  We'd talk on the
16  telephone or we'd visit at the house.
17      Q.   Do you have an office at the dealership?
18      A.   No.
19      Q.   How often do you go down to the
20  dealership?
21      A.   Less often, generally, than once a month.
22  I did not involve myself with the various
23  day-to-day operations.  I would ask him what -- how
24  things are going.  I would go online and check the
25  banking account from time to time.  But as far as
```

21

1  day-to-day stuff, I didn't -- I didn't go down

2  there.

3      Q.   And was it Devon that was running the

4  day-to-day stuff?

5      A.   Yes.

6      Q.   Who is responsible for making sort of

7  bigger decisions about the business?

8           MR. AIREY:  Object to the form.

9      A.   What do you mean "bigger decisions"?

10 BY MS. LEDBETTER:

11     Q.   Like, for example, entering contracts or

12 changing the strategy of, you know, types of cars

13 you're going to sell, things like that.

14     A.   I would do that in consult with Devon and

15 Dan.

16     Q.   Devon has been with Red Barn since the

17 beginning, right?

18     A.   Yes.

19     Q.   Has Dan been with Red Barn since the

20 beginning?

21     A.   No.

22     Q.   How long has he been with Red Barn?

23     A.   He was with us for awhile, probably in

24 2012, and then he left, and then after the

25 bankruptcy he came back with us again.  So that

22

1   would have been probably in '14.

2       Q.   And when he was with you in 2012, was

3   that just for like a year, or had he been with you

4   prior to 2012?

5       A.   He had not been with us before.

6       Q.   When did Red Barn first start doing

7   business with NextGear -- or DSC at the time?

8       A.   I think that was in the summer of 2011

9   just after we were a year old, I think.

10      Q.   And was it Devon that made the first

11  contact with somebody from DSC?

12          MR. AIREY:   Object to the form.

13      A.   I think that Devon was the first one that

14  talked to someone from DSC; however, I'm not sure

15  that he made the -- the initial contact.  I think

16  he was contacted, if I'm not mistaken.

17  BY MS. LEDBETTER:

18      Q.   Did you ever meet with anybody from DSC?

19      A.   Yes.  I met with Stuart LeBauve at the

20  Red Barn offices for him to explain how the

21  floorplan program worked.

22      Q.   Do you know whether Devon had already

23  talked to Stuart LeBauve at that point?

24      A.   Yes.

25      Q.   When did you meet with Stuart, if you

23

1  remember?

2      A.    Well, it would have been before the

3  contract was signed, maybe a month or six weeks or

4  so.

5      Q.    So you met him before actually signing

6  the contract?

7      A.    Yes.

8      Q.    Do you know what Stuart's role was at

9  DSC?

10     A.    He was just the local sales guy, as far

11  as I knew.

12     Q.    In that first meeting, what did he tell

13  you about the floorplan?

14     A.    He gave me a very broad stroked

15  explanation of the function of the floorplan in the

16  overall dealership -- an overall purchase of cars

17  for the dealership.  I do not remember the details

18  of the conversation at all.  I know Devon was

19  anxious to try to get a floorplan program so that

20  we could expand our inventory.  I was a little

21  hesitant.  And so he arranged the meeting between

22  LeBauve and me and Devon to get some further

23  insights into what they did and how they operated

24  and so forth.  As it turned out, I didn't get

25  enough information.

24

1      Q.    Were you familiar with floorplans before
2  this meeting?

3      A.    No.

4      Q.    So you never had one before, for example?

5      A.    No.

6      Q.    Have you ever heard of them before?

7      A.    Yes.

8      Q.    When did you hear about them?

9      A.    When I was a salesman in the car
10  business.

11     Q.    So you were generally familiar with the
12  concept?

13              MR. AIREY:  Object to the form.

14     A.    I don't think familiar would be a proper
15  term.  Aware may be a better term.

