Case 1:14-cv-01589-TWP-DLP  Document 197-8  Filed 04/26/17  Page 1 of 166 PageID #: 3573

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF INDIANA

3                   INDIANAPOLIS DIVISION

4

5    RED BARN MOTORS, INC., PLATINUM MOTORS INC., et

6    al.

7

8                                          PLAINTIFFS

9    V.

10                   CASE NO. 1:14-cv-01589-TWP-DKL

11

12   COX ENTERPRISES, INC., et al.

13

14                                          DEFENDANTS

15   _____

16

17            DEPOSITION FOR THE DEFENDANTS,

18            COX ENTERPRISES, INC., et al.:

19

20     The Deposition of Rule 30(b)(6) Witness, Barry

21   Wayne Mattingly, on Behalf of Mattingly Auto Sales,

22   Incorporated, taken in the above-styled matter at

23   Frost Brown Todd, LLC, 400 West Market Street, 3200

24   Mercer Tower, Louisville, Kentucky, on the 19th day of

25   October, 2016, beginning at 9:04 a.m.

**EXHIBIT 8**

Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 2 of 166 PageID #: 3574

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          21

1    A.    No.

2   [WHEREUPON, phone rings.]

3         MR. JURKIEWICZ:  Are we -- no question

4   pending?

5         MR. MCCARTER:  No.

6   BY MR. MCCARTER:

7    Q.    All right.  And do you remember the name

8   of the officer or officers you met with?

9    A.    Yes.

10   Q.    What was --

11   A.    Curtis Mouser.  And I don't -- don't know

12  how to spell that for you.  I'm sorry.

13   Q.    Okay.  There was the one interview,

14  and --

15   A.    Yes.

16   Q.    -- did he pull records from you?

17   A.    Yes.  Well, no.  He actually had pulled

18  them himself.

19   Q.    From where?

20   A.    The courthouse.  All property records,

21  everything, financial records from liens, that kind

22  of thing.

23   Q.    All right.  You said it was embezzling, but

24  did he give you any more sense specifically what

25  he was looking at?



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 3 of 166 PageID #: 3575

BARRY WAYNE MATTINGLY  30(b)(6)                     October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              22

 1    A.   He was looking at to see what we --

 2   basically, he was looking for money possibly that

 3   we had borrowed.  That's what he was -- told us he

 4   was looking at.

 5    Q.   Okay.  But we're not talking about --

 6    A.   Liens on properties and that kind of

 7   thing.

 8    Q.   Okay.  Did he ever formally tell you he

 9   was done looking?

10    A.   Yes.  His -- I think his quote was, and he

11   looked at my lawyer as he looked at the paper and

12   said, "I can't find anything here."

13    Q.   Okay.  And that all -- that all happened in

14   May of 2012?

15    A.   Yes.

16    Q.   Okay.  How -- do you have any other

17   employees now?

18    A.   No.

19    Q.   Have you in the last ten years or so?

20    A.   No.

21    Q.   Do you have any other representatives

22   who might buy cars for you or the like?

23    A.   Yes.

24    Q.   And who are they?

25    A.   Different people.  Just to give you some



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 4 of 166 PageID #: 3576

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          23

 1   names, Kenny Barker.

 2      Q.   Okay.

 3      A.   In the past -- in the past, a guy named

 4   Sherman Dow, Frankie Anthony.  I think -- I think

 5   Butch Fentress.

 6      Q.   Contress?

 7      A.   Fentress, F-e-n-t-r-e-s-s.

 8      Q.   Okay.  Have these folks all been reps for

 9   you in the last ten years or so?

10      A.   Yes.

11      Q.   Are any of them still reps for you?

12      A.   Yes.

13      Q.   And by "reps," I mean representatives

14   who might --

15      A.   Per -- per -- person who --

16      Q.   -- who might buy or sell cars for you?

17      A.   Yes.

18      Q.   Okay.  And they do that at auctions?

19      A.   Yes.

20      Q.   And again talking about Mr. Barker, Mr.

21   Dow, Mr. Anthony, Mr. Fentress, did they have

22   their own dealerships, or did they buy personally

23   for you?

24      A.   They bought cars for -- through me; yes.

25      Q.   Okay.  Do they do any selling for you?



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 5 of 166 PageID #: 3577

BARRY WAYNE MATTINGLY  30(b)(6)                     October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                24

1    A.    Vehicles they bought were generally for

2    themselves to sell or for family members or

3    something like that to re-sell.

4    Q.    But they would still do that on your

5    account?

6    A.    Yes.

7    Q.    All right.  So what auctions are you

8    dealing at today?

9    A.    Wolfes, W-o-l-f-e-s, Wolfes Auto Auction,

10   and that's in Evansville.

11   Q.    Any others?

12   A.    That's it, pretty much it.  I do go to a

13   few, but rarely, E-town Auto Auction.

14   Q.    Say it again.

15   A.    E-town.

16   Q.    E-town?

17   A.    Elizabethtown Auto Auction.

18   Q.    And where -- is that Kentucky?

19   A.    Yeah, Kentucky.  That's actually --

20   actually outside of E-town, just call it E-town.  And

21   then also one more that I go to occasionally is

22   Clark County Auto Auction.

23   Q.    Can you think of any others you've gone

24   to since May of 2012?

25   A.    That's it.



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 6 of 166 PageID #: 3578

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          25

1      Q.    Okay.   You don't have internal legal

2    counsel; do you?

3      A.    No.

4      Q.    Okay.   How many cars are on your lot

5    now?

6      A.    One.

7      Q.    Do you have more than one lot?

8      A.    No.

9      Q.    Where is your lot?

10      A.    Hardinsburg, Kentucky.

11      Q.    Can you give me the full address?

12      A.    Yeah.   It's 3826 South Highway 261, and

13    that's in Hardinsburg, H-a-r-d-i-n-s-b-u-r-g,

14    Kentucky.

15      Q.    Okay.   Since you incorporated in 2003ish,

16    have you had other lots?

17      A.    No.

18      Q.    When you're buying and wholesaling cars

19    today, do you bring those back to your lot, or do

20    they go straight to other locations?

21      A.    Usually, bring them to the lot.

22      Q.    And what's an average number of cars

23    you've had on your lot since 2012, roughly?

24      A.    Probably one to two.

25      Q.    And before 2012?



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 7 of 166 PageID #: 3579

BARRY WAYNE MATTINGLY  30(b)(6)                                October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                          26

1    A.    We had as many as 15 to 20.

2    Q.    Is it fair to say that would matter more

3    when you have retail buyers, the need --

4    A.    Yes.

5    Q.    -- to see the cars.  Now, I understand you

6    buy and sell cars.  Is it the profit on those cars

7    that you -- is that how you make your money?

8    A.    Yes.

9    Q.    Okay.  So you're trying to buy them low

10   and sell them high?

11   A.    Correct.

12   Q.    Do you do anything else to make money

13   as Mattingly Auto Sales, Inc.?

14   A.    No.

15   Q.    No financing?

16   A.    No.

17   Q.    No service?

18   A.    No.

19   Q.    No parts?

20   A.    No.

21   Q.    Okay.  Has that been true the whole time?

22   A.    The whole time.

23   Q.    Okay.  Do you specialize in a particular

24   type of car?

25   A.    No.



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            27

1    Q.    No.  You still buying classic cars?

2    A.    No.

3    Q.    All your cars are used, though?

4    A.    Yes.

5    Q.    But they can be any different age?

6    A.    Correct.

7    Q.    Any different value?

8    A.    M-hm.

9    Q.    You can sell a high end Porsche and -- as

10   well as a low end --

11   A.    Not where --

12   Q.    -- Sentra?

13   A.    -- I'm from.

14   Q.    Okay.  So you are specializing a little bit

15   in lower end cars?

16   A.    Yes.

17   Q.    Okay.  And what's an average price for

18   it?

19   A.    The one we have for sale today is $2200.

20   Q.    Just curious, what kind of car is it?

21   A.    It's a 2002 Mazda Millenia.

22   Q.    Has the type of car you specialize in

23   changed since 2012?

24   A.    Yes.

25   Q.    In what way?



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 9 of 166 PageID #: 3581

BARRY WAYNE MATTINGLY  30(b)(6)                      October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              28

1    A.   Basically, lower end cars, not -- not the

2    higher dollar SUVs, trucks, sporty cars, you know.

3    From, say, a $15,000 car, now we're down to the

4    under $5,000 cars.

5    Q.   Okay.  But even before 2012, we're

6    talking mid range 15, 20,000?

7    A.   M-hm.

8    Q.   Okay.  Do you ever get cars from other

9    dealers?

10   A.   Yes.

11   Q.   Outside of an auction?

12   A.   Yes.

13   Q.   Okay.  And when and what does that look

14   like?

15   A.   Just the same.  Just if they have

16   something they want to -- they don't want to --

17   they'll take to the auction they don't want, I'll

18   shoot them a price if I -- you know, if it's worth the

19   money, I'll buy it, they'll sell it to me.

20   Q.   Okay.  Any estimate of what percentage

21   of your deals are from --

22   A.   No.  No.  Wouldn't -- wouldn't have any

23   idea.

24   Q.   Okay.  Besides auctions, other dealers,

25   any other way you get cars?



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 10 of 166 PageID #: 3582

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            29

```
 1    A.   That's about it.

 2    Q.   Trade-ins?

 3    A.   Yes.  If -- if there's a trade-in, yes, we

 4  do that.

 5    Q.   Okay.  What about online?  Do you buy

 6  anything online?

 7    A.   No.

 8    Q.   You're aware of SmartAuction, eBay

 9  Motors --

10    A.   Yes.

11    Q.   -- those kind of things?

12    A.   Yes.

13    Q.   And you don't use any of those?

14    A.   No.

15    Q.   Okay.  Is that by choice?

16    A.   Yes.  I just don't -- nothing worth putting

17  on there.

18    Q.   Okay.  I just wanted -- I asked you this

19  before, but you don't sell any add-ons or anything

20  like that, insurance products, any --

21    A.   No.  No.

22    Q.   Okay.  So if -- if you do have a retail

23  deal, what is the form of payment typically on

24  those?  Is it cash or something else?

25    A.   Cash, check, whatever; m-hm.  We don't
```



 1   finance unless they have their own financing or

 2   something.  We don't do it ourselves.

 3      Q.   Have you ever done self financing?

 4      A.   No, not through us.  We used to finance

 5   through another dealer who had financial options.

 6      Q.   Okay.

 7      A.   We never had nothing ourselves.

 8      Q.   So if the buyer comes in with cash, a

 9   certified check, or a bank loan, you can take that?

10      A.   Right.

11      Q.   But you won't do a buy here pay here

12   deal?

13      A.   No.

14      Q.   Okay.  When -- what period of time were

15   you doing the buy here pay here deals through

16   another dealer?

17      A.   Well, it wasn't -- it was through a bank,

18   through a bank.  It was never a buy here pay here.

19   It was -- it -- we quit that in 2012, I guess.

20      Q.   Okay.  Who was that bank?

21      A.   Fort Knox Credit Union.

22      Q.   Say it again.

23      A.   Fort Knox -- Fort Knox Federal Credit

24   Union.

25      Q.   Okay.  When you were working with Fort



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 12 of 166 PageID #: 3584

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            31

 1   Knox, what did those contracts look like?  Was it

 2   just a loan from Fort Knox to the consumer, and

 3   then they would pay you directly?

 4      A.   Yes.  Actually, the -- the loan, I would go

 5   through another dealer.  They did all the

 6   paperwork.  I would -- I -- I didn't have an account

 7   with them.  I would just send the paperwork, the

 8   app -- they would fill out an application, I would

 9   send it to that dealer, that dealer would do all the

10   paperwork.

11           MR. JURKIEWICZ:  Matt?

12           MR. COMAN:  I'm here.

13           MR. JURKIEWICZ:  We're on the record.

14   Matt Coman is joining.

15           MR. COMAN:  I apologize for the

16   interruption.

17   BY MR. MCCARTER:

18      Q.   And so please tell me if this is wrong, but

19   so you -- you would make the deal with the

20   consumer, then you would send the paperwork to

21   another dealer, and they would send it in to Fort

22   Knox Credit Union?

23      A.   Yes.

24      Q.   And then Fort Knox would cut a check to

25   you?



Case 1:14-cv-01589-TWP-DLP  Document 197-8  Filed 04/26/17  Page 13 of 166 PageID #: 3585

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              32

1    A.    To -- no, to Wheatley, to the -- the

2    dealer, to the dealer, and then they would pay me.

3    Q.    Okay.  And what's Wheatley's full name?

4    A.    It was Wheatley Motor Company.  They

5    have since gone out of business.

6    Q.    Do you know whether Wheatley was -- was

7    running a buy here pay here contract where they

8    would keep getting payments from the consumer,

9    or was everything paid off up front by their --

10    A.    Everything was paid by Fort Knox Credit

11    Union to them.

12    Q.    Okay.  Any other form of financing you've

13    used for your sales?

14    A.    No.  Not our sales; no.

15    Q.    Okay.  When you get a trade-in, how do

16    you deal with that?

17    A.    You just value it, and they pay the

18    difference.

19    Q.    So you write a contract for the new car,

20    you give some trade-in credit, and they pay the

21    difference?

22    A.    Correct.

23    Q.    In some of those cases, you have to pay

24    off a previous lienholder?

25    A.    Some; yes.



 1   name?

 2      A.   Yes.

 3      Q.   Okay.  All right.  So since 2012, you

 4   mentioned the three auctions that you -- you've

 5   attended, Wolfes, Clark County, and tell me the

 6   third again.

 7      A.   Clark County.  What was the other?

 8   E-town.  Elizabethtown.

 9      Q.   Okay.  Right.  And before 2012, what

10   auctions were you attending?

11      A.   Them three, as well as Manheim

12   Louisville and Manheim Nashville.

13      Q.   Any others?

14      A.   That's -- I think that's it.

15      Q.   So between 2003 and 2012, the -- the -- it

16   was primarily those five auctions that you went to?

17      A.   Yes.

18      Q.   Okay.  Did you do any buying online

19   during that period?

20      A.   No.

21      Q.   And sometimes it would be you attending,

22   sometimes it would be one of these

23   representatives --

24      A.   Yes.

25      Q.   Okay.



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 15 of 166 PageID #: 3587

BARRY WAYNE MATTINGLY  30(b)(6)                          October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                    35

 1          MS. LASKY:  Don't forget to let him

 2    finish his entire question.  You're doing great, just

 3    give him a little more time.

 4    BY MR. MCCARTER:

 5      Q.   Is it fair to say those wholesale auto

 6    auctions kind of work in the same manner?

 7      A.   Yes.

 8      Q.   Okay.  Can you tell me just generally --

 9    I -- and then we'll break it down -- how it works?

10    How do you go in, get a car from an auction?

11      A.   Basically, you just go in with your card,

12    go up there, bid on it through the on kube --

13    through the lines.  Once you get your ticket, go

14    pay for it, and sign the ticket, get your gate pass,

15    and go home.

16      Q.   With the car or without the car?

17      A.   With the car.

18      Q.   Okay.  So it's a competitive environment

19    where you've got multiple dealers trying to get the

20    car?

21      A.   Yes.

22      Q.   Somehow you scout out the ones you

23    want, and then you bid on them, and if you win the

24    bid, you have to pay for the car, and then you take

25    it?



1   A.   Yes.

2   Q.   Okay.  Have you ever sold at auctions?

3   A.   Yes.

4   Q.   How often?

5   A.   Well, that's the -- part of the wholesale

6  stuff.  You know, it was back before 2012

7  practically every week.

8   Q.   Okay.  So you've been both the buyer and

9  seller at auction?

10   A.   Yes.

11   Q.   On hundreds of cars?

12   A.   Yes.

13   Q.   Okay.  How -- how does it work from the

14  seller's side?  When do you get paid by the

15  auction?

16   A.   If I sell?

17   Q.   Yeah.

18   A.   If I turn in a title, when you -- when you

19  run a car -- if you sell it, I -- I would have to go up

20  front to give them the title, you know, if it's out of

21  state or Kentucky title, Kentucky being you have to

22  have the dealer signed properly.  They turn it in,

23  and they issue me a check.

24   Q.   Okay.  And that check comes from the

25  auction, not the buyer?



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 17 of 166 PageID #: 3589

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            37

1    A.    Auction; m-hm.

2    Q.    And so when you're a buyer, you pay the

3    auction, when you're a seller, you get paid by the

4    auction?

5    A.    Correct.

6    Q.    Okay.  Is that part of the reason you go

7    to auction, to sort of make sure that you get paid

8    if you're a seller?

9    A.    Yes.

10   Q.    And for the buyer, that's a way to be sure

11   you get a title?

12   A.    Yes.

13   Q.    And can the buyer usually take the car

14   immediately, or is there any kind of waiting

15   period?

16   A.    Usually, if it's -- as long as there's no

17   problems with the car, they have that opportunity

18   to ride and drive, to inspect the car to make sure

19   it's proper, what they advertised, and if it's given

20   a time frame, let's say an hour to check it  out --

21   Q.    Yeah.

22   A.    -- then you have to go up and pay for it,

23   and you take it the same day.

24   Q.    And is it my understanding that there's --

25   or it is my understanding that there's some



1   situations where you might have longer if there

2   was some issue with the car, if it's a --

3       A.    Yes.

4       Q.    -- frame damage or something?

5       A.    Yes.

6       Q.    Okay.  So there's -- the auction provides

7   certain relief in cases if a car wasn't disclosed

8   properly?

9       A.    Yes.

10      Q.    So what are the different ways a buyer

11  can pay for the car at the auction?

12      A.    Well, you can write them a check, or if

13  you have a floor plan company you can put it on

14  the floor plan.

15      Q.    I'll come back to the floor plan in a

16  minute, but can you also pay cash?

17      A.    Yes.  Check or cash; yes.

18      Q.    Does it have to be a certified check or

19  business check or what?

20      A.    Business check.

21      Q.    Okay.  So in all cases, you have to find

22  some way to pay for the car before you take it?

23      A.    Yes.

24      Q.    All right.  So you said floor plan is one

25  way you can get the car out of the auction.



1   Explain to me what that means, and how does that

2   work?

3      A.    If I had a -- if I had an auction ticket

4   before from where I purchased the car --

5      Q.    M-hm.

6      A.    -- I would take it to the person that's

7   called a finance officer, whoever it would be that

8   does that, that's their job.  They would scan it,

9   initial it, scan it, put it in their system, stamp it,

10  initial it, something so where you can get it out of

11  the gate.  Like make like a gate pass of where you

12  can take the car out.

13     Q.    But they would have to know that you had

14  credit available from the floor planner in advance?

15     A.    Right.

16     Q.    Okay.  And tell me if this is wrong, but a

17  floor -- a high level floor planner is somebody you

18  have a line of credit with to buy cars?

19     A.    M-hm.

20     Q.    Right?

21     A.    Yes.

22     Q.    Okay.  And so somehow the floor planner

23  and the auction communicate about how much

24  credit you have as Mattingly Auto Sales, and then

25  you can just say, "Put it on my floor plan"?



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              40

```
 1     A.    Yes.

 2           MS. LASKY:  Object to the form.

 3   BY MR. MCCARTER:

 4     Q.    Have you used all those different forms of

 5   payment:  cash, check, floor plan?

 6     A.    Yes.

 7     Q.    So at a high level after you get a car at

 8   auction, then what do you do with it as far as

 9   business?

10     A.    Just --

11           MS. LASKY:  Object to the form.  You can

12   answer.

13           THE WITNESS:  Okay.

14     A.    Just take it to the lot, clean it up,

15   whatever it needs to be, put it up for sale.

16   BY MR. MCCARTER:

17     Q.    Okay.  Would you typically re-sell a car

18   at the same auction, or would you do something

19   differently?

20     A.    Typically, the way I operate I would take

21   it to another auction.

22     Q.    And so you might buy it at an auction

23   where it's less valued, and take it to an auction

24   where it's more valued?

25     A.    Yes.
```



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 21 of 166 PageID #: 3593

BARRY WAYNE MATTINGLY  30(b)(6)                          October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                               41

```
 1     Q.    So you said when you're the seller you
 2   have to provide the title to get paid; right?
 3     A.    Yes.
 4     Q.    And so does that sometime -- does that
 5   always happen on sale day?
 6     A.    I tried to, but sometimes it didn't happen,
 7   you know.  They would -- I wouldn't get paid -- I
 8   never got paid until I provided them a title.
 9     Q.    But that sounds like some sellers can
10   provide it later; is that right?
11     A.    Oh, yeah, you -- you can turn it in later.
12   They would charge you a fee for that, but I would
13   never get paid unless I produced a title.
14     Q.    All right.  But does a buyer -- does a
15   buyer know the title is not going to be available
16   immediately?
17     A.    Some do; yes.
18     Q.    And how do they -- how do you know that?
19     A.    Well, it's -- it's always have to announce
20   it.  It's called TA.
21     Q.    Okay.
22     A.    It would be title absent.  And it kind of
23   goes up on the screen, and they know there will
24   not be a title at that time.
25     Q.    Okay.  Did you ever buy a car TA?
```



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              42

```
 1    A.    Yes.
 2    Q.    What -- what -- why would you buy a car
 3   TA if you can't immediately re-sell it?
 4    A.    Because eventually they'll -- they'll get
 5   me title.  They have a -- a time frame usually of
 6   three weeks.  If they don't provide you with a clear
 7   title, you can take the car back, and the deal is
 8   canceled.
 9    Q.    Okay.  In that mean -- in the meantime,
10   can you go ahead and get the car ready and start
11   offering it?
12    A.    Yes.
13    Q.    Did you ever re-sell a car before you got
14   the title from the auction?
15    A.    Yes.
16    Q.    How often has that happened?
17    A.    It was rare.
18    Q.    Did you ever have a situation where that
19   title never shows up and you have to unwind the
20   deal?
21    A.    It -- I have had a few, very few,
22   fortunately.
23    Q.    And I know we've -- this has been a fairly
24   general conversation, but has that been the sort of
25   process at auction the whole time from 2003
```



1   to 2016?

