UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

RED BARN MOTORS, INC.,
PLATINUM MOTORS, INC.,
MATTINGLY AUTO SALES, INC.,
YOUNG EXECUTIVE MANAGEMENT &
CONSULTING SERVICES, INC.,
Individually, and on behalf
of other members of the
general public similarly
situated,

      Plaintiffs,        Docket No.
                             1:14-cv-01589-TWP-DKL

 vs.

COX ENTERPRISES, INC.,        Class Action
COX AUTOMOTIVE, INC.,
NEXTGEAR CAPITAL, INC. f/k/a
DEALER SERVICES CORPORATION,
successor by merger with
Manheim Automotive Financial
Services, Inc., and JOHN WICK,

      Defendants.

The deposition upon oral examination of

**ADAM GALEMA**, a witness produced and sworn before me,

Paula A. Morgan, Notary Public in and for the County

of Hamilton, State of Indiana, taken on the 10th day

of November, 2016, in the offices of Bose, McKinney &

Evans, 111 Monument Circle, Suite 2700, Indianapolis,

Marion County, Indiana, pursuant to the Federal Rules

of Civil Procedure.  This deposition was taken on

behalf of the Plaintiffs in the above-captioned

matter.

ASSOCIATED REPORTING, INC.
251 East Ohio Street, Suite 940
Indianapolis, Indiana 46204
(317) 631-0940
www.associated-reporting.com

# EXHIBIT 10

16

1        that you don't speak with dealers?

2    A   Correct.

3    Q   How about the sales representatives?  Do you speak

4        with them?

5    A   Sure.

6    Q   What types of conversations do you have with them?

7    A   They are very few and far between.  Generally, it's a

8        question they may ask concerning the status of a

9        vehicle or why something happened the way it did in

10       the system.

11   Q   Why are they asking you that question?

12   A   Well, they're not necessarily asking me directly

13       right now, currently.  But they would ask either

14       myself or my team because we have the knowledge of

15       the business and the knowledge of the system and how

16       it works.

17   Q   So they're calling you if there's maybe a specific

18       issue with a certain vehicle?

19   A   They could.  We are not the go-to operational, you

20       know, call center.  We're the finance team.

21   Q   And that's something I was just trying to get at.  If

22       I was a salesperson and I had an issue with a dealer,

23       I wouldn't be calling you.  I would be calling

24       somebody else first, correct?

25   A   Correct.

17

1   Q   Who would I call, if you know?

2   A   It could vary.  I mean, they could call their

3       supervisor.  They could call in to our call center.

4       They have, you know, the operational knowledge and

5       could help them through that potential issue or

6       question they have.

7   Q   So in your positions, or at least your position now,

8       and maybe since you've been with the company, you've

9       been primarily concerned with obtaining the funding

10      or the funds that NextGear/DSC then lends out to the

11      dealers?

12  A   It's part of my job function, yeah.

13  Q   Do you do work more on the -- obtaining the funds and

14      managing the funds and the budgeting process of DSC

15      versus actually interacting with the individual

16      accounts where that money's being lent to?

17  A   That would be fair, yes.

18  Q   Okay.  Who is more over the individual accounts of

19      the dealers?  Who are making those types of

20      decisions?

21  A   What decisions?

22  Q   Well, how much money they can borrow or if there's an

23      issue with the account.

24  A   Sure.  If you're talking about how much they can

25      borrow, that's going to run through our lending

1          department.

2     Q    Do you supervise that?

3     A    No.

4     Q    Who does, if you know?

5     A    We have a vice president of lending.

6     Q    Who is that?

7     A    His name is Patrick Inks, I-N-K-S.

8     Q    You do monthly reports as well now too, correct?

9     A    Correct.

10    Q    And those are to the -- to Mr. Herman?

11    A    Horan?

12    Q    Horan, I'm sorry.

13    A    He's one of the recipients, sure.

14    Q    These reports wouldn't have an individual sales

15         figure from a particular dealer, correct?

