UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RED BARN MOTORS, INC.,<br>PLATINUM MOTORS, INC.,<br>MATTINGLY AUTO SALES, INC.,<br>YOUNG EXECUTIVE MANAGEMENT &<br>CONSULTING SERVICES, INC.,<br>Individually, and on behalf<br>of other members of the<br>general public similarly<br>situated,<br>　　　　　　Plaintiffs,<br><br>　　　　-v-<br><br>COX ENTERPRISES, INC.,<br>COX AUTOMOTIVE, INC.,<br>NEXTGEAR CAPITAL, INC. f/k/a<br>DEALER SERVICES CORPORATION,<br>successor by merger with<br>Manheim Automotive Financial<br>Services, Inc., and JOHN WICK,<br>　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Docket No.<br>) 1:14-cv-01589-TWP-DKL<br>)<br>) Class Action<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

The deposition upon oral examination of **LOURDES M. GIVENS,** a witness produced and sworn before me, Tami L. Scott, Notary Public in and for the County of Marion, State of Indiana, taken on behalf of the Plaintiffs at the offices of Bose, McKinney & Evans, 111 Monument Circle, Suite 2700, Indianapolis, Marion County, Indiana, on October 20, 2016, at 9:00 a.m., pursuant to the Federal Rules of Civil Procedure.

**ASSOCIATED REPORTING, INC.**
**251 EAST OHIO STREET, SUITE 940**
**INDIANAPOLIS, INDIANA 46204**
**(317) 631-0940**
**www.associated-reporting.com**

# EXHIBIT 11

153

| | | |
|---|---|---|
| 1 | Q | Was Mr. Mattingly a difficult customer for you? |
| 2 | A | He was a little high maintenance. |
| 3 | Q | And when you say high maintenance, did he pay close |
| 4 | | attention to his billing statements? |
| 5 | A | He wanted a lot of freebies whenever he can get one. |
| 6 | Q | Do you recall whether this $60 charge was keyed in |
| 7 | | wrong? |
| 8 | A | No.  This $60 most likely is an audit that was late, |
| 9 | | and we charge a late fee on vehicles that have not |
| 10 | | been reconciled. |
| 11 | Q | Did you ever tell him that? |
| 12 | A | I don't recall. |
| 13 | Q | Did you report to anybody, to your manager or to |
| 14 | | anybody in risk that it was a red -- that it raised |
| 15 | | a flag that he was pushing so hard for a $60 waiver? |
| 16 | A | No.  That would be me watching my portfolio. |
| 17 | Q | Did Mr. Mattingly pay close attention to his account |
| 18 | | and the fees that were charged on there? |
| 19 | A | I would say so. |
| 20 | Q | All right.  Let me give you back 18, which I think I |
| 21 | | gave to counsel, and this is e-mails from December |
| 22 | | of 2011, and who is Julia Mossor, M-O-S-S-O-R? |
| 23 | A | That was my regional director at the time. |
| 24 | Q | And I believe you said Micky Agnew was in risk? |
| 25 | A | Yes. |

154

```
 1   Q    And you don't recall Randy Naish?

 2   A    I'm sorry.  I don't recall which department Brandi

 3        and Micky were at the time.  Looks like the audit

 4        reconciliation center.

 5   Q    I see that.  I see Brandi Naish out at -- thank you

 6        for that.

 7             So is this when you would have received notice

 8        of one of the incident reports that we looked at in

 9        Exhibit 13?  Here you go.  Sorry.  I stole them all.

10   A    This would be the original e-mail that we would get

11        from the audit reconciliation center after an audit

12        gets done by the auditor, and they're letting us

13        know that there is a red flag.

14   Q    And so you respond four minutes after you get the

15        original e-mail, very quickly, "I spoke to Barry as

16        soon as the audit came through last night.  He

17        stated they've been in contact with you and that

18        units are being transported to auctions and that you

19        all would verify them today.  I've locked them as

20        you see.  Please follow up and let me know if you

21        have any issues reconciling the audit prior to going

22        into the holidays."

23             What do you mean by you've locked them?

24   A    I've locked the account so they cannot use it.

25   Q    Meaning they cannot floorplan another vehicle?
```

