UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

RED BARN MOTORS, INC.,              )
PLATINUM MOTORS, INC.,              )
MATTINGLY AUTO SALES, INC.,         )
YOUNG EXECUTIVE MANAGEMENT &        )
CONSULTING SERVICES, INC.,          )
Individually, and on behalf         )
of other members of the             )
general public similarly            )
situated,                           )
            Plaintiffs,             )
                                    ) Docket No.
        -v-                         ) 1:14-cv-01589-TWP-DKL
                                    )
COX ENTERPRISES, INC.,              ) Class Action
COX AUTOMOTIVE, INC.,               )
NEXTGEAR CAPITAL, INC. f/k/a        )
DEALER SERVICES CORPORATION,        )
successor by merger with            )
Manheim Automotive Financial        )
Services, Inc., and JOHN WICK,)
            Defendants.             )


    The deposition upon oral examination of **STUART LABAUVE**, a witness produced and sworn before me, Tami L. Scott, Notary Public in and for the County of Marion, State of Indiana, taken on behalf of the Plaintiffs at the offices of Bose, McKinney & Evans, 111 Monument Circle, Suite 2700, Indianapolis, Marion County, Indiana, on November 9, 2016, at 9:00 a.m., pursuant to the Federal Rules of Civil Procedure.

**ASSOCIATED REPORTING, INC.**
**251 EAST OHIO STREET, SUITE 940**
**INDIANAPOLIS, INDIANA 46204**
**(317) 631-0940**
**www.associated-reporting.com**

**EXHIBIT 12**

63

```
 1   Q    Where did she physically work?  Out of her house?

 2   A    No, sir, in the office.

 3   Q    In the office.  Okay.  So you said she took over as

 4        a customer account representative; is that right?

 5   A    Uh-huh.

 6   Q    And what were her duties in that particular role?

 7   A    Going through, making sure dealers paid on time and

 8        clearing up the audits, any open audit items.

 9   Q    And who did you hire as the customer service

10        representative after Ms. Kidder was promoted?

11   A    Well, we had hired Jerry Banks was another employee.

12        He did what Sasha did also.

13   Q    Okay.  And who else besides Ms. Kidder and

14        Mr. Banks?

15   A    Val Perioux.

16   Q    Could you spell that for us?

17   A    P-E-R-I-O-U-X.

18   Q    And after Val Perioux?

19   A    That's all.

20   Q    That's all?  Who do you currently have --

21   A    Nobody.

22   Q    -- as employees?  Nobody?

23   A    Nobody.

24   Q    Are you responsible for all these various tasks in

25        your role as account executive?
```

64

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | In addition to the handbook, did DSC provide you |
| 3 | | with any other written policy manual? |
| 4 | A | No, sir. |
| 5 | Q | Currently, where are those written policies housed? |
| 6 | A | On our website. |
| 7 | Q | Do you have access to that? |
| 8 | A | Yes, sir. |
| 9 | Q | In general, what is -- let me ask you this question |
| 10 | | in two different parts.  First part would be, first |
| 11 | | question would be what was, I guess, a day in the |
| 12 | | life of Stuart LaBauve as an account executive under |
| 13 | | DSC? |
| 14 | A | At what time period? |
| 15 | Q | Let's say in the beginning.  We will start with the |
| 16 | | beginning, 2007, you said that you were out looking |
| 17 | | for customers; correct? |
| 18 | A | Yes, sir. |
| 19 | Q | And that involved going to different auctions? |
| 20 | A | Yes, sir.  Meeting -- attending the auctions, |
| 21 | | getting to know the auction personnel, meeting new |
| 22 | | dealers, getting applications and supporting |
| 23 | | documents to send into our lending department. |
| 24 | Q | Which auctions did you go to in the beginning? |
| 25 | A | It was Oak View Auto Auction and Louisiana's First |

