IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RED BARN MOTORS, INC., PLATINUM MOTORS, INC., and MATTINGLY AUTO SALES, INC., individually and on behalf of other members of the general public similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COX ENTERPRISES, INC., COX AUTOMOTIVE, INC., NEXTGEAR CAPITAL, INC. F/K/A DEALER SERVICES CORPORATION, successor by merger with Manheim Automotive Financial Services, Inc., and JOHN WICK,<br><br>Defendants. | Case No. 1:14-cv-01589-TWP-DKL |

## DECLARATION OF ADAM GALEMA

1. I am over twenty-one years of age, of sound mind, and competent to make this declaration.

2. I currently serve as the Vice President of Finance for Defendant NextGear Capital, Inc. ("NextGear") and have held that position for 2 years. Before that, I was Controller of NextGear for several years. In my current role, I am responsible for the financial reporting of the company and that it aligns with and reflects our business operations. In that capacity, I am familiar with our floor plan products and related charges and default practices. This Declaration is based on my own personal knowledge, in reliance on the regular practices and procedures of NextGear, and on the records maintained by NextGear.

3. Following its merger with former competitor Manheim Automotive Financial Services, Inc. ("MAFS") in 2013, Dealer Services Corporation ("DSC") changed its name to NextGear Capital, Inc. References to "NextGear" in this Declaration refer to both the current entity and to its predecessors in interest.

4. DSC did not have a corporate relationship with Cox Enterprises, Inc. or Cox Automotive, Inc. until March 1, 2012. Until then, DSC was an independent automotive financing company and was a competitor to Cox Enterprises' MAFS subsidiary.

# EXHIBIT 13

5. Prior to their merger in 2013, DSC and MAFS used different documentation for their notes, security agreements, and various related financing agreements and, as competitors, had not coordinated with each other on those contract terms.

6. Many dealers in the proposed class borrowed through MAFS only, using its unique agreement forms and not the forms of its competitor, DSC.

7. Many dealers in the proposed class borrowed through DSC only, using its unique agreement forms and not the forms of its competitor, MAFS.

8. Some dealers in the proposed class borrowed through both MAFS and DSC, using both companies' agreements.

9. From January 2005 through July 2013, various customers of MAFS and DSC signed materially different versions and subsets of MAFS' and/or DSC's respective agreements.

10. From January 2005 through July 2013, the advance schedule (MAFS) or term sheet (DSC) that accompanied the customer agreements and that specified interest rates, fees, and line of credit amount was specific to each customer. Interest rates and fees varied by customer and by particular financing program.

11. The agreements MAFS and DSC used were substantially and independently revised at least twice since 2007 and have also been revised for specific customers, after negotiation with those customers, on numerous other occasions.

12. After the merger of MAFS and DSC in 2013, all dealers who continued to do business with NextGear executed an entirely new set of contract documentation with NextGear that replaced and novated any prior agreements with MAFS or DSC. A true and correct copy of the primary NextGear form of Demand Promissory Note and Loan and Security Agreement used beginning in 2013 is attached to this Declaration as **Exhibit A**.

13. During the period of March 2013 through October 2013, almost all existing customers of DSC and/or MAFS who wished to continue doing business with NextGear transitioned from their prior DSC and/or MAFS agreements to the new NextGear agreements.

14. When a borrowing dealer purchases a vehicle, that vehicle is dealer inventory and becomes NextGear's collateral to secure any obligations owed to NextGear. In fact, dealers grant NextGear a security interest in all their present and future inventory, including but not limited to specifically-financed vehicles, most other personal property of the dealership (including receivables, chattel paper, etc.), and the proceeds of any of that collateral, which collateral secures all liabilities of the dealer to NextGear and its affiliates.

15. The date NextGear actually conveys funds for a vehicle varies by transaction type and vehicle source. When a borrowing dealer obtains a vehicle from an auction, NextGear sometimes pays the dealer directly and sometimes pays the auction on the dealer's behalf. When NextGear pays the auction directly, the logistics and timing of that direct funding are governed by the agreement or informal understanding between NextGear and the specific auction or auction company.

16. In general, some auction agreements require payment on the day of sale, some upon notice to NextGear that the auction holds the certificate of title to the vehicle being financed, and some upon NextGear's receipt of the certificate of title.

