UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

RED BARN MOTORS, INC.,                  )
PLATINUM MOTORS, INC.,                  )
MATTINGLY AUTO SALES, INC.,             )
YOUNG EXECUTIVE MANAGEMENT &            )
CONSULTING SERVICES, INC.,              )
individually, and on behalf of          )
other members of the general            )
public similarly situated,              )
                                        ) Cause No.
        Plaintiffs,                     )  1:14-cv-1589-TWP-DKL
                                        ) Indianapolis, Indiana
    vs.                                 ) **May 9, 2017**
                                        ) 10:05 a.m.
COX ENTERPRISES, INC., COX              )
AUTOMOTIVE, INC., NEXTGEAR              )
CAPITAL, INC., F/K/A DEALER             )
SERVICES CORPORATION,                   )
successor by merger with                )
Manheim Automotive Financial            )
Services, Inc., and JOHN WICK,          )
                                        )
        Defendants.                     )

**Before the Honorable
TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF
ORAL ARGUMENT

Court Reporter:              David W. Moxley, RMR, CRR, CMRS
                             United States District Court
                             46 East Ohio Street, Room 340
                             Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

**APPEARANCES:**

**For Plaintiffs:**          Kathleen A. DeLaney, Esq.
                             DeLaney & DeLaney, LLC
                             3646 North Washington Boulevard
                             Indianapolis, IN  46205

                             Kerry Murphy, Esq.
                             Lasky Murphy
                             Suite 250
                             715 Girod Street
                             New Orleans, LA  70130

**For Defendants:**          Jason S. McCarter, Esq.
                             Eversheds Sutherland (US), LLP
                             Suite 2300
                             999 Peachtree Street, NE
                             Atlanta, GA  30309-3996

                             Paul D. Vink, Esq.
                             Bose, McKinney & Evans, LLP
                             Suite 2700
                             111 Monument Circle
                             Indianapolis, IN  46204

1                    (In open court.)

2          THE COURT:  Good morning.  We are on the record.

3    This is plaintiff, Red Barn Motors, Inc.; Platinum Motors,

4    Inc.; and Mattingly Auto Sales, Inc. versus defendants, Cox

5    Enterprises, Inc.; Cox Automotive, Inc.; John Wick; NextGear

6    Capital, Inc., defendants.  And our case number is

7    1:14-cv-1589.  And we are here this morning for oral argument

8    on the plaintiffs' motion for class certification.

9              And we'll begin by having counsel, lead counsel,

10   state your name for the record, because lead counsel has the

11   microphone, and introduce those at your table.  And we'll

12   begin with the plaintiffs.

13         MS. DeLANEY:  Thank you, Your Honor.  And good

14   morning.

15         THE COURT:  Good morning.

16         MS. DeLANEY:  I'm Kathleen DeLaney with DeLaney &

17   DeLaney, and I have with me Kerry Murphy from Lasky Murphy.

18         THE COURT:  Okay.  Good morning.

19         MS. DeLANEY:  Thank you.

20         MR. McCARTER:  Good morning, Your Honor.  I'm Jason

21   McCarter from the Eversheds Sutherland law firm in Atlanta.

22   I'm here on behalf of the remaining defendants, NextGear

23   Capital, Cox Automotive, and John Wick.  And with me is Paul

24   Vink, my co-counsel from Bose McKinney --

25         THE COURT:  Good morning.

1          MR. McCARTER:  -- as well as Rick Wright, in-house

2     counsel at NextGear Capital, our client.

3          THE COURT:  Good morning.

4          And for the record, our court reporter is David

5     Moxley.

6          And, Ms. DeLaney, it's your motion, so why don't you

7     come on up to the lectern.  And the Court has reviewed all of

8     the briefings, so I'm familiar with your issues.  And we -- I

9     gave -- the Court has given you 20 minutes per side, and we do

10    have a big clock, so if you watch your clock -- and,

11    Ms. DeLaney, do you want to reserve some of your time for

12    rebuttal?

13         MS. DeLANEY:  Yes.  I would like to reserve five

14    minutes, please.

15         THE COURT:  All right.  I'll let you know when

16    you're nearing five minutes.  Okay.  You may.

17         MS. DeLANEY:  Thank you, Your Honor.  I appreciate

18    you making time for us on this rainy morning.  We are here on

19    our client's motion for class certification and appointment of

20    class counsel.

