```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF INDIANA
                    INDIANAPOLIS DIVISION

RED BARN MOTORS, INC.,           )
PLATINUM MOTORS, INC.,           )
MATTINGLY AUTO SALES, INC.,      )
YOUNG EXECUTIVE MANAGEMENT &     )
CONSULTING SERVICES, INC.,       )
Individually, and on behalf      )
of other members of the          )
general public similarly         )
situated,                        )
            Plaintiffs,          )
                                 ) Docket No.
            -v-                  ) 1:14-cv-01589-TWP-DKL
                                 )
COX ENTERPRISES, INC.,           ) Class Action
COX AUTOMOTIVE, INC.,            )
NEXTGEAR CAPITAL, INC. f/k/a     )
DEALER SERVICES CORPORATION,     )
successor by merger with         )
Manheim Automotive Financial     )
Services, Inc., and JOHN WICK,   )
            Defendants.          )
```

### THE 30(B)(6) DEPOSITION OF
### NEXTGEAR CAPITAL, INC. f/k/a DEALER SERVICES CORPORATION
### UPON ORAL EXAMINATION OF ADAM GALEMA

The 30(b)(6) deposition of NextGear Capital, Inc. f/k/a Dealer Services Corporation upon oral examination of **ADAM GALEMA,** a witness produced and sworn before me, Tami L. Scott, Notary Public in and for the County of Marion, State of Indiana, taken on behalf of the Plaintiffs at the offices of Bose, McKinney & Evans, 111 Monument Circle, Suite 2700, Indianapolis, Marion County, Indiana, on December 20, 2016, at 8:30 a.m., pursuant to the Federal Rules of Civil Procedure.

**ASSOCIATED REPORTING, INC.**
**251 EAST OHIO STREET, SUITE 940**
**INDIANAPOLIS, INDIANA 46204**
**(317) 631-0940**
**www.associated-reporting.com**

# EXHIBIT 29


53

1           determine the interest paid by Red Barn Motors
2           during the time between January 4th, 2012 and
3           March 9th, 2012 on the Mazda Miata?
4                MR. VINK:  Object to the form.  You can answer.
5    A      That is certainly a calculation that I could perform
6           to come up with that amount of interest paid, or
7           amount of interest accrued.  Excuse me.
8    Q      And that would not be the amount of interest paid;
9           correct?
10   A      Correct.
11   Q      And would that be a precise calculation?
12   A      No.  It would be an estimate.  But again, the total
13          amount listed there is an accurate and precise
14          number.
15   Q      The amount of interest listed there is an accurate,
16          precise number of the interest paid throughout the
17          life of the floorplan loan; correct?
18   A      That's correct.
19   Q      And other than doing a per diem estimate, is there
20          any way to calculate the amount of interest accrued
21          per day on any of these transactions based solely on
22          the information contained in Exhibit 2?
23   A      Again, the information here provides you with most,
24          if not all, of the information that you would need
25          that you could put a presumptive calculation

54

1 together that would come up with a very accurate
2 estimate of that interest.
3 Q So when you say most, if not all, it means it does
4 not contain all the information we need to do that
5 calculation; correct?
6 A As we established before, there are potentially fees
7 here not listed, and again, timing and amount of
8 payments are not listed on this report either.
9 Q And those are necessary to figure out the exact
10 interest charged per day on these floorplanned
11 vehicles; correct?
12 A You would need that to calculate a per day, the
13 exact to the penny, yes. But you could obviously
14 get a per diem.
15 MS. LASKY: All right. Let's take a break.
16 Won't be long.
17 (A recess was taken.)
18 BY MS. LASKY:
19 Q Mr. Galema, can you list for me every variable that
20 Discover uses to calculate the interest listed there
21 on Exhibit 2, please?
22 A Try to give you an exhaustive list. It would be
23 principal amount; interest rate; fees; time, number
24 of days; payment history. I think that's probably
25 about it.

