IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RED BARN MOTORS, INC., PLATINUM MOTORS, INC., and MATTINGLY AUTO SALES, INC., individually and on behalf of other members of the general public similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COX ENTERPRISES, INC., COX AUTOMOTIVE, INC., NEXTGEAR CAPITAL, INC. F/K/A DEALER SERVICES CORPORATION, successor by merger with Manheim Automotive Financial Services, Inc., and JOHN WICK,<br><br>Defendants. | Case No. 1:14-cv-01589-TWP-DKL |

## EXPERT REPORT OF JEFFREY D. WIDHOLM

### A. Qualifications (Including Publications and Prior Expert Testimony)

I am the Chief Financial Officer for Morales Group in Indianapolis. I have held this position for 12 months. I have been employed in the used motor vehicle inventory financing (floorplanning) industry for approximately 15 years, including 10 years with Automotive Finance Corporation. I also was the Chief Financial Officer for one of the largest new car dealers in the state of Indiana. I hold a Bachelor of Science Degree from the University of Illinois, Champaign-Urbana and a Masters of Business Administration from Indiana University, Indianapolis. My resume is attached hereto as Appendix A.

In the preceding four years I have not testified as an expert at trial or deposition. I have not authored an article or publication in the past 10 years.

**EXHIBIT 30**

Since lending to independent car dealers is much riskier than lending to new car dealers, most banks do not provide floorplanning to this sector of the industry. Also, banks are not set up to do the extra monitoring required. Since the risk is so much greater, the well managed and thus long term providers utilize several critical policies and procedures to protect them.

Floorplanners like NextGear typically pay the seller of the vehicles as opposed to paying the dealer directly. Most often, this means paying an auto auction directly. This ensures the funds are purchase money, which makes the loan more secure than non-purchase money floorplanning. Also, this method assures the floorplanner that proceeds from the flooring are getting to the seller and not being diverted by the dealer to other unapproved sources. Following receipt of payment, the auction sends the floorplan lender the vehicle title directly so that the dealer cannot be in the title flow and use the title in an unapproved manner. In addition, the auction sends the bill of sale to the floorplan lender so that the lender can see what the dealer paid for the vehicle. It is risky to get the bill of sale from the dealer because it can be altered for a higher value in order to get more floorplan funds from the lender. When an auction purchase occurs and the title is not present, there is a chance the transaction could get unwound. This is one reason the flooplanner often does not send funds to the auction when title is not present.

The most important security for the loan is the vehicle itself. Although floorplanner's typically receive broad collateral rights from the borrower, once a floorplanned vehicle is released to the dealer, it is at risk of being sold out of trust to a retail or other buyer. Notwithstanding that risk, floorplanners are typically still obligated to fund the auction source.

### D. Interest Claim In This Lawsuit.

Based on my experience in the independent dealer floorplan industry, it is a common and accepted practice for floorplanners to charge interest and curtailment fees at the time of floorplanning. This is true regardless of when the floorplanner sends funds to the auction. This

is also true regardless of whether the title is present or not at the auction. There are many reasons titles are not present, but the usual scenario is due to a retail lender holding the title on behalf of the selling dealer.

One justification for this practice is that the floorplanner has a commitment to advance funds to the auction on behalf of the dealer on the date of purchase. At that point the floorplanner is at risk of nonpayment by the dealer and the loss of its vehicle collateral. At this point, the dealer also gets the benefit of the bargain because it can take possession of the vehicle. There is also some administrative burden associated with providing information to the auction on behalf of the dealer. For example, the floorplanner is sending the auction certain reports showing the dealer's credit availability. The floorplanner is often in verbal or electronic dialogue, automated or otherwise, with the auction house related to the dealers' availability in terms of how much they can buy at the auction before they exceed their credit limit.

This practice of charging interest on unfunded liabilities is not unique to the independent dealer floorplan industry. It is particularly common with the financing of acquisition of goods. When a consumer purchases a car at a dealership and finances such vehicle with the dealer or a finance company (indirect financing), the interest starts accruing as soon as the contract is signed. This occurs even though often times the dealership is not paid by the finance company for the vehicle that was just purchased by the consumer for several days or weeks later. There are a variety of reasons why the finance company does not pay the dealership immediately. Mostly this is due to the travel time of the documents getting to the finance company so that they can input the data in their computer system for funding and deliver payment.