UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

RED BARN MOTORS, INC.,
PLATINUM MOTORS, INC.,
MATTINGLY AUTO SALES, INC.,
YOUNG EXECUTIVE MANAGEMENT &
CONSULTING SERVICES, INC.,
Individually, and on behalf
of other members of the
general public similarly
situated,
      Plaintiffs,      Docket No.
                               1:14-cv-01589-TWP-DKL
 vs.

COX ENTERPRISES, INC.,     Class Action
COX AUTOMOTIVE, INC.,
NEXTGEAR CAPITAL, INC. f/k/a
DEALER SERVICES CORPORATION,
successor by merger with
Manheim Automotive Financial
Services, Inc., and JOHN WICK,
      Defendants.

   The deposition upon oral examination of

**JEFF WIDHOLM**, a witness produced and sworn before me,

Paula A. Morgan, Notary Public in and for the County

of Hamilton, State of Indiana, taken on the 21st day

of April, 2017, in the offices of Bose, McKinney &

Evans, 111 Monument Circle, Suite 2700, Indianapolis,

Marion County, Indiana, pursuant to the Federal Rules

of Civil Procedure.  This deposition was taken on

behalf of the Plaintiffs in the above-captioned

matter.

ASSOCIATED REPORTING, INC.
251 East Ohio Street, Suite 940
Indianapolis, Indiana 46204
(317) 631-0940
www.associated-reporting.com

**EXHIBIT 31**

1      AFC lend to independent dealers?
2   A  Yes.
3   Q  Okay.  And AFC is still in business today, correct?
4   A  Yes.
5   Q  Okay.  So other than AFC, during your career, what
6      other independent dealers did you either do --
7      independent specialty lenders did you do business
8      with?
9           MR. MCCARTER:  Object to form.
10  A  Can you clarify?  Because you said independent
11     dealers.  Do you mean independent floorplan
12     companies?
13  Q  Yes.  I'm sorry.  That was a bad question.
14          All right.  You state in here the leading
15     specialty lenders to independent dealers are NextGear
16     and AFC, correct?
17  A  Correct.
18  Q  What percentage of the market do you think those two
19     entities have, if you know?
20  A  I don't know for sure, but my guesstimate is between
21     50 and 75 percent.
22  Q  And that's for the specialty lenders to independent
23     dealers?
24  A  Correct.
25  Q  Okay.  And then the other 50 to -- or 25 to 50

1       percent apparently is spread out across numerous
2       individual specialty lenders?
3   A   Correct.
4   Q   Okay. And you don't have -- of those numerous other
5       two -- or the 25 or 50 percent that is comprised of
6       numerous specialty lenders to independent dealers,
7       who are some of those companies?
8   A   Some of those include one I worked for, Auction
9       Credit, Car Bucks, Auto Use, Westlake Financial. And
10      I can't remember the name. There's a big one in
11      Oklahoma City. I don't remember the name. A big one
12      being that they're more than just a mom and pop. And
13      that's all I can think of right now.
14  Q   And do, if you know, do most community banks offer
15      some sort of floorplan financing for -- either for
16      the independent dealers for used cars?
17  A   My knowledge is that some do, but it's very bank
18      specific.
19  Q   And you've never, other than the Bank One, never
20      worked for any other banks, correct?
21  A   Correct.
22  Q   What are the ways in which a dealer can floorplan a
23      vehicle?
24          MR. MCCARTER: Object to form.
25  A   Can you clarify?

1  Q  Okay. Dealers would typically -- the independent
2     dealers I'm talking about -- buy vehicles at auction,
3     correct?
4  A  They can buy vehicles anywhere, from consumers, from
5     other -- they can buy them directly from other
6     dealers, or they can buy them through auctions.
7  Q  If a dealer is going to buy -- a used car dealer is
8     going to buy a car from an individual, would that
9     be -- could that transaction be financed on the
10    floorplan?
11 A  It depends on the floorplan lender.
12 Q  Are most transactions with the used car dealers
13    between the used car dealer and the auction houses?
14 A  Yes.
15 Q  And would the second largest group of floorplan
16    transactions be between the dealer and the floorplan
17    company involving dealer-owned inventory?
18        MR. MCCARTER:  Object to form.
19 A  I'm not sure if I understand the question.
20 Q  Okay. If a dealer owns a vehicle that they paid cash
21    for and the dealer wants to take a loan on that
22    vehicle, can they approach their floorplan company to
23    get a loan against the title on that?
24 A  It depends on the floorplan company. They can, but
25    it -- I don't -- every floorplan company has their

| | | |
|---|---|---|
| 1 | | own rules. |
| 2 | Q | And you haven't looked specifically at NextGear to |
| 3 | | see whether that's a typical process that they |
| 4 | | utilize, at least with respect to these named |
| 5 | | plaintiffs? |
| 6 | A | I have not. |
| 7 | Q | At the bottom of paragraph 3 you state it's common |
| 8 | | and accepted practice for floorplanners to charge |
| 9 | | interest and curtailment fees at the time of |
| 10 | | floorplanning, correct? |
| 11 | | MR. MCCARTER: Just to clarify, that's the bottom |
| 12 | | of page 3, not paragraph 3. |
| 13 | | MR. AIREY: I'm sorry. I thought I said page 3. |
| 14 | A | Are you in Section D? |
| 15 | Q | Section D, correct. |
| 16 | A | Could you repeat the question? |
| 17 | Q | I'll just make it a question rather than reading it. |
| 18 | | When does a floorplan company generally start to |
| 19 | | charge interest and curtailment fees? |
| 20 | A | At the time of purchase. |
| 21 | Q | And then you state at the time of purchase it does |
| 22 | | not matter whether the floorplanner would actually |
| 23 | | send funds to the auction at that time or not, |
| 24 | | correct? |
| 25 | A | Correct. |

