UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
(Indianapolis Division)

| | | |
|---|---|---|
| RED BARN MOTORS, INC., | * | DOCKET NO. 1:14-cv-01589-TWP-DKL |
| PLATINUM MOTORS, INC., | * | |
| MATTINGLY AUTO SALES, INC., | * | CLASS ACTION |
| YOUNG EXECUTIVE MANAGEMENT | * | |
| & CONSULTING SERVICES, INC., | * | |
| Individually, and on behalf of other | * | |
| members of the general public | * | |
| similarly situated | * | |
| | * | |
| v. | * | |
| | * | |
| COX AUTOMOTIVE, INC., | * | |
| NEXTGEAR CAPITAL, INC., | * | |
| F/K/A DEALER SERVICES | * | |
| CORPORATION, successor by merger | * | |
| with Manheim Automotive Financial | * | |
| Services, Inc., and JOHN WICK | * | |

**************************************************************************

**RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.  STATEMENT OF MATERIAL FACTS IN DISPUTE.....................................................1

    A.  NextGear's Floorplan Agreement.........................................................................1

    B.  NextGear's Account Summaries and Defendants' Fraudulent Conduct ................2

    C.  What Plaintiffs Knew or Could Have Known .....................................................4

    D.  Additional Facts Relating to Scheme to Defraud Plaintiffs and Subsequent
        Blacklisting .........................................................................................................7

    E.  Statements about Plaintiffs' Purported Wrongful Conduct ...................................9

II.  LEGAL STANDARD.............................................................................................10

III.  LAW AND ARGUMENT ......................................................................................10

    A.  Defendants are Not Entitled to Summary Judgment on Breach of Contract
        Claim.................................................................................................................10

    B.  Defendants are Not Entitled to Summary Judgment on Constructive Fraud
        Claim.................................................................................................................15

    C.  Defendants are Not Entitled to Summary Judgment on Substantive RICO
        Claim.................................................................................................................18

        1.  Evidence of Racketeering Activity ...........................................................18

        2.  Defendants Conducted/Participated, Directly/Indirectly, in the
            Enterprises' Affairs  ...............................................................................20

        3.  Proximate Cause......................................................................................22

    D.  Res Judicata (Defendants' Affirmative Defense) ..................................................24

        1.  The Default Judgments Do Not Constitute Judgments on the Merits
            as to the Claims Asserted in this Suit......................................................25

        2.  The Claims Asserted Herein Could Not Have Been Determined in
            the State Court Collection Suits...............................................................26

    E.  "Setoff" (Defendants' Affirmative Defense)........................................................28

    F.  "Unclean Hands" (Defendants' Affirmative Defense) .........................................29

IV.   CONCLUSION......................................................................................................32

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Angelopoulos v. Angelopoulos,* 2 N.E.3d 688 (Ind. Ct. App. 2013)...............................25

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) ........................................22

*Ashwell & Co. v. Transamerica Ins. Co.*, 407 F.2d 762 (7th Cir. 1969) ........................2

*Automatic Radio Mfg. Co. v. Hazeline*, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950)...........2

*Bay v. Cassens Transport Co.*, 212 F.3d 969 (7th Cir. 2000)........................................10

*Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633 (7th Cir. 2015) ........................21

*Boyle v. United States*, 556 U.S. 938 (2009) ........................................21

*Bridge v. Phoenix Bond & Indem, Co.*, 553 U.S. 639 (2008) ........................................22, 23

*Bridge v. Phoenix Bond & Indemnity Co.*, 477 F.3d 928 (7th Cir. 2007) .....................23

*Carrell v. Ellingwood,* 423 N.E.2d 630 (Ind.Ct.App.1981)........................................18

*Casey v. Uddeholm Corp.*, 32 F.3d 1094 (7th Cir. 1994) ........................................10

*Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001)........................................21

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................10

*Cohen v. Ayers*, 449 F. Supp. 298 (N.D. Ill. 1978), *aff'd*, 596 F.2d 733 (7th Cir. 1979)................2

*Coppolillo v. Cort*, 947 N.E.2d 994, 1000 (Ind. App. 2011) ........................................29

*Eichenberger v. Eichenberger,* 743 N.E.2d 370 (Ind. Ct. App. 2001) .........................25

*Elite Enters., Inc. v. Liberty Steel Prods., Inc.*, 2009 WL 3822949,
    *10 (N.D. Ind. 11/12/2009)........................................11

*English Coal Co. v. Durcholz*, 422 N.E.2d 302 (Ind. App. 1981)...............................11

*Fairway Developers, Inc. v. Marcum*, 832 N.E.2d 581 (Ind.Ct.App.2005) ..................29

*Fisher v. State,* 878 N.E.2d 457 (Ind. Ct. App. 2007) ........................................24

*French-Tex Cleaners, Inc. v. Cafaro Co*., 893 N.E.2d 1156 (Ind. Ct. App.2008).........................15

*Fritzinger v. Angie's List, Inc*., 1:12-CV-01118-JMS, 2013 WL 772864
    (S.D. Ind. Feb. 28, 2013) .............................................................................15

*Haroco, Inc. v. American Nat'l Bank & Trust Co.*, 747 F.2d 384 (7th Cir. 1984) .......................22

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992)..................................22

*Illinois Dep't of Revenue v. Phillips*, 771 F.2d 312 (7th Cir. 1985) ..............................................22

*Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466 (7th Cir. 2007) ..........................................18

*LDT Keller Farms, LLC v. Brigitte Holmes Livestock Co., Inc.*, 722 F.Supp.2d 1015
    (N.D. Ind. 2010)................................................................................................18

*McFreen v. Alcatel-Lucent USA, Inc.*, 2014 WL 6997843, *2 (S.D. Ind. Dec. 10, 2014) ...........27

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967 (7th Cir. 1995)...............20

*Moore v. PaineWebber, Inc.*, 189 F.3d 165 (2d Cir. 1999) ...........................................................22

*MPACT Const. Grp., LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901
    (Ind. 2004).......................................................................................................14

*Nikish Software Corp. v. Manatron, Inc.*, 801 F. Supp. 2d 791 (S.D. Ind. 2011) ........................13

*Norwood Promotional Products, LLC v. KustomKoozies, LLC*, 835 F. Supp. 2d 685
    (S.D. Ind. 2011) ............................................................................................13

*Reves v. Ernst & Young*, 507 U.S. 170 (1993) ..............................................................................20

*RWB Servs., LLC v. Hartford Computer Group, Inc.*, 539 F.3d 681 (7th Cir. 2008)...................22

*Sedima, S.P.R.L. v. Imrex Co.*, 474 U.S. 479 (1985) .....................................................................18

*Shellbird, Inc. v. Grossman*, 2010 WL 2985208, *4 (S.D. Ind. 7/23/2010) .................................10

*State Exch. Bank of Culver v. Teague*, 495 N.E.2d 262 (Ind. Ct. App. 1986).............................25

*Tharp v. Catron Int. Sys., Inc.*, 2016 WL 7210940, at *3 (S.D. Ind. Dec. 12, 2016) ...................29

*Tobin v. Ruman*, 819 N.E.2d 78 (Ind.Ct.App.2004) ......................................................................15

*U.S. Automatic Sprinkler Co. v. Reliable Automatic Sprinkler Co.*, 2008 WL 474234, *7 (S.D. Ind. Feb. 15, 2008) ...................................................................24

*United States v. Coleman Capital Corp.*, 295 F.Supp. 1016 (N.D.Ill.1969) ...................................2

*Van Den Biggelaar v. Wagner,* 978 F. Supp. 848 (N.D. Ind. 1997) ..........................................24, 25

*Wagner v. Estate of Fox*, 717 N.E.2d 195 (Ind.Ct.App.1999) .......................................................29

*Wehling v. Citizens Nat. Bank,* 586 N.E.2d 840 (Ind. 1992) ..........................................................27

*Wimberly v. Clark Controller Co.*, 364 F.2d 225 (6th Cir. 1966) ...................................................2

*Zerante v. DeLuca,* 555 F.3d 582 (7th Cir. 2009) ...........................................................................10

## Statutes

18 U.S.C. § 1343 .......................................................................................................................20, 23

18 U.S.C. § 1962 .........................................................................................................18, 20, 22, 24

18 U.S.C. § 1964 ..............................................................................................................................22

## Rules

Fed. R. Civ. Proc. 56 ......................................................................................................................10

Ind. Trial Rule 13(A) ....................................................................................................................26

## Other Authorities

Black's Law Dictionary .............................................................................................................12

Plaintiffs, Red Barn Motors, Inc., Platinum Motors, Inc., and Mattingly Auto Sales, Inc., submit this Memorandum in Opposition to the Motion for Summary Judgment ("Motion") filed by Defendants (Dkt. 192, 193). For the reasons detailed herein, the Motion should be denied.

## I. STATEMENT OF MATERIAL FACTS IN DISPUTE

Defendants' 20-page "Statement of Material Facts Not in Dispute" improperly strays from the actual facts into argument. As set forth below, there are critical facts in dispute that preclude summary judgment in this case.

