UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RED BARN MOTORS, INC., | ) |
| PLATINUM MOTORS, INC., | ) |
| MATTINGLY AUTO SALES, INC., | ) |
| YOUNG EXECUTIVE MANAGEMENT & | ) |
| CONSULTING SERVICES, INC., | ) |
| Individually, and on behalf | ) |
| of other members of the | ) |
| general public similarly | ) |
| situated, | ) |
| Plaintiffs, | ) |
| | ) Docket No. |
| -v- | ) 1:14-cv-01589-TWP-DKL |
| | ) |
| COX ENTERPRISES, INC., | ) Class Action |
| COX AUTOMOTIVE, INC., | ) |
| NEXTGEAR CAPITAL, INC. f/k/a | ) |
| DEALER SERVICES CORPORATION, | ) |
| successor by merger with | ) |
| Manheim Automotive Financial | ) |
| Services, Inc., and JOHN WICK, | ) |
| Defendants. | ) |

THE 30(B)(6) DEPOSITION OF
NEXTGEAR CAPITAL, INC. f/k/a DEALER SERVICES CORPORATION
UPON ORAL EXAMINATION OF ADAM GALEMA

The 30(b)(6)deposition of NextGear Capital, Inc.
f/k/a Dealer Services Corporation upon oral examination
of ADAM GALEMA, a witness produced and sworn before me,
Tami L. Scott, Notary Public in and for the County of
Marion, State of Indiana, taken on behalf of the
Plaintiffs at the offices of Bose, McKinney & Evans,
111 Monument Circle, Suite 2700, Indianapolis, Marion
County, Indiana, on December 20, 2016, at 8:30 a.m.,
pursuant to the Federal Rules of Civil Procedure.

ASSOCIATED REPORTING, INC.
251 EAST OHIO STREET, SUITE 940
INDIANAPOLIS, INDIANA 46204
(317) 631-0940
www.associated-reporting.com

EXHIBIT 1

1        with, who was that?

2    A   Eric Hurst.

3    Q   Hurst?

4    A   Yes.

5    Q   How long has Mr. Hurst been with NextGear?

6    A   Since, I would guess, since around 2005.

7    Q   2005 is when DSC was formed; is that correct?

8    A   Yes.

9    Q   And if I use NextGear, you'll understand that during

10       the time period it was DSC that I'm referring to

11       DSC; is that correct?

12   A   Yes.

13   Q   Great.  And what did you discuss with Mr. Hurst?

14   A   Mainly the topics around training.

15   Q   Did you review any documents with Mr. Hurst?

16   A   No.

17   Q   Anybody else, other than Mr. Goodyear and Mr. Hurst,

18       other than counsel that you spoke with in

19       preparation for your testimony today?

20   A   No.

21   Q   And did you review any documents in preparation for

22       your testimony today?

23   A   Yes.

24   Q   Can you recall what you looked at?

25   A   Just some of the exhibits that we will go through

EXHIBIT 1

1        today, I imagine.

2   Q    Did you review your deposition testimony from

3        November?

4   A    I did.

5            (Deposition Exhibit 2 marked for

6        identification.)

7   Q    I'm going to hand you a document that you have seen

8        in your prior deposition, and it's Bates labeled

9        NGR 1 through 35, and this is a document you're

10       familiar with; correct?

11  A    Yes.

12  Q    And I believe you testified that you had a role in

13       preparing this document; is that correct?

14  A    That's correct.

15  Q    And can you tell me what your role in preparing it

16       was?

17  A    Yeah.  My role was really just fact checking and

18       confirming, validating that the information

19       presented on here was accurate and representative of

20       the data that's in our system.

21  Q    Now, did you have any role in deciding which columns

22       to include in this exhibit?

23  A    No.

24  Q    Now, I just want to go through a few of the column

25       headings and ask what they refer to.

EXHIBIT 1

Page 8

1   A   Sure.  Uh-huh.

2   Q   There is a column, first one is "Floorplan Status".

3       Do you see that?

4   A   I do.

5   Q   And on the first page, there is a list of voided --

6       the first few are voided, denied.  Is it correct

7       that the ones that are marked voided or denied,

8       these vehicles were never floorplanned?

9   A   The ones that are marked voided were floorplanned

10      and subsequently voided.

11  Q   Okay.  Do you know whether any payments were made on

12      those floorplans?

13  A   I do not know.

14  Q   And do you know whether any interest was charged on

15      the cars that were floorplanned and marked voided?

16  A   There would not have been.

17  Q   And then as far as denied, they were never

18      floorplanned at all; is that correct?

19  A   That's correct.

20  Q   Now, "Payee," it seems to be the choice is seller or

21      buyer?

22  A   Yes, that's correct.

23  Q   Can you identify the difference for me, please,

24      between seller and buyer payee?

25  A   Sure.  The seller payee is going to be, in most

EXHIBIT 1

```
 1              cases, the auction or the entity that's obviously

 2              selling the vehicle to our dealer, and when it

 3              says -- the payee is the buyer, that is our dealer

 4              that we are paying.

 5     Q        And in the situations that you are paying the buyer

 6              or the dealer, is that when the dealer already owns

 7              a car and is floorplanning it after the fact?

 8     A        Generally, yes.  Yeah.

 9     Q        And now, "Unit Purchase Date," is that the date that

10              the dealer purchased the unit?

11     A        That's correct.

12     Q        And then the "Flooring Date" is the date that it was

13              floorplanned with NextGear; correct?

14     A        That's correct.

15     Q        Now, as far as the flooring date, is that the date

16              that the first fee is -- the first curtailment or

17              the fee for the first floorplan is charged to the

18              dealer?

19     A        Yes.

20     Q        And then "Completed Date," what is that?

21     A        The completed date is the date that the vehicle is

22              paid off in full.

23     Q        And there is, in this first batch, there is no

24              completed date because they were voided or denied;

25              correct?
```

EXHIBIT 1

Page 10

1    A    Yes.

2    Q    One more question about the flooring date.  Is the

3         flooring date the date on which interest starts to

4         accrue on the unit that is floorplanned?

