```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF INDIANA
                 INDIANAPOLIS DIVISION
RED BARN MOTORS, INC.,           )
PLATINUM MOTORS, INC.,           )
MATTINGLY AUTO SALES, INC.,      )
YOUNG EXECUTIVE MANAGEMENT &     )
CONSULTING SERVICES, INC.,       )
Individually, and on behalf      )
of other members of the          )
general public similarly         )
situated,                        )
              Plaintiffs,        )
                                 ) Docket No.
           -v-                   ) 1:14-cv-01589-TWP-DKL
                                 )
COX ENTERPRISES, INC.,           ) Class Action
COX AUTOMOTIVE, INC.,            )
NEXTGEAR CAPITAL, INC. f/k/a     )
DEALER SERVICES CORPORATION,     )
successor by merger with         )
Manheim Automotive Financial     )
Services, Inc., and JOHN WICK,   )
              Defendants.        )
```

The deposition upon oral examination of LOURDES M. GIVENS, a witness produced and sworn before me, Tami L. Scott, Notary Public in and for the County of Marion, State of Indiana, taken on behalf of the Plaintiffs at the offices of Bose, McKinney & Evans, 111 Monument Circle, Suite 2700, Indianapolis, Marion County, Indiana, on October 20, 2016, at 9:00 a.m., pursuant to the Federal Rules of Civil Procedure.

                ASSOCIATED REPORTING, INC.
              251 EAST OHIO STREET, SUITE 940
                INDIANAPOLIS, INDIANA 46204
                       (317) 631-0940
                 www.associated-reporting.com

**EXHIBIT 3**

Page 55

```
 1   A     When a dealer signs up for a floorplan, they fill
 2         out a one-page application, and then they have to
 3         supply us with "X" amount of documents, which
 4         includes a copy of the check so that we can have the
 5         banking information and the routing number; they
 6         fill out their personal information; and then they
 7         sign the application, stating that they're applying
 8         for a line of credit, along with a driver's license
 9         and a copy of their surety bond.
10   Q     What's the surety bond?
11   A     Some states have surety bonds, some don't.  It
12         varies on state.  And --
13   Q     And that was a -- I'm sorry.  Go ahead.
14   A     And then also if it was a corporation, we needed the
15         articles of incorporation.
16   Q     And the surety bond was issued to the dealer by the
17         state as required for that particular state?
18   A     For that particular state.
19   Q     And were you responsible for obtaining that
20         information from the dealer?
21   A     Whoever was signing up the dealer, whether it's the
22         sales executive or if I happened to sign up the
23         dealer, we would grab all that information from the
24         dealer at the time of -- at the time that we turn it
25         in to corporate to our lending department to review.
```

EXHIBIT 3

| | | |
|---|---|---|
| 1 | Q | So you mentioned the term sales executive.  Is that |
| 2 | | different from what you were? |
| 3 | A | Yes. |
| 4 | Q | What is a sales executive at DSC? |
| 5 | A | DSC sales executives, just as MAFS sales executives, |
| 6 | | they're out there to try to bring customers in to |
| 7 | | get them signed up. |
| 8 | Q | But your focus as an account executive was more the |
| 9 | | management of the existing portfolio; is that |
| 10 | | correct? |
| 11 | A | Correct.  Account executives manage the portfolio; |
| 12 | | sales executive brings the account as a new account. |
| 13 | Q | Did you manage the sales -- any sales executives? |
| 14 | A | Not with DSC. |
| 15 | Q | All right.  So now, would sales executives have the |
| 16 | | authority to go through this contract with dealers? |
| 17 | A | Yes. |
| 18 | Q | All right.  So we talked about the first page of |
| 19 | | Exhibit 1 and what you would review with the dealer. |
| 20 | | Can you tell me what else you would review in this |
| 21 | | packet of documents that's been marked as Exhibit 1 |
| 22 | | with the dealer? |
| 23 | A | Uh-huh.  Okay.  So this is the promissory note, so |
| 24 | | basically I would have the dealer -- I would always |
| 25 | | make a copy for the dealer to take home, so I always |

EXHIBIT 3

```
 1            carry my copy to sign, and then I handed the dealer
 2            a copy, hard copy for them to review afterwards.
 3            Basically, the promissory note, I would tell the
 4            dealer, Mr. Dealer, the promissory note here states
 5            that you are promising to pay us back what you're
 6            borrowing from us, is how I left it.
 7   Q        Did you explain anything else about the promissory
 8            note?
 9   A        No.  This is basically the dealership promising to
10            pay us back what they're borrowing from us.
11                 I would move on to the Term Sheet.  This is
12            your contract at term, and how I explained it to the
13            dealers was imagine buckets of days.  Your first
14            bucket of days at this particular term plan is your
15            45 days.  At day 45, you're going to pay $75 and
16            your interest rate of 4.50, and then at day 46, if
17            you need more time, you can purchase another 30
18            days.  At that point, you pay down or, slash,
19            curtail 7.50 of the principal to bring down the
20            principal, and the clock starts again.  Now you're
21            buying -- and you pay your interest.  Clock starts
22            again day -- after 46 days, you're buying 30 more
23            days for $70.  Interest starts accruing.  If you
24            need more time after the 30 days, you can buy
25            another 30 days for $70.  At that point, you curtail
```

