SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF RIVERSIDE - CENTRAL

MICHAEL GRISSOM Sole Proprietor doing
Business as American Family Auto,

    Plaintiff,

vs.                                           No. RIC475298

DEALER SERVICES CORPORATION, a
Delaware corporation; BOSCH KIA, a
Nevada Corporation dba, FONTANA
BOSCH AUTO CENTER INC., DIAL FINANCE;
CLAUDIA PONCE, an individual; ROSA D.
MACIAS, an individual; ALFRED KING,
an individual; CARLOS BOSCH, an
individual; MARK WHITE, an individual;
and DOES 1 through 100, inclusive,

    Defendants.

---

DEPOSITION OF JOHN WICK

Santa Ana, California

Friday, February 25, 2011

Reported by: ANGELA METZ

CSR No. 12454

|  |  |
|---|---|
| 1 | the date that it was floored, payment sent, if it |
| 2 | was voided in that particular history, but it's not |
| 3 | a report that I could generate, but it would be a |
| 4 | screen shot. |
| 12:46  5 | Q   Now, we're talking about the software |
| 6 | called "Discover"? |
| 7 | A   Yes, sir. |
| 8 | Q   Is that what you're talking about? |
| 9 |     Does accounting have a different software |
| 12:46 10 | to run the accounting side? |
| 11 | A   Well, our general ledger is Great Plains, |
| 12 | but financial transactions are handled inside |
| 13 | Discover. |
| 14 | Q   Okay.  So does Great Plains keep track of |
| 12:47 15 | when -- the date of actual funding of a loan? |
| 16 | A   No. |
| 17 | Q   So the only place the database resides that |
| 18 | tells you when the loan was funded is in Discover? |
| 19 | A   Yes. |
| 12:47 20 | Q   And if you want to get that information |
| 21 | out, you can get the information out; correct? |
| 22 | A   I can print a print screen for that |
| 23 | financial transaction, if I ask the system to show |
| 24 | me that.  It could be possible to write code to pull |
| 12:47 25 | a report, but I don't know if that's possible or |

HAHN & BOWERSOCK 800-660-3187 FAX 714-662-1398
151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626

EXHIBIT 4

```
 1    not.
 2        Q   Okay.  Well, does it matter to DSC when
 3    the -- when these millions of dollars of loans are
 4    actually funded?
 5        A   No.
 6        Q   Okay.  And so when DSC -- DSC doesn't care
 7    when -- is it a fair statement DSC doesn't care when
 8    the loan is funded; correct?
 9        A   Well, I'm not sure we don't care, but from
10    a perspective of DSC's primary concern, if the car
11    has been floorplanned at the auction, we're
12    contractually obligated to pay the auction.
13            It's a contingent liability that DSC has to
14    pay the auction once the funding conditions are met,
15    if there are any conductions.
16        Q   And you have these contracts with the
17    auctions; correct?
18        A   Yes.
19        Q   And they allow you to pay them later?  In
20    other words not -- they -- they allow you to -- the
21    car can get off the lot before they're actually
22    paid; correct?
23        A   Based on our promise to the auction to pay
24    that.
25        Q   Right.
```

