UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF INDIANA
                       INDIANAPOLIS DIVISION

RED BARN MOTORS, INC.,
PLATINUM MOTORS, INC.,
MATTINGLY AUTO SALES, INC.,
YOUNG EXECUTIVE MANAGEMENT &
CONSULTING SERVICES, INC.,
Individually, and on behalf
of other members of the
general public similarly
situated,
              Plaintiffs,            Docket No.
                                     1:14-cv-01589-TWP-DKL
  vs.

COX ENTERPRISES, INC.,               Class Action
COX AUTOMOTIVE, INC.,
NEXTGEAR CAPITAL, INC. f/k/a
DEALER SERVICES CORPORATION,
successor by merger with
Manheim Automotive Financial
Services,  Inc., and JOHN WICK,
              Defendants.

        The deposition upon oral examination of

   **ADAM GALEMA**, a witness produced and sworn before me,

   Paula A. Morgan, Notary Public in and for the County

   of Hamilton, State of Indiana, taken on the 10th day

   of November, 2016, in the offices of Bose, McKinney &

   Evans, 111 Monument Circle, Suite 2700, Indianapolis,

   Marion County, Indiana, pursuant to the Federal Rules

   of Civil Procedure.  This deposition was taken on

   behalf of the Plaintiffs in the above-captioned

   matter.
                    ASSOCIATED REPORTING, INC.
                 251 East Ohio Street, Suite 940
                   Indianapolis, Indiana 46204
                         (317) 631-0940
                    www.associated-reporting.com

EXHIBIT 6

14

```
 1              MR. VINK:  Just to be clear, what time frame are
 2         we talking about?
 3    Q    Let's go with now, and then we'll go back.
 4    A    Okay.
 5    Q    Actually, let's use this time frame since that's --
 6         this would be pre-2015, when you were the controller.
 7    A    Controller?
 8    Q    Yes.
 9    A    Okay.  I mean, the dealer could access reports
10         himself.  He could speak with his account executive.
11         He could also speak with someone in our call center.
12    Q    That's not something that your department would
13         handle, for lack of a better term?
14    A    Correct.
15    Q    So I understand from your affidavit you're now the
16         vice president of finance?
17    A    Correct.
18    Q    What do you do in that role?
19    A    It's a lot of the same responsibilities that I just
20         kind of walked through, just at a higher level.  So
21         much more -- just deeper involvement in financial
22         statement analysis, presentations, deeper
23         relationships with our banks and securitization
24         processes.  Again, the budgeting and forecasting is
25         part of my responsibility.  Again, a lot of the same
```

EXHIBIT 6

15

1          functions, just at a higher level.

2     Q    Who reports to you?

3     A    I have approximately twenty direct reports.  Not all

4          direct.  Excuse me.  Indirect as well.

5     Q    Does the controller report to you now?

6     A    Now we have a different structure.  We have a

7          director of accounting and a director of FP&A, which

8          is financial planning and analysis.

9     Q    Who does the controller report to now?

10    A    There is no controller.

11    Q    Okay.  Is there a CFO now?

12    A    Yes.

13    Q    Who is that?

14    A    Dave Horan.

15    Q    And do you report to him?

16    A    I do.

17    Q    He's your direct report?

18    A    He is my direct supervisor, yes.

19    Q    Do you have other people that you also have to report

20         to in your position?

21    A    No.

22    Q    And now, with your position now, I would also assume

23         you don't speak with dealers?

24    A    No.

25    Q    Okay.  And is that true for your entire time at DSC,

EXHIBIT 6

| | | |
|---|---|---|
| 1 | | that you don't speak with dealers? |
| 2 | A | Correct. |
| 3 | Q | How about the sales representatives?  Do you speak |
| 4 | | with them? |
| 5 | A | Sure. |
| 6 | Q | What types of conversations do you have with them? |
| 7 | A | They are very few and far between.  Generally, it's a |
| 8 | | question they may ask concerning the status of a |
| 9 | | vehicle or why something happened the way it did in |
| 10 | | the system. |
| 11 | Q | Why are they asking you that question? |
| 12 | A | Well, they're not necessarily asking me directly |
| 13 | | right now, currently.  But they would ask either |
| 14 | | myself or my team because we have the knowledge of |
| 15 | | the business and the knowledge of the system and how |
| 16 | | it works. |
| 17 | Q | So they're calling you if there's maybe a specific |
| 18 | | issue with a certain vehicle? |
| 19 | A | They could.  We are not the go-to operational, you |
| 20 | | know, call center.  We're the finance team. |
| 21 | Q | And that's something I was just trying to get at.  If |
| 22 | | I was a salesperson and I had an issue with a dealer, |
| 23 | | I wouldn't be calling you.  I would be calling |
| 24 | | somebody else first, correct? |
| 25 | A | Correct. |

