UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

```
RED BARN MOTORS, INC.,           )
PLATINUM MOTORS, INC.,           )
MATTINGLY AUTO SALES, INC.,      )
YOUNG EXECUTIVE MANAGEMENT &     )
CONSULTING SERVICES, INC.,       )
Individually, and on behalf      )
of other members of the          )
general public similarly         )
situated,                        )
              Plaintiffs,        )
                                 ) Docket No.
        -v-                      ) 1:14-cv-01589-TWP-DKL
                                 )
COX ENTERPRISES, INC.,           ) Class Action
COX AUTOMOTIVE, INC.,            )
NEXTGEAR CAPITAL, INC. f/k/a     )
DEALER SERVICES CORPORATION,     )
successor by merger with         )
Manheim Automotive Financial     )
Services, Inc., and JOHN WICK,   )
              Defendants.        )
```

The deposition upon oral examination of **STUART LABAUVE**, a witness produced and sworn before me, Tami L. Scott, Notary Public in and for the County of Marion, State of Indiana, taken on behalf of the Plaintiffs at the offices of Bose, McKinney & Evans, 111 Monument Circle, Suite 2700, Indianapolis, Marion County, Indiana, on November 9, 2016, at 9:00 a.m., pursuant to the Federal Rules of Civil Procedure.

**ASSOCIATED REPORTING, INC.**
**251 EAST OHIO STREET, SUITE 940**
**INDIANAPOLIS, INDIANA 46204**
**(317) 631-0940**
**www.associated-reporting.com**

EXHIBIT 8

37

```
 1         anyone?
 2    A    That was it.
 3    Q    That was it?  Who made you the offer?
 4    A    Mike Robb.
 5    Q    Okay.  Let me back up a second.  When you left
 6         CitiFinancial, what were you making, ballpark,
 7         annually, as far as income?
 8    A    $50,000.
 9    Q    Per year?
10    A    Yes, sir.
11    Q    And -- oh, I said annually, so I guess I asked that
12         question.  And what was your income estimated that
13         it was going to be for DSC?
14    A    $70,000.
15    Q    Did it take you a long time to decide to accept his
16         offer?
17    A    No.
18    Q    Did you accept it on the spot?
19    A    I was ready to leave.
20    Q    Okay.  Why were you ready to leave?
21    A    You deal with the same customers over and over and
22         help them get through their problems, and they get
23         back into them, and it wears on you.  I wanted
24         something different.
25    Q    Was the sheer volume an issue in your mind as well?
```

EXHIBIT 8

38

```
 1          Was that part of it?
 2   A      No.
 3   Q      No?  The customers that you dealt with, was that
 4          what the issue was?
 5   A      Yeah.  I just, you get burnt out on it.
 6   Q      And what position were they hiring you for and did
 7          they hire you for?
 8   A      They called us general managers.  DSC's title was
 9          general manager.
10   Q      What were your duties in the beginning when you
11          first started?
12   A      To sign up new dealers for the floorplan and to open
13          an office and hire a staff.
14   Q      Did DSC have an office at that time in Baton Rouge?
15   A      No, sir.
16   Q      What was their nearest office in Louisiana?
17   A      Jackson, Mississippi.
18   Q      No offices at all in the whole state?
19   A      No, sir.
20   Q      Who did you report to when you first began at DSC?
21   A      Mike Robb.
22   Q      Where was his office physically?
23   A      Carmel, Indiana.
24   Q      DSC's headquarters?
25   A      Yes, sir.
```

EXHIBIT 8

39

1    Q    Which is now NextGear's headquarters; correct?

2    A    Yes, sir.

3    Q    In turn, who did Mr. Robb report to?

4    A    I don't recall his immediate supervisor.

5    Q    After the merger with MAFS -- you understand the

6         term, the acronym MAFS?

7    A    Yes.

8    Q    Manheim Auto Financial Services, I believe?

9    A    That's correct.

10   Q    At some point, DSC merged with MAFS; is that

11        correct?

12   A    Yes, sir.

13   Q    During your employment?

14   A    Yes, sir.

15   Q    How did the internal structure change when that

16        merger took place, if at all?

17   A    They had --

18             MR. VINK:  Object to the form, but you can

19        answer to the extent you know.

20   A    I mean, they had duplicate processes, so we had to,

21        you know, bring everything under one umbrella and

22        staff it accordingly.

23   Q    Did your supervisor change?

24   A    I think it was Roger Teate at the time.

25   Q    Before or after the merger?

EXHIBIT 8

40

```
1    A    Both; before, during, and after, yes, sir.

2    Q    So that didn't change; correct?

3    A    No, sir.

4    Q    You said there were duplicate processes.  Did your

5         process change from DSC to NextGear, basically?

6    A    No.

7    Q    Same goals; correct?

8    A    They change yearly.

9    Q    Okay.  Same types of goals?

10   A    Yes, sir.

11   Q    Same market target, so to speak?

12             MR. VINK:  Object to the form on the basis of

13        vague, but you can answer if you understand.

14   A    Signing up used car dealers.

15   Q    To floorplans?

16   A    Yes, sir.

17   Q    In general, what do you understand the term

18        "floorplan" to mean?

19   A    Inventory financing.

20   Q    Okay.  And I'm sorry, let me just wrap up a couple

21        things here on that note.

22             Once the structure changed, once MAFS and DSC

23        merged to become NextGear, Cox Automotive owns

24        NextGear; correct?

25   A    Yes, sir.
```

EXHIBIT 8

41

| | | |
|---|---|---|
| 1 | Q | As well as the Manheim auction? |
| 2 | A | Yes, sir. |
| 3 | Q | And Cox Enterprises owns Cox Automotive; correct? |
| 4 | A | I guess that's how they have it structured.  I don't |
| 5 | | know. |
| 6 | Q | And you may have answered this somewhat before, but |
| 7 | | just to make sure that the record is clear, besides |
| 8 | | this litigation, have you been involved in any |
| 9 | | litigation related to NextGear or DSC? |
| 10 | A | No, sir. |
| 11 | Q | When you began at DSC back in 2007, what training |
| 12 | | did you receive on how to perform your duties as an |
| 13 | | account executive? |
| 14 | A | We came up to our corporate office, the new hires, |
| 15 | | for a week. |
| 16 | Q | And that corporate office is in Carmel, Indiana? |
| 17 | A | Yes, sir. |
| 18 | Q | Who provided the training? |
| 19 | A | The corporate staff that they had in place at the |
| 20 | | time. |
| 21 | Q | Approximately how many people, ballpark, from the |
| 22 | | corporate staff participated in the training? |
| 23 | A | Six, seven. |
| 24 | Q | Do you know any of those people? |
| 25 | A | Yes, sir. |

EXHIBIT 8

42

| | | |
|---|---|---|
| 1 | Q | Who was that, if you know? |
| 2 | A | John Fuller was our president.  Sarah Lutey. |
| 3 | Q | How do you spell the last name? |
| 4 | A | L-U-E-T-L-Y (sic), maybe.  I'm not sure. |
| 5 | Q | What is her position or was her position? |
| 6 | A | I don't know her exact title at the time. |
| 7 | Q | High up in the company?  Fair statement? |
| 8 | A | She was one of the corporate people that helped get |
| 9 | | DSC off the ground. |
| 10 | Q | Okay.  One of the original members, so to speak, |
| 11 | | something like that? |
| 12 | A | Yes.  She was office staff that did a lot, you know, |
| 13 | | for everybody. |
| 14 | Q | Okay.  John Fuller, Sarah Lutey.  Who else?  Who is |
| 15 | | next? |
| 16 | A | Shane O'Dell. |
| 17 | Q | Is that the current president of NextGear? |
| 18 | A | Yes, sir. |
| 19 | Q | What was his role back then, if you recall? |
| 20 | A | I don't recall his title at that time. |
| 21 | Q | Again, high up in the company? |
| 22 | A | Yes, sir. |
| 23 | Q | And who was number four? |
| 24 | A | Randy Dohse was involved. |
| 25 | Q | Okay.  Randy, Mr. Dohse, is still involved with the |

