```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF INDIANA
 3                  INDIANAPOLIS DIVISION
 4
 5   RED BARN MOTORS, INC.,        CASE NO.
     PLATINUM MOTORS, INC.,        1:14-cv-1589-TWP-
 6   MATTINGLY AUTO SALES,         DKL
     INC., AND YOUNG EXECUTIVE
 7   MANAGEMENT & CONSULTING
     SERVICES, INC.,
 8   individually and on
     behalf of other members
 9   of the general public
     similarly situated,
10
     VERSUS
11
     COX ENTERPRISES, INC.,
12   COX AUTOMOTIVE, INC.,
     NEXTGEAR CAPITAL, INC.
13   F/K/A DEALER SERVICES
     CORPORATION, successor by
14   merger with Manheim
     Automotive Financial
15   Services, Inc., and JOHN
     WICK
16
17
18          Corporate Deposition of RED BAN MOTORS,
19   INC., through its representative DEVON LONDON, 25852
20   Plantation Avenue, Denham Springs, Louisiana 70726,
21   taken in the offices of Lugenbuhl, Wheaton, Peck,
22   Rankin & Hubbard, 9311 Bluebonnet Boulevard, Suite
23   A, Baton Rouge, Louisiana on Tuesday, October 25,
24   2016, commencing at 9:07 a.m.
25
```

EXHIBIT 10

Page 103

```
 1                    I'm going to show you a document
 2        we're going to call Exhibit #7.  And this is
 3         the only copy I have of this one.  So you guys
 4         can look off each other.
 5   BY MR. McCARTER:
 6      Q.    But I -- I will represent to you that
 7   this is Exhibit B of your amended complaint and I
 8   just -- I want to know have you seen this document
 9   before?
10      A.    Yes.
11      Q.    What is this, I mean, what -- what does
12   it show?
13      A.    This shows all of the DSC payoffs that we
14   made through our -- I believe this was the
15   transaction history of our bank account.
16      Q.    Okay.  So you think that that's a
17   printout from your bank account?
18          MR. COMAN:
19               Actually, let me -- let me stop.  If
20      we can go off the record.
21          MR. McCARTER:
22               Yes.
23        (Discussion held off the record.)
24          MR. McCARTER:
25               Back on the record.
```

EXHIBIT 10

Page 104

1   BY MR. McCARTER:

2        Q.     So, Mr. London, Exhibit #7, the second

3   page of that exhibit was a declaration by a former

4   plaintiff Young Executive in this case, and it's

5   just in there sort of by mistake, because it was in

6   my copy of the complaint.  So the first page of

7   that, and then the third page and succeeding of

8   Exhibit #7 are Exhibit B of your complaint.  And,

9   again, I think you were saying that this came from

10  your bank account?

11       A.     I believe so, yes.

12       Q.     Okay.  And do you recall what it purports

13  to show?

14       A.     It purports to show when payoffs were

15  made to DSC --

16       Q.     Okay.  And you had a way to sort --

17       A.     -- on specific vehicle.

18       Q.     Sorry for interrupting.  So you had a way

19  to sort by payee?

20       A.     No.  I believe I had a way to sort by

21  description, DSC payoff.

22       Q.     Okay.  And just to be clear, though, this

23  would just show the actual amount paid to DSC, it

24  wouldn't necessarily show --

25       A.     Actually, yes, transaction categories,

EXHIBIT 10

1    DSC payoffs.  So it shows me all of the DSC payoffs.

2        Q.    Okay.  But just to be clear, these show

3    actual ACH transfers to DSC, it doesn't really show

4    us what you borrowed on that unit, how much interest

5    or fees?

6        A.    Correct.

7        Q.    This is just the actual money that was

8    transferred to DSC on those dates?

9        A.    On those dates, correct.

10       Q.    Okay.  All right.  Mr. London, did you

11   have any understanding of what Mr. LaBauve's

12   responsibility was or what his role at DSC was?

13       A.    His responsibility was to make sure --

14            MR. COMAN:

15                I'm sorry for interrupting.  Let me

16         just lodge an objection -- to the extent that

17          you know, but let me just lodge an objection

18          to the form, but you can answer the question.

