1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF INDIANA

3                INDIANAPOLIS DIVISION

4

5   RED BARN MOTORS, INC., PLATINUM MOTORS INC., et

6   al.

7

8                                    PLAINTIFFS

9   V.

10                   CASE NO. 1:14-cv-01589-TWP-DKL

11

12   COX ENTERPRISES, INC., et al.

13

14                                    DEFENDANTS

15   _____

16

17         DEPOSITION FOR THE DEFENDANTS,

18         COX ENTERPRISES, INC., et al.:

19

20     The Deposition of Rule 30(b)(6) Witness, Barry

21   Wayne Mattingly, on Behalf of Mattingly Auto Sales,

22   Incorporated, taken in the above-styled matter at

23   Frost Brown Todd, LLC, 400 West Market Street, 3200

24   Mercer Tower, Louisville, Kentucky, on the 19th day of

25   October, 2016, beginning at 9:04 a.m.

EXHIBIT 11

Page 13

1      Q.    In what -- what capacity?

2      A.    I'm an incoming quality inspector.

3      Q.    Income quality?

4      A.    In -- income -- incoming -- incoming

5    quality inspector.

6      Q.    Okay.

7      A.    IQ inspector.

8      Q.    High level what -- what's incoming that

9    you're inspecting?

10     A.    Parts.

11     Q.    Parts.

12     A.    Parts.

13     Q.    Okay.  And in all those previous positions

14   with Texas Gas, FFA, Flynn Brothers, others,

15   did -- what kinds of positions were you holding?

16     A.    Just nothing -- Flynn was just a regular

17   laborer; Bryant Distributing just a truck driver,

18   drove a -- delivery person; and Texas Gas was just

19   laborer.  Everything else was just laborer, I guess

20   you would say.

21     Q.    Okay.  In any of those positions were you

22   in sales?

23     A.    No.

24     Q.    In any of those positions were you in

25   accounting or finance?

EXHIBIT 11

Page 14

1     A.    No.

2     Q.    When you were at the University of

3  Kentucky, what did you study?

4     A.    I just basic -- I took the basic classes,

5  you know, first year classes.  That's pretty much

6  it.

7     Q.    Okay.  Do you have any specialized

8  training in accounting?

9     A.    No.

10    Q.    Any specialized training in finance?

11    A.    No.

12    Q.    Were -- in any of those other previous

13  jobs, were you in accounts receivable or accounts

14  payable?

15    A.    No.

16    Q.    And the same is true at Ford Motor

17  Company?

18    A.    Ford Motor Company, I -- I do -- I'm not

19  actually in the sales or anything like that.  I do

20  parts.  I charge vendors for the parts if they're

21  bad, you know, bad parts.

22    Q.    Okay.  And how -- tell me again how long

23  you've been with Ford.

24    A.    Twenty-seven years.

25    Q.    And where do you work for Ford?  What --

EXHIBIT 11

Page 15

1    where -- where --

2        A.    Louisville.

3        Q.    -- do you go to the office?

4        A.    Louisville, Kentucky.

5        Q.    Okay.  That's always been true?

6        A.    Yes.

7        Q.    At some point, though, you got in the car

8    dealing business?

9        A.    Yes.

10       Q.    And when was that?

11       A.    Well, I've been trading cars since 1980,

12   the day I graduated high school pretty much.

13       Q.    Has that always been for yourself, or --

14       A.    Yes.  I never worked for anybody else.

15       Q.    Was that always under Mattingly Auto

16   Sales, Inc., or did you have prior --

17       A.    I -- I started Mattingly Auto Sales, I

18   believe, in  86, and then I think we incorporated it

19   in 2003 or  4.

20       Q.    So before that, it was just a d/b/a of you?

21       A.    Yes.

22       Q.    Okay.  And so, between  80 and  86, how

23   did you deal in cars?  What entity?

24       A.    Just I -- I bought classic cars, mostly.

25   You know, old cars and cars that need repair,

EXHIBIT 11

Page 16

1    bought them myself.

2       Q.   Just in your own name personally?

3       A.   Yes; m-hm.

4       Q.   Okay.  All right.  So how -- how would you

5    describe the business of Mattingly Auto Sales,

6    Inc.?

7       A.   Just your basic small car dealer.

8       Q.   Okay.  Most of your sales retail?

9       A.   At that time, majority.  I'd say 75%.

10      Q.   At this time?

11      A.   Oh, this time?  No.  We're pretty much --

12   now we're pretty much wholesale.

13      Q.   So when did that change from retail to

14   wholesale?

15      A.   2012.

16      Q.   Does Mattingly Auto Sales have any other

17   owners besides yourself?

18      A.   Just me and my wife.

19      Q.   Okay.  Is your ownership 50/50?

20      A.   Yes.

21      Q.   Okay.  And do you have a corporate title

22   of any sort?

23      A.   I'm president.

24      Q.   Okay.  And what about Mrs. Mattingly?

25      A.   She's vice president.

EXHIBIT 11

1    Q.   Do you have stock certificates or

2  anything like that?

3    A.   No.

4    Q.   Okay.  And again, that was incorporated

5  around 2002, 2003?

6         THE WITNESS:   3 or  4; wasn't it?

7  BY MR. MCCARTER:

8    Q.   Wait.

9    A.    3 --  3 or -- I think it was  4.

10   Q.   Okay.  And let me --

11   A.   It was  4.

12   Q.   It's -- I understand it's natural to ask

13  questions to the side, but here it's just your

14  testimony on behalf of Mattingly, so we can't talk

15  across the room.

16   A.   I want to say it was -- do  3 just to be on

17  the safe side, but I think it was -- that's possible.

18   Q.   Okay.  And that's -- Mattingly Auto Sales

19  is a for profit Kentucky company?

20   A.   Yes.

21   Q.   Okay.  And it's still current and --

22   A.   Yes.

23   Q.   -- in good standing?

24   A.   [nods head]

25   Q.   Has -- other than the sort of switch from

EXHIBIT 11

Page 18

1   retail to wholesale in 2012, has -- has the

2   business changed significantly?

3      A.   Yes.

4      Q.   In what way?

5      A.   We -- our gross sales has dramatically

6   changed.

7      Q.   Can you explain that a little bit more?

8      A.   We probably went from, approximately,

9   say, $800,000 in retail sales down to maybe this

10  year we might do 50 or 60.

11     Q.   But now you're focusing on wholesale

12  sales; right?

13     A.   That's the -- that's the majority of it.

14     Q.   And so what are you doing in wholesale

15  sales?

