Page 1

1             THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF INDIANA
2                  INDIANAPOLIS DIVISION
3    RED BARN MOTORS, INC.,        *
     PLATINUM MOTORS, INC., and    *
4    MATTINGLY AUTO SALES, INC.,   *
     individually and on behalf    *
5    of other members of the       *
     general public similarly      *
6    situated,                     *
                                   *
7        Plaintiffs,               *
                                   *
8    V.                            * Civil Action
                                   * No. 1:14-cv-01589-TWP-DKL
9                                  *
     COX ENTERPRISES, INC., COX    *
10   AUTOMOTIVE, INC., NEXTGEAR    *
     CAPITAL, INC., F/K/A DEALER   *
11   SERVICES CORPORATION,         *
     successor by merger with      *
12   Manheim Automotive            *
     Financial Services, Inc.,     *
13   and JOHN WICK,                *
                                   *
14       Defendants.               *
15
          ******************************************
16
                   ORAL DEPOSITION OF
17
                     DAN WOJCIK
18
                  FEBRUARY 10, 2017
19
          ******************************************
20
21
22
23
24
      Job No. CS2528453
25

EXHIBIT 2

Page 14

1    the actual date of accrual to get more of an

2    understanding of what the case was about.

3        Q.  Okay.  But as you said, you didn't make any

4    specific calculations or transaction-specific analysis

5    with this report?

6        A.  No, sir.

7        Q.  All right.  And then flipping back to the

8    documents relied on in your report, the next item was

9    Nextgear Demand Promissory Note, and it goes on with

10   several other loan documents.  Do you see that?

11       A.  Yes, sir.

12       Q.  Same sort of question there.  Was that specific

13   to one of the plaintiffs, or did you review those for

14   each plaintiff?

15       A.  It was specific.  I believe -- I don't have it

16   in front of me.  So I'm certain -- I looked at one that

17   was specific.

18       Q.  Do you recall whether it was Red Barn or one of

19   the --

20       A.  I don't.

21       Q.  Okay.  Let me show you what I premarked as

22   Exhibit 5.

23                  (Exhibit No. 5 marked)

24       Q.  And I'll represent to you that this is the set

25   of loan documents for Red Barn Motors that was attached

1  to plaintiff's amended complaint, and you can see that
2  from the pacer label at the top.  And if you flip to,
3  let's see, the last page of the note, which is Page 9 of
4  13 in the blue writing at the top.  Do you see this
5  (indicating)?
6            MR. COMAN:  When he says pacer, that's what
7  he means, the blue.
8       A.  I got it.
9       Q.  And there at the bottom you can see that the
10 dealer is Red Barn Motors, Inc.  Do you see that?
11      A.  Yes, sir.
12      Q.  So this is the loan package for Red Barn
13 Motors, Inc. that was attached to plaintiff's complaint.
14 I'll represent that to you.  Do you recall that this is
15 what you looked at in preparing your report?
16      A.  I don't recall.
17      Q.  Okay.  As you sit here today, do you see any
18 documents that you think are missing from this packet
19 compared to what you reviewed for your report?
20      A.  I looked at something that was called Reserve
21 Agreement, Advanced Schedules, Power of Attorney,
22 Individual Guarantees and ACH authorization requests,
23 which I do not see in here -- well, I guess the
24 individual guaranty is, yes, sir.
25      Q.  Okay.  But as we sit here today, do you -- you

1    can't say any more about exactly which copy or which

2    plaintiff that set of loan documents belonged to?

3         A.  Would you repeat that?

4         Q.  That was a bad question.  All right.

5              I'm trying to get some certainty around, you

6    know, which set of loan documents you looked at, and it

7    sounds like you can't tell me the answer to that.  Is

8    that right?

9         A.  Yes, I cannot.

10        Q.  Okay.  So at a high level, again, what role did

11   those loan documents play in preparing your report?

12        A.  To understand how the interest rates were

13   determined -- not interest rates, but the interest

14   accruals were determined, how it was calculated, the

15   definitions of advances, disbursements, liabilities,

16   those kind of things.

17        Q.  Would you say that's general background to your

18   opinions, or do you plan to express an opinion about

19   what's in those loan documents?

20        A.  You have to give that question to me again.

21   I'm sorry, I don't understand the question.

22        Q.  All right.  We'll go through your opinion in

23   more detail.  I just -- I guess I want to understand, do

24   you see your opinion as interpreting those loan

25   documents?

1      A.   Yes.

2      Q.   In what way?

3      A.   As to how interest is to be calculated, number

4  one.  What is an advance under the loans, and interest

5  rates as they apply to those calculations.

6      Q.   Okay.  So at a high level, your read your

7  opinion to go beyond industry practice and to speak to

8  exactly what the Nextgear loan document allow?

9           MR. COMAN:  Let me lodge an objection to

10  form.  Do you understand -- if you understand his

11  question --

12           THE WITNESS:  Right.  He's asking me if

13  I've got a legal opinion.

14      A.   I don't have a legal opinion, but it's based on

15  my experience over 40 years of how you calculate

16  interest.

17      Q.   What is based on that?  That -- your opinion

18  about whether Nextgear followed industry practices or

19  whether their loan documents allow what was alleged here?

20      A.   Whether they followed industry practices.

21      Q.   Okay.  So you're not opining on whether the

22  loan documents do or do not allow the alleged practices?

23      A.   Correct.

24      Q.   All right.  And then let's just move on down

25  the line.  The fourth -- excuse me, the third item,

1    documentary item relied on your report was the

2    declaration of Adam Galema.  And I'll just represent

3    there's a typo there.  G-a-l-e-m-a is his last name.

4    That is another document you relied on?

5         A.  Yes.

6         Q.  Okay.  Let me show you what I've marked as

7    Exhibit 8.

8                (Exhibit No. 8 marked)

9         Q.  Does this look like the declaration you

10   reviewed?

11        A.  Yes.

12        Q.  And at a high level again, how did you use this

13   in preparing your opinion?

14        A.  Limited.  Very limited.

15        Q.  Is it fair to say it was just background?

16        A.  Yes.

17        Q.  Okay.  Do you recall as you reviewed this

18   concluding that anything in here was particularly true or

19   untrue?

20        A.  No.

21        Q.  All right.  And then the last item mentioned in

22   your report as a documentary basis is a document Called

23   Master of Facility and Intercreditor Agreement.  I'm

24   going to show you what I've marked as Exhibit 9.

25                (Exhibit No. 9 marked)

Page 19

1          MR. MCCARTER:  And just for the record,

2    this is called a "Master Facility Intercreditor

3    Agreement," and it appears to be between the Dealer

4    Services Corporation, Manheim Automotive Financial

5    Services, Inc. and Manheim Auctions, Inc., and it's dated

6    June 17th, 2005.  Do you see that?

7          A.  Yes, sir.

8          Q.  And just out of paranoia, I'll also say it's

9    Bates labeled NG 5372 through 5380.  Do you see those

10   numbers at the bottom?

11         A.  Yes, sir.

12         Q.  Is this a document that you relied on?

13         A.  For background information.

14         Q.  And again, just for background information?

15         A.  Yes, sir.

16         Q.  Is there any part of your opinion that seeks to

17   speak to the legal effect of this document?

18         A.  I don't look at it from a legal effect.

19         Q.  Okay.

20         A.  No.

21         Q.  Okay.  So other than the documents we just

22   looked at, Exhibits 4, 5, 6, 7, 8 and 9 -- is that right?

23         A.  Yes.

24              MR. COMAN:  Well, hold on.  I think -- is

25   there a 6 and a 7?

1          MR. MCCARTER:  Did I skip some?

2          MR. COMAN:  Yes, I have -- I see 5, 8 and

3     9.  I do not see -- I think 6 and 7 --

4          MR. MCCARTER:  Can we take a very quick

5     break?

6              (Recess from 10:52 a.m. to 10:53 a.m.)

7     Q.  (By Mr. McCarter) So just to clarify, so I've

8     accidentally skipped Exhibit 6 and 7 so far.

9          So my question, Mr. Wojcik, is Exhibits 4, 5, 8

10    and 9 are the ones that we discussed being relied on in

11    your report.  Is that correct?

12    A.  Yes.

13    Q.  Okay.  And I know there was some uncertainty of

14    whether Exhibit 5 was the exact copy you looked at.

15    That's the loan documents.

16    A.  Correct.

17    Q.  Okay.  Other than those documents, do you

18    recall reviewing any other documents to prepare your

19    report?

20    A.  No.

21    Q.  Okay.  Were there any other facts or

22    assumptions outside these documents that you relied on in

23    preparing your report?

24    A.  No.

25    Q.  Okay.  Nothing represented to you by counsel in

Page 21

1   terms of a fact or an assumption?

2       A.  No.

3       Q.  And nothing represented to you by any third

4   party in terms of a fact or an assumption that underlies

5   your report?

6       A.  No.

7       Q.  Have you spoken at all with the plaintiffs in

8   the case?

9       A.  No.

10      Q.  Have you reviewed the deposition testimony of

11  the plaintiffs in the case?

12      A.  No.

13      Q.  We'll come back to the details of the opinion.

14  But is -- were the depositions of the plaintiffs

15  something that you would have liked to have seen or that

16  you would typically rely on in a case like this?

17      A.  No.

18      Q.  All right.  So let's move back to your CV,

19  which is Exhibit 3.  Do you have that in front of you?

20      A.  Yes, sir.

21      Q.  Okay.  So tell me what your occupation is now.

22      A.  Occupation is as a consultant doing

23  predominately expert witness litigation work.