16  BY MS. LEDBETTER:

17     Q.    You knew that there were things out there
18  called floorplans?

19     A.    Yes.

20     Q.    Do you remember whether you discussed
21  with Stuart the interest that would be charged on a
22  floorplan?

23     A.    No.

24     Q.    No, you didn't discuss it, or, no, you
25  don't remember?

25

1    A.    I don't remember what the particulars

2 were of what we discussed.   The only thing about

3 the interest that I recall is that Devon told me it

4 was going to be four and a half percent, which

5 turned out to be inaccurate.

6    Q.    So you don't remember any discussion

7 about when interest would begin to accrue, right?

8    A.    No.

9    Q.    No, you don't remember?

10    A.    I don't remember.

11    Q.    In that first meeting, did you discuss

12 the curtailment fees that would be charged on the

13 floorplan?

14    A.    I don't recall that we did.

15    Q.    Are you familiar with curtailment fees

16 now?

17    A.    Yes.   Devon raised the term later, and I

18 asked what is that.   So LeBauve didn't tell me

19 enough about it for me to know what it was.   If he

20 mentioned it at all, I don't remember.

21    Q.    Do you have any documents or records or

22 notes of that meeting that would refresh your

23 memory of what you discussed?

24    A.    No.   Unfortunately, all of my documents

25 with Red Barn were lost in the flood, as well as

26

1 the documents of the bankruptcy.

2      Q.   Did you have any other meetings with

3 Stuart after that first meeting?

4      A.   Not that I recall.  I met him once or

5 twice, but we didn't have any discussions.

6      Q.   Is it fair to say that at that first

7 meeting with Stuart LeBauve about maybe a month or

8 so before you signed the floorplan agreement was

9 the only time that you had a substantive

10 conversation with Stuart about the floorplan?

11      A.   That was the only time, to the best of my

12 recollection.

13      Q.   Of course.  I'm going to show you a

14 document that was previously marked in Devon's

15 deposition as Exhibit 5.

16      A.   Yes.  July --

17      Q.   So this is a series of documents that I

18 guess make up the floorplan.  Does this refresh

19 your memory at all of when you might have met with

20 Stuart and had that conversation with him?

21      A.   This document doesn't.

22      Q.   Or the dates on the document?

23      A.   Well, the date on the document says July,

24 so it would have had to have been before that,

25 maybe June, maybe early July.  I don't remember.

1        Q.    And I just want to walk through and make

2   sure these are your signatures.  I think they are.

3   But since you're here, I guess I'll ask you.  So on

4   this first page of the DSC floorplan application,

5   is that your signature on it?

6        A.    Yes.

7        Q.    And is the information on that

8   application correct -- was it correct at the time,

9   to the best of your knowledge?

10                  MR. AIREY:   Other than objecting

11             to -- that there's blackout on it, that

12             probably wasn't there at the time, but...

13                  MS. LEDBETTER:   Right.

14        A.    The address is 26007.  I always referred

15   to it as 26 James Bond.  That's the way I

16   remembered it.

17   BY MS. LEDBETTER:

18        Q.    That's a good way to remember.

19        A.    You will never forget that now.

20        Q.    So all of the information on the

21   application looks right?

22        A.    It looks correct, yes.

23        Q.    And the next few pages --

24        A.    No, it's not correct.  It says a hundred

25   percent -- a hundred percent ownership, and that

28

1  was not correct.

2      Q.   It should be...

3      A.   It should be 50/50 between me and my

4  wife.  But if I was a hundred percent owner and --

5  community property states she'd still be half

6  owner, so...

7              MS. LEDBETTER:  Is this a community

8         property settlement?

9              MR. AIREY:  Yes.

10             THE WITNESS:  Am I right?