2     A.   Yes.

3     Q.   Okay.  All right.  We -- we talked about

4   these floor plan lines of credit.  Is that a common

5   term in the industry, floor plan?

6     A.   Yes.

7     Q.   So what floor plans have -- has Mattingly

8   Auto Sales worked with?

9     A.   We had AFC, DSC, MAFS, M-A-F-S, which

10  you're familiar with, and, of course, now NextGear.

11    Q.   All right.  What period did you work with

12  AFC?

13    A.   They were -- they were my first.  I'm

14  going to say starting in 2003, give or take.

15    Q.   Until when?

16    A.   To two thousand probably  9.

17    Q.   And what was the size of your line during

18  that period?

19    A.   Probably 100,000.

20    Q.   And why did that get closed at some

21  point?

22    A.   I closed it.  Their fees were high.

23    Q.   All right.  And what period did you work

24  with DSC?

25    A.   I'm going to say  6 or  7 through 2012.



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              44

```
 1    Q.   And the size of your lines during that

 2   period?

 3    A.   It increased up to 150 is my final -- final

 4   line.

 5    Q.   From 100?

 6    A.   From 100 to 150.

 7    Q.   And high level, that means you can buy

 8   $150,000 worth of cars and put them on that line

 9   of credit?

10    A.   Yes.

11    Q.   Okay.  And what period were you with

12   MAFS?

13    A.   I'd say from 2003 or  4 to 2012.

14    Q.   Do you remember the size of that line?

15    A.   I believe it was 100, but I -- I don't

16   remember.

17    Q.   And so there's some overlap between

18   those three lines so you would -- you would have

19   multiple lines at the same time sometimes?

20    A.   Yes.

21    Q.   Okay.  And why would you have more than

22   one?

23    A.   Just more -- more credit.

24    Q.   So you can buy more cars that way?

25    A.   Yes.
```



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 25 of 166 PageID #: 3597

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            45

```
 1     Q.    Okay.  And you said NextGear, but is
 2   that -- did you have a separate line with NextGear,
 3   or was that DSC just became NextGear?
 4     A.    It was when NextGear -- actually, it was
 5   DSC, MAFS, and then they combined.
 6     Q.    Okay.
 7     A.    I never had actually a NextGear account.
 8   They were owned by NextGear.
 9     Q.    So your DSC and MAFS lines were closed
10   before they joined and called it NextGear?
11     A.    They actually -- right the same year.  I
12   think they joined in 2012.
13     Q.    Sure.  But you -- you never had a line
14   called a NextGear line?
15     A.    No.  No.
16     Q.    All right.  And so when you use a floor
17   plan to buy at auction, I think you just said you
18   tell the finance person to put it on your line?
19     A.    M-hm.  Correct.
20     Q.    You have to tell them which, AFC --
21     A.    Yes.
22     Q.    -- DSC?
23     A.    Yes.
24     Q.    Okay.  And do they call right then, or do
25   you see how they interact with the floor planner to
```



1   know your credit?

2      A.   No.  They actually, they -- most -- a

3   majority of the time they just scanned it and went

4   on.  I never -- never was close to being over, so

5   there never was a problem.

6      Q.   Okay.  You never got a call the next day

7   saying you didn't have the credit?

8      A.   Right.

9      Q.   Okay.  And do you have any

10  understanding of sort of why these floor planners

11  would let you use their money?

12     A.   I just -- they fill out an application.

13  That's the only reason.

14     Q.   I just meant, what is -- they're just

15  getting something, interest and fees, I guess, or --

16     A.   Oh, yes.  Yes, interest and fees.

17     Q.   And so, if you put a -- if you buy a car at

18  auction, you put it on your DSC line, you don't

19  have to pay cash for it that day?

20     A.   No.

21     Q.   But presumably, you have to pay DSC

22  back for it later?

23     A.   Whenever I sell it or pay it off; yes.  And

24  they were. . .

25     Q.   All right.  So just generally under a DCS



1  line during 2006-2012, what was your

2  understanding of when payment would be due for

3  the money you borrowed?

4    A.    When I sell --

5         MS. LASKY:  Object to the form.

6    A.    When I sold the car.

7  BY MR. MCCARTER:

8    Q.    That second?  Within a day?

9    A.    I think they had -- I think in their

10  paperwork they had a three-day period.  I'd have

11  to look back at that to see.

12    Q.    What if you never sold the car?  Is there

13  some sort of cut off?

14    A.    Yeah.  I think -- I don't want to --

15         MS. LASKY:  Object to the form.  Go

16  ahead.

17    A.    I -- I believe it was 120, 120 days with

18  DSC.  I could be wrong.

19  BY MR. MCCARTER:

20    Q.    Okay.

21    A.    But I rare -- I rarely ever -- never -- I

22  don't think it ever happened.  I either sold it or

23  took it back to the auction, whatever.

24    Q.    But there -- there would be a maturity

25  date if you didn't pay?



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 28 of 166 PageID #: 3600

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            48

```
 1     A.    Correct.

 2     Q.    Okay.  And did AFC work the same way?

 3     A.    Yes.

 4     Q.    What -- do you remember what their

 5   maturity date was?

 6     A.    No, I don't.

 7     Q.    What about MAFS, the same way?

 8     A.    Pretty much the same.

 9     Q.    So you'd have to pay a car if you sold it

10   within a short time period, and then, if you didn't

11   sell it, there would be a cut off?

12     A.    Right.

13     Q.    Okay.  Were those floor plans limited to

14   cars you bought at auction?

15     A.    No.

16     Q.    So you could take a car you bought from

17   another dealer and put it on floor plan?

18     A.    Trade; m-hm.

19     Q.    Okay.  Was that process any different?

20   How did you --

21     A.    No.

22     Q.    Well, how -- so did they pay the dealer

23   directly?

24     A.    No, they paid -- they would pay me.

25   Yeah, they paid me.
```



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              49

1    Q.    So it sounds a little different; right?

2  You're going to have to submit some paperwork --

3    A.    Yeah.  Yes.

4    Q.    -- and you're going to get payment?

5    A.    I would -- I would produce a title to them,

6  and they would pay me for the trade.  Put it on the

7  floor plan for that amount, I guess you'd say.

8    Q.    So how did they know the amount to

9  finance?

10    A.    Usually, my treasurer would work the

11  money, or they have a -- they have a guide they go

12  by.

13    Q.    So some way you would show them what

14  you paid for it, they would compare to it some

15  value guide, and --

16    A.    M-hm.

17    Q.    -- they would finance that amount?

18    A.    Yes.

19    Q.    Okay.  What about at auction, did they

20  ever reject your financing because you paid too

21  much for it?

22    A.    No.

23    Q.    So they would just go with the auction

24  price?

25    A.    Yes.



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              50

```
 1     Q.   Did you have some understanding that the
 2   cars you acquired were -- were collateral for the
 3   loans?
 4     A.   Yes.
 5     Q.   Do you understand what I mean by
 6   collateral?
 7     A.   Yes.
 8     Q.   They could pick up the cars if they didn't
 9   get paid?
10     A.   Yes.
11     Q.   Okay.  And that was true of all the floor
12   planners?
13     A.   Yes.
14     Q.   Do you -- do you know what security
15   interest means?
16     A.   No.
17     Q.   Okay.  And so you would -- the -- the
18   general way it worked, would -- you would repay
19   the principal you borrowed, plus interest, plus fees
20   to the floor planner for the cars you bought?
21     A.   Yes.
22     Q.   Okay.  How would you know exactly how
23   much to pay them?  Like, how much the principal
24   was, plus the interest, plus the fees?
25     A.   Computer.  They had a website with the
```



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 31 of 166 PageID #: 3603

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            51

 1  balances.

 2    Q.    DSC did?

 3    A.    Yes, both.  And MAFS.

 4    Q.    So each time you needed to pay off a

 5  unit, you would look it up on the website and then

 6  pay that amount?

 7    A.    Yes.

 8    Q.    Was that typically by ACH electronic

 9  payment or by check?

10    A.    Yes, ACH.

11    Q.    ACH; okay.  Was that true the whole time

12  you were with DSC?

13    A.    Yes.

14    Q.    Is that true the whole time you were with

15  MAFS?

16    A.    Well, MAFS -- MAFS worked a little

17  different.  I could pay off online or at the auction,

18  because they held the titles at the auction.  So it

19  was convenient.

20    Q.    And you did both?

21    A.    Yes.

22    Q.    What about statements, did you get

23  statements from DSC?

24    A.    No.  It -- only thing we had was the

25  online.



BARRY WAYNE MATTINGLY  30(b)(6)                     October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            52

```
 1      Q.   Okay.  Did you have a secure log-in you
 2   could look at any time and see what you were --
 3   what you owed DSC?
 4      A.   Yes.
 5      Q.   Okay.  Same with MAFS?
 6      A.   Yes.
 7      Q.   How about AFC?
 8      A.   I -- they might have.  I don't remember
 9   about AFC.
10      Q.   Okay.  So other than AFC, DSC, and
11   MAFS, have you ever entered into any inventory
12   financing arrangement with anybody else?
13      A.   No.
14      Q.   Do you have any inventory financing
15   arrangement now?
16      A.   No.
17      Q.   How do you pay for cars you buy now?
18      A.   Just strictly cash.
19      Q.   And that's out of just operations of the
20   business?
21      A.   Yes.
22      Q.   Okay.  But at Wolfes, E-town, and Clark
23   County, they still take your business checks?
24      A.   Yes.
25           MS. LASKY:  Can we just take a quick --
```



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 33 of 166 PageID #: 3605

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              53

```
 1          MR. MCCARTER:  Yeah.

 2          MS. LASKY:  -- break?

 3          MR. MCCARTER:  That's fine.

 4    [WHEREUPON, a brief recess is taken.]

 5    [WHEREUPON, document referred to is marked

 6    Defendants' Exhibit 2 for identification.]

 7    BY MR. MCCARTER:

 8      Q.   Let me show you a couple of documents,

 9    break up the monotony here.  I'll represent to you

10    this is just a printout from the State of Kentucky

11    website, and it shows Mattingly Auto Sales, Inc.

12    being incorporated in March of 2003; do you see

13    that?

14      A.   Yes.

15      Q.   Does that look right to you?

16      A.   Yes.

17      Q.   Okay.  And it's -- as you testified earlier,

18    it shows you and Ms. Mattingly as the officers; do

19    you see that?

20      A.   Yes.

21      Q.   Okay.  Do you see anything on this that

22    looks wrong to you?

23      A.   No, I don't.

24      Q.   Okay.  Do -- side question:  Do you --

25    does Mattingly Auto Sales do its own tax returns?
```



```
1    A.   Yes.

2    Q.   You file tax returns in the name of

3    Mattingly Auto --

4    A.   Yes.

5    Q.   -- Sales, Inc.?

6    A.   Yes.

7    Q.   And who prepares those?

8    A.   Jackson Hewitt.

9    Q.   Okay.  And you have those going back

10   several years?

11   A.   Yes.

12   Q.   Do you have any from pre-2012?

13   A.   Prob -- I'm sure we do, but I don't know

14   how far back we kept.

15   Q.   Okay.  And if I didn't say it, that's

16   Exhibit 2.  I'm going to show you what we're going

17   to call Defendants' Exhibit 3.

18   [WHEREUPON, document referred to is marked

19   Defendants' Exhibit 3 for identification.]

20   BY MR. MCCARTER:

21   Q.   It's two pages front -- one front, one

22   back.  And I'll represent to you this is just a

23   printout from what appears to be your website, and

24   you can see at the bottom it was printed on

25   October 12th, 2016; do you see that?
```



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 35 of 166 PageID #: 3607

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           55

1     A.    Yes.

2     Q.    Does this look like your website?

3     A.    No, this is not my website or my car lot.

4     Q.    So it's not you at all?

5     A.    No.

6     Q.    Okay.  You -- you see on that first page,

7   even though it's got a Hardinsburg office --

8     A.    M-hm.

9     Q.    -- this is not you?

10    A.    No, that's not my office.

11    Q.    Do you know who -- who this dealer is?

12    A.    Yes.

13    Q.    Do they have any connection to you?

14    A.    No.  Other -- well, one.  Name.

15    Q.    Okay.

16    A.    Outside of that, no.

17    Q.    All right.  Do you have a website?

18    A.    No.

19    Q.    Okay.  All right.  It's not a very important

20   exhibit, but it's now marked as an exhibit.

21    All right.  I think you said your relationship

22   with DSC would have began around 2006?

23    A.    I believe so.

24    Q.    And your relationship with MAFS began

25   before that; right?



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 36 of 166 PageID #: 3608

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           56

```
 1     A.   Yes.
 2     Q.   Okay.  I'll go ahead and show you another
 3   document we may use later.  This will be
 4   Defendants' Exhibit 4.
 5   [WHEREUPON, document referred to is marked
 6   Defendants' Exhibit 4 for identification.]
 7   BY MR. MCCARTER:
 8     Q.   And these I'll represent to you are your
 9   interrogatory responses in this case.  You --
10   take -- take as much time as you want, but I'm
11   not -- I'll call your attention to anything specific
12   we need to cover, but have you seen this document
13   before?
14     A.   Yes.
15     Q.   And do you recall participating in
16   preparing these responses?
17     A.   Yes.
18     Q.   And you reviewed and they're true, to the
19   best of your knowledge?
20     A.   Yes.
21     Q.   Okay.
22          MS. LASKY:  And I'll represent to you we
23   have a verification that I'll give to you-all
24   tomorrow.
25          MR. MCCARTER:  Okay.  Signed by Mr.
```



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 37 of 166 PageID #: 3609

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              57

```
 1   Mattingly?

 2          MS. LASKY:  Correct.

 3          MR. MCCARTER:  Okay.

 4   BY MR. MCCARTER:

 5     Q.   And so, if you -- if you flip over to

 6   Number 2, it says you started with -- I think it says

 7   you started with you DSC in late November

 8   of 2006, late -- late October and early November

 9   of 2006; is that --

10     A.   Which one --

11     Q.   -- do you see that?

12     A.   No.  Let me get to that page.

13     Q.   It's Page 4.

14     A.   Okay.

15          MS. LASKY:  It's right here.

16          THE WITNESS:  Okay.

17     A.   All right.  Now, could you repeat the

18   question?

19   BY MR. MCCARTER:

20     Q.   All right.  So this -- this language in the

21   middle of Response Number 2 says in late October,

22   early November 2006, and then that's when you

23   executed a DSC note; do you see that?

24     A.   Yes.

25     Q.   Okay.  Do you recall sort of how your
```



1    relationship with DSC began?  Like, how did you

2    find DSC, or how did they find you?

3       A.    They -- they had a representative at the

4    Louisville Auto Auction, Manheim Louisville, and

5    he was there, and Scott and I, we just was talking,

6    and asked if I'd be interested, and I looked -- he

7    had a brochure, and I looked it over.

8       Q.    And what was attractive about that offer?

9       A.    Just the available money.

10      Q.    Do you recall whether the fees and

11   interest were higher, lower than AFC?

12      A.    Comparable at the time.

13      Q.    And how about MAFS, how did they

14   compare to MAFS?

15      A.    Comparable.

16      Q.    Okay.  So it was primarily having more

17   credit that attracted you?

18      A.    Yes.

19      Q.    Okay.  And who was it -- do you remember

20   the name of that representative?

21      A.    Yes.  It's Mark Holley.

22      Q.    Okay.  Do you recall anything more

23   specific about what Mark Holley said to you in that

24   initial meeting?

25      A.    Nothing.  Just basically over the terms



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 39 of 166 PageID #: 3611

BARRY WAYNE MATTINGLY  30(b)(6)                October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                         59

 1   and the -- the -- how much credit available,

 2   interest rate.  That was pretty much it.

 3      Q.   Okay.  Was there any specific discussion

 4   about how interest would be calculated?

 5      A.   I think it was in the -- in the brochure or

 6   maybe what I signed.  It was a percentage plus

 7   prime with the prime subject to change.

 8      Q.   Was there any specific discussion about

 9   when interest would begin to run?

10      A.   No.

11      Q.   And so did you meet with anybody else

12   from DSC before you signed up with DSC?

13      A.   No.

14      Q.   Did you take the loan forms at that point

15   or just a brochure?

16      A.   First meeting was a brochure, and the

17   second he had the forms, and then I signed them.

18      Q.   Okay.  So you signed them physically

19   present with Mark Holley?

20      A.   Yes.

21      Q.   Okay.  So your interrogatories say you

22   worked with Mark Holley, Lourdes Givens, and two

23   other reps of NextGear at different times.

24      A.   Yes.

25      Q.   Does that sound true?



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              60

1    A.    Yes.

2    Q.    Okay.  And do -- you don't remember the

3    names of the two --

4    A.    Well, I do -- after all this, we found a

5    name -- I -- I couldn't think of his name.  One of

6    the gentleman's name for NextGear was Art -- Art

7    Felix.

8    Q.    Art Felix.

9    A.    Art Felix.

10   Q.    You don't remember the fourth person?

11   A.    No.  I think her name -- no, no.  She

12   was -- the situation was Mark Holley got sick.

13   They had a couple reps in between there, and then

14   Lourdes Givens was the -- took over.

15   Q.    Okay.  So these were -- from your

16   perspective anyway, these were NextGear -- I'm

17   sorry, DSC's reps at Manheim Louisville?

18   A.    Yes.

19   Q.    Okay.  Besides those reps at Manheim

20   Louisville, did you interact with anybody else from

21   DSC?

22   A.    No.  No.  They -- they would travel to

23   different auctions, as well.

24   Q.    Okay.  Do you recall who you interacted

25   with from MAFS?



1    A.    Donna Kronauer.  Is that how -- I don't

2    know how you pronounce that.

3          MS. LASKY:  Kronauer.

4    A.    Kronauer.  Sorry.

5    BY MR. MCCARTER:

6    Q.    Okay.

7    A.    Excuse me.  Kronauer.  She was the rep

8    for MAFS.

9    Q.    Okay.  I don't think we've seen it in the

10   production, but you don't have the original

11   brochure from DSC that you looked at?

12   A.    No.

13   Q.    Okay.  And so I'm sorry if this is

14   repetitive, but you -- did you interact with DSC at

15   any other auction?

16   A.    Yes.

17   Q.    Which one?

18   A.    Both the representatives, Mark Holley,

19   Lourdes Givens, Art Felix would go to -- I would

20   see them at Louisville, Bowling Green, and

21   Evansville, which would be Wolfes.

22   Q.    Okay.  And so it sounds like they kind of

23   worked that region, that circuit?

24   A.    Yes.

25   Q.    Okay.  All right.  Number 4.



1    A.    4.

2    Q.    I'm going to show you what we're going to

3    call Defendants' Exhibit 4, and I'll represent for

4    the record that this is a composite exhibit.   It

5    starts with NextGear 003432, but it has various

6    other Bate's numbers included that go through

7    NextGear 003392.   They're not all sequential.

8      So again, take as much time as you want, but

9    I'll call your attention to specific questions.   I'm

10   not going to ask you to recite the whole document.

11   A.    Okay.   I'm just going to read that.

12   [examines document]

13   Q.    Okay.   So Exhibit 4, does this generally

14   look like an application from you to DSC, as well

15   as some other loan agreements you signed with

16   DSC?

17   A.    Yes.

18   Q.    Okay.   And on that first page that's

19   numbered 3432 at the bottom, NextGear 00 --

20   A.    Yes.

21   Q.    -- 3432, that is your signature?

22   A.    Yes.

23   Q.    And it's -- it's dated October of --

24   of 2006; do you see that?

25   A.    Yes.



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           63

1    Q.    Okay.  So do you think this is your first

2    application --

3    A.    I believe so.

4    Q.    -- with DSC?

5    A.    Sorry.  I believe so; yes.

6    Q.    And at the time, everything on here was

7    true, to the best of your knowledge?

8    A.    Yes.

9    Q.    Okay.  And if you flip over to the second

10   page, it's labeled NextGear 003378; do you see

11   that?