16    A    No.

17    Q    It's more of a compilation of everything that's

18         happened in that month company-wide?

19    A    Correct.

20    Q    Would these figures contain an average transaction

21         amount, or is it even a higher level than that?

22    A    Sure.  No, we -- part of our analysis is to look at

23         average metrics within the portfolio.

24    Q    Would it have credit utilization rates of the dealers

25         or an average credit utilization rate?

1    A    We would have a consolidated utilization rate, yes.

2    Q    How about an average interest rate?

3    A    Yes.

4    Q    And an average number of days financed for vehicles?

5    A    Yes.

6    Q    And you could determine an average daily finance rate

7         throughout the portfolio as well, too, correct?

8    A    Sure, you could get there.

9    Q    And even an average amount of interest that

10        NextGear/DSC earned for that particular day?

11   A    Yeah, you could derive that from the financial

12        statements.

13   Q    Does NextGear ever get to a point where it doesn't

14        have any more funds to offer dealers?  Or is that

15        part of your job to manage, to make sure there's a

16        constant credit facility that's open.

17   A    Yeah.  I mean, there is a limit to the funding that

18        we have available to us, yes.

19   Q    Do you report to anyone at Cox Enterprises, Inc.?

20   A    Directly?  No.

21   Q    How about indirectly?

22   A    At Cox Enterprises?  No.

23   Q    How about Cox Automotive, Inc.?

24   A    Indirectly, yes.

25   Q    And how is it indirectly?

20

1    A    Just in the sense that we are one business unit

2         underneath the Cox Automotive umbrella, if you will.

3    Q    Do you know what the other business units are under

4         Cox?

5    A    I know a few of them.

6    Q    What would they be?

7    A    I wouldn't know all of them.  Manheim, Kelley Blue

8         Book, Autotrader, vAuto, VinSolutions.  Do you want

9         me to --

10   Q    Do you know more?

11   A    An exhaustive list of everything I know?

12   Q    This is a lot, I guess, huh?

13   A    Yeah.

14   Q    How many more are there?

15   A    I believe there are approximately 40 total companies

16        underneath Cox Automotive.

17   Q    Do you know who at Cox Automotive would be your

18        indirect report?

19   A    Sure.

20   Q    Who is that?

21   A    You know, my boss, Dave Horan, reports to the CFO of

22        Cox Automotive.

23   Q    Who is that?

24   A    Neil Johnston.

25   Q    And do you have interaction with him, with

1          Mr. Johnston?

2     A    Yeah.

3     Q    What types of interactions do you have?

4     A    Nothing frequent.  More just if, you know, we're in

5          the same place, he's visiting us or I'm visiting down

6          there.

7     Q    Where are they located?

8     A    Atlanta.

9     Q    Do you go there frequently?

10    A    Three, four times a year.

11    Q    What do you do when you go there?

12    A    Generally, it's part of an overall Cox Automotive

13         function, perhaps for the finance group.

14    Q    Do they put on training events?

15    A    No, I wouldn't call them that.

16    Q    Do you discuss budgeting issues with Cox Automotive?

17    A    I discuss NextGear budgeting issues with Cox

18         Automotive.

19    Q    And do they, ultimately, have to approve the budgets

20         for NextGear?

21    A    Yes.

22    Q    Earlier you discussed a little bit about where

23         NextGear, or I guess it was DSC at the time, got its

24         funds from that it loans out to the dealers.  And you

25         said that it was a sort of private placement, I

1    guess, or publicly traded-type financial instruments?

2    A    Not publicly traded, no.

3    Q    Privately traded?

4    A    Yeah.

5    Q    Is that the same now as well, too?

6    A    Yes.

7    Q    Okay.  So various companies and individuals would be

8         able to buy a debt package?

9    A    It's a 144A transaction, so only investment companies

10        can participate.

11   Q    I'm going to turn to the affidavit that you at least

12        signed in this case.  Are you familiar with this

13        document?