155

```
 1    A    Correct.

 2    Q    Could they get on Discover DSC, or could they not

 3         get into their account at all?

 4    A    Yes.

 5    Q    I'm sorry?

 6    A    They can get into their account.

 7    Q    They just can't -- being locked means they can't

 8         floorplan a vehicle?

 9    A    Right.  Correct.

10    Q    And then you respond -- oh, then Ms. Naish responds,

11         and she says, "Yes, I have spoken with Barry

12         yesterday and he is following up with me today to

13         get units reconciled before the weekend."

14              Do you recall this incident in December of

15         2011, whether it was resolved?

16    A    I do not recall.

17    Q    Do you have any reason to believe that it was not

18         resolved?

19    A    I don't recall dates.  It's been a long time.

20    Q    Mattingly remained a customer of yours after

21         December 2011; correct?

22    A    I don't recall.

23    Q    I'm going to show you what I've marked as 19.

24              (Plaintiffs' Deposition Exhibit 19 is marked

25         for identification.)
```

156

1   Q    What is this document?

2   A    This looks like a CRM visit.

3   Q    What's a CRM visit?

4   A    The system that we have to go in there when we go

5        visit a dealer and put notes in, similar to

6        Salesforce.

7   Q    So this is an entry that you would make in CRM

8        noting a visit with Mattingly; is that right?

9   A    Correct.

10  Q    So does this reflect that you visited Mattingly at

11       9 -- well, probably not 9:30 at night?

12  A    No.

13  Q    But you visited them on April 24th?

14  A    Correct.

15  Q    2012?

16  A    Correct.

17  Q    And LG, your initials?

18  A    Yes.

19  Q    "Spoke with Barry regarding pending floor paying

20       him.  It has been on his floor twice and showing PFC

21       so floor was denied and e-mailed CSC to send title

22       back.  We did talked about event sale going on this

23       week.  He's planning flooring from them."

24           What is PFC?

25  A    So on this note, it looks like Barry was trying to

157

1          floor a specific source vehicle to pay them direct,

2          but it was flagged in the system because we can --

3          the system will recognize if a vehicle has been

4          floored in the past, which refloors are fine;

5          however, this refloor status, the last time that we

6          did an audit, it was coded that it was sold.  So

7          that is a red flag as of why, if it was sold one

8          time, why is the dealer wanting to refloor it when

9          it was sold.

10    Q    Okay.  How do you recall that it was coded as sold?

11    A    Discover will tell us.

12    Q    And in any of the reports that we've seen, do any of

13         those reports reflect that, that we've looked at

14         today?

15    A    It will not consider -- there's not a stock number

16         in this.

17    Q    So this is, you recall that it -- this is based on

18         your recollection, that it was coded as sold?

19    A    Yes.

20    Q    And who is CSC?

21    A    Customer service center.

22    Q    Did you ask -- what did Barry tell you about that?

23    A    I don't recall.

24    Q    But then you talked to him about an event sale going

25         on this week, and he's planning flooring from them.

158

1          What is that?

2    A     If we got specific events in the market, we talked

3          about that as well.

4    Q     Like the flyer we looked at earlier?

5    A     Correct.

6    Q     So this visit on April 24th, whatever concerns you

7          had about this refloor, you were still telling him

8          about additional promotions that DSC was offering;

9          is that correct?

10   A     Correct.

11   Q     Okay.  I'm going to give you 20.

12              (Plaintiffs' Deposition Exhibit 20 is marked

13         for identification.)

14   Q     Exhibit 20 is NG9377.  Is this another entry in CRM?

15   A     Yes.

16   Q     And so does this reflect that you saw Barry the next

17         day?

18   A     At the auction.

19   Q     Saw Barry at ABC, gave event sale flyer?

20   A     Right.

21   Q     Do you think it's that same event that you were

22         referring to in Exhibit 19?