65

```
 1          Choice Auto Auction.
 2    Q     Oak View is located in Baton Rouge; correct?
 3    A     Yes, sir.
 4    Q     And Louisiana's First Choice is located in Hammond,
 5          Louisiana; correct?
 6    A     Yes, sir.
 7    Q     What other auctions besides those two?
 8    A     There was Bayou State Auto Auction.
 9    Q     Where was that located?
10    A     Lafayette, Louisiana.
11    Q     Okay.  What else?
12    A     Alexandria Auto Auction.
13    Q     In Alexandria?
14    A     Yes, sir.
15    Q     All right.
16    A     And Greater Shreveport Bossier.
17    Q     In Shreveport --
18    A     And Mike McTurner's.
19    Q     -- Louisiana?  What was the last one?
20    A     Mike McTurner's.
21    Q     How do you spell the last name?
22    A     M-C-T-U-R-N-E-R.
23    Q     Where was that located?
24    A     Monroe.
25    Q     Monroe.  Any in New Orleans?
```

66

```
 1   A      No, sir.

 2   Q      Manheim Lafayette?

 3   A      No, sir.

 4   Q      Manheim New Orleans?

 5   A      No, sir.

 6   Q      Why not those at that time?

 7   A      They wouldn't let outside floorplanners into their

 8          auctions.

 9   Q      That's not the case anymore; correct?

10   A      No, sir.

11   Q      You're part of the team?

12   A      Yes, sir.

13   Q      All right.  And when you would go to those auctions,

14          how would you basically meet and greet and sell your

15          product?

16   A      We had a sale day table we would set up with our

17          applications and information and meet the dealers,

18          let them know about our product.

19   Q      What was your pitch?  What was your hook?

20   A      To be able to attain more inventory than what they

21          currently had.

22   Q      Why DSC, though, over a competitor at that auction?

23          What would you pitch them on, if anything?

24   A      Our flexible terms that we had at the time.

25   Q      Okay.  And that's in the beginning of 2007.  How did
```

67

1     your activity change over time?  What things did you

2     do in addition to and not do as an account

3     executive?

4  A  At that time, we were called general managers.

5  Q  Okay.

6  A  So still the same operation, but then had a staff as

7     well that would handle, as we grew, they would

8     handle the internal operations.

9  Q  Okay.

10 A  As far as payments, controlling titles, clearing

11    audits, and still help with new business.

12 Q  What was the main focus, of all those different

13    categories of activity, what was the main focus from

14    the corporate standpoint?  Was it to sell more

15    floorplans?

16       MR. VINK:  Object to the form.  You can answer.

17 A  To grow the business.

18 Q  Which means what?

19 A  Dealers and loans.

20 Q  More or less?

21 A  More.

22 Q  Okay.  More volume; correct?

23 A  Yes.

24 Q  Okay.  I say volume.  I should rephrase that.

25    Numbers of floorplans; correct?

68

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | As well as dollar figures per floorplan; is that |
| 3 | | correct? |
| 4 | A | Yes, sir. |
| 5 | Q | To this day, do you still attend auctions? |
| 6 | A | Yes, sir. |
| 7 | Q | How often? |
| 8 | A | Weekly. |
| 9 | Q | Okay.  How many auctions do you go to on a weekly |
| 10 | | basis? |
| 11 | A | At least two. |
| 12 | Q | Which ones do you go to at this point? |
| 13 | A | I will attend Louisiana's First Choice, Oak View |
| 14 | | Auto Auction, ABC Auto Auction Baton Rouge, and |
| 15 | | Manheim Lafayette. |
| 16 | Q | What about Manheim New Orleans? |
| 17 | A | No.  We have another rep that covers that one. |
| 18 | Q | Who is that? |
| 19 | A | Chelsea Reeves. |
| 20 | Q | How do you spell that last name? |
| 21 | A | R-E-E-V-E-S. |
| 22 | Q | Where does that person work out of?  Their house? |
| 23 | A | Yes, sir. |
| 24 | Q | Which location? |
| 25 | A | She's in the New Orleans market. |