17. Borrowing dealers can also finance ("floor") vehicles with NextGear from other non-auction sources, such as trade-ins or vehicles purchased directly from other dealers. The borrowing dealer must provide the bill of sale and title to NextGear. The financed amount is based on either the vehicle's value or a percentage of the purchase price, and interest begins to run on these transactions from the date funds are provided to the dealer or to a third party on the borrowing dealer's behalf.

18. All NextGear and DSC customers had 24-hour online access to information about their accounts, including the total outstanding balances owed on each floor planned vehicle; the principal and interest owed, per vehicle; next amount due and date due, per vehicle; the maturity dates for each Advance; and the published rate and fee schedule applicable to them, by logging into NextGear's website.

19. Consequently, all NextGear and DSC customers had 24-hour online access to all information they would need in order to determine the date on which interest began to accrue for any Advance related to a floor planned vehicle.

20. Because of the substantial variance in terms from one customer's credit line to another's, NextGear account executives do not provide standardized information or statements to customers or potential customers relating to most credit terms and fees, either before the customer signs an agreement with NextGear or during the course of the lending relationship.

21. Some customers paid NextGear, DSC, and/or MAFS in cash or by check, whereas others paid through electronic debit after signing an ACH Authorization. Some also paid in person at auctions or at branches, while others paid remotely.

22. Some dealers in the proposed class never requested or received an Advance.

23. Many dealers in the proposed class never received an Advance on a vehicle purchased at auction because they purchased their inventory only from other dealers directly or via trade-ins.

24. Many dealers in the proposed class defaulted on their obligations to NextGear, but most did not.

25. Many dealers in the proposed class who defaulted on their obligations to NextGear settled their debt quickly and/or amicably, or are still presently under voluntary workout arrangements.

26. Many dealers in the proposed class who defaulted in their obligations to NextGear executed settlement agreements or other releases of all claims against NextGear, whether known or unknown.

27. Many dealers in the proposed class who defaulted on their obligations to NextGear had judgments entered against them in favor of NextGear, and most of those failed to raise or pursue to judgment any counterclaims against NextGear.

28. Many dealers in the proposed class who defaulted on their obligations to NextGear did not settle their debts, nor did they have a judgment entered against them, because it was not cost-effective for NextGear to pursue those collections or seek judgments against them, but in most of those situations, NextGear has not waived its claims against the dealer.

29. Many dealers in the proposed class who defaulted on their obligations to NextGear sought bankruptcy relief and obtained discharges in bankruptcy. Most of those dealers did not expressly retain any claims against NextGear, but a few may have attempted to do so.

30. Some dealers in the proposed class have expressly released any claims they may have against NextGear.

31. Many dealers in the proposed class are no longer existing entities, have been administratively dissolved by their respective state authority, and/or have died.

32. NextGear customers range dramatically in their business size (both revenues and number of employees); their profitability or lack thereof; their creditworthiness; the size of their lines, which can run from $10,000 to in excess of $40,000,000; the number, type, and value of cars they finance with NextGear; how often they use their floor plan; the speed with which they sell and pay off cars on their line; whether and how often they buy "title absent" cars at auction; their number of lots and geographic scope; their access to local, remote, and online auctions and other sources of inventory; their most common sources of inventory; their financial sophistication; whether they have in-house accountants and dealership management software; and their level of operating cash and/or access to other credit; among other differences.

33. Many dealers in the proposed class who defaulted on their obligations to NextGear did so due to an independent inability to pay their business obligations. Therefore, those dealers will have difficulty proving any incremental harm allegedly caused by NextGear's interest charges or alleged "blacklisting." For that and other reasons, the auctions they dealt with would have had separate and valid reasons to cease or limit their relations with many of the dealers in the proposed class even absent any contact with NextGear about any default to NextGear.

34. Many dealers in the proposed class had other lenders in addition to NextGear and defaulted on their obligations to those other lenders. Many of those lenders would have submitted information concerning their defaulted dealers to one or more third parties relating to the "blacklisting" alleged by plaintiffs. Therefore, isolating any alleged damage from NextGear's involvement would be speculative, at best.

35. Auction Insurance Agency is a third-party insurance company that insures some participating auto auctions against bad checks, collection problems, and/or stolen vehicles. It is not affiliated with any of the defendants in this litigation.

4

36. Auction Insurance Agency maintains a list of dealers whose checks it will not insure at participating auctions. This list is sometimes referred to in the industry as the "KO Book." Auctions remain free to do business with dealers on that list if they choose to.