21         And our case is a relatively simple and

22    straightforward case as compared to the last time I was here

23    on one of these cases.  So we represent a class -- a proposed

24    class of used car dealers, and our definition for the class is

25    all used car dealers in the United States who are parties to a

1   floor plan agreement with Dealer Services Corporation, which

2   is now known as NextGear, during the time period of

3   January 2005 through January 2013.  A floor plan agreement is

4   a financing mechanism that is used by used car dealers to get

5   inventory and then sell it using financing.

6           The class definition that we propose is

7   ascertainable, it's a clear definition, simple definition.  We

8   can readily determine whether a particular used car dealership

9   is a member of the class by looking at NextGear's records.

10  It's an objective standard and it's not overbroad.  In fact,

11  we've narrowed the scope of the class in order to address some

12  of the arguments that have been raised by NextGear.

13          A few of the elements of Rule 23 are not in dispute.

14  We believe that numerosity is clearly established.  We have

15  testimony from a company representative that there are 20,000

16  contracts at issue, so that's clearly sufficient for

17  numerosity.  Happily, the adequacy of class counsel has not

18  been disputed, so those two elements have been satisfied, in

19  our view.  On the numerosity point, NextGear's 30(b)(6)

20  deponent gave us the testimony that we think definitively

21  establishes numerosity.

22          THE COURT:  I agree.

23          MS. DeLANEY:  Okay.  Well, we have that, at least.

24          As to commonality, each of the named plaintiffs and

25  putative class members signed a form contract with NextGear,

1  and all of the claims that remain in the case flow from that

2  form contract.  In our circuit, it has been recognized that

3  cases arising out of form contracts are particularly

4  appropriate for class treatment, and we think that is the case

5  here.

6          On our constructive fraud and RICO claims, those

7  also flow from the same contracts and the associated

8  statements provided by NextGear.  So all of the claims derive

9  from the same form contracts, which we think satisfies the

10 commonality requirement of the rule.

11         THE COURT:  Ms. DeLaney, let's talk about the

12 constructive fraud claims --

13         MS. DeLANEY:  Okay.

14         THE COURT:  -- because those are the ones that the

15 Court has the most questions regarding.  Am I correct that, as

16 the defendants argued, these are going to be unique to each

17 car dealer?

18         MS. DeLANEY:  I don't believe so, Your Honor,

19 because the deceptive material is the contracts themselves and

20 the account statements that the dealers were allowed to access

21 through an on-line portal.  Those form documents do not reveal

22 to the used car dealers when money was advanced vis-a-vis when

23 interest was charged.

24         THE COURT:  Well, aren't these based somewhat on

25 oral agreements and statements made between the parties?

1           MS. DeLANEY:  Well, the form contracts have

2     integration clauses, which say that the deal is the deal and

3     the deal is in the four corners of the document.  So oral

4     representations outside the contract, we don't -- I'm certain

5     that on the contract claim, the defendants are going to argue

6     those are not relevant and not admissible.

7           THE COURT:  All right.  But for constructive fraud,

8     you're going to have to show reliance by the complaining

9     party, injury to the complaining party, gaining an advantage

10    by the party to be charged at the expense of the complaining

11    party, and I'm just not certain that this would be a blanket

12    element, that it would be unique to each of these plaintiffs.

13          MS. DeLANEY:  Well, obviously, you've correctly

14    stated the elements of the constructive fraud claim, but in

15    our view, the evidence that we need to establish the deceptive

16    misrepresentation and the reliance are the company's own

17    documents.  So if you look at the form contracts, our clients

18    couldn't read those documents and understand when money was

19    being advanced on their behalf versus when interest was being

20    charged to them.  And the same as when they logged into the

21    on-line system.  Nowhere was that information disclosed to our

22    clients, so that is the deceptive practice that supports the

23    constructive fraud claim.

24          THE COURT:  Was it the same form contract from your

25    class period, 2005 through July of 2013?

1          MS. DeLANEY:  There are -- I'm certain that the

2    defendants are going to argue that the contracts are not the

3    same.  And it really -- you know, if you want to get

4    hyper-technical, each contract is unique because it's signed

5    by a different used car dealer, okay?  But that doesn't

6    address the issue in the case, which is the material terms

7    where the deception occurred, where the constructive fraud

8    derives from, where the RICO claim comes from, are three

9    provisions that are defined in the same way across the

10   contracts.

11         And we'll pull up that language here on the

12   definitions of interest, liabilities, and advance.  These are

13   the key provisions, and they carry through the contracts

14   during the term that we propose for our class definition.  And

15   the key here is the liabilities definition of any and all

16   advances.  Advances is the key one, and advance is defined as

17   any loan or payment in any amount made pursuant to this note

18   by DSC to dealer or on dealer's behalf to any third party.