55

| | | |
|---|---|---|
| 1 | Q | And again, payment history would include the date |
| 2 | | and amount of the payments; correct? |
| 3 | A | That's correct. |
| 4 | Q | Now, we talked about the base rate, and is it |
| 5 | | correct that the base rate was 5 percent from |
| 6 | | August 2008 through the end of 2013? |
| 7 | A | That's correct. |
| 8 | Q | So it remained unchanged; correct? |
| 9 | A | Correct, uh-huh. |
| 10 | Q | I'm going to turn now to, do you recall executing a |
| 11 | | declaration or affidavit -- I can't remember what it |
| 12 | | was filed as -- a declaration in this case? |
| 13 | A | Declaration, yes. |
| 14 | Q | I'm going to mark that as Exhibit 4. |
| 15 | | (Deposition Exhibit 4 marked for |
| 16 | | identification.) |
| 17 | Q | And I know you testified, you were asked some |
| 18 | | questions about this at your individual deposition. |
| 19 | | I want to turn to number 9, which is on the second |
| 20 | | page. |
| 21 | A | Okay. |
| 22 | Q | "From January 2005 through July 2013, various |
| 23 | | customers of MAFS and DSC signed materially |
| 24 | | different versions and subsets of MAFS' and/or DSC's |
| 25 | | respective agreements." |

56

```
 1             I just want to focus on the DSC agreements for
 2        purposes of this question.
 3   A    Sure.
 4   Q    What agreements did you look at in order to make the
 5        statement that DSC customers signed materially
 6        different versions of DSC agreements?
 7   A    I have seen agreements for many of our dealers, and
 8        I'm familiar with the term sheets for each of our
 9        dealers and know them to be different.
10   Q    And when you say the term sheets, that would be what
11        is reflected under the "Term Plan Description"
12        column on Exhibit 2; is that correct?
13   A    That's correct.
14   Q    So all of the different information in the different
15        versions of the term sheets would be reflected in
16        the "Term Plan Description" of Exhibit 2; is that
17        correct?
18   A    Can you repeat that?  Excuse me.  Sorry.
19   Q    That's okay.  All of the relevant information from
20        the term plans, the different term plans executed by
21        the DSC customers, that would all be included in the
22        "Term Plan Description" column of Exhibit 2; is that
23        correct?
24   A    Correct.
25   Q    And you say in the second sentence of number 10,
```

57

1        "Interest rates and fees varied by customer and by
2        particular financing program."  And again, were the
3        interest rates and fees, are those reflected in the
4        "Term Plan Description" column of Exhibit 2?
5    A   Yes.
6    Q   And we've established that prior to August of 2008,
7        so is that up to and including July of 2008 that you
8        used the *Wall Street Journal* prime rate as the base
9        rate?
10   A   Yes, I believe that's true.
11   Q   And then as of August 1st, 2008 through the end of
12       2013, the base rate was 5 percent; correct?
13   A   Correct.
14   Q   And then on 11, you say, "The agreements" -- and
15       again, I just want to focus on DSC -- that DSC used
16       "were substantially and independently revised at
17       least twice since 2007 and have also been revised
18       for specific customers, after negotiation with those
19       customers, on numerous other occasions."
20            Have you reviewed the deposition testimony of
21       anyone else in this case, other than your own?
22   A   No.  I've only reviewed mine.
23   Q   Now, Mr. LaBauve testified -- do you know who he is?
24   A   Yes.
25   Q   That the promissory note, the Demand Promissory Note

58

1           and Security Agreement that DSC used during the
2           relevant time period was a take-it-or-leave-it
3           contract.  Do you understand what is meant by a
4           take-it-or-leave-it contract?
5                MR. VINK:  Objection to the form.  You can
6           answer.
7    A      Yeah, in a general sense, I would understand what
8           that means.
9    Q      Do you, on behalf of NextGear/DSC, have any
10          knowledge of the Demand Promissory Note and Security
11          Agreement, any of the terms in the Demand Promissory
12          Note and Security Agreement being individually
13          negotiated -- not including the Term Sheet -- the
14          Demand Promissory Note and Security Agreement, the
15          individual terms being individually negotiated with
16          any dealers during the relevant time period?
17   A      They are generally not.  It is generally a
18          take-it-or-leave-it.  I am aware that there have
19          been instances where certain points of that contract
20          and agreement have been negotiated.
21   Q      Do you have any specifics on those negotiations?
22   A      I was not involved in them directly.
23   Q      Do you know how many times that terms on the Demand
24          Promissory Note and Security Agreement were changed
25          for individual dealers?