1    Q    And you're making that statement based upon your
2       experience in the floorplan industry and not anything
3       specific to the plaintiffs in this case, correct?
4    A    Based on my experience at Automotive Finance Corp.
5       and Auction Credit and, through that, the general
6       industry standard, based on what those entities'
7       competitors also did.
8    Q    But that opinion isn't specific to the transactions
9       at issue in this case, correct?
10    A    Could you be more specific?
11    Q    Well, we discussed in Exhibit B the documents 1
12       through 6, correct?
13    A    Uh-huh.
14    Q    And you at least cursory reviewed them, correct?
15    A    Correct.
16    Q    Okay.  You're not -- you're making your opinion that
17       what happens in the auto industry, auto specialty
18       lending industry, with respect to whether funds are
19       advanced prior to -- I'm sorry.  I'll repeat that.
20            Your opinion at the bottom of page 3 that states
21       that it's a common practice for floorplanners to
22       charge interest and curtailment fees at the time of
23       floorplanning is true regardless of when the funds --
24       the floorplanner sends funds to the auction, that's
25       based upon -- that opinion is based upon your

| | | |
|---|---|---|
| 1 | | experience in the industry, correct? |
| 2 | A | Correct. |
| 3 | Q | That's not an opinion about, in this particular case, |
| 4 | | whether the documents between the plaintiffs and |
| 5 | | NextGear allow that practice to occur, correct? |
| 6 | A | I'm not opining on the -- I'm not a lawyer, so I'm |
| 7 | | not opining on what the documents actually say.  My |
| 8 | | opinion is based on the experience of the industry. |
| 9 | Q | Okay.  So there's nothing that would prohibit |
| 10 | | NextGear and the plaintiff from having a contract |
| 11 | | that provided for a different time for interest and |
| 12 | | curtailment fees to commence, correct? |
| 13 | A | Could you repeat the question? |
| 14 | Q | Nothing prohibits the plaintiffs in this case and |
| 15 | | NextGear from charging interest and curtailment fees |
| 16 | | at a time different than the time of floorplanning, |
| 17 | | correct? |
| 18 | A | Well, any floorplanner's documentation is |
| 19 | | different -- could be different.  Depends what the |
| 20 | | arrangement was.  But the -- the standard and most |
| 21 | | common practice is the vehicle is purchased at the |
| 22 | | auction, the dealer has availability to -- |
| 23 | Q | I'd just object to the response of the question.  I |
| 24 | | didn't ask what the standard practice was.  I said -- |
| 25 | | my question was specifically nothing prohibits the |

|  |  |  |
|---|---|---|
| 1 |   | named plaintiffs and NextGear from entering into a |
| 2 |   | contract that provides for a different time for the |
| 3 |   | commencement of interest and curtailment fees than |
| 4 |   | what your opinion of the industry practice is, |
| 5 |   | correct? |
| 6 |   | MR. MCCARTER: And I'll just object to the form |
| 7 |   | and the argumentativeness and that it was asked and |
| 8 |   | answered. Now you can try to answer it again. |
| 9 | A | There -- each individual floorplanner and dealer |
| 10 |   | contract can be individually negotiated. If someone |
| 11 |   | is doing a large volume of cars or someone has good |
| 12 |   | negotiating power, I suppose that there can be some |
| 13 |   | variances from the standard industry practices. |
| 14 | Q | With respect to some of these other examples that you |
| 15 |   | indicate regarding credit card companies, have you |
| 16 |   | ever worked at a credit card company before? |
| 17 | A | No. |
| 18 | Q | Have you ever worked in a business where you were |
| 19 |   | processing payments from a credit card company? |
| 20 | A | No. |
| 21 | Q | Have you ever owned a business where you were |
| 22 |   | processing payments from the credit card company? |
| 23 | A | No. |
| 24 | Q | So what personal experience are you using to make a |
| 25 |   | determination that the credit card companies may take |

```
 1            several days to settle with the merchant behind the
 2            scenes, as stated on page 5 of your report?
 3      A     It's based on the CFPB document, which is not in this
 4            package here.  But based on the -- that document that
 5            I read from the CFPB.
 6      Q     That's not based on any experience you have in the
 7            credit card industry.  That's just based on that
 8            document that you read?
 9      A     Yes.
10      Q     As far as the example in the last paragraph on
11            page 4, when a customer purchases a car at a
12            dealership and finances that transaction, that
13            transaction would be based on the contract that the
14            customer signs with the financing company, correct?
15                 MR. MCCARTER:  Object to form.
16      A     Could you clarify?
17      Q     A customer is purchasing a car at the dealership and
18            finances such vehicle with a dealer finance company.
19            You state the interest starts accruing as soon as the
20            contract is signed, correct?
21      A     Correct.
22      Q     Okay.  That's based upon the language within that
23            contract, correct?
24      A     It's based on the standard industry practice for that
25            industry, which is outlined in the contract.
```