### A. NextGear's Floorplan Agreement

Contrary to Defendants' statement, NextGear did not allow Plaintiffs to floorplan vehicles for free; rather, NextGear is a "fee-generated business" and charges a host of fees beginning on the flooring date and at various times thereafter. *See, e.g.,* Deposition of NextGear 30(b)(6) Corporate Representative ("NextGear Dep.) [Ex. 1] 9:15-9:19; [Ex. 2] (Ex. 10 to NextGear 30(b)(6) Dep.) (fee schedule redacted by NextGear); Deposition of Lourdes Givens Dep. ("Givens Dep.") [Ex. 3] 58:18-23.[1]

NextGear's floorplan agreement was a form, or "take-it-or-leave-it" contract created by NextGear, and specifically by Defendant John Wick. *See* NextGear 30(b)(6) Dep. [Ex. 1] 58:9-59:10 (the Demand Promissory Note and Security Agreement is "generally a take-it-or-leave-it"

---

[1] Indeed, during the applicable time period, NextGear's fee revenue generally outpaced its interest revenue and in 2012 that fee revenue exceeded $100 million. *See* NextGear 30(b)(6). Dep., 111:22-112:11.

contract); Deposition Excerpt of John Wick [Ex. 4] 96:7-98:22.[2] In 2013, NextGear began using a revised version of its contract.[3]

**B. NextGear's Account Summaries and Defendants' Fraudulent Conduct**

For purposes of this litigation, NextGear created and produced account summaries containing certain information pertaining to each of Plaintiffs' transactions with NextGear. *See* Deposition of Adam Galema ("Galema Dep.") [Ex. 6] 25:10-26:17; 17:18-23 (the account summaries report was "created for this case"); NGR_000001-000035 ("Account Summaries") [Ex. 7] (Dkt. 165-4).[4] The Account Summaries contain, among other information, the "Flooring Date" and the "Total For" date for each of Plaintiffs' transactions with NextGear. *See* NGR_000001-000035 [Ex. 7]. The "Flooring Date" was the date on which Plaintiffs placed a vehicle on their

---

[2] While Plaintiffs do not dispute the language in their contracts, Defendants' interpretations of that language are disputed. *See* Section III(A) *infra*. The assertions contained in the affidavits of Galema, Jeff Modjeski, and Chuck Warner as to NextGear's "obligation" to the auctions (*see, e.g.,* Dkt. 197-24 at ¶¶ 10-11; Dkt. 197-26 at ¶¶ 4-6; 197-28 at ¶ 4-6) are merely legal conclusions or arguments going to the interpretation of the contract, and should be disregarded by the Court. *See Cohen v. Ayers*, 449 F. Supp. 298, 321 (N.D. Ill. 1978), *aff'd*, 596 F.2d 733 (7th Cir. 1979) ("An affidavit may be disregarded if it contains conclusions of law or of ultimate fact, *Ashwell & Co. v. Transamerica Ins. Co.*, 407 F.2d 762 (7th Cir. 1969); statements made upon information and belief, *Automatic Radio Mfg. Co. v. Hazeline*, 339 U.S. 827, 831 (1950); or argument, *United States v. Coleman Capital Corp.*, 295 F. Supp. 1016, 1021 (N.D. Ill. 1969). If admissible facts and inadmissible statements are mingled in the same affidavit, the court may rely on the facts and disregard the rest. *Wimberly v. Clark Controller Co.*, 364 F.2d 225, 227 (6th Cir. 1966)."). Also, Defendants' statements in the brief and declarations as to their "obligations" to the auctions are not facts but arguments about the interpretation of contracts between NextGear and the auctions, which are not before this Court.

[3] *See* Declaration of Adam Galema, Dkt. 160-2 at ¶ 12 and agreement attached as Exhibit A thereto, Dkt. 160-3 ("2013 Agreement"). The 2013 Agreement purportedly allowed interest to be charged from the floorplan date. *See* sample 2013 Floorplan Agreement (Addendum to Demand Promissory Note and Loan and Security Agreement and attached documents) [Ex. 5] (NG_005148), Demand Promissory Note and Loan Security Agreement, § 3(a) (providing, in pertinent part, that "All outstanding Liabilities relating to a Floorplan Advance or a Receivable Advance shall accrue Interest on a per annum basis from the Floorplan Date or the Receivable Origination Date, as the case may be...") and (NG_005161) (Appendix A), (24) (defining "Floorplan Advance" as "an Advance made pursuant to this Note relating to a Unit of Inventory to be offered for sale, lease or rent, or leased or rented by Borrower in the Ordinary Course of Business") and (25) (defining "Floorplan Date" as "(a) for a Universal Source Purchase, the sale date, regardless of the date the Floorplan Advance is actually requested or funded; and (b) for a Specific Source Purchase, the date the request for the Floorplan Advance is received by Lender, regardless of the date such Floorplan Advance is actually funded."). Tellingly, the earlier versions of the Floorplan Agreement contained no such language; instead simply providing that interest shall accrue on all outstanding liabilities "on a per annum basis." *See* Dkt. 117-1, -3, and -4; Answer, ¶ 39 (Red Barn); ¶ 55 (Platinum); and ¶ 64 (Mattingly).

[4] As shown by the Account Summaries, in all, NextGear conduct 524 transactions with Red Barn. LaBauve Dep. [Ex. 8] 195:11-19; Dkt. 117-2; NGR_000011-000033 [Ex. 7] ("Red Barn Account Summaries"). Mattingly and Platinum conducted 164 and 21 transactions with NextGear, respectively. *See* NGR_000001-000010; NGR_000034-000035.

floorplan, or "floorplanned" a vehicle. *See* NextGear 30(b)(6) Dep. [Ex. 1] 9:12-14. The "Total For" date was the date on which NextGear transferred cash to the seller on Plaintiffs' behalf (typically an auction). *See* Galema Dep. [Ex. 6] 38:8-14.

NextGear charged Plaintiffs interest beginning on the Flooring Date.[5] Importantly, the floorplan date sometimes occurred days or weeks *before* NextGear made payment to an auction on a customer dealer's behalf, and, on several transactions, NextGear did not even fund the loan (*i.e.* pay the seller/auction house) for the vehicle until *after* the customer dealer paid NextGear for the "loan."  *See* NGR_000001-000035 [Ex. 7]; NextGear 30(b)(6) Dep. [Ex. 1] 96:2-9; LaBauve Dep. [Ex. 8] 187:16-191:2. In other words, on many transactions evidenced on NextGear's internal documentation (NGR_000001-000035) [Ex. 7], NextGear <u>did not loan any money</u> (*i.e.* fund the sale) *until after* the customer dealer paid NextGear the entirety of the loan principal, interest, and curtailment fees. *See* NGR_000001-000035 [Ex. 7]; LaBauve Dep. [Ex. 8] 189:23-190:3 (Q. So on that transaction, if "Total for" is the date of advance- - A. Uh-huh. Q. - - that would mean on that particular transaction <u>DSC never paid the auction</u>?  A. According to that assumption, <u>that's correct</u>.) (emphasis added); *see also* NextGear 30(b)(6) Dep. [Ex. 1] 57:8-13.

In the Floorplan Agreements, NextGear represented that Plaintiffs would not be charged interest until NextGear paid for the vehicles.[6] Yet, NextGear, along with its parent company, Cox

---

[5] *See* NextGear's First Amended Responses and Objections to Plaintiffs' First Set of Written Discovery, dated September 27, 2016 [Ex. 9]; Responses to Requests for Admission 3, 4, and 5 (in response to requests relating to the timing of interest charges to Red Barn, Platinum, and Mattingly, respectively, stating that "NextGear generally began to charge interest as of the floor plan date") (emphasis added); NextGear Dep. [Ex. 1]9:12-14 and 96:2-9.

[6] *See* Plaintiffs' Floorplan Agreements (Dkt. 117-1, 117-3, and 117-4) at § 1(a) (defining "Advance" as "any loan or payment in any amount made pursuant to this Note by DSC to Dealer or on Dealer's behalf to any third party"); 1(n) (defining "DSC Financed Inventory" as "any Unit now or hereinafter acquired or retained by Dealer pursuant to an Advance under this Note. DSC Financed Inventory includes Purchase Money Inventory"); § 1(w) (defining "Interest" as "the aggregate rate of interest which accrues on all Liabilities owed by Dealer to DSC..."); § 1(dd) (defining "Purchase Money Inventory" as "a Unit acquired by Dealer pursuant to an Advance under this Note"); §§ 5(b) and (c) (stating that if DSC makes an Advance, "the Advance shall be deemed an additional Liability under this Note from the date on which the Advance is made."); *see also* NextGear Welcome Packet, available at http://www.nextgearcapital.com/welcome-packet/ (last accessed September 30, 2016) ("Over 18,000 dealers have already partnered with NextGear Capital looking for the same thing: a simple way to floor plan.").

Automotive, which also owns and operates Manheim, and its General Counsel, John Wick, collectively, charged interest and fees on money they had not lent. *See* Wick Dep. [Ex. 4] 86:3-8; 20-23; Answer ¶ 21. On February 25, 2011, John Wick testified:

> Q. Okay. And **when do you start charging the dealer** on an individual loan?
> A. The moment that it's floorplanned.
> Q. Okay. And is that – can that be **prior to funding of the loan**?
> A. **Of course**.
> \*\*\*
> Q. But wouldn't it be true that **DSC could enjoy the float** or the access to those funds **until it actually funds the loan**?
> A. **Sure**.

Wick Dep. [Ex. 4] 86:3-8; 20-23 (emphasis added).  *See also* NextGear Dep. [Ex. 1] 99:8-14 (NextGear makes money between floorplan date and date of payment).[7]

Cox Auto continued DSC's interest charging practices when it purchased DSC and merged DSC with Manheim[8] to create NextGear: "DSC has not changed its general practices with respect to charging interest for units floored at auction *since* the acquisition by Cox Auto or the merger by which it became NextGear."  *See* Declaration of Adam Galema, ¶ 6; Dkt. 197-24; *see also* Declaration of John Wick (Dkt. 197-29), ¶ 4.

### C. What Plaintiffs Knew or Could Have Known

As shown by NextGear's own testimony, Plaintiffs did not know, and could not have known, when NextGear paid the auctions. Mr. Galema testified:

> Q. You stated that dealers can get the Receivable Detail Report. Is this one of the reports that you were discussing?
> A. This is a Receivable Detail Report, yes.
> Q. Okay. That's something that the dealer would have?
> A. Yes.
> \*\*\*

---

[7] In addition to being the author to NextGear's form contract, NextGear touts John Wick as the overseer of "all corporate, legislative and litigation matters. *See* http://www.nextgearcapital.com/about/leadership/john-wick/. In addition, John Wick "leads the company's strategic and corporate development." *Id.*

[8] Upon the merger of DSC and Manheim, Defendant Cox Automotive, Inc. owned the successor entity, NextGear, as well as the actual auctions houses operating under Manheim. *See* Answer, ¶ 3; LaBauve Dep. [Ex. X] 40:22-25; 41:1-2.