5    A    Yes.

6    Q    All right.  Now, getting into "Term Plan

7         Description," let's just take that first line, if

8         you don't mind.

9    A    Sure.

10   Q    Can you tell me what the D45/30/30 refers to?

11   A    Yes.  That section refers to the length of each term

12        inside that term plan, so that would indicate that

13        the first term in this term plan is 45 days long,

14        followed by two subsequent terms of 30 days each.

15   Q    And then the next, the F75/70/70, what is that?

16   A    Yes.  Those are the curtailment fees associated with

17        each of those terms, so it would be $75 for that

18        first 45-day term, and then $70 for each of those

19        two 30-day terms.

20   Q    And then the R4.5?

21   A    That indicates the interest that is charged to the

22        dealer.  That is noted as the -- the 4.5 noted there

23        is the spread above either, depending on what time

24        frame we're looking at, it's either the spread above

25        prime or the base rate.

EXHIBIT 1

Page 11

1   Q   And when, what time period would prime apply?

2   A   That would have been from 2005 through, up until

3       August of 2008.

4   Q   And then the base rate would apply from August 2008

5       through the end of the time period we're talking

6       about, which is 2013?

7   A   Yes.  Correct.

8   Q   Okay.  Now, I've also seen reference to base rate

9       fixed, base rate variable, risk rate, and default

10      rate.  Are you familiar with those?

11  A   Yes.

12  Q   When you say base rate, are you referring to base

13      rate fixed?

14  A   Yes.

15  Q   Can you identify any time between August 2008 and

16      the end of 2013 when the base rate variable would

17      have been applied as an interest rate?

18  A   It's my understanding it would have only been used

19      potentially during a transition period where the

20      dealer had not signed a new contract where that base

21      rate fixed had been, you know, initiated.

22  Q   And is there any notation in Exhibit 2 of when the

23      base rate variable might have been applied to the --

24      in addition to the rate listed here?

25  A   No.

EXHIBIT 1

1   Q     What about the risk rate, was that ever applied

2         between August 2008 and 2013?

3   A     It's my understanding that risk rate has never been

4         applied.

5   Q     And then the default rate, has that ever been

6         applied between August 2008 and 2013?

7   A     It's my understanding that has never been applied

8         either.

9   Q     Thank you.  All right.  Now, perhaps we picked a --

10        not the best example, so let's move to a completed

11        one just so that -- let's start, if you don't mind

12        switching, and looking at stock number 1.  Do you

13        see that?  It's a 2002 Pontiac Grand Am GT.

14  A     Yes.

15  Q     So that was on a 30/30/30/45 term.  Those were the

16        terms of that plan; correct?

17  A     Correct.

18  Q     The fees were $30/$30/$30/$100; correct?

19  A     Correct.

20  Q     So that means -- there is a flooring date of

21        November 22nd, 2006, so is it correct that on

22        November 22nd, 2006, Mattingly was charged $30 for

23        starting this floorplan for the 2002 Pontiac Grand

24        Am?

25  A     That's correct.

EXHIBIT 1

Page 14

1   Q   So then after the R2.75, there is a "C%0/0/7.5."

2       Can you explain that for me, please?

3   A   Sure.  That is the curtailment payment, so the

4       principal pay-down that is required at the end of

5       each term to then go into the subsequent term.

6   Q   So at the end of the first term, Mattingly was not

7       required to pay any principal down; correct?

8   A   That's correct.

9   Q   They weren't at the second term, but they were

10      required to pay 7.5 percent at the end of the third

11      term in order to go to the fourth term?

12  A   That's correct.

13  Q   Now, is it correct that looking at -- between

14      Exhibit 2 and Exhibit 3 that the total interest rate

15      charged Mattingly for this transaction was

16      11 percent; is that correct?

17  A   That's correct.

18  Q   And that 11 percent was charged to -- on the

19      financed amount starting on November 22nd, 2006; is

20      that correct?

21  A   It would have been charged on the financed amount,

22      as well as the initial $30 fee.

23  Q   Okay.  So now what I would like you to tell me, in

24      the last -- so the last column on this is interest,

25      and it shows for that one $78.79.  How did NextGear

EXHIBIT 1

```
 1              arrive at that $78.79 figure?

 2    A         It is simply the compounding daily interest

 3              calculation on the amount financed and plus the

 4              initial floorplan fee.

 5    Q         So you would take the 11 percent and the -- I

 6              believe it was on a 360-day year; is that correct?

 7    A         That's correct.

 8    Q         Is it your understanding that it's been on a 360-day

 9              year from 2005 through the end of 2013?

10    A         Yes.

11    Q         So you would figure out what the interest rate

12              daily, 11 percent is daily based on a 360-day year;

13              correct?

14    A         Correct.  As a point of clarification, that daily

15              rate would be truncated after six decimal places.

16    Q         And then that would be applied to the $8,925 plus

17              $30, so $8,955 compounded daily; correct?

18    A         That's correct.

19    Q         Now, let's take this example.  This was paid off --

20              the completed date you said is the date that the

21              vehicle was paid off; correct?

22    A         That's correct.

23    Q         So this was paid off between the -- within the first

24              30-day period; is that right?

25    A         That's right.
```

EXHIBIT 1

1  Q    So how many days -- looking at this, the only fee

2       that was charged is the $30; is that correct?

3  A    Yes.

4  Q    I've seen reference to an $18 records fee.  Are you

5       familiar with that at all in transactions?

6  A    Yes, uh-huh.

7  Q    But I -- none of these floor fees that are listed

8       here appear to include that $18 fee.

9  A    That's correct.

10 Q    Is there a reason that that's not included?

11 A    Yes, sure.  That fee did not exist back then in

12      2006.

13 Q    Okay.  Do you know when it came into existence?

14 A    I would have to review finance schedules, but I

15      believe it's going to be around the 2010 time frame.

16 Q    Let's turn to -- is it your understanding that that

17      $18 fee would have been included in the "Floor Fees"

18      column of Exhibit 2?