EXHIBIT 3

```
 1         15 percent and the interest gets accrued daily.
 2              Also explain to them, if you have a vehicle
 3         for, you know, 48 days, you only pay interest for 48
 4         days, your 75, and then that curtailment of 7.50
 5         because you went over the 45 days.  And that's
 6         pretty much it on this term plan.
 7    Q    Okay.
 8    A    Making sure they understand it.  Power of Attorney,
 9         we tell them that they're giving us power of
10         attorney to sign on their behalf, whether it is for
11         a title that they sell at an auction or whatnot,
12         that that's giving us power to sign on their behalf.
13              The Individual Personal Guaranty, just like the
14         promissory note that, Mr. Dealer, you signed with
15         us, this is basically stating to us that you're
16         personally promising to pay us back what you're
17         borrowing from us.
18              And -- oh, I haven't seen this in a while.  And
19         then at that point, I would go down this pretty much
20         cheat sheet stating that we have fees, to get
21         familiarized with them, and that we are a
22         fee-generated business, so therefore, we're going to
23         charge fees for our services.
24              That we're going to have audits, and they're
25         going to be charged a $75 fee at that time, and it's
```

EXHIBIT 3

Page 59

1      a third party.
2              That the vehicles need to be paid off within 48
3      hours, whether the dealer has been funded or not.
4              That the funding needs to be cleared to us,
5      basically not coming back as an NSF.
6              That the dealer is responsible for managing
7      their account through www.discoverDSC.com.
8              Any NSFs that we get back, if they come back,
9      there is a $25 fee, and they have to wire or give us
10     certified funds immediately.
11             For any vehicle that the -- that is 35,000 or
12     over, the normal standard term plan fee does not
13     apply; now it's .50 percentage of the purchase
14     amount.
15             This is for a rental company, so this wouldn't
16     apply to this dealer.  And this is a rental, does
17     not apply for a dealer.
18             Any vehicles over $50,000 need to be approved
19     by an account executive or general manager.
20             This part here was to use our overnight
21     delivery per dealer's request, and they have to
22     initial whether they want to or not.
23             And then the charge that we would do for a full
24     title, if we needed to process a brand new title.
25             At that time, I would tell them, explain to the

EXHIBIT 3

Page 60

```
 1              dealer, do you understand everything?  Please
 2              initial everything.  And then --
 3    Q         Would you sign on this line as well?
 4    A         And then I would sign, yes, where it says "DSC
 5              Representative."
 6    Q         Okay.
 7    A         And this was just a check cheat sheet for us to make
 8              sure that we got everything done so that we can send
 9              it over to our corporate office.
10    Q         Now, this page that says, "Dealer understands
11              that...", NG3416, I think you said I haven't seen
12              this in a while.  Did DSC stop using this at some
13              point?
14    A         I want to say I was at NextGear because all of our
15              fees are in the portal.  So again, we're a
16              fee-generated business, we're going to charge fees
17              for our services, so we tell the dealers now since
18              we've created that, that we created the portal for
19              them, that they can go in there and they can look at
20              every single fee that we have.
21    Q         But at this time with DSC or prior to doing that
22              with NextGear, that was --
23    A         With DSC --
24    Q         Let me finish the question.
25    A         Sorry.
```

EXHIBIT 3

Page 61

```
 1   Q     That's okay.  Don't worry.  It's very natural.
 2               Did DSC have that information online for
 3         dealers to access?
 4   A     Www.discoverDSC.com.
 5   Q     So all of the fees were listed there?
 6   A     (Nodding head affirmatively.)
 7               MR. VINK:  Yes?
 8   A     Yes.
 9   Q     Thank you.  And when did a dealer get a log-on to
10         discoverDSC.com?
11   A     At the time of contracting.
12   Q     So once they signed this, you would give them a
13         log-in?
14   A     Yes.
15   Q     Now, you said when you were talking, I think, about
16         one of the things you would go over, you said all
17         vehicles are due to be paid within 48 hours, whether
18         the dealer receives the money or not; is that
19         correct?
20   A     Correct.
21   Q     What is the basis for your understanding that they
22         were obligated to pay you, whether they received the
23         money or not?
24   A     I don't understand that question.
25   Q     Can you point to something in this document or
```

EXHIBIT 3