Timestamps: 12:47 (line 5), 12:48 (lines 10, 15, 20, 25)

```
            1         A    Regardless of whether the dealer pays us,
            2    we owe the auction.
            3         Q    Right.
            4              And is there anybody inside DSC that
12:48       5    manages cash flow?
            6         A    It's -- we have an entire accounting
            7    department.
            8         Q    Okay.  And there would be somebody in there
            9    we might call a bean counter who would want to know,
12:49      10    for cash flow purposes, when loans were funded;
           11    correct?
           12         A    I'm sure they -- they would track that
           13    day-by-day.
           14         Q    Because that -- when we're saying "funded,"
12:49      15    that means money goes from DSC to some other party;
           16    correct?
           17         A    Sure.
           18              And then there's also lags in payments from
           19    auctions, and we process a number of payments coming
12:49      20    in and a number of payments going out every day.
           21         Q    What do you mean "lags in payment"?
           22         A    Well, if a dealer is paying a particular
           23    advance off, whether it's a curtailment, they will
           24    cause an ACH to be remitted, but we don't have
12:49      25    availability of those funds immediately.  There's
```

```
 1    a -- there's a lag there from the time it actually
 2    is deposited into our accounts.
 3        Q    Okay.  And when do you start charging the
 4    dealer on an individual loan?
12:49  5        A    The moment that it's floorplanned.
 6        Q    Okay.  And is that -- can that be prior to
 7    funding of the loan?
 8        A    Of course.
 9        Q    Have you ever given a thought as to whether
12:50 10    it's proper for you to charge a dealer on a loan
11    before the loan is funded?
12        A    I think it's proper.
13        Q    And what do you base that on?
14        A    Well, because we have a contractual
12:50 15    obligation to pay the seller, whether they have
16    given the seller or the buyer possession of that car
17    or not.
18             In other words, we're contractually
19    obligated to pay the auction.
12:50 20        Q    But wouldn't it be true that DSC could
21    enjoy the float or the access to those funds until
22    it actually funds the loan?
23        A    Sure.
24        Q    Okay.  And that's -- you're -- we're all
12:50 25    familiar with what we call "playing the float";
```

```
 1   right?
 2       A   Yeah.
 3       Q   And you're aware that that's the case with
 4   respect to these payments -- the funding of loans
 5   through sales of the auctions; correct?
 6           MR. NORMANDIN:  Let me -- let me interrupt
 7   for just a second.  I think this is so far afield of
 8   what --
 9           MR. CHAPMAN:  Okay.  Do you have an
10   objection, Counsel, for the record, because I don't
11   want you to coach the witness?
12           MR. NORMANDIN:  I'm instructing him not to
13   answer that question because it's so far afield of
14   what the Notice of Deposition was about.
15           MR. CHAPMAN:  Are you instructing him based
16   on a privilege?
17           MR. NORMANDIN:  Partly privilege, but sole-
18   -- primarily because of the extent of Notice that
19   this question far exceeds the Notice.
20           MR. CHAPMAN:  Okay.  And you have not
21   identified a privilege.  Do you have one in mind
22   you'd like to put on the record?
23           MR. NORMANDIN:  Privilege will suffice for
24   now.
25           MR. CHAPMAN:  Just the universal privilege?
```

Timestamps: 12:51 (lines 5, 10, 15, 20, 25)

87

```
 1              MR. NORMANDIN:  Privacy, attorney-client
 2   communication, work product, relevance.
 3              MR. CHAPMAN:  As to my line of questions
 4   relating to the float?
 5              MR. NORMANDIN:  Yes.
 6              MR. CHAPMAN:  Okay.
 7   BY MR. CHAPMAN:
 8       Q    Are you going to follow the instructions of
 9   Mr. Normandin?
10       A    I am.
11       Q    Mr. "Werk" -- Mr. Wick, you've been
12   designated by DSC as the person most qualified to
13   address the topics listed on the Notice of Taking
14   Deposition that was marked earlier --
15              Is it exhibit --
16              -- correct? --
17       A    Yes, sir.
18       Q    -- on --
19              MR. NORMANDIN:  Before you go any further,
20   I do move to strike the entire line of question
21   about a float and how that impacts this deposition
22   on the basis of relevancy, outside the scope, and
23   privilege.
24              MR. CHAPMAN:  Attorney-client privilege,
25   work product -- all of those privileges you stated.
```

Timestamps: 12:52 (lines 5, 10, 15, 20, 25)