EXHIBIT 6

1    Q    Who would I call, if you know?

2    A    It could vary.  I mean, they could call their

3         supervisor.  They could call in to our call center.

4         They have, you know, the operational knowledge and

5         could help them through that potential issue or

6         question they have.

7    Q    So in your positions, or at least your position now,

8         and maybe since you've been with the company, you've

9         been primarily concerned with obtaining the funding

10        or the funds that NextGear/DSC then lends out to the

11        dealers?

12   A    It's part of my job function, yeah.

13   Q    Do you do work more on the -- obtaining the funds and

14        managing the funds and the budgeting process of DSC

15        versus actually interacting with the individual

16        accounts where that money's being lent to?

17   A    That would be fair, yes.

18   Q    Okay.  Who is more over the individual accounts of

19        the dealers?  Who are making those types of

20        decisions?

21   A    What decisions?

22   Q    Well, how much money they can borrow or if there's an

23        issue with the account.

24   A    Sure.  If you're talking about how much they can

25        borrow, that's going to run through our lending

EXHIBIT 6

```
 1        department.

 2    Q   Do you supervise that?

 3    A   No.

 4    Q   Who does, if you know?

 5    A   We have a vice president of lending.

 6    Q   Who is that?

 7    A   His name is Patrick Inks, I-N-K-S.

 8    Q   You do monthly reports as well now too, correct?

 9    A   Correct.

10    Q   And those are to the -- to Mr. Herman?

11    A   Horan?

12    Q   Horan, I'm sorry.

13    A   He's one of the recipients, sure.

14    Q   These reports wouldn't have an individual sales

15        figure from a particular dealer, correct?

16    A   No.

17    Q   It's more of a compilation of everything that's

18        happened in that month company-wide?

19    A   Correct.

20    Q   Would these figures contain an average transaction

21        amount, or is it even a higher level than that?

22    A   Sure.  No, we -- part of our analysis is to look at

23        average metrics within the portfolio.

24    Q   Would it have credit utilization rates of the dealers

25        or an average credit utilization rate?
```

EXHIBIT 6

1    A    We would have a consolidated utilization rate, yes.

2    Q    How about an average interest rate?

3    A    Yes.

4    Q    And an average number of days financed for vehicles?

5    A    Yes.

6    Q    And you could determine an average daily finance rate

7         throughout the portfolio as well, too, correct?

8    A    Sure, you could get there.

9    Q    And even an average amount of interest that

10        NextGear/DSC earned for that particular day?

11   A    Yeah, you could derive that from the financial

12        statements.

13   Q    Does NextGear ever get to a point where it doesn't

14        have any more funds to offer dealers?  Or is that

15        part of your job to manage, to make sure there's a

16        constant credit facility that's open.

17   A    Yeah.  I mean, there is a limit to the funding that

18        we have available to us, yes.

19   Q    Do you report to anyone at Cox Enterprises, Inc.?

20   A    Directly?  No.

21   Q    How about indirectly?

22   A    At Cox Enterprises?  No.

23   Q    How about Cox Automotive, Inc.?

24   A    Indirectly, yes.

25   Q    And how is it indirectly?

EXHIBIT 6

```
 1   A   Just in the sense that we are one business unit
 2       underneath the Cox Automotive umbrella, if you will.
 3   Q   Do you know what the other business units are under
 4       Cox?
 5   A   I know a few of them.
 6   Q   What would they be?
 7   A   I wouldn't know all of them.  Manheim, Kelley Blue
 8       Book, Autotrader, vAuto, VinSolutions.  Do you want
 9       me to --
10   Q   Do you know more?
11   A   An exhaustive list of everything I know?
12   Q   This is a lot, I guess, huh?
13   A   Yeah.
14   Q   How many more are there?
15   A   I believe there are approximately 40 total companies
16       underneath Cox Automotive.
17   Q   Do you know who at Cox Automotive would be your
18       indirect report?
19   A   Sure.
20   Q   Who is that?
21   A   You know, my boss, Dave Horan, reports to the CFO of
22       Cox Automotive.
23   Q   Who is that?
24   A   Neil Johnston.
25   Q   And do you have interaction with him, with
```