EXHIBIT 8

43

```
 1         company; correct?
 2    A    Yes, sir.
 3    Q    Do you recall, do you know what his title is now?
 4    A    Now?
 5    Q    Yes.
 6    A    He's one of the vice presidents.  I don't know the
 7         exact title.
 8    Q    What was his title back then?
 9    A    I don't recall.
10    Q    Again, high up in the company?
11    A    Yes, sir.
12    Q    Who is number five?
13    A    Mike Robb was involved.
14    Q    Your regional director?
15    A    Correct.
16    Q    And who else?
17    A    Eric Hurst.
18    Q    Is Mr. Hurst still with the company?
19    A    Yes, sir.
20    Q    What's his role now?
21    A    I don't know his exact title.
22    Q    High up in the company?
23    A    Yes, sir.
24    Q    What was his role back then, if you recall?
25    A    I believe back then he was a branch manager.
```

EXHIBIT 8

44

```
 1   Q    And who else gave the training?

 2   A    That's all that I can recall right now.

 3   Q    Okay.  What materials were provided to you, written

 4        materials, as part of the training?

 5   A    They had given us the policies and procedures for

 6        the floorplanning.

 7   Q    And in general, what did that entail?

 8   A    The policies of, you know, flooring the car; the way

 9        the curtailments were constructed; you know, cars

10        being sold at the auctions; cars floored outside the

11        auctions.

12   Q    The whole process?

13   A    Yes.

14   Q    Okay.  And let's start at the beginning.  During

15        that training, how were you trained and/or educated,

16        so to speak, on what NextGear/DSC wanted to do?

17        What were you to do as an account executive?

18   A    We were to sign up new dealers.

19   Q    What was your goal, or what was the company's goal

20        for you?

21   A    I don't recall the exact numbers.

22   Q    Ballpark?

23   A    I don't even recall.

24   Q    One a week?  One a month?

25   A    Really the only one that sticks out in my mind was
```

EXHIBIT 8

53

| | | |
|---|---|---|
| 1 | Q | Intracompany?  Nobody outside, just company-wide? |
| 2 | A | Yes, sir. |
| 3 | Q | Did you have like a user name and a password? |
| 4 | A | Yes, sir. |
| 5 | Q | You could log in remotely? |
| 6 | A | Not at the beginning. |
| 7 | Q | Okay.  Would you have to be at a desktop, then? |
| 8 | A | We were issued laptops. |
| 9 | Q | Laptops.  Okay.  And where is your office now? |
| 10 | A | My house. |
| 11 | Q | Okay.  Is that where it's always been? |
| 12 | A | No, sir. |
| 13 | Q | You had an office while you were at -- when the |
| 14 | | company was called DSC? |
| 15 | A | Yes, sir. |
| 16 | Q | Where was that located? |
| 17 | A | On Sherwood Forest Boulevard in Baton Rouge. |
| 18 | Q | Same office the whole time? |
| 19 | A | Yes, sir. |
| 20 | Q | When did you all get rid of that? |
| 21 | A | I don't recall the exact date. |
| 22 | Q | Ballpark? |
| 23 | A | 2009. |
| 24 | Q | Before the merger? |
| 25 | A | Yes, sir. |

EXHIBIT 8

54

```
 1   Q    So you were at DSC working basically out of your
 2        house and your car?  Is that fair to say?
 3   A    Yes.
 4   Q    Who controlled -- or what information, again, was on
 5        the Discover system?  You said it was to track
 6        business, but what types of category of information
 7        would be contained on the Discover system?
 8   A    That's where cars were floorplanned, audits were
 9        tracked, payments were tracked, and credit
10        applications.
11   Q    Would this information be categorized at some point
12        per customer dealer?
13   A    Yes, sir.  You'd pull it up individually per dealer.
14   Q    With an account number; is that correct?
15   A    Yes, sir, or name.
16   Q    Or name.  Is it correct that each customer dealer
17        would have its own unique account number?
18   A    Yes, sir.
19   Q    Okay.  Who controlled what information was going to
20        be and what was maintained on the Discover system?
21   A    Our corporate office.
22   Q    Did you input information into that system?
23   A    Yes.  I mean, as a branch manager, I had access to
24        it.
25   Q    What type of information would you input?
```

EXHIBIT 8

55

```
 1   A   At that time, we were -- everything was branch
 2       oriented, so if they had a car to floor, my
 3       employees had payments to post, or we had
 4       applications to input, we would do it there.
 5   Q   So correct me if I'm wrong, you would input whatever
 6       information was critical to that account into the
 7       computer locally in Baton Rouge; correct?
 8   A   Uh-huh.
 9   Q   And of course, someone in corporate or other people
10       in corporate would have access to everything?
11   A   Correct.
12   Q   Okay.  And would individuals at corporate to include
13       both Mike Robb, as well as other individuals,
14       monitor and access that information?
15   A   They have the ability to.
16   Q   And at some points while the company was called DSC
17       and/or with NextGear, have they discussed certain
18       information that was input on that system with you?
19       Did they discuss it with you?
20   A   What kind of information?
21   Q   For example, hey, Stuart, I see X, Y, and Z has
22       happened, I saw that information in there, and then
23       in turn that spurns a conversation?
24   A   Yes, sir.
25   Q   Does that happen on a regular basis?
```

EXHIBIT 8

56

1   A      Yes, sir.

2   Q      Is that part of a regional director's job in

3          monitoring and basically supervising you, to review

4          that information at regular intervals?

5   A      Yes, sir.

6              MR. VINK:  Is this a good time for a break?

7          We've been going about an hour.

8              MR. COMAN:  Sure.  Sounds good.  Let's go off

9          the record.

10             *(A recess was taken, after which time the*

11             *requested material was read back by the reporter.)*

12  BY MR. COMAN:

13  Q      We're going back on the record here after a short

14         break.

15             Mr. LaBauve, when we left off, we were

16         discussing in general, among other things, the

17         Discover system?

18  A      Yes, sir.

19  Q      What system did the customer dealer have access to,

20         if any?  What was that called?

21  A      We call it, in the field, it was the virtual office,

22         I think, to go to, to log into their accounts.

23  Q      Was that separate from the Discover system?

24  A      I don't know how their -- they have the same access

25         to information we do, it's just in a different form.

EXHIBIT 8

57

1    Q    We will talk about that a little bit more

2         specifically down the road, but at this juncture,

3         they couldn't have access to all of the corporate

4         information that you would have access to?

5    A    No.  They have access to their account with their

6         account number and account name.

7    Q    Okay.  And what type of information would they have

8         access to under that account number portal?

9    A    They can see which cars are floored, when they were

10        floored, when payments are due, payoffs on cars, any

11        open audit items, their credit limit, their credit

12        availability.

13   Q    Okay.  And they could print those reports?

14   A    Yes, sir.

15   Q    And that would be per transaction, so to speak?

16   A    They could print whatever they wanted off of it.

17   Q    Right.  So the information, was it maintained, when

18        you said floor date, information like that, that

19        would be per VIN number?

20   A    Yes, sir.

21   Q    Slash stock number as well?

22   A    Yes, it would; VIN number, stock numbers.  There was

23        a number of reports that gave the same information,

24        just in different forms.

25   Q    Okay.  They would not -- the customer dealer would

EXHIBIT 8

58

```
 1        not have access to when DSC was actually paying the

 2        auction house, though; correct?

 3   A    No, sir.

 4   Q    That, only DSC had access to; correct?

 5   A    Yes, sir.

 6   Q    That information was kept from the customer dealer;

 7        correct?

 8            MR. VINK:  Object to the form.

 9   A    I don't even know when we paid the auctions.

10   Q    They wouldn't know; correct?

11   A    The dealer?

12   Q    Correct.

13   A    No.

14   Q    Now, getting back, you said virtual office.  Is that

15        on -- and I'm just trying to understand the terms

16        used by DSC/NextGear.

17   A    Yes, sir.

18   Q    But was that on the same Discover system?  Was that

19        WebFOCUS?  Explain that to me.

20   A    That's more of an IT question.  I don't know if they

21        consider it Discover.  You know, I use Discover.

22        The dealer has access to what we call the virtual

23        office.  In the background, how they access it and

24        what it is, I don't know.

25   Q    Getting back to the training portion, because that's
```

EXHIBIT 8

59

1        where I kind of started this line of questioning, in

2        addition to selling customer dealers various

3        floorplans, or the floorplan, did you help -- and I

4        think you said managed the floorplans with the

5        customers; is that correct?