19   BY MR. McCARTER:

20       Q.    And I'm asking about your working

21   understanding, not whether it was actually right or

22   wrong.

23       A.    Okay.

24       Q.    But how did you understand his role to

25   be?

EXHIBIT 10

Page 106

1          A.     His role was to procure new dealers, to

2     monitor and maintain those dealers, and to keep

3     track of the ongoings of those dealers, to protect

4     DSC, and to procure profit for DSC.

5          Q.     All right.  Do you have a recollection of

6     how many cars you may have financed with DSC?

7          A.     I believe it was 524.

8          Q.     And, again, that's roughly from July 2011

9     to March 2013?

10          A.     Correct.

11          Q.     Okay.  What happened to your recollection

12     in March of 2013 to bring that relationship to an

13     end?

14          A.     What happened --

15          Q.     What happened in March 2013 to bring Red

16     Barn's relationship with DSC to an end?

17          A.     We had some financial difficulties and, I

18     mean, that's pretty much it.

19          Q.     Okay.  Did Red Barn give DSC checks that

20     didn't clear?

21          A.     I don't think so.

22          Q.     You don't think there were any NSF checks

23     involved?

24               MR. COMAN:

25                    Objection as to form.

EXHIBIT 10

1          THE WITNESS:

2                There may have been ACHs that

3      weren't paid, but I don't think there were any

4      actual checks.

5   BY MR. McCARTER:

6      Q.    So you think there may have been payments

7   made to DSC that didn't clear?

8          MR. COMAN:

9                Objection to form.

10         THE WITNESS:

11               I don't know.  I don't know.

12  BY MR. McCARTER:

13     Q.    That's fine.  I'll show you some records

14  in a minute.  I'm trying to get what's your

15  recollection of how did financial difficulties

16  translate into an end of the relationship with DSC?

17     A.    Well, financial difficulties translated

18  to an end with DSC, because we were working with

19  Stuart LaBauve to take care of the deficiencies.  We

20  actually came up with a plan that was going to take

21  care of those deficiencies.  Mr. Richardson

22  presented that plan to DSC and AFC, and AFC agreed

23  to it verbally.  DSC was seeming to go along with it

24  verbally.  And then the vehicles that we had stated

25  that we were going to go sell at First Choice

EXHIBIT 10

Page 108

1     Louisiana Auto Auction to give to -- to give the

2     funds to DSC and AFC were seized.

3          Q.    And I think you said earlier they were

4     seized by First -- Louisiana First Choice and you

5     think on behalf of DSC?

6          A.    I would say I know on behalf of DSC.

7          Q.    You're talking about taking care of

8     deficiencies, though.  It sounds like that there may

9     have been repossessions prior to that.  Does that

10    ring a bell?

11              MR. COMAN:

12                   Objection to form.

13              THE WITNESS:

14                   I don't know if there were

15        repossessions prior to that.

16    BY MR. McCARTER:

17         Q.    So how -- how -- do you have any

18    recollection of how deficiencies to DSC were created

19    in the first place?

20         A.    What caused the problems -- are you

21    asking what caused the problems for us to have

22    deficiencies?

23         Q.    Sure, yes.

24         A.    Okay.  We have a ongoing relationship

25    with Southwest Finance.  Southwest Finance wanted to

EXHIBIT 10

Page 109

1    be our primary lender.  We agreed to that and made

2    them our primary lender.  And sometime in February,

3    we were informed by Southwest Finance that they had

4    accumulated all the paper that they wanted to

5    accumulate.  They had grown the office to the amount

6    that they wanted to grow it to.  And, therefore,

7    they did not want to finance as many vehicles as we

8    were providing them.  So during tax time, this was

9    tax time, we had a whole bunch of deals that we

10   needed to get funded on that we were unable to get

11   funded on very rapidly that were sold that needed to

12   be paid off to DSC by the terms of the agreement.

13        Q.    And so you were unable to make certain

14   payments to DSC that were required under the

15   agreement?

16        A.    That is correct.

17        Q.    Do you remember how many cars you were

18   unable to pay DSC for that were due?

19        A.    I don't remember.  I just know that there

20   was an outstanding balance.

21        Q.    Okay.  Did that lead to DSC recovering

22   cars from Red Barn?