16     A.   Just buying cars and taking them to the

17  auction.

18     Q.   I'll come back to that, but I mean, you --

19  you said you made 50 or 60 in retail.  What are

20  you making in wholesale?

21     A.   Well, I just combined that.  You know,

22  that was a combined number for total.

23     Q.   Okay.

24     A.   Total sales.

25     Q.   All right.  Do you use any trade names as

EXHIBIT 11

Page 19

1   Mattingly Auto Sales, Inc.?

2      A.   No.

3      Q.   What about Mattingly Used Cars?

4      A.   No.

5      Q.   Okay.  Have you -- has Mattingly Auto

6   ever been investigated by any federal, state, or

7   local government agency?

8      A.   Yes.

9      Q.   Okay.  And what -- can you explain that

10  to me?

11     A.   It was Lourdes Givens had the state

12  police investigate us.

13     Q.   And when did that happen?

14     A.   2012, May of 2012.

15     Q.   And Ms. Givens is with NextGear; right?

16     A.   Yes.

17     Q.   Okay.  And what did the state police

18  investigate?

19     A.   I think the -- let's see.  I think the

20  wording was embezzling money from customers.

21     Q.   Do you recall whether any charges were

22  brought on it?

23     A.   Oh, yes.

24     Q.   What were the charges?

25     A.   None.  There was no charges.

EXHIBIT 11

Page 20

```
 1     Q.   No charges; okay.  And how long did that
 2   investigation go on?
 3     A.   I'd say within a -- a week.
 4     Q.   Okay.  And --
 5     A.   Possibly a week.
 6     Q.   Was that May of 2012?
 7     A.   Yes.
 8     Q.   Okay.  Can you -- do you recall at all
 9   more specifically what they were looking at?
10     A.   My whole -- my financial -- Mattingly
11   Auto's financial portfolio, if there was any --
12   what-all we were doing, businesses, properties,
13   that kind of. . .
14          MR. JURKIEWICZ:  We're on the record.
15   Matt Coman is joining by phone.  Are you there,
16   Matt?  Matt?  Matt appears to not be on the phone.
17   BY MR. MCCARTER:
18     Q.   All right.  And -- and during that
19   investigation, who contacted you from the state
20   police?
21     A.   Actually, my lawyer contacted me to meet
22   with him in his law office.
23     Q.   Who was your lawyer at the time?
24     A.   Charles Mattingly.
25     Q.   Is he related to you?
```

EXHIBIT 11

1    A.   No.

2    [WHEREUPON, phone rings.]

3         MR. JURKIEWICZ:  Are we -- no question

4    pending?

5         MR. MCCARTER:  No.

6    BY MR. MCCARTER:

7    Q.   All right.  And do you remember the name

8    of the officer or officers you met with?

9    A.   Yes.

10   Q.   What was --

11   A.   Curtis Mouser.  And I don't -- don't know

12   how to spell that for you.  I'm sorry.

13   Q.   Okay.  There was the one interview,

14   and --

15   A.   Yes.

16   Q.   -- did he pull records from you?

17   A.   Yes.  Well, no.  He actually had pulled

18   them himself.

19   Q.   From where?

20   A.   The courthouse.  All property records,

21   everything, financial records from liens, that kind

22   of thing.

23   Q.   All right.  You said it was embezzling, but

24   did he give you any more sense specifically what

25   he was looking at?

EXHIBIT 11

Page 39

1    Explain to me what that means, and how does that
2    work?
3       A.    If I had a -- if I had an auction ticket
4    before from where I purchased the car --
5       Q.    M-hm.
6       A.    -- I would take it to the person that's
7    called a finance officer, whoever it would be that
8    does that, that's their job.  They would scan it,
9    initial it, scan it, put it in their system, stamp it,
10   initial it, something so where you can get it out of
11   the gate.  Like make like a gate pass of where you
12   can take the car out.
13      Q.    But they would have to know that you had
14   credit available from the floor planner in advance?
15      A.    Right.
16      Q.    Okay.  And tell me if this is wrong, but a
17   floor -- a high level floor planner is somebody you
18   have a line of credit with to buy cars?
19      A.    M-hm.
20      Q.    Right?
21      A.    Yes.
22      Q.    Okay.  And so somehow the floor planner
23   and the auction communicate about how much
24   credit you have as Mattingly Auto Sales, and then
25   you can just say, "Put it on my floor plan"?

EXHIBIT 11

Page 40

```
 1    A.   Yes.
 2         MS. LASKY:  Object to the form.
 3  BY MR. MCCARTER:
 4    Q.   Have you used all those different forms of
 5  payment:  cash, check, floor plan?
 6    A.   Yes.
 7    Q.   So at a high level after you get a car at
 8  auction, then what do you do with it as far as
 9  business?
10    A.   Just --
11         MS. LASKY:  Object to the form.  You can
12  answer.
13         THE WITNESS:  Okay.
14    A.   Just take it to the lot, clean it up,
15  whatever it needs to be, put it up for sale.
16  BY MR. MCCARTER:
17    Q.   Okay.  Would you typically re-sell a car
18  at the same auction, or would you do something
19  differently?
20    A.   Typically, the way I operate I would take
21  it to another auction.
22    Q.   And so you might buy it at an auction
23  where it's less valued, and take it to an auction
24  where it's more valued?
25    A.   Yes.
```

EXHIBIT 11

Page 41

1    Q.   So you said when you're the seller you

2    have to provide the title to get paid; right?

3    A.   Yes.

4    Q.   And so does that sometime -- does that

5    always happen on sale day?

6    A.   I tried to, but sometimes it didn't happen,

7    you know.  They would -- I wouldn't get paid -- I

8    never got paid until I provided them a title.

9    Q.   But that sounds like some sellers can

10   provide it later; is that right?

11   A.   Oh, yeah, you -- you can turn it in later.

12   They would charge you a fee for that, but I would

13   never get paid unless I produced a title.

14   Q.   All right.  But does a buyer -- does a

15   buyer know the title is not going to be available

16   immediately?

17   A.   Some do; yes.

18   Q.   And how do they -- how do you know that?

19   A.   Well, it's -- it's always have to announce

20   it.  It's called TA.

21   Q.   Okay.

22   A.   It would be title absent.  And it kind of

23   goes up on the screen, and they know there will

24   not be a title at that time.

25   Q.   Okay.  Did you ever buy a car TA?

EXHIBIT 11

Page 42

1      A.    Yes.

2      Q.    What -- what -- why would you buy a car

3   TA if you can't immediately re-sell it?

4      A.    Because eventually they'll -- they'll get

5   me title.  They have a -- a time frame usually of

6   three weeks.  If they don't provide you with a clear

7   title, you can take the car back, and the deal is

8   canceled.