24      Q.  Okay.  And so at present you're a professional

25  expert?

Page 22

1        A.   Correct.

2        Q.   Okay.  And what type of cases do you generally

3    testify in?

4        A.   Many of them are lender liability suits, some

5    are depository -- lender liability and depository cases.

6        Q.   Okay.  And how long have you been providing

7    expert testimony?

8        A.   Since 2006, so 11 years.

9        Q.   The CV suggests you've done bank consulting in

10   the same period.  Do you see that?

11       A.   Yes, sir.

12       Q.   And that's outside of your testimonial work?

13       A.   Yes, sir.

14       Q.   What kind of bank consulting do you do

15   generally?

16       A.   Generally loan reviews is part of it, going in

17   and reviewing a portfolio of bank.  Some of it is

18   employee training, loan officer training.  But the bulk

19   of it is -- was helping to turn around banks that were

20   placed under regulatory order by either federal

21   regulators or state bank departments.

22       Q.   Okay.  Just at a high level, who are the

23   federal regulators for banks?

24       A.   Office of Comptroller of Currency, Federal

25   Reverse, Federal Deposit Insurance Corporation are the --

Page 23

1    and FDIC, Federal -- did I say that?

2        Q.   You said the Federal Deposit Insurance

3    Corporation.

4        A.   FCC, FDIC and Federal Reserve Bank.

5        Q.   And at the state level, generally who regulates

6    banks?

7        A.   State Bank Departments.  Each state -- I

8    believe each state has their own state bank department

9    that reviews banks.

10       Q.   Okay.  And is it your understanding that the -

11   I'll call it the principal defendant in this case -

12   Nextgear Capital, Inc. is a used car floor plan lender?

13       A.   It's my understanding, yes, sir.

14       Q.   And do you know, as we sit here today, whether

15   they are regulated by any of those groups that regulate

16   banks?

17       A.   I don't know.

18       Q.   Okay.  Do you have any understanding of whether

19   they are a bank?

20       A.   No.

21       Q.   No they're not, or no you don't --

22       A.   I don't know.

23       Q.   Okay.  All right.  And is it -- I don't want to

24   go through these in details.  Is it fair to say most of

25   your experience with lending and credit has been in a

Page 24

1    bank capacity?

2         A.   Yes, sir.

3         Q.   Okay.  And in those various roles that are on

4    your CV with banks, what type of loans and credit have

5    you been involved with, generally?

6         A.   Generally every aspect of banking I've been

7    involved with in lending, from customer loans to

8    international financings, commercial banking, automobile

9    dealers, fast food franchises, manufacturers,

10   distributors, wholesalers, contractors, retailers.

11        Q.   Okay.  And have you been involved in sort of

12   what I call the different sides of that, origination,

13   monitoring, collection, underwriting?

14        A.   All of the above.

15        Q.   All of the above.  Okay.  What -- you mentioned

16   consumer loans.  At a high level, what are some of the

17   types of consumer loans you've been involved in?

18        A.   Automobile financing, various installment

19   loans, home improvement, mortgage lending, automobile

20   dealer indirect lending, floor plan lending, financing

21   expansions, facilities, equipment.  I think that probably

22   covers most all of it, I believe.

23        Q.   And just to be clear, it sounds like some of

24   that may have morphed into commercial lending.  Right?  I

25   mean, you mentioned automobile financing and installment

Page 25

1    loans and mortgages.  But then when we talk about

2    indirect lending and floor planning, those would be

3    commercial loans, wouldn't they?

4         A.  Well, indirect lending would not necessarily be

5    commercial.  But it did morph into commercial.  My answer

6    was right.

7         Q.  Okay.

8         A.  Sorry.

9         Q.  That's all right.  And then you said

10   international banking.  High level, what does that mean?

11        A.  Financing, banks in foreign countries and

12   governments, predominately, and foreign trade between the

13   U. S. and various countries.

14        Q.  Okay.  And you mentioned fast food franchises.

15   Is that the acquisition of the franchise that would be

16   financed or inventory and equipment lending after that or

17   both?

18        A.  Both.

19        Q.  Both?  Okay.  You mentioned financing of

20   wholesalers and retailers.  Is that specific to

21   automobiles or is that more broad than that?

22        A.  Wholesalers could be distributors of equipment,

23   manufacturing equipment.  Equipment to retailers,

24   distributors of wholesale items between companies.  Gosh,

25   it's all over the place.

1      Q.  Okay.  And in some of those cases where you're

2   financing equipment or inventory, those are commercial

3   secured loans?

4      A.  Yes, sir.

5      Q.  And by secured, we both understand that that

6   means that there's some collateral that supports the

7   obligation and can be collected upon if there's a

8   default?

9      A.  Yes, they can repossess and liquidate it on a

10  default, the equipment or inventory or warehouse

11  receivables.

12     Q.  Okay.  And does that ability in your experience

13  generally make the loan more or less safe?

14              MR. COMAN:  Objection; form.  You can

15  answer.

16     A.  Well --

17              MR. COMAN:  If you understand --

18     A.  -- safer than being unsecured.

19     Q.  Okay.  So it's always a good thing to have

20  collateral if you can get it?

21     A.  Yes, sir.

22     Q.  Okay.  Good.  All right.  So let's turn

23  specifically to automobile financing.  So when you've

24  done consumer automobile financing in your bank roles,

25  what does that look like?  Are we talking loans to

Page 35

1        Q.   Okay.  And sometimes it could be broader than

2   that, the receivables and other assets?

3        A.   Including receivables.  You're talking about

4   inventory loan.

5        Q.   And you mentioned the UCC earlier.  What is the

6   point of the UCC in that?

7        A.   Put it out in the public record that the

8   lender, in this case banker or whoever, has a lien on

9   that inventory, and that anybody that wants to have a

10  lien on it can find out that if they get a lien, it's

11  going to be second behind the primary lender.

12       Q.   And that's important to perfect the security

13  interest?

14       A.   Perfect the security interest.

15       Q.   Okay.

16       A.   Make it a public notice.

17       Q.   Okay.  Do you -- when you were doing or

18  involved with inventory floor planning, was there a most

19  important type of collateral that you were concerned

20  about?

21            MR. COMAN:  Objection; vague.

22       A.   That's -- I can't answer that.

23       Q.   Okay.

24       A.   I mean, be more specific.  I maybe could.

25       Q.   Sure.  In the event of a default, which

Page 36

1    collateral was most likely to be useful to you as a floor

2    planner?

3        A.  Well, the vehicles that are on the floor.

4        Q.  All right.  So -- yeah, specifically the ones

5    you financed.  Right?

6        A.  Right.

7        Q.  And why is that, at a high level; why is that

8    the most likely source of recovery for collateral?

9        A.  Because that's what you financed.

10       Q.  So you might -- sorry, go ahead.

11       A.  I'm not sure where you're going with it.

12   You're financing inventory; the primary concern is that

13   inventory.

14       Q.  Right.  So that's certainly collateral you know

15   the dealer has.  Right?

16       A.  Yes.

17       Q.  And that's collateral you might be holding the

18   title to?

19       A.  Yes.

20       Q.  Right?  And that's collateral you might have

21   priority on under the law?

22       A.  Yes.

23       Q.  And so it would matter to you as a floor plan

24   lender if those vehicles you financed disappeared from

25   the dealer's lot without payment?

Page 37

1      A.   Correct.

2      Q.   All right.  When you were involved in floor

3  planning in your role at these banks, would you typically

4  directly fund the seller or would you fund through the

5  dealer?

6      A.   Define to me what a seller is.

7      Q.   Okay.  So let's just take automotive floor

8  planning, as an example.  If a dealer wants to buy a car

9  and put it on his floor plan with your bank, who would

10  you typically advance funds to?

11      A.   If it's the manufacturer, to the manufacturer.

12      Q.   What if it's not; what if it's anther dealer or

13  to an auction or something like that?

14      A.   To the auction house.

15      Q.   So typically you would direct fund the seller,

16  then, not your borrower?

17      A.   Correct.

18      Q.   Was that always the case, or did you sometimes

19  fund your borrower?

20      A.   I don't recall.

21      Q.   Okay.  When you mentioned manufacturers, does

22  that mean you're involved in new -- new car floor

23  planning?

24      A.   Sometimes.  Not typically, though.  Actually, I

25  have to answer that two ways, I guess.  Years ago it was

Page 38

1    common to finance new car purchases for dealers, but that

2    changed over the years.  And now it's typically the

3    manufacturers do the financing of the floor planning.

4    And lenders, third-party lenders, like banks, aren't

5    doing it much anymore.  So at the end I'd have to say no,

6    did not finance new cars.  It was predominately used

7    cars.

8        Q.  Okay.  And in your experience and at a high

9    level, was there a typical difference in the procedures

10   of new car floor planning and used car floor planning?

11       A.  Mechanically, or --

12       Q.  Yeah.  Operationally, like how you got the

13   money to the right place and how you get the title and

14   the security set up, was there any difference?

15       A.  No.

16       Q.  Okay.  All right.  At a high level, what --

17   what sort of percentage of your time and your experience

18   in banking has been focused on automotive floor planning,

19   versus other types of loans and credit?

20       A.  I really couldn't answer that.

21       Q.  Okay.  Is there a difference in your mind

22   between a loan and credit?

23       A.  Yes.

24       Q.  What's the difference?

25       A.  A credit is -- well, I guess you have to define

Page 39

1   it for me to tell -- I -- it could be the same, it could

2   be different.