11             MS. FELDER:  You were right,

12        correct.

13             THE WITNESS:  So even that is --

14        reasonably correct, okay?

15  BY MS. LEDBETTER:

16     Q.   Okay.  So the next few pages are the

17  Demand Promissory Note and Security Agreement, and

18  I believe the signature for that is on page

19  NG_003569.  And you signed that as president and as

20  guarantor, right?

21     A.   Yes.

22     Q.   That's your signature?

23     A.   (No response.)

24     Q.   And another page, over on 3571, that's

25  the term sheet for the floorplan, and that's your

29

1  signature on that as well?

2      A.   Yes, that's my signature and initials.

3      Q.   All right.  The next page is the Power of

4  Attorney on page 3572, and that's your signature as

5  well?

6      A.   Yes.

7      Q.   The next document is an Individual

8  Personal Guarantee, and it ends on page 3575.  And

9  that's your signature?

10     A.   Yes.

11     Q.   And on the next page, which is the

12 Contract Quick Facts, are those your initials --

13     A.   Yes.

14     Q.   -- and then your signature on the back?

15     A.   Yes.  And there's Stuart LeBauve's

16 signature.

17     Q.   When you signed these documents that

18 we've just gone through, was Stuart there at the

19 time?

20     A.   No.

21     Q.   How did you get these?

22     A.   Well, I don't remember Stuart being there

23 at the time.  He may have been, but I don't

24 remember him being there.  I -- he may have been to

25 instruct me where I need to sign or initial.  I

32

1    that would override it.

2         Q.   Like a later contract or something.

3         A.   No.   We never had a later contract.

4         Q.   Or like a cancellation or...

5         A.   I don't recall signing any other

6    documents.

7         Q.   And did you understand that the

8    Individual Personal Guarantee meant that you

9    personally were on the hook for any debt that Red

10   Barn had to DSC?

11        A.   Yes.

12        Q.   Did you understand that DSC had a

13   security interest in the vehicles that Red Barn

14   floorplanned with DSC?

15        A.   I understood that DSC had a security

16   interest in the cars they floorplanned.   I did not

17   understand that they had a claim, or whatever you

18   would call it, for stuff that they did not

19   floorplan.

20        Q.   And what's your understanding of what a

21   security interest is?

22        A.   That was collateral to them for what they

23   loaned us, as it were, to pay the auction.

24        Q.   And so your understanding was that DSC

25   had a right to repossess the vehicles that they

33

1  floorplanned if Red Barn were to default?

2      A.   Yes.

3      Q.   But you did not at the time understand

4  that DSC -- or you did not understand at the time

5  whether DSC had a right to repossess other vehicles

6  and property if Red Barn defaulted to DSC?

7      A.   That's correct.

8      Q.   And after signing the DSC floorplan, did

9  Red Barn also enter a floorplan agreement with AFC?

10      A.   Yes.

11      Q.   Was that -- did Red Barn enter the

12  floorplan with AFC around the same time as with DSC

13  or much later?

14      A.   Trick question.  It was after.  I don't

15  recall how long after.

16      Q.   Do you know what Red Barn's line of

17  credit was with DSC?  Does two hundred thousand

18  dollars sound right?

19      A.   No.  This -- I looked at this

20  (indicating), and it says two hundred thousand

21  dollars.

22      Q.   And does that sound right to you?

23      A.   Yeah.

24      Q.   Was the floorplan -- or the line of

25  credit with AFC, was that around the same amount?

34

1      A.   No, it was less.

2      Q.   It was less?

3      A.   I don't know exactly how much, but I know

4  it was less.  AFC was less inclined to open a

5  floorplan account with a dealer until they had a

6  little bit more experience than DSC required.  I

7  don't know how -- when we did the one with AFC.  I

8  don't have any idea.

9      Q.   And my understanding from Devon London's