12   A.    Yes.

13   Q.    It looks like some sort of follow-up

14   application or -- that's dated November 2nd, 2006;

15   do you see that?

16   A.    Yes.

17   Q.    Do you recall signing that?

18   A.    Not -- no.

19   Q.    Let me ask you:  Is that your signature?

20   A.    Yes.

21   Q.    Okay.

22   A.    Yes.

23   Q.    And again, you know, this was true, to the

24   best of your knowledge, at the time?

25   A.    Yes.



1  Q.   Okay.  And so then, if we go to the third

2  page of that exhibit that starts at 3379, do you see

3  that?

4  A.   Yes.

5  Q.   That looks like a promissory note you

6  signed with DSC on October -- in October of 2006?

7  A.   Yes.

8  Q.   And your signature -- that is your

9  signature on 3384?

10  A.   Yes.

11  Q.   Okay.  And then the next page, 3385, it's

12  a term sheet dated October 30th, 2006, again, with

13  your signature?

14  A.   Yes.

15  Q.   Okay.  And the next few pages, there's a

16  power of attorney, a -- an individual guarantee, an

17  incumbency certificate, corporate resolutions, and

18  then an understanding page.  Are all those your

19  signature on those pages?

20  A.   Yes.

21  Q.   And these documents are generally dated

22  in October and November of 2006.  So does this

23  look like generally the first batch of documents

24  you signed with DSC?

25  A.   Yes.



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              65

1    Q.    Okay.  Just calling your attention back to

2    the middle, it's labeled 3385, and it's called a

3    term sheet.

4    A.    Yes.

5    Q.    All right.  In that document, you see

6    about four lines down it says program type is

7    retail; do you see that?

8    A.    Okay.  Yes.

9    Q.    Yeah.  Does that mean anything to you?

10   A.    No.

11   Q.    Okay.  If you go on down to the middle of

12   that document, it says [reads] Period:  The initial

13   term for an Advance under this Note shall be 30

14   days and shall mature at that time.  All extensions

15   allowed for the same event shall not -- shall be not

16   more than 30 days.  Do you see that?

17   A.    Yes.

18   Q.    And then below that, it says, "Extensions:

19   The number of Extensions allowed shall be 2."

20   A.    Yes.

21   Q.    Does that refresh your memory about, you

22   know, when a car payment would be due and how

23   many times you could extend it?

24   A.    Yes.

25   Q.    Okay.  And is -- is that accurate?  You



BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              66

 1   had 30 days to pay it, but you could extend it

 2   twice?

 3     A.   Yes.

 4     Q.   Okay.  And of course, if you sold it before

 5   that, you'd have to pay it off; right?

 6     A.   Yes.

 7     Q.   Okay.  Okay.  All right.  Show you a

 8   couple more documents.  We're on Number 6, I

 9   think.

10          MS. LASKY:  Number 5.

11          MR. MCCARTER:  Number 5; okay.

12          THE WITNESS:  I have two 4s.

13          MS. LASKY:  Oh.

14          MR. MCCARTER:  Uh-oh.

15          THE WITNESS:  Let me see what we've

16   got here.  This is 1.

17          MR. MCCARTER:  Let's go off the record

18   for a second.

19   [WHEREUPON, a brief recess is taken.]

20   [WHEREUPON, document referred to is marked

21   Defendants' Exhibit 5 for identification.]

22   BY MR. MCCARTER:

23     Q.   Okay.  Mr. Mattingly, did my error that

24   the exhibit we just talked about that contained the

25   application and initial batch of loan documents will



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 47 of 166 PageID #: 3619

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              67

1    be labeled Exhibit Number 5; do you see that?

2      A.   Yes.

3      Q.   And you agree with that?

4      A.   Yes.

5      Q.   Okay.  And so now I'm going to show you

6    the next exhibit, which we're going to call Exhibit

7    Number 6.

8    [WHEREUPON, document referred to is marked

9    Defendants' Exhibit 6 for identification.]

10   BY MR. MCCARTER:

11     Q.   And again, this is a composite exhibit

12   with different term sheets in it, and some of them

13   were produced by you, and some of them were

14   produced by NextGear; do you see those?

15     A.   Yes.

16     Q.   And is it accurate to say that each of

17   those have your signature on them?

18     A.   Yes.

19     Q.   Okay.  And do you have any reason to

20   doubt that these are the term sheets that applied

21   to your DSC line of credit at -- at the dates

22   indicated on these term sheets?

23     A.   Yes.

24     Q.   You have a reason to doubt that?

25     A.   Oh, I'm sorry.  Yes, they are correct.



BARRY WAYNE MATTINGLY  30(b)(6)                October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            68

```
 1     Q.    Okay.

 2     A.    Sorry.

 3     Q.    Just because I asked the question

 4   backwards.  These are term sheets you signed with

 5   DSC that controlled at the time they say they

 6   controlled?

 7     A.    Yes.

 8           MS. LASKY:  Objection to the form.

 9     A.    Yeah, they look to be accurate.

10   BY MR. MCCARTER:

11     Q.    Okay.  I'm going to show you what we're

12   going to call Defendants' Exhibit 7.

13   [WHEREUPON, document referred to is marked

14   Defendants' Exhibit 7 for identification.]

15   BY MR. MCCARTER:

16     Q.    Again, this is another composite exhibit

17   that starts with NextGear 3394, but it has some

18   documents that you produced and some that we

19   produced.  It includes a power of attorney, indiv --

20   individual personal guarantee, and a few other

21   documents.

22     I just wanted you to confirm that those are

23   your signatures again.

24     A.    Yes.

25     Q.    Okay.  I'm going to show you what we're
```



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 49 of 166 PageID #: 3621

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            69

1  going to call Exhibit 8.

2  [WHEREUPON, document referred to is marked

3  Defendants' Exhibit 8 for identification.]

4  BY MR. MCCARTER:

5     Q.   This document, it's Bate's labeled

6  MA 000022 through MA 34.  Do you see that at the

7  bottom?

8     A.   Yes.

9     Q.   Okay.  And this looks like a promissory

10  note that you signed with DSC in February, on

11  February 5th, 2009; does that look accurate to you?

12  You can look at Page 30.

13    A.   Yes.

14    Q.   Okay.  And Page 31 has a power of

15  attorney?

16    A.   Yes.

17    Q.   And Page 33 is a term sheet?

18    A.   Yes.

19    Q.   And again, those are your signatures on

20  the power of attorney and the term sheet?

21    A.   Yes.

22    Q.   All right.  And then Page 34 is a credit

23  limit amendment to demand promissory note and

24  security agreement; do you see that?

25    A.   Yes.



1    Q.   And that's your signature?

2    A.   Yes.

3    Q.   Okay.  I mean, this generally looks like a

4    batch of loan documents you signed in October

5    of 2011; does that look right?

6    A.   Yes.

7    Q.   Do you believe this is the last set of loan

8    documents you signed with DSC?

9    A.   Yes.

10   Q.   Okay.  And there are handwritten notes

11   on this document, and I'll represent to you that

12   this document was produced by you to us.  Do you

13   know whose handwriting that is?

14   A.   You know what, no, I don't.

15   Q.   Okay.  Is it yours?

16   A.   No.

17   Q.   Would you recognize it if it was your

18   wife's?

19   A.   Yes.

20   Q.   Is it hers?

21   A.   Oh, no.

22   Q.   Okay.

23   A.   Way not neat enough.

24   Q.   Do you recall whether the handwriting

25   was on there when you produced it to your



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 51 of 166 PageID #: 3623

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          71

 1    attorney?

 2      A.    No, I don't.

 3      Q.    Okay.  So these loan documents we just

 4    looked at, Exhibits 6, 7, 8, was it your

 5    understanding they governed the legal terms of

 6    your arrangement with DSC?

 7      A.    Yes.

 8      Q.    Okay.  Are you aware of any other legal

 9    agreements that you had with DSC besides the

10    ones we've looked at?

11      A.    No.

12      Q.    And you know, we talked about this

13    generically with floor plans earlier, but was your

14    understanding that in exchange for DSC's money

15    you would have to pay that money back plus

16    interest and fees?

17      A.    Yes.

18      Q.    Okay.  And you understood they had a

19    security interest in your cars to secure payment?

20      A.    Yes.

21      Q.    Okay.  Did you always pay DSC by ACH?

22      A.    I think at first Mark Holley would come

23    down to auctions if I called him early before -- I

24    think even before they had their website, I could

25    call him and tell him that I was going to be at the



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 52 of 166 PageID #: 3624

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           72

1    auction, need to pay off a particular vehicle, and I

2    would give him a check.  He worked out of

3    Lexington.

4      Q.   And he'd hand you the title?

5      A.   He'd hand me the title, and I'd hand him

6    the check.

7      Q.   Okay.  And I should have asked this

8    before, but that would generally mean that DSC

9    would hold the titles after you floored the car with

10   them until they were paid?

11     A.   Yes.

12     Q.   And is that true of other floor plans?

13     A.   Yes.

14     Q.   Okay.  And that's sort of part of their

15   security to make sure they get paid?

16     A.   Yes.

17     Q.   Do you -- do you have any knowledge of

18   while they were holding those titles whose name

19   the vehicle be titled in?

20          MS. LASKY:  Object to the --

21     A.   No.

22          MS. LASKY:  -- form.

23     A.   No.

24   BY MR. MCCARTER:

25     Q.   During that period you were with



Case 1:14-cv-01589-TWP-DLP Document 197-8 Filed 04/26/17 Page 53 of 166 PageID #: 3625

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           73

1  DSC, 2006 to 2012, how did you keep your books

2  internally at Mattingly, if any?

3     A.   Well, I would -- I don't know that I

4  understand the question.

5     Q.   Okay.  So presumably, you keep some

6  accounting record of some sort of what you paid

7  for a car, how much you sell it for, that sort of

8  thing?

9     A.   Yes.  We'd have something from --

10  familiar -- we called it the manilla -- the binders,

11  and we have ve -- all the -- everything related to

12  that car in that particular binder.

13     Q.   Okay.  Is that --

14     A.   Auction ticket.

15     Q.   Have you heard the term deal jacket?  Is

16  it kind of the same thing?

17     A.   Yeah, jacket.  A jacket; yes.

18     Q.   Okay.

19     A.   Thank you for that term.  I knew it, but I

20  just couldn't -- it was on the tip of my tongue.

21     Q.   No problem.  But at some point when

22  you've got to file your taxes, I guess, you've got

23  to translate that to profit or loss; right?

24     A.   Correct.

25     Q.   How do you do that?



1    A.   Well, we just -- we -- actually, my wife

2    puts them into the computer --

3    Q.   Uh-huh.

4    A.    -- and we just calculate every one of them

5    at -- at the end of the day when it was sold.  We

6    knew on that vehicle what the profit or loss was.

7    Q.   Okay.  Do you know during 2006, 2012,

8    were you using a particular software to do that?

9    A.   No, I don't -- I don't know.

10    Q.   You may have been, you just don't know?

11    A.   Yeah.  There was something, but I don't

12    know what it would be.

13    Q.   Okay.  But as -- as far as you know, you

14    didn't attempt to track how much interest and fees

15    would be due to NextGear during that period?  You

16    just looked at their online statement for that?

17    A.   Yes.  And we could do it the end of the

18    year statement, as well.  There was an end of the

19    year statement they could pull.

20    Q.   From NextGear?

21    A.   From NextGear.

22    Q.   Okay.  And when I say NextGear in those

23    last two questions, we're talking about DSC; right?

24    A.   DSC; yes.

25    Q.   Okay.  So we talked about, you know,



```
 1   your initial discussion with Mark Holley, and you

 2   said there was no specific discussion about the

 3   timing of interest, when it would start accruing;

 4   right?

 5      A.   Correct.

 6      Q.   Did you ever talk about that issue with

 7   anybody at DSC?

 8      A.   Possibly.  I -- I just don't remember.

 9      Q.   As we sit here today, you don't remember

10   any specific conversations with anybody at DSC

11   about when DSC would start charging interest?

12      A.   Well, occasionally, they -- if I was --

13   can -- can I give you an example?

14      Q.   Yeah.

15      A.   If I bought a car today, and let's say I

16   sold it next week, and I paid it off online, there

17   would -- and I -- and when they -- when I check,

18   there's no title available.  So they basically didn't

19   have the title yet, but yet I was still paying the

20   interest, and they didn't even have the title.

21      So I would have to wait until they got the title

22   to send to me.  Other than that, that would be

23   about the only thing.

24      Q.   But did you -- do you remember talking to

25   somebody at NextGear about that?
```



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 56 of 166 PageID #: 3628

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              76

 1    A.   Yes.

 2    Q.   And who was that?

 3    A.   That would be both Mark Holley, as well

 4  as -- mostly, Lourdes Givens.

 5    Q.   Okay.  And what did you say to them

 6  about it?

 7    A.   Just in a -- I said in a jokingly -- I'm sure

 8  that they told me it was common practice, but I

 9  said, "That's kind of a shame that I'm paying

10  interest on something that you-all are still holding

11  the money on that I don't even have yet."

12    Q.   M-hm.  But do you remember any specific

13  discussions with anybody at DSC about when

14  interest would start accruing on your floor plan

15  cars in the first place?

16    A.   Other than --

17         MS. LASKY:   Object to the form.

18    A.   Other than that, no.

19  BY MR. MCCARTER:

20    Q.   Okay.  All right.  I'm going to show what

21  we're going to call Defendants' Exhibit 9.

22  [WHEREUPON, document referred to is marked

23  Defendants' Exhibit 9 for identification.]

24  BY MR. MCCARTER:

25    Q.   This document is Bate's labeled MA 252



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 57 of 166 PageID #: 3629

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              77

 1    through 283.  Do you see that at the bottom?  You

 2    see those numbers --

 3      A.    Yes.

 4      Q.    -- right?

 5      A.    I'm sorry.

 6      Q.    252 --

 7      A.    Yes.  Yes.  I'm sorry.

 8      Q.    No problem.  And I'll represent to you

 9    that MA generally means it's a document that you

10    produced to us.  So is -- do you recognize this

11    document?

12      A.    Yes.  It looks like a sheet; yes.

13      Q.    Does it -- well, it -- it starts with

14    Manheim Automotive Financial Services, Inc.

15    Security Agreement, Inventory Financing bridge

16    Line of Credit; do you see that?

17      A.    Yes.

18      Q.    All right.  Is it fair to say this is

19    generally the loan agreements you signed with

20    MAFS in -- in July of 2010?

21      A.    Yes.  It looks like the typical -- typical

22    thing; yes.

23      Q.    Okay.  And those are your signatures

24    internally, like, for example, on 2 -- Page 272

25    and 275?



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 58 of 166 PageID #: 3630

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                78

1      A.    Yes.

2      Q.    Okay.   And that's your signature on 279?

3      A.    Yes.

4      Q.    And 283?

5      A.    Yes.

6      Q.    Okay.   So, after July 2010, this would

7   generally be the loan agreements that would

8   govern your floor plan with MAFS?

9      A.    Yes.

10      Q.    Okay.

11           MR. MCCARTER:   What number are we

12   on?

13           THE WITNESS:   Number 10 will be the

14   next one.

15   [WHEREUPON, document referred to is marked

16   Defendants' Exhibit 10 for identification.]

17   BY MR. MCCARTER:

18      Q.    All right.   I'm going to show you what

19   we're going to call Defendant's Exhibit 10.   This is

20   Bate's labeled MA 242 through 244.   This is called

21   "MAFS Floor Plan Guideline"; do you see that?

22      A.    Yes.

23      Q.    And is that your signature on the second

24   page?

25      A.    Yes.



1    Q.   Okay.  So these are generally guidelines

2    for the MAFS line around the time you signed this?

3    A.   Yes.

4    Q.   Okay.  And at a high level do you

5    understand that part of your complaint in this case

6    relates to when interest began accruing on your

7    DSC line?

8    A.   Yeah.

9    Q.   Okay.  Can you give me your

10   understanding of what your concern is?

11   A.   I believe they were -- basically when I

12   bought a car title attached or title absent, it

13   appears that they were writing -- charging me

14   interest from Day 1, and MAFS was even charging

15   me interest, two -- two days worth of interest the

16   day I put it on the floor plan.

17   Q.   So on the DSC side, is your only concern

18   the cars that were sold title absent?

19        MS. LASKY:  Object to the form.

20   A.   Possibly.  I believe so.

21   BY MR. MCCARTER:

22   Q.   Okay.  So if the title is present on the

23   day of the auction, you believe it would be

24   appropriate for DSC to start charging interest from

25   that day?

Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 60 of 166 PageID #: 3632

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            80

```
 1     A.    Yes.
 2     Q.    Okay.  And on MAFS, you believe it would
 3   be appropriate for MAFS to start charging interest
 4   from the day of sale if title was present?
 5     A.    Yes.
 6     Q.    Okay.  Do you believe your MAFS line of
 7   credit and your MAFS documents are at issue in
 8   this case?
 9     A.    I'm sorry.  Repeat that.
10     Q.    Do you believe your MAFS line of credit
11   separate from your DSC --
12     A.    M-hm.
13     Q.    -- line of credit is at issue in this case?
14     A.    Possibly; yes.
15     Q.    So on the -- step back to the cars that
16   were sold title absent.  So if you bought a title
17   absent car and you put it on your DSC line, your
18   position is that interest would start being charged
19   from the day of sale?
20     A.    Correct.
21           MS. LASKY:  Object to the form.
22   BY MR. MCCARTER:
23     Q.    Okay.  And is it your position that you
24   think it was only appropriate to charge it once title
25   was present?
```



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 61 of 166 PageID #: 3633

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                81

```
 1    A.    Yes.

 2    Q.    But in that period between when you

 3   purchased it and when the title showed up, where

 4   was the car?

 5    A.    Usually at my lot unless I had it sold.

 6    Q.    And so you would be able to go ahead and

 7   take the car that day from auction, you just

 8   wouldn't have the title until later?

 9    A.    Yes.

10    Q.    Okay.  And is it -- do you have a -- strike

11   that.

12    You'd said earlier that you -- you'd always

13   have to make some part of payment or arrangement

14   for payment with the auction to take the car; right?

15    A.    Yes.

16    Q.    Do you believe the auction would have let

17   you take the car sold title absent without you

18   putting it on the DSC line?

19    A.    I could --

20          MS. LASKY:  Object to the form.

21    A.    I'm not sure if I understand the question.

22   I couldn't leave the auction until that car was

23   signed for by either paid for or by -- if it was a

24   floor plan, somebody has to initial it and scan it

25   in.
```



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            82

1   BY MR. MCCARTER:

2     Q.   Okay.  But you were able to take the cars

3   put on the DSC line because you told the auction

4   you were putting on the DSC line?

5     A.   Yes.

6     Q.   Okay.  And that's true whether the title is

7   present or not?

8     A.   Yes.

9     Q.   Okay.  Let me show what you we're going

10  to call Exhibit 11.

11  [WHEREUPON, document referred to is marked

12  Defendants' Exhibit 11 for identification.]

13  BY MR. MCCARTER:

14    Q.   And this document is Bate's labeled

15  MA 306 through 309.  So this was produced to

16  you -- I mean, by you to us in this case.  Do you

17  recognize this document?

18    A.   Yes.  It looks like a dealer statement

19  document from DSC.

20    Q.   Okay.  And if you -- you can see it was

21  printed on -- on -- in the -- I guess, let's see, this

22  is the second page of the exhibit.  You can see a

23  printed date of Monday, January 11th, 2010 at 4:45

24  p.m.; do you see that?

25    A.   Yes.



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            83

1    Q.   And then it -- it's got a start date of -- on

2    the left-hand side from January 1st, 2009 through

3    December 31st, 2009; do you see that?

4    A.   Yes.

5    Q.   Would this be that sort of year end

6    statement you were talking about?

7    A.   Yes.  Yes.  Yeah.  Correct.

8    Q.   And so is this something you could go

9    online and get from DSC and then print on your

10   end?

11   A.   Yes.

12   Q.   Okay.  It looks like there's a fax line at

13   the top of the document on each page; do you see

14   that?

15   A.   Where -- if you could point it out to me?

16   Q.   Yeah.

17        MS. LASKY:  This.

18   BY MR. MCCARTER:

19   Q.   Right there.

20   A.   Oh, okay.  Yes.  I'm sorry.

21   Q.   Do you --

22   A.   Yes.

23   Q.   -- see that?

24   A.   Yes.

25   Q.   And it -- it shows a fax date of



 1   January 11th, 2010, and it's got a fax number, and

 2   then it says "Dealer Services Corporation."  Do

 3   you read that as a document faxed to you by DSC

 4   or from you to DSC?

 5      A.   From DSC to us.

 6      Q.   Okay.  Yet -- I mean, I know you -- you

 7   probably don't remember, but do you have any

 8   reason to doubt it was faxed to you by DSC on

 9   January 11th, 2010?

10      A.   No, I don't.

11      Q.   Okay.  And do you read this sort of as all

12   the cars financed during that period and the total

13   due and paid on those?