14            MR. VINK:  Are you going to mark this as an

15        exhibit?

16            MR. AIREY:  I wasn't going to.

17            MR. VINK:  Okay.

18   A    Yes, I'm familiar.

19   Q    Okay.  How did this document come about?  Why were

20        you asked to draft this document?

21   A    I was asked to --

22            MR. VINK:  Before you answer that question, make

23        sure that you don't divulge anything that was

24        communicated to you by counsel related to signing

25        this declaration.  That would be protected by the

23

```
 1        attorney-client privilege.

 2   Q    Right.  And I should have said that before.  I don't

 3        want to know anything that they asked you.  And if

 4        that's the only reason that you have for why you did

 5        it, which wouldn't be surprising, then, you know,

 6        that will be your response.  I understand that.

 7   A    Well, are you asking why I'm here or why I signed

 8        this?

 9   Q    How about this.  Do you know why you were chosen to

10        draft this affidavit?

11   A    Yes.

12   Q    Okay.  Why is that?

13   A    Because I have knowledge of how floorplanning works

14        and how the system operates and how we calculate the

15        revenue that we generate.

16   Q    But as far as the individual dealers that are

17        mentioned in this affidavit, like Red Barn and

18        Platinum and Mattingly, did you know about those

19        prior to drafting this affidavit?

20   A    Yes, I've heard of them.

21   Q    Did you have any interaction with or any -- I guess

22        "interaction" is the best word.  Did you have any

23        interaction with their accounts for Red Barn,

24        Mattingly, or Platinum when you were in any of your

25        various positions with DSC?
```

24

1   A   Direct interaction, no.

2   Q   How about indirect?

3   A   Sure.

4   Q   What would that be?

5   A   It would have been part of the analysis that we do on

6       dealers who default and charge off.

7   Q   But you wouldn't have called up someone at Red Barn

8       and said, hey, what's going on here, why are you

9       defaulting, correct?

10  A   Correct.

11  Q   And same with Mattingly or Platinum?

12  A   Correct.

13  Q   So you may have interaction with their account here

14      in Indiana but not actually with any of these

15      dealers, specifically with themselves, or with those

16      dealers?

17  A   I would not communicate directly with the dealer, no.

18  Q   Now, did you actually physically write every word in

19      this affidavit?

20  A   No.

21  Q   Okay.  Who did?

22  A   It's my understanding our legal team.

23  Q   As far as the exhibits that are attached to this

24      affidavit, did you pick which exhibits to put on this

25      affidavit?

25

1   A   No.

2   Q   I'm going to hand you what was marked as Exhibit B to

3       your affidavit.  This document has "NextGear Capital"

4       written on the top of it.

5   A   Correct.

6   Q   Correct?  So it's fair to say that this would have

7       been produced after the merger between DSC and

8       Manheim and -- with Cox, correct?

9   A   Correct.

10  Q   Do you know if this document was produced

11      specifically for this litigation?