23              MR. VINK:  19 is the previous exhibit.

24   A     It looks like it.

25   Q     Okay.  I'm going to show you what I'm going to mark

159

```
 1            as 21.

 2                 (Plaintiffs' Deposition Exhibit 21 is marked

 3            for identification.)

 4     Q      And that's NG6535.  And again, is this another entry

 5            in CRM?

 6     A      Yes.

 7     Q      Okay.  And this is May 4th, so about ten days or so

 8            after you saw Barry at the auction and visited him

 9            at his lot, and it says, "After...", and again, this

10            is a note that you made?

11     A      Yes.

12     Q      "After discussing with GM Manheim Louisville

13            possibly pup cars from this dealer I immediately

14            locked his account.  One slipped thru before I

15            placed lock, the other floor I denied.  Started to

16            get my phone blasted by Barry and e-mails from CSC

17            Barry calling I finally told him we would discuss

18            Monday.  Now he's still calling 7:30 p.m. when I had

19            to put a stop and said Monday end discussion.  I

20            will do full blown audit Monday on him and decide

21            where to go from there."

22                 What do you remember about this?

23     A      I was talking to Manheim Louisville.

24     Q      That's an auction?

25     A      Yes.
```

160

1   Q   Okay.

2   A   And there were some -- I just don't -- I can't

3       remember the whole details of this as far as the

4       conversation with Manheim Louisville, but basically

5       upon some notes in the system that were suspicious

6       with the flooring vehicles that PFC that was trying

7       to be refloored, I basically said let me go do a

8       full-blown audit myself rather than counting on an

9       actual auditor, and then I will decide at that point

10      if we're good.

11  Q   Okay.  So who was the GM in Manheim Louisville?  Do

12      you remember?

13  A   I don't remember.

14  Q   GM is general manager?

15  A   General manager.

16  Q   You don't remember that person's name?

17  A   No.

18  Q   What are pup cars?

19  A   Pick-up.

20  Q   What are pick-up cars?

21  A   Pick-up.  So I was going to pick up the cars if I

22      needed to.

23  Q   And why did that cause you to lock the Mattingly

24      account?

25  A   Whenever there is some kind of question about an

161

```
 1            account, I would rather put a lock on the account

 2            and to stop the bleeding, if there is more bleeding,

 3            until I know that we're safe.

 4   Q   So you don't remember what your discussion with the

 5            GM of Manheim Louisville was about?

 6   A   I don't remember the details, but I know that there

 7            was some red flag for me to write this.  I just

 8            don't know the details of them.

 9   Q   Does this writeup include any of the red flags, the

10            details of the red flags?

11   A   No.

12   Q   Do you recall discussing with Mr. Mattingly on

13            Monday why you had locked his account?

14   A   I did an audit on that following Monday like I said

15            I was going to, and he took me -- I verified the

16            vehicles that were at the lot along with my

17            receivable detail, and then he took me to different

18            parts of in town to verify other vehicles that were

19            on supposedly test drives.

20   Q   Were you able to verify all the vehicles?

21   A   I don't recall that I verified all the vehicles.

22   Q   And what did you do after that Monday audit?

23   A   Well, when I did that audit, there were several

24            vehicles where he took me to different places that

25            had personal items in there.
```

162

1   Q   In?

2   A   In the vehicles.

3   Q   Okay.

4   A   License plates, and like I said, personal items in

5       there.  That is a red flag.  That, to us, tells us

6       this dealer has sold these vehicles and is calling

7       them as demos or test drives and when they're

8       actually sold out of trust.

9   Q   Did you ask Mr. Mattingly if those vehicles had been

10      sold out of trust?

11  A   Yes.

12  Q   And what did he say?

13  A   He said they're on test drives.

14  Q   Do you know whether Mr. Mattingly had salespeople

15      who operated on behalf of Mattingly?

16  A   I do not recall.

17  Q   Were dealers allowed to have cars out with their

18      salespeople?

19  A   We don't allow demos.

20  Q   What's a demo versus a test drive?

21  A   A test drive, typically when a customer is going to

22      buy a car, you go for a test drive; it typically

23      takes five, ten minutes, and then you bring it back.

24      So typically, test drives should be back at the lot.

25  Q   And is that in the promissory note?  Where, to your

163

1      knowledge, where is the provision that DSC does not

2      allow demos?