69

```
 1   Q    Is that the extent of her market, New Orleans?

 2   A    I think she does the north shore of New Orleans, the

 3        west bank, and part of Mississippi.

 4   Q    Okay.  How many customers are you encouraged to make

 5        contact with on a weekly basis?

 6   A    They want us -- at least 20.

 7   Q    Does this include new customers, existing, both?

 8   A    Both.  A bit of both.

 9   Q    How does NextGear track that activity?

10   A    Salesforce.

11   Q    I'm sorry, what's that?

12   A    Salesforce.

13   Q    What does that mean?

14   A    It's an app that we have that has our dealers loaded

15        into it, and we track our visits, and we can input

16        new dealers and track the applications with those or

17        the conversations we have with those.

18   Q    Is the account executive responsible for inputting

19        that information into the system?

20   A    Not solely, no, sir.

21   Q    Who else?

22   A    We have our business development center that will

23        put new applications in there.

24   Q    Okay.  Where are they located?

25   A    Here at Carmel, Indiana.
```

73

1    A    Yes, sir.

2    Q    And what type of information would you put in there?

3         Would you put the account number and the client's

4         name in there?

5    A    We can pull it up either by the account number or

6         the dealership name.

7    Q    What other type of information would you include in

8         there?

9    A    Whatever happened on our visit, we write it up.

10   Q    Okay.

11   A    We write up ourselves.

12   Q    And if you're doing -- give me, for instance, if

13        you're doing 20 per week, and let's say as an

14        example you meet with John Doe Motors, okay, and

15        they're an existing client and you see this person

16        at the auction, okay, and you all talk about the

17        Saints or LSU?

18   A    Uh-huh.

19   Q    You go back to your computer that day; is that

20        right?

21   A    We log the visits as we make them at the

22        dealerships.

23   Q    At the dealerships?  Okay.  Is that so you don't get

24        too far behind, or is that because the company wants

25        basically realtime information?

74

1  A    Realtime information.

2  Q    They focus on that, the company does?

3  A    They want the information accurate.  I mean, we do

4       have the ability to log it up afterwards, but I do

5       it when I'm there.

6  Q    Okay.  And what type of information would you put in

7       there besides the identifiers of who it is and who

8       you talked to?

9  A    Yeah.  The reason why I was there, if I accomplished

10      what I set out to accomplish, if I got any referrals

11      from the dealer, if I picked up any units to floor.

12  Q   Okay.

13  A   If I cleared an audit.

14  Q   Okay.  Were you under any type of requirement to,

15      quote, "touch" or see every existing client at least

16      once per month?

17  A   They ask us to do it within a 30- to 60-day period,

18      depending on your market.

19  Q   And would that involve both physically going out to

20      the exact dealership, as well as maybe seeing that

21      dealership at an auction?

22  A   They count it as only seeing them at the dealership.

23  Q   What if you would see somebody at an auction?

24  A   Yeah, I can have conversations with them, but I

25      don't log them up.

75

| | | |
|---|---|---|
| 1 | Q | Have you ever logged a conversation that you had |
| 2 | | with a dealer at an auction? |
| 3 | A | No. |
| 4 | Q | Are you sure about that? |
| 5 | A | We don't get credit for those, so I never made a |
| 6 | | habit of doing those. |
| 7 | Q | You would input, though, that you went to a |
| 8 | | particular auction on a particular day, though; |
| 9 | | correct? |
| 10 | A | Yes, sir. |
| 11 | Q | And what type of information would you put on an |
| 12 | | auction visit? |
| 13 | A | Usually just that I attended the auction that day, |
| 14 | | and if there was any promo we were running, I would |
| 15 | | put, you know, for the sales blitz we had or |
| 16 | | whatever the circumstance might be, but normally |
| 17 | | just that I attended the auction. |
| 18 | Q | You mentioned audits before.  Do you also conduct or |
| 19 | | oversee site audits for customer dealers? |
| 20 | A | Yes, sir. |
| 21 | Q | You did that for DSC as well as NextGear; is that |
| 22 | | correct? |
| 23 | A | Yes, sir. |
| 24 | Q | Did you document those contacts and those efforts? |
| 25 | A | Yes, sir. |