37. NextGear shares dealer information with Auction Insurance Agency in certain cases, in exchange for access to KO Book information, which NextGear uses as one factor in its own underwriting and credit-review processes. Dealers authorize this in their applications to NextGear and in their loan agreements.

38. Most of the dealers in the proposed class are not listed in the KO Book.

39. **Exhibit B** to this Declaration is a true and correct copy of a report showing the detail of Plaintiff Red Barn Motors, Inc.'s transactions with DSC/NextGear. The information in this report was recorded at or near the time of the transactions, the information was recorded by a person with knowledge of the transactions, records of transactions are kept in the course of NextGear's regularly conducted business activity, and maintaining the information was a regular practice of NextGear.

40. **Exhibit B** shows that from July 2011 through March 2013, Red Barn used DSC/NextGear financing for more than 500 vehicles. It also shows that Red Barn was charged a total of $36,502.46 in interest on those transactions.

41. Red Barn did not pay the full amount of interest charged by NextGear.

42. NextGear notified Auction Insurance Agency only that Red Barn was not responsive to NextGear's collection attempts and had an outstanding balance owing to NextGear. A copy of that e-mail communication is attached to this Declaration as **Exhibit C**.

43. **Exhibit D** to this Declaration is a true and correct copy of a report showing the detail of Plaintiff Mattingly Auto Sales, Inc.'s transactions with DSC. The information in this report was recorded at or near the time of the transactions, the information was recorded by a person with knowledge of the transactions, records of transactions are kept in the course of NextGear's regularly conducted business activity, and maintaining the information was a regular practice of NextGear.

44. **Exhibit D** shows that from November 2006 through May 2012, Mattingly floored approximately 160 vehicles through DSC. It also shows that Mattingly was charged $25,744.44 in interest on those transactions.

45. Mattingly did not pay the full amount of interest charged by NextGear.

46. Manheim Louisville, not DSC, reported to Auction Insurance Agency in late 2012 that Mattingly had failed to pay for a vehicle or otherwise defaulted on its obligations. A copy of the notice is attached to this Declaration as **Exhibit E**.

47. Plaintiff Platinum Motors, Inc. executed a demand promissory note and security agreement with DSC, along with various other related contract documentation, in May 2011. A copy of the contract documentation is attached to this Declaration as **Exhibit F**.

48. Platinum did not have a line of credit or other contract with MAFS.

49. **Exhibit G** to this Declaration is a true and correct copy of a report showing the detail of Platinum's transactions with DSC/NextGear. The information in this report was recorded at or near the time of the transactions, the information was recorded by a person with knowledge of the transactions, records of transactions are kept in the course of NextGear's regularly conducted business activity, and maintaining the information was a regular practice of NextGear.

50. The report attached to this Declaration as **Exhibit G** shows that in June and July 2011, Platinum floored approximately 20 vehicles with DSC but only paid in full for five of the vehicles. The report shows that a handful of the vehicles Platinum floored were not purchased at auction. The report shows that Platinum was charged $2,759.30 in interest on its transactions.

51. Platinum did not pay the full amount of interest charged by NextGear.

52. DSC filed and served a collection action against Platinum and its owner to recover approximately $35,000 owed on the floor plan. A copy of the Complaint is attached to this Declaration as **Exhibit H**. Platinum did not raise any defenses or counterclaims in that litigation.

53. The court entered judgment in favor of NextGear/DSC against Platinum and its owner on February 12, 2014 in the amount of $35,775.30, plus post-judgment interest and NextGear/DSC's reasonable post-judgment attorney fees and court costs incurred in the collection of that judgment. A certified copy of that judgment is attached to this Declaration as **Exhibit I**.

54. Platinum has produced the complaint, summons, and docket report from the collection action in the present litigation. As of the date I am executing this Declaration, these were the only documents Platinum had produced in response to requests for production in this litigation. A copy of Platinum's entire document production is attached to this Declaration as **Exhibit J**. In addition, as of the date I executed this Declaration, Platinum had not provided a verification of its interrogatory responses.

55. As of the date I am executing this Declaration, NextGear has received a total of only $4,542.18 towards the judgment it holds against Platinum's owner and guarantor, and the balance of the judgment amount remains due and owing to NextGear by those parties.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and accurate to the best of my knowledge.

This 31st day of October, 2016.

_____
Adam Galema

6