19   And --

20         THE COURT:  And this language is in each of the

21   contracts?

22         MS. DeLANEY:  During the class period, yes.

23         THE COURT:  Okay.

24         MS. DeLANEY:  Now, that changed in the 2013 contract

25   that we believe went into effect in August of 2013, which is

1  why we limited our class definition to exclude.

2          THE COURT:  Gotcha.

3          MS. DeLANEY:  Okay.  Great.

4          So the key question for the Court to decide -- not

5  today, but at the right stage of the case procedurally -- is

6  whether this definition of advance allowed the defendants to

7  charge interest to our clients when they had not paid any

8  money to anyone on their behalf.  And in some cases, our

9  clients were charged interest on vehicles that were

10  floor-planned and then resold and the notes paid off without

11  money ever being advanced.  So that's the key -- that's the

12  heart of the case, and that language is consistent across the

13  class definition.

14          Additionally, we have testimony from Mr. Wick that

15  confirms that the contracts at issue are form contracts.  He

16  described them as kind of like a credit card application or a

17  credit card agreement.  These are standard take-it-or-leave-it

18  documents that are not subject to individual negotiation.  If

19  you line up the contracts, which are exhibits in the materials

20  that the Court has available, you will see they look

21  remarkably alike.

22          We have additional testimony supporting the notion

23  that these are form contracts from the company's 30(b)(6)

24  witness, and that deponent describes them as, generally, "take

25  it or leave it."  So, again, these are form contracts

1  particularly suitable for class treatment.

2         On commonality with regard to the constructive fraud

3  and RICO claims, we have testimony that we've excerpted here

4  from another defense witness that confirms that the receivable

5  detail reports, these are the information that was available

6  to the dealers about the status of their lines of credit,

7  confirms that that information did not reveal to our clients

8  when NextGear paid the auction for the vehicles that were

9  floor-planned.

10        And, in fact, Mr. Galema says he doesn't know why

11 that would be important to them in the first place.  This is

12 the nub of the constructive fraud and RICO claims.  Nowhere

13 did the company reveal to our clients that they were paying

14 interest on money that hadn't been lent.

15        THE COURT:  Okay.

16        MS. DeLANEY:  We also believe that typicality is

17 satisfied because, again, all of the claims derived from the

18 same form contracts and the defendants treated our clients the

19 same way in that they charged them interest on funds that had

20 not been advanced on their behalf.  The injury is the same

21 across the class.

22        Now, obviously, the damages calculation will vary

23 from used car dealer to used car dealer, depending upon what

24 the extent of their line of credit was, how big the gap in

25 time was on each particular transaction between when interest

1  began to be charged versus when funds were advanced, but those

2  differences are easily manageable through a pretty simple

3  calculation on damages.

4       We believe that our clients are adequate named

5  plaintiffs.  They each suffered the same type of harm, they

6  have participated and cooperated in the litigation through

7  answering written discovery and being available to be deposed,

8  and their interests are aligned with the other class members

9  who suffered the same injury in the same way.

10       I'm confident we will hear from defense counsel that

11  our clients aren't adequate representatives because they

12  defaulted on loans to NextGear, but we have testimony from

13  company witnesses that defaults are common.

14       In fact, I was in the Hamilton County Courthouse a

15  couple weeks ago on a different case, and the case called in

16  after me was a NextGear default against a used car dealer.

17  These happen all the time.  So the fact that they defaulted

18  doesn't make them unique.  And, moreover, to the extent that

19  that's even relevant, it only goes to the measure of their

20  damages, not to their injuries.

21       We believe that predominance is satisfied, as well,

22  because the interest practices by the defendant and the form

23  contracts used by the defendant are the same across the class.

24  Additionally, we face a number of defenses that are applicable

25  across the class, as well.  And there, if you look at the

1   answer, many of the, if not most of the, affirmative defenses

2   are sought to be applied across the entire class.  And, as I

3   said, the same formula can be used to calculate all the class

4   members' damages.

5          And looking to the transaction report, that

6   document -- basically that document can be used for each class

7   member to calculate their individual damages using a

8   consistent methodology for which we have an expert witness who

9   has articulated how that calculation would be done.  And,

10  basically, all the data points that are needed to calculate an

11  individual dealer's damages are contained in the Red Barn

12  transaction report, from which you calculate the amount of

13  interest that they paid that they shouldn't have paid.