59

1   A    I'm not familiar with the number exactly, no.

2   Q    Do you think it was less than ten?

3   A    Hard to say.  It's probably around that number.

4   Q    And do you know how many Demand Promissory Notes and

5        Security Agreements were signed with DSC between

6        2005 and 2013?

7   A    The exact number, I do not know.  There would have

8        been, just to give you an estimate, complete

9        estimate, maybe around, it's hard to say, 20,000

10       during that time frame.

11  Q    So it's your belief that there were maybe around ten

12       out of the around 20,000 that the terms of the

13       Demand Promissory Note and Security Agreement were

14       negotiated; correct?

15         MR. VINK:  Before you answer, I'm just going to

16       object.  I think we're outside of the scope of the

17       30(b)(6), but you're free to answer in your

18       individual capacity.

19         THE WITNESS:  Okay.  Can you read that back?

20         (The requested material was read back by the

21       reporter.)

22  A    Yes.  That would be an accurate estimate.

23         MS. LASKY:  I would just state for the record

24       that I think this falls within Topic 19, which is

25       the factual assertions and allegations made in the

60

1            litigation, so.
2                 MR. VINK:  I understand, but as you know, we
3            objected to that, and I stand by my objection.  He's
4            already answered, so it's largely academic.
5                 MS. LASKY:  That's fine.
6       Q    Turning back to Exhibit 2 for a minute, please.  And
7            Topic 15 is all information and documents that
8            NextGear provided or made accessible to the named
9            plaintiffs during their customer dealer relationship
10           with NextGear, including, but not limited to, all
11           information and documents that were available
12           through the Discover system.
13                So my question is, was that "Total for" line on
14           Exhibit 2 available to any of the customer dealers
15           through the Discover system or any system that they
16           had access to while they were customers of
17           NextGear/DSC?
18      A    Dealers do not have access to that, the date on
19           which payments are made to the -- in auction or
20           buyer.
21      Q    And are you aware of any -- when I use the term
22           "account executive," do you know what I'm referring
23           to?
24      A    Yes.
25      Q    What is an account executive?

61

| | | |
|---|---|---|
| 1 | A | They're our field reps that manage the relationships |
| 2 | | with our dealer clients. |
| 3 | Q | Are you aware of whether the account executives have |
| 4 | | access to the information on when payments are made |
| 5 | | to the auctions or other sellers of floorplanned |
| 6 | | vehicles? |
| 7 | A | I'm not sure.  I believe that they could get that |
| 8 | | information, you know, being an employee of the |
| 9 | | company and having access to the data. |
| 10 | Q | Do you have any information to contradict |
| 11 | | Mr. LaBauve's testimony that he was not aware of |
| 12 | | when payments were made to the auctions for |
| 13 | | floorplanned vehicles? |
| 14 | A | No.  In fact, I would agree with him.  You know, |
| 15 | | it's not something that they, as an account |
| 16 | | executive, that they would know about or pay |
| 17 | | attention to or even desire to know.  It's not |
| 18 | | anything that's put in front of them for them to be |
| 19 | | aware of. |
| 20 | Q | So if it's not put in front of the account |
| 21 | | executives, it's not information that they are |
| 22 | | providing to the customer dealers; correct? |
| 23 | A | Yeah.  I mean, there is no reason really for the |
| 24 | | dealer to know, I guess, when payments are made, but |
| 25 | | that would be correct. |

62

1  Q    So you don't think that it's relevant to the
2       customer dealer to know when NextGear's actually
3       making payments on their behalf?
4  A    No.  I don't think so.
5  Q    Why is that?
6  A    I mean, you know, they're using our services from
7       day one.  You know, it's the same way, I guess, that
8       I don't really care, if I'm making a purchase with
9       my credit card, I don't know or even care to know
10      when the credit card company pays the vendor or
11      where I purchased my gas or whatever it is, you
12      know.  So it doesn't seem like it would be
13      relevant --
14 Q    But are you --
15 A    -- information.
16 Q    I'm sorry.  I didn't mean to interrupt.
17 A    That's okay.
18 Q    Are you being charged interest on your credit card
19      purchases from the date that you make the purchase?
20 A    Yeah, could be.
21 Q    What if you pay it off when you get your statement,
22      are you being charged interest on that purchase?
23 A    No.
24 Q    But the dealers were being charged interest from the
25      date that they floorplanned, regardless of whether