> Q. What I was asking is, does that document, anywhere in that
> document, show when NextGear or DSC --
> A. Sorry.
> Q. -- paid the auction?
> A. **No, it does not.  I don't know why that would be important to
> them.**

NextGear 30(b)(6) Dep. [Ex. 1] 56:17-22; 57:8-13 (emphasis added).  Likewise, Stuart LaBauve,

Red Barn's account executive, stated that while the dealers could view certain information about

their transactions, they did not have access to the dates on which NextGear paid the auctions:

> Q. Okay. They would not -- the customer dealer would have access
> to when DSC was actually paying the auction house, though;
> correct?
> A. No, sir.
> Q. That, only DSC had access to; correct?
> A. Yes, sir.
> Q. That information was kept from the customer dealer; correct?
> MR. VINK:  Object to the form.
> A. I don't even know when we paid the auctions.
> Q. They wouldn't know; correct?
> A. The dealer?
> Q. Correct.
> A. No.

LaBauve Dep. [Ex. 8] 57:25-58:13; *see also id.,* 56:19-57:24 (describing the types of information

to which the dealers did have electronic access).

LaBauve testified that the customer dealer "[h]as no inclination or indication that a

floorplan date is different than the funding date." *Id.* at 182:25-183:3. While the account

summaries that NextGear produced in this case (Dkt. 165-4, NGR-000001-000035) provided the

dates of NextGear's payments to the auctions, those summaries were created specifically for this

case and were not available to the dealers during their relationships with NextGear. *See* Galema

Dep. [Ex. 6] 25:2-26:17; NextGear 30(b)(6) Dep. [Ex. 1] 17:18-23.[9] The account executives—who

---

[9] Further, even those account summaries did not clearly identify which date represented the date of NextGear's payment; that date was marked as the "Total For" date and Mr. Galema at his deposition explained that the "Total For" date referred to the date on which payments were made by NextGear. *See* Galema Dep. [Ex. 6] at 38:8-14 ("Total

were the customer dealers' point of contact with NextGear—likewise did not know when

NextGear paid the auctions. Thus, they did not provide that information to the dealers:

> Q. Do you have any information to contradict Mr. LaBauve's testimony that he was not aware of when payments were made to the auctions for floorplanned vehicles?
> A. No. In fact, I would agree with him. You know, it's not something that they, as an account executive, that they would know about or pay attention to or even desire to know. It's not anything that's put in front of them for them to be aware of.
> Q. So if it's not put in front of the account executives, it's not information that they are providing to the customer dealers; correct?
> A. Yeah. I mean, there is no reason really for the dealer to know, I guess, when payments are made, but that would be correct.
> Q. So you don't think that it's relevant to the customer dealer to know when NextGear's actually making payments on their behalf?
> A. No. I don't think so.

NextGear Dep. [Ex. 1] 61:3-62:4.

In short, there is evidence that shows that Plaintiffs had no way of knowing *when* NextGear

paid the auctions (thus, making the loan) and only had access to the incomplete account statements

provided by NextGear.[10] *See* Dkt. 117-2.[11] As evidenced on Dkt. 117-2, NextGear concealed the actual

date NextGear funded the purchase or loaned money on the customer dealer's behalf. Internally,

however, NextGear maintained such records. *See* NGR_000001-000035 [Ex. 7].

Evidence shows that while LaBauve was at the Red Barn location in Baton Rouge in June-

July 2011 to solicit Red Barn to enter into a floorplan agreement, he concealed that NextGear

---

for" is "the total of the transactions that were funded on that particular date" … "the date that NextGear sent cash to the auction.").

[10] There is evidence that the timing of the receipt of a title does not have anything to do with the timing of the payment. For example, Mr. Mattingly testified that sometimes he would purchase a car at auction, but not receive the title until some time after. *See* Mattingly Dep. [Ex. 11] 42:2-42:8 ("why would you buy a car if you can't immediately re-sell it? A. Because eventually they'll -- they'll get me title. They have a -- a time frame usually of three weeks. If they don't provide you with a clear title, you can take the car back, and the deal is canceled."). There was no way for Mr. Mattingly to know or even suspect that NextGear had not paid for the car on the times that it did not have the title at the time he paid off a vehicle.

[11] *See also* Dkt. 186 at pp. 20-21 ("[P]laintiffs' bank account statements would not have indicated the actual interest rate changed or when NextGear actually paid the auction houses. Without knowing when NextGear actually paid the auction houses, Plaintiffs could not have known of the alleged scheme to prematurely charge fees and interest on their accounts well before NextGear paid the auction houses.").

would charge interest from the date of the auction regardless of when NextGear funded or loaned the money on Red Barn's behalf. *See* LaBauve Dep. [Ex. 8] 167:12-168:1-6; Deposition of Devon London as Red Barn Motors, Inc. 30(b)(6) Representative [Ex. 10] ("London Dep.") 216:21-217:7. Towards the end of the relationship between NextGear and Red Barn, Red Barn's General Manager, London, confronted LaBauve about the timing of the interest charges. *See* London Dep. [Ex. 10] 217:23-218:20. Not surprisingly, LaBauve testified that he "could not recall" this conversation. LaBauve Dep. [Ex. 8] 171:5-172:2. Red Barn did not know NextGear was charging interest before making payments until one transaction at the very end of Red Barn's relationship with NextGear brought NextGear's concealed, fraudulent activity to light:

> Okay. Then, it really came to light with the Ford 500 in 2013 where we had paid off the vehicle. We had paid all of the curtailment fees. We had paid all of the interest. We had paid everything to DSC and DSC was the one that reimbursed us for the money that we paid, because they had never paid the auction for the car. So if the auction had never gotten paid for the car, DSC utilized all of our funds for the time since they were collected without ever making a loan on the vehicle.

London Dep. [Ex. 10] 219:15-220:1.

Similar to its assertions about Red Barn, NextGear's suggestion that Platinum "was fully aware that she would need to pay interest for the benefit of using a floor plan[,]" (Dkt. 193 at 13) and thus could have known that interest would be charged before NextGear made any payments, is disputed as well. The evidence shows that NextGear concealed from Platinum how it calculated interest. *See, e.g.,* NextGear testimony cited above and Platinum Dep. [Ex. 12] 95:18-25.

### D. Additional Facts Relating to Scheme to Defraud Plaintiffs and Subsequent Blacklisting

There is evidence relating both to blacklisting and additional wrongful conduct by NextGear following Plaintiffs' defaults under their floorplans. For example, the evidence shows that once NextGear drained Red Barn of all available credit and equity, NextGear seized Red Barn's

inventory of used cars. LaBauve Dep. [Ex. 8] 198:14-25 [Ex. 13] (Ex. 21 attached to LaBauve

Dep.).  NextGear took great satisfaction in defaulting Red Barn and seizing its property:

> Q. If you flip -- and I'm sorry, Exhibit 25 is NG008104 through 06. Do you see the same basic cars under Red Barn Current Owned Vehicles attached to the second two pages?
> A. Yes, sir.
> Q. And this is the same time frame that DSC is attempting -- DSC/NextGear is attempting to obtain possession of the vehicles; correct?
> A. No, sir. I think we did the possession earlier in March, and this was April 10th.
> Q. Okay. Had you sold them, though, by this point?
> A. I don't know when they sold.
> Q. And once this was sent to Samantha [NextGear employee], what was her response?
> A. "BAM. I like being able to maintain control of situation. Especially when the dealer doesn't even realize that's what I am doing."

*Id.* at 204:2-18 (quotations in the original). With Red Barn down and out as a result of NextGear's

fraudulent activity, NextGear placed Red Barn in the "KO Book" and banned Red Barn from

Manheim (Cox Automotive) and non-Manheim auctions. *Id.* at 205:10-16; London Dep. [Ex. 10]

221:1-15.  As a result of the blacklisting, the auction houses prohibited Plaintiffs from attending and

participating in the routine sales of used cars, further economically damaging Plaintiffs and impairing

their ability to do business. *See* London Dep. [Ex. 10] 221:1-15; 222:23-223:21. As a result of

NextGear's actions, in combination with its parent company Cox Automotive to include its sister-

company, Manheim, Red Barn suffered catastrophic losses to its income, business reputation,

goodwill, and overall valuation. *See id.*

As to Mattingly, in May 2012, without warning or explanation, NextGear declared

Mattingly to be in default under its floorplan agreement, picked up all the cars that Mattingly had

financed with NextGear and ceased all business with Mattingly. *See* Mattingly Dep. [Ex. 11]

89:23-90:7; 149:24-150:5. At that same time, Mattingly also lost credit with MAFS, its only other

source of inventory credit; its sales tumbled precipitously from $800,000 per year to $50-60,000;

and it changed from a retail to a wholesale seller. Mattingly Dep. [Ex. 11] 90:11-91; 17:25-18:24;

16:8-15. Ultimately, NextGear sued Mattingly for amounts owed after the seizure and sale of the cars it had floorplanned and obtained a judgment-- a judgment that Mattingly has not paid based on the understanding that it was discharged in bankruptcy. *See* Mattingly Dep. [Ex. 11] 131:18-22.

### E. Statements about Plaintiffs' Purported Wrongful Conduct

Contrary to NextGear/DSC's assertions in its brief, NextGear/DSC "took" Red Barn's inventory when Red Barn had "an outstanding balance"; however, Red Barn did not provide DSC with "checks that didn't clear" and did not make payments on Devon London's home as suggested by NextGear/DSC in its attempt to obfuscate its own fraudulent conduct. *See* London Dep. [Ex. 10] 109:17-24; 106:15-21; 172:5-173:21.