19 A    It would not be.

20 Q    And why is that?

21 A    We only noted the -- as the asterisk notes on page

22      23, we only included floorplan fees, curtailment

23      fees, extension fees, and specific source fees.

24 Q    Okay.  Where is -- I'm looking at --

25           MR. VINK:  The very last page of the exhibit.

EXHIBIT 1

Page 17

1   A   Yes.  It is the very last page of the section.

2   Q   Oh, I see.  Okay.  On 35; correct?

3   A   There you go, yes.

4   Q   "Floor Fees include floor plan fees, curtailment

5       fees, extension fees, and specific source fees as

6       applicable."  So the $18 records fee is not a -- is

7       not one of these fees; is that correct?

8   A   That's correct.

9   Q   Was the $18 fee included in the interest calculation

10      that is the column on this page?

11  A   To the extent that the records fee, records service

12      charge was included on a floorplan, it would be part

13      of the interest calculation.

14  Q   So how, then, if the floor fees are not all included

15      in this exhibit, how can one accurately calculate

16      the interest if you don't have all the relevant

17      data?

18  A   My understanding of this report is really just for

19      reporting these data points that were in our system,

20      and you know, this is not a report that would be --

21      this is created for this case, so this is not a

22      report that our dealers would see or use to

23      calculate their own interest if they would want to.

24  Q   What would the dealers use to calculate their own

25      interest?

EXHIBIT 1

Page 18

```
 1   A      They have, you know, several options available to

 2          them.  They have their online website, you know,

 3          their dealer portal they can log in to and see all

 4          of their activity, all of their outstanding

 5          floorplans.  They would have reporting available to

 6          them that would show the same outstanding floorplans

 7          that would also indicate the term plans.  They would

 8          have all the information available to them.

 9   Q      But are you aware that Platinum Motors -- does

10          Platinum Motors still have access to their dealer

11          portal?

12   A      They would not.  They're terminated.

13   Q      Does Mattingly Auto Sales still have access to their

14          dealer portal?

15   A      They would not.

16   Q      And Red Barn Motors, do they have still have access

17          to their dealer portal?

18   A      They would not.

19   Q      So are you aware that your counsel has represented

20          to the magistrate judge in this case that they've

21          provided all the information needed to calculate the

22          interest charged in this case and that it was

23          reflected in Exhibit 2?  I believe you're testifying

24          that no, all the information is not included in

25          this; is that correct?
```

EXHIBIT 1

Page 19

1          MR. VINK:  I'm going to interpose an objection
2      because I think that misstates what was said.  The
3      case revolves around interest and curtailment fees.
4      With respect to interest and curtailment fees, this
5      is a complete document.  To the extent you guys are
6      trying to amend your complaint now in the final day
7      of discovery to add additional fees, we would object
8      to that.
9          MS. LASKY:  And I'll just say we're just trying
10     to figure out the interest and how to get to an
11     accurate number, and if we can't match the numbers
12     you've provided, there is no way to get to an
13     accurate number.  And you've represented that this
14     is a way to get to the accurate number, and I'll
15     just say in response it is not, and he's just
16     testified it's not.
17         MR. VINK:  I don't think that's what he's
18     testified to, but --
19  Q  So can you tell me that the floor fees that are --
20     why isn't the $18 record fee included in here?
21  A  It's my understanding that it was not requested.
22     Again, as Paul stated, this was related to floorplan
23     fees, curtailment fees, and interest.
24  Q  So is there any way to do a mathematical calculation
25     based on the numbers we have here to accurately

EXHIBIT 1

```
 1           replicate how NextGear came up with the $78.79

 2           interest line for the 2002 Pontiac Grand Am that we

 3           were just talking about?

 4   A       Sure.

 5   Q       Okay.  Can you tell me how to do that?

 6   A       Yeah.  You would take the $8,925, plus the $30

 7           floorplan fee, and compound that daily using an

 8           11 percent interest rate.

 9   Q       So it's your testimony that the $78.79 only

10           includes -- is the interest based on the fees that

11           were included here?

12   A       The $78.79 is the total interest charged on this

13           particular vehicle.

14   Q       Okay.  But if you said that that interest includes

15           the $18 -- or well, then let's move to one from

16           2010, okay?  I believe you said there was no $18 fee

17           in 2010; is that correct?

18   A       That's correct.

19   Q       Do you know when in 2010 they began to charge the

20           $18?

21   A       No, I do not.

22   Q       Let's do, turning to NextGear 7, or NGR 7, I

23           apologize, there is a stock number 97.  Do you see

24           that, a 1994 Chevrolet Sierra?

25   A       Yes.
```

EXHIBIT 1

Page 53

```
1            determine the interest paid by Red Barn Motors

2            during the time between January 4th, 2012 and

3            March 9th, 2012 on the Mazda Miata?

4                 MR. VINK:  Object to the form.  You can answer.

5    A       That is certainly a calculation that I could perform

6            to come up with that amount of interest paid, or

7            amount of interest accrued.  Excuse me.

8    Q       And that would not be the amount of interest paid;

9            correct?

10   A       Correct.

11   Q       And would that be a precise calculation?

12   A       No.  It would be an estimate.  But again, the total

13           amount listed there is an accurate and precise

14           number.

15   Q       The amount of interest listed there is an accurate,

16           precise number of the interest paid throughout the

17           life of the floorplan loan; correct?

18   A       That's correct.

19   Q       And other than doing a per diem estimate, is there

20           any way to calculate the amount of interest accrued

21           per day on any of these transactions based solely on

22           the information contained in Exhibit 2?

23   A       Again, the information here provides you with most,

24           if not all, of the information that you would need

25           that you could put a presumptive calculation
```