88

```
 1              MR. NORMANDIN:  Same.
 2              MR. CHAPMAN:  Good.
 3      BY MR. CHAPMAN:
 4          Q    Mr. Wick, you are the person most qualified
 5      at DSC on the topic of the Demand Promissory Note
 6      and Security Agreement, the Power of Attorney, the
 7      Personal Guarantee, the Term Sheet, the Application,
 8      and Sole Proprietorship Agreement entered into on or
 9      about August 22, 2006, between Grissom and DSC;
10      correct?
11          A    I am the most qualified person at DSC to
12      discuss those documents from a point of view of what
13      the document is and the particular one that
14      Mr. Grissom and Mr. King signed, yes.
15          Q    Well, I'm not sure -- you've added some
16      verbiage.  I don't know that it means anything, but
17      are you intending to narrow the scope from what I
18      read?
19              MR. NORMANDIN:  Objection; argumentative.
20              THE WITNESS:  I wasn't quite sure I
21      understood your question.  So --
22      BY MR. CHAPMAN:
23          Q    Well, I'm reading from the Notice of Taking
24      Deposition.  I want to confirm you have been
25      designated by DSC as the person most qualified on
```

HAHN & BOWERSOCK 800-660-3187 FAX 714-662-1398
151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626

EXHIBIT 4

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | Q   Not the accounting --                                        |
|       | 2  | A   That's right.                                                |
|       | 3  | Q   Although you've addressed some of it,                        |
|       | 4  | you're not the person most qualified?                            |
| 12:57 | 5  | A   That's right.                                                |
|       | 6  | Q   Okay. How about the -- are you the person                    |
|       | 7  | most qualified at DSC regarding the allegations in               |
|       | 8  | DSC's Second Amended Cross-Complaint that Grissom                |
|       | 9  | was indebted to DSC for the principal sum of                     |
| 12:57 | 10 | $123,398.61 plus accruing interest at the contract               |
|       | 11 | rate from the date of each advance until paid in                 |
|       | 12 | full or date of entry of judgement plus other                    |
|       | 13 | charges allowed under the contract and agreements?               |
|       | 14 | A   I believe so.                                                |
| 12:57 | 15 | Q   Okay. And that would include the                             |
|       | 16 | accounting, would it not?                                        |
|       | 17 | A   That would include the status of the                         |
|       | 18 | account.                                                         |
|       | 19 | Q   Okay.                                                        |
| 12:57 | 20 | A   So when we -- when we filed the Amended                      |
|       | 21 | Complaint, those were facts that I became familiar               |
|       | 22 | with to communicate those to our counsel to put them             |
|       | 23 | into the Complaint.                                              |
|       | 24 | Q   Okay. So kind of a snapshot, but not                         |
| 12:57 | 25 | really the backup or how those numbers were                      |

93

```
 1   calculated?
 2        A    Right.
 3             I -- I am the person most qualified to
 4   discuss the allegations and the facts behind the
 5   numbers in the Complaint that I provided to our
 6   counsel.
 7        Q    Okay.  Well, and I don't think we're going
 8   to finish your deposition here today, so we can
 9   address that later.
10             MR. CHAPMAN:  But, Counsel, I think you
11   need to produce a qualified witness on that topic.
12             MR. NORMANDIN:  We have.
13             MR. CHAPMAN:  I -- I think that your claims
14   in the Second Amended Cross-Complaint go beyond the
15   bald number, and it goes into how they were
16   calculated and the details of that, and I think this
17   witness has admitted he is not that person.
18             MR. NORMANDIN:  He has not so admitted.
19   We're talking about the claims in the Second Amended
20   Cross-Complaint.  This witness is the most qualified
21   person.
22             MR. CHAPMAN:  Okay.  Well, I -- I think
23   we've got a record that we can talk about later.
24   BY MR. CHAPMAN:
25        Q    Are you the person most qualified at DSC
```

12:58 (lines 5, 10, 15, 20, 25)

HAHN & BOWERSOCK 800-660-3187 FAX 714-662-1398
151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626