EXHIBIT 6

|   |   |   |
|---|---|---|
| 1 |   | guess, or publicly traded-type financial instruments? |
| 2 | A | Not publicly traded, no. |
| 3 | Q | Privately traded? |
| 4 | A | Yeah. |
| 5 | Q | Is that the same now as well, too? |
| 6 | A | Yes. |
| 7 | Q | Okay.  So various companies and individuals would be |
| 8 |   | able to buy a debt package? |
| 9 | A | It's a 144A transaction, so only investment companies |
| 10 |   | can participate. |
| 11 | Q | I'm going to turn to the affidavit that you at least |
| 12 |   | signed in this case.  Are you familiar with this |
| 13 |   | document? |
| 14 |   | MR. VINK:  Are you going to mark this as an |
| 15 |   | exhibit? |
| 16 |   | MR. AIREY:  I wasn't going to. |
| 17 |   | MR. VINK:  Okay. |
| 18 | A | Yes, I'm familiar. |
| 19 | Q | Okay.  How did this document come about?  Why were |
| 20 |   | you asked to draft this document? |
| 21 | A | I was asked to -- |
| 22 |   | MR. VINK:  Before you answer that question, make |
| 23 |   | sure that you don't divulge anything that was |
| 24 |   | communicated to you by counsel related to signing |
| 25 |   | this declaration.  That would be protected by the |

EXHIBIT 6

```
 1        attorney-client privilege.
 2   Q    Right.  And I should have said that before.  I don't
 3        want to know anything that they asked you.  And if
 4        that's the only reason that you have for why you did
 5        it, which wouldn't be surprising, then, you know,
 6        that will be your response.  I understand that.
 7   A    Well, are you asking why I'm here or why I signed
 8        this?
 9   Q    How about this.  Do you know why you were chosen to
10        draft this affidavit?
11   A    Yes.
12   Q    Okay.  Why is that?
13   A    Because I have knowledge of how floorplanning works
14        and how the system operates and how we calculate the
15        revenue that we generate.
16   Q    But as far as the individual dealers that are
17        mentioned in this affidavit, like Red Barn and
18        Platinum and Mattingly, did you know about those
19        prior to drafting this affidavit?
20   A    Yes, I've heard of them.
21   Q    Did you have any interaction with or any -- I guess
22        "interaction" is the best word.  Did you have any
23        interaction with their accounts for Red Barn,
24        Mattingly, or Platinum when you were in any of your
25        various positions with DSC?
```

EXHIBIT 6

24

1   A   Direct interaction, no.

2   Q   How about indirect?

3   A   Sure.

4   Q   What would that be?

5   A   It would have been part of the analysis that we do on

6       dealers who default and charge off.

7   Q   But you wouldn't have called up someone at Red Barn

8       and said, hey, what's going on here, why are you

9       defaulting, correct?

10  A   Correct.

11  Q   And same with Mattingly or Platinum?

12  A   Correct.

13  Q   So you may have interaction with their account here

14      in Indiana but not actually with any of these

15      dealers, specifically with themselves, or with those

16      dealers?

17  A   I would not communicate directly with the dealer, no.

18  Q   Now, did you actually physically write every word in

19      this affidavit?

20  A   No.

21  Q   Okay.  Who did?

22  A   It's my understanding our legal team.

23  Q   As far as the exhibits that are attached to this

24      affidavit, did you pick which exhibits to put on this

25      affidavit?

EXHIBIT 6

25

1   A   No.

2   Q   I'm going to hand you what was marked as Exhibit B to

3       your affidavit.  This document has "NextGear Capital"

4       written on the top of it.

5   A   Correct.

6   Q   Correct?  So it's fair to say that this would have

7       been produced after the merger between DSC and

8       Manheim and -- with Cox, correct?

9   A   Correct.

10  Q   Do you know if this document was produced

11      specifically for this litigation?