6  A    Yes, sir.

7  Q    What did that entail?

8  A    Looking at the inventory that they had, and if any

9        was getting aged, pointing those units out to try to

10       liquidate, to move past those units.

11  Q   Did you also receive training on how to collect

12       monies allegedly owed by customer dealers to DSC?

13  A   Yes, sir.

14  Q   Did you also receive any training on how to enter or

15       cause someone to be placed on what's called the KO

16       book?

17  A   No, sir.

18  Q   That was not discussed by Mr. Fuller or any of the

19       other corporate individuals at the initial training?

20  A   I don't recall.

21  Q   When did you first hear of what is referred to as

22       the KO book?

23  A   I don't recall the exact date.

24  Q   Ballpark?

25  A   I do not know.

EXHIBIT 8

60

| | | |
|---|---|---|
| 1 | Q | How soon after working -- starting to work for DSC |
| 2 | | did you learn that term, that process? |
| 3 | A | I don't know. |
| 4 | Q | Soon? |
| 5 | A | I do not know. |
| 6 | Q | Okay.  Was that process listed in any of the |
| 7 | | materials that you received from Mr. Fuller or the |
| 8 | | other individuals at that initial one-week training? |
| 9 | A | I don't recall if that was in there or not. |
| 10 | Q | Those policies and procedures that you received |
| 11 | | initially in that 2007 training, was that also |
| 12 | | maintained electronically for you to review from |
| 13 | | time to time? |
| 14 | A | Yes, sir. |
| 15 | Q | And what system was that based on, or shown on? |
| 16 | A | I believe it was called DOCman. |
| 17 | Q | What did that stand for, if you know? |
| 18 | A | Document management. |
| 19 | Q | Have you ever heard the IT or computer term Discover |
| 20 | | University? |
| 21 | A | Yes, sir. |
| 22 | Q | What is that? |
| 23 | A | That was our training. |
| 24 | Q | Training what? |
| 25 | A | Internal trainings we had. |

EXHIBIT 8

61

1    Q    How often would you have internal trainings?

2    A    Just whenever they assigned us, you know, something

3         new came out, they would assign it to us to go to

4         Discover U to, you know, update ourselves on the

5         training.

6    Q    "They," being corporate?

7    A    Corporate, yes.

8    Q    And in addition to new items, would they also

9         instruct you and suggest to you or mandate, however

10        it happened, that you were to complete some type of

11        training on a regular annual or biannual basis?

12   A    The only annual thing we would have would be our

13        employee handbook that we do.  Other than that, it's

14        only as revised training comes out.

15   Q    Were you provided with a hard copy of the employee

16        handbook?

17   A    We can print it out.

18   Q    And who issued that handbook?  Corporate?

19   A    Yes, sir.

20   Q    Do you recall if they gave you a copy of the

21        handbook at the initial training in 2007?

22   A    I don't recall.

23   Q    In addition to your participation in the training in

24        2007, when additional employees would be hired, did

25        Mr. Fuller and that same staff provide similar

EXHIBIT 8

164

1    Q    Let's start with then.

2    A    Then, yes.

3    Q    Yeah.  After he sues you, I'm not asking about that.

4         While you all were in a contractual

5         relationship, would you describe him as a good

6         person?

7    A    Yes.

8    Q    Take a look at what I will mark as Exhibit 15.

9         *(Plaintiffs' Deposition Exhibit 15 marked*

10        *for identification.)*

11   Q    Copy for your counsel.  And as you're reviewing

12        this, for the record, Exhibit 15 spans ten pages and

13        is Bates labeled NG004523, through and including

14        NG004532.

15   A    *(Witness reading document.)*

16   Q    Are you ready, Mr. LaBauve?

17   A    Yes, sir.

18   Q    On this document here, is this a DSC document, so to

19        speak?

20   A    I've never seen it.

21   Q    Okay.  Well, why don't you go ahead and flip to or

22        turn to, I'm sorry, page NG004525.

23   A    Okay.

24   Q    The section entitled Field Comments?

25   A    Uh-huh.

EXHIBIT 8

165

1  Q    "Field Comments:  AE."  What does it say after that?

2  A    "AE Stuart LaBauve."

3  Q    Okay.  And it reads, "Dealer has been with DSC for

4       over a year now.  After they signed up with us they

5       also signed up with AFC to have a backup floorplan.

6       Since they opened each month they have been able to

7       increase their inventory and sales."

8           It goes on, the next sentence, "They

9       prefer...", then the following sentence:  "I support

10      raising the dealer's limit to $500K.  They manage

11      their account as we expect them to, no NSFs, no

12      audit or payment issues."  Is that what it reads?

13 A    Yes, sir.

14 Q    Is this basically some composite or some reiteration

15      of your comments that we looked at previously?

16 A    Yes, sir.

17 Q    This is in regards to the request.  In fact, if you

18      look to the first page on Exhibit 15, second block,

19      it says the word on the right-hand side, "Request"?

20 A    Uh-huh.

21 Q    Limit 500,000?

22 A    Yes, sir.

23 Q    So this is related to the previous document;

24      correct?

25 A    Yes, sir.

EXHIBIT 8

166

1   Q    The DSC Performance Scores that are blacked out at

2        the bottom, who compiles that information from a

3        corporate standpoint?  Did you?

4   A    No, sir.  This is a corporate document.

5   Q    Okay.  And who would be involved in the collection,

6        compilation, and drafting of such a document?

7   A    I would have to say our lending department, and our

8        risk department probably has some input in it, too.

9   Q    If you also flip back to page 4525, about in the top

10       paragraph under Overall Dealership?

11  A    Uh-huh.

12  Q    Do you see the sentence that starts with "Dealer

13       obtains..." and they have some auction houses

14       listed?

15  A    Yes, sir.

16  Q    And the auction houses that are listed are Oak View,

17       LA First Choice, Manheim, Total Resources, Long

18       Beach, MS Auto Auctions; is that correct?

19  A    Yes.

20  Q    Those are the same auto auctions that we discussed

21       previously; is that correct?

22  A    Yes, sir.

23  Q    If you flip to 4526, those portions of Ratios,

24       Business Bank Statements, Signer Information that

25       are all blanked out or redacted, that would be at

EXHIBIT 8

167

1        the corporate level; is that correct?

2    A   Yes, sir.

3    Q   The information that is hidden behind that or

4        contained behind that redaction is from the

5        corporate level; is that right?

6    A   Yes, sir.

7    Q   Take a look at 4530, where it says Analyst

8        Recommendation.  Do you see that?

9    A   Yes.

10   Q   Beneath a couple of photographs?

11   A   Yes.

12   Q   Do you recognize the scenes depicted in those two

13       photographs?

14   A   Yes, sir.

15   Q   What is that?

16   A   Pictures of their dealership, Red Barn Motors.

17   Q   Is that the same location where you presented the

18       contract to Donald Richardson and Devon London?

19   A   Yes, sir.

20   Q   Is that the same place where you failed to tell them

21       that DSC was going to charge them interest,

22       regardless of when DSC funded the auction?  Is that

23       the same location?

24           MR. VINK:  Objection to the form of the

25       question.

EXHIBIT 8

168

1   A   We didn't have a conversation.

2   Q   You had a conversation when you presented the

3       contract with them, didn't you?

4   A   Yes, sir.

5   Q   You didn't tell them that at the time; correct?

6   A   No, sir.

7   Q   Please read in the record the last line of that

8       sentence.  Actually, it starts -- it's the last two

9       words of that page, "Business financials," and then

10      go up, read that whole sentence into the record,

11      please.

12  A   "Business financials show growth with revenues

13      increasing from [blank] and in 2012 dealer is on

14      path to reach over $4 million in revenues."

15  Q   And the next sentence?

16  A   "Dealer has strong gross profit margin and equity."

17  Q   Did you agree with that assessment?

18  A   These were done through the financial review of our

19      lending department.

20  Q   Right.

21  A   I didn't review those documents.

22  Q   Right.  Do you have any information or data, or did

23      you have any information or data at the time that

24      would cause you to believe otherwise?