23        A.    That led to DSC taking all of our

24   inventory, yes.

25        Q.    And you -- you do or don't remember

EXHIBIT 10

Page 110

1    particular payments coming back or balancing at the

2    time?

3         A.    I don't remember payments balancing

4    unless they were initiated by DSC and we were

5    unaware of it.

6         Q.    Okay.  Do you recall Louisiana Used Motor

7    Vehicle Commission getting involved in -- in those

8    deals in any way?

9         A.    Yes.

10        Q.    And what was their involvement?

11        A.    Their involvement was to secure titles on

12   the vehicles, which had a -- that were DSC's that we

13   had not paid off.

14        Q.    And by securing titles, do you mean

15   secure titles from DSC for the retail customer?

16        A.    No.  They -- they were on the floorplan.

17        Q.    I -- I guess I'm asking why -- why did

18   the Motor Vehicle Commission want titles from DSC?

19             MR. COMAN:

20                  Objection to form.  If you know.

21             THE WITNESS:

22                  I believe I know.  Okay.  I believe

23        I know, but I'm not positive.  I believe

24        there's a law in the state of Louisiana where

25        a third party or something cannot be harmed.

EXHIBIT 10

1          So the titles had to be turned over pursuant

2           to Louisiana law to the customer.

3    BY MR. McCARTER:

4        Q.    Just to confirm, from your perspective,

5    the Louisiana Used Motor Vehicle Commission was

6    trying to get titles from DSC to get to your retail

7    buyers?

8              MR. COMAN:

9                   Objection to form.

10             THE WITNESS:

11                  Yes.

12   BY MR. McCARTER:

13       Q.    And do you have any knowledge of whether

14   DSC turned over titles for that purpose?

15       A.    DSC did.

16       Q.    And that was prior to any payment by Red

17   Barn for those units?

18       A.    Yes.

19       Q.    Do you remember the name of the agent or

20   inspector from the Louisiana Used Motor Vehicle

21   Commission that might have been involved?

22       A.    His name was Ronnie Wisenor.

23       Q.    Is he someone that you had known or

24   worked with before this incident?

25       A.    Just on various complaints, if somebody

EXHIBIT 10

Page 112

1    lodged a complaint against us.  We were regulated by

2    them.  So he was required to look into it and make

3    sure.  A lot of them were title absent complaints.

4        Q.    What do you mean by that, what's a title

5    absent complaint?

6        A.    Well, where we didn't have the title,

7    because we had paid off -- I can give you a bunch of

8    instances, where you had paid off -- we had paid off

9    the DSC and DSC did not have the title yet, but it

10   had gone past the 20 days that was allowed.

11       Q.    Who -- who -- what -- who allowed the 20

12   days, what do you mean by 20 days?

13       A.    You are required -- I -- I believe you're

14   required by Louisiana law, almost positive, 20 days

15   to get the title to the retail buyer in the event of

16   a sale.

17       Q.    Okay.

18       A.    Now, the -- the Louisiana Used Car

19   Commission has told me that they don't enforce that

20   law, because they understand the -- the problem of

21   getting titles from the auctions and floorplan

22   companies and things like that.

23       Q.    Would -- would those typically have been

24   cars that were bought at auction without a title

25   present?

EXHIBIT 10

1    BY MR. McCARTER:

2         Q.    -- it says, on May 7, 2013, there is

3    apparent e-mail.  And it says, "I received a call

4    from the dealer, Don Richardson, and he would like a

5    detailed report of all activity on the account since

6    the default, and would like to know the remaining

7    balance on each unit sold at auction, as well as a

8    list of the units that have not yet sold."

9              Do you know -- do you remember whether

10   Red Barn asked for an account statement around this

11   time?

12        A.    I don't remember.  I didn't ask for an

13   account statement around that time.

14        Q.    Okay.  Do you recall getting or seeing

15   one from DSC that was used in the bankruptcy or for

16   some other purpose?

17        A.    No.

18        Q.    Okay.  I am going if show you what we're

19   going to call Exhibit #19.  For the record, this is

20   Bates labeled NG008120.  This looks like it may be

21   an April 26, 2013 letter from Red Barn's bankruptcy

22   attorney to NextGear; is that right?