9      Q.    Okay.  In that mean -- in the meantime,

10  can you go ahead and get the car ready and start

11  offering it?

12     A.    Yes.

13     Q.    Did you ever re-sell a car before you got

14  the title from the auction?

15     A.    Yes.

16     Q.    How often has that happened?

17     A.    It was rare.

18     Q.    Did you ever have a situation where that

19  title never shows up and you have to unwind the

20  deal?

21     A.    It -- I have had a few, very few,

22  fortunately.

23     Q.    And I know we've -- this has been a fairly

24  general conversation, but has that been the sort of

25  process at auction the whole time from 2003

EXHIBIT 11

Page 43

1    to 2016?

2       A.    Yes.

3       Q.    Okay.  All right.  We -- we talked about

4    these floor plan lines of credit.  Is that a common

5    term in the industry, floor plan?

6       A.    Yes.

7       Q.    So what floor plans have -- has Mattingly

8    Auto Sales worked with?

9       A.    We had AFC, DSC, MAFS, M-A-F-S, which

10   you're familiar with, and, of course, now NextGear.

11      Q.    All right.  What period did you work with

12   AFC?

13      A.    They were -- they were my first.  I'm

14   going to say starting in 2003, give or take.

15      Q.    Until when?

16      A.    To two thousand probably  9.

17      Q.    And what was the size of your line during

18   that period?

19      A.    Probably 100,000.

20      Q.    And why did that get closed at some

21   point?

22      A.    I closed it.  Their fees were high.

23      Q.    All right.  And what period did you work

24   with DSC?

25      A.    I'm going to say  6 or  7 through 2012.

EXHIBIT 11

Page 44

1    Q.    And the size of your lines during that

2    period?

3    A.    It increased up to 150 is my final -- final

4    line.

5    Q.    From 100?

6    A.    From 100 to 150.

7    Q.    And high level, that means you can buy

8    $150,000 worth of cars and put them on that line

9    of credit?

10    A.    Yes.

11    Q.    Okay.  And what period were you with

12    MAFS?

13    A.    I'd say from 2003 or  4 to 2012.

14    Q.    Do you remember the size of that line?

15    A.    I believe it was 100, but I -- I don't

16    remember.

17    Q.    And so there's some overlap between

18    those three lines so you would -- you would have

19    multiple lines at the same time sometimes?

20    A.    Yes.

21    Q.    Okay.  And why would you have more than

22    one?

23    A.    Just more -- more credit.

24    Q.    So you can buy more cars that way?

25    A.    Yes.

EXHIBIT 11

Page 45

1     Q.   Okay.  And you said NextGear, but is

2   that -- did you have a separate line with NextGear,

3   or was that DSC just became NextGear?

4     A.   It was when NextGear -- actually, it was

5   DSC, MAFS, and then they combined.

6     Q.   Okay.

7     A.   I never had actually a NextGear account.

8   They were owned by NextGear.

9     Q.   So your DSC and MAFS lines were closed

10  before they joined and called it NextGear?

11    A.   They actually -- right the same year.   I

12  think they joined in 2012.

13    Q.   Sure.  But you -- you never had a line

14  called a NextGear line?

15    A.   No.  No.

16    Q.   All right.  And so when you use a floor

17  plan to buy at auction, I think you just said you

18  tell the finance person to put it on your line?

19    A.   M-hm.  Correct.

20    Q.   You have to tell them which, AFC --

21    A.   Yes.

22    Q.   -- DSC?

23    A.   Yes.

24    Q.   Okay.  And do they call right then, or do

25  you see how they interact with the floor planner to

EXHIBIT 11

1    Q.   Okay.  And actually, you know, I -- I

2  didn't see this a minute ago, but it -- how many

3  pages are in your document?  I'm sorry.

4    A.   I go all the way up to 4245.  I'm sorry.

5  Or 4 -- 452.  I'm sorry.  Looks like there's -- it's a

6  four-page -- four pages.

7    Q.   Okay.  And so, actually, if -- it looks like,

8  again, it's a composite exhibit.  If you -- if you go

9  back a couple of pages and there's MA 310 --

10   A.   Yeah.

11   Q.   -- and it looks like a fax cover sheet that

12 probably went with the statement that we just

13 looked at that's on 307, 308.

14   A.   M-hm.

15        MS. LASKY:  I'm sorry.  What -- is the

16 question --

17   A.   You'll have to repeat --

18        MS. LASKY:  -- whether --

19   A.   -- the question.

20 BY MR. MCCARTER:

21   Q.   Yeah.  And -- and I don't want to get

22 bogged down on this, but it looks like maybe it was

23 produced -- maybe produced out of order.  Looks

24 like 310, Page 310 might be the fax cover sheet

25 for 307 and -- through 309, because it's got the

EXHIBIT 11

Page 87

1    same date, it's got the fax number.

2        A.    Yes, that's possible.

3        Q.    Okay.  And -- no, let me step back.  310

4    looks like it might be a request from Ms. Mattingly

5    to fax the interest paid in 2009; do you see that?

6        A.    Yes.

7        Q.    Okay.  And so maybe this statement is

8    what was faxed back?

9        A.    Yes.

10       Q.    Okay.  All right.  So let's move on in that

11   same exhibit to Page 361.  It's the next page after

12   the cover sheet; do you see that?

13       A.    Yes.

14       Q.    Again, this was produced by you to us.

15   Do you know what this is?

16       A.    No, I don't.

17       Q.    Does it look like -- I mean, I see AFC in

18   the upper left-hand corner; do you see that?

19       A.    Yeah.  This is something from AFC,

20   apparently.

21       Q.    Okay.

22       A.    So you produced it to us, but it may not

23   have anything to do with DSC?

24       A.    No.

25       Q.    Okay.  All right.  Now, if we go on to

EXHIBIT 11

Page 88

1   Page 452 and 453, it's the last two pages in that

2   exhibit; do you see that?

3      A.   Yes.

4      Q.   And this document looks like it's called

5   "Receivable Detail Report"?

6      A.   Yes.

7      Q.   And it's got a date of 5/23/2012?

8      A.   Yes.

9      Q.   Do you have any sense of what this is and

10   what it shows?

11      A.   This is --

12         MS. LASKY:  Object to the form.

13      A.   This is the final -- this is the final cars

14   that we had with DSC.