3       Q.  Okay.  Well, you -- I'm really just asking

4   about your experience.  But you said in your mind there

5   is a distinction, and I want to know what is --

6       A.  In my mind the distinction is a loan is to

7   actually fund money out to somebody.  A credit is

8   providing them with the potential to loan them money in

9   it the future.

10      Q.  Okay.  What about that scenario we talked about

11  where the dealer retails a car under an installment

12  contract, lets the car out and takes payments and

13  interest on that, is that a loan or is that credit?

14      A.  That's a loan.

15      Q.  Okay.  Even though the dealer is not conveying

16  any money, that's a loan?

17      A.  Well, physically he's not, but technically he

18  has.

19      Q.  Okay.  And we've talked about a lot of

20  different kinds of loans and credit.  In your experience,

21  are those typically documented with a contract between

22  borrower and lender?

23      A.  Absolutely.

24      Q.  And so the terms of that contract would be

25  pretty important in figuring out what the procedures and

Page 40

1  obligations are on each side?

2              MR. COMAN:  Objection to form.  You can

3  answer.

4       A.  Yes.

5       Q.  And at a high level -- and I'll apologize if we

6  covered this, but at a high level, why does a lender

7  engage in a floor plan?

8       A.  Make money for the bank, for the lender.

9       Q.  And that happens in the form of interest and

10  fees?

11      A.  Interest and fees they receive.

12      Q.  And at a high level, what's the benefit to a

13  dealer of engaging in a floor plan with a lender?

14      A.  The ability to purchase automobiles or vehicles

15  to put on his floor plan.

16      Q.  Without using his own money?

17      A.  Correct.

18      Q.  And to be able to sell those and hopefully make

19  a profit on them?

20      A.  Correct.

21      Q.  So at a high level, the dealer gets the

22  inventory and the lender gets the interest and fees?

23      A.  Correct.

24      Q.  I'm going to look quickly at your articles that

25  are on your CV.  I don't know if you want to flip to

Page 41

1    Page 3.
2        A.  Yes.
3        Q.  I couldn't find all of these.  So the first
4    one, "Profit Is an Illusion, Cash Flow is Fact," do you
5    see that one?
6        A.  Yes.
7        Q.  It was published by Community Bank, winter of
8    2006?
9        A.  Yes.
10       Q.  Just tell me, at a high level, what was the
11   theme and the point of that article?
12       A.  Based on 11 year recollection, I believe it was
13   about how lenders too often look at what is the profit on
14   a financial statement versus the actual cash flow that
15   the company receives, and that you get misled by profits.
16   And that was probably the extent of the article.
17       Q.  Is that the bank being misled by the profits of
18   its borrower or of its own profits?
19       A.  Of its borrower.
20       Q.  So what's important to the lender is the cash
21   flow of the borrow?
22       A.  Right.  The cash flow and the ability to repay
23   the debt.
24       Q.  To service the debt payment?
25       A.  Yes, sir.

Page 45

1    quickly.  But can you just tell me your recollection of

2    the subject of your opinion in each of those cases?  And

3    we'll start with the first one, Technology Partners.

4         A.  I'm going to go from recollection, because I

5    haven't reviewed these in years.  But I think that was a

6    depository issue, a defalcation by the depositor.

7         Q.  Okay.  How about --

8         A.  Farm Fresh Producers had to do with catfish

9    farming in southeast Arkansas, and that was a lender

10   liability issue.  Liberty Bank of Arkansas, I think that

11   was a lender liability.  Regions bank versus Tri-Eagle

12   Enterprises was a lender liability case.  Badger Capital

13   was a lender liability case.  Stokes versus Southern

14   States was a lender liability case.  Renasant Bank is a

15   lender -- I guess it's a public record now, isn't it?

16   It's a fiduciary -- it's not a lender liability.  I'm

17   trying to think how you would call it.  I guess it's a

18   fiduciary defalcation case.

19        Q.  And that's the one that's current, Renasant

20   Bank?

21        A.  Yes, sir.

22        Q.  You've testified in the case in a deposition,

23   but the matter still is pending?

24        A.  Yes.  I think it's going to trial in April.

25        Q.  Okay.  All right.  And in any of these cases,

Page 46

1    to you recollection, have you had your opinion stricken

2    or not allowed to be put before the trier of fact?

3         A.  The Regions bank versus Tri Eagle.  Is it that

4    one?  I think -- it was that -- I believe it was that

5    one, but then it was overturned by the Arkansas appellant

6    court.

7         Q.  So the trial court precluded your opinion, and

8    the appellant court allowed it back in?

9         A.  Yeah.  But I don't know what happened to the

10   case after that.

11        Q.  Okay.

12        A.  I think the case was dropped because the

13   plaintiff ran out of money.

14        Q.  And among these cases, that's the only one you

15   can recall where your opinion was formally challenged?

16        A.  Yes.

17        Q.  And are there any older cases not on this list

18   that you can think of where your opinion was challenged?

19        A.  No, there was none.

20        Q.  And I'm not holding you to the description of

21   each of these cases with this term, but you said lender

22   liability a lot, so what do you mean by lender liability?

23        A.  Well, lender liability would be a situation

24   where the borrower brought a lawsuit against the lender

25   for improper actions by the lender.

Page 47

1      Q.  Okay.

2      A.  Could have been either by the loan structure or

3   the collection of the loan or handling of the loan by the

4   lender.

5      Q.  In each of those cases, are you representing

6   the borrower or sometimes the lender?

7      A.  I'll have to think about that one.

8      Q.  And when I say representing, I mean opining on

9   behalf of.

10     A.  Yeah, I understand.  Ask the question, now that

11   I've --

12     Q.  On any of these cases on Page 4 of your CV are

13   you representing the lender?

14     A.  No.

15     Q.  And so in each case it involves lender

16   liability or defalcation, you're representing the

17   borrower?

18     A.  Yes.

19     Q.  And again, for clarity, I mean opining for the

20   borrower?

21     A.  Yes.

22     Q.  Okay.

23              (Discussion off the record)

24     Q.  All right.  I'd like to call your attention

25   back to Exhibit 2, which is the summary of your opinion.

Page 48

1    Do you see that?

2          A.   Yes.

3          Q.   Okay.  I just want to reconfirm one more time

4    that this is a full and complete summary of the opinion

5    you expect to give in this case.

6          A.   Yes.

7          Q.   Okay.  So in this document, you mentioned the

8    four specific underlying documents you looked at, and

9    then you also reference your experience as a bank

10   executive loan officer and bank turnaround specialist.

11   Do you see that?

12         A.   Yes.

13         Q.   And that's the basis of your opinion?

14         A.   Yes.

15         Q.   Okay.  Did you review any treatises on floor

16   plan lending or otherwise to form this opinion?

17         A.   No.

18         Q.   Have you in the past reviewed treatises on

19   floor plan lending?

20         A.   I'm sure I have, but I don't recall what they

21   were.

22         Q.   As we sit here today, don't recall when or what

23   they were called?

24         A.   No.

25         Q.   Is it fair to say it's been more than a few

Page 49

1   years?

2        A.  Yes, sir.

3        Q.  Is it fair to say it's been more than ten

4   years?

5        A.  Yes, sir.

6        Q.  Okay.  In that regard, are you up to speed on

7   sort of current technology among floor plan lenders and

8   how loan information is conveyed online, payments are

9   taken electronically through ACH and that sort of thing?

10       A.  Specific to floor plan lending?

11       Q.  Yes.

12       A.  No.

13       Q.  So when -- let's -- in your capacity as a bank

14  officer or personnel, when was the last time you recall

15  actually being involved with floor plan lending for

16  automotive dealers?

17            MR. COMAN:  Objection to form to the extent

18  involved that can be further defined as opposed to

19  experience on hand versus consulting.

20       Q.  Okay.

21       A.  You'd have to ask it whether you're asking that

22  directly, whether I was involved directly, or --

23       Q.  Yeah, let's do both.  Okay.  So when was the

24  last time as a lender or a bank officer or personnel that

25  you were directly involved in automotive floor plan

Page 50

1   lending?

2       A.  Prior to 2006, I believe.  I'd have to look at

3   my resume again.  Prior to 2006.

4       Q.  Okay.  On your CV, the -- sort of the last

5   chronologically time that you mentioned floor plan

6   lending is in your role as senior vice president at

7   Mercantile Bank from 1997 to 2000.  Do you see that?

8       A.  Yes.

9       Q.  Okay.  So when -- in that role -- it mentions

10  dealer financing and floor plan lending.  Do you see

11  that?

12      A.  Yes.

13      Q.  So were you directly involved in structuring

14  those loans and dealing with borrowers in that role?

15      A.  Yes.

16      Q.  Okay.  And in your later roles as president of

17  National Bank of Arkansas, executive vice president of

18  Bank of England and then at Parkway Bank, were you

19  directly involved with floor plan lending?

20      A.  Yes.

21      Q.  In which of those positions?

22      A.  At least through Bank of English and National

23  Bank of Arkansas.  I can't remember with Parkway Bank.

24      Q.  Okay.  With Bank of England, do you recall how

25  many automotive dealers the bank financed in a floor plan

Page 51

1    format?

2         A.   No, I don't recall.

3         Q.   Would you say it was less than 50 or more than

4    50?

5         A.   Oh, yes, less.

6         Q.   Would you say it was less than ten?

7         A.   Yes.

8         Q.   Less than five?

9         A.   I can't recall.

10        Q.   And so would these typically be local dealers

11   near the bank?

12        A.   Yes.

13        Q.   Is the same true in your role at National Bank

14   of Arkansas?