10 deposition is that those were the only two

11 floorplans that Red Barn had; is that right?

12     A.   That's correct.

13     Q.   So Red Barn never had a floorplan with

14 Manheim Automotive Financial Services?

15     A.   No.

16     Q.   Do you know how AFC charged interest on

17 their floorplan?

18     A.   Not directly.  Indirectly I heard -- so

19 this is hearsay right off the bat, right?

20     Q.   Yeah.

21     A.   -- that they immediately sent a check to

22 the auction when you bought the car.  Don't ask me

23 what "immediate" means, and don't ask me if that's

24 actually correct or not, because I don't know.

25     Q.   Who did you hear that from?

35

1         A.    I heard it from Devon.   I don't know who
2    Devon heard it from.
3         Q.    Did you personally ever communicate with
4    anybody from DSC other than Stuart LeBauve?
5         A.    Yes.
6         Q.    Who did you talk to?
7         A.    A guy named Roger whoever.   That was
8    after we had the difficulty.
9         Q.    Any idea what his last name might be?
10        A.    Devon's deposition contains his last
11   name, but I -- I'm not sure.   I think it might have
12   been Tate, T-A-T-E, but I'm not sure.
13        Q.    And you talked to him after the
14   bankruptcy?
15        A.    No, after we couldn't pay the floorplan
16   and they picked up their cars.   And then in an
17   attempt to avoid bankruptcy, I tried to work out an
18   arrangement to pay off everybody.   And he was the
19   one I talked to, and he was far less than
20   cooperative.
21        Q.    Do you know what his position was with
22   DSC?
23        A.    No.
24        Q.    Was he local or in Indianapolis?
25        A.    He wasn't in Indianapolis.   I think he

36

1  might have been in Alabama, but I don't know that

2  for sure.

3      Q.   Did you ever talk to him personally or

4  just over the phone?

5      A.   No, I never talked to him.  If he walked

6  in the door, I wouldn't know who he was.

7      Q.   So you talked to him over the phone?

8      A.   Phone.

9      Q.   And was that in like the March 2013

10 timeframe?

11     A.   In that general timeframe.

12     Q.   Did you ever talk to anybody else from

13 DSC other than Stuart and Roger?

14     A.   I talked to somebody in corporate, but I

15 don't have a clue what their name was.

16     Q.   When was that?

17     A.   In that same timeframe.

18     Q.   In the March 2013 timeframe?

19     A.   Yeah.  We had a large receivable on buy

20 here pay here, and I thought that if I could

21 persuade the creditors to accept payments over a

22 year that we could pay everybody what we owed them

23 and avoid the expense of a bankruptcy.  Most

24 creditors -- all of the unsecured creditors were

25 willing to do that.  After they picked up the cars,

37

1  in my mind, AFC and DSC were unsecured.  DSC, as it

2  turns out, was not unsecured in their minds, and

3  they had absolutely no interest, whatever, in

4  working out anything.

5      Q.    So you just said in your mind AFC and DSC

6  were unsecured after they had picked up the cars.

7  Can you explain a little bit what you mean by that?

8      A.    Sure.  The car was their security.  When

9  they picked it up, they were unsecured.

10     Q.    Because they had -- they had their

11 security?

12     A.    They had their security.

13     Q.    There was nothing else --

14     A.    They picked up their security and --

15 balance was unsecured in my mind.

16     Q.    Because in your mind, there was nothing

17 else that they had a right to --

18     A.    Right.

19     Q.    -- take as security?  So during the time

20 that Red Barn was doing business with DSC before

21 this -- the events in March 2013 or so, was Stuart

22 LeBauve the only person that you talked to?

23     A.    Yes.

24     Q.    And I guess I should have asked, did you

25 ever talk to Stuart LeBauve after that first

38

1  meeting in 2011 and before the events in March

2  2013?

3      A.   Other than just to shake hands with him