14          MS. LASKY:  Object to the form.

15      A.   It appears so, as well as where it also

16   has collateral audits, as well.

17   BY MR. MCCARTER:

18      Q.   Okay.  The top of Page 2?

19      A.   Yes, it does, and I -- apparently, I missed

20   something here.  It appears that they charged me

21   two lot audits in the same month.  I must have

22   missed that.

23      Q.   Okay.  And you didn't have two lots?

24      A.   No.  It looks like they charged me on

25   the 22nd, and another 75 on the 23rd.



Case 1:14-cv-01589-TWP-DLP Document 197-8 Filed 04/26/17 Page 65 of 166 PageID #: 3637

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              85

1    Q.   Okay.  What is a collateral audit?

2    A.   It's -- it's where they come and check the

3    inventory of your cars to make sure that they're

4    there or where they're at and there's -- that kind

5    of thing.

6    Q.   Okay.  And that's -- that's sort of a

7    routine thing that you agreed they could do?

8    A.   Yes.

9    Q.   Okay.  And you -- you produced this to

10   us.  Do you have any recollection of where you

11   would have found this or where you would have

12   kept it?

13   A.   It would have been -- well, at the time,

14   we would have had it in our records, but it -- we

15   would have got it offline at DCS's website.

16   Q.   Okay.  Well, and we talked a minute ago

17   that maybe it was faxed to you by DSC?

18   A.   Yes.  I -- I would say the year end

19   statement was probably faxed to us.  They --

20   because we probably had to call -- they would

21   probably only do up to date what was current on --

22   online.

23   Q.   Okay.

24   A.   So we'd have to get a current, like, an up

25   to date thing for taxes.



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 66 of 166 PageID #: 3638

BARRY WAYNE MATTINGLY  30(b)(6)                          October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                    86

1    Q.   Okay.  And actually, you know, I -- I

2    didn't see this a minute ago, but it -- how many

3    pages are in your document?  I'm sorry.

4    A.   I go all the way up to 4245.  I'm sorry.

5    Or 4 -- 452.  I'm sorry.  Looks like there's -- it's a

6    four-page -- four pages.

7    Q.   Okay.  And so, actually, if -- it looks like,

8    again, it's a composite exhibit.  If you -- if you go

9    back a couple of pages and there's MA 310 --

10   A.   Yeah.

11   Q.   -- and it looks like a fax cover sheet that

12   probably went with the statement that we just

13   looked at that's on 307, 308.

14   A.   M-hm.

15        MS. LASKY:  I'm sorry.  What -- is the

16   question --

17   A.   You'll have to repeat --

18        MS. LASKY:  -- whether --

19   A.   -- the question.

20   BY MR. MCCARTER:

21   Q.   Yeah.  And -- and I don't want to get

22   bogged down on this, but it looks like maybe it was

23   produced -- maybe produced out of order.  Looks

24   like 310, Page 310 might be the fax cover sheet

25   for 307 and -- through 309, because it's got the



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 67 of 166 PageID #: 3639

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              87

 1   same date, it's got the fax number.

 2     A.   Yes, that's possible.

 3     Q.   Okay.  And -- no, let me step back.  310

 4   looks like it might be a request from Ms. Mattingly

 5   to fax the interest paid in 2009; do you see that?

 6     A.   Yes.

 7     Q.   Okay.  And so maybe this statement is

 8   what was faxed back?

 9     A.   Yes.

10     Q.   Okay.  All right.  So let's move on in that

11   same exhibit to Page 361.  It's the next page after

12   the cover sheet; do you see that?

13     A.   Yes.

14     Q.   Again, this was produced by you to us.

15   Do you know what this is?

16     A.   No, I don't.

17     Q.   Does it look like -- I mean, I see AFC in

18   the upper left-hand corner; do you see that?

19     A.   Yeah.  This is something from AFC,

20   apparently.

21     Q.   Okay.

22     A.   So you produced it to us, but it may not

23   have anything to do with DSC?

24     A.   No.

25     Q.   Okay.  All right.  Now, if we go on to



 1  Page 452 and 453, it's the last two pages in that

 2  exhibit; do you see that?

 3    A.   Yes.

 4    Q.   And this document looks like it's called

 5  "Receivable Detail Report"?

 6    A.   Yes.

 7    Q.   And it's got a date of 5/23/2012?

 8    A.   Yes.

 9    Q.   Do you have any sense of what this is and

10  what it shows?

11    A.   This is --

12         MS. LASKY:  Object to the form.

13    A.   This is the final -- this is the final cars

14  that we had with DSC.

15  BY MR. MCCARTER:

16    Q.   Okay.  And you -- you had possession of

17  this.  Do you recall how you got possession of it?

18    A.   I'm sure it was off the website.

19    Q.   Okay.  You know, it shows 120,311.28

20  outstanding at that point.  Do you see in the

21  middle?

22    A.   Yes.

23    Q.   Do you -- do you know whether Mattingly

24  ever paid that to DSC?

25         MS. LASKY:  Object to the form.



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 69 of 166 PageID #: 3641

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              89

1    A.   No.

2    BY MR. MCCARTER:

3    Q.   No, you didn't pay it?

4    A.   Did not; no.

5    Q.   Okay.  And however -- why did you not

6    pay it?

7    A.   Excuse me?

8    Q.   Why did you not pay that?

9    A.   These cars were involved in the

10   repossession.  Some of them were.  Some of them

11   were already paid off or sold.  Sorry.  Sold.

12   Q.   And so do you have some recollection

13   that some cars were resold and reduced that

14   amount?

15   A.   We had -- we had actually -- several of

16   these cars were ours that we paid off ourselves,

17   and some of them went to repossession.

18   Q.   Okay.  Do you recall whether there was a

19   deficiency on the repossessed cars?

20   A.   Yes.

21   Q.   And was that paid?

22   A.   No.

23   Q.   Okay.  All right.  At some point, I think

24   you said this already, DSC declared a default and

25   picked up cars?



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 70 of 166 PageID #: 3642

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          90

1    A.   Yes.

2    Q.   Okay.  And what's your recollection of --

3    of when that happened?

4    A.   May the 9th of 2012.

5    Q.   Okay.  Do you recall any discussions with

6    DSC at the time about why they did that?

7    A.   No, they did not.  No reason.

8    Q.   No reason.  Did -- did you have any

9    problems with MAFS around the same time?

10    A.   No.

11    Q.   No.  Did MAFS ever declare default?

12    A.   Yes, at the same -- they did it at the

13    same time.

14    Q.   Did they pick up cars?

15    A.   Yes.

16    Q.   Okay.

17    A.   No.  I -- no.  I only took one back to

18    them.

19    Q.   Okay.  So you voluntarily returned one to

20    MAFS after they declared a default?

21    A.   Yes, involuntarily [phonetic].  The

22    remainder of DCS, as well.

23    Q.   So DSC picked up some cars

24    involuntarily, you returned others?

25    A.   Yes.



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 71 of 166 PageID #: 3643

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            91

1    Q.    Okay.  And both of those things happened

2    in May of 2012?

3    A.    Yes.

4    Q.    Okay.  Did you have any -- do you recall

5    whether the AFC line was still out -- or still

6    existing at that time?

7    A.    It was not.

8    Q.    Was not; okay.  Did you have any other

9    sources of inventory credit at the time?

10   A.    No.

11   Q.    Okay.  Had you heard anything from the

12   police, the -- the state police you talked about

13   before, before DSC declared its default?

14   A.    No.

15   Q.    Just as a general matter apart from DSC,

16   would you ever floor the same car more than once?

17          MS. LASKY:  Object to the form.

18   A.    Possibly.

19   BY MR. MCCARTER:

20   Q.    Okay.  In what circumstances would you

21   do that?

22   A.    If it was in my -- it was my name, I would

23   floor it for -- use the money.

24   Q.    You would floor it and use the money?

25   A.    Yeah.  Floor it, and -- and they would



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 72 of 166 PageID #: 3644

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          92

```
 1   pay -- give me -- send me a  check or whatever.

 2     Q.   So if -- was there ever a situation where

 3   you bought it at auction, put it on a floor plan, and

 4   then, at some point, you re-floored the same car

 5   with another --

 6     A.   Yes.

 7     Q.   -- company?  When would that happen?

 8     A.   If it ran over in time, and generally it was

 9   done by Donna, or Lourdes would do it for me.

10     Q.   Okay.  And how did they value the car at

11   that time?  How much -- how did they value how

12   much to finance at that time?

13     A.   I --

14        MS. LASKY:  Object to the form.

15     A.   They would -- I guess they would use a --

16   they had a chart, or they had the auction ticket

17   where I purchased it.

18   BY MR. MCCARTER:

19     Q.   Okay.  Did you ever use the original

20   auction ticket to floor it a second time?

21        MS. LASKY:  Object to the form.

22     A.   No.  No, I don't believe so.  Unless it

23   was -- unless Donna changed the -- I think one

24   instance I just saw some of the paperwork where

25   Donna changed it from MAFS to DSC.
```



 1   BY MR. MCCARTER:

 2     Q.   Did you ever sell a car at auction or

 3   online, like on -- you know OVE, Online Vehicle

 4   Exchange?

 5     A.   M-hm.

 6     Q.   Okay.  Did you ever sell a car at an

 7   auction or on OVE to another dealer at a

 8   pre-arranged price?

 9          MS. LASKY:  Object to the form.

10     A.   No.

11   BY MR. MCCARTER:

12     Q.   Did you ever buy a car at an auction or on

13   OVE from another dealer at a pre-arranged price?

14     A.   Yes.

15     Q.   Okay.  When would that happen?

16     A.   I -- I don't recall dates.

17     Q.   And then did you ever put that car, those

18   cars on the floor plan?

19     A.   Yes.

20     Q.   With DSC?

21     A.   Yes.

22     Q.   Do you -- do you think that's proper to

23   finance a car like that with a floor plan?

24          MS. LASKY:  Object to the form.

25     A.   It would have to be, because they did it



 1   for me.
 2    BY MR. MCCARTER:
 3    Q.   Okay.  But in that situation, you're using
 4   a pre-arranged non-auction price, and you're
 5   representing to a floor planner that that's the
 6   auction price; right?
 7        MS. LASKY:  Object to the form.
 8    A.   I'm not sure of your question, but I can
 9   say that -- they would have to be a certain -- the --
10   the vehicle price would have to meet certain
11   guidelines, and that would be set by Donna, and
12   Lourdes would know that.
13   BY MR. MCCARTER:
14    Q.   Okay.  But if they're -- if they're typically
15   financing the auction price and relying on the
16   auction to set the value and you've preset that
17   value with a dealer unbeknownst to the floor
18   planner, would that be a misrepresentation to the
19   floor planner?
20        MS. LASKY:  Object to the form.
21    A.   No, because they -- they -- they wouldn't
22   allow an overpriced car on the floor plan.
23   BY MR. MCCARTER:
24    Q.   Okay.  How do you -- how do you know
25   that?  How do you know what DSC would finance?



Case 1:14-cv-01589-TWP-DLP  Document 197-8  Filed 04/26/17  Page 75 of 166 PageID #: 3647

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                             95

 1    A.    Well, they'd have a -- they have

 2   guidelines.  I -- I don't know their -- what they call

 3   it.  Manheim has an MMR.  It's an average market

 4   price of a vehicle.

 5    Q.    Do you know for a fact that DSC used

 6   that?

 7    A.    No, I don't.  I'm -- I'm not sure what they

 8   used.

 9    Q.    Okay.  How often do you think that

10   happened where you would sell a car at an auction

11   on -- I'm sorry, buy a car at auction on an OVE at

12   a pre-arranged price?

13    A.    Oh, I --

14         MS. LASKY:  Object to the form.

15    A.    I don't have a number.  I don't have --

16   wouldn't have a number for you.

17   BY MR. MCCARTER:

18    Q.    More than ten?

19    A.    I'd say -- oh, yeah, possibly.  Ten or so.

20    Q.    Ten or so?

21    A.    M-hm.

22    Q.    Okay.  Did you ever -- while you were

23   with DSC, did you ever obtain duplicate titles?

24    A.    No.

25    Q.    Never?



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              96

```
 1    A.    No.

 2    Q.    Okay.  Do -- do you have an

 3   understanding what title washing is?

 4    A.    No.

 5    Q.    Okay.  Did you ever apply for or obtain a

 6   title that removed an owner or a lienholder from

 7   the titles without having paid off that owner or

 8   lienholder?

 9          MS. LASKY:  Object to the form.

10    A.    No.

11   BY MR. MCCARTER:

12    Q.    Okay.  During these de -- the default time

13   frame with DSC, did you close your line with them,

14   or did they close it?

15    A.    I guess they closed it, because they cut

16   us off with them a couple of weeks after that.

17   That -- that printout you had was for our last

18   statement.

19    Q.    Okay.  Did they leave you on sale only for

20   a little bit?

21    A.    No.

22    Q.    Okay.  What about MAFS, did you close

23   that, or did MAFS close it?

24    A.    Once we defaulted, I guess we both

25   closed it.  I -- there was no arrangement.  I just
```



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 77 of 166 PageID #: 3649

BARRY WAYNE MATTINGLY  30(b)(6)                      October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                               97

1   was barred from the auction.

2      Q.    Okay.  You said you were barred from the

3   auction.  Which auction are you talking about?

4      A.    Manheim.

5      Q.    Okay.  And you had an understanding

6   prior to 2012 that MAFS was affiliated with

7   Manheim?

8      A.    Yes.

9      Q.    And was it your understanding that prior

10  to 2012 MAFS and DSC were not affiliated?

11     A.    Yes.

12     Q.    And so DSC was not affiliated with

13  Manheim?

14     A.    Yes, I believe so.

15     Q.    Okay.  So, prior to 2012, did you have

16  an understanding that DSC and MAFS were

17  competitors?

18     A.    Yes.

19     Q.    Okay.  Do you know whether DSC was

20  affiliated, like, connected by corporate ownership

21  with any particular auction company?

22     A.    No, I wouldn't have any idea.

23     Q.    Okay.  So around the time that DSC

24  declared its default, do you remember whether

25  they did a lot audit?



1    A.    They did a lot audit; yes.  Yes.

2    Q.    Okay.  And did they find cars not

3  present?

4    A.    Yes.  Well, they found all cars, but

5  they -- some of them were at different places in

6  town, and I took them to all those.

7    Q.    But that -- that happened over the next

8  few days; right?

9    A.    It was prior, prior to the repossession.

10   Q.    Okay.  So they did a lot audit, not all

11 cars were on your lot; right?

12   A.    Basically, yes.

13   Q.    And over the next few days, you helped

14 them locate each of those cars?

15   A.    No, no.  The same day.

16   Q.    Same day; okay.  And where were the

17 other cars?

18   A.    One was in a garage, and the other one

19 was at a salesman's house.

20   Q.    What were they doing there?

21   A.    One was just in a garage because it was

22 a BMW, and the other one was --

23         THE REPORTER:  I'm sorry.  It was being

24 what?

25         THE WITNESS:  It was a BMW.



 1          THE REPORTER:  Thank you.

 2          THE WITNESS:  Sorry.

 3     A.   And the other was -- the guy was driving

 4   it.

 5   BY MR. MCCARTER:

 6     Q.   Did you have any understanding that the

 7   inventory was supposed to remain on your lot until

 8   it was sold?

 9     A.   No.

10     Q.   Were any of the cars out with retail

11   customers when MAFS was -- I'm sorry, when DSC

12   was looking for them?

13     A.   Yes, there was one.  One.

14     Q.   Had it been sold?

15     A.    It had been sold and waiting to transfer.

16     Q.   When you say waiting to transfer, does

17   that mean to provide title to the buyer?

18     A.   Yes.  To transfer it because they had

19   already paid for it, and it was. . .

20     Q.   And you didn't have the title yet because

21   you hadn't paid DSC for it?

22     A.    Right.

23     Q.   Okay.  Do you recall at all the gap in time

24   there as -- between when you sold it to the retail

25   customer versus when DSC came looking for it?

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                100

1    A.    No, I don't.  I don't remember the exact

2  dates and times, but I -- I know who I sold it to

3  and -- a good friend of mine.

4    Q.    Okay.  Was it beyond the -- the 24-hour

5  period you had to pay DSC?

6          MS. LASKY:  Object to the form.

7    A.    Yes, because I was holding a check for a

8  customer.

9  BY MR. MCCARTER:

10    Q.    Okay.  So at that point, you had sold a

11  car retail, and you hadn't paid DSC for it within

12  the required time frame?

13          MS. LASKY:  Object to the form

14    A.    Right.

15  BY MR. MCCARTER:

16    Q.    Okay.  Have you ever signed a title for

17  someone else that you provided to DSC for floor

18  planning?

19          MS. LASKY:  Object to the form.

20    A.    I -- I don't understand the question about

21  what you're --

22  BY MR. MCCARTER:

23    Q.    Have you ever signed anyone else's name

24  to a -- the title to a vehicle you put on the DSC

25  floor plan?



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          101

 1   A.   Not that I recall; hm-m.

 2   Q.   And have you ever duplicated a title to a

 3 vehicle that you put on the DSC floor plan?

 4   A.   Duplicated?  No.  I had original titles.

 5   Q.   And by duplicating, we understand that

 6 that means going to the state to get another title;

 7 right?

 8   A.   Unless it was put in Mattingly Auto Sales'

 9 name, if that's what you're talking about.

10   Q.   So I just want to make sure you -- you

11 didn't -- you never got a duplicate title from the

12 state on a car that you had already put on the DSC

13 floor plan?

14        MS. LASKY:  Object to the form.

15   A.   I don't -- I don't know.

16 BY MR. MCCARTER:

17   Q.   You don't have any --

18   A.   That one I would not -- I don't know.  I

19 don't have an answer to that one.

20   Q.   Did you ever present a duplicate title to

21 DSC to floor plan a car when you had already sold

22 the car and passed on the original title to someone

23 else?

24   A.   No.

25   Q.   Okay.  Have you ever moved vehicles to



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 82 of 166 PageID #: 3654

BARRY WAYNE MATTINGLY 30(b)(6)                     October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          102

1    avoid DSC repossessing them?

2      A.    Yes.

3      Q.    Okay.  Can you tell me about that?

4      A.    When they -- we moved our vehicles the

5    day that they came in for repossession.  We didn't

6    know what was going on, because we -- we did not

7    have any contact, we were not in contact with --

8    Lourdes would -- would not return our calls.

9      Q.    M-hm.

10     A.    To protect ourselves, we moved vehicles,

11   a few of them.

12     Q.    Where did you move them to?

13     A.    A friend of mine's property.

14     Q.    Who was that?

15     A.    Thornhill Equipment.

16           THE REPORTER:  What was it?

17           THE WITNESS:  Thornhill --

18           THE REPORTER:  Thank you.

19           THE WITNESS:  -- Equipment.

20   BY MR. MCCARTER:

21     Q.    Were all of those vehicles that you moved

22   eventually returned to DSC?

23     A.    Yes, every one of them.

24     Q.    Okay.  Have you ever moved cars to

25   prevent MAFS or AFC from repossessing?



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 83 of 166 PageID #: 3655

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              103

1    A.    No.

2          MS. LASKY:  I'm sorry.  Can we take a

3    break?

4          MR. MCCARTER:  Absolutely.

5          MS. LASKY:  Okay.

6    [WHEREUPON, a brief recess is taken.]

7    BY MR. MCCARTER:

8      Q.   All right.  I just want to clear up a couple

9    of things we heard earlier. You -- you mentioned

10   an Art Felix that you may have dealt with at --

11     A.    Yes.

12     Q.    -- DSC?

13     A.    Yes.

14     Q.    Do you recall that?

15     A.    Yes.

16     Q.    Is it possible Mr. Felix was with AFC?

17     A.    No, he was Dealer Services.

18     Q.    You're sure.

19     A.    Yeah.

20     Q.    Okay.

21     A.    Yes.

22     Q.    And you mentioned an auction at Bowling

23   Green.  Is that ABC Bowling Green?

24     A.    Yes.

25     Q.    Okay.



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 84 of 166 PageID #: 3656

BARRY WAYNE MATTINGLY  30(b)(6)                October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          104

 1    A.    One other thing.  Can I throw this in?

 2  This document on 307 on Exhibit Number 11 --

 3    Q.    Okay.

 4    A.    -- I mean, this was the -- this was a --

 5  let's see if this is the right one.  No, that's not.

 6  I'm sorry.  That's the wrong one [examines

 7  document].

 8    Yeah, I'm sorry.  It's 452.  That was not

 9  requested by us.  We -- we were at that time

10  locked out of the -- DSC's website.

11    Q.    Okay.

12    A.    That was requested, I guess, by that

13  Kevin Fredericks.

14    Q.    Who's --

15    A.    This is --

16    Q.    -- Kevin Fredericks?

17    A.    He's something to do with DSC.  I'm not

18  sure of his title.

19    Q.    Well how did you get it and produce to

20  us?

21    A.    To be honest with you, I don't know.

22    Q.    Okay.

23    A.    I don't recall.

24    Q.    Okay.  And how did you come to this new

25  knowledge during our break?