12  A   Yes.

13  Q   It was specifically --

14  A   It was.

15  Q   Okay.  Did you create this Exhibit B?

16  A   I did not.

17  Q   Do you know who did?

18  A   Yes.

19  Q   Who?

20  A   Our technology team.

21  Q   Did you supervise them when they created it?

22  A   I do not have direct supervision of them.

23  Q   So you didn't ask them to create this document?

24  A   Myself directly?  No.

25  Q   Did you have any input in the information that was

26

| 1 | | put in this document? |
| 2 | A | Yes. |
| 3 | Q | Okay.  So it's fair to say that you asked them to |
| 4 | | create a document with these columns on it? |
| 5 | A | I did not ask them, but I was involved in reviewing |
| 6 | | and testing the accuracy. |
| 7 | Q | Other than your counsel, who else assisted you in |
| 8 | | producing Exhibit B? |
| 9 | A | I can't recall exactly who was involved in the |
| 10 | | development of it.  The only other person I can think |
| 11 | | of is a gentleman, Lucas Hancock. |
| 12 | Q | Is he an IT person? |
| 13 | A | No. |
| 14 | Q | What does he do? |
| 15 | A | He's senior director of customer experience. |
| 16 | Q | Do you know what he does in that role? |
| 17 | A | Yeah.  He manages our call center. |
| 18 | Q | Now, prior to the Manheim and DSC merger, had you |
| 19 | | ever reviewed Manheim Financial Services' promissory |
| 20 | | notes? |
| 21 | A | No. |
| 22 | Q | How about any Manheim documents, like security |
| 23 | | agreements, financial agreements? |
| 24 | A | No.  We are competitors. |
| 25 | Q | So it's fair to say that the first time you would |

27

1      have reviewed those documents would have been in

2      drafting this affidavit?

3           MR. VINK:  Object to the form.  You can answer.

4    Q  Well, let me ask it another way.  When was the first

5      time that you reviewed any documents from Manheim

6      Financial Services, which I'll call MAFS for short.

7    A  Sure.  In this case.  I mean, we did not have any

8      involvement in MAFS documents.

9    Q  Even after the merger you didn't go and look and see

10     what they were doing versus what DSC was doing?

11   A  I did not review a particular legal document of MAFS

12     and compare it to what DSC was doing.

13   Q  Have you done that comparison for this litigation?

14   A  Have I done that?

15   Q  Correct.

16   A  I am not an attorney, so I've not reviewed and, you

17     know, compared every single -- I have not done that.

18   Q  Okay.  So you didn't go through and say what was

19     different between a MAFS document and a NextGear or

20     DSC document?

21   A  No.

22   Q  You said that right now NextGear has about 21,000

23     dealers?

24   A  Correct.

25   Q  Do you know, on a year-by-year basis, approximately

1     how many dealers DCS would have had -- I'm sorry, DSC

2     would have had in, let's say, 2007?

3  A  I can't recall exactly.  If I had to estimate, it

4     would be six to eight thousand.

5  Q  How about in 2005?  Would you know then?

6  A  That was the first year of DSC, so --

7  Q  Okay.  How about 2008?

8  A  Roughly the same, six to eight thousand.

9  Q  And would that be the same up until the merger?

10  A  Correct.

11  Q  Okay.  So with the merger you took on all of -- or

12     NextGear was created to take on all of MAFS customers

13     as well as DSC customers under one company?

14  A  Correct.

15  Q  And so did MAFS have more customers than DSC?

16  A  I believe they did, yes.

17  Q  You said six to eight thousand customers per year.

18     Are they the same six to eight thousand customers

19     every year?

20  A  No.

21  Q  What's the turnover rate of customers that would

22     maybe use the floorplan in 2007 versus 2008?

23  A  I can't speak specifically to the turnover rate back

24     then.  As an estimate, we could potentially turn

25     over, back then, maybe a hundred accounts each month.

1    Q    When you say "turn over," what do you mean by that?

2    A    They could leave our relationship voluntarily.  They

3         can move to another financier, another lender.  They

4         could also default on their account and be charged

5         off.

6    Q    Do you know what the default rate would have been in

7         2007?

8    A    I don't know exactly.  You know, it's going to be

9         somewhere around 5 percent of our dealers.

10   Q    Is that per year or per month?

11   A    It's an annual list.

12   Q    Did that number stay true throughout 2008, 2009,

13        2010?

14   A    I can't speak to that.  I don't have, obviously, the

15        information in front of me.  But it would not have

16        varied significantly other than -- you know, during

17        '08, '09, with the economic downturn, we did

18        experience larger losses.

19   Q    So maybe more than 5 percent in '08, '09?

20   A    Sure.  I think you would find that everywhere.

21   Q    With the six to eight thousand customers that DSC

22        would have had, did those customers also use MAFS as

23        well?

24   A    Some of them could.

25   Q    Do you know, was it common in the industry to have