3  A   It's in the contract, but I don't remember where.

4  Q   Okay.  So you remember doing the audit that Monday?

5  A   Yes.

6  Q   And then you found the vehicles with personal items,

7      and what did you do next?

8  A   Well, one of the triggers was there was a BMW that

9      he said, oh, yeah, the BMW convertible is in a

10     storage facility in town due to all the hail damage

11     that we've had.  I wanted to store it in my storage

12     facility in town.

13         And when I went -- when he took me to the

14     in-town storage facility, it was the -- it was a

15     garage in the back of a chiropractor.  He opened the

16     door.  I looked at the VIN.  The vehicle was locked.

17     I glanced at the VIN number, glanced inside the

18     vehicle, and there is personal items in there, and

19     there is a plate.  It's plated.  So to me, if you

20     have a detached garage that you have plenty of

21     storage, why are you putting a vehicle in storage

22     all the way in town?  That was a red flag.

23  Q   Did you ask him?

24  A   No.  At this point, all I'm doing is taking notes.

25     And I did ask him, and he said, well, it was because

164

1          of the hail, and I just left it at that.

2               So when he takes me to the school facility and

3          tells me that a teacher is test driving this

4          vehicle, again, I look inside and I see personal

5          items; the vehicle was dirty, plated.  That's a red

6          flag.

7               Then he takes me over to another house and

8          tells me that these are his silent partners, and I

9          verify, I believe, one or two cars.  And then he

10         took me to another house, and a gentleman comes out

11         with a baby in the hand and says, oh, I just need to

12         check this vehicle.  I looked at the vehicle,

13         personal items, in a carport, in a personal home.

14         That was a red flag.

15              So at that point, I just needed to go in, pull

16         files, see if there was some kind of silent partner,

17         look at documentation and see what did I have in my

18         hands.  So I finished the audit and I went home.

19   Q     He said they were a silent partner or they were

20         salespeople?

21   A     Silent partner.

22   Q     So can you turn to Exhibit 10, the lending summary

23         that Mark Holley wrote, and he was talking about the

24         little higher offsite average on the back.  "The

25         first is that this is typically a lower volume

165

1          dealer that has a full time job and is driving one

2          at all times and not at the lot."  Do you see that,

3          the bottom of that last paragraph?

4    A     Yes.

5    Q     Was the dealer allowed to drive a car that was

6          floorplanned by DSC?

7    A     Yes.  He would drive himself one here and there and

8          then be back at the lot with it.

9    Q     That was allowed under the terms of the contract?

10   A     That was an exception that we would do.

11   Q     Okay.  And that same exception wasn't available to

12         salespeople working for the dealers?

13   A     No.  Just for the owner.

14   Q     And is that laid out in the contract?

15   A     I don't recall.

16   Q     I'm going to show you two pages that I'm going to

17         mark as 22.

18              (Plaintiffs' Deposition Exhibit 22 is marked

19         for identification.)

20   Q     And they're -- I believe they are notes from the CRM

21         system, two different notes on the same day.  They

22         are marked, just so we're clear, NG6540 and NG9378.

23              Do you recall the dealer had an NSF, or do you

24         recall that Mattingly had an NSF a few weeks prior

25         to May 7th, 2012?

166

| | | |
|---|---|---|
| 1 | A | I didn't recall until I read this, so yes. |
| 2 | Q | So is one NSF enough to default a dealer? |
| 3 | A | I don't know how many he had. |
| 4 | Q | Well, as of the summary you wrote in August of 2011, |
| 5 | | he had none; correct?  I think it was Exhibit 12. |
| 6 | A | I don't have 12. |
| 7 | Q | It's at the top of the third page there. |
| 8 | A | Right.  This was in August of 2011. |
| 9 | Q | He had had no NSFs? |
| 10 | A | Right. |
| 11 | Q | If he'd had an NSF, wouldn't it show up in the |
| 12 | | Discover system in Exhibit 13? |
| 13 | A | Not on this Exhibit 13, because we don't have all |
| 14 | | the notes clearly displayed. |
| 15 | Q | An NSF wouldn't be enough to generate its own |
| 16 | | incident? |
| 17 | A | Yes. |
| 18 | Q | It would not be or it would be?  I'm sorry. |
| 19 | A | It would be.  It would create an incident. |
| 20 | Q | Do you see an incident in Exhibit 13 for an NSF? |
| 21 | A | Looks like May 11, 2012 is when they did the -- when |
| 22 | | they put it as a terminate.  But without being able |
| 23 | | to go in there, nobody can really see this. |
| 24 | Q | Would it be -- did we establish that all the detail |
| 25 | | was found in Exhibit 15, NG3809? |