76

| | | |
|---|---|---|
| 1 | Q | How is that recorded?  Same way? |
| 2 | A | Yeah.  Well, Salesforce, and then our collections |
| 3 | | management in Discover. |
| 4 | Q | Did the computer system change from DSC to NextGear? |
| 5 | A | We still operate off of Discover, which was both. |
| 6 | Q | Okay.  So that's a no?  No change? |
| 7 | A | No, sir. |
| 8 | Q | And we've mentioned before, we've both discussed the |
| 9 | | term floorplan and floorplanning.  Is that a -- are |
| 10 | | those phrases commonly used in the used car |
| 11 | | industry? |
| 12 | A | Yes, sir. |
| 13 | Q | And explain your understanding of the term |
| 14 | | floorplanning. |
| 15 | A | It's setting up a line of credit for a dealer to buy |
| 16 | | inventory. |
| 17 | Q | From whom? |
| 18 | A | It can be from auctions, from wholesalers, from |
| 19 | | individuals, trade-ins. |
| 20 | Q | And in turn, who pays the auction as part of the |
| 21 | | floorplanning? |
| 22 | A | NextGear does. |
| 23 | Q | What is the KO book? |
| 24 | A | Called the knockout book. |
| 25 | Q | What is it? |

77

1    A    If there is a dealer that defaults either with a

2         floorplan or writes a bad check to an auction,

3         Auction Insurance is notified.

4    Q    What is a result for a customer dealer that is

5         placed in the KO book?

6    A    Most floorplan companies won't give a line of

7         credit, and it probably becomes on a cash basis at

8         an auction.

9    Q    So it affects a customer dealer both with floorplan

10        companies and the auctions itself; correct?

11   A    As far as I know, yes, sir.

12   Q    Have you ever caused any of your customers to be

13        listed in the KO book?

14   A    No, sir.

15   Q    Have you ever referred to corporate any of your

16        customer dealers for placement in the KO book?

17   A    No, sir.

18   Q    You've never had a customer dealer default?

19   A    I have.

20   Q    So what do you do?

21   A    Once I secure any inventory and get any bills of

22        sales or disposition of all cars, our risk

23        department takes it from there.

24   Q    As a man on the ground, though, you're a part of the

25        collection effort; correct?

78

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | How many customers have you referred to your -- risk |
| 3 | | management, you said? |
| 4 | A | Yes, sir. |
| 5 | Q | -- your risk management division for placement in |
| 6 | | the KO book? |
| 7 | A | None. |
| 8 | Q | None.  How many of your customer dealers have been |
| 9 | | placed on the KO book? |
| 10 | A | I don't know. |
| 11 | Q | Less than five?  More than five? |
| 12 | A | I have no idea how many.  Once it goes to our risk |
| 13 | | department, I don't deal with it anymore. |
| 14 | Q | Well, you see those customers -- |
| 15 | A | Yes, sir. |
| 16 | Q | -- in the future; correct? |
| 17 | A | Yes, sir. |
| 18 | Q | Right?  And at some point, have any of those |
| 19 | | customers said, well, geez, I'm in the KO book now, |
| 20 | | Stuart?  Can you help me? |
| 21 | A | One time. |
| 22 | Q | Who said that? |
| 23 | A | A guy by the name of Beau Guidry.  I think he had |
| 24 | | Affordable Auto Sales, and he was placed in the KO |
| 25 | | book for a bounced check, and we allowed him to -- |

79

| | | |
|---|---|---|
| 1 | | he got himself out, and we allowed him to work out |
| 2 | | of the floorplan. |
| 3 | Q | And he came to you for help? |
| 4 | A | Yes, because he wanted to pay us off. |
| 5 | Q | Because while he was in the KO book, how was he |
| 6 | | adversely affected? |
| 7 | A | His floorplan with us was -- he didn't have any |
| 8 | | available credit with us anymore. |
| 9 | Q | How many customer dealers do you believe -- I know |
| 10 | | this is just a general ballpark number -- do you |
| 11 | | believe that you have either signed up or |
| 12 | | supervised, so to speak, since your employment in |
| 13 | | 2007?  More than a thousand? |
| 14 | A | No. |
| 15 | Q | More than 400? |
| 16 | A | I couldn't give you an exact figure.  I've never |
| 17 | | looked at that. |
| 18 | Q | The Discover system, though, would contain that |
| 19 | | information; correct? |
| 20 | A | Yes.  I could probably get it. |
| 21 | Q | So someone from corporate could certainly, and |
| 22 | | correct me if I'm wrong, type in Stuart LaBauve and |
| 23 | | maybe have an account history for you? |
| 24 | A | I believe so. |
| 25 | Q | Okay.  And would that show both the dealer's name, |