14         We believe that class treatment is a superior method

15  for resolving this dispute.  I'm certain that the courthouse

16  wouldn't enjoy being inundated with 20,000 separate lawsuits

17  alleging the same breach of contract and the same RICO and

18  constructive fraud violations.  Additionally, the amount of

19  individually recoverable damages is relatively modest, which

20  means that class treatment is particularly appropriate,

21  because, otherwise, in the absence of class treatment, we

22  would have claimants who would be uncompensated even though

23  they were wronged.

24         So, unless the Court has questions now, I'll reserve

25  the balance of my time for rebuttal.

1          THE COURT:  I have no questions.

2          MS. DeLANEY:  Thank you, Your Honor.

3          THE COURT:  Thank you.

4          And, Mr. McCarter, whenever you are ready.

5          MR. McCARTER:  Thank you, Your Honor.

6          Good morning, Your Honor.  As I -- I echo

7    Ms. DeLaney's sentiment.  Thank you for taking the time to

8    hear this for us this morning.

9          THE COURT:  You're welcome.

10         MR. McCARTER:  I have some prepared remarks,

11   obviously, but I would really love to focus on any particular

12   concerns or questions the Court has, so I know you will

13   anyway, but please don't hesitate to interrupt me.

14         THE COURT:  Okay.  Well, let's just start off, do

15   you agree with their numerosity requirement, that that's been

16   met?

17         MR. McCARTER:  Your Honor, we do believe that

18   there's numerosity.  However, we do dispute their particular

19   numbers.  And this sort of blends into our ascertainability

20   argument --

21         THE COURT:  Okay.

22         MR. McCARTER:  -- in the sense that they proposed a

23   class that includes dealers from 2005 through 2013, but they

24   have not proposed to exclude the dealers who then signed a new

25   note with us post-2013.  And as pointed out in our brief, that

1    2013 note was -- is a merger of any prior notes explicitly on

2    its terms.

3            It also contains an arbitration clause with a class

4    waiver whereas in those plaintiffs -- or, excuse me, those

5    proposed class members have agreed to resolve any disputes

6    with NextGear, whether they arose prior to 2013 or thereafter,

7    they've agreed to settle -- or to resolve those -- or to take

8    those in an arbitration proceeding on an individual basis.

9    And so we believe it's entirely inappropriate to include them

10   in this class.  And to the extent the Court is not going to do

11   that, that creates an ascertainability issue.

12           THE COURT:  Okay.

13           MR. McCARTER:  We don't have exact numbers, but it's

14   a huge portion of the dealers that they're talking about, of

15   the 20,000 dealers, maybe as many as half.  So we think that

16   will instantly create confusion and problems to the extent we

17   have to come in and move to compel arbitration on 5,000 to

18   10,000 proposed class members.

19           And I frankly don't quite know how the Court solves

20   that.  I don't know if those are taken one at a time or

21   they're taken in bulk.  It's certainly conceivable that each

22   of those putative class members would have different positions

23   on whether they want to arbitrate.  They may have different

24   experiences on how they got involved with NextGear and whether

25   they were aware of the arbitration clause, that they may want

1  to raise in opposition to a motion to arbitrate.  So I think

2  that creates an ascertainability problem on its face.

3          THE COURT:  Okay.

4          MR. McCARTER:  And within -- I'll go ahead and just

5  while that we're talking about that, I'll say that note also

6  includes damage limitations.  And so if somehow they remain in

7  the class, there would be more complex issues at the damage

8  phase of the trial, sorting out what damages those particular

9  class members are entitled to as opposed to other class

10 members.

11         THE COURT:  Okay.  All right.  Let's talk about, do

12 you agree that class counsel would be adequate?

13         MR. McCARTER:  Yes, ma'am.  We -- obviously, we

14 don't agree that there should be a class, but --

15         THE COURT:  But if --

16         MR. McCARTER:  -- certainly we don't have a

17 particular problem with class counsel.

18         THE COURT:  Okay.  All right.  Let's get started

19 with your presentation.

20         MR. McCARTER:  Sounds good.  And, Your Honor, you

21 hit the nail on the head from the beginning with respect to

22 their constructive fraud and RICO claims.  Those present, we

23 think, insurmountable problems, because those are

24 automatically plaintiff-by-plaintiff, dealer-by-dealer

25 focused.  In other words, they're based on supposed

1  representations we did or did not make to those dealers.