When asked about selling cars out of trust, Mattingly explained that it was due to an error in the listing of vehicles provided by NextGear. *See* Mattingly Dep. [Ex. 11] 207:2-15. The vehicle that NextGear alleges was sold out of Trust by Mattingly because NextGear was not paid within twenty-four hours of a sale was not in fact sold because Mattingly "was holding a check for a customer." Mattingly testified that he never sold a vehicle at auction or through the Online Vehicle Exchange at a pre-arranged price and believed that the flooring of vehicles that he purchased at a pre-arranged price was proper because it was done by NextGear for Mattingly. *See* Mattingly Dep. (Ex. 11] 93:6-10; 12-94:1. Further, as to Mattingly's nonpayment of its NextGear debt, Mattingly testified that he did not intend to pay the debt not because of any nefarious intent, but rather because it had been "discharged at bankruptcy." *See id.* at 131:18-22.

Finally, Platinum's default related to another entity that Platinum did not control, and Platinum did not knowingly sell cars out of trust. *See* Platinum Dep. [Ex. 12] 100:16:25; 101:1; 109:3-6.

## II. <u>LEGAL STANDARD</u>

Pursuant to Rule 56, Defendants bear the heavy burden of proving that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. *See* FED. R. CIV. PROC. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca,* 555 F.3d 582, 584 (7th Cir. 2009); *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).[12]

## III. <u>LAW AND ARGUMENT</u>

### *A. Defendants' are Not Entitled to Summary Judgment on Breach of Contract Claim*

Defendants previously asked this Court to rule that there was no breach of contract because, as a matter of law, the terms of Plaintiffs' contracts allowed NextGear to charge interest on funds that had yet to be released by NextGear to the auction houses. Dkt. 126. In rejecting Defendant's motion to dismiss, this Court held that "[t]he contracts are not sufficiently clear to support the argument that NextGear was plainly allowed to charge interest and fees before actually paying the auction houses on Plaintiffs' behalf. Thus, there are sufficient allegations of a breach to allow the case to proceed beyond the motion to dismiss stage." Dkt. 186 at 27. None of Defendants' arguments on summary judgment advance their argument that they are entitled to judgment as a matter of law any further. Therefore, under the summary judgment standard, where the terms in dispute remain ambiguous, Defendants' motion should be denied.  *See Shellbird, Inc. v. Grossman*, 2010 WL 2985208, *4 (S.D. Ind. 7/23/2010) (denying defendant's summary judgment on breach

---

[12] That this matter will proceed to a bench trial does not alter this standard. *See, e.g., Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994) ("This language leaves no question that the district court improperly weighed the evidence in this case in arriving at its decision to grant summary judgment. This is not entirely surprising, however, because the court assumed that it was required to review the facts *de novo*. . . . However, the appropriate proceedings for such a fact-finding is a bench trial and not the disposition of a summary judgment motion.").

of contract claim in the face of ambiguous contract term); *Elite Enters., Inc. v. Liberty Steel Prods., Inc.*, 2009 WL 3822949, *10 (N.D. Ind. 11/12/2009) (denying cross-motions for summary judgment on breach of contract claim on basis that contract terms were ambiguous); *English Coal Co. v. Durcholz*, 422 N.E.2d 302, 308-09 (Ind. App. 1981) (holding, under Indiana law, "[w]here the terms of a contract are ambiguous and must be determined by extrinsic evidence, construction of the contract is for the jury.").

Defendants raise the same arguments here as on their motion to dismiss. Primarily, they rely on the provision in the contracts that "[a]ll outstanding Liabilities under this Note shall accrue interest…." *E.g.* Red Barn Note [Def. Ex. 21] § 3(a); and, in turn on the definition of "Liabilities" as meaning "any and all Advances, debts, … financial obligations … and duties owing, arising, due or payable from Dealer to DSC of any kind or nature, present o[r] future … whether … due or to become due, now existing or hereafter arising and however acquired." *E.g.* Red Barn Note [Def. Ex. 21] § 1(y). Defendants conclude that, in light of this language, "[t]hus, interest will accrue on all 'Liabilities,' which include—but are not limited to—'Advances.'" Dkt. 193 at 12.

Aside from the fact that this Court has already rejected Defendants' argument, it is clear on its face that Defendants read the word "outstanding" wholly out of the Contracts. Defendants would read the provision for accrual of interest as being that interest will accrue against "all Liabilities"—indeed, that is exactly how they summarize the provision at page 12 of their brief—rather than the actual Contract language of "all outstanding Liabilities." This shows that interest is not to accrue on all "Liabilities," but only on that subset of Liabilities that are due and owing. "Outstanding" cannot mean nothing. Indeed, without limiting the list of defined "Liabilities" as to which interest would accrue, Defendants' proposed interpretation would lead to absurd consequences. For example, Defendants' interpretation would have interest accrue as to both

11

"debts … now [that is, at the time of the execution of the Note] existing or hereafter arising …." The debts "now existing" would be "outstanding Liabilities," but debts that are not even in existence yet and may be "hereafter arising" certainly are not "outstanding" and should not be subject to the accrual of interest in any commercially reasonable transaction. *See* BLACK'S LAW DICTIONARY, AT 1102 (6th ed. 1990) (defining "outstanding" to include "[c]onstituting an effective obligation"). The same should be true for "future" or "contingent" Liabilities, which are included in the "Liabilities" definition but cannot be termed "outstanding" under any commercially reasonable interpretation.

Defendants urge that their interpretation should be treated as commercially reasonable because the accrual of interest between the time of the auction and the time money is supplied to the auction compensates NextGear for the risks associated with the holding of the auction-acquired vehicles in the dealers' inventories. This ignores the basic economic reality that, as long as NextGear keeps the money, it is still enjoying the value of the use of that money—they have not *risked* the money yet, but can continue to invest it or otherwise earn interest on it. *See* Wick Dep. [Ex. 4] 86:3-8; 20-23; NextGear Dep. [Ex. 1] 99:8-14. By charging interest to Plaintiffs on funds that NextGear still holds, NextGear is enjoying a commercially *un*reasonable windfall; only once NextGear actually "Advances" the funds to the auction house has it risked its assets and becomes entitled to the accrual of interest. Indeed, until such time, NextGear is *not* uncompensated, as it collects Boarding Fees,[13] Floorplan Fees,[14] GPS Fees, Vehicle Service Contract Fees, and other fees.

---

[13] *See, e.g.,* Red Barn Note [Def. Ex. 21] § 1(d) ("'Boarding Fee' shall mean that DSC Universal Fee charged by DSC to Dealer and added to the principal amount of the Advance for each individual item of DSC Financed Inventory which is the subject of a DSC Lease Program Advance.").

[14] *See, e.g.,* Red Barn Note [Def. Ex. 21] § 1(u) ("'Floorplan Fee' shall mean the fee charged by DSC to Dealer set forth on the Term Sheet for each individual item of DSC Financed Inventory.").

Indeed, Plaintiffs' interpretation is far more commercially reasonable, as it gives meaning to the term "outstanding," and comports with the prevalent reliance on the concept of the "Advance" in the Contracts, which clearly requires that money be paid by NextGear either to the Dealer or to a third party on the Dealer's behalf prior to the accrual of interest. *See* Plaintiffs' Floorplan Agreements (Dkt. 117-1, 117-3, and 117-4) at § 1(a) (defining "Advance" as "any loan or payment in any amount made pursuant to this Note by DSC to Dealer or on Dealer's behalf to any third party"); 1(n) (defining "DSC Financed Inventory" as "any Unit now or hereinafter acquired or retained by Dealer pursuant to an Advance under this Note. DSC Financed Inventory includes Purchase Money Inventory"); § 1(dd) (defining "Purchase Money Inventory" as "a Unit acquired by Dealer pursuant to an Advance under this Note"); §§ 5(b) and (c) (stating that if DSC makes an Advance, "the Advance shall be deemed an additional Liability under this Note from the date on which the Advance is made."). This avoids the undue windfalls to NextGear from collecting interest from Plaintiffs on funds to which NextGear still has access and from also imposing various fees for the ability to access funds to purchase units of inventory *and* accrue interest on the actual funds when the funds haven't been released. The provisions cited by NextGear cannot be viewed in a vacuum; rather, the Court must interpret the contract as a whole. *See, e.g., Nikish Software Corp. v. Manatron, Inc.,* 801 F. Supp. 2d 791, 800 (S.D. Ind. 2011) (In contract cases, the Court's primary objective is to effectuate the intent of the parties at the time the contract was made, which is determined by examining the language the parties used to express their rights and duties…. The Court must read the contract as a whole, construing language to give meaning to all of the contract's words, terms, and phrases.") (citation omitted); *Norwood Promotional Products, LLC v. KustomKoozies, LLC,* 835 F. Supp. 2d 685, 692 (S.D. Ind. 2011) ("[u]nder Indiana law, it is this

Court's obligation to interpret the contract as a whole in a manner that harmonizes its provisions and gives life to the intent of the parties") (citation omitted).

As shown above, the contract as a whole provides that interest was to be charged beginning when NextGear made a payment to a third party on the dealer's behalf. Further, as the Indiana Supreme Court has held, "when there is ambiguity in a contract, it is construed against its drafter." *MPACT Const. Grp., LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 910 (Ind. 2004). Thus, any dispute as to when interest would be charged should be resolved in Plaintiffs' favor.  Indeed, the revisions to the form contract put in place in 2013 show that NextGear knew how to attempt to effect a form that allowed for accrual of interest from the Floorplan Date—and that the language prior to that change did not accomplish that.