EXHIBIT 1

Page 54

```
 1          together that would come up with a very accurate
 2          estimate of that interest.
 3    Q     So when you say most, if not all, it means it does
 4          not contain all the information we need to do that
 5          calculation; correct?
 6    A     As we established before, there are potentially fees
 7          here not listed, and again, timing and amount of
 8          payments are not listed on this report either.
 9    Q     And those are necessary to figure out the exact
10          interest charged per day on these floorplanned
11          vehicles; correct?
12    A     You would need that to calculate a per day, the
13          exact to the penny, yes.  But you could obviously
14          get a per diem.
15              MS. LASKY:  All right.  Let's take a break.
16          Won't be long.
17              (A recess was taken.)
18    BY MS. LASKY:
19    Q     Mr. Galema, can you list for me every variable that
20          Discover uses to calculate the interest listed there
21          on Exhibit 2, please?
22    A     Try to give you an exhaustive list.  It would be
23          principal amount; interest rate; fees; time, number
24          of days; payment history.  I think that's probably
25          about it.
```

EXHIBIT 1

Page 55

```
 1   Q    And again, payment history would include the date

 2        and amount of the payments; correct?

 3   A    That's correct.

 4   Q    Now, we talked about the base rate, and is it

 5        correct that the base rate was 5 percent from

 6        August 2008 through the end of 2013?

 7   A    That's correct.

 8   Q    So it remained unchanged; correct?

 9   A    Correct, uh-huh.

10   Q    I'm going to turn now to, do you recall executing a

11        declaration or affidavit -- I can't remember what it

12        was filed as -- a declaration in this case?

13   A    Declaration, yes.

14   Q    I'm going to mark that as Exhibit 4.

15            (Deposition Exhibit 4 marked for

16        identification.)

17   Q    And I know you testified, you were asked some

18        questions about this at your individual deposition.

19        I want to turn to number 9, which is on the second

20        page.

21   A    Okay.

22   Q    "From January 2005 through July 2013, various

23        customers of MAFS and DSC signed materially

24        different versions and subsets of MAFS' and/or DSC's

25        respective agreements."
```

EXHIBIT 1

Page 56

```
 1              I just want to focus on the DSC agreements for

 2              purposes of this question.

 3    A    Sure.

 4    Q    What agreements did you look at in order to make the

 5         statement that DSC customers signed materially

 6         different versions of DSC agreements?

 7    A    I have seen agreements for many of our dealers, and

 8         I'm familiar with the term sheets for each of our

 9         dealers and know them to be different.

10    Q    And when you say the term sheets, that would be what

11         is reflected under the "Term Plan Description"

12         column on Exhibit 2; is that correct?

13    A    That's correct.

14    Q    So all of the different information in the different

15         versions of the term sheets would be reflected in

16         the "Term Plan Description" of Exhibit 2; is that

17         correct?

18    A    Can you repeat that?  Excuse me.  Sorry.

19    Q    That's okay.  All of the relevant information from

20         the term plans, the different term plans executed by

21         the DSC customers, that would all be included in the

22         "Term Plan Description" column of Exhibit 2; is that

23         correct?

24    A    Correct.

25    Q    And you say in the second sentence of number 10,
```

EXHIBIT 1

Page 57

1           "Interest rates and fees varied by customer and by

2           particular financing program."  And again, were the

3           interest rates and fees, are those reflected in the

4           "Term Plan Description" column of Exhibit 2?

5   A    Yes.

6   Q    And we've established that prior to August of 2008,

7           so is that up to and including July of 2008 that you

8           used the Wall Street Journal prime rate as the base

9           rate?

10  A    Yes, I believe that's true.

11  Q    And then as of August 1st, 2008 through the end of

12          2013, the base rate was 5 percent; correct?

13  A    Correct.

14  Q    And then on 11, you say, "The agreements" -- and

15          again, I just want to focus on DSC -- that DSC used

16          "were substantially and independently revised at

17          least twice since 2007 and have also been revised

18          for specific customers, after negotiation with those

19          customers, on numerous other occasions."

20           Have you reviewed the deposition testimony of

21          anyone else in this case, other than your own?

22  A    No.  I've only reviewed mine.

23  Q    Now, Mr. LaBauve testified -- do you know who he is?

24  A    Yes.

25  Q    That the promissory note, the Demand Promissory Note

EXHIBIT 1

Page 58

1      and Security Agreement that DSC used during the

2      relevant time period was a take-it-or-leave-it

3      contract.  Do you understand what is meant by a

4      take-it-or-leave-it contract?

5           MR. VINK:  Objection to the form.  You can

6      answer.

7   A  Yeah, in a general sense, I would understand what

8      that means.

9   Q  Do you, on behalf of NextGear/DSC, have any

10     knowledge of the Demand Promissory Note and Security

11     Agreement, any of the terms in the Demand Promissory

12     Note and Security Agreement being individually

13     negotiated -- not including the Term Sheet -- the

14     Demand Promissory Note and Security Agreement, the

15     individual terms being individually negotiated with

16     any dealers during the relevant time period?

17  A  They are generally not.  It is generally a

18     take-it-or-leave-it.  I am aware that there have

19     been instances where certain points of that contract

20     and agreement have been negotiated.

21  Q  Do you have any specifics on those negotiations?

22  A  I was not involved in them directly.

23  Q  Do you know how many times that terms on the Demand

24     Promissory Note and Security Agreement were changed

25     for individual dealers?

EXHIBIT 1

1   A   I'm not familiar with the number exactly, no.

2   Q   Do you think it was less than ten?

3   A   Hard to say.  It's probably around that number.

4   Q   And do you know how many Demand Promissory Notes and

5       Security Agreements were signed with DSC between

6       2005 and 2013?

7   A   The exact number, I do not know.  There would have

8       been, just to give you an estimate, complete

9       estimate, maybe around, it's hard to say, 20,000

10      during that time frame.

11  Q   So it's your belief that there were maybe around ten

12      out of the around 20,000 that the terms of the

13      Demand Promissory Note and Security Agreement were

14      negotiated; correct?

15          MR. VINK:  Before you answer, I'm just going to

16      object.  I think we're outside of the scope of the

17      30(b)(6), but you're free to answer in your

18      individual capacity.

19          THE WITNESS:  Okay.  Can you read that back?

20          (The requested material was read back by the

21      reporter.)

22  A   Yes.  That would be an accurate estimate.

23          MS. LASKY:  I would just state for the record

24      that I think this falls within Topic 19, which is

25      the factual assertions and allegations made in the

EXHIBIT 1

Page 60

1    litigation, so.