EXHIBIT 4

|  |  |
|---|---|
| 1 | regarding DSC's rights, obligations, and duties |
| 2 | pertaining to the agreements entered into between |
| 3 | Michael Grissom and DSC? |
| 4 | A    Yes. |
| 12:59  5 | Q    Are you the person most qualified at DSC |
| 6 | regarding DSC's policies and procedures with regards |
| 7 | to its business activities in California relating to |
| 8 | floorplan or inventory financing and disposable of |
| 9 | collateral? |
| 12:59 10 | A    I think so. |
| 11 | Q    Is there any doubt about that, in your |
| 12 | mind? |
| 13 | A    I don't know what questions you're going to |
| 14 | ask me, but the questions that I'm anticipating, I |
| 12:59 15 | would think that I'm the most qualified. |
| 16 | Q    Well, let me ask you this: |
| 17 | Have you been designated by DSC as the most |
| 18 | qualified person on those topics? |
| 19 | A    I designated myself based on what I believe |
| 12:59 20 | the -- the questions that you're going to pose. |
| 21 | Q    Okay. And -- and that's true with regard |
| 22 | to all of these topics? |
| 23 | A    That's true. |
| 24 | Q    Okay. I'm going to mark as Exhibit 6 and |
| 01:00 25 | hand you a document that is Bates DSC 242 through |

95

```
 1    255.   It is the "Demand Promissory Note and Security
 2    Agreement" and the related documents.
 3             MR. NORMANDIN:  Do you have a copy for me?
 4             MR. CHAPMAN:  I'm following your example.
 5             (Plaintiff's Exhibit 6 was marked
 6             for identification.)
 7    BY MR. CHAPMAN:
 8        Q    Mr. Wick, you drafted this document?
 9        A    I did.
10        Q    And when did you draft the original of
11    this -- this is a form -- or these are a set of
12    forms that are used at DSC; correct?
13        A    Not the current forms, but at the time
14    that -- that American Family executed the documents,
15    they were the current forms.
16        Q    And when did you create the forms that were
17    signed by American Family?
18        A    Between March, 2005, and probably had them
19    finished by June, 2005, because we began lending in
20    the first part of July, 2005.
21        Q    And prior to American Family Auto signing
22    those forms, how many of those forms would you
23    estimate have been used by DSC?
24        A    I don't know what number they were in order
25    of signing up.
```

96

```
 1        Q    Well, DSC signed in August of '06?
 2        A    This particular?
 3        Q    Yes.
 4        A    Yes.
 5        Q    And so you had a little bit over a year of
 6   experience with those forms; correct?
 7        A    Uh-huh, yes.
 8        Q    Do you have an estimate as to how many
 9   dealers had signed those forms?
10        A    It would be pure speculation.  I didn't
11   confirm that number.
12        Q    Okay.  More than 1,000?
13        A    Could be.
14        Q    Okay.  And prior to DSC signing these
15   forms -- withdraw that.
16             Did DSC have the opportunity to make any
17   changes to those forms?
18        A    Anytime I'd like to make changes, I can
19   make them.
20        Q    Have you ever done that?
21        A    Yeah.
22        Q    How many times?
23        A    Probably major changes, two or three.  If I
24   find a typo in the document, I will catch that, and
25   the next time that we use a new form --
```

HAHN & BOWERSOCK 800-660-3187 FAX 714-662-1398
151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626

**EXHIBIT 4**

```
 1        Q    Okay.  Other than typos, in terms of those
 2   two or three major changes, what were those changes?
 3        A    Really only two major changes:  One, of
 4   course, was in conjunction with post-licensing date
 5   activity in California.  We --
 6        Q    Oh, let me -- I'm sorry, but I -- I just
 7   may shorten your answer.
 8             I'm just talking about changes before AFA
 9   signed.
10        A    I don't think any changes were made.
11        Q    Okay.
12        A    I mean, nothing of material or substance.
13        Q    Okay.  Did any dealer ever tell you they
14   wanted to make changes to the form before they
15   signed it?
16        A    They could have told our branch managers.
17   We made it clear, obviously, that these are forms
18   and happy to answer questions if they have them, but
19   it's not a document that we're going to negotiate.
20        Q    So it's a -- what we might call a
21   "take-it-or-leave-it document"?
22        A    Sure.
23        Q    Okay.
24        A    Kind of like a credit card application or a
25   credit card agreement.
```

01:03 — lines 5
01:03 — line 10
01:03 — line 15
01:04 — line 20
01:04 — line 25

98

1  Q  Right.
2     What is the standard practice of DSC in
3  terms of presenting those forms to dealers for
4  signature?