12  A   Yes.

13  Q   It was specifically --

14  A   It was.

15  Q   Okay.  Did you create this Exhibit B?

16  A   I did not.

17  Q   Do you know who did?

18  A   Yes.

19  Q   Who?

20  A   Our technology team.

21  Q   Did you supervise them when they created it?

22  A   I do not have direct supervision of them.

23  Q   So you didn't ask them to create this document?

24  A   Myself directly?  No.

25  Q   Did you have any input in the information that was

EXHIBIT 6

1       put in this document?

2    A  Yes.

3    Q  Okay.  So it's fair to say that you asked them to

4       create a document with these columns on it?

5    A  I did not ask them, but I was involved in reviewing

6       and testing the accuracy.

7    Q  Other than your counsel, who else assisted you in

8       producing Exhibit B?

9    A  I can't recall exactly who was involved in the

10      development of it.  The only other person I can think

11      of is a gentleman, Lucas Hancock.

12   Q  Is he an IT person?

13   A  No.

14   Q  What does he do?

15   A  He's senior director of customer experience.

16   Q  Do you know what he does in that role?

17   A  Yeah.  He manages our call center.

18   Q  Now, prior to the Manheim and DSC merger, had you

19      ever reviewed Manheim Financial Services' promissory

20      notes?

21   A  No.

22   Q  How about any Manheim documents, like security

23      agreements, financial agreements?

24   A  No.  We are competitors.

25   Q  So it's fair to say that the first time you would

EXHIBIT 6

27

```
 1          have reviewed those documents would have been in
 2          drafting this affidavit?
 3              MR. VINK:  Object to the form.  You can answer.
 4     Q    Well, let me ask it another way.  When was the first
 5          time that you reviewed any documents from Manheim
 6          Financial Services, which I'll call MAFS for short.
 7     A    Sure.  In this case.  I mean, we did not have any
 8          involvement in MAFS documents.
 9     Q    Even after the merger you didn't go and look and see
10          what they were doing versus what DSC was doing?
11     A    I did not review a particular legal document of MAFS
12          and compare it to what DSC was doing.
13     Q    Have you done that comparison for this litigation?
14     A    Have I done that?
15     Q    Correct.
16     A    I am not an attorney, so I've not reviewed and, you
17          know, compared every single -- I have not done that.
18     Q    Okay.  So you didn't go through and say what was
19          different between a MAFS document and a NextGear or
20          DSC document?
21     A    No.
22     Q    You said that right now NextGear has about 21,000
23          dealers?
24     A    Correct.
25     Q    Do you know, on a year-by-year basis, approximately
```

EXHIBIT 6

28

```
 1        how many dealers DCS would have had -- I'm sorry, DSC
 2        would have had in, let's say, 2007?
 3    A   I can't recall exactly.  If I had to estimate, it
 4        would be six to eight thousand.
 5    Q   How about in 2005?  Would you know then?
 6    A   That was the first year of DSC, so --
 7    Q   Okay.  How about 2008?
 8    A   Roughly the same, six to eight thousand.
 9    Q   And would that be the same up until the merger?
10    A   Correct.
11    Q   Okay.  So with the merger you took on all of -- or
12        NextGear was created to take on all of MAFS customers
13        as well as DSC customers under one company?
14    A   Correct.
15    Q   And so did MAFS have more customers than DSC?
16    A   I believe they did, yes.
17    Q   You said six to eight thousand customers per year.
18        Are they the same six to eight thousand customers
19        every year?
20    A   No.
21    Q   What's the turnover rate of customers that would
22        maybe use the floorplan in 2007 versus 2008?
23    A   I can't speak specifically to the turnover rate back
24        then.  As an estimate, we could potentially turn
25        over, back then, maybe a hundred accounts each month.
```

EXHIBIT 6

1   Q   When you say "turn over," what do you mean by that?

2   A   They could leave our relationship voluntarily.  They

3       can move to another financier, another lender.  They

4       could also default on their account and be charged

5       off.

6   Q   Do you know what the default rate would have been in

7       2007?

8   A   I don't know exactly.  You know, it's going to be

9       somewhere around 5 percent of our dealers.