25  A   These sort of things, you know, I compile the

EXHIBIT 8

169

```
 1            information, send it to our lending department; they
 2            do the analytics on it all.
 3   Q    But overall, you supported the increase; correct?
 4   A    Yes, sir.
 5   Q    Let me show you as part of that increase, or that
 6            request to increase, I should say, I will show you
 7            16.  A copy for you and one for your counsel.
 8                 (Plaintiffs' Deposition Exhibit 16 marked
 9            for identification.)
10   Q    Did corporate run a credit report?
11   A    I believe so.
12   Q    What's the date listed in the upper right-hand
13            corner of this document?
14   A    11/1/2012.
15   Q    Same number, or same date as Exhibit 15?
16   A    Yes, sir.
17   Q    So this is the same process; correct?
18   A    Yes, sir.
19   Q    And for the record, Exhibit 16 is NG004506 through
20            and including NG004522.  And on the front page, the
21            risker is listed as low to medium risk; is that
22            correct?
23   A    The score is 72.
24   Q    Right.  Beneath that, the actual all-caps words,
25            what does that -- the words of that read, beneath
```

EXHIBIT 8

170

| 1 | | that?  *(Indicating.)* |
|---|---|---|
| 2 | A | Oh, yes, sir, I'm sorry. |
| 3 | Q | What does that read? |
| 4 | A | Low to medium risk. |
| 5 | Q | And as you testified before, your pay structure or |
| 6 | | bonus structure included not only numbers of |
| 7 | | floorplans, but the size of the floorplans |
| 8 | | themselves; correct? |
| 9 | A | Yes, sir. |
| 10 | Q | When I say the size, the dollar figure; correct? |
| 11 | A | The more credit he has, the more he's able to |
| 12 | | purchase and floor, yes, sir. |
| 13 | Q | And the more he uses can potentially -- not can |
| 14 | | potentially -- the more he uses would result in |
| 15 | | higher pay for you; correct? |
| 16 | A | Not necessarily. |
| 17 | Q | Well, explain that to me. |
| 18 | A | Because if my delinquencies are too high, I don't |
| 19 | | get paid anything. |
| 20 | Q | Assuming the delinquencies are within threshold, |
| 21 | | bigger dollar figure, from $200,000 line of credit |
| 22 | | to $500,000 would result in higher pay for you |
| 23 | | incrementally at a minimum; correct? |
| 24 | A | Well, I mean, it depends on if I'm meeting the |
| 25 | | numbers and the goals that are set out in front of |

EXHIBIT 8

171

| | | |
|---|---|---|
| 1 | | me as well.  Just because he is doing better doesn't |
| 2 | | mean everyone else is, too. |
| 3 | Q | It's a factor? |
| 4 | A | Yes, sir. |
| 5 | Q | Now, at some point in 2012, Devon London, who you |
| 6 | | discussed earlier from Red Barn, actually asked you |
| 7 | | at an auction if DSC was charging interest to Red |
| 8 | | Barn before DSC was paying the auction; correct? |
| 9 | A | I don't recall. |
| 10 | Q | You do not recall? |
| 11 | A | No, sir. |
| 12 | Q | You don't recall a conversation where Mr. London |
| 13 | | first confronted you and then you told him you had |
| 14 | | to get back to him? |
| 15 | A | If that's what he's telling you, I mean, I don't |
| 16 | | recall the conversation. |
| 17 | Q | Okay.  Do you have any information to suggest that |
| 18 | | what he is saying is incorrect? |
| 19 | A | I don't have any information either way, correct or |
| 20 | | incorrect. |
| 21 | Q | And isn't it a fact that you then got back to him or |
| 22 | | ran into him soon thereafter, the following week, |
| 23 | | let's say, and you said, you know what, I checked |
| 24 | | with corporate, and that's the way it is? |
| 25 | A | I don't recall that conversation. |

EXHIBIT 8

172

```
1    Q    Did you check with anyone at corporate?

2    A    I don't recall the conversation.

3    Q    Have you ever checked with anyone or inquired with

4         anyone at corporate on whether DSC was paying the

5         auction late, but still, quote, had the floorplan

6         customer dealer on the clock, so to speak?

7              MR. VINK:  Object to the form.  You can answer.

8    A    Yes.  I mean, I -- I did ask the question when I

9         started with NextGear of how auctions were paid.

10   Q    Who did you talk to about that?

11   A    It probably would have been my immediate supervisor,

12        Mike Robb.

13   Q    What did Mike tell you?

14   A    That the auctions are paid differently, but most of

15        the time, it's when titles are available.

16   Q    To whom?

17   A    We didn't go into any specifics.  It was -- as I've

18        done the job, I've learned, you know, different

19        auctions are paid differently, depending on the

20        agreements that are made by the corporate office and

21        the auction.  I'm not -- I don't do those

22        agreements.  I don't have any input in that.

23   Q    Okay.  And those are two different dates that we're

24        talking about; specifically floorplan date, your

25        customer dealer is on the clock; correct?
```

EXHIBIT 8

173

```
 1   A    When the car is floored, yes, sir.

 2   Q    Right.  And when DSC pays the auction varies?

 3   A    Yes, sir, depending on the title.

 4   Q    Not always the same day?

 5   A    And not always for the same auctions.

 6   Q    Right.  Waiting on the title; correct?

 7   A    Not always.

 8   Q    Waiting on notice?

 9   A    Not always.

10   Q    Okay.  The auction houses that we've discussed, does

11        DSC pay them all on every transaction the date DSC

12        floorplans the car?

13   A    From the documents you gave me that -- no, when

14        those documents were executed.

15   Q    Since Mike Robb and since the accusations that came

16        up in this lawsuit, who have you discussed this

17        particular topic with, outside the lawyers?

18   A    No one.

19   Q    When you got sued, earlier this morning you

20        testified -- not when you got sued -- when the

21        company got sued last year, or whenever that was,

22        2014, you discussed it with someone within the

23        company; correct?

24   A    We'd have to go back to the transcript to see what I

25        said.
```

EXHIBIT 8

174

```
1   Q    I think it was your regional.  Who was your regional
2        director in 2014?
3   A    I don't remember exact dates.  I had Roger Teate, I
4        had Ryan Hawley.  I don't know what the dates were
5        that we had discussed.
6   Q    Okay.  And when you discussed the lawsuit or the
7        topic, the basic claim that was being made, when you
8        discussed that with your supervisor, what was your
9        supervisor's response?
10  A    No, I just said we were named -- I had to come up
11       here for the deposition for Red Barn, and he said
12       "I've heard," and that was the extent of it.
13  Q    Well, that's the newest lawsuit.  Originally this
14       morning, you testified that it was the original
15       lawsuit when NextGear got sued is when you discussed
16       that lawsuit/complaint with whomever your supervisor
17       was at the time.  This would be two years ago, a
18       year ago.  Your deposition was only set, let's say,
19       30 days ago.
20  A    So you're asking -- rephrase the question.
21  Q    Earlier this morning, you said -- I asked you have
22       you discussed the topics of this lawsuit with anyone
23       outside of the lawyers, and you said yes.
24  A    Uh-huh.
25  Q    And you gave me your supervisor's name at the time.
```

EXHIBIT 8

175

1   A   And who did you write down?

2   Q   I'm not typing this.  She is.

3   A   I mean, I don't remember the time frame and exactly

4       who we talked about and what and what conversations.

5   Q   Well, we will just -- who did you discuss this with

6       besides the lawyers, the lawsuit?

7   A   I first heard about it from John Poteet.  He gave me

8       a copy of it from Louisiana's First Choice.  And I

9       don't think anything else was done until I got

10      notice that it was ongoing from our corporate

11      counsel, Gary Hoke.

12  Q   When you did, when John -- did John give you a copy?

13  A   Yes, sir.

14  Q   That was at First Choice in Hammond?

15  A   Yes, sir.

16  Q   He gives you have a physical copy of the lawsuit.

17      You read it, obviously; correct?

18  A   Correct.

19  Q   He was sued at the time; correct?

20  A   Yes, sir.

21  Q   He was fired up?

22  A   No, sir.

23  Q   No, sir?  You reviewed it, though?

24  A   Yes, sir, I read it.

25  Q   And obviously, you then took it to someone and said,

EXHIBIT 8

176

1   geez, back at the company, look at this?

2 A No.  I knew -- I mean, the company was obviously

3   served, so I just kept it for my record in my

4   office.  The company knew about it.