23        A.    Yes.

24        Q.    All right.  And Arthur Vingiello --

25        A.    That's to Louisiana First Choice Auto

EXHIBIT 10

Page 170

1    Auction.

2       Q.    Correct.  And so this was your bankruptcy

3    attorney at the time?

4       A.    Yes.

5       Q.    Okay.  And he's representing that Red

6    Barn is a debtor in possession and that DSC should

7    cease from selling any collateral in its possession?

8       A.    Yes.

9       Q.    Okay.  All right.  I am going to show you

10   what we're going to call Exhibit #20.  This is Bates

11   labeled NG008358 through 8359.

12      A.    Okay.

13      Q.    This looks like a series of e-mails

14   between you and personnel at NextGear Capital

15   regarding two vehicles that may have been on your

16   DSC floorplan; is that right?

17      A.    Uh-huh.

18      Q.    Okay.  Can you just describe for me what

19   appears to be happening here?

20      A.    It appears to be that we have possession

21   of two vehicles that were not returned to DSC, and

22   we are trying to get those back in your possession.

23      Q.    Okay.  And the advice was to consult your

24   attorney -- or the response was to consult your

25   attorney?

EXHIBIT 10

Page 171

1       A.     I don't recall that.

2       Q.     I mean, do you see, at the top, it says,

3   "Devon, you will need to consult your attorney"?

4       A.     Oh, okay.

5       Q.     And that e-mail address for you, it looks

6   like wwwdevo@aol.com.

7       A.     Yes.

8       Q.     Is that your e-mail address?

9       A.     Yes, it is.

10      Q.     And so this was going on a couple of

11  months after that letter from your attorney, that we

12  just looked at, Exhibit #19?

13      A.     Uh-huh.

14      Q.     And so that -- the bankruptcy would have

15  been pending at that time?

16      A.     Yes.

17      Q.     Okay.  All right.  I'm going to call this

18  Exhibit #21.

19      A.     Okay.

20      Q.     This document is Bates labeled RB0075.

21  It looks like another, you know, exhibit from the

22  bankruptcy that you may have produced to us.

23             Does that look right to you?

24      A.     Yes.

25      Q.     Okay.  And it's a list of insider

EXHIBIT 10

Page 172

1   transactions, the past year, for Red Barn Motors,

2   Inc.

3           Do you see that?

4      A.    Uh-huh.

5      Q.    All right.  And, among others -- like,

6   the first line item is "Devon house payment."

7      A.    Uh-huh.

8      Q.    1750.  You see that?

9      A.    Uh-huh.

10     Q.    So was Red Barn Motors paying your house

11  payment?

12     A.    No.  That house is actually owned by Don

13  and Barbara Richardson.

14     Q.    So was Red Barn Motors paying Don and

15  Barbara's house payment?

16           MR. COMAN:

17               Objection to form.

18           THE WITNESS:

19               Let me see.  It would appear, based

20      on this, it was.

21  BY MR. McCARTER:

22     Q.    Okay.  And there are several others,

23  below, that say "Devon house payment."  And in the

24  same case, those are all that same house owned by

25  Don and Barbara?

EXHIBIT 10

Page 173

```
 1      A.     Uh-huh.

 2      Q.     Where is that house located?  What's the

 3  address?

 4      A.     25852 Plantation Avenue.

 5      Q.     Is that still owned by the Richardsons?

 6      A.     Yes, it is.

 7      Q.     Okay.  And then the second entry, for

 8  example, says "payment on car financing, BHPH loan."

 9             Do you know anything about what that was

10  for?

11      A.     Payment on car financing, BHPH loan.

12             I don't.

13      Q.     Okay.  You don't have any knowledge of

14  why that would be listed as an insider transaction

15  here?

16             MR. COMAN:

17                  Objection to form.

18                  Obviously, to the extent that you

19     know --

20             THE WITNESS:

21                  I don't know.

22  BY MR. McCARTER:

23      Q.     Do you recall whether you or either the

24  Richardsons had any personal car loan that was being

25  serviced by Red Barn Motors, Inc.?
```

EXHIBIT 10

Page 174

1        A.       Neither me nor the Richardsons had a car

2    loan being serviced by Red Barn Motors.