15   BY MR. MCCARTER:

16      Q.   Okay.  And you -- you had possession of

17   this.  Do you recall how you got possession of it?

18      A.   I'm sure it was off the website.

19      Q.   Okay.  You know, it shows 120,311.28

20   outstanding at that point.  Do you see in the

21   middle?

22      A.   Yes.

23      Q.   Do you -- do you know whether Mattingly

24   ever paid that to DSC?

25         MS. LASKY:  Object to the form.

EXHIBIT 11

Page 89

1      A.    No.

2    BY MR. MCCARTER:

3      Q.    No, you didn't pay it?

4      A.    Did not; no.

5      Q.    Okay.  And however -- why did you not

6    pay it?

7      A.    Excuse me?

8      Q.    Why did you not pay that?

9      A.    These cars were involved in the

10   repossession.  Some of them were.  Some of them

11   were already paid off or sold.  Sorry.  Sold.

12     Q.    And so do you have some recollection

13   that some cars were resold and reduced that

14   amount?

15     A.    We had -- we had actually -- several of

16   these cars were ours that we paid off ourselves,

17   and some of them went to repossession.

18     Q.    Okay.  Do you recall whether there was a

19   deficiency on the repossessed cars?

20     A.    Yes.

21     Q.    And was that paid?

22     A.    No.

23     Q.    Okay.  All right.  At some point, I think

24   you said this already, DSC declared a default and

25   picked up cars?

EXHIBIT 11

Page 90

1    A.   Yes.

2    Q.   Okay.  And what's your recollection of --

3    of when that happened?

4    A.   May the 9th of 2012.

5    Q.   Okay.  Do you recall any discussions with

6    DSC at the time about why they did that?

7    A.   No, they did not.  No reason.

8    Q.   No reason.  Did -- did you have any

9    problems with MAFS around the same time?

10    A.   No.

11    Q.   No.  Did MAFS ever declare default?

12    A.   Yes, at the same -- they did it at the

13    same time.

14    Q.   Did they pick up cars?

15    A.   Yes.

16    Q.   Okay.

17    A.   No.  I -- no.  I only took one back to

18    them.

19    Q.   Okay.  So you voluntarily returned one to

20    MAFS after they declared a default?

21    A.   Yes, involuntarily [phonetic].  The

22    remainder of DCS, as well.

23    Q.   So DSC picked up some cars

24    involuntarily, you returned others?

25    A.   Yes.

EXHIBIT 11

1      Q.    Okay.   And both of those things happened

2    in May of 2012?

3      A.    Yes.

4      Q.    Okay.  Did you have any -- do you recall

5    whether the AFC line was still out -- or still

6    existing at that time?

7      A.    It was not.

8      Q.    Was not; okay.  Did you have any other

9    sources of inventory credit at the time?

10     A.    No.

11     Q.    Okay.  Had you heard anything from the

12   police, the -- the state police you talked about

13   before, before DSC declared its default?

14     A.    No.

15     Q.    Just as a general matter apart from DSC,

16   would you ever floor the same car more than once?

17          MS. LASKY:   Object to the form.

18     A.    Possibly.

19   BY MR. MCCARTER:

20     Q.    Okay.  In what circumstances would you

21   do that?

22     A.    If it was in my -- it was my name, I would

23   floor it for -- use the money.

24     Q.    You would floor it and use the money?

25     A.    Yeah.  Floor it, and -- and they would

EXHIBIT 11

Page 92

```
1    pay -- give me -- send me a  check or whatever.

2      Q.    So if -- was there ever a situation where

3    you bought it at auction, put it on a floor plan, and

4    then, at some point, you re-floored the same car

5    with another --

6      A.    Yes.

7      Q.    -- company?  When would that happen?

8      A.    If it ran over in time, and generally it was

9    done by Donna, or Lourdes would do it for me.

10     Q.    Okay.  And how did they value the car at

11   that time?  How much -- how did they value how

12   much to finance at that time?

13     A.    I --

14          MS. LASKY:  Object to the form.

15     A.    They would -- I guess they would use a --

16   they had a chart, or they had the auction ticket

17   where I purchased it.

18   BY MR. MCCARTER:

19     Q.    Okay.  Did you ever use the original

20   auction ticket to floor it a second time?

21          MS. LASKY:  Object to the form.

22     A.    No.  No, I don't believe so.  Unless it

23   was -- unless Donna changed the -- I think one

24   instance I just saw some of the paperwork where

25   Donna changed it from MAFS to DSC.
```

EXHIBIT 11

Page 93

1    BY MR. MCCARTER:

2      Q.   Did you ever sell a car at auction or

3    online, like on -- you know OVE, Online Vehicle

4    Exchange?

5      A.   M-hm.

6      Q.   Okay.  Did you ever sell a car at an

7    auction or on OVE to another dealer at a

8    pre-arranged price?

9           MS. LASKY:  Object to the form.

10     A.   No.

11   BY MR. MCCARTER:

12     Q.   Did you ever buy a car at an auction or on

13   OVE from another dealer at a pre-arranged price?

14     A.   Yes.

15     Q.   Okay.  When would that happen?

16     A.   I -- I don't recall dates.

17     Q.   And then did you ever put that car, those

18   cars on the floor plan?

19     A.   Yes.

20     Q.   With DSC?

21     A.   Yes.

22     Q.   Do you -- do you think that's proper to

23   finance a car like that with a floor plan?

24           MS. LASKY:  Object to the form.

25     A.   It would have to be, because they did it

EXHIBIT 11

Page 94

1    for me.

2     BY MR. MCCARTER:

3      Q.    Okay.   But in that situation, you're using

4    a pre-arranged non-auction price, and you're

5    representing to a floor planner that that's the

6    auction price; right?

7              MS. LASKY:   Object to the form.

8      A.    I'm not sure of your question, but I can

9    say that -- they would have to be a certain -- the --

10   the vehicle price would have to meet certain

11   guidelines, and that would be set by Donna, and

12   Lourdes would know that.

13   BY MR. MCCARTER:

14     Q.    Okay.   But if they're -- if they're typically

15   financing the auction price and relying on the

16   auction to set the value and you've preset that

17   value with a dealer unbeknownst to the floor

18   planner, would that be a misrepresentation to the

19   floor planner?

20             MS. LASKY:   Object to the form.

21     A.    No, because they -- they -- they wouldn't

22   allow an overpriced car on the floor plan.

23   BY MR. MCCARTER:

24     Q.    Okay.   How do you -- how do you know

25   that?   How do you know what DSC would finance?