15        A.   Yes.

16        Q.   So it would be a handful of local dealers?

17        A.   Yes.

18        Q.   And then going further back with Mercantile

19   Bank, '97 to 2000, same issue, a handful of local

20   dealers?

21        A.   They were all over the state.  I could not tell

22   you how many there were.

23        Q.   Again, less than 50?

24        A.   Probably.

25        Q.   Okay.  In any of these roles on your CV, do you

Page 52

1   recall ever working with more than 25 dealers at the same
2   time?
3        A.   No.
4        Q.   Okay.  Do you recall ever working with more
5   than ten at the same time?
6        A.   Probably at National Bank of Arkansas, I'm
7   sure.
8        Q.   Okay.  Okay.  And apart from the general bank
9   regulators and regulations we talked about, are you aware
10  of any regulations, state or federal, that are specific
11  to automotive floor plan lenders?
12       A.   No.
13       Q.   Other than some of the banks you've worked
14  with, who are other used car automotive floor plan
15  lenders that you know of?
16       A.   Your client.  And I think there's a -- I think
17  there's a competitor client -- competitor lender probably
18  in the same area of Indianapolis.  I don't remember the
19  names of them.
20       Q.   So the first -- you're referring to my client,
21  Nextgear Capital?
22       A.   Yeah.
23       Q.   And they were formerly known as Dealer Services
24  Corporation.  Is that your understanding?
25       A.   Yes.

Page 53

1    Q.  I'll represent to you that's the case.  You

2  refer to DSC in your opinions --

3    A.  Right.

4    Q.  -- so I want to confirm we're talking about the

5  same entity.

6    A.  Yes.

7    Q.  And then the competitor that you're aware of in

8  Indianapolis, you don't remember the name?

9    A.  No.  The reason why I say that is my nephew

10  works for them, and I think they're in Carmel, Indiana,

11  which is a suburb of Indianapolis.

12    Q.  As you we sit here today, do you know the names

13  of any other nonbank floor plan lenders?

14    A.  No.

15    Q.  Do you have any idea how many there are?

16    A.  No.

17    Q.  You can't say whether it's dozens or hundreds

18  or less?

19    A.  No.

20    Q.  It sounds like you spent a lot of time working

21  with turnaround of financial institutions and regulatory

22  orders of banks.  Is that right?

23    A.  Yes.

24    Q.  And in those roles, at a high level, how big a

25  role does floor plan lending play for those banks?

Page 54

1        A.   Small.

2        Q.   Okay.   It's just usually one piece of a little

3    portfolio?

4        A.   A piece of a portfolio.

5        Q.   A little piece of a portfolio?

6        A.   Yes.

7        Q.   Sorry.   I got the modifier in the wrong place.

8             All right.   You say, and I'm looking at the

9    third paragraph of your opinion, "In developing this

10   opinion, I've reviewed the following documents, relied on

11   my knowledge of standard and commonly accepted lending

12   practices and my experience as a bank executive loan

13   officer and bank turnaround specialist."

14             Do you see that?

15       A.   Yes.

16       Q.   Okay.   Where do these standard and

17   commonly-accepted lending practices come from?

18       A.   From my experience.

19       Q.   Okay.   But there's not -- as we sit here today,

20   there's not a treatise or regulation you can think of

21   where I would find those?

22       A.   Not that I'm aware of.

23       Q.   Okay.   You mentioned before that, you know, the

24   legal agreement and contract on the loan can specify the

25   terms between the borrower and lender.   Right?

Page 55

1      A.  Yes.

2      Q.  Okay.  Is it your understanding or experience

3  that the -- that any standards can be varied by agreement

4  among a borrower and a lender?

5      A.  I don't know.

6      Q.  Okay.  All right.  And I just want to confirm

7  the compensation you list here, let's see, one, two,

8  three, four paragraphs down, that's still accurate?

9      A.  Yes, sir.

10      Q.  All right.  So under, "My opinion," it says,

11  "It is standard industry lending practice to charge

12  interest to borrowers for using money actually borrowed."

13  Do you see that?

14      A.  Yes.

15      Q.  So define for me exactly what industry you're

16  talking about there.

17      A.  The lending industry.

18      Q.  Lending as a whole?

19      A.  Yes.

20      Q.  Even though we talked about all kinds of

21  different commercial and consumer loans, different format

22  types, you think that opinion applies to the whole

23  industry?

24      A.  Yes.

25      Q.  Okay.  And we talked about credit and lending.

Page 56

1    And does that apply to both of those, both a -- strike

2    that question.

3            We talked about credit and loans.  Does your

4    opinion apply to both?

5        A.  Those are two different things.  Loans are

6    disbursement of monies.

7        Q.  Okay.

8        A.  Credit is -- is a future activity.  So interest

9    does not accrue on a future activity until that takes

10   place.  I don't understand your question, I guess.

11       Q.  Okay.  Well, presumably if your opinion is that

12   it's standard industry lending practice, then that

13   practice would apply to lenders.  Right?

14       A.  Right.

15       Q.  Would that standard apply to creditors?

16       A.  They lend money, yes.

17       Q.  Okay.  If they release goods on credit, does it

18   apply to them?

19       A.  Yes.

20       Q.  Okay.  So even when you release a good and you

21   don't extend any money, you can't charge interest on it?

22       A.  Well, you effectively lent the money to

23   purchase that good.

24       Q.  Okay.  But in those cases, you can begin

25   charging interest?

Page 57

1          MR. COMAN:  I'm going to object to

2    vagueness.  I'm not sure --

3        A.  Yeah, I'm not sure of your question.

4        Q.  We used the example of the automotive dealer

5    before, that if he releases a car to a consumer without

6    present payment for that car and charges interest and

7    fees for that, is that against standard practice?

8        A.  No.

9        Q.  Okay.  So in that case, he's able to change

10   interest for the use and release of the car to the

11   consumer?

12       A.  You have to be much more specific with me on

13   this one.

14       Q.  Okay.  So we went through the example of a --

15   of an installment sale on a car to a consumer.  Do you

16   remember that?

17       A.  Uh-huh.

18       Q.  In that case the dealer is releasing the car

19   for the consumer's use, and then he's going to get paid

20   over time the principal and interest.  Right?

21       A.  Right.

22       Q.  And he hasn't actual delivered any money to the

23   consumer.  Right?

24       A.  Right.

25       Q.  But he is able to charge interest for the use

Page 63

1      Q.  And that's kind of what we're talking about

2  here?

3      A.  Yes.

4      Q.  And again, to me equipment is a term of art,

5  but we're talking about inventory, as well.  Right?

6      A.  Correct.

7      Q.  All right.  On the top of the second page of

8  your opinion, and again, we're looking at Exhibit 2, you

9  lay out what you say are three variables to determine the

10 amount of interest.  Do you see that?

11     A.  Yes, sir.

12     Q.  And those are the interest rate, the amount

13 borrowed and the specific number of days or time the

14 money has been borrowed.  Do you see that?

15     A.  Yes.

16     Q.  Are those the only three possible variables?

17     A.  Yes.

18     Q.  And is it your belief that that can't be varied

19 by agreement between the borrower and the lender?

20     A.  I guess it could.

21     Q.  Just, for example, if the borrower agreed to

22 pay fees and agreed that the lender could run interest on

23 those fees, then that would be another variable?

24     A.  Well, fees is distinct from borrowing money

25 directly.  But I guess you could charge interest on fees

Page 64

1    that are delinquent.

2         Q.  You could finance the fees.  Correct?

3         A.  Correct.

4         Q.  So that could be another variable, the amount

5    of fees, if the parties agreed?

6         A.  Well, that would be in the amount borrowed.

7         Q.  What about -- what if the parties agreed on a

8    grace period, would that be a variable?

9         A.  I guess they could agree to anything.

10        Q.  Okay.  The next sentence at the top of

11   paragraph -- I'm sorry, top of section -- strike that.

12             The next sentence, the top of Page 2 says, "The

13   effective date to begin calculating interest cannot be

14   determined until the transfer is actually made."  Do you

15   see that?

16        A.  Yes.

17        Q.  But again, the parties could agree on a

18   different effective date.  Right?

19        A.  Yes.

20        Q.  I mean, it could be to the borrower's benefit;

21   we could agree to a week grace period and then we'll run

22   interest from the eighth day.  Right?

23        A.  Yes.

24        Q.  Okay.  The next sentence in that paragraph

25   says, "If no money is physically transferred or lent,

Page 65

1   then the borrower obviously cannot use the money and

2   should not be charged interest."  Do you see that?

3        A.  Yes.

4        Q.  But in the example we went through before, the

5   borrower does have the use of the car as inventory.

6   Right?

7        A.  Yes.

8        Q.  And that is the main benefit to the borrower

9   under the floor plan.  Right?

10        A.  Yes.

11        Q.  Moving on to the next paragraph that starts

12   with, "Interest should," I'm skipping to the last

13   sentence there, you say, "Such a guarantee of floor plan

14   fee is entirely independent of interest, which is a

15   charge for the use of money actually disbursed or lent."

16   Do you see that?

17        A.  Yes.

18        Q.  Do you still believe that to be true?

19        A.  Yes.

20        Q.  Okay.  So what's -- you said actually disbursed

21   or lent.  What's the difference in those two?

22        A.  Well, they're the same thing.

23        Q.  Okay.  So you could have just stopped after

24   actually disbursed?