4  when he was out at the -- he would conduct some of

5  the audits for DSC and make sure that we had all of

6  our cars on the lot.  And I met him once or twice

7  and shook hands with him while he was doing that.

8  But as far as discussions, there were no further

9  discussions.

10      Q.   And when you say lot audit, was Stuart

11  doing a collateral audit to check the collateral on

12  Red Barn's lot?

13      A.   Yes.

14      Q.   And he was --

15      A.   The cars.

16      Q.   He was confirming that the cars were

17  there?

18      A.   Yeah.  The cars that they had

19  floorplanned were there or had been sold and he

20  would look at the paperwork to see if they had been

21  sold there.

22      Q.   Did anybody else ever do those lot audits

23  other than Stuart?

24      A.   I don't know.  I wasn't there for, by

25  far, most of them.

39

1    Q.   But you never met anybody other than

2  Stuart --

3    A.   No.

4    Q.   -- doing them?  Are you familiar with

5  something called the KO book?

6    A.   The what?

7    Q.   The KO book?

8    A.   You mean, "KO"?

9    Q.   Uh-huh.

10   A.   I didn't know it existed until I read

11 Devon's deposition.

12   Q.   Okay.  So until -- so prior to filing

13 this lawsuit, for example --

14   A.   I heard of the "blacklist," but I never

15 heard of the term "KO book."

16   Q.   So what's your -- what's your

17 understanding of the blacklist?

18   A.   That DSC and maybe AFC, I don't know,

19 would put your name on a list of names that was not

20 eligible to finance cars on their floorplan and the

21 auction was not to sell to you.  That was my

22 understanding of it.  If your name was on that

23 book, the auction was absolutely not to sell cars

24 to you.

25   Q.   And the auction was not to sell cars to

40

1  you on the floorplan or at all?

2      A.   At all.

3      Q.   Where did that understanding come from?

4      A.   Devon was telling me what the blacklist

5  was.  I had never heard of the blacklist before he

6  told me.  He said, well, we can't -- let's go to

7  Hammond and buy some cars.  Let's go to Slidell and

8  buy some cars.  Let's go back to Lafayette and buy

9  some cars.  He said, we can't go there.  Why can't

10 we go there?  We're not going to put them on a

11 floorplan, we're just going to pay for them.  He

12 said, well, we're blacklisted, and we can't go to

13 those auctions anymore.

14     Q.   Did he tell you where his understanding

15 came from?

16     A.   Of the blacklisting?

17     Q.   (Nods head.)

18     A.   He had been in business for 22 years.  I

19 don't think it's a secret deal.

20     Q.   So when did you first learn of the

21 supposed blacklisting of Red Barn?

22              MR. AIREY:  Object to the form.

23              THE WITNESS:  Huh?

24              MR. AIREY:  You can answer.

25     A.   That would have been probably in April

41

1  of '13, in that timeframe right after we tried to

2  reopen and start selling cars again, tried to get

3  some inventory.

4  BY MS. LEDBETTER:

5      Q.   Are you familiar with Cox Enterprises,

6  one of the defendants in this lawsuit?

7      A.   I used to have Cox cable, but I think

8  that's all part of the same group.  At some point

9  in the more recent times, DSC became NextGear,

10  NextGear became part of Manheim and then later I

11  discovered that Manheim was owned by the people

12  that owned Cox cable.  And so other than that, I

13  was not aware that Cox was ever involved with

14  anything we were doing.

15      Q.   Do you know when DSC became NextGear?

16      A.   I heard through Devon that it had

17  happened.  And then I heard that they wanted us to

18  sign a new contract, and we didn't.  And I would

19  guess a timeframe would have been late '14 or early

20  '15.  I don't know for sure.  But it was some

21  months after -- after we had had the bankruptcy.  I

22  don't remember how long.  I didn't pay that much

23  attention to it.

24      Q.   So it was your understanding that DSC or

25  NextGear wanted Red Barn to sign a new contract?

42