Case 1:14-cv-01589-TWP-DLP Document 197-8 Filed 04/26/17 Page 85 of 166 PageID #: 3657

BARRY WAYNE MATTINGLY 30(b)(6)                        October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              105

 1    A.    My wife ref -- talked to me.

 2    Q.    Okay.  That's fine.  I just want to make --

 3    A.    Yeah.

 4    Q.    -- sure you know --

 5    A.    Yeah, right.

 6    Q.    -- you're not supposed to be talking to

 7  anybody else during the break.  You can talk to

 8  your attorney, obviously, but you're not supposed

 9  to change your testimony and talk to people about

10  how to testify during the break.  So just next time

11  let's be careful about that.

12    A.    Okay.

13    Q.    Okay.

14        MS. LASKY:  Well, I would just -- as

15  a 30(b)(6), he does have the obligation to educate

16  himself, so --

17        MR. MCCARTER:  Before the deposition,

18  yes, not during the deposition.

19        MS. LASKY:  Okay.

20        THE WITNESS:  Okay.

21        MR. MCCARTER:  Okay.

22  BY MR. MCCARTER:

23    Q.    All right.  So we were -- so you've got a

24  blacklisting allegation in this case, too.

25    A.    Yes.



1    Q.   Do you know that?

2    A.   Yes.

3    Q.   Okay.  What -- what is your understanding

4  of your concern about blacklisting?

5    A.   They -- after -- did not realize until a few

6  years later that Manheim put us on a K -- with

7  Auction Insurance, reported that we did not pay for

8  a vehicle.  And they put us in what they call a KO

9  Book, which basically means that if I write a check

10  to the auction, that they don't insure that check.

11    Q.   Who's "they"?

12    A.   Auction Insurance.

13    Q.   Okay.

14    A.   Auction Insurance will not insure the

15  check.  I found this out from Wolfe's Auto Auction.

16    Q.   Okay.  So it's your understanding that

17  Manheim put you in the --

18    A.   Yes.

19    Q.   -- this KO Book?

20    A.   Yes.

21    Q.   Okay.  And that's not DSC?

22    A.   Well, it was -- actually, at the time it was

23  NextGear.

24    Q.   Okay.

25    A.   Well no, actually, it was Manheim.  It was



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 87 of 166 PageID #: 3659

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            107

1    actually Manheim, from my understanding.  Now I

2    do not know that.  That's what one of the guys at

3    the auction told me.

4        Q.   Okay.  So your knowledge is based on

5    something you heard at Wolfe's Auto Auction.

6        A.   That's when I first heard it, and I actually

7    called them.

8        Q.   Called who?

9        A.   Called Auction Insurance.  And they said

10   I was in the KO Book because I didn't -- and they

11   wouldn't give me much more details other than I

12   didn't pay for a vehicle.

13       Q.   At Manheim.

14       A.   At Manheim.

15       Q.   Okay.

16       A.   Which was part of the bankruptcy, so it

17   was discharged.

18       Q.   Okay.  We'll come to the bankruptcy in a

19   second.

20       A.   Okay.

21       Q.   All right.  So I'll -- you can turn to it, if

22   you want, or I'll just read it to you.  These are in

23   the interrogatories, which I think --

24       A.   The fir -- the first --

25       Q.   Number 4, maybe, Exhibit Number 4.



1    A.    Uh-huh.

2    Q.    And at Response Number 15, which is on

3  Page 12 and 13, at -- at the end of that it says,

4  "Further responding, Mr. Mattingly was informed by

5  Carol Gardner with Wolfe's Auto Auction that

6  Mattingly Auto Sales was listed in the KO Book

7  compiled and issued by Auction Insurance

8  Agency."  Do you see that?

9    A.    Yes.

10   Q.    And is that accurate?

11   A.    Yes.

12   Q.    Okay.  So who's Carol Gardner?

13   A.    She is -- she works for Wolfe's Auto

14  Auction.  I don't know her official titles, but she

15  works for Wolfe -- Wolfe's Auto Action.

16   Q.    Is she a manager there?

17   A.    Yes, of some capacity, but --

18   Q.    Not the --

19   A.    -- what exactly I do not know.

20   Q.    But not the --

21   A.    She's not an owner.

22   Q.    Not the general manager?

23   A.    No.

24   Q.    Okay.  And you said -- I think you said it

25  basically means Auction Insurance Agency won't



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 89 of 166 PageID #: 3661

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              109

 1  insure your checks.

 2    A.   Yes.

 3    Q.   Okay.  And -- but you'd testified earlier

 4  that you are able to write checks at Wolfe's

 5  Evansville and Clark County; right?

 6    A.   Yes.

 7    Q.   All right.  And do you know -- do you

 8  know what connection, if any, Auction Insurance

 9  Agency has to Manheim?

10    A.   I have -- no, I wouldn't have any idea.

11    Q.   Do you know if any -- what connection it

12  has to NextGear?

13    A.   No, I wouldn't have any idea.

14    Q.   Okay.  And earlier in that same

15  Interrogatory Number 15 it says, "Subject to the

16  foregoing specific and general objections,

17  Mattingly Auto Group experienced the effects of

18   blacklisting' by NextGear/DSC by its inability to

19  participate in any auctions at auction houses

20  owned by Manheim and by the refusal of other

21  auction houses to extend credit to Mattingly."

22    A.   Yes.

23    Q.   Do you see that?

24    A.   Yes.  Uh-huh.  Yes.

25    Q.   Thank you.  And that's true.  I mean,



1   that's still your testimony.

2     A.   Yes.

3     Q.   Okay.  Do -- do you -- to the extent

4   Manheim -- you believe Manheim put you in the KO

5   Book for a non-payment to Manheim, do you have

6   any reason to think that's not the reason you can't

7   deal at Manheim?

8     A.   I believe that is the reason; yes.

9     Q.   Okay.  Okay.

10    And this -- this sounds like you can deal at

11  other auction houses; you just don't necessarily

12  get credit from them.

13    A.   Well, can I give you an example?

14    Q.   Yeah.

15    A.   If I bought a vehicle at Wolf -- Wolfe's,

16  being as they -- they just flat told me I am a good

17  customer; but I'm -- according to Auction

18  Insurance, in that situation I have to write them a

19  check that has to clear the bank before I get a

20  title.

21    So if I bought one today and the check cleared

22  three days from now, if I needed the title I have to

23  drive three hours to get it.

24    Q.   Okay.  You can still buy there.  You just

25  have to wait a little longer for the title.



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          111

1    A.    Correct.

2    Q.    Okay.

3    A.    And at ABC Bowling Green, I talked to the

4    general manager, Jim Dodd.  And he would -- he --

5    he said if I went in there to even pay in cash, he

6    has to get approval.  And I haven't talked to him

7    since.  I can't even go in there to pay -- pay -- buy

8    a vehicle because of Auction Insurance.

9       And ABC Bowling Green, which -- ABC Bowling

10   Green is where I go.  So I'm assuming it's all ABC

11   auctions nationwide that I cannot even buy from

12   them even if I pay in cash, $100 bills cash.

13   Q.    But I thought -- I thought you said you

14   are doing business at ABC Bowling Green.

15   A.    No, I -- I'm still go -- I still -- I don't go

16   to that one because it's -- they've changed their

17   dates.  And I never have pursued it because --

18   Q.    Okay.

19   A.    -- I don't ever go to that one.

20   Q.    All right.

21   A.    I haven't been since 2012 probably.

22   Q.    Gotcha.  So -- but it was E-town, Clark

23   County, and Wolfe where you do business now?

24   A.    Yes.

25   Q.    And so they clearly have the ability to do



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 92 of 166 PageID #: 3664

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           112

 1   business with you even if you're in the KO Book.

 2     A.   Yes.

 3     Q.   Okay.  Do you know at all what Auction

 4   Insurance Agency is?

 5     A.    It's an insurance agency that insures

 6   checks for the var -- auc -- auctions all around.

 7     Q.   Okay.  Do you know whether every

 8   auction in the country uses them as an insurer?

 9     A.   No, I wouldn't have any idea.  A lot -- a

10   lot of the big ones do.

11     Q.   Okay.

12     A.   I know Wolfe's does.  Now, whether

13   E-town or Clark County do, I would not have any

14   idea.

15     Q.   Okay.

16     A.   I -- even though I've been to those

17   auctions, I probably haven't purchased a vehicle

18   from them in a couple years.

19     Q.   Okay.  And so you said you called Auction

20   Insurance Agency to confirm what Wolfe's told you;

21   is that right?

22     A.   Yes.

23     Q.   And when was that conversation?

24     A.   That was probably -- I'm going say

25   thir --  14,  15 possibly.



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          113

1   Q.    2014?

2   A.    2014/'15.

3   Q.    Okay.

4   A.    Because I didn't even know it until it was

5   brought up where I bought one at Wolfe's, and they

6   said I -- I had to wait to pick up the title.  And I

7   questioned why, and they -- they referred me to

8   Carol Gardner.

9   Q.    Okay.  Oh, so you talked to Auction

10  Insurance Agency -- Agency before you talked to

11  Carol?

12  A.    No, but she was the one that informed me

13  that I -- about this KO Book store [phonetic].

14  Q.    And that would have happened shortly

15  before the conversation with Auction Insurance --

16  A.    No, I never did talk to Auction Insurance.

17  I talked to Auction Insurance after to find out what

18  was going on.  I talked -- Carol Gardner is the one

19  that told me I was in a KO Book.

20  Q.    Okay.

21  A.    And then I -- and I had heard ex -- "Well,

22  what is that?"  I don't -- you know, didn't know.

23  And then I called Auction Insurance, and that's

24  when they informed me it was Manheim; but they

25  had -- wouldn't give me a whole lot of details other



1    than, "You didn't pay for a vehicle."  And they

2    never -- apparently didn't care of my side of the

3    story.

4       Q.    But did they mention Manheim?

5       A.    I believe so; yes.

6       Q.    Okay.  That conversation --

7             THE REPORTER:  I'm sorry.  Mention

8    what?

9             THE WITNESS:  Manheim.

10            MR. MCCARTER:  Manheim.

11            THE WITNESS:  Manheim.

12            THE REPORTER:  Thank you.

13            MR. MCCARTER:  That's M-a-n-h-e-i-m.

14   BY MR. MCCARTER:

15      Q.    They -- but the conversation with Carol

16   and then the call to Auction Insurance Agency

17   were pretty close in time to one another?

18      A.    It -- the first call to Auction Insurance,

19   yes.

20      Q.    Okay.  And you think that's 2014/2015?

21      A.    Two -- yeah, because it was several years

22   before I even realized it.

23      Q.    Okay.  So between 2012 and two

24   thousand -- that call in 2014/2015, you didn't know

25   you were in the KO Book.

Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 95 of 166 PageID #: 3667

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          115

```
 1    A.    Right.  Correct.

 2    Q.    Okay.  So it -- that means it didn't seem

 3   to have any effect on your business during that

 4   period.

 5         MS. LASKY:  Object to the form.

 6    A.    Well, other than the fact that it would

 7   have -- it'd be -- it's kind of inconvenient to have

 8   to drive for three hours for a title.

 9   BY MR. MCCARTER:

10    Q.    Okay.  Do you have any records from

11   anybody that talk about the KO Book or the in --

12   uninsurable list or. . .

13    A.    I don't recall.  I don't believe so, but I

14   don't -- I don't really know.

15    Q.    Is it something you searched for to

16   produce in this case?

17    A.    I don't re -- I don't remember.  I do -- I'm

18   going to correct myself.  I believe there was a

19   letter from a lawyer that we sent from Stephen

20   Hopkins to Auction Insurance questioning that.

21    Q.    Okay.  And do you think you produced it

22   in this case, or not?

23    A.    I believe so.  I believe -- I believe it was

24   in there somewhere, but I don't. . .

25    Q.    I've got a letter from Mr. Hopkins to
```



 1 | Manheim asking about it.

 2 |    A.    Okay.  It was -- I'm sorry.

 3 |    Q.    Is that what you think --

 4 |    A.    It was to Manheim, apparently.

 5 |    Q.    Okay.  I'll -- I'll show you that in a bit.

 6 |    A.    Yeah, that's -- that's the -- that's the

 7 | one.

 8 |    Q.    Okay.

 9 |    A.    Because Manheim's the one that put me

10 | in, so -- so I guess he sent the letter to them.

11 |    Q.    And is this -- is this KO status -- KO Book

12 | status, is it affection you on the sales side at all?

13 |    A.    No, just on the purchase side, you know.

14 |    Q.    Okay.  Do you -- I should have asked this

15 | earlier, but do you ever work as a representative

16 | for other dealerships?

17 |    A.    No.

18 |    Q.    You -- since 2006, you've never bought or

19 | sold for another dealership?

20 |    A.    Well, I -- I -- yeah, I stand corrected.

21 | I -- I probably have repped for people at auctions

22 | if they're --

23 |    Q.    On --

24 |    A.    -- they had some vehicles there.

25 |    Q.    On sales?



1    A.    Yes.

2    Q.    Okay.  And who -- what dealers were

3  that?

4    A.    I remember doing it for Scott Auto Sales;

5  Parker & Sons.  And then -- off the top of the

6  head, that's the ones I can remember, but that --

7  that would have been prior to 2012, not

8  since 2012.

9    Q.    So you haven't repped cars for anybody

10  since 2012 besides Mattingly?

11    A.    I don't believe so; no.

12    Q.    Okay.  Have you had anybody buy from

13  Mattingly since 2012 under a different dealership's

14  name?

15        MS. LASKY:  Object to the form.

16    A.    I -- clarify that.

17  BY MR. MCCARTER:

18    Q.    Okay.  So earlier we talked about some

19  repre -- representatives who have done some

20  purchasing for you; right?

21    A.    Right.

22    Q.    And I'm assuming they do that under the

23  name of Mattingly Auto Sales?

24    A.    Correct; yes.

25    Q.    So when they're at auction, they buy on



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 98 of 166 PageID #: 3670

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                               118

1    your account.

2       A.    Right.

3       Q.    Have you ever had a dealer buy on its

4    own account or another account and then convey

5    the car to you --

6       A.    Oh, since then?

7       Q.    -- outside of auction?

8       A.    No.

9       Q.    Okay.  You said "since then."  Does that

10   mean since 2012?

11      A.    Yes.

12      Q.    Did you do that before 2012?

13      A.    Rarely.  I don't recall any specific one.  I

14   don't -- I don't believe -- believe so.

15      Q.    Okay.

16      A.    I just -- I just don't recall it.

17      Q.    But, theoretically, that would be a way

18   you could get cars from an auction --

19      A.    Well --

20           MS. LASKY:  Object to the form --

21   BY MR. MCCARTER:

22      Q.    -- to go -- to have another dealer buy

23   them for you and -- and sell them for you?

24      A.    I guess I could, but I don't -- I -- I --

25   honestly, I don't recall ever having another dealer



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 99 of 166 PageID #: 3671

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              119

1    buy a car for me, because most of the time I kind

2    of like to look at them myself.

3       Q.   Yeah, but you've heard of dealers doing

4    that?

5       A.   Yeah, I know -- I know it happens.

6       Q.   Okay.  All right.

7       And so you after the default with NextGear

8    cars, they -- there were some cars picked up;

9    right?

10      A.   Correct.

11      Q.   Okay.  What number --

12      A.   I'm on Number -- that will be Number 12.

13   [WHEREUPON, document referred to is marked

14   Defendants' Exhibit 12 for identification.]

15   BY MR. MCCARTER:

16      Q.   Okay.  I'm going to show you what we're

17   going to call De -- Defendant's Exhibit 12.  This

18   document is MA 074 through MA 0707.

19      This looks like a series of Orders to

20   Repossess, but it was produced by you to us.  Do

21   you -- do you recognize these documents?

22      A.   Yes.

23      Q.   What -- what are these?

24      A.   These are the -- two cars -- two trucks

25   that they had to -- they sent down to repossess,



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 100 of 166 PageID #:
3672

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            120

1    Manheim.

2       Q.    So this is -- these are the cars that you

3    had bought with Manheim money that Manheim's

4    trying to repossess?

5       A.    Yes.

6       Q.    Okay.  Do you know whether these

7    particular cars were recovered?

8       A.    Yes.  The -- let's start with the '94

9    GMC --

10      Q.    Uh-huh.

11      A.    -- that would be 706.  This is the one

12   where we voluntary -- voluntarily brought back to

13   Manheim; spoke with Andrew -- blanking on his

14   last name -- and left it -- you know, sent it back to

15   Manheim Louisville.

16      Q.    Okay.

17      A.    This is the one that is in question over

18   the KO Book.  It was in the repossession, and it's

19   also in the bankruptcy.  Mysteriously with this car,

20   six days after we brought it back to them, it wound

21   up in a junkyard.

22      Q.    Okay.  And this is --

23      A.    We have no idea why.

24      Q.    -- this is the GMC --

25      A.    The  94.



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 101 of 166 PageID #: 3673

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              121

1    Q.    -- that ends in 562 VIN?

2    A.    I don't see the -- yes.  Yes, I do.  Yes.

3    Q.    Okay.  But that car was not on your DSC

4    line.

5    A.    No.

6    Q.    Okay.  And then there's a -- I guess

7    there's a second car on 707?

8    A.    Yes, this one here, 707 -- yes, seven --

9    Q.    It's a Chevrolet 1500; 976 is the last of

10   the VIN?

11   A.    Yes.  Yes.  This car was -- they sent that

12   to be repossessed.  This particular truck had a

13   story behind it, as well.  It was on repo -- they

14   sent it to repossess.  This vehicle was paid off

15   when they came to get it.  I had had it on the floor

16   plan, but I had previously paid it off.

17       And a few days before the repossession, I

18   actually had called and told -- asked them to -- "I

19   was busy at work, and could you go ahead and mail

20   me the title?"  The title never -- after -- several

21   weeks after repossession, we were actually looking

22   for the title.  Could not find it.

23       Called the auction, and they had the title.

24   And I said, "Well, I'll be in Louisville that day.

25   Don't worry about mailing it.  I'll pick it up."



1    We went to pick up the vehicle -- or the title.

2    And I put -- drove over here, and they had a lien

3    on the vehicle -- on a vehicle I had paid off.  Not

4    only did they have that, but they was in Mattingly

5    Auto Sales' name, but the address was to Dixie

6    Auto Sales on Dixie Highway here in Louisville.

7       They -- Manheim, two days after the

8    repossession on a paid-off vehicle, took this

9    vehicle, retitled it, put a lien on it, and sent the

10   title to a dealer -- to -- in my name to another

11   dealer in Louisville.

12      Q.   Okay.  Did -- did you have an

13   understanding at all that -- that MAFS and DSC

14   have a blanket lien on all your inventory?

15      A.   No, just --

16      Q.   Okay.

17      A.   -- the ones that I had floored.

18      Q.   Okay.  And on the -- going back to the

19   GMC that ends in 562 --

20      A.   Uh-huh.

21      Q.   -- you said it was returned to DS -- or to

22   Manheim.  Where -- where was it when they tried

23   to pick it up?

24      A.   It was in our lot -- at our lot.

25      Q.   Okay.  And why do you have these orders



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 103 of 166 PageID #: 3675

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          123

1    to repossess?  Just curious.

2        A.    The -- the-- the repossession guy, the

3    truck driver, actually let us have them, and we

4    made copies of them.

5        Q.    Okay.  All right.

6        And so at some -- after DSC recovers cars and

7    resells them, do you recall getting demand for

8    payment of the deficiency?

9        A.    I believe so; yes.

10       Q.    Okay.  And at some point that proceeded

11   to litigation?

12       A.    Yes.

13       Q.    Okay.  I'm going to show you what we're

14   going to call Exhibit 13.

15   [WHEREUPON, document referred to is marked

16   Defendants' Exhibit 13 for identification.]

17   BY MR. MCCARTER:

18       Q.    And this is Bates labeled MA 41 through

19   MA 61, and then it's -- in the middle of the exhibit

20   it starts a different set of numbers, MA 656

21   through 672.  Does this look like, you know, filings

22   and pleadings from that collection case?

23       A.    Yes.

24       Q.    Okay.  And this is something you've

25   produced to us, so when -- when did you get



```
 1    these?
 2      A.    This -- I'm -- shortly thereafter, like -- it
 3    appears, like, in November of  12 according to the
 4    stamp.  And I'm assuming that -- I'm assuming
 5    that's about the same time when I --
 6      Q.    Okay.
 7      A.    -- when we got it.
 8      Q.    So you do recall getting served with
 9    these when the case was pending?
10      A.    Yes.
11      Q.    Okay.  And it -- it's DSC versus Mattingly
12    Auto Sales and you, personally, Barry Mattingly.
13    Do you see that?
14      A.    Yes.
15      Q.    And you had some understanding that you
16    were a guarantor on the line of credit?
17      A.    Yes.
18      Q.    Okay.  Was your wife a guarantor on the
19    line of credit?
20      A.    No.
21      Q.    Okay.  And she's not named in this case?
22      A.    No.
23      Q.    Okay.  Do you -- I don't want to know
24    about discussions with your counsel, but do you
25    recall what you did with this complaint when you
```



1  got served with it?