167

```
 1            MR. VINK:  While she's looking for that, I
 2       actually have another deposition I have to get to,
 3       so David will take over from here on out, and you
 4       guys can wrap things up.
 5            MS. LASKY:  Thank you.
 6            (Mr. Vink leaves deposition proceedings.)
 7    A   This could be an NSF at the auction level.  If it's
 8       not created in here, it was at the auction level,
 9       but I don't recall.
10    Q   Okay.  But just so the record is clear, you don't
11       see a reference to NSF in either Exhibit 13 or
12       Exhibit 15; is that correct?
13    A   Correct.
14    Q   All right.  So turning back to Exhibit 22, your
15       entry, "have a feeling he's flipping cars and
16       over-flooring after speaking to Donna with MAFS.
17       Did audit accounted for all units."
18            So is that reflecting that the audit you just
19       spoke of, you were able to account for all units,
20       but they were in places that you didn't expect; is
21       that correct?
22    A   Correct.
23    Q   But you were able to find all the cars?
24    A   Correct.
25    Q   So what do you recall about who is Donna with MAFS?
```

1          Let's start there.

2    A    She was the MAFS manager at Manheim Louisville at

3          the time.

4    Q    Okay.  And what do you recall about your

5          conversation with Donna?

6    A    That the dealer appeared to be flipping cars with

7          other dealers.

8    Q    What does that mean?

9    A    Looks like they were running cars under OVE, which

10         is a platform that we have, Manheim has, and when we

11         started to cross-reference the units that were

12         floored on his receivable detail, and she has access

13         to OVE, the prices were much higher.

14             So at that point, I asked that night for copies

15         of all the titles that Barry had floored on his line

16         of credit to actually see the transactions.

17   Q    When you say the prices were much higher, what do

18         you mean by that?

19   A    So we established that if it's a specific source fee

20         and a vehicle -- a dealer buys it for $12,000, but

21         it books for ten, we're only going to give them ten.

22         Somehow, it looks like he learned that if he did it

23         on an OVE transaction, because that's considered a

24         universal source, we would pay full price.  So when

25         I was looking at some of the vehicles that he had

1       floored, he would have a vehicle floored that was

2       worth seven grand, and he had it floored for twelve,

3       just to give examples.

4   Q   And do you know whether OVE, whether -- when cars

5       are listed through OVE whether there is any

6       verification of the price?

7   A   There is no verification because it's an auction

8       purchase.  It's considered an auction purchase.

9   Q   Who sets the prices on OVE?

10  A   The seller sets the price.

11  Q   How are vehicles listed on OVE?

12  A   Basically, an OVE is like a dealer-to-dealer

13      transaction versus having a live auction behind it.

14      So to your point, OVE, if I have a vehicle and I'm

15      selling for $12,000, by now you can come in and say,

16      okay, I'll pay your price for $12,000 and there

17      is -- the transaction gets put together as if it was

18      an auction.

19  Q   What is the purpose of OVE?

20  A   So that the dealers don't have to have vehicles on

21      site.  This is all a platform that dealers can buy

22      online.

23  Q   So it is -- but they're all prearranged sales

24      between buyers and sellers?

25  A   No.  It's a vehicle that's -- there is a hosting

170

1       auction, so let's say the hosting auction will be

2       Manheim Louisville, so anybody that's going to go on

3       OVE to look at Pontiac G6s in the Louisville area,

4       this vehicle will be popping up under Manheim

5       Louisville, and if the dealer decides that he's

6       going to pay what the seller wants, then it counts

7       as a sale under Manheim Louisville.  But it is an

8       online platform.