148

```
 1   Q    Who is it from?

 2   A    Doug Hanson.

 3   Q    What was the date of the e-mail?

 4   A    July 21st, 2011.

 5   Q    Go ahead, and since it's short, just read us -- read

 6        into the record what the e-mail states.

 7   A    "Red Barn Motors and [blank] both put into apps

 8        today, that should give us 5 so far."

 9   Q    What is Mr. Hanson discussing there, "that should

10        give us 5 so far"?  What does that mean?

11   A    Five new applications for the month.

12   Q    For the month or for the day?

13   A    The month.

14   Q    For the month.  Why was that relevant or important

15        to the conversation?

16   A    He had sales goals to meet, and I had sales goals to

17        meet as well.

18   Q    Okay.  These two would -- since Mr. Hanson had a

19        large geographic area that he covered, larger than

20        yours?

21   A    Yes, sir.

22   Q    So when he would discuss Red Barn Motors and blank,

23        whoever the other person that's blanked out, that

24        would obviously be relevant to you?

25   A    Yes.
```

149

1    Q    Correct?

2    A    Yes.

3    Q    Let me show you what is marked as Exhibit 10.  Take

4         a look at that.

5             (Plaintiffs' Deposition Exhibit 10 marked

6         for identification.)

7    Q    And for the record, Exhibit 10 is identified in

8         addition as NG007886.  Were you a party to this

9         e-mail conversation, Mr. LaBauve?

10   A    Yes, sir.

11   Q    What was the date of this e-mail?

12   A    July 23rd, 2011.

13   Q    Since it's short, why don't you just go ahead and

14        read.  Who is it from?

15   A    Doug Hanson.

16   Q    To you?

17   A    Yes.

18   Q    What's the subject?

19   A    Red Barn Motors, Inc.

20   Q    It reads at the bottom from Doug to you, "Contract

21        ready for this dealer, he's in Denham Springs"; is

22        that correct?

23   A    Yes, sir.

24   Q    Denham Springs, Louisiana?

25   A    Yes, sir.

150

1    Q    What was your response?

2    A    "Ok, I'll contact him Monday."

3    Q    And did you have a second response as well, at the

4         top?

5    A    No.  It was from Doug to me.

6    Q    Okay, from Doug to you.  Okay.  And what did Doug

7         say to you in that e-mail?

8    A    "Call me Monday and I will give you the inside

9         scoop."

10   Q    What was the inside scoop?

11   A    I have no idea.

12   Q    Doug would be able to tell us what that inside scoop

13        is?

14   A    I don't know.

15   Q    Is Doug still a NextGear employee?

16   A    No, sir.

17   Q    Where is he now?  Do you know?

18   A    I don't know.

19   Q    When did he leave NextGear?

20   A    He was recently separated.  I don't know if it was

21        this month or last.

22   Q    Do you know why?

23   A    No, sir.

24   Q    Was it under good terms or bad terms?

25   A    I do not know.

151

1 Q   Okay.  Did you discuss the inside scoop, whatever

2     that is, with Mr. Hanson following this e-mail back

3     in July of 2011?

4 A   I have no recollection.

5 Q   Did you inform Red Barn Motors specifically, and I

6     asked you this question earlier in general, but

7     specifically as Red Barn Motors, did you inform

8     anyone from Red Barn Motors during the application

9     process that DSC was actually going to charge

10    interest from the date of the auction, even if DSC

11    did not actually make any advances on the dealer's

12    behalf?