2          And even though their theory is that it was an

3  omission and a duty to disclose, there's a hundred

4  different -- by the evidence, there's a hundred different

5  NextGear account representatives and thousands of dealers, and

6  they had continuing interaction over the course of the

7  relationship.  And so, certainly, there may be evidence, on a

8  plaintiff-by-plaintiff basis, that they were told when

9  auctions got paid and/or that they were aware of that issue.

10          In fact, two of our named plaintiffs were aware of

11  that.  There's undisputed evidence that they became aware of

12  when NextGear paid the auctions behind the scenes during the

13  course of the relationship, and they continued to borrow on

14  hundreds of cars after that.  And so we think that's going to

15  create a particular problem on reliance, a particular problem

16  on showing damages, and we think that's certainly going to be

17  true of many, many, many other class members.

18          So you can look at it from an ascertainability

19  perspective.  Should they be in the class initially?  Or you

20  can look at it in terms of liability.  I mean, that's going to

21  be a -- you know, an issue that would have to be tried for

22  each individual plaintiff.  And we think that's going to be

23  insurmountable here.

24          Your Honor, I would also just point you --

25  obviously, at this point, we filed a motion for summary

1  judgment, as have Plaintiffs, and we've moved on all claims.

2  And the Court can see from that motion that many of the

3  grounds on which we move are specific to these named

4  plaintiffs.  There are grounds such as default judgment,

5  setoff, unclean hands.  And even though there may be a

6  material number of proposed class members who have some of the

7  same issues, it's certainly not the majority.  Mr. Galema's

8  declaration, which was attached to our opposition, shows that.

9          Those are issues that affect a lot of dealers, but

10  nowhere near a majority of the class.  And so we don't think,

11  in that regard, that these particular plaintiffs are typical

12  or adequate to represent good, upstanding dealers who pay

13  their bills, who don't steal cars, who don't write bad checks,

14  and we don't think those absentee plaintiffs, without the

15  opportunity to take care of their own claims, should be

16  saddled with the baggage of these named plaintiffs.

17          And so we would -- you know, this is not a merits

18  hearing, obviously, but the Court is well aware that the Court

19  is empowered to look through to the merits and see what's

20  likely to survive and whether these plaintiffs are good

21  representatives for the rest of the proposed class.

22          And one other sort of overarching point we want to

23  make, Your Honor, is, it's not the merits, but Plaintiffs'

24  theory doesn't add up at all.  We're talking about a situation

25  where they basic -- they had a specific line of credit for the

1   specific purpose of acquiring cars at auction with our

2   voucher, with NextGear's promise to pay the auctions on their

3   behalf.

4          And contrary to what Ms. DeLaney said, NextGear did

5   that in every case.  They paid for the car in every case, and

6   the dealer got exactly what they bargained for.  They took the

7   car without having to pay the auction, and NextGear settled up

8   with the auction behind the scenes.  This is a situation where

9   NextGear did what it was supposed to do, and the dealers did

10  not.

11         And so we think it's absolutely conceivable that

12  some absentee class members would have a better theory.  It

13  could be that they had specific discussions with NextGear

14  outside the contract that led them to believe, you know,

15  differently.  It could be that, you know, there was a specific

16  discussion about what was in the contract, and they were

17  mislead.  I mean, we don't believe that happened on a large

18  scale, but certainly it didn't happen for these plaintiffs.

19         They admitted that there's been -- there was no

20  discussion about when NextGear would pay the auctions at

21  sign-up.  And then, when it came up later, they told the truth

22  and were well aware of the situation.  So we think absentee

23  plaintiffs may actually, theoretically, have better claims

24  than these particular named plaintiffs, and so they shouldn't

25  be saddled with those defenses that are shown in our motion

1   for summary judgment, as well as our answer.

2        There are many other defenses in our answer:  You

3   know, ratification, waiver, estoppel, we've got statute of

4   limitations defenses.  We've raised a number of things in our

5   answer that can be proved at trial that may apply uniquely to

6   these particular plaintiffs and their transactions, that may

7   not apply to the other class members.  And so, you know, it

8   just becomes completely awkward to try to sort that out for

9   tens of thousands of dealers.

10       And, Your Honor, as you know, it is Plaintiffs'

11  burden on all of these issues, you know, on commonality,

12  superiority, numerosity, as well as just showing that they

13  will be adequate as reps, and so we just don't -- we don't

14  think they've met their burden.  Obviously, the Court knows

15  the Court is supposed to do a rigorous analysis of those

16  things, and so to the extent these things remain up in the

17  air, we don't think Plaintiffs have put the evidence forward

18  that would allow the Court to find each of those elements.