Finally, Defendants argue that the thirty-day notice provision at § 4(k) of the Contracts bars any claims by Plaintiffs that NextGear breached the Contracts by accruing interest against unreleased funds. While placed this time with Defendants' arguments regarding breach of contract, this is simply a repackaging of a portion of their previously-rejected *res judicata* arguments:

> The Defendants suggest that the Plaintiffs could have discovered the facts giving rise to their injuries by a diligent review of their own bank statements, which would show when interest and other charges had been automatically debited from their accounts. However, this argument overlooks the fact that the bank account statements would not have indicated the actual interest rate charged or when NextGear actually paid the auction houses. Without knowing when NextGear actually paid the auction houses, the Plaintiffs could not have been apprised of the alleged scheme to prematurely charge fees and interest on their accounts well before NextGear paid the auction houses.

Dkt. 186 at 16. Defendants provide no new support for their argument, and it should be rejected for the same reasons.

The Court's reasoning is further supported by a close reading of the language of the contracts. Section 4(k) provides that a Dealer's account statement is a "definitive statement of Dealer's Credit Line and Liabilities as of the date of the statement and shall be binding upon the

dealer"; "Liabilities" is defined in turn to include "Interest"; but "Interest" is a defined term that does not, in turn, mean a definitive breakdown of the interest accrued and applicable as to each individualized purchase. Instead, it means "the aggregate rate of interest which accrues on all Liabilities owed by Dealer to DSC … by combining the Base Rate plus the applicable Contract Rate, Risk Rate or Default Rate." *E.g.*, Red Barn Note [Def. Ex. 21] § 1(w). As observed by this Court already, this does not include the information that would have been required for Plaintiffs to be apprised of the accrual of interest on funds not yet released to the auction houses.

Accordingly, Defendants have failed to show a lack of genuinely disputed material facts or that they are entitled to judgment as a matter of law on Plaintiffs' breach of contract claims; accordingly, their motion for summary judgment on these claims should be denied.

### B. Defendants are Not Entitled to Summary Judgment on Constructive Fraud Claim

NextGear's argument that Plaintiffs' constructive fraud allegations are just a "repackaging" of the breach of contract allegations should be rejected. While NextGear cites three cases in support of this argument, none of these cases involve constructive fraud. *French-Tex Cleaners, Inc. v. Cafaro Co.*, 893 N.E.2d 1156, 1160 (Ind. Ct. App. 2008) involved a lease dispute under Ohio law. *Tobin v. Ruman*, 819 N.E.2d 78, 83–84 (Ind. Ct. App. 2004), involved an oral attorney fee/employment agreement and a conversion claim. The final case, *Fritzinger v. Angie's List, Inc.*, 2013 WL 772864 (S.D. Ind. Feb. 28, 2013), involved a breach of contract claim and a deception claim, not a constructive fraud claim. In addition, unlike the *Fritzinger* case which was dismissed under Federal Rule of Civil Procedure 12(b)(6), this Court has already found that Plaintiffs here have pled a separate cause of action for constructive fraud. Dkt. 186 at 21–22. NextGear has provided no authority that a Plaintiff cannot bring both a constructive fraud claim and a breach of contract claim.

NextGear does not seriously dispute this Court's earlier ruling that it owed a duty to inform Plaintiffs of the manner in which it was calculating interest, and that NextGear did not so inform the Plaintiffs.[15] NextGear admits that it charged interest from the date a Plaintiff purchased a vehicle from an auction regardless of when NextGear paid the auction, and NextGear admits that it did not tell Plaintiffs this fact. *See* Galema Dep. [Ex. 6] 56:17-22 ; 57:8-13; LaBauve Dep. [Ex. 8] 57:25-58:13; NextGear 30(b)(6) Dep. [Ex. 1] 61:3-62:4.[16] Rather than attack each element of the constructive fraud cause of action, NextGear wrongly attempts to convert this summary judgment to a trial on the merits by arguing that the manner in which NextGear calculated interest was proper.

NextGear attempts to justify its failure to inform Plaintiffs that it was charging interest on money not lent by asserting that otherwise the Plaintiffs would not have paid NextGear anything when NextGear allegedly guaranteed payments to the auctions. *See* Dkt. 193 at 25. NextGear's assertion that it earned nothing before NextGear paid money to the auctions is, however, incorrect. NextGear charged the Plaintiffs not only interest, but a fee for each vehicle transaction. *See* NGR-000001-000035 [Ex. 7] (showing certain fees in addition to interest paid for each transaction). Thus, NextGear was compensated for any use of its credit through the fees charged Plaintiffs.

NextGear's scheme allowed it to double dip, charging both a fee to guarantee the extension of credit, then, in many instances, charging interest before funding payment. As set forth in

---

[15] "Plaintiffs executed a very broad power of attorney in favor of NextGear that gave NextGear far reaching authority over the Plaintiffs. The Plaintiffs also had to execute personal guarantees, and the bank accounts of the Plaintiffs were made available to NextGear. NextGear did in fact freely access the Plaintiffs' bank accounts for numerous transactions. Based on all these facts, the Court determines that the allegations support a special relationship giving rise to a duty to support the first element of the constructive fraud claim. The allegations also are sufficient to support the element of reasonable reliance." Dkt. 186, 21–22. NextGear attempts to argue in a footnote that the Court was mistaken it its ruling, but provides no authority for why the Court was wrong in finding such a duty and the unsupported factual assertions made do not meet the summary judgment burden.

[16] NextGear also does not dispute that it took funds from the Plaintiffs' bank accounts that included interest on money that NextGear had not in fact paid to the auction houses, money which the Plaintiffs have pled as an element of damages in this case. *See* NGR000001-000035 [Ex. 7].

Plaintiffs' expert report, before an interest calculation can be made, a sum of money must be first lent. *See* Expert Report of Dan Wojcik [Ex. 14]. Thus, NextGear could not have charged interest before it even lent money, and NextGear never informed Plaintiffs that they would be paying both a fee per transaction and interest to NextGear before NextGear even lent money on a Plaintiff's behalf. *Id. See also* Galema Dep. [Ex. 6], 56:17-22-57:8-13; LaBauve Dep. [Ex. 8], 57:25-58:13; NextGear 30(b)(6) Dep. [Ex. 1] 61:3-62:4; 96:2-9. Thus, NextGear's arguments concerning materiality, injury, and unfair advantage are without merit.

NextGear asserts that because the Plaintiffs allegedly found out about NextGear's interest charging practices, yet still used NextGear, they could not have reasonably relied upon NextGear's failure to inform Plaintiffs how it was charging interest. *See* Dkt. 193 at 24. This argument fails because, as discussed earlier in this memorandum, the evidence supports a finding that they did not know and could not have known that they knew NextGear was charging them interest on money not lent. *See* supra Section I(C). Platinum's corporate representative testified that she did not know that NextGear was charging her interest on money not lent until 2016, and that NextGear should have informed her of these charges. *See* Platinum Dep. [Ex. 12] 98:1-99:25; 95:11-96-25. Red Barn's corporate representative testified that he did not know that NextGear was charging interest before paying the auctions until he discovered the scheme when a vehicle transaction was unwound at the end of their relationship in 2013. *See* London Dep. [Ex. X] 219:15-220:1. Mattingly's corporate representative testified that he had no reason to believe that NextGear had not paid for a vehicle prior to receiving the title because he himself paid for vehicles at the auction without receiving the title. *See* Mattingly Dep. [Ex. 11] 208:1-19. Even NextGear's own account executive testified that he did not know when the auctions were paid, and NextGear's corporate representative confirmed that account executive, as well as dealers, did not know when the auctions

were paid. *See* LaBauve Dep. [Ex. 8] 57:25-58:13; NextGear Dep. [Ex. 1] 61:3- 62:4. At the very

least, the testimony and documents entered into the record raise factual issues inappropriate for

determination on summary judgment. *LDT Keller Farms, LLC v. Brigitte Holmes Livestock Co.,*

*Inc.*, 722 F.Supp.2d 1015, 1030 (N.D. Ind. 2010) ("gauging the reasonableness of the Plaintiffs'

reliance is a highly fact-specific inquiry that does not lend itself to summary judgment.") (*citing*

*Carrell v. Ellingwood,* 423 N.E.2d 630, 635 (Ind.Ct.App.1981) ("Deception and reliance involve

the state of mind of the victim. As such, their existence or absence is a question of fact for the

trier.") Accordingly, the Plaintiffs respectfully request that this Court deny NextGear's Motion for

Summary Judgment.

### C. Defendants are Not Entitled to Summary Judgment on Substantive RICO Claim

#### 1. Evidence of Racketeering Activity

Defendants again urge this Court to dismiss the RICO violations in the Amended

Complaint. *See* Dkt. 193 at 26-30. Again, however, Defendants' arguments are without merit and

this Court should maintain Plaintiffs' substantive RICO violations. To "state a claim under

§1962(c), a RICO plaintiff must show the '(1) conduct (2) of an enterprise (3) through a pattern

(4) of racketeering activity.'" *Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466, 472 (7th Cir.

2007) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 474 U.S. 479, 496 (1985)). Title 18, United States

Code, Section 1962(c) provides:

> It shall be unlawful for any person *employed by or associated* with any enterprise
> engaged in, or the activities of which affect, interstate or foreign commerce, *to*
> *conduct or participate*, directly or indirectly, *in the conduct of such enterprise's*
> *affairs* through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. §1962(c) (emphasis added).