2              MR. VINK:  I understand, but as you know, we

3         objected to that, and I stand by my objection.  He's

4         already answered, so it's largely academic.

5              MS. LASKY:   That's fine.

6    Q    Turning back to Exhibit 2 for a minute, please.  And

7         Topic 15 is all information and documents that

8         NextGear provided or made accessible to the named

9         plaintiffs during their customer dealer relationship

10        with NextGear, including, but not limited to, all

11        information and documents that were available

12        through the Discover system.

13             So my question is, was that "Total for" line on

14        Exhibit 2 available to any of the customer dealers

15        through the Discover system or any system that they

16        had access to while they were customers of

17        NextGear/DSC?

18   A    Dealers do not have access to that, the date on

19        which payments are made to the -- in auction or

20        buyer.

21   Q    And are you aware of any -- when I use the term

22        "account executive," do you know what I'm referring

23        to?

24   A    Yes.

25   Q    What is an account executive?

EXHIBIT 1

Page 61

```
 1    A    They're our field reps that manage the relationships

 2         with our dealer clients.

 3    Q    Are you aware of whether the account executives have

 4         access to the information on when payments are made

 5         to the auctions or other sellers of floorplanned

 6         vehicles?

 7    A    I'm not sure.  I believe that they could get that

 8         information, you know, being an employee of the

 9         company and having access to the data.

10    Q    Do you have any information to contradict

11         Mr. LaBauve's testimony that he was not aware of

12         when payments were made to the auctions for

13         floorplanned vehicles?

14    A    No.  In fact, I would agree with him.  You know,

15         it's not something that they, as an account

16         executive, that they would know about or pay

17         attention to or even desire to know.  It's not

18         anything that's put in front of them for them to be

19         aware of.

20    Q    So if it's not put in front of the account

21         executives, it's not information that they are

22         providing to the customer dealers; correct?

23    A    Yeah.  I mean, there is no reason really for the

24         dealer to know, I guess, when payments are made, but

25         that would be correct.
```

EXHIBIT 1

Page 62

1   Q   So you don't think that it's relevant to the

2       customer dealer to know when NextGear's actually

3       making payments on their behalf?

4   A   No.  I don't think so.

5   Q   Why is that?

6   A   I mean, you know, they're using our services from

7       day one.  You know, it's the same way, I guess, that

8       I don't really care, if I'm making a purchase with

9       my credit card, I don't know or even care to know

10      when the credit card company pays the vendor or

11      where I purchased my gas or whatever it is, you

12      know.  So it doesn't seem like it would be

13      relevant --

14  Q   But are you --

15  A   -- information.

16  Q   I'm sorry.  I didn't mean to interrupt.

17  A   That's okay.

18  Q   Are you being charged interest on your credit card

19      purchases from the date that you make the purchase?

20  A   Yeah, could be.

21  Q   What if you pay it off when you get your statement,

22      are you being charged interest on that purchase?

23  A   No.

24  Q   But the dealers were being charged interest from the

25      date that they floorplanned, regardless of whether

EXHIBIT 1

Page 63

```
 1              they paid off the car within the first curtailment

 2              period; correct?

 3    A    That's correct, because there is the liability that

 4              we have as NextGear to the auction to fund that

 5              vehicle, and we're accepting all the risk at that

 6              point when the dealer floorplans the car and he's

 7              utilizing his floorplan with us from that point.

 8    Q    Are you aware that there are -- there is a

 9              definition of "Advance" in the Promissory Note and

10              Security Agreement?

11    A    Yes.

12    Q    And it's separate from "Liabilities"; correct?  It's

13              a separate definition?

14    A    It's a different definition, sure.  Yes.

15    Q    And are you aware of any changes to the definition

16              of "Advance" between 2000 -- strike that.

17              There was a substantial revision to the Demand

18              Promissory Note and Security Agreement in 2013;

19              correct?

20    A    That's correct.

21    Q    And were you at all involved in making those changes

22              to that document in 2013?

23    A    No, I was not.

24    Q    Did you speak to anybody about those changes in

25              preparation for your testimony today?
```

EXHIBIT 1

Page 64

1   A      Yes.  Counsel.

2   Q      Okay.  Are you prepared to testify as to those

3          changes?

4   A      To the best of my knowledge, yes.

5   Q      I'm going to show you what I'll mark as Exhibit 5.

6              (Deposition Exhibit 5 marked for

7          identification.)

8   Q      And I believe these were -- this was part of a

9          filing, and it was produced by NextGear.  Have you

10         seen this document before?

11  A      Yes.

12  Q      And on that first page, it's signed -- whose

13         signature is this?

14  A      That would be Brian Geitner.

15  Q      And I --

16             MR. VINK:  Before we get too far into this

17         document, this document is outside of the proposed

18         class period, so I'm going to object on the basis of

19         the fact that it doesn't have any relevance to this

20         case at all, so far as I'm aware.

21             MS. LASKY:  Okay.

22  Q      If you turn to NextGear 5160, it's Appendix A.

23  A      Okay.

24  Q      And there is a definition of "Advance"?

25  A      Yes.

EXHIBIT 1

1   Q     Now, in your declaration --

2         MR. VINK:  While you're looking for that, so I

3   don't have to interrupt every single question, can I

4   get a stipulation to a standing objection to any

5   questions about Exhibit P, really on two bases:

6         Number one, it's outside of the relevant class

7   period.  This note says its effective date is

8   August 5, 2013, which is outside of the class

9   period.

10        And secondly it's my understanding none of the

11  named plaintiffs signed what's reflected here as

12  Exhibit P, and for those reasons, I'd like a

13  standing objection to any questions based on this

14  document.

15        MS. LASKY:  And I'll just respond I thought

16  that it was attached to his declaration, and I'm

17  going to ask some specific questions.  And that's

18  fine; the standing objection is fine.

19        MR. VINK:  Can I respond to that?

20        MS. LASKY:  Yes.

21        MR. VINK:  The last exhibit reflected on his

22  declaration is Exhibit J and this was labeled

23  Exhibit P, so I don't think it could have come from

24  Mr. Galema's declaration.  But you're free to ask

25  your questions.  If I can just have a standing

EXHIBIT 1

Page 93

 1          department.