01:04 5  A  Well, a couple of things would have
6  happened before that, of course. The dealer would
7  have to fill out an application and submitted that
8  for credit approval and underwriting.
9     Then depending on the particular dealer, a
01:04 10 DSC field employee would meet with them to go over
11 the documents and close the documents, if you will.
12 Q  Is there any training provided by DSC to
13 employees on how to undertake that process?
14 A  Yes.
01:05 15 Q  And what is that training?
16 A  In the past, we used to bring all of our
17 branch managers -- they've gone through different
18 title changes throughout the years -- but they would
19 come in for orientation to learn DSC practices,
01:05 20 policies, procedures; and then they would take that
21 back, and they would train their staff in their
22 office.
23 Q  Okay. And how long would that -- would
24 that orientation take place?
01:05 25 A  It would typically be over the course of as

99

```
01:05       1    little as three to four days and perhaps a week, and
            2    then beyond -- the follow-up training would be, you
            3    know, any ad hoc training that would be put together
            4    in the field in a region as the regional vice
            5    president or regional director, as the title was
            6    changed, would coordinate.
            7         Q    And who did the training -- the
            8    orientation -- was that back at Indiana?
            9         A    Yes.
01:06      10         Q    And who did that training?
           11         A    It would depend on what the topic is.  I
           12    would cover the legal training, meaning, this is --
           13    these are the documents that we use.  This is a
           14    note.  This is what a UCC is.  This is what a
01:06      15    Purchase Money Security Interest Notice is.  This is
           16    why we use them.  This is what UCC does so they
           17    would understand the documents when they were asked
           18    questions.
           19         Q    When you did the training, how much of the
01:06      20    three-to-four-days or week-long training was your
           21    portion on the documents?
           22         A    I would usually spend two to three hours
           23    with them.
           24         Q    Okay.  And did you have any written
01:06      25    materials that you used to make your presentation?
```

100

|  |  |
|---|---|
| 1 | A    Yeah, we would have a -- kind of a training |
| 2 | copy of this set of documents.  We'd have a |
| 3 | PowerPoint.  And we would cover topics beyond the |
| 4 | Note itself, of course.  Items like ten-day notices. |
| 01:07  5 | Why they're required.  Why we use them. |
| 6 | But there would be a PowerPoint, and then |
| 7 | there would be documents. |
| 8 | I would spend a decent amount of time |
| 9 | teaching them the difference between purchase money |
| 01:07 10 | advances and non-purchase money advances.  That's an |
| 11 | issue for them to understand so they know how to |
| 12 | handle that in the field. |
| 13 | Q    Does DSC do non-purchase money advances? |
| 14 | A    Sure. |
| 01:07 15 | Q    Okay.  The PowerPoint that you mentioned, |
| 16 | how many slides does that contain? |
| 17 | A    Not many.  Maybe four, five, six, and |
| 18 | that's went through several reiterations. |
| 19 | Q    Does DSC have a -- any manuals for -- to |
| 01:07 20 | train people on how to do their -- fulfill their |
| 21 | duties? |
| 22 | A    We used to, and at the time of this |
| 23 | particular contract signing, we had a -- it had a |
| 24 | binder that we would provide our general managers, |
| 01:07 25 | and they would keep that at the branch. |

HAHN & BOWERSOCK 800-660-3187 FAX 714-662-1398
151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626

**EXHIBIT 4**