10   Q   Is that per year or per month?

11   A   It's an annual list.

12   Q   Did that number stay true throughout 2008, 2009,

13       2010?

14   A   I can't speak to that.  I don't have, obviously, the

15       information in front of me.  But it would not have

16       varied significantly other than -- you know, during

17       '08, '09, with the economic downturn, we did

18       experience larger losses.

19   Q   So maybe more than 5 percent in '08, '09?

20   A   Sure.  I think you would find that everywhere.

21   Q   With the six to eight thousand customers that DSC

22       would have had, did those customers also use MAFS as

23       well?

24   A   Some of them could.

25   Q   Do you know, was it common in the industry to have

EXHIBIT 6

1   Q   And what's the date that is entered into the system?

2   A   In that scenario, for a non-auction purchase, it

3       would be the date that we receive that floorplan

4       information, bill of sale, et cetera, from the

5       dealer.

6           (Deposition Exhibits 1 through 7 were marked for

7       identification.)

8   Q   I'll hand you a stack of documents here.  I do have

9       these marked.  I've got these kind of backwards, but

10      that's 7.  I apologize.  The staple came out.  Here's

11      6.  This is 5, 4, 3, 2, 1.

12          You're familiar with the discovery requests that

13      were asked in this case?

14  A   Generally.

15  Q   One of the requests that we asked for were examples

16      of the contracts of the various years that DSC used

17      during the -- for floorplanning.  Exhibit 1 -- let's

18      see.  If we can look back on page -- it's NG004848.

19  A   (The witness complies.)

20  Q   Right above the redaction box it appears to indicate

21      that this is a November 20, 2005, contract?

22  A   Mine says May 20.

23  Q   I'm sorry.  May 20, 2005.  As far as in 2005, to your

24      knowledge, would this be an accurate representation

25      of the contract that DSC used with its dealers?

EXHIBIT 6

36

1    A    Yeah, I would have no reason to believe it would not

2         be.

3    Q    Now, on -- let's see.  It's the second page of the

4         document, first page of the promissory note.  Under

5         1(a) there's a definition of "advance."  Is that the

6         definition that you were discussing earlier when you

7         talked about loans?

8    A    Correct.

9    Q    Could you read that for me?

10   A    "'Advance' shall mean all loans or payments pursuant

11        to this Note made by DSC to Dealer or on Dealer's

12        behalf to any third party."

13   Q    In your affidavit, on page 2, paragraph 15, that

14        paragraph generally states what you told me earlier,

15        that when NextGear pays an auction direct -- or,

16        sorry.

17             That the date NextGear conveys funds for a

18        vehicle varies by transaction type and source,

19        correct?  First paragraph of that statement.

20   A    Yeah, that statement is true.

21   Q    Okay.  It's also true that for the auction

22        vehicles -- for dealers that buy cars at auction,

23        NextGear charges interest to the dealer on the day

24        that the dealer purchases the car from the auction,

25        correct?

EXHIBIT 6

37

1    A    Generally, yes.

2    Q    You said "generally."  When would they not?

3    A    It could be, you know, if a dealer buys a car at

4         auction and then three months later floorplans it

5         with us, we're not going to backdate interest to the

6         date that it was sold or purchased.

7    Q    I'm sorry.  Could you explain that example a little

8         bit more?

9    A    Sure.  I mean, a dealer buys a car, and he could pay

10        with cash.

11   Q    Okay.

12   A    And then two, three, four months later he might

13        choose to put it on his floorplan to free up that

14        cash.

15   Q    So if a dealer buys a car at auction using the

16        NextGear or DSC floorplan, then, at that time, the

17        date that the dealer purchases that vehicle is the

18        date that interest begins to run?

19   A    Correct.

20   Q    Are you aware of anywhere in the contract where it

21        makes a distinction between vehicles that are bought

22        at an auction and vehicles that are bought at -- or

23        vehicles that are owned by the dealer?

24             MR. VINK:  Object to the form.  You can answer.

25   A    I don't know.

EXHIBIT 6

38

1   Q   With the -- let's see.  It's Exhibit B to your

2       affidavit that I handed you.  I think I gave it to

3       you earlier.