5 Q But the first time you heard about it was from John

6   Poteet?

7 A Yes, sir.

8 Q No one from the company had said, oh, by the way --

9 A No, sir.

10 Q -- one of your accounts, Red Barn, has now sued us?

11 A No, sir.

12 Q You never discussed it with anyone in the company?

13 A No, sir.

14 Q Okay.  Besides lawyers sitting here today, whatever

15   date the date is, November 9, 2016, have you

16   discussed the accusations of the Red Barn lawsuit

17   with anyone in the company?

18 A I mean, when they came up with the depositions, I

19   let Troy know, and he said, "I've heard about the

20   lawsuit."

21 Q Okay.  And what else did you all discuss?

22 A Nothing.  I mean, he knew about it.  I told him I

23   had to come up for depositions, and that was all

24   that was said.

25 Q Okay.  Do you have any information that contradicts

EXHIBIT 8

179

```
 1        have received it?
 2   A    I mean, it was sent to them.  I don't know who --
 3   Q    Right.
 4   A    Gary pulled it.  I don't know who got it from where.
 5   Q    Okay.  And turn to the second page, if you could.
 6        I'm sorry, back on the first page, Customer Profile,
 7        it's got -- it contains the name Red Barn and its
 8        address; is that correct?
 9   A    Yes, sir.
10   Q    Okay.  And on the second page, what columns did
11        NextGear list on this particular report?
12   A    We have the Floor Date, Days, Last Paid, VS for
13        Vehicle Status, Vehicle Description, Color, VIN,
14        Stock Number, Title Status, Due, Disbursement,
15        Source, Original Amount, Principal Balance, One Day
16        Balance, Fee, Interest, Insurance, Other, and Total.
17   Q    Okay.  Let me show you Exhibit 18, and a copy for
18        your counsel.
19            (Plaintiffs' Deposition Exhibit 18 marked
20        for identification.)
21   Q    And for the record, this is four pages.  This
22        document marked as Exhibit 18 appears to have an NG
23        number, I believe, but that is cut off, so I cannot
24        read, unless anyone else in the room can help, the
25        exact number.
```

EXHIBIT 8

180

1    A    I don't see any on it.

2         MR. VINK:  I don't see a number even on our

3         copies.

4         MR. COMAN:  Okay.  I can show you this version,

5         just for the record.  If you see at the bottom, it's

6         cut off.  It appears to be an NG.  If you think

7         otherwise, let me know.

8         MR. VINK:  It appears to be.  It's hard to

9         tell.

10   Q    All right.  But looking on the document itself, on

11        the upper left-hand corner, is this a NextGear

12        Capital document?

13   A    Yes, sir.

14   Q    You've seen this type of document before; correct?

15   A    Yes, sir.

16   Q    And which business is this for?

17   A    Red Barn Motors, Inc.

18   Q    And what's the date of this report, on the

19        right-hand corner?

20   A    Monday, March 18th, 2013.

21   Q    Okay.  If you look pack at Exhibit 17 and 18, is

22        this basically the same type of report for Red Barn,

23        just on a different date?

24   A    Yes, sir.

25   Q    Okay.  So this is a document that is generated by

EXHIBIT 8

181

```
 1        NextGear; correct?
 2    A   Yes, sir.
 3    Q   And if you flip to the second page of this
 4        particular document, although part of this seems to
 5        be cut off -- actually, flip to the third page, if
 6        you could.  Does this page contain the same types of
 7        information as Exhibit 17?
 8    A   Yes, sir.
 9    Q   Starting with Floorplan Date?
10    A   Yes, sir.
11    Q   And left to right; is that correct?
12    A   Yes, sir.
13    Q   Would Red Barn have access to this report?
14    A   Yes, sir.
15    Q   How is that?
16    A   Through the virtual office that he is set up with,
17        by using his dealer number or dealer name to sign
18        in.
19    Q   Where on either 17 or 18, those exhibits, is there
20        any indication that shows when DSC paid the auction?
21    A   In the Disbursement column.
22    Q   Where is that?
23    A   In the middle, D-I-S-B.
24    Q   Okay.  If we look on -- let's use Exhibit 17, and
25        specifically, RB2178.  If we look at that first
```

EXHIBIT 8

182

```
 1        transaction, Stock Number, what, 383?  Do you see
 2        that, Mr. LaBauve?
 3   A    Yes, sir.
 4   Q    What's it -- you said before Disbursement, D-I-S-B?
 5   A    Yes, sir.
 6   Q    What is that under -- I can't read that.
 7   A    It's an "S" for saying we paid the seller, which was
 8        the source, Oak View Auto Auction.
 9   Q    Right.  When?
10   A    It doesn't say that.
11   Q    Okay.  So this is Red Barn.  Do all customer dealers
12        have access to the same type of information we're
13        looking at in 17 and 18?
14   A    Yes, sir.
15   Q    So as Red Barn or some other customer dealer looks
16        at their account, whatever it is, on that date, this
17        is the information that we will see, and the only
18        indication that there's been a payment from DSC to
19        the auction is not a date, but just a dollar sign?
20   A    It's "S" for seller, or if it was something that we
21        floored outside the auction, paid Red Barn in this
22        case for it, it would say "B" for buyer.
23   Q    Okay.  But no date?
24   A    No, sir.
25   Q    So the customer dealer has no inclination or
```

EXHIBIT 8

183

1        indication that a floorplan date is different than

2        the funding date; correct?

3    A   Correct.

4    Q   Now take a look at Exhibit 19.  Copy for your

5        counsel.

6            *(Plaintiffs' Deposition Exhibit 19 marked*

7            *for identification.)*

8    Q   And as you review that document for the record, this

9        is Bates labeled NGR000011, through and including

10       NGR000033.

11   A   *(Witness reading document.)*  Okay.

12   Q   This is a NextGear Capital document; correct?

13   A   Yes, sir.

14   Q   And is it listed underneath NextGear Capital,

15       Business Red Barn Motors, Inc.?

16   A   Yes, sir.

17   Q   Is that their -- is that the account number next to

18       it?

19   A   Their dealer number with NextGear.

20   Q   Fair enough.  Does NextGear refer to this document

21       as a flooring vehicle history report?

22   A   There is no title.  It possibly is.  I mean, I think

23       this is the one that is used to show each piece of

24       inventory that a dealer would have floored with

25       the -- you see the Purchase Amount, Financed Amount,

EXHIBIT 8

184

1   Floor Fees, and Interest.  A lot of times dealers

2   will -- actually, this at the end of the year is

3   for -- or at the end of a month for their tax

4   purposes.

5 Q Dealers never got this, though; correct?

6 A They can request it.

7 Q Would this be available to them?  Did they have

8   access to this?

9 A I don't know if it's on their website or not.

10 Q Do you ever know and can you state for the record

11   any particular dealer that requested and received

12   this document from DSC and/or NextGear?

13 A I did one just earlier this month for Gonzalez

14   Motors and Prestige of Baton Rouge.  If a dealer

15   calls, we can get it for them.

16 Q Prior to 2016?

17 A Anytime.

18 Q Anytime.  Okay.  Where on here is the disbursement

19   date?

20 A I didn't see one on here.

21 Q Do you believe that this document was created for

22   this litigation?

23 A No, sir.

24 Q Or this is --

25 A It's always been available.

EXHIBIT 8

185

1    Q    It's always been available.  To whom?

2    A    To the dealer.

3    Q    I'm the dealer; I'm looking at that.  Strike that.

4         You're the dealer; you're looking at that.

5    A    Uh-huh.

6    Q    Where is the date of advance?

7    A    Well, it would show the Unit Purchase Date and then

8         the Floor Date.

9    Q    Okay.  And let's take, for instance, the first one,

10        just at the top.  Actually, flip over to the

11        following page, the second page, which is NGR000012.

12        Okay?

13   A    Uh-huh.

14   Q    About middle of the page, it has transaction -- I

15        guess it's Stock Number 11.  Do you see that?

16   A    Yes, sir.

17   Q    What's the Flooring Date?  I'm sorry, what's the

18        Unit Purchase Date?

19   A    August 5th, 2011.

20   Q    Okay.  What's the Flooring Date?

21   A    August 5th, 2011.

22   Q    Same date?

23   A    Yes, sir.

24   Q    And those dates typically match; correct?

25   A    Yes, sir.

EXHIBIT 8

186

1   Q   Do you see that "Total for," quote, unquote, on the

2       left-hand side where it says, if you scroll the

3       left-hand side of the page, August 23, 2011?  At the

4       bottom, four rows down, let's say.