3        Q.       Okay.

4        A.       I was provided a vehicle to drive.

5        Q.       By Red Barn Motors?

6        A.       By Red Barn Motors.  But it was an

7    inventory vehicle.

8        Q.       Okay.  Did you guys ever drive DSC

9    vehicles?

10        A.       I would occasionally drive them, to make

11    sure that there weren't any problems with them.  And

12    I would switch off on a daily basis.  But my primary

13    vehicle was not a DSC vehicle.

14        Q.       Would you ever have a DSC vehicle parked

15    at your house overnight?

16        A.       That's possible.

17        Q.       The -- on down, there is a -- it mentions

18    "repay part of the Cliff Richardson loan."

19              Do you know anything about that?

20        A.       I know that Cliff had loaned some money

21    to Red Barn Motors.

22        Q.       And who is Cliff?

23        A.       Cliff is Don's son.

24        Q.       And where -- on down, where it says

25    "Pelican Advisory Group loan to RBM," that's Don's

EXHIBIT 10

Page 175

1    son's insurance company?

2        A.    That's correct.

3        Q.    Okay.  I'm going to show you what we're

4    going to call Exhibit #22.  And I will just

5    represent to you these are just pages that we

6    printed recently from the website redbarnmotors.net.

7             Does this look like Red Barn Motors'

8    website?

9        A.    Yes, it does.

10       Q.    What's going with this pig?  Is that

11   you all's mascot?

12       A.    Yes.

13       Q.    Is it -- do you own the pig?

14       A.    No.  It's a Photoshop.

15       Q.    Gotcha.

16            MR. McCARTER:

17                 All right.  Can we take a short

18     break?

19                 (Recess taken.)

20            MR. McCARTER:

21                 Back on the record.

22   BY MR. McCARTER:

23       Q.    So, Mr. London, one of the things we

24   talked about before was the KO book and at the time,

25   you said you don't know who maintains and organizes

EXHIBIT 10

Page 176

1    the KO book; is that right?

2        A.    Correct.

3        Q.    Okay.  Have you made any inquiry of

4    anyone about how to get out of the KO book?

5        A.    No.

6        Q.    Okay.  The auctions where you cannot

7    write business checks, and I'm sorry please

8    remember, were Long Beach and Baton Rouge -- ABC

9    Baton Rouge?

10       A.    Long Beach and Oak View Auto Auction.

11       Q.    Oak View Auto Auction.  Okay.  And --

12       A.    And we were barred from Manheim auctions.

13       Q.    Okay.  Have you inquired with Manheim how

14   to get reinstated with Manheim?

15       A.    We would have to payoff DSC.

16       Q.    How do you know that?

17       A.    That's what they told me.

18       Q.    Who is they?

19       A.    The manager that I spoke to on the phone.

20       Q.    Who was that, what --

21       A.    I don't know.

22       Q.    Was it a particular auction?

23       A.    It was Manheim New Orleans.

24       Q.    Was it GM or somebody else?

25       A.    Somebody else.

EXHIBIT 10

Page 213

1          MR. COMAN:

2                Yes, sir.

3          MR. McCARTER:

4                This won't take long.  Back on the

5     record.

6     BY MR. McCARTER:

7          Q.    Mr. London, we've talked before about

8     sort of the net income and business before

9     bankruptcy and after bankruptcy.  Do you remember

10    that?

11         A.    Uh-huh.

12         Q.    So prior to bankruptcy, how did the

13    business compare from 2010 to 2011?

14         A.    From 2010 to 2011, there was growth.

15         Q.    Okay.  And is that because you started up

16    in 2010 and you were just expanding operations?

17         A.    Pretty much.  I mean, in 2011 is when we

18    really started operating, you know, and running it

19    like a car dealership.

20         Q.    Yes.  And you got into credit

21    arrangements with both AFC and DSC in 2011?

22         A.    Was it 2011?

23         Q.    I think so.

24         A.    Yes, okay.

25         Q.    Okay.  And did that credit allow you to

EXHIBIT 10

Page 214

1    acquire more inventory and make more profit?

2        A.    Yes.  It allowed us to generate more

3    inventory.

4        Q.    Okay.  And then from 2011 to 2012, was

5    the business still growing, shrinking, do you

6    recall?