EXHIBIT 11

Page 95

1    A.    Well, they'd have a -- they have

2    guidelines.  I -- I don't know their -- what they call

3    it.  Manheim has an MMR.  It's an average market

4    price of a vehicle.

5    Q.    Do you know for a fact that DSC used

6    that?

7    A.    No, I don't.  I'm -- I'm not sure what they

8    used.

9    Q.    Okay.  How often do you think that

10   happened where you would sell a car at an auction

11   on -- I'm sorry, buy a car at auction on an OVE at

12   a pre-arranged price?

13   A.    Oh, I --

14         MS. LASKY:  Object to the form.

15   A.    I don't have a number.  I don't have --

16   wouldn't have a number for you.

17   BY MR. MCCARTER:

18   Q.    More than ten?

19   A.    I'd say -- oh, yeah, possibly.  Ten or so.

20   Q.    Ten or so?

21   A.    M-hm.

22   Q.    Okay.  Did you ever -- while you were

23   with DSC, did you ever obtain duplicate titles?

24   A.    No.

25   Q.    Never?

EXHIBIT 11

Page 96

1    A.    No.

2    Q.    Okay.  Do -- do you have an

3    understanding what title washing is?

4    A.    No.

5    Q.    Okay.  Did you ever apply for or obtain a

6    title that removed an owner or a lienholder from

7    the titles without having paid off that owner or

8    lienholder?

9          MS. LASKY:  Object to the form.

10   A.    No.

11   BY MR. MCCARTER:

12   Q.    Okay.  During these de -- the default time

13   frame with DSC, did you close your line with them,

14   or did they close it?

15   A.    I guess they closed it, because they cut

16   us off with them a couple of weeks after that.

17   That -- that printout you had was for our last

18   statement.

19   Q.    Okay.  Did they leave you on sale only for

20   a little bit?

21   A.    No.

22   Q.    Okay.  What about MAFS, did you close

23   that, or did MAFS close it?

24   A.    Once we defaulted, I guess we both

25   closed it.  I -- there was no arrangement.  I just

EXHIBIT 11

1   was barred from the auction.

2      Q.   Okay.  You said you were barred from the

3   auction.  Which auction are you talking about?

4      A.   Manheim.

5      Q.   Okay.  And you had an understanding

6   prior to 2012 that MAFS was affiliated with

7   Manheim?

8      A.   Yes.

9      Q.   And was it your understanding that prior

10  to 2012 MAFS and DSC were not affiliated?

11     A.   Yes.

12     Q.   And so DSC was not affiliated with

13  Manheim?

14     A.   Yes, I believe so.

15     Q.   Okay.  So, prior to 2012, did you have

16  an understanding that DSC and MAFS were

17  competitors?

18     A.   Yes.

19     Q.   Okay.  Do you know whether DSC was

20  affiliated, like, connected by corporate ownership

21  with any particular auction company?

22     A.   No, I wouldn't have any idea.

23     Q.   Okay.  So around the time that DSC

24  declared its default, do you remember whether

25  they did a lot audit?

EXHIBIT 11

Page 128

1    and from MAFS in that May time frame.

2        A.   Yes.

3        Q.   Do you see that?

4        A.   Yes.

5        Q.   Do you recall -- since you produced them

6    to us, do you recall receiving all these letters

7    around that time?

8        A.   Yes.

9        Q.   Okay.  And a few of them are dated a

10   little later.  Like if you look at Man -- MA 120, you

11   know, it says --

12       A.   Yes, I'm looking -- yes.

13       Q.   -- it says July 24, 2012.  So you would

14   have received it on or about that date?

15       A.   Yes.

16       Q.   And that one, for example, is signed by

17   Donna Kronauer -- Kro -- that's the lady you spoke

18   about before as representing MAFS?

19       A.   Yes.

20       Q.   Okay.  Okay.  All right.

21       Now, excepting the very last two pages, which

22   are MA -- MA 131 and 132, do you recall receiving

23   the rest of those letters from DSC or MAFS as

24   indicated?

25       A.   31, 32?

EXHIBIT 11

Page 129

1    Q.   I'm sorry, except for 131 --

2    A.   Oh, I'm sorry.

3    Q.   -- and 132, did you receive the --

4    A.   Yes.

5    Q.   -- rest of them?

6    A.   Yes, yes.

7    Q.   Okay.

8    A.   I believe so; uh-huh.

9    Q.   And MA 131, 32 -- well, strike that.

10   MA 131 looks like a letter from your attorney

11   to DSC requesting information.  Do you see that?

12   A.   Yes.

13   Q.   And it's -- it's signed by Dwight Preston?

14   A.   Yes.

15   Q.   Is this the attorney you hired to deal with

16   the complaint?

17   A.   The -- the -- the original lawsuit in

18   Indiana?

19   Q.   Yeah.

20   A.   No.

21   Q.   Okay.  So you hired Mr. Preston after

22   that?

23   A.   Yes.

24   Q.   All right.  And is -- did you have a -- I

25   don't want to know the details of it, but did you

EXHIBIT 11

Page 130

1    have a relationship with him before that?

2      A.   Yes.

3      Q.   Okay.  Is he your general attorney?

4      A.   No.

5      Q.   Okay.  And so here you're asking for a

6    detailed analysis and accounting of the DSC

7    claim?

8      A.   Yes.

9           MS. LASKY:  Object to the form.

10     A.   Yes.

11   BY MR. MCCARTER:

12     Q.   Okay.  And is this something he did send

13   on your behalf on or about October of -- 17, 2012?

14     A.   Yes.

15     Q.   Okay.  The very last page of that exhibit,

16   MA 132, is a card for a Terry Dashner at DSC.  Do

17   you see that?

18     A.   Uh-huh.  Yes.

19     Q.   How did you have that card?  What does

20   that have to do with this?

21     A.   He had something to do with DSC.  I

22   remember the name, but I don't remember what he

23   did.

24     Q.   Okay.

25     Q.   All right.  And you had an understanding

EXHIBIT 11

1    that there was a judgement entered in that case

2    DSC filed against you?

3      A.    Yes.

4      Q.    Okay.  I'm going to show you what we're

5    going to call Defendants' Exhibit 15.  Sorry.

6    [WHEREUPON, document referred to is marked

7    Defendants' Exhibit 15 for identification.]

8    BY MR. MCCARTER:

9      Q.    This document, again, is a composite, but

10   it's -- it's sort of, basically, two copies of -- of the

11   judgement.  It's 34 of 33 -- I'm sorry.  Strike that.