25        A.  Correct.

Page 66

1        Q.  Okay.  The next sentence on the third paragraph
2    down, it says, "It is not common or an accepted lending
3    industry practice to charge interest on monies that have
4    not been actually advanced, disbursed or lent for the
5    benefit or use of the borrower or third party."  Do you
6    see that?
7        A.  Yes.
8        Q.  All right.  When you say it's not common, how
9    did you -- how did you determine commonality?
10       A.  I've never seen it.
11       Q.  In your experience?
12       A.  Correct.
13       Q.  Okay.  But again, you were only aware of two
14   nonbank floor plan lenders.  Right?
15       A.  Correct.
16       Q.  And do you know how much of the market those
17   two lenders control?
18       A.  No.
19       Q.  Okay.  So if they controlled 100 percent of the
20   market and that's what they did, it would be common?
21       A.  I guess so.
22       Q.  Okay.  And then if there were dozens of other
23   floor plan lenders who do it, you wouldn't be able to say
24   whether it was common or not?
25       A.  Correct.

Page 67

1      Q.  And when you say "accepted" in that same

2   sentence, who do you mean accepted by?

3      A.  By the industry.  The formula for calculating

4   interest requires three variables.

5      Q.  Well, we just talked that there could be other

6   agreed variables.  Right?

7      A.  There could be lots of agreements on lots of

8   things.

9      Q.  Okay.  And when you say it's not accepted by

10   the industry, again, what industry are you talking about?

11      A.  The lending industry.

12      Q.  But that's not specific to used car automotive

13   floor planners?

14      A.  Not particularly.

15      Q.  And what if it were accepted by the majority of

16   borrowers of the floor plan, would that change your

17   opinion?

18      A.  I would have to see it in writing.

19      Q.  You're an expert.  I'm just asking a

20   hypothetical.  If the majority of borrowers out there

21   accept interest being run from the day they get the car

22   at auction, would that change your opinion?

23              MR. COMAN:  Objection to form.  You can

24   answer.

25      A.  Well, to me that would be documented as a fee.

Page 68

1    I mean, I don't see how you could accrue interest from a
2    point where no money has been advanced.  The formula
3    doesn't work.
4         Q.  Well, the formula you have above doesn't work.
5         A.  Correct.
6         Q.  But again, the parties could agree on a
7    different formula?
8         A.  I guess they could agree on anything.
9         Q.  Okay.  And again, if the majority of borrowers
10   and lenders in the automotive floor plan industry have
11   agreed to that, would that change your opinion that it's
12   not common or accepted?
13        A.  I'd have to look at it.
14        Q.  Again, I'm giving you --
15        A.  You've giving me a hypothetical.  Without
16   looking at documentation, I can't answer that question.
17        Q.  What kind documentation would allow you to --
18        A.  I'd want to see a promissory note that spells
19   that out.
20        Q.  I'm giving you a hypothetical where it is
21   spelled out in the promissory note, and I'm saying that
22   if the majority of used car dealers with floor plans
23   accept it, does that change your opinion that it's not
24   common or accepted?
25             MR. COMAN:  Objection to form.  If you

Page 69

1    understand his question --

2         A.  I understand the question.  I can't answer it

3    without looking at the documentation.

4         Q.  There is no documentation in a hypothetical.

5         A.  Well, hypothetically then it probably is

6    common.

7         Q.  Okay.  And it would be accepted by those

8    dealers if they accepted it?

9         A.  In that particular instance, hypothetically

10   it's accepted.

11        Q.  Okay.  I'm moving into the next sentence, and

12   we can read the whole thing if you'd like.  But I'm

13   really just -- I'm focused on the words in the middle

14   that say, "And placed them on their floor plans."  Just

15   before that it said, "When plaintiffs purchased cars

16   generally at auction and placed them on their floor

17   plans."  Do you see that?

18        A.  Yes.

19        Q.  What do you mean by placed them on their floor

20   plans?

21        A.  The vehicles actually went into -- onto the pad

22   or the concrete of the -- of the auto dealer for sale.

23        Q.  Do you have an understanding of when the

24   vehicle becomes inventory of the buyer?

25        A.  When it's released to the -- to the -- I mean,

Page 70

1    let me -- ask that question again.

2        Q.  Okay.  So on a vehicle, for example, acquired

3    by a dealer at auction, when does that vehicle become the

4    dealer's inventory?

5        A.  When it's placed -- when the money is lent and

6    placed into his possession.  The floor plan is the

7    financing vehicle.  The actual vehicle then it goes onto

8    the dealer's lot to be sold to whoever is going to buy

9    it.

10       Q.  Okay.  We talked above about the dealer being

11   able to sell it once he took it out of the auction.

12   Right?

13       A.  Correct.

14       Q.  So it's inventory of the dealer at that point?

15       A.  Correct.

16       Q.  Okay.  Are you aware that some dealers

17   wholesale from auction to auction?

18       A.  Yes.

19       Q.  So it may never -- the car may never actually

20   go to the dealer's physical lot.  Does that ring a

21   bell -- does that make sense?

22       A.  It's possible.

23       Q.  When the dealer takes it out of the auction

24   where he acquired it to go somewhere else and sell it, is

25   it his inventory at that point?

Page 71

1        A.   In transit, until repaid.

2        Q.   Okay.  That's a yes?

3        A.   Yes.

4        Q.   Okay.  In your experience, sir, are credit

5    cards another way that an individual could acquire a

6    good?

7        A.   Yes.

8        Q.   Okay.  In your experience, when does interest

9    typically start running on a credit card purchase?

10       A.   After the statement date if the amount that's

11   owed under the credit card is not paid by its due date.

12       Q.   Do you know whether the interest commencement

13   date or effective date in your analysis starts after that

14   statement due date, or does it start from the date of the

15   purchase?

16       A.   It starts from the due date.

17       Q.   Okay.  And you don't have an understanding that

18   that's typically a grace period, and that the interest

19   actually is retroactive to the date of purchase?

20       A.   No.

21       Q.   Do you know that not to be the case, or you

22   just don't know?

23       A.   I don't know.

24       Q.   If it's typically a grace period and it runs

25   from the date of sale, would that be against industry

Page 72

1    practice?

2                    MR. COMAN:  Which industry?

3                    MR. MCCARTER:  Good question.

4        Q.  The lending industry.

5        A.  Ask the question again.

6        Q.  Are credit cards part of the lending industry?

7        A.  Yes.

8        Q.  Okay.  If I -- strike that.

9            Do you know one way or another whether that

10   delay in interest is typically just a grace period, and

11   then interest actually is retroactive to the date of

12   sale, or does it only start running after the credit card

13   due date?

14       A.  I don't know.

15       Q.  Okay.  All right.  Moving down to the second to

16   last paragraph on Page 2.  The second sentence says,

17   "If Nextgear Capital intended to charge a fee before

18   money was disbursed, I would expect that Nextgear Capital

19   would make specific disclosures to its borrowers of

20   Nextgear Capital's practice."  Do you see that?

21       A.  Yes.

22       Q.  Please correct me if this is wrong, but I think

23   you said earlier you're not opining whether they did or

24   didn't make that disclosure, you're just opining that

25   they should make it?

Page 73

1      A.  I'm not opining -- well, opine -- you have to

2  ask that question again.

3      Q.  Fair enough.

4      A.  Sorry.

5      Q.  It was compound.

6      A.  Yeah.

7      Q.  Are you saying that Nextgear Capital didn't

8  make that disclosure, or are you just saying that they

9  should have?

10      A.  They should have.

11      Q.  And as we sit here today, can you say that they

12  did or didn't make that disclosure in their loan

13  documents?

14      A.  I haven't seen where they disclosed it.

15      Q.  Does that mean you've studied their loan

16  documents and you made the conclusion that they didn't

17  disclose it?

18      A.  From the documents I've seen.

19      Q.  Okay.  So part of your opinion, then, just to

20  be clear, is that the commencement of interest from the

21  date of sale is not provided for in Nextgear loan

22  documents?

23      A.  That -- you have to start that one over again.

24  I'm sorry.

25      Q.  Is it part of your opinion that Nextgear has

Page 74

1    not made adequate disclosures to the plaintiffs in this

2    case that would allow Nextgear to run interest from the

3    date of auction sale?

4         A.  Correct.

5         Q.  Okay.  All right.  Let's turn back to

6    Exhibit 5.  Let me just confirm again, you're not a

7    lawyer?

8         A.  Correct.

9         Q.  Okay.  And I think you said earlier you're not

10   giving a legal interpretation of these documents?

11        A.  Correct.

12        Q.  So what perspective are you coming from when

13   you say it's not in these documents?

14        A.  It was not clear to me where it says anywhere

15   in here that in this agreement, that the lender could

16   start charging interest before the money was advanced.

17        Q.  Okay.  As you're looking at Exhibit 5, and I

18   know this may or may not be the exact copy you looked at,

19   because you couldn't remember which one it was, do you

20   recall specific sections you looked at to try to analyze

21   that issue?

22        A.  Primarily through the definitions of advance

23   liabilities.  Sorry.  This thing has such small print.

24        Q.  Sure.

25        A.  Floor plan fees, interest liabilities, period,

Page 75

1    to name a few.

2          Q.  Okay.  So let me turn your attention to Item 3,

3    Section 3 of that note we're looking at.  Do you see

4    that?

5          A.  Page 3?

6          Q.  Section 3.  I think it actually is on Page 3,

7    as well.

8          A.  Okay.

9          Q.  And you see the language that says, "Interest

10   shall accrue on all dealer liabilities in accordance with

11   the following"?

12         A.  Yes.

13         Q.  Okay.  And then subpart A says, "All

14   outstanding liabilities under this note shall accrue

15   interest"?

16         A.  Yes.

17         Q.  And it goes on to specify the formula?

18         A.  Yes.

19         Q.  Okay.  So in your interest calculation

20   framework from your opinion, we're applying the agreed

21   interest rate to any liability.  Right?