```
 1      A.    Yeah.

 2      Q.    Why did they want Red Barn to sign a new

 3 contract?

 4      A.    I don't know.

 5      Q.    What was your understanding --

 6      A.    Because you're asking me to tell you what

 7 they thought, and I don't have a clue.

 8      Q.    What was your understanding of why they

 9 wanted Red Barn to sign a new contract?

10      A.    Because they had changed their name.

11      Q.    Were you doing any business with DSC at

12 that point when they wanted you to sign a new

13 contract?

14      A.    Well, maybe it was before the bankruptcy.

15 I don't remember.  It may have been before the

16 bankruptcy.  I just don't remember.

17      Q.    But, in any event, you didn't sign a new

18 contract?

19      A.    Yeah.  It was after they changed their

20 name, they wanted to sign a new contract.  But I

21 don't know why they would want to do that if we

22 weren't buying with them anymore, so maybe it was

23 before.  I don't know.  But we didn't.

24      Q.    And do you know when DSC or NextGear

25 became part of Manheim?
```

43

1      A.    I don't know what the timeframe of that

2 was.  I don't remember.

3      Q.    And do you know when DSC or NextGear or

4 Manheim started to be owned by Cox?

5      A.    I don't have any idea of when that

6 happened.

7      Q.    Is there anything that you think Cox

8 Enterprises did wrong?

9      A.    How would I know?

10      Q.    Well, you sued them.

11      A.    Huh?

12      Q.    You sued them, so...

13      A.    Okay.  You're asking me what Cox did and

14 I don't know what Cox did; however, if you have a

15 snake you want to kill, you don't cut the snake in

16 half, you cut the snake at the head.  If Cox is the

17 head of this whole scheme, then they would be

18 included in the suit.

19      Q.    And what's your basis for thinking that

20 Cox is at the head of or involved in this scheme?

21      A.    They own it.  They own the companies.

22 Are all of these companies wholly-owned

23 subsidiaries?

24      Q.    So your basis for suing them is that they

25 own NextGear?

44

1    A.   We filed a suit.   The attorneys

2 determined the appropriate defendants in that suit

3 for reasons that we have not discussed.   Now you're

4 asking me to get into the mind of my attorneys,

5 which I can't do; you're asking me to get in the

6 mind of Cox, which I can't do; and so I can't

7 legitimately answer your question because I don't

8 know.

9    Q.   And that's fair enough.   I guess what I'm

10 asking for is what your understanding is of what

11 Cox did, Cox Enterprises did that you think was

12 wrong.   Is there anything other than owning

13 NextGear?

14    A.   Here again, you're asking me to have a --

15 speak to knowledge that I do not have.

16    Q.   So you don't know?

17    A.   I don't know.   I can't tell you.

18    Q.   That's fine.   That's -- I mean, if that's

19 the answer, that's the answer.

20    A.   Okay.

21    Q.   Are you familiar with Cox Automotive?

22    A.   No.

23    Q.   So would it be fair to say that you're

24 not aware of anything specific that they did wrong?

25    A.   I'm not aware of their involvement.   I'm

45

1   not aware of what they did or didn't do.  I'm not

2   aware of -- here again, I can't answer that

3   question because I don't have any knowledge to

4   answer it with.

5        Q.   And are you familiar with John Wick?

6        A.   Who?

7        Q.   John Wick.

8        A.   Who is John Wick?

9        Q.   I take it you're not familiar with him?

10       A.   No.

11       Q.   And so you don't know of anything that

12  he --

13       A.   Wick.

14       Q.   -- would have done that was wrong?

15       A.   Wick.  Was he the guy -- did he work for

16  DSC?

17       Q.   He's one of the defendants in the

18  lawsuit.

19       A.   Yeah.  But he's -- he's some guy over

20  programs or something.

21       Q.   Okay.

22       A.   Yeah.  His name was in the deposition, I

23  think.  I think his name -- I think he -- I've

24  heard of him.  He's with NextGear?

25       Q.   Uh-huh.

46

```
 1        A.    Okay.

 2        Q.    And are you aware of anything that you

 3   would say he has done wrong?

 4        A.    I don't know what he has done.

 5              MS. LEDBETTER:  Do you-guys want to

 6              take a break?

 7              MR. AIREY:  You want to take a

 8              break?  Yeah, that sounds good.

 9              (Brief recess taken.)

10   BY MS. LEDBETTER:

11        Q.    All right.  Mr. Richardson, I wanted to

12   ask you some questions about the damages claims in

13   this case.  What was Red Barn's net income

14   immediately prior to the flood in August of this

15   year?

16              MR. AIREY:  Object to the form.  You

17              mean --

18        A.    I'm not sure what you're asking.

19              MR. AIREY:  Do you mean like monthly

20              up to that point in the year?

21              MS. LEDBETTER:  Yeah.

22   BY MS. LEDBETTER:

23        Q.    What was your income for 2016, January

24   through, I guess, July of 2016?