2     A.   Oh, yeah, sure do.

3     Q.   What did you do?

4     A.   Well, my wife's laughing because it -- it

5  was a funny story, but, actually, I did nothing, and

6  my lawyer pretty much did the same.

7     Q.   Okay.

8     A.   Lawyers.

9     Q.   And then later you got this motion for

10  default that starts at 656?

11    A.   I -- [examines document].

12    Q.   If you look at 658, it shows as -- that,

13  you know, DSC representing it served it on you.

14    A.   Six -- oh, I'm sorry.  I don't have that.

15    Q.   The motion starts at 656, and the

16  certificate of service is on 658.

17    A.   Oh, okay.  Sure.  Yeah.

18    Q.   Do you recall getting that motion?

19    A.   Yes, that looks familiar.

20    Q.   Okay.  And again, you produced this to

21  us; so it's in your records somewhere; right?

22    A.   Yes.

23    Q.   Okay.

24    A.   I will give the -- can I -- I stop just to

25  give you a little bit?  The -- my -- the lawyer -- I'm

Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 106 of 166 PageID #: 3678

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            126

1  from Kentucky, so I -- obviously, I had to have a

2  lawyer that was licensed in Indiana.

3      Q.   Uh-huh.

4      A.   The lawyer I hired --

5           MS. LASKY:   Wait.   Wait.   Just make sure

6  you don't tell him what you discussed with that

7  lawyer.

8           THE WITNESS:   Okay.

9      A.   Well, basically, he got sick, so that's kind

10 of -- so that's where we -- what happened in that

11 case.

12 BY MR. MCCARTER:

13     Q.   Okay.

14     A.   And so we had to move on.

15     Q.   So you're saying that's why he didn't

16 answer and it was a default?

17     A.   Right.

18     Q.   Okay.   And -- let's see -- if you keep

19 going back in that same exhibit at Page 665 -- it

20 starts at 665 and goes through the end of the

21 Exhibit at 672, there's an affidavit of debt.  Do you

22 see that?

23     A.   Six -- it's on 665?

24     Q.   Yes.

25     A.   Okay.  Yes.



1    Q.   And -- and I'll represent to you:  This was

2    an exhibit to that motion for default that we looked

3    at earlier.  And again, this is produced by you.  Do

4    you have any reason to believe you didn't get that

5    affidavit of debt?

6    A.   No.  That's correct.  Yeah, we re -- we

7    received this.

8    Q.   Okay.  All right.  I'm going to show what

9    we're going to call Exhibit Number --

10        MS. LASKY:  14.

11        THE REPORTER:  14.

12   BY MR. MCCARTER:

13    Q.   -- 14.

14        MR. MCCARTER:  Thank you.

15        MS. LASKY:  No problem.

16   [WHEREUPON, off-the-record remarks are

17   made.]

18   [WHEREUPON, document referred to is marked

19   Defendants' Exhibit 14 for identification.]

20   BY MR. MCCARTER:

21    Q.   So I just handed you 14 -- Exhibit 14.

22    A.   Yes.

23    Q.   And this, again, is sort of a composite

24   exhibit, but it's -- it's -- it's  documents you

25   produced to us that appear to be letters from DSC

1   and from MAFS in that May time frame.

2     A.   Yes.

3     Q.   Do you see that?

4     A.   Yes.

5     Q.   Do you recall -- since you produced them

6   to us, do you recall receiving all these letters

7   around that time?

8     A.   Yes.

9     Q.   Okay.  And a few of them are dated a

10  little later.  Like if you look at Man -- MA 120, you

11  know, it says --

12    A.   Yes, I'm looking -- yes.

13    Q.   -- it says July 24, 2012.  So you would

14  have received it on or about that date?

15    A.   Yes.

16    Q.   And that one, for example, is signed by

17  Donna Kronauer -- Kro -- that's the lady you spoke

18  about before as representing MAFS?

19    A.   Yes.

20    Q.   Okay.  Okay.  All right.

21    Now, excepting the very last two pages, which

22  are MA -- MA 131 and 132, do you recall receiving

23  the rest of those letters from DSC or MAFS as

24  indicated?

25    A.   31, 32?

BARRY WAYNE MATTINGLY  30(b)(6)                          October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                    129

 1      Q.    I'm sorry, except for 131 --

 2      A.    Oh, I'm sorry.

 3      Q.    -- and 132, did you receive the --

 4      A.    Yes.

 5      Q.    -- rest of them?

 6      A.    Yes, yes.

 7      Q.    Okay.

 8      A.    I believe so; uh-huh.

 9      Q.    And MA 131, 32 -- well, strike that.

10      MA 131 looks like a letter from your attorney

11   to DSC requesting information.  Do you see that?

12      A.    Yes.

13      Q.    And it's -- it's signed by Dwight Preston?

14      A.    Yes.

15      Q.    Is this the attorney you hired to deal with

16   the complaint?

17      A.    The -- the -- the original lawsuit in

18   Indiana?

19      Q.    Yeah.

20      A.    No.

21      Q.    Okay.  So you hired Mr. Preston after

22   that?

23      A.    Yes.

24      Q.    All right.  And is -- did you have a -- I

25   don't want to know the details of it, but did you



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 110 of 166 PageID #: 3682

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          130

1  have a relationship with him before that?

2    A.   Yes.

3    Q.   Okay.  Is he your general attorney?

4    A.   No.

5    Q.   Okay.  And so here you're asking for a

6  detailed analysis and accounting of the DSC

7  claim?

8    A.   Yes.

9         MS. LASKY:  Object to the form.

10   A.   Yes.

11  BY MR. MCCARTER:

12   Q.   Okay.  And is this something he did send

13  on your behalf on or about October of -- 17, 2012?

14   A.   Yes.

15   Q.   Okay.  The very last page of that exhibit,

16  MA 132, is a card for a Terry Dashner at DSC.  Do

17  you see that?

18   A.   Uh-huh.  Yes.

19   Q.   How did you have that card?  What does

20  that have to do with this?

21   A.   He had something to do with DSC.  I

22  remember the name, but I don't remember what he

23  did.

24   Q.   Okay.

25   Q.   All right.  And you had an understanding



1    that there was a judgement entered in that case

2    DSC filed against you?

3      A.   Yes.

4      Q.   Okay.  I'm going to show you what we're

5    going to call Defendants' Exhibit 15.  Sorry.

6    [WHEREUPON, document referred to is marked

7    Defendants' Exhibit 15 for identification.]

8    BY MR. MCCARTER:

9      Q.   This document, again, is a composite, but

10   it's -- it's sort of, basically, two copies of -- of the

11   judgement.  It's 34 of 33 -- I'm sorry.  Strike that.

12     It's NG 3433 through NG 3435, and then it's

13   MA 673 through MA 674.  And it looks like it's sort

14   of NextGear's copy of a judgement against you and

15   your copy of the judgement against you.  Does that

16   look right?

17     A.   Yes.

18     Q.   Okay.  And as we sit here today, have you

19   paid this judgement?

20     A.   No.

21     Q.   Do you have any intent to pay it?

22     A.   No, it was discharged at bankruptcy.

23     Q.   Okay.  We'll come to that in a minute, but

24   who filed bankruptcy?

25     A.   Barry Mattingly.



1    Q.    And would --

2    A.    I did not -- huh?

3    Q.    Did your wife file with you?

4    A.    Yes.

5    Q.    Okay.  Did Mattingly Auto Sales pay --

6    A.    No.

7    Q.    Does Matting --

8          MS. LASKY:  Sorry.  What was your

9    question?

10   BY MR. MCCARTER:

11   Q.    Does Mattig -- did Mattingly Auto Sales,

12   Inc. file bankruptcy?

13   A.    No.

14   Q.    Okay.  Does Mattingly Auto Sales, Inc.

15   intend to pay this judgement?

16   A.    No.

17   Q.    Okay.  If Mattingly Auto Sales, Inc. were

18   to recover damages in this current case, do you

19   believe that it would be -- those will be offset by

20   the amount of that judgement?

21         MS. LASKY:  Object to the form.

22   A.    I wouldn't have any idea.

23   BY MR. MCCARTER:

24   Q.    Okay.  All right.

25   I'm going to show you what we're going to call



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 113 of 166 PageID #: 3685

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              133

```
 1   Defendants' Exhibit 16.
 2   [WHEREUPON, document referred to is marked
 3   Defendants' Exhibit 16 for identification.]
 4   BY MR. MCCARTER:
 5     Q.   All right.  And this is Bates labeled
 6   NG 8820 through 8895.  And I don't want to go
 7   through these in detail.  I'll call your attention to
 8   particular pages, but this would appear to be,
 9   generally, the -- the bankruptcy papers that --
10   of -- of yours and your wife's bankruptcy file?
11     A.   Yes.
12     Q.   Okay.  And it looks like, from the top of
13   that, that that -- that this first document, the
14   petition, was filed in -- September 27, 2013.  Do
15   you see that?
16     A.   Yes.
17     Q.   Does that sound about right to you?
18     A.   About right.
19     Q.   Okay.  And when you signed these
20   bankruptcy papers, they were true, to the best of
21   your knowledge?
22     A.   Yes.
23     Q.   If you flip back to Page 8831 in there, in
24   Exhibit 16, do you see about halfway down there's
25   a list of a judgement in Hamilton Superior Court?
```



1    Do you see that?

2      A.   Yes.

3      Q.   And that's the judgement DSC had against

4    you at the time?

5      A.   Yes.

6      Q.   And there's another judgement mentioned

7    in Breckinridge Circuit Court, Division 1, a civil

8    case right below that.  Do you see that?

9      A.   Yes.

10     Q.   Who -- who is that case?

11     A.   That was a -- like a Discover card.

12     Q.   Okay.  It's a -- a Discover card that went

13   unpaid?

14     A.   Yes, it -- it was in the bankruptcy.

15     Q.   And that was a personal Discover card?

16     A.   Yes.

17     Q.   Do you remember the amount of that

18   judgement?

19     A.   No.  It's -- it -- I'm sure it's listed here,

20   but I -- I don't remember it.

21     Q.   Okay.  And if we skip on back to

22   Page 8860 --

23     A.   Okay.

24     Q.   -- do you see that, it's called Schedule

25   F?



 1    A.    [no audible response]

 2    Q.    And the first two creditor names on there

 3  are Manheim Louisville and then NextGear Capital,

 4  Inc.  Do you see that?

 5    A.    Yes.

 6    Q.    And it shows business debt of Manheim

 7  Louisville -- to Manheim Louisville of 9180?

 8    A.    Yes.

 9    Q.    And is that the -- the -- is that -- was that

10  an amount due to the auction or due to MAFS or

11  both?

12    A.    It was due to -- actually due to MAFS.

13    Q.    Okay.  But as far as you know, this was

14  an accurate statement of the amount at that time?

15    A.    Yes.

16    Q.    Okay.  And then it shows an amount due

17  to NextGear Capital of $58,432.52.  Do you see

18  that?

19    A.    Yes.

20    Q.    And that matches the judgement amount?

21    A.    I believe so.

22    Q.    Okay.  And I'll -- if you can turn back

23  to 8869?

24    A.    [complies]

25    Q.    I realize these are digital signatures, but



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 116 of 166 PageID #: 3688

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              149

 1   was junked.  We don't know why.

 2     Q.   Okay.  But do you -- do you know one way

 3   or the other whether you had Pages 7996 and 7998

 4   at the time you -- this letter was sent on your

 5   behalf?

 6     A.   No, I do not know.  I don't recall them,

 7   but that's not to say we didn't have them.

 8     Q.   Okay.  At or -- at or around the time that

 9   DSC declared the default and -- and began to pick

10   up vehicles, were you part of any discussions with

11   DSC about the default?

12     A.   No.

13     Q.   Okay.  When -- when did you first learn

14   that DSC was declaring a default?

15     A.   When they came -- the day of the

16   repossession.

17     Q.   Okay.  And so if they had internal

18   discussions about that around that time, you

19   weren't a part of those.

20     A.   Right.  Correct.

21     Q.   Okay.  And have you ever seen any of

22   that described in writing?

23     A.   Not that I recall.

24     Q.   Do -- do you have any personal anger or

25   animosity at DSC for the default situation?



1        MS. LASKY:  Object to the form.

2     A.    Well, if -- if I -- my -- my biggest thing, if

3  I was doing something wrong, I wish they had let

4  me know instead of swooping in one day and there

5  they are.

6  BY MR. MCCARTER:

7     Q.    Okay.  Did you ever apply for

8  reinstatement of your credit with DSC or

9  NextGear?

10    A.    No.

11    Q.    And that's fair enough, but what was the

12  reason that you didn't re-apply?

13    A.    I just didn't want to mess with it.  And I

14  didn't --

15    Q.    Okay.

16    A.    -- didn't want to mess with them.

17    Q.    So how did you become involved in this

18  litigation?

19    A.    An attorney from Louisiana contacted me

20  about it.

21    Q.    Without telling me the substance of that

22  conversation, who was that attorney?

23    A.    Hm.  I'm blank on her name.

24    Q.    Do you recall when you were contacted

25  about the current litigation you're being deposed



 1   in?

 2      A.    Gee, this is about a year ago possibly, I

 3   think.

 4      Q.    Did you know Red Barn or any of the

 5   other Plaintiffs in this case before that?

 6      A.    No.

 7      Q.    Have you talked to any of the other

 8   Plaintiffs in this case?

 9      A.    No.

10      Q.    So it looks like you, you know, had raised

11   this KO Book issue with at least Manheim in 2015.

12   Was that --

13      A.    Yes.

14      Q.    -- before or after the attorney from

15   Louisiana contacted you about this litigation?

16      A.    Before.

17      Q.    Okay.  Before that attorney contacted you

18   about this litigation, had you ever raised the issue

19   of when interest begins to accrue with DSC?

20      A.    No.

21      Q.    With NextGear?

22          MS. LASKY:  Object to the form.

23      A.    Re -- repeat that.  I'm sorry.

24   BY MR. MCCARTER:

25      Q.    Okay.  So be -- I think you said you were



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 119 of 166 PageID #: 3691

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          152

1   contacted about being involved in this case by an

2   attorney in Louisiana about a year ago.

3       A.   Uh-huh.

4       Q.   Okay.  Before that, had you ever raised

5   the issue or discussed the issue with DSC about

6   when interest begins to accrue on floor plan cars?

7       A.   I had --

8            MS. LASKY:  Object to the form.

9       A.   I had spoke with Lourdes and Donna on a

10  couple occasions about always looking to save

11  money, and I questioned particularly NextGear and

12  their charging interest two days before it

13  happened -- or two days with -- you know, we put it

14  on today; they already charged you two days.

15  BY MR. MCCARTER:

16      Q.   I think you said earlier that was MAFS;

17  right?

18      A.   MAFS.

19      Q.   Okay.

20      A.   And with Lourdes, it was always -- I was

21  always looking to cut -- you know, to save a dollar.

22  And I asked her -- because one -- an occasion, I --

23  I can't recall the exact vehicle or what happened;

24  but I got a vehicle -- like I say, I got a vehicle,

25  called -- got the -- I called to do -- pay the payoff,



1   and they still didn't have the title, but yet I was

2   charged.  I probably asked her for a deal --

3       Q.    Okay.

4       A.    -- but I don't remember.

5       Q.    And -- and that's those title-absent cars;

6   right?

7       A.    Yes.

8       Q.    Okay.

9       A.    That's when I was aware, because it --

10  it's -- DSC was different, because Manheim

11  actually had an office in their auction.

12      Q.    Yeah.

13      A.    Dealer Services did not.  They just had a

14  rep, so I didn't see much of anything like that.

15      Q.    Did that happen with MAFS, too?  I mean,

16  they would start charging interest when they didn't

17  have the title present yet?

18      A.    Yes.

19      Q.    And did that happen with AFC?

20      A.    That I do not know.  I'm -- I'm sure

21  they -- I'm sure they all work alike, but --

22      Q.    Okay.

23      A.    -- I do not -- don't recall anything about

24  AFC.

25      Q.    But in each of those cases, you had the



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 121 of 166 PageID #: 3693

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              154

 1  car, already had it.  You were doing whatever you

 2  wanted to do with the car.

 3    A.   Yes.

 4    Q.   Okay.  And do you recall when those

 5  discussions with Lourdes would have been?

 6    A.   No, no.  I -- I don't -- I don't know any

 7  dates.

 8    Q.   Okay.  Do you recall when you would have

 9  had the discussion with Donna about the two days

10  of interest?

11    A.   Yes, it would have been in her office.

12    Q.   When?

13    A.   Oh, the -- probably from day one when I

14  realized that they charged it on the compu --

15  you -- you could look at it on the computer and see

16  it.

17    Q.   Okay.  So it was transparent to you,

18  something that you were aware of.

19    A.   Yeah.  And I asked about it, and they

20  said -- their standard answer -- I mean, both of

21  them gave me the sta -- standard answer.  "Well,

22  that's the way we do it."

23    Q.   Okay.  And the same thing with the

24  title-absent, that you -- you were aware you were

25  being charged interest for that period.  You just



 1   didn't like it.

 2      A.    Yeah.

 3      Q.    Okay.

 4            MS. LASKY:  Object to the form.

 5   BY MR. MCCARTER:

 6      Q.    And in each case, you continued to

 7   borrow from DSC and MAFS after those

 8   conversations?

 9      A.    Yes.

10      Q.    Okay.  All right.

11      Do -- are you aware that in this case you have

12   RICO allegations that I'll -- you know, I'm not --

13   I'm not trying to pin you to this summary, but

14   generally you're alleging a conspiracy between

15   NextGear, Cox Automotive, Cox Enterprises, John

16   Wick, and others.  Are you aware of that?

17      A.    Yes.

18      Q.    Okay.  What's your understanding of how

19   that conspiracy works?

20      A.    As -- as far as the word "RICO," I didn't

21   know nothing about it.  The only thing I've ever

22   seen is on A&E channel with mobsters.  Outside of

23   that, I know nothing about it.

24      Q.    Okay.  So -- but, factually, what is your

25   understanding of how this conspiracy works?

 1    A.   Basically, they were charging interest on

 2  titles they did not have.

 3    Q.   Okay.  Are you -- are you aware of any

 4  specific conversations between NextGear and Cox

 5  Automotive about that?

 6    A.   No, I wouldn't -- I wouldn't have any idea.

 7    Q.   Are you aware of any specific

 8  conversations between NextGear and Cox

 9  Enterprises about that?

10    A.   No.

11    Q.   Are you aware of any specific

12  conversations between NextGear and John Wick

13  about that?

14    A.   No.

15    Q.   Are you aware of any conversations

16  among any of those parties about the issue of

17  charging interest?

18    A.   No.

19    Q.   Okay.  And by "conversations," I mean

20  emails, letters.  You haven't seen any --

21    A.   No.

22    Q.   -- of those?

23    A.   No, I would have.

24    Q.   Okay.  Do you -- do you have some --

25  you -- I think you said earlier you understood that



 1   Manheim acquired DSC sometime in 2012?

 2     A.   Yes.

 3     Q.   Okay.  So did -- do you have any

 4   knowledge about interactions between the Cox

 5   entities and DSC before that?

 6     A.   No, I wouldn't have any.  No.

 7     Q.   Okay.  And just -- I think you said this,

 8   but just to confirm:  You never dealt with -- you

 9   never had a line of credit with NextGear after DSC

10   and MAFS were merged into Next -- to become

11   NextGear?

12     A.   After May of  12, no, we nev -- we didn't

13   have -- ever have no business after May of  12.

14     Q.   Okay.  Just the collection and bankruptcy

15   stuff?

16     A.   Yes.

17     Q.   Okay.  All right.

18     You've also got what's called an unjust

19   enrichment claim in this case where you're

20   suggesting that NextGear and/or the other

21   defendants received an unfair benefit from you --

22   or an unjust benefit from you.  What's your

23   understanding of that?

24     A.   Is that --

25         MS. LASKY:  Object to the form.

Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 125 of 166 PageID #: 3697

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            158

1    A.   I'm not really sure what -- the legal term,

2   but it seemed like I was paying them money that

3   they should not have had yet, you know,

4   BY MR. MCCARTER:

5    Q.   And are --

6    A.   -- as far as the interest and stuff.

7    Q.   Okay.  Is -- is that focused on the

8   title-absent cars?

9    A.   Well, yes, and -- and I -- I -- of course, I

10  wouldn't know if they char -- how much they

11  charged daily, or if -- even if I -- even if they did

12  have a title, I don't know the length of it because,

13  you know, I just wouldn't have -- the printout did

14  not say that.  So I wouldn't have caught it.

15   Q.   To the extent you had the cars at that

16  point and you'd been able to take that by putting it

17  on your DSC or MAFS floor plan, what did -- why

18  do you think that's unfair?