9  Q    So is it like eBay?

10 A    Yes.

11 Q    So it's a public --

12 A    No.

13 Q    -- auction?

14 A    No.  Dealer.  Dealer to dealer.

15 Q    Okay.  But any dealer can log on and bid on a car, a

16      qualified dealer?

17 A    As long as they have a log-in with Manheim, yes.

18 Q    And so the dealers list the cars themselves on OVE,

19      or the sellers?  I'm sorry.

20 A    I don't recall the details on how OVE a hundred

21      percent operates.

22 Q    If Mr. Mattingly testified yesterday that Donna

23      Kronauer listed vehicles on OVE for Mattingly, would

24      you have any reason to dispute that?

25 A    I don't know.  I can't recall or have knowledge of

171

1    who because that's at the auction level, so I don't

2    know.

3  Q   And I believe you testified earlier that dealers

4    could floorplan vehicles they already owned; is that

5    correct?

6  A   Yes.

7  Q   You say at the end of this, "Will evaluate discuss

8    with Julie then see if possibly repo."  Who -- oh,

9    is that Julia?

10  A   Mossor.

11  Q   Julia Mossor, your regional rep?

12  A   My regional director.

13  Q   Director.  I'm sorry.  Do you recall your

14    conversations with her?

15  A   I do not.

16  Q   Did you ever recommend that your customers list

17    vehicles on OVE?

18  A   I tell the customers of every way that they can

19    possibly remarket their vehicles, whether it's a

20    Manheim facility or it's an online platform, whether

21    it's taking it to independent auctions that dealers

22    did not know about.

23  Q   And would you direct people to Donna Kronauer if

24    they wanted to utilize OVE?

25  A   No.  I would direct them over to Manheim Louisville.

172

```
 1   Q    And she was at Manheim Louisville; correct?
 2   A    Right.  She was the MAFS manager, and I believe she
 3        was credit and collections at the same time back
 4        then.
 5   Q    So you would direct them to Manheim Louisville
 6        generally, but not her specifically?
 7   A    Correct.
 8   Q    Would they end up speaking to her because she was
 9        the MAFS manager?
10   A    I don't know how their procedures were.  Typically
11        on an OVE transaction, they go to dealer sales, and
12        the dealer sales rep would assist them or a field
13        rep for their -- for that particular market region
14        will assist the dealer.
15   Q    Did you ever, after May 7th, and I believe May 7th
16        was the Monday after the Friday that you --
17        Mr. Mattingly was trying to reach you, you did the
18        audit on May 7th, correct, and Mr. Mattingly took
19        you around to the various places?
20   A    Uh-huh.
21   Q    Did you ever have a conversation with Mr. Mattingly
22        about whether he was flipping cars and
23        over-flooring?
24   A    No, because I didn't have all my paperwork in front
25        of me.  All I had was the receivable details showing
```

173

```
 1        the cars, so I'm able to see what the cars are
 2        floored for, looking at the condition and the type
 3        of vehicle, and at that point, I would actually have
 4        to ask corporate to send me copies of all the titles
 5        and all the bills of sale so that I could sit down
 6        and compare apples to apples.
 7   Q    So not limited to May 7th, but at any time after
 8        May 7th, did you ask Mr. Mattingly what he -- about
 9        whether he was flipping cars and over-flooring?
10   A    I did not.
11   Q    Did you ever get the information you requested from
12        corporate?
13   A    Yes, I did.
14   Q    And after you received that information, you never
15        spoke to him?
16   A    Well, what happened was that evening, after
17        reviewing my documentation and seeing how the titles
18        were not jiving with dates or signatures or the
19        proper -- the proper -- I don't want to say
20        procedure, because it's not procedure, but it's
21        just, there was something that did not feel right
22        after seeing the documentation versus what he paid
23        for and how they were floored.  And plus, me doing
24        an audit and seeing those vehicles off-site plated
25        with personal items inside the vehicles, that, to
```