13 A  I don't recall any specific conversation.

14 Q  Let me show you what I will mark as Exhibit 11.

15        *(Plaintiffs' Deposition Exhibit 11 marked*

16    *for identification.)*

17 Q  Go ahead and take a look at that document and tell

18    me when you've had a chance to review it.

19 A  *(Witness reading document.)*

20 Q  Are you ready, Mr. LaBauve?

21 A  Yes, sir.

22 Q  On Exhibit 11, and specifically for the record, this

23    is labeled Bates number NG003560 through 3581; is

24    that correct?

25 A  No, sir.  They all say 3560 at the bottom.

152

1   Q   If you look above the 3560 as you go back.  There

2       are two numbers.  I know what you mean.

3   A   Yes, sir.

4   Q   So 3560 all the way to 3581; correct?

5   A   Yes, sir.

6   Q   Take a look at the last page, actually, 3581, and

7       tell me if you see your signature on this packet?

8   A   Yes, sir.

9   Q   Is Exhibit 11 right here, this is a DSC application

10      and contract for Red Barn Motors; is that correct?

11  A   Yes, sir.

12  Q   And did you personally deliver this contract to Red

13      Barn Motors at their dealership?

14  A   Yes, sir.

15  Q   Who did you meet with?

16  A   Donald Richardson, Devon London, and Sharon Roach.

17  Q   Did you thoroughly review the contract with

18      Mr. Richardson?

19  A   We went over it, yes.

20  Q   Did you try to sell Mr. Richardson any other DSC

21      products as well?

22  A   At the time, I was just setting up the lines of

23      credit for the floorplans.  And we had insurance; if

24      he didn't have it, we could provide it.

25  Q   Flip to the last page, 3581, if you could.  Right

153

1          above your completed checklist verification and your

2          signature, do you see that last line, the box,

3          "Review any other applicable products and/or

4          services"?

5    A     Uh-huh.

6    Q     Did you make that check?

7    A     I did, yes, sir.

8    Q     That's what you did with Mr. Richardson; is that

9          correct?

10   A     I guess we talked about them.  These were more for

11         products that our sales team were selling.

12   Q     Okay.  And you took part in that sales effort; is

13         that correct?

14   A     Yes, sir.

15   Q     All right.  Turn to page one of the contract, so to

16         speak, which actually is the second page of this set

17         here, and that's going to be NG003561.  Go ahead and

18         find the term "Advance" and read that into the

19         record.

20   A     "'Advance' shall mean any loan or payment in any

21         amount made pursuant to this note by DSC to dealer

22         or on dealer's behalf to any third party."

23   Q     Okay.  Flip to the Term Sheet, NG003571.  These are

24         not redacted on this document, so, what was the

25         percentage, the interest rate under the contract

154

| | | |
|---|---|---|
| 1 | | rate listed on this particular Term Sheet? |
| 2 | A | It was our base rate plus 4.5 percent per annum. |
| 3 | Q | Go ahead and turn to the ACH page in this document, |
| 4 | | which should be NG003578.  Okay, and look again at |
| 5 | | that second bullet point on this page. |
| 6 | A | Which one? |
| 7 | Q | We're on the same page, 3578. |
| 8 | A | Yes, sir. |
| 9 | Q | Do you see the second bullet point? |
| 10 | A | Yes, sir. |
| 11 | Q | Read that into the record, please. |
| 12 | A | "DSC may initiate a required payment from the |
| 13 | | designated account on or after the first business |
| 14 | | day following the date that such amount becomes due |
| 15 | | and owing under the note." |
| 16 | Q | Same as the other contracts we looked at; correct? |
| 17 | A | Yes, sir. |
| 18 | Q | Did you inform anyone at Red Barn Motors during the |
| 19 | | contract signing that DSC was actually going to |
| 20 | | charge interest from the date of the auction, even |
| 21 | | if DSC did not actually make any advances on Red |
| 22 | | Barn's behalf? |
| 23 | A | No, sir. |
| 24 | | MR. COMAN:  Can we go off the record for a |
| 25 | | moment. |