19       And, in particular, we think, even though there may

20  be a common issue or two on the language of the contract,

21  those do not predominate over those fraud-based issues we

22  talked about.  Some of those issues may also come up on a

23  contract basis.  You know, there could be a waiver or

24  ratification based on what the plaintiff actually knew.

25       THE COURT:  Are these form contracts --

1            MR. McCARTER:  Your Honor, the --

2            THE COURT:  -- NextGear used when she says all of

3    the claims flow from the same form contract?

4            MR. McCARTER:  Sure.  Certainly there is -- there

5    are forms of the contract.  There were a couple of forms of

6    the NextGear note that were used pre-2013, and there's a

7    post-2013 form we talked about.  In the pre-2013 form,

8    however, there was lots of variation between dealers on

9    exactly what their interest rate would be, exactly what their

10   fee structure would be.  They were -- they had the opportunity

11   to negotiate that.

12           The testimony has been that not a lot of dealers did

13   it, but certainly some did.  At least ten were referenced, and

14   that was an estimate, so there may be -- there may be more

15   that negotiated their specific language in their contract

16   beyond the fees and the interest.  And so even though it's a

17   small number, those will be issues that have to sort out at

18   some point to prove liability.

19           THE COURT:  Okay.

20           MR. McCARTER:  Your Honor, we think choice of law is

21   another issue that will come up.  The pre-2013 note involved a

22   choice of Indiana law for Indiana borrowers, and it

23   involved -- I mean, I'm sorry, for most borrowers.  And it

24   involved a choice of California law for California borrowers,

25   so there will be slight differences in the elements of the

21

1   claims.

2          But, more importantly, there will be differences in

3   the statute of limitations.  I believe that the constructive

4   fraud claim has a six-year statute of limitations in Indiana,

5   but only three in California.  And breach of contract has six

6   in Indiana and four in California.  So there will be complex

7   issues.  There's a number of California borrowers that will

8   have different statute of limitations applying to their

9   claims.

10          Remember, Plaintiffs have made this discovery rule

11  argument, suggesting that they didn't know when we paid the

12  auctions behind the scenes.  And, again, it's because it

13  didn't matter to them.  But, to that extent, you know, when

14  the particular class member discovered this issue will vary

15  between the class members, and how far we can go back within

16  the statute of limitations will change between those states.

17  So you've got both a discovery rule issue on every potential

18  class member, and you've got a choice of law issue on the

19  California class members.  In that -- in those circumstances,

20  we just don't think the class is sufficiently cohesive to

21  warrant adjudication by these particular plaintiffs.  That's

22  from this Court's *Cox v. Sherman Capital* ruling.

23          I want to also speak to damages, and I think -- I

24  think this is mostly under the superiority argument, but we

25  heard Ms. DeLaney say that there are NextGear records that

1  will show all the transactions, it will show the interest

2  charged on each, and will show the date the auction was paid.

3  However -- and this is actually conceded in their briefing.

4  You can see it.  They can see that those reports were

5  specially prepared for this case to answer specific discovery,

6  including interrogatories, about these plaintiffs.

7          There is no -- and the evidence from the depositions

8  is clear, there is no NextGear record that has all that

9  information.  NextGear took multiple sources of information,

10 compiled those reports, which took several weeks to put

11 together, and quality control, and made sure they were

12 accurate, because, keep in mind, they're taking interest and

13 fee information from one place and they're taking payments to

14 auctions from a different place, because those auctions are

15 often paid in bulk, you know, over all dealers that are due

16 for payment.  And so they had to join those together and put

17 them in one report.

18          And to try to do that for 20,000 plaintiffs over

19 several weeks at a time will take a massive amount of effort

20 from NextGear, but it will also take a massive amount of

21 effort from the plaintiffs to review it and to have their

22 expert go through that on a dealer-by-dealer basis.

23          And one very important point is, that report does

24 not include payment information, which, you know, would be the

25 payments from the dealer on those cars.  And what that means

1   is that when payments come in during the course of a car being

2   on a floor plan, the amount to which interest is charged, the

3   principal, is still due, you know, is what we multiply against

4   the interest.  It will drop for each dealer as they make

5   payments.  And that's not reflected or captured in that

6   report, and it will actually change each transaction to get an

7   exact amount of interest charged in those initial days.  You

8   would have to have payment records, and some of those may be

9   in NextGear's possession, but some of them may have to come

10  from each dealer to do an exact calculation.