Defendants disingenuously claim that Plaintiffs' RICO claim "[d]epends entirely on its

"blacklisting" allegation." *See* Dkt. 193 at 26-27. They base their assertion on Plaintiffs' discovery

responses which Defendants failed to accurately quote to this Court. Defendants cite to interrogatories and responses thereto for each named Plaintiff. *See id.* In those interrogatories, Defendants questioned the factual basis for the allegation contained in Paragraph 116 of the Amended Complaint. *See* Dkt. 193-3 (Red Barn's Supp. & Am. Resp. to Interrog. 12 [Ex. 2]); Dkt. 193-4 (Mattingly's Supp. & Am. Resp. to Interrogs. 9-12 [Ex. 3]); and Dkt. 193-5 (Platinum's Supp. & Am. Resp. to Interrogs. 9-12 [Ex. 4]). In contravention of Defendants' incomplete and inaccurate quotation provided to this Court, Plaintiffs' discovery response made on November 3, 2016, specifically cited Defendants to the following:

> The NextGear Enterprise maintains a structure, in that the executive management of NextGear (including John Wick, as detailed above) knowingly established a uniform approach to secretly charge customers interest and curtailment fees which NextGear itself was unauthorized to obtain because NextGear had not provided any financing to the auction houses via Floorplan Agreements. The NextGear Enterprise includes auction houses owned and operated by the Defendants as well as other auction houses associated with the Defendants where these auction houses concealed NextGear's actions allowing NextGear to conduct the pattern of racketeering activity. The NextGear Enterprise executes and carries out individual, fraudulent transactions on a daily basis, which are solicited by lower-level employees, including Account Executives such as Stuart LaBauve and others throughout the United States. The NextGear Enterprise maintains this common and shared purpose of defrauding customers for the Enterprise's unlawful financial gain. The NextGear Enterprise maintains the same basic structure and personnel and does not take another form from the racketeering activity versus other activity. In addition to the fraudulent activity detailed herein, NextGear and the NextGear Account Executives also conduct/facilitate legitimate automobile resales and related financing which further conceal their fraudulent activity as they continue to pose as legitimate industry participants.

*See id.* (footnotes omitted) (citing Dkt. 89-2 (117) (emphasis added).

As set forth in the discovery responses and pleadings before this Court, Plaintiffs' claims center on the multiple acts of wire fraud committed by Defendants day after day, year after year. *See* Dkt. 186 at 33 ("[t]he purpose of the enterprise was to defraud Plaintiffs, and others, **to obtain money by charging interest and fees on money not actually loaned by NextGear**.") (emphasis

added). The "blacklisting" activity is one of the acts undertaken by the Enterprise; however, the improper charging of interest are the wire fraud acts specifically pled and evidenced by Defendants' own records (NGR_000001-000035 [Ex. 7]), which definitively show that Defendants executed multiple racketeering acts; to wit: wire fraud in violation of Title 18, United States Code, Section 1343.   Therefore, Defendants are not entitled to summary judgment on the evidence of racketeering activity.

### 2. Defendants Conducted/Participated, Directly/Indirectly, in the Enterprises' Affairs

Next, Defendants complain that, "[t]here is simply no evidence in the record that any of the Defendants conducted a RICO enterprise. . . ." *See* Dkt. 193 at 27. Defendants incorrectly claim that the Court's holding in *Reves v. Ernst & Young*, 507 U.S. 170, 178-79 (1993), raised the liability threshold above that shown in the instant matter. In *Reves*, a bankruptcy trustee of a cooperative, on behalf of a class of noteholders, filed suit against an outside accounting firm that conducted audits on the cooperative's financial statements. *Reves*, 507 U.S. at 175. There, the class alleged that the outside accounting firm deliberately and intentionally failed to follow generally accepted accounting principles ("GAAP") in order to inflate the assets and net worth of the cooperative and deceive noteholders about to cooperative's insolvency. *Id.* Writing for the majority, Justice Blackmun explained:

> Once we understand the word "conduct" to require some degree of direction and the word "participate" to require some part in that direction, the meaning of § 1962(c) comes into focus. In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the affairs is required.

*Id.* at 179 (footnotes omitted) (emphasis in the original); *see also MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 978 (7th Cir. 1995) (lower-rung participants liable when they enable an enterprise to achieve its goals by knowingly implementing management's decisions).

The remaining Defendants in this matter clearly participated in the affairs of the NextGear Enterprise. First, as detailed above, Defendant John Wick (overseer of "all corporate, legislative and litigation matters" where Wick "leads the company's strategic and corporate development") personally created the "take-it-or leave-it" contract. *See* NextGear 30(b)(6) Dep. [Ex. 1] 58:9-59:10 (the Demand Promissory Note and Security Agreement is "generally a take-it-or-leave-it" contract); Wick Dep. [Ex. 4] 96:7-98:22. Next, NextGear, Cox Automotive, and Wick collectively charged interest and fees on money they never lent in the first place (*i.e.* "enjoyed the float" from Defendants' own customer dealers). *See id.* 86: 3-8; 20-23; Answer ¶ 21.

As referenced above, NextGear's Corporate Representative, Adam Galema and John Wick himself, admitted that Cox Auto continued this fraudulent conduct when it purchased DSC and merged DSC with Manheim to create NextGear. *See* Declaration of Adam Galema, ¶ 6 (Dkt. 197-24) ("DSC has not changed its general practices with respect to charging interest for units floored at auction *since* the acquisition by Cox Auto or the merger by which it became NextGear."); Declaration of John Wick, ¶ 4 (Dkt. 197-29).[17] As the evidence establishes that Wick, DSC, Cox Automotive and NextGear all had a role in the Enterprise-from drafting the documents to causing

---

[17] To the extent Defendants re-urge their "person/enterprise" argument lodged in their motion to dismiss, for the same reasons, it fails here. The applicable caselaw dictates that an enterprise "requires no more than the formal legal distinction between 'person' and 'enterprise' (namely incorporation) . . . ." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) (emphasis added). In *King*, a boxing promoter, Don King, was *the employee* and *owner/sole shareholder* of Don King Productions, a corporation. There, the United States Supreme Court found that distinction satisfied RICO because "[t]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing more in the statute that requires more 'separateness' than that." *Id.* at 163. Further, an association-in-fact does not require any structural features beyond "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purposes." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655 (7th Cir. 2015) (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)). Clearly, as detailed herein, the instant enterprise had purpose, longevity, and relationships among its participants sufficient to satisfy the definition found in 18 U.S.C. § 1961(4). What DSC began years before (at its formation in 2005 according to John Wick), NextGear continued after the merger with Manheim and Cox Automotive until the named Plaintiffs ended their respective relationships with Defendants.

the improper interest to be charged to concealing those charges from Plaintiffs-Defendants are not entitled to summary judgment on the existence of an Enterprise.

### 3. Proximate Cause

Plaintiffs' RICO claim easily meets the "proximate cause" requirement. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268-69 (1992); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006); *Bridge v. Phoenix Bond & Indem, Co.*, 553 U.S. 639, 648 (2008). Section 1964(c) identifies four factors that a plaintiff must establish to have standing to bring a civil RICO claim: (1) the plaintiff must be a "person" (2) who sustains injury (3) to its "business or property" (4) "by reason of" the defendant's violation of Section 1962. 18 U.S.C. § 1964(c); *see, e.g., RWB Servs., LLC v. Hartford Computer Group, Inc.*, 539 F.3d 681, 687 (7th Cir. 2008) (holding that a plaintiff pleads causation, as required for standing, if a predicate act was sufficient to cause plaintiff's injury and that predicate act was part of the Section 1962 violation); *Illinois Dep't of Revenue v. Phillips*, 771 F.2d 312, 317 (7th Cir. 1985) (permitting state tax agency to bring RICO action for alleged tax fraud); *Haroco, Inc. v. American Nat'l Bank & Trust Co.*, 747 F.2d 384, 398 (7th Cir. 1984) (excessive interest charges).[18]

In *Holmes v. Securities Investor Protection Corp.*, the Supreme Court applied a common law test to determine proximate cause. *Holmes*, 503 U.S. at 268-69. There, a fraudulent scheme injured a securities firm and its clients who purchased artificially inflated securities. The Securities Investor Protection Corp. ("SIPC") became a receiver and advanced money to protect the clients. Through subrogation, the SIPC then sued under RICO. The Supreme Court held that the SIPC did not have standing to assert RICO claims. Instead, the Court concluded that those who were directly

---

[18] Defendants' claim regarding "loss" and "transaction" causation is unfounded and the case Defendants cite, *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 170 (2d Cir. 1999), is inapplicable, out of circuit, and pre-dates *Bridge v. Phoenix Bond & Indem, Co.*, 553 U.S. 639, 648 (2008).

injured - the securities firm and the clients - were the ones to sue; the SIPC's injury was too attenuated. *Id.* at 271. Here, Plaintiffs have alleged and shown in discovery that they have each suffered a direct injury as a result of Defendants' fraudulent activity (*i.e.* the RICO enterprise's racketeering activity). Moreover, Defendants, as detailed herein, concede that they in charged (took) money from Plaintiffs (and thousands of other customer dealers) by secretly charging Plaintiffs (and thousands of other customer dealers) interest and fees on money not lent on the customer dealers' behalf; all in violation of 18 U.S.C. § 1343 (wire fraud).

In *Bridge v. Phoenix Bond & Indemnity Co.*, the Supreme Court addressed whether a plaintiff asserting a RICO claim predicated on mail fraud can satisfy the proximate cause requirement without establishing reliance on the defendant's fraudulent misrepresentation. *Bridge*, 553 U.S. at 648-49. The Court resolved a long-running judicial debate by holding that "a plaintiff asserting a RICO claim predicated on mail fraud [wire fraud] *need not show*, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." *Id.* at 661. In *Bridge*, a competitor sued another, alleging that its false statements to the county gave it an unfair advantage in auctions for tax liens. Even though the false statements were in affidavits submitted to the Cook County Treasurer's Office, the county was not injured by the fraud. Instead, he competitor was the only party injured, and therefore was the party best positioned to bring a claim. The Court therefore affirmed the Seventh Circuit's holding that "the direct *victim* may recover through RICO whether or not it is the direct *recipient* of the false statements." *Bridge v. Phoenix Bond & Indemnity Co.*, 477 F.3d 928, 932 (7th Cir. 2007) (emphasis in original).

Here, NextGear did not reveal that it would secretly debit money in the form of interest and fees when NextGear did not even lend money on Plaintiff's behalf to the auction houses (or

delayed doing so for weeks) (*i.e.* the predicate act caused Plaintiff's injury and that predicate act was part of the Section 1962 violation).[19] Accordingly, proximate cause for the RICO claim exists.