 2   Q      And so was the risk department responsible for

 3          reporting dealers to the KO book and also monitoring

 4          when dealers were placed in the KO book?

 5              MR. VINK:  Object to form.  You can answer.

 6   A      The risk team monitors the accounts that are in

 7          default status and that are in collection efforts.

 8          They do not have any authority to put somebody in

 9          the KO book.

10   Q      Who does have the authority to do that?

11   A      Auction Insurance Agency.

12   Q      Does anybody at DSC or NextGear have authority to

13          report people to Auction Insurance Agency?

14   A      Yes.  The folks in the risk department.

15   Q      So Kevin Frederick would be one of the people who

16          would have authority to report a customer dealer to

17          Auction Insurance Agency?

18   A      If not him, his manager would, sure.

19   Q      Do you know who his manager was in 2012?

20   A      I would not know.  I'm sorry.

21   Q      That's okay.  If you look at 3809, three lines up

22          from the bottom.

23   A      Uh-huh.

24   Q      It's dated May 15, 2012?

25   A      Yes.

EXHIBIT 1

Page 94

1   Q   And it says "Modified by Kevin Frederick."  It says,

2       "Method, Involuntary Liquidation," and then it says

3       "KMF 5/15.  Had swat meeting submitting to KO book

4       and will file lawsuit now.  No need to wait."

5           Do you know what a swat meeting is?

6   A   Yes.

7   Q   What is that?

8   A   That's just a meeting, internal meeting with the

9       risk folks, and I believe operations would be part

10      of that as well, where they talk about a particular

11      dealer, the circumstances around the dealer, and the

12      appropriate actions to take with the dealer.

13  Q   And he says, "Had swat meeting submitting to KO book

14      and will file lawsuit now.  No need to wait."

15          Do you have any knowledge that on May 15, 2012,

16      or on or about May 15, 2012, Mr. Frederick did not

17      submit Mattingly to the KO book or to Auction

18      Insurance Agency?

19  A   I know he wouldn't have submitted them to the KO

20      book, just because that's not something that we have

21      control over, but I mean, I'm not certain whether he

22      did or did not send an e-mail to AIA.

23  Q   So you don't know one way or the other?  You don't

24      have anything to contradict that he notified Auction

25      Insurance Agency as of May 15, 2012 about Mattingly;

EXHIBIT 1

Page 95

```
 1            correct?

 2    A      As far as I know, there is no e-mail that exists for

 3            that, which would be the appropriate documentation

 4            to do so.

 5    Q      Could they have done it by phone call?

 6    A      Not that I'm aware of.

 7    Q      Was there a policy that spelled out how people in

 8            risk with NextGear/DSC had to contact Auction

 9            Insurance Agency?

10    A      I do not believe the policy explicitly states how

11            they have to contact them.

12    Q      Just so the record is clear, the Exhibit E that we

13            marked as Exhibit 11 that was attached to your

14            declaration, that's dated August 2012; correct?

15            Actually, dated November 2012.  I apologize.

16    A      Yes.  Yeah, the e-mail is dated November 2012.

17    Q      Okay.  Sorry.  The e-mail is dated November 2012,

18            and that's referred to in paragraph 46 of your

19            declaration; correct?

20    A      Correct.

21    Q      But this entry on Exhibit 12 by Mr. Frederick is

22            dated May 2012; correct?

23    A      Uh-huh.  Yes.

24    Q      So we don't dispute that May 2012 occurred before

25            November 2012; correct?
```

EXHIBIT 1

1   A    May 2012 is before November 2012, yes.

2   Q    All right.  Thank you.  Now, we've discussed that

3        NextGear/DSC, and there is no dispute, charges

4        interest beginning on the floorplan date and that

5        there are some times and some transactions a time

6        period between when NextGear/DSC begins charging

7        interest to the dealers and when they pay the

8        auction for the car; correct?

9   A    That's correct.

10  Q    And you're responsible for financial tracking?

11       That's one of your responsibilities for

12       NextGear/DSC; correct?

13  A    Yes.

14  Q    Now, is there any financial tracking of the amounts

15       that NextGear/DSC earns on the interest charged

16       between the time the vehicle is floorplanned and the

17       time the payments are made to a seller?

18  A    No.  None whatsoever.

19            MS. LASKY:  Can we take a break?

20            (A recess was taken.)

21  BY MS. LASKY:

22  Q    Turning back to Exhibit 2, if you look at NGR 33,

23       there is a total at the bottom.  There are several

24       totals?

25  A    Yes.

EXHIBIT 1

Page 97

1    Q    This is for Red Barn.  So is it correct that the
2         total interest charged Red Barn throughout the life
3         of the relationship with NextGear/DSC was
4         $36,502.46?
5    A    Yes.  That would be my -- yes, that's correct.
6    Q    Is that any different than the total interest paid
7         by Red Barn?
8    A    Sure.
9    Q    Okay.  How would you determine the total interest
10        paid by Red Barn, using Exhibit 2?
11   A    Payments are not listed on here, so you would not
12        have -- you don't have how much was actually paid by
13        Red Barn.
14   Q    And the $70,300 for the floor fees, total for the
15        floor fees, again, we've established this does not
16        include all of the fees assessed to Red Barn;
17        correct?
18   A    That's correct.
19   Q    And again, this $70,300 does not include all of the
20        fees paid by -- or does not -- may not necessarily
21        be the same as all the fees paid by Red Barn;
22        correct?
23   A    That's correct.
24   Q    Now, are you aware that Mr. LaBauve testified that
25        Red Barn was a, I believe -- and I can find his

EXHIBIT 1

1           exact word -- was a typical DSC/NextGear customer?

2                MR. VINK:  Object to the form.  You can answer.

3    A    I didn't review his deposition, so I can't state for

4         certain that he said that or not.

5    Q    I believe that you testified at your prior

6         deposition about the average credit line size?