4   A   Yes.  Sorry.

5   Q   Okay.  In the far left column there's -- -- on the

6       first page, about halfway down, it says "Total for"?

7   A   Correct.

8   Q   Do you know what that "Total for" means?

9   A   That is the total of the transactions that were

10      funded on that particular date.

11   Q   So that's the day that NextGear funded the

12      transaction to the auction or buyer in this case?

13   A   It is the date that NextGear sent cash to the

14      auction.

15   Q   Now, the day that NextGear sends cash to the auction

16      is, in many cases, days and even weeks later than the

17      actual day that the dealer buys from the auction,

18      correct?

19   A   Sure.

20   Q   And in some instances a dealer can purchase the

21      vehicle at auction, sell that vehicle, send funds to

22      NextGear before NextGear actually pays the auction as

23      well, correct?

24   A   That is possible.

25   Q   In the affidavit you indicate that there's a dealer

EXHIBIT 6

39

1     that has a $40 million line of credit with NextGear?

2  A  Yes.

3  Q  Who is that?

4  A  We have -- I don't know who exactly has the $40

5     million line of credit.  That's just a range given.

6  Q  That's just something you looked on a computer system

7     somewhere to see what the max range was, without

8     actually knowing who it was?

9  A  Yeah.  I mean, it's all information within our

10    system.

11 Q  How many dealers have a $40 million line of credit,

12    do you know?

13 A  We only have a couple that are in that -- at that

14    level.

15 Q  Do you know what the average credit limit, credit

16    line is for a dealer?

17 A  Yeah.  The mathematical average is approximately

18    $300,000 today.

19 Q  Has that gone up or down in the years since you've

20    been working at NextGear?

21 A  It has increased.

22 Q  You don't know what the dealers' names are that have

23    a $40 million line of credit?

24    MR. VINK:  Object to form.  You can answer.

25 A  I mean, I can give you a couple of names of our

EXHIBIT 6

40

1        largest accounts.

2    Q   Yeah.

3    A   I don't know that they're exactly $40 million.

4    Q   Okay.

5    A   Hertz Corporation, Wholesale, Inc.  Those would be

6        probably two of our bigger ones.

7    Q   Does NextGear do any business with, like, the

8        Enterprise rental car?

9    A   No.

10   Q   Do you know what Hertz uses its line for?

11   A   It's my understanding it's for their car sales

12       division.  It's a very short time frame that they're

13       on floorplan.

14   Q   Do you know how many dealers would have been doing

15       business with NextGear from 2005 through 2012 but

16       would not have been doing business in 2013?

17   A   I could provide a guess.  If you -- complete estimate

18       here, but dealers who may have been terminated,

19       right?  Is that what you're getting at, dealers

20       who --

21   Q   Who no longer do business with DSC, for whatever

22       reason.  I know you said there was about a 5 percent

23       turnover earlier.

24   A   Yeah.  It could be -- again, I don't have the

25       information in front of me.  But a pure guess for

EXHIBIT 6

41

1    that time frame might be, I don't know, four to five

2    thousand dealers.  Pure guess.

3  Q   That's something you could find out through the

4    system, though?

5  A   Yeah.

6  Q   And NextGear would have a record of the relationship

7    between a particular dealer and NextGear/DSC for each

8    transaction that that dealer has done with NextGear

9    or DSC?

10 A   Correct.  We have a history of all the transactional

11   volume for a particular dealer, as a dealer with DSC

12   and NextGear.

13 Q   And it would be similar to what was Exhibit B to your

14   affidavit?

15 A   Correct.  That's where -- this report was created

16   using that data.

17        MR. AIREY:  I'm sorry.  I'm trying to narrow this

18   down for you.  It's good I'm pausing.  We've gone

19   over some of this.

20        Actually, if we could take a five-minute break.

21        (A recess was taken.)

22 Q   With the affidavit that you drafted, on page 3, at

23   paragraphs 24, 25, and 26 -- well, let's go 24 and

24   25.  You say many dealers in the proposed class

25   defaulted on their obligations to NextGear, correct?

EXHIBIT 6

53

1    A    The information resides in the system.  It is not a

2         metric or a data point that we review frequently.

3    Q    But you do review that sometimes, correct?

4    A    I've seen data around it, yeah.

5    Q    What was the purpose for that data?

6    A    Just to investigate, make sure that vehicle was still

7         a valid floorplan.