5   A   Oh, yes, sir, I see that.

6   Q   What's that date?

7   A   The date on total for 8/23/2011.

8   Q   That's the date of advance; correct?

9   A   I don't know what that date is.  It just says total

10      for that date.

11  Q   Why does it say "Total for"?  What does that mean?

12  A   I don't know, because there is nothing after it.

13  Q   Have you ever seen a document like this that lists

14      on the left-hand side or any side "Total for",

15      quote, unquote?

16  A   I mean, I don't know what that -- that someone -- I

17      don't know what it is.

18  Q   Right.  And I appreciate that you don't know what it

19      is.  Have you ever seen it?

20  A   No, sir.

21  Q   If a customer for some reason has access to this and

22      looks on the left-hand side and sees "Total for -

23      August 23, 2011," is there any indication of what

24      that date even stands for?

25  A   Not according to what's on here on this document.

EXHIBIT 8

187

| | | |
|---|---|---|
| 1 | Q | Take a look at page 14, if you keep flipping.  Do |
| 2 | | you see second from the bottom, that section of |
| 3 | | transactions that start with the 1997 Ford Explorer? |
| 4 | A | On page 14? |
| 5 | Q | Yes, sir. |
| 6 | A | Yes, sir. |
| 7 | Q | Okay.  Do you see the Flooring Date, or I'm sorry, |
| 8 | | the Unit Purchased Date? |
| 9 | A | Yes, sir. |
| 10 | Q | Is what? |
| 11 | A | 8/17/2012. |
| 12 | Q | I'm looking at the 1997 Ford Explorer. |
| 13 | A | Oh, I'm looking at an '02. |
| 14 | Q | Okay.  1997, Stock Number 58. |
| 15 | A | We're on different pages. |
| 16 | Q | Okay.  NGR14. |
| 17 | A | Yes, sir.  '97 Ford Explorer XLT. |
| 18 | Q | Stock Number 58; is that correct? |
| 19 | A | Yes, sir. |
| 20 | Q | What is the Unit Purchase Date? |
| 21 | A | August 26, 2011. |
| 22 | Q | That's from an auction? |
| 23 | A | Oak View Auto Auction. |
| 24 | Q | Red Barn buys it at Oak View; correct? |
| 25 | A | Yes, sir. |

EXHIBIT 8

188

1   Q   8/26.  What's the Flooring Date?

2   A   8/26/2011.

3   Q   Same date; correct?

4   A   Yes, sir.

5   Q   And then the completed date next to it on the right,

6       what is that?

7   A   That's when it was paid in full, September 12th,

8       2011.

9   Q   Who paid it in full?  Red Barn?

10  A   It doesn't show on this particular report.

11  Q   Well, someone paid DSC; correct?

12  A   Well, the dealer paid -- yes, sir, someone paid.

13  Q   DSC has been made whole at that point; correct?

14  A   Yes, sir.

15  Q   Look at the advance date on the left-hand side,

16      "Total for," what date is that?

17  A   No one said that that was the advance date.  We

18      didn't know what that date was.

19  Q   Let's assume for the purposes of this deposition

20      that that's what NextGear has proclaimed to us, that

21      "Total for" stands for date of advance.

22  A   If that's what NextGear told you.

23  Q   Okay.  You don't have any information that says what

24      I just said was wrong?

25  A   Oh, I don't know.  Like I said, I don't know what

EXHIBIT 8

189

```
 1          that date means.
 2   Q    Assuming that to be true, what's the date?
 3   A    October 7th, 2011.
 4   Q    So explain that transaction to me, then.
 5   A    The dealer was able to buy a car at Oak View Auto
 6        Auction.
 7   Q    On which date?
 8   A    August 26th, 2011.
 9   Q    Okay.
10   A    He was able to take it to his lot, recondition it to
11        put it up for sale.
12   Q    And he sells it and pays DSC off on what date?
13   A    September 12th, 2011.
14   Q    DSC never came out of pocket any money on that deal,
15        did it?
16   A    I don't know.  It doesn't show a disbursement date
17        on here.
18   Q    Let's assume that October 7th, that "Total for"
19        date, was a disbursement date.
20   A    If that's what the "Total for" is, the disbursement
21        date, that's when the money would have been
22        disbursed.
23   Q    So on that transaction, if "Total for" is the date
24        of advance --
25   A    Uh-huh.
```

EXHIBIT 8

190

1   Q   -- that would mean on that particular transaction

2       DSC never paid the auction?

3   A   According to that assumption, that's correct.

4   Q   Right.  Assuming that to be true, DSC was never out

5       of pocket any money?

6   A   But we would have --

7           MR. JURKIEWICZ:  Object.  That's not what the

8       math adds up to.  Think about it.  The disbursement

9       date means the date money was disbursed.

10          MR. COMAN:  Well, you can testify later, David.

11      Right now, Stuart is testifying.  Give me some

12      available dates.

13  Q   But on this particular transaction, DSC never came

14      out of pocket any money.  They were actually paid

15      before by Devon London, by Red Barn, before they

16      even funded the auction; correct?

17          MR. VINK:  Object to the form.

18  A   DSC was paid; I don't know by who.  It doesn't show

19      it on this report.

20  Q   And when were they paid?

21  A   September 12th, 2011.

22  Q   When did DSC disburse?

23  A   It doesn't say on here.

24  Q   What's the "Total for" date?

25  A   10/7/2011.

EXHIBIT 8

191

1    Q    That's after 9/2/11?

2    A    Yes.  Correct.

3    Q    One second, please.  Flip to page 16, please, Bates

4         label 16.

5    A    *(Witness complied with request of Counsel.)*

6    Q    And about midway down, you see Stock Number 96, 1993

7         GMC Sierra?

8    A    Hold on.  Stock Number what?

9    Q    96.

10   A    96?  Yes, sir, I have it.

11   Q    What's the Unit Purchase Date?

12   A    October 12th, 2011.

13   Q    And the Floorplan Date?

14   A    October 12th, 2011.

15   Q    Okay.  And "Total for" date, left-hand side for that

16        transaction?

17   A    December 9th, 2011.

18   Q    And then Completed Date seven days later?

19   A    It's on December 16th, 2011.

20   Q    Okay.  So under this particular transaction, Red

21        Barn, as evidenced by this document, this NextGear

22        document, purchases a car from where?  Where is the

23        auction?

24   A    Long Beach Auto Auction.

25   Q    The DSC clock starts ticking; correct?

EXHIBIT 8

192

```
 1   A    Yes, sir, it did.

 2   Q    DSC does not fund until December 9th; correct?

 3   A    It doesn't --

 4            MR. VINK:  Object to the form.  Witness has

 5        already testified he doesn't know what that means,

 6        what that column represents.

 7   Q    What does "Total for" mean?

 8   A    I don't know.

 9   Q    I'm sorry.  What is the "Total for" date on that

10        transaction?

11   A    12/9/2011.

12   Q    Okay.  Almost two months later?

13   A    Yes, sir.

14   Q    All right.  And then Devon pays the car off a week

15        later?

16   A    It was completed a week later.  Well, on

17        December 16th, 2011.

18   Q    DSC was paid on December 16th?

19   A    Yes, sir.

20   Q    If you flip to NGR30, if you look to Stock Number

21        384, 2003 Dodge Ram 1500 ST?

22   A    Yes, sir.

23   Q    What is the Unit Purchase Date?

24   A    October 19th, 2012.

25   Q    What's the Floor Date?
```

EXHIBIT 8

193

1   A   October 19th, 2012.

2   Q   Same dates; correct?

3   A   Yes, sir.

4   Q   From where?  Which auction?

5   A   Oak View Auto Auction.

6   Q   When was the completed date; i.e., the date DSC was

7       paid?

8   A   December 19th, 2012.

9   Q   What is listed in the left-hand column, "Total for"?

10  A   That date is October -- I'm sorry -- January 15th,

11      2013.

12  Q   After the December 19th, the previous year; correct?

13  A   Yes, sir.

14  Q   And that date of January 15, 2013 is almost a month

15      after DSC was paid; is that correct?