7        A.    It was growing.

8        Q.    Okay.  And then 2012 to 2013, was it --

9    was it growing in 2013 before the NextGear default?

10       A.    It was always on an upward swing.

11       Q.    Okay.  You testified earlier, though, and

12   it's in your answer as well, but in 2013 -- I'm

13   sorry, not your answer, in your complaint, that in

14   2013, Red Barn ran into financial difficulties --

15       A.    Uh-huh.

16       Q.    -- is that right?

17       A.    Correct.

18       Q.    And you described those as being mostly

19   caused by the issue of Southwest Finance, right?

20       A.    Well, it was not largely caused by the

21   issue with Southwest Finance.  That was an issue.

22   It was largely caused by this scheme that siphoned a

23   whole bunch of money off of the business.

24       Q.    Okay.  Prior to DSC, you know, claiming

25   default and picking up its cars in March of 2013,

EXHIBIT 10

Page 215

1    were you having any other financial difficulties,

2    were there any other creditors you were having

3    trouble paying?

4         A.    It all happened at once.  It all happened

5    at once.

6         Q.    Okay.  But at some point prior to DSC

7    picking up cars, Southwest Finance informed you that

8    they weren't going to buy as much paper as you

9    thought they were going to buy?

10        A.    That is correct.

11        Q.    Okay.  And were there any other creditors

12   that you can recall Red Barn defaulting to prior to

13   the middle of March 2013?

14        A.    No.  I believe we were current with

15   everybody.

16        Q.    Okay.

17             MR. McCARTER:

18                  Okay.  No further questions, thank

19      you.

20                       EXAMINATION

21   BY MR. COMAN:

22        Q.    Mr. London, I just have a few.  At the

23   beginning of your relationship with DSC -- and I say

24   your relationship, I should rephrase.

25             Red Barn -- Red Barn's relationship with

EXHIBIT 10

Page 216

 1   Dealer Services Corporation, did DSC, through

 2   contracts or through representatives represent to

 3   you that they would only charge you interest and

 4   curtailment fees beginning from the date of advance?

 5                  MR. McCARTER:

 6                       Object to form.

 7   BY MR. COMAN:

 8        Q.    You can answer.

 9                  MR. McCARTER:

10                       Object.  Asked and answered.  Go

11        ahead.

12                  THE WITNESS:

13                       Yes.

14   BY MR. COMAN:

15        Q.    Okay.  Did DSC conceal that fact from Red

16   Barn?

17        A.    Yes.

18                  MR. McCARTER:

19                       Object to form.

20   BY MR. COMAN:

21        Q.    Let me rephrase it.  I'm sorry.

22               Did Red Barn conceal the fact that it

23   was, in fact -- did DSC conceal from Red Barn that

24   it was, in fact -- DSC was hiding and actually

25   charging interest and curtailment fees to you

EXHIBIT 10

Page 217

1    without your knowledge?

2              MR. McCARTER:

3                   Object to form.  These are all

4         leading and full of false assumptions.

5    BY MR. COMAN:

6         Q.    You can answer.

7         A.    Yes.

8         Q.    Did that damage Red Barn or did Southwest

9    damage Red Barn?

10              MR. McCARTER:

11                   Object to form.

12              THE WITNESS:

13                   The damage to Red Barn was caused by

14         DSC.

15   BY MR. COMAN:

16        Q.    Earlier, you testified under counsel's

17   questions regarding Stuart LaBauve and an

18   interaction you had with him, without the quote, you

19   were somewhere midstream, let's say, in the

20   relationship between Red Barn and DSC.  Do you

21   recall that testimony?

22        A.    Yes.

23        Q.    Okay.  And describe for us the

24   interaction that you had and the confrontation,

25   quote/unquote, that you had with Stuart LaBauve and

EXHIBIT 10

Page 218

1    what you learned at that date?

2              MR. McCARTER:

3                   Objection, asked and answered in

4         detail.

5    BY MR. COMAN:

6         Q.    You can answer.

7         A.    I basically learned at that date that DSC

8    was charging interest from the date of the advance

9    -- from the date of the -- from the date of the

10   auction versus the date that we actually

11   floorplanned the vehicle through the auction.