12     It's NG 3433 through NG 3435, and then it's

13   MA 673 through MA 674.  And it looks like it's sort

14   of NextGear's copy of a judgement against you and

15   your copy of the judgement against you.  Does that

16   look right?

17     A.    Yes.

18     Q.    Okay.  And as we sit here today, have you

19   paid this judgement?

20     A.    No.

21     Q.    Do you have any intent to pay it?

22     A.    No, it was discharged at bankruptcy.

23     Q.    Okay.  We'll come to that in a minute, but

24   who filed bankruptcy?

25     A.    Barry Mattingly.

EXHIBIT 11

Page 132

1    Q.   And would --

2    A.   I did not -- huh?

3    Q.   Did your wife file with you?

4    A.   Yes.

5    Q.   Okay.  Did Mattingly Auto Sales pay --

6    A.   No.

7    Q.   Does Matting --

8         MS. LASKY:   Sorry.  What was your

9    question?

10   BY MR. MCCARTER:

11   Q.   Does Mattig -- did Mattingly Auto Sales,

12   Inc. file bankruptcy?

13   A.   No.

14   Q.   Okay.  Does Mattingly Auto Sales, Inc.

15   intend to pay this judgement?

16   A.   No.

17   Q.   Okay.  If Mattingly Auto Sales, Inc. were

18   to recover damages in this current case, do you

19   believe that it would be -- those will be offset by

20   the amount of that judgement?

21        MS. LASKY:   Object to the form.

22   A.   I wouldn't have any idea.

23   BY MR. MCCARTER:

24   Q.   Okay.  All right.

25   I'm going to show you what we're going to call

EXHIBIT 11

Page 133

1    Defendants' Exhibit 16.

2    [WHEREUPON, document referred to is marked

3    Defendants' Exhibit 16 for identification.]

4    BY MR. MCCARTER:

5      Q.   All right.  And this is Bates labeled

6    NG 8820 through 8895.  And I don't want to go

7    through these in detail.  I'll call your attention to

8    particular pages, but this would appear to be,

9    generally, the -- the bankruptcy papers that --

10   of -- of yours and your wife's bankruptcy file?

11   A.   Yes.

12     Q.   Okay.  And it looks like, from the top of

13   that, that that -- that this first document, the

14   petition, was filed in -- September 27, 2013.  Do

15   you see that?

16   A.   Yes.

17     Q.   Does that sound about right to you?

18   A.   About right.

19     Q.   Okay.  And when you signed these

20   bankruptcy papers, they were true, to the best of

21   your knowledge?

22   A.   Yes.

23     Q.   If you flip back to Page 8831 in there, in

24   Exhibit 16, do you see about halfway down there's

25   a list of a judgement in Hamilton Superior Court?

EXHIBIT 11

Page 134

1    Do you see that?

2       A.   Yes.

3       Q.   And that's the judgement DSC had against

4    you at the time?

5       A.   Yes.

6       Q.   And there's another judgement mentioned

7    in Breckinridge Circuit Court, Division 1, a civil

8    case right below that.  Do you see that?

9       A.   Yes.

10      Q.   Who -- who is that case?

11      A.   That was a -- like a Discover card.

12      Q.   Okay.  It's a -- a Discover card that went

13   unpaid?

14      A.   Yes, it -- it was in the bankruptcy.

15      Q.   And that was a personal Discover card?

16      A.   Yes.

17      Q.   Do you remember the amount of that

18   judgement?

19      A.   No.  It's -- it -- I'm sure it's listed here,

20   but I -- I don't remember it.

21      Q.   Okay.  And if we skip on back to

22   Page 8860 --

23      A.   Okay.

24      Q.   -- do you see that, it's called Schedule

25   F?

EXHIBIT 11

Page 146

1    Q.   Okay.  So seeing the date of this letter,

2  does that refresh your memory at all about when

3  you talked to Carol at Wolfe's?

4    A.   It would have been shortly there before,

5  yes.  So it -- it would have been a few -- I'm going

6  to say a few months before that.

7    Q.   Okay.  And you talked to Auction

8  Insurance Agency by phone somewhere between

9  those two dates?

10   A.   Right.

11   Q.   Okay.  And here he's -- he's suggesting

12 that it's your understanding that he's been -- you

13 know, that you've been advised that Manheim

14 Auctions is responsible for your placement on that

15 list of bidders that you're now calling the KO Book;

16 right?

17   A.   Yes, I believe it was mi -- one of the

18 Auction Insurance reps.

19   Q.   Okay.  And here he's describing that as a

20 list of bidders who are required to verify their

21 financial ability to purchase vehicles at auction.

22   A.   Yes.

23   Q.   And so he's -- neither he nor you are

24 really saying it's impossible for you to purchase at

25 auction.  You're just saying it's more difficult?

EXHIBIT 11

1    A.    No, it --

2          MS. LASKY:  Objection to form.

3    A.    I can purchase some -- I cannot purchase

4  at any Manheim.

5  BY MR. MCCARTER:

6    Q.    Okay.  And he says in the middle

7  paragraph that you believe it's in retaliation for

8  your bankruptcy filing, and then also for the

9  disposition of that GMC Sierra; right?

10   A.    Yes.

11   Q.    Do you know one way or the other when

12 you were put on the KO Book list?

13   A.    I wouldn't know that.  I do not know that.

14   Q.    Okay.  Did you get any response from

15 Manheim to this letter?

16   A.    No.

17   Q.    Did you send a copy of this letter to

18 DSC?

19   A.    No.

20   Q.    The documents that come after that in

21 that same exhibit --

22   A.    Uh-huh.

23   Q.    -- 7995 and the following --

24   A.    Yes.

25   Q.    -- do they relate to this letter in some

EXHIBIT 11

Page 148

1    way?  It's -- it's --

2       A.   Yes.

3       Q.   -- possible they were just produced in

4    that order, but --

5       A.   This is the -- the truck in question, the --

6       Q.   Okay.

7       A.   -- the -- back to 7996.  I believe this is

8    just -- and the following pages are all related to

9    that same vehicle.

10      Q.   Did you --

11      A.   79 -- wait a minute.

12      Q.   Go -- no, go ahead. Sorry.

13      A.   7975 is the receipt from the junkyard

14   where the au -- the truck ended up six days after I

15   returned it to Manheim.

16      Q.   Okay.  Do you think those documents, if

17   all were included in his letter?

18      A.   To be honest with you, I do not know that.

19   I don't know.

20      Q.   I mean, it does say [reads] I'm enclosing

21   here with a copy of the bill of sale of said vehicle.