22         A.  Yes.

23         Q.  Okay.  Turn your attention to "Liabilities."

24   It's got several items that qualify as liabilities.  Do

25   you see that?

Page 76

1        A.  Yes.

2        Q.  Okay.  So advances is a defined term, and

3    that's one of the types of liabilities.  Did you see

4    that?

5        A.  Yes.

6        Q.  We'll turn to the definition of advance in a

7    minute.  But what's your industry standard understanding

8    of what an advance is?

9        A.  Money either disbursed directly to the borrower

10   or to a third party.

11       Q.  And are you concluding that that cannot be a

12   commitment to fund the third party, it has to actually be

13   cash?

14       A.  Yes.

15       Q.  Okay.  All right.  So debts is the next type of

16   liability.  It's not capitalized.  What's your

17   understanding of a debt?

18       A.  Debt is a financial obligation.

19       Q.  So a financial obligation from the borrower to

20   Nextgear can be a liability under this agreement?

21       A.  Yes.

22       Q.  Okay.  Then you see, "DSC financed inventory

23   liabilities," which is capitalized.  Do you see that?

24       A.  Yes.

25       Q.  All right.  And there's a definition of DSC

Page 77

1    financed inventory, and then there's a definition of

2    liabilities.  Is it your understanding that as it sits in

3    this Section 1-Y, that's what it means?

4              MR. COMAN:  Objection to vagueness.  What

5    were you referring back to, Jason?  I'm sorry.

6              MR. MCCARTER:  I'm just trying to summarize

7    it for him.

8         Q.  So what is your understanding of what "DSC

9    financed inventory liabilities" means there?

10        A.  I have to read it.

11        Q.  Okay.

12        A.  It has it described here, "Shall mean any unit

13   now or hereafter acquired or retained by dealer pursuant

14   to an advance under this note."  So it requires that

15   there be an advance made under the note for that

16   inventory -- for that unit to be acquired or retained by

17   the dealer.

18        Q.  Okay.  So if there's an advance made on a

19   vehicle by Nextgear for the dealer, it becomes a

20   liability here?

21        A.  Yes.

22        Q.  Okay.  Then "Financial Obligations" is not

23   capitalized.  What's your understanding what financial

24   obligations mean?

25              MR. COMAN:  I'm going to object to that

Page 79

1   effectively happens the same day.  If I sell you

2   something and then you sign a note saying you will pay

3   from this date forward, that's a financial obligation.

4        Q.  Okay.  So that installment sales contract

5   situation is a financial obligation?

6        A.  Yes.

7        Q.  All right.  "DSC Administrative Fees."

8        A.  Hang on one second.  Okay.

9        Q.  What's that mean?

10       A.  Means that a fee is a liability on behalf of

11   the borrower to the lender.

12       Q.  Okay.  All right.  Let me see if I can speed

13   this up a little.

14           The next several are DSC universal fees,

15   interest floor plan fees, NSF fees.  Do you see that?

16       A.  Yes, sir.

17       Q.  So is it your understanding that each of those

18   items can be a liability that interest can accrue on?

19       A.  Yes.

20       Q.  Okay.  Okay.  I should have included late fees.

21   To the extent the dealer owes late fees, it's your

22   understanding that Nextgear can charge interest on that?

23       A.  If it's agreed upon, yes.

24       Q.  And this is the agreement that we're looking

25   at.  Right?

Page 80

1        A.   Yes.

2        Q.   Okay.  And then it's got charges.  So what's

3    your industry understanding of what charges means?

4        A.   Catch all.

5        Q.   Say it again?

6        A.   Something that's just catches everything else

7    the attorney didn't come up with.

8        Q.   Okay.  And so interest can run on those?

9             MR. COMAN:  And let me just lodge an object

10   to that, to the extent that again these are terms that

11   are defined or not defined in here.  But if your question

12   is his general understanding in the industry, if there's

13   any difference between those, I believe is an objection

14   for form as to vagueness.

15             But subject to that, you can answer his

16   question.

17             MR. MCCARTER:  Okay.  And of course, I

18   specifically asked about his understanding in the

19   industry.  And to be clear, he's the one who has put as

20   part of his opinion that he doesn't think this agreement

21   allows Nextgear to charge interest, and we have discussed

22   that liabilities is what interest applies against, so

23   we're walking through each element of the definition of

24   liability so he can explain how he came to that opinion.

25        Q.   With that said, what's your understanding of

Page 81

1    expenses?

2        A.  It could be any -- well, any expenses that are

3    agreed upon that -- I don't know what the expenses are

4    here.  They're not even defined.  I can't answer

5    these questions.  You're asking me about what are charges

6    which are not defined and they're expenses which are not

7    defined in there.  If there's no money advanced, you

8    cannot accrue interest on a loan.

9        Q.  Well, you said earlier the parties could agree

10   to whatever they wanted to agree.

11       A.  But it's not in here.

12       Q.  And that's what I'm asking you about.  You're

13   saying it's not in here, so now we have to go through

14   what is in here, and you explain to me why it's not in

15   there.  And that's what I'm doing one at a time.  I

16   didn't want to go here either, but --

17       A.  Okay.  Let's do that.

18       Q.  -- that's what you opined on.

19       A.  Okay.  Let's go back to those that are not

20   defined in here.

21       Q.  So expenses is not specifically defined in

22   here.  Right?

23       A.  Correct.

24       Q.  But it can accrue interest under this

25   agreement?

Page 82

1          A.   I don't know.

2          Q.   Okay.   Again, this is the part of the

3     definition of liabilities.   We just discussed how

4     Section 3 allows interest on all liabilities.   Right?

5          A.   Okay.

6          Q.   Okay.   So do you have any understanding from

7     your industry experience of what expenses could mean?

8          A.   No.

9          Q.   Attorneys' fees, cost of collection can accrue

10    interest.   Those are pretty self explanatory?

11         A.   Yes.

12         Q.   Now, "Liabilities also include covenants and

13    duties owing, arising, due or payable from dealer to DSC

14    of any kind or nature."   Do you see that?

15         A.   Yes.

16         Q.   Do you have any understanding based on your

17    experience of what that might mean?

18         A.   No.

19         Q.   It can also -- "Interest can also accrue here

20    on present or future under any instrument, guaranty or

21    other document, whether arising under this note or any

22    other agreement."   Do you see that?

23         A.   Yes.

24         Q.   Have you reviewed -- besides these documents as

25    Exhibit 5, have you reviewed any other agreements between

Page 83

1    the dealer and Nextgear?

2        A.  Other than the ones that were in my opinion.

3        Q.  But at the beginning you couldn't identify

4    exactly what those were.  Right?

5            MR. COMAN:  Objection.  His testimony is

6    what it is from before.

7            MR. MCCARTER:  Is that an instruction not

8    to answer?

9            MR. COMAN:  No, it's an objection.

10       Q.  Okay.  You can go ahead and answer.

11       A.  I don't understand the question.

12       Q.  Okay.  Do you know one way or another whether

13   you've looked at all agreements between each plaintiff

14   and Nextgear?

15       A.  No, I don't know.

16       Q.  So if interest were allowed in one of the other

17   agreements you haven't looked at, you wouldn't be able to

18   say one way or another?

19       A.  I haven't seen a document.

20       Q.  Okay.  And then nearing the end, it says,

21   "Whether directly or indirectly, including those acquired

22   by assignment, absolute or contingent, primarily or

23   secondary, due or to become due, now existing or

24   hereinafter arising or however acquired."  Do you see

25   that language?

Page 84

1       A.   Yes.

2       Q.   That's a lot of terms.  But do you have any

3   sense based on your experience in the industry of what

4   that would mean or be intended to capture?

5       A.   I have no idea what it's saying.

6       Q.   Do you know what a direct versus an indirect

7   liability is?

8       A.   Yes.

9       Q.   What's your understanding of that?

10      A.   Well, as it explains, indirect is like a

11  guarantee or commitment to support something else

12  indirectly.

13      Q.   So do you read this to mean that if something

14  is payable by Nextgear, either directly or indirectly on

15  the borrower's behalf, they can charge interest?

16              MR. COMAN:  I'm going to object.  I believe

17  that misstates his testimony.  But if you understand what

18  his question is --

19              MR. MCCARTER:  That wasn't a restatement of

20  testimony.  I'm asking a new question.

21      A.   I can't opine on that.

22      Q.   Okay.  It also says absolute or contingent.

23  What's your understanding of what that means?

24      A.   I don't know.

25      Q.   Okay.  It says interest -- it says primary or

Page 85

1    secondary is the type of liability.  Do you have any

2    sense of what primary versus secondary might mean on an

3    obligation?

4          A.  No.

5          Q.  Due or to become due.  Do you have a sense of

6    what that means?

7          A.  Yeah.  Something that's due or to become due.

8          Q.  So if there's something that's due now or that

9    becomes due in the future by Nextgear for the borrower,

10   it can become a liability?

11         A.  I can't opine to that other than by definition.

12         Q.  So you don't know one way or another whether

13   that is a liability here?

14         A.  No.

15         Q.  And then it says, "Now existing or hereinafter

16   arising or however acquired."  Same question, does that

17   mean an obligation that exists now or one that arises in

18   the future can be a liability?

19         A.  I have no idea.

20         Q.  Okay.  So there are a number of terms in here

21   that you don't know what they mean or don't have an

22   opinion on their meaning?