25        A.    2016, I'm not sure at this point.  It
```

47

1  wasn't very much because we -- we had some off

2  stuff this year.  Now, in 2012 our net income

3  before taxes was in the neighborhood of about

4  750,000 dollars.  In 2014 there was about 125,000

5  dollars.  In 2015 it should come in between 150 and

6  175,000 dollars.  We have all those records -- the

7  flood has interrupted our business cycle a little

8  bit.  We didn't get everything completed yet.

9      Q.   So you said it was not very much in 2016

10  because...

11     A.   Well, January is a slow month in the car

12  business.  February I think we sold about 22 cars

13  or something like that and in March about 20, April

14  about the same.  But in May, June and July -- now,

15  May, June and July were very slow months.  The car

16  sales was in the mid to upper teens.  Last year in

17  2015 our average sales from January through October

18  was 35 cars a month.  So this year we're going to

19  have a -- and then the flood came along, and we're

20  probably going to have a loss this year.

21     Q.   Was there any particular reason that May

22  through July was slow?

23     A.   It was slow in the whole market.  At the

24  auction Devon talked to a lot of the other car

25  dealers and they were having the same issue.  And

48

1   instead of calling the banks wanting them to take

2   the car deal, the banks were calling you wanting a

3   car deal.  It was crazy.

4        Q.   Was it just the general economy?

5        A.   I don't know exactly what caused it, but

6   it was general through the whole Baton Rouge area.

7        Q.   Now, you mentioned your income for 2012,

8   2014 and 2015.  What was it in 2013?  Do you know

9   the net income?

10       A.   Don't know.

11       Q.   That was the year of the bankruptcy,

12  right?

13       A.   Yes.

14       Q.   Were you doing business while that

15  bankruptcy was pending?

16       A.   We started back, after the bankruptcy, in

17  business as debtor in possession.

18       Q.   When was that that you started?

19       A.   Huh?

20       Q.   When did you start the business back up?

21       A.   I think it was in April of '13.  We

22  didn't have -- very little inventory because most

23  of it had been confiscated.  Is that a good word?

24  So -- oh, well, let's see.  '13?  We had an

25  operating loss in '13 in the general neighborhood

49

1  of 450,000 dollars.

2      Q.    What about 2011, do you remember the net

3  income then?

4      A.    No.  And I don't have any records to tell

5  me.

6      Q.    And what about 2010, do you have any

7  recollection of what Red Barn's income was that

8  year?

9      A.    No.

10      Q.    And do you have any records of that year?

11      A.    The flood got my records.  It wasn't a

12  lot in 2010 because we were just barely getting

13  started.  But I don't know what it was.  I don't

14  have any idea.

15      Q.    Do you have a copy of Red Barn's tax

16  returns?

17      A.    No.

18      Q.    What happened to those?  Was that the

19  flood?

20      A.    The flood.

21      Q.    Do you know if the CPA that works with

22  Red Barn has copies of those returns?

23      A.    I don't know.

24      Q.    Do you know if his office was affected by

25  the floods?

72

1      A.    It's not as competitive on a car later in

2   the auction.

3      Q.    All right.  Any other pecuniary losses

4   that you can think of?

5      A.    Not off the top of my head.

6      Q.    And what are the consequential damages

7   that Red Barn is claiming against DSC?

8                  MR. AIREY:  Object to the form.

9      A.    As much as we have not been able to

10  actually calculate those damages in several

11  instances, that would not be a question I can

12  answer.

13  BY MS. LEDBETTER:

14     Q.    Are there any other damages or losses

15  that Red Barn is asserting that we haven't talked

16  about?

17                  MR. AIREY:  Object to the form.  You

18          can answer.

19     A.    Not off the top of my head.  I think

20  we've covered most of it.

21  BY MS. LEDBETTER:

22     Q.    Did Red Barn make any attempt to reduce

23  the damages that it suffered?

24     A.    Yes.  We have reduced employees.  We have

25  tried to get the cars that we can get at as good a

73

1  price as we can.  We just can't get the other ones

2  that we would like to have.  But we still are going

3  to some auctions.  We have continued going to

4  Oak View here in Baton Rouge, but that hasn't --

5  hasn't proven to be as satisfactory because one of

6  the major suppliers of cars at that auction has

7  decided to sell the cars themselves now.  So the

8  cars that -- that are in our bracket to buy have

9  been shrunk.  So we drive to Long Beach,

10  Mississippi to try to buy some cars over there.

11           And then there's ABC auction here in

12  Baton Rouge by the airport that Devon goes to.  And

13  so trying to reduce cost to operate at less expense

14  is what we're trying to do to mitigate damages.

15  What we've done is to try to sell the cars at

16  the -- at a good price or more -- more near the

17  retail price than in the past to mitigate the

18  damages to maintain the -- the business.