19   A.   It's just --

20        MS. LASKY:  Object to the form.

21   A.   -- costing me more money.

22  BY MR. MCCARTER:

23   Q.   Okay.  Did you -- I think you said

24  title-absent cars were disclosed on the block or

25  some --



```
 1      A.    Yes.

 2      Q.    Okay.  So you could have not purchased

 3   title-absent cars if you chose to.

 4      A.    Yes.

 5      Q.    Okay.  And if you did choose to purchase

 6   a title-absent car, you could choose not to put that

 7   on your DSC line.

 8      A.    Right.

 9      Q.    Okay.  And to -- during the period when

10   you had an AFC and a MAFS line, you could have

11   chosen to put the car on your AFC line instead of

12   your MAFS line.

13      A.    Like we -- yeah, we could choose --

14   choose anybody, I guess.

15      Q.    And the same thing, when you had a

16   DSC/MAFS line, you could have chosen to put the

17   car on MAFS instead of DSC.

18      A.    Yes.

19      Q.    Or you could have chosen to pay cash for

20   them.

21      A.    Yes.

22      Q.    Okay.

23      A.    Of course, when I paid cash at the

24   auction, if I wrote the auction a check today with a

25   title-absent, they don't actually cash my check
```



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 127 of 166 PageID #: 3699

BARRY WAYNE MATTINGLY 30(b)(6)                October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                        160

1  until they receive the title.

2    Q.   Okay.  What benefit do you believe you

3  conferred on John Wick, who's a Defendant in this

4  case?

5    A.   I wouldn't have any idea.

6    Q.   Okay.  What benefit do you believe you

7  conferred on Cox Enterprises in this case?

8    A.   The same.  I have no any.

9    Q.   Okay.  What benefit do you believe you

10  conferred on Cox Automotive in this case?

11    A.   No idea.

12    Q.   Okay.  All right.

13    You said before, I think, two -- correct me if

14  this is wrong, but before 2012 you might

15  have 20, 25 cars in the lot, or was it 15, 20?

16    A.   Anywhere -- more like 15.

17    Q.   Okay.  And now you might have 1 or 2 on

18  the lot?

19    A.   Yes.

20    Q.   Okay.  But might you be owning other

21  cars that are at auction or somewhere else?

22    A.   I could --

23        MS. LASKY:  Object to the form.

24    A.   -- but that's -- right now that's the only

25  ones we have for sale.



 1  │ BY MR. MCCARTER:

 2  │   Q.    Okay.  So, on average, you're owing 1

 3  │ or 2 cars at a time now?

 4  │   A.    Yes.

 5  │   Q.    Okay.  And, on average, you think you

 6  │ were owning 15 or so before --

 7  │   A.    I'd be -- I'd have 15 and --

 8  │   Q.    -- before 2012?

 9  │   A.    Yes.

10  │   Q.    Okay.  Do you have any recollection of

11  │ sort of what your net income was annually from the

12  │ automotive business between 2006 and 2012?

13  │   A.    No, I don't -- I don't recall right off the

14  │ top of my head.

15  │   Q.    Can you ballpark it?

16  │   A.    I know -- I could give you ballpark of

17  │ gross sales --

18  │   Q.    Okay.

19  │   A.    -- if that would help you any.  It -- it'd

20  │ be -- let's say prior to  12, we -- we would do

21  │ anywhere from 800.  And I -- I think one time we

22  │ might have even hit a million.  This year our gross

23  │ sales would luckily to -- be 60,000.

24  │   Q.    Okay.  But, obviously, gross sales

25  │ doesn't -- hasn't --



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            162

```
 1      A.    Turn -- turned a --
 2      Q.    -- yet subtracted out of your --
 3      A.    -- turned a profit.
 4      Q.    -- costs; right?
 5            MS. LASKY:  Wait, wait, wait.
 6   BY MR. MCCARTER:
 7      Q.    Gross sales hasn't yet taken out your
 8   cost of doing business; right?
 9      A.    Correct.
10      Q.    All right.  So do you have any
11   recollection of what your net income was any time
12   between 2006 and 2012?
13      A.    No.
14      Q.    Would that be shown on accounting
15   records or tax returns that --
16      A.    Tax; uh-huh.
17      Q.    -- that you would still have access to?
18      A.    Yes.
19      Q.    Okay.  And since 2012, do you have any
20   sense of what your net income would be from the
21   automotive business?
22      A.    Yes.
23      Q.    What is it?
24      A.    I -- I don't recall the income last year.
25   I -- I don't recall it off the top of my head.
```

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          168

1     Q.    Yeah.

2     A.    A -- not -- not that I recall.  I mean, I

3   don't know what you're looking for in that answer.

4     Q.    Okay.  How about the interest issue?

5   Have you done anything --  demand payment of

6   interest back from NextGear?

7     A.    No.

8     Q.    Okay.

9     A.    I mean --

10    Q.    Have you -- well, strike that.

11    Okay.  Do you have an understanding that you

12  and the other Plaintiffs are seeking to represent a

13  class of Plaintiffs in this case?

14    A.    Yes.

15    Q.    What is your understanding of -- of that

16  class?

17    A.    The only thing --

18          MS. LASKY:  Object to the form.

19    A.    I don't know much about that stuff.  It --

20  legal stuff.  The only thing I know, it's just a --

21  "class action" means -- I -- I assume it to be a

22  group of people --

23  BY MR. MCCARTER:

24    Q.    Okay.

25    A.    -- a group of entities or whatever.



```
 1      Q.   Do you have some understanding it's

 2   other NextGear borrowers?

 3      A.   Yes.

 4      Q.   Okay.  Do you have any idea of how far

 5   back or anything like that?

 6      A.   No; huh-uh.

 7      Q.   Okay.  Have you spoken to any other

 8   dealers about this case?

 9      A.   No.

10      Q.   Besides your attorney and your wife, have

11   you spoken to anybody else about this case?

12      A.   No.

13      Q.   Do you -- have you made any kind of

14   study of what the other NextGear dealers look like

15   or what their business looks like?

16      A.   No.

17           MS. LASKY:  Object to the form.

18   BY MR. MCCARTER:

19      Q.   Okay.

20      A.   No.

21      Q.   Do you have some understanding that

22   other NextGear borrowers may be bigger than you?

23           MS. LASKY:  Object to the form.

24      A.   That's possible; yes.

25   BY MR. MCCARTER:
```



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 132 of 166 PageID #: 3704

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           170

 1     Q.    Do you -- have you heard of dealers

 2   having multiple lots?

 3     A.    With NextGear?

 4     Q.    Yeah.

 5     A.    No, I wouldn't know any --

 6     Q.    Okay.

 7     A.    -- anything about their personal business.

 8     Q.    Do -- do all dealers buy the same types of

 9   cars?

10     A.    No.

11     Q.    So they can be higher end?  Lower end?

12     A.    Yes.

13     Q.    Okay.  Some can deal in volume and some

14   can deal in just high-profit cars?

15     A.    Yes.

16     Q.    Okay.  Do you -- do all dealers go to

17   auctions?

18     A.    I assume --

19          MS. LASKY:  Object to the form.

20     A.    -- I -- I don't know about the other

21   people's business.  You know, I wouldn't have any

22   idea.

23   BY MR. MCCARTER:

24     Q.    Okay.  Do -- do you have some reason to

25   believe that all the other NextGear borrowers have



```
 1   defaulted and been in collection with NextGear?

 2          MS. LASKY:  Objection --

 3      A.   I wouldn't have --

 4          MS. LASKY:  -- to form.

 5      A.   -- any idea.

 6   BY MR. MCCARTER:

 7      Q.   Okay.  Do you know anything about new

 8   loan forms that NextGear may have implemented

 9   after --

10      A.   No.

11      Q.   -- you stopped dealing with NextGear?

12      A.   No.

13      Q.   Okay.  Have you been part of any

14   discussions between --

15   [WHEREUPON, off-the-record remarks are

16   made.]

17   BY MR. MCCARTER:

18      Q.   Have you been part of any discussions

19   between NextGear and auto auctions about

20   payoffs?

21      A.   No.

22      Q.   Have you been part of any discussions

23   between DSC and auto auctions about the payoff

24   between the auction and DSC?

25      A.   No.
```



1     Q.    Okay.  Have you personally been part of

2   or reviewed any agreements between Nextgear and

3   DSC and any auctions?

4     A.    No.

5     Q.    Okay.

6         MR. MCCARTER:  Okay.  Let's go off the

7   record for a second.

8   [WHEREUPON, a brief recess is taken.]

9   BY MR. MCCARTER:

10    Q.    Mr. Mattingly, I'm just going to clear up a

11  few things I may have missed before or don't know

12  the answer to.  So I understand your wife, Ms.

13  Mattingly, is a co-owner and vice president of

14  Mattingly Auto Sales, Inc.; correct?

15    A.    Correct.

16    Q.    Okay.  Operationally, though, what's her

17  role?  What does she do for the business?

18    A.    Basically does the book work.

19    Q.    Okay.  And has that been true

20  since 2006?

21    A.    Yes.

22    Q.    And this is Ms. Mattingly in the room with

23  you?

24    A.    Yes.

25    Q.    Okay.  So at some point, if we needed



Case 1:14-cv-01589-TWP-DLP Document 197-8 Filed 04/26/17 Page 135 of 166 PageID #: 3707

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           173

 1   more information about your bookkeeping and

 2   accounting and revenue records, would she be the

 3   person to testify to that?

 4      A.   She could answer quest -- if -- if we had

 5   them that far back, yes.

 6      Q.   Okay.  Does she do anything else for the

 7   business?

 8      A.   No.

 9      Q.   Does she buy or sell at auction?

10      A.   No.

11      Q.   Does she talk to retail customers about

12   sales?

13      A.   Yeah, if I'm not there.

14      Q.   Okay.  The other reps that we talked

15   about buying at auction for you, did they ever deal

16   with your retail customers?

17      A.   No.

18      Q.   Okay.  Are they all independent

19   contractors?

20      A.   Yes.

21      Q.   Okay.  Do you do 1099s on them?

22      A.   No.

23      Q.   Okay.  Do you pay them in cash?

24      A.   No, I -- I do not pay them anything.

25      Q.   Okay.  So how do they make their money?



 1    A.    They -- they would -- If they -- basically,

 2  they buy the car with a check -- on my check.

 3    Q.    Yep.

 4    A.    They would purchase the car under me.  If

 5  they sold it, they would just write me the check for

 6  whatever the amount is that they paid for it at the

 7  auction.  I didn't ma -- basically, I didn't make any

 8  money off of them.

 9    Q.    So why -- why would you let them buy on

10  your account if you don't make any money?

11    A.    The -- well, one hand washes the other.

12  You know, they might have to do something for me

13  in their business.

14    Q.    Like what?

15    A.    Well, just maybe come up with a car,

16  trade, you know, that kind of thing.

17    Q.    Okay.  All right.

18    Were any of the cars that, you know,

19  NextGear -- that were involved in the NextGear

20  default, were they purchased by any of these other

21  individuals?

22    A.    Yes.

23    Q.    Okay.  Were any of the cars with those

24  other individuals when NextGear tried to acquire --

25    A.    Yes.



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 137 of 166 PageID #: 3709

BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          175

1    Q.    Yes?

2    A.    Yes.  Yes.

3    Q.    Okay.  And -- and which individuals?

4    A.    Kenny Barger.

5    Q.    Barger?

6    A.    Bar -- B-a-r-g-e-r.

7    Q.    Does he have his own lot?

8    A.    No.

9    Q.    Was he trying to sell the cars wholesale

10   at auction, or something else?

11   A.    No, he would just drive them and sell

12   them later.

13   Q.    From where?

14   A.    He -- from his house or take them to the

15   auction or -- he has a farm-selling business, I

16   guess you would say.  You know, he -- he's a

17   trailer, I guess you might. . .

18   Q.    So he doesn't -- at the -- at the time,

19   anyway, in 2012 he didn't have a lot with a sign?

20   A.    No.

21   Q.    Was he a licensed car dealer?

22   A.    Yes, through me.  He didn't have his own

23   dealership.  Is that -- is that what you're asking?

24   Q.    Yeah.  Did he have a license as a dealer?

25   A.    No.



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 138 of 166 PageID #: 3710

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          177

1    Q.    -- cars you might own --

2    A.    Yeah, other than cars.

3    Q.    -- do you own a building or --

4    A.    No.

5    Q.    -- anything like that?

6    A.    No.

7    Q.    Okay.  Do you have equipment for the

8    dealership?

9    A.    No.

10    Q.    Okay.  Is your job with Ford as an income

11    quality inspector -- incoming quality inspector, is

12    that a full-time job?

13    A.    Yes.

14    Q.    Okay.  And it has been for the whole

15    time?

16    A.    Yeah, for all -- yes --

17    Q.    Okay.

18    A.    -- 27 years.

19    Q.    Twenty-seven years?  Okay.  So when did

20    you work on the car business?  Like what time of

21    the day?

22    A.    Depending on what shift I was on,

23    weekends or during the day I would --

24    A.    Okay.

25    Q.    At the time -- at the time of the re --



```
 1   started, I'm trying to think what year.  Basically, I

 2   worked night shift up until two thousand possibly

 3   seven.  Then I went to day shift, a day-shift job.

 4     Q.   Is it fair to say your job with Ford is your

 5   main job?

 6     A.   Yes.

 7     Q.   Okay.  What -- what do you make from

 8   Ford now?

 9     A.   Last year maybe 100,000.

10     Q.   Okay.  And is that all salary, or is there a

11   bonus component.

12     A.   There are bonuses included in that.

13     Q.   Okay.  How's that changed since 2002 --

14   two -- I'm sorry, 2012?

15     A.   I -- really, the only other thing would

16   be -- is raises.

17     Q.   So roughly from what level?  I mean, I

18   don't need exact numbers, but. . .

19     A.   I'd say a 20% increase possibly.

20     Q.   Okay.

21     A.   You know, I'd -- I'd have to look back.  I

22   wouldn't have any -- you know, right off the top of

23   my head.

24     Q.   Is it steady 3 --

25     A.   Nor -- nor --
```



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 140 of 166 PageID #: 3712

BARRY WAYNE MATTINGLY  30(b)(6)                      October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            179

1    Q.   -- 3% a year --

2    A.   -- nor --

3    Q.   -- or 5% a year?

4    A.   Yeah, getting normal raises.  Yeah, I --

5    yes, that's about -- that's about right.

6    Q.   Okay.  And are the bonus -- what are the

7    bonuses based on?

8    A.   Profit sharing.

9    Q.   Okay.  And that income has not been

10   affected by the DSC situation?

11   A.   No.

12   Q.   Has it been affected for the positive?  I

13   mean, have you had more time to focus on Ford?

14   A.   Well, yes, I have the same time of -- the

15   other was part-time.

16   Q.   Okay.

17   A.   Same thing.

18   Q.   Were there -- at -- at the time of the

19   NextGear default in, you know, May of 2012, were

20   there a couple of vehicles involved that you had

21   acquired from ABC Bowling Green?  Does that ring

22   a bell?

23   A.   I'm sure I have.  I'm sure I've purchased

24   some there --

25   Q.   Okay.



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 141 of 166 PageID #: 3713

BARRY WAYNE MATTINGLY  30(b)(6)                          October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                               180

1       A.    -- floored them from there; yes.

2       Q.    Do you recall whether there were any

3   cars that you floored from ABC Bowling Green with

4   DSC that hadn't actually sold at ABC Bowling

5   Green?

6       A.    Yes.

7       Q.    Okay.  Can you tell me about those?

8       A.    Yes.  To put them on the floor plan,

9   they -- with a suggested -- started with Art Felix to

10  Lourdes to Donna Kronauer, they -- if I wanted to

11  put them on a  floor plan just to run them through

12  the auction and for -- to another dealer to the --

13  through the -- through there or to put them on --

14  we had to put them on the floor plan, more or less.

15      Q.    But when you say "run them through the

16  auction," you mean they ran through, and then they

17  didn't sell --

18      A.    Right.

19      Q.    -- and so you had a no-sale ticket.

20      A.    Yeah.

21      Q.    And then those were put on a floor plan

22  with a no-sale ticket.

23       A.    Yeah, or I purchased them from the

24  dealer whose name was in.

25      Q.    But you used the no-sale ticket to put



 1 | them on the floor plan.

 2 |   A.   Well, it was a -- it was a no-sale ticket,

 3 | but they would -- it would turn into a sale, I guess

 4 | you would say, to put them on the floor plan.

 5 |   Q.   Well -- so I -- and if you don't --

 6 |   A.   It's --

 7 |   Q.   -- know the answer, that's fine, but

 8 | what's the value of -- of running it through and not

 9 | selling it?  I mean, how does that help --

10 |   A.   Well --

11 |   Q.   -- for --

12 |   A.   -- to -- to -- what -- what you're -- what

13 | you're asking is -- is to put them on the floor plan,

14 | Lourdes and Art Felix would have to say, "Put

15 | them -- run it through the auction as -- as -- as a

16 | post or trade," and I don't -- I can't remember if

17 | they do trades or not, but, "Run it through the

18 | auction, have a -- you know, put it on there, and

19 | we could put it on the floor plan as a sale through

20 | the auction."

21 |   And the -- you know, I -- I said, "Well, that

22 | sounds like a winner to me," because it sounded

23 | like a good deal.

24 |   Q.   Okay.  And you're say -- so you're saying

25 | they're fully aware that it didn't sell at auction.

1   That is just ran and --

2     A.    They are --

3     Q.    -- no sale.

4     A.    Yes.  Yes.

5     Q.    Okay.

6     A.    Yes.

7     Q.    And do you know anything about a Post

8   Office Box 66 that titles may have been sent to

9   related to your dealer --

10    A.    Yes, it was Breckenridge Automotive.

11    Q.    Okay.  So what is -- what is Breckenridge

12  Automotive?

13    A.    It's -- it's a business that we would put

14  titles, you know, if it just -- detail work, parts, or

15  something, me and a friend of mine we had some --

16  starting a business, but it was never an official car

17  lot.

18         THE REPORTER:  I'm sorry.  It was or

19  wasn't?

20         THE WITNESS:  It was never a -- not an

21  official car lot.

22         THE REPORTER:  Thank you.

23    A.    As opposed to an auto sales.

24  BY MR. MCCARTER:

25    Q.    So you were doing business with a friend



1   under the name of Breckenridge Automotive.

2     A.   Yes.

3     Q.   And there you did detail work?

4     A.   Detail, parts, you know, tru -- you know,

5   anything that we needed to do.  We just never did

6   use it, and then dissolved it.

7     Q.   All right.  And was it -- so when you say

8   "dissolved it," does that mean it was a legal

9   entity?  Did you --

10     A.   Yes.

11     Q.   -- incorporate it?

12     A.   Yes, it was an LLC.

13     Q.   Okay.  Who was the friend?

14     A.   It was Richard Smiley, and the entity was

15   owned by Denise, my wife.

16     Q.   Is there any reason you would have titles

17   for cars that were on your NextGear floor plan or

18   your DSC floor plan sent to that address?

19     A.   Yes.  They had to have a -- they had to

20   have a title from -- from a -- someone else other

21   than Barry Mattingly.  So with their -- they told me

22   how to do this, the reps, to put it into a dealership

23   name or some other name.  The dealer would sign

24   it to Mattingly Auto Sales, and we could put it on

25   the floor plan.



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            184

1    Q.   So you're -- you're saying that you were

2    advised to create a -- an apparent transaction

3    between Breckenridge and Mattingly Auto sales so

4    that that car could be floored with NextGear.

5    A.   Yes.

6    Q.   Okay.  And you're saying that the

7    DSC/NextGear people told you to do that?

8    A.   Well, they -- well, they said it would

9    work, and that's how I could put them on that way.

10   And that's what I did.

11   Q.   Okay.  And who specifically advised you

12   of that?

13   A.   The first person was Art Felix, and then

14   Lourdes and then Donna at MAFS.

15   Q.   Would -- but Donna wouldn't have spoken

16   for the Next -- for the DSC --

17   A.   No, no.

18   Q.   -- floor plan --

19   A.   No.

20   Q.   -- right?

21   A.   No, but she was aware of it because --

22   Q.   Okay.

23   A.   -- she'd actually done some for me,

24   so. . .

25   Q.   Would -- would DSC typically finance

1  those cars at the price that you showed on the

2  ticket between Breckenridge and you?

3     A.   Yes.

4     Q.   And that -- that was sort of an artificial

5  price that your two entities made up?

6     A.   Right, or -- it was always under their --

7  under their level, under their max-out range, I

8  guess.

9     Q.   And Breckenridge didn't have a line with

10  DSC --

11     A.   No.

12     Q.   -- right?  Okay.

13     So you're moving cars from Breckenridge's

14  name to Mattingly Automotive's name so they can

15  be put on Mattingly Automotive's floor plan?

16     A.   Correct.

17     Q.   Okay.  So how did Breckenridge acquire

18  the cars in the first place?

19     A.   Oh, that -- I mean, just regular

20  purchases.  I mean, just trades or trade-ins or

21  anything like that.