11          And we solved that for these three named plaintiffs

12  just by stipulating that a per diem rate of interest was close

13  enough, because for these three plaintiffs and their smallish

14  claims, it didn't make that big a difference.  But when we're

15  talking about, you know, as many as 15,000 or 20,000 dealers,

16  it will make a difference.  And NextGear has not stipulated to

17  that, and so it's going to be a massive amount of discovery

18  and a massive amount of analysis.

19          THE COURT:  Okay.

20          MR. McCARTER:  Okay.  One other point I want to make

21  in passing is, there's been some talk about the statements

22  that NextGear provided to the dealers, and we made this point

23  in our motion for summary judgment.  Those statements, under

24  the contracts at issue, are supposed to be definitive.  The

25  agreement was written in a way so that if a dealer got that

1  statement, it could look at it, it could decide if it was

2  correct or not, it could ask questions about it.  And then if

3  he didn't, it would become definitive and binding between the

4  parties.

5          And so, as a substantive matter, we think that's

6  going to resolve Plaintiffs' contractual claims.  But there

7  may be variation among the dealers on how often they got

8  those, whether they filed objections or made objections to

9  those, and so that's another issue that would have to be

10  discovered into with each dealer and proved on each dealer.

11          Your Honor, I apologize.  We've gone fast.  I'm

12  trying to make sure I didn't miss anything.

13          THE COURT:  Okay.

14          MR. McCARTER:  One other point I did want to make on

15  damages.  Even though Ms. DeLaney suggested that these are

16  fairly small amounts of damages for each plaintiff, their

17  briefing suggests tens of thousands of dollars of overpaid

18  interest and fees for each of the putative class members.

19  This is in their motion, in their reply brief.  And that is

20  before any punitive damages or trebling based on their fraud

21  or RICO theories.  And so we certainly believe there's more

22  than adequate incentive for each of the absentee class members

23  to pursue their claims if they're so inclined.  Those damages

24  are, you know, far and above, we've believe, what's typical

25  for a class action in a case like this.

1          THE COURT:  Okay.

2          MR. McCARTER:  Another point, Your Honor, is on --

3    even though they've suggested that all claims flow through the

4    contract, that's not what their complaint has said, it's not

5    what their briefing has said today, and it's not what their

6    discovery responses have said.

7          Even though the tortious interference claim is gone,

8    previous discovery from Plaintiffs suggest that supposed

9    blacklist -- blacklisting of each plaintiff, as well as each

10   class member, is part of their RICO claim.  And maybe they're

11   ready to abandon that here today, I don't know, but previously

12   they said the blacklisting supported their RICO claim.

13         And, as we pointed out in our briefing in

14   Mr. Galema's declaration, that absolutely would vary by

15   dealer.  Most of our borrowers are still perfectly in good

16   standing and -- with us, as well as everybody else.  And we

17   pointed out, any that are not, at most, they would have been

18   reported to an independent agency, which would have made the

19   decision on whether they went in what's called their KO Book,

20   their uninsurable list.  And then it remains up to every

21   auction and lender out there whether to do business with those

22   dealers.  And so if blacklisting is still part of Plaintiffs'

23   complaint, then certainly that's going to vary by every absent

24   class member.

25         THE COURT:  Okay.

1              MR. McCARTER:  Your Honor, anything else before I

2    go?

3              THE COURT:  Nothing else.

4              MR. McCARTER:  Okay.  Thank you very much.

5              THE COURT:  Thank you.

6              And, Ms. DeLaney?

7              How much time does she have, John?

8              MS. DeLANEY:  I think I have about seven --

9              THE COURT:  Seven and a half.

10             MS. DeLANEY:  Okay.

11             THE COURT:  All right.

12             MS. DeLANEY:  Great.  Okay.  So, in no particular

13   order, the post-2013 contract that is outside the class

14   definition added language to specifically fix the very problem

15   that we're here about now, which is why the post-2013 contract

16   claims are out of the class.  So that's not relevant.

17             To the extent that there are people who are within

18   the class definition, who also signed the post-2013 contract,

19   we don't have a motion to compel arbitration that's been

20   filed.  The case has been pending for years.  This is a

21   hypothetical problem that is readily fixed if it's a real

22   problem.