### D. Res Judicata (*Defendants' Affirmative Defense*)

Defendants' motion for summary judgment re-urges the previously-rejected res judicata argument. As res judicata is an affirmative defense, it is Defendants' burden to demonstrate that res judicata bars Mattingly and Platinum's claims. *See Fisher v. State,* 878 N.E.2d 457, 460-61 (Ind. Ct. App. 2007). Defendants have not met that burden, and Mattingly and Platinum's claims are not barred by res judicata. As this Court previously held on the motion to dismiss, "[i]t is reasonably inferred from the allegations of the Amended Complaint that the Plaintiffs could not have discovered their injuries until after their relationship with NextGear had ended." Dkt. 186 at 17-18. As set forth below, the evidence now supports the Court's earlier holding that Plaintiffs could not have discovered their injuries until after their relationship with NextGear, and the Court should again hold that their claims are not barred by res judicata.[20]

---

[19] *See* LaBauve Dep. [Ex. 8] 167:12-168:1-6; 182:25-183:3 (LaBauve admitted that the customer dealer "[h]as no inclination or indication that a floorplan date is different than the funding date. . . ."); London Dep. [Ex. 10] 216:21-217:7; Defendant NextGear Capital, Inc.'s First Amended Responses and Objections to Plaintiffs' First Set of Written Discovery, dated September 27, 2016 [Ex. 9]; Responses to Requests for Admission 3, 4, and 5 (in response to requests relating to the timing of interest charges to Red Barn, Platinum, and Mattingly, respectively, stating that "NextGear generally began to charge interest as of the floor plan date"); NextGear 30(b)(6) Dep. [Ex. 1] 9:12-14 ("Q. And then the "Flooring Date" is the date that it was floorplanned with NextGear, correct? A. That's correct."); 96:2-9 (NextGear charges interest beginning on the floorplan date). However, the floorplan date sometimes occurred days or weeks *before* NextGear made payment to an auction on a customer dealer's behalf, and, on several transactions, NextGear did not even fund the loan (*i.e.* pay the seller/auction house) for the vehicle until *after* the customer dealer paid NextGear for the "loan." *See* NGR_000001-000035 [Ex. 7]; NextGear 30(b)(6) Dep. [Ex. 1] 96:2-9 ("Q. ... Now, we've discussed that NextGear, and there is no dispute, charges interest beginning on the floorplan date and that there are some times and some transactions a time period between when NextGear begins charging interest to the dealers and when they pay the auction for the car, correct? A. That's correct."); LaBauve Dep. [Ex. 8] 187:16-191:2.

[20] Even if Defendants had established the elements of res judicata—which they have not—the Court would have discretion to refuse to apply the doctrine. *Van Den Biggelaar v. Wagner*, 978 F. Supp. 848, 857 (N.D. Ind. 1997) (citation omitted). The Seventh Circuit "does not adhere to a rigid view of the doctrine. Res judicata must yield on occasion to competing public policies." *Id.* at 856-857. "[F]inality and fairness are both important goals of the doctrine of res judicata, but when there is an apparent conflict between these two goals, fairness is to be chosen without hesitation." *U.S. Automatic Sprinkler Co. v. Reliable Automatic Sprinkler Co.*, 2008 WL 474234, *7 (S.D. Ind. Feb. 15, 2008). The default judgments were entered in collection suits filed by a company that improperly charged thousands of dealers interest on transactions before advancing funds on their behalf and failed to disclose when payments were being made on their behalf. To dismiss Mattingly and Platinum's claims on res judicata grounds would violate fundamental fairness.

Claim preclusion only bars a subsequent action when four requirements are satisfied: (1) the former judgment must have been rendered by a court of competent jurisdiction; (2) the former judgment must have been rendered on the merits; (3) the matter now in issue was, or could have been, determined in the prior action; and (4) the controversy adjudicated in the former action must have been between the parties to the present suit or their privies. *Angelopoulos v. Angelopoulos,* 2 N.E.3d 688, 696 (Ind. Ct. App. 2013) (citation omitted). As the second and third requirements are not met, claim preclusion does not bar Mattingly and Platinum's claims. *See id*.

### 1. The Default Judgments Do Not Constitute Judgments on the Merits as to the Claims Asserted in this Suit

Defendants incorrectly assert that there is no dispute that there is a final judgment on the merits between the same parties as to the claims raised by Mattingly and Platinum in this case. *See* Dkt. 193 at 30-31. To the contrary, the default judgments entered against Mattingly and Platinum are not judgments on the merits as to Plaintiffs' claims raised in this suit. "Where a default judgment is entered, only those issues presented by the complaint can be deemed concluded; the defaulting party cannot be charged with admitting matters not within the complaint by his default." *Van Den Biggelaar v. Wagner,* 978 F. Supp. 848, 856-57 (N.D. Ind. 1997) (citations omitted). *See also State Exch. Bank of Culver v. Teague,* 495 N.E.2d 262, 267 (Ind. Ct. App. 1986) (cited in *Eichenberger v. Eichenberger,* 743 N.E.2d 370, 374 (Ind. Ct. App. 2001), case cited by Defendants) (same principle). The default judgments are not final judgments on the merits with respect to Plaintiffs' breach of contract, constructive fraud, and civil RICO claims, as the collection suits in which the judgments were entered were very limited and did not address the issues raised in this suit.

The short complaints filed by NextGear in the earlier collection suits alleged one cause of action against Mattingly and Platinum—breach of contract for default and unpaid amounts under

the applicable promissory notes[21]—and very few facts, including the existence of a Promissory Note and Floorplan Agreement, guaranty signed by the dealer's principal, advance of funds, and failure to repay. Plaintiffs' remaining claims in this suit, including breach of contract, constructive fraud, and civil RICO, brought individually and on behalf of a putative class of similarly situated dealers, are significantly broader in scope than NextGear's earlier collection suits and the default judgments certainly did not resolve them. Thus, Mattingly and Platinum's claims herein cannot be deemed adjudicated by the default judgments.

### 2. The Claims Asserted Herein Could Not Have Been Determined in the State Court Collection Suits

Contrary to Defendants' arguments, Mattingly and Platinum's claims were not and could not have been determined and would not have been compulsory counterclaims in the earlier collection suits. NextGear's reference to Indiana Rule of Trial Procedure Rule 13(A) focuses on the "same transaction or occurrence" language of the compulsory counterclaim rule but excludes the preceding language which is critical to the analysis here: "(A) Compulsory counterclaims. A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject-matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction…" Ind. R. Trial P. 13(A). Under this Rule, claims that had not accrued at the time of the original suit cannot be considered compulsory counterclaims. *See id.* and *State Exch. Bank,* 495 N.E.2d at 267 (claims that did not accrue until

---

[21] DSC also asserted a claim for breach of guaranty against each of the individual guarantors based on the dealers' default under the note.

well after the time for filing an answer had expired could not be considered compulsory counterclaims under Rule 13(A)).[22]

Here, Mattingly and Platinum's claims had not accrued at the time the collection suits were initiated because they did not know, and in the exercise of ordinary diligence could not have discovered, that NextGear often charged interest before making payments to the auctions. As the Court previously held, "[w]ithout knowing when NextGear actually paid the auction houses, Plaintiffs could not have been apprised of the alleged scheme to prematurely charge fees and interest on their accounts well before NextGear paid the auction houses." Dkt. 186 at 16. The evidence now bears out that conclusion. As Defendants have admitted, and as set forth in the Statement of Material Facts in Dispute, the date of NextGear's payments to the auctions *was not provided* to the dealers. *See, e.g.,* Galema Dep. [Ex. 6] 56:17-22-57:8-13; LaBauve Dep. [Ex. 8] 57:25-58:13; NextGear 30(b)(6) Dep. [Ex. 1] 61:3-62:4. NextGear did not provide that information to its dealers, and its dealers (including Mattingly and Platinum) did not know, and could not have known, when the auctions were paid. As multiple NextGear employees, including Galema at the 30(b)(6) deposition, testified, even the account executives did not know when NextGear paid the auctions, and thus did not provide that information to the dealers. *See* LaBauve Dep. [Ex. 8] 57:25-58:13; NextGear 30(b)(6) Dep. [Ex. 1] 61:3-62:4. Thus, during the time of their relationships with NextGear and the collections suits, Plaintiffs could not through ordinary diligence have discovered that they had been charged interest prior to any advance by NextGear.

---

[22] Under Indiana law, "the cause of action of a tort claim accrues and the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another." *Wehling v. Citizens Nat. Bank,* 586 N.E.2d 840, 843 (Ind. 1992). Likewise, a breach of contract claim accrues when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered the breach of contract. *McFreen v. Alcatel-Lucent USA, Inc.,* 2014 WL 6997843, *2 (S.D. Ind. Dec. 10, 2014) (citing *Wehling,* 586 N.E.3d at 842).

The fact that Mattingly spoke with its account executive about the timing of interest relative to NextGear's receipt of a vehicle's title does not change the critical fact that Mattingly did not know (and had no way to know) when NextGear was paying the auctions. The timing of receipt of a title does not have anything to do with the timing of the payment. *See, e.g.,* Mattingly Dep. [Ex. 11] 42:2-42:8. There was no way for Mattingly to know or suspect NextGear had not paid for the car on the times that it did not have the title at the time he paid off a car.

Defendants' argument that Platinum failed to exercise due diligence because it "failed to investigate" how interest was charged falls flat in light of the deposition testimony of Platinum's principal, Nicol Perry, that she did regularly receive account statements from NextGear and also would go online to discoverdsc.com to check her account—neither of which provided her with information on the timing of NextGear's payments to the auctions. Platinum Dep. [Ex. 12] 68:10 to 70:9. Moreover, even if Platinum had asked its account executive when NextGear made payments to the auctions, it would have been to no avail as the account executive did not have that information. *See* NextGear 30(b)(6) Dep. [Ex. 1] 61:3-62:4.[23] For these reasons, Mattingly and Platinum's claims were not compulsory counterclaims within the scope of Rule 13(A) and could not have been adjudicated in the prior actions. Summary judgment on res judicata is inappropriate.