7    A    Sure.  Yeah.

8    Q    What is that?

9    A    Today, the average credit line is around $300,000.

10   Q    What about between 2005 and 2013?

11   A    Probably closer to $200,000.

12   Q    And do you recall what the Red Barn credit line was?

13   A    I don't.  I don't recall.

14   Q    If you look at the last page of -- do you have

15        Exhibit 9 in front of you?

16   A    I have 9, yes.

17   Q    Does it say the credit limit there?

18   A    Yes.

19   Q    What is that?

20   A    It says $200,000.

21   Q    And again, so as of approximately 2011, you said

22        this was the average size of a credit line with

23        DSC/NextGear?

24   A    Yes, very close to the mathematical average.  Now,

25        we have a wide array of dealers that we work with,

EXHIBIT 1

Page 99

1          and I would say it's very much a coincidence, I

2          guess, that the numbers are close, but again, you

3          know, a lot of variance in the credit limits that we

4          extend.

5     Q    But again, the mathematical average during this time

6          period was approximately $200,000; correct?

7     A    That would be my estimation, yes.

8     Q    Now, is it correct that NextGear/DSC makes money off

9          of the time between -- off of the interest paid

10         between the time that a vehicle is floorplanned and

11         the date that the money is loaned or paid to the

12         auction?

13    A    Yeah.  I mean, interest accrues during that time

14         frame, so yes.

15    Q    How does NextGear/DSC fund its payments to auctions

16         and to sellers?

17    A    The method of the payment or the process?

18    Q    Let's start with method, and then we can get to

19         process.

20    A    Okay.  The method would be in most cases via ACH.

21    Q    And the process?

22    A    Process being that in a general sense as floorplans

23         are added to the system, and every night the system

24         will automatically, based on the criteria that --

25         the data points that have been entered on each

EXHIBIT 1

 1         floorplan, determines which floorplans can be

 2         funded, grabs those and, you know, sends them

 3         through to the bank to be sent via ACH.

 4    Q    And I believe you testified to this in your prior

 5         deposition:  What is the source of NextGear/DSC's

 6         funding for the floorplan payments it makes?

 7    A    Yeah, so we have securitization facilities that we

 8         get the majority of our funding from.  The rest of

 9         it would come from, you know, our pockets, if you

10         will.

11    Q    And are those funding sources drawn down on a daily

12         basis when the system figures out which floorplans

13         can be funded, or is there a monthly draw?  How does

14         that work?

15    A    Yeah.  No, we right-size our advances through that

16         securitization facility on a weekly basis.

17    Q    So if NextGear/DSC is being paid interest prior to

18         the time that it draws down on its security or on

19         its credit facility to pay for the dealer's

20         purchases, the money that it earns on that interest

21         is not offset by payments it had to make to borrow

22         the money; is that correct?

23              MR. VINK:  Object to the form.  You can answer.

24    A    It's very hard to follow dollar for dollar, just

25         with the enormity of the cash flowing through the

EXHIBIT 1

Page 101

1          business, but we are certainly still obligated to

2          pay that, and the funds that we do not draw from the

3          securitization facility would come out of our own

4          pockets.

5     Q    But if you haven't made the payment yet, there is no

6          money coming out of your own pockets; correct?

7     A    On that particular loan, sure.

8     Q    You said on page 19 of your deposition, you were

9          asked, "You could determine an average daily finance

10         rate throughout the portfolio as well, too;

11         correct?"

12              And you said, "Sure.  You could get there."

13              And then Mr. Airey asked, "And even an average

14         amount of interest that NextGear/DSC earned for that

15         particular day?

16              "Yeah.  You could derive that from the

17         financial statements."

18    A    Sure.

19    Q    Can you explain what you meant by how you could

20         derive the average amount of interest that

21         NextGear/DSC earned for that particular day from the

22         financial statements?

23    A    Yes, sure.  You would look at the interest revenue

24         line on our P & L and just divide it by the number

25         of days of the month to get your average interest

EXHIBIT 1

Page 102

```
 1            earned.  That's what I was speaking to there.

 2    Q      Is that a line item that is on the P & Ls, the

 3            average amount of interest earned per day?

 4    A      No.

 5    Q      But it is a standard line item on the P & Ls between

 6            2005 and the end of 2013, the monthly amount of

 7            interest earned by NextGear/DSC?

 8    A      That's correct.

 9    Q      And is that -- that's under a revenue line item on

10            the P & Ls?

11    A      Yes.

12    Q      And that would be on a dealer-wide basis for all

13            20,000 customer dealers or however many customer

14            dealers were in the NextGear portfolio at any given

15            month; correct?

16    A      Sure.  It's an aggregate of all of that interest.

17    Q      Has NextGear/DSC ever calculated the average time or

18            average amount of days between the floorplan date

19            and the payment date to an auction?

20    A      No, never.

21    Q      Has that ever been factored in -- has that time or

22            the interest made between the floorplan date and the

23            payment date ever been factored in to financial

24            projections done by NextGear/DSC?

25    A      No, never.
```

EXHIBIT 1

Page 108

1   Q   Are auctions the majority of the transactions?

2   A   Yes.

3   Q   Would you say more than 75 percent?

4   A   Yeah.  Not much more.  Maybe 80.

5   Q   So if a dealer is unable to floorplan at an auction,

6       do you believe that would have an effect on their

7       business?

8           MR. VINK:  Object to the form.  You can answer.

9   A   Without knowing the financials of a business, you

10      know, if they don't have a floorplan provider, they

11      would have to use their own cash.

12  Q   Now, DSC is currently owned by Cox Automotive;

13      correct?

14  A   NextGear is, yes.

15  Q   NextGear, I'm sorry.  NextGear is owned by Cox

16      Automotive?

17  A   Yes.

18  Q   Prior to the purchase by Cox Automotive and -- well,

19      on the DSC website, it says that DSC is one of the

20      leading -- I'll read you the exact language -- the

21      industry's leading comprehensive provider of lending

22      products for vehicle dealers and auctions.

23          Was that a true statement prior to the purchase

24      by Cox?