8    Q    So the system could generate that information for

9         each transaction, correct?

10   A    Yeah, those data points reside in the system for

11        every transaction.  And those are the same data

12        points shown on this report.

13   Q    Let's make it easier.  Let's walk through one of the

14        transactions here.  If we go to page NGR000012, which

15        is page 2 of Exhibit B that was attached to your

16        affidavit, if we go to the column starting underneath

17        where it says "Total for - 8/17/2011," it's stock

18        number 13.  It says "2000 Saturn S-Series SL2."  Walk

19        me through that transaction.

20   A    Sure.  I mean, based on the facts here, dealer would

21        have purchased the vehicle at Oak View Auto Auction

22        on August 5, 2011.  That auction would have

23        transmitted that flooring information to DSC at the

24        time, on the same date, August 5, 2011, and -- you

25        know, under the terms there noted to the right.  And

EXHIBIT 6

54

1       then that third date there is completed date,

2       August 17, 2011.

3            Based on that information there, you know, it's

4       easy to reason that we had an agreement with the

5       auction to fund that vehicle either on notice of

6       title or on possession of title.  And that's why

7       the -- sorry.  Let me get my dates right.  It's the

8       one underneath it.  So, yeah, that's why on the 18th

9       of August the funding occurred.

10   Q   When you say "the funding occurred," that's the day

11      that NextGear sent funds to Oak View Auction in this

12      case?

13   A   That's correct.

14   Q   But you're not familiar with the terms or contents of

15      the Oak View Auction agreement between NextGear

16      and -- in this case it was DSC and -- well, between

17      Oak View Auction and DSC?

18   A   I don't have that document in front of me, no.  I can

19      make a reasonable --

20   Q   If we go to NGR000014 -- it's page 4 -- toward the

21      bottom of the page it's stock number 58.  It's a 1997

22      Ford Explorer.

23   A   Yes.

24   Q   Can you walk me through that transaction as well?

25   A   Sure.  Dealer would have purchased that vehicle at

EXHIBIT 6

55

```
 1          Oak View Auto Auction on August 26, 2011.  That
 2          auction would have sent that information to DSC on
 3          the same date, August 26.  And that dealer -- the
 4          dealer, ultimately, paid that vehicle off, completed
 5          it on September 12, 2011.  And, again, same thing.
 6          They would have -- the auction received -- or we sent
 7          funding to the auction on October 7, 2011.
 8     Q    And that August 26 date, the flooring date, that's
 9          the day that DSC would have been charging, started
10          charging, Red Barn Motors interest?
11     A    Yes, that's correct.  That's the day they started
12          utilizing their floorplan for that vehicle.
13     Q    Now, this document, which is Exhibit B that was
14          created for this litigation, is this something also
15          that a dealer would be able to create?
16     A    This exact form?  No.  This is created specifically
17          for this case.  The dealer does have access to
18          reporting that's very similar, that has all the same
19          information on it.
20     Q    It would have the "Total for" date on it?
21     A    I believe it would, yes.
22     Q    Is there any indication on here of what "Total for"
23          means?
24     A    On this report it does not specifically say, but we
25          understand that to be the case, that it's the total
```

EXHIBIT 6

56

1       amount funded on that particular day.  I believe the

2       reporting available to the dealer is a little more

3       descriptive.

4   Q   Have you seen more descriptive reporting that's

5       available to the dealer than this?

6   A   To the extent that this -- this report has a lot of

7       information on it.  Again, I can't say exactly if

8       every single column on here is on the report that

9       they see, but, you know, to my -- yeah, I would say

10      that all those are -- in one form or another, all

11      that information is on the reporting, the Receivable

12      Detail Report that the dealer has access to.

13          MR. AIREY:  I don't have additional copies of

14      this.  This was an exhibit that we used yesterday,

15      Exhibit 17.

16          MR. VINK:  Okay.

17  Q   You stated that dealers can get the Receivable Detail

18      Report.  Is this one of the reports that you were

19      discussing?

20  A   This is a Receivable Detail Report, yes.

21  Q   Okay.  That's something that the dealer would have?

22  A   Yes.

23  Q   Get?  Okay.  Can you show me where the "Total for"

24      column is on that?