16  A   If that's what that date stands for.

17  Q   I'm just asking you about the actual date.

18  A   Yes, the date is a month later.

19  Q   Right.  It's a month later.  A month after -- the

20      "Total for" date is a month after DSC is paid;

21      correct?

22  A   If that's what that date stands for, when we're

23      paid, yes.

24  Q   Correct.  Well, Completed Date is definitely when

25      DSC gets paid?

EXHIBIT 8

194

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And the "Total for" date, we will leave that to |
| 3 | | NextGear; correct? |
| 4 | A | Yes.  I'm not sure. |
| 5 | Q | All right.  And 31, please, if you could turn to |
| 6 | | that page.  If you look in the upper portion of |
| 7 | | that, maybe a third of the way down, you see Stock |
| 8 | | Number 436? |
| 9 | A | Yes, sir. |
| 10 | Q | 2001 Hyundai Santa Fe GLS? |
| 11 | A | Uh-huh. |
| 12 | Q | What's the Unit Purchase Date? |
| 13 | A | November 30, 2012. |
| 14 | Q | Floor Date is a week later? |
| 15 | A | It is December 6th, 2012. |
| 16 | Q | When was the Completed Date; i.e., when DSC was |
| 17 | | paid? |
| 18 | A | January 10th, 2013. |
| 19 | Q | Which auction? |
| 20 | A | Oak View Auto Auction. |
| 21 | Q | What is the "Total for" date on the left-hand side |
| 22 | | as to that transaction? |
| 23 | A | January 28th, 2013. |
| 24 | Q | After DSC had been paid; correct? |
| 25 | A | Yes, sir. |

EXHIBIT 8

195

1    Q    And if you could flip to the last page, 33, if you

2         look about three lines up from the bottom, so to

3         speak, see Stock Number 524, 2005 Dodge Neon?

4    A    Which page?

5    Q    Thirty-three.

6    A    Oh, yes, sir.

7    Q    Okay.  Stock numbers are -- let me ask you about

8         that.  Stock numbers indicate the number of vehicles

9         or transactions a particular account has?

10   A    Yes, sir.

11   Q    So, in the lawsuit, it reads 524 transactions

12        between Red Barn and DSC/NextGear.  Does that appear

13        to be correct?

14   A    That looks like the last stock number on this

15        document.

16   Q    Okay.  524?

17   A    Yes, sir.

18   Q    And that's one stock number per transaction?

19   A    Yes, sir.

20   Q    All right.  At the end of the relationship between

21        DSC and NextGear and Red Barn, NextGear repossessed

22        Red Barn's inventory; correct?

23   A    Yes, sir.

24   Q    Let me show you what's marked as Exhibit 20.

25             (Plaintiffs' Deposition Exhibit 20 marked

EXHIBIT 8

196

1          *for identification.)*

2    Q     A copy for your counsel.  And as you review that

3          document, I will state for the record that Bates

4          label reads NG005828, through and including

5          NG005832.

6    A     Yes.

7    Q     Were you a party to this e-mail communication?

8    A     I believe I was.

9    Q     If you look at the --

10   A     I am.

11   Q     And what's the date of this e-mail or e-mails?

12   A     Looks like it started on March 14, 2013.

13   Q     And the front page, does it also include March 15?

14   A     Yes, sir.

15   Q     And what's the time listed on the top front, the

16         last e-mail of this thread?

17   A     3:39 p.m.

18   Q     Okay.  Does this e-mail and the communications that

19         are listed in here, does this concern DSC's efforts

20         to take Red Barn's inventory at Louisiana's First

21         Choice?

22   A     Yes, sir.

23   Q     And that's in Hammond, Louisiana?

24   A     Yes, sir.

25   Q     Who are the other people listed in this e-mail?

EXHIBIT 8

197

| | | |
|---|---|---|
| 1 | | Roger Teate was your regional director; is that |
| 2 | | correct? |
| 3 | A | At the time, yes, sir. |
| 4 | Q | Who is Kathy Clark? |
| 5 | A | She is a director of risk. |
| 6 | Q | Okay.  Is she involved -- in general, when do you |
| 7 | | interface with people in risk, so to speak? |
| 8 | A | About this time. |
| 9 | Q | Okay.  Douglas Kachur? |
| 10 | A | Yes, sir. |
| 11 | Q | Is that how you pronounce his name? |
| 12 | A | Yes. |
| 13 | Q | Who is he? |
| 14 | A | I believe he was in our remarketing department. |
| 15 | Q | What does that mean? |
| 16 | A | He kept track of the repossessing of inventory and |
| 17 | | made sure that they were sold. |
| 18 | Q | Bradley Cohen? |
| 19 | A | I think he was just another risk manager. |
| 20 | Q | Okay.  Keith Klinger, Klingler? |
| 21 | A | Yeah.  He was a risk manager as well.  Risk account |
| 22 | | manager. |
| 23 | Q | All right.  Let me show you Exhibit 21. |
| 24 | | *(Plaintiffs' Deposition Exhibit 21 marked* |
| 25 | | *for identification.)* |

EXHIBIT 8

198

1   Q   Copy for your counsel.  For the record, this is

2       Bates labeled NG005838, through and including

3       NG005842.  And let me know when you've had a chance

4       to review it.

5   A   *(Witness reading document.)*  Okay.

6   Q   Are you a part of this conversation?

7   A   Yes, sir, I'm on it.

8   Q   Did you review this document recently?

9   A   I believe -- no, sir, I don't think so.

10  Q   What is the date of this e-mail at the top?

11  A   March 15, 2013.

12  Q   And what's the time?

13  A   4:05 p.m.

14  Q   Does Exhibit 21 also concern DSC's, their efforts to

15      take Red Barn's inventory at Louisiana's First

16      Choice of Hammond?

17  A   It was discussing Red Barn and the NSF and probably

18      all that same e-mail chain.

19  Q   Okay.  What did Douglas say at the top of the

20      e-mail?

21  A   Keep in mind that Louisiana repossessions must be

22      voluntary.

23  Q   What did he mean by that?

24  A   Means we have to have the dealer's permission to

25      remove the vehicles.

EXHIBIT 8

199

1    Q    Did you have the dealer's permission?

2    A    He handed me the keys.

3    Q    Who did?

4    A    Devon.

5    Q    Which cars did this concern?

6    A    I think 45 units on the lot.

7    Q    And where were those cars taken to?

8    A    Louisiana's First Choice.

9    Q    What happened then?

10   A    That's when our risk department takes over to do

11        whatever is done in risk with the repossessed

12        inventory.  I don't know the whole process.  I've

13        never worked in that department.

14   Q    But as the, quote, "man on the ground," my words and

15        your words, so to speak, you were involved in the

16        process; correct?

17   A    Yes, sir.

18   Q    Let me show you Exhibit 22.  And a copy for your

19        counsel.

20            *(Plaintiffs' Deposition Exhibit 22 marked*

21        *for identification.)*

22   Q    Let me know when you've had a chance to review it.

23   A    *(Witness reading document.)*  Okay.

24   Q    Were you a party to this e-mail communication?

25   A    Yes, sir.

EXHIBIT 8

200

1   Q    What's the date?

2   A    March 15th, 2013.

3   Q    Same date as the previous two e-mails; is that

4        right?

5   A    Yes, sir.

6   Q    And what's the time?

7   A    5:21 p.m.

8   Q    Okay.  And the second e-mail from the top, what did

9        Roger Teate write to you?

10  A    He said "Stuart, let's take them there, it is

11       closer."

12  Q    What is he referring to?

13  A    Getting them to First Choice Auto Auction.

14  Q    What was your response to Roger?

15  A    "I have already let the transporter know and will

16       get keys this afternoon."

17  Q    Show you what I will mark as Exhibit 23.

18            *(Plaintiffs' Deposition Exhibit 23 marked*

19       *for identification.)*

20  Q    Let me know when you have a chance to review.  And

21       for the record, Exhibit 23 is Bates labeled NG008580

22       and 8581.