12        Q.    And what was your understanding at that

13   time from Stuart LaBauve as to that difference in

14   time between those two?

15             MR. McCARTER:

16                  Object to form.

17             THE WITNESS:

18                  That was just the way that it was.

19        He said that -- that's the way it was.  They

20        always go from the date of the sale.

21   BY MR. COMAN:

22        Q.    Okay.  And did your knowledge and

23   understanding of this process evolve from that

24   moment to the end of the relationship, let's say, in

25   March of 2013?

EXHIBIT 10

1    A.    Yes, it did.

2    Q.    Okay.  Tell us how.

3    A.    Well, we had the conversation with Stuart

4  and under the assumption it was three to four days

5  or however many days it was, we chose to continue

6  the relationship and just not cause any problems,

7  but --

8    Q.    Let me stop you there.

9          MR. McCARTER:

10              No.  Let him answer the question.

11       He's answering the question and you stopped

12       him in the middle of his answer.  Go ahead and

13       answer.

14          THE WITNESS:

15              Okay.  Then, it really came to light

16       with the Ford 500 in 2013 where we had paid

17       off the vehicle.  We had paid all of the

18       curtailment fees.  We had paid all of the

19       interest.  We had paid everything to DSC and

20       DSC was the one that reimbursed us for the

21       money that we paid, because they had never

22       paid the auction for the car.  So if the

23       auction had never gotten paid for the car, DSC

24       utilized all of our funds for the time since

25       they were collected without ever making a loan

EXHIBIT 10

Page 220

1        on the vehicle.  Then, I started thinking

2        about all of the times that we had actually

3        paid off a car before DSC had the title and

4        how many times this actually happened, and it

5        was voluminous.  It was not one time.  It

6        wasn't two times.  It was many times that we

7        paid off DSC and the title wasn't available

8        and we had to wait for the title.  And that

9        was when I realized how big the scheme was and

10       how voluminous it was.

11  BY MR. COMAN:

12       Q.   Are you done?

13       A.   Yes.

14       Q.   I didn't mean to cut you off.  Your

15  knowledge level that you just described, that was at

16  the end of the relationship; is that correct?

17       A.   Yes.

18       Q.   That grew and expanded from your original

19  conversation with Stuart LaBauve when you confronted

20  him about the differential in time; is that correct?

21            MR. McCARTER:

22                 Objection to form.

23            THE WITNESS:

24                 That is correct.

25  BY MR. COMAN:

EXHIBIT 10

Page 221

1        Q.    All right.  Now, you were asked several

2   questions regarding auction houses and you mentioned

3   Manheim Auctions.  Okay.  How many of those auctions

4   have you been barred from, at least that you know of

5   specifically, Manheim auctions?

6              MR. McCARTER:

7                   Object to form.

8              THE WITNESS:

9                   I have been told by Manheim New

10       Orleans that I'm barred from all Manheim

11       auctions.

12   BY MR. COMAN:

13        Q.    Okay.  Did you also check with Manheim

14   Lafayette?

15        A.    Manheim Lafayette has barred us, yes.

16        Q.    Okay.  The non-Manheim auction houses in

17   the industry, you described at length the various,

18   and I'll call them restrictions; is that a fair

19   statement that you're operating under at this point?

20              MR. McCARTER:

21                   Object to form.

22              THE WITNESS:

23                   Repeat the question.

24   BY MR. COMAN:

25        Q.    Sure.  Look over here.  I'm sorry.  The

EXHIBIT 10

Page 222

1    non-Manheim auctions, the deposits, whatever --

2    whatever relationship you have at this point with

3    non-Manheim auctions --

4        A.    Uh-huh.

5        Q.    -- in the business relationship, okay,

6    how is that -- is that restricting -- is that

7    adversely affecting you and your business at this

8    minute?

9            MR. McCARTER:

10               Objection to form.

11           THE WITNESS:

12               Yes, it does.

13   BY MR. COMAN:

14       Q.    How?

15       A.    It -- it limits our ability to procure

16   cars.  It limits our ability to write checks on

17   vehicles.  We have to pay for the vehicle at the

18   time that we purchase the vehicle, whether title is

19   present or not.  The auctions -- the amount of

20   auctions that we can go to limits our ability to get

21   the same inventory that other dealers have access

22   to.