22      A.   That -- that is possibly on 7995.  That's

23   where the bill of sale was --

24   well, both of them are actually bill of sale

25   possibly, but we did show where the ju -- the car

EXHIBIT 11

Page 149

1   was junked.  We don't know why.

2     Q.   Okay.  But do you -- do you know one way

3   or the other whether you had Pages 7996 and 7998

4   at the time you -- this letter was sent on your

5   behalf?

6     A.   No, I do not know.  I don't recall them,

7   but that's not to say we didn't have them.

8     Q.   Okay.  At or -- at or around the time that

9   DSC declared the default and -- and began to pick

10  up vehicles, were you part of any discussions with

11  DSC about the default?

12    A.   No.

13    Q.   Okay.  When -- when did you first learn

14  that DSC was declaring a default?

15    A.   When they came -- the day of the

16  repossession.

17    Q.   Okay.  And so if they had internal

18  discussions about that around that time, you

19  weren't a part of those.

20    A.   Right.  Correct.

21    Q.   Okay.  And have you ever seen any of

22  that described in writing?

23    A.   Not that I recall.

24    Q.   Do -- do you have any personal anger or

25  animosity at DSC for the default situation?

EXHIBIT 11

Page 150

1          MS. LASKY:   Object to the form.

2     A.   Well, if -- if I -- my -- my biggest thing, if

3     I was doing something wrong, I wish they had let

4     me know instead of swooping in one day and there

5     they are.

6     BY MR. MCCARTER:

7     Q.   Okay.   Did you ever apply for

8     reinstatement of your credit with DSC or

9     NextGear?

10    A.   No.

11    Q.   And that's fair enough, but what was the

12    reason that you didn't re-apply?

13    A.   I just didn't want to mess with it.   And I

14    didn't --

15    Q.   Okay.

16    A.   -- didn't want to mess with them.

17    Q.   So how did you become involved in this

18    litigation?

19    A.   An attorney from Louisiana contacted me

20    about it.

21    Q.   Without telling me the substance of that

22    conversation, who was that attorney?

23    A.   Hm.   I'm blank on her name.

24    Q.   Do you recall when you were contacted

25    about the current litigation you're being deposed

EXHIBIT 11

Page 151

1    in?

2        A.    Gee, this is about a year ago possibly, I

3    think.

4        Q.    Did you know Red Barn or any of the

5    other Plaintiffs in this case before that?

6        A.    No.

7        Q.    Have you talked to any of the other

8    Plaintiffs in this case?

9        A.    No.

10       Q.    So it looks like you, you know, had raised

11   this KO Book issue with at least Manheim in 2015.

12   Was that --

13       A.    Yes.

14       Q.    -- before or after the attorney from

15   Louisiana contacted you about this litigation?

16       A.    Before.

17       Q.    Okay.  Before that attorney contacted you

18   about this litigation, had you ever raised the issue

19   of when interest begins to accrue with DSC?

20       A.    No.

21       Q.    With NextGear?

22             MS. LASKY:  Object to the form.

23       A.    Re -- repeat that.  I'm sorry.

24   BY MR. MCCARTER:

25       Q.    Okay.  So be -- I think you said you were

EXHIBIT 11

Page 152

1    contacted about being involved in this case by an

2    attorney in Louisiana about a year ago.

3        A.    Uh-huh.

4        Q.    Okay.  Before that, had you ever raised

5    the issue or discussed the issue with DSC about

6    when interest begins to accrue on floor plan cars?

7        A.    I had --

8              MS. LASKY:  Object to the form.

9        A.    I had spoke with Lourdes and Donna on a

10   couple occasions about always looking to save

11   money, and I questioned particularly NextGear and

12   their charging interest two days before it

13   happened -- or two days with -- you know, we put it

14   on today; they already charged you two days.

15   BY MR. MCCARTER:

16       Q.    I think you said earlier that was MAFS;

17   right?

18       A.    MAFS.

19       Q.    Okay.

20       A.    And with Lourdes, it was always -- I was

21   always looking to cut -- you know, to save a dollar.

22   And I asked her -- because one -- an occasion, I --

23   I can't recall the exact vehicle or what happened;

24   but I got a vehicle -- like I say, I got a vehicle,

25   called -- got the -- I called to do -- pay the payoff,

EXHIBIT 11

1    and they still didn't have the title, but yet I was

2    charged.  I probably asked her for a deal --

3        Q.   Okay.

4        A.   -- but I don't remember.

5        Q.   And -- and that's those title-absent cars;

6    right?

7        A.   Yes.

8        Q.   Okay.

9        A.   That's when I was aware, because it --

10   it's -- DSC was different, because Manheim

11   actually had an office in their auction.

12       Q.   Yeah.

13       A.   Dealer Services did not.  They just had a

14   rep, so I didn't see much of anything like that.

15       Q.   Did that happen with MAFS, too?  I mean,

16   they would start charging interest when they didn't

17   have the title present yet?

18       A.   Yes.

19       Q.   And did that happen with AFC?

20       A.   That I do not know.  I'm -- I'm sure

21   they -- I'm sure they all work alike, but --

22       Q.   Okay.

23       A.   -- I do not -- don't recall anything about

24   AFC.

25       Q.   But in each of those cases, you had the

EXHIBIT 11

Page 204

1    about Auction Access?  Does that ring a bell?

2    A.   Oh, yes.  Yes.

3    Q.   Are these guys registered as reps for you

4    with Auction Access or directly at the auctions?

5    A.   Directly at auctions.

6    Q.   Okay.

7    A.   Mr. Barger was Auction Access, because

8    that's a Manheim -- that's a -- Manheim uses them.

9    So I know he --

10   Q.   Okay.

11   A.   -- was through Manheim.

12   Q.   Okay.

13   A.   But not now, of course.

14   Q.   Do you have any sense of how your

15   pre-2012 net income as Mattingly Auto Sales, Inc.

16   compares to other NextGear dealers pre-2012?

17   A.   No.

18   Q.   Do you have any sense of how your net

19   income compares to other NextGear dealers

20   since 2012?