23         A.  Correct.

24         Q.  Okay.

25              MR. MCCARTER:  Do you need a break?

Page 86

1              THE REPORTER:  I do.

2              (Recess from 12:18 p.m. to 12:30)

3       Q.  (By Mr. McCarter)  We're back on the record.

4    Mr. Wojcik, before we took a break, we were looking at

5    the note on Exhibit 5.  Do you still have that in front

6    of you?

7       A.  Yes.

8       Q.  And again, just for the record, it's called a

9    Demand Promissory Note and Security Agreement.  Right?

10      A.  Yes.

11      Q.  Okay.  So we looked at the definition of

12   "Liabilities" at 1-Y.  Now I'd like to turn your

13   attention to the definition of "Advance" at 1-A.  Do you

14   see that?

15      A.  Yes.

16      Q.  And do you recall that an advance was one type

17   of liability under 1-Y?

18      A.  Yes.

19      Q.  Okay.  So the definition of advance says,

20   "Shall mean any loan or payment in any amount made

21   pursuant to this note by DSC to dealer or on dealer's

22   behalf to any third party."  Do you see that?

23      A.  Yes.

24      Q.  So what's your understanding of the -- or the

25   term, excuse me, "payment" in that sentence?

Page 87

1          A.  A loan would be -- the way I interpret that is

2    a loan direct to the dealer, and a payment would be on

3    behalf of a dealer to a third party.

4          Q.  So you don't think the loan can be made to the

5    dealer or on the dealer's behalf?

6          A.  Question again?

7          Q.  Well, it seems like -- you know, there's two

8    "or"s in that sentence, and it seems like you're putting

9    the loan before the first "or" with the "to the dealer"

10   before the second "or."  Do you see that?

11         A.  I think I answered just the way you asked it.

12         Q.  Okay.  So are you saying in this sentence a

13   loan cannot be made to a third party on a dealer's

14   behalf?

15         A.  Well, that's what it says, shall be -- "Any

16   loan or payment in any amount made pursuant to this note

17   by DSC to dealer or on dealer's behalf to any third

18   party."  That's what I just said.

19         Q.  So a loan can be made to the dealer or to a

20   third party?

21         A.  Correct.

22         Q.  And a payment can be made to the dealer or --

23         A.  Or a payment, correct.

24         Q.  Okay.

25              THE WITNESS:  Sorry.

Page 88

1          MR. MCCARTER:  Do you mind reading that

2     back, just to make sure we got it all?  The last like two

3     questions and answers.

4               (Requested portions of transcript

5               read aloud).

6     Q.  I'm going to need to ask it again.

7          So in this definition of advance at 1-A, is it

8     your reading that a loan can be made to a dealer or on

9     the dealer's behalf to a third party?

10         MR. COMAN:  I'm going to lodge an objection

11    to form, but you can answer.

12    A.  To me this means what it says.  It says a loan

13    could be made by DSC to dealer, or a payment could be

14    made by DSC on dealer's behalf to any third party.

15    Q.  Okay.  So you read this sentence to mean that a

16    loan has to be made to the dealer, and not a third party,

17    but a payment can be made to a third party?

18    A.  Correct.

19    Q.  Okay.  All right.  I'm going to turn your

20    attention to 1-F, "Collateral."  And it says, "Should

21    have the meaning set forth in Paragraph 2 of the note."

22    Do you see that?

23    A.  Yes.

24    Q.  And if we turn over to Paragraph 2 on Page 3,

25    it says, "Grant of security interest.  Oh.  Sorry.  Have

Page 89

1    you had a chance to read it?

2         A.  Yes.

3         Q.  It's a simple question.  You see that

4    collateral is a defined term in 2-A?

5         A.  Yes.

6         Q.  Okay.  So do you have any reason to disagree

7    that the items in 2-A are DSC's collateral under this

8    agreement?

9         A.  No.

10        Q.  Okay.  And turning your attention to Section 4

11   where it's, "Dealer's Representation, Warranties and

12   Covenants," did you in preparing your opinion review

13   Section 4 with any kind of detail?

14        A.  Question?

15        Q.  Did you review Section 4 closely in preparing

16   your opinion?

17        A.  I believe so.

18        Q.  Okay.  I'll call your attention to Section 4-I.

19   It's on Page 4 of the document, and it's the fifth item

20   down.  Do you see that?

21        A.  Yes.

22        Q.  All right.  Without reading it into the record,

23   what's your -- do you have -- and take your time to read

24   it.  But do you have an understanding of what that

25   provision provides?

Page 90

1        A.   Okay.  Question after it, please?

2        Q.   Sure.  Just at a high level, do you have an

3    understanding that that basically requires the dealer to

4    hold any financed inventory in trust for the lender?

5        A.   Yes.

6        Q.   Okay.  Do you know what a sale out of trust is?

7        A.   Yes.

8        Q.   What is it, in your experience?

9        A.   Sign a vehicle and not giving the money to the

10   financial institution that has been funding that item or

11   that vehicle.

12       Q.   And typically that would be the payoff for the

13   vehicle, the dealer would keep the profit?

14       A.   Yes.

15       Q.   I mean, if things are done right?

16       A.   Yes.

17       Q.   Okay.  Okay.  And turning your attention to

18   sub-item K, 4-K two paragraphs down.  Do you see that?

19       A.   Yes.

20       Q.   Take a second to read it.

21       A.   Okay.

22       Q.   In your experience, have you seen a provision

23   similar to that before?

24       A.   I don't understand the provision.

25       Q.   Okay.  In preparing your opinion, did you

Page 91

1    review any account or loan statements that were delivered

2    or provided by Nextgear, DSC, to the plaintiffs

3    contemporaneously with those obligations?

4         A.   Sorry.  I don't understand the question.

5         Q.   Okay.  So we looked at Exhibit I, think, 4 that

6    was a list of transactions.  Right?

7         A.   Yes.

8         Q.   Okay.  Do you have a high level of

9    understanding that that's a document created and produced

10   in this litigation by Nextgear?

11        A.   Yes.

12        Q.   Apart from that, did you look at any statements

13   from Nextgear or DSC to the plaintiffs that showed their

14   debt amount, their interest due, their transactions or

15   anything like that?

16        A.   I review it as what's in my opinion letter,

17   opinion report.

18        Q.   Is that a no?

19        A.   Correct.

20        Q.   Okay.  So you can't say as we sit here today

21   one way or the other whether Nextgear provided the

22   dealers, the plaintiffs in this case, with any statements

23   under this Section 4-K?

24        A.   I don't know.

25        Q.   Okay.  So turning back to your report in the

Page 92

1   sentence that started this line of questioning.  It's the
2   last one in the second to last paragraph.  Just for the
3   record, it says, "If Nextgear Capital intended to charge
4   a fee before money was advanced, I would expect that
5   Nextgear Capital would make specific disclosures to its
6   borrowers of Nextgear Capital's practice."  Do you see
7   that sentence?
8        A.  Yes.
9        Q.  Does that mean it's your opinion that if the
10  charges were disclosed, they would be okay?
11       A.  Yes.
12       Q.  Okay.  So they're not -- the interest at issue
13  is not illegal or doesn't violate a regulation in your
14  experience, you just think it's something that needs to
15  be disclosed in the contract?
16            MR. COMAN:  Objection to the extent it
17  calls for a legal conclusion.  Subject to that, you can
18  answer.
19       A.  It's not disclosed.  It should be disclosed.
20       Q.  Okay.  Are you aware as we sit here today of
21  any regulation or law that would make it illegal to
22  charge that interest, if it were disclosed?
23       A.  No.
24       Q.  Okay.  Are you aware of any law or regulation
25  that requires the disclosure of that interest?

Page 93

1      A.  No.

2      Q.  Okay.  So I would like to turn your attention

3  back to Exhibit 9, which was the Master Facility

4  Intercreditor Agreement.

5      A.  Okay.

6      Q.  Okay.  What -- based on your industry

7  experience, what is your understanding of what this

8  document is doing at a high level?

9              MR. COMAN:  I'm going to lodge a general

10  objection as to vagueness.  I know you did say high

11  level, Jason, but it is a multipage document.  I believe

12  he testified earlier to background.  But subject to that,

13  if you have any opinion as to that.

14      Q.  Let me rephrase it.

15      A.  I'm rereading this.

16      Q.  That's fine.  Go ahead.  And I'm not -- I'll

17  call your attention to specific provisions, but I just

18  want a high level understanding or your understanding of

19  why the parties might enter a document like this.

20      A.  It's been about a month since I reviewed this,

21  so --

22      Q.  Take your time.

23      A.  Okay.

24      Q.  Okay.  Do you -- again, do you have a high

25  level view on what this document is intended to do?

Page 94

1        A.   I'm not sure what high level means, but I think

2   I understand the document.

3        Q.   Okay.  What does it do?

4        A.   Well, it's an agreement between Manheim

5   Automotive Financial Services and its affiliate Manheim

6   Auctions, Inc. to transact business between each other on

7   the sale of vehicles.

8        Q.   Okay.

9        A.   And the -- and the parties to this are two

10  subsidiaries of -- or -- I don't know if they're

11  subsidiaries, but related parties to Dealer Services

12  Corporation.

13       Q.   Okay.  I'm going to represent to you that

14  Manheim now is affiliated with Nextgear Capital, but at

15  the time it was not.  So do you have any sense on what --

16  strike that question.

17            Do you know what Manheim Auctions does?

18       A.   I assume from just the title that they purchase

19  vehicles or sell vehicles on behalf of third parties to

20  another party, auction vehicles.

21       Q.   Okay.  So does that -- do you think Manheim

22  Auctions is a dealer or something else?

23       A.   I assume from reading this and my understanding

24  that it's an auction company.