19      Q.    You mentioned that, I guess, a major

20  seller at Oak View Auto Auction decided to sell the

21  cars themselves.  What did you mean by that?

22      A.    They quit sending them to auction.  They

23  just put them on their own lot.

24      Q.    And they're selling to retail customers

25  now?

74

1     A.    Pardon?

2     Q.    Are they selling to retail customers now?

3     A.    Yes.

4     Q.    Anything else you can think of that Red

5 Barn has done to attempt to reduce its damages?

6     A.    Yes.  We have avoided floorplanning.

7     Q.    And how has that reduced the damages?

8     A.    We don't have to pay that expense

9 anymore.  Interest is not the only expense of

10 floorplanning.  If you paid the fee to use DSC plus

11 the additional fee for the first curtailment,

12 you're somewhere in the neighborhood of 150, 160

13 dollars per car on expense.  By not

14 floorplanning -- assuming other floorplans have

15 similar fees.  By not using a floorplanning

16 operation, we can mitigate the damages by operating

17 more efficiently.

18     Q.    When did Red Barn stop using the AFC

19 floorplan?

20     A.    The same time we stopped using the AFCs.

21     Q.    The same time you stopped using DSC?

22     A.    Huh?

23     Q.    The same time you stopped using DSC?

24     A.    DSC, yes.  DSC and AFC were on the lot at

25 the same time picking up cars.

75

1    Q.    And were the fees for AFC and DSC pretty

2  similar?

3    A.    I'm not familiar with the fees on AFC.

4    Q.    So when you mentioned 150 to 160 dollars

5  per car --

6    A.    That was DSC's number.  And the only

7  reason I know that is because I asked Devon.  I

8  said, what are these fees?  And he told me.

9    Q.    This was marked as Exhibit 16 on Devon

10  London's deposition.  And this is the amended

11  bankruptcy petition of Red Barn Motors; is that

12  right?

13    A.    Yes.

14    Q.    And did you authorize this document to be

15  filed with the bankruptcy court?

16    A.    Yes.

17    Q.    Have you ever filed for personal

18  bankruptcy at any point?

19    A.    Yes.

20    Q.    When was that?

21    A.    Well, in the 1980s.  I'm not sure of the

22  date.

23    Q.    Have you ever filed for personal

24  bankruptcy since opening Red Barn Motors?

25    A.    No.

76

1     Q.   So take a look at Schedule B of

2 Exhibit 16.  And I'm looking at the page.  It's

3 Bates numbered RB 00006.

4     A.   Six?

5     Q.   Yes.

6     A.   That's Schedule B?

7     Q.   Uh-huh.

8     A.   Okay.

9     Q.   And towards the bottom of page six it

10 lists an unfiled claim against NextGear

11 Capital/Dealer Services Corporation for unfair

12 trade practices.  Do you see that?

13    A.   Yes.

14    Q.   Is that this case?

15    A.   Yes.

16    Q.   So you don't have any other unfiled

17 claims against NextGear or DSC, right?

18    A.   No.

19    Q.   And what are the insurance claims listed

20 right below that?

21    A.   That was a --

22          MR. AIREY:  (Indicating).

23          THE WITNESS:  Yeah, I see that.

24    A.   We are the loss payee on insurance for

25 cars that buy here, pay here.  This appears to be a

77

1  claim for someone who totaled a car and were

2  pending insurance payment.

3         Q.   So like a car insurance payment?

4         A.   Yeah.  Well --

5         Q.   For the property damage or something like

6  that?

7         A.   Yeah.

8         Q.   Okay.  Looking at the next page, which is

9  RB 0007, it lists DSC vehicles.  Is that the DSC

10 collateral?

11        A.   Yes.

12        Q.   And why was the amount -- or the value

13 unknown?

14        A.   Because we were never furnished any

15 printout of the value of the vehicle, the pay-off

16 value, the amount received when they sold the

17 vehicle and the balance on that vehicle.  And so we

18 didn't know what that number was.

19        Q.   Did you contact NextGear shortly after

20 you filed for bankruptcy to ask for a detailed

21 report of Red Barn's activity?

22        A.   Yes.

23        Q.   And what was the result of that?

24        A.   We got no report.

25        Q.   Why were you calling to ask for it?

78

1      A.    Pardon?

2      Q.    Why were you calling to ask for it?

3      A.    To find out where we were relative to

4 what our -- what our remaining payment was to them,

5 what our remaining balance due to them was.  And we

6 never got the report.

7      Q.    Do you know if a report was ever sent to

8 your bankruptcy attorney?

9      A.    Not to my knowledge.  NextGear never

10 responded to anything in the bankruptcy, the

11 notices, no proof of claim, no telephone calls, no

12 card from Hawaii, nothing.  We got -- there was

13 total silence.

14     Q.    Turn to the next page, page eight.  This

15 is Schedule D of the bankruptcy, right?

16     A.    Schedule D, secured claims.

17     Q.    So this shows that AFC had a 50-thousand

18 dollar claim with 13,592 being unsecured.  Do you

19 see that?

20     A.    Yes.

21     Q.    Do you have any reason to think that was

22 inaccurate at the time?

23     A.    No.  I don't think it was necessarily

24 inaccurate.  I just -- I can't tell you exactly --

25 well, just reading, it says that we had certain