22     Q.   Were they purchased and traded -- were

23  they purchased by Breckenridge or traded to

24  Breckenridge, or had they been purchased by

25  Mattingly in the first place?



1          MS. LASKY:  Object to the form.

2     A.    Purchased by Mattingly.  I mean, it was

3    our -- it was our vehicle, but they told me how to

4    show -- I needed to have the title done to someone

5    else's name.

6    BY MR. MCCARTER:

7     Q.    Okay.  So did the title show Mattingly

8    Auto Sales assigned to Breckenridge, Breckenridge

9    assigned back to Mattingly Auto Sales?

10    A.    No, no.  It was a new title.  It was always

11   dealer at the la -- it was -- would say Bracken --

12   so this title here was Breckenridge Automotive, or

13   whoever it may be; then I would dealer assign it to

14   Mattingly Auto Sales, and then sold -- you know,

15   put on the floor plan.

16    Q.    Okay.  So did -- did Breckenridge

17   Automotive have a dealer license?

18    A.    No.

19    Q.    Okay.  So it was dealing in cars without a

20   dealer license.

21    A.    Right.

22    Q.    Okay.

23    A.    It was like an individual, your name or

24   something like that.  It just couldn't be in my

25   personal name or Mattingly Auto Sales to -- on a



1  trade.

2     Q.   Do you have any idea how many times

3  this happened --

4     A.   No.

5     Q.   -- over the years?

6     A.   That -- no.

7     Q.   Estimate?

8     A.   No, I wouldn't have any idea.

9     Q.   Okay.  Do you -- do you have a sense of

10  whether Breckenridge Automotive was supposed to

11  have a license under the law to transfer those

12  cars?

13     A.   Yes, they would not have -- it was --

14  there's no need to, because it was not a

15  dealership; don't need to have a license.

16     Q.   Okay.  All right.

17     So -- but just to be clear:  We're talking about

18  cars that belong to Mattingly Auto Sales being

19  assigned to Breckenridge and being assigned back

20  to Mattingly so they could be put on the NextGear

21  floor plan.

22     A.   Correct, but it actually wouldn't be

23  assigned -- well, as far as what you're assigning,

24  it would be tilted.  I'd have a title.

25     Q.   Okay.



1    A.    And -- and then -- then reassigned -- or

2    assignment to Mattingly Auto Sales.

3    Q.    Okay.  Breckenridge got that title in its

4    name in the first place somehow; right?

5    A.    Right.

6    Q.    All right.  So how did it do that?

7    A.    Just transferred it.

8    Q.    From Mattingly Auto Sales.

9    A.    Or -- Mattingly Auto Sales or a trade-in

10   from John Doe or whoever.

11   Q.    Okay.  So we're talking about cars that

12   were originally purchased by Mattingly Auto Sales

13   or traded to Mattingly Auto Sales.  You assigned

14   those to Breckenridge.  Breckenridge gets a new

15   title, and assigns those back to you.

16   A.    Through the -- run through the auction.

17   Q.    So the second part -- the second

18   transaction from Breckenridge to you is run

19   through the auction?

20   A.    Or -- yeah, or -- could be, or -- I could

21   run it through the auctions or just give it to them

22   and say, "Here, Donna.  Here's the title.  Put it on

23   the floor plan."

24   Q.    Okay.  That's fine.  I -- I just want to be

25   clear that they -- these are cars started out



```
 1   belonging to Mattingly --

 2     A.   Yeah.  Well --

 3     Q.   -- Auto Sales; right?

 4     A.   I misspoke, I guess.  Breckenridge

 5   Automotive couldn't run it through the auction

 6   because they're not a dealer.  Your -- that's

 7   correct; yeah.

 8     Q.   They -- they could not them run through

 9   auction.

10     A.   Right.

11     Q.   Okay.  So again, Mattingly Auto Sales

12   may have acquired it at auction or by trade-in;

13   right?

14     A.   Uh-huh; correct.

15     Q.   Okay.  And then you assign them or

16   convey them to Breckenridge Automotive; right?

17     A.   Right.

18     Q.   And that wouldn't happen at auction

19   because Breckenridge couldn't go to auction.

20     A.   That's correct.

21     Q.   Okay.  And so then Breckenridge is going

22   to assign them back to you, Mattingly Auto Sales.

23   And they're getting -- they're not going to go to

24   auction because Breckenridge can't go to auction;

25   right?
```



BARRY WAYNE MATTINGLY 30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          190

1     A.    Correct.

2     Q.    And then Mattingly Automotive is going to

3  take that car and put it on its -- its DSC floor plan.

4     A.    Correct.

5     Q.    Okay.  Do you think that happened more

6  than five times?

7     A.    I -- I'd -- I'd have to look.  I -- I don't

8  know.  It's possible.  It's possible.  I don't know.

9     Q.    Okay.  Did you have any sense that DSC

10  might be relying on the --the price that you --

11  Breckenridge created to Mattingly as the floor plan

12  amount?

13        MS. LASKY:  Object to the form.

14     A.    You have to -- run it by me again.

15  BY MR. MCCARTER:

16     Q.    Okay.  So did -- did DSC finance those

17  cars at the price that Matt --

18     A.    We put on -- yes.

19        MS. LASKY:  Wait, wait, wait.

20  BY MR. MCCARTER:

21     Q.    -- that you put on?

22        MS. LASKY:  Let him -- let him finish.

23        THE WITNESS:  I'm sorry.  I'm sorry.

24  BY MR. MCCARTER:

25     Q.    Did DSC finance those cars at the price



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 152 of 166 PageID #: 3724

BARRY WAYNE MATTINGLY  30(b)(6)                        October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                                191

1   that Breckenridge and Mattingly assigned to that

2   second transaction?

3     A.   Yes.

4     Q.   Okay.  Did -- were you -- as Mattingly

5   Auto Sales or through Breckenridge, were you ever

6   involved in creating bills of sale later on cars that

7   had already been assigned to you?

8     A.   To put them on MAFS and the -- yes, we'd

9   have to have a bill of sale.

10    Q.   Okays.  So sometimes you would have

11  gotten the car title to you long before, but then

12  you would create a bill of sale to -- to put it on the

13  floor?

14    A.   Yes.  I'd have to have a -- from

15  Breckenridge, just use it as example, Breckenridge

16  to Mattingly, I'd have to have a bill of sale.  And

17  they would -- that was also a requirement from the

18  floor plan companies.

19    Q.   Okay.  So I -- I understand the floor plan

20  companies required a bill of sale, but are you --

21  are you saying the floor plan companies told you

22  to go out and create a bill of sale for a transaction

23  that occurred months before and will --

24    A.   Yes.

25    Q.   -- put it on the floor?



Case 1:14-cv-01589-TWP-DLP  Document 197-8  Filed 04/26/17  Page 153 of 166 PageID #: 3725

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                            192

1     A.    Uh-huh.

2     Q.    Okay.  Did you -- did -- at the time, did

3   you see any problem with that, that it might be a

4   mis-representative bill of sale?

5     A.    No, because both -- like I said, both

6   representatives were aware of it, so it seemed like

7   something like, you know, they -- they didn't mind.

8     Q.    Okay.  Would -- would the -- the -- when

9   you and -- when Breckenridge assigned price on its

10  deal on Mattingly Auto Sales, was that always the

11  same price at which Mattingly had acquired it at

12  auction?

13    A.    That I wouldn't know.  I can't remember

14  all that stuff.  It's -- that's so long ago.

15    Q.    Is it possible --

16    A.    I couldn't give you numbers.

17    Q.    -- it was at a higher price?  So in other

18  words, you originally required as Mattingly at one

19  price, then you convey to Breckenridge for -- for

20  nothing, and then Breckenridge conveys it back to

21  Mattingly at a higher price?

22        MS. LASKY:  Object to the form.

23    A.    I  mean, it's possible depending on if

24  there was repairs involved.  I -- I -- I just don't

25  recall specifics.



1  BY MR. MCCARTER:

2    Q.   Okay.  So -- but in -- if that happened,

3  you could be financing it with NextGear at a higher

4  price than you paid at auction for it.

5         MS. LASKY:  Object to the form.

6    A.   I'd just have -- it's -- I guess that would

7  make sense, but I just -- I don't recall doing it.  I

8  mean, I just don't recall the details.

9  BY MR. MCCARTER:

10   Q.   You don't recall either way?  You can't

11  say --

12   A.   No, I --

13   Q.   -- it happened?

14   A.   -- I don't know.  I don't know.

15        MS. LASKY:  Object to the form.

16  BY MR. MCCARTER:

17   Q.   So besides Breckenridge -- oh, strike

18  that.

19   Breckenridge Automotive, LLC, is that a

20  Kentucky LLC?

21   A.   Yes.

22   Q.   Okay.  Is it still existing?

23   A.   No.

24   Q.   When was it shut down?

25   A.   I think maybe two years ago.



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 155 of 166 PageID #: 3727

BARRY WAYNE MATTINGLY  30(b)(6)                October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              194

1    Q.    Okay.  Did it file tax returns?

2    A.    Yes.

3    Q.    All right.  And did it have profit --

4    A.    No.

5    Q.    -- during -- at all?

6    A.    Huh-uh.

7    Q.    Okay.  Did it file its own returns, or did

8    it -- or was it passed through to you, and you --

9    A.    It filed its own return -- had to file --

10   LLCs in Kentucky have to file their own return.

11   Q.    Okay.  And did Jackson Hewitt do those,

12   too?

13   A.    Yes.

14   Q.    Okay.  And how -- what -- what years,

15   roughly, was Breckenridge Automotive in

16   existence?

17   A.    I'd say  10,  11,  12 -- probably about

18   four years, from, say,  12 to -- or  11 -- or  10

19   to  14 possibly.

20   Q.    2010 to 2014?

21   A.    Possibly, yes.

22   Q.    Okay.

23   A.    I'd have to -- I don't remember, to be

24   honest with you.  That's close.  Somewhere in that

25   time frame definitely.



```
 1      Q.    Do you recall Breckenridge Automotive

 2   ever dealing at auction, Manheim or otherwise?

 3      A.    No.

 4      Q.    Okay.  Have you or your wife ever done

 5   your own business under any other entity besides

 6   Mattingly Automotives -- Automobile Bill -- excuse

 7   me, Mattingly Automotive Sales, Inc. or

 8   Breckenridge Automotive?

 9      A.    No.

10      Q.    Okay.  All right.

11      I'm just going to read a paragraph to you from

12   your declaration in this case to support your

13   motion for class certification.  Paragraph 7 says,

14   [reads] As a result of Defendants' conduct alleged

15   in the verified amended complaint, Mattingly Auto

16   Sales has suffered monetary loss, including, but

17   not limited to, interest and fees on money not lent

18   and damage to its business relationships.

19      Do you recall signing that?

20      A.    It sounds familiar, but. . .

21      Q.    Okay.  Is that true?

22      A.    Yes.

23      Q.    All right.  So we covered damages

24   earlier, but do you -- what is your best

25   understanding of -- of the amount of your damages
```



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 157 of 166 PageID #: 3729

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              196

 1   as we sit here today?

 2      A.   I wouldn't --

 3           MS. LASKY:  Objection.

 4      A.   I wouldn't have any idea about that.

 5   BY MR. MCCARTER:

 6      Q.   Okay.  What is your understanding of the

 7   type of damages you have as we sit here today?

 8      A.   I -- like I said, once again, I -- I just

 9   wouldn't have any idea; wouldn't know how to

10   answer that one.

11      Q.   Okay.  So I -- I think you said you

12   sometimes would work on some cars you acquired

13   at auction before you sold them; is that right?

14      A.   Correct.

15      Q.   Okay.  What -- I mean, just give me some

16   examples of what that might look like.

17      A.   Cleanup, tires, maybe some paint work,

18   just various.

19      Q.   All right.  And those things cost money?

20      A.   Absolutely.

21      Q.   And do -- do you have some way to track

22   those and take them off out of your profit on the

23   unit?

24      A.   Yes.

25      Q.   Okay.  And how do you do that?



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 158 of 166 PageID #: 3730

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              197

 1    A.    What -- what do you mean?

 2    Q.    How do you figure out -- how do you keep

 3  track of what you --

 4    A.    Oh.

 5    Q.    -- spend on a car --

 6    A.    We have a fi --

 7    Q.    -- that's not --

 8        MS. LASKY:   Wait.  Wait a minute.

 9  BY MR. MCCARTER:

10    Q.    Let me finish.

11    A.    I'm sorry.

12    Q.    How do you keep track of what you spend

13  on a car besides just purchase price and figure out

14  what your net profit is?

15    A.    We have a file for each individual, say,

16  like a repair shop, paint shop, different -- any time

17  a ticket's made, it goes to that -- into their folder.

18    Q.    Okay.  But you track that by car with

19  the --

20    A.    Yeah.  We --

21    Q.    -- deal jackets --

22    A.    -- also can do it by cars.

23    Q.    -- with the dealer jackets we talked about

24  before; right?

25    A.    Yes.



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                           203

```
 1   Sales.

 2      Q.   Okay.  And is he -- does he reside in

 3   Hardinsburg, too?

 4      A.   No, he lives in another town.

 5      Q.   Where does he live?

 6      A.   Garfield.

 7      Q.   Kentucky?

 8      A.   Yes.

 9      Q.   Okay.  What about Mr. Anthony?  Do you

10   still do business with him?

11      A.   Yes.  He buys -- he'll buy a couple a

12   year.

13      Q.   Where does he reside?

14      A.   I think McDaniels, Kentucky.

15      Q.   Okay.  And what about Mr. Fentress?  Do

16   you still do business with him?

17      A.   Yes.

18      Q.   And --

19      A.   Hardins --

20      Q.   -- where does he reside?

21      A.   -- Hardinsburg.

22      Q.   And how many does he buy a year?

23      A.   Well, this is the first year, so -- I don't

24   know yet.

25      Q.   Okay.  Do you -- do you know anything
```



Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 160 of 166 PageID #: 3732

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              204

 1   about Auction Access?  Does that ring a bell?

 2      A.   Oh, yes.  Yes.

 3      Q.   Are these guys registered as reps for you

 4   with Auction Access or directly at the auctions?

 5      A.   Directly at auctions.

 6      Q.   Okay.

 7      A.   Mr. Barger was Auction Access, because

 8   that's a Manheim -- that's a -- Manheim uses them.

 9   So I know he --

10      Q.   Okay.

11      A.   -- was through Manheim.

12      Q.   Okay.

13      A.   But not now, of course.

14      Q.   Do you have any sense of how your

15   pre-2012 net income as Mattingly Auto Sales, Inc.

16   compares to other NextGear dealers pre-2012?

17      A.   No.

18      Q.   Do you have any sense of how your net

19   income compares to other NextGear dealers

20   since 2012?

21      A.   No.

22      Q.   Okay.  Did you ever have a transaction

23   with NextGear that you -- you had floored with

24   NextGear that had to be unwound and taken off the

25   NextGear line?



```
 1     A.   I'm sure that I have sometimes if there

 2   was an arbitration issue on a car, but I don't

 3   recall.

 4     Q.   Okay.  So that would be a car you bought,

 5   then you would take it back for arbitration, and

 6   you would take it off the line somehow?

 7     A.   Yes.  That -- that -- they would just ta --

 8   call them and say we -- the car got turned back in.

 9   And I don't believe they -- I -- I just don't believe

10   they even charged me fees.  I wouldn't -- wouldn't

11   swear to it, but I'm sure it's happened; just don't

12   recall.

13     Q.   Okay.

14          MR. MCCARTER:  Okay.  I'm done.

15          MS. LASKY:  I do have a few questions.

16          MR. MCCARTER:  Okay.

17          MS. LASKY:  Okay.

18   EXAMINATION

19   BY MS. LASKY:

20     Q.   Mr. McCarter was asking you about the

21   transactions between Breckenridge and Mattingly.

22   Do you recall that?

23     A.   Yes.

24     Q.   Okay.  The price that was assigned to the

25   transaction between Breckenridge and Mattingly,
```

Case 1:14-cv-01589-TWP-DLP   Document 197-8   Filed 04/26/17   Page 162 of 166 PageID #: 3734

BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                          206

 1   was that verified by Manheim or DSC in any way,

 2   to your knowledge?

 3      A.   Yes, they would -- yes.

 4      Q.   And how was that?

 5      A.   I -- I -- I wouldn't know.  They would -- if

 6   it was -- I guess, if it was over what they called

 7   the limit of value, they would let me know.

 8      Q.   Okay.  Did they ever let you floor plan

 9   anything that was over the limit of value?

10      A.   Yes, older cars were standard -- you

11   know, standard like that, like a -- say a -- as an

12   example, say a 1980 Chevrolet Ford that I pick up

13   today, it might have book value of a few thousand

14   dollars, but it might be worth 10.

15      Q.   And that was approved --

16      A.   Yes.

17      Q.   -- by Manheim?

18      A.   They always approved it; yes.

19      Q.   And then that was approved by DSC?

20      A.   Yes.

21      Q.   Okay.  Now, do you recall discussions

22   about the time of the repossession there was one

23   car that was sold but was not paid off to DSC in

24   time?  Do you recall those?

25      A.   Yes.



1    Q.    What -- what can you tell us about that?

2    A.    Well, that was my mistake  and it -- it's

3    probably in this [sic] records.  And I -- I --

4    actually, let me look -- look it up and show it to

5    you.

6        The vehicle was purchased, sold to an ve --

7    an individual.  When -- when it came time at the

8    repossession, I had not paid it off because I

9    overlooked it, because the car was listed -- it was

10   a sport track.

11       And your -- guys are familiar with a sport

12   track, but it was listed as Explorer, which

13   technically it is an Explorer sport track.  And I just

14   overlooked it.  And that's the own -- you know,

15   that's -- that's what happened on that one.

16   Q.    Okay.  And do you recall the questions

17   about when you would receive title to a vehicle

18   that you paid for by cash or check at an auction?

19   A.    Yes.

20   Q.    And when you floor planned a car, did you

21   receive the title when you got the vehicle at the

22   auction?

23   A.    No.

24   Q.    Do you know who got the title?

25   A.    The floor plan company.



 1    Q.    Okay.  Do you know when they got the

 2   title?

 3    A.    No, I don't have -- have that information.

 4   I'm assuming they -- they would not -- if --

 5   whenever the title came in, that day or later, they

 6   would have to pay for it to receive the title, but

 7   I'm not privy to that information of when and all

 8   that.

 9    Q.    Do you have any reason to believe that

10   the floor plan company would receive the title

11   before they paid for the car?

12    A.    No.

13    Q.    And does that apply whether it was a

14   title-absent car or a title that was --

15    A.    The same.

16    Q.    -- available -- sorry, or a title that was

17   available the -- the same day?

18    A.    I would not know; yeah.  I would assume

19   it would be the same.

20    Q.    Okay.  And when you sell a vehicle to a

21   customer or to an auction, what do you need to

22   give the customer or the auction in order for you

23   to get paid?

24    A.    Well, if -- typically, if I bought a car at

25   the auction and put it on floor plan or at auction,



 1  and I -- I would get the car, I -- if I sold the car, I

 2  would not receive -- let's just say John Doe.

 3    John Doe purchased the car from me.  And he

 4  financed it at ABC Bank, and they approved the

 5  loan.  I would have to pay off the vehicle at either

 6  the auction or the floor plan company.  They would

 7  send me the title.

 8    And once I did put the lien and -- and all that

 9  on the title and the transferred it with the

10  lienholder being ABC Bank, ABC Bank would issue

11  me a check.  So I would actually have to pay for

12  the vehicle before I received my money from the

13  bank.

14    Q.   Okay.  And would the money -- would

15  the -- in that instance, would the bank give you the

16  money without -- without receiving the title to the

17  car?

18    A.   No, no, not without a lien.

19        MS. LASKY:  That's all I have.

20        MR. MCCARTER:  I -- I did have one just

21  point of clarification on that.

22  RE-EXAMINATION

23  BY MR. MCCARTER:

24    Q.   So I think you said you -- you assumed

25  that the -- that the floor planner -- I'm sorry.



BARRY WAYNE MATTINGLY  30(b)(6)                    October 19, 2016
RED BARN MOTORS vs. COX ENTERPRISES                              210

```
 1   Strike that.
 2     When a car was sold title-absent, you
 3   assumed that the floor planner would pay the
 4   auction when the title came in; right?
 5     A.   I believe so, yeah.
 6          MS. LASKY:  Object to the form.
 7   BY MR. MCCARTER:
 8     Q.   Okay.  And that was kind of how it worked
 9   with you, too; right?  You said if you're buying one
10   title-absent, you'd give them a check, and they
11   wouldn't drop it until the title came in.
12     A.   Correct.
13     Q.   Okay.
14          MR. MCCARTER:  No further questions.
15   Thank you.
16          MS. LASKY:  Okay.  Thank you.
17          THE WITNESS:  Okay.  No problem.
18   Thank you.
19   [WHEREUPON, the Deposition of Rule 30(b)(6)
20   Witness, Barry Wayne Mattingly on behalf of
21   Mattingly Auto Sales, Incorporated, concludes
22   at 1:07 p.m.]
23   .
24   .
25   .
```