23             But if I were representing NextGear, I think it

24   might make a lot of sense to have one court decide all 20,000

25   claims rather than doing 10,000 individual arbitrations, which

27

1   is going to be far more expensive, time-consuming, and costly

2   for everyone.  So this arbitration clause argument is a

3   complete red herring.  We're not here on a motion to compel

4   arbitration.  It's not relevant to class certification.

5          In terms of the choice of law issue with regard to

6   California contracts, we have no idea how many people have

7   California contracts.  That information has not been provided

8   to us during discovery, it hasn't been provided in briefing to

9   the Court.  So I don't know whether there's a single person or

10   single used car dealer who would fall within the California

11   choice of law provision.

12          But, even if there is, that is readily addressed

13   through a subclass.  So we have a class of nationwide dealers

14   and then we have a subclass of California dealers who have

15   California law applicable to them.  So that is not at all a

16   barrier to class certification.

17          The notion that there might be better named

18   plaintiffs out there who we haven't found yet, again, is a

19   problem that has a ready fix if -- to the extent that it

20   exists, and that's the opt-out process.  If there are dealers

21   out there who think they have different or better claims than

22   we have brought in this case, then they are free to opt out of

23   the class and pursue their own individual claims.  That's what

24   the opt-out process is all about.  So, again, that's a problem

25   that doesn't exist.  And to the extent it does, there's a

1   ready fix built into the Rule 23 process.

2               THE COURT:  What about the blacklisting --

3               MS. DeLANEY:  Well, the blacklisting --

4               THE COURT:  -- allegations in the RICO claim?

5               MS. DeLANEY:  Right.  The blacklisting claims have

6   been dismissed out of the case, so it reminds me of someone

7   who recently won an electoral college vote and keeps talking

8   about it.  Those claims are done.  We don't -- they're not

9   part of the claims that we're seeking class certification on.

10  So, again, it's a red herring.

11              And I agree that the damages sought by each used car

12  dealer in the class will hopefully dwarf the type of consumer

13  fraud class action damages that the Court sees more commonly,

14  but it's not cost-effective for anyone to bring a case about

15  $10,000 in federal court.  I mean, that's what the class

16  method is for.

17              With regard to the damages calculation, we did have

18  a stipulation that the per diem method was appropriate for the

19  three named plaintiffs.  We haven't asked for that stipulation

20  yet on a class-by-class basis because we don't have a class

21  yet, but we do have testimony from the company's 30(b)(6)

22  witness that the per diem calculation method is "very

23  accurate."  So we don't think that there's a real issue here

24  about calculating damages.

25              And while I understand the argument is that these

1  transaction reports were prepared for purposes of litigation

2  and responding to discovery, so what?  It's in the company's

3  database.  They generated the reports.  They don't dispute the

4  accuracy of the reports or the feasibility of using those

5  reports to calculate damages on an individual-by-individual

6  basis.

7        And I can't imagine that it would be more efficient

8  or cost-effective to go through the same process of generating

9  an individual report like that 20,000 times instead of doing

10  it once, where you select all 20,000 people and do it one time

11  instead of over and over and over again.  So, again, the class

12  method is the best, most efficient way to address these

13  claims.

14        I think that covers the points that I intended to

15  respond to.  If the Court has any questions, I would be happy

16  to try to answer them.

17        THE COURT:  No, I have no further questions.

18        MS. DeLANEY:  Okay.  We would be happy to submit a

19  proposed order that's more detailed if the Court so desires.

20        THE COURT:  No.  We're good.

21        MS. DeLANEY:  Okay.  Thank you very much.

22        THE COURT:  All right.  You all have been very

23  helpful, Counsel, and we will get you a ruling as soon as

24  possible.  Anything further from the plaintiffs for today?

25        MS. DeLANEY:  No.  Thank you, Your Honor.

1          THE COURT:  Anything further from the defendants?

2          MR. McCARTER:  No.  Thank you, Your Honor.

3          THE COURT:  Okay.  This hearing is adjourned, and

4     thank you very much for your great oral arguments.

5          THE COURTROOM DEPUTY:  All rise.

6          (Proceedings adjourned at 10:41 a.m.)

7

8               CERTIFICATE OF COURT REPORTER

9

10       I, David W. Moxley, hereby certify that the

11    foregoing is a true and correct transcript from

12    reported proceedings in the above-entitled matter.

13

14

15

16    /S/ David W. Moxley_____    May 12, 2017
      DAVID W. MOXLEY, RMR/CRR/CMRS
17    Official Court Reporter
      Southern District of Indiana
18    Indianapolis Division

19

20

21

22

23

24

25