### E. "Setoff" (Defendants' Affirmative Defense)

Defendants make the unsupported assertion that two Plaintiffs are "barred" from pursuing claims because of prior judgments that could exceed the judgment value that those Plaintiffs could

---

[23] This testimony from Mattingly and Platinum also defeats Defendants' motion as to Plaintiffs' previously-raised fraudulent concealment argument. Defendants wrongfully assert that "Mattingly was well aware while it was doing business with NextGear that NextGear charged interest even before title came in on a vehicle…" to establish that Mattingly had actual knowledge of the wrongful interest charges. This, however, is contrary to the testimony of Mr. Mattingly cited herein. Furthermore, as established by the testimony of Ms. Perry, she reviewed the account information provided by NextGear—none of which, by Defendants' own admissions—would have provided her with the information necessary to know that she had been wrongfully charged interest. As a result, Defendants' have failed to sustain their burden on summary judgment as to the application of fraudulent concealment.

recover herein. However, this Court has recognized the contrary: that a claim for "setoff is not an affirmative defense that can destroy Plaintiffs' right of action; rather, it may reduce the amount of [Defendant's] liability to Plaintiffs in the event that Plaintiffs are successful on their claims." *Tharp v. Catron Int. Sys., Inc.*, 2016 WL 7210940, at *3 (S.D. Ind. Dec. 12, 2016) (Pratt, J.). Also in *Tharp*, this Court recognized that a claim for setoff is a permissive counterclaim, not an affirmative defense. *Id.* ("Therefore, Catron's claim for a setoff is properly characterized as a permissive counterclaim.").[24] Because Defendants have not asserted any counterclaims in this matter, their claim for setoff is not properly before this Court.[25]

### F. "Unclean Hands" (Defendants' Affirmative Defense)

Not only has NextGear failed to meet its legal burden on summary judgment as to the equitable defense of unclean hands, the relevant facts also make NextGear unable to prevail on that defense on summary judgment or at trial.

> The unclean hands doctrine is an equitable tenet that demands one who seeks equitable relief to be free of wrongdoing in the matter before the court. *Fairway Developers, Inc. v. Marcum*, 832 N.E.2d 581, 584 (Ind.Ct.App.2005), *trans. denied*. The purpose of the unclean hands doctrine is to prevent a party from reaping benefits from his or her misconduct. *Id.* at 585. For the doctrine of unclean hands to apply, the alleged wrongdoing must be intentional and must have an immediate and necessary relation to the matter being litigated. *See id.* at 584. The doctrine of unclean hands is not favored by the courts and must be applied with reluctance and scrutiny. *Wagner v. Estate of Fox*, 717 N.E.2d 195, 202 (Ind.Ct.App.1999).

*Coppolillo v. Cort*, 947 N.E.2d 994, 1000 (Ind. App. 2011).

---

[24] Because a claim for the collection of amounts due under the default judgments obtained against Mattingly and Platinum may only be a permissive, but not mandatory, counterclaim supports Plaintiffs' position that res judicata does not apply to these claims.

[25] Further, the cases cited by Defendants are inapplicable. The *Citizens Bank of Maryland* case addresses setoff as provided in Section 363 of the Bankruptcy Code while the *Pichon* case involved an act of criminal conversion, neither of which are at issue here.

As discussed below, the evidence does not support a finding of unclean hands on the part of Plaintiffs. NextGear's attempts to paint Plaintiffs as fraudsters in this case is without merit and is certainly without sufficient basis to prevail on summary judgment on unclean hands.

As to Mattingly, Mr. Mattingly repeatedly testified on behalf of the company that the litany of wrongs alleged by NextGear-- wrongs that were never disclosed to Mattingly at the time they was defaulted by NextGear-- were not certainly intentional, if they were wrongdoings at all. When asked if he had "any personal anger or animosity at DSC for the default situation," Mattingly responded: "[m]y biggest thing, if I was doing something wrong, I wish they had let me know instead of swooping in one day and there they are." *See* Mattingly Dep. [Ex. 11] 149:24-150:5. When asked about selling cars out of trust, Mattingly explained that it was due to an error in the listing of vehicles provided by NextGear:

> [t]hat was my mistake and it – it's probably in this [sic] records. And I -- I -- actually, let me look -- look it up and show it to you. The vehicle was purchased, sold to an ve -- an individual. When -- when it came time at the repossession, I had not paid it off because I overlooked it, because the car was listed -- it was a sport track. And your -- guys are familiar with a sport track, but it was listed as Explorer, which technically it is an Explorer sport track. And I just overlooked it. And that's the own -- you know, that's – that's what happened on that one.

*Id.* at 207:2-15.

The vehicle that NextGear alleges was sold out of Trust by Mattingly because NextGear was not paid within twenty-four hours of a sale was not in fact sold because Mattingly "was holding a check for a customer." Mattingly testified that he never sold a vehicle at auction or through the Online Vehicle Exchange at a pre-arranged price and believed that the flooring of vehicles that he purchased at a pre-arranged price was proper because it was done by NextGear for Mattingly. *See id.* at 93:6-10; 12-94:1. Finally, Mattingly testified he did not intend to pay the debt to NextGear not because of any nefarious intent, but rather because it had been "discharged at bankruptcy." *See id.* at 131:18-22.

30

As to Red Barn, only NextGear defrauded anyone. NextGear "took" Red Barn's inventory when Red Barn had "an outstanding balance"; however, Red Barn did not provide DSC with "checks that didn't clear" and did not make payments on Devon London's home as suggested by NextGear in its attempt to obfuscate its own fraudulent conduct. *See* London Dep. [Ex. 10] 109:17-24; 106:15-21; 172:5-173:21.

Likewise, Platinum does not have unclean hands in this matter, and NextGear's assertions that Platinum knowingly sold cars out of trust are disputed by the testimony of Ms. Perry. Ms. Perry testified that she had a dealership named CarKey Auto, Inc. ("CarKey") that she operated with her former boyfriend for a number of years. When their relationship ended, Ms. Perry testified that she opened up another dealership, Platinum, with what she thought was a separate line of credit from NextGear. *See* Platinum Dep. [Ex. 12] 93:15-25. Ms. Perry explained that she thought she was no longer responsible for the CarKey line of credit. *Id*. Subsequently, and unknown to Ms. Perry, CarKey sold vehicles out of trust. Because Ms. Perry had (apparently) not been removed as guarantor of CarKey's credit line, NextGear held her personally liable for CarKey's default. *See id.* at 100:16-101:1;109:3-6. Thus, Platinum's default related to the actions of another entity that Platinum did not control, and that Platinum did not sell cars out of trust. *Id*. Ms. Perry's mistake was in not making sure that NextGear removed her personal guaranty from CarKey's line of credit. Thus, Platinum's recovery in equity is not barred by the doctrine of unclean hands.

Accordingly, Defendants are not entitled to summary judgment on unclean hands.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.

Respectfully submitted,

/s/ James M. Garner

CATHERINE E. LASKY (La. Bar No. 28652)
*Pro Hac Vice*
KERRY A. MURPHY (La. Bar No. 31382)
*Pro Hac Vice*
**LASKY MURPHY, L.L.C.**
715 Girod Street, Suite 250
New Orleans, Louisiana 70130
Telephone: (504) 603-1500
Facsimile: (504) 603-1503
klasky@laskymurphy.com
kmurphy@laskymurphy.com

GLADSTONE N. JONES, III (La. Bar No. 22221) *Pro Hac Vice*
LYNN E. SWANSON (La. Bar No. 22650)
*Pro Hac Vice*
**JONES, SWANSON, HUDDELL & GARRISON, L.L.C**.
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 523-2500
Facsimile: (504) 523-2508
gjones@jonesswanson.com
lswanson@jonesswanson.co

CASSIE E. FELDER (La. Bar No. 27805)
*Pro Hac Vice*
**THE CASSIE FELDER LAW FIRM**
7515 Jefferson Hwy., #313
Baton Rouge, LA 70806
Main: (504) 232-1733
Cell: (504) 400-1127
cassie@cassiefelderlaw.com

JAMES M. GARNER (La. Bar No. 19589)
*Pro Hac Vice*
RYAN D. ADAMS (La. Bar No. 27931)
*Pro Hac Vice*
MATTHEW M. COMAN
(La. Bar No. 23613)
*Pro Hac Vice*
JACOB AIREY (La. Bar No. 27933)
*Pro Hac Vice*
**SHER GARNER CAHILL RICHTER KLEIN & HILBERT, L.L.C.**
909 Poydras Street, Suite 2800
New Orleans, Louisiana 70112
Telephone: (504) 299-2100
Facsimile: (504) 299-2300
jgarner@shergarner.com
radams@shergarner.com
mcoman@shergarner.com
jairey@shergarner.com

Kathleen A. DeLaney (#18604-49)
**DELANEY & DELANEY, L.L.C.**
3646 North Washington Blvd.
Indianapolis, IN 46205
Telephone: (317) 920-0400
Facsimile: (317) 0404
Kathleen@delaneylaw.net

**COUNSEL FOR PLAINTIFFS AND THE PROPOSED CLASS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 24th day of May, 2017, a copy of the foregoing was filed electronically. Notice of the filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

David J. Jurkiewicz
Paul D. Vink
BOSE MCKINNEY & EVANS, LLP
111 Monument Circle
Suite 2700
Indianapolis, IN 46204

Jason S. McCarter
Tracey K. Ledbetter
EVERSHEDS SUTHERLAND (US) LLP
999 Peachtree Street, NE, Suite 2300
Atlanta, GA 30309-3996

*/s/ James M. Garner*
JAMES M. GARNER