25  A   If that was on their website, yes.

EXHIBIT 1

Page 109

1    Q    Do you know, was NextGear the largest provider of

2         used car financing in the used car market prior to

3         the purchase by Cox?

4    A    From the size of the portfolio, no, we were not.

5    Q    From the size, the number of customer dealers?

6    A    No.

7    Q    By any metrics, were you?

8    A    Potentially dealers.  Not, you know, I don't know,

9         don't pretend to know the metrics for all of our

10        competitors, so it's hard to say.

11   Q    What is the size of NextGear or DSC's portfolio in

12        2013 prior to the purchase by Cox?

13             MR. VINK:  Object, just because I think we're

14        beyond the scope of the 30(b)(6), but you can answer

15        in your individual capacity.

16   A    The acquisition occurred in 2012, and our portfolio

17        was a little north of 600 million.

18   Q    And when you say portfolio, that is -- can you

19        explain that?

20   A    Yeah, sure.  Sorry.  That's loans outstanding.

21   Q    And do you know the size of the NextGear portfolio

22        today?

23   A    Yes.

24   Q    What is that?

25             MR. VINK:  Same objection.  Outside the scope.

EXHIBIT 1

Page 110

1          You can answer.

2     A    Today we are around 4.2 billion.

3     Q    And is that just NextGear?

4     A    Uh-huh.  Yes.

5     Q    Yes?  Okay.  When we spoke about Exhibit 2 and the

6          total floor fees and the total interest for Red Barn

7          on NGR 33, are the -- and I believe you testified

8          that interest is a line item on the revenue side of

9          your P & Ls; correct?

10    A    Correct.

11    Q    Are fees a revenue item on your P & Ls as well?

12    A    Yes.

13    Q    And that applies to all 20,000 dealers or however

14         many dealers are in your portfolio in any given

15         month; correct?

16    A    Yes.

17    Q    So other than fees and interest, between 2005 and

18         2013, does DSC have any other sources of revenue?

19    A    I mean, proudly stated, that's it.  We're a

20         floorplan provider, so it's the fees and interest

21         related to our services for them.

22    Q    Turning back to the average -- your testimony from

23         your prior deposition about the average amount of

24         interest, and I apologize if I've asked this, do you

25         know what the average daily interest was for

EXHIBIT 1

Page 111

1          NextGear/DSC in 2013?

2    A    I don't, no.

3    Q    In 2012?

4    A    No.

5    Q    For any year between 2005 and 2013?

6    A    Without looking at a financial statement, I wouldn't

7          have any recollection of it.

8    Q    Do you recall the average or the amount of interest

9          on the revenue line items for the financial

10         statements on a yearly basis for any of those years?

11   A    I don't.  I don't.

12   Q    Do you recall in 2012 whether it was greater than

13         $10 million for the year?

14   A    2012?  Yes.

15   Q    Greater than $100 million?

16   A    No.  I would have to say no.

17   Q    Greater than $50 million?

18   A    Estimation, yes.

19   Q    And in this case, in the Red Barn case, the number

20         of fees charged, and again, this doesn't reflect all

21         the fees in Exhibit 2, but is greater than the

22         interest.  Is it true across all of the dealers that

23         the fees, the total fees are generally more than the

24         amount of interest charged?

25             MR. VINK:  Again, same objection.  We're well

EXHIBIT 1

Page 112

```
 1            outside of the scope of the 30(b)(6).  If you know
 2            the answer, you can answer in your personal
 3            capacity.
 4       A    Yes.  Our fees, our fee revenue would outpace our
 5            interest revenue.
 6       Q    And that's across the board from 2005 through 2013?
 7       A    I would say yes.
 8       Q    Okay.  And would you say that in 2012 that the fee
 9            revenue was over $100 million?
10                 MR. VINK:  Same objection.  Outside the scope.
11       A    Yes.
12                 MS. LASKY:  All right.  I think we -- I want on
13            the record that we are going to reserve our rights
14            to keep this open, work with the training materials,
15            and I would also state on the record that in light
16            of the testimony that you cannot accurately
17            calculate the daily interest based on the
18            information in Exhibit 2, that, you know, we will be
19            seeking relief from the Court on that, and so we
20            will reserve our rights to revisit that as well,
21            based on the ruling of the Court on that motion.
22                 So, with that -- go ahead.
23                 MR. VINK:  I'll just simply say on the record,
24            we certainly disagree with that characterization,
25            but understand your position, and that's why we have
```

EXHIBIT 1

Page 113

1        judicial offices.

2              MS. LASKY:  I assume you don't have any

3        questions?

4              MR. VINK:  I do not.  No questions on cross.

5              MS. LASKY:  Okay.  Thank you very much for your

6        time.  I appreciate it.

7              MR. VINK:  He will read and sign.

8                    AND FURTHER THE DEPONENT SAITH NOT

9

10              _____

                        ADAM GALEMA

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 1

Page 114

```
 1    STATE OF INDIANA              )
                                    )
 2    COUNTY OF MARION              )

 3
           I, Tami L. Scott, Notary Public in and for the
 4    County of Marion and State of Indiana, do hereby
      certify that the above-named deponent herein was by me
 5    first duly sworn to tell the truth, the whole truth,
      and nothing but the truth in the aforementioned matter;
 6
           That the foregoing deposition was taken on behalf
 7    of the Plaintiffs at the time and place heretofore
      mentioned, with all counsel being present as duly
 8    noted;
 9         That the deposition was taken down by means of
      stenograph notes, was reduced to typewriting under my
10    direction, and is a true record of the testimony given
      by said deponent, and was thereafter presented to the
11    deponent for signature;
12         I do hereby further certify that I am a
      disinterested person in this cause of action, that I am
13    not a relative of the attorneys for any of the parties
      or otherwise interested in the event of this cause of
14    action.
15         IN WITNESS WHEREOF, I have hereunto set my hand and
      have affixed my official notarial seal on this_____day
16    of_____, 2016.
17
                      _____
18                     TAMI L. SCOTT, NOTARY PUBLIC
19
      County of Residence:
20    Marion County
21    My Commission Expires:
      June 10, 2017
22
23
24
25
```

EXHIBIT 1