25  A   On this report there's not a "Total for" amount.

EXHIBIT 6

57

1    Q   Okay.  Is there a day that shows when NextGear paid
2        the auction on that report?
3    A   Yes.  There is a column labeled "Days."  That is the
4        number of days that that vehicle has been on
5        floorplan.  You can run that back to the floordate
6        and determine kind of when that floorplan started.
7        Sorry.  Did you -- restate your question.
8    Q   What I was asking is, does that document, anywhere in
9        that document, show when NextGear or DSC --
10   A   Sorry.
11   Q   -- paid the auction?
12   A   No, it does not.  I don't know why that would be
13       important to them.
14           MR. AIREY:  Can we take a little break?  We're
15       pretty much toward the end.
16           MR. VINK:  Okay.
17           (A recess was taken.)
18   Q   Earlier you mentioned Lucas Hancock, I believe?
19   A   Yes.
20   Q   And he is the director of customer experience now?
21   A   Correct.
22   Q   Okay.  Who was in that role before him?
23   A   I couldn't tell you.  It's a new role as well, within
24       the last couple of years.
25   Q   Was there somebody that did a similar role prior to

EXHIBIT 6

58

1        this role being created?

2    A   During this time frame there would not have been

3        someone in that position.

4    Q   There was still a -- was there a call center during

5        the time frame of the Red Barn transactions?

6    A   During a portion of that time frame.

7    Q   When did the call center start?

8    A   I believe it was around 2010, 2011.

9    Q   What did the dealers do prior to 2010, 2011 when they

10       wanted to contact DSC?

11   A   They contacted their account executive.

12   Q   And then he would go to a regional director?  He

13       would report to a regional director then?

14   A   Yeah, he reported to a regional director.  Whether or

15       not he went to that director with every single

16       issue --

17   Q   And then who would the regional directors report to?

18   A   During this time I believe we had maybe a couple of

19       vice presidents of operations.  I don't recall

20       exactly the org structure back then.

21   Q   Do you know the names of any of those people?

22   A   I'm trying to think.  I'm not sure who was in those

23       positions back then.

24   Q   Are those people still with the company now, just in

25       different roles?

EXHIBIT 6

59

1   A   I mean, I don't know who it would have been.  I mean,
2       we -- yeah, it's hard to say.
3   Q   So you just don't have any recollection of who those
4       people were?
5   A   No.
6   Q   So you wouldn't have had a lot of interaction with
7       them?
8   A   Well, I would have.  I just don't know, in 2009 or
9       2010, what the org structure was exactly or who was
10      in each role.
11  Q   In your current role do you participate in monthly
12      financial review meetings?
13  A   Yes.
14  Q   And who usually attends those meetings?
15  A   All of the executive team of NextGear.
16  Q   That's, like, the CEO, the CFO?
17  A   Yeah, the C-level and the vice presidents.
18  Q   Do you take minutes at those meetings?
19  A   No.
20  Q   How about notes?
21  A   No.
22  Q   Does anybody?
23  A   People may take individual notes as they see fit, but
24      there's no standard format.
25  Q   Are the financial statements circulated prior to the

EXHIBIT 6

60

```
 1        meetings?
 2   A    Yeah, they're circulated ahead of time.
 3   Q    What's generally included in those financial review
 4        meetings?  What data do you look at?
 5   A    We look at, you know, financial -- you know, an
 6        income statement view.  We definitely look at our
 7        defaults and charge-offs.  Also, you know, do a
 8        little bit of forecasting and looking ahead.
 9   Q    For your position, do you have any policies,
10        procedure books that you routinely look at that may
11        have been created specifically for NextGear?
12   A    I mean, there are NextGear policies, yes.  They're
13        available to the entire company.
14   Q    Do you have any specific ones that are just for your
15        department?
16   A    Sure.
17   Q    What are those called?
18   A    Travel/entertainment expense policy.  We have payment
19        posting policies.  That's generally -- you know, a
20        couple of the main ones.  There could be others.
21   Q    Do you have policies regarding the withdrawal or
22        termination of credit from customer dealers?
23   A    We do have a policy around charge-offs and defaults,
24        so yes.
25   Q    Does your department handle when something is charged
```

EXHIBIT 6