23  A    Okay.

24  Q    Were you a party to this e-mail communication?

25  A    Yes, sir.

EXHIBIT 8

201

```
 1   Q    What's the date of the e-mail?

 2   A    March 26th, 2013.

 3   Q    Just eleven days after the previous e-mail; is that

 4        right?

 5   A    Yes, sir.

 6   Q    Please read what you wrote to Douglas Kachur and

 7        Samantha Snyder in the first e-mail at the bottom of

 8        the page.

 9   A    Said, "I am at First Choice where the cars were

10        brought and they have a couple of questions.

11            "1.  Will we be able to run first 39 that were

12        brought here in next week's sale.

13            "2.  Wash and vac?"

14   Q    What was Samantha's response?

15   A    She sent an e-mail to Amanda Butler, "Amanda please

16        see below – this is for Red Barn #61099.  Looks like

17        10 days should be up by next week."

18   Q    And at the top, the last e-mail from Amanda to

19        Douglas, or from you to Amanda at the top of the

20        page, what did you write to them?

21   A    "Can we run without titles being at the auction."

22   Q    Who had the titles?

23   A    NextGear did, or DSC.

24   Q    Are you sure Red Barn didn't have the titles?

25   A    I was referring to the cars that we picked up from
```

EXHIBIT 8

202

1           his lot.

2    Q      Are you sure these are the same cars?

3    A      I'm talking about the 39 that were brought there.

4           The first 39 that we brought here.

5    Q      Did you have titles to all of his inventory?

6    A      The stuff that was on the floorplan.  I mean, I'd

7           have to go back and look at the receipt for detail

8           to see which titles we had.

9    Q      Let me show you what I will mark as Exhibit 24.

10          *(Plaintiffs' Deposition Exhibit 24 marked*

11          *for identification.)*

12   Q      Do you see your name listed on this e-mail thread?

13   A      Yes, sir.

14   Q      What's the date, March 20, 2013; is that right?

15   A      Yes, sir.

16   Q      And you write, "I just received this proposal from

17          the dealer."  Is that correct?

18   A      Yes, sir.

19   Q      And this was -- the subject line is "Red Barn

20          Contracted Vehicle Sales Title Dilemma"; correct?

21   A      Yes, sir.

22   Q      What did Samantha Snyder say in response?

23   A      "BAM."

24   Q      What did she mean by that?

25   A      You'd have to ask her.

EXHIBIT 8

203

```
 1   Q    What was Samantha Snyder's role and involvement?

 2        She's in risk?

 3   A    I believe so, yes, sir.  I don't know -- I don't

 4        even know if she's around.  You'd have to get with

 5        corporate on that.

 6   Q    When is the last time you communicated with her?

 7   A    Oh, I don't know.

 8   Q    The last few months?

 9   A    No.

10   Q    Been a while?

11   A    Yes, sir.

12   Q    Okay.  This wasn't your only interaction with her

13        back in 2013, though; correct?  Or you tell me.

14   A    I can't tell you the last time I spoke, or I mean,

15        communicated with her.

16   Q    Okay.  Take a look at Exhibit 25.

17             (Plaintiffs' Deposition Exhibit 25 marked

18        for identification.)

19   Q    Do you know Jeni Caillouet?  Is she a Red Barn

20        employee?

21   A    The name doesn't sound familiar.

22   Q    Do you see the subject line, "Red Barn current

23        inventory"?

24   A    Yes, sir.

25   Q    The bottom, April 10?
```

EXHIBIT 8

204

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | If you flip -- and I'm sorry, Exhibit 25 is NG008104 |
| 3 | | through 06.  Do you see the same basic cars under |
| 4 | | Red Barn Current Owned Vehicles attached to the |
| 5 | | second two pages? |
| 6 | A | Yes, sir. |
| 7 | Q | And this is the same time frame that DSC is |
| 8 | | attempting -- DSC/NextGear is attempting to obtain |
| 9 | | possession of the vehicles; correct? |
| 10 | A | No, sir.  I think we did the possession earlier in |
| 11 | | March, and this was April 10th. |
| 12 | Q | Okay.  Had you sold them, though, by this point? |
| 13 | A | I don't know when they sold. |
| 14 | Q | And once this was sent to Samantha, what was her |
| 15 | | response? |
| 16 | A | "BAM.  I like being able to maintain control of a |
| 17 | | situation.  Especially when the dealer doesn't even |
| 18 | | realize that's what I am doing." |
| 19 | Q | At the end of the relationship between Red Barn and |
| 20 | | DSC, they were then placed into the KO book; |
| 21 | | correct? |
| 22 | A | I don't know.  We'd have to check with Auction |
| 23 | | Insurance. |
| 24 | | *(Plaintiffs' Deposition Exhibit 26 marked* |
| 25 | | *for identification.)* |

EXHIBIT 8

205

1   Q   Let me check right here.  Exhibit 26, Bates labeled

2       NG005770.  Do you see this e-mail dated 4/19/2013?

3   A   Yes, sir.

4   Q   Subject line "KO report"?

5   A   Yes, sir.

6   Q   From Gabriel Stark?

7   A   Yes, sir.

8   Q   And to Dealer Services.  Do you see that?

9   A   Yes, sir.

10  Q   All right.  It reads, "Good morning, Below are the

11      12 NextGear Capital dealers added to the KO report

12      last week."  And at the bottom, the unredacted

13      portion, that lists Red Barn Motors, Inc.; is that

14      correct?

15  A   Yes, sir.  That's when they were placed in the KO

16      book.

17  Q   In addition to the KO book, did DSC/NextGear also

18      ban Red Barn from the auctions it owns through

19      Manheim?

20          MR. VINK:  Object to the form.  You can answer

21      the question.

22  A   You'd have to ask Manheim who they let in and don't

23      let in.

24  Q   Did DSC/NextGear inform Manheim, just as it did the

25      Auto Auction Insurance Company, that they were to

EXHIBIT 8

206

1        be --

2    A   I believe --

3           MR. VINK:  Let him finish asking the question.

4    Q   That they were to be barred, banned, what have you?

5    A   The -- as far as I'm aware with the Auction

6        Insurance, they send this list out to floorplan

7        companies and all auctions.

8    Q   Do you know one way or the other whether DSC, in

9        addition to what you just stated, also contacted

10       directly Manheim and said, hey, Red Barn, put them

11       on the Manheim list, so to speak?

12   A   No, I don't know.

13   Q   Okay.  Who at DSC during that time frame of early

14       2013 would have been responsible for that?  Would

15       that be risk as well?

16   A   Yes, sir.

17   Q   Samantha Snyder, possibly?

18   A   I don't know.

19   Q   Someone in that department?

20   A   Yes, sir.

21   Q   Is that the same as we sit here, November 2016?

22   A   Yes, sir, the risk department.

23          MR. COMAN:  Why don't we go off the record.

24          *(A recess was taken.)*

25          MR. COMAN:  Back on the record after a short

EXHIBIT 8

207

1     break.  Thank you for your time, Mr. LaBauve.  I

2     have no further questions.

3          MR. VINK:  Okay.  We have nothing on

4     cross-examination.

5          So, we will take signature.  That means you'll

6     get an opportunity to review the deposition

7     transcript and make any non-substantive changes to

8     your testimony and make sure that our good reporter

9     has all your Louisiana spellings correct.

10              AND FURTHER THE DEPONENT SAITH NOT

11

12          _____

13                    STUART LABAUVE

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 8

208

```
 1   STATE OF INDIANA           )
                                )
 2   COUNTY OF MARION           )

 3
          I, Tami L. Scott, Notary Public in and for the
 4   County of Marion and State of Indiana, do hereby
     certify that the above-named deponent herein was by me
 5   first duly sworn to tell the truth, the whole truth,
     and nothing but the truth in the aforementioned matter;

 6
          That the foregoing deposition was taken on behalf
 7   of the Plaintiffs at the time and place heretofore
     mentioned, with all counsel being present as duly
 8   noted;

 9        That the deposition was taken down by means of
     stenograph notes, was reduced to typewriting under my
10   direction, and is a true record of the testimony given
     by said deponent, and was thereafter presented to the
11   deponent for signature;

12        I do hereby further certify that I am a
     disinterested person in this cause of action, that I am
13   not a relative of the attorneys for any of the parties
     or otherwise interested in the event of this cause of
14   action.

15        IN WITNESS WHEREOF, I have hereunto set my hand and
     have affixed my official notarial seal on this_____day
16   of_____, 2016.

17
                        _____
18                        TAMI L. SCOTT, NOTARY PUBLIC

19
     County of Residence:
20   Marion County

21   My Commission Expires:
     June 10, 2017
22

23

24

25
```

EXHIBIT 8