23       Q.    Has that -- all those items, have those

24   adversely affected Red Barn's income?

25       A.    Yes.

EXHIBIT 10

Page 223

```
 1        Q.     Has it adversely affected Red Barn's

 2   business reputation?

 3             MR. McCARTER:

 4                  Object to form.  Lack of foundation.

 5             THE WITNESS:

 6                  Yes.

 7   BY MR. COMAN:

 8        Q.     Has that adversely affected your goodwill

 9   within the industry?

10             MR. McCARTER:

11                  Object to form.

12             THE WITNESS:

13                  Absolutely.

14   BY MR. COMAN:

15        Q.     Has it also affected the overall

16   valuation of Red Barn at this point?

17             MR. McCARTER:

18                  Object to form.

19   BY MR. COMAN:

20        Q.     You can answer.

21        A.     Absolutely.

22             MR. COMAN:

23                  Okay.  One moment, please.

24                  I don't think I have any further

25        questions at this time.
```

EXHIBIT 10

Page 224

1          MR. McCARTER:

2               Okay.  I've got to clear up a couple

3      things.

4                    RE-EXAMINATION

5  BY MR. McCARTER:

6      Q.    So we went in detail over your

7  conversations with Mr. LaBauve before and you said

8  in the initial conversations with him, you said that

9  he concealed the interest issue, but you didn't

10  recall any specifics representations about the

11  timing of interest.  Do you remember that?

12      A.    He said -- repeat.

13      Q.    Okay.  So both your complaint and your

14  testimony earlier was that Mr. LaBauve concealed the

15  timing of DSC's interest charging in initial sales

16  meeting that you had with him, but you testified he

17  didn't make any specific statements or

18  representations to you about the interest.  Do you

19  recall that?

20      A.    Yes.

21      Q.    Okay.  And so when your attorney just now

22  asked you about did he misrepresent to you in that

23  initial conversation, you're talking about the

24  concealment and not actual statements, correct?

25      A.    I don't understand your question.

EXHIBIT 10

Page 225

1      Q.    Okay.  So he didn't make any actual
2  statements to you about the timing of interest and
3  when it would start on the DSC line in your initial
4  meeting with Mr. LaBauve?
5      A.    No, but the contract stated it.
6      Q.    Okay.  So you're relying on what's in the
7  contract?
8      A.    I'm relying on what's in the contract and
9  what was represented by Stuart LaBauve, which is not
10  the truth --
11      Q.    Okay.
12      A.    -- the -- the 4 percent, the -- there
13  were -- there were numerous things that weren't
14  true.
15      Q.    Okay.  We're specifically talking about
16  the timing of when interest began to accrue on the
17  advance.  And you testified that Mr. LaBauve did not
18  make any statements to you on that issue in your
19  initial sales meeting with him.  Do you recall that?
20      A.    Yes.
21      Q.    Okay.  And there was some testimony just
22  now with your attorney where you were talking about
23  non-Manheim auctions.  We -- we covered a handful.
24  Was it three or four non-Manheim auctions that
25  you've dealt at since 2013.  Do you recall that?

EXHIBIT 10

Page 226

1   Again, they were Oak View Auto Auction, Long Beach,

2   Mississippi, Baton Rouge ABC.  Okay.  Have you dealt

3   at any other Manheim auctions since 2013?

4        A.    No.

5        Q.    Okay.  Have you tried to deal at any

6   other Manheim auction -- non-Manheim auction since

7   2013?

8        A.    Yes.

9        Q.    Which one?

10       A.    I don't know the name of it.

11       Q.    Do you know where it was?

12       A.    It was, I believe, in Lafayette.  We --

13   we signed up and we basically have not gone.

14       Q.    So you -- you can go to this -- this

15   non-Manheim auction in Lafayette, you just chose not

16   to?

17       A.    I don't -- I -- I don't remember if we

18   were approved or not approved.

19       Q.    Okay.  So as we sit here today, you don't

20   know whether you can do business at that auction?

21       A.    Correct.

22       Q.    Okay.  Have you tried to go to any other

23   non-Manheim auctions since 2013?

24       A.    No.

25       Q.    Besides ABC Baton Rouge, have you tried

EXHIBIT 10