21   A.   No.

22   Q.   Okay.  Did you ever have a transaction

23   with NextGear that you -- you had floored with

24   NextGear that had to be unwound and taken off the

25   NextGear line?

EXHIBIT 11

Page 205

1    A.    I'm sure that I have sometimes if there
2  was an arbitration issue on a car, but I don't
3  recall.
4    Q.    Okay.  So that would be a car you bought,
5  then you would take it back for arbitration, and
6  you would take it off the line somehow?
7    A.    Yes.  That -- that -- they would just ta --
8  call them and say we -- the car got turned back in.
9  And I don't believe they -- I -- I just don't believe
10  they even charged me fees.  I wouldn't -- wouldn't
11  swear to it, but I'm sure it's happened; just don't
12  recall.
13    Q.    Okay.
14          MR. MCCARTER:  Okay.  I'm done.
15          MS. LASKY:  I do have a few questions.
16          MR. MCCARTER:  Okay.
17          MS. LASKY:  Okay.
18  EXAMINATION
19  BY MS. LASKY:
20    Q.    Mr. McCarter was asking you about the
21  transactions between Breckenridge and Mattingly.
22  Do you recall that?
23    A.    Yes.
24    Q.    Okay.  The price that was assigned to the
25  transaction between Breckenridge and Mattingly,

EXHIBIT 11

Page 206

1    was that verified by Manheim or DSC in any way,

2    to your knowledge?

3        A.   Yes, they would -- yes.

4        Q.   And how was that?

5        A.   I -- I -- I wouldn't know.  They would -- if

6    it was -- I guess, if it was over what they called

7    the limit of value, they would let me know.

8        Q.   Okay.  Did they ever let you floor plan

9    anything that was over the limit of value?

10       A.   Yes, older cars were standard -- you

11   know, standard like that, like a -- say a -- as an

12   example, say a 1980 Chevrolet Ford that I pick up

13   today, it might have book value of a few thousand

14   dollars, but it might be worth 10.

15       Q.   And that was approved --

16       A.   Yes.

17       Q.   -- by Manheim?

18       A.   They always approved it; yes.

19       Q.   And then that was approved by DSC?

20       A.   Yes.

21       Q.   Okay.  Now, do you recall discussions

22   about the time of the repossession there was one

23   car that was sold but was not paid off to DSC in

24   time?  Do you recall those?

25       A.   Yes.

EXHIBIT 11

Page 207

1    Q.    What -- what can you tell us about that?

2    A.    Well, that was my mistake  and it -- it's

3  probably in this [sic] records.  And I -- I --

4  actually, let me look -- look it up and show it to

5  you.

6    The vehicle was purchased, sold to an ve --

7  an individual.  When -- when it came time at the

8  repossession, I had not paid it off because I

9  overlooked it, because the car was listed -- it was

10  a sport track.

11    And your -- guys are familiar with a sport

12  track, but it was listed as Explorer, which

13  technically it is an Explorer sport track.  And I just

14  overlooked it.  And that's the own -- you know,

15  that's -- that's what happened on that one.

16    Q.    Okay.  And do you recall the questions

17  about when you would receive title to a vehicle

18  that you paid for by cash or check at an auction?

19    A.    Yes.

20    Q.    And when you floor planned a car, did you

21  receive the title when you got the vehicle at the

22  auction?

23    A.    No.

24    Q.    Do you know who got the title?

25    A.    The floor plan company.

EXHIBIT 11

1    Q.    Okay.  Do you know when they got the

2    title?

3    A.    No, I don't have -- have that information.

4    I'm assuming they -- they would not -- if --

5    whenever the title came in, that day or later, they

6    would have to pay for it to receive the title, but

7    I'm not privy to that information of when and all

8    that.

9    Q.    Do you have any reason to believe that

10   the floor plan company would receive the title

11   before they paid for the car?

12   A.    No.

13   Q.    And does that apply whether it was a

14   title-absent car or a title that was --

15   A.    The same.

16   Q.    -- available -- sorry, or a title that was

17   available the -- the same day?

18   A.    I would not know; yeah.  I would assume

19   it would be the same.

20   Q.    Okay.  And when you sell a vehicle to a

21   customer or to an auction, what do you need to

22   give the customer or the auction in order for you

23   to get paid?

24   A.    Well, if -- typically, if I bought a car at

25   the auction and put it on floor plan or at auction,

EXHIBIT 11

Page 209

1    and I -- I would get the car, I -- if I sold the car, I

2    would not receive -- let's just say John Doe.

3       John Doe purchased the car from me.  And he

4    financed it at ABC Bank, and they approved the

5    loan.  I would have to pay off the vehicle at either

6    the auction or the floor plan company.  They would

7    send me the title.

8       And once I did put the lien and -- and all that

9    on the title and the transferred it with the

10   lienholder being ABC Bank, ABC Bank would issue

11   me a check.  So I would actually have to pay for

12   the vehicle before I received my money from the

13   bank.

14      Q.   Okay.  And would the money -- would

15   the -- in that instance, would the bank give you the

16   money without -- without receiving the title to the

17   car?

18      A.   No, no, not without a lien.

19           MS. LASKY:  That's all I have.

20           MR. MCCARTER:  I -- I did have one just

21   point of clarification on that.

22   RE-EXAMINATION

23   BY MR. MCCARTER:

24      Q.   So I think you said you -- you assumed

25   that the -- that the floor planner -- I'm sorry.

EXHIBIT 11

Page 210

1     Strike that.

2       When a car was sold title-absent, you

3     assumed that the floor planner would pay the

4     auction when the title came in; right?

5       A.    I believe so, yeah.

6           MS. LASKY:  Object to the form.

7     BY MR. MCCARTER:

8       Q.    Okay.  And that was kind of how it worked

9     with you, too; right?  You said if you're buying one

10    title-absent, you'd give them a check, and they

11    wouldn't drop it until the title came in.

12      A.    Correct.

13      Q.    Okay.

14          MR. MCCARTER:  No further questions.

15    Thank you.

16          MS. LASKY:  Okay.  Thank you.

17          THE WITNESS:  Okay.  No problem.

18    Thank you.

19    [WHEREUPON, the Deposition of Rule 30(b)(6)

20    Witness, Barry Wayne Mattingly on behalf of

21    Mattingly Auto Sales, Incorporated, concludes

22    at 1:07 p.m.]

23    .

24    .

25    .

EXHIBIT 11

```
 1                    C A P T I O N

 2          The Deposition of Rule 30(b)(6)

 3   Witness, Barry Wayne Mattingly, on behalf of

 4   Mattingly Auto Sales, Incorporated, taken in the

 5   matter, on the date, and at the time and place set

 6   out on the title page hereof.

 7             It was requested that the deposition be

 8   taken by the reporter and that same be reduced to

 9   typewritten form.

10             It was agreed by and between counsel

11   and the parties that the Deponent will read and

12   sign the transcript of said deposition.

13   .

14   .

15   .

16   .

17   .

18   .

19   .

20   .

21   .

22   .

23   .

24   .

25
```

EXHIBIT 11