25       Q.   Okay.  Have you ever heard of Manheim before

Page 95

1   this case?

2        A.  Yes.

3        Q.  In what capacity?

4        A.  Probably read it about in Wall Street Journal

5   or something.

6        Q.  Do you know what -- as we sit here today, do

7   you know what Manheim does?

8        A.  Specifically other than that, no.

9        Q.  I'm going to turn your attention to

10  Section 3-A.  And just for context, you may want to go

11  ahead and read B and C.

12       A.  Did you say D?

13       Q.  I just said B and C.  I mean, obviously --

14       A.  Oh, B.

15       Q.  -- you can read as much as you want, but I

16  thought B and C would give it context.

17       A.  Okay.  Okay.

18       Q.  Okay.  Do you have an understanding that this

19  is basically setting up a direct floor plan procedure

20  between DSC and Manheim Auctions?

21       A.  It's the mechanics of it.

22       Q.  Okay.  And you see in the middle of

23  Paragraph 3-A where it says, "Manheim may verify dealers'

24  available credit by accessing dealers' information online

25  at www.discoverDSC.com and may print a report containing

Page 96

1    such information.  DSC unconditionally and absolutely

2    agrees to pay Manheim the facility payment up to and

3    including the available amount of credit showing on

4    dealer's account report for any vehicle purchased at

5    Manheim by dealer the day Manheim accesses such a

6    report"?

7         A.  Yes.

8         Q.  Do you see that?

9         A.  Uh-huh.

10        Q.  So do you read this to mean that if Manheim

11   releases a car after confirming a dealer had credit with

12   DSC, that DSC is absolutely and unconditionally committed

13   to pay Manheim for that?

14        A.  Yes.

15        Q.  And do you see at 3-C that basically once those

16   conditions are satisfied, DSC sends the money to Manheim

17   via ACH payment?

18        A.  Yes.

19        Q.  Okay.  And so I'd asked you before, you know,

20   when the dealer leaves the car with an -- leaves the

21   auction with a car and directs it on to its floor plan,

22   who bore the risk of loss, and you said it was unclear

23   between the auction and the floor planner.  Do you recall

24   that?

25        A.  Yes.

Page 97

1      Q.  Okay.  So does this at least in this
2  arrangement between Manheim and DSC, does this answer the
3  question of who bears that risk of loss?
4      A.  In those three sections, no.
5      Q.  Okay.  So if Manheim releases the car based on
6  available credit from DSC, and DSC is unconditionally and
7  absolutely committed to pay Manheim, wouldn't that be
8  true that DSC bears the risk of the collateral
9  disappearing after the dealer takes the car?
10                  MR. COMAN:  Object to form.
11     A.  I don't know.
12     Q.  Okay.  But to be clear, under this arrangement
13  as outlined in 3-A, B and C, you can't say that DSC would
14  not have to bear that loss if the dealer took the car and
15  it disappeared?
16                  MR. COMAN:  Objection; asked and answered.
17     A.  Well, I wasn't asked to opine on the
18  relationship between Manheim and DSC, or whoever they
19  are.
20     Q.  Okay.  You did rely on this document in
21  preparing your opinion, though.  Right?
22     A.  I reviewed it.
23     Q.  And remind me again why you reviewed it?
24     A.  It was provided, and I looked at it to see if
25  it had any bearing on my opinion.

Page 98

1      Q.  And so if a car is directly floored under this

2    document with DSC, you can't say one way or the other

3    between the auction and DSC who bears that risk of loss?

4              MR. COMAN:  Objection; asked and answered.

5      A.  No.

6      Q.  I think I asked this before.  If I did, I

7    apologize.  But you did say when a dealer buys a car at

8    auction, they typically have to pay for it some way or

9    another?

10     A.  Yes.

11     Q.  Okay.  You mentioned the other floor plan

12   lender that you think may be in Carmel, Indiana.  Do you

13   know when they begin to run interest on auction

14   purchases --

15     A.  No.

16     Q.  -- that are floated with them?

17     A.  No.

18     Q.  Okay.  I think I know the answer to this.  But

19   are you aware of the interest accrual practices of any

20   other nonbank, used car floor planners?

21     A.  No.

22     Q.  Okay.

23             MR. MCCARTER:  Just give me one second, I'm

24   cutting out stuff.

25             MR. COMAN:  Do you want to go off the

Page 99

1    record for a second?

2              MR. MCCARTER:  Yes.

3              (Recess from 12:55 p.m. to 12:57 p.m.)

4         Q.  (By Mr. McCarter)  Just a couple of more quick

5    questions.  I think you said your nephew worked at AFC --

6    I'm sorry, at a finance company?

7         A.  I don't know where he work -- which one it is,

8    but he works for a used car auction -- auto auction

9    company that -- or works for the company that finances

10   vehicles like yours does.

11        Q.  Okay.

12        A.  I don't know the name of it.

13        Q.  But you don't know whether it's an auction

14   company or an independent lender?

15        A.  It's an independent lender because he works on

16   the computer side of it.  But I don't know the name of

17   it.

18        Q.  What's his name?

19        A.  That's a good question.  Sorg, S-o-r-g -- is it

20   Michael or Jeremy?  Michael, I guess.

21        Q.  Sorg Michael?

22        A.  Michael Sorg, S-o-r-g.

23        Q.  Okay.

24        A.  He's a low level.

25        Q.  He's an IT person at this finance company?

                                                    Page 100

 1        A.  Right.

 2        Q.  Okay.  And are you -- are you familiar with any

 3   guidance from the Office of the Comptroller of Currency

 4   on floor plan lending?

 5        A.  No.

 6        Q.  So if they have a handbook on floor plan

 7   lending dated October 2015, you've never seen that?

 8        A.  No.

 9        Q.  And have you ever seen any guidance from the

10   Consumer Financial Protection Bureau on credit card grace

11   periods?

12        A.  Not that I'm aware of.

13        Q.  Okay.

14             MR. MCCARTER:  All right.  I'm done.  Thank

15   you.

16             MR. COMAN:  I've got a couple of questions.

17   It won't be long.

18                     EXAMINATION

19   BY MR COMAN:

20        Q.  If you can take out Exhibit 2, which is your

21   report.

22        A.  Oh, okay.

23        Q.  Okay.  And if you go to the second --

24        A.  You think I would know that.

25        Q.  Well, not by that number.

Page 101

1          If you could turn to the second page, or the

2     back page.

3          A.  Yes.

4          Q.  In the second paragraph -- the other

5     paragraphs, you know, you have already spoken about.  But

6     that second paragraph there that starts with "Interest

7     should," and I'll read it out into the record.  "Interest

8     should not be confused with a fee, which is entirely

9     different."  Explain that to us.

10          A.   Interest -- it goes back to the paragraph

11     previously where it's a calculation of how interest is

12     accrued, so that a borrower knows -- and a lender knows

13     how much interest is owed.  A fee is a flat amount of

14     money that is -- that is charged predominately for

15     services performed or for a guaranty.

16          Q.  So let me ask you this, then.  So to get this

17     straight in my head, and this is based somewhat on what

18     you wrote in your first paragraph of that same page.

19     Interest has three components that you've already

20     discussed.  And No. 1, it says, "Interest rate."  That's

21     a percentage.  Right?

22          A.   Correct.

23          Q.  No. 2, "The amount borrowed," and No. 3, "The

24     specific number of days or time the money has been

25     borrowed and thus physically transferred to the borrower

Page 102

1   or a third party."  A fee is separate and distinct from
2   that.  Correct?
3                MR. MCCARTER:  Object to form.
4        A.  Yes.
5        Q.  Okay.  And in fact, in that same paragraph, the
6   next sentence reads, "It is common for lenders to charge
7   borrowers fixed or flat fees for services performed or as
8   a guarantee that funds will be made available to
9   borrowers at some future date."  Correct?
10       A.  Yes.
11       Q.  And the last sentence in that paragraph reads,
12  "Such a guarantee or floor plan fee is entirely
13  independent of interest, which is a charge for the use of
14  money actually disbursed or lent."  Is that correct?
15       A.  Yes.
16       Q.  And you maintain that opinion --
17       A.  Yes.
18       Q.  -- as you sit here today?
19                MR. MCCARTER:  Object to form.
20       Q.  I'm sorry, you'll need to let him --
21       A.  Okay.
22       Q.  But anyway, so that last sentence I read, do
23  you -- obviously do you maintain that opinion?
24       A.  Yes.
25       Q.  Okay.  Turn to Exhibit 5.  If you could -- do

Page 103

1    you have that in front of you?  That is a document for

2    the record that is entitled "Demand Promissory Note and

3    Security Agreement."  Do you see that document?

4         A.  Yes.

5         Q.  It actually has an exhibit sticker at the

6    bottom, or a copy of one that says A, as in Apple.  Do

7    you see that?

8         A.  Yes.

9         Q.  With a pacer reading as document 117-1.  Do you

10   see that?

11        A.  Yes.

12        Q.  And this is the same document that you had

13   discussed previously.  Turn to Page 3, Section 3.  The

14   section that is entitled all caps, "Interest Rate."

15        A.  Yes.

16        Q.  Previously this document was discussed during

17   your testimony.  And in reference to word "Liabilities"

18   in 3-A, what are the words directly preceding the word

19   "Liabilities"?

20        A.  "Outstanding."

21        Q.  Okay.  "All outstanding."  Is that what it

22   reads?

23        A.  All outstanding, yes, sir.

24        Q.  So the reference back to liabilities also in

25   this document, though, the modifier on that is